UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

17 CV 4327

-----------------------------------------------------------X

MICHAEL DARDASHTIAN, individually and
on behalf of COOPER SQUARE VENTURES,
LLC, NDAP, LLC and CHANNELREPLY, LLC

_____Civ._____(    )

Plaintiffs,

-against-

DAVID GITMAN, JEREMY FALK, SUMMIT
ROCK HOLDINGS, LLC, ACCEL COMMERCE,
LLC, DALVA VENTURES, LLC, KONSTANTYN
BAGAEV, OLESKSII GLUKHAREV and
CHANNEL REPLY, INC.,

Defendants.

AFFIDAVIT OF
MICHAEL DARDASHTIAN
IN SUPPORT OF ORDER
TO SHOW CAUSE SEEKING
RESTRAINTS

**VOLUME 1 OF 3**

-----------------------------------------------------------X

Michael Dardashtian, being duly sworn deposes and says:

1.  I am the Plaintiff herein and as such I am fully familiar with the facts and
    circumstances of this matter as set forth herein. I have reviewed and executed the
    Verified Complaint which is true to my own personal knowledge.

2.  I write this affidavit in support of my Order to Show Cause seeking immediate
    restraints and a preliminary injunction against Defendants.

3.  Defendant David Gitman ("Gitman") and I are co-managers and equal members
    of Cooper Square Ventures, LLC ("CSV") each holding a 50% profit percentage
    in such entity.

4.  CSV is a software technology company registered in New York which specializes
    in e-commerce, software as a service ("SaaS"), software creation and technology
    consulting services.  It also creates, operates, acquires and owns websites and
    dozens of domain names.

1

5. CSV was founded by me and Defendant Gitman in August, 2011 and maintains its principal offices in Manhattan, New York and our corporate mailing address for service of process is in Great Neck, New York.

6. To date, CSV has consummated in excess of $10 million dollars of closed transactions. CSV owns and operates NDAP, LLC, and the e-commerce SaaS solution "Channel Reply." CSV is also an investor in Sigmento, a technology startup company based in Israel and Plumburs, an online plumbing supply ecommerce business. A diagram created by Defendant showing CSV's online properties and products is annexed hereto as **Exhibit "1."**

7. CSV's business operations rely completely on its proprietary software codes. Therefore, CSV has instituted layers of security, including but not limited to the following: all company passwords are stored in 1Password, a secure, heavily encrypted password storage system and all software codes are hosted on secure, encrypted AWS servers. The codes are also stored on a private and secure, encrypted GitHub repository for backups and testing. GitHub describes itself as the largest host of source code in the world.

8. On August 13, 2011, Defendant Gitman and I each executed the CSV operating agreement thereby consenting to the personal jurisdiction, venue and forum of the Supreme Court of New York, County of New York and the United States District Court for the Southern District of New York to resolve any and all disputes arising out of or related to CSV's operating agreement. CSV's operating agreement is annexed hereto as **Exhibit "2."**

9.  On August 9, 2011, I procured an Employer Identification Number ("EIN") from the Internal Revenue Service for business related to CSV.  Redacted copy of the receipt is  annexed hereto as **Exhibit "3**."

10. On and before August 24, 2011, I secured a business partnership with NDA Holding, LLC for the benefit of CSV.

11. On August 24, 2011, Defendant Gitman and I, as co-managers of CSV, entered into an operating agreement with NDA Holding, LLC, thereby creating NDAP, LLC, a limited liability company ("NDAP"). NDAP was formed for the purpose of creating an e-commerce software platform to sell and distribute auto parts called Car Part Kings ("CPK"). NDAP's operating agreement is annexed hereto as **Exhibit "4a"** and filing of Articles of Organization is annexed hereto as **Exhibit "4b**."

12. On August 25, 2011, I applied for an EIN from the Internal Revenue Service for NDAP, and subsequently opened a dual member signee business checking bank account with Bank of America for Defendant Gitman and I to conduct business for NDAP. Redacted copy of the EIN receipt is annexed hereto as **Exhibit "5a"**.

13. From August 24, 2011, up until December 31, 2014, CSV was a minority member of NDAP, LLC with a profit percentage of 49% subject to NDA Holding, LLC's 51% ownership interest.

14. On October 13, 2011, Defendant and I, as dual member signees opened a business checking account at Bank of America under the name Cooper Square Ventures, LLC. Redacted signature cards annexed hereto as **Exhibit "5b**."

15. Beginning in and around 2012, CSV spent years creating a proprietary software as a service solution (SaaS) called "ChannelReply."  ChannelReply integrates eBay and Amazon customer service messages and order information into a customer service software tool for easy messaging. My full description of ChannelReply's services are annexed hereto as **Exhibit "5c**." An email with Defendant's description of ChannelReply is annexed hereto as **Exhibit "5d**."

16. On September 3, 2014, CSV launched a beta version of ChannelReply, to test the online product and entered into its first customer service agreement, redacted copy annexed hereto as **Exhibit "6**." A redacted copy of the first customer invoice receipt is annexed hereto as **Exhibit "7a**."On October 21, 2014, CSV made Konstantyn Bagaev  (hereinafter "Bagaev") ChannelReply's lead software developer. Bagaev, a freelancer based in Russia, was originally contracted through Upwork, a global freelance service to work on ChannelReply. On November 14, 2014, Bagaev was added to our company payroll as an independent contractor.  The scope of his services included working on various projects including but not limited to ChannelReply and its API connection and Car Part Kings..  Emails annexed hereto as **Exhibits "7b"** and "**7c"** and an unexecuted redacted version of Bagaev' s IC agreement with his work order  is attached as **Exhibit "7d."**

17. I believe Defendant Gitman possesses the executed version of Mr. Bagaev's agreement and I am unable to access it at the present time because Defendant Gitman has removed my access to all company accounts by changing the passcodes and removing my access to our password storage databank.

4

18. On or about December 31, 2014, CSV purchased the remaining 51% ownership interest in NDAP from NDA Holding, LLC by executing two debt instruments totaling approximately $500,000 dollars. CSV thereby assumed 100% ownership in NDAP. Exhibits of same are intentionally omitted at **Exhibits "8"** and **"9."**

19. From August 24, 2011 until present, NDAP created, owned and operated an original proprietary software. Such proprietary software facilitated the online inventory and sale of auto parts through Car Part Kings.

20. From August 24, 2011 until around January, 2016, NDAP was doing business as "Car Part Kings", an online automotive parts reseller, and consummated in excess of $10 million in closed transactions.  Website screenshot annexed hereto as **Exhibit "10a"** and DBA confirmation annexed as **Exhibit "10b."**

21. From on or about September 2014 until present, CSV offered ChannelReply to third party businesses as a subscription service, charging a monthly service fee. Website screenshot annexed hereto as **Exhibit "11a."** The ChannelReply website's Terms of Service and Invoices to customers clearly evidence that CSV owns and operates the ChannelReply service. Terms of Service and Invoices are annexed hereto as **Exhibits "11b", "11c and "7a**".

22. To date, ChannelReply has consummated in excess of $350,000 dollars in closed transactions and has an ongoing revenue stream of approximately $30,000 per month, and has more than two hundred businesses presently enrolled as customers. Our customer base spans not just the United States of America, but the entire Globe (world). Our national and international customer base completely rely upon ChannelReply to help integrate and respond to customer service

communications from eBay and Amazon. Many of our customers transact millions of dollars in sales every month on these online marketplaces. Among our customers are several large worldwide retailers whose names I will identify to the Court if the Court deems necessary. In the alternative, I would prefer not to publicize the names of CSV's clientele.

23. On July 10, 2015, NDAP entered into a confidential brokerage agreement with mergers and acquisitions advisor The Peakstone Group, LLC ("Peakstone Agreement"), to raise equity investments and help sell its proprietary software. Exhibit referencing same is intentionally omitted at **Exhibit "12."**

24. On or about February 5, 2016, I communicated with the CEO of a large auto parts retailer to explore a sale of CPK's proprietary software.

25. On or around May 11 2016, Defendant Gitman informed me he would be leaving his full-time position as acting CTO (Chief Technology Officer) of CSV to accept a full-time job as CTO of CueConnect.

26. On June 7, 2016, Defendant Gitman and I discussed creating a separate LLC for ChannelReply, Defendant sarcastically said the company should be called "Really Going out of Business" before agreeing that it should be called ChannelReply, LLC. Text conversation and email annexed as **Exhibit "13a" and "13b"**.

27. On June 9, 2016, I registered ChannelReply, LLC (ChannelReply, LLC") with the Secretary of State in New York, registration annexed hereto as **Exhibit "14"**.

28. Beginning on June 17, 2016, I published notice of ChannelReply, LLC. Evidence annexed hereto as **Exhibit "15."**

29. On June 27, 2016, I scheduled a call with CSV's company attorney Jeffrey
    Rothman to inquire about stock options for ChannelReply, LLC annexed hereto as
    **Exhibit "16".**

30. On July 8, 2016, an auto parts retailer expressed interest in the purchase of
    NDAP's proprietary Cataloging and PIM systems software for CPK. On or about
    August 11, 2016, discussions had progressed significantly for the sale of CPK's
    technology.  As CSV approached the final deal-making phase, I reached out to a
    trusted advisor named Jeremy Falk, ("Falk") to act as a third-party middleman to
    assist in negotiating written terms. I knew Falk because prior to January, 2016,
    Falk had expressed an interest, on behalf of AGI, an alternative investment
    management firm, in making an equity investment in CPK's to facilitate the
    growth of the business. At the time, Falk had also expressed an interest in
    becoming the sole, exclusive fundraiser for our other product ChannelReply.
    Defendant Gitman and I refused to give Falk such exclusivity, but he then offered
    to act as an outside advisor for a potential sale of CPK. There was no initial
    written contract between Falk and CSV and Falk did not initially request
    payment. Falk's company is Summit Rock Holdings, LLC ("Summit Rock").

31. On August 24, 2016 Defendant Gitman requested a letter from CSV on company
    letterhead so he could request a work Visa for Bagaev. Text message annexed
    hereto as **Exhibit "17".** On or around September 6, 2016, I acquired an EIN for
    ChannelReply, LLC, redacted copy annexed hereto as **Exhibit "18".**

32. On Wednesday, Oct. 5, 2016, I sent Defendant an operating agreement for
    ChannelReply, LLC which Defendant said he would sign. Defendant never

returned an executed version of the ChannelReply, LLC operating agreement to me so I could not open a bank account for ChannelReply, LLC. The Channel Reply operating agreement and transmittal to Defendant Gitman are annexed hereto as **Exhibits "19a"and "19b".**

33. Several months later in or around December, 2017, Defendant told me his job as CTO at CueConnect had not worked out. I had indicated that in the six months when he had been working elsewhere, I, alone, had succeeded in doubling ChannelReply's monthly revenue from approximately $12,000 to $24,000. Spreadsheets evidencing the doubling of ChannelReply's revenue are annexed hereto as **Exhibit "19c"**.

34. I noticed Defendant Gitman began developing a renewed interest in ChannelReply, LLC and ChannelReply, LLC but still did not actively work on or involve himself in the product.

35. On or about December 28, 2016, Falk contacted me and began demanding payment for tax write-off purposes. I stated that I would not be paying absent an agreement. Email correspondence is annexed hereto as "**Exhibit "20a"**".

36. In September, 2017, we were utilizing the accounting firm of Liebman, Goldberg & Hymowitz, LLP, ("the Liebman Firm") to handle all accounting issues related to NDAP, CSV and ChannelReply. Defendant Gitman and I had agreed that the Liebman Firm would take over all company books for daily bookkeeping purposes. However, when Defendant Gitman returned from his six month absence while at his job as CTO at CueConnect, he reviewed the bank account, and saw that I had received compensation of $10,000, paid in two installments of $5,000

for the six months when I was running ChannelReply myself and he was

employed by CueConnect. Around May 12, 2017 Defendant and I had spoken on

two occasions about reducing the expenses he was running through our company

when he left.  Defendant insisted on continuing to have the company pay for his

BMW and other personal expenses when he went to work for Cue Connect and in

exchange he had agreed I could pay myself reasonable compensation for working

full-time running our company in his absence. I reminded Defendant of this but he

denied it and improperly accused me of taking money from the company and

"hiding things". Defendant than  demanded we hire a bookkeeper based in the

Philippines named Mary Faith Anden ("Anden") who he had found on Upwork to

review and make adjustments to NDAP and CSV's company books outside of the

Liebman Firm. While I was fully satisfied with the Liebman Firm, I consented to

the retention of Anden for the time being to appease Defendant Gitman so that he

would recognize that nothing untoward had happened in his absence and that I

was obviously entitled to compensation for operating the companies alone. Ms.

Anden did not provide or otherwise demonstrate that she had any knowledge of

U.S. accounting principles or tax laws. My correspondence with Defendant from

May and September is annexed hereto as **Exhibits "20b," "20c," "20d," and**

**"20e," "20f," "20g," "20h," and "20i** ." Defendant Gitman's expenses, including

BMW payment is annexed hereto as **Exhibit "72(b)."**

37. I was recently contacted by the founder of a company that CSV has invested in

and told that back in March, Defendant had met with said company without

notifying me.  The company founder told me that Defendant had brought in

9

Anden to "fix" their books and she created somewhat of an accounting nightmare for them, which is still affecting them to this day.

**FALK'S DEMAND FOR FEE FOR SALE OF NDAP**

38. On February 15, 2017, around 10:40am, Falk texted me asking me to "send the peak agreement," referring to my old confidential Peakstone Agreement so he could show it to the company who wanted to purchase CPK. Confused, I responded saying, "peak agreement is long been voided at this point." Falk continued to pressure me, saying "All co want to know all arrangements that are potential liabilities. Their lawyers will ask for it. We are trying to show that not just 1 party in mix." Redacted text messages annexed hereto as **Exhibits "21" and "22."**

39. On February 15, 2017 at 11:28am, I forwarded The Peakstone Agreement to Falk with the understanding that he needed it to show in connection with the purchase of CPK as part of a due diligence process. Document referencing same is intentionally omitted at **Exhibit "23".**

40. On February 17, 2017, Falk sent me back a doctored up version of The Peakstone Agreement, entitled Services Agreement. In this proposed "agreement", Falk asked Defendant and me to pay him $160,000 upon the closing of a sale of our company, NDAP, as well as .25% of the purchase price so he could have an "equity component." At this point in time, Falk had not sent me any offer related to a deal. I found his lump sum payment request to be uncustomary and bizarre considering we did not have any idea of the value of a potential deal. Falk had not

even procured the purchaser, I had. Email correspondence is intentionally omitted **Exhibit "24."** See redacted Falk's Services Agreement as **Exhibit "25".**

41. On February 17, 2017, I responded to Falk's email, saying his fees would need to be "reasonable depending on the sale price". I also communicated that I would not sign the document unless it was reviewed and approved by my company attorney. Said email chain is annexed hereto as **Exhibit "24".**

42. On or about February 20th, 2017, Falk told me a deal was on the horizon but refused to tell me the offer or nature of ongoing discussions with the prospective purchaser. Falk said he would not give me any information unless I signed his services agreement.

43. On or about February 26, 2017 through March 7, 2017, Defendant and Falk emailed me pressuring me to sign Falk's agreement even though our company attorney had not finished reviewing it. Email correspondence annexed hereto as **Exhibit "24".**

44. On March 3, 2017 I sent back our redlined version of his agreement, saying, "….Have we heard anything back or received an offer from [company name omitted] yet?" Falk responded, "Will review. No counter offer yet." I responded, "Counter? Was there an initial offer?" Falk replied, "Mistyped. No offer." Redacted email exchange annexed hereto as **Exhibit "27".**

45. On March 5, 2017, Falk sent back more revisions, and said, "Give me a call to discuss and let's get this done soon so we can get to a transaction asap!" Redacted email exchange annexed hereto as **Exhibit "28".**

46. On March 7, 2017, Falk emailed me saying that his lawyer suggested that the time frame of the agreement should be backdated. When I reviewed his updated document, it stated that Falk had been providing his services since December 2015, "solely with respect to the buyer and solely concerning the transaction." However, Falk had only become involved in the CPK sale as of August 2016 when I introduced him to the prospective purchasing company.  In his email dated March 7, 2017, Falk threatened that if we did not agree to the change in time frame for his services related to the transaction that we would need to go back and duplicate his work in the midst of deal negotiations, saying "the alternative I see is that I notify [company name omitted] of such and then either Mike or Dave resends to [company name omitted], the same documents that I have already provided…Up to you which route you want to take. I need to then have the data come again from CSV to [company name omitted]."  Redacted email correspondence annexed hereto as **Exhibit "29a".**

47. On March 7, 2017 Defendant wrote back to Falk and me five minutes later, stating, "Jeremy, thank you for all your hard work. We truly appreciate it. All your suggested changes are reasonable.  Mike, this situation has become emotional and embarrassing at this point. Please execute this immediately. I'm ready to counter sign." I was incredibly uncomfortable signing a document that stated that Falk had provided services to our company for close to a year and a half when he had only been in the transaction for around six months.  I was also uncomfortable with the fact that Falk, was potentially withholding information pertaining to an offer.  I was worried that Falk would hurt a potential deal, if we

did not agree to his demands. I wrote back to Defendant saying, "I'm trying to protect us. I suggest you talk to Jeff, what it seems Jeremy is trying to do is attach himself to NDAP and CSV so that we possibly owe him money if a deal is not done or we try and do something with CR (Channel Reply). I'm not comfortable with that. Also, he is including LLC's that don't exist in this agreement, which puts us at risk. He's including potential deals in this agreement that don't exist. He's refused to show me an offer letter and refused to have me on the phone with [company name omitted] proving that there is even an offer at this point...have you seen or heard anything from [company name omitted]? Why are we jumping through hoops if no deal is on the table?" Email exchange annexed hereto as **Exhibit "29a".**

48. Around March 7, 2017, I advised our attorney to put a clause in Falk's services agreement stating that "In the event, the Transaction does not close, for any reason or for no reason, NO compensation shall be due Consultant." I added this clause to protect the company's reserve capital in the event a sale did not materialize and to provide us with an out in the event the deal value was lower than Falk's proposed fee.   Email exchange annexed hereto as **Exhibit "29a".**

49. On March 7th, 2017, I executed Falk's services agreement under the pressure of Defendant and to get information I believed Falk was withholding related to a deal offer. Redacted executed agreement annexed hereto as **Exhibit "29b".**

50. On or around March 10, 2017,  Falk communicated an offer and sent a Letter of Intent (LOI) from the prospective purchaser dated March 8, 2017 which was one day after I had signed Falk's services agreement.  Redacted email correspondence

regarding Falk's indication of interest and letter of intent is annexed hereto as **Exhibits "30".** Buyer's LOI is intentionally omitted  **and "31".**

51. In and around March 13, 2017, I negotiated a settlement on CSV's debt instruments with NDA Holding, LLC.

52. On March 15, 2017, Defendant emailed me after speaking with Falk, saying, "I spoke to Jeremy. He's okay taking 80k in light of the PA offer. Jeremy, please confirm. I responded, "sounds good…." Falk then responded back to the same email chain, about two minutes after my email, on March 15, 2017, confirming his agreement to reduce his service fee to $80k. Falk, responded back to both myself and Defendant saying, "Yes." Email exchange annexed hereto as **Exhibit "32".**

### GITMAN FORMS ACCEL, A COMPETITIVE BUSINESS WITH FALK

53. On March 20, 2017, unbeknownst to me at the time, Defendant Gitman registered a limited liability company called Accel Commerce ("Accel"), specializing in e-commerce.  According to Upwork, a freelance hiring platform, Accel has been operating since January 2017, when Defendant left Cue Connect. Accel registration and Upwork account with Defendant listed as business manager are annexed hereto as **Exhibit "33a" and "33b".**

54.  In and around April 2017, Defendant opened a bank account for Accel and hired Anden to do Accel's bookkeeping using CSV's Upwork account. Upwork takes screenshots of freelancers, based on their consent, while they are working on company projects to track their work. The screen shots from CSV's Upwork

account evidence Anden doing work for Accel and Defendant's Accel bank account. Screenshots annexed hereto as **Exhibit "34".**

55. In and around late April through June, 2017, I logged into our company's Upwork account multiple times to monitor the work of CSV"s freelancers.  I continued to see screenshots of Anden working on the books of Accel. I also saw correspondence between Anden and Defendant Gitman discussing Defendant Gitman's potential business partnership with Falk.  On one occasion, he told Anden in an email "he will review your work. I'm trying to focus more on the technology and Jeremy is focusing on the finance side." (Annexed hereto as **Exhibit "35a"**).

56. This took me by complete surprise because Falk was supposed to be our independent consultant and was working on our potential CPK deal. I checked the Secretary of State website and found that Accel Commerce had been formed back in March 20, 2017.  Upwork screenshots annexed hereto as **Exhibits "35a,", "35b", "35c", "35d," 35e",")35f",** redacted email from Mary Anden to Falk and Gitman regarding the 'Accel P&L annexed hereto as **"35g," and  "35h."**

57. On May 8, 2017, CSV's company attorney forwarded me a further revised draft of an asset purchase agreement among NDAP, LLC, COOPER SQUARE VENTURES, LLC and [purchasing company omitted]. Redacted covering email annexed hereto as **Exhibit "36."** Negotiations correspondence between Dardashtian and Defendant intentionally omitted at **Exhibits 37,38, 39, 41, 42 and 44.**

58. In or around the beginning of May, 2017, right when we were about to sign the purchase agreement, Defendant began demanding that he receive more than his 50/50 profit share with me from any CPK sale, despite the 50/50 profit share in our operating agreement. Falk began acting as the supposed objective middleman while Defendant refused to meet with me or directly discuss profit sharing with me by phone. All the while Falk never disclosed that he was simultaneously potentially working on a side business with Defendant, engaging in the same type of business as CSV: e-commerce software solutions.

59. On May 17th, 2017 through May 22, 2017, Falk and Defendant Gitman began making unreasonable demands, including that I give up 15% of my profit share to an employee, pay Falk more than the $80k we had all agreed to in writing on March 15, 2017, and pay the company back for the healthcare benefits that I had taken for approximately one year. He also indicated that Anden had calculated that I owed the company more than $120,000 and that I was due nothing from the sale of our company and instead owed the company and therefore Defendant Gitman money.  Defendant Gitman provided me with zero proof of these alleged debts due to the company nor any proof of why I wouldn't be entitled to my 50% profit percentage from the sale of NDAP, as per our operating agreement.  I am happy to provide the court with these email conversations as additional Exhibits, should the court deem it necessary.

60. On May 22, 2017, I checked CSV's TimeDoctor account. TimeDoctor takes screenshots of the laptops of CSV's remote employees and independent contractors, with their consent, to document their work.  I saw that Defendant

began discussing plans behind my back to meet with ChannelReply's lead developer Bagaev to meet with him and another developer for ChannelReply named Oleksii Glukharev in Russia to discuss "future plans".  Text message chat annexed hereto as **Exhibit "40"**.

61.  In and around this time, to facilitate the deal, I offered several generous concessions to Defendant, in writing, on multiple occasions, but none satisfied him.

62. On May 25, 2017 I received an email from an attorney named Umar who said he was representing Defendant but refused to provide written documentation that Defendant was paying him independently.

63. On May 25, 2017 at 4:50pm, Defendant began demanding that our company accountant Joel Liebman validate Anden's faulty accounting, which the company accountant later admitted was "wholly inadequate."  He copied our company lawyer Jeff Rothman and company accountant Joel Liebman on an email, writing "Hi Joel, I have had an accounting to create the true up in my previous email. Can you please validate this accounting on behalf of company, CSV and NDAP. Thank you." Email annexed hereto as **Exhibit "43".**

64. On Friday May 26, 2017, I wrote back to all, notifying Defendant Gitman that after paying several accountants who he previously chosen and fired, followed by Anden, who we are still paying, that I did not want to spend company money on Liebman validating Anden's confusing and faulty accounting since we planned to pay his accounting firm to review our books anyway at the end of the tax year.

## GITMAN'S MISAPPROPRIATION OF CSV BANK OF AMERICA ACCOUNT

65. On Friday May 26, 2017 CSV's Bank of America company bank account had a balance of $73,982.53.  Bank statement annexed as **Exhibit "45a and 45b".**

66. On the morning of Saturday May 27, 2017, at the start of a long holiday weekend to celebrate memorial day and knowing the bank would not be open again until Tuesday, and with no notice whatsoever to me, Defendant went to a Bank of America branch in Pennsylvania and decided to wire all company funds out of CSV's bank account and into a new account that he opened.  See redacted statement and letter from Bank of America annexed hereto as **Exhibits "45a "and "46."**

67. On my phone, around 10:30 am, I received a notification that all available cash belonging to CSV"s company account had been withdrawn. My online account information, on my mobile device, showed two wire transfers, one for $50,000 and one for $23,982.53 bringing the account balance down to zero. I immediately called the bank and was told that Defendant Gitman had withdrawn all of the money belonging to CSV. Bank email alert annexed hereto as **Exhibit "47"** and Bank statement annexed as **Exhibit "45a"**.

68. On May 27, 2017, around 4:30pm I received an email from Defendant Gitman stating that he took all of the money from our company bank account, will make unilateral authorizations regarding the sale (despite the requirement under our operating agreement that all major decisions be made 50/50) and essentially threatening me to sign a purchase agreement early next week and forego my profit share from a sale until his unilateral accountings are done and he determines who is owed what. He said he would authorize Falk and his LLC Summit Rock

Holdings to continue to act as the broker of the deal, even though I expressed

concern over Falk's conflict of interest in working with Defendant in Accel He

wrote in part, "Your resistance for an accounting has given me cause to transfer

the company's cash balances to a call deposit account....I will also continue to

authorize Summit Rock Holdings in working with [company name omitted] to

execute on the terms of purchase. I agree Umar should work directly with your

lawyer. Please reply with your attorney's information. I will remind you once

again that you will receive the final asset purchase agreement early next week. It

would be rational and prudent for you to execute the agreement before the

accounting is complete." Redacted email annexed as **Exhibit "48".**

69. On Saturday May 27, 2017 I spoke with our company attorney and wrote the

following to Defendant, in part "All of this is very concerning to me.  As you

know, Cooper Square Ventures owns and operates Channel Reply... Accordingly,

I contacted our business attorney Jeff Rothman.  While he stated that he

represents us both and cannot take sides, he suggested a reasonable resolution that

he believes would be fair to both of us. I agree with his suggestion, find it to be

reasonable and am prepared to follow it. Jeff stated all funds should be returned to

our business account immediately and in exchange we should both agree to be co-

signees on the account, which would require a dual signature before any funds are

withdrawn by either of us, thereby protecting the capital of our business.

Passwords must also be shared by both of us, no one person may lock the other

person out by virtue of our equal partnership. I am relying on you, as my fiduciary

partner, to act in the best interests of our business and put the full monies/capital

funds back into our business account before the start of the next business

day.  Your actions to the contrary would not only be detrimental to me but

detrimental to Channel Reply.  Further, Jeff has suggested that we move ahead

with the [company name omitted] purchase provided that we agree beforehand

that all funds from said purchase, except those owed to [company name omitted]

(since this is undisputed), be placed in escrow with him while Joel Liebman and

his associates conduct an audit. Once the audit is complete, Jeff suggests we

participate in a mediation and if that does not lead to a resolution then an

arbitration would follow. The funds would not be released to anyone except

pursuant to the terms of an order from an independent mediator or arbitrator from

one of these conflict resolution processes.  If you agree to Jeff's suggestion then

let me know and Jeff will draw up a document that we can both sign.  Mike.

Redacted email is annexed as **Exhibit "49".**

70. Defendant did not respond.

### GITMAN'S UNILATERAL CHANGING OF ALL PASSCODES, REFUSING ACCESS TO PLAINTIFF TO ALL COMPANY ACCOUNTS, TRANSFER OF COMPANY DATA AND PROPRIETARY AND CONFIDENTIAL INFORMATION, MISAPPROPRIATION OF PLAINTIFF'S BUSINESS IDENTITY

71.  On May 27, 2017 up until present, I have tried to logon to my CSV Bank of

America bank account and am unable to access it. I received notification that my

passcode had been changed, thereby locking me out. Screenshot annexed as

**Exhibit "50"**

72. I am also locked out of my NDAP, LLC Bank of America business account as

well.  Screenshot annexed hereto as **Exhibit "51."**

73. As I tried to access other company portals, I quickly noticed that I could not access any of my company accounts that I use to run multiple websites and businesses through CSV.

74. Our company stores all passwords to all accounts on a heavily encrypted password storage site called "1 password." This is a site designed to control all company level passwords for all accounts.

75. I have reason to believe that Defendant Gitman abused his administrator privileges and began his lockout by removing my company access to 1 password. When I tried to login it says account suspended. Therefore, I cannot access passwords to around two dozen company portals housing all company data, customer lists, codes, payment information, receipts, company historical documents, proprietary information etc.  Screenshot annexed hereto as **Exhibit "52."**

76. Defendant also abused his administrator privileges in Google Suite to lock me out. Google Suite is a business level version of Google.  The suite of services provided by Google includes email addresses, Google docs: including all of my company documents-- everything business related that Google offers. It holds company data, documents, customer lists, subscriptions, invoices, etc.

77. Defendant created a new Google domain G suite for ChannelReply to transfer all of ChannelReply's proprietary documents, email addresses and other confidential information away from CSV's business accounts and to a new G suite portal that only he controls. I can't access it.  Defendant sent employees new invite logins for access but not me.  If Defendant deleted our account it could result in irreparable

harm as it cannot be restored. Screenshot of new G Suite convo and G Suite deletion policies annexed hereto as **Exhibits "53a" and "53b."**

78. Since Defendant has taken all of CSV's company data over to his new G-Suite and locked me out of 1Password, I cannot access any company accounts except for my NDAP, LLC email address. This means that anything new going forward, new incoming or outgoing emails, new and past data and documents, I cannot access.

79. Defendant has not only locked me out, but he has stolen my business identity by taking my email address michael@channelreply.com to the new G suite. Screenshots annexed hereto as **Exhibit "54."**

80. In addition, Defendant Gitman put a picture of his face up on Google so that if anyone receives an email or has received an email in the past from my email address, the email says Michael@channelreply.com and Michael Dash (my business name) but has Defendant Gitman's face on it in Gmail, as if he is me. He also now gets all emails going to and intended for me by ChannelReply's customers and business associates. I fear he may be responding as me. If he doesn't respond, it also looks like I am not responding to my customers and colleagues. Either way he has enormous power to continue to damage my reputation and the company I spent years building. See Defendant Gitman's face associated with my email annexed hereto as **Exhibits "55a" and "55b."**

81. I believe Defendant also used his access to our Google Suite to download all data, reset all passwords, delete or suspend some accounts. I believe that he may have downloaded all of my NDAP business data and emails. I have evidence through

an email tracking software called MixMax that he may have opened and downloaded my personal investment and tax documents, which I sent to my accountant. Mix Max shows that at around 6:02am Defendant began opening certain company emails from Brooklyn NY. When someone goes in to open an email that wasn't sent to them, MixMax shows the recipient's name but the location of the person opening the email. Minutes after Defendant opened two company documents from Brooklyn, it shows that someone from Brooklyn, NY opened a personal investment document and a tax document that I had sent privately to my accountant and downloaded it. My accountant doesn't live in Brooklyn and wasn't in Brooklyn that morning, neither was his assistant who was cc'd on the email. Therefore, the only other person who had the access to download and open it was Defendant since he holds master admin to my NDAP email.   Mix Max proof attached as **Exhibits "56a," "56b," "56c" and "56d."**

## DEFENDANT'S TERMINATION OF PLAINTIFF'S ACCESS
## TO ALL COMPANY ACCOUNTS

82. I have reason to believe that Defendant changed passwords to Chargebee and Stripe which are the payment portals for existing ChannelReply customers to pay their subscriptions. Those passwords were saved on my personal computer. When I went to login I could not. When I tried to reset the passwords, the password resets were sent to Michael@channelreply.com which is now under Defendant's control. I cannot access those accounts and therefore cannot access any payment information for ChannelReply. Stripe is an online payment portal for customers,

Chargebee is subscription management portal for customers. See **Exhibits "57a," "57b", "57c".**

83. Defendant had these capabilities because he is a master administrator of accounts on Google Domain by virtue of him creating our company Google account which I was also an equal administrator of. Prior to May 27, 2017, both Defendant and I, as 50/50 owners of CSV were listed as administrators on all shared accounts. On May 27, 2017, Defendant abused his company access and removed me as an administrator on Google Domain. By removing me as admin from the ndap-llc.com level domain, which controls all of our subdomains, Defendant has removed my access to more than a dozen active email addresses that I use to conduct business and get information related to my business from vendors and customers. The email addresses that fall under NDAP, LLC and under the CSV umbrella include but are not limited to: Car Part Kings, Cooper Square Ventures, Plumburs, NDAP, LLC, Next Day Auto Parts, which would result in me not having access to any Google drive accounts associated with the email accounts above which contain all of my business documents, accountings, receipts, transaction records, customer information, proprietary information, etc. I also cannot access any Google analytics accounts associated with the email addresses above.  Many of our company accounts were opened by me and are under my name.  List of locked out accounts annexed hereto as **Exhibit "58."**

84. Defendant has also changed shared company passwords, or revoked or suspended my access to the following business accounts:

a) 1Password Account – this is a password and login account management system. It holds all of my personal passwords and the companies shared passwords. Account was paid for out of company funds.

b) Chargebee Account – This is our subscription management account that holds the customer information and billing information for all of our ChannelReply customers

c) Stripe Account – This is our credit card billing service that allows us to receive credit card payments from our customers.

d) PayPal Account – This is an online payment system which allows us to take online payments from our customers.

e) Upwork Account – This is a freelancer marketplace that allows us to hire and pay freelancers to run the business.

f) Zendesk Accounts – This is a customer service management account which allows us to talk to our customers when they email us through support tickets.

g) JIRA Account – This is a project management software that allows us to manage projects effectively for our business and work with one another to successfully complete tasks.

h) Slack – This is a messaging management software for our business that allows company employees and freelancer to openly communicate with one another and share documents.

i) Amazon Seller Central – This is our Amazon seller account that allows us to sell products on Amazon and manage our MWS accounts for channelreply sellers through our admin.

j) eBay Accounts – This allows us to sell products on ebay and manage our ebay subscription id's for channelreply sellers through our admin.

k) Timedoctor – This allows us to manage the time management of employees and freelancers via an online portal to track time and take screenshots of employees and freelancer work.

l) Amazon Web Services (AWS) – This is where we manage all of our Amazon Web Servers which keep the businesses servers running effectively.

m) American Express Account – This is a NDAP corporate credit card account

n) Magento Accounts – This is our Magento Admin which allows us to see all backend data associated with our business

o) Quickbooks Accounts – This is where all the finances are held and all accounting and reconciliation is done.

p) Desk.com Account - This is a customer service management account which allows us to talk to our customers when they email us through support tickets.

q) Godaddy Account – We have a company godaddy account which owns and operates many domains, I cannot login to Godaddy to even list all of the domains we own together.

r) Magemojo – This is our Magento hosted server account

s) Mailchimp – This is our email subscription newsletter account

t) Github – This is where all of our software is checked in and stored for sharing

u) Ringcentral – This is our VOIP system that allows us to make and receive internet phone calls and faxes

v) Join.me – This is a screenshare service that allows us to talk to customers and share our screens with them

See 1Password lockout containing all passwords to these company accounts annexed hereto **as Exhibit "59."**

85. We both held the power to disable, suspend or delete the other from any of those shared accounts at any time, however, I of course never exercised that power because it would have been contrary to our good faith partnership and my fiduciary duty to not harm my partner. I also would never usurp control over all business accounts and lock my partner out, but this is precisely what he has done to me. I cannot take any actions to conduct or act in the interests of my active and running businesses or customers, or prevent the loss of revenue let alone build more client relationships. Defendant is not only threatening the existence of my

present businesses but estopping me from growing them, and causing me to lose business relationships.

86. By a stroke of luck, the one thing Defendant Gitman forgot to lock me out of was TimeDoctor, the software that is installed on laptops by employees and takes screenshots of employees while they work remotely. My access to TimeDoctor allowed me to see some of what Defendant was planning, what he was doing and saying to employees during the lockout because his messenger conversations with employees showed up on their computer screens and TimeDoctor snapped pictures of these conversations in real time.

87. On May 27, 2017, I received a notification that someone requested to change the Password to Channel Reply's PayPal account which accepts payments from customers. See **Exhibits "60a," "60b" and "60c."**

88. From May 27, 2017 to present, I have seen evidence through TimeDoctor screenshots that Defendant has been spreading lies to employees about me, using Slack messenger, to turn them against me. His lies include telling them that they were owed distributions and I took their distributions, even though they are not company owners. I cannot participate in these conversations on Slack to defend myself because Defendant has locked me out of our company account. Therefore, I was forced to watch him degrade me for nearly two weeks with no way to defend myself while we prepared this application to the Court.  See **Exhibits "61" and "62."**

## DAMAGE TO CSV CUSTOMERS

89. By 2:11pm on Sunday May 28, 2017 our account balance was overdrawn by negative $10.89. CSV's bank account not only collects revenue in the form of monthly service fees from customers, but it also funds the operation of the service. Auto-debits have been prescheduled to pay for servers, employees and other digital portals that help service CSV. There is presently no capital in CSV's account due to Defendant Gitman's actions, and thus, CSV's contractual obligations are not being paid and the account continues to overdraw. This can very quickly lead to the shutdown of ChannelReply which is presently servicing subscriptions held by more than two hundred worldwide customers. These business relationships took years to build and are not only a source of monthly revenue but an invaluable asset to the company and me as a businessman, 50% owner and co-manager of CSV. The loss of these customers would cause irreparable harm to me, ChannelReply and CSV, and its other businesses. Defendant's actions can also cause our third party customers to lose or damage relationships with their own customers, if they cannot service them properly through ChannelReply and is causing harm to their customer service capabilities in that I cannot help them with issues. Defendant has redirected customer support emails to himself but has no experience with customer service and has not indicated whether he is providing any. Mobile screenshot of overdrawn account annexed hereto as **Exhibit "63".**

90. On Monday May 29, 2017, Defendant canceled my participation in a pre-scheduled weekly conference call with international employees running ChannelReply. He removed the event from my calendar so that I could not join

the Skype call and get any information, updates or ask any questions about my active and running business.  Screenshot of calendar cancellation annexed as **Exhibit "64".**

91. On Monday May 29, 2017, after blocking my access to a company conference call with employees, Defendant spoke with Bagaev, CSV's lead developer who created the proprietary software upon which ChannelReply operates, indicating his intent to fly to either Russia or the Ukraine to meet with him and ChannelReply's other lead developer privately, saying, "I'm looking at flights now." The text conversation is annexed hereto as **Exhibit "66b**." It is my good faith belief that Defendant Gitman is scheduled to leave for the Ukraine this Friday, June 9, 2017 to enter into contractual agreements with CSV's two lead developers to enter into a competitive business with them, possibly ChannelReply, Inc., but in any event to utilize CSV and ChannelReply's code and confidential and proprietary information against CSV and ChannelReply. Defendant Gitman has induced the two lead developers to turn their allegiance away from me, CSV and ChannelReply by offering them an ownership interest in his new competing company, help in obtaining Visas and access to their own US bank accounts and by filling them with lies about me and my business relationship with Defendant Gitman. See conversation referenced annexed hereto as **Exhibit "65."**

92. By 8:01pm on Monday May 29, 2017, I received mobile notification that the CSV bank account was overdrawn by $229.40 due to preexisting debits to pay for services essential to operate Channel Reply. Again, I cannot gain online access to

my bank account because Defendant has changed the shared online password. Mobile screenshot annexed hereto as **Exhibit "66a"**.

93. On Tuesday May 30, 2017, Falk sent me and Defendant a revised Asset purchase agreement from [company name omitted]. Defendant replied, Thanks. Will review. Planning to execute today. " Redacted emails annexed hereto as **Exhibit "67"**.

94. On Tuesday May 30, 2017, Defendant also reached out to our company attorney Jeff Rothman requesting an in person meeting. Defendant stated he did not want to meet with me and only wanted to meet with Rothman and that Rothman could then communicate with me. Email exchange annexed hereto as **Exhibit "68"**.

95. On Tuesday May 30, 2017 at approximately 3pm, Defendant Gitman told Channel Reply's lead developer Bagaev that he usurped my company email address and customers tried but could not reach me for service. The employee said, "Dave, in some cases, customers were contacting Mike by email without going to support@channelreply.com. " Defendant replies, "I get those emails now." Email exchange annexed hereto as **Exhibit "54"**.

96. On Tuesday May 30, 2017 at approximately 5:08pm, Defendant Gitman again stated to Bagaev his intent to fly to Russia immediately to meet privately with him and ChannelReply's other developer and discuss my company without me present. Defendant says in part, "I am checking flights for tomorrow." Text conversation annexed hereto as **Exhibit "69"**.

97. On May 30, 2017, Defendant Gitman acknowledged to developer Glukharev that he moved the ChannelReply email and account information to a new G suite.,

saying "I'm moving ChannelReply email to a dedicated G suite account.   You should have received an email in your personal inbox with the new account. Can you give me your old password so I can migrate your email?." He changed employee passwords so they could access the G suite with all company emails and documents, saying "I reset your NDAP password to kick off the migration of your emails to CR's new G Suite account." Again see **Exhibit "53**."

98. On May 30, 2017 Defendant registered Channel Reply Inc. with the Secretary of State in Delaware for the purpose of transferring all of CSV and ChannelReply's assets into a new company for his own use, misappropriating the tradename and intellectual property, including all of the software and trade secrets, stealing the company and converting all of its assets and employees, while locking me out so that I had no access to any resources to try to prevent this unlawful and fraudulent action or to defend myself, my company or to protect my company's customers or employees.  See proof of registration annexed hereto as **Exhibit "70."**

99. On May 31, 2017, Defendant Gitman began driving up debt using CSV's depleted bank account and credit card. He paid an invoice to a ChannelReply worker from CSV's overdrawn bank account for $218.51 further driving the account into an overdrawn status. The accompanying invoice says the charge comes from Defendant Gitman and lists his personal home address in Brooklyn, New York. Defendant Gitman also charged a lease payment for his BMW through CSV's overdrawn account in an amount greater than $500. See Invoice attached **as Exhibit "71,"** and evidence of overdraw as **Exhibit "72a" and "72b."**

100. On June 1, 2017, Defendant again degraded me to the lead developers, lying that I "stole" from the company and want to use the money to buy a seven figure house and claiming I was running a "pyramid scheme." Defendant Gitman acknowledged he believed I would sign the CPK deal and give into his demands because he thought I needed money from the deal to buy a house.  See **Exhibits "73" and "74."**

101. On June 1, 2017, Defendant acknowledged to our lead developer that he has been unlawfully viewing my emails from my NDAP, LLC company email address and called me a "bully".  See **Exhibit "75."**

102. On June 1, 2017 I used my limited access to my NDAP email to take screenshots evidencing that Defendant had replaced my face with his own so that people who have past or future emails from my business email address Mike@channelreply.com see my full name but Defendant's face.  Since May 31, 2017 until at least June 4, 2017, Defendant Gitman has misappropriated my identity by inserting his face and likeness with my email address and name, intentionally misrepresenting himself as me to customers and others who view my email. He still has possession of my email account so I cannot read incoming emails or respond.

103. On June 1, 2017, Defendant sent CSV and ChannelReply's Russia-based developers new employment agreements for them to become employees of his newly-formed and unlawful company "Channel Reply, Inc." He did this using the email David@dalva.ventures.  Upon closer examination it appears Defendant formed Dalva Ventures in February of 2017, which led me to wonder how long he

may have been planning to steal and convert ChannelReply to his own use and for his own benefit.  See **Exhibits "76a," "76b," "76c", "76d", "76e", "76f" and "76g" (Dalva Registration).**

104. June 1, 2017 Defendant called me a parasite to the lead developer to further degrade me and tarnish my business reputation. See **Exhibit "77."**

105. On June 1, 2017 Defendant Gitman improperly solicited and offered employees of CSV a stock plan agreement and 125,000 shares of equity in Channel Reply, Inc.  and also told CSV and ChannelReply's lead developer he will be considered a Co-founder of his new unlawful Channel Reply Inc. company to win his loyalty.  See **Exhibits "78a," "78b", "78c", "78d".**

106. On June 2, 2017 Defendant further reinforced to CSV's developer that he would make him a co-founder of the new Channel Reply Inc. company and fight for his rights. When the developer praised Defendant's nobility, Defendant said that he would like to believe there are more people like him and just wants to do the right thing and lead by example.  See conversation annexed hereto as **Exhibit "79."**

107. On June 2, 2017 Defendant made assurances to CSV's lead developer that Defendant Gitman is attempting to pirate away from CSV and ChannelReply that he will get him a Visa to further win his loyalty. He also discussed getting him a house.   See conversation annexed hereto as **Exhibit "80."**

108. On June 2, 2017, Defendant Gitman spoke to the lead developer about getting all customer emails and making new hires for his new unlawful company, Channel Reply, Inc. He also discussed getting venture capital and said he knew a VC guy

who would help. I was not sure but thought he could be referring to Falk. See **Exhibits "81a," "81b", "81c", "81d", "81e" and "81f."**

109. On June 2, 2017 Defendant told ChannelReply's lead developer that I stole money (a lie) and he would be considering reporting me to the IRS and also promised the lead developer he would get him access to US accounts. See **Exhibit "82."**

110. On June 2, 2017 Defendant essentially and incredibly indicated to our lead ChannelReply developer that after he converted all of CSV's assets to his new company Channel Reply Inc., he would then offer me a 5% share of his new company, but if I did not accept his offer, then the 5% share I was offered would revert back to the developer.  When the developer questioned why I would ever accept a 5% share of a company (of which I already own 50%) Defendant said "it was a fair and generous offer" and again promulgated the lie that I took money from the company to turn my employees against me.  See **Exhibit "83."**

111. On June 2, 2017 I noticed that Defendant Gitman had updated the CSV funded TimeDoctor account name to be "David's company" further evidencing his intent and plot to steal CSV and ChannelReply and to make them his and only his (essentially his alter-ego). However, Defendant Gitman is still billing CSV's empty bank account for TimeDoctor. See **Exhibits "84a," "84b" and "84c."**

112. On June 2, 2017 Defendant charged $3,500 to amazon web services using NDAP's American Express credit card, thereby driving up CSV's debt to over $7,000 despite emptying its bank account so I cannot pay our jointly held business credit card. He also locked me out of the amazon web services account by

changing the passwords so I cannot even see what the charge is for. See redacted **Exhibits "85a" and "85b."**

113. On June 4, 2017 the lead developer asked whether they should update the ChannelReply website and remove CSV's Terms of Service identifying CSV as the owner of ChannelReply and replace it with new terms of service for ChannelReply's existing customers so they can convert those customers to Defendant's new Channel Reply Inc. company. Defendant says "absolutely" he will. See **Exhibit "86."**

114. From May 27, 2017 when Defendant Gitman depleted CSV's bank account through the present date, customers have still been under contract with CSV, believing they are paying CSV. Meanwhile I have reason to believe Defendant Gitman has rerouted CSV's customer payments to his own personal accounts or his new company Channel Reply Inc's accounts without notifying consumers. I believe this because he has locked me out of our Stripe and Chargebee accounts which collect and deposit customer payments into our CSV bank account and our CSV bank account continues to go overdrawn. I have not seen any customer payments from Stripe or Chargebee in our payment portals since May 27, 2017 which is not customary. I am not sure where he has redirected customer payments. I have also received an email notice that a new PayPal account has been created for ChannelReply but I am unsure whether it is for ChannelReply or Channel Reply, Inc.  I do not have access to that new account because my PayPal password was changed. See **Exhibits "60a," "60b" and "60c."**

115. On June 5, 2017, Defendant Gitman sent another demand letter saying he refuses to discuss ChannelReply until I meet his demands with regard to the sale of NDAP. He aggressively orders me to do things, starting his demands with the phrase, "you will" do this, and "you will" do that. He added new terms, demanding payment for his past and future work, and demanding I grant an employee 15% of the profit shares from the sale of NDAP. He told me there is no "deal" to be made. See redacted **Exhibit "87."**

116. On June 5, 2017, Defendant expressed plans to ChannelReply's lead developer that he wanted to develop a new corporation in the Ukraine to cut company taxes. I fear he will soon be trying to divert CSV's funds, assets and proprietary information abroad**. See Exhibit "88."**

117. On June 6, 2017 Defendant finalized travel plans to fly to the Ukraine to meet with Bagaev and Glukharev from June 12th-17th, 2017**. See Exhibits "89a" and "89b."**

118. Defendant Gitman has clearly evidenced a complete disregard for the law, for any semblance of respect for his fiduciary duties to me and to our companies, and has demonstrated a willful election to act in a deceitful and fraudulent manner. It appears clear that Defendant Gitman believes that he is above the law and beyond reproach. In order to deter Defendant Gitman from undertaking any further action to damage me, our companies, our worldwide customers or their worldwide customers. I am pleading with this Court to enter all of the restraints to return our companies to the place they were in prior to his egregious actions, and to impose

serious sanctions and repercussions against Defendant Gitman to develop his

compliance with the law.

I certify under penalty of perjury that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Michael Dardashtian, Individually
and on behalf of NDAP, LLC,
Cooper Square Ventures, LLC and
ChannelReply

Sworn to before me this 8th
Day of June, 2017

Notary Public

TANIA JEAN BAPTISTE
Notary Public - State of New York
NO. 01JE6348837
Qualified in Kings County
My Commission Expires Oct 3, 2020

38

EXHIBIT LIST

| Document | Exhibit |
|---|---|
| Diagram created by Gitman showing CSV's online properties and products | 1 |
| CSV's Operating Agreement | 2 |
| CSV Employee EIN Receipt | 3 |
| NDAP's Operating Agreement | 4(a) |
| NDAP's Articles of Organization | 4(b) |
| NDAP EIN from IRS | 5(a) |
| CSV Bank Signature Cards | 5(b) |
| Dardashtian Description of ChannelReply | 5(c) |
| Gitman's Description of ChannelReply | 5(d) |
| CSV Customer Service Agreement (beta version) | 6 |
| First ChannelReply Customer Invoice Receipt | 7(a) |
| Scope of Bagaiev/Developer Services | 7(b) |
| Bagaiev Service Emails | 7(c) |
| Bagaiev Service Agreement | 7(d) |
| Intentionally Omitted | 8,9 |
| Intentionally Omitted | 9,8 |
| CPK Website Screenshot $10 million | 10(a) |
| DBA confirmation NDAP | 10(b) |
| CSV Offers ChannelReply as Subscription Service | 11(a) |
| Channel Reply Service and Invoices | 11(b) |
| Channel Reply Service Invoices | 11(c) |
| Peakstone Agreement | 12 |
| Emails between Dardashtian and Gitman re: ChannelReply, LLC | 13(a) and (b) |
| Channel Reply, LLC Registration with Sec. State | 14 |

1

| | |
|---|---|
| ChannelReply Publication | 15 |
| Dardashtian inquiry with Rothman re stock options | 16 |
| Gitman's request for work Visa for Developer | 17 |
| EIN for Channel Reply, LLC | 18 |
| ChannelReply Operating Agreement | 19(a) and (b) |
| Dardashtian doubles ChannelReply's Revenue Spreadsheets | 19(c) |
| Falk demands payment for tax write off, Dardashtian request for Falk Agreement | 20(a) |
| Correspondence re Liebman and Anden | 20(b)-20(i) |
| Intentionally Omitted | 20(j) |
| Falk Texts requesting Peakstone Agreement | 21 and 22 |
| Dardashtian sends Peakstone Agreement to Falk | 23 |
| Emails regarding Falk's Agreement | 24 |
| Falk Services Agreement | 25 |
| Emails for Dardashtian to Sign Falk Services Agreement | 26 |
| Email Negotiations Falk and Dardashtian "no offer yet" | 27 |
| Falk Email re revisions | 28 |
| Falk threatens Mike- double the work | 29(a) |
| Signed Service Agreement with Falk | 29(b) |
| Falk LOI | 30 |
| Intentionally Omitted | 31 |
| Gitman email Falk agrees to $80k Commission | 32 |
| Gitman listed as business manager | 33(a) and (b) |
| Anden doing work for Accel | 34 |
| Emails re Gitman and Falk starting a business | 35(a) |
| Upwork screen shots | 35(b)-(f) |
| Accel P&L | 35(g) and (h) |

Purchase Agreement Covering email for NDAP                                    36

Intentionally Omitted                                                        37

Intentionally Omitted                                                        38

Intentionally Omitted                                                        39

Text Message meetings between Gitman and Bagaiev                              40

Intentionally Omitted                                                        41

Intentionally Omitted                                                        42

Email re Gitman's request to Liebman/Rothman to validate Anden's accounting  43

Intentionally Omitted                                                        44

BoA statement balance $74                                                    45(a) and (b)

BoA letter re transferred funds                                              46

BoA email Alert                                                              47

Gitman admitting he took money                                               48

Rothman/Liebman recommendation for Liebman to do audit                       49

Logon Failure CSV BoA                                                        50

Lockout of NDAP account                                                      51

Screenshot of lockout of portals                                             52

Gitmans Google Doman G Suite to transfer documents, emails, etc              53(a) and (b)

Screenshot of Gitman taking michael@channelreply.com to G suite              54

Gitman's face on Mikes email                                                 55(a) and (b)

MixMax- Gitman's misappropriation of Dardashtian's personal information      56(a)-(d)

Stripe/Chargebee portal                                                      57(a)-(c)

List of locked out accounts                                                  58

Passwords for accounts                                                       59

Notification of Request to Change Password to ChannelReply Paypal Acct       60(a)-60(c)

Gitman's Disparaging comments about Dardashtian                              61-62

| | |
|---|---|
| Mobile Screenshot of Overdrawn CSV Bank Account | 63 |
| Screenshot calendar cancellation of Dardashtian's participation in Skype Conference | 64 |
| Gitman assists to obtain Developers visas | 65 |
| Mobile Screenshot of Denied Access to CSV Bank Account | 66a |
| Correspondence re: Gitman's travel to Russia | 66b |
| Emails re Falk revised asset purchase agreement | 67 |
| Gitman correspondence to Jeff Rothman | 68 |
| Gitman "checking for flights" to Russia | 69 |
| Registration of Gitman's Channel Reply, Inc. | 70 |
| Overdrawn CSV Account Invoice, Gitman lease payment for BMW | 71-72(b) |
| Gitman's disparaging comments about Dardashtian June 1,2017 | 73-74 |
| Gitman acknowledges he has been viewing Dardashtian's emails | 75 |
| Dalva Ventures registration and related documents | 76a-76g |
| Gitman sends disparaging messages about Dardashtian | 77 |
| Gitman's solicitation of Developers with stock plan agreements, equity, etc. | 78a-78d |
| Gitman promises Developer to make co-founder of Channel Reply Inc. | 79 |
| Gitman promises to assist Developer to get visa | 80 |
| Gitman/Developer correspondence re getting venture capital | 81a-81f |
| Gitman tells Developer Dardahstian stole money | 82-83 |
| Gitman updates CSV account to be "David's Company" | 84a-84c |
| Gitman locks Dardashtian out of Amazon Web Services Account | 85a-85b |
| Gitman agrees to update ChannelReply website and remove CSV's Terms of Service | 86 |
| Gitman sets unreasonable demands as a condition to NDAP sale | 87 |
| Gitman expresses intent to set up new corporation in Ukraine | 88 |
| Gitman's travel plans to Ukraine | 89a-89b |
| Gitman Chase Bank Recs, Channel Reply Inc. | 90 |