UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

MICHAEL DARDASHTIAN, individually and
on behalf of COOPER SQUARE VENTURES,
LLC, NDAP, LLC and CHANNELREPLY, LLC          17 CV 4327 (LLS)

                                        Plaintiffs,

          -against-

DAVID GITMAN, JEREMY FALK, SUMMIT          REPLY AFFIDAVIT OF
ROCK HOLDINGS, LLC, ACCEL COMMERCE,        MICHAEL
LLC, DALVA VENTURES, LLC, KONSTANTYN       DARDASHTIAN IN
BAGAEV, OLESKSII GLUKHAREV and             SUPPORT OF ORDER TO
CHANNEL REPLY, INC.,                       SHOW CAUSE SEEKING
                                        Defendants.   RESTRAINTS
------------------------------------------------------------X

Michael Dardashtian, being duly sworn deposes and says:

1.  I am one of the Plaintiffs herein, and a co-manager and 50% member of Cooper

Square Ventures, LLC ("CSV"), NDAP, LLC ("NDAP") and ChannelReply, LLC ("CR,

LLC") (hereinafter collective the "Plaintiff Companies"), and as such, I am fully familiar

with the facts and circumstances of this matter as set forth herein.

2.  There can be no better illustration of David Gitman's ("Gitman") fraud,

deception, unlawful activity, admitted and willful violations of this Court's orders, clear

lack of credibility, ability to knowingly manufacture false statements, and continued use

of "loose language" to mislead this Court after being admonished for doing so, than

Gitman's own Affidavit, which I will attempt to point out in detail below. I apologize in

advance for the length of my affidavit and the abbreviated timeframe for having to review

it, but Gitman's false and misleading statements require the detail.

3. Before doing so, I must now advise the Court that Gitman, in addition to attempting to steal the Plaintiffs' trade secrets, money and to set up his new company, Defendant Channel Reply, Inc. ("Channel Reply, Inc." and/or "CR, Inc.") has now induced the Plaintiff Companies' lead developers, Konstantyn Bagaev ("Bagaev") and Oleksii Glukharev ("Glukharev"), to terminate their relationship with the Plaintiffs as he had told the Court would happen. I attach hereto Bagaev and Glukharev's June 20, 2017 termination letters as **Exhibit A.** This was obviously a planned strategic move on Gitman's part as he telegraphed his move to the Court yesterday when he alluded to the fact that the developers "might" quit. A plain reading of the letters which are only addressed to Mr. Gitman and are identical in form, evidences that Gitman likely wrote the letters and told Bagaev and Glukharev to sign them. In the interim, however, while we are addressing the conspiracy between Gitman and the Plaintiff Developers, Plaintiffs will require the immediate ability to retain a new developer so that ChannelReply can continue uninterrupted. A new developer will be able to take the ChannelReply business and insure the continuation of its operation and servicing of its customers, which are now in jeopardy because of Gitman's damaging actions. Plaintiffs request immediate permission from the Court to retain a new developer, one that is loyal to the Plaintiffs, and not to Gitman, so that the Plaintiff Companies are not held hostage as Gitman has allowed them to be thus far. Plaintiffs are currently researching the best candidate for the job. Due to time constraints, and Plaintiff Companies inability to maintain the code without a developer, I was able to find a consultant, Jacob Bennett, Lead Software Developer at WilberGroup located in Illinois, who can assist Plaintiff Companies to find a new developer capable of this task. Mr. Bennett's resume is annexed hereto at **Exhibit**

<u>A</u> at pp. 3-4. I also respectfully seek permission from the Court to retain Mr. Bennett for purposes of assisting me to find a developer as quickly as possible.

4.   It is equally important that this Court recognize that, after reading the Gitman Affidavit, Gitman incredulously states that both he and the developers intend upon continuing with their misappropriation of ChannelReply's source code and customer information, all of which is only the Plaintiffs' trade secret, proprietary and confidential information (collectively "trade secrets"), and which was paid for by the Plaintiffs, to put Plaintiff ChannelReply out of business because, according to Gitman, none of them have a "signed contract" with Plaintiffs. It is clear that he intends to use the Russian developers, Bagaev and Glukharev (collectively referred to as "Plaintiffs Developers") or others to do so and possibly outside the jurisdiction of this Court. This behavior warrants sanctions.

5.   The Court, anticipating this issue, during the Court conference expressed concern over the possibility that Gitman might seek to depart with the Plaintiffs Developers, and with the Plaintiffs' trade secrets, and the difficulties that could arise in untangling this issue if he does so. I am pleading with this Court to sanction Mr. Gitman appropriately and to restrain him from entering into any competitive business activity, including any competitive business activity using the Plaintiffs' trade secrets, including the ChannelReply source code and customer information and data, with Plaintiffs Developers or any third party, either within or outside of the United States of America. A serious sanction, combined with this restraint is the only possible deterrent other than incarceration for his noncompliance that will insure compliance. Alternatively, it should

be clear to the Court at this juncture that Gitman will unquestionably move ahead and attempt to unfairly compete with Plaintiffs using their trade secrets.

6.   Even after this Court's verbal order on June 19, 2017 ("June 19th Order"), Gitman has disregarded this Court's clear directive that he was to comply in all respects with restoring Plaintiffs' condition to that which existed on May 26, 2017. I attach as **Exhibit B** Gitman's counsel's email claiming that Gitman had fully complied with the June 19th Order, which was completely false. Attached as **Exhibit C** is my counsel's response to Gitman's attorney, which attached my work product and efforts to determine whether Gitman had, in fact, complied. Just on the limited issues raised by Gitman, it was clear that he did not comply. I refer the Court to his counsel's reply letter, which admits that he did not comply even after they contended he did. **Exhibit D**. My counsel's response is attached as **Exhibit E**. Dealing with Gitman's compliance is analogous to a "hide and go seek" mission and unfair that I or this Court should have to continue to tolerate same. As of June 20, 2017 at 9:37 p.m., the accounts which I still have not been completely restored to as of May 27, 2017 are also annexed hereto at Exhibit E at Tab 1, with screenshots confirming Gitman's continued non-compliance with the Orders of the Court.

7.   In Paragraph 3 of his affidavit, Defendant Gitman states that he and I "intended to create a limited liability company," when in fact we did form a valid Limited Liability Company. Cooper Square Ventures, LLC was registered with the State of New York on August 5, 2011 (**Exhibit F**), filed its Articles of Organization on August 4, 2011, acquired an EIN on August 9, 2011 (**Exhibit G**) and created a formal operating agreement ("CSV Operating Agreement") which was signed by both Defendant and I on August 13, 2011 (**Exhibit H**), all within a consistent timeframe.  As Gitman

4

inconsistently admits, "On October 13, 2011, Dardashtian and I opened a business checking account at Bank of America under the name Cooper Square Ventures, LLC." (Gitman Aff in Opp. at para. 7).

8.   It appears that Gitman now wants to argue that CSV Operating Agreement that he signed and which we have been operating under for over five (5) years is somehow not valid, when he says "CSV was never properly memorialized" by an operating agreement. Gitman then obviates the need for me to rebut when he undermines his own argument by admitting, "However, Dardashtian and I understood that our dealings concerning CSV were covered by the operating agreement and we have operated under it since 2011." (Paragraph 3 Def Aff).

9.   Gitman is again misleading this Court. Our corporate attorney, Jeffrey Rothman, through a scrivener's error, omitted the word "Ventures" in the name and only included "Cooper Square" by mistake. Neither Gitman nor I were concerned as we both signed the CSV Operating Agreement, and as Gitman admits, operated under it. Gitman's raising of the issue, only now, demonstrates his deceptiveness. I refer the Court to the Affidavit of Jeffrey Rothman, Esq., Plaintiffs' corporate attorney, who verifies that the omission of the word "Ventures" in the CSV Operating Agreement was nothing more than a scrivener's error. (See Rothman Aff. at paras. 3, 10-11). I rely on Mr. Rothman as our company attorney, to do a final review of our documents, and since the scrivener's error was his, both Gitman and I must not have recognized the error at the time.

10. As this Court knows, an Operating Agreement is an internal document set by the company members, which outlines rules and provisions from which to run a company. Since operating agreements may be amended at any time, it would be a simple formality

to amend ours to include the word "ventures" after Cooper Square. However, Gitman has never once requested this or pointed this out to me. Instead, Gitman takes it upon himself to point out to this Court that the intent of the agreement was clear and he signed it and "understood that our dealings concerning CSV were covered by the operating agreement," and undertook a mutual partnership with me, running the businesses under the CSV Operating Agreement, for the past five (5) years. Additionally, Gitman later in his Affidavit tries to invoke provisions of the CSV Operating Agreement, which he has inconsistently tried to contest, only to use them for his benefit. ( Gitman Aff in Opp at para. 3).

11. Gitman, also says Cooper Square LLC "is an entity that was already registered to do business in the State of New York and has *no relation to me*, Dardashtian or CSV." (Emphasis added). Gitman's statement is false. In fact, a simple search of the New York State Division of Corporations Entity Search shows that there is no entity registered with the name of "Cooper Square, LLC", only variations of this name, one of which is Cooper Square Ventures, LLC", which is the company registered by myself and Gitman. Gitman makes this misleading statement knowing full well that CSV is a company registered to do business in the State of New York and, under which we have operated for years. Gitman then goes on to admit, "Dardashtian and I are each managing members of CSV. We both made initial capital contributions of $500" and later admits, "we took equal distributions and expenses." (Gitman Aff in Opp. at para. 3). Why would Gitman even make reference to Cooper Square, LLC knowing the facts as recited above, other than to attempt to mislead this Court and waste valuable time and resources that are required to rebut the obvious? I ask that he pay Mr. Rothman's fees associated with having to

produce an Affidavit to address this issue. Cooper Square, LLC does not exist. I attach hereto as **Exhibit I** a copy of proof that there was no business entities found for Cooper Square LLC.

12. In Paragraph 11 of his affidavit Gitman lists various domains owned by CSV, but purposely and deceitfully omits channelreply.com which is a domain owned and operated by CSV, and the subject of this litigation.

13. In Paragraph 12, Defendant Gitman says, "despite repeated requests to Dardashtian, I have never received an accounting of the transactions closed by the company" and claims he cannot corroborate the $10 million dollars in closed transactions. As far back as 2012, an email to a bookkeeper named Betsy Thomas evidences just how familiar Gitman was and continues to be with the Plaintiff Companies' accounting. This email evidences that Defendant Gitman himself setup NDAP's orders to go through a software service called Magento so that he could track all transactions. He also demonstrates his full knowledge of and involvement with Amazon and eBay orders, all of which collectively track the orders that makeup most, if not all, of the $10 million in closed transactions through NDAP, which is owned by CSV. **Exhibit J**.

14. Gitman tries to make this Court believe that I maintained control over the accounting, to the exclusion of him, when in actuality Gitman played an equal role, as co-managing member, in all aspects of the business including finances. Gitman always had full access to our Quickbooks account, full access to our bank statements, full access to our tax returns and full access to our company accountant, Joel Liebman. Gitman could have and may have, at any time, requested an accounting from Joel Liebman or looked

into any financial information regarding our company transactions. However, as I will show, Gitman wasted company resources by paying various bookkeepers over the years, many of whom he chose on his own, and I consented just to appease his frequent need to reorganize things the way he wanted to. I only consented to Gitman's bookkeeping demands because I felt comforted by the fact that Mr. Liebman remained as our trusted and consistent company accountant, overseeing a control version of our annual books and tax returns.

15. In Paragraph 16, Gitman lies to the Court when he says "The entity diagram attached to Dardashtian Aff. as Exhibit 1 was not the entity diagram created by me and this version was never implemented by me..." This diagram was, in fact, created in our Lucid Chart on May 23, 2014 and the "owner" or in other words the creator of this document is listed as David Gitman (**Exhibit K**). On August 22, 2014, Defendant Gitman shared the Lucid Chart Document called "Cooper Square Ventures Holdings" diagram with me via email. (Email annexed hereto as **Exhibit L**)

16. In Paragraph 16, Defendant Gitman contends that Channel Reply, LLC is operated by NDAP, LLC. In fact, as I mentioned in my prior affidavit to this Court, on our channelreply.com website, the Terms of Service clearly states that Cooper Square Ventures owns and operates channelreply.com. Customers are invoiced by Cooper Square Ventures and our contracts are by and between the customer and Cooper Square Ventures with first customer contract; see terms of service annexed hereto as **Exhibit M**.

17. In Paragraph 17, Defendant Gitman again lies to this Court, when he states that he secured the business partnership with NDA Holdings, LLC. If necessary, I can and will request a letter from NDA Holdings, LLC disputing the same.

18. In Paragraph 19, Defendant Gitman admits he hired Konstantyn Bagaiev "via NDAP's Upwork account" thereby admitting that Mr. Bagaiev was hired by Plaintiff NDAP, which is owned by Plaintiff CSV. He also admits that Mr. Bagaiev was hired to "develop a script to answer eBay messages in a Help Desk like Zendesk." *This was the script that would evolve into the ChannelReply service*. (Emphasis added). This script was initially created to address an internal company need and later, Gitman and I decided to market and sell it as a service to help other companies with the same need, creating the ChannelReply SaaS (Software as a Service) product.

19. In Paragraph 20, Gitman admits that "Bagaiev and Glukharev, who are based in Eastern Europe, worked for NDAP as an "independent contractors."  However, Defendant Gitman then goes on to contradict himself and say in paragraph 21 that the two "have not executed any contractor agreement with NDAP or any other plaintiff entity." This is false. Gitman may have potentially destroyed this agreement but a screenshot through the TimeDoctor software evidences Bagaiev, comparing his independent contractor agreement with NDAP to the new employment agreement provided by Defendant Gitman to him for Channel Reply Inc. on June 1, 2017 between the hours of 2:17 and 3:30am. **Exhibit N**. At the same time that he is viewing his existing independent contractor agreement with NDAP, he is speaking on the phone with Gitman as evidenced in the screenshot, presumably going over how his present agreement differs from the new one.

20. Despite Defendant Gitman saying that Bagaiev and Glukharev were generally paid through NDAP's Bank of America bank account, this only took place in the beginning, when ChannelReply was first formed. Once the service generated sufficient

capital to fund its own operations, Bagaiev and Glukharev were paid through CSV's Bank of America bank account, as bank statements clearly evidence and around this time, Gitman and I took steps to create an LLC for ChannelReply, Plaintiff ChannelReply, LLC, which Gitman agreed to, but he then later neglected to sign the operating agreement, leaving Plaintiff ChannelReply to continue to operate under the CSV umbrella.

21. In Paragraph 22, Defendant Gitman contends that he never executed the work order between NDAP and Bagaiev and that he "would never sign" the independent contractor agreement between NDAP and Bagaiev because according to Defendant Gitman it "is against my interest and does not protect me or *my team*. (Emphasis added) For example, it includes restrictions against Bagaiev that I would never agree to." This statement best illustrates Gitman's breach of his fiduciary duty and duty of loyalty to the Plaintiffs. Gitman is telling the Court he would do nothing to protect the Plaintiff Companies from a potential misappropriation by the Plaintiffs Developers who are apparently "his team" and not the actual company and me to whom he has the fiduciary duty and duty of loyalty.

22. However, the NDAP Independent Contractor Agreement between NDAP and Bagaiev was a "boiler plate" company agreement, custom made for independent contractors and the very same agreement that Gitman signed when the company retained another NDAP developer named Alice Fritz. Gitman is just making up stories to attempt to misappropriate Plaintiffs' trade secrets and is using the Plaintiffs developers to assist.

23. In Paragraph 25, Defendant Gitman contends that his outside role with

CueConnect "had no negative impact on…CR LLC…" or his involvement with Plaintiff's other businesses. However, on numerous occasions, including on May 23, 2017, Gitman admitted he had little to no involvement in ChannelReply or its operations during that time when he told Bagaiev "After the CPK sale, I will be able to help CR more." **Exhibit O**. He also admitted in an email dated December 7, 2016 that he would not be of much help with the NDAP sale because he was leaving CueConnect. **Exhibit P**.

24. In Paragraph 26, Gitman's contention that I worked for ChargePass, "which seemed to focus on payment technology for the cannabis industry" is intended to be misleading and inflammatory. In fact, I did short term, part-time consulting work for ChargePass, a credit card processing solution, which is predominantly in taxicabs, in the form of helping the company with marketing campaigns, none of which involved cannabis. Gitman fails to mention that Cooper Square Ventures subleased office space from Frontier Payments, which owns ChargePass and our companies received benefits as a result of my consulting work, including perks related to our sublease. In any case, my consulting with ChargePass did not adversely affect Plaintiff Companies in any way.

25. In Paragraphs 27 and 28, Gitman falsely states to this Court that my present employer, Yotpo "is a direct competitor of CR LLC" when, in fact, its products have nothing to do with, and are not even remotely similar to ChannelReply's customer service messaging integration platform. Instead, as Gitman points out himself, it focuses on "reviews, ratings" for ecommerce and is a "marketing content solution." Clearly a company that helps websites generate reviews, ratings and marketing solutions is entirely different from ChannelReply's business which helps companies answer customer service messages by integrating messaging from eBay and Amazon. Gitman knows this and is

intentionally misleading the Court to paint me in a false light. Gitman also represents that he doesn't believe that I disclosed my work and ownership to my new company when in fact, contrary to Defendant Gitman's frequently unfounded suspicions, I absolutely did. Defendant Gitman's incorrect and unfounded suspicions or *beliefs* about what I did or did not tell others are of no consequence to this Court or my employer and no relevance to this litigation. (Emphasis added).

26. In Paragraph 29, Defendant Gitman goes on to assume that I am "*likely* to *inevitable* disclose CR LLC's confidential and/or proprietary information in connection with" my work with Yotpo. While Gitman's unfounded, suspicion-filled prophecies are also of no consequence to this Court, what is directly relevant is Gitman's admission that he and I possess knowledge about ChannelReply's "confidential and proprietary information". As already mentioned, and as Gitman knows, ChannelReply is running an entirely different and unrelated product than Yotpo. Gitman lies again by saying that my role with ChannelReply "is now limited to accounting and finance." In fact, I work on ChannelReply on a regular basis, speaking with vendors and customers and can and will provide substantial proof of the same to this Court upon request.

27. In Paragraph 30, Gitman says that he and I decided to give two of our ChannelReply developers equity in CR, LLC and "based on this decision, a new company was created – this was CR LLC." In fact, the opposite occurred. Defendant Gitman and I formed ChannelReply, LLC independently, and later discussed potentially granting the developers an equity stake in the future. As evidenced by our registration with the State of New York, ChannelReply, LLC was created in June of 2016. Nearly four months after its creation, Gitman and I discussed, and I notified the developers, in

writing, of a "plan to give" equity in the business, but also notified them that "I'm working with our attorney to get the paperwork in place. Right now it is a bit too expensive for us to proceed with a formal options plan and package".  Gitman later frustrated any future plan to grant equity by refusing to sign the ChannelReply LLC operating agreement.  Therefore, ChannelReply continues to be owned and operated by CSV and equity grants to the developers have not yet come to fruition as we had planned. (**Exhibit Q**).

28. In Paragraph 31, Gitman calls me "head of finance" for the companies, yet we never had designated roles in the CSV Operating Agreement or otherwise, and both played overlapping roles in all facets of company operations as co-managers. In fact, ample written correspondence over the course of the company operations can and does demonstrate that Gitman played just as integral of a role in the finances as myself. Gitman claims that I paid "CR LLC expenses through other bank accounts, including, without limitation, NDAP and CSV bank accounts", and that he believes this was to "create ambiguity" and "complexity to hide [hid] misuse of company funds." In fact, throughout his sworn Affidavit, while making continuous reference, Gitman provides zero proof of any misuse of company funds by me. His statements are nothing more than a distraction to mislead the Court. In contrast, I have provided ample proof of misappropriation, breach of his fiduciary duties to both me and the Plaintiff Companies, and the misappropriation and misuse of company funds by Gitman.

29. In addition, Gitman and I both decided, as co-managers, to use NDAP resources to fund the initial creation of ChannelReply until the company began to generate substantial revenue to fund its own operating expenses. Furthermore, NDAP is

owned by CSV, and these loaned funds were later paid back to NDAP when CSV began

to fund NDAP while we proceeded to sell it, after NDAP's online sales had shut down.

   30. Proof that Gitman had full knowledge of and participated in the

funding of ChannelReply with NDAP funds is evidenced in the fact that Gitman regularly

used NDAP's American Express Card to pay for software expenses related to the

operation of ChannelReply. Only Gitman has possession over his NDAP credit card, and

discovery in this case, would and will yield years of charges on Gitman's NDAP credit

card, made only by him, for the benefit of ChannelReply. Furthermore, in Paragraph 20,

Gitman admits that ChannelReply's developers were initially paid through NDAP's Bank

of America account until we switched them over to CSV's account, when ChannelReply

began generating revenue. These and other examples, demonstrate that Gitman

participated in the initial funding of ChannelReply through NDAP, funds that were later

loaned in the opposite direction, potentially cancelling each other out.

   31. In Paragraph 32, Defendant Gitman has the audacity to state that I "made no

contributions which contributed to CR LLC's growth in a material way." Gitman is again

lying to this Court. I have already presented evidence to this Court that I helped double

ChannelReply's sales in less than six months, while Gitman was sarcastically saying we

should call our company "Really going out of business" and abandoning the company to

go work full-time for CueConnect. I have always contributed materially to ChannelReply

and its growth, from building a customer base to forming the essential and critical

relationships with the vendors that made ChannelReply a viable service. Without

customers and vendors, the software would not have practical application or monthly

revenue. Furthermore, I have helped integrate ChannelReply with some of the largest

messaging platforms in the world, and was even granted the prestigious honor of speaking at Salesforce's Dreamforce conference last October which is attended by thousands of IT professionals. From customer acquisition to brand development, partnerships and marketing, customer support along with ideas to build upon and develop our technology and new interfaces, I have been devoted to ChannelReply's development and responsible for a large part of ChannelReply's success, along with the help of Plaintiffs' developers, who I had a great working relationship with until Gitman tried to steal ChannelReply for himself. Gitman, all but admits his conspiracy with Bagaiev in his references to he and Bagaiev as the self-proclaimed creators of ChannelReply. He leaves out that ChannelReply was created for Plaintiff Companies, paid for by Plaintiff Companies, funded by Plaintiff Companies, and using Plaintiff's Developers, resources and backing, all while Gitman was a co-manager and member of Plaintiff Companies.

32. In Paragraph 33, Defendant Gitman again misrepresents by saying, "at all times since its inception, I have actively worked on CR LLC." He later admitted in his own Affidavit that he was only available on an "as needed" basis after the basic technology was created and operational and even told employees he would help with CR after the NDAP sale. **Exhibit O**.

33. In Paragraph 34, Defendant Gitman continues to make unsupported allegations against me, claiming I "built complicated accounting systems," and that I refused to confirm books and accountings despite him repeatedly requesting this. He has presented zero proof of this and it is all false. Again, as co-manager, Gitman has had full access to all company Quickbooks accounts, the company accounting firm, company credit card statements and bank accounts. There were no complicated accounting systems, it was the

15

opposite. We had Quickbooks which tracked everything, but we also had just two company bank accounts and one company credit card. It would be quite simple for Gitman to retrieve our monthly bank account and credit card statements and see all incoming funds and outgoing payments. Yet, Gitman has never bothered once to do this.

34. In fact it is Defendant Gitman who has repeatedly complicated our accounting matters by hiring multiple bookkeepers to reconcile, re-reconcile and re-reconcile our books over the years, leading to botched Quickbooks, which our company accountant has to fix in order to file our taxes. The latest example is when Gitman once again developed his "suspicions" and demanded we hire yet another bookkeeper. I, of course, consented to anyone Gitman wanted in order to appease his "suspicions." Gitman went through several potential candidates, even consulting with and hiring and firing a few, wasting our company money, before settling on a bookkeeper based in the Philippines named Mary Faith Anden, whom he found online. I did not want to consent to using a foreign bookkeeper as her Upwork profile indicated she had been educated outside of the United States, and did not provide any evidence that she was familiar with U.S. accounting principles or tax laws. However, Gitman demanded it. To appease him, I agreed, only because I did not want trouble and knew that our company accountant, Joel Liebman, would have final say over our books and tax returns.

35. As our longtime company accountant reiterated to both Gitman and I during a recent conference call, Mary Faith Anden's ("Anden") bookkeeping was "wholly inadequate." In fact, her bookkeeping was a botched reconciliation of Quickbooks, and she did not even corroborate her filings with our bank statements dating back to 2011. I later found out from another company that both Gitman and I invested in together, that

Gitman also pressured that company into hiring this same bookkeeper and she did tremendous damage to their company books as well. Gitman's conduct and misplaced distrust is damaging. **Exhibit R**.

36. Based on Anden's deficient accounting, Gitman developed more unfounded, undocumented and flat out false "suspicions" that I apparently may have taken money from the company, which I had not, and decided *he* would in fact, steal company funds, without my authorization or any notice to me, which he proceeded to do on May 27, 2017. (Emphasis added).

37. In Paragraph 36, Defendant Gitman claims that Joel Liebman is my personal accountant, but fails to mention that he too used Mr. Liebman for both professional and personal matters. Gitman even consulted Mr. Liebman on family matters, as Mr. Liebman expressed in a conference call attended by both me and Gitman. Furthermore, despite Gitman recently saying to this Court that Mr. Liebman should not "have any oversight", it was Gitman, himself, who demanded, in an email to me, that Mr. Liebman perform an independent audit before Gitman would agree to release the money that he had stolen from CSV's bank account. **Exhibit S**.

38. In Paragraph 37, Defendant Gitman attaches an exhibit with correspondence from Anden detailing her attempts to speak with me. First, it is important to note that she is located in the Philippines, which has a twelve hour time difference. Second, I had a call scheduled with her, which she never appeared upon, and finally, on April 17, 2017, Gitman and I spoke with our company accountant Joel Liebman, and we agreed that Mr. Liebman would take over the accounting.

39. In Paragraph 38, Defendant Gitman states that CSV paid out "tens of thousands in

healthcare expenses" to me and he "did not receive an equivalent distribution." I only

opted to receive healthcare benefits from the company for a limited time. Gitman had the

full option of receiving healthcare benefits and chose not to take them because healthcare

was available to him through his wife's job. Gitman keeps positing these benefits as

distributions when they are in fact benefits and should be treated as such. In kind, they

provided a tax deduction to the company, which Gitman benefited from in the form of

reduced taxes.

40. Regardless, my healthcare benefits have no relevance to this litigation.

41. Paragraph 39 is also entirely irrelevant. Gitman lies to the Court and

contradicts himself by trying to give the impression that we were not paid equally. In

fact, in Paragraph 9 of his same affidavit, Gitman states the opposite, "we took equal

distributions and expenses."

42. As I previously mentioned in my original Affidavit to this Court, the only time I

took an additional distribution was when I received Five Thousand Dollars per month for

two months, or a total of Ten Thousand Dollars which was all I received for six months'

worth of work, and something Gitman agreed to on two separate occasions. I took this

distribution, with his full agreement, around the time that Gitman went to work full-time

for CueConnect and I, alone, was managing ChannelReply, CSV and NDAP, full-time

without his assistance. As previously mentioned and supported by me with evidence, I

spoke with Gitman about this and he agreed to it, only to later deny it. However, during

this time, Gitman was also running his car, and other personal expenses through the

business despite working elsewhere, and that was also one of the reasons why he agreed

to let me be compensated for my work, since I was not receiving a salary at that time and needed to provide for my family while working on the NDAP sale. **Exhibit T**.

43. In Paragraph 40, Gitman again lies by saying I was "on the sidelines for everything", while he built the technology with Bagaiev. Again, this self-serving statement is false, as I not only coordinated with the software development but built all partnerships, customer relationships, website illustrations and video demonstrations plus other marketing materials, branding, community networking, and made countless other practical contributions to make this service a business. Gitman conveniently omits that he took these actions while a co-manager and member of Plaintiff Companies and for the benefit of Plaintiff Companies.

44. In Paragraph 41, Defendant Gitman admits that in February, 2016 he had "less involvement in CR LLC development," and that the team only reached out to him "as needed" because the product was fully developed and operational. This illustrates several things: one, Gitman played a limited to no role beyond the technology in the operation of ChannelReply, and now that the technology is "fully developed and operational," he is not required for the day-to-day operations of running the ChannelReply business. Two, Gitman is indeed a fabricator as in Paragraph 33 he claimed that "at all times since its inception" he had "actively worked on CR LLC," only to contradict himself yet again by indicating that from February, 2016 up until he arrived on scene to try to steal the company, he did not play an active role but instead was passive and was contacted by Plaintiffs' Developers on an "as needed" basis.

45. In Paragraph 44, right after indicating his limited role in assisting with

ChannelReply from February 2016 onward, Gitman acknowledges my active role relating to ChannelReply by admitting that I was integral in integrating our service into Desk.com to diversify our partnerships. His attempts at trying to make himself sound better than me not only fall flat but whether a desk.com or a Zendesk integration added more immediate short term revenue vs. long-term revenue and customer acquisition really is a business debate for another day that adds nothing to the relevance of the subject matter of this litigation and wastes this Court's time. Similarly, Gitman's claims in Paragraph 45 is nothing more than a fact dispute. The only difference is I produced a revenue spreadsheet showing how the revenues doubled over my time when I alone ran the company, and Gitman, as is obvious, has produced nothing.

46. In paragraph 47, Gitman again lies, as screenshots evidence that Plaintiffs' developer Bagaiev possessed his subcontractor agreement with NDAP ("Bagaiev Agreement"), which he signed, but which is being withheld by Gitman. The screenshots even evidence Bagaiev on a call with Gitman while reviewing his Agreement and comparing it to the new competing Channel Reply, Inc. contract that Gitman offered him, along with stock options, help obtaining a visa and co-founder status to try and unlawfully solicit and lure him away from CSV and NDAP  (previously annexed to my Affidavit in Support of the June 8 OSC at Exhibit 80) annexed hereto as **Exhibit U.** Importantly, Gitman admits he did nothing to follow up with Bagaiev or Glukharev to sign any agreements protecting the company's "intellectual property" even though Gitman was on the development team with these individuals and knew that the company owned valuable intellectual property.

47. In fact, the exact provision that Bagaiev was viewing in Bagaiev Agreement, was

the provision pertaining to confidentiality. In the work order section of the Bagaiev

Agreement, the scope of services section makes it clear that Bagaiev was hired to work

on NDAP and ChannelReply. NDAP  (previously annexed to my Affidavit in Support of

the June 8 OSC at Exhibit 7(d)).  In addition to being bound by NDAP's confidentiality

and work for hire clauses in the Bagaiev Agreement for his work on Channel Reply and

NDAP, Bagaiev is also bound by Upwork's terms of services, which are designed to

inure to the benefit of the client contracting freelance developers through the Upwork

service. Bagaiev was originally hired, as Gitman himself admits to in Paragraph 19,

through Upwork which is an online website used to hire freelance contractors. Upwork

has its own terms of service, which Bagaiev agreed to be bound by when he was

contracted by CSV and NDAP through Upwork. Those terms of services, in part, grant

all rights in all work product to the Upwork client, in this case NDAP and CSV.

48. The Upwork Terms of Service reads in part,

"Client reserves all other rights and interest, including, without limitation, all
Intellectual Property Rights, in and to the Client Materials. Upon completion or
termination of the Service Contract, or upon Client's written request, Freelancer
will immediately return all Client Materials to Client and further agrees to destroy
all copies of Client Materials and Deliverables Upon Freelancer's receipt of full
payment from Client, the Work Product, including without limitation all
Intellectual Property Rights in the Work Product, will be the sole and exclusive
property of Client, and Client will be deemed to be the author thereof. If
Freelancer has any Intellectual Property Rights to the Work Product that are not
owned by Client upon Freelancer's receipt of payment from Client, Freelancer
hereby automatically irrevocably assigns to Client all right, title and interest
worldwide in and to such Intellectual Property Rights. Except as set forth above,
Freelancer retains no rights to use, and will not challenge the validity of Client's
ownership in, such Intellectual Property Rights." **Exhibit V.**

49. As Gitman admits in Paragraph 19 of his Affidavit in Opposition, he hired

Bagaiev on March 15, 2012, specifically to help CSV develop the "script", or, in other

words, the code that would form the foundation for the ChannelReply service. For the

next two and one-half years, Bagaiev worked on ChannelReply under the Terms of Service of Upwork as a work for hire, bound by his obligation that all work product including "without limitation all intellectual property rights in the work product," would be the "sole and exclusive property of Client," NDAP and CSV. Then, in October of 2014, Gitman sent out an email welcoming Bagaev to the CSV team, again reinforcing that he was hired to work for Plaintiff, CSV. Gitman states, Bagaiev "has been working with us for 2 years on ChannelReply (Zendesk eBay integration). K will continue to develop ChannelReply and help us grow and optimize our catalogs." Gitman signs his name to the email, with the signature line of Cooper Square Ventures, as co-managing member. **Exhibit W.**

50. This email not only proves that ChannelReply's code was created and developed for the first two years with Bagaiev having a clear understanding that it was a proprietary work product wholly-owned by and created for CSV, but Bagaiev later signed an additional employment agreement with NDAP and ChannelReply, again agreeing to be an independent contractor with no right to the ChannelReply work product and code and further agreed to be bound by the Plaintiff Companies' confidentiality provisions. (the Bagaev NDAP Agreement was previously annexed to my Affidavit in Support of the June 8 OSC at Exhibit 7(d)).

51. Gitman's argument in Paragraph 48 that Bagaiev and Glukharev are permitted as subcontractors and/or consultants to usurp ChannelReply's "source code, customer data etc. on any future projects regardless of whether they pertain to CSV or any of CSV's entities" is a ruse designed to try to aid him in his scheme to have the Plaintiffs' Developers help him unlawfully convert the Plaintiffs' trade secrets outside of

the reach of this Court. If Gitman cannot succeed, or is permanently restrained from stealing the Plaintiffs' proprietary code and its customers, then it appears that Gitman's argument is merely alluding to another ambition - to have the Plaintiffs Developers do it for him, since they are located in Eastern Europe. Not only do the Plaintiffs Developers have no right to steal the Plaintiff's valuable intellectual property and trade secrets, including the Plaintiffs' customers and code which they were paid as a work for hire to develop exclusively for the Plaintiffs' as their intellectual property , but this suggestion only reinforces that Gitman is not acting in the best interests of the Company or for the protection of the Company, has unlawful motives which appear clear, and is wholly unfit to reassume the role of co-manager in the future. I beg this Court to impose sanctions and enter additional restraints to protect Plaintiffs from Gitman's clear agenda which upon reading his Affidavit is abundantly clear; that is, to steal ChannelReply or allow the Plaintiffs' Developers to do so for their and his benefit.

52. In Paragraph 49, Gitman again disavows his managerial responsibilities, by flat out stating that he intends to compete with the very company that he was charged with protecting and managing. He states, "I also have no agreement that restricts my ability to utilize source code or customer data. Similarly there is no agreement which restricts my ability to compete against CSV or any of the related agreement." Gitman seems to have gotten himself stuck in a quagmire of contradictory legal arguments. First, defendant Gitman claims that he is a manager of CSV. In Paragraph 24 he claims he remains the "CTO of CSV." He admits in Paragraph 3 that he understands that his "dealings concerning CSV were covered by the operating agreement," but then he states his flat out intention to steal CSV's code and customers and use them to compete with CSV in a

23

newly formed company called Channel Reply, Inc. This mal-intentioned ambition is wholly incompatible with Gitman's fiduciary duties with regards to CSV. In fact, the CSV Operating Agreement which he admits to signing and operating under since 2011, contains a Confidentiality clause in Article 12.2 which unquestionably binds Gitman, saying, he must not "communicate, divulge, disclose, disseminate or otherwise reveal, to any person or entity, or use for any purpose whatsoever any Confidential Information, except as may be necessary in the course of performing authorized services for the Company…" **Exhibit H.** Further, Gitman is under an obligation to "take all necessary steps and precautions to protect any Confidential Information…" The "rights and remedies" of the Confidentiality clause in the CSV Operating Agreement are provided "in addition to the rights, remedies and protections afforded to the Company under any applicable law, statute or regulation." Subparagraph (b) of Article 12.2 defines "Confidential Information" as "all information or data relating to the business and affairs of the Company" including, without limitation, "any of the Company's processes, data, designs" and "computer programs, information of or relating to suppliers or customers" and "any other information that may be considered to be proprietary to or a trade secret of the Company," among other specificities. **Exhibit H.**

53. Gitman incorrectly relies on the "competitive undertakings" clause in Article 12.1 of the CSV Operating Agreement directly preceding the Confidentiality clause, to mistakenly justify his ambition to misappropriate the Plaintiff Companies' Confidential Information for the benefit of his competing company, Defendant, Channel Reply Inc. However, he fails to take note of the nuance which begins the competitive undertakings clause and that is it begins with the phrase, "except as otherwise provided herein." This

preemptive phrase relegates the competitive undertakings clause to a subordinate role as it relates to the succeeding Confidentiality clause. Thus, the competitive undertakings clause is not meant to compete with or undermine Gitman's superior obligations to protect and manage the company, act in its best interests and not violate the Confidentiality clause.

54. In Paragraph 50, Gitman states writes, it was "untenable for me to continue to devote my full-time and attention to that business" so "I created a new company called Channel Reply, Inc." Gitman blames me for him being unable to devote his time and attention to our company, yet he is somehow able to magically devote his full-time and attention to his new unlawful competing company CR Inc. Gitman states that his inability to focus his time and attention on our company of which he is a managing member was due to my "actions" that were according to him "harming the business," yet he provides no proof whatsoever of any actions that I took that resulted in harm to our jointly owned company. That is, because no such proof exists.

55. In Paragraph 51, Gitman states that the developers, "expressed to" him "they did not feel comfortable working directly" for me, yet he provides no proof of this and I always had a wonderful working relationship with both developers, particularly when Defendant Gitman was working full-time for CueConnect. We never had any issues until Gitman tried to steal ChannelReply and began seducing the developers with promises of ownership in his new company, among other bribes. Gitman's actions are a willful and deliberate breach of his fiduciary duty to both me and the Plaintiff Companies and I ask be dealt with harshly by this Court.

56. In paragraphs 53-55, Gitman claims I could not find a buyer for NDAP

and that Defendant Jeremy Falk ("Falk") secured a letter of intent in January 2017. Again this is false. I have numerous emails documenting that I in fact reached out to and procured a purchaser for NDAP on my own in February, 2016, and only around six months later, in August of 2016, did I introduce Falk to said purchaser to act as a consultant to negotiate deal terms, after the purchaser had already reviewed the technology and assets of NDAP. Falk did not procure a letter of intent until March, 2017, and only presented it to me with the date listed as one day after he and Gitman had pressured me into signing a fraudulent consulting agreement which falsely represented the extent of Falk's involvement and included an uncustomary and largely inflated fee. Again, Gitman provides no proof to support any of his false claims, because there is none. Gitman's reference to the NDAP deal and Falk's involvement is completely irrelevant background material that has little to do with the emergent application before this Court.

57. Gitman's claims in Paragraph 56 are again unsupported and false.

58. In Paragraph 58, Gitman claims the "proposed NDAP asset purchase is of the technology assets, not the branding, marketing or customer base," again this is false. As per the written letter of intent from the purchaser dated March 28, 2017, which I have omitted to protect the confidentiality of the sale but may produce upon request, the purchaser "would acquire all technology assets…" plus "additionally, we would acquire all marketing and intellectual assets associated with the company, including but not limited to, customer files, email lists" as well as "logos, taglines, inventory files, vendor feeds, product feeds, and product catalogs" among other things. Thus, Gitman again lies to this Court when he says the purchase did not include "branding, marketing or customer

base." Again, his lack of honesty and perhaps lack of knowledge with regard to the details of the Plaintiff Companies' operations coupled with his desire to steal the Plaintiff Companies' assets and use them to unfairly compete with Plaintiffs, clearly demonstrates that Gitman is unfit to manage CSV or NDAP.

59. In Paragraph 61, Defendant Gitman again lies to this Court, saying that I had negotiated an $80,000 commitment to the broker, when emails evidence that Gitman requested that Falk take $80,000, and that he was happy that I had negotiated our approximately $800,000 company debt down to $100,000 so that both he and I could receive a share of the profits from the sale of NDAP. In fact, it was Gitman's insistence that Falk be paid $110,000, instead of $80,000, which has delayed the consummation of the NDAP transaction. It is only because of this litigation that Gitman has conceded to the $80,000 payment to Falk.

60. In Paragraph 62, Gitman again lies to this Court by saying I was looking for ways to "enhance" my share of the NDAP sale, when, in fact, it was Gitman who began demanding more than the 50% we were both guaranteed from our operating agreement. On one occasion, just to make the deal happen, I even offered to give Gitman almost 2/3rds of the profit percentages from the sale, but it still was not good enough to satisfy Gitman. He suggested that I "owed" the company money but provided no proof of the same, and then said he would throw me about 10% of the sale price because "of our friendship" over the years. In another attempt to deprive me of any reasonable share of my own company, Gitman and Falk offered me less than 20% of the NDAP sale price and then created a chargeback scenario whereby Gitman could work post-sale for the purchaser of NDAP, and charge his post-sale hours working for the purchaser as a

consultant in the transition, against my profit share until it was down to nothing, despite him being promised a generous hourly salary by the purchaser for additional work. This is all documented in lengthy email chains, which I can provide to this Court upon request. In contrast, Gitman provides zero proof of his allegations yet again.

61. In Paragraph 63, Gitman claims he suggested moving forward with the NDAP deal, and putting all the money in escrow so that a final accounting could be completed. In fact, Gitman unilaterally siphoned all of our company money from CSV and deliberately locked me out of ChannelReply in what felt to me like an extortion attempt, whereby he was holding one of our company's hostage until I agreed to give up my profit percentage on the sale of another. This is all but admitted in Gitman's own Affidavit. Any "suggestions" Gitman says he made were actually demands that he made in conjunction with threats and intimidation, while holding me and our company at his mercy. I am the one who reached out to our company attorney, Jeffrey Rothman, and offered up his third-party suggestion that Gitman put the money back into CSV's bank account, and that the NDAP net sale proceeds go into an escrow account until an accounting was performed, and thereafter, a mediation or arbitration. I indicated that the prevailing party in the accounting and arbitration or mediation should be entitled to recover their attorney's fees. However, Gitman refused to do any of this. Again, this is documented in lengthy emails, which I can provide upon request.

62. In Paragraphs 64-70, Gitman merely admits all of his unlawful and unwarranted actions. First he admits that it was his own concerns or "suspicions" that prompted him to withdraw all of Plaintiffs 'funds and convert them to an account in his individual name, and later to his unlawful competing company's name CR Inc. Yet despite reiterating that

he had concerns, Gitman provides this Court with no proof whatsoever that any of his concerns had any foundation in reality. Gitman has provided no proof because there is no proof of his allegations premised on his suspicions. He again claims I refused to provide him with an accounting of the books, when in fact he has always had access to the books, bank statements and company accountant. I approved his hiring of Mary Faith Anden who also was given access to our books. Gitman states he was "concerned" I had "taken distributions without informing" him and that's why he was justified in stealing our company's funds and locking me out of all company accounts. He claims that I "hid revenue" but provides no proof that I took it or where it is hidden, because I never improperly took or hid any of Plaintiffs' revenue. All revenue that our companies earned was used for the funding of and the benefit of our companies' operations and Gitman was apprised of or had the resources to apprise himself of this. As mentioned earlier, he played a large role in paying for our software services and the like. Unfortunately for Gitman, our world would be chaotic if everyone took matter into their own hands and did what they felt was right based on their "suspicions."

63. In reality, Gitman is simply trying to mask and use these suspicions as a disguised rationale for taking his unlawful actions which were taken exclusively for the purpose of tanking ChannelReply so he could pursue the valuable business opportunity on his own and with the Plaintiffs' Developers.

64. In Paragraph 66, Gitman admits that his personal attorney Umar Farooq, Esq. not only helped him, and advised him to steal and retain CSV's capital, but also assisted him in unlawfully establishing the competing company Channel Reply, Inc. and converting and misappropriating CSV's assets and proprietary intellectual property, as well as

inducing the CSV employees to join his new unlawful company by "incentivizing" them with stock options. In Paragraph 69, Gitman again lies and is inconsistent when he says he is not aware of any "trade secret information from CR LLC that is being utilized in CR Inc." given that he already stated he believes he and the employees have the right to use CR LLC's code and customers and has previously admitted in his Affidavit that ChannelReply contains confidential and proprietary intellectual property. CR, Inc. is conducting the exact same business as ChannelReply, using ChannelReply's code, accounts, emails, data and customers, and is misappropriating all of ChannelReply's revenue. This is obvious as this Court ordered that all such revenue be returned to Plaintiffs from CR, Inc. and Gitman said he would return it.

65. In Paragraph 67, Gitman lies to this Court and uses the sale of NDAP as a creative excuse for his unlawful transfer of Plaintiffs' Accounts away from Plaintiffs and me and to CR, Inc. There was no need to transfer these accounts to CR, Inc. for the potential sale of NDAP, which as of this date does not even have a signed contact. Certainly, there was no basis to make such a transfer even if that were the reason without notifying me of the transfer. His statement is pure fabrication.

66. In Paragraph 70, Gitman contends he has been working to "maintain the employment of our development team..." Gitman is incredibly disingenuous with this Court. Gitman contends he is the CTO, manager and 50% member of the Plaintiff Companies. At the same time, and according to Gitman, he has done nothing to secure the development teams' commitment to sign agreements to protect ChannelReply's trade secrets even though he is part of the development team. Worse yet, Gitman actually said that Plaintiff's Developers should be able to use ChannelReply's source code and have no

restrictions because there is no "written agreement" and that Gitman should be able to as well. (Gitman Aff in Opp at para. 22). Gitman's actions are egregious and warrant sanctions, fines and restraints.

67. In Paragraphs 71 and 72, Gitman denies hiding his plans to create Channel Reply Inc. from me despite the fact that he had locked me out of all company accounts and our Slack service which I use to communicate with Plaintiffs' Developers. While he again lies and says that he was discussing future plans with Bagaiev for CR LLC, in fact, screenshots show that he was discussing hiring additional developers and employees to grow his new unlawful company Channel Reply Inc.

68. In paragraph 73, Gitman suggests that Bagaiev would only meet with him and not me. Why then did tell Bagaev to "block me", remove me from Skype and take other actions to distance me from the Plaintiffs' Developers. A review of the June 8, 2017 screenshot I took from the TimeDoctor account evidences that the Plaintiff Developers were looking for a peaceful resolution and it was Gitman who told them he will "never" work with me again. (Previously submitted in connection with my Affidavit in Support of the OSC dated June 16, 2017 at Exhibit I).

69. In Paragraph 74, Gitman again lies to this Court by saying I never had an account with TimeDoctor. In fact, both he and I had an account with separate logins under NDAP, until Gitman decided to create a new ChannelReply account for Time Doctor, and only create a login for himself. He told me that to save money we would both share one company login, and he stored the shared password in our encrypted company database, 1Password. The only reason I was able to access TimeDoctor after he locked

me out of 1Password (which Gitman admitted to in his Affidavit) was because I had luckily saved the password on my computer the last time I logged in.

70. In Paragraphs 78 and 79, Gitman again lies to this Court, this time blaming the deletion of the Plaintiffs' Developers TimeDoctor accounts on the Plaintiffs' Developers, when Gitman wrote in his letter to your Honor that he was the one who recommended to the Plaintiffs' Developers to stop using TimeDoctor. (Previously submitted in connection with my Affidavit in Support of the OSC dated June 16, 2017 at Exhibit Q). Furthermore, a letter I acquired from the co-founder of Time Doctor confirms that only Defendant Gitman as the account owner would have the ability to delete the Plaintiffs' Developers' TimeDoctor accounts, and therefore, their tracked work data from Time Doctor, and not the employees themselves. (Previously submitted in connection with my Affidavit in Support of the OSC dated June 16, 2017 at Exhibit E). Incredibly, Gitman takes the position that the Plaintiffs' Developers told him there was unauthorized access on June 9, 2017, the day after I filed the Order to Show Cause including my Affidavit that stated I was able to uncover Gitman's fraud because he forgot to disconnect me from TimeDoctor. Then, while my attorneys were before Judge Ramos, I obtained a screenshot of a conversation between Gitman and Bagaiev where Gitman indicated that he did not know how I was learning the details of his unlawful conduct. (Previously submitted in connection with my Affidavit in Support of the OSC dated June 16, 2017 at Exhibit I). Gitman plays a game with this Court and says that the TimeDoctor account "may have" been deleted because of the "security breach". There was no security breach as Gitman knew it was me on the TimeDoctor account and wanted to eliminate my only means of discovering his fraudulent actions.

71. In Paragraph 80, Gitman again reiterates how his unfounded concerns prompted him to steal company funds, and lock me out of my own company, saying "I grew increasingly worried that Dardashtian had misappropriated company funds." Yet with no proof whatsoever that I misappropriated anything, and all of the opportunity to discover it, Gitman unilaterally decided the solution to his suspicions would be for him to go, and in fact, misappropriate company funds and remove me from my own company so he could start his own competing company with our company's trade secrets and assets. This is a case of Gitman self-fulfilling his own warped prophecies.

72. In Paragraphs 80-83, Gitman merely admits that he improperly stole Plaintiff's funds with the help of his seemingly misguided, or perhaps unethical attorney, and then violated the Court's TRO by again withdrawing more funds to pay such unethical attorney. Gitman neglects to mention that he violated the TRO on two occasions, only bringing up one instance, and forsaking to address his payment to his company, Defendant, Dalva Ventures, which was also restrained from withdrawing funds by the June 8 OSC. Gitman also says he paid his counsel Farooq with company funds in connection with the NDAP sale even though Farooq is not our company attorney and I expressly communicated in writing to both Farooq and Gitman that I did not approve any payments to Farooq from company funds, since he was engaged by Gitman for personal representation when he unsuccessfully tried to whittle down my profit percentage related to the sale. So, on the one hand, Gitman says Farooq represented NDAP in its sale, and on the other hand, Gitman said Farooq was his personal attorney for the within matter. Farooq appeared at the time of the initial OSC on June 8th. Farooq was in a conflict at the time he appeared.

73. In Paragraph 84, Gitman blames me for holding up the sale of NDAP when in fact, it has been his irresponsible, deliberate and haphazard actions that have and continue to hold up the sale. If Gitman had fairly agreed to split the profits of the sale with me 50/50 as per our operating agreement, or even agreed to any of the generous offers I made to him agreeing to give him as much as a 65/35 split, which I was not obliged to do, then we would have closed the NDAP deal by now. Instead, Gitman's greed has cost all of us more than we will likely make from the sale, due to attorney's fees to stop Gitman from stealing ChannelReply. I am asking the Court to charge Gitman for all of my and Plaintiff Companies' attorney's fees and any damages resulting from the NDAP transaction, all of which are directly attributable to Gitman's actions.

74. In Paragraph 86, Gitman admits that I could not access my Bank of America account because of "login issues" which he claims he had nothing to do with, but states that they are "easily corrected through Bank of America customer support."

75. In Paragraphs 87, 88 and 89, Gitman again lies about interfering with my access to Plaintiffs' company accounts, while at the same time admitting that he was "transferring non-NDAP assets away from NDAPs accounts including G Suite." I had no prior knowledge of such transfers, nor did I authorize any of them, and they coincidentally all occurred on the same day that Gitman recklessly withdrew all of our CSV funds from the bank, transferred them to his name leaving no money in the Plaintiffs' bank account, and sent me a threatening letter that I would be "rational and prudent" to sign the NDAP purchase agreement on his terms (Previously submitted in connection with my Affidavit in Support of the OSC dated June 8, 2017 at Exhibit 48).

76. In Paragraph 90, Gitman again lies as I have a screenshot from TimeDoctor

showing him admitting to "migrating" CR's email accounts to a new G Suite for Channel Reply, Inc. and admitting to changing NDAP's passwords. **Exhibit X.**

77. In Paragraph 91, Gitman admits to "monitoring" my emails.

78. In Paragraph 92, Gitman's unfounded and unsupported "suspicions" again resurface as his justification for unlawfully suspending my 1Password account which contained all company passwords for nearly two dozen accounts because he wanted "to protect the company" and "following a review of applicable operating agreements". His words to this Court are a gross fabrication and make absolutely no sense.

79. In Paragraph 93, Gitman lies again by saying that his face on my account was only viewable to me, when it fact it was viewable to anyone with a Gmail account who received emails from me in the past, and this is easily confirmable via Google. Gitman states it was caused by a "known issue from the G Suite migration" thereby admitting that he did migrate Plaintiffs' account information to a new G Suite, despite just denying doing so in Paragraph 90 where he says, "I did not move company data from NDAP to a new G Suite account."

80. In Paragraph 94, Gitman admits to reading and "monitoring" my business emails, neglecting to mention that he also unlawfully downloaded my personal financial tax and investment records, as evidenced in my original affidavit. He contends that I am subject to such an intrusion as "an employee" of the company. However, I am an equal co-manager of the company. Gitman is not in a superior position to me in his managerial role, and does not get all consuming power to secretly control and monitor my emails yet his remain confidential and within his control as well. He claims I "routinely engaged in

e-mail monitoring" yet again provides no proof of this because it is false. I have never accessed nor do I have access to his company emails.

81. In Paragraph 95, Gitman admits that he stole my business email, Michael@channelreply.com, and migrated it to his new unlawful G Suite for Channel Reply, Inc. and therefore, I "did not have access to send or receive emails from May 30, 2017 when the G Suite migration started until June 14, 2017." However, as if it is a consolation, Gitman then says that once he completed his unlawful migration of my personal company business email bearing my name to his unlawful Channel Reply, Inc. G Suite, he "Forwarded" me emails so that I could view them but not login to my own email account and reply or receive emails without Gitman screening them first. What Gitman omits from this web of lies is that he was served with the OSC on June 8, 2017 and was not permitted to undertake any migration on June 14, 2017. He simply willfully and deliberately violated this Court's Order. Gitman is attempting to orchestrate a fraud on this Court by suggesting that he necessarily took these actions on June 14, 2017 in preparation of the NDAP sale, when the contract was and still is not signed, and despite his having been served with the June 8, OSC preventing these exact actions from occurring. Gitman's statements are incredulous.

82. In Paragraph 96, Defendant Gitman brazenly admits converting company accounts to Channel Reply, Inc., and misappropriating company funds to his new unlawful company, all without my knowledge or authorization. He gratuitously says that I have access to them as of June 18, 2017 (10 days after the Court-ordered deadline to restore my access), but many of the accounts he has restored are not in the same condition as they were prior to his removal, the content, ownership names and even

36

structure of such accounts has been changed on numerous occasions. Gitman has no regard for this Court's orders or for my rights as a co-manager and 50% owner of the Plaintiff Companies.

83. In Paragraph 97, Gitman says he founded the new unlawful Channel Reply Inc. and planned to make me a "co-founder" and grant me an "equity interest." In a rare moment, Gitman doesn't flat out lie, in fact he did plan to offer me an equity interest of 5% in his new unlawful company which he had hoped would house the Plaintiffs' Developers, the Plaintiff's ChannelReply code, Plaintiff's customers, and all of Plaintiffs' assets of a company that I presently own 50/50 with him, and that somehow I would accept his "take it or leave it" offer of 5% and forego my 50% that I already own. However, if I did not choose to accept his illogical offer, he told the developer Bagaiev that my 5% would revert to Bagaiev. Bagaiev expressed his curiosity over why Gitman thought that I would ever accept such an offer and Gitman said because it was "fair and generous." (Previously submitted in connection with my Affidavit in Support of the OSC dated June 8, 2017 at Exhibit 83).

84. In Paragraph 98, Gitman lies again, and says he never misappropriated intellectual property or employees and there was "no improper solicitation" despite my providing screenshots of him offering our Plaintiffs' software developers stock options, assistance with a visa, co-founder status and other perks for joining Channel Reply, Inc. (Previously submitted in connection with my Affidavit in Support of the OSC dated June 8, 2017 at Exhibit 16). Gitman claims "there were no other employees besides myself and Dardashtian of CR LLC", when I have provided ample proof that he presented both of Plaintiffs' Developers with stock plans and employment agreements.

37

85. In paragraphs 99 and 100, Gitman lies about my access to among others, company payment portals which I still cannot access, and essentially threatens that I may lose access to certain accounts if the NDAP sale occurs. However, it is not up to Gitman to decide how accounts are transferred with the NDAP sale. This is something that Company management should work on to provide a transition that retains CSV's company accounts and data.

86. In Paragraph 101, Gitman admits to unlawfully transferring to Defendant Channel Reply, Inc., CSV's payment accounts which are directly responsible for receiving and depositing Plaintiffs' customers' receivables every month into CSV's bank account. Gitman further admits to deleting CSV's vital payment accounts. He boldly states they "no longer exist", but that he has provided me with access to his new unlawful company CR, Inc.'s accounts. I do not accept this attempt by Gitman to misappropriate Plaintiffs' customer receivables belonging to CSV to his new unlawful company CR, Inc. Gitman's actions are egregious and require swift intervention by this Court.

87. In Paragraph 104, Gitman appears to admit that he may have deleted some of Plaintiffs' company accounts, including data that cannot be restored, and could be lost forever. This reckless and irresponsible action has not only caused irreparable harm to me and the company, but is also creating chaos for company operations and entirely frustrates the purposes of this Court's June 8 and 9 OSC which was to grant me and the Plaintiffs relief by restoring me and Plaintiff companies to our positions before he acted on his "suspicions" to the detriment of all Plaintiffs. Gitman still has not provided a shred of proof to support any of his concerns, suspicions or worries, and instead created the very circumstances he falsely accused me of as a basis to steal ChannelReply. If Gitman

deleted Plaintiffs' company accounts beyond repair, this is further evidence that he must not resume a managerial role with any of the Plaintiffs' companies. The representation contained in this paragraph made on June 19, 2017 by Gitman is false as I was not provided with access to all of Plaintiffs' accounts until this Court at the time of the June 19, 2017 conference, dictated to Gitman that he must comply and restore my access or face possible serious consequences and still things are not as they were and may never be as a result of Gitman's actions. Evidence of Gitman's lie is that on June 21, 2017 Gitman is still attempting to restore my access to Plaintiffs' accounts. **Exhibits B,C,D and E.**

88. In Paragraph 105, Gitman lies when he says he did not tell the Plaintiffs Developers lies about me. In fact, screenshots show him saying that I was running a "pyramid scheme" when I was not and he has provided no proof of such, among other disparaging comments he made about me to employees, including saying I am a "bully," when I am merely trying to protect the Plaintiffs Companies, and my interest in same, from Gitman's bullying tactics. (Previously submitted in connection with my Affidavit in Support of the OSC dated June 8, 2017 at <u>Exhibits 73 and 74</u>).

89. In Paragraph 107, Gitman again lies by saying CSV has no customers, when in fact CSV owns and operates ChannelReply which services more than two hundred (200) worldwide customers who use and rely upon ChannelReply to service their millions of customers. Again, Gitman justifies his misappropriation of Plaintiffs' company funds by saying he was keeping those funds "safe from Dardashtian's misappropriation," of which he has provided no evidence. Gitman goes on to claim in Paragraph 108 that his actions, including but not limited to, overdrawing the CSV bank account so it could not pay its obligations, inducing the Plaintiffs' Developers to join his

new unlawful competing company, deleting, removing or transferring my email so I could not respond to customers or vendors, deleting Plaintiffs' accounts and accompanying data potentially beyond repair, eliminating or obstructing my ability to communicate with the Plaintiffs' developers "were to protect contractors, stakeholders, and provide customers the best service." What stakeholders is Gitman referring to?

90. Gitman's Affidavit is a fictional story filled with lies, deception and inconsistencies. He has exhibited a blatant disregard for the truth and for this Court's Orders, which as has been made abundantly clear to Gitman, are not a suggestion, but a directive. Gitman does not care about his words, which he uses loosely and with the purpose to mislead. He has only one goal in mind, steal Channel Reply, its trade secrets, and he is willing to go to extreme measures to accomplish his goal. He made that clear at the Court's June 19, 2017 conference when he advised the Court while appearing to address his deliberate violations of the Court's orders that he wanted to compete and intended to do so through Channel Reply, Inc. Nothing can be clearer. Now, he has induced the Plaintiffs' lead developers to terminate their relationship with Plaintiffs leaving ChannelReply in immediate jeopardy of not being able to service its many customers. Already unanswered work orders and customer inquiries that require tech know how from developers to be solved are piling up. He has travelled to Russia to meet with Plaintiffs' developers, and made it clear that it was to offer them a stake in his Channel Reply, Inc. The Plaintiffs' Developers hold the key to the code that controls ChannelReply. Gitman has made this a dangerous game of poker, and is risking the future of the Plaintiffs' Companies and their trade secrets, and ChannelReply's very existence now hangs in the balance.

91. I respectfully request that the Court enter all preliminary restraints, including the additional restraints necessary given Gitman's new actions since the last hearing. I ask that the Court find Gitman in contempt of this Court's Orders and impose sanctions and fines against him to insure compliance with the Court's orders. I ask that this Court award attorney's fees in Plaintiffs' favor as all of the fees incurred have been a direct result of Gitman's deliberate, intentional and unlawful actions. It is critical that Gitman be precluded from further damaging Plaintiffs' Companies.

I certify under penalty of perjury that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Michael Dardashtian, Individually and on behalf of NDAP, LLC, Cooper Square Ventures, LLC and ChannelReply

Sworn to before me this 21
Day of June, 2017

Notary Public

SURESH MAHARAJ
Notary Public - State of New York
NO. 01MA6146472
Qualified in Nassau County
My Commission Expires Aug 6, 2018