UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

MICHAEL DARDASHTIAN, individually and
on behalf of COOPER SQUARE VENTURES,
LLC, NDAP, LLC and CHANNELREPLY, LLC

                                          Plaintiffs,

                    -against-

DAVID GITMAN, JEREMY FALK, SUMMIT
ROCK HOLDINGS, LLC, ACCEL COMMERCE,
LLC, DALVA VENTURES, LLC, KONSTANTYN
BAGAEV, OLESKSII GLUKHAREV and
CHANNEL REPLY, INC.,

                                          Defendants.
-------------------------------------------------------------X

Case No. 17 CV 4327 (LLS)

AFFIDAVIT OF
JEFFREY E. ROTHMAN, ESQ

Jeffrey E. Rothman, Esq. being duly sworn deposes and says:

1. I am an attorney in good standing licensed to practice in the State of New York. I
   have also served as the attorney for Cooper Square Ventures, LLC ("CSV"). I
   submit this Affidavit based on my own personal knowledge of CSV and the
   operating agreement that Messrs. Gitman and Dardashtian requested that I prepare
   for such entity.

2. This Affidavit is not being submitted for purposes of taking sides in this litigation
   between Mr. Dardashtian and Mr. Gitman. The purpose of this Affidavit is to
   clear up any confusion that may exist as a result of the fact that the operating
   agreement I prepared for CSV mistakenly states in the operating agreement the
   name of the entity as "Cooper Square, LLC, and not "Cooper Square Ventures,
   LLC" which is what was intended.

1

3.    The fact that I mistakenly and inadvertently omitted the word "Ventures" from the name of the entity, "Cooper Square [Ventures]"was a scrivener's error on my part. Messrs. Gitman and Dardashtian requested that I prepare the operating Agreement for CSV and not Cooper Square, LLC, an entity with whom I am not familiar. The formation documents that I relied upon in preparing the operating agreement for CSV all refer to CSV and not "Cooper Square". It was simply my mistake.

4.    The background is as follows: In or about the late summer, early fall of 2011, I was retained to represent Michael Dardashtian and David Gitman concerning a business opportunity that they were pursuing with a company called Parts Authority.

5.    Mr. Dardashtian and Mr. Gitman intended to operate a company that sold Parts Authority auto parts over the internet.

6.    An LLC named NDAP was formed with a Parts Authority entity, with the Parts Authority entity owning 51% and Mr. Gitman and Mr. Dardashtian jointly and equally owning the remaining 49%.

7.    Mr. Gitman and Mr. Dardashtian wished to hold their joint and equally-owned 49% interest in NDAP through a limited liability company that they had previously formed called Cooper Square Ventures, LLC or CSV as referred to above.

8.    I drafted the Cooper Square Ventures, LLC Operating Agreement, which was ancillary to the main focus of my representation concerned with the NDAP deal with Parts Authority.

2

9.  The Cooper Square Ventures, LLC Operating Agreement was to formalize the relationship of Mr. Gitman and Mr. Dardashtian as equal members of Cooper Square Ventures, LLC and where each of them was a co-manager.

10. As set forth above, in drafting the Cooper Square Ventures, LLC Operating Agreement, I inadvertently did not include the word "Ventures" in the title of the Operating Agreement. A copy of the Cooper Square Ventures, LLC Operating Agreement is annexed hereto as Exhibit A.

11. It was clear, however, that the Cooper Square Ventures, LLC Operating Agreement which I mistitled was meant and intended by Messrs. Gitman and Dardashtian to be the governing document of Cooper Square Ventures LLC, through which Mr. Gitman and Mr. Dardashtian owned an equal interest in NDAP.

12. Multiple correspondence sent by and between myself, Mr. Gitman and Mr. Dardashtian was circulated prior to its execution. I maintain copies of all correspondence reflecting same in my records.

13. However, no one, including me, caught the inadvertent omission of "Ventures" in the Cooper Square Ventures, LLC Operating Agreement. Mr. Gitman and Mr. Dardashtian both executed the Cooper Square Ventures, LLC Operating Agreement with the intent to be bound by it notwithstanding.

14. The Cooper Square Ventures, LLC Operating Agreement is evenhanded and does not favor one member over the other, which was its specific intent as Mr. Gitman and Mr. Dardashtian both intended to be equal partners, both serving as co-

3

managers and both being members with equal profit percentages, capital contributions and management rights.

I certify under penalty of perjury that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

_____
JEFFREY ROTHMAN, ESQ.

Sworn to before me this 21ST
Day of June, 2017

_____
Notary Public

BARBARA ROWAN
NOTARY PUBLIC, STATE OF NEW YORK
NO. 01RO4790103
QUALIFIED IN NASSAU COUNTY
MY COMMISSION EXPIRES 01/31/2018

4

EXHIBIT A

EIN: _____

OPERATING AGREEMENT

*of*

COOPER SQUARE, LLC

THIS AGREEMENT is made and entered into on August ___, 2011, by the following persons ("Members"):

MICHAEL DARDASHTIAN
DAVID GITMAN

The following person or persons shall serve as the initial "Manager(s)" of the Company in accordance with Article 8:

MICHAEL DARDASHTIAN
DAVID GITMAN

Article 1
Select Definitions

"Act" means the Limited Liability Company Act from time to time in force in the State.

"Agreement" means this Operating Agreement, as originally executed and as amended, modified, supplemented or restated from time to time.

"Base Rate of Interest" means a rate equal to 375 basis points over the prime rate of interest as published from time to time in *The Wall Street Journal* or similar publication if *The Wall Street Journal* is not available.

"Charter" means the articles of organization, certificate of formation or similar instrument, as amended from time to time, issued by the State evidencing the formation of the Company.  The Charter was issued on _____, 200__, and bears State File No. _____.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Company" means the limited liability company formed upon the filing of the Charter and whose affairs are governed by this Agreement.

"Management" has the meaning set forth in Article 8.

"Manager" means the person or persons identified as such in this Agreement, including persons subsequently appointed as such in accordance with Article 8.

"Member" means the person or persons identified as such in this Agreement, including persons subsequently admitted to the Company as Members in accordance with Article 10.

"Profit Percentages" has the meaning set forth in Section 6.1.

"State" means the State of New York, which has issued the Company's Charter.

## Article 2
## Organizational Matters

2.1    Formation and Statutory Authority.

(a)    *Formation*.  The Company was formed upon the issuance of the Charter by the State. The Company hereby ratifies and adopts the acts and conduct of the Company's organizer in connection with the filing of the Charter as acts and conduct by and on behalf of the Company.  The organizational and other activities for which the organizer was responsible have been completed and the organizer is hereby relieved of any further duties and responsibilities in that regard.

(b)    *Statutory Authority*.  The Company shall be operated as a limited liability company in accordance with this Agreement and the Act.  The rights and obligations of the Members and Management *inter se* and in relation to the Company shall be determined in accordance with this Agreement and the Act. To the extent that anything contained in this Agreement conflicts with the Act, or modifies, supplements or otherwise affects any rights or obligations under the Act, this Agreement shall supersede the Act, except to the extent expressly restricted by the Act.

2.2    Filings.  Management shall make such filings and do or cause to be done such other acts and things as shall be required to continue the existence of the Company in the State and shall cause the Company to be qualified or registered under assumed or fictitious names statutes or similar laws in any jurisdiction in which the Company owns property or transacts business to the extent such qualification or registration is necessary or, in the judgment of Management, advisable in order to protect the limited liability of the Members or to permit the Company to lawfully own property or transact business. Management shall execute, file and publish all such certificates, notices, statements or other instruments necessary to permit the Company lawfully to own property and conduct business as a limited liability company in all jurisdictions where the Company elects to own property or transact business and to maintain the limited liability of the Members.

2.3    Name.  The name of the Company is the name set forth in the heading of this Agreement. The affairs of the Company shall be conducted under the Company name or such other name as Management may select in accordance with the Act. If the Company uses a fictitious or assumed name, Management shall execute and file all certificates required by any jurisdiction in which the activities of the Company make it necessary or desirable to do so.  The Company shall have the exclusive ownership of and right to use the Company name and any other names under which the Company conducts its affairs.

2.4    Principal Office of the Company.  The principal office of the Company shall be located at such place within or outside the State as Management may from time to time designate.  The Company may have secondary offices at such other place or places as Management may from time to time designate.

2.5    Records to be Maintained.  Management shall at all times during the continuance of the Company keep at the Company's principal office such records and information as the Company may be required to maintain in accordance with the Act.

2.6 Registered Office and Registered Agent. Management shall designate a registered office and a registered agent in accordance with the Act. Management may from time to time in accordance with the Act change the Company's registered office and/or registered agent. Management shall select and designate a registered office and registered agent for the Company in each other state in which the Company is required to maintain or appoint one.

## Article 3
## Purpose of the Company

The purpose of the Company is to engage in any and all lawful businesses, make any and all lawful investments and undertake such other activities related or incidental thereto as Management may determine is in the interests of the Company, including owning membership interests in other business entities engaging in the business of internet sales.

## Article 4
## Duration of the Company

4.1 Duration of the Company. The Company shall continue in perpetuity unless sooner dissolved in accordance with the other provisions of this Article.

4.2 Winding-Up. The Company shall commence a winding-up of its affairs upon the earliest of:

(a) Disposition of All or Substantially All of its Non-Cash Assets. The sale or other disposition of all or substantially all of the Company's non-cash assets; but if the foregoing sale or other disposition involves (i) the receipt of a deferred payment obligation, whether or not secured, or (ii) the receipt of payment in whole or in part in kind, then at Management's election the term of the Company shall not end, and it shall continue, subject to the other provisions of this Agreement, until the earlier of the time that (A) the deferred payment obligation shall have been paid in full, (B) the in kind considerations received by the Company shall have been sold or otherwise converted to cash or (C) Management elects to distribute the deferred payment obligation or in kind considerations.

(b) Decision of Management. Management's decision to do so. Management shall provide the Members with notice of its decision to commence the winding-up of the Company.

(c) Decision of the Members. The decision of the Members to do so. A decision of the Members under this paragraph shall require the approval of Members holding at least fifty-one (51%) percent of the Profit Percentages (as hereinafter defined) and the approval of Management.

(d) Judicial Dissolution. Upon the entry of a judicial decree of dissolution of the Company in accordance with the Act.

The winding-up of the Company shall be conducted in accordance with this Agreement generally and Article 16 in particular.

4.3 Continuation of Company Upon Certain Events. The death, disability, court declaration of incompetence, bankruptcy, dissolution, liquidation or other dissociation of a Member shall not dissolve the Company, but it shall be continued with the successor or legal representative of such Member; such successor or legal representative shall, to the extent of the interest acquired, be entitled only to the predecessor Member's rights, if any, in the distributions of the Company, and no such person shall have any right to participate in the management of the affairs of the Company or vote on any Company matter

3

without the written consent of Management.  See Article 10 for additional provisions applicable to any such successor or legal representative.

## Article 5
### Capital Contributions to the Company

5.1    Capital Contributions.  Each Member shall contemporaneously with the execution of this Agreement contribute to the capital of the Company the amount of money or property set forth opposite that Member's signature hereto.

5.2    Additional Capital Contributions.  Except as set forth in this Agreement or as required by the Act, no Member shall be assessed for additional capital contributions.

(a)    By Agreement of Members.  The Members may, by unanimous agreement, at any time or from time to time, make additional capital contributions to the Company.

(b)    By Action of Management.  If Management determines that it is necessary or desirable for the Company to obtain additional funds in the form of additional capital contributions, then:

(i)    Management shall send to each Member a notice (the "First Requirement Notice"), which shall advise Members as to the total amount of capital required by the Company (the "Requirement Amount"), the portion of the Requirement Amount which may be contributed by each Member (determined pro rata according to the Members' Profit Percentages) and the date on which such capital is required to be contributed to the Company (the "Requirement Date").  The Requirement Date shall be not less than 10 days after the date of the First Requirement Notice.

(ii)    Should any Member not exercise its option and contribute its capital within the period provided in clause (i), above, Management shall promptly send to each Member who made contributions pursuant to clause (i), above a notice (the "Second Requirement Notice") of the uncontributed portion of the Requirement Amount, each of whom may elect to make a further capital additional contribution to the Company by delivering to Management, within five days of the date of the Second Requirement Notice, written notice of the same, which notice shall include a statement of the maximum amount of the uncontributed Requirement Amount such Member would be willing to contribute.  The portion of the uncontributed Requirement Amount that may be contributed by each Member shall be determined by Management ratably according to the relative maximum amounts that the Members propose to contribute in their notices to Management, and shall be paid by the Member to the Company immediately upon demand therefore.  No Member, however, shall be required to pay more than the maximum amount it proposed to contribute to the Company.

(iii)    Additional capital contributions under this Section are voluntary; but once a Member shall have agreed to make an additional capital contribution hereunder, the Company shall have all of the rights and remedies set forth in this Agreement resulting from the failure of the Member to make such capital contribution.

(iv)    In the event that the entire Requirement Amount is not contributed by all Members in proportion to their Profit Percentages in effect immediately prior to

4

the First Requirement Notice, the Profit Percentages of the Members shall be adjusted with prospective effect to take account of the additional capital contributions made by the contributing Members in relation to the sum of (A) those additional capital contributions and (B) the aggregate amount of the capital contributions of the Members immediately prior to the additional capital contributions.

5.3    Defaulting Members.  The Company shall be entitled to enforce the obligations of each Member to make the contributions specified in this Article, and the Company acting at the direction of Management shall have all remedies available at law or in equity in the event any such contribution is not so made.  The Company shall be entitled to recover the reasonable attorney's fees and other costs of enforcing the Members' obligations under this Article, and shall also be entitled to recover interest on any unpaid contributions, from the due date of such capital contribution, at the Base Rate of Interest from time to time in effect.

## Article 6
## Distributions by the Company

6.1    Definitions.  The following terms shall have the following meanings:

"Available Cash" shall consist of all cash on hand of the Company irrespective of its source, excluding, however, (i) "Capital Event Proceeds" (as defined below) and (ii) such reserves as Management may establish.

"Capital Event Proceeds" shall consist of the net amount of cash received by the Company from the sale, exchange, refinancing, condemnation, casualty loss or other disposition by the Company of its assets outside of the ordinary course of business, less (i) the portion thereof disbursed by Management for the payment of the Company's debts and expenses and (ii) such other reserves as Management may establish.  Capital Event Proceeds shall include amounts distributed to the Company as an owner of another entity to the extent that the amount distributed, in the hands of the distributing entity, is in the nature of Capital Event Proceeds.  Amounts released from a reserve of Capital Event Proceeds shall be treated as Capital Event Proceeds.

"Unreturned Capital" consists of so much of a Member's actual capital contributions to the Company that have not been returned to such Member by way of distributions made under this Article that are identified (in the distribution provisions of this Article) as distributions of Unreturned Capital.

"Profit Percentages" of the Members shall be as set forth opposite each Member's signature to this Agreement (or in such Member's subscription agreement, joinder to this Agreement or other instrument admitting the Member to the Company), as the same may be adjusted from time to time in accordance with this Agreement.

6.2    Distributions of Available Cash.  Available Cash shall be distributed to the Members according to their Profit Percentages at such times as Management shall determine.

6.3    Distributions of Capital Event Proceeds.  Capital Event Proceeds shall be distributed to the Members at such times as Management shall determine in the following rank and order:

   (a)    Among the Members in proportion to, and to the extent of, their Unreturned Capital.

   (b)    The remainder, if any, among the Members according to their Profit Percentages.

6.4     Withholding of Taxes.   If the Company is required to withhold and remit any Federal, state, foreign or local taxes levied on all or part of a Member's allocable share of the Company's income, the Company shall have the right to do so and such withholding by the Company shall be treated as a distribution to the Member for whom such withholding is made and shall reduce the amount of future distributions to be paid to such Member.  In Management's discretion, the Member for whom such withholding would be made shall make a capital contribution of immediately available funds in the amount of any balance needed by the Company to satisfy such withholding liability within three days after being so notified by the Company.  Should a Member fail to timely make any such capital contribution, such Member shall be in default and shall indemnify and hold the Company and the other Members harmless for any costs, penalties, payments or damages incurred by the Company or the other Members as a result of such failure, and such Member shall pay the Company interest in respect of any disbursements made by the Company as a result of such Member failing to timely make the capital contributions required by this Section at the Base Rate of Interest from time to time in effect.  The Company shall have the authority to apply and setoff any distributions to which such defaulting Member would otherwise be entitled towards the satisfaction of the liabilities to the Company incurred by such Member under this Section.  This Section shall also have application to taxes that are not in the nature of withholding taxes but are assessable against the Company with reference to (or where there is exemption from based upon) the status or nature of a Member.

6.5     Priorities.   Except as may be expressly provided in this Agreement, no Member shall have a priority right over any other Member as to distributions.

6.6     Interest on Capital Contributions.   Except as may be expressly provided in this Agreement, no interest shall be allowed to any Member upon the amount of its Unreturned Capital.  Any amounts distributed as a preferred return shall not be considered interest.

6.7     Set-Off Rights.   The Company shall be entitled to set-off against any distributions or other amounts that may be or become due to a Member from the Company any amounts that may be due from such Member to the Company or another Member.

6.8     Restrictions on Distributions.   No distributions may be made to the Members if, after giving effect to such distributions, either the Company would be unable to pay its debts as they become due in the usual course of business or the net assets of the Company would be less than zero.

Article 7
Accounting and Tax Matters

7.1     Books of Account.   Management shall cause proper and true books of account to be maintained for the Company in conformity with sound accounting principles consistently applied.  There shall be recorded in the Company's books of account the particulars of all monies, goods or effects belonging to or owing to or by the Company, or paid, received, sold or purchased in the course of the Company's activities and all of such other transactions, matters and things relating to the Company as are usually entered in books of account kept by companies engaged in activities of a like kind and character.

7.2     Method of Accounting and Fiscal Year.   The Company's books of account shall be maintained on the cash or accrual basis, as determined by Management.  The Company's fiscal year shall be the calendar year unless determined otherwise by Management.

7.3     Reports and Returns.   As soon as practicable after the close of each fiscal year Management shall provide each Member with such statements as shall be necessary to advise the Members properly about their investment in the Company for income tax reporting purposes.

6

Management shall be responsible for engaging an accountant to prepare and to see to the filing of all Federal, state and local tax returns on behalf of the Company. Members acknowledge that the Company may not be able to provide all information required for income tax reporting purposes on a timely basis and that they should expect to extend the time for filing their income tax returns.

7.4   Capital Accounts. As part of the Company's books of account, an individual "Capital Account" shall be maintained for each Member at all times in accordance with sound accounting principles consistently applied.

7.5   Financial (Book) Allocations. The net profit or net loss of the Company, determined on an annual basis in accordance with sound accounting principles, shall be allocated as follows:

(a)   *In the case of a net profit:*

    (i)   If any net losses were allocated in any prior fiscal year pursuant to clause (b), below:

        (A)   Among the Members to the extent of and in proportion to the prior period allocations made to them or their predecessors in accordance with clause (b)(ii), below, not previously eliminated by allocation under this clause. Allocations hereunder shall be made in the reverse order in which such net losses were originally allocated (*i.e.*, most recent net loss allocations are reversed first).

        (B)   Among the Members to the extent of and in proportion to the prior period allocations made to them or their predecessors in accordance with clause (b)(ii), below, not previously eliminated by allocation under this clause. Allocations hereunder shall be made in the reverse order in which such net losses were originally allocated (*i.e.*, most recent net loss allocations are reversed first).

        (C)   Then in accordance with clause (ii), below.

    (ii)   If net losses were not previously allocated among the Members pursuant to clause (b), below, or if clause (i)(C), above, applies, then among all of the Members according to their Profit Percentages.

(b)   *In the case of a net loss:*

    (i)   If any net profits were allocated in any prior fiscal year in accordance with clause (a)(ii), above, then among the Members to the extent of and in proportion to the prior period allocations made to them or their predecessors in accordance with clause (a)(ii), above, not previously eliminated by allocation under this clause. Allocations hereunder shall be made in the reverse order in which such net profits were originally allocated (*i.e.*, most recent net profit allocations are reversed first).

    (ii)   Then among the Members, to the extent of and in proportion to their Unreturned Capital.

(iii)   Then among the Members according to their Profit Percentages; but no allocation of loss or deduction shall be made to a Member to the extent such allocation causes or increases a deficit in such Member's Capital Account balance at the end of the fiscal year to which such allocation relates; such loss or deduction shall instead be allocated among the other Members in accordance with their relative Profit Percentages, subject to the limitations of this clause; except that once all of the Members' Capital Account balances have been reduced to zero, such loss or deduction shall be allocated among the Members in a manner that Management determined fairly comports with the Members' economic interests in the Company and risk of loss.

7.6    Tax Allocations.    Except as provided herein, or as otherwise required by the Code or Treasury Regulations promulgated thereunder (including, without limitation, Treasury Regulations Section 1.704-1 and 1.704-2), Company income, gain, loss, deduction, credit and other partnership items, as computed for Federal income tax purposes, shall be allocated among the Members in the same manner as the corresponding book items are allocated pursuant to Section 7.5.

7.7    Changes in Profit Percentages.    In the event of any changes in any Member's Profit Percentage during a fiscal year, Management shall take into account the requirements of Code Section 706(d) and shall have the right to select any method of determining the varying interests of the Members during the fiscal year which satisfies Code Section 706(d).

7.8    Tax Elections.    Management shall have the right to make (and revoke) any and all tax elections for the Company, including, without limitation, an election to adjust the tax basis of Company assets under Code Section 754.

7.9    Administration of Tax Proceedings.    Management shall appoint, remove and replace the Company's "Tax Matters Partner" as defined in Code Section 6231(a)(7) (referred to herein as the "Tax Matters Member"). The Tax Matters Member shall have the right to resign by giving 30 days written notice to the Members.  Upon the resignation of the Tax Matters Member, a successor Tax Matters Member shall be selected by Management.

7.10    Federal    Taxpayer    Identification    Number.    Management    hereby    authorizes to apply for a Federal taxpayer identification number for the Company and to execute in connection therewith Internal Revenue Service Form SS-4 as an authorized signatory for and on behalf of the Company or any of its Members or members of Management.

Article 8
Management of the Company

8.1    Management by Managers.    The affairs of the Company shall be managed and controlled by Management in accordance with this Agreement generally and this Article in particular. Management shall be comprised of one or more "Managers."

(a)    Number.    There shall be two (2) Manager(s) of the Company.

(b)    Appointment of Manager(s).    The Members appoint the person or persons identified on the first page of this Agreement as the initial Manager(s) of the Company.

(c)    Decision-Making.    Whenever Management shall be required to take any action, make any decision or exercise any discretion and there shall be more than one Manager, then except as otherwise

8

provided in this Agreement, the action, decision or exercise of discretion shall require the approval of all of the persons appointed as Manager.

(d) *Removal and Replacement of Managers.* Members holding at least fifty-one (51%) percent of the Profit Percentages shall have the authority at any time and from time to time to (i) remove a Manager from office and (ii) appoint a new Manager whenever there is a vacancy in the office of Manager. A successor Manager shall be entitled to all of the rights and privileges of the Manager, as Manager, to whose position it succeeded, and shall be subject to all of the obligations of the predecessor Manager, as Manager, whether or not such successor Manager is a signatory to this Agreement.

Michael Dardashtian (and his successors collectively) shall have the authority at any time and from time to time to remove and replace Michael Dardashtian (and any of his successors) as Manager. David Gitman (and his successors collectively) shall have the authority at any time and from time to time to remove and replace David Gitman (and any of his successors) as Manager. A successor Manager shall be entitled to all of the rights and privileges of the Manager, as Manager, to whose position it succeeded, and shall be subject to all of the obligations of the predecessor Manager, as Manager, whether or not such successor Manager is a signatory to this Agreement.

8.2    Authority of Management.

(a) *Exclusive Right to Manage.* Except as otherwise provided herein, Management shall have the sole and exclusive right and authority to operate, manage, conduct and control the affairs of the Company. Management shall make all decisions affecting the affairs of the Company and shall carry out the purposes of the Company as Management deems proper, convenient or advisable.

(b) *Power and Authority.* Without limiting the generality of the foregoing, and consistent with the purposes of the Company, Management shall have all of the rights, powers and authority under the Act and otherwise as provided by law, including the right, power and authority to: acquire assets; purchase goods and services; sell, exchange, lease, license or otherwise deal in or with any and all assets of the Company; open and maintain one or more bank accounts and designate (and change the designation of) signatories thereon; borrow funds to finance the Company's activities and in connection with such borrowing, mortgage, hypothecate, pledge, lien or otherwise encumber the revenues and assets of the Company; guaranty the debts of affiliates and others when Management believes it will benefit the Company to do so; enter into any contract or agreement or amend or cancel the same; and invest and reinvest any funds or other assets of the Company – all as incident to or necessary for the operations of the Company. Without limitation of the foregoing, and for the avoidance of any doubt, it is explicitly declared that Management has the right, power and authority to sell, exchange or otherwise dispose of all or substantially all of the Company's assets, including in a transaction that is not in the ordinary course of business.

(c) *No Duty to Inquire.* Nothing herein contained shall impose any obligation on any person or firm doing business with the Company to inquire as to whether or not Management has exceeded its power and authority in executing any agreement, contract, lease, mortgage, security agreement, deed or other instrument on behalf of the Company, and any such third person shall be fully protected in relying upon such authority. Management may designate one or more persons to act as authorized signatories of the Company and the signatures of such authorized signatories on any agreement, contract, lease, mortgage, security agreement, deed or other instrument shall be binding on the Company.

(d) *General Proscriptions.* Without the written consent or ratification of all of the Members, Management shall have no authority to expend or use Company money or property other than on the

9

account and for the benefit of the Company or to pledge any of the Company's credit or property for other than Company purposes.

8.3     Management's Time Commitment.  Management shall cause so much time to be devoted to the business of the Company as, in its judgment, the conduct of the Company's business shall reasonably require.

8.4     Compensation of Management.  Management shall not be entitled to any fees or other remunerations for its services in managing the Company.  Insofar as a member of Management is a Member, this Section shall not be construed to limit such Member's share of distributions under this Agreement.

8.5     Expenditures by Management.  The Company shall reimburse Management for any costs that may be properly expended on behalf of the Company made out of funds other than those of the Company.

8.6     Related Business Partners.  Management may employ, contract for services with, acquire or sell goods, property and materials from or to and otherwise deal with any Member, any member of Management or any affiliate of the foregoing on any basis which is customary and competitive, or otherwise fair and reasonable.

8.7     Liability of Management.  Management (which for purposes of this Section and Section 8.8 shall include its partners, officers, directors, shareholders, members, managers, employees, agents and affiliates) shall not be liable to a Member or the Company for honest mistakes of judgment, or for action or inaction, taken reasonably and in good faith for a purpose that was reasonably believed to be in the best interests of the Company, or for losses due to such mistakes, action or inaction, or for the negligence, dishonesty or bad faith of any employee, broker or other agent of the Company, provided that such employee, broker or agent was selected, engaged or retained and supervised with reasonable care. Management may consult with counsel and accountants in respect of Company affairs and be fully protected and justified in any action or inaction that is taken in accordance with the advice or opinion of such counsel or accountants, but if, and only if, they shall have been selected with reasonable care.  The Members shall look solely to the assets of the Company for the return of their capital and, if the assets of the Company remaining after payment or discharge of the debts and liabilities of the Company are insufficient to return such capital, they shall have no recourse against Management for such purpose. Notwithstanding any of the foregoing to the contrary, the provisions of this Section shall not be construed to relieve (or attempt to relieve) any person of any liability by reason of gross negligence, recklessness or intentional wrongdoing or to the extent (but only to the extent) that such liability may not be waived, modified or limited under applicable law, but shall be construed so as to effectuate the provisions of this Section to the fullest extent permitted by law.

8.8     Indemnification.  The Company shall indemnify any person who was or is a party, or is threatened to be made a party, to any threatened, pending or completed action, suit or proceeding (other than an action by or in the right of the Company), whether civil, criminal, administrative or investigative, by reason of the fact that the person is or was a manager, member, officer, employee or agent of the Company, or is or was serving at the request of the Company as a director, manager, officer, employee or agent of another limited liability company, corporation, partnership, joint venture, trust or other enterprise, against expenses (including attorney's fees and costs), judgments, fines and amounts paid in settlement actually and reasonably incurred by the person in connection with the action, suit or proceeding, if the person acted in good faith and in a manner the person reasonably believed to be in, or not opposed to, the best interests of the Company or, with respect to any criminal action or proceeding, had no reasonable cause to believe the person's conduct was unlawful.  The termination of any action,

suit or proceeding by judgment, order, settlement, conviction or upon a plea of *nolo contendere* or its equivalent shall not, of itself, create a presumption that the person did not act in good faith and in a manner that the person reasonably believed to be in, or not opposed to, the best interests of the Company or, with respect to any criminal action or proceeding, that the person had reasonable cause to believe that the person's conduct was unlawful.

8.9     **Officers of the Company.**   Management may from time to time appoint one or more persons to serve as officers of the Company, in such capacities and with such delegated rights and powers as Management may approve; provided, however, that no such officer shall have any different or greater rights and powers than Management has under this Agreement.  Officers appointed by Management shall be entitled to be indemnified by the Company in accordance with Section 8.8.

Article 9
Membership in the Company

9.1     Rights and Obligations of the Members.   Unless a Member is a member of Management, and except as expressly provided in this Agreement to the contrary, no Member shall take part in the control or management of the Company, nor shall any Member have any authority to act for or on behalf of the Company or to sign for or bind the Company.  Unless admitted to the Company as a Member in accordance with Article 10, no person who is not a signatory to this Agreement shall be considered a Member.  The Company and Management need deal only with persons as Members that are so admitted and shall not be required to deal with any other person (other than with respect to distributions to assignees pursuant to assignments in compliance with Article 10) merely because of an assignment or transfer of an interest to such person or by reason of the incapacity of a Member.  Any distribution made in accordance with this Agreement by the Company to the person shown on the Company records as a Member or to its legal representatives, or to the assignee of the right to receive Company distributions as provided herein, shall acquit the Company and Management with respect to such distribution of all liability to any other person that may have an interest in or claim to such distribution by reason of any other assignment by the Member with respect to such distribution or by reason of such Member's incapacity, or for any other reason.

9.2     Liability.   No Member shall be personally liable for any of the debts of the Company or any of the losses thereof beyond the amount contributed or required to be contributed by it to the Company under this Agreement and as otherwise specified in the Act.

9.3     Expenditures of Members.   In the discretion of Management, the Company may reimburse the Members for any costs that may be properly expended by them on behalf of the Company made out of funds other than those of the Company.

9.4     Partition and Accounting.   No Member shall have the right to partition any property of the Company during the term of this Agreement, or while such assets are held in trust pursuant to Section 16.4, nor shall any Member make application to any court of authority having jurisdiction in the matter or commence or prosecute any action or proceeding for such partition and the sale thereof, and upon any breach of the provisions of this Section by any Member, the other Members, in addition to all of the rights and remedies in law and in equity that they may have, shall be entitled to a decree or order restraining and enjoining such application, action or proceeding.  To the maximum extent permitted by law, the Members specifically renounce, waive and forfeit all rights, whether arising under contract or statute or by operation of law, to seek, bring or maintain any action in any court of law or equity for an accounting.

9.5     Resignations and Withdrawals.   No Member shall be entitled to withdraw or resign from the Company, except pursuant to the terms of this Agreement.  No Member shall be entitled to receive

11

any money or property from the Company except (a) by way of distributions as provided pursuant to Article 6, (b) by way of distributions upon the winding-up of the Company pursuant to Article 16, (c) in respect of any loans to the Company then due and owing to such Member and (d) as expressly provided elsewhere in this Agreement.

9.6    Trustee Liability.

(a)    *Actions as Trustees.*  When this Agreement is executed by the trustee of any trust, such execution is by the trustee, not individually, but solely as trustee in the exercise and under the power of authority conferred upon and vested in such trustee, and it is expressly understood and agreed that nothing herein contained shall be construed as creating any liability on the part of any such trustee personally to pay any amounts required to be paid hereunder, or to perform any covenant, either express or implied, contained herein, all such liability, if any, being expressly waived by the parties hereto by their execution hereof. Any liability of any Member which is a trust to the Company or to any third person shall be only that of such trust to the full extent of its trust estate and shall not be a personal liability of any trustee, grantor or beneficiary thereof.

(b)    *Successor Trustee.*  Any successor trustee or trustees of any trust which is a Member herein shall be entitled to exercise the same rights and privileges and be subject to the same duties and obligations as its predecessor trustee.  As used in this Agreement, the term "trustee" shall include any or all such successor trustees.

(c)    *Termination of Trust.*  The termination of any trust which is a Member shall not terminate the Company.  Upon the allocation or distribution of all or any portion of the Company interest of a trust which is a Member pursuant to the exercise of any power of appointment, or otherwise, to a beneficiary of such trust or to another person or persons or to another trust or trusts, whether or not such distribution shall terminate such distributing trust, each such distributee shall be entitled to be admitted to the Company as a Member to the extent of the proportionate share of the Company interest distributed to it, subject to the terms of this Agreement, including, without limitation, the restrictions contained in Article 10.

## Article 10
## Transfers by Members and Issuance of Additional Interests

10.1    Transfers by Members.

(a)    *Generally.*  Except as set forth herein, no Member shall sell, exchange, pledge, mortgage, hypothecate or otherwise transfer or encumber its interest in the Company without the prior written consent of Management.  Any such transfer or encumbrance shall be void from inception and of no force or effect whatsoever.  Direct or indirect transfers of interests in entities that are Members shall also be subject to the limitations of this Section.

(b)    *Permitted Transferees.*  Management shall not unreasonably withhold or delay its consent to a transfer of all or any part of a Member's interest to a Permitted Transferee.  In the case of a Member who is an individual, a Permitted Transferee is (i) such Member's spouse; (ii) a lineal descendant or ancestor of such Member or a spouse of any of the foregoing; (iii) a trust established for the benefit of the Member or any person described in clauses (i) or (ii), above; (iv) any entity wholly-owned and controlled by the Member and/or any one or more of the persons described in clauses (i), (ii) or (iii), above; or (v) any other Member.  In the case of a Member who is an entity, a Permitted Transferee is any person who is directly or indirectly controlled by the Member or directly or indirectly controls the Member; as used

herein, "control" means possessing more than 50 percent of the capital, profits and voting rights of an entity.

10.2    Transfers by Management. Management is an agent of the Company and its interest in managing the affairs of the Company is not susceptible of being and may not be sold, assigned, pledged, mortgaged or otherwise disposed of or transferred. Insofar as a member of Management is a Member or is otherwise entitled to distributions under Article 6, Section 10.1 shall govern the transfer of such member of Management's right to distributions and other economic interests in the Company.

10.3    Issuance of Additional Interests.

(a)    *Additional Members and Membership Interests.*   Management may admit into the Company one or more additional Members or issue additional membership interests to existing Members on such terms as Management may determine is fair and reasonable.

(b)    *Adjustment of Profit Percentages.* Upon the admission into the Company of one or more additional Members or the issuance of additional interests to existing Members, Management is authorized to adjust the Profit Percentages of the existing Members to take account of the additional capital contributions made by the additional Members in relation to the sum of (A) those additional capital contributions and (B) the aggregate capital contributions of the Members immediately prior to the capital contributions of the additional Members. The dilution of Profit Percentages of the existing Members shall be in proportion to the existing Members' Profit Percentages. If an additional or existing Member is to receive a Profit Percentage (or an additional Profit Percentage) and is not required to make a capital contribution in respect of same, Management is authorized to dilute the Profit Percentages of the existing Members in proportion to the existing Members' Profit Percentages.

Nothing herein contained shall be construed to require or cause the dilution of any so-called carried interest or promote interest that may inure to a Member or a member of Management.

(c)    *Rights and Obligations of Additional Members.* Additional Members shall be entitled to all of the rights and privileges of the original Members hereunder and shall be subject to all of the obligations and restrictions hereunder, and in all other respects their admission shall be subject to all of the terms and provisions of this Agreement.

10.4    General Provisions. The following rules shall apply to transfers of Company interests and the admission of additional persons to the Company:

(a)    *Procedure for Admission.* No person shall be admitted as a transferee or additional Member hereunder unless and until (i) in the case of an assignment of an interest in the Company permitted hereby, the assignment is made in writing, signed by the assignor and accepted in writing by the assignee, and a duplicate original of the assignment is delivered to and accepted by Management, and (ii) the prospective admittee executes and delivers to the Company a written agreement, in form and substance satisfactory to Management, pursuant to which said person agrees to be bound by this Agreement.

(b)    *Binding Effect.* Any person acquiring or claiming an interest in the Company, in any manner whatsoever, shall be subject to and bound by all terms, conditions and obligations of this Agreement to which its predecessor in interest, if any, was subject or bound, without regard to whether such person has executed a counterpart hereof or any other document contemplated hereby. No person, including the legal representatives, heirs or legatees of a deceased Member, shall have any rights or

13

obligations greater than those set forth herein and no person shall acquire an interest in the Company or become a Member except as permitted hereby.

(c)    *Actions Prior to Acceptance of Assignment.*  Notwithstanding that a person acquiring or claiming an interest in the Company is bound by all terms, conditions and obligations of this Agreement to which its predecessor in interest, if any, was subject or bound, the Company and Management shall be entitled to treat the assignor of the assigned interest as the absolute owner thereof in all respects and shall incur no liability for distributions made in good faith to such assignor prior to such time as the documents specified in this Section have been delivered to and accepted by Management. Any person to whom an interest in the Company is attempted to be transferred in violation of this Article shall not have the rights of a Member of the Company otherwise provided under the Act, including, but not limited to, the right (i) to receive distributions from the Company, (ii) to vote on any matter, (iii) to participate in the management of the Company, (iv) to act as an agent of the Company, (v) to obtain any information or accounting of the affairs of the Company or (vi) to inspect the books or records of the Company. If, however, by law, the Company is required to recognize the purported transfer of a Member's interest in the Company, the purported transferee's rights shall be strictly an economic interest in the Company limited solely to distributions (and accompanying allocations) as provided by this Agreement with respect to such economic interest, and the Member whose interest in the Company has purportedly been transferred shall have no right to any distributions with respect to such interest in the Company. Any distributions to such purported transferee may be applied (without limiting any other legal or equitable rights of the Company) to satisfy any debts, obligations or liabilities for damages that the transferor or transferee may have to the Company. A Member attempting to engage in any purported transfer that has not been approved in writing by Management shall be liable to indemnify and hold harmless the Company and the other Members from all costs, liability and damages that either of them may incur (including, but not limited to, incremental tax liability and attorney's fees and expenses) as a result of such purported transfer. For purposes of this paragraph, an economic interest in the Company shall mean a person's interest in the Company including, without limitation, such person's rights to distributions (and accompanying allocations), but excluding the right to vote and otherwise to participate in the management and control of the affairs of the Company.

(d)    *Consent of Members.*  Each Member hereby consents to the substitution of any assignee of a Member's interest or the admission of any additional person as a Member as approved by Management.

(e)    *Costs.*  The costs incurred by the Company in processing an assignment (including attorney's fees and costs) shall be borne by the assignee, and shall be payable prior to and as a condition of admission to the Company.

Article 11
Miscellaneous Provisions

11.1   Loans from Members.  If Management determines that it would be in the interests of the Company to borrow funds from a Member or an affiliate of a Member, then prior to accepting any such funds:

(a)    *Notice to Members.*  Management shall send to each Member a notice (the "Loan Notice"), which shall advise each Member of the total amount of funds which the Company seeks to borrow (the "Loan Amount"), the terms of the proposed borrowing (including the rate of interest and the collateral security, if any) and the date on which such funds are required (the "Loan Date"). The Loan Date shall be not less than five days after the Loan Notice. Said borrowing may be secured or unsecured,

14

as determined by Management in its sole discretion, but shall be evidenced by one or more promissory notes as are customary.

(b)     *Election to Participate.*  Within five days of the date of the Loan Notice, Members may elect to participate in the borrowing by delivering to Management written notice of the same, together with its portion of the Loan Amount.  The portion of the Loan Amount which each Member may elect to lend to the Company shall be determined *pro rata* according to the Members' Profit Percentages.  Any portion of the Loan Amount not loaned by the Members in accordance with this Section may be loaned by any Member or affiliate of a Member as Management may determine.

(c)     *Excuse.*  The provisions of this Section shall not apply to short-term loans made in exigent circumstances bearing a market rate of interest.

(d)     *Priority.*  Management shall have the discretion to repay all loans from Members or affiliates of Members before distributions are made to the Members under Sections 6.2 or 6.3.

11.2     Right of Reimbursement and/or Contribution.  In the event any Member (or affiliate of a Member) guaranties any indebtedness of the Company, then the Company shall promptly reimburse the guarantor for any and all payments made by the guarantor thereunder.  Without limitation of the foregoing sentence, and notwithstanding the terms of any such guaranty, as between and among the Members, each of the Members shall be liable with respect to such guaranty in proportion to such Member's Profit Percentage.  If any Member (or affiliate of a Member) makes payment with respect to a guaranty of Company indebtedness that at time of demand has not been reimbursed by the Company, the other Members shall immediately make a payment to such Member (or such affiliate of a Member) such that after all payments between and among the Members are made, each Member shall have contributed to the payment of such guaranty an amount equal to the amount of such payment multiplied by such Member's Profit Percentage.  Any Member and any affiliate of a Member making payment on any such guaranty or making a contribution in respect thereof shall have the right to enforce this Section.  This Section shall apply to any person who holds an interest in the Company, whether or not such person is a Member.  In the event that the obligation under the guaranty arises by reason of the gross negligence, fraud or willful misconduct of a particular Member (or affiliate of a particular Member), that Member shall be solely responsible for funding the reimbursement obligations described herein.

11.3     Conversion.  Notwithstanding anything to the contrary in this Agreement, Management shall have the right and power in its sole discretion to cause the Company to contribute its assets to, merge with, consolidate with or convert into any other entity formed under the laws of the State or the laws of any other state in accordance with the Act, whereupon the assets and liabilities of the Company shall become the assets and liabilities of such other entity, the Members (including Management) or, in the case of a contribution, the Company, shall become the owner(s) of such other entity (without modification of their economic interests *inter se*), and Management shall become the controlling person of such other entity.  By way of illustration and not by way of limitation, the Company may be converted into a limited partnership in which Members are limited partners and Management is the general partner, or into a real estate investment trust in which Members are non-voting shareholders and Management is the sole voting shareholder.  Should the Company merge with, consolidate with or convert into another entity in accordance with this Section, Members agree that they shall be bound by the terms of the organizational documents of such entity as presented by Management.  Such organizational documents (viewed as if they were amendments to this Agreement) shall comport with Section 15.1.  The execution of such organizational documents (viewed as if they were amendments to this Agreement) shall be subject to Section 15.2.

15

11.4 "Bring-Along" Rights.  In the event that Management proposes to enter into one or more agreements to sell to any person or persons (referred to herein collectively as the "purchaser") all or substantially all of the membership interests in the Company in a single transaction or related series of transactions in lieu of a sale of all or a substantial part of the assets of the Company, all of the Members hereby agree to sell their respective interests in the Company to the purchaser on the terms set forth in such agreements.  The agreements shall provide for the payment to the Members for their interests in the Company amounts equal to the amounts that they would have received had the Company (a) sold all of its assets at the price implicit in the price to be paid by the purchaser for the membership interests in the Company, (b) satisfied all of its obligations and (c) made liquidating distributions to the Members in accordance with Article 16 hereof.  The costs associated with the sale shall, in general, be borne by the Members in the same proportion.  Management may reallocate among the Members so much of the considerations that a Member would be entitled to receive as equals the amounts which such Member then owes to the Company or to another Member.  Amounts that the purchaser agrees to pay in consideration of consulting, employment, non-competition and similar agreements shall be allocated (if not allocated in the agreements) among the Members as Management shall deem reasonable and appropriate.  Management is hereby granted by each Member a power of attorney, coupled with an interest, to execute in the name of the Member any and all agreements, contracts, documents and other instruments (including instruments of assignment) which Management deems necessary or useful in order to consummate the transactions aforesaid; said instruments shall be deemed to have been executed on behalf of the Members as if signed by the Members themselves.

11.5    Redemption of Interests.

(a)    *Membership Interests Subject to Redemption.*  The interests of any Member in the Company shall be subject to redemption (*i.e.*, purchase by the Company) as provided in this Section.

(b)    *Election to Redeem Made by Management.*  The decision to redeem a Member's interest in the Company in accordance with this Section shall be made by Management in its sole discretion, but only in the following circumstances applicable to a Member:

(i)    Willful or serious misconduct by the Member with respect to the business, operations or assets of the Company.

(ii)    Fraud or dishonesty on the part of the Member, whether or not with respect to the business or affairs of the Company, which affects the business, operations, assets or reputation of the Company.

(iii)    The Member's conviction of a felony crime, or a non-felony crime involving an act of moral turpitude.

(iv)    A transfer by the Member of its interest in the Company in violation of this Agreement.

(v)    An attempt by the Member to withdraw from the Company in violation of this Agreement.

(vi)    An attempt by the Member to partition the property of the Company in violation of this Agreement.

(vii)    A breach by the Member of any of the other terms, conditions and obligations contained in this Agreement.

16

(viii)   A failure to contribute additional capital to the Company pursuant to Management's call in Section 5.2(b) above.

(ix)   A breach by the Member of any employment agreement between the Member and the Company.

(x)   Any event resulting in a separation of the Member from service to the Company as an employee, contractor or agent.

For purposes of clauses (i), (ix) and (x), the term "Company" shall include the Company and any of its subsidiaries or other affiliates.

The interests of all transferees, successors or assignees of a Member (including a Permitted Transferee) shall also be subject to redemption under this Section if any transferee, successor or assignee has engaged in any of the acts described in the clauses set forth above or if, in the case of a partial assignment, the assigning Member (while a Member) engaged in any of the acts described in the clauses set forth above.

(c)   *Redemption Notice.* If Management decides to redeem a Member in accordance with this Section, Management shall send such Member (the "Redeemed Member") written notice (the "Redemption Notice") of its decision. The Redemption Notice shall specify the date on which the redemption shall close (the "Redemption Closing Date"); the Redemption Closing Date shall be established in accordance with paragraph (f).

(d)   *Purchase Price.* The purchase price (the "Purchase Price") of a Redeemed Member's interest shall equal (i) the amount that the Redeemed Member would have received had the Company (A) terminated on the date the Redemption Notice was given, (B) sold all of its assets at their fair market values on the date the Redemption Notice was given, (C) satisfied all of its debts and obligations and (D) made distributions to the Members in accordance with Section 16.2, less (ii) any distributions made to the Redeemed Member after the date the Redemption Notice is given to Redemption Closing Date. The fair market values of the Company's assets shall be determined by Management.

(e)   *Payment of Purchase Price.* The Purchase Price shall be paid in the form of an unsecured promissory note (the "Redemption Note") payable to the Redeemed Member and payable over a three year term. The principal amount of the Redemption Note shall bear interest at the lowest rate necessary to avoid the imputation of additional interest for Federal income tax purposes. Level payments of interest and principal shall be made on the note on a quarterly basis to fully amortize the principal balance over the term of the Redemption Note. The first payment under the Redemption Note shall be due 90 days after the Redemption Closing Date. The Redemption Note shall be prepayable at any time and from time to time. The outstanding balance of the Note shall be prepaid upon the dissolution of the Company in accordance with Section 16.2(b).

(f)   *Redemption Closing Date and Closing Deliveries.* The Redemption Closing Date shall be on a date and at the time specified by Management in the Redemption Notice but not later than the 30th day following the date the Redemption Notice is given. Closing shall occur at the Company's principal office or at such other place specified by Management in the Redemption Notice. At the closing the Company shall tender the Note to the Redeemed Member and the Redeemed Member shall accept the same and execute such documents of transfer as Management may request. If the Redeemed Member shall not accept the tender or execute said documents, Management shall be entitled to execute the documents of transfer for and on behalf of the Redeemed Member, with the same effect as if the Redeemed Member had done so itself, and the contemplated transfer shall be deemed closed once Management has deposited the Note (i) as an interpleader in any court of competent jurisdiction or (ii) in

17

a non-interest bearing escrow account at any established title company, trust company or banking institution, under instructions that the same (and any payments made under the Note after such deposit) may be withdrawn by the Redeemed Member upon demand. The closing of a redemption as contemplated in this paragraph shall not prejudice a Redeemed Member's right to contest the amount of the Purchase Price but a Redeemed Member shall not be permitted to contest the closing as contemplated by this paragraph.

(g)     *Allocation of Redeemed Member's Interest.* The Percentage Interest of a Redeemed Member shall be reallocated among the Members in accordance with their relative Profit Percentages. If a member of Management possesses a Profit Percentage, the reallocation shall also include such member of Management.

## Article 12
## Special Covenants

12.1     Competitive Undertakings. Except as otherwise provided herein, any Member and Management may engage in business ventures of any nature and description independently or with others, including, but not limited to, business of the character described in Article 3 (or any part thereof), and neither the Company nor any of the Members shall have any rights in or to such independent ventures or the income or profits derived therefrom.

12.2     Confidentiality.

(a)     *Restriction on Disclosure.* Each Member (which term, for purposes of this Section, includes each member of Management, whether or not such member of Management is a Member) recognizes and acknowledges that by virtue of its relationship with the Company it may be exposed to, discover, develop, generate or contribute to the Company's Confidential Information (as defined below). Each Member agrees that it will not, at any time or in any manner, either directly or indirectly, publish, communicate, divulge, disclose, disseminate or otherwise reveal to any person or entity, or use for any purpose whatsoever any Confidential Information, except as may be necessary in the course of performing authorized services for the Company or as may be required by applicable order of court, law, statute or regulation. Each Member further agrees to notify the Company before disclosing any Confidential Information under compulsion of law. Each Member hereby acknowledges that all Confidential Information is valuable, material and will significantly affects the effective and successful conduct of the Company's business and its goodwill. Each Member will take all necessary steps and precautions to protect any Confidential Information and shall comply with all policies of the Company in regard to Confidential Information. Upon the Company's request, any Member shall promptly return to the Company any and all correspondence, notes, data and documents containing or reflecting Confidential Information, keeping no copies for himself. The rights and protections granted herein are in addition to the rights, remedies and protections afforded to the Company under any applicable law, statute or regulation.

(b)     *Definitions.* For the purposes of this Agreement, the term "Confidential Information" shall mean all information or data relating to the business and affairs of the Company not generally known outside of the Company, including, without limitation, any of the Company's processes, data, designs, compilations of information, apparatus, computer programs, information of or relating to suppliers or customers, customer requirements, cost or price data, research data, business plans, marketing or sales plans or information, financial data, salary information, policies and procedures, sales know-how or any other information that may be considered to be proprietary to or a trade secret of the Company, whether or not such information is considered a trade secret within the meaning of applicable law. Information shall not be considered "Confidential Information" if any of the following apply:

18

(i)     It is already in or enters into the public domain otherwise than as a consequence of a breach of the terms of this Agreement.

(ii)    It is already properly and lawfully in the possession of the receiving party and is not subject to any obligation of secrecy on the receiving party's part.

(iii)   It becomes available to a party on a non-confidential basis from a source other than the Company, provided that such information was properly and lawfully in the possession of such source and not, so far as the receiving party is aware (after making due and careful inquiry), subject to any obligation of secrecy on the part of such source.

### Article 13
### Securities and Other Matters

13.1    No Registration Statement.    The interests evidenced by this Agreement have not been registered with the Securities and Exchange Commission or any state but have been issued pursuant to exemptions under the Federal Securities Act of 1933, as amended (the "Securities Act"), and applicable state securities laws.

13.2    Transfers of Interests Restricted.    The sale, transfer, pledge, hypothecation or other disposition of any of interests in the Company is restricted and may not be accomplished except in accordance with this Agreement and an applicable registration statement or an opinion of counsel satisfactory to Management that registration is unnecessary or an exemption from registration under the Securities Act and applicable state securities laws.

### Article 14
### Intentionally Omitted

### Article 15
### Amendments to Operating Agreement

15.1    Amendments.    The terms of this Agreement may be modified or amended at any time and from time to time with the written consent of Management and Members holding a majority of the Profit Percentages; but, in no event shall any modification or amendment to this Agreement (a) disproportionately decrease the right of any Member to distributions; (b) cause any Member to incur any personal additional liability with respect to the Company; or (c) amend this Article – unless in each case the Members adversely affected thereby consent in writing to such modification or amendment.

15.2    Power of Attorney.    Each Member hereby agrees that, upon the execution of this Agreement, it shall and hereby does consent and appoint Management as its true and lawful attorney, coupled with an interest in its name, place and stead to sign, execute, acknowledge, swear to and file any and all documents which in the discretion of such attorney are required to be signed, executed, acknowledged, sworn to or filed by the Member to discharge the purposes of the Company as hereinabove stated or the provisions of this Agreement. Without limitation, among the documents which Management may execute on behalf of each Member shall be the following:

(a)     Any amendments to this Agreement, when this Agreement is amended in accordance with Section 15.1.

19

(b)     The Charter and any other instrument which may be required of the Company pursuant to the Act or the laws of any other jurisdiction and any amendments thereto that are not prohibited by Section 15.1.

The grant of authority set forth in this Section is a special power of attorney coupled with an interest, is irrevocable and shall survive the death, incapacity, insolvency, bankruptcy, liquidation or dissolution of a Member, may be exercised by Management for a Member by a facsimile signature or by listing the names of all of the Members executing any instrument with the signature of Management, as attorney in fact for all of them; and shall survive the delivery of an assignment by a Member of all or any portion of its interest, except that where the assignee has been approved by Management for admission to the Company as a substituted Member, the power of attorney shall survive the delivery of such assignment for the sole purpose of enabling Management to execute, acknowledge and file any instrument necessary to effect such substitution, and the grant of authority set forth in this Section shall be deemed to have been made by such substitute Member.

## Article 16
## Winding-Up and Dissolution of the Company

16.1     Winding-Up and Dissolution Procedures.  Upon an event described in Section 4.2, the affairs of the Company shall be wound-up and the Company shall be dissolved.  Management shall preside over the winding-up and dissolution of the Company or may appoint one or more agents to do so. Management shall make such filings in the State and in such other states in which the activities of the Company make it necessary or desirable to do so and do or cause to be done such other acts and things as shall be required to dissolve the Company.

16.2     Distributions Upon Winding-Up.  Except as otherwise provided in this Article, the winding-up and dissolution of the Company shall involve:

(a)     The orderly sale or other disposition of the Company's non-cash assets within a commercially reasonable time.

(b)     The payment or settlement of (and where appropriate, the establishment of reasonable reserves for) the Company's debts and other obligations, including to Members who are creditors, in the order of priority and to the extent provided by law.

(c)     The distribution of any remaining sums among the Members in accordance with Section 6.3.

16.3     Distributions In Kind.  In the event that Management determines that it is necessary or desirable to make a distribution of Company property in kind, such property shall be transferred and conveyed to the distributees as tenants in common so as to vest in them undivided interests in the whole of such property in proportion to their respective rights to share in the proceeds of the sale of such property in accordance with the provisions of Section 16.2(c).  All such Company property shall be valued at fair market value as determined by Management and shall be subject to such reasonable conditions and restrictions as are necessary or desirable in order to preserve the value of the assets distributed or for legal reasons.

16.4     Liquidating Trust.  In the discretion of Management, all or any portion of the distributions that would otherwise be made to the Members pursuant to Section 16.2(c) may be distributed to a trust established for the benefit of the Members for the purposes of liquidating Company assets, collecting amounts owed to the Company and paying any debts or other obligations of the

Company arising out of or in connection with the Company. Management shall appoint one or more persons as liquidating trustee. The assets of any such trust shall be distributed to the Members from time to time in the discretion of the Liquidating Trustee in the same proportions as the amount distributed to such trust by the Company would otherwise have been distributed to the Members pursuant to this Agreement.

16.5    Final Accounting. As part of the winding-up of the Company, a final accounting shall be made of the activities of the Company from the date of the last previous accounting to the date of dissolution. If a Member has a deficit in its Capital Account, such Member shall not be obligated to contribute any amount of that deficit to the Company.

Article 17
General Provisions

17.1    Notices. All notices, demands, offers or other communications required or permitted to be given pursuant to this Agreement shall be in writing and shall be transmitted by courier, recognized overnight delivery service (such as FedEx) or first class (postage prepaid) certified U.S. mail. Any notice, demand, offer or other communication shall be effective on the date of receipt at the address of the addressee. Notices, demands, offers or other communications to a Member shall be addressed to the Member at the address beneath the Member's name on the signature page of this Agreement or, if applicable, in such Member's subscription agreement. Notices, demands, offers or other communications to the Company shall be addressed to the Company in care of Management. Notices, demands, offers or other communications to Management shall be addressed to each member of Management at the address beneath each such person's name on the signature page of this Agreement. Any Member or member of Management may change its address for all future notices, demands, offers or other communications by giving notice to all of the other Members and members of Management stating its new address.

17.2    Successors. This Agreement and all the terms and provisions hereof shall be binding upon the parties hereto and their respective legal representatives, heirs, successors and assigns, except as expressly herein otherwise provided.

17.3    Third Party Benefits. Without limiting Section 17.2, the provisions of this Agreement are intended solely to benefit the Company and the parties hereto and, to the fullest extent permitted by applicable law, shall not be construed as conferring any benefit upon any other person, including without limitation any creditor of the Company (and no such creditor or other person shall be a third party beneficiary of this Agreement), and except as required by the Act, the Members shall have no duty or obligation to any such creditor or other person to make any contributions or return any money or other property to the Company.

17.4    Governing Law. This Agreement shall be construed in conformity with the domestic laws of the State, as applied to agreements whose only parties are residents of the State and which are to be performed entirely within the State.

17.5    Severability. If any provision of this Agreement, or the application of such provision to any person or circumstance, shall be held invalid by a court of competent jurisdiction, the remainder of this Agreement, or the application of such provision to persons or circumstances other then those to which it is held invalid by such court, shall not be affected thereby.

17.6    Other Rules of Construction. Every provision of this Agreement shall be construed simply according to its fair meaning and not strictly for or against any Member (notwithstanding any rule

21

of law requiring an Agreement to be strictly construed against the drafting party). The following additional rules of construction shall apply to this Agreement:

(a) All pronouns shall include the masculine, feminine or neuter thereof, wherever the context and facts require such construction.

(b) The term "person" refers to an individual, corporation, partnership, joint venture, limited liability company, limited liability partnership, association, joint stock company, statutory trust, common-law trust, unincorporated organization, government authority or any other organization whether or not a legal entity.

(c) The term "party" means a signatory to this Agreement, including a Member, member of Management and any successor to any of the foregoing, whether or not such successor has executed or otherwise joined in this Agreement. The fact that a successor is a party shall not give that person any greater rights than it has under the express terms of this Agreement. By way of illustration, a successor who has not been admitted to the Company in accordance with Article 10 is a party to this Agreement for purposes of the dispute resolution procedures in Section 17.8, but despite being a party is still subject to the limitations of Section 10.4(c).

(d) All terms defined in this Agreement in the singular have the same meanings when used in the plural and vice versa.

(e) The use of the word "including" herein shall not be considered to limit the provisions which it modifies but instead shall mean "including without limitation" unless the provision states otherwise.

(f) Headings, titles and subtitles us are inserted for convenience of reference only and are to be ignored in any construction of the provisions hereof.

(g) An "Article" of this Agreement is typically identified with a number (e.g., "Article 17"). A "Section" of this Agreement corresponds to an Article and is typically identified with a number that includes a decimal (e.g., "Section 17.6"). A "paragraph" of this Agreement corresponds to a Section and is typically identified by a lower case letter (e.g., paragraph "(g)"). A "clause" of this Agreement corresponds to a paragraph and is typically identified with a roman numeral or an upper case letter (e.g., "(i)," "(I)" or "(A)").

(h) Except where express reference is made to "business days," references in this Agreement to a number of days within which an action must be taken (including the giving of notice or the delivery of documents) shall mean calendar days. Notwithstanding the preceding sentence, whenever the final day on which an action must be taken (including the giving of notice or the delivery of documents) occurs on a non-business day (i.e., Saturday, Sunday or a holiday recognized by the U.S. Federal government, the State or the state in which the Company's principal office is located), then such period or date shall be extended until the immediately following business day.

17.7 Members Not Agents. Nothing contained herein shall be construed to constitute any Member the agent of another Member, except as specifically provided herein.

17.8 Dispute Resolution. The Company and the parties to this Agreement hereby irrevocably and unconditionally agree that any suit, action or proceeding arising out of or related to this Agreement or the Company shall be brought only in the United States District Court for the Southern District or in the Supreme Court of New York County, State of New York, and the specific choice from among the

22

foregoing shall be determined by the party initiating such suit, action or proceeding. To the fullest extent permissible by law, the Company and the parties to this Agreement hereby consent to the personal jurisdiction, venue and forum of such courts and hereby irrevocably and unconditionally waive any claim or objection that it is not subject to the jurisdiction of such courts, that the venue is improper, that the forum is inconvenient or any similar objection, claim or argument. Service of process on any of the parties hereto with regard to any such action may be made and is considered legally proper by mailing the process to such person by certified mail to the address of such person as provided in Section 17.1 or to any subsequent address to which notices shall be sent.

17.9    Waiver of Trial by Jury. Each party acknowledges and agrees that any controversy which may arise under this Agreement is likely to involve complicated and difficult issues, and therefore each such party hereby irrevocably and unconditionally waives any right such party may have to a trial by jury with respect to any litigation directly or indirectly arising out of or relating to this Agreement. Each party understands and has considered the implications of this waiver. Each party makes this waiver voluntarily.

17.10    Attorney's Fees. If the Company, any Member or any member of Management obtains a judgment in connection with a dispute arising under or in connection with any this Agreement, such party shall be entitled to recover from the non-prevailing party its court costs, and reasonable attorney's fees and disbursements incurred in connection therewith and in any appeal or enforcement proceeding thereafter, in addition to all other recoverable costs.

17.11    Remedies. Subject to any express provisions of this Agreement, no remedy conferred upon the Company, any Member or any member of Management is intended to be exclusive of any other remedy herein or by law provided or permitted, but each shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law, in equity or by statute.

17.12    Waiver. No waiver by the Company, any Member or any member of Management of any breach of this Agreement shall be deemed to be a waiver of any other breach of any kind or nature, and no acceptance of payment or performance by the Company, any Member or any member of Management after any such breach shall be deemed to be a waiver of any breach of this Agreement, whether or not the Company, any Member or any member of Management knows of such breach at the time it accepts such payment or performance. No failure or delay on the part of the Company, any Member or any member of Management to exercise any right it may have shall prevent the exercise thereof by the Company, any Member or any member of Management at any time such other may continue to be so in default, and no such failure or delay shall operate as a waiver of any default.

17.13    Entire Understanding. This Agreement (and any subscription agreement that a Member may have entered into with the Company in connection herewith) constitutes the entire understanding among the Members and supersedes any prior understanding and/or written or oral agreements among them with respect to the Company. In the event of any conflict between this Agreement (and any subscription agreement that a Member may have entered into with the Company) and any other written or oral communications between the Company, Management or any employee or agent of either, and the Members (including any private placement memorandum for the issuance of interests in the Company), this Agreement (and any subscription agreement that a Member may have entered into with the Company) shall control and take precedence. Notwithstanding anything to the contrary contained in this Agreement, the parties hereto acknowledge that, as of the date hereof, Management, on its own behalf and/or on behalf of the Company, may agree in letters or other writings with one or more Members (each, an "other agreement"), and may from time to time hereafter agree in other agreements entered into with one or more Members to be admitted to the Company following the date hereof, in its sole discretion, to exceptions or departures from the provisions of this Agreement. Each other agreement, as in effect from

23

time to time, shall be incorporated herein by reference with respect to the Member or Members who are parties thereto. The parties hereto agree that any such exceptions or departures contained in an other agreement with a Member shall govern with respect to the Member who is a party to such other agreement notwithstanding the provisions of this Agreement.

17.14   Further Assurances.  Each of the parties hereto shall hereafter execute and deliver such further instruments and do such further acts and things as may be required or useful to carry out the intent and purpose of this Agreement and as are not inconsistent with the terms hereof.  Recognizing that the Company, the Members and the members of Management may find it necessary from time to time to establish to third parties the then-current status of performance hereunder, each party hereto agrees, upon the written request of another party hereto, reasonably from time to time, to furnish promptly a written statement of the status of any matter pertaining to this Agreement or the Company to the best of the knowledge and belief of the party making such statements.

17.15   Counterparts and Electronic Transmission.  This Agreement may be executed in counterparts, each of which shall be an original, but all of which shall constitute one and the same instrument. Signatures to this Agreement that are transmitted electronically (*i.e.*, via e-mail or facsimile) shall be binding.

*[Signatures begin on next page of this document]*

24

*[Signature Page to Operating Agreement]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed.

MANAGER:

MANAGER:

_____
Michael Dardashtian
Print Name of Manager

_____
David Gitman
Print Name of Manager

_____
Signature

_____
Signature

_____
Address

_____
Address

| | PROFIT PERCENTAGES | CAPITAL CONTRIBUTIONS |
|---|---|---|

MEMBERS:

_____
Michael Dardashtian
Print Name of Member

50%    $500.00

_____
Signature

_____
Address

_____
David Gitman
Print Name of Member

50%    $500.00

_____
Signature

_____
Address