UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X

MICHAEL DARDASHTIAN, individually and
on behalf of COOPER SQUARE VENTURES,
LLC, NDAP, LLC and CHANNELREPLY, LLC

Case No. 17 CV 4327 (LLS)

                              Plaintiffs,

        -against-

DAVID GITMAN, JEREMY FALK, SUMMIT
ROCK HOLDINGS, LLC, ACCEL COMMERCE,
LLC, DALVA VENTURES, LLC, KONSTANTYN
BAGAEV, OLESKSII GLUKHAREV and
CHANNEL REPLY, INC.,
                              Defendants.
--------------------------------------------------------X

---

## PLAINTIFF'S MEMORANDUM OF LAW IN REPLY AND IN FURTHER SUPPORT FOR PRELIMINARY INJUNCTIVE RELIEF

---

Dated: June 21, 2017

Barry S. Guaglardi, Esq. (BSG2401)
ARTURI, D'ARGENIO,
GUAGLARDI & MELITI, LLP
Attorneys for Plaintiff
365 West Passaic Street, Suite 130
Rochelle Park, NJ 07662
Phone: (201)947-4100
Fax:    (201)947-4010
Email: bguaglardi@adgmlaw.com

## SUMMARY OF THE ARGUMENT

Plaintiffs submit this Reply Memorandum in response to the Defendants' opposition to Plaintiffs' Order to Show Cause Seeking a Preliminary Injunction and other relief ("OSC") and in further support of that application.

Defendants' opposition is premised almost entirely on the flawed proposition that due to Gitman's mere suspicion and distrust of Plaintiff Dardashtian, that Gitman's "self-help" remedy to transfer, delete and/or otherwise misappropriate the Plaintiff Companies' accounts, emails, software, funds, proprietary information, trade secrets, which he co-owns and manages, was somehow a reasonable position to take under the circumstances and the applicable law. Yet, Gitman has produced no evidence whatsoever to substantiate his claim that "self-help" was appropriate or remotely lawful under these circumstances. Without any evidence to support it, Gitman then contends that "through a series of events," Gitman began to "suspect Dardashtian of siphoning funds from the various businesses and even forging his signature in relation to one of these entities." (Gitman Brief at p. 2) (emphasis added). Gitman disdainfully argues that in "acting in good faith, Gitman took steps to protect the various assets of the existing companies." (emphasis added). Id. Nothing can be further from the truth in his fictional version of the facts.

In other words, Gitman engaged in "self help," and misappropriated the Plaintiff Companies' accounts, funds, passwords, codes, trades secrets and even Plaintiff Dardashtian's email identity, supposedly based on his mere suspicion, and misplaced lack of trust of Dardashtian, and decided to accordingly misappropriate all of the Plaintiff Companies' assets, business accounts, funds, proprietary, confidential and trade secret information into a separate competing company created by Gitman, under the confusingly similar and identical name Channel Reply, Inc. ("Channel Reply, Inc." or "CR, Inc.") . Gitman has cited to no law which

supports Gitman's "self help" remedy or provides him with any authority to take the unlawful and deliberate acts he did, even if the Court were to believe any aspect of Gitman's fictional account of the facts.

Likewise, Gitman's proposition that CSV does not have a valid operating agreement or that CSV does not own Channel Reply is without merit and lacks evidentiary support. His mere reference to the CSV Operating Agreement as not being recognized just further evidences his effort to manipulate any fact possible, even when his argument is not grounded in logic, to his advantage. Jeffrey Rothman, Esq., CSV's attorney, in his affidavit explained his mistaken omission of the word "Ventures" in the CSV Operating Agreement, which Gitman signed, evidencing the validity and enforceability of the CSV Operating Agreement. That rebuttal Affidavit was completely unnecessary as was having to address Gitman's attack of its validity, but for Gitman's deceitful behavior.

In reality, Gitman's fraud, deception, unlawful activity, admitted and willful violation of this Court's orders, and continued use of "loose language" to mislead this Court by way of two (2) affidavits, requires the imposition of preliminary injunctive relief as a result of Gitman's clear and brazen disregard of the law, the CSV Operating Agreement, and the Orders of this Court. Gitman should also be sanctioned and required to pay Plaintiffs' attorneys fees, Mr. Rothman's attorney's fees for his Affidavit and all other costs associated with this proceeding.

Preliminary injunctive relief is particularly appropriate where, as here, the harm that will be inflicted on the Plaintiffs in the absence of such relief is effectively irreversible. See Regional Railroad Reorganization Act Cases, 419 U.S. 102 (1974) (the court should exercise its jurisdiction to "minimize or prevent irreparable injury."). That is precisely the situation here. Gitman's unilateral seizure of complete control over the Plaintiff Companies' bank and other

accounts, email accounts, proprietary data, confidential information, trade secret information, and efforts to utilize the Plaintiff Companies' accounts as his own personal *piggy bank*, if continued, would be impossible to reverse. As important is the fact that Gitman's agenda is to destroy ChannelReply as a business owned by the Plaintiffs, and to convert all such assets, intellectual property paid for by Plaintiffs, and to misappropriate same, all for the benefit of his competing company, Channel Reply, Inc. Gitman has now completely brainwashed the Plaintiffs' Developers, Bagaev and Oleksii, encouraged them to send termination letters into Plaintiffs, to leverage the Plaintiffs and obstruct and otherwise interfere with ChannelReply's ability to operate. (*See Dardashtian Reply Aff. at Ex. A*). These actions, by themselves, warrant preliminary injunctive relief in order to save the Plaintiffs ChannelReply from closure, and to also save the 200 or so clients of Plaintiffs' ChannelReply from not being serviced. This is Gitman's hope and desire. That is why Gitman "gratuitously" offered Plaintiff Dardashtian a 5% interest in Gitman's Channel Reply, Inc. Gitman's conduct is nothing less than incredible. (*Dardashtian Reply Aff. at para. 83*).  In the face of two Court orders, he defiantly disregarded same, used "loose language" in his Certification to the Court, and deliberately refused to return and restore Plaintiff Dardashtian's access to all of Plaintiffs' accounts, deleted data, transferred other data, lied to the Court as to his reasons, and until this Court admonished Gitman on June 19, 2017 and gave him a final opportunity to comply, he refused.

As set forth below, Gitman currently still has $13,951.98 of Plaintiffs' customer receivables that he diverted to his personal JPMorgan Chase Bank account by way of the Plaintiff Companies' Stripe Account, and which, until yesterday, June 20, 2017, he prevented Plaintiff Dardashtian from accessing. Gitman's willful misappropriation, failure to restore the Plaintiffs to the condition that existed on May 26, 2017 before Gitman unilaterally changed the

status quo, and violations of this Court's orders are continuing as of the present time. More severe action must be taken by the Court to cause Gitman's compliance. (*See Dardashtian Reply Aff. at Ex. D, last page*).

As stated above, on June 20, 2017, Gitman's intentional actions have now induced Plaintiff Companies' developers to now resign from Plaintiffs as a planned strategic move, which will ultimately require the Plaintiff Companies to find and retain a new developer or potentially go dark on customers. (*See Dardashtian Reply Aff. at Ex. A*). As the lead developer has resigned, nobody at the Plaintiff Companies can maintain the proprietary codes. Thus, a replacement developer needs to be immediately appointed. Due to time constraints, Dardashtian was able to locate a consultant capable of finding a new developer, Jacob Bennett, Senior Web Application Developer at Wilber Group in located in Illinois, not Eastern Europe. Mr. Bennett's qualifications are submitted herewith. (*See Dardashtian Reply Aff. at para 3; Ex. A at pp. 3-4).*

If a preliminary injunction is not issued, Plaintiffs will be irreparably harmed far beyond the serious harm already suffered at the hands of Gitman: They will be unable to exclusively control their competitive advantage in the market place and trade secret information; they will be unable to communicate with their customers; they will be unable to operate their proprietary software which will be lost to Gitman's Channel Reply, Inc. as a direct competitor, thus destroying Plaintiffs' ChannelReply business in its entirety. Gitman's control over Channel Reply, Inc., and the other Gitman Entities now existing and those potentially unknown, if continued, will be an immediate and dramatic reduction in the value of the ChannelReply software for it is now in the hands of a direct competitor, controlled by Gitman. ChannelReply has control of Plaintiffs' trade secrets, developers, customers, software programs, source and other codes, confidential information, expansion plans, tradename and everything that Plaintiff

owns and Gitman intends to use all of that for his own benefit and to put Plaintiffs' ChannelReply out of business.

Moreover, Defendants' assertion that Gitman's compliance with the TRO has "cured many of Dardashtian's claims, especially regarding access to funds and passwords," is wholly inaccurate. As set forth below, Gitman has still not restored Dardashtian to channelreply.com which enables Plaintiff to receive emails from customers and which enables Plaintiff to access multiple other accounts which Gitman was otherwise obligated to restore. Gitman has still not restored the Plaintiffs to the condition they were in on May 26, 2017 before Gitman changed the status quo, and Gitman was afforded more than ample opportunity to redress his unlawful behavior. (*See Dardashtian Reply Aff. at Ex. E, Tab 1*).

Likewise, Dardashtian's supposed "restored" ability to "access funds" is also a meaningless proposition. Indeed, Dardashtian had access to the Plaintiff Companies' funds before May 27, 2017, but it was Gitman's access and control over those funds which enabled Gitman to deplete the accounts and misappropriate those funds in the first place. Merely *restoring* Plaintiff with access to the accounts in which Plaintiff is a 50% owner is not full "compliance with the TRO", and is more importantly, not the standard or the remedy that the preliminary injunction is designed to protect. The TRO was and is designed to preserve the status quo which Gitman is still violating. The Preliminary Injunction, however, is also designed to ensure that Gitman's conflicts of interests, ongoing pursuit to unfairly compete with Plaintiff Companies as communicated in Gitman's own affidavit to this Court, and misappropriation of Plaintiffs accounts, confidential, proprietary and trade secret information does not continue during the pendency of this action.

Gitman has shown absolutely no good faith in this litigation thus far, as best evidenced by his continuing failure and refusal to comply with both TROs, as fully set forth below. Gitman has also provided no indicia that absent preliminary restraints and severe sanctions that he will be restrained, or be remotely willing to refrain from committing the same or similar misconduct in the future. Absent a preliminary injunction and sanctions, Plaintiffs fear the worst. Plaintiffs requested and received temporary restraints and still to this day are appealing for Gitman's compliance. Allowing Gitman to continue his underhanded tactics will surely result in additional irreparable harm as such tactics are still evolving and unfolding before this Court. The latest instance of the lead developers resigning, which Gitman telegraphed to the Court the day before it occurred, only illustrates Gitman's commitment to obtain what he wants at all costs.

Indeed, there is no requirement that Plaintiffs should undergo the expense of exhausting the entire federal proceeding before seeking relief at this juncture. See Mitchum v. Foster, 407 US. 226 (1972). The preliminary injunction is not a complete adjudication on the merits, but is rather "preliminary" so that no additional irreparable harm is suffered during this proceeding in which Gitman categorizes as a "business dispute between co-owners" rather than what it really is, Plaintiffs desperate attempt to hold on to its assets and protect its proprietary software in spite of Gitman's scheme to misappropriate and convert all that Plaintiff has built, and the value and profits of same, from being usurped by Gitman through his breach of every possible fiduciary duty. (*Gitman Brief in Opp. at p. 2*).

Gitman's conduct since this action commenced, is further proof that absent Gitman's complete removal from Plaintiff as a manager or operator, and absent the continued service of a neutral third party administrator, Joel Liebman, Gitman will undoubtedly have the ability to and will engage in the same or similar form of misconduct in the future, thereby causing Plaintiffs

additional substantial expense just to redress it, as Plaintiffs have already had to endure with this Court twice already. Gitman needs to be enjoined, sanctioned and compelled to pay for his wrongs. If that does not work, Gitman needs to be detained in order to insure compliance with this Court's orders.

## ARGUMENT

### I.      Plaintiffs Are Overwhelmingly Likely to Prevail on the Merits

The burden upon the movant to demonstrate a likelihood of success upon the merits is not a great one. As to the likelihood of success "the movant need not show that success is an absolute certainty. It need only be shown that the probability of the movant prevailing is better than fifty percent." Abdul Wali v. Coughlin, 754 F.2d 1015, 1025 (2d Cir. 1985).

Notwithstanding, Plaintiffs have shown a likelihood of success on the merits by way of in excess of 100 exhibits to substantiate Plaintiffs' claims and the irreparable harm Gitman has already committed against the Plaintiff Companies.  Even if the Court were to disregard the evidence submitted in support of the OSC, Gitman's admissions in his own sworn affidavits directly evidence his breaches of fiduciary duties to the Plaintiff and Plaintiff Companies, his unlawful and improper misappropriation and conversion of the Plaintiff Companies' funds, proprietary information and trade secrets. Gitman's sworn affidavits further show his lack of candor and respect to this Court for the lies, "loose language" and intentionally false assertions contained therein, which is also set forth below. Gitman's affidavit further evidences repeated subjective justifications by Gitman for his own misconduct with no proof whatsoever to back up such assertions.

### (A) Plaintiffs Have Offered a Valid Operating Agreement Which Gitman Has Violated Even By His Own Admission

First, at the heart of Gitman's argument, Gitman asserts that Plaintiffs have offered "no valid operating agreement for CSV, at least on its face. Instead, plaintiffs have attached an operating agreement for an entity called Cooper Square, LLC." (*See Dardashtian Reply Aff. at Ex. H).*

Thus, Gitman concludes that the CSV Operating Agreement does not apply. Yet, in the same breath, Gitman acknowledges that "Dardashtian and I understood that our dealings concerning CSV were covered by the operating agreement and we operated under it since 2011." (*Gitman Aff. in Opp at para. 3*). Clearly, Gitman is now trying to distance himself from the CSV Operating Agreement after approximately five (5) years of operating in accordance with it, because he breached it on multiple occasions.

The exhibits annexed hereto evidence that the intent of the parties was clear that "Cooper Square Ventures, LLC" was covered by the CSV Operating Agreement. Indeed, "Cooper Square Ventures, LLC" owns Plaintiff NDAP, LLC, and Channel Reply. The CSV Operating Agreement identifies its purpose to include "any lawful business," "including owning membership interests in other business entities engaging in the business of internet sales ("e-commerce"). See the CSV Operating Agreement at Article 3. Plaintiff ChannelReply, Plaintiff NDAP, LLC and CSV are all in the business of e-commerce. (*See Dardashtian Reply Aff. at Ex. H).*

Now, Gitman contends that the CSV Operating Agreement is not the CSV Operating Agreement, because the CSV Operating Agreement is entitled "Cooper Square, LLC" and not "Cooper Square Ventures, LLC." (*See Gitman Brief in Opp at p.3*). Gitman's assertion that the "Cooper Square, LLC" is unrelated to "Cooper Ventures, LLC" is yet another outrageous

attempt by Gitman to slither from his fiduciary duties as a fiduciary of "Cooper Square Ventures, LLC." Gitman's argument to support this outrageous assertion is based on nothing more than a scrivener's error. Indeed, "Cooper Square, LLC" does not exist. (*See Dardashtian Reply Aff. at Ex. I; see also Rothman Aff. at para 3*).

Rather, the CSV Operating Agreement which was prepared by CSV's attorney, Jeffrey Rothman, Esq., was executed by Gitman and Dardashtian on August 13, 2011. While the CSV Operating Agreement inadvertently omits the word "Ventures" in its title, the Articles of Organization and Employee Identification Number ("EIN") do not. (*See Dardashtian Reply Aff. at Ex. F; see also EIN for Cooper Square Ventures dated August 9, 2011 at Ex. G*). The Cooper Square Ventures, LLC Operating Agreement, Department of State filing and publication of same followed shortly thereafter, are all contemporaneous in time and purpose.

In addition, the *scrivener*, Jeffrey Rothman, Esq., counsel to the Plaintiff Companies, has acknowledged in his supporting Affidavit that his mistaken omission of the word "Ventures" from the CSV Operating Agreement was simply an inadvertent scrivener's error that neither Gitman, Dardashtian or he picked up. (*See Rothman Aff*).

Merely because CSV Operating Agreement omitted the word "Ventures" does not render the agreement unenforceable. Gitman acknowledges that he operating under the CSV Operating Agreement since 2011, and conveniently never complained of or identified the error until now (*Gitman Aff. in Opp at para. 3*). Most importantly, Gitman acknowledges that "Dardashtian and I understood that our dealings concerning CSV were covered by the operating agreement," which is a clear expression of the parties' intent at the time the CSV Operating Agreement was executed.

Moreover, a scrivener's error may be corrected through the use of parol evidence to establish mutual mistake. *See* Restatement (Second) of Contracts § 214(d); *see also Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Ams.*, No. 04-CV-10014, 2005 U.S. Dist. LEXIS 16788, 2005 WL 1950116 (S.D.N.Y. Aug. 12, 2005) ("Parol evidence is admissible to correct a mutual mistake."). <u>Westinghouse Elec. Corp. v. New York City Transit Auth.</u>, 735 F. Supp. 1205, 1221 (S.D.N.Y. 1990) (contract may be reformed to correct clerical error, but not to correct "'errors' that result from conditions of subjective or objective contractual uncertainty").

Mr. Rothman's inadvertent failure to include the word "Ventures" is clearly clerical which has nothing to do with conditions of subjective or objective contractual uncertainty.

Gitman's attempt to distance himself from the CSV Operating Agreement is therefore without merit and should be disregarded by this Court. Gitman should be bound by its terms. In this regard, Plaintiff has shown a likelihood of success that Gitman violated the CSV Operating Agreement, by misappropriating and withdrawing funds from CSV's Bank of America bank account, transferring funds from the CSV Bank of America Bank account for his own personal use (in further violation of the TRO) and in violation of Article 8.2 (d) of the Operating Agreement, deleting proprietary data and misappropriating confidential and trade secret information belonging to the Plaintiff Companies in violation of Article 12.2 of the Operating Agreement. Plaintiffs has demonstrated further that Gitman has deliberately violated this Court's orders.

### (B) Dardashtian Has The Authority To Commence This Action Individually and Derivatively on Behalf of Plaintiff Companies Pursuant to the Operating Agreements and Application of Law

Gitman contends that Plaintiffs cannot bring this action on Plaintiff Companies' behalf, citing Article 8.1 (c) of the CSV Operating Agreement. It is nonsensical for Gitman to disavow

the CSV Operating Agreement in the same breath in which he invokes its provisions and acknowledges that his "dealings concerning CSV were covered by the operating agreement and we have operated under it since 2011." (*Gitman Aff. in Opp at para. 3*).

Notwithstanding, Gitman's assertion is again, without merit. Article 8.1 (a) –(c) does not preclude a member of the Plaintiff Company or the Plaintiff Company itself from commencing suit against the other member individually or derivatively. Article 8.1 (a)- (c) merely designates the roles of the managers, the managers' decision making authority regarding management and how such managers are appointed. Article 8.1(c) expressly states:

> "Whenever Management shall be required to take any action, make any decision or exercise any discretion and there shall be more than one Manager, <u>then except as otherwise provided in this Agreement</u>, the action decision or exercise of discretion shall require the approval of all of the persons appointed as manager." (Emphasis Added).

> (*See Dardashtian Reply Aff. at Ex. H*).

Contrary to Gitman's assertions, the CSV Operating Agreement grants the authority to a member of the Company and the Company itself to commence suit against the other member, see e.g. Article 8.7 (manager shall not be relieved of "any liability by reason of gross negligence, recklessness or intentional wrongdoing"); Article 17.8 (dispute resolution clause designating the Southern District or the Supreme Court of New York County as the appropriate jurisdiction for "any suit, action or proceeding arising out of or related to this Agreement"); Article 17.10 (the Company or any member "obtains a judgment in connection with a dispute arising under or in connection with any this Agreement [sic], such party shall be entitled to recover from the non-prevailing party its court costs, and reasonable attorney's fees and disbursements…").

Moreover, Gitman's citation to *Crane A.G. v. 206 W. 41st* St. and *Sterling Indus. V. Ball Bearing Pen Corp.*, is misplaced. <u>Crane, A.G. v. 206 W. 41st St. Hotel Assoc.</u>, L.P., 87 A.D. 3d [1st Dept. 2001]. Crane involved two co-owners who could not agree on whether their company

11

should defend a foreclosure action instituted by a third party. Crane did not involve a manager instituting a suit against another manager individually and/or derivatively, to protect the interests of the Company for deliberate and wrongful behavior that may destroy the Company. See also Sterling Indus. V. Ball Bearing Pen Corp., 298 N.Y. 483 (1949)  (where Corporation President needed Board of Directors' consent to initiate suit pursuant to Section 60 of the Stock Corporation Law). The instant matter is one member *against* another for Gitman's intentional wrongdoing and other related malfeasance, and to protect the Company's best interests from being destroyed, which is expressly permitted pursuant to Article 8.7 of the CSV Operating Agreement.

Here, Gitman cites to no provision in the CSV Operating Agreement which "require the consent of all managers before bringing an action on behalf of the entity" because no such provision exists. (*See Gitman Brief in Opp at pp. 8-9*). Dardashtian is a 50% member of CSV, and a co-manager, and it is well settled that members of limited liability companies may bring derivative suits on the LLC's behalf. Tzolis v. Wolff, 10 NY3d 100 (2008).

### (C) Gitman's Creation of Channel Reply, Inc., Was a Direct Violation of the CSV Operating Agreement, a Breach of His Fiduciary Duties Owed to Dardashtian and Plaintiff Companies and a Violation of Law

(i)     *Gitman's Breach of the CSV Operating Agreement*

Shockingly, Gitman shamelessly certifies that he has "no agreement that restricts [his] ability to utilize source code or customer data," citing 12.1 of the CSV Operating Agreement. Article 12.1 of the Operating Agreement states:

> "*Except as otherwise provided herein*, any Member and Management may engage in business ventures of any nature and description independently or with others, including but not limited to, business of the character described in Article 3, and neither the Company nor any of the Members shall have any rights in or to such independent ventures or the income or profits derived therefrom."  (emphasis added)

Conveniently, Gitman omits from his certification the very next provision in the CSV Operating Agreement which states the following:

> "Each Member agrees that it will not, at any time or in any manner, either directly or indirectly, publish, communicate, divulge, disclose, disseminate or otherwise reveal to any person or entity, or use for any purpose whatsoever any Confidential Information, except as may be necessary in the course of performing authorized services for the Company...."Article 12.2. (emphasis added)

The use by Gitman and the other Gitman Entities of the "Company's Confidential Information" for Gitman and/or Gitman's Entities' benefit to the exclusion of Plaintiffs is certainly prohibited, unfair and reprehensible conduct. Gitman's misappropriation of Plaintiff Companies' trade secrets, including the source code of ChannelReply, transfer of Plaintiff's company computer data, suspension by Gitman of Dardashtian's 1 Password Account, Google Suite, G suite and other accounts that have made it impossible for Dardashtian to both understand the complexity of Gitman's fraud as well as to manage Plaintiffs CSV, NDAP and ChannelReply, overwhelmingly demonstrate Gitman's bad intent to completely abscond with Plaintiffs CSV and ChannelReply's business. (See *Dardashtian Aff in Support of June 8 OSC, at para. 84, Exs. 53a-b, 54, 59*).

These actions by Defendant Gitman are clearly a breach of his fiduciary duty against self-dealing and harming the Plaintiff Companies, as well as being a violation of the express terms of the CSV Operating Agreement. Gitman's deliberate and willful conduct is reprehensible and he must be sanctioned.

(ii)     *Gitman's Clear Violation of His Fiduciary Duties to Plaintiffs*

Gitman's contention that he should be relieved of any breach of fiduciary duty claims because he was "acting in good faith" to shield the company from Gitman's suspicion of

13

Dardashtian somehow "siphoning of funds," without any corroborating proof, is absurd. *(Gitman Brief in Opp at p. 3)*.

By Gitman's own admission, the examples of his breaches of fiduciary duty to Dardashtian and the Plaintiff Companies are endless. Gitman has already admitted that he improperly and without Dardashtian's prior knowledge or authorization, improperly transferred Plaintiff Companies' data, funds, software programs, email accounts, proprietary information and trade secrets (hereinafter "Plaintiff Company Data") to Channel Reply, Inc., Gitman's competing company. *(See Gitman Aff in Opp at para. 50)*. "Because of Dardashtian's actions, I created a new company called Channel Reply Inc."; *see also Gitman Aff in Opp at para. 66* (I moved the money from the CSV bank account into a call account…"); *see also Gitman Aff in Opp at para. 68* ("I also had to move all technology accounts and subscriptions that were for CR LLC away from NDAP."); *see also Gitman Aff in Opp at para. 79* (Bagaiev and Mr. Glukharev may have deleted Time Doctor because of the security breach"); *see also Gitman Aff in Opp at para. 83* ("I did mistakenly thereafter transfer out $5,060 for payment to the company's counsel, Mr. Farooq…") *see also Gitman Aff in Opp at para. 95* ("Dardashtian did not have access to send or receive emails at michael@channelreply.com from May 30, 2017…); *see also Gitman Cert. at para. 96* ("…the Chargebee and Stripe accounts were moved to CR Inc."). In addition, Gitman again uses "loose language" to suggest that he is "*not aware* of any trade secret information from CR LLC that is being utilized in CR Inc.," even though "CR Inc." is Gitman's company and Gitman is well aware of "CR Inc.'s" purpose. *(See Gitman Aff. in Opp at para. 69)*.

Moreover, Gitman suggests that "CR Inc. was created with the idea that Dardashtian would also be a co-founder in this company and have an equity interest." Yet, in making such an incredible representation to this Court, Gitman never sought Dardashtian's consent to transfer the

14

Plaintiff Company Data to Defendant Channel Reply, Inc. in the first place. Gitman did so on his own volition without an order from the Court and in direct violation of the CSV Operating Agreement. *(See Dardashtian Reply Aff. at Ex. H at Article 12.2).*

Perhaps most importantly, by Gitman suggesting that he intended to make Dardashtian a "co-founder in Defendant [ChannelReply, Inc.] and [give Dardashtian] an equity interest," Gitman is essentially saying that he intended to strip Dardashtian of his 50% interest in Plaintiff ChannelReply only to give Dardashtian an undisclosed "equity" interest in Defendant Channel Reply, Inc., which Gitman suggested to a CSV developer would be a mere 5% to Dardashtian, and which Gitman called "fair and generous." (*See Dardashtian Reply Aff. at para. 60).* That conduct itself is evidence of theft. Dardashtian is a 50% owner of all of the Plaintiff Companies, and its proprietary and trade secret software, including all Company Data. For Gitman to remotely suggest that giving Dardashtian a 5% "equity interest" in the very entities in which Dardashtian is already a 50% owner is absurd.

Gitman is indeed speaking out of both sides of his mouth. On the one hand, he suggests that he engaged in "self help" because he suspected Dardashtian of "siphoning funds," while, on the other hand, he is suggesting that he transferred the Company Data for the benefit of them both, with the intention of making Dardashtian a "co-founder" in Channel Reply, Inc. (*See Gitman Brief in Opp at p. 2; Gitman Aff. in Opp at para. 97).* Regardless of the inconsistent reasoning, Gitman's admitted "self help" tactic was in direct violation of the law, in direct violation of the CSV Operating Agreement, and in direct violation of the temporary restraints entered by this Court.

(iii)     *Gitman's Breaches of Fiduciary Duties And Attempts to Steal Plaintiff Companies' Developers*

"The acts of working in concert and managing a limited liability company clearly gives rise to a relationship among the members which is analogous to that of partners, who, as fiduciaries of one another, owe a duty of undivided loyalty to the partnership's interests." [Kalikow v. Shalik, 43 Misc. 3d 817, 986 N.Y.S. 2d 762 (Supreme Court of New York, Nassau County, 2014), citing, Birnbaum v. Birnbaum, 73 N.Y.2d 461, 539 N.E.2d 574 (1989)].

It is further well settled that,

"This is a sensitive and "inflexible rule of fidelity, barring not only blatant self-dealing, but also requiring avoidance of situations in which a fiduciary's personal interest possibly conflicts with the interest of those owed a fiduciary duty…Included within the rules broad scope is every situation in which a fiduciary, who is bound to single-mindedly pursue the interests of those to whom a duty of loyalty is owed, deals with a person, "in such close relation [to the fiduciary] that possible advantage to such other person might consciously or unconsciously influence the fiduciary's judgment."

[Birnbaum, 73 N.Y.2d at 466, 539, N.E.2d at 576].

Here, in what is perhaps is the clearest example of Gitman's self-interests over the interests of the Plaintiff Companies and Dardashtian, is Gitman's acknowledgment that he "would never" have the developers sign the non-disclosure agreement, though that agreement is what actually protects the Plaintiff Companies' Company Data and trade secret information from unlawful disclosure or use by the Plaintiffs' Developers. *(Gitman Aff. in Opp at para. 22).*

Specifically, with reference to the non-compete and non-disclosure agreement entered into between the Plaintiff Companies and the developers, Gitman contends that he "never executed the proposed "Work Order" between NDAP and Bagaiev," and "would never have signed this document [as it is] against my interest [as it] does not protect me or my team." *See Dardashtian Aff. June 8 OSC, at Ex. 7(d); see also Gitman Aff. in Opp at para. 22.*

The Court must question why Gitman would not want to restrain the Plaintiffs Developers from disclosing the Plaintiff Companies' proprietary information to third parties, or

using it for their own advantage, or how such an agreement would <u>not</u> be in the Plaintiff Companies best interests as Gitman suggests. Clearly, a non-compete or non-disclosure agreement between the Plaintiff Companies and its developers would ensure the secrecy, confidentiality and unauthorized use of the Plaintiff Companies' proprietary and trade secret information to the detriment of the Plaintiffs Companies. The mere fact that Gitman does not want the developers to be restrained from using Plaintiff Company Data in a competing company, Channel Reply Inc., or for their own use, is direct evidence of Gitman's refusal to uphold the basic tenets of his duty of loyalty to the Plaintiff Companies and to Dardashtian, in accordance with Gitman's fiduciary obligations. Gitman clearly intends to use the Plaintiffs' Developers and the Plaintiff Company Data for the benefit of Channel Reply, Inc., or another competing company now or in the future, which is why he contends no such "Work Order" was signed.  In fact, Gitman even alludes to the possibility that he could use the Plaintiffs' Developers as instruments of future theft, by asserting in his affidavit that given the purported "lack of contractual agreements," the Plaintiffs' Developers are "permitted to use source code, customer data, etc., on any future projects regardless of whether they pertain to CSV or any of CSV's entities." While Plaintiffs do not have the benefit of accessing certain destroyed data, prior screenshots were obtained reflecting Gitman's communications with the lead developer while he reviewed the "Work Order" agreement and compared it to a new employment agreement furnished to him by Gitman for Channel Reply, Inc. (*See Dardashtian Reply Aff. at Ex. N).* Obviously, if Gitman were looking out for himself, Dardashtian and the Plaintiff Companies as he is required to do under his fiduciary duty, he would have insured, as a member of the development team, that he secured the Plaintiffs' Developers non-disclosure of the Plaintiffs' Companies' confidential, proprietary and trade secret information, rather than to

17

protect the Plaintiffs' Developers from being bound, which is the exact opposite of his duty. Gitman has knowingly and willfully has breached his duty.

In fact, most recently, in a letter addressed to Gitman but sent to Dardashtian on June 20, 2017, and immediately thereafter, each of the Plaintiff Companies' Developers, Bagaev and Oleksii, sent a notice of resignation, resigning from Plaintiff ChannelReply, *effective immediately*. (*See Dardashtian Reply Aff. at Ex. A*). Conveniently, Bagaev's notice of resignation came one day following the parties hearing on June 19, 2017, upon Gitman's promise to this Court that he would extinguish Channel Reply, Inc. Bagaev's notice of resignation is clearly being used as another mechanism by Gitman to meddle with Plaintiffs' attempts to enforce their rights and retain the Plaintiffs Developers for Channel Reply, Inc.'s benefit. Indeed, Glukharev's notice of resignation is virtually identical to Bagaev's notice of resignation. (*See Dardashtian Reply Aff. at Ex. A*). Given the restraints currently in place against Channel Reply, Inc. Gitman does not want the developers working for the Plaintiff Companies.

Unfortunately, Gitman deleted the screenshots from the TimeDoctor account (due to an alleged and unsubstantiated "breach" of the TimeDoctor system on the same date the June 8 OSC was entered) which has conveniently prevented Plaintiffs from obtaining any additional evidence of communications (screenshots) between Gitman and the developers since June 8, 2017.  Gitman claims that TimeDoctor was cancelled because of an unauthorized breach when, in reality, it is obvious he cancelled it because I stated in my Affidavit that I was able to discover his fraud through the use of TimeDoctor as it was the only account he forgot to freeze me out of.

Notwithstanding, without TimeDoctor, Dardashtian has no way of monitoring Gitman's communications with the Plaintiffs' Developers any longer or monitoring employee work

product. As of this date, Gitman still has not restored TimeDoctor or the "deleted data" due to Gitman's unsubstantiated "security breach," in further violation of the OSC.

From Gitman's own affidavit, the exhibits annexed to Plaintiffs' OSC, and Gitman's misconduct since the temporary restraints were entered, is evidence alone that Plaintiffs have established more than a likelihood of success on the merits in this regard.

### (D) Dardashtian's Application is Not Based Upon Conclusory Allegations

Gitman contends that Dardashtian's "injunction application is based upon conclusory allegations, contradicted by Gitman's Affidavit and must fail." (*Gitman Brief in Opp at p. 10).* Yet, Gitman has not produced any evidence in support of (1) the contradictory testimony contained in Gitman's affidavit, or (2) any evidence which contradicts the in excess of 100 exhibits produced by Plaintiff in connection with this OSC. Gitman's admissions of misappropriation and dishonesty to this Court by way of sworn affidavits further substantiates Plaintiffs claims in this case.

### (E) The Equities Lie Heavily in Plaintiffs' Favor

Not surprisingly, Gitman contends that Plaintiffs have failed to establish that a balance of the hardships *tips* decidedly in Plaintiffs' favor. (*Gitman Brief in Opp at p. 13*). However, the purpose of this OSC is to restore the status quo and prevent Gitman from continuously engaging in "self help" tactics which have already, and will continue to, irreparably harmed the Plaintiff Companies and Dardashtian, prior to and since the June 8th TRO was entered.

As set forth in Plaintiffs' OSC, Plaintiffs are seeking an order returning the status quo as it existed on May 26, 2017, prior to the time of Defendant Gitman's unlawful conduct, and theft and misappropriation of Plaintiff CSV, NDAP and ChannelReply's Company Data. Maintaining the status quo certainly weighs heavily in favor of Plaintiffs as Plaintiffs merely seek that this

19

Court restrain further unlawful misappropriation, depletion, usage, reproduction and unauthorized access of and to Plaintiffs assets, tradename, computer data, trade secrets, confidential information, customers, and other valuable information unquestionably owned only by Plaintiffs, and to prevent continued pillaging by Gitman and the Gitman Entities by unfairly seeking to compete with the Plaintiff companies by misappropriation and then using those trade secret and other confidential and proprietary assets, including the "Channel Reply" trade name against Plaintiffs. Plaintiffs are also entitled to the restoration of all conditions and access that existed prior to Gitman's unlawful actions.

This application further seeks to restore the status quo and compel Gitman to replace the funds he wrongfully siphoned to himself in a reckless self-help move to dictate how and what he desired, even since the temporary restraints were entered by this Court and to prevent such misconduct during the pendency of this litigation. (See e.g. *Gitman Aff. in Opp at para.83*, acknowledging that he wrongfully misappropriated funds after the temporary restraints were entered by this Court, but neglecting to acknowledge that he did so two occasions).  A preliminary injunction is the only way to ensure that Gitman does not continue to engage in the same misconduct that he has engaged in prior to and after the June 8th OSC was entered. For the Court to grant injunctive relief to merely ensure Gitman's compliance with the law is not inequitable. Merely asking Gitman to abide by the law and comply with the CSV Operating Agreement while the litigation is pending should not be a hardship for him, either.

For Gitman to contend that the equities lie in his favor and to not restore the status quo is baseless.

**II.      GITMAN HAS AND CONTINUES TO VIOLATE THE TEMPORARY RESTRAINTS AND HAS STILL NOT RESTORED PLAINTIFFS COMPLETE ACCESS TO ALL PLAINTIFF COMPANY DATA**

*(a) Gitman's Continuing Violations of the OSC at paragraph (b)*

In accordance with the temporary restraints issued by Hon. Edgardo Ramos, U.S.D.J., Gitman was required to restore the Plaintiff Company Bank of America Bank Account ("BoA Account") by no later than 5:00 p.m. on Tuesday, June 13, 2013, see Amended Order at para (b).

As set forth in Plaintiffs Affidavit in Support of his Order to Show Cause dated June 16, 2017, after Gitman withdrew $73,982.53 from the BoA Account and then replenished it, Gitman withdrew the sum of $5,373.00 from the BoA Account on June 13, 2017. (See Dardashtian Aff June 16 OSC at Ex. C). The $5,373.00 was *transferred* to Gitman's competing company, Dalva Ventures, which is also subject to the restraints in the June 8 OSC.

On that same date, Gitman filed a sworn affidavit with this Court contending that he has complied with the OSC. (*See Gitman Affidavit  dated June 13, 2017 at para. 5*). Gitman intentionally used his words "loosely," again, by stating that he "transferred" all monies withdrawn by him from the BoA account, when he knew he withdrew $5,373.00 thereafter, and was not in compliance with the OSC.

On June 15, 2017, Gitman then deposited the sum of $10,560.00 into the BoA Account, but withdrew the sum of $5,060 to pay his personal attorney, Umar Farooq, Esq., with those funds (*See Gitman Aff. in Opp at para. 83*, "I did mistakenly thereafter transfer out $5,060 for a payment to the company's counsel, Mr. Farooq, for work performed in connection with the NDAP sale"). Again, Gitman is using his words "loosely" as Mr. Farooq is Gitman's personal attorney who has assisted Gitman in the creation of Defendant Channel Reply, Inc., which Gitman later admits in same affidavit. Gitman than inconsistently refers to Farooq as NDAP's attorney and that is why he paid him.

21

On Sunday, June 18, 2017, well after the June 8, 2017 deadline, Gitman sent to Dardashtian a request to join "ChannelReply, Inc." on Stripe. Stripe is payment software belonging to the Plaintiff Companies which enables Plaintiffs to accept and make payments on the Plaintiff Companies behalf. However, Gitman did not immediately restore Dardashtian to the Stripe account, as otherwise required to restore the status quo, which has prevented Dardashtian from knowing about any incoming receivables due to the Plaintiff Companies since on or since May 27, 2017. Gitman's "Invite Request" on June 18, 2017 is not only an acknowledgement that Gitman's June 13, 2017 Affidavit was false, in that he represented to this Court that he fully restored Plaintiffs' access.

In addition, Gitman chooses his words "loosely" again, by suggesting that since the TRO was entered, the BoA account balance "was no less than the $74,052.53 as required by the TRO."

However, on June 20, 2017, when Gitman finally restored the Stripe account back to the Plaintiff Companies, Dardashtian was only then able to see the transactional history that he was deprived of seeing since May 27, 2017 ("Blocked Period"). Since restoring Dardashtian to Stripe, Dardashtian has since learned that approximately $13, 951.98 is owed to Plaintiff Companies that Gitman diverted to his own account during the time period Dardashtian was locked out of the Stripe Account.  (*See Dardashtian Reply Aff. at Ex. C.)*Upon review of the Stripe transactional history, all monies received via Stripe during the Blocked Period were diverted to Gitman's *personal* JP Morgan Chase Bank Account. (*See Dardashtian Reply Aff. at Ex. C.)*During this period of time when the restraints were in effect, approximately $17,079.25 of funds belonging to Plaintiff Companies' Stripe Account were diverted by Gitman to Gitman's personal JP Morgan Chase bank Account, $13, 951.98 of which still has not re-deposited into the

CSV BoA Account. (*See Dardashtian Reply Aff. at Ex. C.*) This is despite Gitman's false and "loose" contentions that he has "fully replenished the BoA Account", and did as "required by the TRO" (*Gitman Aff. in Opp at paras. 64- 70; 83*).

On June 20, 2017, after being educated by Plaintiffs as to his false statements, Gitman also re-deposited an *additional $3,651.84* that Gitman was directly reimbursed (as opposed to CSV being reimbursed) for his travels that were already paid for by Plaintiff Companies, which he neglected to mention in any affidavit since this litigation commenced. In fact, the reimbursement check for Gitman's travels was paid to Plaintiff Companies by a third party. Gitman contacted that third party and requested cancellation of the check issued to Plaintiff Companies, and requested that the reimbursement check be reissued directly to him. Thus, when Plaintiff Companies went to deposit their rightfully owed funds to compensate them for Gitman's travel costs, the check bounced. Gitman neglected to mention in any affidavit that this amount was due to Plaintiff, not him, that he had converted the funds, lied about them to this Court, and not replenished such funds in the amount of $3,641.84 to Plaintiffs at that time.  (*See Dardashtian Reply Aff. at Ex. D,  Bank of America Receipt at last page*)

> (b) *Gitman's Continuing Violations of paragraph (g) of the OSC and Failure to Restore the Status Quo and Complete Access to the Plaintiff Company Accounts*

Despite Gitman's multiple representations to the contrary, Gitman, still as of June 20, 2017, has not restored Plaintiff complete access to the Plaintiff Companies' accounts despite Judge Ramos' and Judge Stanton's order for Gitman to restore the status quo as it existed on May 26, 2017. In addition to Gitman's non-compliance with paragraph (g) of the OSC as set forth in Plaintiffs June 16, 2017 OSC, Gitman continues to treat this as a game.

On June 20, 2017 at 11:33 a.m. counsel for Gitman, Lindsay Ditlow, Esq., sent correspondence advising that "Gitman is complying with the Court's Order." (*See Dardashtian Reply Aff. at Ex. B.*)

On June 20, 2017 at 12:18 p.m., counsel for Dardashtian, Barry Guaglardi, Esq., advised that Gitman was still not in compliance with the Court's Order. (*See Dardashtian Reply Aff. at Ex. B at pp. 4-5.*)

On June 20, 2017 at 4:13 p.m., Ms. Ditlow provided spreadsheets "detailing all account information and password information for Mr. Dardashtian." (*See Dardashtian Reply Aff. at Ex.B at pp. 6-7.*)

On June 20, 2017 at 6:01 p.m., counsel for Dardashtian sent Ms. Ditlow a detailed list of accounts that Plaintiff could still not access despite Gitman's false contention that he has fully restored access in accordance with Judge Stanton's order. Counsel for Dardashtian further produced an explanation as to why Plaintiff could not access the accounts, along with a detailed accounting of what was still missing from the CSV BoA Account. (*See Dardashtian Reply Aff. at Ex. C.*)

On June 20, 2017 at 7:47, Ms. Ditlow thanked counsel for the additional information as "Mr. Gitman continues his efforts to comply with all orders." Ms. Ditlow further attached screenshots purportedly "resolving the account issues," which it does not. (*See Dardashtian Reply Aff. at Ex. D.*)

As of June 20, 2017 at 9:37 p.m., Plaintiff still does not have access to and/or there continues to remain issues with the following accounts:

(1) Michael@channelreply.com. Gitman has simply forwarded Dardashtian's emails to Dardashtian to an alternative email address, which does not provide Dardashtian with the ability to access or control Dardashtian's own email as he did prior. All G-Suite accounts should have been moved back to the parent account of NDAP-LLC as it was

prior to May 27, 2017. Gitman has not restored this account as it existed on May 26, 2017.

(2) G-Suite has not been moved back to NDAP-LLC. Rather, Gitman's new G-Suite Account still exists which is not the status quo as of May 26, 2017. Dardashtian was previously able to access all channelreply.com emails through ndap-llc.com. Dardashtian still cannot do so as of the present date. The "new" Channel Reply, Inc., G-Suite account should be terminated. Gitman has not restored this account as it existed on May 26, 2017.

(3) Slack – Dardashtian was recently invited to the Slack Account, however no employees are active on the Slack account as they were prior to May 26, 2017. Gitman has not restored this account as it existed on May 26, 2017.

(4) Godaddy – Dardashtian still does not have access to the main NDAP account that Gitman continues to withhold. Again, Godaddy is the Plaintiff Companies account that controls all other accounts. Dardashtian should not have subaccount access to parent accounts, Dardashtian should have master administrator access to have access to the same information as Gitman. Gitman has not restored this account as it existed on May 26, 2017.

(5) NDAP User Account- the NDAP user account still has two authorization requirements that are sent to Gitman's cell phone which has still not been fixed by Gitman.

(6) Stripe- Gitman provided Dardashtian with access to the Stripe account, however Gitman is now the sole owner of the Stripe Account. Prior to May 26, 2017, Dardashtian was the owner of the Stripe account. At minimum, Dardashtian should have the same administrator capabilities as he did on May 26, 2017. Gitman has not restored this account as it existed on May 26, 2017.

(7) Chargebee – Dardashtian cannot access the Chargebee account through michael@channelreply.com, which prevents Dardashtian from accessing other accounts. No account has been created. Gitman has not restored this account as it existed on May 26, 2017.

(8) PayPal – Dardashtian cannot access the account at paypal@channelreply.com which did not exist prior to May 26, 2017. The paypal@channel.com account should be removed and the primary account should be restored to paypal@coopersquareventures.com login as it did prior to May 26, 2017.

(9) AWS – Dardashtian can access the AWS account but needs to be made an administrator for complete access to the account. Dardashtian likewise has limited access to Channel Reply as he is not the administrator.

(10)   Magento – Dardashtian still cannot access the Magento account (username mdash), and Dardashtian is unable to reset the password.  Gitman has not restored this account as it existed on May 26, 2017.

(*See Dardashtian Reply Aff. at Ex. E, Tab 1.*)

Gitman has perjured himself to this Court by way of his sworn affidavits, has refused to comply with the Orders of this Court, continues to breach his fiduciary duties to Plaintiff Companies, has incentivized the Plaintiff Companies' developers to resign, and is continuing his pursuit to destroy Plaintiff ChannelReply and unfairly compete with the Plaintiff Companies' business operations. Absent injunctive relief, there is absolutely no way to ensure that Plaintiff Companies will survive this litigation. As of June 20, 2017, Gitman purportedly "continues his efforts to comply with all orders" despite the fact that his full compliance was required as of June 8, and then June 9, and then June 15, 2017. See all Court orders. Gitman should not be given the benefit of any doubt based on his intentional misconduct and dishonesty that he has exhibited thus far.

## III.   DEFENDANTS CONTENTION THAT PLAINTIFFS CLAIMS ARE COMPENSABLE BY MONEY DAMAGES IS WITHOUT MERIT

Gitman contends that the Court should deny the Plaintiffs' OSC because "monetary damages are available to adequately compensate the alleged loss." (*Gitman Brief in Opp at p. 14*). Gitman's conclusory assertion is again, without merit.

The Second Circuit has clearly recognized that "the loss of trade secrets is not measureable in terms of money damages." Computer Assoc. Int'l, Inc. v. Bryan, 784 F. Supp. 982, 986 (E.D.N.Y., 1992), citing, FMC Corp. v. Taiwan Tainan Giant Indus. Co., 730 F.3d, 61, 63 (2d Cir. 1984).  This is true because "a trade secret once lost is, of course, lost forever." FMC Corp. v. Taiwan Tainan Giant Indus. Co., 730 F.3d at 63.  Therefore, loss of a trade secret is considered irreparable harm as a matter of law. See, Computer Assoc. Int'l, Inc. v. Bryan, supra.

As further outlined above, Gitman has and continues to misappropriate CSV and Plaintiff ChannelReply's trade secrets, including but not being limited to, its proprietary software, source and other codes, and customer information, including their payments, all of which are vital to the continued operation of Plaintiffs Companies. Without these codes, without the ability to manage these codes, or if these codes are used unfairly be Gitman's competing businesses set up for that express purpose, Plaintiffs' businesses are unable to function and will be rendered completely valueless, resulting in continued irreparable harm as clearly recognized as a matter of law. If Gitman is not using Plaintiff Companies trade secrets in any competing company, as he "loosely" suggests, the restraints imposed should not be a burden on him as co-owner, co-manager and fiduciary of the Plaintiff Companies.

As well, the true extent of Gitman's misconduct is presently unknown. Gitman has destroyed evidence, transferred and deleted data, disparaged Dardashtian to the Plaintiffs' Developers and induced the Plaintiffs' Developers to resign to put Plaintiff ChannelReply out of business. In doing so, Gitman has diminished the Plaintiff Companies ability to operate and earn a profit, and has obstructed Plaintiff Dardashtian's ability to conduct and cultivate business and respond to customers and venders using his own business email address or in any other manner. There is no adequate remedy at law for the irreparable harm that has been caused by Gitman thus far and injunctive relief is warranted and required.

## CONCLUSION

Based upon the foregoing, the Court should grant the foregoing preliminary injunctive relief against Gitman and Gitman's Entities to preserve the status quo and minimize the likelihood of continued irreparable harm to Plaintiffs.

By:    ARTURI, D'ARGENIO, GUAGLARDI & MELITI, LLP

_____

Barry S.Guaglardi

Dated: June 21, 2017

## CERTIFICATE OF SERVICE

I hereby certify that on June 21, 2017, a true and accurate copy of Plaintiff's Reply Affidavit with accompanying exhibits, Affidavit of Jeffrey Rothman, Esq, and Reply Brief was filed electronically and is available for viewing and downloading from the ECF system to:

Lindsay F. Ditlow, Esq.
Brian S. Cousin, Esq.
Dentons US LLP
1221 Avenue of the Americas
New York, NY 10020

Edward P. Gilbert, Esq.
Morrison Cohen LLP
909 Third Avenue
New York, NY 10022

Barry Guaglardi, Esq.