# EXHIBIT 2

LIMITED LIABILITY COMPANY OPERATING AGREEMENT

OF

NDAP, LLC

Limited Liability Company Operating Agreement

of

NDAP, LLC

This Limited Liability Company Operating Agreement of the above, a limited liability company organized pursuant to the New York Limited Liability Company Law, is entered into and shall be effective as of the Effective Date, by and among the Company and the persons executing this Agreement.

ARTICLE I
DEFINITIONS

For purposes of this Agreement (as defined below), unless the context clearly indicates otherwise, the following terms shall have the following meanings:

1.1  Act.  The New York Limited Liability Company Act and all amendments to the Act.

1.2  Additional Contribution.  An additional Capital Contribution payable by the Members to the Company pursuant to Article VIII.

1.3  Additional Contribution Share. A Member's proportionate share of an Additional Contribution, (i) equal to the product of (A) such Member's Initial Sharing Ratio (set forth in Schedule A to this Agreement) and (B) such Additional Contribution or (ii) as otherwise agreed by the Members under Section 8.2.

1.4  Agreement.  This Limited Liability Company Operating Agreement including all amendments adopted in accordance with the Agreement and the Act.

1.5  Articles. The Articles of Organization of the Company, as amended from time to time, and filed with the Secretary of State of New York.

1.6  Assignee. A transferee of a Membership Interest who has not been admitted as a Substitute Member.

1.7  Bankrupt Person. A Person who: (1) has become the subject of an Order for Relief under the United States Bankruptcy Code by voluntary or involuntary petition, or (2) has initiated, either in an original Proceeding or by way of answer in any state insolvency or receivership Proceeding, an action for liquidation, arrangement, composition, readjustment, dissolution, or similar relief.

1

1.8  **Business Day.**  Any day other than Saturday, Sunday or any legal holiday observed in the State of New York.

1.9  **Capital Account.** The account maintained for a Member or Assignee determined in accordance with Article VIII.

1.10 **Capital Contribution.** Any contribution of Property or services made by or on behalf of a Member or Assignee.

1.11 **Commitment.** The Capital Contributions that a Member is obligated to make, including a Member's Initial Capital Contribution and any Additional Contribution Share of a Member.

1.12 **Company.**  The company named at the beginning of this Operating Agreement, a limited liability company formed under the laws of New York, and any successor limited liability company.

1.13 **Default Interest Rate.** The prime rate published by the Wall Street Journal for the last Business Day on which a Commitment is payable.

1.14 **Delinquent Member.** A Member who has failed to meet the Commitment of that Member.

1.15 **Disability.**  The inability of a Member by reason of injury or mental or physical illness to substantially perform his usual duties as a manager for a period of six (6) consecutive months without an intervening return to work exceeding twenty (20) days during said period.

1.16 **Disposition.**  Any sale, assignment, exchange, mortgage, pledge, grant, hypothecation, or other transfer, absolute or as security or encumbrance (including dispositions by operation of law).

1.17 **Dissociation.**  Any action which causes a Person to cease to be a Member as described in Article XII hereof.

1.18 **Dissolution Event.** An event, the occurrence of which will result in the dissolution of the Company under Article XIII.

1.19 **Distribution.**  A transfer of Property to a Member on account of a Membership Interest as described in Article IX.

1.20 **Effective Date.** The date of filing of the Articles of Organization or such other date as set forth in the Articles of Organization.

1.21 **Fiscal Year.** The calendar year.

2

1.22 **Initial Capital Contribution.** The Capital Contribution agreed to be made by the Members as described In Article VIII.

1.23 **Initial Membership Interest.** The Initial Membership Interest set forth in Schedule A.

1.24 **Initial Sharing Ratio.** The Initial Sharing Ratio set forth in Schedule A.

1.25 **Majority.** For purposes of this Agreement, Majority shall mean more than fifty (50%) percent of the Membership Interests.

1.26 **Management Right.** The right of a Member to participate in the management of the Company, to vote on any matter, and to grant or to withhold consent or approval of actions of the Company.

1.27 **Managing Member.** A member (or The Member) selected to manage the affairs of the Company under Article VII hereof.

1.28 **Manager.** A person (or the persons) selected to manage the affairs of the Company under Article VII hereof.

1.29 **Member.** A person executing the Agreement as a Member, and a Substitute Member.

1.30 **Membership Interest.** The rights of a Member to Distributions (liquidating or otherwise) and allocations of the profits, losses, gains, deductions, and credits of the Company, and, to the extent permitted by this Agreement, to possess and exercise Management Rights.

1.31 **Net Cash Flow.** With respect to any fiscal period of the Company, all revenues of the Company during that period decreased by (a) cash expenditures for operating expenses, (b) capital expenditures to the extent not made from reserves, (c) reserves for contingencies and working capital, established in such amounts as the Members may determine, (d) repayment of principal on any financing and (e) taxes.

1.32 **Organization.** A Person other than a natural person, including without limitation corporations (both non-profit and other corporations), partnerships (both limited and general), joint ventures, limited liability companies, business trusts and unincorporated association, but the term does not include joint tenancies and tenancies by the entirety.

1.33 **Person.** An individual, trust, estate, or any Organization permitted to be a member of a limited liability company under the laws of the State of New York.

1.34 **Principal Office.** The Principal Office of the Company set

3

forth in Section 2.6.

1.35 **Proceeding.** Any administrative, judicial, or other adversary proceeding, including without limitation litigation, arbitration, administrative adjudication, mediation, and appeal or review of any of the foregoing.

1.36 **Property.** Any property, real or personal, tangible or intangible, including money, and any legal or equitable interest in such property, but excluding services and promises to perform services in the future.

1.37 **Schedule A.** Schedule A to this Agreement setting forth the name, address, Initial Capital Contribution, number of Units, Initial Membership Interest and Initial Sharing Ratio of each Member, and the Member designated as the Tax Matters Partner.

1.38 **Sharing Ratio.** With respect to any Member, as of any date, the ratio (expressed as a percentage) of (i) such Member's Capital Contribution to (ii) the aggregate Capital Contributions of all Members, or such other ratio as shall be agreed by all Members from time to time. The Initial Membership Interest and Sharing Ratio of each Member is set forth in Schedule A hereof, and Schedule A shall be amended as necessary to conform to any changes thereof agreed to by the Members. In the event all or any portion of a Membership Interest is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Membership Interest and Sharing Ratio of the transferor to the extent it relates to the transferred Membership Interest.

1.39 **Substitute Member.** An Assignee who has been admitted to all of the rights of membership pursuant to Section XI hereof.

1.40 **Tax Characterization and Additional Tax Terms.** It is intended that the Company be characterized and treated as a partnership for, and solely for, federal, state and local income tax purposes. For such Purpose, (i) the Company shall be subject to all of the provisions of Subchapter K of Chapter 1 of Subtitle A of the Code, (ii) all references to a "Partner," to "Partners" and to the Partnership in this Agreement (including the provisions of Section 7.4 and the provisions of Article VIII) and in the provisions of the Code and Tax Regulations cited in this Agreement shall be deemed to refer to a Member, the Members and the Company, respectively. In addition, the following terms shall have the following meanings:

(a) <u>Adjusted Capital Account Deficit</u> shall mean, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

4

(i)   Credit to such Capital Account the minimum gain chargeback that such Member is deemed to be obligated to restore pursuant to the penultimate sentences of Section 1.704-2(g)(1) and 1.704-2 (i)(5) of the Tax Regulations; and

(ii)   Debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), and 1.704-1(b)(2)(ii)(d)(6) of the Tax Regulations.

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Tax Regulations and shall be interpreted consistently therewith.

(b)   Code shall mean the Internal Revenue Code of 1986.

(c)   Nonrecourse Deductions has the meaning set forth in Section 1.704-2(b)(1) of the Tax Regulations.

(d)   Nonrecourse Liability has the meaning set forth in Section 1.704-2(b)(3) of the Tax Regulations.

(e)   Partner Nonrecourse Debt has the meaning set forth in Section 1.704-2(b)(4) of the Tax Regulation.

(f)   Partner Nonrecourse Debt Minimum Gain means an amount, with respect to each Partner Nonrecourse Debt, equal to the Partnership Minimum Gain that would result if such Partner Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Section 1.704-2(i)(3) of the Tax Regulations.

(g)   Partner-Nonrecourse Deductions has the meaning set forth in Sections 1.704-2(i)(1) and 1.704-2(i)(2) of the Tax Regulations.

(h)   Partnership Minimum Gain has the meaning set forth in Sections 1.704-2(b)(2) and 1.704-2(d) of the Tax Regulations.

(i)   Profits and Losses shall mean, for each Fiscal Year, an amount equal to the Company's taxable income or loss for such Fiscal Year, determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income or loss), with the following adjustments:

(i)   Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this Section 1.36(i) shall be added to such taxable income or loss;

5

(ii)  Any expenditures of the Company described in Section 705(a)(2)(B) of the Code or treated as Section 705(a)(2)(B) of the Code expenditures pursuant to Section 1.704-1(b)(2)(iv)(i) of the Tax Regulations, and not otherwise taken into account in computing Profits or Losses pursuant to this Section 1.39(i) shall be subtracted from such taxable income or loss;

(iii) Notwithstanding any other provisions of this definition, any items which are specially allocated pursuant to Sections 8.4 or 8.5 shall not be taken into account in computing profits or Losses.

The amounts of the items of partnership income, gain, loss, or deduction available to be specially allocated pursuant to Sections 9.4 or 9.5 shall be determined by applying rules analogous to those set forth in clauses (i) through (iii) above.

(j)  _Tax Regulations_ shall mean the federal income tax regulations promulgated by the United States Treasury Department under the Code as such Tax Regulations may be amended from time to time.  All references herein to a specific section of the Tax Regulations shall be deemed also to refer to any corresponding provision of succeeding Tax Regulations.

1.41 Unit.  One of the  one hundred units of Membership Interest that are authorized to be issued under this Agreement. Each Unit represents a Membership Interest with an Initial Sharing Ratio of one percent (1%), subject to adjustment as provided herein.

A Unit is divisible into fractional parts.  References to Units herein shall be solely for the purpose of certificating the Membership interests authorized hereunder. Voting, the granting or withholding of consents or approvals, and allocation of Profits and Losses and Distributions shall be made pursuant to the applicable provisions of this Agreement without reference to the number of Units held by Members.

ARTICLE II
FORMATION

2.1  Organization.  The Members hereby organize the Company as a New York limited liability company pursuant to the provisions of the Act.

2.2  Agreement.  For and in consideration of the mutual covenants herein contained and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Members executing the Agreement hereby agree to the terms and conditions of the Agreement, as it may from time to time be amended. It is the express intention of the Members that

6

the Agreement shall be the sole source of agreement of the parties, and, except to the extent a provision of the Agreement expressly incorporates federal income tax rules by reference to sections of the Code or Tax Regulations or is expressly prohibited or ineffective under the Act, the Agreement shall govern, even when inconsistent with, or different than, the provision of the Act or any other law or rule. To the extent any provision of the Agreement is prohibited or ineffective under the Act, the Agreement shall be deemed to be amended to the least extent necessary in order to make the Agreement effective under the Act. In the event the Act is subsequently amended or interpreted in such a way to make any provision of the Agreement that was formerly invalid valid, such provision shall be considered to be valid from the effective date of such interpretation or amendment.

2.3     Name. The name of the Company is the name set forth at the beginning of this Operating Agreement, and all business of the Company shall be conducted under that name.

2.4     Term. The Company shall be dissolved and its affairs wound up in accordance with the Act and the Agreement, unless the term shall be extended by amendment to the Agreement and the Articles, or unless the Company shall be sooner dissolved and its affairs wound up in accordance with the Act or the Agreement.  In all other respects, the term is perpetual.

2.5     Registered Agent and Office. The registered agent for the service of process and the registered office shall be that person and location reflected in the Articles. The Members may, from time to time, change the registered agent or office through appropriate filings with the Secretary of State of New York. In the event the registered agent ceases to act as such for any reason or the registered office shall change, the Members shall promptly designate a replacement registered agent or file a notice of change of address as the case may be.

2.6     Principal Office.  The Principal Office of the Company shall be located at 106-16 Jamaica Avenue, Richmond Hill, New York 11418

2.7     Publication. Within 120 days after the Effective Date, the Members shall cause a notice containing the substance of the Articles, in the form required by the Act, to be published once in each week for six successive weeks in two newspapers of the county in which the Principal Office is located.

ARTICLE III
PURPOSE; NATURE OF BUSINESS

The business purpose of the Company is to engage in any and all business activities permitted under the laws of the State of New

7

York, including but not limited to the operation and management of
real property.

The Company shall have the authority to do all things necessary or
convenient to accomplish its purpose and operate its business as
described in this Article III.   The Company exists only for the
purpose specified in this Article III, and may not conduct any other
business without the unanimous consent of the Members.   The
authority granted to the Members hereunder to bind the Company shall
he limited to actions necessary or convenient to this business.

ARTICLE IV
ACCOUNTING AND RECORDS

4.1   Records to be Maintained. The Company shall maintain the
following records at the Principal Office:

(a)   a current list of the full name set forth in
alphabetical order and last known mailing address of each Member,
together with the information set forth on Schedule A relating to
each Member's Initial Capital Contribution, number of Units,
Membership Interest and Sharing Ratio;

(b)   a copy of the Articles and all amendments thereto,
together with executed copies of any powers of attorney pursuant to
which the Articles or any such amendment has been executed;

(c)   a copy of the Company's federal, state and local
income or information tax returns and reports for the three most
recent Fiscal Years;

(d)   a copy of this Agreement including all amendments
thereto; and

(e)   the Company's books and records, including financial
statements of the Company, which shall be open to inspections by the
Members or their agents at reasonable times.

4.2   Reports to Members. The Company shall provide reports,
including a balance sheet.

4.3   Tax Returns and Reports. The Members, at Company expense,
shall prepare and timely file income tax returns of the Company in
all jurisdictions where such filings are required, and the Company
shall prepare and deliver to each Member, within ninety (90) days
after the expiration of each Fiscal Year, and at Company expense,
all information returns and reports required by the Code and Tax
Regulations and Company information necessary for the preparation
of the Members' federal income tax returns.

8

ARTICLE V
NAMES AND ADDRESSES OF MEMBERS

The names and addresses of the Members are as stated on Schedule A.

ARTICLE VI
RIGHTS AND DUTIES OF MEMBERS

6.1  Management Rights.   No member other than the Managing Member shall have authority to bind the Company on any Management Right except that the following actions shall require the Majority consent of all of the Members:

( a)  the sale of Company Property other than in the ordinary course of business;

( b)  the merger or consolidation of the Company with any other Person;

( c)  the continuation of the Company after a Dissolution Event;

( d)  the borrowing of funds or the pledging, mortgaging or otherwise encumbering of any Company Property, except in the ordinary course of business.

( e)  the requirement that Additional Contributions be made.

( f)  the selection of the Company's regularly engaged accountants;

and the following actions shall require the consent of sixty-six and two-thirds (66 2/3 %) percent of all Members:

(a)  any amendment to the Agreement or to the Articles;

(b)  the payment of compensation to the Managing Members; and

(c)  the admission of a new Member.

6.2  Liability of Members.   No Member shall be liable as such for the liabilities of the Company.

6.3  Indemnification.  A Member shall indemnify the Company for any costs or damages incurred by the Company as a result of any unauthorized action by such Member.

6.4  Representations and Warranties. Each Member, and in the

9

case of a trust or other entity, the person(s) executing the Agreement on behalf of the entity, hereby represents and warrants to the Company and each other Member that: (a) if the Member is an entity, it has power to enter into the Agreement and to perform its obligations hereunder and that the person(s) executing the Agreement on behalf of the entity has the power to do so; and (b) the Member is acquiring its interest in the Company for the Member's own account as an investment and without an intent to distribute the interest. The Members acknowledge that their interests in the Company have not been registered under the Securities Act of 1933 or any state securities laws, and may not be resold or transferred without appropriate registration or the availability of an exemption from such requirements.

   6.5   Conflicts of Interest/Confidentiality.

        (a)   David Gitman and Michael Dardashtian shall not be entitled to enter into transactions that may be considered to be competitive with the Company and agree that during the term of this Agreement and for a period of twenty-four (24) months following the termination of this Agreement, they shall not be engaged in any business, whether internet based or of a traditional brick and mortar type that is competitive with the Company without the express written permission of the Majority of the Members of the Company. If such competitive business is of a traditional brick and mortar type, such business will not be considered competitive if it is located outside of the City of New York or Nassau and Suffolk counties or the District of Columbia or Prince Georges County in Maryland.

        (b)   A Member, including a Managing Member, does not violate a duty or obligation to the Company merely because the Member's conduct furthers the Member's own interest. A Member may lend money to and transact other business with the Company. The rights and obligations of a Member who lends money to or transacts business with the Company are the same as those of a person who is not a Member, subject to other applicable law. No transaction with the Company shall be voidable solely because a Member has a direct or indirect interest in the transaction if the transaction is fair and reasonable to the Company.

        (c)   David Gitman and Michael Dardashtian agree that all Confidential Information they receive while Members of the Company shall be maintained by them in the strictest of confidence, to be used only in connection with the operation of the Company and for no other purpose, including, but not limited to the retail or wholesale distribution or sale of auto parts, whether through internet based or through a traditional brick and mortar locations, unless with the express written permission of the Majority of the Members of the Company.   For purposes of this Agreement, Confidential Information shall mean information which is non-public,

confidential or proprietary in nature.

ARTICLE VII
MANAGING MEMBER

7.1  Managing Member.  Except as otherwise provided in the Agreement, the management of the Company and all decisions concerning the daily business affairs of the Company shall be made by the Managing Member.  The Managing Members shall be:  Cooper Square Ventures, LLC, the Members of which must be only David Gitman or Michael Dardashtian or either of them and no other natural persons or entities unless agreed to by the Majority Members.

7.2  Term of Office as Managing Member.  Each Managing Member shall serve until the Dissociation of such Managing Member or any removal of such Managing Member pursuant to Section 7.8.

7.3  Authority of Managing Member to Bind the Company.  Only the Managing Members and authorized agents of the Company shall have the authority to bind the Company.  Subject to Section 6.1, the Managing Members have the power, on behalf of the Company, to do all things necessary or convenient to carry out the daily business and affairs of the Company (as described in Article III), including:

(x)  the establishment of the Company's offices;

(y)  the hiring and appointment of employees and agents of the Company, the defining of their duties and the establishment of their compensation, and the dealing with tradespeople on such terms as the Managing Members shall determine;

(z)  the purchase of liability and other insurance to protect the Company's business and Property;

but shall specifically not include the following, which shall be decided by a Majority of the Members:

(a)  the institution, prosecution and defense of any Proceeding in the Company's name;

(b)  the purchase, receipt, lease or other acquisition, ownership, holding, improvement, use and other dealing with Real Property, wherever located;

(c)  the sale, conveyance, mortgage, pledge, lease, exchange, and other disposition of Property, except in the ordinary course of business of the Company;

(d)  the entering into of contracts and guaranties involving greater than $ 50,000.00 either singly or cumulatively,

11

incurring of liabilities; borrowing of money, issuance of notes, bonds, and other obligations, and the securing of any of its obligations by mortgage or pledge of any of its Property or income;

(e)  the lending of money, investment and reinvestment of the Company's funds, and receipt and holding of Property as security for repayment;

(f)  the payment of pensions and establishment of pension plans, pension trusts, profit sharing plans, and benefit and incentive plans for Members, employees, and agents of the Company;

(g)  the participation in partnership agreements, joint ventures, or other associations of any kind with any entity, person or persons;

(h)  the indemnification of any Person;

(i) the making of such elections under the Code and Tax Regulations and other relevant tax laws as to the treatment of items of Company income, gain, loss, deduction and credit, and as to all other relevant matters as the Managing Member deems necessary or appropriate, including without limitation, elections referred to in Section 754 of the Code, the determination of which items of cash outlay shall be capitalized or treated as current expenses, and the selection of the method of accounting and bookkeeping procedures to be used by the Company.

7.4  **Actions of the Managing Member.**  The Managing Member has the power to bind the Company as provided in this Article VII. No Person dealing with the Company shall have any obligation to inquire into the power or authority of the Managing Member acting on behalf of the Company.  If there is more than one Managing Member, the Managing Members shall manage the Company by the affirmative vote of all the Managing Members.

7.5  **Compensation of Managing Member.**  The Managing Member shall be reimbursed for all reasonable expenses incurred in managing the Company and shall not be entitled to compensation, unless a Majority of all of the Members' consent thereto.   The Managing Members shall be required to devote full time to the management of the Company business for the proper management of such business and be the principal activity that the Managing Members are engaged in.

David Gitman and Michael Dardashtian shall each receive a salary from the Company of $1,000.00 per week, which shall begin on November 1, 2011.

7.6  **Managing Member's Standard of Care.**  Each Managing Member shall discharge the Managing Member's duties to the Company and the

12

other Members in good faith and with that degree of care that an ordinarily prudent person in a similar position would use under similar circumstances, recognizing he or she is acting on behalf of all Members in the nature of a fiduciary. In discharging its duties and obligations, as set for in section 7.7, a Managing Member shall be fully protected in relying in good faith upon the records required to be maintained under Article IV and upon such information, opinions, reports or statements by any Person as to matters the Managing Member reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, profits or losses of the Company or any other facts pertinent to the existence and amount of assets from which Distributions to Members might properly be paid. The Company shall indemnify and hold harmless each Managing Member against any loss, damage or expense (including attorneys' fees) incurred by the Managing Member as a result of any act performed or omitted on behalf of the Company or in furtherance of the Company's interests without, however, relieving the Managing Member of liability for failure to perform his or her duties in accordance with the standards set forth herein. The satisfaction of any indemnification and any holding harmless shall be from and limited to Company Property and the other Members shall not have any personal liability on account thereof.

7.7 **Authority of the Managing Members.** The Managing Members shall have full and complete charge of all daily affairs of the Company, its management and control, subject to the terms and conditions of this Agreement. Except as otherwise prohibited by law or by this Agreement, the Managing Members shall continue to possess all of the rights and powers of a member in a limited liability company under the laws of the State of New York.

Notwithstanding anything contained herein to the contrary, all decisions concerning the affairs of the Company and its management and control shall be made by the unanimous consent of all Managing Members if there be more than one (1) Managing Member. The preceding sentence shall not apply, however, in the event that the Managing Members unanimously designate one (1) of the Managing Members to serve as the Managing Member. In such event, the Managing Members shall have the exclusive control and management of the day-to-day operation of the Company business. The Managing Member shall continue to serve as such for as long as he or she shall have the unanimous consent of the Managing Members.

7.8 **Resignation; Removal of Managing Member.** The Managing Member shall have a right to resign upon sixty (60) days' notice to the Company, and may be removed as Managing Members by a Majority vote of the Members only for cause which for purposes of this

13

Agreement shall be defined to mean gross misconduct injurious to the Company, a willful failure to perform their duties or the conviction of a crime.

## ARTICLE VIII
### CONTRIBUTIONS AND CAPITAL ACCOUNTS

8.1  **Initial Contributions.**  Each Member shall make the Initial Capital Contribution described for that Member on Schedule A at the time and on the terms specified in Schedule A and shall perform that Member's Commitment, and shall receive the number of Units of Membership Interest and Sharing Ratio described for that Member on Schedule A.  The Managing Member shall issue certificates representing the Units subscribed for by the Members.  No Member shall have the right to withdraw or be repaid any Capital Contribution except as provided in the Agreement.

8.2  **Additional Contributions.**  In addition to the Initial Capital Contributions, the Members shall make such Additional Contributions as the Majority of the Members shall vote, from time to time.  However, no additional capital contributions shall be required until the following is done by the Company:

(a)  make reasonable attempts to borrow the amount of additional funds determined needed by the Majority and then

(b)  allow each Member the opportunity to lend to the Company additional funds determined by the Majority to be necessary as provided in paragraph 8.3.

8.3  **Enforcement of Commitments.** In the event any Member (a Delinquent Member) fails to perform the Delinquent Member's obligation to commit additional capital pursuant to section 8.2 above, the other Members shall give the Delinquent Member a notice of such failure. If the Delinquent Member fails to perform the Commitment (including the payment of any costs associated with the failure and interest at the Default Interest Rate) within ten Business Days of the giving of such notice, the other Members may reduce the number of units and sharing ratio of the non-contributing partner and increase the number of units and sharing ratio of the contributing member by a percentage equal to the fraction, the numerator of which is the capital advanced by the contributing member and the denominator of which is the total capital contributions contributed by all Members since inception of the Company.

In the event the Delinquent Member fails to meet such Commitments, the other Members may elect to lend additional money to the Company at an interest rate equal to the Prime Rate of JPMorgan Chase in effect at the time the loan is outstanding, as adjusted monthly.

8.4  **Capital Account.** A separate capital account shall be maintained for each Member throughout the term of the Company in accordance with the rules of Section 1.704- 1(b)(2)(iv) of the Tax Regulations as in effect from time to time, and, to the extent not inconsistent therewith, to which the following provisions apply:

(a)  To each Member's Capital Account there shall be credited (i) the amount of money contributed by such Member to the Company (including liabilities of the Company assumed by such Member as provided in Section 1.704-1(b)(2)(iv)(c) of the Tax Regulations); (ii) the fair market value of any property contributed to the Company by such Member (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to under Section 752 of the Code); and (iii) such Member's share of Profits and items of income and gain that are specially allocated.

(b)  To each Member's Capital Account there shall be debited (i) the amount of money distributed to such Member by the Company (including liabilities of such Member assumed by theCompany as provided in Section 1.704-1(b)(2)(iv)(c) of the Tax Regulations) other than amounts which are in repayment of debt obligations of the Company to such Member; (ii) the fair market value of property distributed to such Member (net of liabilities secured by such distributed property that such Member is considered to assume or take subject to under Section 752 of the Code); and (iii) such Member's share of Losses or items of loss or deduction that are specifically allocated.

(c)  The Capital Account of a transferee Member shall include the appropriate portion of the Capital Account of the Member from whom the transferee Member's interest was obtained.

(d)  In determining the amount of any liability, there shall be taken into account Section 752(c) of the Code and any other applicable provisions of the Code and Tax Regulations.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Section 1.704-1(b) of the Tax Regulations, and shall be interpreted and applied in a manner consistent with such Tax Regulations. In the event the Members shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto (including, without limitation, debits or credits relating to liabilities that are secured by contributed or distributed property or that are assumed by the Company or any Member), are computed in order to comply with such Tax Regulations, the Members may make such modification, provided that it is not likely to have a material effect on the amounts distributable to any Member pursuant to Article XII hereof upon the dissolution of the

15

Company. The Members also shall (i) make any adjustments that are necessary or appropriate to maintain equality between the Capital Accounts of the Members and the amount of Company capital reflected on the Company's balance sheet, as computed for book purposes, in accordance with Section 1.704-1(b)(2)(iv)(g) of the Tax Regulations and (ii) make any appropriate modifications in the event unanticipated events might otherwise cause this Agreement not to comply with Section 1.704-1(b) of the Tax Regulations.

8.5  **No Obligation to Restore Deficit Balance.** Except as required by law, no Member shall be required to restore any deficit balance in its Capital Account.

8.6  **Withdrawal; Successors.** A Member shall not be entitled to withdraw any part of its Capital Account or to receive any distribution from the Company, except as specifically provided in the Agreement, and no Member shall be entitled to make any capital contribution to the Company other than the Commitments. Any Member, including any additional or Substitute Member, who shall receive an interest in the Company or whose interest in the Company shall be increased by means of a transfer to it of all or part of the interest of another Member, shall have a Capital Account with respect to such interest initially equal to the Capital Account with respect to such interest of the Member from whom such interest is acquired except as otherwise required to account for any step up in basis resulting from a termination of the Company under Section 708 of the Code by reason of such interest transfer.

8.7  **Interest.** No Member shall be entitled to interest on such Member's Capital Contribution or on any Profits retained by the Company.

8.8  **Investment of Capital Contributions.** The Capital Contributions of the Members shall be invested in demand, money market or time deposits, obligations, securities, investments or other instruments constituting cash equivalents, until such time as such funds shall be used for Company purposes. Such investments shall be made for the benefit of the Company.

8.9  **No Personal Liability.** No Member shall have any personal liability for the repayment of any Capital Contributions of any Member.

ARTICLE IX
ALLOCATIONS AND DISTRIBUTIONS

9.1  **Profits and Losses.** Profits and Losses, and each item of Company income, gain, loss, deduction, credit and tax preference with respect thereto, for each Fiscal Year (or shorter period in respect of which such Items are to be allocated) shall be allocated among the Members as provided in this Article IX.

16

9.2  **Profits.** After giving effect to the special allocations set forth in Sections 9.4 and 9.5, Profits for any Fiscal Year shall be allocated in the following order of priority:

(a) First, to the Members, if any, who received any allocation of Losses under Section 9.3(c), in proportion to (and to the extent of) the excess, if any, of (i) the cumulative Losses allocated to such Members pursuant to Section 9.3(c) for all prior Fiscal Years, over (ii) the cumulative profits allocated to such Members pursuant to this Section 9.2(a) for all prior Fiscal Years;

(b) Second, to the Members, in proportion to (and to the extent of) the excess, if any, of (i) the cumulative Losses allocated to each Member pursuant to Section 9.3(b) hereof for all prior Fiscal Years, over (ii) the cumulative Profits allocated to each Member pursuant to this Section 9.2(b) for all prior Fiscal Years;

(c) Third, to the Members, in proportion to (and to the extent of) the excess, if any, of (i) the cumulative Losses allocated to each Member pursuant to Section 9.3(a)(ii) hereof for all prior Fiscal Years, over (ii) the cumulative Profits allocated to such Member pursuant to this Section 9.2(c) for all prior Fiscal Years;

(d) Fourth, the balance of the Profits remaining, if any, among the Members, pro rata, in proportion to their respective Sharing Ratios.

(e) Notwithstanding the provisions of Section 9.2 and 9.3, David Gitman and Michael Dardashtian together, or an entity formed by them, shall receive an allocation of profits and losses equal to sixty-six and two thirds (66 2/3%) percent during the initial twenty-four (24) months of the term of this Agreement and thereafter fifty (50%) percent of profits or losses for each month thereafter.

Notwithstanding the above [entity to be formed] agrees to lend to the Company its share of its allocated profit (less taxes due thereon) earned during the first twenty-four months of operation of the Company, without interest.

9.3  **Losses.** After giving effect to the special allocations set forth in Sections 9.4 and 9.5, Losses shall be allocated as set forth in Section 9.3(a), subject to the limitation in Section 9.3(b) below, and, if applicable, as provided in Section 9.3(c).

(a) Losses for any Fiscal Year shall be allocated in the following order of priority:

(i) first, to the Members in proportion to and to the extent of the excess, if any, of (A) the cumulative Profits

17

allocated to each such Partner pursuant to Section 9.2(d) hereof for all prior Fiscal Years, over B) the cumulative Losses allocated to such Partner pursuant to this Section 9.3(a)(i) for all prior Fiscal Years; and

(ii) the balance, if any, among the Members in proportion to their respective Sharing Ratios.

(b) The Losses allocated pursuant to Section 9.3(a) hereof shall not exceed the maximum amount of Losses that can be so allocated without causing any Member to have an Adjusted Capital Account Deficit at the end of any Fiscal Year. In the event some, but not all, of the Members would have Adjusted Capital Account Deficits as a consequence of an allocation of Losses pursuant to Section 9.3(a) hereof, the limitation set forth in this Section 9.3(b) shall be applied on a Member by Member basis so as to allocate the maximum permissible Losses to the Members under Section 1.704-1(b)(2)(ii)(d) of the Tax Regulations.

(c) In the event that there are any remaining Losses in excess of the limitations set forth in Section 9.3(b), such remaining Losses shall be allocated among the Members in proportion to their respective Sharing Ratios.

9.4   Special Allocations. The following special allocations shall be made in the following order:

(a) Minimum Gain Chargeback. Except as otherwise provided in the Tax Regulations, notwithstanding any other provision of this Article VIII, if there is a net decrease in Partnership Minimum Gain during any Fiscal Year, each Member shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Partnership Minimum Gain, determined in accordance with Section 1.704-2(g) of the Tax Regulations. Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Sections 1.704-2(f)(6) and 1.704-2(j)(2) of the Tax Regulations. This Section 9.4(a) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(f) of the Tax Regulations and shall be interpreted consistently therewith.

(b) Partner Minimum Gain Chargeback. Except as otherwise provided in Section 1.704-2(i)(4) of the Tax Regulations, notwithstanding any other provision of this Article VIII, if there is a net decrease in Partner Nonrecourse Debt Minimum Gain attributable to a Partner Nonrecourse Debt during any Fiscal Year, each Member who has a share of the Partner Nonrecourse Debt Minimum Gain attributable to such Partner Nonrecourse Debt, determined in

18

accordance with Section 1.704-2(i)(5) of the Tax Regulations, shall be specifically allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Partner Nonrecourse Debt Minimum Gain  attributable to such Partner Nonrecourse Debt, determined in accordance with Section 1.704-2(i)(4) of the Tax Regulations. Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Sections 1.704-2(i)(4) and 1.704-2(j)(2) of the Tax Regulations. This Section 9.4(b) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(i)(4) of the Tax Regulations and shall be interpreted consistently therewith.

(c) <u>Qualified Income Offset.</u> In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Section 1.704- 1(b)(2)(ii)(d)(4), Section 1.704-1(b)(2)(ii)(d)(5), or Section 1.704-1(b)(2)(ii)(d)(6) of the Tax Regulations, items of Company income and gain shall be specially allocated to the Member in an amount and manner sufficient to eliminate, to the extent required by the Tax Regulations, the Adjusted Capital Account Deficit of the Member as quickly as possible, provided that an allocation pursuant to this Section 9.4(c) shall be made only if and to the extent that the Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article IX have been tentatively made as if this Section 9.4(c) were not in this Agreement.

(d) <u>Gross Income Allocation</u>. In the event any Member has a deficit Capital Account at the end of any Fiscal Year which is in excess of the sum of the amounts such Member is deemed to be obligated to restore pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Tax Regulations, each such Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this Section 9.4(d) shall be made only if and to the extent that such Member would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Article IX have been made as if Section 9.4(c) and this Section 9.4(d) were not in this Agreement.

(e) <u>Nonrecourse Deductions</u>. Nonrecourse Deductions for any Fiscal Year shall be specially allocated among the members in proportion to their Sharing Ratios.

(f) <u>Partner Nonrecourse Deductions</u>. Any Partner Nonrecourse Deductions for any Fiscal Year shall be specially allocated to the Member who bears the economic risk of loss with respect to the Partner Nonrecourse Debt to which such Partner Nonrecourse Deductions are attributable in accordance with Section

19

1.704-2(i)(1) of the Tax Regulations.

(g) Mandatory Allocations Under Section 704(c) of the Code. Notwithstanding the foregoing provisions of this Section 8.4, in the event Section 704(c) of the Code or Section 704(c) of the Code principles applicable under Section 1.704-1(b)(2)(iv) of the Tax Regulations require allocations of Profits or Losses in a manner different than that set forth above, the provisions of Section 704(c) of the Code and the Tax Regulations thereunder shall control such allocations among the Members. Any item of Company income, gain, loss and deduction with respect to any property (other than cash) that has been contributed by a Member to the capital of the Company or which has been revalued for Capital Account purposes pursuant to Section 1.704-1(b)(2)(iv) of the Tax Regulations) and which is required or permitted to be allocated to such Member for income tax purposes under Section 704(c) of the Code so as to take into account the variation between the tax basis of such property and its fair market value at the time of its contribution shall be allocated solely for income tax purposes in the manner so required or permitted under Section 704(c) of the Code using the "traditional method" described in Section 1.704-3(b) of the Tax Regulations; provided, however, that curative allocations consisting of the special allocation of gain or loss upon the sale or other disposition of the contributed property shall be made in accordance with Section 1.704-3(c) of the Tax Regulations to the extent necessary to eliminate any disparity, to the extent possible, between the Members' book and tax Capital Accounts attributable to such property; further provided, however, that any other method allowable under applicable Tax Regulations may be used for any contribution of property as to which there is agreement between the contributing Member and the other Members.

9.5  Curative Allocations.  The allocations set forth in Sections 9.4 (a) through (g) (the "Regulatory Allocations") are intended to comply with certain requirements of the Tax Regulations. It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss, or deduction pursuant to this Section 9.5. Therefore, notwithstanding any other provision of this Article IX (other than the Regulatory Allocations), the Members shall make such offsetting special allocations of Company income, gain, loss, or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of this Agreement and all Company items were allocated pursuant to Sections 9.2 and 9.3. The Members (i) shall take into account future Regulatory Allocations under Sections 9.4(a) and 9.4(b) that, although not yet made, are likely to offset other Regulatory Allocations previously made under Sections 9.4(e)

20

and 9.4(f) and (ii) may reallocate Profits and Losses for prior open years (or items of gross income and deduction of the Company for such years) among the Members to the extent it is not possible to achieve such result with allocations of items of income (including gross income) and deduction for the current year and future years. This Section 9.5 shall control notwithstanding any reallocation or adjustment of taxable income, taxable loss, or items thereof by the Internal Revenue Service or any other taxing authority.

   9.6   Other Allocation Rules.

      (a) For purposes of determining the Profits, Losses, or any other item allocable to any period (including allocations to take into account any changes in any Member's Sharing Ratio during a Fiscal Year and any transfer of any interest in the Company), Profits, Losses, and any such other item shall be determined on a daily, monthly, or other basis, as determined by the Members using any permissible method under Section 706 of the Code and the Tax Regulations thereunder.

      (b) The Members are aware of the income tax consequences of the allocations made by this Article IX and hereby agree to be bound by the provisions of this Article IX in reporting their shares of Company income and loss for income tax purposes.

      (c) Solely for purposes of determining a Member's proportionate share of the "excess nonrecourse liabilities of the partnership within the meaning of Section 1.752-3(a)(3) of the Tax Regulations, the Members' interests in Company Profits are in proportion to their Sharing Ratios.

      (d) To the extent permitted by Section 1.704-2(h)(3) of the Tax Regulations, the Members shall endeavor to treat distributions of Net Cash Flow as having been made from the proceeds of a Nonrecourse Liability or a partner Nonrecourse Debt only to the extent that such distributions would cause or increase an Adjusted Capital Account Deficit for any Partner.

      (e) Except as otherwise provided in this Article IX, an allocation of Company Profits or Losses to a Member shall be treated as an allocation to such Member of the same share of each item of income, gain, loss and deduction taken into account in computing such Profits or Losses.

      (f) For purposes of determining the character (as ordinary income or capital gain) of any profits allocated to the Members pursuant to this Article IX, such portion of profits that is treated as ordinary income attributable to the recapture of depreciation shall, to the extent possible, be allocated among the Members in the proportion which (i) the amount of depreciation previously allocated to each Member bears to (ii) the total of such

21

depreciation allocated to all Members. This section 9.6(f) shall not alter the amount of allocations among the Members pursuant to this Article IX, but merely the character of income so allocated.

(g)   Except for arrangements expressly described in this Agreement, no Member shall enter into (or permit any Person related to the Member to enter into) any arrangement with respect to any liability of the Company that would result in such Member (or a person related to such Member under Section 1.752-4(b) of the Tax Regulations) bearing the economic risk of loss (within the meaning of Section 1.752-2 of the Tax Regulations) with respect to such liabilities unless such arrangement has been approved by all Members. To the extent a Member is permitted to guarantee the repayment of any Company indebtedness under this Agreement, each of the other Members shall be afforded the opportunity to guarantee such Member's *pro rata* share of such indebtedness, determined in accordance with the Members' respective Sharing Ratios.

9.7   **Minimum 1% Interest of Managing Member.**   Notwithstanding anything in this Article IX, the Managing Member shall at all times during the existence of the Company have a minimum 1% allocation of each material item of income, gain, loss, deduction and credit of the Company.

9.8   **Distribution of Net Cash Flow.** (a) <u>Amounts and Timing</u>. Net Cash Flow shall be distributed to the Members in proportion to their respective shares of Profits allocated to each of them for such period (and prior periods) under Section 9.3, to the extent that such amounts have not been distributed previously under this Section 9.7. Such distributions shall be made within 90 days of the end of each Fiscal Year to those persons recognized on the books of the Company as Members or as Assignees on the last day of such Fiscal Year.

(b)   <u>Amounts Withheld</u>.   All amounts withheld pursuant to the Code and Tax Regulations or any provision of any state or local tax law with respect to any payment, distribution, or allocation to the Company or the Members shall be treated as amounts distributed to the Members pursuant to this Section 9.7 for all purposes under this Agreement. The Members are authorized to withhold from distribution, or with respect to allocations, to the Members and to pay over to any federal, state, or local government any amounts required to be so withheld pursuant to the Code and Tax Regulations or any provision of any other federal, state, or local law, and shall allocate any such amounts to the Members with respect to which such amount was withheld.

(c)   <u>Draws for Members</u>. The Company may pay to each Member a quarterly draw, to be unanimously determined by a Majority of the Members, and each such draw, if any, shall be treated as a loan from the Company to each Member receiving such draw and shall be deemed

repaid by reducing the amount of each subsequent distribution to the Member receiving such draw pursuant to this Section 9.7(c) by the lesser of (a) the entire amount otherwise distributable to the Member receiving such draw and (b) the entire amount of any unrepaid draws pursuant to this Section 9.7(c). All draws hereunder shall be made to the Members pro rata based on their estimated respective shares of Profits allocated to each of them for such Fiscal Year under this Article VIII. Any draw by any Member made pursuant to this Section 9.7(c) shall not result in any decrease in the Sharing Percentage of such Member.

## ARTICLE X
## TAXES

10. 1   **Tax Matters Partner.**   The Managing Members shall be the Tax Matters Partner of the Company pursuant to Section 6231(a)(7) of the Code. Such Managing Member shall not resign as the Tax Matters Member unless, on the effective date of such resignation, the Company has designated another Member as Tax Matters Member and such Member has given its consent in writing to its appointment as Tax Matters Member. The Tax Matters Member shall receive no additional compensation from the Company for its services in that capacity, but all expenses incurred by the Tax Matters Member in such capacity shall be borne by the Company. The Tax Matters Member is authorized to employ such accountants, attorneys and agents as it, in its sole discretion, determines is necessary to or useful in the performance of its duties. In addition, such Member shall serve in a similar capacity with respect to any similar tax related or other election provided by state or local laws.

10.2 **Mandatory Section 754 Election.**   Upon a transfer by a Member of an interest in the Company, which transfer is permitted by the terms of this Agreement, or upon the death of a Member or the distribution of any Company Property to one or more Members, the Members, upon the request of one or more of the transferees or distributees, shall cause the Company to file an election on behalf of the Company, pursuant to Section 754 of the Code, to cause the basis of the Company's property to be adjusted for federal income tax purposes in the manner prescribed in Section 734 or Section 743 of the Code, as the case may be. The cost of preparing such election, and any additional accounting expenses of the Company occasioned by such election, shall be borne by such transferees or distributees.

## ARTICLE XI
## DISPOSITION OF MEMBERSHIP INTERESTS

11.1 <u>Disposition</u>. Except as set forth in this Article XI, no Member or Assignee may Transfer all or a portion of the Member's or Assignee's Membership Interest.

23

11.2 <u>Dispositions not in Compliance with this Article Void</u>. Except as expressly permitted or required by this Agreement, no Member or Assignee shall Transfer all or any portion of his Membership Interest in the Company or any rights therein without the consent of a Majority. Any Transfer or attempted Transfer by any Member or Assignee in violation of the preceding sentence shall be null and void and of no force or effect whatsoever.

11.3 <u>Restrictions on Transfers</u>. Each Member hereby acknowledges the reasonableness of the restrictions on Transfer imposed by this Agreement in view of the Company's purposes and the relationship of the Members. Accordingly, the restrictions on Transfer contained herein shall be specifically enforceable. Each Member hereby further agrees to hold the Company and each Member (and each Member's successors and assigns) wholly and completely harmless from any cost, liability, or damage (including, without limitation, liabilities for income taxes and costs of enforcing this indemnity) incurred by any of such indemnified Persons as a result of a Transfer or an attempted Transfer in violation of this Agreement.

11.4 <u>Permitted transfers</u>.

(a) <u>General</u>. A Member or Assignee shall have the right to Transfer all or any portion of his Membership Interest only by means of a Permitted Transfer.

(b) <u>Definition of Permitted Transfer; Permitted Transferees</u>.

(i) A "Permitted Transfer" is any Transfer by a Member or Assignee of all of that Member's Membership Interest to a Permitted Transferee provided that such Transfer otherwise complies with the conditions and restrictions of this Article XI.

(ii) A "Permitted Transferee" of a Member or Assignee is any Person who is (1) another Member of the Company, (2) any other Person approved as a Permitted Transferee by the consent of a Majority or (3) permitted to receive a Membership Interest pursuant to Sections 11.6, 11.7, 11.8 or 11.9 hereof.

c) <u>Conditions to Permitted Transfers</u>. A Transfer otherwise permitted as a Permitted Transfer under this Section shall not be a valid Transfer of a Membership Interest and shall be considered null and void unless and until the following conditions are satisfied:

(i) The transferor and transferee shall execute such documents and instruments of conveyance and assumption as may be necessary or appropriate in the opinion of counsel to the Company to effect such Transfer and to confirm the Permitted Transferee's agreement to be bound by the provisions of this Agreement and assumption of all monetary obligations of the transferor Member with

respect to the Membership Interest being transferred and the transferor Member's agreement to guarantee the prompt payment and performance of such assumed obligations.

(ii) The transferor and transferee shall furnish the Company with the transferee's taxpayer identification number, sufficient information to determine the transferee's initial tax basis in the Membership Interest Transferred, and any other information reasonably necessary to permit the Company to file all required Federal and state tax returns and other legally required information statements or returns. Without limiting the generality of the foregoing, the Company shall not be required to make any Distribution otherwise provided for in this Agreement with respect to any Transferred Membership Interest until it has received such information.

(iii) Except as otherwise specifically provided, a Member making a Permitted Transfer of all of his Membership Interest and the Permitted Transferee thereof shall pay all reasonable costs and expenses incurred by the Company in connection with such Transfer.

(iv) In the opinion of tax counsel to the Company, the transfer of the Membership Interest shall have no adverse tax consequences for the Company.

(d) <u>Admission of Permitted Transferee as a Member</u>. A Permitted Membership Interest can be transferred to a Member in the Company only upon the consent of a Majority. The rights of a Permitted Transferee who is not admitted as a Member shall be limited to the right to receive allocations and Distributions from the Company with respect to the Membership Interest Transferred, as provided by this Agreement. The transferee of such Membership Interest shall not be a Member with respect to such Membership interest, and, without limiting the foregoing, shall not have the right to inspect the Company's books, act for or bind the Company, or otherwise interfere in its operations.

(e) <u>Effect of Permitted Transfer on Company</u>. The Members intend that the Permitted Transfer of a Membership Interest in the Company shall not cause the dissolution of the Company under the Act; however, notwithstanding the occurrence of any such dissolution, the Members shall continue to hold the Company's assets and operate its business in Company form under this Agreement as if no such dissolution had occurred.

11.5 <u>Distribution Among Members</u>. If a Permitted Transfer of a Membership Interest occurs during any Fiscal Year, any Net Profits, Net Loss, and all other items attributable to such Membership Interest for such Fiscal Year shall be divided and allocated between the transferor and the transferee by taking into account their

25

varying interests during the Fiscal Year in accordance with Section 706(d) of the Code, using any conventions permitted by law and selected by the Company. All Distributions on or before the date of a Permitted Transfer shall be made to the transferor, and all Distributions thereafter shall be made to the transferee. Solely for purposes of making such allocations and Distributions, the Company shall recognize a Permitted Transfer not later than the end of the calendar month during which it is given notice stating the date such Membership Interest was Transferred and such other information as the Company may reasonably require. If a Transfer is not a Permitted Transfer then all of such items shall be allocated, and all Distributions shall be made, to the Person who, according to the books and records of the Company, on the last day of the Fiscal Year during which the Transfer occurs, was the owner of the Membership Interest. The Members and the Company shall incur no liability for making allocations and distributions in accordance with the provisions of this Section and this Agreement, whether or not the Members or the Company has any knowledge of any Transfer of ownership of any interest in the Company.

11.6 <u>Transfers Between Members</u>. Except as specifically provided, the restrictions of Article XI shall not apply to a Transfer from one Member to another Member.

11.7 <u>Transfer to Descendants of Members</u>. The restrictions of Article XI shall apply to a Transfer from a Member to his or her descendant, either during his or her life, or upon his or her death by Will, either directly or in a Trust for the descendant's benefit.

11.8 <u>Tag-Along/Drag-Along</u>. If at any time any Member proposes to sell fifty (50%) percent or more of the Membership Interests of the Company to a bona fide purchaser in an arms-length transaction, for fair value, such Member shall provide each other Member with not less than twenty (20) days' prior written notice of such proposed sale, which notice shall include all of the terms and conditions of such proposed sale and which shall identify the purchaser. In such notice, the offering Member shall indicate whether he/it elects to require each other Member to sell to the purchaser the same percentage (the "Percentage") of the Membership Interests then owned by each such other Member as the percentage of the total number of Membership Interests owned by such offering Member which are to be sold pursuant to the bona fide purchaser and, if such offering Member so elects, each such other Member shall sell the same Percentage of his/its Membership Interests to the purchaser at the same time as, and on the same terms and conditions at which, the offering Member sells the Membership Interests owned by him/it.

If the offering Member shall not elect to require each other Member to sell his/its Membership Interest pursuant to the preceding paragraph, each other Member shall have the option, exercisable by written notice to the offering Member within ten (10) days after the receipt of the offering Member's notice, to require the offering

Member to arrange for the bona fide purchaser to purchase the same Percentage of the Membership Interests then owned by each such other Member as well as the offering Member's Interests at the same time as, and upon the same terms and conditions at which, the offering Member sells his/its shares.  If any such other Member shall make this election, the offering Member agrees that he/it shall either (a) arrange for the proposed purchaser to purchase the same Percentage of the Membership Interest then owned by each such other Member at the same time as, and upon the same terms and conditions at which, the offering Member sells hi/its Membership Interests, or (b) not effect the proposed sale to such purchaser.

    11.9 <u>Purchase of Shares on Death of Member</u>.

    (a) Upon the death of a Member, the Member's Estate shall be obligated to sell and the Company shall be obligated to purchase, at the price determined under Section 11.9(d), the Membership Interest of the deceased Member.

    (b) The transfer of the deceased's Member's Membership Interest shall take place within 180 days following the appointment of the Estate's representative.

    (c) The price determined hereunder shall be paid in twenty (20) semi-annual installments, bearing interest at the then Applicable Federal Rate.

    (d) The purchase price of each percentage share of Membership Interest which is purchased pursuant to any of the provisions of this Agreement, except as otherwise hereinafter provided, shall be the value per interest of such Membership Interest which is determined by a mutually selected appraiser or, if the parties cannot agree on an appraiser, by an appraiser selected by an appraiser selected by each.  If such appraisers cannot agree on a third appraiser, then the price shall be determined by the American Arbitration Association, under its commercial arbitration rules then in effect in Nassau County.

## ARTICLE XII
## DISSOCIATION OF A MEMBER

    12.1  Dissociation. A person shall cease to be a Member upon the happening of any of the following events:

        (a) the withdrawal or retirement of a Member;

        (b) the bankruptcy of a Member;
        (c) in the case of a Member who is a natural person, the death of the Member or the entry of an order by a court of competent jurisdiction adjudicating the Member incompetent to manage the Member's personal estate;

27

(d) in the case of a Member that is a trust or who is acting as a Member by virtue of being a trustee of a trust, the termination of the trust (but not merely the substitution of a new trustee);

(e) in the case of a Member that is a separate Organization other than a corporation, the dissolution and commencement of winding up of the separate Organization;

(f) in the case of a Member that is a corporation, the filing of a certificate of dissolution, or its equivalent, for the corporation or the revocation of its charter; or

(g) in the case of a Member that is an estate, the distribution by the fiduciary of the estate's entire interest in the company.

12.2   Rights of Dissociating Member.  In the event any Member dissociates prior to the expiration of the term of this Agreement, the Member shall be entitled to participate in the winding up of the Company to the same extent of any other Member.  The Company shall pay to the Member, beginning six months from the date of such Dissociation, an amount equal to the value of the Member's Membership Interest in the Company, to be paid over a period not to exceed five years together with interest at the Applicable Federal Rate necessary to avoid the imputation of interest under the Code. The payments shall be personally guaranteed by the remaining members. The value of the Member's Membership Interest shall include the amount of any Distributions to which the Member is entitled under the Agreement and the fair market value of the Member's Membership Interest as of the date of Dissociation as determined by a duly qualified appraiser selected by a majority of the Members, including the Dissociated member or his legal representative.  If said Members can not agree upon an appraiser, each Member shall select an appraiser and those appraisers shall select the appraiser who shall determine the fair market value of the Member's Membership Interest.

ARTICLE XIII
DISSOLUTION AND WINDING UP

13.1 Dissolution. The Company shall be dissolved and its affairs wound up, upon the first to occur of any of the following events (each of which shall constitute a Dissolution Event):

(a)  the expiration of the term of the Agreement, unless the Company is continued with the consent of all of the Members;

(b) the unanimous written consent of all of the Members;

(c)  the Dissociation of any Member, unless at the time

28

of such Dissociation there are at least two remaining Members and the Company is continued with the consent of all of the remaining Members within 180 days after such Dissociation;

       (d) when there is but one Member.

    13.2   Effect of Dissolution. Upon dissolution, the Company shall not be terminated and shall continue until the winding up of the affairs of the Company is completed and a certificate of dissolution has been issued by the Secretary of State of New York.

    13.3   Distribution of Assets on Dissolution. Upon the winding up of the Company, the Members acting together or such Person(s) designated by the Members representing at least a majority of the Members' Sharing Ratios) shall take full account of the assets and liabilities of the Company, shall liquidate the assets (unless the Members determine that a distribution of any Company Property in-kind would be more advantageous to the Members than the sale thereof) as promptly as is consistent with obtaining the fair value thereof, and shall apply and distribute the proceeds therefrom in the following order:

       (a)   first, to the payment of the debts and liabilities of the Company to creditors, including Members who are creditors, to the extent permitted by law, in satisfaction of such debts and liabilities, and to the payment of necessary expenses of liquidation;

       (b)   second, to the setting up of any reserves which the Members may deem necessary or appropriate for any anticipated obligations or contingencies of the Company arising out of or in connection with the operation or business of the Company. Such reserves may be paid over by the Members to an escrow agent or trustee selected by the Members to be disbursed by such escrow agent or trustee in payment of any of the aforementioned obligations or contingencies and, if any balance remains at the expiration of such period as the Members shall deem advisable, shall be distributed by such escrow agent or trustee in the manner hereinafter provided;

       (c)   then, to the Members in accordance with positive Capital Account balances taking into account all Capital Account adjustments for the Company's taxable year in which the liquidation occurs. Liquidation proceeds shall be paid within 60 days of the end of the Company's taxable year in which the liquidation occurs. Such distributions shall be in cash or Property (which need not be distributed proportionately) or partly in both, as determined by the Members.

    If at the time of liquidation the Members shall determine that an immediate sale of some or all Company Property would cause undue loss to the Members, the Members may, in order to avoid such loss; defer liquidation.

13.4   **Winding Up and Filing Articles of Dissolution.** Upon the commencement of the winding up of the Company, articles of dissolution shall be delivered by the Company to the Secretary of State of New York for filing. The articles of dissolution shall set forth the information required by the Act. The winding up of the Company shall be completed when all debts, liabilities, and obligations of the Company have been paid and discharged or reasonably adequate provision therefor has been made, and all of the remaining Property of the Company has been distributed to the Members.

## ARTICLE XIV
## MISCELLANEOUS

14.1   **Notices.** Notices to the Company shall be sent to the Principal Office of the Company. Notices to the Members shall be sent to their addresses set forth on Schedule A. Any Member may require notices to be sent to a different address by giving notice to the other Members in accordance with this Section 14.1. Any notice or other communication required or permitted hereunder shall be in writing, and shall be deemed to have been given with receipt confirmed if and when delivered personally, given by prepaid telegram or mailed first class, postage prepaid, delivered by courier, or sent by facsimile, to such Members at such address.

14.2   **Headings.** All Article and section headings in the Agreement are for convenience of reference only and are not intended to qualify the meaning of any Article or section.

14.3   **Entire Agreement.** This Agreement together with the schedules and appendices attached hereto constitutes the entire agreement between the parties and supersedes any prior agreement or understanding between them respecting the subject matter of this Agreement.

14.4   **Binding Agreement.** The Agreement shall be binding upon, and inure to the benefit of, the parties hereto, their successors, heirs, legatees, devisees, assigns, legal representatives, executors and administrators, except as otherwise provided herein.

14.5   **Saving Clause.** If any provision of this Agreement, or the application of such provision to any Person or circumstance, shall be held invalid, the remainder of this Agreement, or the application of such provision to Persons or circumstances other than those as to which it is held invalid, shall not be affected thereby. If the operation of any provision of this Agreement would contravene the provisions of the Act, such provision shall be void and ineffectual.

14.6   **Counterparts.** The Agreement may be executed in several counterparts, and all so executed shall constitute one agreement, binding on all the parties hereto, even though all parties are not signatory to the original or the same counterpart. Any counterpart

30

of either the Agreement shall for all purposes be deemed a fully executed instrument.

14.7   **Governing Law.** The Agreement shall be governed by and construed in accordance with the laws of the State of New York.

14.8   **No Membership Intended for Nontax Purposes.** The Members have formed the Company under the Act, and expressly do not intend hereby to form a partnership, either general or limited, under the New York Partnership Act. The Members do not intend to be partners one to another, or partners as to any third party. To the extent any Member, by word or action, represents to another person that any Member is a partner or that the Company is a partnership, the Member making such wrongful representation shall be liable to any other Members who incur personal liability by reason of such wrongful representation.

14.9   **No Rights of Creditors and Third Parties under Agreement.** The Agreement is entered into among the Company and the Members for the exclusive benefit of the Company, its Members, and their successors and assignees. The Agreement is expressly not intended for the benefit of any creditor of the Company or any other person. Except and only to the extant provided by applicable statute, no such creditor or any third party shall have any rights under the Agreement or any agreement between the Company and any Member with respect to any Capital Contribution or otherwise.

14.10   **General Interpretive Principles.** For purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

(a)   the terms defined in this Agreement include the plural as well as the singular, and the use of any gender herein shall be deemed to include the other gender;

(b)   accounting terms not otherwise defined herein have the meanings given to them in the United States in accordance with generally accepted accounting principles;

(c)   references herein to "Sections", "paragraphs", and other subdivisions without reference to a document are to designated Sections, paragraphs and other subdivisions of this

agreement;

       (d)  a reference to a paragraph without further reference to a Section is a reference to such paragraph as contained in the same Section in which the reference appears, and this rule shall also apply to other subdivisions;

       (e)  the words "herein", "hereof, "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular provision; and

       (f)  the term "include" or "including" shall mean without limitation by reason of enumeration.

       IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals as of the Effective Date.

COOPER SQUARE VENTURES, LLC

By: _____
David Gitman, Managing Member

By: _____
Michael Dardashtian, Managing Member

NDA HOLDING LLC
By: BRWY LLC, its sole member

By: _____

AS TO PARAGRAPH 6.5 ONLY:

_____
David Gitman

_____
Michael Dardashtian

TAX MATTER PARTNER:

By: _____

\\Server1\documents\00008674.000.WPD

SCHEDULE A

| Name and Address of Member | Description of Value Of Initial Capital Contribution | No. Of Units Membership Interest and Sharing Ratio |
|---|---|---|
| Cooper Square Ventures, LLC | 4900 | 49 units/49.0% |
| NDA Holding LLC | | 5100 |
| 51 units/51.0% | | |

\\Server1\documents\00008674.000.WPD