H68XDAR2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

MICHAEL DARDASHTIAN, et al.,

                  Plaintiffs,

        v.                   17 CV 4327 (LLS)

DAVID GITMAN, et al.,

                  Defendants.

------------------------------x

                                   New York, N.Y.
                                   June 8, 2017
                                   6:10 p.m.

Before:

                    HON. EDGARDO RAMOS,

                                   District Judge

                         APPEARANCES

ARTURI, D'ARGENIO & GUAGLARDI, LLP
     Attorneys for Plaintiffs
BY:  BARRY S. GUAGLARDI
     EVAN OSTRER

DENTONS US LLP
     Attorneys for Defendants David Gitman, Dalva Ventures,
LLC, Channel Reply, Inc.
BY:  BRIAN S. COUSIN (Via telephone)

UMAR FAROOQ, ESQ. P.C. (Via telephone)
     Attorney for Defendants David Gitman, Dalva Ventures, LLC,
Channel Reply, Inc.

MORRIS & OUT
     Attorneys for Defendants Jeremy Falk and Summit Rock
Holdings, LLC
BY:  EDWARD GILBERT (Via telephone)

1          (In robing room)

2          MR. FAROOQ:  Umar Farooq, U-m-a-r F-a-r-o-o-q.  My law

3   firm is Umar Farooq., Esq, P.C.,and I represent David Gitman

4   and Dalva Ventures, LLC, and Channel Reply, Inc.  My address is

5   640 Ellicott Street, Buffalo, New York.

6          THE COURT:  I'm sorry.  You said you represent Gitman,

7   Dalva, and what?

8          MR. FAROOQ:  And Channel Reply, Inc.

9          THE COURT:  Next.

10         MR. COUSIN:  This is Brian Cousin.  Judge, we spoke a

11  moment ago.  I'm with Dentons US LLP.  We have been asked to

12  represent David Gitman, Dalva Ventures, and Channel Reply, Inc.

13  as well.

14         MR. GILBERT:  Good afternoon, your Honor.  Edward

15  Gilbert from Morris & Out.  I also have not been formally

16  retained yet.  I represent here Jeremy Falk and Summit Rock

17  Holdings, LLC.

18         THE COURT:  Present in the room are.

19         MR. GUAGLARDI:  Barry Guaglardi and Evan Ostrer,

20  Arturi, D'Argenio, Guaglardi & Meliti.  We represent plaintiffs

21  Michael Dardashtian, Cooper Square Ventures, LLC, NDAP, LLC.

22         THE COURT:  Can everyone hear me?  Whenever anyone

23  speaks, speak loudly, slowly, clearly, hopefully like I'm

24  speaking now, because we are at a severe disadvantage with our

25  phone system here.  Okay?

 1            So, Mr. Guaglardi, you're going to have to keep your

 2   voice up.

 3            MR. GUAGLARDI:  I will, your Honor.

 4            Barry Guaglardi.  We represent the plaintiffs --

 5   Michael Dardashtian; Cooper Square Ventures, LLC; NDAP, LLC;

 6   and Channelreply, LLC.

 7            THE COURT:  This is Judge Ramos again.  We are here

 8   because the plaintiffs have sought a temporary restraining

 9   order restraining your clients and others from taking certain

10   actions in connection with the business of Cooper Square

11   Ventures, NDAP, and Channelreply, LLC.

12            So let me just ask the gentlemen on the phone whether

13   you have received copies of the papers that have been filed.

14            MR. COUSIN:  This is Mr. Cousin.  I have not.

15            THE COURT:  Mr. Farooq?

16            MR. FAROOQ:  I have received an email a few hours ago.

17   I haven't really had the chance to review the documents to make

18   sure that they've been properly filed and served, but I have

19   received an email with a number of documents, including the

20   cover letter and other documents in relation to the complaint.

21            MR. GILBERT:  This is Ed Gilbert on behalf of

22   Mr. Falk.  I received a number of documents as well.  I'm not

23   certain I have all the documents that were filed by plaintiff,

24   but I certainly have Mr. Dardashtian's affidavit and the order

25   to show cause.

```
 1              THE COURT:  What I will do is I will have
 2   Mr. Guaglardi summarize in five minutes.  I take it at least
 3   some of the folks on the phone are generally familiar with the
 4   facts and the business.
 5              So, Mr. Guaglardi, in five minutes, why are you
 6   seeking the TRO?
 7              MR. GUAGLARDI:  Yes, your Honor.  Thank you.
 8              THE COURT:  Voice up.
 9              MR. GUAGLARDI:  Thank you, Judge.  Mr. Dardashtian and
10   Mr. Gitman are 50/50 partners, and they are co-managers in the
11   plaintiff Cooper Square Ventures and NDAP, LLC.
12              Cooper Square Ventures owns a software solution called
13   Channel Reply.  Channel Reply is a trade secret intellectual
14   property, proprietary property, belonging to CSV.
15              It was developed in conjunction with two developers,
16   Konstantyn Bagaev and Olesksii Glukharev, who are in Russia who
17   were retained by CSV as a work-for-hire to prepare this
18   intellectual property for CSV.
19              Channel Reply is a software solution that allows store
20   owners that market their products on Ebay and on Amazon to be
21   able to message and communicate with their customers and help
22   facilitate that.  Channel Reply does somewhere in the
23   neighborhood of $30,000 a month in revenue and has more than
24   200 clients throughout the United States and worldwide.
25              Mr. Gitman was the chief technology officer of the
```

1    Plaintiffs CSV and NDAP.  Mr. Gitman had access to all of the

2    codes and the software that belonged to the plaintiff

3    companies, all of the codes and passwords that accessed all of

4    the accounts of the plaintiff companies, as did

5    Mr. Dardashtian.

6          At some point in time over the last two weeks,

7    Mr. Gitman went ahead, and he took all of the money from the

8    CSV Bank of America banking account which was in the

9    neighborhood of $75,000 or $80,000.  He took it without

10   knowledge or authority of Dardashtian and in violation of his

11   fiduciary duties.

12         He took the money and put it into his own bank account

13   into his own name as is evidenced by a document we've attached

14   as an exhibit in the affidavit.  That money was used in the

15   operating account for Channel Reply to pay for its servers to

16   handle all of the messaging that goes in between its customers.

17   It was done without my client's knowledge or consent.

18         Now Channel Reply does not have the ability to pay its

19   debts when they become due.  There have been automatic debits

20   on the accounts that have brought the accounts into overdraw

21   status.

22         Additionally, Mr. Gitman, without my client's

23   knowledge, terminated my client's access, changed all of the

24   pass codes and passwords to all of the accounts in CSV,

25   eliminating my client's ability to have access to any of the

1    accounts, to not know at all what was going on.

2         My client logged on.  His passwords, which he has had

3    since the inception of these businesses, told him the passwords

4    have been changed.  It was never approved.  It was never

5    discussed.  Mr. Gitman just did it.

6         In addition, Mr. Gitman took my client's email and

7    eliminated my client's access to his own Channel Reply emails.

8    He then took his own facial feature and put his facial feature

9    on my client's email as if he were Michael Dardashtian or

10   Michael Dash.  He did this without my client's knowledge or

11   without my client's authorization.

12        Then Mr. Gitman went ahead and formed a company,

13   Channel Reply, Inc.  He did that without my client's knowledge

14   or without my client's authorization.  Two years ago, the

15   parties, Gitman and Dardashtian, agreed that they were going to

16   take the Channel Reply solution and they were going to put it

17   in a separate entity.

18        My client formed Channelreply, LLC for that purpose.

19   My client presented Mr. Gitman at that time with the

20   opportunity so that they could continue to be 50/50 partners in

21   that business because Cooper Square Ventures owns Channel

22   Reply.  Mr. Gitman never signed the documents.

23        Then Mr. Gitman formed Channel Reply, Inc.  Now

24   Mr. Gitman has contacted the developers, who are Defendants

25   Bagaev and Glukharev who are in contact and agreement with CSV

1   and who are their developers who are paid and has solicited

2   them to go into business with him and with Gitman and Channel

3   Reply, Inc. and take the trade secret intellectual and

4   proprietary property owned by CSV and abscond with it and take

5   it and use it for Channel Reply, Inc.

6           The two developers have acknowledged in their

7   agreements with the plaintiffs that the technology and software

8   that they developed was intellectual property, that it was

9   protectable, and that it was trade secret and that it was owned

10  by Cooper and that it was a work-for-hire and that they had no

11  interest in it.

12          We now have become aware that Mr. Gitman, after taking

13  all the money out of the bank, terminating Dardashtian's access

14  to everything, taking all of the intellectual property and

15  trying to move it over to Channel Reply, Inc., has now

16  scheduled to leave tomorrow to go to the Ukraine and to meet

17  with the two developers.

18          He has offered them salaries.  He's offered to take

19  care of their visas.  He's offered to find them living

20  residences.  He's offered to give them equity participation in

21  the Channel Reply, Inc. business, all without my client's

22  knowledge or consent.

23          He then apparently discussed with the developers that

24  he might then offer to Dardashtian a 5 percent interest in

25  Channel Reply, Inc. when currently Channel Reply, the solution

 1   and the only software and only code, is owned 100 percent by

 2   Cooper, and Dardashtian owns 50 percent of Cooper.  In

 3   addition, Gitman has frozen out Dardashtian from speaking to

 4   all of the developers.  I need to bring this to the Court's

 5   attention, your Honor.

 6          Today, after we served the papers, the one program

 7   that my client was not terminated from is a program that allows

 8   my client and Mr. Gitman to see what the developers and the

 9   employees of CSV and Channel Reply are doing.

10          After they were served with the papers, Judge,

11   Mr. Gitman entered into a communication with one of the

12   developers, Konstantyn Bagaev, and it's very relevant, and I

13   want to show it to the Court.  I blew it up so that the Court

14   has it.

15          I'm going to read it.  It's today.

16          THE COURT:  Slowly, Mr. Guaglardi.

17          MR. GUAGLARDI:  I will.  Konstantyn Bagaev starts with

18   "Okay."  Then.

19          MR. KONSTANTYN BAGAEV:  Mike calling.  I decline.

20          MR. DAVID GITMAN:  That's a good idea.

21          MR. KONSTANTYN BAGAEV:  He wants to chat.

22          MR. DAVID GITMAN:  I strongly recommend blocking him.

23   I'm reading the doc now.  I don't get how he knows all these

24   details.

25          MR. KONSTANTYN BAGAEV:  I speak with him.  Sorry.

1              MR. DAVID GITMAN:  It's okay.

2              MR. KONSTANTYN BAGAEV:  Maybe I misheard something,

3    but he has some screen shots in quotes.

4              MR. DAVID GITMAN:  Generally it's not a good idea to

5    talk directly with people who are suing you, hmm.

6              MR. KONSTANTYN BAGAEV:  I asked the paper about my

7    share of 5 percent costs, $25,000.  He told "Yes, and it is

8    true."  Then he told me that you lie everywhere and stealing

9    company.  I asked if I owned taxes for my salary -- he told --

10   he doesn't know.  I didn't share any more info.

11             MR. DAVID GITMAN:  Okay.

12             MR. KONSTANTYN BAGAEV:  He told he wants to be 50/50

13   partner with you.

14             MR. DAVID GITMAN:  I have no interest in ever working

15   with Mike again.

16             MR. KONSTANTYN BAGAEV:  I need a look.  We can talk

17   with voice.  Probably I'll call to Alexi and tell him that

18   everything is okay.

19             MR. DAVID GITMAN:  Sure."

20             This, Judge, is what was submitted after the papers

21   were served.  In this document, Mr. Gitman not only -- he

22   reaffirms everything we put in our papers.  He told a paid

23   developer for CSV to block the owner of CSV and not communicate

24   with him and shut him out, number one.

25             Number two, I never emailed Gitman the documents.  I

1    emailed Mr. Farooq the documents which means Mr. Farooq sent

2    Gitman the documents.  Gitman's response to reading the

3    documents was, "I don't get how he knows all these details."

4         So that means -- he didn't say the details were

5    untrue.  He said he now knows he was hiding the details from

6    us.  He doesn't know how he got them, and he's trying to figure

7    it out because he blocked complete access for Dash.

8         Judge, as we sit here today, we have two 50/50

9    partners who are co-managers who each have a fiduciary duty to

10   each other and to the companies.  One party has abused that

11   fiduciary duty, has completely terminated the other party's

12   access, and destroyed the status quo, number one.

13        He has drained the banking accounts without authority

14   and transferred them into his own name, not even to a company

15   name.  He has misused my client's business identity and put his

16   face on it and is misrepresenting to the third parties,

17   including all of the people who get customer service, who

18   Michael Dardashtian is.

19        He has formed a company for the express purpose of

20   stealing the trade secrets and intellectual property that are

21   owned 50/50 by him in CSV and is now looking to bring in the

22   developers who are the only people with the knowledge of the

23   trade secret and the intellectual property and who can control

24   it and who are abroad and bring them in as equity partners in

25   the new business and to make the client the offer of 5 percent

1    of a software technology company he already owns 50 percent of.

2           While he's doing that, he's directing the codevelopers

3    to not communicate with the co-manager of the company they are

4    employed by and is directing them to not communicate.

5           He also, Mr. Gitman, is not communicating while he is

6    engaging in the conversion, misappropriation, computer theft,

7    infringement of the tradename, the operating agreement --

8           THE COURT:  Why don't you summarize, again, briefly

9    the allegations concerning Mr. Falk.

10          MR. GUAGLARDI:  Mr. Falk.  Thank you, your Honor.

11          Mr. Falk is the owner of Summit Rock Holdings, LLC.

12   Mr. Falk was a party involved in assisting Mr. Gitman and

13   Mr. Dardashtian with the sale of Plaintiff NDAP.

14          NDAP is an online software provider that sells

15   automobile parts, that in its simplest form.  The company has a

16   contract which Mr. Gitman has signed.  I think it's for

17   $450,000 or $480,000 to a buyer.

18          Mr. Falk has been a party that was involved in helping

19   broker, for lack of a better word, that transaction.  There was

20   a dispute as to -- and there's an agreement that Mr. Falk has.

21   Mr. Falk has agreed, based on documents we've seen, to take I

22   think $80,000 as his commission.

23          My client was awaiting confirmation of that commission

24   in order to determine whether or not to move forward with that

25   sale.  We tried to work through Mr. Gitman.  It didn't work.

1     So now we can work through Mr. Falk's attorneys.

2          Mr. Falk also has entered into -- on the NDAP sale,

3     your Honor, Mr. Gitman is demanding that the net sale proceeds

4     after the payment to Falk and to one other supplier get divided

5     70/30, 70 to him, as opposed to 50/50 because he's contending

6     money was taken.

7          So we tried to work out an accounting with the

8     corporate accountant.  I've been speaking to Mr. Farooq who is

9     on the phone, and we haven't gotten there yet.  So Mr. Falk's

10    involvement in that transaction was as a broker.

11         In addition, it's our understanding that Mr. Falk has

12    become now involved with Mr. Gitman in another e-commerce

13    competitive business by the name of Accel Commerce.

14         That business -- the description of it is in our

15    papers as well.  It does exactly the same as these other

16    businesses.  They're all involved in electronic commerce, and

17    the developers have developed the code and the software to be

18    able to do this.

19         So we have an understanding that Mr. Falk is now

20    working with Mr. Gitman and may be in possession of our trade

21    secrets, intellectual property, and competing against us, even

22    though, as our broker signed an agreement with us, he has a

23    duty to NDAP not to breach his fiduciary duties that he has to

24    our client as well.

25         So we right now understand Mr. Falk to be working with

H68YDARC

 1   Mr. Gitman in at least Accel Commerce and we believe in

 2   connection with the theft of our trade secrets involved in our

 3   other businesses.  So that's what we have going on with

 4   Mr. Falk.

 5           THE COURT:  Folks, can you hear me okay?

 6           MR. COUSIN:  Yes, your Honor.

 7           THE COURT:  I've read the papers.  What is concerning

 8   to me are the allegations that Mr. Gitman has, first of all,

 9   according to the allegation --

10           MR. GILBERT:  Your Honor, I'm sorry to interrupt.

11   You're fading in and out.

12           THE COURT:  What is concerning to me are the

13   allegations that Mr. Gitman siphoned all of the funds from the

14   Cooper Square accounts, and these are accounts, as I understand

15   them, as to which both Mr. Dardashtian and Mr. Gitman were

16   cosigners; that he has locked Mr. Dardashtian out of all of the

17   codes; that he has locked him out of his businesses, etc.; that

18   he has taken over his email; and that he has done all of this

19   without his authority or consent.

20           So that kind of self-help in connection, again, a

21   dispute concerning what appeared to me to be straightforward

22   trade secrets is of some concern.

23           So if you could address yourselves to that.

24           MR. COUSIN:  This is Mr. Cousin.  The only thing I can

25   say -- because I haven't read the papers and I've never spoken

1  to Mr. Gitman.  So I don't know what his response would be to

2  that.

3       Maybe Mr. Farooq has a more complete response or at

4  least some response.  I don't have any facts at my disposal,

5  your Honor, because I just got the first phone call at 5:45

6  today about a hearing at 6:00.  So I'm at a decided

7  disadvantage.

8       I understand Mr. Farooq is not a litigator.  He's

9  never been in court before.  I think that it would be

10 prejudicial, highly prejudicial, to Mr. Gitman to force me to

11 respond on his behalf at this point without having read any of

12 the papers or even interviewed him about the facts.

13      THE COURT:  I understand.

14      I take it, Mr. Farooq, you would not be want to speak

15 in this regard?

16      MR. FAROOQ:  No, your Honor.  I haven't really had a

17 chance to read the documents that have been presented to me in

18 the email.  Like I said, they were given to me a few hours ago.

19      In fact, I was really surprised because until

20 yesterday, Mr. Guaglardi was actually offering to negotiate

21 certain items.  I was under the impression that he was moving

22 forward with that.  It just came out of nowhere for me.

23      THE COURT:  Mr. Gilbert.

24      MR. GILBERT:  Your Honor, I only represent Mr. Falk

25 and Summit Rock.  I have no knowledge about what Mr. Gitman has

1    or has not been doing.

2              THE COURT:  Okay.

3              MR. GILBERT:  Your Honor, I can certainly speak to the

4    allegations against Mr. Falk.

5              THE COURT:  Why don't you do that.

6              MR. GILBERT:  Okay.  Certainly, your Honor.

7    Your Honor, Summit Rock is a single-member LLC, and Mr. Falk is

8    the single member of that LLC.  Summit Rock had a contractual

9    agreement with Cooper Square Ventures and NDAP.  Everything

10   that plaintiff's counsel said with respect to that agreement is

11   somewhat accurate.

12             I would say that Mr. Falk was a consultant, not a

13   broker.  He conducted due diligence.  He solicited proposals,

14   etc.  He is due to receive more than $110,000 pursuant to the

15   express terms of that services agreement.

16             There are really no allegations in the complaint that

17   he hasn't done any work with respect to that.  I would note,

18   your Honor, that that services agreement does not have a

19   non-compete in it, which brings me to the next point.

20             There are allegations in the complaint that my client

21   is connected to a Accel Commerce.  He did not have any

22   ownership interest in a Accel Commerce whatsoever.  He does not

23   have any contractual relationship with a Accel Commerce,

24   whether oral or written.

25             With respect to whether or not Accel Commerce competes

1    with other entities, short of saying that because Accel

2    Commerce is involved in e-commerce, a competitor, would

3    certainly be too broad a statement.

4           Your Honor, I just got involved about an hour and a

5    half ago.  My understanding is that Accel Commerce does not

6    compete with Channel Reply.  Channel Reply engages in some sort

7    of enterprise where it assists resellers of merchandise on Ebay

8    and Amazon with messaging.

9           My understanding of Accel Commerce is that it helps

10   e-commerce retailers sell their product.  My understanding from

11   my client is right now is that Accel Commerce, which was only

12   formed a few months ago, has one client that sells lobsters.

13          I don't think they're a competitor.  I think that the

14   allegations in the complaint which I have reviewed do not

15   sufficiently allege misappropriation of any intellectual

16   property on behalf of Mr. Falk.

17          I certainly don't think at this stage the plaintiff

18   has demonstrated a likelihood of success.

19          THE COURT:  Mr. Guaglardi.

20          MR. GUAGLARDI:  Your Honor, if I can just address what

21   I've heard.

22          THE COURT:  Keep your voice up, please.

23          MR. GUAGLARDI:  Thank you.

24          Judge, as to Mr. Farooq, first of all, the documents

25   were submitted more than three hours ago.  Secondly, it's our

 1    understanding from the documents we've seen that Mr. Farooq was

 2    the attorney that formed or assisted in forming Channel Reply,

 3    Inc.  So to that extent, we're going to have to evaluate

 4    Mr. Farooq's status in the litigation, and he may be a witness,

 5    if not a party.

 6           With respect to Accel, counsel indicated that Mr. Falk

 7    has no ownership interest, and then he said that Mr. Falk has

 8    no contractual relationship.  What he did not say is whether

 9    Mr. Falk has any involvement.  That was conveniently not

10    discussed.

11           So, first of all, why would counsel be even speaking

12    to Accel if his client has no stake in the game and his client

13    is not an owner or an employee or a subcontractor.  So his

14    client does have involvement, just not as an owner and not in a

15    contractual relationship.

16           So he should have no concern about restraints being

17    entered against Accel because he's not a party to it.  He's not

18    an owner.  He's got no standing to even make a defense as to

19    show restraint against Accel Commerce.

20           So, as we sit here right now, we have Mr. Gitman -- by

21    the way, when I spoke with Mr. Farooq, which is true.  I spoke

22    with him over the last couple days -- we were communicating

23    solely about the sale of NDAP.

24           In fact, I asked Mr. Farooq to communicate with me

25    about Channel Reply, and his written response to me was, we

 1    don't want to talk about Channel Reply.  We'll talk about that

 2    after you sign the asset purchase agreement to sell NDAP.  So

 3    he refused to communicate when we were trying in good faith to

 4    resolve these issues.  We got shut down.

 5            His client is fully aware of what's gone on.  These

 6    allegations are written in documents that were authored by

 7    Mr. Gitman himself.  Mr. Gitman in his email admitted that he

 8    drained the bank account.

 9            The documents from Bank of America, which are

10    indisputable, show that the money was transferred to

11    Mr. Gitman.  My client has given his sworn statement he never

12    authorized that.

13            All of the passwords were terminated by Mr. Gitman.

14    In Mr. Gitman's own words in the emails, he tells the

15    developers he shut my client out of access to everything.  He

16    then even ridiculed and boldly made fun of the fact that he

17    took on and impersonated my client in his own email by saying,

18    "Boom."  This happens out of nowhere.

19            He sent the email to himself showing that he was

20    stealing my client's email.  This can't be any more clear.

21    There can be no evidence that's going to rebut what happened.

22            Even today in the document that we presented to

23    your Honor in which Mr. Gitman communicated with Mr. Bagaev, he

24    even admits he can't figure out how Dash knows all the details.

25            He read the documents.  He knows they're true.  He

 1    knows he locked my client out, and he can't figure out how my

 2    client could have figured everything out knowing that he locked

 3    my client out.

 4            So now we have a company that my client is a

 5    50 percent owner of that he is completely shut out of, and that

 6    is not what the status quo was, your Honor.  The status quo was

 7    my client was a 50 percent owner, a 50 percent co-manager.  He

 8    had access to everything.  He is a dual signatory on the bank

 9    account.  He was actively involved in everything.  He signed

10    off on everything.  There was nothing done without his

11    involvement.

12            Now, through what your Honor characterized correctly

13    as purely self-help, Mr. Gitman unilaterally made the decision

14    he was going to terminate Dash, and then what I just presented

15    to your Honor spells it out very clearly.

16            Mr. Gitman says -- Mr. Bagaev said to Mr. Gitman, "He

17    told me he wants to be 50/50 partners with you."  Is that not

18    demonstrating good faith?  My client is saying I'm a 50/50

19    partner.  All I want to do is continue to be the 50/50 partners

20    that we are.

21            Mr. Gitman's response, "I have no interest in ever

22    working with Mike ever."  So we have a guy who locked him out,

23    has stolen the money, is stealing the trade secrets, is

24    impersonating the person, is infringing on the exact tradename

25    and the goodwill, is confusing the customers and is saying, I'm

H68YDARC

1   not going to be a partner with this guy going forward while he

2   locked him out and stole everything.

3           We're entitled to all of these restraints, Judge.

4   He's leaving tomorrow on a plane to go sign deals of the

5   developers with Cooper, the intellectual property that my

6   client has spent years, time, effort, and money developing and

7   Cooper has paid for to steal the trade secrets and to interfere

8   with the subcontractor relationships, to induce them to blow

9   off Cooper and all of the companies my client is involved with

10  to go be only involved with Gitman and his companies.

11          While he's doing it, he's lying and disparaging Dash

12  to try and convince these developers that Dash is the bad guy.

13          THE COURT:  Here is what I think I want to do:  First

14  of all, plaintiff is asking for 22 different types of

15  restraints.  Under no circumstance am I going to grant all of

16  these restraints.

17          I have read the papers.  I have determined

18  preliminarily that plaintiffs have established irreparable harm

19  with respect to the Defendant Trade Secrets Act; that the

20  testimony of trade secrets, including codes and customer lists,

21  etc., can be irreparable harm under New York Labor Law.

22          I find that at the very least, if there is no

23  likelihood of success on the merits, there are at least serious

24  questions going to the merits and that the harm weighs in favor

25  of plaintiffs.

 1              Further, I find that the public interest would not be

 2    disserved by a temporary restraining order.

 3              MR. COUSIN:  You faded out, your Honor.  I'm sorry.

 4              THE COURT:  I was walking through the elements of a

 5    TRO.  I'm speaking only with respect to the Defendant Trade

 6    Secrets Act.  I find the same with respect to the breach of

 7    fiduciary duty under New York Labor Law, that Mr. Gitman has

 8    breached his fiduciary duty to Mr. Dardashtian.

 9              Now, what I am not clear on is whether beyond

10    Mr. Gitman plaintiffs have established their entitlement to a

11    restraining order over the balance of the defendants, including

12    Mr. Falk, his company Summit Rock, Accel Commerce, and the two

13    Russian programmers.

14              As to Mr. Gitman and to Channel Reply, Inc., I believe

15    that a temporary restraining order will issue.

16              Why should I issue the order as to Dalva,

17    Mr. Guaglardi?  What is Dalva?

18              MR. GUAGLARDI:  Dalva is a company, your Honor, that

19    was formed by Mr. Gitman that is involved in the same type of

20    business, e-commerce.  Dalva is the one that has been acting as

21    a middle person in making some of these transactions and in

22    having some of these communications.

23              It is just another entity that Mr. Gitman has formed,

24    unbeknownst to my client, which is engaging in exactly the same

25    type of activity and is involved in communications with the

1    developers, is involved in communications with the same

2    relevant parties.

3            It's the same exact scenario as what's going on with

4    Channel Reply, Inc. other than the tradename infringement.

5    That's the only distinction.

6            MR. FAROOQ:  Your Honor, can I say something.

7    Normally I don't get involved when parties go to court.  I feel

8    like I'm forced to say something because of the urgency that

9    Mr. Guaglardi has created around this issue.

10           I've dealt with a number of very sophisticated

11   parties.  This is an issue of two sophisticated parties that

12   are resolving a very complicated commercial dispute that has

13   elements of corporate law, intellectual property, trade secret

14   law, accounting allocations, accounting distributions.

15           The way this case is presented now with Mr. Guaglardi

16   making it seem like it's really urgent -- until yesterday,

17   Mr. Guaglardi was discussing and negotiating key terms of a

18   potential settlement in relation to the proceeds of the same,

19   which is where the case started.

20           I don't want to talk about substantive issues because

21   once we are in court, I want to make sure that those

22   substantive issues are properly addressed, including corporate

23   law issues that are fundamental issues in relation to the

24   accounting allocation and distribution that needs to be made

25   under that operating agreement of Cooper Square Ventures.

1         So, from my perspective, when we are talking about

2   trade secrets, there are certain assumptions that have to be

3   made, the first assumption being that actually trade secrets

4   belong to the entity which seeks protection.

5         If we find out later on that that entity did not own

6   the trade secrets or, for example, as a general principle under

7   a contractor relationship, under a subordinate for hire, the

8   contractor owns the property -- I'm just giving that as an

9   example, not as a determination that that's the case here

10  because I have not been in an agreement -- a contractor

11  agreement on an IT assignment from a contractor over to

12  Mr. Dardashtian, and even in relationship to Channel Reply, I

13  have not seen any sort of ownership documents to show that

14  Cooper Square Ventures owned it.

15        I'm just giving that as an example of the kind of

16  issues that I see where later on, if we find out that they

17  actually were true, we are rushing to an injunction where there

18  was actually no need because this is a sophisticated deal

19  between two sophisticated corporate parties.

20        Like I said, right now there are issues around

21  corporate law, intellectual property, trade secrets, contractor

22  IT assignments, intellectual property around that, and

23  accounting allocations, which is something that was being

24  discussed currently between Mr. Guaglardi and I in terms of

25  signing this asset purchase agreement.

1          NDAP is currently being purchased by a buyer.  We were

2   planning on keeping the proceeds of the sale into an escrow

3   account that was going to be held by Mr. Jeff Rothman who would

4   then disburse the proceeds once we've done an accounting.

5          According to my client, Mr. Dardashtian has taken --

6   at least from initial knowledge, that they have over $120,000

7   in distributions without, for example, following any of the

8   corporate resolutions or corporate consent, member consent that

9   usually are signed before any distribution either on a

10   quarterly or a yearly basis.

11          Like I said, I'm giving this as an example of things

12   that I've come across since I got involved.  Those are open

13   questions that will need -- a determination will need to be

14   made -- unless the parties settle outside of court, a judge

15   will need to make a determination, whether, for example, to

16   establish in favor of one party, whether a party has

17   intellectual property.

18          To create an urgency and make those statements of fact

19   now would be causing extreme prejudice to my client who

20   basically would have to stop all their operations just because

21   somebody says that that is in fact the case when a lot of those

22   things are really arguable around intellectual property,

23   ownership of different assets, and also around accounting

24   issues.

25          MR. GUAGLARDI:  If I can just briefly respond.

1          THE COURT:  Keep your voice up, Mr. Guaglardi.  Very,

2     very briefly.  Just speak to the issue of the ownership of the

3     trade secrets and the intellectual property.

4          MR. GUAGLARDI:  Channel Reply, the solution, Judge,

5     was developed by the Russian developers in a contract where

6     they are identifying that it is a work-for-hire owned by the

7     company Cooper.

8          The company Cooper has received a revenue for it.  The

9     company Cooper has operated the channel supply solution.  There

10    is no dispute that it's a trade secret, no dispute that it's an

11    intellectual property.  The developers themselves developed it,

12    and they acknowledge that it's intellectual property and

13    proprietary property.  It's been operated that way.

14          There are secure encrypt passwords that are protecting

15    this software.  It's excluding the public from getting access.

16    There is no dispute.

17          THE COURT:  There may be a dispute.  More to the

18    point, can you point to the exhibits in your papers that

19    establish what you've said.

20          MR. GUAGLARDI:  If your Honor would briefly.  I need

21    to just look for them.

22          If you go to Exhibit 7, your Honor.  7 is the

23    NDAP LLC, 7-D.  I'm sorry.  7-D is the NDAP LLC.  It's unsigned

24    by Konstantyn Bagaev because we can't get in to get these

25    signed documents.

 1          If you go to the third full page, works made for

 2   hire -- I can read it into the record if your Honor wants me

 3   to.

 4          THE COURT:  No.  I'll read it.  "Contractor

 5   acknowledges that all right, title, and interest in all works

 6   of authorship, designs, computer programs, copyrights, and

 7   copyright applications, etc., shall be regarded as works made

 8   for hire with company as the sole author and the owner thereof,

 9   including, without limitation, as works specially ordered or

10   commissioned for use as part of an audio/visual work."

11          MR. GUAGLARDI:  Then the next sentence, your Honor.

12          THE COURT:  "Company will own all right, title, and

13   interest in intellectual property with the full and

14   unrestricted right to exploit same in any manner or media, now

15   known or hereafter devised, and without any additional

16   compensation to contractor."

17          In any event, my concern is the manner in which

18   Mr. Gitman is alleged to have taken or undertaken these acts.

19   I find that a restraining order is appropriate with respect to

20   Mr. Gitman's actions with respect to the bank account and with

21   respect to denying Mr. Dardashtian access to the company

22   records, programs, etc.

23          So the restrictions that I will order today will

24   address those limited issues.  So Mr. Gitman will be required

25   to return the money, to refrain from continuing to siphon the

money.  He will be ordered to allow Mr. Dardashtian access to

the company records, programs, etc., email systems, etc.

I will go through to see what other restrictions are

appropriate in that regard.  Because it's going to take some

time, I will do that not with counsel, unless you want to sit

around while I do it.  Actually, you may want to.  Then I will

read the restrictions that will be imposed, but the

restrictions will be on Mr. Gitman, Dalva, and Channel Reply,

Inc.

By the way, there are other claims, other counts in

the complaint, in addition to the Defendant Trade Secrets Act

and the violation of New York fiduciary duty law, and I have

not analyzed each of those counts, but certainly with respect

to those two counts, I believe that the restrictions are

appropriate.

MR. GUAGLARDI:  Your Honor, if I may, there is one

more, your Honor, on Exhibit 7 that we just read into the

record.

On Exhibit 7 that we just read into the record, if you

look at Exhibit A to Exhibit 7, it says for the contractor

Konstantyn Bagaev, "The scope of services, act on behalf of

client in capacity of work for hire, consultant working on

various projects, including but not limited to Channel Reply."

So, in further illustration of the fact that this is

intellectual property that's protected and owned by the

1    companies, the plaintiff, Channel Reply, is listed on Exhibit A

2    where it demonstrates that that's what they're working on, as

3    the developers call it, intellectual property.  I just wanted

4    to point that out.

5         MR. COUSIN:  Your Honor, this is Mr. Cousin.  May I be

6    heard for a moment?

7         THE COURT:  Yes, you may.

8         MR. COUSIN:  Thank you, your Honor.

9         You know, as I said before, I'm at a disadvantage

10   because I haven't really read the papers.  As people are

11   talking, I'm just trying to piece together some of it.  I just

12   have a couple comments.

13        The first thing is I read the TRO that's being

14   requested.  Aside from the fact that there are about 22

15   restraints or so, I think some of the restraints go beyond even

16   with respect to Mr. Gitman, Dalva Ventures, and Channel Reply,

17   go beyond what would be normally entered into as an injunction

18   of this type.

19        I think that asking these parties to reverse actions

20   or take actions, in some respects, goes beyond maintaining the

21   status quo.  So I want your Honor to consider that as you look

22   through the requested restraints.

23        The second thing is I notice that of course there

24   needs to be a bond posted for a TRO of this nature.  We would

25   request that a significant bond be posted to give me an

1    opportunity to review the facts and to determine whether

2    in fact these facts as alleged are true.

3            If they are not true, if in fact this is a wrongfully

4    entered injunction, we need to have adequate protection and

5    security so that our clients, our potential clients I should

6    say, will be able to be made whole for the injunction.

7            In addition to that, it's really more of a question,

8    but I'm trying to understand from the papers.  I'm just trying

9    to thumb through them to see whether there's an allegation that

10   Mr. Gitman was an employee of the plaintiff entity at the time

11   that he allegedly undertook these wrongful acts.

12           I can't tell that, but it's very significant because

13   it may affect whether or not Mr. Gitman, for example, would

14   have the right to indemnification or advancement of fees from

15   the plaintiff entity.

16           If that's the case, he would request an immediate copy

17   of any indemnification or advancement documents so we can make

18   a determination as to whether or not the plaintiff companies

19   should be advancing the legal fees for Mr. Gitman in his

20   defense.

21           Then finally, I note that I have not been able to

22   detect any post-employment restrictive covenant or any other

23   restrictive covenants, and I wondered whether there were such

24   restrictive covenants that would somehow apply to Mr. Gitman.

25           MR. GUAGLARDI:  If I may, Judge, just briefly.

```
 1              THE COURT:  Yes.  Keep your voice up.

 2              MR. GUAGLARDI:  First of all, Mr. Gitman is an owner

 3    and co-manager of the plaintiff companies, and his obligations

 4    arise from that, not just from his being an employee.  That's

 5    the first issue.

 6              As far as an indemnity, counsel is asking if there

 7    should be an indemnity to provide that the company advance fees

 8    for Mr. Gitman because of his own bad acts, which is

 9    respectfully unwarranted.

10              MR. COUSIN:  Alleged.

11              MR. GUAGLARDI:  Thirdly, the issues on a bond, there

12    is no obligation to post a bond.  This is to restore the status

13    quo.  This is not to go forward and have money posted in an

14    area where my client has an advantage to the money that might

15    put Gitman at a disadvantage.

16              Restoring my client's password access, putting money

17    in the bank from where it was stolen, making sure that no trade

18    secrets are misappropriated are things that return the parties

19    to the status quo and do not require the posting of a bond.

20    This is not that type of a case.

21              THE COURT:  I am going to require you to post a bond.

22    So I want the parties to start thinking about what an

23    appropriate amount might be.

24              By the way, in the event that the counsel on the phone

25    were not aware, the judge assigned to this matter is
```

1   Judge Louis Stanton.  However, he is unavailable today.  So

2   this matter was referred to me as the part 1 judge on duty here

3   in the Southern District this week.

4           So any order or any relief from the TRO that I enter

5   will almost certainly need to be addressed to Judge Stanton,

6   unless he is unavailable again next week in which case -- I

7   don't know who the part 1 judge is next week.

8           Let me just go through.  I am granting as I will edit

9   the restraint A in the proposed order, again, enjoining only

10  Gitman and his companies.  I am granting B.  I'm not granting C

11  or D.  I'm granting E but, again, only as to Gitman and his

12  companies.  I'm granting F as to Gitman and his companies.  I'm

13  granting G.

14          MR. GUAGLARDI:  May I be heard on H, your Honor?  The

15  only distinction on H is that the nature of the intellectual

16  property is not destroyed.

17          THE COURT:  I will grant H only with respect to Gitman

18  and his companies.  By "his companies," I'm referring to Dalva

19  Ventures and Channel Reply, Inc.

20          I'm not granting I.

21          MR. COUSIN:  Your Honor, did you say no or yes to

22  that?

23          THE COURT:  No to letter I.

24          MR. COUSIN:  Thank you.

25          THE COURT:  No to J.  I'm granting K as to Gitman and

 1   his companies.

 2          MR. GUAGLARDI:  Your Honor, you said no to J?

 3          THE COURT:  No to J.  No to L.  No to M.  I'm granting

 4   N with respect to Gitman and his companies.  No to letter O.

 5   No to letter P.  No to letter Q.  No to letter R.  Do I need to

 6   grant S?

 7          MR. GUAGLARDI:  Yes.

 8          THE COURT:  Why?

 9          MR. GUAGLARDI:  Because this is all of the information

10   that needs to be put back.

11          THE COURT:  Was it taken?

12          MR. GUAGLARDI:  S.  It was appropriated, or access to

13   it was shut off.  So we don't know whether things are

14   physically gone.  There are backups.  There are discs.  We

15   don't know where it is.  We want to make sure it's all put

16   back.  To our knowledge, it's all gone.  We have no access, and

17   we have not been --

18          THE COURT:  Those are two different things.  Not

19   having access doesn't mean that it's gone.

20          MR. GUAGLARDI:  If your Honor looks, we're talking

21   about discs, drives, everything that's hard, not just

22   electronic.  All of the information that these companies run

23   by -- backups, drives, discs -- we believe, based on the fact

24   that we've been terminated out of everything and we haven't

25   seen anything, that it's all gone.  The money is gone.  The

1    tradename is gone.  The access is gone.

2            THE COURT:  As I understand it, Mr. Gitman hasn't shut

3    down the company.  He's just shut Dardashtian out.

4            MR. GUAGLARDI:  No.  Your Honor, we believe he's

5    operating Channel Reply through Channel Reply, Inc.  We believe

6    that our company doesn't exist except in his new name.

7            In fact, the papers show that all the money these

8    customers pay on a monthly basis are no longer being deposited

9    into the bank account, which tells us they have to be deposited

10   into another bank account, and we haven't had access to it.

11           So to return all of the information is not only going

12   to be relevant to preserve the company, but it's also relevant

13   for discovery purposes because we're going to need that

14   information to demonstrate to the Court what he's done.

15           THE COURT:  But you don't get a TRO because you want

16   discovery.

17           MR. GUAGLARDI:  I mention that secondarily.  The

18   primary issue is to preserve the res of the company and to make

19   sure that all of the hard equipment and everything that's

20   listed in Exhibit S is returned.

21           By the way, there is no prejudice whatsoever to

22   your Honor entering that.  All you're doing is asking for the

23   status quo to be preserved and for all of this information,

24   which is owned by the plaintiffs, to be returned to the

25   plaintiffs.  If it's there, then it doesn't matter.  If it's

 1    not there, then it needs to be returned.  There is no prejudice

 2    to enter into that.

 3            THE COURT:  Someone wanted to be heard?

 4            MR. COUSIN:  Your Honor, this is Mr. Cousin.  I

 5    disagree with what counsel just said in that I think that

 6    returning these types of drives when there has not been a

 7    determination or a fact-finding as to who these things actually

 8    belong to could create not only prejudice but significant

 9    damage to our clients, our potential clients.

10            I think that the more prudent thing to do would be to

11    make a representation or have a representation from these

12    defendants that they should preserve that information, discs,

13    drives, etc., and back everything up and then give a

14    representation to the Court that they have done that so that

15    nothing is destroyed.

16            MR. GUAGLARDI:  Judge, if I may.  We completely

17    disagree.  The issue before your Honor is the ownership of this

18    information.  Channel Reply, Inc. wasn't formed until two weeks

19    ago.

20            It couldn't have been owned by anybody but plaintiffs.

21    There was no other entity that existed.  This information was

22    bought by plaintiffs.  It was paid for by plaintiffs.  There

23    was no Channel Reply, Inc. to have owned it or paid for it.

24    They've misappropriated it, and now they want to operate a

25    competitive business using our information that we paid for.

 1            THE COURT:  I'm granting letter S with respect to

 2   Mr. Gitman and his companies.

 3            I'm not granting T.  I'm not granting U.  V is okay.

 4            MR. GUAGLARDI:  Judge, I just want to make one

 5   comment.  When you said on Gitman's companies, because you

 6   didn't include Accel, I wanted to point your Honor to Exhibit

 7   35 if I could.  I can just show your Honor my copy to make it

 8   easier.

 9            THE COURT:  Sure.

10            MR. GUAGLARDI:  "David Gitman, managing partner,

11   accelcommerce.com" with his own accelcommerce.com email.

12            Clearly he's in the middle of owning a 50 percent

13   ownership interest in our companies and being a co-manager and

14   competing with the same companies with the same trade secrets

15   and the same software.  We would ask that the restraints be

16   extended to Accel Commerce as well.

17            There is no prejudice to anyone if these same

18   restraints are imposed upon Accel because otherwise, everything

19   your Honor entered becomes moot because Accel is going to steal

20   it.

21            THE COURT:  Accel will be included.  I don't believe

22   that that should prejudice Mr. Falk because we do have a

23   representation that he has no ownership interest in it or

24   contractual relationship with it.

25            Now on the issue of a bond.  Mr. Cousin, do you have a

1      view as to what type of bond should be required?

2              MR. COUSIN:  I'd like to ask, if it's okay with

3      your Honor, Mr. Farooq to comment on this because I have

4      absolutely no idea of the value of this business or what kind

5      of damage that could be done as a result of the injunction

6      being entered.  I just simply have no idea.

7              MR. FAROOQ:  Yes.  I work with a lot of startups.

8      Intellectual property is not valued the same way as established

9      companies.  Their potential does not fully represent the value

10     of the company.

11             The only thing we are aware of to now is that the sale

12     of NDAP -- I think the sale price was a few hundred thousand

13     dollars, but that's just a small part of the overall restraints

14     that are being placed right now.

15             Like I said, I usually don't get engaged.  I'm not

16     familiar with a bond.  I think, from my perspective, this will

17     severely limit my client's ability to do anything, and he may

18     eventually close down the business for good.

19             This is an online space.  So this can really destroy

20     the business.  I'm not sure.  It could be worth the next five

21     years of effort or more than that.

22             By the way, my client is actually meeting with a

23     buyer, and that sale is not going to go through.  I think if we

24     were to come up with a number, I would ask the Court to come up

25     with something off the multiple businesses that may eventually

1   be shut down with the restraints that are put on my client.

2        I haven't talked to my client.  They may decide that

3   it's not doable because if they shut down for 30 days, the

4   whole business is going to be shut down.  So I apologize, but I

5   can't come up with a number.

6        MR. COUSIN:  Your Honor, can I ask a couple questions

7   of Mr. Farooq and see if we can come to a valuation process?

8        MR. GUAGLARDI:  Judge, I object.  Mr. Farooq isn't

9   here for purposes of valuation.  In fact, Mr. Farooq and his

10  client have taken a position that the company has no value and

11  that he's left the company.

12       MR. FAROOQ:  Please don't say for me what I've said.

13  You've made your own statements.  Please stick to that.  I'm

14  just telling you -- I can speak for myself.

15       THE COURT:  What I will do is I will enter a bond in

16  the amount of $50,000 to be posted by Monday noon.

17       MR. COUSIN:  Thank you, your Honor.

18       THE COURT:  Just to recap, the restraints that will be

19  entered against Mr. Gitman, Accel Commerce, Dalva Ventures, and

20  Channel Reply, Inc. are the letters A, B as in boy, E, F, G as

21  in Gary, H, K, N as in Nancy, S as in Sam, and V, a bond of

22  $50,000 to be posted by June 12.

23       Counsel already have copies of the papers; correct?

24       MR. COUSIN:  Your Honor, I just received whatever

25  Mr. Farooq gave me.  So, if he gave me everything, then I have

1  everything.

2  THE COURT:  Well, in any event, we will give

3  Mr. Guaglardi a copy of this this evening.  He should email it

4  to all counsel this evening and serve copies of all the papers,

5  including this order, by noon tomorrow.

6  MR. GUAGLARDI:  Can I do that electronically,

7  your Honor?

8  THE COURT:  You may.

9  MR. GUAGLARDI:  Thank you, your Honor.

10  MR. COUSIN:  Your Honor, may I just ask a question?

11  THE COURT:  Yes.

12  MR. COUSIN:  There was a statement that your Honor

13  made, although I may have misheard you because of the

14  telephone, when you were speaking before about the injunction

15  standard.

16  It sounds to me like you made a comment saying that

17  you were making a finding of breach of fiduciary duty, and I'm

18  concerned about that based on the fact that Mr. Gitman and his

19  entities have not had an opportunity to put in responsive

20  papers and there has been no hearing on the facts.

21  THE COURT:  Mr. Cousin --

22  MR. COUSIN:  I just want to make sure I didn't mishear

23  that.

24  THE COURT:  Mr. Cousin, if I said that, I misspoke.

25  My only findings today relate to whether or not the plaintiffs

H68YDARC

 1   have met the standard for the issuance of a temporary

 2   restraining order.  I'm not making any ultimate determinations.

 3          MR. COUSIN:  Thank you, your Honor.  I appreciate it.

 4          MR. GUAGLARDI:  Your Honor, recognizing that

 5   your Honor made your decision, on paragraph J, I have to just

 6   bring it up.

 7          Paragraph J -- the purpose of paragraph J is to

 8   prevent Mr. Gitman from going to the Ukraine tomorrow and

 9   inducing the two developers to leave the company and take the

10   software and go with them to his company.

11          That is the primary reason why we're here, and I

12   recognize that the other restraints dealing with the protective

13   trade secrets were entered, but we have developers who are

14   subcontractors of Cooper currently paid by Cooper working for

15   Cooper and have duties to Cooper.  So does Mr. Gitman.

16          There can be no prejudice to preclude or restrain

17   Mr. Gitman from traveling to the Ukraine to form a competitive

18   business with the two Russian developers in direct competition

19   with Cooper.  That is exactly what that is designed to

20   restrain.

21          If your Honor doesn't enter that, he will leave

22   tomorrow, go offer organizational documents and shareholder

23   agreements to those Russian developers, and they will sign off

24   on them, and they will destroy the business.

25          THE COURT:  I'm not going to prevent from Mr. Gitman

1   from going anywhere he wants to go and having whatever

2   conversations he wants to have.  He will know, if he doesn't

3   already, that he will be restrained in several significant

4   respects, and any further actions that he takes that allegedly

5   will harm the company, he does at his peril.

6          MR. GUAGLARDI:  That is on the record.  Thank you.

7          THE COURT:  I will direct the parties to contact

8   Judge Stanton's chambers.  This temporary restraining order can

9   be in place for no longer than 14 days.  So any application to

10  dissolve or extend should be made to Judge Stanton, and you

11  should contact Judge Stanton in order to schedule a preliminary

12  injunction hearing.

13         MR. GUAGLARDI:  Thank you very much, your Honor.

14         MR. COUSIN:  Thank you, your Honor.

15         MR. FAROOQ:  Thank you, your Honor.

16         MR. GILBERT:  Thank you, your Honor.

17         THE COURT:  Unless there is anything else, on the

18  phone.

19         MR. COUSIN:  No, your Honor, not from Mr. Cousin.

20         THE COURT:  Mr. Gilbert.  Did we lose Mr. Gilbert?  I

21  guess we did.

22         Mr. Farooq, nothing from you?

23         MR. FAROOQ:  No, your Honor.

24         THE COURT:  Very well.

25         MR. GUAGLARDI:  Your Honor, I would just ask for all

1    counsel on the phone to please email me today, except for

2    Mr. Farooq's whose email I have, their email and contact

3    information so I can send them the documents tomorrow because I

4    don't know anything without that.

5            THE COURT:  Dentons is a big-time firm.  So you can

6    find them easily.

7            Okay, folks.  We're adjourned.

8            MR. COUSIN:  Thank you, your Honor.

9            (Adjourned)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25