```
                    UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF NEW YORK

In re:                            :
                                      Docket #17cv4327
 DARDASHTIAN, et al.,             : 1:17-cv-04327-LLC-JCF

                  Plaintiffs,     :

   - against -                    :

 GITMAN, et al.,                  : New York, New York
                                    September 27, 2017
                  Defendants.     :

----------------------------------- :


                    PROCEEDINGS BEFORE
              THE HONORABLE JAMES C. FRANCIS,
        UNITED STATES DISTRICT COURT MAGISTRATE JUDGE


APPEARANCES:

For the Plaintiffs:     ARTURI D'ARGENIO & GUAGLARDI, LLP
                        BY:  BARRY S. GUAGLARDI, ESQ.
                             EVAN OSTRER, ESQ.
                        365 West Passaic Street
                        Rochelle Park, New Jersey 07662


For Defendants:         DENTONS US LLP
                        BY:  LINDSAY FAYE DITLOW, ESQ.
                             BRIAN SCOTT COUSIN, ESQ.
                             MARK DOUGLAS MEREDITH, ESQ.
                        1221 Avenue of the Americas
                        New York, New York 10020


For Defendants          MORRISON COHEN, LLP
  Falk & Summit:        BY:  EDWARD PAUL GILBERT, ESQ.
                        909 Third Avenue, 27th Floor
                        New York, New York 10022



Transcription Service: Carole Ludwig, Transcription Services
                       141 East Third Street #3E
                       New York, New York 10009
                       Phone:  (212) 420-0771
                       Fax:  (212) 420-6007

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.
```

**INDEX**

**E X A M I N A T I O N S**

| Witness | Direct | Cross | Re-Direct | Re-Cross | Court |
|---------|--------|-------|-----------|----------|-------|
| None | | | | | |

**E X H I B I T S**

| Exhibit Number | Description | ID | In | Voir Dire |
|----------------|-------------|----|----|-----------|
| None | | | | |

1

```
 1                                                          3
 2              THE CLERK:   This is Dardashtian v. Gitman.
 3    Counsel, please state your name for the record.
 4              MR. GUAGLARDI:   Good afternoon, Your Honor -- or
 5    morning, Barry Guaglardi and Evan Ostrer on behalf of the
 6    plaintiffs.  And Judge, I want to apologize.  We were
 7    running late this morning.  We were coming in from New
 8    Jersey and there was an accident on the bridge so we got
 9    stuck a little.  I apologize to the Court.
10              MR. OSTRER:   Good morning, Your Honor.
11              THE COURT:   Good morning.
12              MS. DITLOW:   Good morning, Your Honor, Lindsay
13    Ditlow and my colleagues Brian Cousin, Mark Meredith from
14    the law firm Dentons on behalf of defendants David Gitman,
15    Accel Commerce, Dalva Ventures and Channel Reply, Inc.
16              THE COURT:   Good morning.
17              MS. DITLOW:   Good morning.
18              MR. COUSIN:   Good morning.
19              MR. MEREDITH:   Good morning, Judge.
20              MR. GILBERT:   Good morning, Your Honor, Edward
21    Gilbert from Morrison & Cohen on behalf of the defendants
22    Falk and Summit Rock Holdings.
23              THE COURT:   The purpose of this conference is
24    really to take stock.  At our last meeting I had the
25    impression that the issues that the parties had initially
```

4

1

2   raised were largely resolved.  But then when I shook the

3   tree, I had the impression there appeared to be additional

4   issues outstanding.  So my agenda today is to identify what

5   those issues are and determine the best way to move forward

6   with them.  So I'm happy to hear from you.

7           MR. GUAGLARDI:   Thank you, Judge.  So I guess in

8   no particular order of importance, we had sent the letter

9   that was dated September 20th to Your Honor.  And the first

10  issue was to determine whether or not Channel Reply, Inc.

11  was in fact dissolved.  We have since received paperwork

12  from the defendants indicating that it has been dissolved.

13  And when we were here before Your Honor the last time, we

14  hadn't received all of the paperwork.  Subsequent to that,

15  we did receive it.  And so that issue appears to have been

16  resolved.

17          We overheard before Judge Stanton -- I overheard,

18  I thought Mr. Gitman say that he had taken action to reserve

19  either a domain name or trademark the name Channel Reply.

20  It's been represented to me by counsel, that in fact has not

21  happened, and that there's been no appropriation of the

22  intellectual property trade name Channel Reply.  So we

23  accept counsel's representation on that issue.

24          When we left Your Honor the last time, there was

25  going to be the sale of one of the plaintiff companies MDAP

                                                                  5

(phonetic).  And Judge Stanton removed Mr. Gitman as a

manager and appointed Mr. Dardashtian, who is seated to my

left, as a manager and appointed the corporate accountant as

the co-manager, Mr. Leman (phonetic).

          And so we undertook to go through and consummate

the sale of NDAP, and we did it with a lot of obstruction

from Mr. Gitman.  But we eventually were able to sell the

company.  So the company's been sold, and the proceeds of

the company are presently in the company's bank account and

have not been distributed.

          THE COURT:   What company's bank account?

          MR. GUAGLARDI:   MDAP, plaintiff MDAP.  The monies

from the sale of the company have been placed into the

company's bank account, which is the plaintiff MDAP.  I can

give Your Honor the specific company bank account if Your

Honor wants.  Oh, I apologize, my mistake.  It's in the

attorney trust account.

          THE COURT:   That makes more sense.  I'm not sure

how you sell something and then put --

          MR. GUAGLARDI:   Jeffrey Rothman is a corporate

accountant and it's in his -- corporate attorney and it's in

his trust account where they remain.

          THE COURT:   Okay.

          MR. GUAGLARDI:   And there's been no application

```
 1                                                      6
 2  that's been made for the distribution of those proceeds.
 3  And I understand that that's an issue that's been raised by
 4  the defendant.  And because of the various issues that have
 5  been undertaken in this matter before it got to Your Honor,
 6  and all of the position we take -- the obstruction, the
 7  attorney's fees, everything that's gone on to get Mr. Gitman
 8  in compliance -- we want that money held until we have a
 9  hearing where we have a settlement on the distribution of
10  that money.
11        Because we believe that that money should not be
12  distributed to Mr. Gitman because of his various variations
13  of law.  We'd rather have that money in trust until we have
14  a time that the Court makes a determination on the
15  disposition of that money.  And as we sit here today,
16  there's been no relief sought by the defendant formally for
17  the distribution of that money.
18        THE COURT:  I'm a little perplexed as to what the
19  legal basis is for holding money as to which Mr. Gitman is
20  presumably entitled to 50 percent.
21        MR. GUAGLARDI:  Well the basis would be that
22  there is an operating agreement that governs MDAP.  And the
23  operating agreement states clearly that if either member
24  violates the terms of the operating agreement, that they're
25  going to be responsible for attorney's fees relating to
```

7

1

2   bring whatever that violation is into compliance.  And in

3   this case, there have been numerous violations by Mr. Gitman

4   of that operating agreement, many of which this Court has

5   found as a basis in entering the restraints that have

6   entered on June 8th, June 9th, June 19th, June 21st.

7          So it would be, we believe, imprudent to release

8   the money to Mr. Gitman when in fact Mr. Gitman may owe the

9   money back either to Mr. Dardashtian or to the company

10  itself because the company and/or Mr. Dardashtian having

11  incurred expenses relating to Mr. Gitman's violations of

12  law.

13         THE COURT:  How much money is in the account?

14         MR. GUAGLARDI:  Thirty thousand, approximately,

15  is in the trust account because as a result of the sale,

16  there were accounts payable that had to be paid prior to the

17  net sale proceeds.

18         THE COURT:  And how quickly is that going to

19  disappear if you're fighting whether some of it should go to

20  attorney's fees?

21         MR. GUAGLARDI:  I don't believe that any of it's

22  going to disappear.  It's been placed in trust, so the

23  intent was not to use the proceeds until subject to the

24  court order.

25         THE COURT:  I guess the better way to say it is

```
                                                          8
 1
 2  how fast are you going to run up bills to $30,000 fighting

 3  over $30,000?

 4          MR. GUAGLARDI:   I don't think -- I think the real

 5  issue is, Judge, the amount of money that has been expended

 6  to get Mr. Gitman in compliance through Judge Ramos and

 7  Judge Stanton, has well exceeded the 30,000.  So there is

 8  no, you know, at this point, the fight has happened.  The

 9  issues of noncompliance have been addressed by three judges

10  in this court, including Your Honor, who last had to bring

11  this to Gitman in compliance.  And at this juncture, now

12  that Mr. Gitman is no longer a manager, there has been peace

13  within the company.  And the company is operating without

14  headache and without obstruction, which is one of the bases

15  why we would never agree to allow Mr. Gitman to jump back in

16  as a manager.

17          Because when he was, there was nothing other than

18  a multitude of problems, violations, misappropriation,

19  formations of new companies.  And one of the biggest issues

20  that we have before Your Honor now is we have a broker who

21  was part of the sale of MDAP, some at Rock Holdings and

22  their principal Falk.  And they were seeking to be paid

23  $110,000 as a result of that sale.

24          Mr. Falk is also affiliated with Mr. Gitman and

25  one of the co-defendants Accel Commerce, who was restrained
```

1                                                                9

2   by this Court when they found out that Mr. Gitman was with

3   Mr. Falk.  So as a result of that affiliation, we entered

4   into negotiations with counsel for Summit Rock and Falk, who

5   seated at the table.  And we were able to negotiate with him

6   and settle the matter as it results to Summit Rock, and

7   Falk, and the plaintiff MDAP, and the rest of the

8   plaintiffs, and Mr. Gitman to resolve all of the claims as

9   between each of them, and to reduce the $110,000 commission

10  to 55,000.

11          And we entered into a settlement agreement.  And

12  by entering into it, I mean we prepared one.  It went back

13  and forth multiple times between Mr. Dardashtian as the

14  manager and counsel for Falk, to the point where we've

15  agreed on the settlement agreement.  Mr. Gitman, by virtue

16  of his 50 percent ownership in the business benefits, as

17  does Mr. Dardashtian in the reduction of the commission and

18  the settlement despite the fact that we settled and we

19  agree, counsel for Mr. Gitman refuses to enter into the

20  settlement agreement.  They do so based on language in the

21  settlement agreement that has nothing to do with the

22  substantive settlement.  It's got to do with how we

23  characterize who owns Channel Reply.

24          And the reason -- and we had a conference before

25  we came to Your Honor to talk about -- like a meet-and-

1                                                                    10

2    confer to find out what the deal is.  So we found out that

3    the reason that they disagree with the language is because

4    they take the position that the plaintiff Cooper Square

5    Ventures does not own Channel Reply.  That's the position

6    they take.  That's what was advanced to me.  I said, who

7    owns it?  And they said, well, Gitman owns it and

8    Dardashtian owns it.  And they agreed to give a sweat equity

9    position to the Russian developer, who's a defendant in the

10   case, of 5 percent.

11          And I said what are you talking about?  There's no

12   document that says that.  And they produced a text that said

13   that might be something that happens in the future,

14   depending upon a number of different events.  It never

15   happened.  This developer was the developer that Mr. Gitman

16   went and flew to the Ukraine for, to take the source code of

17   Channel Reply and bring it and form a new business Channel

18   Reply, Inc. -- which Judge Stanton said to vaporize and

19   which has been since resolved -- and try and loop him in as

20   a 5 percent owner and make the argument that he is.

21          So the now, Gitman and Dardashtian, instead of

22   owning 50-50 are now 47-1/2 each.  Add the 5 percent to the

23   Russian developer, and now Gitman tries to control a

24   majority even though this Russian developer who got sued,

25   and who quit before we were before Your Honor, and tried to

11

1

2  work with getting into misappropriate the source code, is

3  now working back as an independent contractor calmly for Mr.

4  Dardashtian with no problem.

5       So now, where we have the settlement of the Falk

6  matter, they're trying to undermine it because of language

7  that has nothing to do with the Falk matter strategically to

8  create an argument later that there is no 50-50 ownership so

9  we can be back before this Court again on the issue of who

10 owns this company.  And that is the last thing we want to

11 do.  It's got nothing to do with resolving this matter, the

12 Falk matter, and it's just creating more litigation.

13      And what I did was I told counsel for Gitman, how

14 can you take the position that plaintiff Cooper Square

15 Ventures does not own Channel Reply, and show me what

16 documents you rely on that disagree with the language that

17 counsel for Falk and us have agreed to?  And they sent me a

18 text.

19      In the meantime, the Cooper Square Venture's tax

20 returns that were filed with a K-1 that went to Mr. Gitman

21 are the only thing that report all the income from Channel

22 Reply.  Channel Reply is a software solution; it's not its

23 own independent entity.  Because when my client formed

24 Channel Reply, LLC -- not Channel Reply, Inc. -- Channel

25 Reply, LLC, Mr. Gitman wouldn't sign off on it.  So the

1

2  actual operating business is owned by Cooper Square

3  Ventures.  Every dollar of its income is reported in Cooper

4  Square Ventures and it's in their bank account.  It's

5  reported on their tax return of which Mr. Gitman gets his K-

6  1 as a 50-50 owner, and I have copies of these documents for

7  Your Honor.

8          The terms of service for Channel Reply, that every

9  customer gets, says right in it that the contracting party

10 is Cooper Square Ventures and that Channel Reply is Cooper

11 Square Ventures.  Here's the document that Mr. Gitman

12 created with Mr. Dardashtian that today and has always been

13 the only document used for every customer it has.

14         THE COURT:  I guess at this stage, I'm still in

15 the agenda-setting mode.  As I understand it, you've

16 identified two issues so far that we still need to take care

17 of.  One is the disposition and the proceeds in the attorney

18 trust account from the sale of MDAP and the other is the

19 settlement of the --

20         MR. GUAGLARDI:  Falk.

21         THE COURT:  Thank you, for Summit Rock and Falk.

22         MR. GUAGLARDI:  Correct.

23         THE COURT:  What else?

24         MR. GUAGLARDI:  Well the defendants brought up

25 reinstating Mr. Goodman as a co-manager, which we

1                                                    13

2   strenuously, vehemently, and absent a hearing, would never

3   agree to.  Because all we see is headaches and problems into

4   the future and back in this court.

5            THE COURT:   Okay.  What else?

6            MR. GUAGLARDI:   That's it.

7            THE COURT:   Let me hear from --

8            MR. GUAGLARDI:   Thank you, Your Honor.

9            THE COURT:   -- Mr. Gitman's counsel.

10           MS. DITLOW:   Thank you.  I just wanted to take a

11  moment to correct some of the misstatements that plaintiff's

12  counsel --

13           THE COURT:   Please don't.  Let's talk about the

14  agenda.

15           MS. DITLOW:   Sure, absolutely.  So in regards to

16  the disposition of proceeds, as we've said, they have been

17  held.  We also would like to have an understanding --

18  plaintiff's counsel mentioned that accounts payable from the

19  sale proceeds were made.  We've never been informed of that,

20  per Judge Stanton's orders.  We were supposed -- both Mr.

21  Gitman and his counsel were supposed to be kept in the loop.

22  We are unaware that any distributions have already been

23  made.  We'd like to understand what those are.  And as we

24  have done all along, request that any of the sales proceeds

25  be distributed accordingly.

1                                                                14

2              We don't believe that formal application needs to

3   be made, as Your Honor pointed out.  They are both 50-50

4   owners.  There is nothing that would require and essentially

5   to hold on to those sale proceeds claiming that they might

6   be entitled to them down the road.  There's nothing short of

7   impermissible self-help.  So we don't think that they should

8   be able to hold on to them and the proceeds should be

9   distributed.  We'd also like a copy of the trust agreement,

10  as that, again, has never been provided to us, something

11  that should've been done per Judge Stanton's orders.

12             In regards to the settlement of Mr. Falk --

13             THE COURT:   Before we leave that --

14             MS. DITLOW:   Sure.

15             THE COURT:   -- if you get distribution what do

16  you need the trust agreement for?

17             MS. DITLOW:   Well we'd like to see it.  I mean,

18  again, this is paperwork that should have been already

19  provided to us.  We were unaware where the proceeds were

20  entirely held and these payments that have been made to

21  them.  Mr. Gitman, as 50 percent owner, should be kept in

22  the loop and as his counsel, we should be as well.  And I

23  think it would just be prudent for us to have the paperwork

24  that is available to plaintiff's counsel.

25             MR. GILBERT:   Judge, can I just add one thing on

1                                                                      15

2  that?  If distributions have already been made pursuant to

3  an agreement that we haven't seen, they may have been made

4  improperly.  And looking at the agreement, we might have a

5  cause of action against either the trustee or beneficiary or

6  both, based on the trust agreement.

7            THE COURT:   Okay.  Go ahead.

8            MS. DITLOW:   Regarding the Summit Falk settlement

9  agreement there were extensive negotiations.  However, we

10 proposed a red line to address some of the issues with very

11 specific wording, and that was never responded to by

12 plaintiff's counsel.  The next e-mail we received was a

13 signed settlement agreement by Mr. Dardashtian and Mr. Falk.

14 However, the specific language that we have issue to is that

15 it's factually inaccurate, and it's factually inaccurate by

16 Mr. Dardashtian's own admission.

17           So based on that and, Your Honor, if I may, I'd

18 like to show you the e-mail or text that Mr. Guaglardi

19 referred to which it says is by Mr. Dardashtian to Mr.

20 Bagaev and says, "As discussed, the plan is to give you a 5

21 percent equity stake in the business."  The subject of this

22 e-mail is Channel Reply options.  "I'm working with our

23 attorney to get the paperwork in place.  Right now it is a

24 bit too expensive to proceed with formal options, plan and

25 package.  Please bear with us as we continue to work on the

16

1
2 issue.  Know that your contribution to the company is vital
3 and we look at you as a partner.  Regards, Michael
4 Dardashtian."

5          So based on that -- and we believe there's also a
6 similar communication and similar promise to the developer
7 Oleksii Glukharev of 2.5 percent, and which we'd also
8 request documents concerning -- that that bets the question
9 that CSV is not the whole owner of Channel Reply.  And
10 because of that, we have proposed language that is now
11 acceptable to Mr. Falk, and which Mr. Dardashtian has not
12 responded to, which we proposed that would enable all
13 parties to sign off on the settlement agreement.  But
14 however, as mentioned, we have not heard from plaintiff's
15 counsel on that.

16          MR. GUAGLARDI:   If I may, Judge, I think it's
17 important for the Court to just hear a very brief response
18 on that so that the Court could put it in context.  As to
19 the sale, the first issue, the sale price was 450,000.  In
20 the contract for sale that Mr. Gitman approved it says in
21 the contract $100,000 is to be paid to one of their
22 suppliers.  So in the contract it was approved, they know
23 it, there's no question about it.  So that was authorized.

24          The remaining money, except the 30,000, hasn't
25 been received by the company.  Under the terms of the

1                                                               17

2  agreement, it's paid over time in the future, and they know

3  that as well because they signed the contract.  So any

4  position that there's money in the bank where they haven't

5  been aware is absolutely false.  We sent the contracts to

6  counsel, they were negotiated back and forth -- these

7  contracts.  They are fully aware of these contracts.  In

8  fact, we wouldn't close the deal because we didn't want the

9  exposure without getting an approval from counsel for

10 Gitman.  They knew the 100,000 was paid and they know that

11 the balance is paid over time.  It's all in the contract.

12         THE COURT:  And is the balance going to be net to

13 the owners, that is --

14         MR. GUAGLARDI:  Yes.

15         THE COURT:  -- there's no other outstanding debt

16 that will have to be paid out of the --

17         MR. GUAGLARDI:  Yes, other than the fee to Falk.

18         THE COURT:  Right.

19         MR. GUAGLARDI:  Yeah, other than -- the 100,000

20 was already agreed to and has been paid.  The Falk, we have

21 negotiated from 110 to 55.  The balance is net money that

22 goes to the parties which has been in escrow, which is going

23 to be paid over time under the terms of the agreement, of

24 which they're well aware.  So any position on that, that

25 they didn't know that, is absolutely untrue, completely

1    untrue.  That's the first thing.

2        The second thing, which I think the Court can now

3    see, they are holding hostage the settlement of the Falk

4    deal.  And by the way, counsel -- it's on this side of the

5    table other than counsel for Falk, the other three

6    attorneys, they represent Mr. Gitman.  They don't represent

7    the two Russian developers, although they're advocating on

8    the two Russian developers' behalf.  So that should spell

9    largely -- large volumes to the Court.

10        Three attorneys that represent a 50 percent owner

11   are advocating that that 50 percent owner should be diluted

12   because of a Russian developer by at least half of the 5

13   percent to the one.  And now I quietly just heard, even

14   though there's no e-mail, that the other Russian developer

15   had a similar deal.  So they're advocating for the Russian

16   developers on a similar deal, with no documents, and an e-

17   mail without a signed agreement of any kind.  And they're

18   only doing it for one reason, for the same reason that they

19   did that brought us to Judge Ramos when they were trying to

20   take the intellectual property and slide it to Mr. Gitman in

21   a new company, and when Mr. Gitman flew to the Ukraine to

22   bring the two Russian developers as partners in the new deal

23   with him, to exclude Mr. Dardashtian.  So they lost so far

24   in this court and were restrained.  They were told to

1
2  vaporize Channel Reply, Inc., which they since dissolved.

3          They then interfered in every way they could and

4  this Court shut them down completely as a result of our

5  efforts.  And now, now that we have them out, and we're

6  running the business normal, and the one Russian developer

7  Mr. Bagaev, Konstantyn Bagaev, has now since come back to

8  the company and said, sorry, I want to do business with your

9  guys and work for you.

10          We have an independent contractor agreement that

11  Mr. Bagaev signed, although we can't seem to find the signed

12  copy which was not in our possession that Mr. Bagaev

13  operated under and got paid under, and say anything he did

14  was a work-for-hire for the company, and he worked as an

15  independent contractor for the company.  And what he did for

16  the company was the company's trade secret and the company's

17  intellectual property.

18          So now that we shut it down, finally were calm,

19  Mr. Bagaev is back because he knows he can't go with Mr.

20  Gitman.  Now Mr. Gitman wants to get back in the company,

21  start it all over again, and is now trying to take a

22  position advocating for the two Russian developers to dilute

23  his own interest.  Why would anybody want to dilute their

24  own interest?

25          MR. GILBERT:  I can answer that if I have a

1                                                        20

2  chance.

3          THE COURT:    Yes, thanks for the reply.  Go ahead.

4          MR. GILBERT:    Okay.  Thank you, Your Honor.

5  First of all, I didn't interrupt -- we didn't interrupt your

6  side.

7          THE COURT:    Just go ahead and talk to me.

8          MR. GILBERT:    This side of the table, Your Honor,

9  this side is on the side of truth.  That side is on the side

10 of what's not true.  What we're not trying to do is change

11 anything.  What we're trying to do is establish so the Court

12 can see what the facts have always been in this case.  The

13 text message that we have demonstrates that Mr. Dardashtian

14 himself admitted that one of the Russian developers was a

15 partner and owned 5 percent of the venture.

16         We believe that there's a similar text message,

17 which the Russian developer doesn't have access to anymore

18 because he doesn't have access to his texts and e-mails,

19 that shows that 2-1/2 percent was promised to him as a

20 partner as well.  This was long before any litigation was

21 brought.

22         THE COURT:    Let's stop there.  Doesn't that

23 dispute preclude the distribution of funds from the trust?

24         MR. GILBERT:    I don't think so, Your Honor,

25 because the trust distribution is from the parent company

1

2  which, you know, we're not saying -- and correct me if I'm

3  wrong.  You may want to respond to that because you have

4  more of the information.

5       MS. DITLOW:   Yes, Your Honor.  So the trust

6  proceeds are regarding the sale of MDAP, which is a separate

7  entity from Channel Reply, which is what the ownership

8  dispute is relating to.  The two really don't have any

9  issue.  Should the sale proceeds be distributed, neither one

10  of the developers would have any interest in those sale

11  proceeds.

12       MR. GILBERT:   It's a separate entity, Your Honor,

13  and pursuant to the asset purchase agreement, the monies

14  that we're talking about that are in the trust agreement

15  were in exchange for the sale of that particular asset, not

16  with respect to the other company that we're discussing the

17  ownership interest in.  So I don't know if that helps.  We

18  have a diagram.  If you're interested, we could show you.

19       THE COURT:   Well we may ultimately need that but

20  I'm not going to resolve it at the moment, so let's set that

21  aside.  You can go ahead and finish your agenda.

22       MR. GILBERT:   Thank you, Your Honor.  You know,

23  with regard to opposing counsel's comment that we knew

24  everything that was going on in terms of distribution of

25  $100,000, we did see drafts of the asset purchase agreement,

22

1
2  absolutely.  But after that was signed, and then when monies

3  were paid, we never got any courtesy, you know, any

4  information with respect to monies have come in under the

5  agreement, monies will be dispersed under a trust agreement.

6  We haven't received any information about that and that's

7  not proper.

8        They had a fiduciary responsibility to Mr. Gitman

9  to inform him of any distributions, even if it's under the

10  asset purchase agreement.  Our position may very well be

11  that the asset purchase agreement does not mention the issue

12  of priority that necessarily the $100,000 should be paid out

13  prior to a distribution to Mr. Gitman.  That may very well

14  be our position.  But we'd like to know what they have

15  before they distribute it, and we never got that

16  information.

17        So with regard to opposing counsel's comment about

18  the K-1s and that Mr. Gitman knew about what was going on in

19  the business with the filings or the tax returns or things

20  like that, that was all controlled by their side of the

21  table.  Mr. Gitman didn't have control over the accounting,

22  the tax returns.  All those people were basically in bed

23  with that side of the table, nothing to do with Mr. Gitman.

24        So in terms of the agenda, Your Honor, because I

25  know you want to focus on that, we do believe, as we set

1                                                      23

2   forth in our September 19th letter that we have articulated

3   the issues that we think should be on the agenda, if you

4   look at the September 19 letter -- if you don't have a copy,

5   Your Honor, I'm happy to give it to you.

6           THE COURT:   I have it.

7           MR. GILBERT:   We talk about the fact that Mr.

8   Gitman should be reinstated.  We believe that the original

9   order having him come out for a temporary co-manager was

10  just temporary until Mr. Gitman resolved the issues, which

11  opposing counsel has now admitted that they don't have a

12  problem with those continuing issues.  The only thing he

13  says about that is, you know, life was really difficult with

14  Mr. Gitman.  And that's what happens when you have a 50-50

15  joint ownership.  Life can be really difficult.

16          In fact, a lot of times no decisions can be made,

17  but that's not really to say that Mr. Gitman should not be a

18  co-manager anymore.  That's the house that they agreed to

19  live in, a 50-50 co-management situation, co-ownership

20  situation, without anyone else.  Once the Court's criteria

21  for the injunctive relief has been satisfied, I fully

22  believe the Court should allow Mr. Gitman to reassume his

23  full responsibilities.

24          If at that point they can't get anything done

25  because they're clashing heads, that's not wrong.  That's

1

2   what happened when they entered into a 50-50 partnership.

3   That means that the Court needs to help the parties come to

4   a resolution.  Maybe they have to sell the business, maybe

5   they have to reach a settlement, and that's another thing

6   that we want to put on the agenda.  We would like to ask

7   Your Honor for assistance, not just to put Mr. Gitman back

8   into his position as co-manager, but to help the parties

9   resolve the disputes between them going forward.

10          We don't want all these issues and the running of

11  the business to be resolved by Mr. Dardashtian.  Mr. Gitman

12  doesn't trust anything that Mr. Dardashtian does and he

13  hasn't for many months now.

14          THE COURT:   That's a good predicate for a

15  resolution.

16          MR. GILBERT:   Well, you know, it is because it's

17  like -- and I hate to use the example.  But if you feel that

18  your spouse is no longer trustworthy, that you can't live in

19  the same house anymore, you have to separate; you have to

20  figure out a way.  And the Courts can help the parties reach

21  an equitable distribution in situations like that.  And

22  we're asking for the Court's assistance in that regard.

23          We also talked about the Falk settlement

24  agreement.  Let me just mention one thing on that.  Counsel

25  was late.  We understand he was late due to traffic.  In the

25

1 meantime, we spent 45 minutes outside talking, and a few
2 minutes of that we spent with Mr. Falk's counsel trying to
3 see if he was okay with the language that we had proposed,
4 because we hadn't heard back from opposing counsel at all,
5 even though we proposed this language over a week ago.  And,
6 you know, we came up with a sentence, an additional
7 sentence, that we haven't had a chance to tell opposing
8 counsel about yet, that satisfied Mr. Falk.  And he said
9 this will be fine.  It has to do with the restraints over
10 Mr. Falk as well as the characterization of the Channel
11 Reply and ownership interest.
12 
13         So we tried to come up with language that would
14 satisfy both that side of the table and Mr. Falk's counsel.
15 And we think we have, but we haven't had an opportunity to
16 really ask opposing counsel about that yet because of the
17 fact that he didn't respond to us.  You know, with regard to
18 any other issues --
19         MR. MEREDITH:   Your Honor, if I might just add, I
20 don't want to get into a history of the relationship, but I
21 just wanted to make clear for the Court that while the
22 representation may be correct if there wasn't some kind of
23 formal request for proceed distribution on the asset
24 purchase agreement, I myself personally wrote to Barry on
25 August 15th asking about asset proceeds distributions of the

1                                                                    26

2   asset purchase agreement.  I called him.  I wrote him on

3   August 16th asking again about asset purchase agreement and

4   proceed distributions, and I wrote him again on August 28th,

5   again asking him about asset purchase agreement distribution

6   proceeds for both Mr. Gitman and Mr. Dardashtian.  We've

7   never once implied that we were only interested in

8   distributions for Mr. Gitman.

9          And so if there was a -- and none of those were

10  responded to at all, total radio silence, so I do want to

11  just point that out, Your Honor, that we have brought up the

12  issue, we have tried to resolve it to at least learn what is

13  going on, and we've gotten zero response.

14         THE COURT:   All right.  Well let me tell you

15  where I think we are.  This whole process was triggered by

16  Judge Stanton's inquiry as to whether I thought that my

17  mandate had been fulfilled.  And I think my response is I'm

18  not sure because I haven't heard from the parties since our

19  last conference, so let me find out.

20         And what I'm hearing is that there are at least

21  three open issues that may or may not relate to a

22  preliminary injunction, since that's sort of the next step,

23  that's the point in the litigation where we are.  So we need

24  to resolve those and those, I think, are not resolvable

25  absent an evidentiary hearing.

27

Before we go down that route, I think a
significant effort should be made at trying to resolve this,
because the cost of further litigation is soon going to
outstrip the value of the property here, if it hasn't
already.  In that respect, I want to set a very close date
for our convening and trying to get it all fully resolved.
What is your pleasure?  My trial that was scheduled for the
balance of the week has collapsed.  I have a lot of time.
I'm going to (inaudible).

        MR. GILBERT:  What's your schedule for the rest
of today?

        THE COURT:  I've got a settlement conference that
is now half an hour late.  I'm going to have to deal with
that.  I can see you folks immediately thereafter if you
want to take advantage of that.

        MR. GILBERT:  From our side of the table, we're
absolutely encouraged and interested in that.

        MR. GUAGLARDI:  We would do that as well, Judge.

        THE COURT:  Great.  I think it may be valuable if
you folks take the time between now and when I can extricate
myself from the other settlement conference to talk among
yourselves.  So let me offer you this space.  I'm going to
use the jury room for my other settlement conference and
when I'm done with that, I'll come back and see you, see

1                                                        28

2   where you are, and see when you think it might be most

3   productive to use me.

4             MR. GILBERT:   Thank you very much.

5             MR. GUAGLARDI:   Thank you.

6             THE COURT:   Thank you.

7             (Whereupon the matter is adjourned.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

29

C E R T I F I C A T E

      I, Carole Ludwig, certify that the foregoing

transcript of proceedings in the United States District

Court, Southern District of New York, Dardashtian, et al.,

v. Gitman, et al., Docket #17cv4327, was prepared using PC-

based transcription software and is a true and accurate

record of the proceedings.

*Carole Ludwig*

Signature_____

Date:  October 3, 2017