## **Exhibit 21**

Wed, Feb 15, 10:44 AM

I'm reaching out to Alice.

Can you send any other CSV or ndap legal docs.

Can u send the peak agreement, any other liabilities on the business. Thank you.

> no other liabilities – peak agreement is long been voided at this point

Can you send it. With all other docs. Creating a repository that ~~will~~ will demand access to

Standard x and o

> why would ███ need to know about that doc its been voided

**Exhibit 22**

why would ████ need to know about that doc its been voided

All co want to know all arrangements that are potential liabilities. Their lawyers will ask for it. We are trying to show that not just 1 party in mix.

OK will send – not sure what other docs are necessary at this point..

i dont have any other agreements in place

They won't take sellers word for it. They have to go thru their process. They are also PE owned FYI.

yes i know – ill go thru see what else we have but we haven't

**Exhibit 23**

# INTENTIONALLY OMITTED

**Exhibit 24**

# INTENTIONALLY OMITTED

**Exhibit 25**

## COOPER SQUARE, LLC / COOPER SQUARE VENTURES, LLC

### SERVICES AGREEMENT

This Agreement for Services is a binding agreement (this "*Agreement*") that is made and entered into as of February 15, 2017 (the "*Effective Date*") by and between Summit Rock Holdings LLC, a Delaware limited liability company ("*Consultant*") and the following: Cooper Square Ventures, LLC, and Cooper Square, LLC, and NDAP, LLC (dba/ Car Part Kings) and NDA Holdings LLC (the "*Company*"). "Consultant" and "Company" herein referred to individually as a "*Party*," or collectively as the "*Parties*").

### RECITALS

WHEREAS, Consultant has rendered the Services (as defined below) to the Company dating from December 1, 2015 through the execution and termination of this Agreement.

WHEREAS, the Company desires to retain Consultant to perform the services described herein, and for Consultant at its discretion to perform such services on the terms and conditions described herein.

NOW THEREFORE, in consideration of the promises and mutual agreements contained herein, the Parties hereto, intending to be legally bound, agree as follows:

Section 1.          Services

1.1.     Consultant has since December 1, 2015 successfully performed, and shall continue to perform some, of the following services for the Company (or its designee): (i) providing strategic and financial analysis and conduct due ____nce (which may include constructing financial models and managing certain aspects of Company transactions), (ii) ____e the Company in connection with the sale of assets of the Company, the merger or joint venture of the Company with another entity, and /or the recapitalization of the Company, a change of control, or a licensing transaction of the Company (iii) solicit proposals from investors and purchasers, (iv) provide advice to the Company in the negotiation process, (v) perform business development for current businesses and the sourcing of new investment opportunities for the Company, (vi) contribute toward the institutionalization of the Company and develop its processes to enable capital raising for the execution of transactions, and (vii) contribute toward the formalization of business development or investment processes, protocols and operating procedures (items (i) through (vii), together with other services previously provided, are collectively referred to herein as the "*Services*").

Section 2.          Compensation and Consideration

2.1.     The Company hereby engages the Consultant. As compensation and consideration for some of the Services rendered by Consultant, the Company will provide a one-time payment of US$160,000 in cash by wire transfer immediately upon the closing of a transaction.  The Company in compensation and consideration of Services provided by the Consultant, Consultant will be in addition be awarded and paid by Company in cash by wire transfer an amount equal to 0.25% of the Purchase Price for a transaction resulting in a change of control of the NDA Holdings, LLC to another Party which shall be payable upon the closing of a transaction.

The term "Purchase Price" shall encompass the value of (1) all consideration received or to be received by the Company pursuant to a transaction, whether such consideration is paid in cash, debt which for purposes of calculating the "Purchase Price" shall be reduced to present value or equity securities, when received and (2) future monetary considerations payable to Company or its owners (whether prior to or post termination of this Agreement) including the earn outs when paid, royalty fees, license fees, when paid and equity ownership (or in the case of a sale of assets, the consideration received for such assets, ____ received and (3) to the extent not included in the Purchase Price, the value of any outstanding long-term debt of the ____ess assumed by the investor as part of the transaction.  Note, any outstanding payables greater than 90 days will be considered as long term debt. If a transaction involves a combination or series of transactions, the Purchase Price shall be the

1

sum of (i) Purchase Price at the initial closing plus (ii) the Purchase Price at each subsequent date, which shall be calculated and paid when received by Company.

### Section 3.        Confidentiality

3.1.    *Confidentiality.* Consultant will do everything reasonably possible to preserve Company confidentiality. Company will not hold Consultant liable for any actions by investor or potential purchasers, or any other parties related to the process that may violate the confidentiality. Consultant agrees to hold in confidence all proprietary information provided by the Company in connection with this project. Consultant agrees not to share any confidential information with persons outside of its office without the Company's consent, except that the Consultant may share the materials with potential third parties in connection with its duties. Confidential Information shall not include any such information which (i) was publicly known or made generally available prior to the time of disclosure to Consultant; (ii) becomes publicly known or made generally available after disclosure to Consultant through no wrongful action or inaction of Consultant; or (iii) is in the rightful possession of or was obtained by Consultant, without confidentiality obligations or restrictions at the time of disclosure.

### Section 4.        Term and Termination

4.1.    *Term.* This Agreement shall remain in effect until after the close of a transaction with the Company (the "*Term*"). Consultant shall continue to receive any and all accrued but unpaid Compensation and Consideration payable to Consultant under this Agreement. Consultant shall continue to perform services and be eligible to receive any and all compensation under this Agreement on any opportunities which, as of the date of termination any work had begun by Consultant. The Company shall promptly pay to Consultant any compensation owed upon the receipt or distribution of any funds from which Consultant is eligible for compensation under this Agreement.

### Section 5.        Indemnification

5.1.    In connection with Consultant's engagement (which engagement commenced prior to the date hereof) to advise and assist the Company, the Company, agrees to indemnify and hold harmless Consultant and its affiliates, the respective members, directors, officers, agents and employees of Consultant and its affiliates and each other person, if any, controlling Consultant or any of its affiliates and each of their respective successors and assigns, the fullest extent permitted by law, from and against any losses, claims, damages, or liabilities (or actions, including shareholder actions, in respect thereof) related to or arising out of such engagement. Company shall defend, indemnify and hold the Consultant harmless from and against any and all liability, loss, expense, including attorneys' fee, or claims for injury or damages (each a "*Claim*") arising out of the performance of this Agreement. Expenses incurred by Consultant in defending any Claim shall be paid by the Company in advance of the final disposition of such Claim upon receipt by the Company of an undertaking. Company will reimburse Consultant and any other party entitled to be indemnified hereunder for all expenses (including counsel fees) as they are incurred by Consultant or any such other indemnified party in connection with investigating, preparing or defending any such action or claim whether or not in connection with pending or threatened litigation in which Consultant is a party.

If the indemnification provided for in the foregoing paragraph is judicially determined to be unavailable (other than in accordance with the terms hereof) to any person otherwise entitled to indemnity in respect of any losses, claims, damages, or liabilities referred to herein, then, in lieu of indemnifying such person hereunder, the Company shall contribute to the amount paid or payable by such person as a result of such losses, claims, damages, or liabilities (and expenses relating thereto) (i) in such proportion as is appropriate to reflect the relative benefits to the Company, on the one hand, and Consultant, on the other hand, of the engagement provided for in this Agreement or (ii) if the allocation provided for in clause (i) above is not available, in such proportion as is appropriate to reflect not only the relative benefits referred to in such clause (i) but also the relative fault of the Company, as well as any other relevant equitable considerations.

The Company also agrees that neither Consultant, nor any of its affiliates nor any officer, directors, employee or agent of Consultant or any of its affiliates, nor any person controlling Consultant or any of its affiliates, shall have any liability to the Company for or in connection with such engagement. The foregoing agreement shall be in addition to any rights that Consultant, the Company or any indemnified party may have at common law or otherwise, including, but not limited to any right to contribution. For the sole purpose of enforcing and otherwise giving effect to the provisions of this Agreement, the

2

Company hereby consents to personal jurisdiction and service and venue in any court in which any claim which is subject to this agreement is brought against Consultant or any other indemnified party.

### Section 6.        Miscellaneous

6.1.    *Governing Law; Consent to Personal Jurisdiction*. This Agreement shall be governed by the laws of the State of New York, without regard to the conflicts of law provisions of any jurisdiction.

6.2.    *Authority / Indemnity.*  The person(s) signing this Agreement has full legal authority to bind the Company to this Agreement.

6.3.    *Arbitration.* Any dispute, controversy or claim arising out of or relating to this Agreement including, but not limited to, the validity, interpretation, performance, breach or termination of this Agreement shall be resolved in accordance with the procedures specified in this Agreement, which shall be the sole and exclusive procedures for the resolution of any such disputes. The Parties shall attempt in good faith to resolve any dispute arising out of or relating to this Agreement promptly by negotiation.  In the event that any dispute is not resolved to the satisfaction of any Party, such Party may provide the other written notice of any dispute not resolved in the normal course of business (a "*Dispute Notice*").  If a dispute has not been resolved within 30 days after delivery of the related Dispute Notice, such Party may initiate arbitration of the dispute in the manner hereinafter provided. Such dispute shall be settled by arbitration in accordance with the then current rules of the American Arbitration Association ("*AAA*") by a sole independent and impartial arbitrator, which arbitrator shall be appointed under the procedures of the AAA Commercial Arbitration Rules and Mediation Procedures.  The arbitration shall be governed by the United States Arbitration Act, 9 U.S.C. Sections 1-16, and judgment upon any award rendered by the arbitrator may be entered by any court having jurisdiction thereof.  The place of arbitration shall be New York, New York. The procedures specified in this section shall be the sole and exclusive procedures for the resolution of disputes arising between the Parties arising out of or relating to this Agreement. All negotiations pursuant to this section shall be confidential and treated as compromise and settlement negotiations for purposes of the Federal Rules of Evidence and applicable state rules of evidence.

6.4.    *Assignability.*  This Agreement will be binding for the benefit of the Consultant's heirs, executors, assigns, administrators, and other legal representatives. There are no intended third-party beneficiaries to this Agreement, except as expressly stated. Notwithstanding anything to the contrary herein, the Company may assign this Agreement and its rights and obligations under this Agreement to any successor to all or substantially all of the Company's relevant assets, whether by merger, consolidation, reorganization, reincorporation, sale of assets or stock, or otherwise.

6.5.    *Entire Agreement*. This Agreement constitutes the entire agreement and understanding between the Parties with respect to the subject matter herein and supersedes all prior written and oral agreements, discussions, or representations between the Parties. Consultant represents and warrants that he/she is not relying on any statement or representation not contained in this Agreement. To the extent any terms set forth in any exhibit or schedule conflict with the terms set forth in this Agreement, the terms of this Agreement shall control unless otherwise expressly agreed by the Parties in such exhibit or schedule. The undersigned acknowledges that the Company has received all necessary approvals, read the Agreement and received a copy and understands that this is a legal binding contract.

6.6.    *Survival.* All sections of this Agreement will survive termination or expiration of this Agreement.

6.7.    *Headings.* Headings are used in this Agreement for reference only and shall not be considered when interpreting this Agreement.

6.8.    *Severability.* If a court or other body of competent jurisdiction finds, or the Parties mutually believe, any provision of this Agreement, or portion thereof, to be invalid or unenforceable, such provision will be enforced to the maximum extent permissible so as to effect the intent of the Parties, and the remainder of this Agreement will continue in full force and effect.

6.9.    *Modification, Waiver.* No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in writing signed by the Parties.  Waiver by the Company of a breach of any provision of this Agreement will not operate as a waiver of any other or subsequent breach.

3

6.10. *Notices.* Any notice or other communication required or permitted by this Agreement to be given to a Party shall be in writing and shall be deemed given (i) if delivered personally or by commercial messenger or courier service, (ii) when sent by electronic mail or confirmed facsimile, or (iii) if mailed by U.S. registered or certified mail (return receipt requested), to the Party at the Party's address written below or at such other address as the Party may have previously specified by like notice. If by mail, delivery shall be deemed effective three business days after mailing in accordance with this section.

(a)     If to Cooper Square Ventures, LLC or NDAP, LLC (dba/Car Part Kings), to:

1010 Northern Blvd, Suite 208
Great Neck, NY 11021

(b)     If to Consultant, to the address for notice on the signature page to this Agreement or, if no such address is provided, to the last address of Consultant provided by Consultant to the Company.

6.11. *Attorneys' Fees.* In any proceeding at law or equity that is brought by one of the Parties to this Agreement to enforce or interpret the provisions of this Agreement, the prevailing Party may be awarded reasonable attorneys' fees, in addition to any other relief to which that Party may be entitled.

6.12. *Signatures.* This Agreement may be signed in multiple counterparts, each of which shall be deemed an original, with the same force and effectiveness as though executed in a single document.

ITNESS WHEREOF, the Parties hereto have executed this Consulting Agreement as of the date first written above.

**SUMMIT ROCK HOLDINGS, LLC**          **COOPER SQUARE, LLC**

**COOPER SQUARE VENTURES, LLC**

By: _____          By: _____

Name:  Jeremy Falk                                    Name:  Michael Dardashtian

Title:  Authorized Signatory                            Title:  Member

Address for Notice:

By: _____

Name:  David Gitman

Title:  Member

4

**Exhibit 26**

# INTENTIONALLY OMITTED

**Exhibit 27**



Mike Dash <mdash@ndap-llc.com>

**SHR-CSV services agreement**

**Jeremy Falk** <jeremy.falk@gmail.com>
To: Michael Dash <mdash@ndap-llc.com>                                                              Fri, Mar 3, 2017 at 12:27 PM
Cc: David Gitman <dgitman@ndap-llc.com>

Mistyped. No offer

On Mar 3, 2017, at 12:24 PM, Michael Dash <mdash@ndap-llc.com> wrote:

Counter? Was there an initial offer?

On Mar 3, 2017, at 12:19 PM, Jeremy Falk <jeremy.falk@gmail.com> wrote:

Will review. No counter offer yet

## **Exhibit 28**



**Mike Dash <mdash@ndap-llc.com>**

## Consulting Agreement: 3.6.2017 - draft

**Jeremy Falk <jeremy.falk@gmail.com>**                                    Sun, Mar 5, 2017 at 8:23 AM
To: Mike Dash <mdash@ndap-llc.com>, David Gitman <dgitman@ndap-llc.com>

Guys,

I reviewed the lawyer's comments. Below is an explanation of the majority of the points in question. I have accepted what I could and kept the original language where I cannot (and it is unreasonable for me to accept.) See highlights below. Some other adjustments are included in the doc. Can one of you give me a call to discuss?

Introductory paragraph: Cooper Square LLC: Attached is the operating agreement that I received from Mike that has CSV incorporated as "Cooper Square". It may have been an error in initial drafting but I have not seen documentation that shows "Cooper Square Ventures," only "Cooper Square". I have included both LLC names to ensure that the correct entity is captured. I have attached your operating agreement that I received. If there is an alternative document I should review, please let me know. Otherwise, let's keep both listed names in the document.

Section 1. Recitals:

Please give me a call to discuss this point. I appropriately included the total services that have been provided, not just transaction process execution. This preference should not matter to CSV since it is merely a description of services.

The key point outlined in 2 places in the document is that CSV only gives consideration to Consultant if a transaction is consummated. I would like to discuss this so give me a call.

Section 2. Compensation Timing/Schedule:

The compensation payment schedule should be consistent with: 1) what you previously agreed to with Peak (in fact, Peak had better terms since you were going to pay them in full at signing of a transaction); and 2) standard practice in the industry.

Instead of Consultant being placed at the front of the line, CSV is pushing me to the back of the line which is highly unusual. However, if you prefer to stage payments to me then an accommodation could be that it should be by percentage of distribution that CPK receives. As an accommodation, we can do 60% of distributions to Consultant until the fee is paid out. That to me seems like a reasonable compromise.

Section 2: Purchase Price Definition:

I have kept the changes here that I believe I can live with. I am keeping the other parts of the definition consistent with what was originally agreed to with Peak. It is consistent with industry practice.

Section 4. Term and Termination:

I understand what you are seeking to accomplish. I propose that the Agreement shall remain in effect until the later of: 1) submission of an offer or 2) May 30, 2017. I understand your desire to have me drive the transaction quickly so I moved the date forward (from June to May) as an accommodation. However, I cannot speak to your ability or ~~your~~ ability to close by then so I cannot agree to your "closing of transaction" stipulation. That middle ground should work.

Section 5. Indemnification:

5/30/2017                                    ndap Mail - Consulting Agreement: 3.6.2017 - draft

This needs to stay in for the following reasons: 1) It was in the Peak document and agreed to by CSV and signed off by your attorney; and 2) It is a standard clause in these arrangements; and 3) With everything going on between the CSV partners, I feel it is necessary at this juncture to keep the indemnification clause in the document. I have not run the business since inception so I should not be liable for any materials I have provided.

Section 6.3 Arbitration:

This clause is standard in Agreements. It is intended to find a cost effective and efficient means to resolve disagreements. If you want to go down a more challenging track then you can force any disputes to court which is not in your interest. I would encourage standard arbitration as an efficient alternative.

Section 6.11. Attorney's fees:

This is included since it keeps everyone "honest and on the same page". Reasons to comply since it can be expensive to "not comply" and a further incentive to do as was negotiated.

Give me a call to discuss and let's get this done soon so we can get to a transaction asap!

Jeremy



**2 attachments**

 **ConsultingAgreementv1_3.6.17.docx**
35K

**Cooper Square Ventures, LLC - Operating Agreement.pdf**
3821K

— **Exhibit 29**  —



Mike Dash <mdash@ndap-llc.com>

## CPK: SRH Consulting Agreement

**Michael Dash** <mdash@ndap-llc.com>                                    Tue, Mar 7, 2017 at 10:03 AM
To: David Gitman <david@gitman.net>

Thats exactly what I had Jeff draft in the agreement, he is including language that makes it open ended and can be
construed as consulting services in a contract if he were to chose at any point to sue us.  I made it very clear in our
version he only gets paid if a deal closes. He changed it.

**Michael Dash**
**ndap**
Tel: (646) 553-5918
mdash@ndap-llc.com | http://www.ndap-llc.com

On Tue, Mar 7, 2017 10:02 AM, David Gitman david@gitman.net wrote:
How do we owe him money if there is no deal?

> On Tue, Mar 7, 2017 at 10:00 AM Michael Dash <mdash@ndap-llc.com> wrote:
> I'm trying to protect us.  I suggest you talk to Jeff, what it seems Jeremy is trying to do is attach himself to NDAP and
> CSV so that we possibly owe him money if a deal is not done or we try and do something with CR.  I'm not
> comfortable with that.  Also, he is including LLC's that don't exist in this agreement which put's us at risk.  He's
> including potential deals in this agreement that don't exist.  He's refused to show me an offer letter and refused to
> have me on the phone with ~~████~~ proving that there is even an offer at this point.. have you seen or heard anything
> from ~~████~~. Why are we jumping through hoops if no deal is on the table?
>
> **Michael Dash**
> **ndap**
> Tel: (646) 553-5918
> mdash@ndap-llc.com | http://www.ndap-llc.com

> On Tue, Mar 7, 2017 9:56 AM, David Gitman david@gitman.net wrote:
> Jeremy, thank you for all your hard work. We truly appreciate it. All your suggested changes are reasonable.
>
> Mike, this situation has become emotional and is embarrassing at this point. Please execute this immediately. I'm
> ready to counter sign.

> > On Tue, Mar 7, 2017 at 9:51 AM Jeremy Falk <jeremy.falk@gmail.com> wrote:
> > Mike and Dave,
> >
> > I included Dave on this email chain. I reviewed CSV's proposed changes and included revisions to the attached
> > file. I have been counseled that the edits presented are reasonable, appropriate and put me in a far worse
> > position than industry standard. My lawyer is also expressing to me that what CSV is asking of me is beyond
> > normal, and telling me under no circumstances to sign this attached agreement. My changes are appropriate and
> > reasonable. I am willing to execute an agreement if we implement the changes that were agreed to on Sunday
> > that are now correctly reflected in the doc.
> >
> > We have spent a lot of time on this agreement and I have stretched as far as I can.  I also recognize that you feel
> > that you have extended yourselves too. This is not an emotional decision for me - If we can get this agreement
> > done then let's get to ~~████~~ However, the points below are necessary for me.  I can't prevent you from flushing to

zero all the progress that has been made. Let me know how you guys want to proceed.

1) There are minor tweaks relating to incorrect grammar, misspellings, missing periods etc.

2) Signature line: I re-included David Gitman in the signature of this document. He needs to be included in this process and execute this agreement. It cannot only be Mike.  You are partners in CSV.

3) Section 1: Services.  I have been providing services to you guys for a few years. My lawyer says that it should reflect a "Since December 1, 2015" time frame in the "Services" segment.  If you don't want to include it in the document then the alternative I see is that I notify ▇▇▇ of such and then either Mike or Dave resends to BAP the same documents that I have already provided so that it is coming from a Member of CSV.  Up to you which route you want to take. I need to then have the data come again from CSV to ▇▇▇ That can practically happen seamlessly.

4)  Section 2. Mike and I agreed on to Sunday to "1/3, 1/3, 1/3 on all distributions".  The draft I received yesterday did not reflect what we agreed to on Sunday. They have me being paid at an unusual pace which I am not comfortable with. We directly discussed the scenario that is now drafted in this Agreement. I cannot execute anything other than this schedule.  I implemented very accommodating terms here: Industry standard and your former Peak agreement has this role being paid upfront.  What I drafted is what we discussed and both agreed to on Sunday.

Why the "30 day" delay on distributions? I can understand if you need a few days to execute so I am agreeing to 7 days. The 30 days is what you offer business vendors. Immediate payment is standard in this scenario.

5) Section 6.3: Indemnification.  An appropriate indemnification needs to be included. I originally included the Peak indemnification clause which was much longer. You edited and I revised down to 1 paragraph. This is standard practice and I have limited to the extent that anyone feels comfortable.

6) Section 4: Term. I already discussed this with Mike and you agreed to this on Sunday. It never made it in to the latest draft. Agreement remains in effect until a date (I proposed 4/14) or an indication of interest from ▇▇▇ You originally drafted a signed transaction closing which is unreasonable. We agreed to this change on Sunday.

Please review this yourselves and determine what are next steps.

Jeremy

# EXHIBIT B

DocuSign Envelope ID: 21A1002A-987E-448B-AD4F-7B2A739C104D

## COOPER SQUARE VENTURES, LLC/NDAP,LLC

## SERVICES AGREEMENT

This Agreement for Services is a binding agreement (this *"Agreement"*) that is made and entered into as of March 3, 2017 (the *"Effective Date"*) by and between Summit Rock Holdings LLC, a Delaware limited liability company (*"Consultant"*) and the following: Cooper Square Ventures, LLC, and NDAP, LLC (dba/ Car Part Kings) (the *"Company"*). "Consultant" and "Company" herein referred to individually as a *"Party*," or collectively as the *"Parties"*.

## RECITALS

WHEREAS, Company has engaged in negotiations with ▬▬▬▬▬ (the "Buyer") concerning a contemplated sale of NDAP, LLC and/or its assets to Buyer (the "Transaction"); and

WHEREAS, the Company desires to retain Consultant to perform the services described herein with respect to negotiations with Buyer solely with reference to the Transaction, and for Consultant to perform such services on the terms and conditions described herein.

NOW THEREFORE, in consideration of the promises and mutual agreements contained herein, the Parties hereto, intending to be legally bound, agree as follows:

### Section 1.    Services

1.1.    Consultant since December 1, 2015 has provided Services and shall continue to perform the following services for the Company (or its designee) solely with respect to the Buyer and solely concerning the Transaction: (i) providing strategic and financial analysis and conducting due diligence (which may include constructing financial models and managing certain aspects of the Transaction), (ii) advising the Company in connection with the sale of assets pertaining to the Transaction or the structuring of the Transaction as a merger or joint venture with Buyer, (iii) soliciting proposals from Buyer, (iv) providing advice to the Company in the negotiation process, (v) performing business development for current businesses and the sourcing of new investment opportunities for the Company as same may pertain to the Transaction, (vi) advising concerning institutionalization of the Company and the development of its processes to enable capital raising for the execution of the Transaction, and (vii) contributing toward the formalization of business development or investment processes, protocols and operating procedures as same may pertain to the Transaction (items (i) through (vii), together with other services previously provided, are collectively referred to herein as the *"Services"*).

### Section 2.    Compensation and Consideration

2.1.    Company hereby engages Consultant to perform the Services with Buyer solely concerning the Transaction and for no other purpose.  As compensation and in full payment and consideration of all Consultant's services rendered hereunder, Company shall pay Consultant a fee (the "Fee") solely in the event of a closing of the Transaction and solely in the event Company receives payment of the Purchase Price (as defined below).  The Fee shall be calculated as follows:

(a)    The total Fee shall equal:

$110,000.00 + (0.0025 x Purchase Price)

DocuSign Envelope ID: 21A1002A-987E-448B-AD4F-7B2A739C104D

(b)      Payment of the Fee. Consultant will receive one-third (33%) of all distributions to the Company until the total Fee (Section 2.1 (a)) is paid to Consultant, after which 100% of distributions shal be paid  to the Company. Consultant will be paid no later than seven (7) days after Company's receipt of Purchase Price installments.

(c)      The term "Purchase Price" shall encompass the value of (1) all consideration received or to be received by the Company pursuant to a transaction, whether such consideration is paid in cash, or debt which for purposes of calculating the "Purchase Price" shall be reduced to present value or equity securities, when received and (2) future monetary considerations payable to Company or its owners (whether prior to or post termination of this Agreement) including the earn outs when paid, royalty fees, license fees, when paid and equity ownership (or in the case of a sale of assets, the consideration received for such assets, when received and (3) to the extent not included in the Purchase Price, the value of any outstanding long-term debt of the business assumed by the investor as part of the transaction.  Note, any outstanding payables greater than 90 days will be considered as long term debt if assumed by Buyer as part of the Transaction.  If a Transaction involves a combination or series of installments, the Purchase Price shall be the sum of the amount paid at the closing plus the amount of the installments.

(d)      In the event the Transaction does not close, for any reason or for no reason, **NO** compensation shall be due Consultant.

### Section 3.        Confidentiality

3.1.      *Confidentiality.* Consultant will do everything reasonably possible to preserve Company confidentiality.  Company will require all potential parties and professionals to whom confidential information is provided to maintain confidentiality of all such confidential information.  Consultant agrees to hold in confidence all proprietary information provided by the Company in connection with this project. Consultant agrees not to share any confidential information with persons outside of its office without the Company's consent, except that the Consultant may share the materials with the Buyer in connection with its duties, subject to Buyer agreeing to hold such confidential information in confidence.  Confidential Information shall not include any such information which (i) was publicly known or made generally available prior to the time of disclosure to Consultant; (ii) becomes publicly known or made generally available after disclosure to Consultant through no wrongful action or inaction of Consultant; or (iii) is in the rightful possession of or was obtained by Consultant, without confidentiality obligations or restrictions at the time of disclosure.

### Section 4.        Term and Termination

4.1.      *Term.* This Agreement shall remain in effect until the submission of a letter of intent or April 14, 2017, whichever shall occur first (the "*Term*").  Any sums due consultant pursuant to Section 2.1 shall survive termination of this Agreement.

### Section 5.        Intentionally Omitted

### Section 6.        Miscellaneous

6.1.      *Governing Law; Consent to Personal Jurisdiction.* This Agreement shall be governed by the laws of the State of New York, without regard to the conflicts of law provisions of any jurisdiction.

6.2.      *Authority.*  The person(s) signing this Agreement has full legal authority to bind the Company to this Agreement.

6.3.      **Indemnification.** (a)   Company shall indemnify and hold harmless the Consultant, its officers and employees from and against any damages, liabilities, claims, and losses, costs and expenses, but only to the extent caused by negligent acts, errors and omissions of Company, or of those for whom the Company is legally liable related to or arising out of such engagement.  Company shall defend, indemnify and hold the Consultant harmless from and against any and all liability, loss, expense, including attorneys' fee, or claims for injury or damages (each a "*Claim*") arising out of the performance of this Agreement.  Expenses incurred by Consultant in defending any Claim shall be paid by the Company in

DocuSign Envelope ID: 21A1002A-987E-448B-AD4F-7B2A739C104D

advance of the final disposition of such Claim upon receipt by the Company of an undertaking. Company will reimburse Consultant and any other party entitled to be indemnified hereunder for all expenses (including counsel fees) as they are incurred by Consultant or any such other indemnified party in connection with investigating, preparing or defending any such action or claim whether or not in connection with pending or threatened litigation in which Consultant is a party.   The Company also agrees that neither Consultant shall have any liability to the Company for or in connection with such engagement.

        (b)      Consultant shall indemnify and hold harmless the Company, its officers and employees from and against damages, liabilities and losses, costs and expenses, but only to the extent caused by the negligent acts, errors and omissions of Consultant, or of those for whom the Consultant is legally liable, which arise out of the Consultant's performance of its services under this Agreement.

        6.4.    *Assignability.* This Agreement will be binding for the benefit of the Consultant's heirs, executors, assigns, administrators, and other legal representatives. There are no intended third-party beneficiaries to this Agreement, except as expressly stated. Notwithstanding anything to the contrary herein, the Company may assign this Agreement and its rights and obligations under this Agreement to any successor to all or substantially all of the Company's relevant assets, whether by merger, consolidation, reorganization, reincorporation, sale of assets or stock, or otherwise.

        6.5.    *Entire Agreement.* This Agreement constitutes the entire agreement and understanding between the Parties with respect to the subject matter herein and supersedes all prior written and oral agreements, discussions, or representations between the Parties. Consultant represents and warrants that he/she is not relying on any statement or representation not contained in this Agreement. To the extent any terms set forth in any exhibit or schedule conflict with the terms set forth in this Agreement, the terms of this Agreement shall control unless otherwise expressly agreed by the Parties in such exhibit or schedule. The undersigned acknowledges that the Company has received all necessary approvals, read the Agreement and received a copy and understands that this is a legal binding contract.

        6.6.    *Survival.* All sections of this Agreement will survive termination or expiration of this Agreement.

        6.7.    *Headings.* Headings are used in this Agreement for reference only and shall not be considered when interpreting this Agreement.

        6.8.    *Severability.* If a court or other body of competent jurisdiction finds, or the Parties mutually believe, any provision of this Agreement, or portion thereof, to be invalid or unenforceable, such provision will be enforced to the maximum extent permissible so as to effect the intent of the Parties, and the remainder of this Agreement will continue in full force and effect.

        6.9.    *Modification, Waiver.* No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in writing signed by the Parties.  Waiver by the Company of a breach of any provision of this Agreement will not operate as a waiver of any other or subsequent breach.

        6.10.    *Notices.*  Any notice or other communication required or permitted by this Agreement to be given to a Party shall be in writing and shall be deemed given (i) if delivered personally or by commercial messenger or courier service, (ii) when sent by electronic mail or confirmed facsimile, or (iii) if mailed by U.S. registered or certified mail (return receipt requested), to the Party at the Party's address written below or at such other address as the Party may have previously specified by like notice. If by mail, delivery shall be deemed effective three business days after mailing in accordance with this section.

        (a)      If to Cooper Square Ventures, LLC or NDAP, LLC (dba/Car Part Kings), to:

        1010 Northern Blvd, Suite 208
        Great Neck, NY 11021

        with a copy to:

        Seligson, Rothman & Rothman
        29 West 30th Street, 10th Floor
        New York, NY 10001

DocuSign Envelope ID: 21A1002A-987E-448B-AD4F-7B2A739C104D

Attn: Jeffrey E. Rothman, Esq.

(b)    If to Consultant, to: or unless a change in address is provided

450 East 83rd Street (Suite 15C)
New York, New York 10028

6.11.    *Intentionally Omitted.*

6.12.    *Signatures.*  This Agreement may be signed in multiple counterparts, each of which shall be deemed an original, with the same force and effectiveness as though executed in a single document.

**[Signature Page Follows]**

DocuSign Envelope ID: 21A1002A-987E-448B-AD4F-7B2A739C104D

**IN WITNESS WHEREOF**, the Parties hereto have executed this Consulting Agreement as of the date first written above.

**SUMMIT ROCK HOLDINGS, LLC**

By: _Jeremy Falk_
Name: Jeremy Falk
Title: Authorized Signatory

**COOPER SQUARE VENTURES, LLC**

By: _Michael Dardashtian_
Name: Michael Dardashtian
Title: Member

_David Gitman_
Name: David Gitman
Title:  Member

**NDAP, LLC**

By: _Michael Dardashtian_
Name: Michael Dardashtian
Title: Member

_David Gitman_
Name: David Gitman
Title: Member

**Exhibit 30**



Mike Dash <mdash@ndap-llc.com>

---

## CPK: BAP Indication of Interest

---

**Jeremy Falk** <jeremy.falk@gmail.com>                                    Fri, Mar 10, 2017 at 9:03 AM
To: Mike Dash <mdash@ndap-llc.com>, David Gitman <david@gitman.net>

Mike.and Dave,

████ finalized a CPK indication of interest with their board of directors yesterday evening PT.  We received last night an indication of interest from ████ Let's discuss next steps at 11:15am ET.

(Note: This is not an executed version. Renee will send that through later this morning.)

Jeremy

---

📄 **CPK LOI 2017.03.09.pdf**
   288K

**Exhibit 31**

# INTENTIONALLY OMITTED

**Exhibit 32**

# GMail
by Google

## Proposal for PA...

Mike Dash <mdash@ndap-llc.com>

Jeremy Falk <jeremy.falk@gmail.com>
To: Michael Dash <mdash@ndap-llc.com>
Cc: David Gitman <dgitman@ndap-llc.com>

Wed, Mar 15, 2017 at 11:42 AM

Yes

On Mar 15, 2017, at 11:40 AM, Michael Dash <mdash@ndap-llc.com> wrote:

Sounds good.  I am sending Randy email shortly.  Once he confirms, I will push to have Jeff draw up an agreement for PA to sign.

Thanks.

On Wed, Mar 15, 2017 11:38 AM, David Gitman dgitman@ndap-llc.com wrote:
I just spoke to Jeremy. He's okay taking 80k in light of the PA offer. Jeremy, please confirm.

Are we going to put in place an agreement with PA? Do we need to draw something up?



100% Recycled   30% PCW

## **<u>Exhibit 33</u>**

Delaware.gov

Governor | General Assembly | Courts | Elected Officials | State Agencies

Department of State: Division of Corporations

*State of Delaware*
*The Official Website of the First State*

**HOME**
About Agency
Secretary's Letter
Newsroom
Frequent Questions
Related Links
Contact Us
Office Location

**SERVICES**
Pay Taxes
File UCC's
Delaware Laws Online
Name Reservation
Entity Search
Status
Validate Certificate
Customer Service Survey

**INFORMATION**
Corporate Forms
Corporate Fees
UCC Forms and Fees
Taxes
Expedited Services
Service of Process
Registered Agents
GetCorporate Status
Submitting a Request
How to Form a New Business Entity
Certifications, Apostilles & Authentication of Documents

Allowable Characters

View Search Results

## Entity Details

THIS IS NOT A STATEMENT OF GOOD STANDING

| | |
|---|---|
| **File Number:** | 6353519 |
| **Entity Name:** | ACCEL COMMERCE LLC |

| | | | |
|---|---|---|---|
| **Incorporation Date /** | 3/20/2017 | | |
| **Formation Date:** | (mm/dd/yyyy) | | |

| | | | |
|---|---|---|---|
| **Entity Kind:** | Limited Liability Company | **Entity Type:** | General |
| **Residency:** | Domestic | **State:** | DELAWARE |

**REGISTERED AGENT INFORMATION**

| | |
|---|---|
| **Name:** | HARVARD BUSINESS SERVICES, INC. |
| **Address:** | 16192 COASTAL HWY |
| **City:** | LEWES | **County:** | Sussex |
| **State:** | DE | **Postal Code:** | 19958 |
| **Phone:** | 302-645-7400 |

Additional Information is available for a fee. You can retrieve Status for a fee of $10.00 or more detailed information including current franchise tax assessment, current filing history and more for a fee of $20.00.
Would you like ○Status ○Status,Tax & History Information  Submit

Back to Entity Search

For help on a particular field click on the Field Tag to take you to the help area.

site map | privacy | about this site | contact us | translate | delaware.gov

# EXHIBIT B



**Accel Commerce**          $5.56 - $250.00 /hr

eCommerce

⊙ Brooklyn, United States (UTC-05:00)

## Overview

Over 15 years of success deploying technical solutions that drive dramatic growth in sales, profit and market share

Highly creative entrepreneur with a 15-year track record of innovation and success. Strength in conceptualizing, recommending, architecting and aligning technology investments with evolving business, market and client needs.

Background includes leading the design and development of solutions for such industry leaders as MediaLink Worldwide, eBay, ToysRUs.com and TheGlobe.com complemented by leading e-commerce development firm from $400K in revenues to over $8.5M in 4 years.

Successful in creating vision, identifying opportunities, building organizations, and delivering strong growth for start-up and established organizations within intensively competitive Internet, eCommerce & New Media markets.

Change agent with strong build out, transformation and turnaround leadership. Skilled in establishing, revitalizing, integrating and optimizing technologies, systems, teams and processes to reduce costs and achieve operational excellence. Practiced in managing offshore teams.

Provide dedicated leadership in researching, evaluating and implementing emerging cloud computing, security, eCommerce, and business continuity technologies, standards and best practices to mitigate risk, achieve compliance and ensure optimal uptime of core systems, services and environments. less

---

**Contact**

| | |
|---|---|
| Member Since | Jan 30, 2017 |
| Current Jobs | 0 |
| Total Jobs | 1 |
| Current Members | 7 |
| Total Hours | 6 |
| Total Earned | $200+ |
| Last Worked | Feb 25, 2017 |

**Business Managers**

 David G.

**Agency Members**

 Aramayis H.
🏅 TOP RATED
92% Job Success
Last worked 2 months ago

 William R.
88% Job Success
Last worked 1 day ago



## **Exhibit 34**

Accountant
Reconcile - TOTAL BUS CHK (3650)
Checks and Payments
Deposits and Other Credits
Dashboard
Banking
Expenses
Employees
Reports
Taxes
Accounting
Finish Now
Finish Later
Cancel
Online Statements - Google Chrome
ACCEL COMMERCE LLC
16192 COASTAL HWY
LEWES DE 19958-3608
Website Chase.com
Service Center 1-800-242-7338
Deaf and Hard of Hearing 1-800-242-7383
Para Espanol 1-888-622-4273
International Calls 1-713-262-1679
CHECKING SUMMARY
Beginning Balance
Deposits and Additions
ATM & Debit Card Withdrawals
Ending Balance
DEPOSITS AND ADDITIONS
Online Transfer From Chk
Card Purchase Return
Total Deposits and Additions
ATM & DEBIT CARD WITHDRAWALS
Card Purchase
Recurring Card Purchase