Michael Dardashtian, Et Al. V. David Gitman, Et Al.
Case No. 17 CV 4327 (LLS)(RWL)

Expert Rebuttal Report of The Withum Valuation Report
Solely Prepared by Justin Kuczmarski, MBA, CPA, CVA, ABV, CEIV, CIRA, CFF

MICHAEL DARDASHTIAN, ET AL.

Plaintiff,

V.

DAVID GITMAN, ET AL.

CASE NO. 17 CV 4237 (LLS)(RWL)

## EXPERT REBUTTAL REPORT OF

## THE WITHUM DETAILED VALUATION REPORT

## OF COOPER SQUARE VENTURES, LLC
## AS OF VALUATION DATE OF MAY 1, 2020

## SOLELY PREPARED BY

## JUSTIN KUCZMARSKI, MBA, CPA, CVA, ABV, CEIV, CIRA, CFF

## Report Date: June 26, 2020



**Michael Dardashtian, Et Al. v. David Gitman, Et Al.**
**Case No. 17 CV 4327 (LLS)(RWL)**

**Expert Rebuttal Report of The Withum Valuation Report**
**Solely Prepared by Justin Kuczmarski, MBA, CPA, CVA, ABV, CEIV, CIRA, CFF**

## Table of Contents

**I.   EXECUTIVE SUMMARY** ........................................................................................... 3

OVERALL BIO ACROSS VALUATION & CORPORATE ADVISORY SERVICES ....................... 4
TECHNOLOGY BIO AND VALUATION REVIEW RECORD ................................................... 6
RECORDS OBTAINED FROM COUNSEL ............................................................................ 7
EXECUTIVE SUMMARY HIGHLIGHTS OF MY WITHUM VALUATION REBUTTAL ................... 7
   *Overall Critique* ........................................................................................................ 7
   *Problems with the Usage of the Direct Capitalization Method for Valuing the Company* ................... 8
   *Lack of Valuation Sanity Check from Other Methods, Particularly Leading Market Methods* ........... 9

**II.   WITHUM VALUATION REBUTTAL** ..................................................................... 13

VALUATION SYNTHESIS: USING MULTIPLE INDICATIONS OF VALUE FROM LEADING METHODS ....................... 13
WHY DIRECT CAPITALIZATION VALUATION METHOD SHOULD NOT APPLY FOR VALUING THE COMPANY ........ 13
LACK OF MARKET SANITY CHECK IN BYPASSING GUIDELINE PUBLIC COMPANY METHOD ("GPCM") ............. 18
LACK OF MARKET SANITY CHECK IN BYPASSING GUIDELINE MERGED AND ACQUIRED METHOD ("GMAM") ... 22
PROFESSIONAL STANDARDS' COMPLIANCE ISSUES: LACK OF DOCUMENTED COMPLIANCE WITH SSVS ........ 27
PROFESSIONAL STANDARDS' COMPLIANCE ISSUES: NO STATEMENT OF COMPLIANCE WITH SSFS ............. 34
APPARENT LACK OF WITHUM TECHNOLOGY EXPERTISE FROM A VALUATION OR M&A STANDPOINT ............. 34
LACK OF VALUATION CREDENTIALS BY LEADING WITHUM EXPERT CARLEEN J. GASKIN, CPA, CFF ............. 36
DISCOUNT FOR LACK OF MARKETABILITY ("DLOM") ................................................... 39
LACK OF UPWARD ADJUSTMENT IN BUSINESS VALUE FOR THE S-CORP. PREMIUM ....................... 43
ANALYSIS OF EXCESS CASH ....................................................................................... 44
IN SUMMARY ............................................................................................................. 45

**APPENDICES A** ..................................................................................................... 47

DIRECT CAPITALIZATION METHOD: EXCERPTS FROM THEORY AND BEST PRACTICES ................. 47

**APPENDIX B** ......................................................................................................... 54

BIO & FULL CV OF JUSTIN KUCZMARSKI, MBA, CPA, CVA, ABV, CEIV, CIRA, CFF ............. 54



**Michael Dardashtian, Et Al. V. David Gitman, Et Al.**
**Case No. 17 CV 4327 (LLS)(RWL)**

**Expert Rebuttal Report of The Withum Valuation Report**
**Solely Prepared by Justin Kuczmarski, MBA, CPA, CVA, ABV, CEIV, CIRA, CFF**

# I. EXECUTIVE SUMMARY

1. I have been retained by Sim & Depaola, LLP ("S&D"), counsel to Mr. David Gitman ("Gitman," "Defendant"), to perform litigation support consulting services in connection with the case of Michael Dardashtian, Et Al. ("Plaintiff") V. David Gitman, Et. Al. The case reference is No. 17 CV 4327 (LLS)(RWL).

2. I have not yet performed a detailed valuation report, whether as a future addendum to this Rebuttal Report or in the form of an independent, standalone valuation report of the Company ("Company") under dispute, Cooper Square Ventures LLC (d/b/a "ChannelReply"). The Company is a help desk support software firm for usage by leading software platforms. The business-to-business nature of the Company's software, which bridges online marketplaces and help desk software firms via its proprietary support software, fits the definition of both application and system software. I have structured my review of the WithumSmith+Brown, PC ("Withum") valuation report ("Withum Valuation Report") dated May 30, 2020, around the analysis of the ChannelReply entity. The Company had other corporate entities in the past, but these remain essentially non-operational.

3. My findings in this expert rebuttal report ("Rebuttal Report") are subject to change if new information becomes available. As such, I reserve the right to make amendments to the Rebuttal Report. I reserve the right to perform these additional valuations and forensic advisory steps upon receipt of more information from the Company or changing needs mandated during the current shareholder litigation dispute.

4. My Rebuttal Report comprises a report for litigation purposes that analyzes the WithumSmith+Brown, PC ("Withum") valuation report ("Withum Valuation Report") dated May 30, 2020. The Withum Valuation Report valued the Company

5. I have no prior relationship with any attorney in this matter or any party to the case. Members of my advisory team also have no prior relationships with any parties.

6. I have performed select review valuation procedures in this Rebuttal Report. I present my findings in *Section II, Withum Report Rebuttal.* The structure of the Rebuttal Report is as follows:

**Rebuttal Report Structure**

| Section | Section Title | Pages |
|---------|---------------|-------|
| I | Executive Summary | 3-13 |
| II | Withum Valuation Rebuttal | 14-47 |
| Appendix A | Excerpts from Valuation Theory Covering Direct Capitalization Method | 48-54 |
| Appendix B | Full Bio & CV of Justin Kuczmarski, MBA, CPA, CVA, ABV, CEIV, CIRA, CFF | 55-61 |



NAV
VALUATION
& ADVISORY LLC

**Michael Dardashtian, Et Al. V. David Gitman, Et Al.**
**Case No. 17 CV 4327 (LLS)(RWL)**

**Expert Rebuttal Report of The Withum Valuation Report**
**Solely Prepared by Justin Kuczmarski, MBA, CPA, CVA, ABV, CEIV, CIRA, CFF**

## Overall Bio Across Valuation & Corporate Advisory Services

7. I possess a dual background in the last 21 years as a full-time valuation advisory expert and M&A advisor. For the latter, I specialize in the valuation and M&A advisory of technology and healthcare technology companies. I have instructed members of the judiciary on valuation fundamentals as an instructor at the National Judicial College.

8. I graduated from Princeton University with a B.A. in Politics in May 1999. I earned a dual MBA in both Professional Accountancy and Finance from Fordham University's Gabelli School of Business in May 2001. I attended the latter on a partial academic fellowship in both the accounting and finance departments.

9. I have been recognized by my peers and professional organizations. I was selected for a 2016 *40 Under 40* honoree by the National Association of Certified Valuation Analysts ("NACVA"). I was a finalist for *Crain's New York 40 Under 40* in 2011.

10. I maintain six credentials or professional licenses. These licenses and their respective professional associations are as follows:[1]

---

[1] The requirements to earn a leading credential in public accounting, forensic accounting, bankruptcy and restructuring, or corporate finance / valuation vary among the major credentialing organizations (i.e. the American Institute of Certified Public Accountants ("AICPA"), the Association of Insolvency and Restructuring Advisors ("AIRA"), and the National Association of Certified Valuation Analysts ("NACVA")). However, all of these national organizations have common general credentialing requirements: (1) post-baccalaureate academic coursework in their respective disciplines, (2) work experience in respective disciplines (i.e., valuation, bankruptcy, or forensic advisory), (3) submission of "demonstration" forensic reports or sample valuations reports subject to a rigorous and contrarian peer review, and (4) passing of a comprehensive examination in theory, practice, and professional standards. The latter is often specific to the credential's scope.

This accreditation process is intended to ensure that a CPA, CVA, ABV, CEIV, CIRA, CFF or similarly credentialed analyst is proficient in (1) the application of credential-specific advisory theory and (2) the understanding of best practices. I currently maintain a CPA license in both New York State and Virginia. The CPA license requires the passage of four core areas (auditing, business and economics, financial reporting, and taxes and regulation) and a master's educational level or higher. A CPA license also entails other state-level requirements separate from the other identified credentials. I have served as an instructor for leading CPA preparatory course providers (i.e., Becker CPA Prep) across all four areas of the CPA exam.



**Michael Dardashtian, Et Al. V. David Gitman, Et Al.**
**Case No. 17 CV 4327 (LLS)(RWL)**

**Expert Rebuttal Report of The Withum Valuation Report**
**Solely Prepared by Justin Kuczmarski, MBA, CPA, CVA, ABV, CEIV, CIRA, CFF**

| License / Credential | Acronym | Profession | Professional Association | Kuczmarski License / Certification Number |
|---|---|---|---|---|
| Certified Public Accountant | CPA | Public Accounting | State CPA licensure from both New York State and Virginia | Obtained in 2006 New York: #097040 Virginia: #32493 |
| Certified in Financial Forensics | CFF | Forensic Accounting | American Institute of Certified Public Accountants (AICPA) | Obtained in 2008 AICPA Membership #4524732 |
| Accredited in Business Valuation | ABV | Business Valuation | American Institute of Certified Public Accountants (AICPA) | Obtained in 2007 AICPA Membership #4524732 |
| Certified in Entity and Intangible Valuation | CEIV | Intangible Asset Valuation (Software, Databases, Etc.) | American Institute of Certified Public Accountants (AICPA) | Obtained in 2017 AICPA Membership #4524732 |
| Certified Valuation Analyst | CVA | Business Valuation | National Association of Certified Valuation Analysts (NACVA) www.nacva.com | Obtained in 2006 CVA Credential #0990970 |
| Certified Insolvency and Restructuring Advisor | CIRA | Bankruptcy and Restructuring | Association of Insolvency & Restructuring Advisors (AIRA) www.aira.org | Obtained in 2011 CIRA Credential #1386 |

Chart 1.1: Licenses and Certifications of Justin Kuczmarski

11. Three of my credentials directly encompass valuation expertise in either business valuation or intangible asset valuation. The CEIV credential focuses on intangible assets, such as software, customer bases, and patents, that reside at the core technology firms such as the Company.

12. I am also a credentialed forensic accountant. I hold a Certified Public Accountant license in both New York and Virginia. I served as a part-time, weekend instructor for three years for the largest CPA course provider, Becker CPA Prep, across all four parts of the CPA exam. I hold the Certified in Financial Forensics ("CFF"), the official CPA credential covering forensic accounting fundamentals. I participate in select matrimonial cases. I am listed and eligible as both a Fiduciary Part-36 accountant and a Fiduciary Part-36 appraiser in eight counties for New York State[2]. The Part 36 program is a program for independent experts to assist in matrimonial disputes. I have been appointed a neutral expert in matrimonial matters for New York State. In non-matrimonial matters, I am trained as a mediator. I have served as a commercial, federal mediator for the Eastern District of New York.

13. I have participated in over 1,000 hours of continuing education credit training in my career across mainly valuation courses but also covering other practice areas. I have an extensive record as a valuation conference speaker, webinar speaker, and panelist. Appendix B presents my full bio and curriculum vitae ("CV").

---

[2] Please see http://ww2.nycourts.gov/courts/2jd/kings/civil/fiduciary.shtml for more information.



Michael Dardashtian, Et Al. V. David Gitman, Et Al.
Case No. 17 CV 4327 (LLS)(RWL)

Expert Rebuttal Report of The Withum Valuation Report
Solely Prepared by Justin Kuczmarski, MBA, CPA, CVA, ABV, CEIV, CIRA, CFF

## Technology Bio and Valuation Review Record

14. My practice focuses extensively on technology companies, particularly software entities known as SaaS (software-as-a-service) or Platform-as-as-Service (PaaS).

15. I frequently serve as a television commentator for TD Ameritrade Network, Yahoo! Finance, i-24 News, and China Global Television Network (CGTN). My appearances on these networks focus on technology valuation and technology mergers and acquisitions.

16. I have been an advisor for either tens of technology transactions or initial public offerings. I participated as one of the lead valuation advisors in the Seamless – GrubHub merger of 2013 and their subsequent initial public offering in spring 2014. Please see my full bio and CV in Appendix B.

17. The Company is a SaaS firm focused on marketing technology services, of which help desk support services, is a sub-industry.

18. I have valued or advised in tens of benefits management software firms, start-up software firms, tens of industry-specific software firms, and information technology firms. I was a marketing service and marketing technology M&A investment banker in the mid-2000s. I have continued this technology industry focus since that time before incorporating a growing focus on valuation and other corporate services in the last 15 years. I understand the valuation and industry nuances of the software industry, whether application software firms or system software firms.

19. My dual experience in valuation advisory services overall and valuation / M&A consulting and advisory for technology firms provides both functional and industry expertise, a background that guided my rebuttal analysis of the Withum Valuation Report of the Company. ChannelReply is a growing software firm with a top-line compounded annual growth rate (CAGR") of 43.1% in the three years from year-end 2016 to year-end 2019.

20. I have performed over 600 valuation and forensic reports in the last 21 years. I have performed valuations for corporate transactions, financial reporting, tax compliance, litigation purposes, and alternative dispute resolution ("ADR") forums. In the process, I have delivered hundreds of valuations, forensic engagements, and financial advisory assignments.

21. I am well versed in the *review* of valuation reports and best practices across theory and methodology. Valuation experts can gain extensive review experience mostly within either national advisory practices or national accounting firms that serve thousands of audit clients.

22. I have reviewed over 1,000 valuation reports, mostly during the 2005 to 2015 period for audit clients of my prior employer, Crowe LLP. From 2005 to 2015, I led a valuation and advisory team at national accounting and professional services firm Crowe LLP. I have never had a report overturned by the IRS or U.S. Tax Court.

23. My review number is extensive due to my national review responsibilities at Crowe LLP, and the firm's audit focus on private equity and venture capital funds. These financial sponsors, or alternative



**Michael Dardashtian, Et Al. V. David Gitman, Et Al.**
**Case No. 17 CV 4327 (LLS)(RWL)**

**Expert Rebuttal Report of The Withum Valuation Report**
**Solely Prepared by Justin Kuczmarski, MBA, CPA, CVA, ABV, CEIV, CIRA, CFF**

investment, funds often owned tens of technology and business services portfolio companies and similarly purchased and sold tens of investments across the two sectors. Crowe is the ninth-largest accounting and professional services by revenue and employs nearly 5,000 U.S. professionals.

24. I founded NAV Valuation & Advisory LLC in the fall of 2015 to focus on independent valuation and corporate advisory services across a broad range of professional and transactional services. NAV offers sell-side M&A services and other corporate advisory services traditionally not offered by many standalone advisory firms or advisory/consulting divisions within accounting and professional services firms.

25. I specialize in shareholder dispute valuations for litigations or alternative dispute resolution. I am trained as a mediator and have served as a commercial, federal mediator for the Eastern District of New York.

26. I have testified as an expert witness in three cases, all of which were shareholder cases. I testified as an expert witness in a marketing technology shareholder dispute in 2005 and two other shareholder cases in 2017 and late 2019, respectively.

27. I have served as an expert consultant in tens of complex valuation cases, particularly the class-action Fannie Mae litigation during 2009-2012. Please see my full bio and curriculum vitae ("CV") in Appendix B for a listing of notable litigation support experience.

28. Litigation support advisory remains a blended part of my practice, ranging anywhere from 20% to approximately 40% annually of my professional time. My litigation support advisory often involves disputes centered on valuation or complex asset valuation, such as credit valuation or structured credit valuation. The remaining components of my practice encompass either business/intangible valuation advisory services for portfolio clients and investment funds or M&A advisory services.

## Records Obtained from Counsel

29. The following represent materials in my possession: 1) legal complaints and responses, 2) corporate tax returns, and the Withum Valuation Report itself. The latter is the most relevant component of my Rebuttal Report. I reserve the right to adjust and update my conclusions to account for additional documentation in any future independent valuation or expansion of the Rebuttal Report herein.

## Executive Summary Highlights of My Withum Valuation Rebuttal

### Overall Critique

30. Additional analysis of the Withum Valuation Report would be possible upon access to their valuation work papers or any future clarity on their procedural process and fulfillment of required steps, whether through depositions or discovery. Such access would help one ascertain what contemporaneous steps the Withum team performed and documented accordingly in their analysis.

31. In summary, the Withum Valuation Report fails to substantiate both key valuation components and documentation, proving necessary compliance with professional standards.



Michael Dardashtian, Et Al. V. David Gitman, Et Al.
Case No. 17 CV 4327 (LLS)(RWL)

Expert Rebuttal Report of The Withum Valuation Report
Solely Prepared by Justin Kuczmarski, MBA, CPA, CVA, ABV, CEIV, CIRA, CFF

<u>Problems with the Usage of the Direct Capitalization Method for Valuing the Company</u>

32. In my opinion, the Withum Valuation Report should have selected more than just one business valuation method. The selected business valuation method is a direct capitalization valuation method, which is not an appropriate valuation method for the Company for the reasons set forth below, in *Section II, Withum Valuation Report*, and the valuation theory and best practices excerpts in Appendix A.

33. Capitalization is mathematically equal to the division of a proposed constant benefit stream by an expected spread between the discount rate and a proposed constant growth rate. The spread of the two rates is known as the capitalization rate. Put differently, the equation of discount rate less an assumed constant growth is called the capitalization rate.

> **Capitalization Rate = Discount Rate – Growth Rate**

34. In a direct capitalization method, or a variation of the direct capitalization method known as the excess earnings method, a smaller spread equals a higher value, all else equal.

35. The challenges in a direct capitalization method are centered around both a constant growth assumption and constant assumption of an annual benefit stream.  Both are rare in the real world. The deficiencies apply to the direct capitalization method and a variation of the method known as the excess earnings method, a subset variation of the direct capitalization method which similarly relies on the key principle of capitalization.[3] Due to the variation on assumptions used, the direct capitalization method can produce an extremely wide variance on value and thus, can lead to manipulation.

36. The valuation textbook *Standards of Value, 2nd Edition,* written by Shannon Pratt, Jay Fishman, and Withum Valuation and Forensic Practice Head William Morrison noted that the excess earnings method *is rare for fair value disputes.*[4]

37. Valuation theory and best practices undercut the usage and shun of the direct capitalization method (often dubbed the capitalized income method) for either early-stage businesses or businesses with high growth. The Company possessed both: early-stage attributes and observed high growth or change. Accordingly, these facts alone nullify the direct capitalization method for valuing the Company for all Valuation Dates.

38. A discounted economic income method, known as a discounted cash flow ("DCF"), is more appropriate. I discuss a DCF method shortly. *Valuing A Business, 5th Edition*, written by Shannon Pratt and Alina Niculita, noted the following:[5]

---

[3] Trugman, Gary. *Understanding Business Valuation, 5th Edition,* Copyright 2017 by the American Institute of Certified Public Accountants. Page 505.
[4] Fishman, Jay; Pratt, Shannon and Morrison, William. *Standards of Value, 2nd Edition.* Copyright 2013 by John Wiley & Sons. Page 137
[5] Pratt, Shannon. *Valuing a Business: The Analysis and Appraisal of Closely Held Companies*, *5th Edition.* Copyright 2009 by McGraw-Hill, Inc. Page 244



NAV VALUATION & ADVISORY LLC

Michael Dardashtian, Et Al. V. David Gitman, Et Al.
Case No. 17 CV 4327 (LLS)(RWL)

**Expert Rebuttal Report of The Withum Valuation Report**
Solely Prepared by Justin Kuczmarski, MBA, CPA, CVA, ABV, CEIV, CIRA, CFF

> The important conceptual underpinning of the capitalized economic income valuation model is that there is either a constant annual income stream in perpetuity or a constant annualized rate of growth (or decline) in the economic income variable being capitalized into perpetuity. **Obviously, this constant growth rate projection is rarely met in the real world. [Bold Added]**

> Unlike the discounted economic income model, the capitalization model does not take into consideration the timing of future changes in expected economic income. **The greater the differences in the anticipated changes over time, especially in the early years, the more the analyst is encouraged to apply the discounted economic income method rather than the capitalized income method. [Bold Added]**

39. The excess earnings method, though not applied in the Withum Valuation Report, is nonetheless a direct capitalization method variation.

40. Even in this limited scope, the excess earnings method is often suspect due to the challenges of capitalization, which produces unreliable valuations. The IRS has shunned the excess earnings method for years. An excerpt from *Understanding Business Valuation, 5th Edition*, reiterates this dismissal. *Understanding Business Valuation* has long served as a core self-study training book of the American Institute of Certified Public Accountants ("AICPA"). The textbook captured this prevalent skepticism of the excess earnings method and its direct capitalization focus in a quote from Shannon Pratt in a 1985 *Business Valuation News* article:[6]

> The excess earnings method of valuation is another version of a capitalization earnings approach. **It is the most widely used and missed of all methods for valuing small business and professional practices.** It is widely written about, and more than half the business and professional practice brokers that I know use some version of it. **It is widely used in divorce proceedings for determining the value of goodwill in professional practices. Yet the Internal Revenue Service, who spawned the method back in 1920, now roundly denounces it.[2] [Bold Added]**

Lack of Valuation Sanity Check from Other Methods, Particularly Leading Market Methods

41. Valuation advisory, whether the business appraisal of private businesses, mergers and acquisitions, real estate appraisal or machinery and equipment appraisal, is rooted in market data and professional judgment. The linkage of market data and professional judgment exists since market data should help guide professional judgment. It is no secret that two of the three leading business valuation methods are market-driven methods. These market methods – the guideline public company method ("GPCM") and the Guideline merged and acquired method ("GMAM") – comprise two-thirds of the three leading business valuation methods. The IRS, in IRS Revenue-Ruling 59-60, a hallmark of private company valuation, lists the analysis of guideline public company prices as a factor to consider.[7]

> The market price of stocks of corporations engaged in the same or a similar line of business having their stocks actively traded in a free and open market, either on an exchange or over the counter.

---

[6] Trugman, Gary. *Understanding Business Valuation, 5th Edition,* Copyright 2017 by the American Institute of Certified Public Accountants. Page 505.
[7] Internet URL: http://www.irs.gov.



Michael Dardashtian, Et Al. V. David Gitman, Et Al.
Case No. 17 CV 4327 (LLS)(RWL)

**Expert Rebuttal Report of The Withum Valuation Report**
**Solely Prepared by Justin Kuczmarski, MBA, CPA, CVA, ABV, CEIV, CIRA, CFF**

42. The other leading business valuation method is the discounted cash flow ("DCF") method, an income approach method. These three valuation methods are leading business valuation methods because they often provide a more reliable valuation.

43. Put differently, Withum not only left out the chance for corroborating value indicators in choosing just the direct capitalization method but also shunned any one of the three leading business valuation methods entirely (DCF method, guideline public company method, and guideline M&A method).

44. In my view, it would be one thing solely to select one of these three leading business valuation methods. It is quite another to select just one non-leading valuation method, such as the direct capitalization method for solely valuing the Company.

45. Theory and best practices clearly state that the 1) direct capitalization method is not a leading method overall, 2) not recommended for usage in fair value disputes, and 3) inappropriate for an a) early-stage/start-up business exhibiting b) high growth and c) owning significant technology.[8] The last three sub-elements in factor # 3 each individually alone obviate the direct capitalization's usage for the Company. It is beyond debate that the Company possessed all three of these elements (intangible nature, start-up stage, and high-growth nature) for the applicable Valuation Dates. Thus, the direct capitalization method would not be reliable in capturing the value of the Company.

46. Simply put, there is no overall support for the selection of the direct capitalization method for valuing the Company. I base this opinion from both a theoretical perspective and a best practices standpoint. If one objectively considers the full gamut of facts of the Company and its early-stage, technology focus, then the support is documented.

47. *Section II* presents an in-depth discussion of the faults of the direct capitalization in valuing the Company.

48. I outline several key concerns in the summary chart below. I present the full rebuttal points to date in *Section II, Withum Valuation Rebuttal.*

---

[8] Valuation theory and best practices stipulate the direct capitalization method, in any variation, should be avoided to value a company when *any* of the following are present: 1) company has significant intangible value, 2) company is a start-up, or 3) a company is high-growth company. Refer to Appendix A for supporting excerpt from valuation theory and best practices.



**Michael Dardashtian, Et Al. V. David Gitman, Et Al.**
**Case No. 17 CV 4327 (LLS)(RWL)**

**Expert Rebuttal Report of The Withum Valuation Report**
**Solely Prepared by Justin Kuczmarski, MBA, CPA, CVA, ABV, CEIV, CIRA, CFF**

| Category # | Rebuttal Point Location in *Section II, Withum Valuation Rebuttal* (Ordering for Demonstrative Purposes Only) | Category of Rebuttal | Rebuttal Point |
|---|---|---|---|
| 1.1 | Direct Capitalization Method | Lack of Proper Methodology or Lack of Additional Methodology to Support a Defendable Valuation Range | **Direct Capitalization Method is not applicable to 1) start-up companies, 2) high-growth companies, or 3) companies with significant intangible value. All three characteristics clearly depict the Company as of the May 1, 2020 and previous valuation dates.** Please see references in *Section II, Withum Valuation Rebuttal.* |
| 1.2 | Direct Capitalization Method | Lack of Proper Methodology or Lack of Additional, Leading Business Valuation Methodology to Support a Defendable | Direct Capitalization Method is not applicable for a business that has exhibited sizable growth or growth which is **not** emblematic of mature, steady state growth. |
| 1.3 | Direct Capitalization Method | Lack of Support for Income Normalizations | Direct Capitalization Method subtracts for normalized income and does not provide the source of income adjustments or provide any supporting documentation. |
| 2.1 | No Market Sanity Check Via Usage of Guideline Public Company Method | Lack of Proper Methodology or Lack of Additional, Leading Business Valuation Methodology to Support a Defendable Valuation Range | The Withum Valuation Report does not provide any support for whether the Withum Report team performed a search, selection, and screening of market data in the form of guideline public companies. **The usage of guideline public company data reflects the Guideline Public Company Method ("GPC" or "GPCM"). It is a leading market approach method and can be applied to small businesses, typically when implied public valuation multiples are adjusted for either growth or size. While some industries lack sufficient data on guideline public companies, there are over 300 publicly-traded software firms as of the Valuation Date headquartered in the U.S. There are also over 100 publicly-traded small-capitalization and micro-capitalization public companies in the U.S.** Withum stated "the GPC method was considered for purposes of calculating the value of the Subject Interest as of the Valuation Dates, but not used given the lack of comparable publicly-traded firms." The Withum Report should have at least noted how the Report team searched, screened, and eliminated the hundreds of possible public software companies. Publicly traded software firms, even if small or micro-capitalization from a market size standpoint, can trade at Enterprise Value to Revenue (EV/Revenue) multiples greater than 3.0 times and possibly above to 5.0 times. Enterprise Value to EBITDA (EV/EBITDA) multiples can be greater than 15.0 times. I reserve the right to perform additional analysis to corroborate guideline company multiples applicable to the Company. |
| 2.2 | No Market Sanity Check Via Usage of Guideline Merged and Acquired Method | Lack of Proper Methodology or Lack of Additional, Leading Business Valuation Methodology to Support a Defendable Valuation Range | The Withum Valuation Report does not provide any support for whether the Withum Report team performed a search, selection, and screening of market data in the form of guideline private and public M&A transactions. **The usage of guideline, actual transactional data is the Guideline Merged and Acquired Method ("GMAM"). GMAM, like the Guideline Public Company Method, is a leading market approach method and can be applied to small businesses. There were over 150 software M&A transactions in just the two years from May 1, 2018 to May 1, 2020 from leading middle-market M&A database,** *DealStats.* |
| 3.1 | Lack of Industry Transactional Experience Record or Technology Industry Valuation Expertise | Team's Lack of Industry Record and Tech Industry Experience | Withum Report team appears to lack both software M&A and software valuation expertise. |
| 3.2 | Lack of Industry Transactional Experience Record or Technology Industry Valuation Expertise | Team's Lack of Industry Record and Tech Industry Experience | Withum's testifying expert, Partner Carleen J. Gaskin, CPA, CFF, is head of their Matrimonial Forensic Accounting. She appears to lack either software M&A or software valuation experience. She does not maintain any valuation credentials. Her CFF (Certified in Financial Forensics) credential is a forensic accounting credential from the American Institute of Certified Public Accountants ("AICPA"). She has testified in only matrimonial matters. Ms. Gaskin's case record shows she has testified in 17 matters, **of which 15 are the same name and presumed to be forensic accounting services for matrimonial matters.** It remains to be seen if she has been qualified as a pure valuation expert in any jurisdiction per her bio, CV, and case record. |

**Michael Dardashtian, Et Al. V. David Gitman, Et Al.**
**Case No. 17 CV 4327 (LLS)(RWL)**

**Expert Rebuttal Report of The Withum Valuation Report**
**Solely Prepared by Justin Kuczmarski, MBA, CPA, CVA, ABV, CEIV, CIRA, CFF**

| Category # | Rebuttal Point Location in *Section II, Withum Valuation Rebuttal* (Ordering for Demonstrative Purposes Only) | Category of Rebuttal | Rebuttal Point |
|---|---|---|---|
| 4.1 | Valuation Standards' Compliance Issues | Violation of Professional Standards Through Lack of Documentation or Sheer Absence of Required Disclosure / Analysis | Withum Report team did not include any supporting documentation that substantiates the required compliance with SSVS No. 1 from the AICPA. Statement on Standards for Valuation Services No. 1 ("SSVS") is the AICPA valuation standards mandatory for all CPA performing valuations. **Best practices dictate a report checklist or contemporaneous workpapers corroborating compliance.** The Withum Report does not present any compliance checklist in the Withum Valuation Report, an unusual step considering the Withum Report claims to adhere to the highest level of AICPA valuation reports known as a Detailed Valuation Report. |
| 4.2 | Valuation Standards' Compliance Issues | Violation of Professional Standards Through Lack of Documentation or Sheer Absence of Required Disclosure / Analysis | Withum Report team did not include any supporting documentation for 1) either independent Company projections or 2) a financial statement comparison versus industry competitors or industry information. The latter is called a cross-sectional comparison. Both valuation procedures are required elements in a detailed valuation report. A cross-sectional comparison only help solidify understanding a company's financial position and outlook, both essential element in the analysis and proper usage of future projections. **The absence of both elements (independent projection analysis and a cross-sectional financial statement analysis of the Company against the industry) arguably comprises two violation of AICPA valuation standards.** |
| 4.3 | Forensic Services Standards Compliance Issues | Violation of Professional Standards Through Lack of Documentation or Sheer Absence of Required Disclosure / Analysis | Withum Report team did not include any supporting documentation, nor any statement claiming adherence, to prove compliance with the AICPA's Statement on Standards for Forensic Services No. 1 ("SSFS"). **Unlike with SSVS, where Withum appears to have explicitly stated compliance in the Withum Report itself without complete report documenation proving this compliance, the Withum Report team is silent and does not claim adherence to SSFS.** |
| 5 | Discount for Lack of Marketability | Valuation Best Practices | Withum Report performed a reasonable DLOM analysis. However, the Report does not indicate if they considered if a DLOM, per recent case law, did not apply to a New York State fair value case such as the Company valuation. |
| 6 | Lack of Support or Discussion of S-Corporation Adjustment | Valuation Best Practices | Withum Report team did not apply the S-Corporation Adjustment, **which could have understated the business valuation by anywhere from 15% to 20%.** |
| 7 | Lack of Support or Discussion of Excess Cash | Valuation Best Practices | Withum Report team did not apply analyze excess cash, an add-back to business enterprise value. Standards mandate analysis of non-operating assets such as excess cash. |

Page 12



Michael Dardashtian, Et Al. V. David Gitman, Et Al.
Case No. 17 CV 4327 (LLS)(RWL)

Expert Rebuttal Report of The Withum Valuation Report
Solely Prepared by Justin Kuczmarski, MBA, CPA, CVA, ABV, CEIV, CIRA, CFF

## II.  WITHUM VALUATION REBUTTAL

The following analysis presents the comprehensive valuation rebuttal analysis I introduced earlier in *Section I, Executive Summary.*

### Valuation Synthesis: Using Multiple Indications of Value from Leading Methods

49. Corroborating information within a selected methodology and across methodologies substantiates a valuation conclusion. Ideally, indications of value synthesize or gravitate around a documented valuation range. The triangulation of results is the valuation synthesis touted in valuation textbooks and literature.

50. Usage of just one valuation method often violates this core valuation maxim suggesting usage of multiple methods to derive a defendable valuation conclusion. Another way to think of the valuation synthesis process would be to consider residential home value.

51. Here, valuation factors to consider would be the prevailing price per square foot (a market indicator emblematic GPCM) and paid prices for similar properties. The latter is the sales comparison approach in real estate appraisal.

52. Finally, one could analyze the present value of the rental income of the home under an income approach valuation method.

53. Corroborating analysis under the prevailing price per square foot, paid prices for similar properties, and the present value of the rental income would provide a reliable measure of value. Reliance on only one method alone cannot be a reliable measure of value.

54. All three real property valuation indicators loosely mirror the leading business valuation methods and the ideal valuation synthesis of business valuation, and homebuyers would likely be skeptical of any value indicator well removed from any other two valuation indicators.

### Why Direct Capitalization Valuation Method Should Not Apply for Valuing the Company

55. Some professionals may argue that the direct capitalization method could be used as a method due to the small size of the Company or the stated non-existence of projections or budgets. The latter arguably requires follow-up inquiry when one considers two elements of the Company.  However, the non-existence of projections or budgets does not stand to reason for the following reasons.

56. First, the Company received a court-appointed CPA business executive (Joel Liebman, CPA) to help manage the business. The appointment stemmed from the current shareholder dispute. CPAs typically prepare budgets and projections in the overall course of management, mainly when there are allegations in disputes and financial management questions that arise that are in question. The reality alone makes it unclear why Company management had no available budgets or projections for purposes of the valuation.

NAV
VALUATION
& ADVISORY LLC

Michael Dardashtian, Et Al. V. David Gitman, Et Al.
Case No. 17 CV 4327 (LLS)(RWL)

**Expert Rebuttal Report of The Withum Valuation Report**
**Solely Prepared by Justin Kuczmarski, MBA, CPA, CVA, ABV, CEIV, CIRA, CFF**

57. Secondly, the bios of the Withum Partners Carleen J. Gaskin, CPA, CFF, and Jessica Hollobaugh, CPA, ABV, CFE, reiterate how both professionals mainly specialize in financial investigation matters, particularly matrimonial matters. Both are the primary authors of the Withum Valuation Report. I have served in matrimonial matters and can attest to how a "kicking the tires" investigation mentality and approach is essential and often tantamount in these litigious matters.

58. It remains to be seen why all three Withum Valuation Report authors, all of whom are senior practitioners, did not compensate for the inability to obtain any budgets or projections by preparing any independent Withum budgets/projections. *The void is heightened when one realizes valuation standards mandate consideration of projection analysis, and the Company averaged a 43.1% compound annual growth rate ("CAGR") in revenue for the three-years from year-end 2016 to year-end 2019.* The 43.1% observed growth threshold significantly overshadows the presumed Withum projected growth rate of 4% for periods (short-term, near-term, and long-term) that they utilized to complete the Direct Capitalization Valuation Method. The Company's actual growth rates are below:[9]

**Table 2**

|  | 1/1/2016-<br>12/31/2016 | 1/1/2017-<br>12/31/2017 | 1/1/2018-<br>12/31/2018 | 1/1/2019-<br>12/31/2019 |
|---|---|---|---|---|
| CSV/ChannelReply Tax Return Revenues^ | $ 418,899 | $ 377,136 | $ 590,089 | $ 792,465 |
| Less: NDAP Revenues | (234,355) | (1,000) | - | - |
| CSV/ChannelReply Actual Revenues | $ 184,544 | $ 376,136 | $ 590,089 | $ 792,465 |

^ 2019 tax return has not been filed; amount from internal financial records.

15

| Formula | Metric | 2016 Revenue | 2017 Revenue | 2018 Revenue | 2019 Revenue |
|---|---|---|---|---|---|
| [A] | Revenue | $184,544 | $376,136 | $590,089 | $792,465 |
| [B] = Change in [A] | Annual Change in Revenue |  | $191,592 | $213,953 | $202,376 |
| [C] = [B] / Prior Year [A] | Annual Year-Over-Year % Change in Revenue |  | 103.8% | 56.9% | 34.3% |
|  | 3-Year Compound Annual Growth (Year-End 2016 to Year-2019) |  |  | 43.1% |  |

59. Usage of a direct capitalization method implies a "one-size fits all" growth rate for the perpetuity of any business, an assumption that only fits a very narrow and limited pool of companies. However, the Company does not fit into this very narrow and limited pool of companies and, therefore, is not part of this basket. An excerpt from the Withum Valuation Report and their reasoning is below.[10]

---

[9] Chart below Withum's Table 2 represent my calculations. Table 2 is on page 15 of the Withum Valuation Report.
[10] Page 9, Withum Valuation Report



Michael Dardashtian, Et Al. V. David Gitman, Et Al.
Case No. 17 CV 4327 (LLS)(RWL)

Expert Rebuttal Report of The Withum Valuation Report
Solely Prepared by Justin Kuczmarski, MBA, CPA, CVA, ABV, CEIV, CIRA, CFF

investment and market rates of return available from alternative investments of similar type and quality as of a valuation date. If the cash flow stream is expected to continue beyond the discrete time period, the residual value of the business is also estimated and discounted to present value. The sum of the discounted cash flows and the discounted residual value are used to determine an estimate of value for the subject company. The DCF method was considered in our analysis, but not employed given that a forecast was not provided to us and we were unable to estimate the future cash flows ourselves. Additionally, based on discussions with management, the future expectations of operations are estimated to remain relatively consistant. There are no significant growth opportunitioes or unplanned expenses projected.

60. The Withum Valuation Report cannot have it both ways. The authors cannot credibly support a steady-state growth rate assumption of 4% to be the end-all, constant perpetual growth rate, and assume there are no growth opportunities ahead. Why? A core business model of the Company, and any SaaS software business, is centered on scalability and growth.

61. The authors cannot also credibly support an assumed steady-state growth of 4% without having performed any standards-satisfying inquiry and analysis of projections (either management projections or Withum's own independent projections) and knowing that the 4% growth rate in Withum's direct capitalization method is less than 1/10 of the 3-year revenue growth rate of 43.1%.

62. These dichotomies are arguably more concerning when one considers how significant components of online retail e-commerce stood poised for heightened growth during at least *some* period, whether over the short-term of 1-year or near-term of a few years, as of May 1, 2020, Valuation Date. This heightened growth would be attributable to a shift to e-commerce due to public fears of entering physical retail stores from COVID 19.

63. Online help desk support software, such as the Company's dual application and system support software, assists online e-commerce participants. Such firms would likely benefit to some degree even if the COVID 19 positive trends for online e-commerce were inevitably modest. I am not a retail analyst and cannot forcefully opine one way the other on the mixture balance between online and offline commerce. My point is that some degree of favorable growth rate variations arguably existed at the time of May 2020, a possibility Withum dismissed quickly by stating *without citation* that "in the best-case scenario during the pandemic, spending on software will slow and remain in the 2 to 4 percent range."[11] It is unclear on what type of software, whether application software or system software, Withum is referencing and the exact source for this metric.

64. The source, context, and linkage of that alleged range to the Company strongly require an explanation, especially when one accepts how help desk support software is crucial to e-commerce and not categorized as a luxury expenditure.

65. The Withum Valuation Report seems to have categorized the Company as an IT consulting provider in the Withum Valuation Report's industry analysis. The Company is neither a consultancy nor an IT consultancy. IT consultancies such as Accenture and Capgemini have

---

[11] Page 13, Withum Valuation Report.



Michael Dardashtian, Et Al. V. David Gitman, Et Al.
Case No. 17 CV 4327 (LLS)(RWL)

Expert Rebuttal Report of The Withum Valuation Report
Solely Prepared by Justin Kuczmarski, MBA, CPA, CVA, ABV, CEIV, CIRA, CFF

standard industrial codes ("SIC codes") in SIC 87, Management Services, and not in any software SIC codes, which start at three-digit SIC 737. *It appears that Withum utilized the wrong industry growth rate for one of their rationales in valuing and supporting a steady-state 4% growth rate in the direct capitalization method.*

66. The Company is software firm that sells/licenses its help desk support software as a service. The Company and its SaaS business model are not reflective of a software development company. Software development companies are agencies.[12] The Company is not an agency. Software development companies create code, websites, and technology for other businesses to deploy. The Company instead utilizes a proprietary software for resale as a business-to-business tool.

67. Judging by the bios of the Withum Valuation Report authors, each professional is neither a market research analyst for the retail or e-commerce industries nor an advisor with a technology client record. Further inquiry may shed light on the Withum thought process to opine on projected short-term software growth rates during the pandemic or for measuring growth rates overall. Such additional information would be helpful when one recalls the Withum team, by their own words, appeared to have collectively performed no follow-up forecasting – for the industry or Company - when told Company projections did not exist. A presentation of this statement is below.

> investment and market rates of return available from alternative investments of similar type and quality as of a valuation date. If the cash flow stream is expected to continue beyond the discrete time period, the residual value of the business is also estimated and discounted to present value. The sum of the discounted cash flows and the discounted residual value are used to determine an estimate of value for the subject company. The DCF method was considered in our analysis, but not employed given that a forecast was not provided to us and we were unable to estimate the future cash flows ourselves. Additionally, based on discussions with management, the future expectations of operations are estimated to remain relatively consistant. There are no significant growth opportunities or unplanned expenses projected.

68. Software is designed to scale quickly, and this business model is why software firms often have high gross profit margins, sometimes over 70%, due to the low percentage of the cost of services/cost of goods sold. The Company had a high gross margin percentage as of the Valuation Dates. It is also unclear what types of necessary growth discussions – if any - the Withum team had with Company management, including Joel Liebman, CPA, if they never received any projections and appeared not to have asked for follow-up projection-like information.

69. I base these statements on my analysis of the Withum Valuation Report and how the Withum team did not prepare any contemporaneous projections for their independent valuation result.

---

[12] Internet URL: https://medium.com/@charisoltech/what-do-software-development-companies-do-7a683afeb3f9. The article "What Do Software Development Companies Do" captures the agency focus of a software development business model, a focus separate from a software firm such as the Company, which has a hybrid, SaaS emphasis on application software and system software.



**Michael Dardashtian, Et Al. V. David Gitman, Et Al.**
**Case No. 17 CV 4327 (LLS)(RWL)**

**Expert Rebuttal Report of The Withum Valuation Report**
**Solely Prepared by Justin Kuczmarski, MBA, CPA, CVA, ABV, CEIV, CIRA, CFF**

Analysis of projections and industry financial statement data are best practices and components to support a conclusion of value put forth in AICPA valuation standards found in SSVS.[13] Ultimate clarity is warranted in understanding these open fronts and the extent of Withum's perceived arm's-length procedures.

70. The direct capitalization method is occasionally used by matrimonial practitioners to value professional practices or businesses with traditional, hard assets.[14] The scenarios above similarly do not describe the Company for any Valuation Date.

71. The direct capitalization business valuation method stems from the yield capitalization method in real estate appraisal, where single-digit growth rates in rents may support for steady-state growth. The Company does not have hard assets such as real estate and *had not entered a steady state of stable growth as of the Valuation Date*, a pivotal point to remember for why a simple direct capitalization method was not applicable. Growth could ebb and flow, and valuation practitioners can model various scenarios using a DCF method, whether a two-stage or three-stage DCF model to analyze various stages of perceived growth. Both variations of the DCF model are common methods to value multi-stage growth in an income approach method of business valuation. However, the direct capitalization business valuation method is not an appropriate valuation method simply because the Company has not entered a steady state of stable growth as exemplified by its high rate of growth at 43.1% in the last three years.

72. There is a sanity check within an income approach valuation to test any direct capitalization method, particularly one like the direct capitalization method used by Withum, which utilized assumptions that significantly differ from either reasonable expectations or actual prior historical results. *The check of a direct capitalization method is to compare the various growth rates implied in a DCF method value to the growth rates and value in a direct capitalization method.*

73. This process allows one to construct a sanity check of the direct capitalization method. However, Withum did not provide this check in its Valuation Report, and such a check should ideally exist in their contemporaneous work papers. However, there is nothing in the Withum Valuation Report that indicates that this sanity check was performed to support their valuation of the Company.

74. If the direct capitalization method is adequately constructed, then the direct capitalization method value result should approximate or equal the DCF method value indication. Additionally, the implied capitalization rate across both income approach methods should also align. The capitalization rate is the spread between the discount rate and growth rate.

75. It is important to reiterate how most valuation practitioners handle high-growth businesses in a multi-stage discounted cash flow ("DCF") through the application of a two stage-model (or even a three-stage DCF model). Multi-stage DCF models are designed to handle various

---

[13] See SSVS Paragraph Sections 29, 53, and 58.

[14] The direct capitalization method is known commonly as the yield capitalization method in valuing real estate. Please see Appendix A for excerpts from valuation theory on how the direct capitalization method of business valuation is used in matrimonial matters.



Michael Dardashtian, Et Al. V. David Gitman, Et Al.
Case No. 17 CV 4327 (LLS)(RWL)

Expert Rebuttal Report of The Withum Valuation Report
Solely Prepared by Justin Kuczmarski, MBA, CPA, CVA, ABV, CEIV, CIRA, CFF

growth phases rather than a subjective one-growth stage. In these multi-stage DCF models, valuation practitioners often forecast growth tapering down and declining across time, a trajectory that mirrors high-growth firms, particularly in technology, that experience robust growth before either their business or sub-industry often matures.

76. It is possible in certain circumstances for growth to accelerate later, a scenario that is not uncommon for specific industries. Biotech and technology companies can witness this top-line revenue or earnings scalability/growth.

77. Please see Appendix A for full excerpts from leading valuation sources that capture this sanity check and other facets of the direct capitalization method I introduced in the preceding pages.

78. I have included the Linkedin.com timeline bios for both Withum Partners Carleen J. Gaskin, CPA, CFF, and Jessica Hollobaugh, CPA, ABV, CFE shortly as excerpts in the pages ahead.

## Lack of Market Sanity Check in Bypassing Guideline Public Company Method ("GPCM")

79. The Withum Valuation Report does not provide any support for whether the Withum Report team performed a search, selection, and screening of market data in the form of Guideline public companies.

80. The usage of guideline company data is the Guideline Public Company Method ("GPC" or "GPCM"). GPCM is a leading market approach method that provides one of the most reliable measures of the value of a company. The analysis of the GPCM is one of eight factors in the IRS Revenue-Revenue 59-60, the oft-cited guide for analyzing private company value. Valuators can apply the method to small businesses, typically when implied public valuation multiples are adjusted for either growth or size. The latter process is known as size-adjusting or growth-adjusting multiples. Valuation theory in *Financial Valuation, 4th Edition*, a textbook written by over 30 senior valuation practitioners, captures this process.[15] *Financial Valuation* also noted how a market approach method, such as the GPCM, should be considered in "virtually all valuations" *and regardless of company size*. The excerpt is presented below.[16]

> The market approach should be considered in virtually all valuations. **Whether the subject is a large, diversified company or a small operation, sources of data may be available to estimate its value. Even if the comparables are not truly like the subject, this approach may provide a sanity check on the values obtained using other approaches or indications of how the market has changed over a period of time. [Bold Added]**

81. While some industries lack sufficient data on guideline public companies, this is not the case for the Company. There are over 300 publicly traded software firms as of the Valuation Date headquartered in the U.S.[17]

---

[15] Hitchner, James and Et. Al. Pages 333-341, *Financial Valuation: Application and Models, 4th Edition.* Copyright 2017 by John Wiley & Sons.
[16] *Ibid,* Page 341
[17] Database totals from leading third-party database vendor, Y-Charts. Please see www.ycharts.com



Michael Dardashtian, Et Al. V. David Gitman, Et Al.
Case No. 17 CV 4327 (LLS)(RWL)

**Expert Rebuttal Report of The Withum Valuation Report**
**Solely Prepared by Justin Kuczmarski, MBA, CPA, CVA, ABV, CEIV, CIRA, CFF**

82. There are also over 100 publicly traded small-capitalization and micro-capitalization SaaS public companies in the U.S alone.

83. Withum stated: "the GPC method was considered for purposes of calculating the value of the Subject Interest as of the Valuation Dates, but not used given the lack of comparable publicly-traded firms."[18]

84. *The Withum Report should have at least noted how the Report team searched, screened, and eliminated the hundreds of possible public software companies.* Publicly traded software firms, even if small or micro-capitalizations, can trade at Enterprise Value to Revenue (EV/Revenue) multiples higher than 3.0 times and possibly above to 5.0 times revenues.

85. Enterprise Value to EBITDA (EV/EBITDA) multiples can be higher than 15.0 times. I reserve the right to perform additional analysis to corroborate guideline company multiples applicable to the Company in an independent valuation analysis outside of my Rebuttal Report review.

86. A common misconception from non-valuators is that companies must be perfect comparable companies for usage in the guideline public company method (GPCM) of business valuation. The GPCM, and the Guideline Merged and Acquired Method, incorporates the word guideline for a specific reason.

87. The critical consideration in the application of the guideline public company method is that the appraiser "must choose guideline companies logically and be able to justify their selection."[19] Furthermore, the "strength of data leads to the judgment as to the weight ultimately accorded to them among the various valuation multiples within the guideline publicly traded company method."[20] This strength of data also impacts the overall weight "accorded to the guideline publicly traded company method among other valuation methods."[21]The criteria often utilized to filter and select guideline public companies include 1) similarity of the guideline companies to the subject company, 2) trading activity, and 3) the statistical dispersion of valuation multiple data points. Valuation literature notes the following in selecting and screening for guideline companies.[22]

### HOW MANY GUIDELINE COMPANIES?

The answer to this answer to this question depends on a number of factors:

1. Similarity to the subject-the more similar, the fewer needed
2. Trading activity-again, the more actively traded, the fewer needed
3. Dispersion of valuation multiple data points-the wider the range of relevant valuation multiple data points, the more companies it takes to identify a pattern relevant to the subject company

---

[18] Page 18, Withum Valuation Report
[19] Pratt, Shannon. *Valuing a Business: The Analysis and Appraisal of Closely Held Companies*, *5th Edition.* Copyright 2009 by McGraw-Hill, Inc. Page 274
[20] *Ibid,* page 278
[21] *Ibid,* Page 278
[22] *Ibid,* Page 274



Michael Dardashtian, Et Al. V. David Gitman, Et Al.
Case No. 17 CV 4327 (LLS)(RWL)

**Expert Rebuttal Report of The Withum Valuation Report**
**Solely Prepared by Justin Kuczmarski, MBA, CPA, CVA, ABV, CEIV, CIRA, CFF**

88. Every business and industry are different. There is no definitive "hard and fast" rule for the applicable number of guideline companies. The total for both software industries is over 300 per leading public company database vendor, Y-Charts.

89. The Company is technically a "full-stack" software program that blends a front-end user interface and a back-end database. Hence, the Company, as confirmed by the Defendant, is technically both an application software firm and a system software firm.

90. *There are no consulting services related to the installation of the ChannelReply help desk support software, a fact that disqualifies the IT consulting industry analysis Withum discussed and cited in their Report, particularly concerning growth rates.* Put simply, clients of the Company can help onboard themselves to the ChannelReply software. Therefore, linking IT *consulting* data to the Company is inaccurate.

91. It is helpful to understand that a full stack web developer is a subset of software engineering. The following excerpt clarifies the distinction.[23]

> **What is the difference between a software engineer and a full stack web developer?**
>
> Software engineering is a broad term.  The job could encompass everyone from embedded engineers to C# specialists. Typically though, a software engineer will know how to architect a system – they can decide the way it should be built before developers go ahead and build it.
>
> Full stack web development is a subset of software engineering – a job that involves handling all the work of databases, servers, systems engineering, and clients – and requires someone who is at home with front-end and back-end technologies.

92. A comprehensive application of the Guideline Public Company Method would embody searching, screening, and filtering to substantiate, which *guideline* comparable firms were capable of inclusion in the method. Investment bankers and valuation experts can categorize guideline public companies into either primary or secondary guideline companies, additional flexibility to apply the GPCM.

93. It remains uncertain whether Withum searched guideline public companies across any of the hundreds of publicly traded software companies in the U.S. alone. Software M&A and initial public offerings of software firms flourished in recent years, creating an overall industry that is one of the largest categories of publicly traded companies in the U.S. *across all sizes and types of software.* Therefore, identifying comparable companies can be facilitated.

94. In conclusion, there was an opportunity to perform the GPCM, mainly if Withum had accounted for the business-to-business software dynamics of the Company to grasp the hybrid application and system software nature of the company's full-stack, SaaS business model. They are significant citations in valuation theory and best practices that the guideline public

---

[23] Internet URL: https://www.randstad.co.uk/career-advice/career-guidance/full-stack-developer-vs-software-engineer/



NAV
VALUATION
& ADVISORY LLC

Michael Dardashtian, Et Al. V. David Gitman, Et Al.
Case No. 17 CV 4327 (LLS)(RWL)

Expert Rebuttal Report of The Withum Valuation Report
Solely Prepared by Justin Kuczmarski, MBA, CPA, CVA, ABV, CEIV, CIRA, CFF

company should be vetted fully in all business appraisals.[24] The Company's hybrid, dual software model (application and system software combination) would increase the chances publicly traded application software firms, system software firms, or public companies embodying elements of both would meet the criteria for inclusion in the GPCM.

95. Additionally, the Withum team could have used the GPCM data and adjust for the smaller size of the Company. The Withum team could have utilized size-adjusted, implied valuation multiples, which are often applied as standard practice in valuations. Such analysis would compensate for any size-effect between the Company and selected guideline primary or secondary public companies. An argument that "public companies are larger than the subject company" does not hold weight in this case. Valuation professionals are trained and versed in adjusting for size effects across the various valuation methodologies. As reiterated previously, a market approach method, such as the GPCM, should be considered in "virtually all valuations"[25] *and regardless of company size.*[26]

96. Overall, the lack of any supporting detail underlying Withum's method rejection of the GPCM and any supporting documentation the team applied the search matrix process at the heart of the Guideline Public Company Method represents a deficiency in their valuation analysis. Withum acknowledged that guideline companies do not have to be "identical to the subject company but similar enough to guide the valuation process."

> - The Guideline Public Company ("GPC") method is based on the premise that pricing multiples of publicly traded companies can be used as a tool to be applied in valuing closely held companies. The mechanics of the method require the use of the stock price in conjunction with other factors to create a pricing multiple that can be used, with certain adjustments, to apply against the company's similar factor to determine an estimate of value for the subject company. The publicly-traded companies that are used as guidelines will not be identical to the subject company but similar enough to provide guidance in the valuation process. The GPC method was considered for purposes of calculating the value of the Subject Interest as of the Valuation Dates, but not used given the lack of comparable publicly-traded firms.

97. AICPA valuation standards in SSVS allow some flexibility in reporting requirements for litigation reports, a dynamic called "litigation exception." There is debate about which standards must reside as part of reporting elements and which should be included. Valuation professionals are nevertheless not exempt from developing the required procedures in SSVS. In other words, SSVS notes how the development of the standards, or fulfillment of the work, remain requirements. The AICPA designed the standards to help foster minimum work product compliance regardless of reporting documentation. An excerpt from Paragraph .13 in the SSVS Section entitled *Illustrations Relating to Litigation Engagements and Certain*

---

[24] Hitchner, James and Et. Al. See Pages 300-341, *Financial Valuation: Application and Models, 4th Edition.* Copyright 2017 by John Wiley & Sons.
[25] Hitchner, James and Et. Al. See Page 341, *Financial Valuation: Application and Models, 4th Edition.* Copyright 2017 by John Wiley & Sons.
[26] *Ibid,* Page



**Michael Dardashtian, Et Al. V. David Gitman, Et Al.**
**Case No. 17 CV 4327 (LLS)(RWL)**

**Expert Rebuttal Report of The Withum Valuation Report**
**Solely Prepared by Justin Kuczmarski, MBA, CPA, CVA, ABV, CEIV, CIRA, CFF**

*Controversy Proceedings* captures the concept.[27]

> *Illustration 4.* Does the Statement include any exceptions relating to litigation or controversy proceedings?
>
> **.13**
>
> *Conclusion.* Yes, the Statement includes a reporting exemption for certain controversy proceedings (SSVS No. 1, paragraph 50 [VS section 100.50]); however, there is no litigation or controversy proceeding exemption from the developmental provisions of the Statement (SSVS No. 1, paragraphs 21–46 [VS section 100.21–.46]) in circumstances in which an engagement to estimate

> https://publication.cpa2biz.com/MainUI/PrintDocument.ashx?id=1333792&type=Docume...   4/13/2015
> Copyright © 2015, American Institute of Certified Public Accountants, Inc. All Rights ...   Page 44 of 59

> value is performed (*Illustration 1*).

98. In conclusion, in analyzing the GPCM, valuation professionals must nonetheless document the process of searching, screening, and filtering/selecting guideline public companies, particularly in the software industry. The software industry encompasses one of the most extensive sets of public companies, particularly across small and micro-capitalization public companies.  Withum's position that there is a "lack of comparable publicly-traded firms" does not stand to reason due to the extensive sets of public companies in this business.

99. In my 21 years of professional practice, dismissing every public company in an industry with over 300 possible guideline public companies (in the U.S. alone[28]) warrants an additional explanation and contemporaneous support that was not provided for in the Withum Valuation Report.

**Lack of Market Sanity Check in Bypassing Guideline Merged and Acquired Method ("GMAM")**

100.    The Withum Valuation Report does not provide any support for whether the Withum Report team performed a search, selection, and screening of market data in the form of guideline private and public M&A transactions.

101.    The usage of actual transactional data in a business valuation analysis is the Guideline Merged and Acquired Method ("GMAM").

102.    The GMAM, like the Guideline Public Company Method ("GPCM"), is a leading market approach method and can be applied to small businesses via guideline data. There were 150 transactions in the two years from May 1, 2018, to May 1, 2020 from just one leading M&A

---

[27] SSVS Paragraph .13 from the AICPA (American Institute of Certified Public Accountants) Internet URL:
https://www.aicpa.org/InterestAreas/ForensicAndValuation/Resources/Standards/DownloadableDocuments/SSVS_Full_Version.pdf
[28] There are also hundreds of international publicly traded software firms.



**Michael Dardashtian, Et Al. V. David Gitman, Et Al.**
**Case No. 17 CV 4327 (LLS)(RWL)**

**Expert Rebuttal Report of The Withum Valuation Report**
**Solely Prepared by Justin Kuczmarski, MBA, CPA, CVA, ABV, CEIV, CIRA, CFF**

database for private businesses, *DealStats*. Most of the transactions from *DealStats* originated from the lower middle-market. Furthermore, a longer time frame would have yielded additional totals numbering in the *hundreds* of transactions.

103.    A broad representation of potential guideline transactions from leading M&A database *DealStats* is shown below. The median EV / Revenue is 3.45 times[29], and the median EV / EBITDA multiple is 18.0 times for the two years from May 1, 2018 to May 1, 2020. EBITDA standards for earnings before interest, taxes, depreciation, and amortization. EBITDA is not a perfect proxy for cash flow but is often used as such by valuators and M&A investment bankers.

---

[29] Market Value of Invested Capital ("MVIC") is used as a proxy for the transaction value or enterprise value in the *DealStats* database. There is a slight difference at times between MVIC and enterprise value in the GPCM.



**Michael Dardashtian, Et Al. V. David Gitman, Et Al.**
**Case No. 17 CV 4327 (LLS)(RWL)**

**Expert Rebuttal Report of The Withum Valuation Report**
**Solely Prepared by Justin Kuczmarski, MBA, CPA, CVA, ABV, CEIV, CIRA, CFF**



Page 24



**Michael Dardashtian, Et Al. V. David Gitman, Et Al.**
**Case No. 17 CV 4327 (LLS)(RWL)**

**Expert Rebuttal Report of The Withum Valuation Report**
**Solely Prepared by Justin Kuczmarski, MBA, CPA, CVA, ABV, CEIV, CIRA, CFF**

104.   The data above has not been fully screened, searched, and filtered since my scope to date is to review the Withum Valuation Report and not to independently derive a second report which fulfills the requirements of a full, detailed AICPA-compliant valuation report.

105.   *Notwithstanding, the market sanity check guidance across 150 transactions indicate market-implied valuation/pricing multiples, and a valuation conclusion, potentially well above the valuation conclusion in the Withum Valuation Report.* The Withum Valuation Report *derived its value conclusion solely from a method that should not have been applied in the first place.*

106.   Software public companies or software M&A transactions (most transactions from *DealStats* above are private, lower middle-market deals) often exhibit premium EV / EBITDA multiples in comparison to even other technology industries. Simply put, software firms transact at higher EV / EBITDA multiples than more labor-intensive consulting practices, even IT consulting practices.

107.   The EV / EBITDA multiple, along with EV/Revenue, comprise two of the most frequently used invested capital multiples valuation professionals utilized to value an entire company. Invested capital multiples indicate implied valuation multiples, or "pricing" multiples, buyers paid for the entire capital of a business.

108.   The Withum Valuation Report does not present any indication of historical EBITDA. The absence is surprising for two reasons. First, EBITDA is directly computed from the income statement, and the Withum Valuation Report captures a detailed income statement of the Company in their Exhibit 2.

109.   Second, the absence of EBITDA presentation is notable when one grasps how prevalent the EBITDA metric is for both financial statement analysis, a required element of a standards-compliant valuation, and in any business valuation using the leading market approach methods. The latter entails the Guideline Public Company Method or Guideline Merged and Acquired Method.

110.   The Company did not have any depreciation or interest expense per the financial statements used by Withum. It is, therefore, possible that the pretax income of $420,777 as of year-end 2019 would approximate the Company's concluded EBITDA as of the May 1, 2020, final Valuation Date. Such a final determination would require more understanding of the Company's financial records and interim financials for the year 2020.

111.   The Company's EBITDA would possibly increase from expense add-backs or decline to account for salary adjustments. I cannot opine fully on adjusted EBITDA without a better understanding of the internal structure and accounting of the Company. The Company may have also adopted an entrepreneurial technology mindset to preserve compensation cash (hence fully subtracting for normalized salary expenses would be minimal and in line with select industry participants) while the business was growing. Tech companies use techniques



**Michael Dardashtian, Et Al. V. David Gitman, Et Al.**
**Case No. 17 CV 4327 (LLS)(RWL)**

**Expert Rebuttal Report of The Withum Valuation Report**
**Solely Prepared by Justin Kuczmarski, MBA, CPA, CVA, ABV, CEIV, CIRA, CFF**

such as bootstrapping of existing cash sources and equity incentives to accomplish their growth incentives and minimize cash burn. Technology firms often deploy equity issuance significantly more than any form of debt to also preserve payments of interest. Industry ratios and public companies shed light on how most technology firms are structured primarily with equity. Most technology companies, particularly early-stage and growing firms, feature little to no debt.

112.    These questions and the breakdown of adjusted EBITDA totals remain open. I present an excerpt from Exhibit 2[30], the Company's historical income statements, below.

**Cooper Square Ventures, LLC**
**d/b/a ChannelReply**
**Income Statements**

EXHIBIT 2

| | 7/1/2015-6/30/2016 | 1/1/2016-12/31/2016 | 7/1/2016-6/30/2017 | 1/1/2017-12/31/2017 | 1/1/2018-12/31/2018 | 1/1/2019-12/31/2019 |
|---|---|---|---|---|---|---|
| Revenues | 191,447 | 418,899 | 289,430 | 377,136 | 590,089 | 792,465 |
| Cost of Goods Sold | | | | | | |
| Purchases | - | - | - | 16,125 | - | - |
| Other Costs | 702 | - | 685 | - | 123 | 13 |
| Total Cost of Goods Sold | 702 | - | 685 | 16,125 | 123 | 13 |
| Gross Profit | 190,745 | 418,899 | 288,745 | 361,011 | 589,966 | 792,452 |
| Expenses | | | | | | |
| Advertising | 94 | 2,618 | 392 | 619 | 2,759 | 3,333 |
| Auto Expense | - | - | - | - | 5,494 | 5,428 |
| Bank Charges | 1,215 | 30,427 | 9,183 | 13,348 | 1,048 | 26,887 |
| Compensation of Officers | 198,062 | 9,000 | 9,000 | - | - | - |
| Computer Expenses | 2,058 | 4,592 | 7,119 | 10,116 | 16,029 | 26,579 |
| Delivery & Shipping | - | 5,059 | - | - | - | - |
| Dues & Subscriptions | - | - | - | 455 | - | - |
| Insurance | 9,637 | 23,689 | 11,787 | 2,777 | 4,857 | 6,060 |
| Meals & Entertainment | 1,901 | 4,338 | 4,166 | 2,417 | 158 | 91 |
| Miscellaneous | - | 19,133 | - | 511 | - | - |
| NY Taxes - Based on Income | - | 50 | - | 175 | - | - |
| Office Expense | - | 16,753 | - | - | - | - |
| On-Line Service Charges | - | - | - | - | 19,150 | - |
| Payroll Service | 706 | 429 | 132 | - | - | - |
| Payroll Taxes | 545 | 2,867 | 854 | - | - | - |
| Professional Fees & Consultants | 31,375 | 154,782 | 163,004 | 195,668 | 414,996 | 287,167 |
| Rents | - | - | 1,266 | 2,553 | 3,764 | 6,796 |
| Salaries & Wages | - | 20,951 | - | - | - | - |
| Site Operations | - | 43,365 | - | 9,251 | - | - |
| Supplies | 84 | 104,699 | 57 | 76 | - | 13 |
| Taxes | - | - | 25 | - | 3,388 | 300 |
| Telecommunications | 1,422 | 4,336 | 6,456 | 5,734 | 3,937 | 4,410 |
| Travel | 13,693 | 22,451 | 24,973 | 23,523 | 4,414 | 4,561 |
| Violations | - | - | - | - | 67 | 51 |
| Total Expenses | 260,792 | 470,139 | 238,414 | 267,223 | 480,061 | 371,675 |
| Pre-Tax Income | (70,047) | (51,240) | 50,331 | 93,788 | 109,905 | 420,777 |
| Other Income (Expense) | | | | | | |
| Interest Income | - | 2 | - | - | - | - |
| Capital Gain(Loss) | - | - | - | (241) | - | - |
| Section 1231 Gain(Loss) from Trade or Business | - | - | - | 66,014 | - | - |
| Plumburs, LLC | - | (1,265) | - | (2,464) | - | - |
| Total Other Income (Expense) | - | (1,263) | - | 63,309 | - | - |
| Net Book Income (Loss) | (70,047) | (52,503) | 50,331 | 157,097 | 109,905 | 420,777 |

**Notes:**
Years ended 12/31/2016, 12/31/2017, and 12/31/2018 were obtained from the respective tax returns for CSV/ChannelReply. The twelve months ended 6/30/2016 and 6/30/2017 and year ended 12/31/2019 information was obtained from the CSV/ChannelReply QuickBooks file.

113.    It is nevertheless noteworthy that the Withum Valuation Report did not describe or present

---

[30] Page 62, Withum Valuation Report



**Michael Dardashtian, Et Al. V. David Gitman, Et Al.**
**Case No. 17 CV 4327 (LLS)(RWL)**

**Expert Rebuttal Report of The Withum Valuation Report**
**Solely Prepared by Justin Kuczmarski, MBA, CPA, CVA, ABV, CEIV, CIRA, CFF**

any EBITDA total or EBITDA analysis, even within the financial statement analysis of the Company.



## Professional Standards' Compliance Issues: Lack of Documented Compliance with SSVS

114.    I have noted earlier how a projection analysis is a required part of the financial statement analysis of an AICPA-compliant detailed business valuation report. A detailed valuation report is the highest level of reporting and the report Withum submitted failed to perform a projection analysis.

115.    Projection analysis is also integral to analyzing any Company, particularly a high-growth technology firm where future expectations must be scrutinized in themselves and against industry competitors.

116.    Additionally, the relative financial statement analysis of the business against industry participants and competitors (called a cross-sectional comparison) is also required in CPA valuation standards known as Statement on Standards for Valuation Services No. 1 ("SSVS").

117.    The Withum Valuation Report did not include both 1) an independent analysis of projections and 2) any financial statement comparison of the Company versus industry benchmarking data, whether databases or specific guideline public companies.[31] The latter

---

[31] There are over 300 publicly traded software firms in the U.S. Many of these firms are small-capitalization or micro-



**Michael Dardashtian, Et Al. V. David Gitman, Et Al.**
**Case No. 17 CV 4327 (LLS)(RWL)**

**Expert Rebuttal Report of The Withum Valuation Report**
**Solely Prepared by Justin Kuczmarski, MBA, CPA, CVA, ABV, CEIV, CIRA, CFF**

only help solidify understanding a company's financial position and outlook, both essential element in the analysis and proper usage of future projections.

118.     *The absence of both elements (any projection analysis and a cross-sectional financial statement analysis of the Company against the industry) arguably comprises two violation of AICPA valuation standards found in SSVS.* I capture the excerpt from SSVS No. 1 below.

---

capitalization companies and capable of benchmarking against the Company from a financial statement comparison at very least.



**Michael Dardashtian, Et Al. V. David Gitman, Et Al.**
**Case No. 17 CV 4327 (LLS)(RWL)**

**Expert Rebuttal Report of The Withum Valuation Report**
**Solely Prepared by Justin Kuczmarski, MBA, CPA, CVA, ABV, CEIV, CIRA, CFF**

*Financial Information*

.29

The valuation analyst should obtain, where applicable and available, financial information on the subject entity such as the following:

https://publication.cpa2biz.com/MainUI/PrintDocument.ashx?id=1333792&type=Docume...   4/13/2015

Copyright © 2015, American Institute of Certified Public Accountants, Inc. All Rights ...   Page 10 of 59

- Historical financial information (including annual and interim financial statements and key financial statement ratios and statistics) for an appropriate number of years
- Prospective financial information (for example, budgets, forecasts, and projections)
- Comparative summaries of financial statements or information covering a relevant time period
- Comparative common size financial statements for the subject entity for an appropriate number of years
- Comparative common size industry financial information for a relevant time period
- Income tax returns for an appropriate number of years
- Information on compensation for owners including benefits and personal expenses
- Information on key man or officers' life insurance
- Management's response to inquiry regarding the following:

  - Advantageous or disadvantageous contracts
  - Contingent or off-balance-sheet assets or liabilities
  - Information on prior sales of company stock

.30

The valuation analyst should read and evaluate the information to determine that it is reasonable for the purposes of the engagement.

*Valuation Approaches and Methods*

.31

In developing the valuation, the valuation analyst should consider the three most common valuation approaches:

- **Income (income-based) approach**
- **Asset (asset-based) approach** (used for businesses, business ownership interests, and securities) or **cost approach** (used for intangible assets)
- **Market (market-based) approach**

Page 29



Michael Dardashtian, Et Al. V. David Gitman, Et Al.
Case No. 17 CV 4327 (LLS)(RWL)

**Expert Rebuttal Report of The Withum Valuation Report**
Solely Prepared by Justin Kuczmarski, MBA, CPA, CVA, ABV, CEIV, CIRA, CFF

119.    The Withum Valuation Report itself did not include any supporting documentation that substantiates the required compliance with SSVS No. 1 from the AICPA in regards to any analysis of projections and industry financial statement data. Statement on Standards for Valuation Services No. 1 ("SSVS") is the AICPA valuation standards mandatory for all CPA performing valuations. CPA professionals, whether accredited with valuation credentials or not, must comply with the Statement on Standards for Valuation Services No. 1 ("SSVS," issued in June 2007)[32] in the valuation of a business interest.

120.    Best practices for valuation reporting dictate a valuation report checklist *in the report* or contemporaneous work papers corroborating actual SSVS compliance. The Withum Valuation Report does not present any compliance checklist in the Withum Valuation Report itself, an arguable disclosure deficiency considering the Withum Valuation Report claimed adherence to the highest level of AICPA valuation reporting known as a Detailed Valuation Report.

121.    The lack of any projection analysis or industry financial statement analysis, as noted earlier, comprises two critical areas of SSVS deficiency. One could argue that the Withum team also failed to analyze the customer base or key contracts since the Withum Valuation Report is silent on the issue of the customer base or sales backlog/sales pipeline analysis. The excerpt above in paragraph 30 of SSVS illustrated the SSVS requirement to analyze "advantageous or disadvantageous contracts."[33]

122.    A reader of the Withum Valuation Report cannot infer if the Company, especially given its recent growth, could foreseeably double in size or grow between 50% and 100% or more for the calendar year 2020. The Company as of the May 1, 2020 Valuation Date had averaged a top-line CAGR of 43.1% in the last three years from year-end 2016 to year-end 2019.

123.    *Readers and reviewers of the Withum Valuation Report are arguably uncertain about the future Company conditions when the Report acknowledges 1) there was no analysis of projections[34], the 2) Company featured robust revenue growth[35], 3) future operations were judged to remain consistent[36] and yet 4) perpetual earnings growth rate of 4%[37] is now warranted for all growth of earnings in the direct capitalization method.* There appear to be contradictions amidst these statements. There also appears to be no discussion in the Withum Valuation for how earnings growth in technology companies improves, or scales, over time, particularly in software firms, even if the pace of revenue growth does not keep up. It is unclear how any scale is incorporated in the Withum universal growth rate of 4% for earnings.

124.    Other possible areas of valuation standards non-compliance in the Withum Valuation Report include the failure to properly analyze all other assets such as excess cash and no

---

[32] Internet URL:
https://www.aicpa.org/InterestAreas/ForensicAndValuation/Resources/Standards/DownloadableDocuments/SSVS_Full_Version.pdf The AICPA codified SSVS No. 1 as part of the Accounting Standards Codification starting in June 2015 as VS 100.
[33] *Ibid*, Paragraph 30
[34] Page 19, Withum Valuation Report,
[35] Page 15, Withum Valuation Report,
[36] Page 19, Withum Valuation Report,
[37] Page 24, Withum Valuation Report,



**Michael Dardashtian, Et Al. V. David Gitman, Et Al.**
**Case No. 17 CV 4327 (LLS)(RWL)**

**Expert Rebuttal Report of The Withum Valuation Report**
**Solely Prepared by Justin Kuczmarski, MBA, CPA, CVA, ABV, CEIV, CIRA, CFF**

disclosure of the record of personnel interviews.

125.   Withum also did not disclose one way or the other if any member of the firm had previously established a tax service relationship or an attestation/accounting service relationship with any entity owned by the Company or its shareholders. Considering Withum is a large, 1,000-person firm with six offices in the tri-state area, such disclosure helps judge a conflict of interest even if any of the Valuation Report authors have not individually or collectively performed attestation or tax services of this kind in the past.[38]

126.   SSVS requires such auxiliary service disclosure, especially in compliance-based valuations (i.e., tax-based valuations) and assignments for litigation contexts.

127.   I have prepared the chart below, outlining the leading areas of concern in the Withum Valuation Report from the standpoint of SSVS.

128.   Blue-highlighted areas represent areas where Withum appears to have neither performed a required step – whether in the Withum Valuation Report itself or possibly in their work papers - nor disclosed sufficient documentation, or any documentation, to justify departure from the standards step. Potential examples of the latter include insufficient Withum Valuation Report documentation to support the Withum dismissal of the Guideline Public Company Method or Guideline Merged and Acquired Method.

---

[38] Internet URL: https://www.accountingtoday.com/data/the-2019-top-100-firms-overview



Michael Dardashtian, Et Al. V. David Gitman, Et Al.
Case No. 17 CV 4327 (LLS)(RWL)

Expert Rebuttal Report of The Withum Valuation Report
Solely Prepared by Justin Kuczmarski, MBA, CPA, CVA, ABV, CEIV, CIRA, CFF

| Comparison of Valuation Reporting: Elements in a SSVS No. 1 Detailed Valuation Report | | |
|---|---|---|
| REPORTING ON CONCLUSIONS OF VALUE | | |
| | AICPA Detailed Valuation Report per SSVS No. 1 (aka VS Section 100 in Accounting Standards Codification (ASC))<br><br>Withum Valuation: Claimed To Be A Detailed Valuation Report | Review Comment |
| Item was considered a reporting requirement if "shall" or "should" was used in the reporting standard sections | AICPA<br>¶ 51; 68 | |
| **Engagement identification requirements** | | |
| Transmittal letter | 51 | |
| Table of contents | 51 | |
| Introduction | 52 a - r | |
| Client | 52.a | |
| Identification, Description of Subject being valued | 52.d,e; 68.a | |
| Interest being valued | 52.d,e; 68.b | |
| Valuation (or Effective) or Calculation Date | 52.g | |
| Intended use and/or users of the valuation | 52.c; 65.d | |
| Report Date | 52.h | |
| Type of report | 52.i | |
| Premise of value | 52.j | |
| Standard of value defined | 52.k | |
| Purpose and intended use of the engagement/report | 52.b; 68.b | |
| Sources of information disclosed | 51; 53.a - j | |
| Interviewees | 53.c | Interviewee list is unclear. |
| Site visit disclosure or lack of | 53.a (4) | |
| **Analysis and development of value requirements** | | |
| Nature and history of business | 57; 27 (9) | |
| Economic conditions, present and outlook | 57; 65.b | |
| Past, current and future prospects of business/industry | 53; 58; 29 | Withum analysis in this category is unclear or absent. |
| Financial Analysis of earnings/dividend capacity | 58; 30 | Withum analysis in this category is unclear or absent. |
| Past sales of interest in the business being appraised | 61.c | |
| Market prices of similar businesses publicly traded | 61.c | Withum analysis in this category is absent. |
| Similar business/interest sales | 61.c | Withum analysis in this category is absent. |
| Ownership, Size, nature, restrictions and agreements | 52.f; 59-62 | |
| Extent the interest appraised contains control | 52.f | |
| Extent interest has or lacks elements of marketability | 52.f | |
| Nonoperating/excess operating assets | 64 | Withum analysis in this category is absent. |
| Valuation approaches and methods considered | 59; 31 | |
| Valuation approaches and methods used (or procedures) | 60 - 62 | |
| Valuation approaches and methods rejected | 60 - 62 | |
| Valuation adjustments (DLOC, DLOM etc.) | 58.a; 63 | |
| Calculation report procedures purpose / performed | 76 | |



**Michael Dardashtian, Et Al. V. David Gitman, Et Al.**
**Case No. 17 CV 4327 (LLS)(RWL)**

**Expert Rebuttal Report of The Withum Valuation Report**
**Solely Prepared by Justin Kuczmarski, MBA, CPA, CVA, ABV, CEIV, CIRA, CFF**

| Comparison of Valuation Reporting: Elements in a SSVS No. 1 Detailed Valuation Report | | |
|---|---|---|
| | REPORTING ON CONCLUSIONS OF VALUE | |
| | AICPA Detailed Valuation Report per SSVS No. 1 (aka VS Section 100 in Accounting Standards Codification (ASC))<br><br>Withum Valuation: Claimed To Be A Detailed Valuation Report | Review Comment |
| **Conclusion of value and signature** | 68.d; f | |
| Reconciliation of estimates | 68 | Withum analysis in this category is absent. |
| Estimate, calculation or opinion disclosure | 68.d,f | |
| Signature of primary appraiser | 68.g | |
| Calculation caveat statement | 76.f | |
| Firm signature option | 68.g | |
| **Financial information disclosure** | 54-56 | |
| Historical financial statement (F/S) summaries | 58 | |
| Adjustments to historical F/S summaries | 63 | |
| Adjusted F/S summaries | 58 | |
| Projected/forecasted F/S including assumptions | 58 | Withum analysis in this category is absent. |
| Tax return information | 53 | |
| If appropriate, financial comparison to industry | 53, 58 | Withum analysis in this category is absent. |
| **Limiting conditions and assumptions** | | |
| The scope of work of the appraisal incl. limitations | 15; 52.l; 65.a; 68 .e,g,l,m | |
| Use of report limitations | 52.l; 65.d; 68.b | |
| **Representations/Certifications Required** | 51; 65 a thru h | |
| Subsequent events in certain circumstances | 52.p; 43 | |
| Jurisdictional exception application | 52.q; 10 | Withum analysis in this category is unclear. |
| Firm attestation engagement disclosure | 54; 15 | Withum analysis in this category is unclear. We do not know if Withum has an attestation relationship with any party. |
| Economic and industry data source disclaimer | 65.b | |
| Tax preparer/client relationship disclosure | 55 | Withum analysis in this category is unclear. We do not know if Withum has an tax relationship with any party. |
| Appraisal based fees / contingent fees | 65.e | |
| Hypothetical conditions if any | 52.n; | |
| Extraordinary assumptions if any | TNU | |
| Disclosure of not auditing, reviewing or compiling | 56 | |
| The reports scope limitations | 52; 62.e | |
| Statement of independence | 15 | |
| If a specialist was used, a reliance use statement | 15; 52.o; 65.f | |
| No obligation to update statement | 65.g | |
| Conforms to organizations' standards | 65.c; 68.c | |
| Disclosure/Signature of dissenting opinion | 77 | |
| Qualifications of the appraiser | 67 | |



Michael Dardashtian, Et Al. V. David Gitman, Et Al.
Case No. 17 CV 4327 (LLS)(RWL)

**Expert Rebuttal Report of The Withum Valuation Report**
Solely Prepared by Justin Kuczmarski, MBA, CPA, CVA, ABV, CEIV, CIRA, CFF

### Professional Standards' Compliance Issues: No Statement of Compliance with SSFS

129.    The new litigation standards from the AICPA, Statement on Statements for Forensic Services No. 1 ("SSFS"), issued in late 2019 and effective January 1, 2020, also applies to the Withum Valuation Report due to its litigation context.

130.    Hence, both SSVS and SSFS both applied to the Withum Valuation Report.

131.    The Withum Report is silent on SSFS compliance and does not provide a valuation checklist or declaration of adherence in the Withum Valuation Report itself. It is, therefore, impossible to ascertain what Withum performed for a procedural standpoint, or not, in documenting adherence.

132.     More information is necessary to ascertain SSFS compliance in the Withum Valuation Report itself or the contemporaneous work papers.

### Apparent Lack of Withum Technology Expertise from a Valuation or M&A Standpoint

133.    Technology firms, business services firms, marketing services companies, and marketing technology firms all represent, both now and historically, attractive industries for either private equity ("PE") or venture capital ("VC") firms.

134.    Two reasons often drive the interest from financial sponsors such as PE and VC firms: the industry's ability to combine stable cash flows/recurring revenue and possible high growth.

135.    Private equity firms have also increased their technology exposure in the last decade. Dry powder, or uncommitted investment capital, has more than doubled since 2016 for private equity firms focused on technology firms.[39] The technology industry can display growth variability or shifts at times. Hence, even smaller firms as the Company that display scalability, coupled with recurring revenue/recurring cash flows, and observed high growth, could attract such interest in the years ahead.

136.    The Company does not need additional offices or personnel to scale, an observable fact, and why many technology public and private technology firms can boast gross margins more than 80%.[40] The threshold is well above the gross margins for most service companies, professional practices, or commercial enterprises.

137.    The "Rule of 40" represents a guideline maxim for SaaS operators to shoot for and an investment criterion which funds deploy to screen, source, and filter potential SaaS software acquisition targets such as the Company. The importance of the "Rule of 40" was clarified concisely in a December 2018 article framework from leading private equity and venture capital firm Bain & Company. Bain partners stated how software firms should strive for revenue growth and profit margin of more than 40% annually.

---

[39] Internet URL: https://pitchbook.com/news/articles/tech-focused-pe-funds-are-rising-and-thriving
[40] Service businesses, whether consulting firms or most professional practices,



**Michael Dardashtian, Et Al. V. David Gitman, Et Al.**
**Case No. 17 CV 4327 (LLS)(RWL)**

**Expert Rebuttal Report of The Withum Valuation Report**
**Solely Prepared by Justin Kuczmarski, MBA, CPA, CVA, ABV, CEIV, CIRA, CFF**

The Rule of 40—the principle that a software company's combined growth rate and profit margin should exceed 40%—has gained momentum as a high-level gauge of performance for software businesses in recent years, especially in the realms of venture capital and growth equity. Increasingly, software industry executives are embracing the Rule of 40 as an important metric to help measure the trade-offs of balancing growth and profitability.

138.    The Bain investors noted that "beating the Rule of 40 in a single year is admirable, but the greater challenge is balancing growth and performance year after year." Furthermore, Bain noted the following:[41]

> Software companies that can balance growth and profitability to outperform the Rule of 40 have valuations (measured by the ratio of enterprise value to revenue) double that of companies that fall "below the line," and they achieve returns as much as 15% higher than the S&P 500. Companies whose growth slows and that fail to improve profitability often find themselves the target of activist investors and private equity acquirers.

139.    The Company had surpassed the Rule of 40 with its 43.1% three-year revenue CAGR *even before consideration of profits, which were sizable from a percentage standpoint in recent years.* The addition of an adjusted profitability margin, even one normalized, to the Company's Rule of 40 would only help clarify the Company's solid financial footing and possible above-average valuation multiple.

140.    It appears the Withum authors did not analyze the correct specific industry outlook of the *software* industry in their repeated discussion of the IT consulting industry and their cited market reports from various providers. The market research reports Withum selected, such as market research from vendor *IBISWorld*, focused on the IT consulting industry.

141.    The IT consulting industry is a service industry that offers technology services on a billable basis or project basis. From a strict definitional standpoint, the IT consulting industry often embodies a billable business model, not unlike professional services.

142.    The software industry is nevertheless a distinct industry within the broader IT sector. Software firms can charge for set-up installation "service fees," which are billable consulting fees. However, after the initial installation, most SaaS software revenue is purely software – and not service-fee driven. SaaS firms generate recurring revenue on a per-user, per-month ("PMPM") basis that is a subscription. Installation fees, if any, are often a fraction of the SaaS lifetime total value, or LTV, of a client whose annual recurring revenue can eventually grow significantly. The SaaS industry started 20 years ago to meet the need of clients who wanted to avoid costly upfront installations and have the flexibility of software-as-a-service that was billed monthly or annually.

143.    The Company's software, as confirmed with the Defendant and an analysis of the ChannelReply website, *is a dual front-end application software and back-end system software that incorporates no installation services time or implementation service fee charges.* It is unclear if Withum performed an analysis of the Company's software customer base or critical

---

[41] Internet URL: https://www.bain.com/insights/hacking-softwares-rule-of-40/



Michael Dardashtian, Et Al. V. David Gitman, Et Al.
Case No. 17 CV 4327 (LLS)(RWL)

Expert Rebuttal Report of The Withum Valuation Report
Solely Prepared by Justin Kuczmarski, MBA, CPA, CVA, ABV, CEIV, CIRA, CFF

contracts. SSVS notes in paragraph 30 how "advantages or disadvantageous contracts" should be considered in a valuation. It remains unknown if Withum analyzed the Company's software client base, or customer base, through any review or inquiry of crucial revenue streams or customer agreements.

144.    One thing is clear. The Company is not an IT consultancy. ChannelReply is instead a pure software firm. As such, Withum's focus on growth rates or discussion surrounding IT consulting is, therefore, mostly moot. Computing services such as IT consulting may occasionally fall in a broader SIC code of 73. However, software industry codes are differentiated and marked for public and private companies in a range through 7372 through 7375.

### Lack of Valuation Credentials by Leading Withum Expert Carleen J. Gaskin, CPA, CFF

145.    Ms. Carlene J. Gaskin, CPA, CFF, specializes in forensic accounting. She is the Practice Head of Withum's Matrimonial Practice.

146.    Ms. Gaskin is a senior forensic CPA with a forensic accounting credential, Certified in Financial Forensics ("CFF"), from the AICPA. Appendix C presents her Withum Valuation Report bio, Withum homepage bio, and her Linkedin.com bio.

147.    Ms. Gaskin does not currently maintain a valuation credential from the three leading valuation organizations (AICPA, National Association of Certified Valuation Analysts, or American Society of Appraisers). Appendix B captures how the American Institute of Certified Public Accountants, the issuer of the CFF credential, clearly states the CFF is a forensic accounting credential. The curriculum requirements of the credential include a section where approximately 5% to 10% of the material covers damages valuation for litigation assignments.

148.    It is fair to state that the CFF credential is therefore not a business valuation credential.

149.    Ms. Gaskin's Withum Report bio emphasizes her extensive record and accolades across forensic accounting and matrimonial matters. Her litigation record reflects 17 testifying matters, of which 15 matters encompass the same surname. One can assume these matters were matrimonial cases.

150.    Based on her bio, other areas of her practice include family law, mediation, and collaborative law advisory, represent forensic accounting for matrimonial cases. Her Linkedin.com profile bio, where she depicts her titles, reiterates the forensic accounting focus. The crux of these professional practice areas likely centers around forensic accounting – not business valuation or intangible asset valuation, a separate area of valuation advisory. It remains to be seen if her practice areas year-over-year encompass either business valuation for early-stage companies or any technology companies, particularly software firms. Please see Ms. Gaskin's employment history titles below.[42]

---

[42] Internet URL: https://www.linkedin.com/in/carleengaskin as of June 25, 2020



Michael Dardashtian, Et Al. V. David Gitman, Et Al.
Case No. 17 CV 4327 (LLS)(RWL)

**Expert Rebuttal Report of The Withum Valuation Report**
**Solely Prepared by Justin Kuczmarski, MBA, CPA, CVA, ABV, CEIV, CIRA, CFF**



151.    Ms. Jessica Hollobaugh, CPA, ABV, CFE, has a professional bio broadly very similar to Ms. Gaskin. She practiced across tax, accounting, and audit services before switching to forensic accounting services and forensic services focused on criminal matters. Like Ms. Gaskin, she is recognized professionally in forensic accounting matters. Ms. Hollabaugh is the Practice Head for Withum's White-Collar Practice. She appears to have extensive



**Michael Dardashtian, Et Al. V. David Gitman, Et Al.**
**Case No. 17 CV 4327 (LLS)(RWL)**

**Expert Rebuttal Report of The Withum Valuation Report**
**Solely Prepared by Justin Kuczmarski, MBA, CPA, CVA, ABV, CEIV, CIRA, CFF**

experience in financial matters for criminal matters.[43]



152.    In sum, one cannot conclusively opine on another professional's experience without more clarity or a record of valuations or technology advisory/technology assignments. Future discovery may help clarify these questions.

---

[43] Internet URL: https://www.linkedin.com/in/jessica-hollobaugh as of June 25, 2020



Michael Dardashtian, Et Al. V. David Gitman, Et Al.
Case No. 17 CV 4327 (LLS)(RWL)

Expert Rebuttal Report of The Withum Valuation Report
Solely Prepared by Justin Kuczmarski, MBA, CPA, CVA, ABV, CEIV, CIRA, CFF

## Discount for Lack of Marketability ("DLOM")

153.    I analyzed the Withum Valuation Report's analysis of the Discount for Lack of Marketability ("DLOM"). The Withum Valuation Report utilized the Stout Study, formerly known as the FMV DLOM Database.

154.    The searchable database is a leading DLOM database to establish the initial *quantitative* Step 1 staring point for the DLOM. Step 1 is known in valuation literature as the RSED or Restricted Stock Equivalent Discount. Withum next opted to perform a *qualitative* analysis of the *Estate of Mandelbaum* case factors in this leading U.S. Tax Court case. The factors are best practices for Step 2 in a DLOM computation. The term PEDI, or Private Equity Discount Increment, is the definition in business valuation literature to capture the qualitative Step 2 factors referred to as the *Mandelbaum* factors.

155.    I agree with the context of most of the Withum discussion points in the Mandelbaum framework. The factors represent a set of *qualitative* factors that adjust the DLOM upward or downward. For instance, factor 1, financial statement analysis condition, and factor 2, dividend-paying capacity, both remain strengths of the Company and hence would warrant a *lower* DLOM (and hence higher value). The Withum two-step approach is established in the valuation profession.

156.    My questions on the Withum DLOM analysis center around the discount starting point, *quantitative* Step 1 that created the valuation range. Questions remain what the data points are for this range. Withum did not disclose the raw support for this starting report in an exhibit.

157.    It also remains to be seen what other leading DLOM databases, such as the Valuation Advisors' Pre-IPO DLOM Database and the Pluris DLOM Database, Withum cross-checked. Withum could have performed a valuation synthesis of the Step 1 data from the Stout Study / FMV DLOM Database. Additionally, questions center on what other leading methods, such as put option DLOM models, Withum further utilized to corroborate their DLOM range. Overall, based on the data in the Withum analysis, the 25% DLOM appears reasonable.

158.    However, there is a broader question regarding whether any DLOM is genuinely applicable in this New York State fair value dispute.

159.    New York State fair value decisions for dissenting shareholder cases or minority oppression cases have often applied a DLOM in a noncontrolling valuation. However, every company-specific fact pattern is unique. Recent case law has also produced several precedents where a DLOM i*s not applied* based on facts of the case. In recent cases, the centerpiece support for the non-application of the DLOM were facts and criteria that made the application of a DLOM equivalent to suppressing value and creating a subsequent windfall to the controlling shareholder seeking to purchase the noncontrolling interest.

160.    New York is one of the few states that has not curtailed a DLOM in a fair value case as a



**Michael Dardashtian, Et Al. V. David Gitman, Et Al.**
**Case No. 17 CV 4327 (LLS)(RWL)**

**Expert Rebuttal Report of The Withum Valuation Report**
**Solely Prepared by Justin Kuczmarski, MBA, CPA, CVA, ABV, CEIV, CIRA, CFF**

matter of precedent or statute.[44] Most states have abolished the DLOM via either precedent or statute. New Jersey, for example, prohibits a DLOM in a fair value dispute and prohibits a DLOC, or discount for lack of control.

161.     In *Zelouf Intl. Corp v. Zelouf (2014 Slip Op 24405)*, the New York Supreme Court in New York County, clarified that a DLOM was not mandatory. The ruling did not unwind New York State prior precedent law but rather stated how the DLOM is fact-specific and hence, not mandatory in all situations. The ruling also noted how New York cases had applied the DLOM formulaically through stating the "court's role is not to blithely apply formalistic and buzzwordy principles, so the resulting valuation is cloaked with an air of financial professionalism."[45] *Cf. Agranoff,* 791 A2d at 896

162.     We present the full DLOM section excerpt from *Zelouf* below.[46]

> Finally, the court abides by its decision not to apply a Discount for Lack of Marketability (DLOM). The factual basis for finding a DLOM inappropriate in this case is set forth in the Decision (*see id.* at 12-15) and will not be repeated here. However, given New York's contentious DLOM jurisprudence and the persuasive opinions of the academic community and non-New York courts, this court believes the issue merits further discussion.

> The court begins by noting that no New York appellate court has ever held that a DLOM must be applied to a fair value appraisal of a closely held company. On the contrary, the Court of Appeals has held that "there is no single formula for mechanical application." *Matter of Seagroatt Floral Co., Inc.,* 78 NY2d 439, 445 (1991). Indeed, the Court of Appeals recognizes that "[v]aluing a closely held corporation is not an exact science" because such corporations "by their nature contradict the concept of a market' value." *Id.* at 446. As set forth in the Decision, since Danny is not likely to give up control of the Company, Nahal should not recover less due to possible illiquidity costs in the event of a sale that is not likely to occur. [FN2]

> In effect, applying a DLOM here would be the economic equivalent of imposing a minority discount — that is, Nahal realising less for her shares because she is being forced to sell while Danny gets to realize their full value by staying in control. It is well settled that minority discounts are not permitted under New York law. *See Friedman v Beway Realty Corp.,* 87 [*4] NY2d 161, 169 (1995). Indeed, it is the tension between the application of a DLOM, which is done in most cases but is not *legally required,* and the practical effect of a DLOM here serving as a minority discount, repugnant to New York courts and *never allowed,* that drives the court's ruling.

> Moreover, although the court is aware that this is a commercial part which strictly adheres to legal principals and does not decide cases based on sympathy, the Decision should make clear that nothing about how Nahal has been treated in any way resembles normative

---

[44] The Modified Business Corporation Act (MBCA) and American Law Institute (ALI) both reject DLOMs at the shareholder level. Per Matthews and Patterson, "the Model Business Corporation Act (MBCA), created by the American Bar Association and which has been adopted as the basis for corporate law in most states, explicitly opposes discounts at the shareholder level in determining fair value." "NY's Unfair Application of Shareholder-Level Marketability Discounts". Copyright January 2016 in *Business Valuation Update*
[45] *Zelouf Intl. Corp v. Zelouf (2014 Slip Op 24405)*
[46] *Zelouf Intl. Corp v. Zelouf (2014 Slip Op 24405)*



**Michael Dardashtian, Et Al. V. David Gitman, Et Al.**
**Case No. 17 CV 4327 (LLS)(RWL)**

**Expert Rebuttal Report of The Withum Valuation Report**
**Solely Prepared by Justin Kuczmarski, MBA, CPA, CVA, ABV, CEIV, CIRA, CFF**

notions of fairness. Her husband was rendered comatose shortly after he complained about the controlling family members' conduct, she and her husband were deprived of company medical insurance when she complained about the controlling family members' conduct, her equity was taken from her on the eve of trial before a jury when the controlling family members effected a freeze-out merger, and, throughout it all, Nahal incurred millions of dollars of legal costs.

Finally, it should be noted that serious consideration ought to be given to arguments made by those who question the theoretical and empirical underpinnings of the premises behind DLOMs. *See generally* Peter Mahler, "The Marketability Discount in Fair Value Proceedings: An Emperor Without Clothes," New York Business Divorce, July 11, 2011. (and links to other analysis therein); *see also Floorgraphics, Inc. v News Am. Marketing In-Store Servs., Inc.,* 546 FSupp2d 155, 177 n.7 (D NJ 2008). This is an area of heated debate in the legal and valuation communities, and more compelling appellate resolution of these issues would surely be welcomed by all.

Additionally, in other jurisdictions, courts have refused to apply a DLOM for various reasons in cases such as this. See L*awson Mardon Wheaton, Inc. v Smith, 160 NJ 383, 402 (1999)* ("We find most persuasive those cases holding that marketability discounts should not be applied in determining the fair value' of a dissenting shareholder's share in an [FN3] appraisal action"); *Camino, Inc. v Wilson, 59 FSupp2d 962, 971 (D Neb 1999)* (applying a DLOM [*5] "would allow the majority to victimize the minority[,] is not allowed," and is incompatible with a valuation of a corporation as a going concern); *Cox Enters., Inc. v News-Journal Corp.,* 469 FSupp2d 1094, 1108-09 (MD Fla 2006) (noting that in Florida, courts may apply DLOM, but it is not mandatory, and refusing to apply DLOM based on restricted stock study comparisons in lieu of actual evidence of illiquidity of company being valued), *aff'd* 510 F3d 1350 (11th Cir 2007); *Diluglio v Pab,* 1997 WL 839873, at *2-3 (RI Super Ct 1997) (Rhode Island Supreme Court prohibits DLOMs and disagrees with New York's interpretation of fair value), accord *Charland v Country View Golf Club, Inc.,* 588 A2d 609, 612-13 (RI 1991). [FN4]

That being said, this court is *not* holding that a DLOM is necessarily legally inappropriate in valuations of closely held companies. Such a holding would be incompatible with binding New York precedent. Rather, in this case, under the unique set of facts set forth in the Decision, applying a DLOM is unfair. This court's understanding of the applicable precedent is that, while many corporate valuation principles ought to guide this court's analysis, this court's role is not to blithely apply formalistic and buzzwordy principles so the resulting valuation is cloaked with an air of financial professionalism. Cf. Agranoff, 791 A2d at 896 ("Although valuation exercises are highly dependent on mathematics, the use of math should not obscure the necessarily more subjective exercise in judgment that a valuation exercise requires"). To be sure, sound valuation principles ought to be and indeed were utilized in computing the Company's value (i.e., the court's adoption of most of Vannucci's valuation). Nonetheless, the gravamen of the court's valuation is *fairness*, a notion that is undefined, making it a classic question of fact for the court. Fairness, in this court's view, necessarily requires contextualizing the applicable valuation principles to the actual company being valued, as opposed to merely deciding *a priori*, and in a vacuum, that certain adjustments must be part of the court's calculus. [*6] From this perspective, the court reached its conclusion that an application of a DLOM here would be tantamount to the imposition of a minority discount. Consequently, the court finds it fairer to avoid applying a minority discount at all costs rather than ensuring that all hypothetical liquidity risks are accounted for. [FN5]



**Michael Dardashtian, Et Al. V. David Gitman, Et Al.**
**Case No. 17 CV 4327 (LLS)(RWL)**

**Expert Rebuttal Report of The Withum Valuation Report**
**Solely Prepared by Justin Kuczmarski, MBA, CPA, CVA, ABV, CEIV, CIRA, CFF**

Accordingly, it is ORDERED that the parties' motion and cross-motion for reargument are granted in part as follows: (1) the portions of the Decision regarding the applicable statute of limitations and total damages calculation are vacated and decided in accordance with the instant decision; (2) the court adheres to all other aspects of the Decision; and (3) judgment in this action shall only be entered after post-reference briefing is submitted in the manner described herein.

163.   The *Zelouf* case noted that "as set forth in the Decision, since Danny is not likely to give up control of the Company, Nahal should not recover less due to possible illiquidity costs in the event of a sale that is not likely to occur."

164.   The same fact pattern may possibly mirror the situation at the Company as of the Valuation Date. There was tension and discord as of the Valuation Date between Plaintiff and Defendant.

165.   The *Zelouf* ruling proclaiming how there is no DLOM in shareholder fair value situations when the controlling shareholder is "not likely to give up control of the Company"[47] was recently also reiterated in *La Verghetta v. Lawlor*,[48] which stated that "no New York appellate court has ever held that a lack of marketability discount is mandatory (*Zelouf Intl. v Zelouf,* 47 Misc 3d 346, 350 [Sup Ct, NY County 2014]."[49]

166.   *La Verghetta v. Lawlor* also noted that a DLOM in situations when the controlling shareholder has no intent to sell the acquired interest is not permissible since such as DLOM in these circumstances "would be the economic equivalent of imposing an impermissible minority discount-that is, La Verghetta will [be] realizing less for his interest while the Innocentis get to realize their full value by staying in control. (*Zelouf,* 47 Misc 3d at 350-351)."[50]

167.   As such, the fact pattern of these cases may render a DLOM moot. Such analysis is a legal concern outside of my review. Questions on whether Plaintiff counsel and Withum discussed fair value case law that prohibited a DLOM – rather than in case law that supports a DLOM - remain open.

168.   We present the DLOM discussion summary in *La Verghetta v. Lawlor* below.

The Court declines to impose 35% discount for lack of marketability on the ground that the Court does not accept that two of the three reasons given by Trugman for such a discount have any factual validity: the deferred tax issue and the assumed holding period. While the Court would have given consideration to an entity-level discount for lack of marketability based upon the transfer restrictions imposed by the Franchisor, Trugman does not provide a basis for calculating the appropriate amount of the discount. Stated differently, Trugman does not set forth how much discounting would be appropriate solely by reason of the

---

[47] *Zelouf Intl. Corp v. Zelouf (2014 Slip Op 24405)*
[48] *Verghetta v Lawlor (2016 NY Slip Op 30423)*
[49] *Ibid*, Page 23
[50] *Ibid*, Page 24



Michael Dardashtian, Et Al. V. David Gitman, Et Al.
Case No. 17 CV 4327 (LLS)(RWL)

Expert Rebuttal Report of The Withum Valuation Report
Solely Prepared by Justin Kuczmarski, MBA, CPA, CVA, ABV, CEIV, CIRA, CFF

transfer restrictions. Indeed, he testified that he did not even attempt to quantify such a discount. Since Defendants seek to impose such a discount, their failure to establish what the appropriate level of discount would be results in the discounting of the discount. Trugman's effort to maximize Defendants' position by a "high-end" discount is thus not persuasive.

Moreover, even if the Court could determine an appropriate discount level, the Court would nevertheless conclude that no discount for lack of marketability is appropriate in this situation. No New York appellate court has ever held that a lack of marketability discount is mandatory (Zelouf Intl. Corp. v Zelouf, 47 Misc 3d 346, 350 [Sup Ct, NY County 2014]). In this case, the parties have agreed that the best means for resolving the disputes between La Verghetta and the Innocentis is to have JGJ buy out La Verghetta's interest for fair value. In exchange for that buy-out, La Verghetta agreed to give up his claims based upon, inter alia, breach of fiduciary duty and conversion, and Defendants agreed to give up their counterclaims. The construct is that La Verghetta will receive his fair value and the Innocentis can move on with JGJ free of him. The Innocentis made clear in their testimony that they did not intend to sell JGJ and that no amount of money would tempt them to do so. Thus, while they correctly contend that Schaeffer's valuation for JGJ and JGJg is widely inflated, they refuse to sell at Schaeffer's value.

Consequently, the imposition of a lack of marketability discount would be inappropriate in this context. As the Court observed in a similar context in Zelouf, since the Innocentis are not likely to sell JGJ, La Verghetta should not recover less due to possible illiquidity costs in the event of a sale that is not likely to occur. While La Verghetta was not compelled to stipulate to sell, he will be obligated to sell at the price fixed by the Court. Hence, applying a discount for lack of marketability would be the economic equivalent of imposing an impermissible minority discount-that is, La Verghetta will realizing less for his interest while the Innocentis get to realize their full value by staying in control. (Zelouf, 47 Misc 3d at 350351).[51]

## Lack of Upward Adjustment in Business Value for the S-Corp. Premium

169.    The valuation benefit of the SEAM model and other S-Corporation / pass-through entity adjustment models derive from how pass-through entities such as the Company avoid capital gains taxes until a tax basis is recovered. The Company is a New York S Corporation, and hence the Company is taxed as a flow-through entity *without double layers of taxation (entity level and dividend level).*

170.    Withum did not apply any S-Corporation adjustment model, such as the leading S-Corporation Equity Adjustment Model, or SEAM, to account for how the Company is beneficially structured not to pay any dividend taxes. The lack of any S-Corporation adjustment model – such as the SEAM - is a deficiency in the Withum Valuation Report.

171.    Valuation theory states how "the models [for valuing this pass-through entity benefit] have been constructed to address the valuation of noncontrolling shareholder interests in S

---

[51] *Ibid*, Pages 25-26



Michael Dardashtian, Et Al. V. David Gitman, Et Al.
Case No. 17 CV 4327 (LLS)(RWL)

Expert Rebuttal Report of The Withum Valuation Report
Solely Prepared by Justin Kuczmarski, MBA, CPA, CVA, ABV, CEIV, CIRA, CFF

corporations."[52] The SEAM multiple is also "applied to equity values and not invested capital."[53] Most S-Corporation models arrive at a 15% to 20% increase in business enterprise value. The computations depend on assumed dividend payout rates and federal and state tax rates.

172.     If one were to assume a 50% dividend payout and the current New York State federal and corporate tax rates, a SEAM of approximately 18% is the approximate increase in business enterprise value.[54] The S-Corporation adjustments have been more accepted in the U.S. Tax Court, jurisdictions, and valuation best practices in the last 15 years to account for the benefit of an LLC or S-Corporation over a C-Corporation. The IRS takes a polarizing view that there is *no tax-impacting* a flow-through entity and hence no need for a SEAM, or S-Corporation adjustment. Best practices dictate a S-Corporation adjustment *only when there is a tax-impacting and the adjustment offsets the tax-impact across methods.*

173.     Withum was not inappropriate in tax-impacting the income in the direct capitalization method. However, as emphasized above, best practices dictate that if a valuation practitioner does tax impact a flow-through entity, then an S-Corporation adjustment premium, such as the SEAM, is necessary to adjust the business enterprise value upward. The adjustment accounts for the Company's favorable LLC or S-Corp. structure.

174.     The failure to adjust upward for an S-Corporation adjustment could therefore represent a 15% to 20% *understatement* of the Company.

## Analysis of Excess Cash

175.     The Company may have possessed excess cash as of the Valuation Date. It appears there is some level of excess cash if one were to properly bifurcate excess cash from necessary operating cash.

176.     Withum did not analyze excess cash, a classic non-operating asset in a business valuation. *Understanding Business Valuation, 5th Edition,* the AICPA's newly updated valuation textbook, noted how the cash above the cash ratio might be deployed to measure excess cash.[55]

> Cash to Current Liabilities = Cash ÷ Current Liabilities
>
> Cash and cash equivalents are the most readily available assets with which to pay liabilities. This ratio indicates whether the subject company has a strong enough cash position to meet its short-term obligations. This ratio can also assist the valuation analyst in determining whether the subject company is carrying excess cash on its balance sheet. Excess cash may show a poor use of current assets by management. I wish that I had the problem of having excess cash. My kid made sure that never happened!

---

[52] Trugman, Gary. *Understanding Business Valuation, 5th Edition,* Copyright 2017 by the American Institute of Certified Public Accountants. Pages 761-762)
[53] Trugman, Gary. *Understanding Business Valuation, 5th Edition,* Copyright 2017 by the American Institute of Certified Public Accountants. Pages 768-770)
[54] Precise results depend on payout assumptions and an analysis of the Company's effective tax rate
[55] Trugman, Gary R. *Understanding Business Valuation.* Copyright 2017 by the American Institute of Certified Public Accountants (AICPA), Page 478.



Michael Dardashtian, Et Al. V. David Gitman, Et Al.
Case No. 17 CV 4327 (LLS)(RWL)

Expert Rebuttal Report of The Withum Valuation Report
Solely Prepared by Justin Kuczmarski, MBA, CPA, CVA, ABV, CEIV, CIRA, CFF

177.   Non-operating assets are a 1:1 upward adjustment in business valuation, and non-operating liabilities are subtracted 1:1 in a business valuation. An example of another non-operating asset, though not applicable to the Company, is real estate owned by a Company. Such property assets are traditionally valued *separately in piecemeal* and added dollar-for-dollar to a business valuation result *at the end of the analysis.*

178.   We would need to analyze further operating cash requirements, both as of the Valuation Dates and prospectively, for the Company to opine on excess cash of the Company. This analysis would be incorporated into a business valuation analysis. The analysis of excess cash and any non-operating asset or liabilities is an explicit requirement in SSVS. We depicted this absence concern earlier in our review of SSVS and the Withum Valuation Report.

| | | |
|---|---|---|
| Site visit disclosure or lack of | 55.a (7) | |
| **Analysis and development of value requirements** | | |
| Nature and history of business | 57; 27 (9) | |
| Economic conditions, present and outlook | 57; 65.b | |
| Past, current and future prospects of business/industry | 53; 58; 29 | Withum analysis in this category is unclear or absent. |
| Financial Analysis of earnings/dividend capacity | 58; 30 | Withum analysis in this category is unclear or absent. |
| Past sales of interest in the business being appraised | 61.c | |
| Market prices of similar businesses publicly traded | 61.c | Withum analysis in this category is absent. |
| Similar business/interest sales | 61.c | Withum analysis in this category is absent. |
| Ownership, Size, nature, restrictions and agreements | 52.f; 59-62 | |
| Extent the interest appraised contains control | 52.f | |
| Extent interest has or lacks elements of marketability | 52.f | |
| Nonoperating/excess operating assets | 64 | Withum analysis in this category is absent. |
| Valuation approaches and methods considered | 58; 34 | |

## In Summary

179.   I have raised a range of application, scope, and theoretical concerns in the Withum Valuation Report. My concerns often center around documentation and select vital concepts that were either misapplied or not applied correctly.

180.   Future analysis, coupled with work paper discovery and additional inquiry, will shed insight into what materials were precisely analyzed or not incorporated in the Withum valuation analysis and the eventual Withum Valuation Report.

181.   In conclusion, I performed all the writing of the Rebuttal Report, valuation review analysis, and all procedure to support its conclusions. The opinions presented herein are, therefore, exclusively my own. I performed 100% of the professional time incurred to date in my analysis. My standard billing rate is $350 per hour.

182.   None of NAV's fees are contingent on either the present or future outcomes of this matter. NAV delivered progress billing invoices throughout this engagement that comply with NAV's customary monthly billing.



**Michael Dardashtian, Et Al. V. David Gitman, Et Al.**
**Case No. 17 CV 4327 (LLS)(RWL)**

**Expert Rebuttal Report of The Withum Valuation Report**
**Solely Prepared by Justin Kuczmarski, MBA, CPA, CVA, ABV, CEIV, CIRA, CFF**

183.   I have no prior relationship with any attorney in this matter or either the Plaintiff or Defendant. I have never been disqualified under the federal expert admissibility doctrine of *Daubert*. I also never have been convicted of a crime or charged with any professional misconduct.

184.   NAV's billable fees to date were paid in full before the delivery of this Rebuttal Report, and we will be paid in full before the start of possible expert witness testimony. This timing adheres to best practices in professional standards.

185.   In my signature below, I represent that this Report is my analysis and quantification as of the date it was written.

*Justin Kuczmarski*

_____

Justin Kuczmarski, MBA, CPA, CVA, ABV, CEIV, CIRA, CFF

June 26, 2020



## APPENDICES A

**Direct Capitalization Method: Excerpts from Theory and Best Practices**



Excerpt from *A Consensus View: Q&A Guide to Financial Valuation* by Shannon Pratt, James Hitchner, and Jay Fishman
Pages 12-14
Copyright 2016 by Valuation Products & Services
The textbook Q&A guide is designed for practitioners.

A CONSENSUS VIEW Q&A GUIDE TO FINANCIAL VALUATION

One way to address this conundrum is to prepare a DCF analysis, obtain the value, and then calculate a CCF analysis based on the implied blended growth rate that reconciles with the value of the DCF model. No, we are not trying to trick anyone or hide anything. In our report we would explain what we did, which is solve for the appropriate growth rate in our CCF method. We would also put the DCF analysis in the workpapers.

Let's take an example where the subject company's historical growth rates are not indicative of future growth rates. Let's say that the company is expected to grow by 15% for the next two years, 10% in the third year, and then level out to the historical growth rate of 4%. Let's also assume that the discount rate is 20% and the cash flow last year was $1,000,000.

**Capitalization Method**

If you do a straight-up capitalization method using historical cash flows, the value is $1,040,000 / (.20 - .04) = $6,500,000. We know this is the wrong value. Now, let's do a DCF.[14]

| Discounted Cash Flow Method | | | | | |
|---|---|---|---|---|---|
| Year | 1 | 2 | 3 | 4 | Terminal Year |
| Cash Flow | $1,150,000 | $1,322,500 | $1,454,750 | $1,512,940 | $9,834,110 |
| PV Factor | .8333 | .6944 | .5787 | .4823 | .4823 |
| PV | $958,295 | $918,344 | $841,864 | $729,691 | $4,742,991 |

**Value = $8,191,000 (rounded)**

As you can see, the correct value of $8,191,000 (in a venue where the methodology is considered unacceptable) is 26% higher than the incorrect value of $6,500,000 (by methodology considered acceptable). Okay, how do we fix this?

Calculate the implied capitalization rate by comparing the CCF cash flow to the DCF value:

$1,040,000 / $8,191,000 = .126969[15]

---

14    For simplicity, we used an end-of-year present value convention
15    We are using six decimal places solely for this proof.

12

The excerpts above explain how DCF method can check the reasonableness of the direct capitalization method. The direct capitalization method is sometimes called the Capitalized Cash Flow Method.



NAV
VALUATION
& ADVISORY LLC

CHAPTER 1   INCOME APPROACH

This results in a capitalization rate of 12.6969% (not rounded). To determine the blended growth rate (three years of higher interim growth plus the long-term growth), take the discount rate of 20% and subtract the capitalization rate of 12.6969% to obtain the blended growth rate of 7.3031%. Let's check the math using a CCF method. Next year's cash flow is estimated to be $1,040,000. The new, but now correct capitalization rate is 20% - 7.3031% = 12.6969%.

$1,040,000 ÷ .126969 = $8,191,000

It is important that the valuation report explains that you believe that the company's future growth will be higher than the historical growth for the next three years and what is driving that growth. The DCF method was used to determine a blended growth rate. This includes the three years of higher growth; then, from year three on, you used the long-term growth rate of 4%, which is consistent with historical growth. You then used that blended growth rate in your capitalization of cash flow method.

The analyst's report and testimony, if taken, should provide the court with more foundation regarding the income approach in general and the concept of present value in particular. This will help the court to understand that a multi-year DCF method employs the same present-value concepts as the single-year CCF method. Hopefully, this will make it easier for the court to understand that the DCF method is the proper method.

## 6.  Improper Use of the Discounted Cash Flow and Capitalized Cash Flow Methods

**Question:**  Have you ever seen analysts use both the capitalized cash flow and discounted cash flow methods to manipulate the value?

**Answer:**  Unfortunately, some analysts will use both in order to manipulate their conclusion of value. This happens when the two values are very different. They will use a CCF method to obtain a higher or lower value when historical performance is expected to decline or improve. Let's take two examples, one where the best method is the DCF method and the other where the best method is the CCF method:



The excerpts above explain how DCF method can check the reasonableness of the direct capitalization method. The direct capitalization method is sometimes called the Capitalized Cash Flow Method.



A Consensus View *Q&A* Guide to Financial Valuation

**Example 1** (Assume the DCF is the most reasonable method with higher interim growth) Calculate value under a DCF method and a CCF method and apply weights

| | | |
|---|---|---|
| DCF value = $10 million @ 50% weight | = | $5.0 million |
| CCF value = $ 7 million @ 50% weight | = | <u>$3.5 million</u> |
| | | $8.5 million |

So, what's the appropriate value, $8.5 million or $10 million? Obviously it is $10 million.

**Example 2** (Assume the CCF method is the most reasonable method due to flat growth) Calculate value under a DCF method and a CCF method and apply weights

| | | |
|---|---|---|
| DCF value = $10 million @ 50% weight | = | $5.0 million |
| CCF value = $ 7 million @ 50% weight | = | <u>$3.5 million</u> |
| | | $8.5 million |

So, what's the appropriate value, $8.5 million or $7 million? Obviously it is $7 million.

> The excerpts above explain how DCF method can check the reasonableness of the direct capitalization method. The direct capitalization method is sometimes called the Capitalized Cash Flow Method.



Excerpt from *Valuing A Business, 5th Edition* by Shannon Pratt
Copyright 2008 by McGraw-Hill
Pages 243-245
The textbook is one of the leading textbooks in private company valuation.

Formula 10–8

$$PV = \frac{E_o(1 + g)}{k - g}$$

where:

| | | |
|---|---|---|
| $PV$ | = | Present value |
| $E_o$ | = | Amount of economic income in the period immediately past |
| $k$ | = | Discount rate (required yield rate or total rate of return) |
| $g$ | = | Expected average growth rate of $E$, annually compounded in perpetuity |

Formulas 10–5 and 10–8 are often referred to as the *Gordon growth model*, the *dividend growth model*, or the *constant growth model*.[5] They represent a technically correct simplification of the basic discounted economic income model, *provided that the critical assumption underlying this simplification is met—that is, the economic income variable is expected to have a constant average annually compounded rate of growth in perpetuity.*

---

[5] For a mathematical proof of this formula, see, for example, Richard A. Brealey and Stewart C. Myers, *Principles of Corporate Finance*, 7th ed. (New York: McGraw-Hill, 2003), pp. 37–38.

10 / Income Approach: Capitalized Economic Income Method      **243**

Since this assumption is rarely met in the real world, this growth model is often used only as the final stage of a multistage discounted economic income model. For example, it is common to make specific income forecasts for some period (often five years or until the company is expected to reach a reasonably stable state), and then use the constant growth model to reflect income expectations from that point forward. An example of this will be shown later in the chapter.

Assume the following:




## When to Use the Discounting versus the Capitalization Method

The obvious implication of all this, when one stops to think about it simplistically, is that *the difference between the discounting model and the capitalization model is how one treats anticipated changes in future income over time*:

1. In discounting, *changes over time in the expected economic income are treated specifically in the terms of the numerator of the present value equation.*
2. In capitalizing, *changes over time in the expected economic income are treated as a single average percentage change, and that annualized percentage is subtracted (assuming it is positive) from the cost of capital in the denominator.*

The important conceptual underpinning of the capitalized economic income valuation model is that there is either a constant annual income stream in perpetuity or a constant annualized rate of growth (or decline) in the economic income variable being capitalized in perpetuity. Obviously, this constant growth rate projection is rarely met in the real world.

Unlike the discounted economic income model, the capitalization model does not take into consideration the timing of future changes in expected economic income. The greater the differences in the anticipated changes over time, especially in the early years, the more the analyst is encouraged to apply the discounted economic income method rather than the capitalized income method.

This leads to some generalizations about the relative attractiveness of the two basic income approach valuation methods:

1. *Stable or evenly growing economic income flow.* If the economic income flow is either stable or growing (or declining) at a fairly even rate, the capitalized

> The excerpts clarify how high growth obviates the usage of direct capitalization method.

economic income method should conclude as accurate a value indication as the discounted economic income method.

2. *Predictable but uneven changes.* If there are reasons to believe that changes will be significant but predictable, even though uneven, the discounted economic income model should produce a more accurate valuation.
3. *Short- or intermediate-term supergrowth.* If growth is expected to be quite high in the immediate future, the discounted economic income model should produce a more accurate valuation. One of the most common mistakes in the application of this method is to use a 10 percent growth for the first few years (even though it may not be sustainable over the long term) and then subtract that 10 percent from the present value discount rate. This mistake will result in a low capitalization rate and in an overvaluation of the subject company.
4. *Changes that are erratic and unpredictable as to timing.* If the company's economic income is unstable and also more or less random as to timing, the company's risk increases, and thus the present value discount rate increases. However, the discounted economic income method may not be able to produce any more accurate a value indication than the direct capitalization method.

> The excerpts clarify how high growth obviates the usage of direct capitalization method.



Excerpt from *Business Valuation Body of Knowledge, 2nd Edition*, by Shannon Pratt
Page 92
The textbook remains as a primer for certification training.

92                                                    Valuation Approaches and Methods

## Capitalization Method

### *Advantages of Capitalization Method*

- Widely used by investors (although probably not as much as discounted cash flow).
- Does not require specific-period, long-term forecasts.
- Simple to understand and explain.
- Used at one time or another in almost all courts.

### *Disadvantages of Capitalization Method*

- Oversimplification of discounting method; future economic benefits are not reflected explicitly and may be difficult or unreasonable to assume a constant growth rate.
- Implicitly assumes that a variable capitalized represents a reasonable base from which future benefits will proceed.
- Both the measure of economic income to be capitalized and the capitalization rate may be controversial.
- Difficult to use in start-up or high-growth companies.

The excerpt explains how the direct capitalization method is difficult and not applicable for start-up or high growth companies.



APPENDIX B

**Bio & Full CV of Justin Kuczmarski, MBA, CPA, CVA, ABV, CEIV, CIRA, CFF**





### Justin Kuczmarski, MBA, CPA, CVA, ABV, CEIV, CIRA, CFF

**Valuation, Financial Advisory, Forensic Litigation Expert - Bio and CV**

President, NAV Valuation & Advisory LLC
125 Maiden Lane – Suite 5C * New York, NY 10038
(212) 418-1234 (Main) * (516) 356-2065 (Mobile) * Justin@NAVValuation.com

### Education

Mr. Kuczmarski received a B.A. in Politics from Princeton University. He also received an MBA from Fordham University in both Finance and Professional Accountancy, where he attended on an academic fellowship in both departments.

### Media

Mr. Kuczmarski is a frequent TV commentator on both M&A transactions and technology. He has appeared on multiple national and international stations such as TD Ameritrade, Yahoo Finance, i-24, China Central TV, and China Global Television Network covering both topics.

### Published Books

- ◼ Mr. Kuczmarski is the Sole Author of the 300-page guidebook entitled *The Executive's Guide to Business Valuation: Essentials for Advisors and Business Owners.*

### Financial Advisory and Valuation Advisory Experience

Mr. Justin Kuczmarski, MBA, CPA, CVA, CEIV, CIRA, CFF, is the President of NAV Valuation & Advisory LLC ("NAV"). Mr. Kuczmarski possesses a unique background combining senior experience in both M&A investment banking and corporate financial advisory services.

Before founding NAV, Mr. Kuczmarski had served as both a Practice Leader in Financial Advisory Services for a top 10 accounting and consulting firm as well as a Practice Leader for a leading technology M&A boutique bank.

He holds three leading valuation credentials/licenses (CVA, ABV, CEIV), two credentials/licenses in public and forensic accounting (CPA and CFF), and one in bankruptcy and restructuring advisory (CIRA). He brings real-world M&A experience to his delivery of valuation services, financial advisory, forensic support, and M&A advisory. M&A deal sheet and services record is available upon request.

He was a finalist in 2011 for *Crain's New York Top 40 under 40*.  In 2016, Mr. Kuczmarski was a recipient of the <u>NACVA 40 Under 40</u> from the nation's leading valuation association, the National Association of Certified Valuation Analysts (NACVA).

### M&A Experience



Mr. Kuczmarski has been involved in over 150 transactions during his 20-plus year career from either an M&A investment banking or financial advisory perspective. He specializes in the following industries: asset management, business services, real estate, and technology. Notable clients include some of the nation's leading private equity firms and family offices.

In 2013-14, Mr. Kuczmarski led the due-diligence and initial public market valuation and pricing of two high-profile technology IPOs.

## Litigation Support and Forensic Experience

Mr. Kuczmarski specializes in the complete gamut of cases across litigation support. He is a Registered Mediator for SD-NY and ED-NY. He is also New York State Part-36 expert appraiser and expert accountant for eight New York State counties. Mr. Kuczmarski has also defended his valuation and forensic accounting reports in litigation cases and tax compliance assignments. He has led several high-profile securities litigation cases.

Mr. Kuczmarski is also active in shareholder dispute matters, particularly investment fund disputes.

In 2010-2013, Mr. Kuczmarski was one of four plaintiff financial experts in the high-profile, class-action case against a leading mortgage servicer. The case settled successfully.

He is also frequently engaged as a litigation expert for damages claims. These cases have centered on matrimonial, medical damages, and professional liability cases. Mr. Kuczmarski has applied his valuation expertise in the quantification of property lost profits and business interruption claims. He has also successfully defended his analysis before the IRS in multiple tax compliance appraisals.

Mr. Kuczmarski also has provided valuation advice for insurance companies, insurance assets, real estate firms, and complex intangibles.

## Litigation Support and Forensic Accounting Experience – Recent Case Record

Recent notable engagements in the last ten years include the following litigation support assignments:



| Date | Matter | Side Represented | Industry | Type of Case | Services | Outcome |
|------|--------|------------------|----------|--------------|----------|---------|
| 2020- | Confidential | Plaintiff | Financial Services; Asset Management | Shareholder Case | Complex Credit Valuation and Business Valuation | Pending |
| 2020- | Lori Bogin V. New York Presbyterian | Defendant | Healthcare & Financial Services | Wrongful Death | Lost Earnings Valuation | Pending |
| 2020- | Dardashtian Et. Al V. Gitman Et Al. | Defendant | Technology | Shareholder Case | Business Valuation | Pending |
| 2019- | J Construction Companies V. Nesenoff & Miltenberg, LLP | Defendant | General Construction; Construction Manager | Forensic Accounting | Forensic Accounting and Fraud Tracing; Damages Analysis | Pending |
| 2019- | Confidential FINRA Dispute | Plaintiff | Financial Services; Asset Management | Economic Damages; FINRA Arbitration | Economic Damages | Settled |
| 2019- | Confidential FINRA Dispute | Plaintiff | Financial Services; Asset Management | Economic Damages; FINRA Arbitration | Economic Damages | Settled |
| 2019- | Confidential; Leading Construction Contractor in Brooklyn & Manhattan | Plaintiff | General Construction; Construction Manager | Forensic Accounting | Forensic Accounting and Fraud Tracing; Damages Analysis | Pending in Kings County, NY |
| 2018- | Confidential; Leading Specialty Contractor in the Northeast | Dissenting Shareholder | Specialty Construction | Shareholder Dispute | Business Valuation | Pending; Ongoing Negotiations |
| 2018- | Confidential | Defendant | General Construction; Construction Manager | Shareholder Dispute | Business Valuation | Settled |
| 2018- | Matrimonial Action | Defendant | Apparel | Matrimonial Action | Forensic Services | Pending |
| 2016-2018 | Confidential | Contractor | Construction & Engineering Services | Fraud Investigation | Forensic Accounting and Fraud Tracing | Pending |
| 2016-2017 | Confidential Shareholder Dispute | Defendant | Insurance | Shareholder Dispute & Business Valuation – Attempted Buyout | Independent Business Valuation, | Settled |



| | | | | | Damages Analysis, & Forensic Services | |
|---|---|---|---|---|---|---|
| **2017-2018** | Matrimonial Action | Plaintiff | Technology | Matrimonial Action for High-Profile Tech Executive | Forensic Services | Settled |
| **2016-2017** | American Arbitration Association *Ferraro V. Blacker* | Defendant | Alternative Investment Industry – Credit Hedge Fund | Shareholder Dispute & Business Valuation – Structured Financial and Credit Hedge Fund | Independent Business Valuation, Damages Analysis, & Forensic Services | Settled |
| **2016-** | Supreme Court of the State of New York County of Nassau *Rocco Iacoviello V. Michele Iacoviello* IAS Part 38. Index No. 201139/2015 | Third-Party Valuator – Court Appointed in Nassau County, NY | Law Firm | Matrimonial Dispute & Business Valuation – Court Appointed Expert in Nassau County to Value Spouse Interest in Husband's Law Firm | Independent Business Valuation: Matrimonial Action | Settled |
| **2016-** | *Finnie V. BASICS, Inc.* | Defendant | Non-Profit | Whistleblower Damages Claim and False Claims Act | Forensic Accounting Analysis | Pending |
| **2015** | United States Bankruptcy Court Eastern District of New York *Federation Employment and Guidance Service Inc. d/b/a/ FEGS Health and Human* (Debtor) Case No. 15-71074 | Debtor | Non-Profit | Bankruptcy | Interim Chief Revenue Officer | Settled |
| **2014-2015** | The United States Court of Federal Claims *Thomas Smith V United States* Case No. 11-616C | Plaintiff | Aerospace & Defense | Patent Valuation | Independent Patent Valuation, Infringement Damages Analysis, & Forensic Services | Confidential Settlement |



| 2010-2013 | U.S. District Court for the District of Columbia, Case No. 04-01639<br><br>*Fannie Mae Securities Litigation* | Plaintiff | Credit Analysis & Structured Finance | Class Action Securities Fraud Claim | Expert Consultant for a team of 10 professionals<br><br>Internal Control Services, Credit Analysis & Structured Credit Valuation | $153 Million Settlement[56] |
|---|---|---|---|---|---|---|
| 2012-2013 | Confidential | Forensic Investigation | Business Services | Forensic Investigation | Forensic Investigation & Fraud Analysis about Alleged Vendor Fraud | Resolved Internally |
| 2011 | United States Bankruptcy Court Central District of California – Los Angeles Division<br><br>*Orange Grove Services, Inc.* (Debtor)<br><br>Case No. 2:10-bk-21336-EC Chapter 11 | Debtor | Real Estate & Credit Analysis | Chapter 11 Bankruptcy (Reorganization) | Credit Analysis, Credit and Real Estate Due-Diligence, Loan Analysis, and Reorganization | Reorganization Completed |
| 2011 | United States Bankruptcy Court Central District of California – Los Angeles Division<br><br>*J&J Warehouse Company, LLC, A Delaware LLC* (Debtor)<br><br>Case No. 2:11-bk-18813-BB Chapter 11 | Debtor and Debtor in Possession | Real Estate & Credit Analysis | Chapter 11 Bankruptcy (Reorganization) | Credit Analysis, Credit and Real Estate Due-Diligence, Loan Analysis, and Reorganization | Reorganization Completed |

---

[56] Internet URLs: http://www.ohioattorneygeneral.gov/Media/News-Releases/May-2013/$153-Million-Settlement-Announced-in-Class-Action; http://www.reuters.com/article/us-kpmg-settlement-idUSBRE94617S20130507



## Credit Analysis & Credit Valuation Experience

Mr. Kuczmarski has extensive experience as a financial advisory expert and valuation expert in credit assignments. He has applied his multi-disciplinary expertise in analyzing the credit outlook, capacity, and liquidity of fund investments, real estate portfolios, and various mezzanine tranches of private equity.

Mr. Kuczmarski specializes in complex credit valuation assignments before the U.S. Tax Court. His analysis has been upheld numerous times and has withstood all IRS challenges to date. He has delivered over 25 formal credit opinion valuations for private company loans. These interest rate valuations apply to both intraparty and international debt transactions.

He has also led extensive bankruptcy assignments where credit and collateral values formed the crux of the Chapter 11 reorganization process. He also has served as a structured finance credit expert in shareholder disputes and securities cases. Please see the case record section above. From 2010 to 2013, Mr. Kuczmarski led a team that analyzed the securities damages for fraud and credit allegations for Federal National Mortgage Association (Fannie Mae). The class-action case, initiated by the Ohio Attorney General, resulted in a $153 million settlement with Fannie Mae.

## Industry Experience: Construction & Real Estate Services

Mr. Kuczmarski has significant construction and real estate consulting experience. Many of his assignments involve complex credit analysis, credit valuation, construction analysis, and real estate valuation. He has served as an expert witness in leading construction matters. His areas of construction litigation expertise entail damages analysis, business interruption cases, fraud investigations, and shareholder valuation disputes.

Mr. Kuczmarski also specializes in private loan valuation opinions. He has delivered over 25 formal appraisals for private company loans. His interest rate analyses have focused on both intraparty and international debt transactions.

He has also used his real estate and construction expertise in bankruptcy assignments, negotiations, and across tens of financial statement audits. Additional real estate engagements include the following services: capitalization rate valuations, debt capacity studies, due diligence for forensic accounting, and due diligence for financial scenario modelling.

## Industry Experience: Alternative Investment Industry

Mr. Kuczmarski serves as a financial advisory expert for alternative investment funds. He has reviewed hundreds of financial statement audits of fund portfolio companies and general partners during ten years at Crowe Horwath LLP, where he led the alternative investment valuation practice for audit clients.

Mr. Kuczmarski also has expertise in financial valuation services for alternative investment funds.

| Credit – Private Loans | Credit – RMBS and CDO Structured Finance | Credit – Distressed Credit Card Portfolios | Equity – Private |
|---|---|---|---|

Page 58



| Equity - Public | Equity – Venture Capital | Derivatives: Plain-Vanilla Options | Derivatives: Employee Stock & Incentive Options |
|---|---|---|---|
| Derivatives: Warrants | Intangible Assets & Intellectual Property | Preferred Equity – Plain Vanilla | Preferred Equity: Complex & Convertible |
| Real Estate – Air Rights | Real Estate – Public REITs & Private Partnerships | Transfer Pricing Assets | Waterfall Asset Allocations |

## Licenses and Certifications

- Certified Public Accountant (CPA), New York State and Virginia
    - NYS # 097048
    - Virginia License # 32493

- Accredited in Business Valuation (ABV) – American Institute of Certified Public Accountants (AICPA)
    - ABV No. 4602

- Certified Insolvency & Restructuring Advisor (CIRA) – Association of Insolvency & Restructuring Advisors (AIRA)
    - CIRA No. 1386

- Certified Valuation Analyst (CVA) - National Association of Certified Valuation Analysts (NACVA)
    - NAVCA No. 30674
    - CVA No. 0990970

- Certified in Financial Forensics (CFF) – American Institute of Certified Public Accountants (AICPA)
    - CFF No. 1019

- Certified in Entity and Intangible Valuation (CEIV) – American Institute of Certified Public Accountants (AICPA)

## Employment History

NAV Valuation & Advisory LLC (2015-)
- President of Multidisciplinary Financial Advisory Firm

Crowe Horwath LLP (2005-2015)
- Practice Leader at both Crowe Horwath LLP and predecessor firm (Hays & Company LLP)

Petsky Prunier (2004-2005)
- Valuation Practice Leader and M&A Investment Banker

Willamette Management Associates / Willamette Capital (2002-2004)
- Valuation Advisory, Financial Advisory Services, and M&A Investment Banker



## Professional Affiliations

- American Institute of Certified Public Accountants (AICPA)
- AICPA Forensic and Valuation Section
- Association for Corporate Growth – Connecticut Chapter Member
- Association of Insolvency and Restructuring Advisors (AIRA)
- New York State Society of CPAs
- National Association of Certified Valuation Analysts (NACVA)

## Board of Director Service

- Board Member, Westminster R.C. Cathedral (London) (Board Member 2013-)
- Board Member, Princeton University Cannon Club (Board Member 2013-2015)

## University Adjunct Professor

- St. John's University – Manhattan Campus MBA Program – Peter J. Tobin School of Business, Winter 2013-Fall 2014
  - Accounting 600: Advanced Financial Statement Analysis – Part 1
  - Accounting 601: Advanced Financial Statement Analysis – Part 2

- Adjunct Professor, DeVry University – College of Business and Management, Spring 2011
  - Introduction to Accounting

## Judicial Valuation Teaching

- Speaker, National Judicial College (http://www.judges.org), Washington D.C., November 12-14, 2008.

  - Selected to serve on an AICPA faculty team teaching valuation and accounting to federal and state judges

## Professional Certification Teaching

- Instructor, Becker CPA Preparatory programs: Taxation and Regulation; Summer 2012
- Instructor, Becker CPA Preparatory programs: Auditing; January 2012
- Instructor, Becker CPA Preparatory programs: Taxation; January 2012
- Instructor, Becker CPA Preparatory programs: Auditing; December 2012
- Instructor, Becker CPA Preparatory programs: Auditing; July 2011
- Instructor, Becker CPA Preparatory programs: Financial Accounting; December 2011
- Instructor, Becker CPA Preparatory programs: Business and Economics; March 2011
- Center for Professional Education (2007 to 2009)
    - Courses Included Fair Value Accounting & Corporate Finance

## Noteworthy Publications and Representative Conference Speaking Events

- Litigation Finance Webinar, Elev8 Conference, June 23, 2020
- The Knowledge Group Webinar on U.S Transfer Pricing, November 20, 2019
- The Knowledge Group Webinar on U.S Transfer Pricing, May 22, 2019



- The Knowledge Group Webinar on U.S Tax Act and Transfer Pricing, November 15, 2018
- Voltaire Conference on Private Equity Valuation, June 2018
- The Knowledge Group Webinar on Transfer Pricing, February 15, 2018
- Voltaire Webinar on Tech Unicorns, November 2, 2017
- The Knowledge Group Webinar on Transfer Pricing, November 7, 2017
- The Knowledge Group Webinar on Economic Damages, July 26, 2017
- Numerous Media TV Interviews for CCTV, CGTN, and i24, 2016-
- Princeton University – NYC Alumni Entrepreneur Panel, May 18, 2016
- CoreNet Atlanta – Speaker, "Lease Accounting Changes," August 21, 2014
- Speaker, New York State Society of CPAs' 2012 Employee Benefits Conference, January 31, 2012, "Restructuring and Bankruptcy Considerations for Defined Benefit Pension Plans."
- Speaker, New York State Society of CPAs' 2010 Employee Benefits Conference, May 6, 2010,
     "FASB 157 and Plan Investments"
- Speaker, New York Tax Study Group, January 25, 2010,
     "Estate Tax Reform: Hot-Button Issues"
- Speaker, New York Tax Study Group, February 17, 2009, Eisner and Lubin LLP conference
     "Business Valuation and Tax Case Law Update: Spotting Red Flags"
- Key-Note Speaker, Hamptons Roads Tax Forum, Virginia Beach, VA, May 21, 2008
     "International Transfer Pricing: Latest Trends and Developments"

## Noteworthy Continuing Education Courses & Conferences Attended

- AICPA Annual Business Valuation Conference
- National Association of Certified Valuation Analysts: Annual Conference
- New York State Society of CPAs: Alternative Investment Conferences
- New York State Society of CPAs: Business Valuation Conferences
- New York State Society of CPAs: Employee Benefit Conferences
- New York State Society of CPAs: Real Estate Conferences
- Hundreds of Online CPE Courses Across Diversified Financial Advisory Services

