UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

MICHAEL DARDASHTIAN, individually and
on behalf of COOPER SQUARE, LLC a/k/a
COOPER SQUARE VENTURES,
LLC, NDAP, LLC and CHANNELREPLY,                    1:17 Civ.4327 ( LLS) (RWL)

                                    Plaintiffs,

        -against-

DAVID GITMAN, ACCEL COMMERCE, LLC,
DALVA VENTURES, LLC, KONSTANTYN
BAGAIEV, OLESKSII GLUKHAREV and
CHANNEL REPLY, INC.,

                                    Defendants.

-------------------------------------------------------------X


**<u>PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION
FOR PARTIAL- SUMMARY JUDGMENT AND DISMISSAL OF DEFENDANTS'
COUNTERCLAIMS</u>**


Dated: August 14, 2020



**GUAGLARDI & MELITI, LLP**


Barry S. Guaglardi (BG24501)
Evan A. Ostrer (EO1099)
365 West Passaic Street, Suite 130
Rochelle Park, New Jersey 07662
(201) 947-4100

*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

Page No(s).

PRELIMINARY STATEMENT AND RELEVANT PROCEDURAL HISTORY........ 1

STATEMENT OF FACTS ...................................................................... 5

ARGUMENT ..................................................................................... 5

I.     SUMMARY JUDGMENT SHOULD BE ENTERED AS
TO COUNT 20 COMPELLING A REDEMPTION OF ALL
OF DEFENDANT GITMAN'S RIGHT, TITLE AND
STOCK INTEREST IN PLAINTIFF COMPANIES ............................7

     A.  GITMAN'S WILLFUL AND SERIOUS MISCONDUCT
TRIGGERS THE REDEMPTION OF HIS RIGHT, TITLE
AND MEMBERSHIP INTERESTS IN CSV, AND
JUSTIFIES PARTIAL SUMMARY JUDGMENT IN FAVOR
OF PLAINTIFFS AS TO COUNT TWO (2)
OF THE AMENDED COMPLAINT ........................................... ...15

     B. GITMAN'S FRAUD AND DISHONESTY REQUIRES THE
REDEMPTION OF HIS MEMBERSHIP AND ENTITLES
PLAINTIFFS SUMMARY JUDGMENT AS TO
COUNTS 5, 10, 12, 18, 19 OF THE AMENDED COMPLAINT .......... ...22

     1.  Summary Judgment Should Be Entered as to Count Five (5) ................... 22

     2.  Summary Judgment Should Be Entered As To Count 10 ..................... ...28

     3.  Summary Judgment Should be Entered as to Count 12 ..........…............. 30

     4.  Summary Judgment Should Also Be Entered as to Count Eighteen (18) ...... 31

     5.  Plaintiffs Are Also Entitled to Summary Judgment as to Count
Nineteen (19) ................................................................... 33

     C. GITMAN'S BREACH OF THE CSV OPERATING AGREEMENT
REQUIRES THE REDEMPTION OF ALL OF HIS RIGHT, TITLE
AND MEMBERSHIP INTEREST IN PLAINTIFF COMPANIES,
AND FURTHER JUSTIFIES THE GRANT OF SUMMARY
JUDGMENT IN FAVOR OF PLAINTIFFS AS TO
COUNT 7 INCLUDING AN AWARD OF ATTORNEY'S FEES ..…........ 36

i

        1.  Breach of the CSV Operating Agreement ................................36

        2.  Judgment For Attorney's Fees in favor of Plaintiffs ..................... 38

   D.  AS A RESULT OF THE VARIOUS ACTS OF MALFEASANCE
       COMMITTED BY GITMAN CSV SENT THE REQUIRED
       NOTICE FOR THE REDEMPTION TO GITMAN ...........…........ 40

   E.  THE PURCHASE PRICE FOR THE REDEMPTION OF GITMAN'S
       INTEREST IN THE PLAINTIFF COMPANIES SHALL BE AS SET
       FORTH IN THE PLAINTIFFS' VALUATION REPORT ................... 41

II.      DEFENDANT GITMAN'S COUNTERCLAIMS SHOULD BE
       DISMISSED IN THEIR ENTIRETY ........................................... 44

   A.  PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT
       ON DEFENDANTS' INDIVIDUAL AND DERIVATIVE
       CLAIMS FOR BREACH OF FIDUCIARY DUTY ........................... 44

   B.  PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT
       ON DEFENDANTS' THIRD COUNTERCLAIM FOR
       BREACH OF CONTRACT ....................................................... 53

   C.  PLAINTIFFS ARE ENTITELD TO SUMMARY JUDGMENT ON
       DEFENDANTS' FOURTH COUNTERCLAIM FOR TORTIOUS
       INTERFERENCE WITH CONTRACT ......................................... 56

   D.  PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON
       DEFENDANTS' FIFTH COUNTERCLAIM FOR TORTIOUS
       INTERFERENCE WITH PROSPECTIVE ECONOMIC
       ADVANTAGE ..................................................…........ 58

   E.  PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT
       ON DEFENDANTS' CLAIM FOR UNJUST ENRICHMENT AND
       THE IMPOSITION OF A CONSTRUCTIVE TRUST ........…........ 61

   F.  PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON
       DEFENDANTS' SEVENTH COUNTERCLAIM FOR
       DECLARATORY JUDGMENT, WHICH SEEKS A
       DECLARATION THAT GITMAN IS FREE TO COMPETE ...…........ 63

   G.  PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT
       ON DEFENDANTS' EIGHTH COUNTERCLAIM
       FOR ACCOUNTING ............................…............................ 67

H. PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON DEFENDANTS' NINTH COUNTERCLAIM FOR DECLARATORY JUDGMENT, WHICH SEEKS A DECLARATION THAT GITMAN HAS A 67.5% OWNERSHIP INTEREST IN CHANNELREPLY …………………………..…………… 69

I. DEFENDANTS' REQUEST FOR A JURY TRIAL SHOULD BE STRICKEN PURSUANT TO THE CSV OPERATING AGREEMENT …………………………………………………..…….. 71

CONCLUSION ………………………………………………………..…….. 71

# TABLE OF AUTHORITIES

**Page No(s).**

**Cases**

Alb.-Plattsburgh United Corp. v. Bell, 307 A.D.2d 416 (3d Dep't 2003) .................................. 48

Alvarez v. Prospect Hosp., 68 N.Y.2d 320 (1986) ................................................................... 53

Ashland Mgmt. v. Janien, 82 N.Y.2d 395 (1993) .................................................................... 34

Balta v. Ayco Co., LP, 626 F. Supp. 2d 347 (W.D.N.Y. 2009) ............................................ 44,45

Birnbaum v. Birnbaum, 73 N.Y.2d 461 (1989) ........................................................................16

Bright View Trading Co. v. Park, No. 03 Civ. 2330 (HB), 2004 U.S. Dist. LEXIS 18572
(S.D.N.Y. Sept. 15, 2004) ....................................................................................................... 29

Brooks v. Key Tr. Co. Nat'l Ass'n, 26 A.D.3d 628 (3d Dep't 2006) ......................................... 46

Carvel Corp. v. Noonan, 3 N.Y.3d 182 (2004) .................................................................. 56, 57

CBS Corp. v. Dumsday, 268 A.D.2d 350, 702 N.Y.S.2d 248 (1st Dep't 2000) ........................ 66

Celle v. Barclays Bank Pub. Ltd. Co., 48 A.D.3d 301 (1st Dep't 2008) .................................... 44

Chris Demetriades & Demetriades Devs. v. Kaufmann , 698 F. Supp. 521 (S.D.N.Y. 1988) .... 32

Colavito v. N.Y. Organ Donor Network, Inc., 8 N.Y.3d 43 (2006) ........................................... 28

Comput. Assoc. Int'l, Inc. v. Bryan, 784 F. Supp. 982 (E.D.N.Y. 1992) .................................. 35

Comput. Assocs. Int'l v. Altai, 982 F.2d 693 (2d Cir. 1992) .................................................... 35

Cruz v. McAneney, 31 A.D.3d 54 (2d Dep't 2006) .................................................................. 61

Duane Jones Co. v. Burke, 306 N.Y. 172 (1954) ..................................................................... 64

Electrolux Corp. v. Val-Worth, Inc., 6 N.Y.2d 556 (1959) ...................................................... 32

Farago Advert., Inc. v. Hollinger Int'l, Inc., 157 F. Supp. 2d 252 (S.D.N.Y. 2001) ................... 37

Florence, E. & W. v. R. Co. v. Pember , 26 P. 1 (Kan. 1891) .................................................. 20

Forschner Grp. v. Arrow Trading Co., 904 F. Supp. 1409 (S.D.N.Y. 1995) ............................. 30

Glen Cove Assocs., L.P. v. N. Shore Univ. Hosp., 240 A.D.2d 701 (2d Dep't 1997) .... 58, 59-60

Integrated Cash Mgmt. Servs. v. Digit. Transactions, Inc., 920 F.2d 171 (2d Cir. 1990) ........... 34

Kalikow v. Shalik, 43 Misc. 3d 817, 986 N.Y.S.2d 762 (Sup. Ct. of New York, Nassau Cnty.
2014) ........................................................................................................................................16

Klein v. Lawson, 58 N.Y.S.2d 152 (Sup. Ct. 1945) ................................................................. 65

Kurtzman v. Bergstol, 40 A.D.3d 588 (2d Dep't 2007) ............................................................ 44

Lama Holding Co. v. Smith Barney Inc., 88 N.Y.2d 413 (1996) ............................................... 56

Lawrence v. Kennedy, 95 A.D.3d 955 (2d Dep't 2012) ............................................................ 67

Linkco, Inc. v. Fujitsu Ltd., 230 F. Supp. 2d 492 (S.D.N.Y. 2002) ............................... 32, 33, 35

Long Is. Light. Co. v. Allianz Underwriters Ins. Co., 35 A.D.3d 253 (1st Dep't 2006) ............. 62

LoPresti v. Terwilliger, 126 F.3d 34 (2d Cir. 1997) .................................................................. 28

N.Y. Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc. , 599 F.3d 102 (2d Cir. 2010) ............... 31

NBT Bancorp v. Fleet/Norstar Fin. Grp., 215 A.D.2d 990 (3d Dep't 1995) ............................. 58

Newbro v. Freed, 409 F. Supp. 2d 386 (S.D.N.Y. 2006) ......................................................... 28

Pacheco v. United Med. Assocs., P.C., 305 A.D.2d 711 (3d Dep't 2003) ................................ 56

Pamilla v. Hosp. for Special Surgery, 223 A.D.2d 508 (1st Dep't 1996) ................................. 60

Paradiso & DiMenna, Inc. v. DiMenna , 649 N.Y.S.2d 126 (1st Dep't 1996) ........................... 29

Paramount Film Distrib. Corp. v. State, 30 N.Y.2d 415, 285 N.E.2d 695, 334 N.Y.S.2d 388 (1972) ...................................................................................................................................... 61

Pokoik v. Pokoik, 982 N.Y.S.2d 67 (1st Dep't 2014) .............................................................. 44

Pross v. Jadam Equities, Ltd., 134 A.D.2d 154 (1st Dep't 1987) ............................................. 69

Q-Colo. Indus. v. Hoffman, 625 F. Supp. 608 (S.D.N.Y. 1985) .............................................. 35

Slabakis v. Schik, 2016 N.Y. Slip Op. 31584(U) (2016) ......................................................... 58

Sykes v. RFD Third Ave. I Assoc., L.L.C., 39 A.D.3d 279, 833 N.Y.S.2d 76 (1st Dep't 2007) 38

Thome v. Alexander & Louisa Calder Found. , 70 A.D.3d 88 (1st Dep't 2009) ........................ 69

Thyroff v. Nationwide Mut. Ins. Co., 8 N.Y.3d 283 (2007) ..................................................... 29

United Drug Co. v. Theodore Rectanus Co., 248 U.S. 90 (1918) ......................................... 65, 66

United States v. Hsu, 155 F.3d 189 (3d Cir. 1998) ..................................................................23

Vogt v. Witmeyer, 87 N.Y.2d 998 (1996) ............................................................................... 60

Wechsler v. Hunt Health Sys., 330 F. Supp. 2d 383 (S.D.N.Y. 2004) ...................................... 35

White v. Ivy, 63 A.D.3d 1236 (3d Dep't 2009) ....................................................................... 56

Williams & Co. v. Collins, Tuttle & Co. , 6 A.D.2d 302, 176 N.Y.S.2d 99 (1st Dep't 1958) .... 56

Yafa Jewelry, Inc. v. All Those Underwriters Subscribing to Policy of Ins. Numbered 96FA0026180A, 96 A. 307, 42 F. Supp. 2d 307 (S.D.N.Y. 1999) .............................................. 37

## Statutes

N.Y. C.P.L.R. 3001 ............................................................................................................. 3, 7

18 U.S.C. § 1836(b)(3) (2018) .................................................................................... 5,22,23,28

18 U.S.C. § 1832 (2018) ............................................................................................... 6, 22, 28

18 U.S.C. § 1846 (2018) ........................................................................................................... 6

15 U.S.C. § 1125 (2018) .............................................................................................. 6, 30, 31

N.Y. C.P.L.R. 5.2(b) ................................................................................................................ 8

N.Y. C.P.L.R. 16.2 ............................................................................................................ 8, 42

N.Y. Ltd. Liab. Co. Law § 409 ............................................................................................... 15

N.Y. Bus. Corp. Law § 626(e) ................................................................................ 38

18 U.S.C. § 135 (2013) ......................................................................................... 69

## **Rules**

NY CLS LLC 702 ............................................................................................... 3, 7

Rule 56 ............................................................................................................... 5,6

Restatement (Second) of Torts § 757 (1979) ....................................................... 34

Restatement, Torts, § 755 .................................................................................... 65

Plaintiffs respectfully submit this memorandum of law in support of Plaintiffs' within motion for partial-summary judgment on Counts 2, 5, 7, 10, 12, 18, 19 and 20 of Plaintiffs' First Amended Verified Complaint, dated May 1, 2020, and dismissing Defendants Amended Counterclaims, dated June 9, 2020, in their entirety.

**PRELIMINARY STATEMENT**
**AND RELEVANT PROCEDURAL HISTORY**

On June 8, 2017, this Action commenced by way of Order to Show Cause and Verified Complaint against the Defendants, alleging various claims against Gitman, including Gitman's breach of fiduciary duty, misappropriation of trade secrets, conversion, and unlawful competition under federal and state law. (See Verified Complaint, Declaration of Barry Guaglardi, hereinafter "Guaglardi Decl." at Exhibit A). This Action was commenced on an emergent basis as a result of Gitman "locking out" Dardashtian from approximately twenty-one (21) of the Cooper Square Ventures, LLC ("CSV") NDAP, LLC ("NDAP") and ChannelReply (hereinafter collectively the "Plaintiff Companies") electronic operating accounts; unlawfully transferring and otherwise misappropriating CSV and ChannelReply's confidential and proprietary information and trade secrets into Gitman's newly formed competing company (namely Channel Reply Inc.); soliciting the Plaintiff Companies' developers ("Developers") to join Gitman's competing company, Channel Reply Inc., and unlawfully transferring all of the funds maintained in the Plaintiff Companies' operating accounts to Defendants' own banking account, increasing the Plaintiff Companies' debt and jeopardizing the Plaintiff Companies' ability to do business. (Id at Exhibit G).

On June 9, 2017, Dardashtian obtained from this Court temporary restraints, including, but not limited to, in sum and substance, the requirement that Gitman immediately restore Dardashtian's access to all of the Plaintiff Companies' electronic and operating accounts, re-

1

deposit the $73,982.53 that Gitman unlawfully transferred from the Plaintiff Companies' bank account, and restraining Gitman from sharing and/or utilizing the ChannelReply code in his competing company, Channel Reply Inc. (Id).

After hearing the parties on June 19, 2017 and June 21, 2017, and after reviewing the orders issued by Judge Ramos on June 8, 2017 and June 9, 2017, and this Court on June 19, 2017, Dardashtian obtained from this Court preliminary injunctive relief, granting the same relief set forth above and as specifically set forth in the Court's Order, in addition to the removal of Gitman as co-manager of the Plaintiff Companies (See Court's Order dated June 21, 2017 at Guaglardi Decl. Ex. H). In Gitman's Affidavit to the Court on June 19, 2020, Gitman claimed that his newly formed e-commerce businesses Accel was for Gitman to work on his "own" and that Gitman's involvement with his partner, Jeremy Falk "was limited to Mr. Falk *advising* [Gitman] from time-to-time on finance and accounting…" (Guaglardi Decl. J at para 110). It was later revealed through discovery that Gitman and Falk were both members of two e-commerce companies, Defendants Accel Commerce and Dalva Ventures, and had signed operating agreements well before Gitman's June 19, 2017 Affidavit.(Dardashtian Aff. Exs. 37, 39; see also Accel Profit and Loss Statements at Ex. 38).

On June 21, 2017, this matter was transferred to the Honorable James C. Francis, IV, U.S.M.J., regarding Gitman's compliance with the Orders of this Court, for the purpose of restoring the factual situation to that existing on May 26, 2017 and to recommend directions to be included in a preliminary injunction as necessary to address [Defendant Gitman's] continuing violations.

On July 14, 2017, Defendants Gitman, Accel Commerce, LLC, Dalva Ventures, LLC and Channel Reply Inc. moved for dismissal of Plaintiffs' Complaint. The motion was granted in part

and denied in part by Opinion and Order of this Court dated November 28, 2017. In sum, this Court dismissed Plaintiffs' claims of Gitman's violation of the CFAA, identity theft and injunctive relief (as an independent claim). All other claims by Plaintiffs remain against these Defendants[1]. (See Court's Opinion and Order dated November 28, 2011 at Guaglardi Decl. Ex. I).

By Order dated October 10, 2017, Judge Francis Ordered that Plaintiffs' motion for a preliminary injunction be consolidated with an expedited trial on the merits, and shall remain in full force and effect pending trial. On October 30, 2017, this matter was re-designated to Judge Robert W. Lehrburger, U.S.M.J., for completion of discovery, all specific non-dispositive disputes between the parties and a potential resolution of this matter. From October, 2017, through December, 2018, the parties attended status and settlement conferences with the Court, and met directly through counsel, and it was apparent that a resolution could not be accomplished. On November 25, 2019, Judge Lehrburger granted Defendants' former counsel, Denton's motion to withdraw, and numerous Scheduling Orders have followed for completion of discovery. Defendant Gitman's delays, obfuscation and disregard of discovery and the Scheduling Orders of the Court are not addressed herein.

On May 1, 2020, Plaintiffs filed their First Amended Verified Complaint, adding two counts: Count Twenty (20) Declaratory Judgment pursuant to NY CPLR 3001, compelling the redemption of all of Defendant Gitman's right, title and interests in the Plaintiff Companies pursuant to Article 11.5 of the CSV Operating Agreement; and Count Twenty-One (21) Judicial Dissolution of CSV and its wholly owned companies pursuant to NY CLS LLC 702 and Articles 4.2 and 16 of the CSV Operating Agreement, and ordering Plaintiff Dardashtian and/or Plaintiff

---

[1] All claims against Jeremy Falk and Summit Rock Holdings, LLC were dismissed by way of Stipulation and Order of Dismissal on January 10, 2018 [ECF #74].

CSV to be permitted to equitably buy-out all of Defendant Gitman's right, title and membership interests in the Plaintiff Companies. (See Guaglardi Decl. at Ex. D pp. 70- 73).

On May 1, 2020 and May 2, 2020, CSV issued and otherwise served a Notice of Redemption ("Redemption") to Gitman seeking to redeem all of Defendant Gitman's right, title and membership interests in the Plaintiff Companies pursuant to Article 11.5 of the CSV Operating Agreement (Guaglardi Decl. at Ex. N). The closing of the Redemption was scheduled to take place on June 1, 2020 ("Redemption Closing Date") upon which all transfer documents would be presented to Defendant Gitman for purposes of the redemption of his right, title and interests in the Plaintiff Companies, which would effectively resolve most claims in dispute among the parties. The Redemption Notice was duly received by Gitman on May 4, 2020. On May 6, 2020, Gitman issued a "Rejection of Notice of Redemption" to CSV. (Guaglardi Decl. at Ex. O).

By Stipulation dated May 29, 2020, it was agreed by and among the parties to maintain the status quo. The parties agreed that the Redemption Closing Date would be postponed, without prejudice to Plaintiffs' rights, and for such relief to be addressed within Plaintiffs' motion for summary judgment against Defendants. It was agreed among the parties that the Redemption Closing would await a decision by this Court granting and/or approving such relief requested by Plaintiffs. (Guaglardi Decl. Ex. P).

On June 18, 2020, after the conclusion of party depositions, Defendants produced responses to Plaintiffs' post-deposition discovery demands. Defendants' responses confirmed that Defendants are not in possession of any documents or information to support their counterclaims as further addressed herein (Guaglardi Decl. Ex. M). Defendants' failure to substantiate their claims and/or refute Plaintiffs' claims only further supports an award of

summary judgment in Plaintiffs' favor with an award of attorney's fees in favor of Plaintiffs and

against Defendants in accordance with the parties' CSV Operating Agreement and applicable

law.

## STATEMENT OF FACTS

It is respectfully submitted that there are sufficient material facts not in dispute for this

Court to decide on summary judgment for each claim set forth herein. Plaintiffs respectfully refer

this Court to Plaintiffs' Rule 56.1 Statement of Undisputed Facts ("Statement of Facts"); the

Affidavit of Michael Dardashtian ("Dardashtian Aff."), Affidavit of Carleen Gaskin ("Gaskin

Aff"), Affidavit of Konstantyn Bagaiev ("Bagaiev Aff."); Declaration of Joel Liebman, C.P.A.;

with all accompanying exhibits annexed thereto, for a detailed statement of relevant facts in

support of the instant motion.[2]

## ARGUMENT

Summary Judgment is appropriate when the record shows that there is no genuine dispute

as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.

R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S. Ct. 2505, 91 L.

Ed. 2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-26, 106 S. Ct. 2548, 91 L. Ed. 2d

265 (1986). A genuine dispute only exists "if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The moving party initially bears the burden of informing the Court of the absence of a

genuine dispute of material fact by citing particular evidence in the record. Fed. R. Civ. P.

---

[2] Plaintiffs do not address Count 1 (Injunctive Relief) which the Court found could not be asserted as an independent cause of action (Guaglardi Decl. Ex. I); Count 4 (Aiding and Abetting Breach of Fiduciary Duties) as such claims rely and depend on Plaintiffs' Breach of Fiduciary Duty claim (Count 2); Count 6 (in part which seeks injunctive relief pursuant to 18 USC 1836(b)(3); Count 9 (Breach of Fair Dealing) for it falls within Plaintiffs' other tort-based claims, which are reserved for trial, if necessary; Counts 11 and 14 (Civil Conspiracy) as such claims rely and depend on Plaintiffs' other tort-based claims, which are reserved for trial, if necessary; Count 16 (Defamation) which is reserved for trial, if necessary.

56(c)(1); *Celotex*, 477 U.S. at 323-24; *Koch v. Town of Brattleboro*, 287 F.3d 162, 165 (2d Cir. 2002). If the nonmoving party has the ultimate burden of proof on specific issues at trial, the movant may also satisfy its own summary judgment burden by demonstrating that the adverse party cannot produce admissible evidence to support an issue of fact. *Celotex*, 477 U.S. at 322-23; *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam). If the moving party meets its initial burden, the burden then shifts to the opposing party to establish a genuine dispute of material fact. *Beard v. Banks*, 548 U.S. 521, 529, 126 S. Ct. 2572, 165 L. Ed. 2d 697 (2006); *PepsiCo*, 315 F.3d at 105.

However, in order to defeat a motion for summary judgment the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). The nonmoving party "must present concrete particulars and cannot succeed with purely conclusory allegations." *Marathon Enterprises, Inc. v. Schroter GMBH & Co. KG*, No. 01 Civ. 595, 2003 U.S. Dist. LEXIS 2274, 2003 WL 355238, at *4 (S.D.N.Y. Feb. 18, 2003) (internal quotation marks and citation omitted). "There is no issue for trial unless there exists sufficient evidence in the record favoring the party opposing summary judgment to support a jury verdict in that party's favor." *Id.* "[I]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* (quoting *Anderson*, 477 U.S. at 249-50). In deciding the motion, the Court views the record in the light most favorable to the nonmoving party. *Koch*, 287 F.3d at 165.

For the reasons set forth below, Plaintiffs are entitled to Summary Judgment as to Counts 2 (Breach of Fiduciary Duty), 5 (Violation of 18 USC 1832 and 18 USC 1836), 7 (Breach of Contract), 10 (Conversion), 12 (Unfair Competition 15 USC 1125), 15 (Tortious Interference),

18 (Unfair Competition under NY State Law), 19 (Misappropriation of Trade Secrets), 20

(Declaratory Judgment under CPLR 3001), 21 (Equitable Buy-Out under NY CLS LLC 702)  of

the Amended Complaint.

## I.   SUMMARY JUDGMENT SHOULD BE ENTERED AS TO COUNT 20 COMPELLING A REDEMPTION OF ALL OF DEFENDANT GITMAN'S RIGHT, TITLE AND STOCK INTEREST IN PLAINTIFF COMPANIES

This Court "may render a declaratory judgment having the effect of a final judgment as to

the rights and other legal relations of the parties to a justiciable controversy whether or not

further relief is or could be claimed." NY CPLR 3001.

Pursuant to Article 11.5(a) of the CSV Operating Agreement signed by Defendant

Gitman "the interests of any Member in the Company shall be subject to redemption (i.e.,

purchase by the Company) as provided in this Section." (See CSV Operating Agreement at

Dardashtian Aff. Ex. 2).

Pursuant to Article 11.5(b) of the CSV Operating Agreement, it states, in pertinent part:

The decision to redeem a Member's interest in the Company in accordance with this Section shall be made by Management in its sole discretion, but only in the following circumstances applicable to a Member:

(i)     Willful or serious misconduct by the Member with respect to the business, operations or assets of the Company.

(ii)    Fraud or dishonesty on the part of the Member, whether or not with respect to the business or affairs of the Company, which affects the business, operations, assets or reputation of the Company.

(iii)   The Member's conviction of a felony crime, or a non-felony crime involving an act of moral turpitude.

(iv)    A transfer by the member of its interest in the company in violation of this Agreement.

(v)     An attempt by the Member to withdraw from the Company in violation of this Agreement.

(vi)    An attempt by the Member to partition the property of the Company in violation of this Agreement.

(vii)   A breach by the Member of any of the other terms, conditions and obligations contained in this Agreement.

(viii)   A failure to contribute additional capital to the Company pursuant to Management's call in Section 5.2(b) above.

(ix)   A breach by the Member of any employment agreement between the Member and the Company.

(x)   Any event resulting in a separation of the Member from service to the Company as an employee, contractor or agent.

Further, Article 11.5(c) of the CSV Operating Agreement, states, in pertinent part,

> If Management decides to redeem a Member in accordance with this Section, Management shall send such Member (the "Redeemed Member") written notice (the "Redemption Notice") of its decision. The Redemption Notice shall specify the date on which the redemption shall close (the "Redemption Closing Date"); the Redemption Closing Date shall be established in accordance with paragraph (f).

Article 11.5(d) of the CSV Operating Agreement, states, in pertinent part,

> The purchase price (the "Purchase Price") of a Redeemed Member's interest shall be equal to (i) the amount that the Redeemed Member would have received had the Company (A) terminated on the date the Redemption Notice was given, (B) sold all of its assets at their fair market values on the date the Redemption Notice was given, (C) satisfied all of its debts and obligations and (D) made distributions to the Members in accordance with Section 16.2....

Pursuant to Article 11.5(d) of the CSV Operating Agreement, it states, in pertinent part, that "the fair market value of the Company's assets shall be determined by Management."

Here, as shown below, Defendant Gitman committed several violations triggering the redemption of his membership interest in CSV. Not only do Defendant Gitman's acts require the redemption of his right, title and membership interest in CSV, but they also justify the entry of Summary Judgment in favor of Plaintiffs as to several other counts contained in Plaintiffs' Amended Complaint.

Gitman's violations of Article 11.5(b) of the CSV Operating Agreement, include, but are not limited to the following:

A. On May 27, 2017, without the consent or knowledge of Michael Dardashtian, Gitman caused $73,982.53 to be withdrawn from the CSV Bank of America operating account ending #7345 and deposited into a banking account maintained and owned solely by Gitman which actions are contrary to Article 9 of the CSV Operating Agreement and applicable law. On said date, Gitman's unauthorized withdrawal of CSV's funds undermined CSV's ability to

properly maintain the operation of Plaintiff Companies. Gitman has acknowledged such actions in writings to Dardashtian and in his Affidavit to this Court. See Dardashtian Aff. at Ex. 24 p.1; see also Guaglardi Decl. Ex. J at para 66 "I moved the money from the CSV bank account into a call account…").

B.  On May 28, 2017, CSV's Bank of America operating account balance was overdrawn by negative $10.89 as a result of Mr. Gitman's actions. (Dardashtian Aff. Ex. 63)

C.  Plaintiffs had no access to the funds unlawfully withdrawn by Gitman nor knowledge of their whereabouts. (Dardashtian Aff. Ex. 64).

D.  On or about May 29, 2017, and continuing thereafter, Gitman unilaterally canceled Dardashtian's participation in pre-scheduled weekly conference calls with the Plaintiff Companies' Developers, Konstantyn Bagaiev and Oleksii Glukharev (referred to herein as the "Developers") who were assisting in the operation and maintenance of ChannelReply and its platform. (Id.)

E.  Without Dardashtian's knowledge or authorization, Gitman removed scheduled events from Dardashtian's calendar so that he could not join Skype conferences with the Plaintiff Companies' Developers , terminated Dardashtian's access to the Plaintiff Companies' electronic accounts and funds and removed Dardashtian's ability to obtain updates and/or participate in ChannelReply's daily business operation as had been customary in the past and which Dardashtian was otherwise entitled to do as a Co-Manager and 50% owner of the Plaintiff Companies. (Id.)

F.  On May 30, 2017, Gitman formed Channel Reply Inc., an entity of which Dardashtian was not an owner, to directly compete with ChannelReply, without Dardashtian's knowledge or consent. Gitman, without authorization from Dardashtian, unlawfully usurped CSV and ChannelReply's proprietary assets, customers, electronic accounts, proprietary software code, email accounts and confidential information for Gitman's own use, through Channel Reply Inc., thereby effectively converting and otherwise misappropriating ChannelReply, and all of its assets, including but not limited to, its tradename, electronic and other accounts, customer lists, trade secrets, intellectual and proprietary property, software, relationship with Plaintiff Companies' developers and the code used to operate ChannelReply. (Dardashtian Aff. Exs 26; 41, 42).

G.  Gitman's formation of Channel Reply Inc. unlawfully used the ChannelReply tradename owned by CSV in a further effort to unlawfully compete with CSV and ChannelReply. (Id.)

H.  On or about June 1, 2017,  Gitman sent agreements, prepared by or on behalf of Gitman, to the Plaintiff Companies' Developers, Konstantyn Bagaiev (referred to herein as "Bagaiev") and Oleksii Glukharev (referred to herein as "Glukharev")(collectively referred to herein as the "Plaintiff Companies' Developers" or "Developers"), seeking to induce the Plaintiff

Companies' Developers to terminate their business relationships with the Plaintiff Companies and Dardashtian, and to join Gitman as a co-owner, employee and/or independent contractor of Channel Reply Inc., thereby seeking to interfere with ChannelReply's orderly operation, all with the intent to harm and otherwise damage the Plaintiff Companies. (Dardashtian Aff. Ex. 42). Gitman was later involved in the preparation and/or review of the actual termination letters prepared for and on behalf of the Plaintiff Companies' Developers. Dardashtian Aff. (Dardashtian Aff. Ex. 34, Guaglardi Decl. Ex. Q pp. 34-35; Bagaiev Aff. Ex. A). Gitman further made defamatory statements against Dardashtian to Plaintiff Companies' Developers to further induce their departure from Plaintiff Companies and attempt to sour their relationship with Dardashtian and loyalty to the Plaintiff Companies. Gitman also orally and in writing, encouraged Plaintiff Companies' Developers to delete their texts with Gitman, and to not to communicate with Dardashtian. (Guaglardi Decl. Ex. Q at p. 40, Dardashtian Aff. Ex. 146).

I.  Without the consent of Dardashtian, on June 2, 2017 and continuing thereafter, Gitman made debits from the CSV operating account, including for his BMW automobile lease payment and a $3,500 payment to amazon web services using a Plaintiff Companies' American Express credit card, thereby increasing CSV's debt to over $7,000.00.(Dardashtian Aff. Exhibits 71, 72a, 72b).  Gitman further admits that he "mistakenly" used CSV's funds to pay his personal counsel Umar Farooq, which he reimbursed to the Plaintiff Companies from his Dalva Ventures bank account. (Dardashtian Aff. Ex. 44; see also, Guaglardi Decl. Ex. J at para 83 "I did mistakenly thereafter transfer out $5,050…").

J.  On or about and between June 2, 2017 through July 8, 2017, Gitman exceeded and abused his then existing authorization to access the Plaintiff Companies' online electronic accounts by terminating Co-Manager Dardashtian's access thereto. The Plaintiff Companies' accounts for which Gitman terminated Dardashtian's access include, but are not limited to, the following:

   a.  1Password Account – this is a password and login account management system. It holds all of Michael Dardashtian's personal passwords and the companies shared passwords. The account was paid for out of Plaintiff Companies' funds.

   b.  Chargebee Account – This is the Plaintiff Companies' subscription management account that holds the customer information and billing information for the Plaintiff Companies, including ChannelReply's customers.

   c.  Stripe Account – This is the Plaintiff Companies' credit card billing service that allows the Plaintiff Companies to receive credit card payments from ChannelReply customers.

   d.  PayPal Account – This is an online payment system which allows the Plaintiff Companies to take online payments from ChannelReply customers.

e.   Upwork Account – This is a freelancer marketplace that allows the Plaintiff Companies to hire and pay freelancers to run the ChannelReply business owned by CSV.

f.   Zendesk Accounts – This is a customer service management account which allows the Plaintiff Companies to communicate with their customers through support tickets.

g.   JIRA Account – This is a project management software that allows the Plaintiff Companies to manage projects effectively for business tasks.

h.   Slack – This is a messaging management software for CSV's business that allows Plaintiff Companies' employees and freelancers to openly communicate with one another and share documents.

i.   Amazon Seller Central – This is the Plaintiff Companies' Amazon seller account that allows the Company to sell products on Amazon and manage MWS accounts for ChannelReply sellers.

j.   eBay Accounts – This allows the Plaintiff Companies to sell products on eBay and manage their eBay subscription identifications for ChannelReply sellers.

k.   Timedoctor – This allows the Plaintiff Companies to manage the time management of employees and freelancers via an online portal to track time and take screenshots of employees and freelancer work.

l.   Amazon Web Services (AWS) – This allows the Plaintiff Companies to manage all of their Amazon Web Servers which keep the businesses servers running effectively.

m.   American Express Account – This is a NDAP corporate credit card account used by the Plaintiff Companies in their business operation.

n.   Magento Accounts – This is the Plaintiff Companies' Magento Administrator which allows the Plaintiff Companies to monitor all backend data associated with their business.

o.   QuickBooks Accounts. This provides access to the Plaintiff Companies' QuickBooks accounts.

p.   Desk.com Account - This is a customer service management account which allows the Plaintiff Companies to communicate with their customers through support tickets.

q.   Godaddy Account – the Plaintiff Companies have an account with godaddy which owns and operates many domains. Mr. Gitman terminated Dardashtian from his previously existing login access to Godaddy .

r.   Magemojo – This is the Plaintiff Companies' Magento hosted server account.

s.   Mailchimp – This is the Plaintiff Companies' email subscription newsletter account.

t.   Github – This is where all of the Plaintiff Companies' software is checked in and stored for sharing.

u.   Ringcentral – This is the Plaintiff Companies' VOIP system that allows the Plaintiff Companies to make and receive internet phone calls and faxes.

v.   Join.me – This is a screenshare service that allows the Plaintiff Companies to communicate with customers.

Dardashtian Aff. Ex. 59

K.   Gitman unilaterally and without Dardashtian's knowledge and/or authorization, changed, altered and/or reset of all of the Plaintiff Companies' passwords, thereby deleting, terminating, removing and/or suspending Dardashtian's previously existing access to all of the Plaintiff Companies' above-referenced accounts. (Dardashtian Aff. Exs. 57a, 57b, 57c). Gitman admits to terminating Dardashtian's access to the Plaintiff Companies' accounts by transferring CSV's Chargebee and Stripe accounts to Channel Reply Inc. (Guaglardi Decl. Ex. J at para 96, Gitman certified "While at one point the Chargebee and Stripe accounts were moved to CR Inc., as of June 18, 2017 Dardashtian has access to these accounts").

L.   Gitman usurped Dardashtian's company email address so that customers and vendors could not reach Dardashtian and Gitman even placed his own face on Dardashtian's email profile causing confusion among Company customers, vendors and employees. Gitman acknowledges that "Any lockout was only temporary while things were cleared with accounting and properly set-up." However, changes were not temporary, as Gitman later admitted in a self-prepared spreadsheet that several accounts no longer existed, after his transfer of accounts including Dardashtian's business email address, ChannelReply's sales and support email addresses and Dardashtian's Slack account. (Guaglardi Aff. Ex. J at para 97; Dardashtian Aff. Ex. 146).

M.   Gitman misappropriated and diverted Plaintiff Companies' customer payments and revenues away from Plaintiff Companies using his control over Plaintiff Companies electronic payment portals. Gitman admits to the transfer (Id at para 82); and Channel Reply, Inc.'s bank records confirms the receipt of customer payments via Stripe (Dardashtian Aff. Ex. 41).

N.   Gitman further tried to hold up the sale of the assets of Plaintiff, NDAP, a Plaintiff, CSV owned and controlled company, and demanded financial concessions from Plaintiff Companies by issuing oral and written demands upon Dardashtian that he, in part, pay a portion of Plaintiff Companies' profits from the future sale of Plaintiff NDAP's assets to an employee named Alice Fritz and pay amounts in excess of what was agreed upon to broker, Jeremy Falk, who Gitman was secretly engaged in at least one competing business with at the

time, unbeknownst to Dardashtian or Plaintiff Companies. (See e.g. Dardashtian Aff. Ex. 24; 37, 39)

O.   Gitman, without Dardashtian's knowledge or consent, operated one or more competing businesses with Plaintiff Companies' broker Jeremy Falk while Falk was representing Plaintiff CSV as a broker for the sale of the assets of NDAP, and shared certain financial information related to Plaintiff Companies with Falk without Dardashtian's knowledge or consent and in violation of the CSV Operating Agreement. (Dardashtian Aff. Ex. 23, 37, 38, 39).

P.   Gitman previously attempted to obtain a paid job with a company that Plaintiff, CSV had invested in, named Sigmento, without disclosing this to Dardashtian. (Dardashtian Aff. para 6, 43, Ex. 1, 130).

Q.   As further stated above, Gitman also separated himself from serving the Plaintiff Companies by forming a competing company and converting/misappropriating Plaintiff Companies' assets, Developers, employees, funds, customers and confidential and proprietary information belonging to Plaintiff CSV and Plaintiff ChannelReply diverting same over to Gitman's newly formed competing company, Defendant, Channel Reply Inc, to the detriment of Plaintiff Companies.

R.   On or about June 20, 2017, Gitman conspired with and/or otherwise induced the Plaintiff Companies' Developers to resign from and otherwise terminate their business relationship with the Plaintiff Companies, including ChannelReply, in a further effort to shut down ChannelReply and unlawfully compete against Plaintiff Companies and ChannelReply using Mr. Gitman's newly formed entity, Channel Reply Inc., with the intent to harm the Plaintiff Companies (Dardashtian Aff. Ex. 34). As a direct result of the Plaintiff Companies' Developers' resignations, Plaintiff Companies were unable to service existing customers, lost new customers and had to expend considerable funds to train and hire third party contractors to take over for the newly departed Plaintiff Companies' Developers in order to keep the Plaintiff Companies' business operations afloat. (Guaglardi Decl. Ex. N).

S.   Prior to the commencement of this Action, Gitman also refused to speak to Dardashtian for months. Pending the sale of Buy Auto Parts, Gitman refused to participate in discussions relating to the sale impairing the ordinary function of the Plaintiff Companies' business (Dardashtian Aff. Ex. 145). Gitman further refused to meet with Dardashtian, seeing no "value in it." (Dardashtian Aff. Exs. 147 and 148. Gitman made multiple changes to the Plaintiff Companies' books and records and refused to back-up the books when making over a month of edits during due diligence related to the sale of Buy Auto Parts. (Dardashtian Aff. Ex. 119). Gitman's actions in refusing to speak to Dardashtian, altering the books, holding up the sale of BAP were additional breaches of his fiduciary duties to the Plaintiff Companies and Dardashtian, and contrary to his role as then co-manager of the Plaintiff Companies.

The facts are undisputed that as a result of the aforementioned events orchestrated by Mr.

13

Gitman, the Court ordered Gitman's temporary separation and removal as a Co-Manager to the Plaintiff Companies. By Order of the Honorable Louis L. Stanton, U.S.D.J. dated June 19, 2017 the Court granted preliminary injunctive relief, in part, in favor of the Plaintiff Companies and Plaintiff Dardashtian, against Gitman, including, but not being limited to, (i) the removal of Gitman as Co-Manager of the Plaintiff Companies (ii) for Gitman to fully restore the Plaintiff Companies' operating and banking accounts, and (iii) for Gitman to immediately dissolve Defendant Channel Reply Inc. Gitman was also ordered to restore Dardashtian's previously existing access to all Plaintiff Companies' electronic and other accounts (Guaglardi Decl. Ex. G).

Defendant Gitman signed the CSV Operating Agreement and has sought to enforce it in this litigation. As such, he should be bound by its terms. He has committed various violations of the CSV Operating Agreement, each of which justify the relief sought under Article 11.5 that is a Redemption of all of his right, title and interest in the Plaintiff Companies. Gitman's conduct is reprehensible and demonstrates an absolute disregard for his fiduciary duties to each of the Plaintiffs. Gitman has actually sought to harm the Plaintiff Companies, put them out of business, and compete with them, all for the purpose of his own pecuniary gain and personal satisfaction. There can be no more fair and just result than the redemption of Gitman's interests in the Plaintiff Companies. To permit Gitman to remain, would be illogical given his actions, all of which are not only undisputed, but boldly admitted by Gitman himself. Gitman advised this Court that he *will* compete with the Plaintiff Companies, even though he is a member of them. That statement by Gitman, and his conduct throughout this litigation, demonstrates a willful disregard of the basic good faith and fair dealing that is required among members of a business. The Plaintiff Companies have been able to operate successfully through the leadership of

14

Plaintiff Dardashtian solely because the Court has removed Defendant Gitman from management. Gitman's conduct justifies the redemption of his interests.

For these reasons set forth herein, the redemption of all of Gitman's right, title and ownership interests in the Plaintiff Companies is warranted, and Plaintiffs should be entitled to Summary Judgment on Count 20 of the Amended Verified Complaint. Gitman should be ordered to execute all documents necessary to effectuate the redemption of all of his right, title and interest in and to the Plaintiff Companies in accordance with the terms of the Redemption Notice, or an attorney in fact should be appointed to execute such transfer documents on Gitman's behalf.

## A. GITMAN'S WILLFUL AND SERIOUS MISCONDUCT TRIGGERS THE REDEMPTION OF HIS RIGHT, TITLE AND MEMBERSHIP INTERESTS IN CSV, AND SUPPORTS SUMMARY JUDGMENT IN FAVOR OF PLAINTIFFS AS TO COUNT TWO OF THE AMENDED COMPLAINT

Count Two (2) alleges breach of fiduciary duty.  The elements of a claim for breach of fiduciary duty are "(i) the existence of a fiduciary duty; (ii) a knowing breach of that duty; and (iii) damages resulting therefrom." Johnson v. Nextel Commc'ns, Inc., 660 F.3d 131 (2d Cir. 2011) (citing Barrett v. Freifeld, 883 NYS 2d 305 (N.Y. App. Div. 2009).

Pursuant to New York Consolidated Laws Service Limited Liability Company Law, §409, a manager of an LLC,

> "shall perform his or her duties as a manager, including his or her duties as a member of any class of managers, in good faith and with that degree of care that an ordinarily prudent person in a like position would use under similar circumstances."
>
> [NY CLS LLC §409(A)].

Further,

> "The acts of working in concert and managing a limited liability company clearly gives rise to a relationship among the members which is analogous to that of partners, who, as fiduciaries of one another, owe a duty of undivided loyalty to the partnership's interests."

15

[Kalikow v. Shalik, 43 Misc. 3d 817, 986 N.Y.S. 2d 762 (Supreme Court of New York, Nassau County, 2014), citing, Birnbaum v. Birnbaum, 73 N.Y.2d 461, 539 N.E.2d 574 (1989)].

It is also well settled that,

> "This is a sensitive and "inflexible rule of fidelity, barring not only blatant self-dealing, but also requiring avoidance of situations in which a fiduciary's personal interest possibly conflicts with the interest of those owed a fiduciary duty…Included within the rules broad scope is every situation in which a fiduciary, who is bound to single-mindedly pursue the interests of those to whom a duty of loyalty is owed, deals with a person, "in such close relation [to the fiduciary] that possible advantage to such other person might consciously or unconsciously influence the fiduciary's judgment." [Birnbaum, 73 N.Y.2d at 466, 539, N.E.2d at 576].

The facts are undisputed that Gitman has breached his fiduciary duties to Dardashtian, individually, and to the Plaintiff Companies, of which Gitman is a 50% owner.

This Court has already recognized that as a co-manager, Gitman owed fiduciary duties to both Dardashtian and the Plaintiff Companies. See, Ostrer Decl. Ex. I at p. 17 (Opinion and Order, dated November 28, 2017); see e.g. the NDAP Operating Agreement which also recites that each manager "is acting on behalf of all Members in the nature of a fiduciary." See, Dardashtian Aff. Ex. 4a, Section 7.6.

On behalf of the Plaintiff Companies, Gitman sought to pay NDAP's broker and consultant, Jeremy Falk, an *inflated* commission in connection with the sale of NDAP, and influenced Dardashtian to do the same, without ever disclosing to Dardashtian that Gitman and Falk were partners and members of two competing e-commerce companies, Dalva Ventures, LLC ("Dalva") and Accel Commerce, LLC ("Accel") (See correspondence with Gitman at Dardashtian Aff. Ex. 29a; see also operating agreements for Gitman and Falk's companies Accel and Dalva at Dardashtian Aff. Exs. 37 and 39). Though Falk is not a member of the Plaintiff Companies, Gitman shared with his undisclosed partner, Falk, ChannelReply's confidential and proprietary profit and loss statements without Dardashtian's consent in order to gain a competitive advantage. (Dardashtian Aff. Ex. 23) In the year 2017 alone, Accel generated over

$70,000.00 in income. (See Accel Profit and Loss Statements at Dardashtian Aff. Ex. 38). In February 2017, Falk formed Dalva with Gitman (and Gitman's spouse) who are listed as members. (Dardashtian Aff. Ex. 39). In early March, Gitman, a partner with Falk in two competing companies that Dardashtian did not know about, tried to induce Dardashtian to agree to compensate Falk as a consultant. Gitman stated "Jeremy, thank you for all your hard work. We truly appreciate it. All your suggested changes are reasonable. Mike, this situation has become emotional and embarrassing at this point. Please execute this immediately. I'm ready to counter sign." (Dardashtian Aff. Ex 29, bottom of first page email on March 7, 2017 at 9:56 a.m.). It was later discovered that Accel Commerce had been operating since January 2017 and Gitman had shared ChannelReply's profit and loss statements with Falk, which were unrelated to the sale of carpartkings (Dardashtian Aff. Ex. 23).

This Court *supervised* Gitman's return of CSV's funds that Gitman converted without Dardashtian's prior knowledge or authorization. Defendant Gitman transferred over $70,000.00 from the CSV Bank of America Bank account into a separate account maintained solely by Defendant Gitman, leaving the Plaintiff Companies with a negative balance, thereby preventing the Plaintiff Companies of its ability to pay any expenses or operational costs (See Dardashtian Aff. Exs. 66a, 71, 72a and 72b).

On May 31, 2017, Defendant Gitman drove up the Plaintiff Companies' debt by using CSV's then depleted bank account and credit card. He paid an invoice to a ChannelReply worker from CSV's overdrawn bank account for $218.51 further driving the account into an overdrawn status. The accompanying invoice said the charge came from Gitman and listed his personal home address in Brooklyn, New York.  (Id).

17

On June 2, 2017, Gitman also charged $3,500 to amazon web services using NDAP's American Express credit card. See, Dardashtian Aff. Exhibits 85a and 85b. Gitman also charged a lease payment for his own personal BMW automobile through CSV's overdrawn account in an amount greater than $500, at a time when Gitman knew the bank account did not have the funds to pay it. See Invoice attached as Exhibit "71," and evidence of overdrawn status as Exhibits "72a" and "72b."

This Court also directed and supervised Gitman's return of ChannelReply's confidential information and trade secrets to and from three competing companies all formed by Gitman, namely Defendants Accel, Dalva and the company Gitman formed to put ChannelReply out of business, Channel Reply Inc.

Defendant Gitman was directed by this Court to return approximately $5,060.00 from his Dalva bank account to repay the Plaintiff Companies the money that Gitman converted without Dardashtian's prior knowledge or consent (Dardashtian Aff. Ex. 44). Defendant Gitman confirmed that he "mistakenly" used $5,060.00 of the Plaintiff Companies' funds to pay Gitman's own independent counsel, Umar Farooq, Esq. who formed Channel Reply Inc. for Gitman and who was acting in opposition to the relief sought by Plaintiffs and to solely protect Defendant Gitman. (See, David Gitman's Affidavit dated June 21, 2017 at Guaglardi Decl. Ex. J at para 83).

This Court also directed and supervised Gitman's restoration of Dardashtian's access to approximately 21 of the Plaintiff Companies' online accounts, including accounts containing Dardashtian's personal financial information (Dardashtian Aff. Exs 50, 51, 52, 54, 55a, 55b, 57, 59). By way of Certification to this Court, Gitman admits that he suspended Dardashtian's

personal "1 Password" account, which Gitman restored "in compliance with the TRO." See,

Gitman Affidavit at Guaglardi  Decl. Ex. J at para 93 (Gitman Aff).

By way of Certification to this Court, Gitman also admits that the Plaintiff Companies'

Chargebee, Slack and Stripe accounts were transferred to Channel Reply Inc. at his direction, but

no longer exist and could not be restored. (Id at para 96). Thus, "in an effort to fully comply with

the TRO" Gitman created new Chargebee, Slack and Stripe accounts in order to provide

Dardashtian with access. (Id at para 101).

This Court also directed and supervised the return of ChannelReply's accounts and

information, including ChannelReply's customer lists, that Gitman usurped by transferring

ChannelReply's proprietary property to new domains owned and controlled by Defendant

Gitman thereby preventing Dardashtian from having any access, thereby jeopardizing the

Plaintiff Companies' relationship with its own customers (Id). Gitman provided an excel

spreadsheet to Plaintiffs detailing which accounts he could and could not restore after he

unlawfully transferred them. On the spreadsheet, he explains that Dardashtian's business email

address, where Dardashtian was reached by vendors, partners and customers, was transferred by

Gitman to Channel Reply Inc.'s G Suite and "no longer exists." Similarly, the sales and support

email addresses for ChannelReply as well as Dardashtian's personal slack account, also "no

longer exists" as Gitman was not able to restore them. (Dardashtian Aff. Ex. 146).

The Stripe Account that Gitman admits he transferred to another domain, was

ChannelReply's credit card billing service that allowed CSV to receive credit card payments

from ChannelReply customers (Dardashtian Aff. Exs. 57a, 57b, 57c). The Slack account that

Gitman admits he unlawfully transferred, was a messaging management software for CSV that

allowed the Developers to openly communicate with one another and share company data with

each other and the Plaintiff Companies' members (Id at Ex. 146; see also, Guaglardi Decl. Ex. J. para 101).

After this Action commenced, Gitman induced ChannelReply's developers, Konstantyn Bagaiev ("Bagaiev") and Oleksii Glukharev ("Glukharev") (collectively referred to herein as the "Plaintiff Companies' Developers" or the "Developers") to resign from the Plaintiff Companies which they did, by defaming Dardashtian and promising the Developers stock options in his newly formed competitor company, Channel Reply Inc. (Dardashtian Aff. Exs. 78a, 78b, 78c. 78d; see also Stock Plan Agreement at Ex. 42)[3]. On June 1, 2017, Defendant Gitman sent to the Developers new employment agreements for them to become employees of Channel Reply, Inc. Gitman did this using his email David@dalva.ventures, from Defendant Dalva Ventures, another undisclosed competing company Gitman formed, and without copying Dardashtian to the transmittal (and or ever advising Dardashtian that he had this competitive company or a Dalva email account). (See Dardashtian Aff. at Exs 76a-g).

After Gitman was preliminarily removed by the Court as co-manager of the Plaintiff Companies, Gitman then induced, coerced and otherwise assisted the Developers to resign from Plaintiff Companies through lies and manipulation. Gitman then assisted the Developers by drafting, or assisting, their own purported "resignation letters" to CSV/ChannelReply. This was done by Gitman to put ChannelReply out of business and to benefit himself through his competitive company, Channel Reply Inc. (Guaglardi Decl. at Ex. G; Bagaiev Aff. Ex. A).

To this end, on June 20, 2017 at 7:38 a.m., Defendant Gitman sent to the Developers a resignation letter "template." (Bagaiev Aff. Ex. A; Guaglardi Decl. Ex. Q at p. 36).[4] At 8:51

---

[3] Plaintiffs' reserve their defamation claims for trial, if necessary.
[4] As set forth in the Declaration of Barry Guaglardi, annexed to the Affidavit of Konstantyn Bagaiev at Exhibit A is a true copy of Skype conversations between Bagaiev and Gitman, which is comprised of 146 pages. The same

a.m., Gitman asked Bagaiev "Can you check my suggestions?" (Id at p. 38). At 3:37p.m.,

Gitman told Bagaiev that his (former) attorney "Lindsay [Ditlow] (from Dentons) asked me to

send you an email to send mike the resignation letter." (Id at p. 35). Defendant Gitman followed

at 5:46 p.m. that "The "lawyers want it to come from you not them. Otherwise Mike

[Dardashtian] might argue that we are conspiring." (Id); See also resignation letters at

Dardashtian Aff. at Ex. 34). Gitman even went so far as to implicate his own attorneys in his

surreptitious actions to conspire to damage the Plaintiff Companies.

Even after Gitman was removed as a co-manager of the Plaintiff Companies, Gitman

continued to undermine Dardashtian's ability to manage the Plaintiff Companies to make

Dardashtian appear incompetent. For example, on September 27, 2017, months after Gitman

induced the Developers to resign (Dardashtian Aff. Ex. 34), while the parties appeared before the

Magistrate of this Court, Gitman wrote to Bagaiev that he was "able to get his phone into [the]

court room" and "recorded [Dardashtian] saying [he] will never give [Bagaiev] any ownership."

(See conversations at Guaglardi Decl. at Ex. Q p.25-26; Bagaiev Aff. Ex. A). Gitman's goal was

to ensure that the Developers did not like or trust Dardashtian so that they would not return to

work for the Plaintiff Companies. Gitman's actions directly sought to damage the Plaintiffs.

By inducing the Developers to resign, the Plaintiff Companies were then forced to retain

another IT company at a higher and additional expense to replace the Developers (Dardashtian

Aff. paras 121-124). Gitman's efforts were, at minimum, contrary to the best interests of the

Plaintiff Companies and a direct breach of Gitman's fiduciary duties to Plaintiffs.

To restore the status quo, this Court then directed and thereafter supervised the

dissolution of Gitman's competing business, Channel Reply Inc., which Gitman created

---

exhibit is annexed to the Declaration of Barry Guaglardi at Exhibit Q, which includes page numbers on each page
for the Court's reference.

undisputedly and admittedly to directly compete with CSV/ChannelReply, by usurping ChannelReply's own customers, using ChannelReply's same proprietary code and software, and boldly utilizing ChannelReply's actual trade name (See dissolution documents at Dardashtian Aff. Ex. 26 p 1). This shameless action by Defendant Gitman clearly justifies the redemption of all of his right, title and interest in CSV, the company he owns half of and which he sought to put out of business by misappropriating all of its assets so he could directly compete against it.

**B. GITMAN'S FRAUD AND DISHONESTY TRIGGERS THE REDEMPTION OF HIS MEMBERSHIP AND SHOULD SUPPORT SUMMARY JUDGMENT AS TO COUNTS 5, 10, 12, 18, 19 OF THE AMENDED COMPLAINT**

Defendant Gitman's several and significant acts of fraud and dishonesty not only breached his obligations under the CSV Operating Agreement triggering the redemption of his right, title and membership interests in CSV, but also serve as the basis for the granting of summary judgment in Plaintiffs' favor on various other counts in Plaintiffs' Amended Complaint.

1. **Summary Judgment Should Be Entered as to Count Five (5)**

Count 5 alleges violation of 18 USC 1832 and 18 USC 1836 of the Federal Trade Secret Act. 18 U.S.C.S. § 1832 provides:

(a) Whoever, with intent to convert a trade secret, that is related to a product or service used in or intended for use in interstate or foreign commerce, to the economic benefit of anyone other than the owner thereof, and intending or knowing that the offense will, injure any owner of that trade secret, knowingly –

(1) steals, or without authorization appropriates, takes, carries away or conceals, or by fraud, artifice, or deception obtains such information;

(2) without authorization copies, duplicates, sketches, draws, photographs, downloads, uploads, alters, destroys, photocopies, replicates transmits, delivers, sends, mails communicates, or conveys such information;

(3) receives, buys, or possesses such information, knowing the same to have been stolen or appropriated, obtained, or converted without authorization;

(4) attempts to commit any offense described in paragraphs (1) through (3); or

(5) conspires with one or more persons to commit any offense described in paragraphs (1) through (3), and one or more of such persons do any act to effect the object of the conspiracy,

shall, except as provided in subsection (b), be fined under this title or imprisoned not more than 10 years, or both.

(b) Any organization that commits any offense described in subsection (a) shall be fined not more than the greater of $5,000,000.00 or 3 times the value of the stolen trade secret to the organization, including expenses for research and design and other costs of reproducing the trade secret that the organization has thereby avoided.
[18 U.S.C.S. § 1832].

The legislature created federal private cause of action for trade secret misappropriation:

An owner of a trade secret that is misappropriated may bring a civil action under this subsection if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce.

[18 U.S.C.S. §1836].

A "trade secret" is defined as

all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if –

(A) the owner thereof has taken reasonable measures to keep such information secret; and

(B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from disclosure or use of the information;

[18 U.S.C.S. §1839(3)]. (Emphasis added).

The definition of a trade secret under 18 U.S.C.S. §1839(3) protects a broader range of technological and intangible information than most civil laws. U.S. v. Hsu, 155 F.3d 189 (3d Cir. 1998). "Trade secrets are no longer restricted to formulas, patterns, and compilations, but now include program and codes 'whether tangible, and whether or how stored.'" Id. Moreover, "a

trade secret must not be generally known to, or readily ascertainable by, the general public, rather than simply those who can obtain economic value from the secret's disclosure or use." Id. An owner of a trade secret is "the person or entity in whom or in which rightful legal or equitable title to, or license in, the trade secret is reposed." 18 U.S.C.S. §1839(4).

"Misappropriation" occurs under the following circumstances,

(A)   acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(B)   disclosure or use of a trade secret of another without express or implied consent by a person who—

(i) used <u>improper means</u> to acquire knowledge of the trade secret; (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was-

(I)    derived from or through a person who had used improper means to acquire the trade secret;
(II)   acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or
(III)  derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret;"

[<u>18 U.S.C.S. §1839(5)</u>]. (Emphasis added).

"Improper means" includes "theft, bribery, breach or inducement of a breach of duty to maintain secrecy, or espionage through electronic or other means." <u>18 U.S.C.S. §1839(6)</u>.

The facts are undisputed that the Plaintiff Companies' customer lists, addresses, vendor lists and addresses, computer software and programs, computer pass codes, ChannelReply's software code, and CSV and ChannelReply's electronic services that are used in or intended for use in interstate and foreign commerce are protected trade secrets. The ChannelReply software solution is the Plaintiffs Companies' intellectual property and is not available to the general public and is protected from the reach of competitors with similar services (Dardashtian Aff at para 7; Exs. 6; 9; 11; 12; Bagaiev Aff. at paras 95-99; Bagaiev Ex. B). The ChannelReply software is a streamlined customer service product that helps its subscribers manage their multi-

24

platform digital marketplace(s) (Id at Ex. 11). By offering software as a service (Saas),

ChannelReply utilizes multi-faceted and highly sophisticated interfaces and API (application

web interfaces) to seamlessly tie together all retail channels so that its subscribers can

communicate and manage all of their Amazon, eBay and Walmart messages in a single location.

ChannelReply offers multiple services to its customers, and subscriptions are designed on an

individual basis to meet the customers' individual needs.(Id, see also Dardashtian Aff. para 7).

The software itself also allows ChannelReply subscribers to interact with ChannelReply

through HTTP requests, and the application development team enables the integration of

ChannelReply's services with the other web applications. See page 2 of ChannelReply Terms of

Service at Dardashtian Aff. Ex. 11b; 12, 59).

The ChannelReply software is created by a collection of code, which is written using a

human-readable programming language, and by communicating algorithms to specify the action

to be performed by the software. (Dardashtian Aff. Ex. 11b; 12, 59; Bagaiev Aff. at paras 95-99).

CSV has exclusive control over ChannelReply, and only CSV, its members and its team who

helped create and monitor it have full and complete access to it.  (Dardashtian Aff. Exs. 9; 11b;

12).

The ChannelReply software solution, code and data which is designed to meet customer

needs, was created at great expense to do business in the competitive market place in foreign and

interstate commerce. Its customer lists, addresses, vendor lists, computer software programs,

computer pass codes and financial data are highly proprietary and confidential and are not

maintained by the Plaintiff Companies for the world to see. (Dardashtian Aff. para 6; see also,

Bagaiev Aff. at paras. 94-96).

ChannelReply's protect-ability can also be assessed.  At all times relevant herein, CSV has taken precautions to protect delicate software, codebase, database, server and financial information from being accessed by third parties or malicious agencies including the encryption and password protection with several layers of security (Dardashtian Aff. at para. 7; Ex. 9, 11b, 59). CSV protects the ChannelReply infrastructure in several ways. The ChannelReply software and code is stored on a closed Github account, only accessible to ChannelReply Developers who have access provided to them by CSV (Id; see also, Bagaiev Aff. at paras. 94-96).. The ChannelReply database and servers are hidden behind a firewall and only production servers have access to it. The production servers are available by a ChannelReply deployment tool only of which certain developers have access to, determined by CSV's management. All bank information is accessible by a two (2) factor authentication system through Bank of America's website. (Dardashtian Aff at para 6, 7; Ex. 59).

CSV's "terms of service" with ChannelReply's customers requires all information that is disclosed to each customer to remain "confidential." (Dardashtian Aff. 12 p. 2). To protect its software, customers agree to service agreements, and are provided with limited rights to access and use ChannelReply only in accordance with the subscription or service they seek (Id at Section 4). CSV requires each customer to agree to ChannelReply's technical safeguards to protect the security and confidentiality of its service data (Id at Section 3.3.) It requires each customer to refrain from hacking and/or attempting to gain access beyond the scope of their subscription, expressly prohibiting customers from attempting to "modify, adapt or hack [ChannelReply's service], or otherwise to gain unauthorized access to the service or related system or networks." (Id section 2.3) It further identifies the ChannelReply service as CSV's intellectual property, which belongs "exclusively to the ChannelReply Contracting Party (CSV)

26

which cannot be disseminated to third parties. (Id at Section 4. Remedies for a customer's breach of the terms of service are also contained therein (Id)[5].

Facts to support Gitman's misappropriation of such confidential information are undisputed. On May 30, 2017, Defendant registered Channel Reply Inc. with the Secretary of State in Delaware. (Dardashtian Aff. Ex. 26, pp.3-4). Gitman transferred all of CSV and ChannelReply's assets into a new company owned solely by Gitman and for Gitman's sole benefit, misappropriating CSV and ChannelReply's tradename and intellectual property, including all of its software and trade secrets, stealing the company and converting all of its assets and employees, while locking Dardashtian out so that he could not gain access to any of the accounts to prevent it.  (See also Channel Reply Inc. bank records at Dardashtian Aff. Ex. 41; Stock Plan Agreements at Ex. 42 at Exhibit D "Assignment of IP and Other Assets"; see also, Ex. 70). Gitman then coerced and manipulated the Developers to resign. Gitman effectively attempted to put ChannelReply and Plaintiff Companies out of business by removing its ability to operate and service its customers.

On May 30, 2017, Gitman acknowledged to Glukharev, in writing, that he moved the ChannelReply email and account information to a new G suite account. Defendant Gitman said "I'm moving ChannelReply email to a dedicated G suite account. You should have received an email in your personal inbox with the new account. Can you give me your old password so I can migrate your email?" (Dardashtian Aff. Exs 53a, 53b). Gitman also changed the Developers' passwords so that they could access the new G suite with all company emails and documents. Gitman wrote to the Developers, "I reset your NDAP password to kick off the migration of your

---

[5] Gitman's contentions in this litigation that ChannelReply is not a trade secret, or is not proprietary, or is not confidential, are false and illustrate his own breach of his fiduciary duty to CSV and ChannelReply. It is respectfully submitted that such bogus claims are merely advanced by Gitman in a transparent effort to defend or otherwise excuse his blatant misconduct and attempt to compete with the Plaintiff Companies he is supposed to protect.

emails to CR's new G Suite account." (See Dardashtian Aff. Ex.53). Gitman also accessed and

disclosed Dardashtian's personal financial information through his conversion of Dardashtian's

business email address michael@channelreply.com. Gitman told, Bagaeiv, "I get those emails

now." (See email exchange at Dardashtian Aff. Ex.54).

As stated above, these facts are undisputed by Gitman's own admission. Gitman certified

that the ChannelReply Slack and Stripe accounts were transferred to Channel Reply Inc. but no

longer exist. See, Guaglardi Decl. Ex. J at para 96 (Gitman Aff).

But for the Court's Order directing the restoration of the Plaintiff Companies' accounts,

including the dissolution of Channel Reply Inc., Gitman would have succeeded in taking full

control of ChannelReply under his competing company Channel Reply Inc.[6]

Gitman's actions were a direct violation of 18 USC 1832 and 18 USC 1836 of the Federal

Trade Secret Act and summary judgment should be granted as to Count 5.

### 2.    Summary Judgment Should Be Entered As To Count 10

Count 10 pleads conversion.  "A conversion takes place when someone, intentionally and

without authority, assumes or exercises control over personal property belonging to someone

else, interfering with that person's right of possession. Colavito v. NY Organ Donor Network,

Inc., 8 NY3d 43 (N.Y. 2006).  "An action will lie under New York law for conversion of money

where there is an obligation to return or otherwise to treat in a particular manner the specific

money in question." LoPresti v. Terwilliger, 126 F.3d 34 (2d Cir. 1997).

Further, "funds of a specific named bank account are sufficiently identifiable to support a

conversion claim." Newbro v. Freed, 409 F. Supp. 2d 386 (SDNY 2006).  The conversion of

---

[6] Even after the Court entered temporary injunctive relief, Gitman did not comply so as to restore the Plaintiff Companies to the status quo, requiring Plaintiffs' to return to Court by way of a second Order to Show Cause. Gitman's excuse was that he "may have misinterpreted elements of the TRO. I have taken measures to ensure that this type of mistake will not happen again…") (Guaglardi Decl. Ex. K, para 3).

funds from a corporate account results in a corporate and not individual injury. See <u>Bright View Trading Co. v. Park</u>, 2004 U.S. Dist. LEXIS 18572 at 13 (SDNY. Sept. 15, 2004); <u>Paradiso & DiMenna, Inc. DiMenna</u>, 649 NYS 2d 126 (NY App. Div. 1996).

A claim for conversion also applies to electronic records stored on a computer. <u>Thyroff v. Nationwide Mut. Ins. Co.</u>, 8 NY 3d 283 (N.Y. 2007).

On or about May 30, 2017, without Dardashtian's authorization, knowledge or consent, Gitman authorized and transferred a total of $72,982.53 from CSV's Bank of America account ending in #7345 (Dardashtian Aff. Ex. 46). Dardashtian and Gitman were dual signatories to the account, and Gitman took advantage by intentionally withdrawing and siphoning the funds from CSV's Bank Account to his own company's account of which Dardashtian was not an owner.

On June 19, 2017, Gitman certified to this Court that he complied with the Court's Order and returned "all monies withdrawn by [Gitman] since May 27, 2017." (Guaglardi Decl. Ex. K at para 9). Gitman further certified that he provided Dardashtian with full and complete access to all existing NDAP, CSV and Channel Reply electronic accounts. (Id at para 10).[7]

Gitman, without any authority whatsoever, surreptitiously and admittedly took complete control of every single aspect of ChannelReply's personal property, including its accounts, its code, its passwords, its computer data, its customer lists, its financial information, its payment portals, its email accounts, its tradename and any and every other type of property belonging to CSV/ChannelReply. At the same time, Gitman ensured his control by removing Dardashtian's

---

[7] Gitman was still not in compliance with the Court's Order as of June 13, 2016. Gitman only restored Dardashtian to accounts which Gitman deemed as being "owned and/or paid for by Mr. Dardashtian and/or the plaintiff entities, which [Gitman has] knowledge of and access to." [Id at para 5]. It was weeks after June 21, 2017 when this matter was transferred to the Honorable James C. Francis IV, U.S.M.J., where Gitman fully restored Plaintiffs' access to the Plaintiff Companies accounts.

access and ability to prevent the conversion. Gitman even took control of Dardashtian's likeness when impersonating him on Gitman's email account.

By his own admission, and undisputed evidence, Gitman committed blatant conversion which should not only support the grant of summary judgment as to Count 10, but should also support Plaintiffs' request for an order permitting redemption of all of Defendant Gitman's right, title and membership interests in the Plaintiff Companies.

### 3.   Summary Judgment Should be Entered as to Count 12

This Count pleads False Designation/Unfair Competition under 15 USC 1125 Against Gitman and Channel Reply Inc.

15 U.S.C.S. §1125 provides a civil cause of for trade name infringement.  The statute provides, in relevant part,

"(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which ---

(A) Is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services or commercial activities by another person, or

(B) In commercial advertising or promotion, misrepresents the nature characteristics, qualities, or geographic origin of his or her or another's persons goods, services or commercial activities shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act."

<u>15 U.S.C.S. §1125 (a)(1).</u>

The section has frequently provided support for unfair competition claims. <u>Forschner Group v. Arrow Trading Co.</u>, 904 F. Supp. 1409, 1415 (S.D.N.Y. 1995).

Gitman's use of the term "ChannelReply" to compete through "Channel Reply Inc." is clearly intended by Gitman to trade off of the ChannelReply trade name, and if the Court did not order the dissolution of Channel Reply Inc., it would clearly have caused confusion, mistake or

deceit to the public as to the affiliation as Gitman knew it would when he misappropriated the tradename to trade off of it.. ChannelReply's customers (who Gitman usurped by way of transferring all customer lists and data) would have had no way of knowing whether they were doing business with a different competing entity as was Gitman's hope when he misappropriated the name. Gitman's Channel Reply Inc. bank records further confirm the theft of ChannelReply's customers as the customers continued uninterrupted to do business with Channel Reply Inc. not knowing that the fraudulent company was different than CSV's ChannelReply. See the transfer balances related to CSV's Stripe account. (Dardashtian Aff. Ex. 41).

The Plaintiffs were unquestionably damaged as a result of Gitman's actions. Plaintiffs were compelled to seek Court intervention on an emergent basis just to prevent the devastating harm that would have occurred but for the Court's Order that Channel Reply Inc. be dissolved and the misappropriation of the tradename "ChannelReply" be terminated. The Court helped mitigate Gitman's damages in this sense, however Gitman causes extensive damages in attorneys' fees alone in connection with the commencement of this Action and in the multiple applications to obtain Gitman's compliance with the Court's Orders. (Guaglardi Decl. Ex. G; Dardashtian Aff. Ex. 26).

Gitman's egregious and unlawful misconduct, which prompted the need for such equitable relief in the first instance, should support Plaintiffs' request for the redemption of Gitman's right, title and membership interests in the Plaintiff Companies as well as support a grant of summary judgment on Count 12 for Defendants' violation of Unfair Competition under 15 USC 1125.

### 4. Summary Judgment Should Be Entered as to Count Eighteen (18)

Count Eighteen (18) asserts Unfair Competition under New York State law.

"The central principle underlying a claim for unfair competition under New York law is that one may not misappropriate the results of labor, skill and expenditures of another." <u>Linkco, Inc. v. Fujitsu</u> Ltd. 230 F. Supp. 2d 492, 500 (S.D.N.Y. 2002).  Unfair competition must also involve some level of bad faith. <u>Id</u>.

New York pattern jury instructions recognize the following types of unfair competition: misappropriation of trade secrets or trademarks, trade name infringement, palming off, misappropriation, false labeling or advertising. <u>Id</u>.

However, the Second Circuit has made clear that, "unfair competition is not limited to categories of infringement that have been described in New York's pattern jury instructions recognized by courts but instead encompasses a broad range of conduct." <u>Id</u>.  New York unfair competition law stands for the "broader principle that property rights of commercial value are to be and will be protected from any form of commercial immortality." <u>Id</u>., <u>citing</u>, <u>National Basketball Ass'n v. Motorola, Inc.</u>, 105 F.3d 841, 851 (2d Cir. 1997).  Indeed, the "incalculable variety of illegal commercial practices denominated as unfair competition is proportionate to the unlimited ingenuity that overreaching entrepreneurs and trade pirates put out to use." <u>Electrolux Corp. v. Val-Worth, Inc.</u>, 6 N.Y.2d 556, 568 (1959).

"A claim for unfair competition based upon misappropriation, generally involves the taking of a property right." <u>Linkco, Inc. v. Fujitsu Ltd.</u> 230 F. Supp. 2d at 500 (*internal citations omitted*). Under New York law, "persons have a protectable property interest in their labor, skill expenditure, name and reputation."

Among the practices recognized as unfair competition is the taking and exploitation of company documents for use in a competitive business, even where such information may not qualify as a trade secret. <u>Demetriades v. Kaufman</u>, 698 F. Supp. 521, 526 (S.D.N.Y., 1988).

As set forth above, the facts are undisputed that Gitman took the Plaintiff Companies' funds, software, code, electronic accounts, proprietary data, assets, trade secrets, tradename, customer lists and customers with him in his unlawfully created (and which he has since dissolved) Channel Reply Inc., which was created for the specific purpose of unlawfully competing with CSV/ChannelReply. He unlawfully utilized CSV's software ChannelReply, coerced and manipulated the Developers to leave the Plaintiff Companies and to work for his company, Channel Reply Inc. upon the promise of ownership, and then transferred all of CSV's accounts to a new domain maintained by him, through Channel Reply Inc. (Dardashtian Aff. Exs 53a and 53b). Gitman did business and generated income under the unlawfully created Channel Reply Inc. (Dardashtian Aff. Ex. 41). Gitman was compelled by this Court to dissolve Channel Reply Inc. and has acknowledged such dissolution of Channel Reply Inc. (Guaglardi Decl. Ex. K at para 16; see also Dardashtian Aff. Ex. 26). But for the Court's intervention, years of Dardashtian's hard work, development, goodwill and relationships to build the Plaintiff Companies for the benefit of both Dardashtian and Gitman would have been destroyed by Gitman's greed and ego.

For the reasons set forth above, Gitman's conduct supports the grant of summary judgment on Count 18 and further supports Plaintiffs' requested relief seeking the redemption of all of Gitman's right, title and membership interests in the Plaintiff Companies.

### 5.  Summary Judgment Should be Entered as to Count Nineteen (19)

This count pleads misappropriation of Trade Secrets belonging to Plaintiff CSV under New York Law.

Under New York law, a plaintiff claiming misappropriation of a trade secret must

allege that (1) plaintiff possesses a trade secret; and (2) defendant is using the trade secret "in breach of an agreement, confidence, or duty, or as a result of discovery by improper means." Faiveley Transp. Malmo AB v. Wabtec Corp., 599 F.3d 110, 117 (2d Cir. 2009).

The Restatement of Torts §757, adopted by New York Courts, defines a trade secret as "any formula, pattern, device or compilation of information which is used in one's business and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." Integrated Cash Management Servs. v. Digital Transactions, Inc., 920 F.2d 171, 173 (2d Cir. 1990).

In determining whether a trade secret exists, New York courts consider the following factors:

(1) the extent to which the information is known outside of the businesses;

(2) the extent to which it is known by employees and others involved in the business;

(3) the extent of the measures taken by the business to guard the secrecy of the information;

(4) the value of the information to the business and its competitors;

(5) the amount of effort or money expended by the business developing the information;

(6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

[Ashland Mgmt., Inc. v. Janien, 82 N.Y.2d 395 (1993)].

"A trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret." Integrated Cash Management Servs., 920 F.2d at 174 (finding that the software program at issue was a trade secret even where the individual utility programs were known to the public).

The movant is not required to demonstrate that the information it seeks to protect is vital to its business, but only that "the information would provide the unauthorized user of it with an

unfair competitive advantage which it would not otherwise have enjoyed." Computer Assoc. Int'l, Inc. v. Bryan, 784 F. Supp. 982, 986 (E.D.N.Y. 1992) *internal citations omitted*. "In determining whether the matter is protectable as a trade secret, courts frequently examine the method by which defendant acquired it, e.g. such as by stealing or copying. Id.

In general "…computer software, or programs are clearly protectable under the rubric of trade secrets, if the other elements are also proven." Q-Co Industries, Inc. v. Hoffman, 625 F. Supp. 608, 617 (S.D.N.Y. 1985).

"Precisely because trade secret domain protects the discovery of ideas, processes, and systems which are explicitly precluded from coverage under copyright law, courts and commentators alike consider it a necessary and integral part of the intellectual property protection extended to computer programs." Computer Assoc. Int.' v. Altai, 982 F.2d 693, 717 (2d Cir. 1992).

Customer lists are also afforded trade secret protection. Linko, Inv. v. Fujitsu Ltd., 230 F. Supp. 2d 492, 498 (S.D.N.Y. 2002).

Moreover,

"even where the information would not otherwise qualify as a trade secret, the unauthorized physical taking and exploitation of internal company documents, included detailed customer information by an employee for use in his future business or employment is to be enjoined as unfair trade competition." Computer Assoc. Int'l, Inc. v. Bryan, 784 F. Supp. 982, 986 (E.D.N.Y. 1992) *internal citations omitted*

As an initial and important matter, the Court has determined that software programs and codes, like those Plaintiff ChannelReply seeks to protect, are generally considered a trade secret subject to protection. See, Q-Co Industries, Inc. v. Hoffman, 625 F. Supp. 608, 617 (S.D.N.Y. 1985).

Gitman admittedly misappropriated the software programs, customer lists, codes and all other highly protected proprietary property and trade secrets of the Plaintiff Companies surreptitiously, by improper means, and without the knowledge or authorization of Plaintiff Dardashtian, and for the purpose of unlawfully competing with Plaintiff Companies and to put the Plaintiff Companies out of business.

What Gitman misappropriated was EVERYTHING. He did so knowing that it was invaluable to the Plaintiff Companies, which is why he did not just resign and attempt to re-create it himself. The Plaintiff Companies highly-skilled Developer acknowledges in his agreement with the Plaintiff Companies that ChannelReply's code is a trade secret and Bagaeiv testifies to this Court in his Affidavit that the programs and codes upon which ChannelReply is built are not easily duplicated and invaluable to Plaintiff Companies.

Gitman has maliciously engaged in knowing misappropriation of Plaintiff Companies' trade secrets and this Court should grant summary judgment on Count 19.

## C. GITMAN'S BREACH OF THE CSV OPERATING AGREEMENT REQUIRES THE REDEMPTION OF ALL OF GITMAN'S RIGHT, TITLE AND MEMBERSHIP INTERESTS IN PLAINTIFF COMPANIES, AND FURTHER SUPPORTS SUMMARY JUDGMENT IN FAVOR OF PLAINTIFFS AS TO COUNT 7 INCLUDING AN AWARD OF ATTORNEY'S FEES

### 1. Breach of the CSV Operating Agreement

"The elements of a breach of contract claim in New York are (1) the existence of a contract, (2) plaintiff's performance, (3) breach by the defendant, and (4) damages." Wechsler v. Hunt Health Sys., Ltd., 330 F. Supp. 2d 383, 403-04 (S.D.N.Y. 2004). In a breach of contract action, summary judgment is appropriate if "the language of the contract is unambiguous, and

reasonable persons could not differ as to its meaning." Farago Adver., Inc. v. Hollinger Int'l, Inc., 157 F. Supp. 2d 252, 258 (S.D.N.Y. 2001).

Relevant to the issue at hand, "[u]nder New York law... the initial interpretation of a contract is a matter of law for the court to decide." Yafa Jewelry Inc. v. All Those Underwriters Subscribing to Policy of Ins. Numbered 96FA0026180A, 42 F. Supp. 2d 307, 310 (S.D.N.Y. 1999) (quoting K. Bell & Assocs. v. Lloyd's Underwriters, 97 F.3d 632, 637 (2d Cir. 1996)) (internal quotation marks omitted).

Aside from Gitman's tortious and egregious misconduct set forth above, Article 12.2 of the CSV Operating Agreement provides that Plaintiff Dardashtian and Defendant Gitman shall not publish, communicate, divulge, disclose, disseminate or otherwise reveal to any person or entity, or use for any purpose whatsoever any Confidential Information belonging to CSV. "Confidential Information" is defined as any of CSV's "processes, data, designs, compilations of information, financial data, salary information, policies and procedures, sales know-how or any other information that may be considered to be proprietary or a trade secret of the Company, whether or not such information is considered a trade secret within the meaning of applicable law." (See CSV Operating Agreement at Dardashtian Aff. Ex. 2).

Article 9 of the CSV Operating Agreement further sets forth the rights and obligations of the Members, which includes Gitman and Dardashtian's agreement that neither Dardashtian nor Gitman may "bring or maintain an action in any court of law or equity for an accounting." (Id. at Section 9.4). As stated above, Gitman transferred all of the Plaintiff Companies' funds to a separate account maintained solely by Gitman, which Gitman claimed he did as a result of Dardashtian's alleged "resistance for an accounting." (Dardashtian Aff. Ex. 24). Gitman's Eighth Counterclaim likewise seeks declaratory judgment for an accounting of CSV and CSV's related

entities in direct breach of Article 9.4 of the CSV Operating Agreement. See Amended

Counterclaim at Guaglardi Decl. Ex. E at para 132.

Article 11.5 of the CSV Operating Agreement has already been addressed in the

Redemption section above and which Gitman has violated in multiple respects.

Gitman breached Article 12.2 of the CSV Operating Agreement by divulging and

disseminating CSV's Confidential Information, as that term is defined in the CSV Operating

Agreement, to operate Defendant Channel Reply Inc. Gitman likewise disseminated CSV's

confidential information to third parties, including "financial data," namely ChannelReply's

profit and loss statements to Jeremy Falk, who is neither a member nor manager of the Plaintiff

Companies, but an undisclosed business partner of Gitman's.  (See Dardashtian Aff. Ex. 23).

Such actions support a grant of summary judgment on Count 7 as well as support

Plaintiffs' request for the redemption of all of Gitman's rights, title and membership interests in

the Plaintiff Companies.

## 2.  Judgment For Attorney's Fees in favor of Plaintiffs

"To determine whether a party has prevailed for the purpose of awarding attorney's fees

[in New York], the court must consider the true scope of the dispute litigated and what was

achieved within that scope. To be considered a prevailing party, one must simply prevail on the

central claims advanced, and receive substantial relief in consequence thereof (Sykes v RFD

Third Ave. I Assoc., LLC, 39 AD3d 279, 279, 833 N.Y.S.2d 76 [1st Dept 2007] [internal

citations and quotations omitted]); see also N.Y. Bus. Corp. Law 626 (e) (New York law permits

a successful derivative plaintiff to recover attorney's fees from the defendants).

Article 17.10 of the CSV Operating Agreement also provides that the prevailing party is

entitled to recover attorney's fees from the non-prevailing party "if the Company, any Member

or any member of Management obtains a judgment in connection with a dispute." (Dardashtian Aff. at Ex. 22). Likewise, paragraph 6.7 of the NDAP Operating Agreement provides that a "member shall indemnify the Company for any costs or damages incurred by the Company as a result of any unauthorized action by such Member." (Dardashtian Aff. Ex. 4). [8]

Both in contract and as a matter of law, Plaintiffs should be entitled to recover attorney's fees from Defendant Gitman and the other Defendants. Plaintiffs were compelled to seek emergent Court intervention as a result of Gitman's actions, which including locking Dardashtian out of all of the Plaintiff Companies' accounts, depleting the funds that would enable the Plaintiff Companies to do business, increasing the Plaintiff Companies' debt all while Gitman was in pursuit of creating a competing company after misappropriating and unfairly using the Plaintiff Companies' trade secrets, computer data, tradename, intellectual and proprietary property. This is in addition to all of the other malfeasance committed by Gitman which is undisputed based upon the evidence produced.

But for Plaintiffs' application for emergent relief and the Court restricting Gitman's unlawful misconduct and restoring the status quo as stated above, the Plaintiff Companies would have suffered a frustration of purpose and even greater damage. In fact, it was Gitman's desire to put the Plaintiff Companies out of business and "kill" the Plaintiff Companies as set forth above as it would only make Gitman "look better." It was only as a result of Plaintiffs' actions that Gitman's scheme was stopped, however at substantial cost due to the multiple applications to the Court just to obtain Gitman's compliance with Court Orders.

---

[8] Article 8.8 of the CSV Operating Agreement also contains an indemnification provision, which states in substance, for the Company to indemnify any person who was or is a party by reason of the fact that the person is or was a manager of member, against expenses including attorney's fees and costs if such fees were reasonably incurred if the member acted in good faith and for the best interests of the Company. Gitman's creation of competing companies and usurping the Plaintiff Companies' software, funds, accounts and customers required Dardashtian to commence suit on an emergent basis, at minimum, to avoid such irreparable harm.

Plaintiffs were compelled to institute this Action to stop Gitman from continuing his unlawful pursuit of the destruction of the Plaintiff Companies and the misappropriation of the Plaintiff Companies' trade secrets, tradename, intellectual property, customers and assets. This Court removed Gitman as Co-manager and granted preliminary injunctive relief as a result of Gitman's egregious misconduct to ensure the well-being of the Plaintiff Companies for the duration of this Action.

This Court should award attorney's fees in this matter to Dardashtian, in part, and to the Plaintiff Companies, in part, and against Defendant Gitman as the other Defendants are entities set up by Gitman who are shell companies and alter egos of Gitman with no assets. Plaintiffs should be able to set off against the value of any interest Gitman may have in the Plaintiff Companies, and any monies Gitman may be determined to be due in the event of a redemption or buyout of his interests in the Plaintiff Companies, the amount of any legal fees awarded in favor of Dardashtian and/or the Plaintiff Companies.

## D. AS A RESULT OF THE VARIOUS ACTS OF MALFEASANCE COMMITTED BY GITMAN, CSV SENT THE REQUIRED NOTICE FOR THE REDEMPTION TO GITMAN

As set forth above, Article 11.5(c) of the CSV Operating Agreement, states, in pertinent part,

If Management decides to redeem a Member in accordance with this Section, Management shall send such Member (the "Redeemed Member" written notice (the "Redemption Notice") of its decision. The Redemption Notice shall specify the date on which the redemption shall close (the "Redemption Closing Date"); the Redemption Closing Date shall be established in accordance with paragraph (f).

Article 11.5(f), states, in pertinent part,

The closing of a redemption as contemplated in this paragraph shall not prejudice a Redeemed Member's right to contest the amount of the Purchase Price but a Redeemed Member shall not be permitted to contest the closing as contemplated in this paragraph.

On May 1, 2020, Plaintiffs' issued the Redemption Notice to Gitman to redeem all of Gitman's right, title and membership interests in Plaintiff Companies for the reasons set forth above. (Guaglardi Decl. Ex. N; Dardashtian Aff. Ex. 2, Article 11.5). On May 6, 2020, Gitman served a "Rejection of Notice of Redemption, Cooper Square Ventures, LLC" advising that Gitman "never at any point consented, endorsed, supported or approved of the proposed redemption." (Guaglardi Decl. Ex. O). Gitman's purported rejection of the redemption is contrary to Article 11.5(f) which does not permit Gitman to contest the closing, but only the Purchase Price. As such, Gitman's "rejection" should be disregarded in all respects.

By Stipulation dated May 29, 2020, the parties agreed to adjourn the Redemption Closing without prejudice to Plaintiffs' rights, to a date to be set by the Court subject to the disposition of the within motion. (Guaglardi Decl. Ex. P at paras 8-9).

The Plaintiff Companies have the discretion to redeem Gitman's right, title and interest pursuant to Article 11.5, and based upon the undisputed facts set forth in this application, the Plaintiff Companies have properly exercised such discretion, and this Court has the authority to compel the Redemption of Gitman's right, title and interest pursuant to the terms set forth in the Redemption Notice and for the purchase price set forth therein, which is unrebutted.

For these reasons, Plaintiffs should be entitled to Summary Judgment on Count 20 of the Amended Verified Complaint and Gitman should be ordered to execute all transfer documents necessary to effectuate the Redemption of all of his right, title and interest in and to the Plaintiff Companies, or alternatively, the Court can order that an attorney in fact should be appointed to execute such transfer documents on Gitman's behalf at the Redemption Closing.

**E. THE PURCHASE PRICE FOR THE REDEMPTION OF GITMAN'S INTEREST IN THE PLAINTIFF COMPANIES SHALL BE AS SET FORTH IN THE REDEMPTION NOTICE AND BASED UPON PLAINTIFF COMPANIES' VALUATION REPORT**

Article 11.5(d) of the CSV Operating Agreement, it states, in pertinent part,

the purchase price (the "Purchase Price") of a Redeemed Member's interest shall equal to (i) the amount that the Redeemed Member would have received had the Company (A) terminated on the date the Redemption Notice was given, (B) sold all of its assets at their fair market values on the date the Redemption Notice was given, (C) satisfied all of its debts and obligations and (D) made distributions to the Members in accordance with Section 16.2....

Pursuant to Article 11.5(d) of the CSV Operating Agreement, it states, in pertinent part, that "the fair market values of the Company's assets shall be determined by Management."

Here, Plaintiffs have obtained an expert valuation of Gitman's interest in the Plaintiff Companies performed by Withum, the Plaintiffs' valuation expert. See Affidavit of Carleen Gaskin, CPA/CFF ("Gaskin Aff") at Exhibit A. This valuation report is unrebutted.

In accordance with Article 11.5 of the CSV Operating Agreement, Management determined that the redemption amount to be paid to Gitman for the redemption of all of his right, title, ownership and interest in CSV and ChannelReply is $505,000.00 payable as set forth in the Redemption Notice (Guaglardi Aff. Ex. N).[9]

Management determined that the Purchase Price to be paid to Gitman by CSV, on behalf of NDAP, for the redemption of all of his right, title, ownership and interest in Plaintiff's non-operating company, NDAP, shall be computed as follows:

The NDAP Asset Sale Price-$450,000[10]

Less Parts Authority Debt Paid- $100,000

Less Broker Fee Paid to Jeremy Falk- $55,000

Current Net Payments in the Escrow Account- $130,000 ("NDAP Escrow")

Payments Due from Buy Auto Parts to NDAP are $5,000 per month with a total balance due NDAP as of May 1, 2020 in the amount of $165,000 ("Buy Auto Parts Receivable")

---

[9] See also Gaskin Aff. at Ex. A pp. 1-2 for expert valuation pp 1-2, 37, value $549, 271 plus all of NDAP Promissory Note payments received post May 1, 2020.

[10] See also Gaskin Aff. Ex. A. at pp. 34-35; Table 12, Table 14.

Total of NDAP Escrow ($130,000) plus Buy Auto Parts Receivable ($165,000) equals $295,000 assuming the full Buy Auto Parts Receivable is collected. (Id).

For the redemption of all of Gitman's right, title and interest in Plaintiff, NDAP, Gitman should be paid his 50% of the $130,000 presently in Escrow or $65,000 and thereafter 50% of the Buy Auto Parts Receivable payable as set forth in the Redemption Notice (Id).

Consistent with the valuation of the Plaintiff Companies, in accordance with Article 11.5 of the CSV Operating Agreement, Management determined that the Purchase Price to be paid to Gitman by CSV, for his 50% ownership interest in its non-operating company, Plumburs, LLC, for the redemption of all of Gitman's right, title, ownership and interest in Plumburs, LLC, shall be computed as follows:

Plumburs, LLC CitiBank Account Balance- $9,081.62[11]
Less BPVC, LLC's 50% interest in the CitiBank Account- $4,540.81
CSV's 50% interest in the CitiBank Account Balance- $4,540.81
Gitman's 25% interest in Plumburs, LLC CitiBank Account- $2,270.41

Management has also determined that the Purchase Price to be paid to Gitman by CSV, for his 50% ownership interest in Plumburs, LLC, for the redemption of all of his right, title, ownership and interest in Plaintiff's non-operating company, Plumburs, LLC, shall be 25% of the Plumbers, LLC CitiBank Account in the amount of $2,270.41 (Id).

The foregoing values cannot be challenged by Defendants and undisputed. As such, there is no material issue of fact as to any of the values set forth in the Redemption Notice and summary judgment is warranted on Count 20.

---

[11] See Gaskin Aff. Ex. A at pp. 35; Table 12.

Subject to the Court's approval, the Plaintiff Companies should be permitted to redeem all of Gitman's right, title and interests in the Plaintiff Companies in the manner set forth above, and as more particularly set forth in the Redemption Notice. (Id).

## II. DEFENDANT GITMAN'S COUNTERCLAIMS SHOULD BE DISMISSED IN THEIR ENTIRETY

### A. PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON DEFENDANTS' INDIVIDUAL AND DERIVATIVE CLAIMS FOR BREACH OF FIDUCIARY DUTY

(i) *Defendants' First Counterclaim- Breach of Fiduciary Duty Against Dardashtian by Gitman*

For Defendants' to prevail on their breach of fiduciary duty claim, Defendants must prove the existence of a fiduciary relationship, misconduct by the Plaintiffs, and damages that were directly caused by the Plaintiffs' misconduct." Kurtzman v. Bergstol, 40 A.D.3d 588 (2nd Dep't 2007); see also Pokoik v. Pokoik, 982 N.Y.S.2d 67, 70 (1st Dep't 2014).

It is also well settled that Defendants may not maintain both a contract claim and a breach of fiduciary duty claim, without allegations that, apart from the terms of the contract, the parties created a relationship of higher trust than would arise from their contracts alone, so as to permit a cause of Action for breach of a fiduciary duty independent of the contractual duties. See Balta v. Ayco Co., LP, 626 F. Supp. 2d 347. See also, Celle v Barclays Bank P.L.C., 48 AD3d 301 [1st Dept 2008] (a claim for breach of fiduciary duty will be dismissed where there exists an agreement that covers the same subject matter).

Under New York law, a tort cause of action generally does not lie where it is duplicative of a claim sounding in contract. However, an actionable tort may exist when the plaintiff asserts that the defendant breached a duty independent of the contract. See Balta v. Ayco Co., LP, 626 F. Supp. 2d 347.The duty can be considered independent of the contract even if it arises out of

the relationship that the contract created. This legal duty must spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent upon the contract. (Id).

Defendants cannot demonstrate that Plaintiffs breached any fiduciary duties to Gitman, the Plaintiff Companies or both.

Here, Gitman, individually, asserts a breach of fiduciary duty claim against Dardashtian arising out of Dardashtian's role as a member of CSV (Guaglardi Decl. Ex. E, para 85). Gitman maintains in conclusory fashion that "[a]s a member of CSV, at all relevant times, Dardashtian has owed various fiduciary duties to Gitman (a 50% owner and member) to conduct himself and discharge his duties and responsibilities in good faith, loyally, and fairly." (Id). Gitman concludes that Gitman has "been injured by Dardashtian's breaches in an amount to be determined at trial," but believed to be not less than $500,000.00 (Id at 87). However, Gitman does not allege or demonstrate which alleged claim of right and/or harm belongs to Gitman or the Plaintiff Companies, or both.

In the Defendants' Counterclaim under "Statement of Facts" there are four (4) theories upon which Defendants' breach of fiduciary duty claims are based:

(1) In paragraphs 43 and 45, Gitman alleges that due to Dardashtian's "inaction", Dardashtian "lost the Plumburs' eBay seller account, but Defendants have not produced any discovery to substantiate this claim or identify how the Plaintiff Companies were damaged due to such alleged "in" even if that were true (Id. at para 43). Gitman does not specify whether this alleged claim of right and/or harm belongs to Gitman or the Plaintiff Companies, or both. Gitman alleges Dardashtian's "inaction"caused his personal eBay account to be suspended because it was "linked" to CSV's Plumburs eBay account. Defendants have not produced any discovery to substantiate this claim. Defendants also do not plead, from where, Dardashtian's alleged duty to protect or maintain Gitman's *personal* eBay account arises. Defendants do not specify whether this alleged claim of right and/or harm belongs to Gitman or the Plaintiff Companies, or both.

(2) In paragraphs *46-54*, Gitman contends that Dardashtian failed to "fulfill promises to the Developers" which also remains unsubstantiated, illogical and is not a claim upon which Defendants even have standing to assert. The Developers continue to work for the Plaintiff

Companies as of the present. Gitman does not demonstrate that such duty to fulfill promises to CSV's freelancers exists nor how such allegations, even if they were true, harmed the Plaintiff Companies or Gitman. Gitman again does not allege or demonstrate whether this alleged claim of right and/or harm belongs to Gitman or the Plaintiff Companies, or both. Nor does Gitman demonstrate that he has standing to assert such illusory claims on behalf of the Developers.

(3) In paragraphs 55-59, Defendants maintain that "upon information and belief" Dardashtian forged Gitman's signature on a "work order" with Bagaiev, however Gitman contends that "Bagaiev knew it was a forged document, he never executed it." Gitman does not explain how such alleged misconduct, even if it were true, harmed the Plaintiff Companies, or Gitman, or both. Gitman alleges the same forgery claim regarding "debt instruments" with NDA Holding, LLC which had the effect of reducing CSV's outstanding debts and transferring full ownership of NDAP including carpartkings to CSV. Gitman does not produce any discovery to substantiate this claim nor explain how such alleged misconduct, even if it were true, harmed the Plaintiff Companies, or Gitman, or both.

(4) In paragraphs 70-82, Gitman claims that Dardashtian has "refused to consent to an accounting" which does not give rise to a breach of fiduciary duty claim, as both Gitman and Dardashtian agreed by way of the CSV Operating Agreement that neither party may seek an accounting. Gitman relies on the CSV Operating agreement in support of his counterclaims. Complying with the CSV Operating Agreement does not constitute a breach of contract or duty, and is entirely without merit. Notwithstanding, Gitman again does not allege or demonstrate how this caused harm to Gitman or Plaintiff Companies and whether this claim of right and/or harm belongs to Gitman or the Plaintiff Companies, or both.

Gitman's First Counterclaim is based on conclusory allegations of fiduciary wrongdoing. Those allegations that could arise from a fiduciary relationship articulate a fiduciary duty that is already "expressly encompassed within the contractual relationship by the requirement implicit in all contracts of fair dealings and good faith." See Brooks v. Key Trust Co. Nat'l Assoc., 26 A.D.3d 628, 630 (3d Dept. 2006) (citation omitted).

Even if Gitman's allegations are true, Gitman's individual breach of fiduciary duty claims against Dardashtian arise either expressly or impliedly under the CSV Operating Agreement and/or NDAP Operating Agreement which govern the fiduciary responsibilities of the parties.

Indeed, Defendants' Third Counterclaim for breach of contract alleges that Dardashtian

"improperly disseminated the Plaintiff Companies' Confidential Information," and that

"Dardashtian used Confidential Information in connection with his employment with Yotpo,"

causing "significant damage to Gitman." (Guaglardi Decl. Ex. E at paras 97-99).  In paragraphs

59-69 of Defendants' counterclaim, Defendants use the same alleged facts to support

Defendants' breach of fiduciary duty claims. Defendants specifically allege that "Dardashtian

breached his fiduciary duties to the Plaintiff Entities by misappropriating confidential and/or

proprietary information belonging to those entities," which are the exact same allegations to

support both causes of action. (Id).

Defendants do not allege or demonstrate any distinction between Defendants' breach of

contract and breach of fiduciary duty causes of action which are again, redundant and

duplicative.  See Celle v Barclays Bank P.L.C., supra, 48 AD3d 301 [1st Dept 2008] (a breach of

fiduciary duty claim was properly dismissed as the agreement "covers the precise subject matter

of the alleged fiduciary duty").

Defendants fail to demonstrate a cognizable breach of fiduciary duty cause of action.

(ii)     *Second Counterclaim- Breach of Fiduciary Duty by Dardashtian to the Plaintiff Companies*

Gitman's Second Counterclaim *mirrors* Defendants' First Counterclaim, but is asserted

derivatively on behalf of the Plaintiff Companies. Defendants allege in support of this claim the

same allegations, namely that the "aforesaid misconduct by Dardashtian constitutes numerous

breaches of the fiduciary duties he owed to CSV and NDAP." (Guaglardi Decl. Ex. E, paras 84-

86; compare with 90-92).  However, again Gitman does not allege or demonstrate with

particularity, which alleged claim of right and/or harm belongs to Gitman or the Plaintiff

Companies, or both. Nor does Gitman demonstrate that he has standing to assert such claims on behalf of the Plaintiff Companies.

Notably, it was in Defendants' prior motion to dismiss Plaintiffs' Complaint [ECF #62], where Defendants argued to dismiss Plaintiffs' breach of fiduciary duty claims because "the pertinent inquiry is whether the thrust of the plaintiff's Action is to "vindicate his personal rights as an individual and not as a stockholder on behalf of the corporation," *citing* Albany-Plattsburgh United Corp. v. Bell, 307 A.D. 2d 416 (3rd Dept. 2003). Defendants argued that Plaintiffs failed to allege with the "requisite particularity the various individual and purportedly derivative claims to provide the required clarity (citations omitted). See, Defendants' Reply Brief dated August 25, 2017 [ECF 62].

By Decision and Order dated November 28, 2017, this Court found that "Dardashtian adequately segregates the derivative and individual claims" and rejected Defendants' argument (Guaglardi Decl. Ex. I, p. 11). However, Defendants fail to plead the same particularity here.

Aside from asserting two separate breach of fiduciary duty claims, Defendants do not articulate how Defendants were harmed either individually or derivatively. Both causes of action rely on the "aforesaid misconduct by Dardashtian" yet there is no distinction in each cause of action asserted. These claims are both redundant and duplicative and should be dismissed.

Defendants fail to adequately plead their Second Counterclaim.

If a party "fails to properly support an assertion of fact," the court may "consider the fact undisputed." "The court shall grant summary judgment if the movant shows that there is no genuine dispute…" (F.R.C.P 56).

Since Defendants incorporate "each and every allegation" set forth in its "Statement of Facts," in support of its First and Second Counterclaims, Plaintiffs hereby make reference, *with*

*particularity*, to those portions of Defendants' factual assertions that are clearly contradicted and refuted by documentary evidence:

## Plumburs

a. *In Paragraphs 43-44*, Defendants claim that because of Dardashtian's alleged "inaction," CSV "lost" its Plumbur's eBay seller account. Gitman's claims are illusory. While Gitman blames Dardashtian, Gitman was a co-manager of CSV and its CTO at the time. A company email from 2014 shows Gitman involved in eBay management for NDAP, particularly the monitoring of eBay seller account ratings. As CTO, Gitman was responsible for managing the Plumbur's eBay account. (See Dardashtian Aff. Ex. 93). Emails from July 2013 and January 2014 prove Plumburs' outside partner created the eBay account at *Gitman's* behest and that *Gitman* requested the eBay credentials from the Plumbur's partner who set it up. (Id at Exs. 91 and 92). Gitman had to login to link his personal account to the business one, proving he had access to manage or supervise the eBay account. (Id at Para 45). An email from January 2014 also shows that Gitman launched the Plumbur's eBay account. (Id at 95).

b. *In Paragraph 45*, Defendants claim that because of Dardashtian's alleged "inaction," Gitman's personal account was "suspended." Gitman says after 18 years of developing a perfect rating, he "is now unable to buy or sell any items on eBay due to Dardashtian's lack of basic eBay account management". Gitman's claim is likewise illusory, as the eBay account *personally* belonged to Gitman, so it would be Gitman who is responsible for "basic eBay account management," of his own account (Id at para 45). Gitman claims that he was protective of his personal eBay account rating for 18 years, but neglected to safeguard it or be involved in its management until it was "suspended." Defendants do not demonstrate how Dardashtian or CSV would be responsible for Gitman's "personal eBay account" or how such alleged conclusory allegations constitutes a breach of fiduciary duty to Gitman.

c. Gitman also deceptively neglects to inform the court of clearly contradictory evidence demonstrating that his own "inaction" which damaged Plumburs. Email correspondence from August of 2016 through September of 2017, reflects Plumbur's 50% partner, who emailed Gitman repeatedly to get him to work on or assign a developer to Plumburs. He asked that the developers load more "skus," The partner asked Gitman, the CTO, to please have a developer address the technical errors, but Gitman repeatedly ignored him. When Gitman did reply he wrote, "I haven't had time to look at it. I should have some time over the next week." The following week the partner followed up again, "how's this looking?" to which Gitman replied, "I haven't had an hour to look at it yet. I'll try to find time this weekend." The following week the partner emailed Gitman again, asking, "Hey, where does this stand?" and was ignored. About three weeks later the partner again wrote, "Hey David, Is there any update on getting the duplicate transactions fixed in the system yet and having the new products loaded?" He continued, "if this has zero priority then that needs to be addressed. The products we do have listed have a hit ratio that is highly encouraging... There are new lines that are being established now that could vastly change the trajectory of the venture...to stand still any

longer has past the point of tolerance…" Gitman replied, "I agree with you. However I want to see a clean set of books before we make any decisions." Gitman continued to neglect Plumburs and ignore the partner, tying Dardashtian's hands because of his refusal to devote CSV resources to Plumburs. (Exhibits 96, 97, 98, 99) Skype conversations in May 2016, when Gitman left CSV for a full-time job at Cue Connect show Dardashtian encouraged Gitman to work on or put CSV developer resources toward Plumburs. (Id at Ex. 94).

## NDAP

a.   Dardashtian and Gitman shared responsibilities for the companies as co-owners and co-managers pursuant to the CSV Operating Agreement and NDAP Operating Agreement which do not define specific managerial roles and responsibilities. (Dardashtian Aff. Ex. 2, CSV Operating Agreement). Defendants falsely allege that Dardashtian did not create an "outbound" sales and marketing program when in reality, ecommerce companies generate sales and acquire customers through "inbound" marketing such as email marketing, generating fresh content (SEO) through blog posts and articles, converting traffic into leads and purchases, retargeting customers, paying for online ads, adding referral and loyalty programs, etc.. Numerous published articles, a few of which are attached highlight Dardashtian's involvement in developing NDAP and ChannelReply into profitable businesses. (See Dardashtian Aff. Ex. 102; see also Bagaiev Aff. at paras 5-7). It is respectfully submitted that Gitman's tit for tat weighing of daily contributions is irrelevant and does not demonstrate a viable breach of fiduciary duty cause of action.

## ChannelReply

a.   The documentary evidence utterly refutes Gitman's allegations that Dardashtian was not involved in ChannelReply. See e.g. Bagaiev Aff. at paras. 15, 22, 100-101). It was Gitman who was seldom involved in ChannelReply (Id at para 102 "Dave was not involved in the ChannelReply product at all during this time period while Mike was involved in the development of the product every day"). Gitman alleges that on and around 2014 he "developed the idea for ChannelReply," yet his own email welcoming lead developer Konstantyn Bagaiev to the NDAP team, states that Bagaiev had been working on ChannelReply for CSV for "two years" since 2012. (See Guaglardi Decl. Ex. E para 35; see also Dardashtian Ex. 7b).

b.   Gitman falsely claims that *he* developed plans that "included creating a ChannelReply application for Zendesk," but it was actually Zendesk's partner and integrations manager who reached out to ChannelReply in February of 2014 after ChannelReply had established its beta testing, because he saw "Michael's post in the forum about building an eBay integration and how it's almost complete" and invited ChannelReply to submit an app to Zendesk. As evidenced in the email Dardashtian was the lead on ChannelReply's partnership with Zendesk and does to this day. Dardashtian Aff. Ex. 107. ChannelReply has since developed multiple integrations, solutions and advancements, many of which have been created in Gitman's absence. See Dardashtian Aff. Exs 19c and 20b-I; see also Bagaiev Aff. 103). When Gitman left for Cue Connect, Dardashtian succeeded in doubling ChannelReply's

monthly sales without him (Id at Ex. 19c). Gitman did not begin to get involved with ChannelReply's actual business operations until he threatened the Company's existence by unlawfully usurping its codes, customers and assets just a few months later in late May of 2017, much to ChannelReply's detriment, writing to Bagaiev "I'm back, and better than ever." (Dardashtian Aff. Ex. 111). When Gitman was trying to run Channel Reply Inc., he was unfamiliar with ChannelReply's operations, including but not limited to its customers, monthly revenue and developer's hourly rates and had to ask Bagaiev for all the details on Skype (Dardashtian Aff. Ex. 109).

c. Defendants' claim that "Dardashtian was also unable to develop new ChannelReply product features, failed to negotiate an Amazon India account for ChannelReply service, and was unable to negotiate a contract with Salesforce, Zendesk, Freshdesk, Amazon or eBay" is likewise false. The proof demonstrates that ChannelReply does have an Amazon India integration along with over 20 other countries (See Dardashtian Aff. Ex. 110: "It simply took time due to Amazon's strict guidelines of auditing and vetting 3rd party app developers"). Gitman again misleads the court when he says Dardashtian could not negotiate 3rd party contracts. ChannelReply now has many new features and a variety of 3rd party integrations that it has built over the years, as the company has expanded, over and above the initial Zendesk app (See Bagaiev Aff. at para 101)

### Developers

a. Defendants reference one email taken out of context as their sole proof in support of their claim a joint venture was created between CSV, Gitman and the developers. (Guaglardi Decl. Ex. E para 34). In fact, the only equity discussed with the Developers was the possibility of a future employee stock option in a new LLC that would be a CSV subsidiary owned 50/50 by Dardashtian and Gitman. Bagaiev, who is a supposed member in Gitman's "joint venture" denies having any ownership in ChannelReply (See Bagaiev Aff. para 105). There is no joint venture and Gitman has offered not a single shred of documentary evidence to support his fabricated claim. See also Exhibits 13 14, 15 19a, 19b, 20a-i, which undermine Gitman's contentions.

b. Defendants allege that "upon information and belief," Dardashtian "forged Gitman's signature" on a "work order between NDAP and Bagaiev dated January 1, 2016" by "placing Gitman's electronic signature on the document without authorization." (Dardashtian Aff. Ex. 8). Defendants allege, "Dardashtian acknowledged this forgery to Bagaiev during an online Skype conversation on January 29, 2016." (Guaglardi Decl. Ex. E para 57). Such allegations are false. In January of 2016, Bagaiev asked Dardashtian over Skype for a contract to provide to his bank (Dardashtian Aff. Ex. 124). Dardashtian was "surprised Gitman had not handled this already" and replied, "we have a contract, didn't you sign it?" Bagaiev responded, "I never seen it. Do you have a copy?" Dardashtian then sent him CSV's standard independent contractor agreement, but Bagaiev did not seem to know how to e-sign the document, writing "I suppose we should print last page, sign it and scan ?" Dardashtian signed the work order "to illustrate how Bagaiev could easily e-sign it." (Id). He did not sign the actual agreement. Bagaiev replied, "how did you do that?" and Dardashtian replied, "there is a signature button in .pdf, click the little briefcase on top." Bagaiev replied back, "Ok, I signed it. Thanks." (Id). There was no signature, thus there was no forgery as Gitman contends.

Notwithstanding, the proof also shows that the parties historically executed documents on each other's behalf depending on who was handling a contract or near their computer when a matter needed to be handled. For example, when Jeremy Falk emailed Dardashtian and Gitman a brokerage agreement, Dardashtian wrote to Gitman on Skype, "u want me to sign agreement for u?" Gitman replied, "great letter," and Dardashtian replied, "yea, def looks good." Dardashtian later signed the agreement for both of them and forwarded it back with Gitman cc'd on the email (Dardashtian Aff. Ex. 121).

## ACCOUNTING AND ACCESS TO FINANCIAL RECORDS

a.  Defendants' claim that "Dardashtian controlled company finances for all of the entities." (Guaglardi Decl. Ex. E at para 15). As set forth above, Dardashtian and Gitman have always had equal access to the company's Quickbooks account, credit cards and bank statements. There was one company Quickbooks account which Defendant Gitman has accessed throughout the history of Plaintiff companies. (Dardashtian Aff. Ex. 114).  There was one company American Express account and Dardashtian and Gitman each had a credit card for it. Both charged company expenses on their respective credit cards. There was one CSV bank account and both Dardashtian and Gitman had access to it, as evidenced by Gitman's ability to remove all company funds unilaterally on May 29, 2017 (Dardashtian Aff. Exs 5b, 45a, 45b, 48).

b.  Defendants' claim that Dardashtian maintained poor accounting practices are clearly contradicted by the documentary evidence (Guaglardi Decl. Ex. E para 70). Emails show that apart from Gitman annually making changes to the company books, Gitman traditionally hired and interacted with all company bookkeepers that he retained (Dardashtian Aff. Exs 118, 119, 226).

c.  Defendants' claim that Dardashtian blocked Gitman's access to the books and "blocked [bookkeeper] Frayman from providing Gitman with the requested accounting." (Guaglardi Decl. Ex. E para 23). Though Dardashtian was not required to provide an accounting pursuant to the CSV Operating Agreement as set forth above, contrary to Defendants' claims, on or about October 31, 2016 Gitman had been reviewing the books and told Dardashtian he didn't "understand what's going on with the books." Dardashtian replied, "why don't we run thru them…" but Gitman insisted on a "third-party doing right now." Dardashtian suggested CSV bookkeeper Freyman to go over the books with Gitman. Gitman said he would be "fine with Freeman doing it". (Dardashtian Aff. Ex. 118). Between October 2016 through late January of 2017, Gitman hired or attempted to hire multiple bookkeepers over the course of just three months including Zachary Mayhew, Dee Clay and Mary Faith Andan. On and around November 1, 2016, when Defendant asked Dardashtian by email if he could hire Dee Clay, Dardashtian responded, "You make the call, I trust you." Contrary to paragraphs 73 and 74 in Gitman's Counterclaim, CSV's Quickbook logs show that Defendant Gitman logged on to Quickbooks five times on the *same day* that Gitman claims Dardashtian "blocked" Gitman's access. (Id at Ex. 115). Defendants' claim that Dardashtian did not "cooperate" with Ms. Andan is likewise false as reflected in correspondence exchanged between them. See e.g. Dardashtian Aff. at Ex 129. Ms. Andan accessed the books at least 100 times leading up to this litigation (Id).

d. Defendants' bad faith claim that Dardashtian blocked Gitman from being an administrator on the CSV accounting software is also false and refuted by the documentary evidence. As of January, 2017 when Defendant Gitman claims that he was "blocked" from being an administrator on Quickbooks, emails show Gitman *was* the company administrator on the account when Dardashtian was limited to "user" of that account (Dardashtian Aff. Ex. 118).

e. Defendants' claim that Dardashtian took "payments from CSV and/or NDAP from 2011 to February 2015". (Guaglardi Decl. Ex. E para 20). Defendants also claim, however, that "Gitman also received payments from CSV and/or NDAP during this time" but "do not know if [Dardashtian received payments equal to those taken by Dardashtian." (Id at para 21). Defendants' allegations are without merit, but are false and unsubstantiated. Gitman's discovery responses confirm that Defendants are not in possession of any proof of disproportionate distributions, misappropriation or theft allegedly committed by Dardashtian. (Guaglardi Decl. Ex. M at p. 5, para. 12; see also Dardashtian Aff. at Exs. 20a-i).

## B. PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON DEFENDANTS' THIRD COUNTERCLAIM FOR BREACH OF CONTRACT

The New York Court of Appeals has held that general allegations which are merely conclusory and unsupported by competent evidence are insufficient to defeat a motion for summary judgment. Alvarez v Prospect Hosp., 68 NY2d 320, 324 (1986).

As set forth above, in support of Defendants' breach of contract claim, Defendants' maintain that Dardashtian has breached Section 12.2 of the CSV Operating Agreement, which provides, in relevant part, that neither Gitman nor Dardashtian shall "publish, communicate, divulge…" the Plaintiff Companies' "Confidential Information." (Guaglardi Decl. Ex. E at para 97). Defendants allege that "[u]pon information and belief, Dardashtian has used Confidential Information of CSV, including, without limitation, customer lists and product development information, in connection with [Dardashtian's] employment with Yotpo in breach of the CSV Operating Agreement." (Id. at 98).

On May 11, 2020, Plaintiff served to Defendants post-deposition discovery requests, demanding *again* that Defendants produce "all documents and emails that Mr. Gitman contends

he has to support that Michael Dardashtian allegedly took customers from Plaintiff

ChannelReply to Yotpo." (See Guaglardi Decl. Ex. M at demand #5 customer names

intentionally redacted). Defendants' response to this demand was that there were "[n]one in

Defendants/Counterclaim-Plaintiffs' possession." (Id). Defendants have not provided any

evidence to support this claim, or which tends to substantiate the veracity of Defendants'

allegations. Defendants have similarly not provided any evidence whatsoever that Plaintiffs have

breached Section 12.2 of the CSV Operating Agreement.

    Defendants claim in conclusory fashion that Yotpo "competes" with ChannelReply and

claims "as many as 225 ChannelReply customers may have been brought to Yotpo by

Dardashtian" and "at least 15 ChannelReply customers became first-time Yotpo customers soon

after Dardashtian officially started working at Yotpo." The only document Defendant has handed

over in discovery to support this is a spreadsheet of a list of crossover clients who use *both*

ChannelReply and Yotpo (Guaglardi Decl Ex. M at attachment "List of Channel Reply

Customers" customer names intentionally redacted). The spreadsheet belies Defendant's claims

as those customers either were or still are ChannelReply and Yotpo customers at the same time.

If Yotpo and ChannelReply were competitors, offering competing services, it would be illogical

for customers to pay for duplicative services from competing companies. Notably, the dates on

Gitman's data spreadsheet illustrate that most if not all of the clients signed up with Yotpo first,

before signing up with ChannelReply or signed up for Yotpo before Dardashtian began working

for Yotpo, which also undermines his claim that Dardashtian "brought" customers to Yotpo. (Id).

    On December 15, 2106, Gitman emailed Dardashtian, after Dardashtian joined Yotpo,

asking if Dardashtian could interview a colleague of Gitman's from Cue Connect to help run

ChannelReply, Gitman wrote, "also let me know if you want any of the CC sales guys for

Yotpo." (Dardashtian Aff. at Ex. 138). In other words, Gitman offered to help Dardashtian with Yotpo, and for purposes of this litigation, Dardashtian's actions were improper. Gitman certainly did not view Yotpo as a competitor to ChannelReply then.  Notably, on June 30, 2014, Gitman is quoted in a published article for Yotpo discussing its advantages, saying, "Optimising our site manually for millions of long-tail search terms isn't scalable. Having reviews means our customers can generate these search terms by reviewing a product," says David. "This way, we are able to turn user-generated content into new customers." (Dardashtian Aff. Ex. 137).

Defendants' claim that Dardashtian shared confidential information with Volo Commerce on "November 7, 2016," "without first obtaining a non-disclosure agreement" is likewise false. To the contrary, Dardashtian, who was exploring a potential partnership with Volo for the benefit of CSV *did sign* a mutual non-disclosure agreement and partner agreement with Volo in October of 2015. It was executed by Volo and sent back to Dardashtian the first week of November, 2015. (Dardashtian Aff. Exs. 131, 132).  Notably, the Desk.com integration, which Gitman alleges that Dardashtian used to "divert resources" away from "established ChannelReply product lines," is actually a new integration for ChannelReply that has resulted in an increase in new customers and revenue for ChannelReply. (Dardashtian Aff. Ex. 133; Bagaiev Aff. at para 103).  Gitman's contentions are without merit and Summary Judgment should be granted on Defendants' Breach of Contract claim.

## C. PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON DEFENDANTS' FOURTH COUNTERCLAIM FOR TORTIOUS INTERFERENCE WITH CONTRACT

Tortious interference with contract requires the existence of a valid contract between the plaintiff and a third party, defendant's knowledge of that contract, defendant's intentional procurement of the third-party's breach of the contract without justification, actual breach of the

contract, and damages resulting therefrom. See <u>Lama Holding Co. v. Smith Barney Inc.</u>, 88

N.Y.2d 413.

In addition, "the party asserting such a claim must allege a particular business

relationship or contract with a third party that was affected by the offending party's actions."

(<u>White v. Ivy</u>, 63 AD3d 1236 [3d Dept. 2009]; <u>Pacheco v United Med. Assocs.</u>, 305 AD2d 711,

[3d Dept. 2003][stating that the culpable conduct must be "the proximate cause of the rejection

of the... proposed contractual relations"]. See also, <u>Carvel Corp. v. Noonan</u>, 3 N.Y.3d 182

(2004) (tortious interference claim was dismissed where the plaintiffs "motive in interfering with

the [defendants'] relationships with their customers was normal economic self-interest").

Defendants are required to support this claim with more than mere speculation". See <u>Williams &</u>

<u>Co. v Collins, Tuttle & Co.</u>, 6 AD2d 302, 176 N.Y.S.2d 99 [1958]).

Defendants' allege that "Gitman and CSV entered into a joint venture with the

Developers concerning the ChannelReply platform and suite of products." (Guaglardi Decl. Ex.

E, para 102).  Defendants provide no actual proof of this so-called "joint venture" because there

never was a joint venture and Gitman knows that and is trying to mislead this Court.

Both Dardashtian and the lead developer, Konstantyn Bagaiev claim no such knowledge

of such oral "joint venture" and according to Gitman, Bagaiev was one of the members of the

joint venture and Dardashtian was another. (Bagaiev Aff. Ex. para 105: "If Dave's claim is true,

it certainly was never discussed with me..."). Rather, Dardashtian, Gitman and the Developers

once discussed the possibility of stock options in a future pool for employees of ChannelReply

(Dardashtian Aff. Exs 13a, 13b, 14,15, 16, 140). Such conversations did not create a "joint

venture" or a contract upon which a tortious interference claim could exist. Bagaiev

acknowledges that he does not have an ownership interest in ChannelReply, "David never told

me he would own half of CSV"'s interest" and it was always Bagaiev's understanding that

""Mike and Dave were equal 50/50 partners in all of their businesses..." (Bagaiev Aff. para.

105; see also Bagaiev Aff at Ex. B). Gitman's purported "joint venture" is a complete

fabrication advanced by Gitman to obtain a greater ownership interest in ChannelReply, contrary

to CSV's best interests.

CSV has always owned and operated the ChannelReply product, contracted with its

customers, collected payments, controlled its revenue and filed taxes for the same (See

Declaration of Joel Liebman, CPA "Liebman Decl."). CSV always maintained ownership and

control of the product, its profits and losses. Thus, Defendants have offered no proof to support

any of the material elements necessary to prove the existence of such an oral joint venture that is

not reflected in any document, ever.

Defendants' allegations that Dardashtian was "tasked with preparing the necessary paper

work setting forth Gitman's, CSV's and the Developer's respective ownership interests in the

ChannelReply joint venture" likewise cannot support a claim for tortious interference with a

contract that does not exist. (Guaglardi Decl. Ex. E, para 103).

Though Gitman seeks damages for not being able to continue in his unlawful activity,

Defendants fail to demonstrate how Plaintiffs' failure to "prepare paperwork" or commencement

of this suit enjoining Gitman's "joint venture" constitutes the "wrongful conduct" necessary for

their tortious interference claim. (Carvel Corp. v. Noonan, supra). Especially in light of this

Court's prior Decision and Order, and recommendation that Mr. Gitman make Channel Reply

Inc. "evaporate," Plaintiffs efforts to protect their own economic interests by preserving the

Plaintiff Companies' assets are in the best interests of the Plaintiff Companies, and is certainly

not "tortious conduct" for which a tortious interference claim can arise. With the exception of

Gitman's stock plan agreements with the Developers for Gitman's competing company Channel Reply Inc., Defendants have failed to demonstrate with any competent evidence the existence of an enforceable contract that Plaintiffs purportedly interfered with.

For these reasons, it is respectfully submitted that dismissal of Defendants' Fourth Counterclaim should be academic, and summary judgment should likewise be granted.

## D. PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON DEFENDANTS' FIFTH COUNTERCLAIM CLAIM FOR TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

To establish such a claim, Defendants must likewise demonstrate that the Plaintiffs' interference with Defendants' prospective business relations was accomplished by "wrongful means" or that Plaintiffs acted for the sole purpose of harming the Defendants (see, Glen Cove Assocs. v North Shore Univ. Hosp., 240 AD2d 701, 702, lv denied 91 NY2d 801; NBT Bancorp v Fleet/Norstar Fin. Group, 215 AD2d 990, affd 87 NY2d 614, supra). "Wrongful means" includes physical violence, fraud, misrepresentation, civil suits, criminal prosecutions and some degree of economic pressure, but more than simple persuasion is required ( Guard-Life Corp. v Parker Hardware Mfg. Corp., supra, at 191); see also, Slabakis v. Schik , 2016 N.Y. Slip Op. 31584(U), need control, profits and losses, corporate docs can show opposite intent).

Again, the only "joint venture" upon which Defendant Gitman's tortious interference claim could possibly depend, is the same "joint venture," Channel Reply Inc., that Gitman was ordered by this Court to dissolve as it both unlawfully interfered with and improperly utilized and otherwise misappropriated the Plaintiff Companies' proprietary property and trade secrets to operate its unlawful business (See Dardashtian Aff. Ex. 26).

The only evidence of Plaintiffs' purported interference with Defendants' prospective albeit unlawful, business relations is by the very commencement of this Action, wherein

Plaintiffs sought to prevent (1) Defendants from unlawfully competing with the Plaintiff Companies, (2) Defendant Gitman's siphoning the Plaintiff Companies funds; (3) Defendant Gitman removing Dardashtian from access to the Plaintiff Companies' accounts; (4) Defendant Gitman inducing the Developers to resign from the Plaintiff Companies and to join Gitman in his new and unlawful competing venture; and (5) Defendant Gitman usurping and otherwise misappropriating the Plaintiff Companies' proprietary code, customers, trade secrets, tradename and other assets to operate a direct competitor, Channel Reply Inc.

This Court granted Plaintiffs such temporary restraints to preserve the status quo (Guaglardi Decl. Ex. G). It is from the preliminary relief awarded to Dardashtian and the Plaintiff Companies that has enabled the Plaintiff Companies to no longer suffer the threat of a frustration of purpose, and possible demise, and to continue doing business in the e-commerce industry. The Court's preliminary order (1) requiring Gitman to return the Plaintiff Companies' funds back into the Plaintiff Companies' operating banking accounts (that Gitman admits he took and has since restored, but could not be fully restored, including the Slack, Stripe and Chargebee accounts[12]); and (2) requiring Gitman to restore Dardashtian's access to the Plaintiff Companies' accounts and Dardashtian's personal accounts (which Gitman admits he did and has since restored) establishes Gitman's misappropriation of the Plaintiff Companies' property. As a matter of law, Defendants cannot establish that Plaintiffs' commencement of this Action, which already demonstrated a likelihood of success on the merits contrary to Gitman's assertions, constitutes "wrongful means" as contemplated under existing law. See <u>Glen Cove Assocs. v</u>

---

[12] Gitman certified to this Court that he "moved" the Plaintiff Companies' Chargebee and Stipe accounts to Channel Reply, Inc." but those specific accounts no longer exist. See Guaglardi Decl. Ex. J at paras, 96, 101. Gitman created new Chargebee, Slack and Stripe accounts to provide Dardashtian with access "in an effort to fully comply with the TRO." Id at para 101.

<u>North Shore Univ. Hosp.</u>, 240 AD2d 701. See, <u>Vogt v Witmeyer</u>, 87 NY2d 998, 999; <u>Matter of Pamilla v Hospital for Special Surgery</u>, 223 AD2d 508).

Lastly, Defendants allegation that Dardashtian somehow "mislead the Developers and betrayed their trust causing damage to the relationship between the Developers, Gitman and CSV" is absurd and entirely without merit (Guaglardi Decl. Ex. E, para 112). Gitman lied and misled Bagaiev as Bagaiev testifies in his Affidavit. Thus, Gitman claims, that "the ChannelReply platform and product lines were not properly expanded and ***Gitman*** lost out on considerable revenue and marketplace exposure." (Id at para 113) (Emphasis added).

In other words, because Gitman could not pursue his unlawful competing company, Channel Reply Inc. and the Developers chose to return to work for the Plaintiff Companies, Gitman, **himself,** lost out on considerable revenue and marketplace exposure by not cutting Dardashtian out of ChannelReply and keeping the lion's share to himself. Gitman's fantastic cause of action can only be viewed to further demonstrates that Gitman's actions were contemptuous and contrary to the concept of good faith and fair dealing. Clearly, Gitman's conduct was not ever designed to be in the best interests of the Plaintiff Companies who he sought to eliminate by forming his competitor company, Channel Reply Inc. The facts are undisputed that after Gitman seized the trade secrets and assets of ChannelReply for Channel Reply Inc., Bagaiev questioned Gitman about why Dardashtian would ever agree to accept 5% of a company when Dardashtian was already a 50% owner of the same company. (Bagaiev Aff. para 105-106; Ex. A). Gitman's prospective business advantage was through an unlawful business that he unlawfully created, to the detriment of the Plaintiff Companies, harming the Plaintiff Companies and Dardashtian contrary to his fiduciary duties and well-settled law.

Plaintiffs should be entitled to Summary Judgment on Defendants' Fifth Counterclaim which should be dismissed in its entirety.

## E. PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON DEFENDANTS' CLAIM FOR UNUST ENRICHMENT AND THE IMPOSITION OF A CONSTRUCTIVE TRUST

A cause of action based on unjust enrichment is closely related to a cause of action to impose a constructive trust, since "[t]he ultimate purpose of a constructive trust is to prevent unjust enrichment" (Cruz v McAneney, 31 AD3d 54 [2006].

To establish an unjust enrichment cause of action, Defendants must demonstrate that (1) the Plaintiffs were enriched, (2) at that Defendants' expense, and (3) it is against equity and good conscience to permit the Plaintiffs to retain what is sought to be recovered (see Paramount Film Distrib. Corp. v State of New York, 30 NY2d 415, 421, 285 NE2d 695, 334 NYS2d 388 [1972]). "[T]he essential inquiry in any action for unjust enrichment or restitution is whether it is against equity and good conscience to permit the defendant to retain what is sought to be recovered" (id.).

Here, Defendant Gitman asserts this claim, alleging that Dardashtian took "unequal distributions and/or expense payments from CSV as compared to Gitman", and Dardashtian's receipt of unequal benefits is inequitable. (Counterclaim at paras 119-120). Defendants further allege that Dardashtian "directed all income received from the ChannelReply platform to CSV's bank account. However, the parties to the ChannelReply joint venture entered into an oral constructive trust regarding the ownership interest of the ChannelReply platform." Gitman further claims that CSV was "not the sole owner of the ChannelReply platform" and therefore Dardashtian has sought to "unjustly enrich himself" by claiming that "the ChannelReply platform belongs to CSV in its entirety." (Guaglardi Decl. Ex. E, para 121-122).

Defendants' contentions are again illogical. By Dardashtian claiming that CSV solely owns ChannelReply in its entirety, Dardashtian is claiming that Gitman and Dardashtian **equally** own ChannelReply 50/50 as supported by the CSV Operating Agreements (Dardashtian Aff. Ex. 2, last page; see also Liebman Decl). Dardashtian clearly cannot be enriching himself, as Dardashtian's claim that CSV solely owns ChannelReply (which is supported by actual documentary evidence) enriches both Dardashtian and Gitman **equally**. The CSV Operating Agreement was signed by Gitman, and its ownership is substantiated by Gitman's own income tax returns and CSV's Form K-1's (Id) that show Dardashtian and Gitman as equal 50/50 owners. Gitman's contention that Dardashtian has been unjustly enriched for sharing an equal ownership interest with Gitman in ChannelReply is delusional.

Second, Defendants' have failed to demonstrate with any evidence whatsoever that Channel Reply Inc. is not solely owned by CSV 100%, as set forth above, and as agreed to in the CSV Operating Agreement, in every income tax return ever filed by CSV and Gitman and Dardashtian's respective tax returns (and Form K-1's) that reflect 50/50 ownership between the parties. (See Liebman Decl).

Third, Defendants have failed to demonstrate that Dardashtian unlawfully took "unequal distributions and/or expense payments from CSV" as again, Defendants in their discovery responses confirm that they have no such proof in their possession. (Guaglardi Decl. Ex. M; para 12). Gitman offers no proof and has no proof for these claims as he has had unfettered access to CSV's books, financial records and accounts. (Dardashtian Aff. Ex. 114).

Defendants have failed to allege and/or demonstrate that Plaintiffs were unjustly enriched in any way at Defendant Gitman's expense, or that there is any basis for the imposition of a

constructive trust. Plaintiffs should be entitled to Summary Judgment on Defendants' Sixth

Counterclaim which should be dismissed.

## F. PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON DEFENDANTS' SEVENTH COUNTERCLAIM FOR DECLARATORY JUDGMENT, WHICH SEEKS A DECLARATION THAT GITMAN IS FREE TO COMPETE

A claim for declaratory judgment "requires an actual controversy between genuine

disputants" and may not be used "as a vehicle for an advisory opinion." Long Is. Light. Co. v.

Allianz Underwriters Ins. Co., 35 A.D.3d 253 (1st Dep't 2006).

This Count truly illustrates Gitman's true motive in this litigation, to be able to take

ChannelReply's proprietary property and trade secrets and use them for his benefit by competing

with the very company he is half owner of, to the detriment of the Plaintiffs. His intentions

evidence Gitman's bad faith.

Defendant Gitman contends that because there "is no agreement which restricts Gitman's

ability to compete against CSV, NDAP, and/or ChannelReply" and therefore Gitman is "free to

own and/or work for any entity which competes with CSV and/or its related entities as long as

Defendant Gitman does not utilize CSV's Confidential Information (as defined in paragraph 12.2

of the CSV Operating Agreement) to do so." (Counterclaim at para 128-130).

In support, Gitman relies on Article 12.1 of the CSV Operating Agreement, which states,

in pertinent part,

> Competitive Undertakings. *Except as otherwise provided herein*, any Member and Management may engage in business ventures of any nature and description independently or with others, including, but not limited to, business of the character described in Article 3, and neither the Company nor any of the Members shall have any rights in or to such independent ventures of the income or profits derived therefrom." (Guaglardi Decl. Ex E, para 129) (Emphasis added)[13].

---

[13] Gitman contends that he can utilize ChannelReply's assets to compete with CSV and the so-called ChannelReply "joint venture" as competitive undertakings are permitted under the CSV Operating Agreement. Thus, Gitman is acknowledging that ChannelReply is governed by the CSV Operating Agreement. Gitman's conflicting theories pertaining to why he thinks he should be able to usurp or otherwise own ChannelReply separate and apart from

The CSV Operating Agreement does not say that Gitman is free to compete provided that he does not use the Plaintiff Companies' Confidential Information.

Notably, Defendants previously sought the *same relief* in their motion to dismiss Plaintiffs' Verified Complaint. By Order dated November 28, 2017, this Court recognized that "CSV permits its members to form and operate a competing business, but not to take CSV's actual business." (Emphasis added) (Guaglardi Decl. Ex. at p 4). Though Gitman contends that ChannelReply is not "proprietary," this Court likewise found that "the 'outside activities' clause pursuant to Article 8.2(d) of the CSV Operating Agreement prohibits Dardashtian and Gitman from using CSV's confidential and proprietary information for their own benefit or that of any competing business (Id). (Emphasis added). The CSV Operating Agreement also forbids Dardashtian and Gitman from using CSV *money or property other than for CSV's benefit.*"(Id, *citing* Article 8.2(d) of the CSV Operating Agreement) (Emphasis added).

Though the CSV Operating Agreement permits "competitive undertakings" it does not entitle Defendant Gitman to violate the law, including purposely damaging the Plaintiff Companies by unlawful means and for his own selfish and pecuniary gain.

"An injury to a person's business by procuring others not to deal with him, or by getting away his customers, if unlawful means are employed, such as fraud or intimidation,  or if done without justifiable cause, is an actionable wrong." See Duane Jones Co. v Burke, 306 NY 172, 190, [1954].)

A business or enterprise, has a title or name well established in the public mind, the owner has definite rights and remedies against another who unfairly uses such title or name in his

---

CSV, themselves evidence that the joint venture never occurred. It is just one of several false theories Defendants have put forth in bad faith to accomplish the ultimate goal of doing the very harm that the Court's preliminary injunction was designed to prevent.

business and thereby deceives or confuses the public.  In such cases, the latter is held

accountable on the theory that he has engaged in unfair competition, rather than on the theory

that he has converted or appropriated to his use the property of the former. (See American Law

Institute, Restatement, Torts, § 755; United Drug Co. v. Rectanus Co., 248 U.S. 90, 97; Klein v.

Lawson, 58 N. Y. S. 2d 152, affd. 269 App. Div. 935.)

Here, Defendant Gitman carefully planned and executed an unlawful scheme by

soliciting Falk and the Developers, with the intention of misappropriating Plaintiff Companies'

proprietary property to create competing businesses under the misplaced guise that he is "freely

permitted to do so," by way of the "competitive undertakings" provision contained within Article

12 of the CSV Operating Agreement as his shield. (Dardashtian Aff. Exs. 23, 37, 38, 39, 41, 42).

As stated above, Gitman sent ChannelReply's confidential profit and loss statements to

Falk (Gitman's undisclosed business partner in another undisclosed e-commerce business Accel

Commers), without Dardashtian's authorization or consent, which at minimum, provided Falk

with greater knowledge of ChannelReply's finances, and would assist Gitman with his new

unlawful competing businesses (Id at Ex. 23). Gitman also defamed Dardashtian to the

Developers, inducing the Developers to resign from the Plaintiff Companies and to join Gitman

in his "joint venture" Channel Reply Inc., blatantly utilizing the same ChannelReply tradename

to compete with ChannelReply (Dardashtian Aff. Ex. 34). See e.g. United Drug Co. v. Rectanus

Co., 248 U.S. 90, 97. Gitman then induced the Developers to assist Defendant Gitman in the

removal of Dardashtian from having access to all of the Plaintiff Companies' online accounts,

and transferring the Plaintiff Companies' accounts to new accounts maintained by Gitman and

Channel Reply Inc. (Dardashtian Aff. Ex 57; 59). Again, Gitman usurped all of the Plaintiff

Companies' proprietary and confidential information, including the trade secrets and code for the

ChannelReply platform for the benefit of Defendant Channel Reply Inc. (Id at Ex. 41; 26). New York courts have long held that the misappropriation and improper use of another's trade secrets is sufficient to constitute a claim for unfair competition. (CBS Corp. v Dumsday, 268 AD2d 350, 353, 702 NYS2d 248 [1st Dept 2000].)

Neither the CSV Operating Agreement nor this Court in its November 28, 2017 Decision, interpreted such conduct to be protected under Article 12 of the CSV Operating Agreement. Defendant Gitman's request for declaratory judgment entitling him to engage in such continuing misconduct provided that he *merely* refrain from using the Plaintiff Companies' "Confidential Information" is offensive to the concept of good faith and fair dealing and to his respective fiduciary obligations to the Plaintiff Companies[14].

Defendants' request for a declaratory judgment to compete only evidences more of the same continuing breach of Gitman's duty of loyalty to CSV and intention not to act in the best interests of CSV and to arguably attempt to put it out of business for the purpose of creating the very same product and depriving Dardashtian of his share.

Defendant Gitman's continued attempt to expand his ability to compete with the Plaintiff Companies only further demonstrates Gitman's absolute disloyalty to the Plaintiff Companies, which he still owns. Gitman's request that this Court condone or otherwise award Gitman relief that would permit Gitman to interfere with the Plaintiff Companies' best interests, while using the Plaintiff Companies' technology, know how, intellectual property, trade name, Developers and customers further undermines his standing to assert derivative claims on the Plaintiff Companies' behalf.

---

[14] When Bagaiev returned to work for CSV and signed a new independent contractor agreement, Gitman wrote to Bagaiev: "I'm asking the Judge to dissolve CR and all other entities. It was worth saving before you signed the papers. At this point I see no future in us working well together and think everything should be dissolved." (Dardashtian Ex. 117; Bagaiev Aff. Ex. B)

Defendants have failed to demonstrate an actual controversy and Plaintiffs should be entitled to Summary Judgment on Defendants' Seventh Counterclaim, which should be dismissed as a matter of fact and law.

## G. PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON DEFENDANTS' EIGHTH COUNTERCLAIM FOR ACCOUNTING

The right to an accounting is premised upon the existence of a confidential or fiduciary relationship, and a breach of the duty imposed by that relationship, respecting property in which the party seeking the accounting has an interest. Lawrence v Kennedy, 95 AD3d 955 [2012], quoting Palazzo v Palazzo, 121 AD2d 261 [1986]).

Defendants' Eighth Counterclaim seeks an accounting of the Plaintiff Companies pursuant to NY CLS LLC § 1102 "based on Dardashtian's [alleged] various breaches of his duties…" (Guaglardi Decl. Ex. E, para 132).

Gitman maintains that "in accordance with NY LLC L 1102(b), this Court should Order that Dardashtian make available to Gitman all records, including, without limitation, financial statements and income tax returns or information and reports maintained by CSV and/or the related entities for the three most recent fiscal years, and any other information regarding the affairs of CSV and entities as is just and reasonable." (Id at para 133).

Even if Gitman were entitled to an accounting, Defendant Gitman has had multiple bookkeepers and unfettered and complete access to all of the Plaintiff Companies' records at all times relevant herein. (Dardashtian Aff. Exs 114, 115, 118, 166). Gitman has been provided with access to all such records during the course of e-discovery during this litigation. Defendant Gitman has logged into CSV's Quickbooks account hundreds of times and produced his tax returns to Plaintiffs as part of discovery, only to later request them again from Plaintiffs just weeks before his expert reports were due as an excuse. (Id at Ex. 114).

Notwithstanding the fact that Defendants could have undertaken their own accounting of the Plaintiff Companies at any time given their complete access to all records that could comprise such an accounting, Defendants' Eight Counterclaim is flawed as Defendants seek relief that is expressly precluded by the CSV Operating Agreement. As stated above, Article 9.4 of the CSV Operating Agreement states, in pertinent part,

> "To the maximum extent permitted by law, the Members specifically renounce, waive and forfeit all rights, whether arising under contract or statute or by operation of law, to seek, bring or maintain any action in any court of law or equity for an **accounting**." (Operating Agreement at p. 11; 9.4). (Emphasis added).

In addition, NY CLS LLC § 1102 (b) states,

> Any member may, *subject to reasonable standards as may be set forth in, or pursuant to, the operating agreement*, inspect and copy at his or her own expense, for any purpose reasonably related to the member's interest as a member, the records referred to in subdivision (a) of this section, any financial statements maintained by the limited liability company for the three most recent fiscal years and other information regarding the affairs of the limited liability company as is just and reasonable (Emphasis added).

Defendant Gitman knows he is not entitled to an accounting under the CSV Operating Agreement and has failed to demonstrate an equitable entitlement to such relief. Defendants have failed to demonstrate a breach by Dardashtian that would permit an accounting even if the CSV Operating Agreement did not apply. Gitman has offered no excuse why he did not perform his own accounting with the experts he said he retained over the past three years. Gitman has failed to act diligently on his own behalf and waived any right to an accounting to be ordered by this Court.

Plaintiffs should be entitled to Summary Judgment on Defendants' Eight Counterclaim for an accounting which should be dismissed in its entirety.

## H. PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON DEFENDANTS' NINTH COUNTERCLAIM FOR DECLARATORY JUDGMENT, WHICH SEEKS A DECLARATION THAT GITMAN HAS A 67.5% OWNERSHIP INTEREST IN PLAINTIFF CSV AND/OR CHANNELREPLY

"Declaratory judgments are a means to establish the respective legal rights of the parties to a justiciable controversy. The general purpose of the declaratory judgment is to serve some practical end in quieting or stabilizing an uncertain or disputed jural relation either as to present or prospective obligations." Thome v. Alexander & Louisa Calder Found., 70 AD3d 88  (1st Dep't 2009) (internal quotation omitted).

Determining ownership interests in a corporation is a proper use for a declaratory judgment. See Pross v. Jadam Equities Ltd., 134 AD2d 154 (1st Dep't 1987) (vacating summary judgment that granted declaratory relief and ordering further discovery where issues of fact exist as to ownership of partnership interest); 43 NY Jur. 2d Declaratory Judgments § 135 (2013) ("Matters dealing with the rights and status of corporations and their stockholders, and the relation between them, have frequently been the subject matter of declaratory judgment actions.").

Here, Defendant Gitman seeks a judicial declaration with regard to the ownership of ChannelReply. However, Defendant Gitman asks this Court to find that ChannelReply is not owned solely by CSV 100%, but rather, Gitman asks this Court to find that Plaintiff CSV owns only 50% of ChannelReply, and that Gitman, **individually** owns 42.5%, and that Defendant Bagaiev owns 5%, and Defendant Glukharev owns 2.5%. In other words, Defendant Gitman seeks to reduce CSV's ownership interest in ChannelReply to give Gitman, **individually,** a greater ownership interest in ChannelReply. Gitman asks this Court to make this incredible finding despite Gitman's execution of the CSV Operating Agreement which provides Gitman with only a 50% ownership interest in ChannelReply and nothing more (Dardashtian Aff. Ex. 2). Again, Gitman's fabricated claim does not serve the best interests of the Plaintiff Companies, further demonstrating that his derivative claims are asserted in bad faith and should be dismissed.

In support of Gitman's self-serving claim, Defendant Gitman's purported ownership of ChannelReply reduces CSV's ownership from 100% to 50%, giving Gitman himself a 67.5% cumulative ownership interest in it (half of CSV or 25% plus 42.5% individually) . Gitman's allegations further suggest that Dardashtian only owns half of CSV's 50% interest in ChannelReply, thereby diluting Dardashtian's previous 50% interest to a 25% interest in ChannelReply, while the remaining 75% interest is shared among Gitman (67.5%) and the Developers (7.5%).

There is **zero** competent evidence, documentary or otherwise, to substantiate Defendant Gitman's illusory claims which are contradicted by actual documentary proof in the record as set forth above. Gitman and Dardashtian signed tax returns attaching their respective Form K-1's, the CSV Operating Agreement signed by Gitman that provides for 50/50 ownership (Dardashtian Aff. Ex. 2, last page; Liebman Decl). It is apparent when Defendant Gitman commenced his Counterclaims, he *assumed* that the Developers were loyal to him and not the Plaintiff Companies, and that Gitman could use this Court to restructure ChannelReply's ownership interest and diminish Dardashtian's interest in Plaintiff Companies in Defendant Gitman's favor. The Developers have not appeared in this Action, have returned to work for the Plaintiff Companies, and have admitted that they never had any such ownership interest in the Plaintiff Companies consistent with Bagaiev's Affidavit, Joel Liebman's Affidavit, and the accompanying exhibits annexed to Dardashtian's Affidavit. The facts are undisputed that CSV owns ChannelReply 100%, which is owned by Gitman and Dardashtian equally.

Plaintiffs are entitled to summary judgment on Defendants' Ninth Counterclaim seeking Declaratory Judgment, which should be dismissed in its entirety.

## I. DEFENDANTS' REQUEST FOR A JURY TRIAL SHOULD BE STRICKEN PURSUANT TO THE CSV OPERATING AGREEMENT

Both parties knowingly and voluntarily waived their respective right to a jury trial in Article 17.9 of the CSV Operating Agreement (Dardashtian Aff. Ex. 2)  Defendants, in their Amended Answer and Counterclaim, have sought to enforce the CSV Operating Agreement, which provides for a waiver of the parties' respective right to a trial by jury. The parties hereto agreed to no trial by jury in this matter and Plaintiffs hereby withdraw their request for a trial by jury. Defendants' jury demand should likewise be stricken.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully seek an Order granting Plaintiffs summary judgment in all respects, and dismissing each and every one of Defendants' counterclaims with prejudice, and for such other and further relief as the Court deems just and proper pursuant to Rule 56 of the Federal Rules.

Dated: August 14, 2020

Respectfully submitted,

GUAGLARDI & MELITI, LLP

By: _____

Barry Guaglardi (BSG2401)
Evan Ostrer (EO1099)

365 West Passaic Street, Suite 130
Rochelle Park, NJ 07662
(201) 947-4100
bguaglardi@adgmlaw.com

*Attorneys for Plaintiffs*