UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MICHAEL DARDASHTIAN, individually and on behalf of COOPER SQUARE VENTURES, LLC NDAP, LLC and CHANNEL REPLY<br>Plaintiffs,<br><br>-against-<br><br>DAVID GITMAN, JEREMY FALK, SUMMIT ROCK HOLDINGS, LLC, ACCEL COMMERCE, LLC, DALVA VENTURES, LLC, KONSTANTYN BAGAIEV, OLESKSII GLUKHAREV and CHANNEL REPLY, INC.<br>Defendants. | Case No. 17 CV 4327 (LLS)<br><br>**AFFIDAVIT OF DAVID GITMAN IN OPPOSITION TO PLAINTIFFS' ORDER TO SHOW CAUSE SEEKING PRELIMINARY INJUNCTION** |

**DAVID GITMAN**, being duly sworn deposes and says:

1.      I am one of the defendants in this action. I am fully familiar with the facts and circumstances of this matter as set forth herein.

2.      I write this affidavit in opposition to the plaintiffs' Order to Show Cause seeking a preliminary injunction against the defendants.

## BACKGROUND FACTS

3.      Plaintiff Michael Dardashtian ("Dardashtian") and I intended to create a limited liability company called Cooper Square Ventures, LLC ("CSV") in 2011. However, it has come to my attention that CSV was never properly memorialized by an operating agreement. Instead, Dardashtian's family real estate attorney Jeffrey E. Rothman, Esq. of the law offices of Seligson, Rothman & Rothman, created an operating agreement from Cooper Square LLC, which is an entity that was already registered to do business in the State of New York and has no relation to me, Dardashtian, or CSV. However, Dardashtian and I understood that our

dealings concerning CSV were covered by the operating agreement and we have oeprated under it since 2011.

4.    Dardashtian and I are each managing members of CSV. We both made initial capital contributions of $500 each on October 18, 2011.

5.    From 2011 through February 2016, I worked full time on CSV and its businesses including, among others, NDAP, LLC ("NDAP"), ChannelReply, LLC ("CR LLC"), and Plumbers.

6.    In addition to being a co-founder, I am also the Chief Technology Officer ("CTO") of CSV and was also in charge of product and operations.

7.    On October 13, 2011, Dardashtian and I opened a business checking account at Bank of America under the name Cooper Square Ventures, LLC.

8.    Dardashtian and I were paid through CSV payroll which was run through CSV's Bank of America bank account and were the only individuals paid through CSV.

9.    Dardashtian and I both drove the overall strategy of the businesses. I was responsible for all technology and product strategy and development, as well as management of the developers and contractors. Dardashtian was responsible for sales, marketing, finance, and accounting. We took equal distributions and expenses.

10.    Despite Dardashtian's claims, CSV maintains no physical office, but it does have a virtual office with the Great Neck Executive Office Center at 1010 Northern Blvd, Suite 208, Great Neck, NY 11021.

11.    CSV is a holding company for eCommerce websites and owns the following domain names: channelgento.com, coopersquare.ventures, coopersquareventures.com, saasecomerce.com, speckify.com, wholsesaledash.co, and wholesaledash.net.

2

12.     Despite repeated requests to Dardashtian, I have never received an accounting of the transactions closed by the company. I therefore cannot corroborate Dardashtian's claims of $10 million dollars of transactions closed by the company as claimed in Dardashtian Aff. paragraph 6.

13.     CSV's business operations utilize licensed software and services, open source software with varying licenses such as GNU or MIT, and software developed by both employees and contractors.

14.     CSV does not have encrypted AWS servers as Dardashtian contends, instead, CSV utilizes certain encryption techniques like PKI SSL to secure access to servers, services and data for PCI compliance. Limited code are stored on Github, but not for back-ups and testing as Dardashtian contends.

15.     Github is a hosted git server that provides a distributed version control system which is used in CSV's, NDAP's and CR LLC's Software Development Lifecycle.

16.     CSV maintains an ownership in NDAP. NDAP operates CR LLC and CR LLC expenses were routinely paid by NDAP and CSV bank accounts. The entity diagram attached to Dardashtian Aff. as Exhibit 1 was not the entity diagram created by me and this version was never implemented by me or Dardashtian.

17.     Contrary to Dardashtian's assertion in his Affidavit at paragraph 10, while Dardashtian did initiate the relationship, it was me who secured the business partnership with NDA Holdings, LLC, thereby creating NDAP. This was based on consulting work that I delivered between May and October 2011 for which I still have not received compensation.

18.     NDAP was formed for the purpose of creating an e-commerce software platform to sell and distribute auto parts called Next Day Auto Parts, later rebranded as Car Part Kings

3

("CPK").

19. On March 15, 2012, I hired Konstantyn Bagaiev ("Bagaiev") via NDAP's UpWork account to help me develop a script to answer eBay messages in a Help Desk like Zendesk.

20. CR LLC is operated by NDAP. Bagaiev and Glukharev, who are based in Eastern Europe, worked for NDAP as an independent contractors. Bagaiev and Glukharev were generally paid through NDAP's Bank of America bank account.

21. Neither Bagaiev nor Glukharev have not executed any contractor agreement with NDAP or any other plaintiff entity.

22. I never executed the proposed "Work Order" between NDAP and Bagaiev that is attached to the Dardashtian Aff. as Exhibit 7d. I never gave Dardashtian authority to sign my name on documents. I would never have signed this document is against my interest and does not protect me or my team. For example, it includes restrictions against Bagaiev that I would never agree to. I believe Dardashtian also forged my signature on this document. I have reason to believe that Dardashtian forged my signature on a number of other documents as well, including, without limitation, NDA Holding, LLC debts instruments.

23. Since May 2011, NDAP has created, purchased, licensed closed and open source software to facilitate the sale of auto parts through NDAP, CPK, and other outlets.

24. Contrary to Dardashtian's assertions in paragraph 25 of his Affidavit, I remain the CTO of CSV.

25. While at one point in time I did take an additional CTO role with CueConnect, I disclosed my outside roles and responsibilities to CueConnect. That outside CTO role had no negative impact on CSV, NDAP, CR LLC, or any other holding.

26. Dardashtian failed to disclose in his affidavit that he also maintained positions outside

4

of CSV, including work for ChargePass, which seemed to focus on payment technology for the cannabis industry since on or about February 10, 2016 through approximately August 9, 2016, and a current full-time role as Yotpo, Ltd's ("Yotpo") Head of Sales. Dardashtian has worked for Yotpo since on or about October 31, 2016.

27.     Yotpo is a direct competitor of CR LLC, as it markets itself as a marketing content solution and generates reviews, ratings, questions and answers for eCommerce websites.

28.     I don't believe Dardashtian has disclosed his work and ownership of CR LLC to Yotpo.

29.     Dardashtian's employment with Yotpo may have had a negative impact on CR LLC's operations. For example, CR LLC previously developed a feedback management feature. Yotpo has recently introduced this feature. Based on Dardashtian's knowledge of CR LLC's confidential information he is likely to inevitable disclose CR LLC's confidential and/or proprietary information in connection with his work for Yotpo. Additionally, Dardashtian's work for Yotpo has had a negative effect on the business as Dardashtian is no longer involved on a day-to-day basis. Since Dardashtian started working at Yotpo, he has had little to no involvement with the company. His role is now limited to accounting and finance.

30.     On June 7, 2016, Dardashtian and I discussed giving a small salary increase to the developers, including Bagaiev. We ultimately decided to give them equity in lieu of money. Based on this decision, a new company was created -- this was CR LLC. However, an operating agreement for CR LLC was never executed.

31.     In his capacity as head of finance for the companies, Dardashtian paid CR LLC expenses through other bank accounts, including, without limitation, NDAP and CSV bank accounts. I believe he did this to create ambiguity and unnecessary complexity to hide hid

5

misuse of company funds.

32.     CR LLC was built by me and Bagaiev.  The idea and architecture of the business was created by me with no involvement by Dardashtian.  I hired Bagaiev to help me build the product.  Dardashtian made no contributions which contributed to CR LLC's growth in a material way.

33.     At all times since its inception, I have actively worked on CR LLC.

34.     As set forth above, Dardashtian made only limited contributions to CR LLC, including sloppy accounting practices and lack of attention to maintaining separate business accounts.  Specifically, Dardashtian built complicated accounting systems and co-mingled bank accounts between entities, when this was not required or proper practice.  CSV's accountant, Mr. Lieberman, is also the personal accountant of Dardashtian. On a number of occasions since July 2015, I asked for the books and records of the company to be confirmed in accordance with GAAP, but Dardashtian repeatedly refused.

35.     CSV then hired a bookkeeper in the end of 2016 to review the accounts. I asked Dardashtian to meet with the bookkeeper several times.  Dardashtian is now disputing the bookkeeper's quality of work despite never working with her and also has not provided any evidence of why he disputes the quality of her work.

36.     Since Mr. Lieberman is Dardashtian's personal accountant and is, therefore, not independent, he should not have any oversight or responsibility.

37.     Dardashtian, in his Affidavit, continually points out my expenses and car payments, but neglects to mention that he also had a leased Volvo with the same terms and comparable personal expenses.  Attached hereto as Exhibit A is a true and correct copy of an e-mail from the bookkeeper, Ms. Anden, detailing her attempts to address with Dardashtian the numerous

6

expenses he placed on an NDAP credit card.

38.     CSV paid out tens of thousands in health care expenses to Dardashtian, when I did not receive an equivalent distribution.

39.     When I first started working for CSV in 2011, I was not compensated. I deferred my compensation for the first six months of my work. Then, in or about November 2011, I began to receive compensation ($1,000 a week) for my work for CSV. Dardashtian and I both received the same compensation for our work until approximately February 2015. In February 2015, I stopped receiving compensation for my work even though I continued to work full-time for CSV. Notwithstanding the fact that I stopped receiving payments at that time, I understand that Dardashtian continued to make payments to himself. I understand Dardashtian admits to this in his Affidavit.

### MY CREATION OF CHANNEL REPLY, INC. WAS NOT A BREACH OF ANY FIDUCIARY DUTIES OWED TO PLAINTIFFS AND IT WAS DARDASHTIAN'S ACTIONS WHICH REQUIRED THE CREATION OF A NEW ENTITY

40.     I had the initial idea of CR LLC. In March 15, 2012, I hired Bagaiev as a developer for this. In very close cooperation, Bagaiev and I built the product. All of the decisions were made by me. Dardashtian was on the sidelines for everything related to CR LLC, watching me and Bagaiev. At Bagaiev's suggestion, in April 25, 2016, I hired Oleksii Glukharev ("Glukharev") as a developer on CR LLC.

41.     In February 2016, when CPK stopped operating, I had less involvement in CR LLC development. At this point CR LLC was already a completed product with all its main features, with stable Amazon Web Services structure that I built. The team reached out to me as needed, but the product was fully developed and operational.

42.     During this time, Dardashtian insisted on a Desk.com integration, which took most of

7

our resources and after a year brought us about 10% of what our Zendesk integration does, which I implemented.

43.     Dardashtian incorrectly states that he doubled revenue during half of a year in 2017 (sic) (Dardashtian Aff., 33), but all he did is negotiate the Desk.com integration, make a speech at a Desk.com conference, and do some occasional account management. Accordingly, in 2016, his contributions were not responsible for the doubling of revenue.

44.     The actual growth rate of CR LLC at this time was the same for the 6 months after Dardashtian stopped doing any work. There was organic growth at a constant rate for which Dardashtian did not contribute.

45.     Dardashtian's statement in paragraph 33 of his affidavit that he "alone" doubled revenue is indicative of his disrespect for the development team. The development team actually found his participation having a negative impact, and therefore asked me to get back involved and work with them on strategy. Dardashtian couldn't develop new product features, negotiate an Amazon India account for our service, he lost our live test ebay seller account and he couldn't create a new one which we needed to continue operating.

46.     Furthermore, the eBay account used for CR LLC was suspended because Dardashtian did not do any basic work to ensure it met certain required seller performance standards. This caused irreparable harm to both the business and reputations of CR LLC and me. My personal eBay account was also suspended because of this as the accounts were linked, and I had spent 17 years developing a perfect rating.

47.     Despite asking and offering for years, Dardashtian never followed up with Bagaiev or Glukharev to sign any agreements protecting the company's intellectual property.

48.     Given the lack of contractual agreements, they are permitted to use source code,

8

customer data, etc. on any future projects regardless of whether they pertain to CSV or any of CSV's entities.

49.     I also have no agreement that restricts my ability to utilize source code or customer data. Similarly, there is no agreement which restricts my ability to compete against CSV or any of the related agreement. *See* Dardashtian, Aff., Exh. 2, paragraph 12.1 ("Competitive Undertakings. Except as otherwise provided herein, any Member and Management may engage in business ventures of any nature and description independently or with others, including, but not limited to, business of the character described in Article 3 (or any part thereof), and neither the Company nor any of the Members shall have any rights in or to such independent ventures of the income or profits derived therefrom.").

50.     Because of all the actions by Dardashtian outlined above which were harming the business and making it untenable for me to continue to devote my full time and attention to that business, I created a new company called Channel Reply, Inc. ("CR Inc.").

51.     Bagaiev and Glukharev had expressed to me that they did not feel comfortable working directly for Dardashtian and would quit if need be. If this were to occur, CR LLC and would have be closed down entirely.

### PROPOSED SALE OF NDAP AND DARDASHTIAN'S IMPEDING OF THE SALE AND AVOIDANCE OF LIABILITIES

52.     In 2015, it became clear that while NDAP had a solid technology platform, there was limited marketing and declining margins. Since we did not envision future growth, we closed the website and Dardashtian was tasked with finding a buyer.

53.     When Dardashtian was unable to find any buyer, he sought out a broker in or about May 2015. That broker's contract expired on or about September 10, 2015 and, thereafter,

Dardashtian engaged a second broker to find a potential buyer. Ultimately, Dardashtian hired defendant Jeremy Falk as the broker.

54.     At this point, any sale would be an overall loss for the members, but we wanted to recoup some of that loss.

55.     In January 2017, Mr. Falk secured a letter of intent from a potential buyer. I spent several days preparing an overview of CPK's technology assets and a demonstration.

56.     Dardashtian and I both signed the initial term sheet, and then I led the process of due diligence to secure the sale. I had asked Dardashtian for many months to make sure that the books and records were in order so that a transfer of assets would be clean and proper, but he refused to do so because he said he didn't want to spend money on that process.

57.     In April 2017, I spent a week on-site at the buyer to finalize the deal and initiate the technology integration. It was based on the quality of performance during that week that the buyer finalized their offer and moved to close the deal. During this entire time, Dardashtian was working full-time at Yotpo.

58.     The proposed NDAP asset purchase is of the technology assets, not the branding, marketing or customer base.

59.     When the terms of the final deal became clear, I documented my labor and future commitments so that I could be fairly compensated. For example, the terms required that I commit an additional number of consulting hours beyond the hours I already provided in 2017.

60.     Dardashtian had no future obligations to NDAP. This meant that the deal was actually costing me money, because I was spending most of my time attempting to consummate the transaction.

61.     As we were getting close to signing the asset purchase agreement for NDAP, I believe Dardashtian realized that there was not much money to be gained. It was surely disappointing for all of us. It was a small deal, and Dardashtian had negotiated a $100,000 liability to a previous partner as well as an $80,000 commitment to the broker, Mr. Falk. Both of those negotiations were Dardashtian's responsibility and I did not complain even though they came out of my profits too.

62.     However, Dardashtian began looking for ways to enhance his share. He pretended that there was no contract with Mr. Falk, nor an agreement to give our loyal NDAP developer of 5 years, her share. This worker had always been promised 15% of NDAP and her loyalty and commitment were critical since she was to continue to work for NDAP post-sale.

63.     At first, Dardashtian agreed that I should be compensated for my hours and future risk, but then didn't seem to like what that meant for him so kept finding different ways to secure more. In May 2017, I suggested that we move forward with the deal, but put all the money in escrow so that a final accounting could be completed and we could meet our responsibilities to others. *See* Dardashtian Aff., Exhs. 29 and 32.

### TRANSFERS OF ACCOUNTS AND MONEY IN CSV BANK ACCOUNT

64.     As a part of the NDAP sale, I needed to separate out all assets that were intermingled with NDAP and, as Dardashtian had not properly segmented expenses, financial accounts or legal agreements -- this was not an easy task.

65.     Because Dardashtian was refusing to provide me with an accounting of the books and records and had never created a legal ownership structure for CR LLC, I became increasingly concerned that he was intentionally hiding something in the financials.

66.     I had also previously been concerned that Dardashtian had taken distributions without

informing me. Since Dardashtian blocked me from the accounting, he has full control of all the entities financial accounts, and he hid revenue (CR LLC itself earned more than $130,000 net profit during January 2016 - June 2017, yet there was only $73,000 in the account), so as a managing member, I needed to step in. Therefore, I moved the money from the CSV bank account into a call account, with guidance from my attorney, Mr. Farooq, who I retained on April 26, 2017, to assist me with my review of the NDAP transaction and on May 26, 2017, to assist with the creation of CR Inc.

67. The goal was to continue to run CR LLC, but not enable any access to that money until an accounting was complete.

68. I also had to move all technology accounts and subscriptions that were for CR LLC away from NDAP. Dardashtian may not have understood the technology enough to realize this, but these efforts were part of our commitment in the asset purchase agreement.

69. Dardashtian had not properly protected the company and had not properly incentivized the developers or other workers. My counsel, Mr. Farooq, advised me to set up a new company going forward and create a stock ownership plan to incentivize the developers. I am not aware of any trade secret information from CR LLC that is being utilized in CR Inc.

70. While I've been forced to defend my reputation and pay substantial legal fees, I've also been working daily to maintain the prospect of our NDAP sale for which many people are depending; as well as maintain the employment of our development team who would have quit based on Dardashtian's actions.

12

## I DID NOT IMPROPERLY CONSPIRE BEHIND DARDASHTIAN'S BACK, IMPROPERLY WITHDRAW COMPANY FUNDS, OR INTERFERE WITH THE NDAP SALE

71.     Time Doctor is a payroll software.  Contrary to Dardashtian's assertions, I never used Time Doctor to make plans behind Dardashtian's back.

72.     Bagaiev wanted to discuss with me a roadmap for CR LLC, something that was never hidden from Dardashtian.  These "future plans" included, without limitation, additional product features, the recruiting and hiring of additional developers, marketers, and focusing on customer success.

73.     Bagaiev sought to meet with me and not Dardashtian since Dardashtian was too busy with his full-time job for Yotpo and had not been effective or proactive in any previous CR LLC strategy or execution.

74.     Dardashtian has also falsely claimed to this Court that he has been locked out of his Time Doctor account.  However, Dardashtian, who chose to have little involvement in the business, has never had a CR LLC Time Doctor account and never before asked for such an account.

75.     However, in an effort to fully comply with the Court's temporary restraining order dated June 8, 2017, and as amended on June 9, 2017 (the "TRO"), I have created an account for Dardashtian in Time Doctor and he has full access to TimeDoctor.

76.     Dardashtian's contention that his access to Time Doctor was not restored following the entry of the TRO is also false.

77.     CR LLC's current Time Doctor account was opened on April 20, 2017 in preparation for the NDAP sale.  An active version of Time Doctor opened on October 12, 2013, which Dardashtian has always had access to, contains more than two years worth of data.

13

78.     However, on June 9, 2017, I was informed by Bagaiev that there had been an unauthorized access to the Time Doctor account. After working with Time Doctor technical support, I was informed by Bagaiev and Mr. Glukharev to stop using Time Doctor as the account could not be secured without changing passwords, which was prohibited by the TRO.

79.     I understand that Bagaiev and Mr. Glukharev may have deleted Time Doctor because of the security breach.

80.     As set forth above, I routinely requested from Dardashtian a financial accounting and never received one. I advised Dardashtian that if he did not provide the requested accounting I would have to take action. An accounting was never provided to me. Because of this, I grew increasingly worried that Dardashtian had misappropriated company funds. In an effort to protect the company, and following review of applicable operating agreements with counsel, I transferred funds maintained in a CSV bank account with Bank of America to a call deposit account.

81.     Dardashtian's access to the CSV Bank Account was never changed.

82.     Following the entry of the TRO, I transferred a total of $74,052.53 into the CSV Bank of America account. This $74,052.53 includes the original transfer of $73,982.53 and $50 in overdraft fees.

83.     I did mistakenly thereafter transfer out $5,060 for a payment to the company's counsel, Mr. Farooq, for work performed in connection with the NDAP sale. I apologize for this transfer; I had not yet formally engaged counsel at that time and did not understand that I was prohibited from using the account for legitimate company expenses. After conferring engaging counsel, I made another deposit into the account to cover the transfer so that the

14

CSV Bank of America account balance was no less than the $74,052.53, as required by the TRO. Attached hereto as Exhibit B is a true and correct copy of the CSV Bank of America account balance.

84.     Dardashtian never notified me of concerns he had with the NDAP sale, including concerns that Mr. Falk had a conflict of interest. I never tried to interfere with the closing of the sale, in fact, it's been Dardashtian's actions which have prevented the sale from closing. For example, Dardashtian has refused to pay many of the liabilities owed and filed this suit which prevents a closing due to the rep and warranties in the asset purchase agreement.

85.     In regards to the May 27, 2017 communication outlined in the Dardashtian Aff. at paragraph 69, Dardashtian's contention that I did not respond is incorrect. My counsel, Mr. Farooq responded on my behalf.

### I DID NOT MISAPPROPRIATE COMPANY ACCOUNTS, COMPANY CONFIDENTIAL AND PROPRIETARY INFORMATION, OR DARDASHTIAN'S BUSINESS IDENTITY

86.     I did not change or attempt to change the credentials of Dardashtian's CSV Bank of America account. Exhibit 50 attached to the Dardashtian Aff. simply shows an error message stating that an incorrect username or password was used to login. Any login issues are easily corrected through Bank of America customer support, and were not caused by any actions that I took.

87.     I never changed or attempted to change the credentials of Dardashtian's NDAP Bank of America account. Exhibit 51 attached to the Dardashtian Aff. simply shows an error message stating that an incorrect username or password was used to login. Any login issues are easily corrected through Bank of America customer support.

88.     I did not suspend Dardashtian's NDAP G Suite account.

15

89.     I have been transferring non-NDAP assets away from NDAP's accounts including GSuite that are part of the NDAP Asset Purchase Agreement since March 6, 2017, and this is something Dardashtian is well aware of.  Attached hereto as Exhibit C are e-mail communications showing Dardashtian's knowledge of this.

90.     Other than copying e-mail on May 30, 2017 in preparation for the NDAP sale, I did not move company data from NDAP to a new G Suite account.  No e-mails, data or documents were impacted from the transferring of accounts that are listed in the NDAP Asset Purchase Agreement.

91.     While I did monitor Dardashtian's e-mail account, I did not delete Dardashtian's access to his account.

92.     As set forth above, I routinely requested from Dardashtian a financial accounting and never received one.  I advised Dardashtian that if he did not provide the requested accounting I would have to take action.  An accounting was never provided to me. Because of this, I grew increasingly worried that Dardashtian had misappropriated company funds.  In an effort to protect the company, and following review of applicable operating agreements with my counsel, Mr. Farooq, I suspended Dardashtian's 1Password account.  This has since been restored in compliance with the TRO.

93.     Dardashtian's contention that I put a picture of my face on Dardashtian's e-mail account is incorrect.  This was caused by a known issue from the GSuite migration, and only Dardashtian views this, it does appear outwardly.

94.     I did not download all data or reset all GSuite passwords as Dardashtian contends.  I did review Dardashtian's user account, but as an employee of the company, Dardashtian's e-mails were subject to monitoring.  It is also ironic that Dardashtian complains of this practice

as he routinely engaged in e-mail monitoring as well as tracking.

## I DID NOT TERMINATE DARDASHTIAN'S ACCESS TO ALL COMPANY ACCOUNTS

95.     In connection with the preparations for the NDAP sale, Dardashtian did not have

access to send or receive e-mails as michael@channelreply.com from May 30, 2017, when

the GSuite migration started until June 14, 2017.  However, after June 14, I was able to

forward emails to Dardashtian because since the migration to the GSuite account was

complete.

96.     While at one point the Chargebee and Stripe accounts were moved to CR Inc., as of

June 18, 2017, Dardashtian has access to these accounts.

97.     CR Inc. was created with the idea that Dardashtian would also be a co-founder in this

company and have an equity interest.  No theft took place.  Any lockout was only temporary

while things were cleared with accounting and properly set-up.

98.     Through the creation of CR Inc. no intellectual property was misappropriated.  There

was no misappropriation of trade secrets.  And there were no employees besides myself and

Dardashtian of CR LLC and, as such, there was no improper solicitation or competition by

any developer who worked for NDAP or CR LLC.

99.     Dardashtian has administrator access to the following:  GSuite account, 1Password

account, Chargebee account, Stripe account, PayPal account, Upwork account, Zendesk

accounts, JIRA account, Slack, Amazon Seller Central, eBay accounts, TimeDoctor, Amazon

Web Services, American Express account, Magento accounts, Quickbooks accounts,

Desk.com account, Magemojo, Mailchimp, Github, and Ringcentral.  *See* Dardashtian Aff.,

Exh. 58. An updated spreadsheet detailing Dardashtian's access is attached hereto as Exhibit

D. However, Dardashtian may lose access to some of these accounts if the NDAP sale is closed and the asset purchase agreement executed.

100.    Dardashtian also has access to the GoDaddy Account. However, Dardashtian may lose access to this account if the NDAP sale is closed and the asset purchase agreement executed. The GoDaddy Account was only moved in connection with the NDAP sale and not for any improper reason.

101.    The Chargebee Account, Stripe Account, and Slack Account, were transferred to CR Inc. and the specific accounts no longer exist, but I have provided Dardashtian with access to all the data and communications in these new accounts in an effort to fully comply with the TRO.

102.    Dardashtian has access to the NDAP American Express Account. Any login issues are easily corrected through American Express customer support.

103.    I have no knowledge of the following accounts: Desk.com and Join.me

104.    In an effort to fully comply with the TRO, I have provided Dardashtian with access to all accounts I have knowledge of to the extent possible based on existing accounts. To the extent an account is no longer in existence and cannot be restored, I've made every effort to provide Dardashtian with access to the same data and communications which were contained in the accounts Dardashtian requested.

105.    I did not make any of the false statements Dardashtian accuses me of in paragraph 88 of his Affidavit including, without limitation, lies about Dardashtian to employees.

## I HAVE NOT DAMAGED CSV CUSTOMERS

106.    Contrary to Dardashtian's allegations, I have not damaged CSV customers.

107.    CSV has no customers. It is only a holding company. No damages were caused by

18

placing CSV funds into a call deposit account safe from Dardashtian's misappropriation. Additionally, the CSV team, which did not include work by Dardashtian, never stopped working and all customer questions were promptly addressed.

108. All actions I took were to protect contractors, stakeholders, and provide customers the best service.

## MY ACTIONS WITH ACCEL WERE NOT VIOLATIVE OF ANY AGREEMENT NOR A BREACH OF MY FIDUCIARY DUTIES TO PLAINTIFFS

109. In early 2017, I decided that I no longer wanted to partner with Dardashtian on any new ventures, as I did not believe he added sufficient value to our partnership.

110. I began a new company, Accel Commerce ("Accel"), so that I could begin exploring new business opportunities on my own. While I have not built anything yet, and am not sure of the direction it will take, it will be in eCommerce as I have been working in eCommerce since 1998.

111. All of the skills and expertise that I brought to CSV were based on my decades of experience in the industry.

112. Dardashtian did not have any prior eCommerce experience prior to our partnership in 2011.

113. Since Mr. Falk had done work for me previously and I was pleased with his past performance, I asked him to advise me on Accel.

114. My involvement with Mr. Falk was limited to Mr. Falk advising me from time-to-time on finance and accounting as my experience is not in those areas.

115. There is no agreement between me and any of the plaintiffs which prevents me from working independently and using my knowledge and expertise in doing so.

19

I certify under penalty of perjury that the foregoing statements made by me are true.  I am aware that of any of the foregoing statements made by me are willfully false, I am subject to punishment.

June 19, 2017

David Gilman

104008922

20

# EXHIBIT A

**Ditlow, Lindsay F.**

**Subject:** FW: Scenario on Michael Dash- credit card issue

---------- Forwarded message ---------
From: Mary Faith Andan <mfgandan@gmail.com>
Date: Mon, Jun 5, 2017 at 9:34 AM
Subject: Scenario on Michael Dash- credit card issue
To: David Gitman <david@coopersquare.ventures>

Dear David,

This is to give you the detailed scenario about meeting with Michael Dash.

During my reconciliation on credit card expenses (NDAP Account), I found out that there are various expenses incurred on **Michael Dash credit card,**

which I need to confirm if those are **"Personal or Business "** expenses. So since you told me to send the list of credit card expenses.

- March 18, 2017 I send him and email and attached the list of cc expenses so he can check.

- On March 20, 2017, I received a reply from **Michael Dash** saying that he is travelling to Las Vegas for the week so he may not be able to get back to me.

**"Hi Mary - I am traveling to Las Vegas for the week sorry for the delay, I was able to glance at these on my phone." I can take a look into my account when I'm back I have some time to match them up."**

- On April 2, I sent a follow up email to Michael Dash regarding credit card expenses, If he already find time to check the expenses.
- On April 3, Michael Dash replied:

**" Mary there is no info behind any of these files.. when I download it just shows me the transaction amount and qb subject.. can you send me the full file ?**

So, I resend the file again( *please note that David Gitman is also copied on the said email) I'm not really sure why David can see the full details and yet Michael Dash CAN NOT see the details on the excel file)*

- On April 3, I received another email from Michael Dash with this reply **"file doesn't have any detail in it"**

1

- April 3, Michael ask me if we can schedule a call. Michael's email **"Can we schedule some time this week to review all the work you have been doing.. ?Thurs or Friday work best for me." What time is better mornings or afternoons EST. How about Friday at 2pm EST?** We agree on April 7, 2017 at 9am EST

- Come April 7, I asked him if we will push the meeting, it was reschedule at 130pm. However, the meeting was not able to push through for some reason. Then the meeting was cancelled then. I asked him if we can meet the following day , April 8 at 9am EST;

- On April , 8, 2017. Michael Dash replied **"I cannot do this weekend - can we do Monday @ 9am est?**Then we both agree on Monday at 9am EST! I also sent a google invite to Michael Dash.

- April 10, 2017, Monday , I'm waiting for his call but Michael did not call.

- April 14, 2017, Friday, I follow up Michael Dash if we can have a call . But he said **"No I am not free on weekends. I will follow up with some free times"** I asked him , how about next Monday but he never replied anymore.


I hope this helps.

Thank you
Faith

2

# EXHIBIT B

6/19/2017 Account Details Print Friendly

 **Bank of America**

## Cooper Square Ventures: Account Activity

Balance Summary:$81,046.31 (available as of today 06/19/2017)
View:today 06/19/2017

### All Transactions

| Date | Description | Status | Amount | Available Balance |
|------|-------------|--------|--------|-------------------|
| **Amount included in Available Balance** | | | | |
| Processing | CHECKCARD 06/18 GITHUB.COM *GIF8H SAN FRANCISCO CA | P | -25.00 | 81,046.31 |
| Processing | CHECKCARD 06/18 GITHUB.COM *GIESP SAN FRANCISCO CA | P | -25.00 | 81,071.31 |
| Processing | ACH CREDIT PAYPAL TRANSFER ON 06/19 | P | 251.31 | 81,096.31 |
| Processing | ACH CREDIT PAYPAL TRANSFER ON 06/17 | P | 300.27 | 80,845.00 |
| 06/16/2017 | MAYHEW FINANCIAL DES:SALE ID: INDN:COOPER SQUARE VENTURES CO ID:9215986202 WEB | C | -28.00 | 80,544.73 |
| 06/16/2017 | MAYHEW FINANCIAL DES:SALE ID: INDN:LLC CHANNELREPLY CO ID:9215986202 CCD | C | -28.00 | 80,572.73 |
| 06/16/2017 | Gt Nk Executive Office Center Bill Payment | C | -210.16 | 80,600.73 |
| 06/16/2017 | CHECKCARD 0615 BACKUPIFY 800-571-4984 CT 24492157166894370503517 CKCD 7372... | C | -12.00 | 80,810.89 |
| 06/16/2017 | PAYPAL DES:TRANSFER ID:56YJ2A6F6FYWS INDN:COOPER SQUARE VENTURES CO... | C | 123.78 | 80,822.89 |
| 06/16/2017 | PAYPAL DES:TRANSFER ID:56YJ2A6GB54CC INDN:COOPER SQUARE VENTURES CO... | C | 1,046.97 | 80,699.11 |
| 06/15/2017 | UPCOUNSEL.COM DES:UPCOUNSEL. ID:UPCOUNSEL.COM INDN:UPCOUNSEL INC CO... | C | -5,775.00 | 79,652.14 |
| 06/15/2017 | BKOFAMERICA MOBILE 06/15 3565752999 DEPOSIT *MOBILE NY | C | 3,651.84 | 85,427.14 |
| 06/15/2017 | WIRE TYPE:WIRE IN DATE: 170615 TIME:0515 ET TRN:2017061500115001... | C | 10,560.00 | 81,775.30 |
| 06/14/2017 | CHECKCARD 0612 UPWORKESCROW*BAL-11JUN 888-8503375 CA 24436547165008919817633... | C | -310.98 | 71,215.30 |
| 06/14/2017 | CHECKCARD 0612 UPWORKESCROW*BAL-11JUN 888-8503375 CA 24436547165008919715373... | C | -13.36 | 71,526.28 |
| 06/14/2017 | PAYPAL DES:TRANSFER ID:56YJ2A6DZZAHQ INDN:COOPER SQUARE VENTURES CO... | C | 172.00 | 71,539.64 |
| 06/13/2017 | Wire Transfer Fee | C | -30.00 | 71,367.64 |

| Date | Description | Status | Amount | Available Balance |
|------|-------------|--------|--------|-------------------|
| 06/13/2017 | JPMorgan Chase DES:Auth Debit ID:6289123079 INDN:Auth CO ID:9200502233 CCD | C | -0.57 | 71,397.64 |
| 06/13/2017 | WIRE TYPE:WIRE OUT DATE:170613 TIME:1432 ET TRN:2017061300317654 SERVICE... | C | -5,060.00 | 71,398.21 |
| 06/13/2017 | JPMorgan Chase DES:Auth Crdt ID:6289123077 INDN:Auth CO ID:9200502233 CCD | C | 0.28 | 76,458.21 |
| 06/13/2017 | JPMorgan Chase DES:Auth Crdt ID:6289123074 INDN:Auth CO ID:9200502233 CCD | C | 0.29 | 76,457.93 |
| 06/13/2017 | PAYPAL DES:TRANSFER ID:56YJ2A6BXVBJL INDN:COOPER SQUARE VENTURES CO... | C | 143.63 | 76,457.64 |
| 06/13/2017 | PAYPAL DES:TRANSFER ID:56YJ2A6CTK554 INDN:COOPER SQUARE VENTURES CO... | C | 220.38 | 76,314.01 |
| 06/13/2017 | WIRE TYPE:WIRE IN DATE: 170613 TIME:1346 ET TRN:2017061300299657... | C | 5,373.00 | 76,093.63 |
| 06/13/2017 | WIRE TYPE:WIRE IN DATE: 170613 TIME:0845 ET TRN:2017061300190933... | C | 68,669.53 | 70,720.63 |
| 06/12/2017 | PAYPAL DES:TRANSFER ID:56YJ2A6B6EGPW INDN:COOPER SQUARE VENTURES CO... | C | 520.65 | 2,051.10 |
| 06/12/2017 | PAYPAL DES:TRANSFER ID:56YJ2A6A2VMAC INDN:COOPER SQUARE VENTURES CO... | C | 710.12 | 1,530.45 |
| 06/09/2017 | PAYPAL DES:TRANSFER ID:56YJ2A6939SF2 INDN:COOPER SQUARE VENTURES CO... | C | 270.84 | 820.33 |
| 06/08/2017 | PAYPAL DES:TRANSFER ID:56YJ2A67XCRFJ INDN:COOPER SQUARE VENTURES CO... | C | 199.79 | 549.49 |
| 06/07/2017 | CHECKCARD 0605 UPWORKESCROW*BAL-04JUN 888-8503375 CA 24436547158008905752033... | C | -148.47 | 349.70 |
| 06/07/2017 | PAYPAL DES:TRANSFER ID:56YJ2A66QM7SG INDN:COOPER SQUARE VENTURES CO... | C | 229.22 | 498.17 |
| 06/06/2017 | PAYPAL DES:TRANSFER ID:56YJ2A65JRHQE INDN:COOPER SQUARE VENTURES CO... | C | 346.11 | 268.95 |
| 06/05/2017 | PAYPAL DES:TRANSFER ID:56YJ2A62VCRGU INDN:COOPER SQUARE VENTURES CO... | C | 124.23 | -77.16 |
| 06/05/2017 | PAYPAL DES:TRANSFER ID:56YJ2A64NEXPC INDN:COOPER SQUARE VENTURES CO... | C | 296.84 | -201.39 |
| 06/01/2017 | OVERDRAFT ITEM FEE FOR ACTIVITY OF 06-01 ELECTRONIC TRANSACTION POSTING DATE... | C | -35.00 | -498.23 |

6/19/2017         Account Details Print Friendly

| Date | Description | Status | Amount | Available Balance |
|------|-------------|--------|--------|-------------------|
| 06/01/2017 | VCFS DES:LEASE PMT ID:33030003875 INDN:DARDASHTIAN, MICHAEL CO ID:2650088516 PPD | C | -448.89 | -463.23 |
| 06/01/2017 | PAYPAL DES:TRANSFER ID:56YJ2A5YJ4SK4 INDN:COOPER SQUARE VENTURES CO... | C | 47.77 | -14.34 |

### Statement as of 06/01/2017

| Date | Description | Status | Amount | Available Balance |
|------|-------------|--------|--------|-------------------|
| 05/31/2017 | OVERDRAFT ITEM FEE FOR ACTIVITY OF 05-31 ELECTRONIC TRANSACTION POSTING DATE... | C | -35.00 | -62.11 |
| 05/31/2017 | BMWFINANCIAL SVS DES:BMWFS PYMT ID:214157981 INDN:David... | C | -528.57 | -27.11 |
| 05/31/2017 | CHECKCARD 0529 UPWORKESCROW*BAL-28MAY 888-8503375 CA 24436547151008890782125... | C | -218.51 | 501.46 |
| 05/31/2017 | PAYPAL DES:TRANSFER ID:56YJ2A5XEH68E INDN:COOPER SQUARE VENTURES CO... | C | 76.01 | 719.97 |
| 05/30/2017 | CHECKCARD 0528 ATLASSIAN ATLASSIAN B.V 7454706714906114612750 CKCD 5734... | C | -0.33 | 643.96 |
| 05/30/2017 | PAYPAL DES:ECHECK ID:J22222ARBWBSC INDN:COOPER SQUARE VENTURES CO... | C | -77.50 | 644.29 |
| 05/30/2017 | CHECKCARD 0528 ATLASSIAN ATLASSIAN B.V 7454706714906114612750 CKCD 5734... | C | -10.89 | 721.79 |
| 05/30/2017 | PA TLR transfer to CHK 5141 Banking Ctr NORTHWOOD #0094043 PA Confirmation#... | C | -23,982.53 | 732.68 |
| 05/30/2017 | PA TLR transfer to CHK 5141 Banking Ctr NORTHWOOD #0094043 PA Confirmation#... | C | -50,000.00 | 24,715.21 |
| 05/30/2017 | PAYPAL DES:TRANSFER ID:56YJ2A5UY7J66 INDN:COOPER SQUARE VENTURES CO... | C | 82.39 | 74,715.21 |
| 05/30/2017 | PAYPAL DES:TRANSFER ID:56YJ2A5VNPYCC INDN:COOPER SQUARE VENTURES CO... | C | 124.23 | 74,632.82 |
| 05/30/2017 | PAYPAL DES:TRANSFER ID:56YJ2A5TWZHHQ INDN:COOPER SQUARE VENTURES CO... | C | 124.23 | 74,508.59 |
| 05/30/2017 | PAYPAL DES:TRANSFER ID:56YJ2A5WFM786 INDN:COOPER SQUARE VENTURES CO... | C | 526.06 | 74,384.36 |

EXHIBIT C

UpWork

Search

Remember to .

**David Gitman** to Justin Michael :

Mike, Justin has concerns (keeping him from sleeping) moving to another upwork account.

Justin, could you reiterate your concerns to Mike.

Thanks

Apr 6

**Michael Dash** to David :

Why can't we keep him on current upwork account?

Apr 6

**me** to "Michael :

That's going to BAP.

Apr 6

**Michael Dash** to me :

He asked me for a raise recently. If he goes off upwork all together and on timedoctor that gives him a 10% boost. I'll try and Skype w him later today. I'm ooo watching kid Amys having a procedure done so a lil out of pocket today.

Apr 6



Reply



# EXHIBIT D

| Service | Account | Status 7/10/17 | Notes 7/10/17 | Status 7/18/17 | Notes 7/18/17 |
|---|---|---|---|---|---|
| G Suite | Admin | Confirmed | | Confirmed | |
| G Suite | mdash@ndap-llc.com | Confirmed | | Confirmed | |
| G Suite | partners@ndap-llc.com | Confirmed | | Confirmed | |
| G Suite | mdash@carpartkings.com | Confirmed | | Confirmed | |
| G Suite | mdash@coopersquare.ventures | Confirmed | | Confirmed | |
| G Suite | mdash@coopersquareventures.com | Confirmed | | Confirmed | |
| G Suite | mdash@plumburs.com | Confirmed | | Confirmed | |
| G Suite | michael@channelreply.com | - | channelreply.com Confirmed | Confirmed | Forwarded to michael@coopersquare.ventures |
| G Suite | partners@ndap-llc.com | Confirmed | | Confirmed | |
| G Suite | partners@plumburs.com | Confirmed | | Confirmed | |
| G Suite | paypal@coopersquareventures.com | Confirmed | | Confirmed | |
| G Suite | sales@carpartkings.com | Confirmed | | Confirmed | |
| G Suite | sales@channelreply.com | - | channelreply.com Confirmed | Confirmed | Forwarded to support@channelreply.com |
| G Suite | sales@nextdayautoparts.com | Confirmed | | Confirmed | |
| G Suite | support@channelreply.com | - | channelreply.com Confirmed | Confirmed | Forwarded to support@channelreply.zendesk.com |
| Bank Of America | Cooper Square Ventures | Confirmed | | Confirmed | |
| Bank Of America | NDAP | Confirmed | | Confirmed | |
| 1Password | mdash@ndap-llc.com | Confirmed | | Confirmed | |
| ChargeBee | michael@channelreply.com | - | Moved to was mc Confirmed | Confirmed | Invite sent to Mikes email |
| Stripe | michael@channelreply.com | - | Moved to was mc Confirmed | Confirmed | Invite sent to Mikes email |
| PayPal | michael@channelreply.com | - | Moved to was mc Confirmed | Confirmed | Username: CRMDASH17 Password: Change!me |
| UpWork | Cooper Square Ventures | Confirmed | Invite sent to Mike Confirmed | | |
| UpWork | Channel Reply | Confirmed | Invite sent to Mike Confirmed | | |
| UpWork | Plumburs | Confirmed | Invite sent to Mike Confirmed | | |
| Zendesk | mdash@coopersquareventures.com | Confirmed | | Confirmed | |
| Jira | mdash@ndap-llc.com | Confirmed | | Confirmed | |
| Slack | mikedash1@gmail.com | - | Moved to was mc Confirmed | Confirmed | |
| Amazon Seller Central | mdash@ndap-llc.com | Confirmed | | Confirmed | |
| eBay | carpartkings | Confirmed | | Confirmed | |
| Timedoctor | mdash@ndap-llc.com | Confirmed | | Confirmed | Invite sent to Mike Confirmed |
| Amazon Web Services | mdash | Confirmed | | Confirmed | |
| American Express | ndapamexonline | Confirmed | | Confirmed | |
| American Express | ndapamexonline2 | Confirmed | | Confirmed | |
| Magento | mdash | Confirmed | | Confirmed | |
| Quickbooks | Cooper Square Ventures (mdash@ndap-llc.com) | Confirmed | | Confirmed | |
| Quickbooks | Car Part Kings (mdash@ndap-llc.com) | Confirmed | | Confirmed | |
| desk.com | N/A | - | | I have no knowle - | |
| GoDaddy | coopersquareventures (mdash@coopersquarevent | Confirmed | | Invite sent to Mike Confirmed | I have no knowledge of this account |

| Service | Account | Status | Notes |
|---|---|---|---|
| GoDaddy | ndap (mdash@ndap-llc.com) | Confirmed | Confirmed |
| GoDaddy | Plumburs (mdash@plumburs.com) | Confirmed | Invite sent to Mke Confirmed |
| MageMojo | dgitman@ndap-llc.com | Confirmed | Confirmed |
| MageMojo | dgitman@plumburs.com | Confirmed | Confirmed |
| MailChimp | mikedash1 | Confirmed | Confirmed |
| Github | mikedash1 | Confirmed | Confirmed |
| Ringcentral | | 6465535918 Confirmed | Confirmed |
| join.me | N/A | - | I have no knowle- - I have no knowledge of this account |