# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------X

MICHAEL DARDASHTIAN, individually and
on behalf of COOPER SQUARE LLC a/k/a
COOPER SQUARE VENTURES,
LLC, NDAP, LLC and CHANNELREPLY,

                         Plaintiffs,

          -against-

DAVID GITMAN, ACCEL COMMERCE, LLC,
DALVA VENTURES, LLC, KONSTANTYN
BAGAIEV, OLESKSII GLUKHAREV and
CHANNEL REPLY, INC.,

                      Defendants.

17 Civ. 4327 (LLS)

AFFIDAVIT OF KONSTANTYN
BAGAIEV AKA KOSTIANTYN
BAGAIEV

-------------------------------------------------X

I, Konstantyn Bagaiev, am over the age of eighteen and understand the obligations of an oath. Being duly sworn, I hereby state the following.

1. I submit this Affidavit truthfully and without compensation for my testimony. It is based on my own personal knowledge. I do not wish to take sides between Mr. Dardashtian (Mike) and Mr. Gitman (Dave) and I hope that they can both find a way to resolve their disputes.

2. I have communicated with Dave through different communication applications including Skype. Attached as Exhibit A are my Skype communications with Dave from May 27, 2017 to December 14, 2017.

3. I believe these Skype communications were exchanged between Dave and Mike in this case. I have read these Skype communications and believe that Exhibit A is a true copy of my Skype communications with Dave during this time period.

4. In the year 2012, I was looking for employment on *oDesk.com* (now it is upwork.com), which is an online portal used by employers to hire freelancers.

1

5.   On *oDesk.com*, I was first introduced to Dave, who at the time was looking for a freelancer to create a solution to improve customer support for his business with his partner Mike known as NDAP ("NDAP").

6.   I learned from my many communications with Dave that he and Mike were equal co-owners of several other businesses, including Cooper Square Ventures (CSV).

7.   When I first started to do work for Dave and Mike, I was not successful in creating a solution to optimize customer support for NDAP, but I completed some unrelated tasks on NDAP's website Carpartkings.com which NDAP owned and operated.

8.   As Dave has a background in IT and I have experience as a software developer and IT, I developed a good relationship with Dave.

9.   In January, 2014, Dave asked me to assist both him and Mike with improving customer support in the operation of CSV.

10. At that time, I had full-time employment in the Ukraine, so I agreed to work part-time for Dave and Mike and their business.

11.  In our efforts to improve customer support for CSV, I successfully created a messaging connecter between eBay and Zendesk which NDAP used for carpartkings.

12. In September, 2014, I worked to improve CSV's messaging connecter that became the software solution known as ChannelReply.

13. I then decided to leave my full-time job in the Ukraine to work for CSV as its lead software developer for the ChannelReply platform.

14. During payment negotiations with CSV, Dave advised me that because he is an "equal partner" of CSV with Mike, he will "push" Mike to meet my compensation expectations. I did not know whether there were any other partners in CSV other than Dave and Mike, but I

believed Dave was going to defend my compensation expectation. I developed a trust for Dave, and valued that he took time to make sure I was paid the right amount.

15. While working on the ChannelReply platform I developed a relationship with Mike. I worked with Mike to provide support to CSV's customers, gather feature requests and decide what feature to implement and what feature to not implement. We shared a goal of growing ChannelReply's customers. I also worked on the carparts business when needed to bring Agile methodologies to coordinate work with multiple freelancers. This enabled them to grow at a faster rate by adding more bandwith to the development team and releasing features faster.

16. In the Spring of 2015, Dave, Mike and I began to see the real potential of ChannelReply. We all discussed the idea of hiring another developer since there was more work needed to build a reliable and scalable solution. The first hire didn't work out, so we decided to hire another software developer, Oleksii Glukharev, also from the Ukraine. I believed Oleksii would benefit CSV by helping me with the daily operation of ChannelReply. At that time I worked from the Ukraine and was lead developer of the ChannelReply technology software.

17. In August of 2015, Dave visited me and Oleksii in the city of Kharkiv in the Ukraine, to meet us in person.

18. While meeting with Dave, I asked Dave to increase my hourly rate. Dave advised me that the decision was not completely up to him, but that Dave would speak to Mike about it for me.

19. Several days after Dave's trip to Kharkiv, Dave advised me that he and Mike were having hard times with their Carpartkings' business. Due to financial issues, Dave told me that instead of a higher hourly rate of pay, he wanted to offer me equity in ChannelReply instead.

20. I told Dave that I liked Dave's proposal, but there was never a final agreement

3

between me and CSV. I never received equity in ChannelReply. I was instead given a raise that I was happy with in the coming months.

21. In February of 2016, Dave stopped operating Carpartkings. He told me that he was looking for other work. Dave stopped working with ChannelReply. He made himself available to me when we needed help with the AWS (Amazon Web Services) infrastructure. His help was not needed often so we did not work as much as we did before. I started to work mostly with Mike on a daily basis. We worked together on developing ChannelReply. We had a good relationship. Mike gave me salary increase, a platform to operate ChannelReply and I was happy. We worked together to improve the ChannelReply and CSV's growth.

22. In the summer of 2016, I was advised by Mike that ChannelReply became profitable for the first time. I resumed discussions with him regarding an equity interest. I asked for equity in ChannelReply as Dave had initially suggested.

23. Mike and I discussed a potential 5% equity interest in ChannelReply at some point in the future. Mike indicated it was not financially possible at the time. In the Autumn of 2016, I still had not received a 5% equity interest, so I received an hourly raise. I was okay with that financial arrangement.

24. Dave told me that he "almost kicked Mike to protect [my] hourly rate." I was surprised and upset. I trusted Dave and became suspicious of Mike based on what Dave told me. From what Dave told me, I felt that Mike did not appreciate me or my work.

25. Mike confirmed my new hourly rate and told me he was happy with my job performance. I was still not convinced based on what Dave told me about Mike. As I was getting different stories from both Dave and Mike, I did not know who to believe.

26. In December, 2016, Dave worked full-time as head of technology for another company

named Cue Connect. At that time, Dave told me that he planned on visiting Kiev to meet his new

software development team for Cue Connect. I told Dave I could meet him in Kiev to discuss

ChannelReply. We could discuss plans for the software and company moving forward, Mike was

aware of this meeting because he asked me to try and Dave up since he seemed a bit depressed at

that time by having some drinks together and a good time.  Unfortunately the plans that Dave and I

discussed in Kiev in regards to ChannelReply product and feature roadmap never materialized.

27. Dave and I met in Kiev. Dave told me that he was not happy with his relationship with Mike.

Dave blamed Mike for the failure of Carpartkings. It did not seem that Dave and Mike were on good

terms.

28. As I worked for CSV full-time on ChannelReply, I did not tell Mike about

Dave's comments. Mike was helpful dealing with CSV's customers and partnerships and the overall

progress of ChannelReply. I continued to work with Mike on ChannelReply's product integrations,

customer support and feature requests. I hoped Dave's issues with Mike would resolve in time.

29. In the Spring of 2017, I learned that Dave hired a freelancer from the Philippines on

*upwork.com*, Mary Faith Andan. She was to check CSV/ChannelReply's financial records. Dave put

me in touch with Ms. Andan to clarify any questions she had related to payments of ChannelReply

customers.

30. Dave told me this was because Mike stole money and Mike did not want to pay another

developer for Carpartkings. I assume that because of Dave's suspicions he hired Ms. Andan.  Dave's

comments about Mike made me nervous. If true, Mike could do same to me as I am

also a developer. I asked Dave if he had proof of Mike stealing money. Dave told me that all of his

accountants that he talks to say they have no doubts about that.

31. In May, 2017,  Dave advised me that he decided to remove Mike from

5

ChannelReply and start his own company doing the same thing as ChannelReply. He was going to use ChannelReply's software, codes, name and customers. Dave told me that he would provide me with the equity interest that I wanted if I agreed to join him. Dave wanted me to leave Mike and CSV/ChannelReply.

32. Dave told me that his "lawyer filed the paperwork for [my] ownership in Dave's new company, and that I would "see it in a few days". Exhibit A, May 26, 2017, 1:18 p.m.

33. Dave created a new Google Suite account for his new company, and forwarded all CSV's @channelreply.com emails to that new location. Dave then removed Mike from our existing channels including Slack, Zendesk and the channelreply.com emails. He asked that I assist him with the transfer of CSV/ChannelReply's customers to these new locations for Dave's new company.

34. Dave also created a Clerky account (an online software for legal document and company corporate account creation), where he added me as a co-founder of "Channel Reply Inc.". Dave told me to sign documents on that site online, which would provide me with a 5% equity interest in his new company, Channel Reply Inc. I helped Dave transfer the company accounts to new accounts for ChannelReply Inc. as Dave requested.  Exhibit A.

35. On May 30, 2017, Dave told me that he was moving the ChannelReply email to a dedicated G Suite account, and that he would be providing me access in an email.

36. On May 31, 2017, Mike contacted me and asked me to call him. It was made clear to me by Dave that what he was doing should not be shared by me with Mike. Dave told me that I should not call Mike back. I should wait until after Dave's visit to me in the Ukraine and that I should "block" Mike. Exhibit A, May 31, 2017 4:27 p.m.-4:29 p.m.

37. Dave offered me increased hourly rate. While I appreciated the gesture, I told Dave

6

that my compensation was not the first issue to solve. I told Dave to sort things out with Mike. Dave told me that my compensation was a priority and that I needed to be protected. Exhibit A, June 1, 2017 5:39 a.m. to 5:48 a.m.

38. Dave then sent me initial stock agreements for Dave's new company, ChannelReply, Inc. giving me equity interest as Dave promised. Exhibit A 5:56 a.m.

39. I asked Dave how we should behave with Mike for the time being. I asked Dave to describe the current situation with ChannelReply, and if Mike was receiving shares too. Dave told me that he "sent Mike shares" but that "Mike will not (accept) the shares unless he gets all of the money from the auto parts deal." Exhibit A, June 1, 2017, 12:47 p.m. -12:49 p.m.

40. Dave told me that he requested an audit of the company because if Mike refused that meant he had something to hide. Dave told me Mike refused an accounting giving me reason not to trust Mike. Exhibit A, June 1, 2017 12:51 p.m.

41. I reiterated to Dave that I wanted to speak with Mike. I did not like the idea of keeping my head in the sand. Dave told me to not communicate with Mike for "a while longer." Dave wanted more time to work with me on developing a position and plan for ChannelReply before I talk to Mike. Exhibit A, June 1, 2017, 12:56p.m. to 12:58 p.m.

42. Dave told me that "if Mike didn't f**k over all the shareholders and liabilities that we're supposed to pay just to pay him himself, we would not be in this position". "Mike will continue to have ownership at CR. However I will not be in a position to let him be in charge of money". Exhibit A, June 1, 2017, 1:05 p.m.

43. On June 4, 2017, while transferring everything to Dave's new company, ChannelReply Inc., I asked Dave that if Channel Reply is a new company. I asked if ChannelReply's existing customers are accepting the terms and conditions with the old or new company, and if we need to update them. Dave told me that he wanted "our" lawyer to review the current one.

7

44. Dave told me that he was making arrangements to come to the Ukraine to meet with me to discuss the future of ChannelReply. He wanted to "explain everything in person." June 4, 2017 1:23 p.m. Dave was coming to visit me June 12th through June 17th.

45. I asked Dave "So you are in parity now right? [Mike] stolen money, and you stolen Channel Reply right? Dave told me that he did not steal ChannelReply and that Mike will continue to have ownership in ChannelReply. Exhibit A, June 4, 2017, 2:27p.m. to 2:29 p.m.

46. I began to question Dave because it appeared that Mike would "not have half ownership as [Mike] had." Exhibit A, June 4, 2017, 2:29 p.m.

47. I told Dave that I always believed that Dave and Mike were 50/50 partners. When I was hired Dave told me Mike was an equal partner. But Dave now told me that Mike "never had half." Exhibit A, June 4, 2017 2:30 p.m.

48. I was concerned about what Dave was doing. I do not know the laws in the United States but trusted Dave. Dave told me that if it goes to court, "I think Mike would go to jail." Exhibit A, June 4, 2017 2:35 p.m.

49. I assumed that because Dave told me that his accountants could confirm that Mike stole money, Dave could create his own business. Because Dave told me he would provide me with an equity interest in his new company, I believed that Dave was also looking out for my best interests. I told Dave that he could count on me.

50. Though Dave told me that there was nothing wrong about his actions, it seemed too easy or too good to be real. I was still nervous what Dave was doing could be wrong. I asked to see proof that Mike stole money again. I wanted to see something that would prove Dave could remove Mike from the company. Dave never provided it to me. I was also nervous because Dave did not want me to talk to Mike who was also my employer.

51. I asked Dave several questions about my employment with Channel Reply Inc. Dave

8

referred me to his attorney Umar Farooq. Dave and Mr. Farooq began to offer me better compensation than the 5% equity that I was promised. I was told that if I agreed to work with ChannelReply, Inc. I would get the compensation.

52. At that time I did not sign any documents that Dave and/or Mr. Farooq prepared for me to sign. I wanted proof Mike stole money. I insisted that Dave should instead speak with Mike first before addressing my compensation. Eventually Dave pressured me to sign some documents from Clerky of which I do not have copies when the case was filed. I do not recall what these were and I do remember feeling uneasy about signing these since the case had already been filed.

53. Dave advised that he would like to visit Kharkiv to meet me and Oleksii in person to further discuss our roles with his new company, Channel Reply Inc., and to plan "our future."

54. On June 4, 2017, Mike sent messages to Dave, Oleksii and I letting us know that he was aware of what we were doing. We were shocked. Mike demanded that Dave immediately restore Mike's access to their CSV/ChannelReply's business accounts, and to "return things back to normal." Otherwise, Mike advised that he intended to go to Court.

55. I urged Dave to respond to Mike and to explain Dave's side of the story, cc'ing myself and Oleksii. Dave ignored my request, which made me more nervous.

56. Dave told me that Mike had "too much information." Mike was removed from all of CSV/ChannelReply's business accounts, yet somehow Mike seemed aware of Dave's discussions with me, and everything done for ChannelReply Inc. We did not know how Mike had this information. Dave transferred of all of CSV/ChannelReply's business accounts and banking accounts to his business.

57. We also did not know how Mike knew of Dave's planned trip to the Ukraine. Dave couldn't

9

understand how Mike knew everything he tried to keep secret from him. Dave told me that we needed to change our passwords. I assisted Dave to change passwords, and switch the company accounts to a new location so that Mike could not see anything anymore. Exhibit A, June 4, 2017, 3:31 p.m. to 4:33 p.m.

58. I continued to work with Dave to transfer the company accounts. We moved to a new ChargeBee, Stripe and PayPal account, and discussed ways to have ChannelReply's customers "resubscribe" after the transfer. Dave asked me to look into the 245 active subscriptions of customers to transfer. Exhibit A, June 4, 2017 4:31 p.m.

59. Dave asked me who knows "that we opened a new bank account?" I told Dave that I never told anyone, which is when we discovered that we did not remove Mike's access to TimeDoctor. TimeDoctor allowed Mike to see live-action screenshots of all of our communications. Exhibit A, June 4, 2017 4:41 p.m. to 4:48 p.m.

60. Dave believed that there was also "a leak" in his communications, and told me that he might wipe his laptop. Exhibit A, June 4, 2017 5:59 p.m.

61. On June 5, 2017, Mike contacted me again. He advised to not sign anything with Dave and to just keep working on ChannelReply. I told this to Dave and Dave advised that he is "afraid of our laptops being compromised." Dave told me to reset more passwords. Exhibit A, June 5, 2017 8:20 a.m. to 8:21 a.m.

62. After Mike filed this lawsuit, Dave told me that he "would like to leave [me and Oleksii] with a few options to think about overnight, tonight. Should we go back to [ChannelReply] the way things were (I might step away in this case), fight in court, start a competing product, etc. Exhibit A, June 12, 2017, 10:49 a.m.

63. Dave advised me to still not to talk to Mike. He told me that I should not

trust Mike because Mike would not agree to do an accounting. Dave told me that Mike would not agree to an accounting because it would prove that Mike stole money from CSV/ChannelReply. I still trusted Dave at the time.  I did not understand why Dave now needed an accounting to prove Mike stole, Dave told me he already had proof Mike stole.

64. Dave expressed his surprise with the lawsuit. I told Dave that it was a logical step from Mike, since Dave took the entire company away from Mike.

65. Dave and I looked into Mike's access to CSV/ChannelReply's accounts which Dave and I had switched to a new site in an attempt to figure out how Mike knew of everything that Dave did to terminate Mike's access.

66. Dave and I discovered that Mike still had access to CSV/ChannelReply's TimeDoctor account. Mike was also able to see Dave's creation of Channel Reply Inc. and the documents regarding my ownership of stock in Channel Reply Inc.

67. I was afraid that Dave's wish to start his own company without Mike as an equal owner was interfering with CSV/ChannelReply's best interest. Dave continued to accuse Mike of stealing money. Dave assured me that he would prove it to the judge immediately. I again asked Dave for proof, but Dave again said that the accounting should show it.

68. I recommended to Dave that he should immediately gather his proof to show to the judge. I was afraid that all of my hard work with ChannelReply would be lost if Dave did not have the proof that he said he did.

69. It was around this time in June when Dave met me and Oleksii in Kharkiv. At this meeting, Dave shared some ideas that he had with respect to Channel Reply Inc.'s future. Dave also showed me documents that Mike filed with the Court.

70. Dave was extremely upset, and at this time, I had sympathy for Dave and he had my support

11

while he compiled his proof that he did nothing wrong. I wanted to see for myself that this situation was all Mike's fault. After assisting Dave with removing Mike's access to ChannelReply, I had no choice but to hope that everything Dave told me was true.

71. On June 20, 2017, Dave told me that his lawyer, "Lindsay," asked Dave to send me an email, requesting that I send Mike a letter resigning from CSV/ChannelReply. I agreed, because at the time, I helped Dave transfer ChannelReply's customers to new accounts, and helped remove Mike's access to ChannelReply's portals. I could not see how I could work with Mike especially because of what Dave told me. After the actions I had taken with Dave, I believed that the only way that I could continue working for ChannelReply would be for Channel Reply Inc. or not at all. I did what I thought was right decision for me and ChannelReply.

72. Dave sent to me a template for a resignation letter and told me that if I make a Google doc and share it with him he would "be happy to help edit it". Dave sent me the document and I advised Dave that I was not sure what I could add or change, and that he "should show this to Dentons." June 20, 2017, 7:45 a.m. to 10:11 a.m.

73. Dave advised me that his "lawyers want it to come from [me] not them otherwise Mike might argue that we are conspiring." Exhibit A, June 20, 2017, 5:46 p.m.

74. Dave then sent me the draft of my resignation letter to sign which Dave or his lawyers prepared for my and Oleksii's signatures.

75. At Dave's direction, I sent the letter of my resignation from CSV/ChannelReply to Mike.

76. I also urged Dave to file a claim against Mike to explain his version of events, and to advise the Court that Dave was not looking to hurt Mike's interests, but just to remove Mike from handling the finances for their business. Dave did not do that. I no longer understood what Dave's intentions were. I began to suspect that Dave was not looking out for the best interests of ChannelReply.

77. I learned that Dave was removed by the Court from his management control as a result of his actions. When Dave was required to return all access back to Mike, Dave told me that he was happy to no longer have control, and to let "Mike kill the companies" so that it would make Dave look better. I expressed my disagreement with Dave as I did not want ChannelReply to suffer at all. Dave did not seem to care.

78. For reasons I do not know, Dave also did not make these same arguments to the Court that he told me were valid. Instead, Dave said things to benefit himself and to give him a greater ownership interest in ChannelReply. Dave always said Mike was doing wrong things for money, but Dave was doing it. I was afraid that Dave was going to ruin the hard work that I did to improve the ChannelReply software over the course of several years.

79. Dave accused Mike of stealing ChannelReply's customers. I told Dave that was not true, because ChannelReply has not lost any customers. Dave told me that he was meeting with the district attorney to see to it that Mike was prosecuted. I do not believe Mike was prosecuted.

80. Once CSV/ChannelReply was restored and Channel Reply Inc. was shut down, Mike asked Oleksii and I reconsider our resignation and to return to work. I was shocked that Mike did not blame us for Dave's actions, and instead he asked that I continue to work for ChannelReply because we were important for ChannelReply.

81. I told Mike that I would no longer work for him or Dave until there was a peaceful agreement between them.

82. A few days later, Dave advised me that Mike hired a new company to replace me and Oleksii as software developers to keep ChannelReply operating. Dave told me he could hire me to work for another company of his called Accel Commerce.

83. Oleksii advised me that he was not happy with what was going on with Dave and decided to leave ChannelReply anyway.

13

84. However, I truly cared about ChannelReply and wanted to see it continue to operate properly. I noticed a lot of errors in my mailbox from the ChannelReply servers that the new developers couldn't fix fast enough due to the new developers not having much experience with our custom software and platform. I contacted Mike to advise of these errors and assisted Mike to correct them.

85. It was clear to me that Dave lost control of CSV and ChannelReply. Dave's desire to have a business without Mike was Dave's priority, even if it was at the expense of ChannelReply and everything that we worked for.

86. After Dave was removed as manager, he continued to offer me the opportunity to compete with the very product that I was a leader in creating, ChannelReply. Dave reminded me that I never signed any non-compete agreement with ChannelReply or CSV. He told me that I was still free to work with him and compete with CSV/ChannelReply using the same software and code that I was a leader in creating for CSV/ChannelReply.

87. Dave also tried to convince me that Mike was not looking out for my best interests and that I should not work with Mike going forward. I decided not to tell Dave about my assistance to Mike to correct ChannelReply's malfunctions or my desire to go back to ChannelReply.

88. Dave's proposal was not acceptable to me. With everything that occurred, I could not accept leaving the ChannelReply product just to unfairly compete with it. While Dave continuously advised that Mike was stealing money, Dave has still never provided me with any proof to support any of his accusations either.

89. On September 27, 2017, Dave advised me that he had a conference in court with the judge. He found a way to bring his cell phone into the court. Dave told me that he recorded Mike while in court with the judge saying that Mike "will never give [me] any ownership." I finally

14

thought that Dave had some proof that Mike was not looking out for my best interests. Exhibit A, September 27, 2017 at 1:46 p.m. to 1:47 p.m.

90. Dave told me that he would give me a copy of the recording. When I asked him for a copy later that day, Dave advised that unfortunately he "stopped recording at 30 min" and does not have Mike "saying he will never give [me] any ownership. However, [Dave] will try to get that in email as we will be asking for it in a settlement offer." Exhibit A, September 27, 2017 at 5:47 p.m. Again, I was left without proof of anything that Dave was telling me.

91. In June, 2017, Mike gave me proof that Dave's accusations were untrue. I received emails and verification that Mike never sought to deprive the developer of money in the Carpartkings deal, the opposite of what Dave had told me. I was also shown that Mike never stole any money, and if Dave's stories were true, he would have shown me proof which he never did.

92. Before I reached any conclusions, Dave told me that he was going to file claims against Mike, and that when I see them I will be convinced that Dave is the one person on my side.

93. When I saw Dave's allegations against Mike I could not believe some of the statements that he made, as I have personal knowledge they are not true. I could not believe his claims about the ChannelReply software.

94. Dave incorrectly claimed that the data and code for ChannelReply is not confidential, that it is based on a 70 year old store and forward system, and that there has been no effort to construct and refine any algorithms to distinguish the ChannelReply product from the competition. Dave said that an ecommerce merchant can build a similar software to that of ChannelReply to respond to their customers and eBay or Amazon for about "$2,500 plus operational and administrative costs." I find these claims by Dave to be insulting. It is the equivalent of someone saying that anyone can make a modern car move when it utilizes a 130 year old technology of burning fuel. These claims made by Dave are not true at all and Dave knows it.

95. ChannelReply is not a simple software solution for a single merchant. I helped create it specifically as a self-management product for hundreds of customers to work simultaneously on multiple servers, which it does successfully to this day.

96. Together, we integrate into multiple different marketplaces and five help desks to make ChannelReply available to many large and small businesses all at the same time. The ChannelReply software stores information about hundreds of sellers which itself is confidential, and every single integration no matter the marketplace or helpdesk has lots of specific features to match expectations of hundreds customers at the same time. This is also confidential. By gathering customer information to match their expectations, we are creating a unique marketable tool, an advantage in the marketplace that separates ChannelReply from our competitors. This is the property of CSV/Channel Reply and no one else. I have spent hundreds of hours speaking to customers, working on development support and marketplaces, fixing and adjusting business logistics. I even did some of that work with Dave's assistance so he knows. This is secret information that is only known to the CSV and the ChannelReply team. The ChannelReply portal itself has thousands of visitors per week in the eCommerce industry. Our onboarding process is state of the art and I did not create it for our competitors to see. All of this makes the product unique and valuable as a result of years worth of development and tweaking.

97. For Dave to suggest that the ChannelReply software, code and data can be duplicated for $2,500 truly offends me. Even with the cheapest developers and minimal features, it would cost much more for a merchant to build the solution for himself over a long period of time and it would not cover any specific use cases and not even be close to a "similar solution." Dave's statement is wrong.

98. ChannelReply's terms of service with each of its customer requires CSV to keep each

16

customer's data confidential with exceptions and for each customer to keep ChannelReply's service and data confidential. ChannelReply's terms and conditions require each customer to agree to have limited access to the software based on their subscription or service they seek. We have policies for personal devices, data erasure, privacy, software development, source code, production servers and databases, password management, data encryption specifically to strengthen the security to remain competitive in the marketplace.

99. I trust that Dave does not believe his own assertions. If ChannelReply were so easy to duplicate by anyone he would not have needed to take it from CSV and use it for Channel Reply, Inc. He would have spent the $2,500.00 instead of transferring ChannelReply to Channel Reply Inc. and getting into trouble with the Courts.

100. Dave also claimed that Mike was not responsible for any of the growth of ChannelReply. That is not true. I met Dave when Dave was looking for someone (like me) to build a solution to connect eBay to Zendesk.  I do not  know whose idea it was to make ChannelReply, but I credit Dave for finding me, cause if he didn't, I would not have helped him and Mike create ChannelReply. I am quite sure at the beginning that developing ChannelReply was discussed between Dave and Mike because Mike agreed on behalf of CSV to pay me for my services to help develop it. Because Dave found me, I was able to help create the product for Mike and Dave's carparts business on eBay. Aside from the software itself, the development of it and dealing with customer support was my responsibility..

101. In the beginning, Dave found someone who built a simple design for registering and onboarding customers based on my mockups and was involved in the server's infrastructure. However, once ChannelReply was created, it was Mike who found our first actual customers, and was responsible for allowing ChannelReply to be more useful by assisting with marketing, customer feedback for improvements and broadening our customer base. I believe that

17

Dave did his job well as CTO, as someone responsible for technical success. After the most basic functionality of ChannelReply was implemented and we had our first clients, the rest was built without Dave. Mike and I worked on building the Zendesk app every day as well as all the new solutions and integrations over the years. Dave credits himself as if he developed most of everything himself, got all of our customers and made the software what it is today, but he was not very involved most of the time so it's simply untrue.

102. In February 2016, when CSV's carparts business was not doing well, Dave left to obtain outside employment. Dave was not involved in the ChannelReply product at all during this time period while Mike was involved in the development of the product every day. Dave only paid attention when we needed his help with AWS infrastructure (less than ten times a year). He did not appear interested in ChannelReply at all until May, 2017.

103. I worked with Mike, who was involved every day, on ChannelReply's portal, on our blog, on new integrations, and the redesigning of our App to further improve marketability. The software development, and 50% of customer support was my responsibility, and I helped hire new developers and designers for ChannelReply with Mike's approval. This was a collective effort.

104. My relationship with Mike was broken by Dave, not the other way around. Dave's statements that Mike made "no contributions in material way" to ChannelReply or NDAP is not true.

105. Dave also claims that ChannelReply was or is owned 50% by CSV, 42.5% by Dave individually, 5% by me, and 2.5% by Oleksii. I don't believe this is true. If Dave's claim is true, it certainly was never discussed with me. I had never heard about moving 50% of the ownership of ChannelReply to me, Dave and Oleksii as part of the development team. Dave never told me he would own half of CSV's interest and additional interest and not Mike. This would leave

18

Mike with 25% of ChannelReply which I never heard was an agreement ever. It was always my understanding that Mike and Dave were equal 50/50 partners in all of their businesses, including CSV/ChannelReply, and Dave commonly used the phrase to me "I'm equal partner."

106. I have always expressed my desire to have a 5% equity interest in ChannelReply, and have had those discussions with both Dave and Mike on several occasions. I never owned any interest in their businesses, including ChannelReply. Dave did provide me with a written agreement granting me a 5% equity interest in Channel Reply, Inc. when he asked me to resign from CSV/ChannelReply, but the equity agreement no longer exists as I have since learned that Channel Reply Inc. has been dissolved.

107. By reading Dave's counterclaim, which he said would "convince me" that his claims against Mike were true, I noticed untrue claims in his version of events. Dave's false description of the ChannelReply software offends me most. I am convinced that Dave made this claim so that he can duplicate the confidential ChannelReply software just to compete with it. This is not in the best interests of the ChannelReply software that I helped create. I do not support that.

108. After I resigned from CSV/ChannelReply and began to see the full story, I advised Mike that I was ready to get back to customer support and continue working for CSV/ChannelReply full-time. I wanted the chance to do my job and make sure ChannelReply continues to do well. Dave expressed his disappointment with that too.

109. Upon resuming my work for ChannelReply, Dave still maintained his credentials to be able to access ChannelReply, but would only turn them over when Mike's lawyers would continuously request them. When I would ask Dave for the credentials, Dave would ignore me. It was apparent that my relationship with Dave was based on choosing him over Mike or ChannelReply. My loyalty has always been to the ChannelReply software that I helped create.

110. Several months after I returned to working for CSV/ChannelReply, Mike asked me to sign a new contract with CSV containing a non-compete agreement. I understood that in light of everything that happened it was reasonable and I signed it. A true copy of my agreement is attached as Exhibit B.

111. After Dave became aware that I signed the contract with CSV, Dave finally contacted me. Dave said that "he can't protect me anymore, you're on your own" etc. Exhibit A, December 11, 2017, 8:15 a.m. The last two phrases that I remember from Dave are: "Doesn't matter anyway since you gave up on it.", "Working on motion to dissolve the company now." Exhibit A, December 14, 2017, 12:10 p.m. I found Dave's statement to be a threat against ChannelReply. Though he has not contributed to ChannelReply in quite some time it is my understanding that he is still an equal owner of ChannelReply.

112. Mike and I have since worked together to create more integrations, we have doubled our income and customer numbers. Mike increased my hourly rate several times, and I have not had any problems with payments. I believe that Mike has always acted with ChannelReply's best interests in mind and I have no reason to question our continuing success going forward. The past few years since Dave has been removed have been a noticed improvement in team work and is a very impressive achievement in terms of the way we can react, scale and solve any situation. I'm proud to be a part of this team.

113. Right now, we just suffer from uncertainty because this case is still open.

114. I am extremely proud of my work for ChannelReply and it was always my goal to participate in its success and growth with Mike and Dave. Unfortunately, Dave had other plans.

115. My loyalty has always been to ChannelReply. When Dave tried to remove Mike from

ChannelReply, I allowed myself to get caught in the middle of a dispute between partners. At the time, I believed that my actions were to help and show my loyalty to the ChannelReply software and mistakenly believed that everything Dave told me about Mike was true.

116. I was misled by Dave into believing that Mike was looking to harm CSV and ChannelReply, and that Mike "stole money," and that Mike was trying to undercut my ability to make money. I have learned that my concerns about Mike were not based on anything that Mike did, but based only on what Dave told me. I am saddened that Dave's desire to have this company without Mike in it has caused everyone involved to suffer, including me.

117. I am grateful Mike still allowed me to come back to work for CSV and ChannelReply and give me the opportunity to help make this company even better than it was before I returned.

118. I wish that the events that took place unfolded differently, but I am confident that ChannelReply is in the right place now, and will continue to grow and prosper with our current staff and management.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

*Konstantyn Bagaiev 29.07.2021*

Konstantyn Bagaiev
AKA KOSTIANTYN BAGAIEV

WITNESS:

Signature: _____

Name: _____

Address: _____

21

  

## СВІДОЦТВО

Місто Харків, Україна тридцятого липня дві тисячі двадцятого року.

Я, Бєлінська К.В., приватний нотаріус Харківського міського нотаріального округу, посвідчую, що Багаєв Костянтин Олександрович, 15 січня 1983 року народження, який зареєстрований за адресою: м. Харків, пр. Ювілейний, буд. 57/106, кв. 41, "30" липня 2020 року о 10 годині 15 хвилин знаходився за адресою робочого місця приватного нотаріуса Харківського міського нотаріального округу Бєлінської К.В.: 61058, Україна, місто Харків, вулиця Сумська, будинок 41.

Його особу встановлено.

Зареєстровано в реєстрі за № /3312

Стягнуто плати у гривнях згідно ст. 31 Закону України «Про нотаріат».

Приватний нотаріус                      К.В. Бєлінська



НОР 179746     Увага! Бланк містить багатоступеневий захист від підроблення

МІНІСТЕРСТВО ЮСТИЦІЇ УКРАЇНИ