UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

MICHAEL DARDASHTIAN, individually and
on behalf of COOPER SQUARE LLC a/k/a
COOPER SQUARE VENTURES,
LLC, NDAP, LLC and CHANNELREPLY,                    17 Civ 4327 (LLS)

                                   Plaintiffs,

       -against-

DAVID GITMAN, JEREMY FALK, SUMMIT          AFFIDAVIT OF
ROCK HOLDINGS, LLC, ACCEL COMMERCE,        MICHAEL DARDASHTIAN
LLC, DALVA VENTURES, LLC, KONSTANTYN       IN SUPPORT OF SUMMARY
BAGAIEV, OLESKSII GLUKHAREV and            JUDGMENT
CHANNEL REPLY INC.,
                           Defendants.
-----------------------------------------------------------------X

     Michael Dardashtian, being duly sworn deposes and says:

    1.  I am the Plaintiff in the above captioned matter and as such I am fully familiar

with the facts and circumstances of this matter as set forth herein. I have reviewed and

executed the Plaintiffs' First Amended Verified Complaint which is true to my own

personal knowledge.

    2.  I write this affidavit in support of Plaintiffs' Motion for Summary Judgment.

    3.  Defendant David Gitman ("Gitman") and I are co-managers and equal members

of Cooper Square, LLC a/k/a Cooper Square Ventures, LLC ("CSV") each holding a

50% ownership interest and profit percentage in such entity[1].

---

[1] As set forth in the accompanying Affidavit of Jeffrey Rothman, Esq dated June 21, 2017, Mr. Rothman
prepared the CSV Operating Agreement which mistakenly stated that the name of CSV was "Cooper
Square, LLC" not "Cooper Square Ventures, LLC" which is what was intended. The omission of
"Ventures" from the CSV Operating Agreement was an inadvertent mistake. See Mr. Rothman's Affidavit
at Guaglardi Decl. at Ex. "L" para 2, 11-13.

1

4. CSV is a software technology company registered in New York which specializes in e-commerce, software as a service ("SaaS"), software creation and technology consulting services. It also creates, operates, acquires and owns websites and numerous domain names.

5. CSV was founded by me and Defendant Gitman in August, 2011 and maintained principal offices in Manhattan, New York before becoming a remote company. As of the filing of this action, CSV consummated in excess of $10 million dollars of closed transactions. CSV also owns receivables belonging to NDAP, LLC ("NDAP"). NDAP was a wholly owned subsidiary of CSV and its assets were sold during the course of this action.

6. As of the commencement of this action, CSV was an investor in Sigmento, a technology startup company based in Israel and Plumburs, an online plumbing supply ecommerce business. A diagram created by Defendant Gitman showing CSV's online properties and products is annexed hereto as **Exhibit "1."** CSV's business operations rely completely on its proprietary software codes. Therefore, CSV has instituted layers of security, including but not limited to the following: all company passwords are stored in 1Password, a secure, heavily encrypted password storage system and all software codes are hosted on secure, encrypted AWS servers. The codes are also stored on a private and secure, encrypted GitHub repository for backups and testing. GitHub describes itself as the largest host of source code in the world.

7. CSV also fully owns the e-commerce SaaS solution "Channel Reply," one of its software products which is likewise protected by CSV through layers of security, including a secure encrypted AWS server for its software code. ChannelReply is an

online SaaS product that facilitates the messaging of e-commerce marketplace owners'
communications to customers and potential customers worldwide. Customers pay a
monthly subscription fee to CSV/ChannelReply to connect their Marketplace store
message with customers, allowing for free-flowing communications between the
company and customer. CSV/ChannelReply has a physical office address located in
Great Neck, New York, but, due to the technology driven nature of the Company,
CSV/ChannelReply's business is largely conducted remotely.

8.   On August 13, 2011, Defendant Gitman and I each executed the CSV Operating
Agreement. A true copy of CSV's Operating Agreement is annexed hereto as **Exhibit
"2."**

9.   On August 9, 2011, I procured an Employer Identification Number ("EIN") from
the Internal Revenue Service for business related to CSV.  Redacted copy of the receipt is
annexed hereto as **Exhibit "3**."

10. Earlier in the Spring of 2011, I proposed the idea of a business partnership
with NDA Holding, LLC, and when Defendant Gitman agreed to come on board, I
negotiated the terms and secured the partnership for the benefit of CSV.
On August 24, 2011, Defendant Gitman and I, as co-managers of CSV, entered into an
operating agreement with NDA Holding, LLC, thereby creating NDAP. NDAP was
formed for the purpose of creating an e-commerce software platform to sell and distribute
auto parts called Carpartkings ("CPK"). NDAP's operating agreement is annexed hereto
as **Exhibit "4a"** and filing of Articles of Organization is annexed hereto as **Exhibit "4b."**

11.  On August 25, 2011, I applied for an EIN from the Internal Revenue Service for NDAP, and subsequently opened a dual member signee business checking bank account with Bank of America for me and Defendant Gitman and to conduct business for NDAP. Redacted copy of the EIN receipt is annexed hereto as **Exhibit "5a"**.

12.  From August 24, 2011, up until December 31, 2014, CSV was a minority member of NDAP, LLC with a profit percentage of 49% subject to NDA Holding, LLC's 51% ownership interest. On or about December 31, 2014, CSV purchased the remaining 51% ownership interest in NDAP from NDA Holding, LLC. Defendant Gitman and I spoke with CSV's attorney, Jeffrey Rothman, about these agreements and he negotiated the terms with NDA Holding's attorney. Defendant Gitman and I were copied on emails pertaining to the drafting and signing of these documents, as well as the subsequent establishment of an Escrow Account by CSV's attorney. Emails of same are annexed hereto as **Exhibit "127."**

13.  From August 24, 2011, until around January, 2016, NDAP was doing business as "Carpartkings", an online automotive parts reseller, and consummated in excess of $10 million in closed transactions.  A website screenshot is annexed hereto as **Exhibit "10a"** and DBA confirmation annexed as **Exhibit "10b."**  During the course of this action, NDAP was sold to Buy Auto Parts, however CSV still owns assets (funds in the bank and receivables) belonging to NDAP derived from the sale.

14.  On October 13, 2011, Defendant and I, as dual member signees opened a business checking account at Bank of America under the name Cooper Square Ventures, LLC. Redacted signature cards annexed hereto as **Exhibit "5b."**

15. Beginning in and around 2012, CSV spent years creating the proprietary software "ChannelReply". My full description of ChannelReply's services are annexed hereto as **Exhibit "5c."** An email Gitman sent in 2015 to a potential investor contains Gitman's own description of ChannelReply and confirms that it is CSV's software. The email is annexed hereto as **Exhibit "5d."** The ChannelReply website's Terms of Service and Invoices to customers clearly evidence that CSV owns and operates the ChannelReply service. Terms of Service and Invoices are annexed hereto as **Exhibits "11b", "11c and "7a".**

16. During the summer of 2014, CSV launched a beta version of ChannelReply, to test the online product. CSV entered into its first customer service agreement for ChannelReply on September 3, 2014, a redacted copy is annexed hereto as **Exhibit "6."** A redacted copy of the first customer invoice receipt is annexed hereto as **Exhibit "7a"** and redacted email to a potential customer is annexed hereto as **Exhibit "106."**

17. CSV made Konstantyn Bagaiev (hereinafter "Bagaiev") ChannelReply's lead software developer. Bagaiev, a freelancer based in Russia was originally contracted through Upwork, a global freelance service to work on ChannelReply.

18. In October 2014, Defendant Gitman formally welcomed Bagaiev to CSV, writing, "Bagaiev has been working with us for 2 years on ChannelReply." Gitman's email is annexed hereto as **Exhibit "7b."**

19. In November 14, 2014, Bagaiev was added to our company payroll as an independent contractor. The scope of his services included working on various projects on a freelance basis, including but not limited to ChannelReply and its API connection and Carpartkings.

20.  As CTO, Defendant Gitman typically handled the onboarding of developers. For example, he handled the execution of the contract for NDAP developer Alice Fritz, on CSV's behalf. Although, we both always worked together depending on who was available. CSV had a standard independent contractor agreement for all of our freelancers.  The same agreement has been used by Plaintiff Companies for the majority of its independent contractors, not contracted through Upwork, since the Company's inception in 2011.

21.   I later found out in January of 2016, from Bagaiev that Gitman *never* had Bagaiev sign CSV's independent contractor agreement, of which I was not aware. A true copy of the independent contractor agreement is annexed hereto as **Exhibit "8."** Bagaiev needed a copy for his bank, so I provided him with one. See **Exhibit "124."** I did not sign the actual agreement. My conversation with Bagaiev is annexed hereto as **Exhibit "124."**

22.   In this action, Mr. Gitman accuses me of forging Mr. Gitman's signature on the independent contractor agreement and because of this *alleged* forgery Gitman claims that Bagaiev never signed the independent contractor agreement. I have since reviewed Bagaiev's conversation with Gitman regarding the independent contractor agreement which confirms that Gitman's accusations against me are false. In an effort to get Bagaiev to confirm my alleged forgery, Bagaiev said, "Dave, I've explained you before about the agreement, which I needed for my bank. I've signed it but never sent my signature to Mike." See **Exhibit "125."** I respectfully submit that even if I had executed an independent contractor agreement on Gitman's behalf it would have been for the benefit of the company and with his approval as per our usual routine.

23.   Gitman occasionally had me sign contracts on behalf of the company for him, with his approval, when he was not available. For example, on January 18, 2016, Gitman asked me to sign Falk's contract for him. I wrote, "u want me to sign agreement for u?" and Gitman replied back, "great letter... though I could wipe my ass with it."   See **Exhibit "121."** Defendant and I also frequently shared the task of ensuring that freelancers sign our standard independent contractor agreements. See examples at **Exhibit "122"** and **"123."**

24.   Through the commencement of this action, ChannelReply consummated in excess of $350,000 dollars in closed transactions and had an ongoing revenue stream of approximately $30,000 per month, and has more than two hundred businesses presently enrolled as customers. Our customer base spans not just the United States of America, but the entire Globe (world). Our national and international customer base completely rely upon ChannelReply to help integrate and respond to customer service communications from eBay and Amazon. Many of our customers transact millions of dollars in sales every month on these online marketplaces. Among our customers are several large worldwide retailers whose names I will identify to the Court if the Court deems necessary. In the alternative, I would prefer not to publicize the names of CSV's clientele.

25.   On July 10, 2015, NDAP entered into a confidential brokerage agreement with mergers and acquisitions advisor The Peakstone Group, LLC ("Peakstone Agreement"), to raise equity investments and help sell its proprietary software. Exhibit referencing same is intentionally omitted at **Exhibit "12."** Defendant Gitman was

7

involved in discussions with Peakstone and his emails are annexed hereto as part of **Exhibit "127."**

26.    On or about February 5, 2016, I reached out to and communicated with the CEO of a large auto parts retailer to explore a sale of CPK's proprietary software. My emails are annexed hereto as **Exhibits "100 & 143."**

27.    On or around February and March of 2016, I tried to get Defendant Gitman more involved in the daily operations of ChannelReply since he had primarily focused on carpartkings and we were looking to sell off its assets.  I told our lead developer how much I believed in ChannelReply and that I wanted to continue to build, grow faster and increase our customer base to 300. I expressed these same aspirations to Defendant Gitman but he did not think there was any work for him to do on ChannelReply and didn't believe in its success. My discussions with Bagaiev about same are annexed hereto as **Exhibit "104."**

28.  On or around May 11 2016, Defendant Gitman informed me he would be leaving his full-time position as acting CTO (Chief Technology Officer) of CSV to accept a full-time job as CTO of CueConnect. By way of phone call on May 12, 2016, Defendant Gitman and I discussed reducing overhead for CSV and carpartkings. A week later on May 19, 2016, I received a $5,000 draw from CSV. For the next six months, I focused on the carpartkings sale and growing ChannelReply. I doubled ChannelReply's sales. Evidence of my doubling of ChannelReply's sales is annexed as **Exhibit "19c."** My financial discussions with Defendant are annexed hereto as **Exhibits "20b-i".**

29. On May 12, 2016, Bagaiev reached out to me via Skype saying he noticed on Facebook that Gitman had left for Cue Connect and was following up on his request for a raise several months ago. He mentioned, Gitman had brought up the possibility of employee equity in lieu of a raise and wanted to discuss. I spoke to him by phone explaining that the company was in flux with Defendant Gitman gone and CSV looking to sell off carpartkings. We were reducing expenses but that I would discuss the possibility of a future grant of equity for him with Defendant Gitman. Our conversation is annexed hereto as **Exhibit "120."**

30. On and around October 2016, with Defendant Gitman's knowledge and consent, I took outside employment with Yotpo while continuing my role as manager and member of the Plaintiff Companies. Yotpo is an e-commerce marketing platform that provides ratings/reviews for website of products and business services. It provides visual curated content to companies that run their own website or business.  At Yotpo, I worked to help start up an enterprise sales team to sell Yotpo's service to small businesses and ultimately became the head of enterprise sales. Yotpo is *not* a competitor to the Plaintiff Companies, including ChannelReply, or any of its affiliates. In fact, CSV was one of Yotpo's first customers and still remains a customer to this day. Defendant had, in the past, participated in promotional events and articles for Yotpo. Shortly after I began working at Yotpo, Defendant Gitman asked me if I wanted any of the Cue Connect guys for a new Yotpo sales team, and later said he would assist me with signing up a large retailer as a Yotpo customer. Evidence of the above is annexed as **Exhibits "12a, 134, 135, 136, 137, 138, 139"**.

31. On and around June 7, 2016, when the Developers again asked for a raise or equity grant, Defendant Gitman and I discussed creating a separate LLC for ChannelReply, Defendant sarcastically said the company should be called "Really Going out of Business" before agreeing that it should be called ChannelReply, LLC. Text conversation and email annexed as **Exhibit "13a" and "13b"**.

32. On June 9, 2016, I registered ChannelReply, LLC (ChannelReply, LLC") with the Secretary of State in New York, registration annexed hereto as **Exhibit "14"**. Beginning on June 17, 2016, I published notice of ChannelReply, LLC. Evidence annexed hereto as **Exhibit "15"**.

33. On June 27, 2016, I scheduled a call with CSV's company attorney Jeffrey Rothman to inquire about future employee stock options for ChannelReply, LLC, which was established as a wholly owned subsidiary of CSV annexed hereto as **Exhibit "16"**.

34. On July 8, 2016, the auto parts retailer I originally contacted and had been communicating with, expressed interest in the purchase of NDAP's proprietary Cataloging and PIM systems software for CPK. On or about August 11, 2016, discussions had progressed significantly for the sale of CPK. As CSV approached the final deal-making phase, I reached out to Jeremy Falk, ("Falk") to act as a third-party middleman to assist in negotiating written terms. Falk's letter of intent to invest and the email where I involve him as the broker for carpartkings sale are annexed hereto as **Exhibits "100 & 144."**

35.   On August 24, 2016 Defendant Gitman requested a letter from CSV on company letterhead so he could request a work Visa for Bagaiev. Text message annexed hereto as **Exhibit "17"**. On or around September 6, 2016, I acquired an EIN for ChannelReply, LLC, redacted copy annexed hereto as **Exhibit "18"**.

36. On Wednesday, Oct. 5, 2016, I sent Defendant an operating agreement for ChannelReply, LLC which Defendant said he would sign. Defendant never returned an executed version of the ChannelReply, LLC operating agreement to me so I could not open a bank account or commence the paperwork necessary to create an employee stock options pool for ChannelReply, LLC.  The ChannelReply, LLC unsigned operating agreement and transmittal to Defendant Gitman are annexed hereto as **Exhibits "19a"and "19b"**.

37. Defendant Gitman and I had agreed that the Liebman Firm along with Greg Freyman, CSV's longstanding bookkeeper, would continue overseeing all company books for daily bookkeeping purposes. In September, I received another $5,000 draw, pursuant to my agreement with Gitman, who remained at Cue Connect in his full-time position. Later that month, Gitman inquired about the $10,000 I had received and claimed we never discussed it even though we did. Gitman insisted that in exchange for my draw, he wanted the company to pay for his BMW and other personal expenses when he went to work for Cue Connect. I reminded Defendant of this in a memorialized Skype conversation, annexed as **Exhibits "20b-i"**.

38. On October 19th, 2016, after Defendant Gitman neglected to sign the Channel Reply, LLC operating agreement, I emailed Bagaiev, explaining we could not offer him and our other developer Oleksii Glukharev equity at this time because it was too

expensive to create the paperwork, but hoped to be able to in the future and requested they be patient as we continue to work on the issue. I informed Gitman and he replied back asking what percent equity I had discussed with the developers. Id at **Exhibit 140.** Contrary to Gitman's assertions, the Developers never had an ownership in CSV, ChannelReply or its other related companies. Bagaiev Aff. **Exhibit B**, Section 1(e); see also, Liebman Decl.

39. The next day, Defendant Gitman asked me about whether I was going to accept a job offer with Yotpo and what I would tell the Developers. I told Defendant Gitman that I had spoken with Bagaiev and explained it was too expensive and that Bagaiev was fine with it. Defendant Gitman changed the topic to discuss a mailchimp message I had sent. **Exhibit "142a & 142b."**

40. In and around September and October of 2016, the Plaintiff Companies were utilizing the accounting firm of Liebman, Goldberg & Hymowitz, LLP, ("the Liebman Firm") to handle all accounting issues related to NDAP, CSV and ChannelReply.  On October 31st, 2016, Gitman advised that he did not understand what was going on with the financial books of the Plaintiff Companies and he was going to "pull someone in to make sense of them." I offered to sit down with him and run through them together but he said he wanted a "third-party." On November 1st, 2016, Defendant Gitman copied me on an email to Freyman, confirming his desire to have Freyman reconcile the books for NDAP, ChannelReply and CSV. Later that day, Defendant Gitman emailed me again changing his mind, requesting a different bookkeeper named Dee Clay who would work for a cheaper price. I wrote back that he could make the call, because I trusted him. Our conversations are annexed hereto as **Exhibit "118."**

41. On November 8th 2016, Gitman notified me on slack that he was personally changing around our accounts and access to it. Between November and January, Gitman told me he wanted to hire yet another bookkeeper, named Zachary Mayhew, and so I gave him access to our accounts and confirmed it with Gitman via slack. Our conversation is annexed hereto as **Exhibit "118."**

42. In December, 2016, Defendant Gitman indicated to me that he would be back to CSV in a few days because his job at Cue Connect had not worked out.  It seemed he was going through a difficult time personally.

43. On December 15, 2016, Gitman emailed me advising that he did not want to participate in discussions related to the sale of carpartkings. He said "You can try to sell it. Frankly I don't think you will. I've never seen you raise a dollar or sell an asset." Since he was CTO, his involvement with prospective purchasers was very important. I was confused by the tone of Gitman's email. Defendant's email is annexed hereto as **Exhibit "145."**

44. On January 22, 2016, Defendant Gitman emailed me about hiring another bookkeeper. He told me he didn't think Mayhew was interested in helping. He said he had spent the day with a bookkeeper and couldn't figure out "what's going on with our books. I need you to step in and sort them out. I'm at my limit." I had offered a few times for myself or our bookkeeper Freyman to sit and help defendant Gitman with whatever was confusing him but he was not open to it. I did not understand what he was confused about and tried on multiple occasions to help him answers to any questions that he may have had. Because we only had one credit card, one bank account and one Quickbooks

account, I did not know what if anything concerned Gitman.  Our conversation is annexed hereto as **Exhibit "118."**

45. I expected to hear from his new bookkeeper but the following day, Gitman made more changes to our books. It was not the first time, Gitman had tried to take things into his own hands despite his obvious confusion over how accounting works, since he is not a CPA. Gitman had a history of making changes to our company books. He has hired at least six different bookkeepers, including his brother, since the Companies began and emails I was cc'd on show he often made revisions to our company books over the years. One accountant he hired years before, wrote that Gitman made over 1,000 edits himself and advised Gitman to stop doing it until a CPA could take a look at the books. Past company emails are annexed hereto as **Exhibit "126."**

46. On January 23, 2020, Gitman asked me to help him pull all of our Amex statements, which I did. He then wanted the statements from "the beginning of time." I sent all of the ones we had. He then asked to be made the master administrator of an old NDAP Quickbooks account that we were no longer using. I was confused. That same day Jeremy Falk, who was helping us with the sale of carpartkings, suspiciously called me to ask that Gitman be master administrator. I sent Falk and Gitman emails from Freyman explaining that Gitman was already an administrator on the account with the highest level of access, even higher than mine. We could not make him master, I explained, because our CSV bookkeeper was master. Given Defendant's confusing behavior, adding multiple bookkeepers to our accounts and making his own changes without backup copies, I did not feel comfortable with this, considering a purchaser was engaged in due diligence related to a potential sale.  Our conversation is annexed hereto as **Exhibit "119."**

47. Later that night Defendant Gitman again messaged me that he was making changes to the books. I told him I did not think that either of us should be making any changes to the books because a purchaser for carpartkings was conducting due diligence in relation to the sale. Gitman replied it was too late, he had been making changes for a month already and he was not going to stop. I told him I did not understand what was confusing him or why he was being so nasty to me. I had offered many times to go through anything with him and agreed to all of his bookkeepers. He didn't respond. Our slack conversation is annexed hereto as **Exhibit "119."**

48. To appease Gitman, I continued to consent to the retention of any bookkeepers Gitman wanted, including Ms. Andan, so that hopefully Gitman would recognize that nothing untoward had happened in his absence. Ms. Andan received full access to our Quickbooks account and I helped upgrade the account at her and Defendant Gitman's requests. Ms. Andan logged on over one hundred times from February 2017 through late June 2017, at Defendant Gitman's direction, even after this litigation had commenced and Defendant continued to assert that I had blocked his and his accountants' access to company accounts. My correspondence with Mary Faith Andan is annexed hereto as **Exhibits "129a-f" and evidence of Andan's Quickbook logins as Exhibit "128."**

49. Gitman then demanded that we hire a bookkeeper based in the Philippines named Mary Faith Andan (referred to herein as "Andan" or "Ms. Andan") who he had found on Upwork to review and make adjustments to NDAP and CSV's company books outside of the Liebman Firm. While I was fully satisfied with the Liebman Firm, I consented to the retention of Ms. Andan for the time being to appease Defendant Gitman. Ms. Andan did not provide or otherwise demonstrate that she had any knowledge of U.S.

accounting principles or tax laws. My correspondence with Defendant Gitman from May and September is annexed hereto as **Exhibits 20b-i.** Defendant Gitman's expenses, including his BMW payment is annexed hereto as **Exhibit 72(b).**

50. It became clear to me in March of 2017 that not only was Defendant refusing to speak to me for reasons that I did not know, but he took steps to harm my reputation. On March 25th, 2017, I was contacted by the founder of a company in Israel that CSV was invested in called Sigmento. The founder asked, "What's up with David?" He was here to "help" us and said a bunch of things…Understood it didn't end up well between the two of you. He then wanted to come in as partner at Sigmento and when we said we couldn't pay 25K a month for 50% of his time he started going behind my back and pull weird moves that don't work here…Just wanted to know your side of things as I am not sure I believe everything," Defendant had met with said company without notifying me.  I later found out that Defendant Gitman had brought in Ms. Andan to "fix" their books and she created somewhat of an accounting nightmare for them, which affected them for many months after and therefore indirectly harmed CSV's investment in the Company's success. Ms. Andan similarly did tremendous damage to CSV's books. She, along with Gitman, made hundreds of edits, revisions and re-categorizations. Our accountant Joel Liebman and bookkeeper Greg Freyman told me she had made our books a mess. I had to pay Freyman to fix all of her damage. My correspondence with Sigmento is annexed hereto as **Exhibit "130."** Defendant has also harmed CSV's other company Plumburs.

51. Around the time Defendant Gitman left for Cue Connect he stopped working on Plumburs in a substantial way. See **Exhibit "94."**  When Defendant returned from Cue Connect, our partner in Plumburs emailed him repeatedly asking to fix technical errors in

the system so we could load more products and grow the company but Gitman refused and repeatedly ignored the partner. He ignored him for weeks only to reply, "I want to see a clean set of books before we make any decisions." When the partner asked to shut down Plumburs after months of no development work, I agreed but Defendant Gitman did not reply.

52. In June, when he changed CSV's accounts and locked me out, he also changed CSV's Paypal account which was connected to Plumburs and locked our partner out. See **Exhibits "94, 96-99."**

53. In September, 2017, CSV's partner in Plumburs again requested Plumburs be dissolved. Presently, Plumburs has been inactive for years. Defendant Gitman refuses to dissolve it. See **Exhibits "96-99."** Defendant Gitman's refusal to work on Plumburs affected the company's operations and ability to sell on platforms including its eBay account, which Gitman has had complete control and access to. Defendant Gitman was the one to have our partner at Plumburs create the eBay account and Defendant launched it. Once he received credentials, Gitman improperly tied his personal account to the Plumburs business account to improve his seller rating, without my approval or knowledge and neglected to attend to it. See **Exhibits "91, 92, 93 & 95"** evidencing Defendant's integral involvement with our company's eBay accounts, including Plumburs' and the monitoring of seller ratings for NDAP.

## FALK'S DEMAND FOR FEE FOR SALE OF NDAP

54. In or around December, 2016, Defendant Gitman's job as CTO at CueConnect did not work out. In the six months when Gitman had been working elsewhere, I, without Gitman's participation or assistance, had succeeded in doubling ChannelReply's monthly

revenue from approximately $12,000 to $24,000. Spreadsheets evidencing the doubling of ChannelReply's revenue in Defendant Gitman's absence are annexed hereto as **Exhibit "19c"**.

55. Back in October, 2016, I had told Gitman ChannelReply was growing rapidly with new customers, and in December I notified him that two venture capitalists had reached out about potentially investing in ChannelReply. My communication is annexed as **Exhibits "112 & 113."** Defendant Gitman expressed his renewed interest in working with the Plaintiff Companies which was welcomed by me without any objection whatsoever. Instead, over the next few months he did not contribute meaningfully to ChannelReply.

56. On or about December 28, 2016, Falk contacted me and began demanding payment for his consulting fee for tax write-off purposes. I stated that I would not be paying him in the absence of a written agreement. Email correspondence is annexed hereto as **"Exhibit "20a"**.

57. On February 15, 2017, around 10:40am, Falk texted me asking me to "send the peak agreement," referring to my old confidential Peakstone Agreement so he could show it to the company who wanted to purchase carpartkings. Confused, I asked why they would want that document and also wrote, "peak agreement is long been voided at this point." Falk continued to pressure me, saying "All co want to know all arrangements that are potential liabilities. Their lawyers will ask for it. We are trying to show that not just 1 party in mix." Redacted text messages annexed hereto as **Exhibits "21" and "22."**

58. On February 15, 2017 at 11:28am, I forwarded The Peakstone Agreement to Falk with the understanding that he needed it to show in connection with the purchase of carpartkings as part of a due diligence process.

59. On February 17, 2017, Falk sent me back a doctored-up version of The Peakstone Agreement, entitled Services Agreement. In this proposed "agreement", Falk asked Defendant and me to pay him $160,000 upon the closing of a sale of our company, NDAP, as well as .25% of the purchase price so he could have an "equity component." At this point in time, Falk had not sent me any offer related to any potential deal for NDAP. I found Falk's lump sum payment request to be uncustomary and bizarre considering we did not have any idea of the value of a potential deal. Falk had not even procured a purchaser, I had. See redacted Falk's Services Agreement as **Exhibit "25".**

60. On February 17, 2017, I responded to Falk's email, saying his fees would need to be "reasonable depending on the sale price". I also communicated that I would not sign the document unless it was reviewed and approved by my company attorney.

61. On or about February 20, 2017, Falk told me a deal was on the horizon but refused to tell me the offer or nature of ongoing discussions with the prospective purchaser. Falk said he would not give me any information unless I signed his services agreement.

62. Suspiciously, within a few months of Defendant Gitman returning to work with the Plaintiff Companies full time, Defendant Gitman emailed me pressuring me to sign Falk's proposed agreement. I did not know at that time that in February, 2017, as they both pressured me to sign Falk's agreement, Falk had already created a competing company for himself and Defendant Gitman called Dalva Ventures behind my back. The

following month in March, 2017, Gitman and Falk had formed Accel Commerce, another competitor which was owned by Dalva Ventures. **Exhibit "37" and "38."**

63. On March 3, 2017, I sent back our redlined version of Falk's agreement, saying, "….Have we heard anything back or received an offer from [company name omitted] yet?" Falk responded, "Will review. No counter offer yet." I responded, "Counter? Was there an initial offer?" Falk replied, "Mistyped. No offer." Redacted email exchange annexed hereto as **Exhibit "27"**.

64. On March 5, 2017, Falk sent back more revisions, and said, "Give me a call to discuss and let's get this done soon so we can get to a transaction asap!" Redacted email exchange annexed hereto as **Exhibit "28"**.

65. On March 7, 2017, Falk emailed me saying that his lawyer suggested that the timeframe of the agreement should be backdated. When I reviewed his updated document, it stated that Falk had been providing his services since December 2015, "solely with respect to the buyer and solely concerning the transaction." However, Falk had only become involved in the Carpartkings sale as of August 2016 when I introduced him to the prospective purchasing company. In his email dated March 7, 2017, Falk threatened that if we did not agree to the change in time frame for his services related to the transaction that we would need to go back and duplicate his work in the midst of deal negotiations, saying "the alternative I see is that I notify [company name omitted] of such and then either Mike or Dave resends to [company name omitted], the same documents that I have already provided…Up to you which route you want to take. I need to then have the data come again from CSV to [company name omitted]." Redacted email correspondence annexed hereto as **Exhibit "29a"**.

66. Defendant Gitman suspiciously supported Falk's position.

67. On March 7, 2017 Defendant Gitman wrote back to Falk and me five minutes later, stating, "Jeremy, thank you for all your hard work. We truly appreciate it. All your suggested changes are reasonable.  Mike, this situation has become emotional and embarrassing at this point. Please execute this immediately. I'm ready to counter sign."

68. I was incredibly uncomfortable signing a document that stated that Falk had provided services to our company for close to a year and a half when he had only been in the transaction for around six months. I was also uncomfortable with the fact that Falk, was potentially withholding information from me pertaining to an offer to purchase a company of which I owned 50%.  However, I was worried that Falk would hurt a potential deal, if we did not agree to his demands. I wrote back to Defendant Gitman, who owned the remaining 50% of our company, saying, "I'm trying to protect us. I suggest you talk to Jeff, what it seems Jeremy is trying to do is attach himself to NDAP and CSV so that we possibly owe him money if a deal is not done or we try and do something with CR (Channel Reply). I'm not comfortable with that. Also, he is including LLC's that don't exist in this agreement, which puts us at risk. He's including potential deals in this agreement that don't exist. He's refused to show me an offer letter and refused to have me on the phone with [company name omitted] proving that there is even an offer at this point…have you seen or heard anything from [company name omitted]? Why are we jumping through hoops if no deal is on the table?" Email exchange annexed hereto as **Exhibit "29a"**.

69. Defendant Gitman neglected to inform me that Defendant Gitman and Falk were now partners in another competing venture, Accel Commerce. Gitman's loyalties were to Falk, Dalva and Accel Commerce, not to me or the Plaintiff Companies. I was unaware of Gitman's disloyalty at the time.

70. Around March 7, 2017, I advised our attorney to put a clause in Falk's services agreement stating that "In the event, the Transaction does not close, for any reason or for no reason, NO compensation shall be due Consultant." I added this clause to protect the company's reserve capital in the event a sale did not materialize and to provide us with an out in the event the deal value was lower than Falk's proposed fee. Email exchange annexed hereto as **Exhibit "29a"**.

71. On March 7, 2017, I executed Falk's services agreement under the pressure of Defendant Gitman, and also to get the information that I believed Falk was intentionally withholding from me related to a deal offer. Redacted executed agreement annexed hereto as **Exhibit "29b"**.

72. On or around March 10, 2017, Falk communicated an offer and sent a Letter of Intent (LOI) from the prospective purchaser dated March 8, 2017 which was one day after I had signed Falk's services agreement. Redacted email correspondence regarding Falk's indication of interest and letter of intent is annexed hereto as **Exhibits "30"**.

73. In and around March 13, 2017, I negotiated a settlement on CSV's debt instruments with NDA Holding, LLC, a benefit to the Plaintiff Companies, including Defendant Gitman.

74. On March 15, 2017, Defendant emailed me after speaking with Falk, saying, "I spoke to Jeremy. He's okay taking 80k in light of the PA offer. Jeremy, please confirm. I responded, "sounds good...." Falk then responded back to the same email chain, about two minutes after my email, on March 15, 2017, confirming his agreement to reduce his service fee to $80k. Falk, responded back to both myself and Defendant saying, "Yes." Email exchange annexed hereto as **Exhibit "32"**.

75. I have since learned that on March 20, 2017, unbeknownst to me at the time, Defendant Gitman registered a limited liability company called Accel Commerce ("Accel"), specializing in e-commerce, the same industry of the Plaintiff Companies.

76. According to Upwork, a freelance hiring platform, Accel has been operating since January 2017, when Defendant left Cue Connect, made changes to our books and stopped speaking with me. Accel's registration and Upwork account which has Defendant Gitman listed as a business manager are annexed hereto as **Exhibit "33a" and "33b"**.

77. Also unbeknownst to me, was that Defendant Gitman and Falk were utilizing email addresses for "accelcommerce.com", to exchange information in my absence or without my knowledge.

78. Without my authorization and consent, and in violation of CSV's Operating Agreement, Defendant Gitman shared with Falk ChannelReply's confidential financial information, including its profit and loss statements despite the fact that Falk was not a member, employee or agent of ChannelReply who needed this confidential financial information to perform any service on behalf of the company. Email from Gitman to Falk

unlawfully disseminating ChannelReply's proprietary information is annexed hereto as **Exhibit "33c".**

79. In and around April 2017, Defendant opened a bank account for Accel and hired Ms. Andan to do Accel's bookkeeping using CSV's Upwork account. Upwork takes screenshots of freelancers, based on their consent, while they are working on company projects to track their work. The screen shots from CSV's Upwork account evidence Andan doing work for Accel and Defendant's Accel bank account. Screenshots annexed hereto as **Exhibit "34".**

80. In and around late April through June, 2017, I logged into our CSV Upwork account multiple times to monitor the work of CSV's freelancers. I continued to see screenshots of Andan working on the books of Accel. I also saw correspondence between Andan and Defendant Gitman discussing Defendant Gitman's potential business partnership with Falk. On one occasion, he told Andan in an email "he will review your work. I'm trying to focus more on the technology and Jeremy is focusing on the finance side." (Annexed hereto as **Exhibit "35a"**).

81. This took me by complete surprise because Falk was supposed to be our independent consultant and was working on our potential Carpartkings deal. I checked the Secretary of State website and found that Accel Commerce had been formed back in March 20, 2017. Upwork screenshots annexed hereto as **Exhibits "35a,", "35b", "35c", "35d," 35e","35f",** redacted email from Mary Andan to Falk and Gitman regarding the 'Accel P&L annexed hereto as **"35g," and "35h."**

82. On May 8, 2017, CSV's company attorney forwarded me a further revised draft of an asset purchase agreement among NDAP, LLC, Cooper Square Ventures, LLC and [purchasing company omitted]. Redacted covering email annexed hereto as **Exhibit "36."**

83. In or around the beginning of May, 2017, right when we were about to sign the purchase agreement, Defendant Gitman began demanding that he receive *more than* his 50% profit share with me from any Carpartkings sale, despite the 50/50 profit share we agreed to as set forth in our NDAP and CSV operating agreements.

84. Falk was supposedly acting as the "objective middleman" while Defendant Gitman refused to meet with me or directly discuss profit sharing with me by phone, or advise me of his partnership with Falk. All the while, Falk also never disclosed to me that he was actively, and at the same time, involved in a competitive business with Defendant Gitman as his partner, engaging in the same type of business as CSV: e-commerce software solutions. At this time, Falk through Gitman's breach of duty, now had full access to ChannelReply's confidential financial records, which were supplied to him secretly by Gitman and without my knowledge, authorization or consent. **Exhibit "41".**

85. On May 17, 2017 through May 22, 2017, Falk and Defendant Gitman began making unreasonable demands, including that I give up 15% of my profit share to an employee, pay Falk a consulting fee of more than the previously agreed upon $80,000 (that we had all previously agreed to in writing on March 15, 2017), and then also be required to repay the company back for the healthcare benefits that I had received for the past one year (which Gitman was also free to receive, but elected not to because he received healthcare benefits through his spouse). Defendant Gitman had also indicated to

me that Ms. Andan had calculated that I owed the company more than $120,000 and that

I was due nothing from the sale of our company (NDAP) and instead, I owed NDAP

money, and therefore I owed Defendant Gitman money. <u>Essentially, Defendant Gitman</u>

<u>was holding the sale of NDAP hostage saying that unless I gave him a greater percentage</u>

<u>of the profit from the sale of NDAP. Otherwise, he would not consent to the sale</u>. I have

yet to see any documentation to reflect how Defendant Gitman (or Ms. Andan) arrived at

such a false and ridiculous assertion. Since this Action commenced, Defendant Gitman

has still provided me with zero proof of these alleged debts due to NDAP, nor any proof

of why I wouldn't be entitled to my 50% profit percentage from the sale of NDAP, as per

our operating agreement.  **Exhibit "24."**

86. When I requested Defendant Gitman speak with me directly and meet in person

or speak by phone to resolve any issues he was having, he outright refused to

communicate with me directly. Even when I offered Defendant Gitman more than his

50% profit percentage just to move forward and avoid protracted disagreement and

litigation, he rejected any and all of my offers that I submitted for the purposes of

peaceful resolution, to continue working together on our joint companies and to amicably

complete the pending sale of carpartkings.

87. On May 17, 2017, Falk wrote to me and Defendant Gitman saying, "there is

no deal unless you guys figure it out. The gap is too wide between you. I recommend that

you two should meet…would you guys be willing to meet?" Falk suggested we meet on

our own or with him. Defendant Gitman replied within ten minutes, "Jeremy, I'm not

interested in meeting. I don't see any value in it." Defendant Gitman replied two minutes

later with another email writing, "I appreciate your help but I have no interest in

meeting." The following day, Falk wrote to us both again, saying he had spoken to Gitman multiple times and "Dave communicated to this point that he does not want to sit down to resolve this matter." Falk continued, "Mike indicated that if everyone takes a haircut… then we can get to the number that he desires." But Falk indicated even with haircuts, it still doesn't "get near the number that Dave is looking for." Falk indicated the stalemate was at large risk of no transaction for the sale of Carpartkings.

88. Gitman refused to speak with me, his fiduciary business partner, equal partner for the past six plus years, and 50/50 co-owner, and Gitman's non-communicative behavior has continued through when he absconded with CSV's funds and locked me out of all of CSV's accounts, all the way through present.

89. Defendant Gitman has refused to speak with me even once, even in the presence of our company attorney, for reasons unbeknownst to me. His behavior of recalcitrance is toxic and has resulted in this costly and protracted litigation which I had no choice but to initiate in order to protect the Plaintiff Companies which he was prepared to watch die just to eliminate me from his life.  See **Exhibits "147 & 148."**

90. It was at this time I began to notice that Defendant Gitman was intentionally engaging in a course of conduct specifically designed to hurt the Plaintiff Companies.

91. On May 22, 2017, I checked CSV's TimeDoctor account. TimeDoctor takes screenshots of the laptops of CSV's remote employees and independent contractors, with their consent, to document their work. I saw that Defendant began discussing plans behind my back to meet with ChannelReply's lead developer Bagaiev, and to meet with him and another developer for ChannelReply named Oleksii Glukharev in Russia to discuss "future plans". Text message chat annexed hereto as **Exhibit "40"**.

27

92. In and around this time, to facilitate the NDAP deal and develop some level of communication with Gitman, I offered several generous concessions to Defendant Gitman, in writing, on multiple occasions. Without getting into specific detail of these discussions, I addressed methods to resolve our differences, including the buyout/redemption of his interests in the Plaintiff Companies, but none satisfied him. My offers which are presented to show my efforts to be conciliatory are annexed hereto in **Exhibit "68."**

93. On May 25, 2017, I received an email from an attorney named Umar Farooq who advised that he was representing Defendant Gitman. Farooq refused to provide me with written documentation evidencing that Defendant Gitman was paying him independently and not intending to pay him with Plaintiff Companies' funds.

94. On May 25, 2017 at 4:50pm, Defendant Gitman demanded that our company Accountant, Joel Liebman, validate his and Ms. Andan's faulty accounting, which the company accountant later admitted was "wholly inadequate." Defendant Gitman copied our company lawyer, Jeff Rothman, Esq., and company accountant, Joel Liebman, CPA, on an email, writing "Hi Joel, I have had an accounting to create the true up in my previous email. Can you please validate this accounting on behalf of company, CSV and NDAP. Thank you." Email annexed hereto as **Exhibit "43".**

95. On Friday May 26, 2017, I wrote back to all, notifying Defendant Gitman that after paying several accountants who he previously chose and fired, followed by Ms. Andan, who we were still paying, that I did not want to spend company money on Liebman validating Ms. Andan's confusing and faulty accounting. I further advised that

it was a waste of the Plaintiff Companies' funds as Mr. Liebman was reviewing our books at the end of the tax year.

96. At this point in time, Defendant Gitman sought to take matters into his own hands in seeking to destroy the Plaintiff Companies and me by taking malicious actions for his own self-interest.

## GITMAN'S MISAPPROPRIATION OF CSV BANK OF AMERICA ACCOUNT

97. On Friday May 26, 2017 CSV's Bank of America company bank account had a balance of $73,982.53.  Bank statement annexed as **Exhibit "45a and 45b"**.

98. On the morning of Saturday May 27, 2017, at the start of a long holiday weekend to celebrate Memorial Day and knowing the bank would not be open again until Tuesday, and with no notice whatsoever to me, Defendant Gitman went to a Bank of America branch in Pennsylvania and decided to wire all company funds out of CSV's bank account and into a new account that he opened and that was not in the name of the Plaintiff Companies. See redacted statement and letter from Bank of America annexed hereto as **Exhibits "45a "and "46."**

99. On my phone, around 10:30 am, I received a notification that all available cash belonging to CSV's company account had been withdrawn. My online account information, on my mobile device, showed two wire transfers, one for $50,000 and one for $23,982.53 bringing the account balance down to zero. I immediately called the bank and was told that Defendant Gitman had withdrawn all of the money belonging to CSV. Bank email alert annexed hereto as **Exhibit "47"** and Bank statement annexed as **Exhibit "45a"**.

29

100.    On May 27, 2017, around 4:30pm I received an email from Defendant Gitman stating that he took all of the money from our company bank account, will make unilateral authorizations regarding the sale of NDAP (despite the requirement under our operating agreement that all major decisions be made 50/50) and essentially threatening me to sign a purchase agreement early next week and forego my profit share from a sale of NDAP until his unilateral accountings are done and he determines who is owed what. Gitman said he would unilaterally authorize Falk and his company, Summit Rock Holdings, to continue to act as the broker of the NDAP deal, even though I expressed concern over Falk's conflict of interest in working with Defendant in Accel. He wrote in part, "Your resistance for an accounting has given me cause to transfer the company's cash balances to a call deposit account….I will also continue to authorize Summit Rock Holdings in working with [company name omitted] to execute on the terms of purchase. I agree Umar should work directly with your lawyer. Please reply with your attorney's information. I will remind you once again that you will receive the final asset purchase agreement early next week. It would be rational and prudent for you to execute the agreement before the accounting is complete." Redacted email annexed as **Exhibit "48 & 68"**.

101.    On Saturday May 27, 2017, I consulted with our company attorney and wrote the following to Defendant, in part "All of this is very concerning to me.  As you know, Cooper Square Ventures owns and operates ChannelReply. Accordingly, I contacted our business attorney Jeff Rothman. While he stated that he represents us both and cannot take sides, he suggested a reasonable resolution that he believes would be fair to both of us. I agree with his suggestion, find it to be reasonable and am prepared to

30

follow it. Jeff stated all funds should be returned to our business account immediately and in exchange we should both agree to be co-signees on the account, which would require a dual signature before any funds are withdrawn by either of us, thereby protecting the capital of our business. Passwords must also be shared by both of us, no one person may lock the other person out by virtue of our equal partnership. I am relying on you, as my fiduciary partner, to act in the best interests of our business and put the full monies/capital funds back into our business account before the start of the next business day. Your actions to the contrary would not only be detrimental to me but detrimental to ChannelReply.  Further, Jeff has suggested that we move ahead with the [company name omitted] purchase provided that we agree beforehand that all funds from said purchase, except those owed to [company name omitted] (since this is undisputed), be placed in escrow with him while Joel Liebman and his associates conduct an audit. Once the audit is complete, Jeff suggests we participate in a mediation and if that does not lead to a resolution then an arbitration would follow. The funds would not be released to anyone except pursuant to the terms of an order from an independent mediator or arbitrator from one of these conflict resolution processes. If you agree to Jeff's suggestion then let me know and Jeff will draw up a document that we can both sign.  Mike." Redacted emails are annexed as **Exhibit "49 & 68"**.

102.    Defendant Gitman did not respond.

### GITMAN'S UNILATERAL CHANGING OF ALL PLAINTIFF COMPANIES' PASSCODES, ELIMINATING DARDASHTIAN'S ACCESS TO ALL PLAINTIFF COMPANIES' ACCOUNTS, UNLAWFULLY TRANSFERRING OF PLAINTIFF COMPANIES' DATA, CODE AND PROPRIETARY AND CONFIDENTIAL INFORMATION, MISAPPROPRIATION OF DARDASHTIAN'S BUSINESS IDENTITY

103. On May 27, 2017, and through the commencement of this Action, I tried to logon to the CSV Bank of America bank account and was unable to access it. I received notification that my passcode had been changed, thereby locking me out. Screenshot annexed as **Exhibit "50"**.

104. I was also locked out of my NDAP, LLC Bank of America business account as well. Screenshot annexed hereto as **Exhibit "51."**

105. As I tried to access other company portals, I quickly noticed that I could not access any of my company accounts that I use to run multiple websites and businesses through CSV.

106. The Plaintiff Companies store all passwords to all accounts on a heavily encrypted password storage site called "1 password." This is a site designed to control all company level passwords for all accounts.

107. It was apparent that Defendant Gitman abused his administrator privileges and began his lockout by removing my company access to 1 password. When I tried to login it notified me that the account was suspended. Therefore, I could not access passwords to around two dozen company portals housing all of the Plaintiff Companies' data, customer lists, codes, payment information, receipts, company historical documents, proprietary information etc. Screenshot annexed hereto as **Exhibit "52."**

108.   Defendant Gitman also abused his administrator privileges in Google Suite to lock me out. Google Suite is a business level version of Google. The suite of services provided by Google includes email addresses, Google docs: including all of my company documents-- everything business related that Google offers. It holds company data, documents, customer lists, subscriptions, invoices, etc.

109.   Defendant Gitman created a new Google domain G suite for ChannelReply to transfer all of ChannelReply's proprietary documents, email addresses and other confidential information away from CSV's business accounts and to a new G suite portal that only Gitman controlled. Defendant Gitman sent employees, namely the Plaintiff Companies' Developers Konstantyn Bagaiev and Oleksii Glukharev (referred to herein as the "Developers") new invite logins for access but not me.  Screenshot of new G Suite conversation and G Suite deletion policies annexed hereto as **Exhibits "53a" and "53b."**

110.   Once Defendant Gitman took all of CSV's company data over to his new G-Suite and locked me out of 1Password, I could not access any company accounts except for my NDAP, LLC email address. This meant that new incoming or outgoing emails, new and past data and documents, I could no longer access.

111.   Defendant Gitman not only locked me out of all Plaintiff Companies' accounts, but he used my business identity by taking my email address michael@channelreply.com to the new G suite. Screenshots annexed hereto as **Exhibit "54."**

112.  In addition, Defendant Gitman impersonated me by putting a photo of his face up on Google so that if anyone received an email or had received an email in the past from my email address, the email says Michael@channelreply.com and Michael Dash

(my business name) but had Defendant Gitman's face on it in Gmail, as if he were me,

which had the further effect of deceiving the public and misappropriating my

identity. See Defendant Gitman's face associated with my email annexed hereto as

**Exhibits "55a" and "55b."**

## DEFENDANT GITMAN'S TERMINATION OF DARDASHTIAN'S ACCESS TO ALL PLAINTIFF COMPANIES' ACCOUNTS

113. Defendant Gitman also changed the passwords to Chargebee and Stripe which

are the payment portals for existing ChannelReply customers to pay their subscriptions.

Those passwords were saved on my personal computer. Leading up to the

commencement of this Action, I was removed from all login capabilities. When I tried to

reset the passwords, the password resets were sent to Michael@channelreply.com which

was under Defendant Gitman's control. I could not access those accounts and therefore

could not access any payment information for ChannelReply. Stripe is an online payment

portal for customers, Chargebee is a subscription management portal for customers. See

**Exhibits "57a," "57b", "57c".**

114. Defendant Gitman had these capabilities because he was the master

administrator of accounts on Google Domain by virtue of him creating our company

Google account of which I was also an equal administrator. Prior to May 27, 2017, both

Defendant and I, as 50/50 owners of CSV were listed as administrators on all shared

accounts. On May 27, 2017, Defendant abused his company access and removed me as

an administrator on Google Domain. By removing me as admin from the ndap-llc.com

level domain, which controls all of our subdomains, Defendant successfully removed my

access to more than a dozen active email addresses that I use to conduct business and get

34

information related to my business from vendors and customers. The email addresses that fell under NDAP, and under the CSV umbrella include but are not limited to: Carpartkings, Cooper Square Ventures, Plumburs, NDAP Next Day Auto Parts, resulted in me not having access to any Google drive accounts associated with the email accounts. I was thus removed from access to all of my business documents, accountings, receipts, transaction records, customer information, proprietary information, etc. I also could not access any Google analytics accounts associated with the email addresses above.  List of locked out accounts annexed hereto as **Exhibit "58."**

115.  Defendant Gitman also improperly changed shared company passwords, or revoked or suspended my access to the following business accounts:

a)  1Password Account – this is a password and login account management system. It holds all of my personal passwords and the companies shared passwords.  Account was paid for out of Plaintiff Companies' funds.

b)  Chargebee Account – This is our subscription management account that holds the customer information and billing information for all of our ChannelReply customers

c)  Stripe Account – This is Plaintiff Companies' credit card billing service that allows us to receive credit card payments from our customers.

d)  PayPal Account – This is an online payment system which allows Plaintiff Companies' to take online payments from our customers.

e)  Upwork Account – This is a freelancer marketplace that allows Plaintiffs to hire and pay freelancers to run the business.

f)  Zendesk Accounts – This is a customer service management account which allows Plaintiffs to talk to our customers when they email us through support tickets.

g)  JIRA Account – This is a project management software that allows Plaintiffs to manage projects effectively for our business and work with one another to successfully complete tasks.

h)  Slack – This is a messaging management software for our business that allows Plaintiff Companies' employees and freelancer to openly communicate with one another and share documents.

i)  Amazon Seller Central – This is our Amazon seller account that allows us to sell products on Amazon and manage our MWS accounts for ChannelReply sellers through our admin.

j)  eBay Accounts – This allows us to sell products on ebay and manage our ebay subscription id's for ChannelReply sellers through our admin.

k)  Timedoctor – This allows us to manage the time management of employees and freelancers via an online portal to track time and take screenshots of employees and freelancer work.

l)  Amazon Web Services (AWS) – This is where we manage all of our Amazon Web Servers which keep the businesses servers running effectively.

m)  American Express Account – This is a NDAP corporate credit card account

n)  Magento Accounts – This is our Magento Admin which allows us to see all backend data associated with our business

o)  Quickbooks Accounts – This is where all the finances are held and all accounting and reconciliation is done.

p)  Desk.com Account - This is a customer service management account which allows us to talk to our customers when they email us through support tickets.

q)  Godaddy Account – We have a company godaddy account which owns and operates many domains, I cannot login to Godaddy to even list all of the domains we own together.

r)  Magemojo – This is our Magento hosted server account

s)  Mailchimp – This is our email subscription newsletter account

t)  Github – This is where all of our software is checked in and stored for sharing

u)  Ringcentral – This is our VOIP system that allows us to make and receive internet phone calls and faxes

v)  Join.me – This is a screenshare service that allows us to talk to customers and share our screens with them

See 1Password lockout containing all passwords to these Plaintiff Companies'
accounts annexed hereto **as Exhibit "59."**

116.  Initially, both Gitman and I held the power to disable, suspend or delete the
other from any of those shared accounts at any time, however, I of course never exercised
that power because it would have been contrary to our good faith partnership and my
fiduciary duty to not harm my partner. I also would never usurp control over all business
accounts and lock my partner out, but this is precisely what Defendant Gitman did to me.
I could not take any actions to conduct or act in the interests of my active and running
businesses or customers, or prevent the loss of revenue let alone build more client
relationships. Defendant not only threatened the existence of our businesses but stopped
me from growing them, and caused me to lose business relationships and eventually lose
my business email address, ChannelReply's sales and support email addresses and my
personal slack email address which were all deleted by Gitman and not recoverable, as he
indicated on a spreadsheet he created for the Court when he had to admit he could not
restore them. I later incurred more damages having to hire expensive replacement
developers to run the Plaintiff Companies so ChannelReply would not go out of business
when Gitman defamed me and convinced our then-existing Developers not to speak with
me and to repeatedly "block" me. See **Exhibit "146."**

117. By a stroke of luck, the one thing Defendant Gitman forgot to lock me out of was
TimeDoctor, the software that is installed on laptops by employees and takes screenshots
of employees while they work remotely. My access to TimeDoctor allowed me to see
some of what Defendant was planning, what he was doing and saying to employees
during the lockout because his messenger conversations with employees showed up on

their computer screens and TimeDoctor snapped pictures of these conversations in real time.

118. On May 27, 2017, I received a notification that someone requested to change the Password to Channel Reply's PayPal account which accepts payments from customers. See **Exhibits "60a," "60b" and "60c."**

119. From May 27, 2017 to the commencement of this Action, I was able to observe and take live action screenshots through the TimeDoctor software, of Defendant Gitman spreading lies to Developers about me, using Slack messenger, to turn them against me, and utilizing the Developers to assist Gitman to start a new competing company under the same name (Channel Reply Inc.) using CSV's confidential and proprietary information, codes, products and services. Gitman's lies included telling the Developers that they were owed distributions and I took their distributions, even though they are not company owners. He also told Bagaiev that Bagaiev owed taxes in the United States and I had failed to pay them for him when this is not true. Bagaiev is a freelancer who performs all of his work outside of the U.S. and is exempt from U.S. taxes. It is my belief that Defendant spread these lies in furtherance of his efforts to defame me and get the Developers to resign from the Plaintiff Companies, which they later did with Gitman's assistance, and to join Gitman in his new competing venture(s). Defendant Gitman later instructed the Developers not to speak with me. I could not participate in these conversations on Slack to defend myself because Gitman locked me out of our company account. Therefore, I was forced to watch him degrade me for nearly two weeks with no way to defend myself while we prepared to commence this lawsuit. See **Exhibits "61" and "62." (See Defendant's Skype with Bagaiev).**

### DAMAGE TO CSV CUSTOMERS AND POTENTIAL TO DESTROY PLAINTIFF COMPANIES' BUSINESS

120.  By 2:11 PM on Sunday May 28, 2017 our account balance was overdrawn by negative $10.89. CSV's bank account not only collects revenue in the form of monthly service fees from customers, but it also funds the operation of the service. Auto-debits were prescheduled to pay for servers, employees and other digital portals that help service CSV. There was no capital in CSV's account due to Defendant Gitman's actions, and thus, CSV's contractual obligations were not being paid and the account continued to overdraw. Defendant Gitman's actions threatened the shutdown of ChannelReply which was (and is) servicing subscriptions held by more than two hundred worldwide customers. These business relationships took years to build and were not only a source of monthly revenue, but an invaluable asset to the Plaintiff Companies and I as a businessman, 50% owner and co-manager of CSV. The loss of existing and potential customers, including at least one extremely large retailer, has caused irreparable harm to me, ChannelReply and CSV, and its other businesses. Defendant's actions also threatened third party customers to lose or damage relationships with their own customers, which would likewise result in the deterioration of our business relationships, damaging the Plaintiff Companies that Defendant Gitman co-owns. Defendant Gitman even redirected customer support emails to himself but had no experience with customer service. Mobile screenshot of overdrawn account annexed hereto as **Exhibit "63"**.

121.  On Monday May 29, 2017, Defendant canceled my participation in a pre-scheduled weekly conference call with the Developers running ChannelReply. He removed the event from my calendar so that I could not join the Skype call and get any information, updates or ask any questions about my active and running business.

Screenshot of calendar cancellation annexed as **Exhibit "64"**. Unbeknownst to me at the time, Defendant Gitman was already working with the Developers to create his new business. During the course of this litigation, Konstantyn Bagaiev provided to me his entire Skype chat history with Defendant Gitman, **which reveals Defendant Gitman's efforts and attempts to destroy the Plaintiff Companies to benefit himself**. (Emphasis added). See Skype Conversation with Bagaiev at Bagaiev Aff **Ex. A**; Guaglardi Decl. **Ex. Q**.

122.   On Monday May 29, 2017, after blocking my access to a company conference call with employees, Defendant spoke with Bagaiev, CSV's lead developer who helped create the proprietary software upon which ChannelReply operates, indicating his intent to fly to either Russia or the Ukraine to meet with him and ChannelReply's other lead developer privately, saying, "I'm looking at flights now." The text conversation is annexed hereto as **Exhibit "66b"**. Defendant Gitman's trip was to further induce the Developers to turn their allegiance away from me, CSV and ChannelReply by offering them an ownership interest in his new competing company, Channel Reply Inc., and to help them in obtaining Visas and access to their own US bank accounts and by filling them with lies about me and my business relationship with Defendant Gitman. See conversation referenced annexed hereto as **Exhibit "65." See Stock Agreements at Exhibit "65a".**

123.   By 8:01pm on Monday May 29, 2017, I received mobile notification that the CSV bank account was overdrawn by $229.40 due to preexisting debits to pay for services essential to operate ChannelReply. Again, I could not gain online access to my

bank account because Gitman changed the shared online password.  Mobile screenshot annexed hereto as **Exhibit "66a"**.

124.  On Tuesday May 30, 2017, Falk sent me and Defendant a revised Asset Purchase Agreement from [company name omitted]. Defendant replied, Thanks. Will review. Planning to execute today. "Redacted emails annexed hereto as **Exhibit "67"**.

125.  On Tuesday May 30, 2017, Defendant Gitman also reached out to our company attorney Jeff Rothman requesting an in-person meeting. Defendant Gitman stated he did not want to meet with me and only wanted to meet with Rothman, and that Rothman could then communicate with me. Email exchange annexed hereto as **Exhibit "68"**.

126.  On Tuesday May 30, 2017 at approximately 3:00 PM, Defendant Gitman told ChannelReply's lead developer, Bagaiev, that he was successful in usurping my company email address. Bagaiev said, "Dave, in some cases, customers were contacting Mike by email without going to support@channelreply.com. "Defendant Gitman replied, "I get those emails now."  Email exchange annexed hereto as **Exhibit "54"**.

127.  On Tuesday May 30, 2017 at approximately 5:08PM, Defendant Gitman again stated to Bagaiev his intent to fly to Russia or Ukraine immediately to meet privately with him and ChannelReply's other developer, and discuss issues relating to his converting the assets of the Plaintiff Companies without me present. Defendant said, in part, "I am checking flights for tomorrow." Text conversation annexed hereto as **Exhibit "69"**.

128.  On May 30, 2017, Defendant Gitman acknowledged to developer Glukharev that he moved the ChannelReply email and account information to a new G suite account. Defendant Gitman said "I'm moving ChannelReply email to a dedicated G suite account.

You should have received an email in your personal inbox with the new account. Can you give me your old password so I can migrate your email?" He changed employee passwords so they could access the G suite with all company emails and documents, saying "I reset your NDAP password to kick off the migration of your emails to CR's new G Suite account." Again see **Exhibit "53."** All of this was done without my knowledge or consent.

129. On May 30, 2017 Defendant registered "Channel Reply Inc." with the Secretary of State in Delaware for the purpose of transferring all of CSV and ChannelReply's assets into a new company owned by Gitman, misappropriating the Plaintiff Companies' tradename and intellectual property, including all of the software, code and trade secrets, stealing the company and converting all of its assets and employees, including the Developers, while locking me out so that I had no access to any resources to try to prevent this unlawful and malicious conduct or to defend myself, my company or to protect my company's customers or employees. See proof of registration annexed hereto as **Exhibit "70."**

130. On May 31, 2017, Defendant Gitman drove up the Plaintiff Companies' debt by using CSV's then depleted bank account and credit card. He paid an invoice to a ChannelReply worker from CSV's overdrawn bank account for $218.51 further driving the account into an overdrawn status. The accompanying invoice said the charge came from Defendant Gitman and listed his personal home address in Brooklyn, New York. Defendant Gitman also charged a lease payment for his BMW automobile through CSV's overdrawn account in an amount greater than $500, at a time when Defendant

Gitman knew the bank account did not have the funds to pay it. See Invoice attached **as Exhibit "71,"** and evidence of overdraw as **Exhibit "72a" and "72b."**

131. On May 31, 2017, I emailed the Developers, after they both refused, at Gitman's direction, to speak with me. I implored them not to get involved and to "please stay neutral." I wrote to them as they know how much work and effort I had put into ChannelReply to make it successful over the past few years and wanted to put them on notice that Defendant Gitman had locked me out of the Plaintiff Companies and that it was unlawful to do so. I informed them of my repeated attempts to sit down and peacefully resolve any issues Defendant Gitman was having and that he was refusing to do so, and asked the Developers not to continue participating in Plaintiff Companies' affairs or meetings without my involvement. My goal was to protect them from being involved or taking any unlawful actions at Defendant Gitman's direction that could compromise either of them or, CSV or ChannelReply. Shortly thereafter, Bagaiev relayed my email to Defendant Gitman who thanked him for passing the information and said "I know this must be difficult for you" to Bagaiev.  Bagaiev replied by expressing his gratitude that Gitman was granting him ownership of ChannelReply through his unlawful company Channel Reply Inc., writing, "I still can't accept that I really have some share, it's like my heart doesn't believe it." Further evidence that the Developers were never granted equity in any of the Plaintiff Companies, including ChannelReply, until Defendant Gitman tried to make them the owners of Channel Reply Inc.

132. Oleksii Glukharev, Plaintiff Companies' other developer, also informed Gitman that I had reached out and asked the developers not to be involved in our dispute. While discussing changes to his new Channel Reply Inc. agreement, Gitman told

Glukharev that he saw my email and that my email asking them not to get involved in our dispute is a "bully tactic." Gitman was manipulating the Developers. See **Exhibits "141a, 141b, 141c."**

133.  On June 1, 2017, Defendant Gitman again defamed me to the Developers, lying that I "stole" from the company and wanted to use the money to buy a seven-figure house and claiming I was running a "pyramid scheme." Defendant Gitman acknowledged he believed I would sign the Carpartkings deal and give into his demands because he thought I needed money from the deal to buy a house, which was false.  See **Exhibits "73" and "74."**

134. On June 1, 2017, Defendant Gitman acknowledged to Bagaiev that he had been unlawfully viewing my emails from my NDAP company email address and called me a "bully".  See **Exhibit "75."**

135. On June 1, 2017, Defendant sent to the Developers new employment agreements for them to become employees of his newly-formed and unlawful company "Channel Reply, Inc." He did this using the email David@dalva.ventures, without copying me to the transmittal (and or ever advising me that he had a Dalva Ventures' email account). I later learned that Defendant Gitman formed Dalva Ventures in February of 2017, which leads me to question how long he may have been planning to steal and convert ChannelReply for his own use and for his own benefit.  See **Exhibits "76a," "76b," "76c", "76d", "76e", "76f" and "76g"; see also Dalva Operating Agreement at Exhibit "39."**

136. On June 1, 2017 Defendant called me a parasite to the Bagaiev to further defame me and tarnish my business reputation. See **Exhibit "77."**

137. On June 1, 2017 Defendant Gitman improperly solicited and offered the Developers of CSV a stock plan agreement and 125,000 shares of equity in Channel Reply, Inc., and also told Bagaiev that he will be considered a Co-founder of his new unlawful Channel Reply Inc. company to win his loyalty. See **Exhibits "78a," "78b", "78c", "78d".** See also "Stock Plan Agreement" for Channel Reply, Inc. at **Exhibit "42."**

138. On June 2, 2017 Defendant further reinforced to Bagaiev that Defendant Gitman would make him a co-founder of the new Channel Reply Inc. company, and fight for his rights. When Bagaiev praised Gitman's nobility, Defendant said that he would like to believe there are more people like him and just wants to do the right thing and lead by example. See conversation annexed hereto as **Exhibit "79."**

139. On June 2, 2017 Gitman made assurances to Bagaiev that Gitman is attempting to pirate away from CSV and ChannelReply and that he will get him a Visa to further win his loyalty. He also discussed getting him a house. See conversation annexed hereto as **Exhibit "80."**

140. On June 2, 2017, Defendant Gitman spoke to Bagaiev about getting all customer emails and making new hires for his new unlawful company, Channel Reply, Inc. He also discussed getting venture capital and said he knew a VC guy who would help. I was not sure but I believe he was referring to Falk, Gitman's partner in Accel. See **Exhibits "81a," "81b", "81c", "81d", "81e" and "81f."**

141.  On June 2, 2017 Defendant told Bagaiev that I stole money (a lie) and he would be considering reporting me to the IRS and also promised Bagaiev that he would get him access to US accounts. See **Exhibit "82."**

142. On June 2, 2017 Defendant Gitman indicated to Bagaiev, our lead Developer, that after he converted all of CSV's assets to his new company Channel Reply Inc., he would then offer me a 5% share of his new company, but if I did not accept his offer, then the 5% share I was offered would revert back to Bagaiev. When Bagaiev questioned why I would ever accept a 5% share of a company (of which I already own 50%) Defendant said "it was a fair and generous offer" and again promulgated the lie that I took money from the company to turn my employees against me. See **Exhibit "83."**

143.  On June 2, 2017, I noticed that Defendant Gitman had updated the CSV funded TimeDoctor account name to be "David's company" further evidencing his intent and scheme to steal CSV and ChannelReply. However, Defendant Gitman was still billing CSV's empty bank account for TimeDoctor. See **Exhibits "84a," "84b" and "84c."**

144.  On June 2, 2017 Defendant charged $3,500 to amazon web services using NDAP's American Express credit card, thereby driving up CSV's debt to over $7,000 despite emptying its bank account so I could not pay our jointly held business credit card. He also locked me out of the amazon web services account by changing the passwords so I could not see what the charge was for. See redacted **Exhibits "85a" and "85b."**

145. On June 4, 2017, Bagaiev asked Defendant whether they should update the ChannelReply website and remove CSV's Terms of Service, which identifies to our customers that CSV is the owner of ChannelReply, and replace it with new terms of service for ChannelReply's existing customers so they can convert those customers to

Defendant's new Channel Reply Inc. company. Defendant said "absolutely." See **Exhibit "86."**

146. On May 27, 2017 through middle of June, when Defendant Gitman depleted CSV's bank account, customers were under contract with CSV, believing they were paying CSV. However, I received an email notice that a new PayPal account was created for ChannelReply but I am unsure whether it was created for ChannelReply or Channel Reply Inc. I did not have access to that new account because my PayPal password was changed by Defendant Gitman. See **Exhibits "60a," "60b" and "60c."**

147. On June 5, 2017, Defendant Gitman sent another demand letter saying he refused to discuss ChannelReply until I met his demands with regard to the sale of NDAP. He aggressively ordered me to do things, starting his demands with the phrase, "you will" do this, and "you will" do that. He added new terms, demanding payment for his past and future work, and demanded that I grant an employee of NDAP fifteen percent (15%) of the share of the profit from the sale of NDAP. See redacted **Exhibit "87."**

148. On June 5, 2017, Defendant Gitman expressed plans to ChannelReply's lead Developer, Bagaiev that he wanted to develop a new corporation in the Ukraine to cut company taxes. **See Exhibit "88."**

149. On June 6, 2017 Defendant finalized travel plans to fly to the Ukraine to meet with Bagaiev and Glukharev from June 12th-17th, 2017, which he did. **See Exhibits "89a" and "89b."**

150. Since this Action commenced, I have learned that in the month of June, 2017 alone, Defendant Gitman's competing company Channel Reply Inc. was doing business and had a total of $22,579.25 deposits. Channel Reply Inc.'s bank statements

further show that Defendant Gitman made payments to Konstantyn Bagaiev in the amount of $4,347.92 from that account, and that Defendant Gitman used that account to return a portion of the funds that he had misappropriated from the CSV Bank Account, in the amount of $3,454.94 on June 20, 2020, which was the day following the Court's order for him to do so. See Channel Reply Inc. bank statement annexed hereto as **Exhibit "90."**

151. After the commencement of this Action, Defendant Gitman admitted that he locked me out of the Plaintiff Companies' accounts and diverted the funds from our CSV Bank Account into a separate account owned exclusively by him. Through the direction and supervision of this Court, Defendant Gitman was directed to restore my access to the Plaintiff Companies' accounts and return the funds back into the CSV Bank Account. However, Defendant did not initially fully comply with the Court's orders and compelling him to do so, required multiple requests and more than one expensive motion to the Court as well as several in-person conferences with Judges, where Gitman was ordered to bring his personal computer into Court to complete the transfers.

152. After Defendant Gitman was removed as co-manager of the Plaintiff Companies on a preliminary basis, I later learned that Gitman tried to undermine my abilities to co-manage the Plaintiff Companies in his absence. See e.g. **Exhibit 64b** at June 10, 2017 at 10:33 a.m. where Gitman states to Bagaiev "Let Mike kill the companies. It only makes me look better" (page 3).

153. By emails dated June 20, 2017, the Developers each sent identical letters (with the exception of their signatures) (the "Developers' Resignation Letters") advising me of their intention to resign from ChannelReply because "the recent events clearly show [the

Developers] that there is no future for [the Developers] in working with Michael Dardashtian.". Copies of the Developers' Resignation Letter's annexed hereto as **Exhibit "34."**

154.  I later learned through Defendant Gitman's discovery production, that Defendant Gitman participated in the drafting of the Developer's Resignation Letters. On June 20, 2017 at 7:38 a.m., Defendant Gitman sent to the Developers a resignation letter "template." At 3:37p.m., Defendant Gitman told the Developers that "Lindsay [Gitman's former attorney with Dentons] asked me to send you an email to send mike the resignation letter." Defendant Gitman followed at 5:46 p.m. that "The "lawyers want it to come from you not them. Otherwise Mike might argue that we are conspiring." See Guaglardi Decl. at **Exhibit Q** pp. 35-36.

155.  After this Action was commenced, I also learned that Defendant Gitman was shocked that I knew all of the information that I did, including his opening of a new bank account for Channel Reply Inc. When Defendant Gitman and Bagaiev discovered that I still had access to the TimeDoctor software, Defendant Gitman told Bagaiev to "disable screenshots just in case (sic)." Guaglardi Decl. at **Exhibit Q** at p. 95.

156.  Before our Court appearance regarding my motion for preliminary injunctive relief, Defendant Gitman also advised Bagaiev to clear his text conversations with him. Guaglardi Decl. at **Exhibit Q** p. 40. See "Please clear txt conversation".

157.  Following the Developers' resignations from the Plaintiff Companies, the Plaintiff Companies were temporarily compelled to retain another IT company to handle ChannelReply's proprietary code and maintain the orderly function of its day to day operation at a higher expense.

158. During our Court appearance, months after Defendant Gitman had been preliminarily removed as a co-manager, Defendant Gitman was still trying to undermine my relationship with the Developers of the Plaintiff Companies.

159. On September 27, 2017, Defendant Gitman advised Bagaiev that he was "able to get his phone into [the] court room" and that Defendant Gitman surreptitiously "recorded [me] saying [I] will never give [Bagaiev] any ownership." Gitman further advised Bagaiev that the Judge allowed Gitman to bring his phone "to bring up papers about settlement." Gitman also then advised Bagaiev that he would send Bagaiev the recording. When Bagaiev asked Defendant Gitman for a copy of the recording, Gitman advised "it stopped recording at 30 min. I don't have Mike saying he will never give you any ownership. However, I will try to get that in email as we will be asking for it in a settlement offer." Guaglardi Decl. at Exhibit Q at pp 20, 25-26.

160. It is apparent that for months after the Court entered injunctive relief, Defendant Gitman was still trying to interfere with the Plaintiff Companies' best interests and undermine my relationship with the Developers.

161. It was only after Defendant Gitman's removal as manager where I was finally able to communicate with Bagaiev directly without Defendant Gitman's interference.

162. On November 16, 2017, in furtherance of my efforts to bring the Developers back to work for the Plaintiff Companies, Bagaiev signed an agreement with CSV to serve as an independent contractor. A copy of the agreement is annexed to Bagaiev Aff. at **Exhibit "B."** I am happy to report that following Defendant Gitman's

removal as co-manager of the Plaintiff Companies, the Developers have continued to loyally serve CSV and ChannelReply through the present.

163.  I would expect that an owner would be loyal to the Plaintiff Companies and look out for the Plaintiff Companies' best interests. Yet, on December 11, 2017 at 8:02 a.m., Defendant Gitman criticized the Developers' return to work for the Plaintiff Companies. Defendant Gitman stated to Bagaiev "Why did you have to fuck me over?" and told Bagaiev in substance, that Bagaiev should not have signed an agreement and returned to work for the Plaintiff Companies. Bagaiev Aff. Ex. A; Guaglardi Decl. Ex. Q at p. 9. Gitman added that he was working to "dissolve the company…" Guaglardi Decl. Ex. Q at p. 1. As of the present, Defendant Gitman is still not aligned with the Plaintiff Companies' best interests, or its success moving forward which is why a redemption or buyout of Gitman's interests in the Plaintiff Companies should be permitted. See **Exhibit "117."**

164.  In fact, Defendant Gitman incredibly contends that ChannelReply is *not* owned by CSV 100%. Rather, Defendant Gitman somehow contends that ChannelReply is owned by CSV (50%), Defendant Gitman individually (42.5%), Bagaiev (5%) and Glukharev (2.5%).  This is despite the fact that the CSV Operating Agreement and his own income tax returns and Form K-1's reflect to the contrary. In support, Defendant Gitman argues that I refused to execute "the necessary documentation to effectuate the promised shares to the Developers and to Gitman."

165.  Defendant Gitman never asked me to execute the "necessary documentation" because Defendant Gitman's claim is entirely false. He knows that we had hoped to give the Developers a future grant of equity from an employee stock option

plan in Channel Reply, LLC, a proposed subsidiary of CSV, but the offering plans were never drawn up because Gitman never agreed to execute the Channel Reply, LLC operating agreement. Defendant Gitman, fresh off of leaving a new job that did not work out, instead decided to indulge his newfound "suspicions" and spend months ignoring me, accusing me and hiring multiple bookkeepers, while he and them created a mess and found nothing. He then chose to stop talking to me in January 2017 and partner with Falk, as they teamed up against me to try to extract proceeds from the sale of carpartkings and when that didn't work, steal ChannelReply.

166.   Defendant Gitman has produced zero documentation to confirm any of his delusional allegations, or any documentation that ChannelReply is not owned by CSV 100%, because ChannelReply is owned by CSV 100%, as reflected in the Plaintiff Companies' tax returns, his and my tax returns, ChannelReply's service agreements with ChannelReply's customers, and the marketing of ChannelReply on the internet as stated above since its inception. Bagaiev's agreement with CSV dated November 16, 2017, likewise confirms that Bagaiev has no ownership in ChannelReply. See Bagaiev Aff at Exhibit B, Section 1(e).  Incredibly, when Defendant Gitman promised Bagaiev shares in Channel Reply, Inc., Bagaiev, Plaintiff Companies lead developer, advised Defendant Gitman "well for me you [and Dardashtian] were always 50/50 partners." Guaglardi Decl. at Exhibit Q p 105. Gitman then told Bagaiev two-hours later to "disable screenshots just incase (sic)".  Guaglardi Decl. at Exhibit Q p 95.

167.   Defendant Gitman also demanded records for the Plaintiff Companies for the prior three years when Defendant Gitman has already had full, complete and uninterrupted access to all records at all times relevant hereto. In his Counterclaim,

Defendant Gitman asked for all records, including "financial statements and income tax returns or information and reports maintained by CSV and/or the related entities for the three most recent fiscal years, and any other information regarding the affairs of CSV and the related entities as is just and reasonable." At all times relevant hereto, Defendant Gitman has had complete access to all of the Plaintiff Companies' financial records, tax returns and the like. Defendant Gitman has signed, filed and received copies of his tax returns from the Company accountant Joel Liebman, CPA. Gitman produced his tax returns as part of his first round of discovery during this litigation. A Quickbooks log shows Defendant Gitman and his numerous accountants have continuously accessed the Company's books and financial records. In fact Defendant Gitman has logged on continuously for years, often several times a month, including when he left for a full-time job at Cue Connect and came back claiming he wanted to know what was going on with the books while he was gone. Defendant Gitman also logged on multiple times on November 1, 2016 and January of 2017, despite claiming in his counterclaims that I had blocked his access to the Quickbooks. Defendant Gitman has only served to interfere with the orderly operation of the Plaintiff Companies. As can be seen since he was removed as a co-manager by this Court, Defendant Gitman, as a member, consultant, employee or otherwise, is not necessary for the successful operation of the Plaintiff Companies. See **Exhibit "114, 115 and 116"**.

168.  During the course of this Action, Defendant Gitman requested access to online accounts, which he had access to in an effort to try to accuse me of locking him out as he did to me previously. I was compelled on multiple occasions to send screen shots proving Defendant Gitman's access.

169.   Through Defendant Gitman's new counsel, Defendant Gitman made requests for the same financial records that he has always had access to. I provided screen shots with proof of Defendant Gitman's access again, and further requested that Mr. Leibman send Defendant Gitman the records that he requested, even though Defendant Gitman already had such records in his custody, possession and control at all times relevant herein. See **Exhibit "92."**

170.   Defendant Gitman has also sent letters to my employer Yotpo regarding his false claims in this lawsuit as a means of harassment and retaliation to try to interfere with my employment and cause me to be terminated. He did this with full knowledge that Yotpo is not a competitor of CSV. Yotpo and ChannelReply provide entirely different and complimentary, not competing services. ChannelReply assists with customer service messaging and Yotpo assists businesses with website reviews, among other things. In the course of discovery, Defendant Gitman handed over a spreadsheet of a list of crossover clients who used by ChannelReply and Yotpo as false evidence that I tried to steal ChannelReply's customers and bring them to Yotpo. The spreadsheet illustrates that most if not all of those clients signed up with Yotpo first, before they signed up with ChannelReply and/or at a date before I began working for Yotpo. Guaglardi Decl. Ex. M attachment at pp. 9- 14 "List of Channel Reply Customers". The identity of customers are intentionally redacted.

171.   Defendant Gitman made numerous false allegations against me in his counterclaims. Among them, Defendant Gitman said I had shared confidential company information with Volo Commerce, an alleged competitor without a non-disclosure agreement. In fact, when I reached out to Volo, who is not a competitor to ChannelReply,

back in October of 2015, about forming a partnership, and did so with Defendant's full knowledge, the first thing I did was sign a non-disclosure agreement and partnership agreement. I further worked with Volo, when they helped me prepare a presentation for Dreamforce which is an elite technology conference and Defendant Gitman was fully aware of my presentation. See **Exhibits "131, 132, 133."** Defendant also alleged that ChannelReply doesn't have an Amazon India account which is not true, as we do. See **Exhibit "110."** It simply took time due to Amazon's strict guidelines of auditing and vetting 3rd party app developers. Defendant claimed among other things that I did not create an "outbound" sales and marketing program. Ecommerce companies generate sales and acquire customers through "inbound" marketing such as email marketing, SEO, converting traffic, retargeting customers, paying for online ads, all of which I have done for CSV. Numerous national articles I participated in to enhance SEO and publicity for CSV, also detail my work, involvement and leadership on CSV, NDAP and ChannelReply and are annexed hereto as **Exhibit "102."** He claimed he ran our Zendesk partnership and I had no involvement in NDAP or ChannelReply. In reality, I have always had the relationship with Zendesk and they reached out to me from the start. See **"Exhibit 107."**

172.   I also designed, built and customized the entire Zendesk app with Bagaiev; see just a few excerpts from our development conversations annexed hereto as **Exhibit "103."** Defendant Gitman claims I have not negotiated contracts for ChannelReply but contracts with 3rd party integrators such as Salesforce, Zendesk, Freshdesk, Amazon and eBay are extremely rare. If any company at all were to obtain one, it would be a large player in the market, not a start-up just beginning business like ChannelReply. It is a

similar system to Apple's app store in which one can develop and market an app, however, there is no direct contract with Apple to list your app in the store, only an agreement signed by a developer to use their Terms of Service. Over the years Bagaiev and I have created many new features and integrations for ChannelReply and that is why it has grown.

173.   While I always tried to involve Defendant Gitman in ChannelReply, he was not interested until the Plaintiff Companies started generating money, and even though, not until he lost his job at Cue Connect. See **Exhibit "104."**

174.   In May, 2017, Gitman tried to steal the Plaintiff Companies and in June, 2017, when he finally took an interest in CSV and ChannelReply, he wrote to the Developers, "I'm back and better then ever." See **Exhibit "111."** However, due to his lack of involvement in the Plaintiff Companies, over the years, Defendant needed to ask Bagaiev about ChannelReply's customers, monthly revenue, expenses and the Developers' hourly rates, including when the first Zendesk script was built, because Gitman was unfamiliar with ChannelReply's operations and developments. Defendant also did not even have a working ChannelReply email or try to access ChannelReply's accounts until March of 2017, despite its operation for years, logging in and admitting he had been using the "wrong email." See **Exhibit "108 and 109."**

175.   Defendant Gitman has been deceitful and non-compliant during the course of this litigation every step of the way, which he has delayed at every opportunity. Defendant Gitman has instructed spoliation of evidence as described above including his request that the Developers "disable screenshots just incase (sic.)." Guaglardi Decl. at Exhibit Q p. 95. Defendant also failed to produce critical discovery related to his

conversations with Plaintiff Companies' Developers that also only came to light after the
Developers shared those conversations with Plaintiff Companies. I was compelled to seek
this information from Gitman's prior attorneys as a condition of their application to be
relieved as his counsel. He has unconscionably lied in court documents, in an attempt to
defame me by accusing me of theft and forgery without providing any proof of any of his
accusations or claims and astoundingly, lied, knowing that Company emails and
documents that both he and I have access to would eventually expose those lies. As an
equal member of the Plaintiff Companies, he has solicited the resignation of the
Developers and participated in the drafting of the Developers' Resignation Letters to the
Plaintiff Companies to cause the Plaintiff Companies to go out of business **Exhibit "34."**
He has formed a competing company and taken all of the Plaintiff Companies'
intellectual and other property, including the tradename "ChannelReply" to operate
against the Plaintiff Companies. **Exhibits "23", "26" "37", "39", "41" "42."** He has
wasted my time, cost the Plaintiff Companies hundreds of thousands of dollars in legal
fees and damages, wasted his own attorneys' time who has not asserted a lien against
him, wasted this Court's time with endless efforts to bring him into compliance, and now
that discovery is finally over, we need to bring this matter to a final conclusion.

**Defendant Gitman's actions do not justify him continuing as a member of the**

**Plaintiff Companies.**

176.   Defendant Gitman has not only unlawfully disregarded orders of this Court,
but has even been deceptive to the Court by secretly recording me during at least one
Court conference, for the purpose of further damaging the Plaintiff Companies. As stated
above, even more egregiously, Gitman's communications with the Developer Bagaiev

indicate he was assisted by his attorneys from Dentons in orchestrating to have the

Plaintiff Companies' Developers resign, knowing that the Plaintiff Companies rely upon

them to operate efficiently. Gitman's obfuscation in this litigation, starting from the

beginning and continuing through today, which has unnecessarily delayed its resolution

for years, and been acknowledged by Judge Lehrburger in his most recent order, has

caused tremendous financial damage to me personally and to the Plaintiff Companies.

Plaintiffs have paid and incurred legal fees to our attorneys in excess of $455,000 thus far

for the handling of this Action, as well as having incurred fees to LitEgation, a company

responsible for hosting electronic data for Defendants' discovery review since 2018 as a

result of Gitman's delay in his review which fees are in excess of $62,000, as well as fees

to Plaintiffs' expert, Withum, which are in excess of $35,000, and additionally fees to the

Plaintiffs' replacement IT developer, Tighten Co, which fees were required as the

Plaintiffs' Developers resigned due to Gitman's action as aforementioned. These fees

were in excess of $19,000. Defendants have seriously damaged me and the Plaintiffs'

Companies.

177.    I respectfully request the opportunity as part of Plaintiffs' Motion for

Summary Judgment to supplement Plaintiffs' Motion and submit Plaintiffs' attorney's

fees invoices and other damages invoices to the Court for the Court's review and

consideration in the event that the Court grants Plaintiffs' request for an award of

attorney's fees and reimbursement of other costs against Defendant Gitman and the other

Defendants.

178.    Despite all of Defendant's plots, knowing and willful lies, disobedience,

malicious acts and multiple malicious statements indicating his desire to put Plaintiff

Companies out of business, in violation of his fiduciary duties, the Plaintiff Companies, its employees and customers, have thrived under my management, absent Defendant's involvement and unnecessary drama. The Plaintiff Companies have grown over two hundred percent (200%) without Gitman. **Exhibit "19c" "20b-I",** see also the valuation of the Plaintiff Companies at **Gaskin Aff. Ex. A.** It is my hope that the within Affidavit with the proof annexed hereto will support the granting of Plaintiffs' Motion for Summary Judgment, and further justify an award of attorney's fees pursuant to the CSV Operating Agreement Sections 8.8 and 17.10 which I believe are well justified given Defendant Gitman's intentional and malicious actions which have been completely exposed at this point. I am asking the Court to grant CSV the right to redeem all of Defendant Gitman's right, title and interest in the Plaintiff Companies, or permit me to buyout Defendant Gitman's interest. That is a just result for Plaintiffs and will not unfairly prejudice Defendant Gitman who will receive the fair value of his interest less any damages and legal fees that this Court may determine is properly due to Plaintiffs.

179.   My goal is to focus my time on continuing to operate the Plaintiff Companies in a successful manner and move on from this litigation which has taken its toll on the Plaintiff Companies, me, my family, personally, professionally and financially. I am simply asking for a just result given the undisputed proofs Plaintiffs have put before this Court, and I appreciate the Court's patience as we have provided a great deal of information so that the Court has a thorough review of all relevant facts which show that there is no material fact in dispute that requires a trial in this matter.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

I certify under penalty of perjury that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Michael Dardashtian, Individually
and on behalf of NDAP, LLC,
Cooper Square Ventures, LLC and
ChannelReply

Sworn to before me this
13th day of August, 2020

Notary Public

ANAT H. GORDON
Notary Public State of New York
No. 01GO6024591
Qualified in Nassau County
Commission Expires May 10, 2022

60