

## Exhibit 1



## **<u>Exhibit 2</u>**

EIN: 45-2943587

OPERATING AGREEMENT
*of*
COOPER SQUARE, LLC

THIS AGREEMENT is made and entered into on August /3, 2011, by the following persons ("Members"):

MICHAEL DARDASHTIAN
DAVID GITMAN

The following person or persons shall serve as the initial "Manager(s)" of the Company in accordance with Article 8:

MICHAEL DARDASHTIAN
DAVID GITMAN

Article 1
Select Definitions

"Act" means the Limited Liability Company Act from time to time in force in the State.

"Agreement" means this Operating Agreement, as originally executed and as amended, modified, supplemented or restated from time to time.

"Base Rate of Interest" means a rate equal to 375 basis points over the prime rate of interest as published from time to time in *The Wall Street Journal* or similar publication if *The Wall Street Journal* is not available.

"Charter" means the articles of organization, certificate of formation or similar instrument, as amended from time to time, issued by the State evidencing the formation of the Company. The Charter was issued on August 4, 2011, and bears State File No. 110805000120.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Company" means the limited liability company formed upon the filing of the Charter and whose affairs are governed by this Agreement.

"Management" has the meaning set forth in Article 8.

"Manager" means the person or persons identified as such in this Agreement, including persons subsequently appointed as such in accordance with Article 8.

"Member" means the person or persons identified as such in this Agreement, including persons subsequently admitted to the Company as Members in accordance with Article 10.

"Profit Percentages" has the meaning set forth in Section 6.1.

"State" means the State of New York, which has issued the Company's Charter.

Article 2
Organizational Matters

2.1    Formation and Statutory Authority.

(a)    *Formation*.  The Company was formed upon the issuance of the Charter by the State. The Company hereby ratifies and adopts the acts and conduct of the Company's organizer in connection with the filing of the Charter as acts and conduct by and on behalf of the Company.  The organizational and other activities for which the organizer was responsible have been completed and the organizer is hereby relieved of any further duties and responsibilities in that regard.

(b)    *Statutory Authority*.  The Company shall be operated as a limited liability company in accordance with this Agreement and the Act.   The rights and obligations of the Members and Management *inter se* and in relation to the Company shall be determined in accordance with this Agreement and the Act.  To the extent that anything contained in this Agreement conflicts with the Act, or modifies, supplements or otherwise affects any rights or obligations under the Act, this Agreement shall supersede the Act, except to the extent expressly restricted by the Act.

2.2    Filings.  Management shall make such filings and do or cause to be done such other acts and things as shall be required to continue the existence of the Company in the State and shall cause the Company to be qualified or registered under assumed or fictitious names statutes or similar laws in any jurisdiction in which the Company owns property or transacts business to the extent such qualification or registration is necessary or, in the judgment of Management, advisable in order to protect the limited liability of the Members or to permit the Company to lawfully own property or transact business. Management shall execute, file and publish all such certificates, notices, statements or other instruments necessary to permit the Company lawfully to own property and conduct business as a limited liability company in all jurisdictions where the Company elects to own property or transact business and to maintain the limited liability of the Members.

2.3    Name.  The name of the Company is the name set forth in the heading of this Agreement. The affairs of the Company shall be conducted under the Company name or such other name as Management may select in accordance with the Act.  If the Company uses a fictitious or assumed name, Management shall execute and file all certificates required by any jurisdiction in which the activities of the Company make it necessary or desirable to do so.  The Company shall have the exclusive ownership of and right to use the Company name and any other names under which the Company conducts its affairs.

2.4    Principal Office of the Company.  The principal office of the Company shall be located at such place within or outside the State as Management may from time to time designate.  The Company may have secondary offices at such other place or places as Management may from time to time designate.

2.5    Records to be Maintained.  Management shall at all times during the continuance of the Company keep at the Company's principal office such records and information as the Company may be required to maintain in accordance with the Act.

2

2.6    <u>Registered Office and Registered Agent</u>.  Management shall designate a registered office and a registered agent in accordance with the Act.  Management may from time to time in accordance with the Act change the Company's registered office and/or registered agent.  Management shall select and designate a registered office and registered agent for the Company in each other state in which the Company is required to maintain or appoint one.

<u>Article 3</u>
<u>Purpose of the Company</u>

The purpose of the Company is to engage in any and all lawful businesses, make any and all lawful investments and undertake such other activities related or incidental thereto as Management may determine is in the interests of the Company, including owning membership interests in other business entities engaging in the business of internet sales.

<u>Article 4</u>
<u>Duration of the Company</u>

4.1    <u>Duration of the Company</u>.  The Company shall continue in perpetuity unless sooner dissolved in accordance with the other provisions of this Article.

4.2    <u>Winding-Up</u>.  The Company shall commence a winding-up of its affairs upon the earliest of:

(a)    *Disposition of All or Substantially All of its Non-Cash Assets*.  The sale or other disposition of all or substantially all of the Company's non-cash assets; but if the foregoing sale or other disposition involves (i) the receipt of a deferred payment obligation, whether or not secured, or (ii) the receipt of payment in whole or in part in kind, then at Management's election the term of the Company shall not end, and it shall continue, subject to the other provisions of this Agreement, until the earlier of the time that (A) the deferred payment obligation shall have been paid in full, (B) the in kind considerations received by the Company shall have been sold or otherwise converted to cash or (C) Management elects to distribute the deferred payment obligation or in kind considerations.

(b)    *Decision of Management*.  Management's decision to do so.  Management shall provide the Members with notice of its decision to commence the winding-up of the Company.

(c)    *Decision of the Members*.  The decision of the Members to do so.  A decision of the Members under this paragraph shall require the approval of Members holding at least fifty-one (51%) percent of the Profit Percentages (as hereinafter defined) and the approval of Management.

(d)    *Judicial Dissolution*.  Upon the entry of a judicial decree of dissolution of the Company in accordance with the Act.

The winding-up of the Company shall be conducted in accordance with this Agreement generally and Article 16 in particular.

4.3    <u>Continuation of Company Upon Certain Events</u>.  The death, disability, court declaration of incompetence, bankruptcy, dissolution, liquidation or other dissociation of a Member shall not dissolve the Company, but it shall be continued with the successor or legal representative of such Member; such successor or legal representative shall, to the extent of the interest acquired, be entitled only to the predecessor Member's rights, if any, in the distributions of the Company, and no such person shall have any right to participate in the management of the affairs of the Company or vote on any Company matter

without the written consent of Management.  See Article 10 for additional provisions applicable to any such successor or legal representative.

### Article 5
### Capital Contributions to the Company

5.1     Capital Contributions.  Each Member shall contemporaneously with the execution of this Agreement contribute to the capital of the Company the amount of money or property set forth opposite that Member's signature hereto.

5.2     Additional Capital Contributions.  Except as set forth in this Agreement or as required by the Act, no Member shall be assessed for additional capital contributions.

(a)     *By Agreement of Members*.  The Members may, by unanimous agreement, at any time or from time to time, make additional capital contributions to the Company.

(b)     *By Action of Management*.  If Management determines that it is necessary or desirable for the Company to obtain additional funds in the form of additional capital contributions, then:

(i)     Management shall send to each Member a notice (the "First Requirement Notice"), which shall advise Members as to the total amount of capital required by the Company (the "Requirement Amount"), the portion of the Requirement Amount which may be contributed by each Member (determined *pro rata* according to the Members' Profit Percentages) and the date on which such capital is required to be contributed to the Company (the "Requirement Date").  The Requirement Date shall be not less than 10 days after the date of the First Requirement Notice.

(ii)     Should any Member not exercise its option and contribute its capital within the period provided in clause (i), above, Management shall promptly send to each Member who made contributions pursuant to clause (i), above a notice (the "Second Requirement Notice") of the uncontributed portion of the Requirement Amount, each of whom may elect to make a further capital additional contribution to the Company by delivering to Management, within five days of the date of the Second Requirement Notice, written notice of the same, which notice shall include a statement of the maximum amount of the uncontributed Requirement Amount such Member would be willing to contribute.  The portion of the uncontributed Requirement Amount that may be contributed by each Member shall be determined by Management ratably according to the relative maximum amounts that the Members propose to contribute in their notices to Management, and shall be paid by the Member to the Company immediately upon demand therefore.  No Member, however, shall be required to pay more than the maximum amount it proposed to contribute to the Company.

(iii)     Additional capital contributions under this Section are voluntary; but once a Member shall have agreed to make an additional capital contribution hereunder, the Company shall have all of the rights and remedies set forth in this Agreement resulting from the failure of the Member to make such capital contribution.

(iv)     In the event that the entire Requirement Amount is not contributed by all Members in proportion to their Profit Percentages in effect immediately prior to

4

the First Requirement Notice, the Profit Percentages of the Members shall be adjusted with prospective effect to take account of the additional capital contributions made by the contributing Members in relation to the sum of (A) those additional capital contributions and (B) the aggregate amount of the capital contributions of the Members immediately prior to the additional capital contributions.

5.3     Defaulting Members.  The Company shall be entitled to enforce the obligations of each Member to make the contributions specified in this Article, and the Company acting at the direction of Management shall have all remedies available at law or in equity in the event any such contribution is not so made.  The Company shall be entitled to recover the reasonable attorney's fees and other costs of enforcing the Members' obligations under this Article, and shall also be entitled to recover interest on any unpaid contributions, from the due date of such capital contribution, at the Base Rate of Interest from time to time in effect.

Article 6
Distributions by the Company

6.1     Definitions.  The following terms shall have the following meanings:

"Available Cash" shall consist of all cash on hand of the Company irrespective of its source, excluding, however, (i) "Capital Event Proceeds" (as defined below) and (ii) such reserves as Management may establish.

"Capital Event Proceeds" shall consist of the net amount of cash received by the Company from the sale, exchange, refinancing, condemnation, casualty loss or other disposition by the Company of its assets outside of the ordinary course of business, less (i) the portion thereof disbursed by Management for the payment of the Company's debts and expenses and (ii) such other reserves as Management may establish.  Capital Event Proceeds shall include amounts distributed to the Company as an owner of another entity to the extent that the amount distributed, in the hands of the distributing entity, is in the nature of Capital Event Proceeds.  Amounts released from a reserve of Capital Event Proceeds shall be treated as Capital Event Proceeds.

"Unreturned Capital" consists of so much of a Member's actual capital contributions to the Company that have not been returned to such Member by way of distributions made under this Article that are identified (in the distribution provisions of this Article) as distributions of Unreturned Capital.

"Profit Percentages" of the Members shall be as set forth opposite each Member's signature to this Agreement (or in such Member's subscription agreement, joinder to this Agreement or other instrument admitting the Member to the Company), as the same may be adjusted from time to time in accordance with this Agreement.

6.2     Distributions of Available Cash.  Available Cash shall be distributed to the Members according to their Profit Percentages at such times as Management shall determine.

6.3     Distributions of Capital Event Proceeds.  Capital Event Proceeds shall be distributed to the Members at such times as Management shall determine in the following rank and order:

(a)     Among the Members in proportion to, and to the extent of, their Unreturned Capital.

(b)     The remainder, if any, among the Members according to their Profit Percentages.

6.4 <u>Withholding of Taxes</u>. If the Company is required to withhold and remit any Federal, state, foreign or local taxes levied on all or part of a Member's allocable share of the Company's income, the Company shall have the right to do so and such withholding by the Company shall be treated as a distribution to the Member for whom such withholding is made and shall reduce the amount of future distributions to be paid to such Member. In Management's discretion, the Member for whom such withholding would be made shall make a capital contribution of immediately available funds in the amount of any balance needed by the Company to satisfy such withholding liability within three days after being so notified by the Company. Should a Member fail to timely make any such capital contribution, such Member shall be in default and shall indemnify and hold the Company and the other Members harmless for any costs, penalties, payments or damages incurred by the Company or the other Members as a result of such failure, and such Member shall pay the Company interest in respect of any disbursements made by the Company as a result of such Member failing to timely make the capital contributions required by this Section at the Base Rate of Interest from time to time in effect. The Company shall have the authority to apply and setoff any distributions to which such defaulting Member would otherwise be entitled towards the satisfaction of the liabilities to the Company incurred by such Member under this Section. This Section shall also have application to taxes that are not in the nature of withholding taxes but are assessable against the Company with reference to (or where there is exemption from based upon) the status or nature of a Member.

6.5 <u>Priorities</u>. Except as may be expressly provided in this Agreement, no Member shall have a priority right over any other Member as to distributions.

6.6 <u>Interest on Capital Contributions</u>. Except as may be expressly provided in this Agreement, no interest shall be allowed to any Member upon the amount of its Unreturned Capital. Any amounts included as a preferred return shall not be considered interest.

6.7 <u>Set-Off Rights</u>. The Company shall be entitled to set-off against any distributions or other amounts that may be or become due to a Member from the Company any amounts that may be due from such Member to the Company or another Member.

6.8 <u>Restrictions on Distributions</u>. No distributions may be made to the Members if, after giving effect to such distributions, either the Company would be unable to pay its debts as they become due in the usual course of business or the net assets of the Company would be less than zero.

Article 7
Accounting and Tax Matters

7.1 <u>Books of Account</u>. Management shall cause proper and true books of account to be maintained for the Company in conformity with sound accounting principles consistently applied. There shall be recorded in the Company's books of account the particulars of all monies, goods or effects belonging to or owing to or by the Company, or paid, received, sold or purchased in the course of the Company's activities and all of such other transactions, matters and things relating to the Company as are usually entered in books of account kept by companies engaged in activities of a like kind and character.

7.2 <u>Method of Accounting and Fiscal Year</u>. The Company's books of account shall be maintained on the cash or accrual basis, as determined by Management. The Company's fiscal year shall be the calendar year unless determined otherwise by Management.

7.3 <u>Reports and Returns</u>. As soon as practicable after the close of each fiscal year Management shall provide each Member with such statements as shall be necessary to advise the Members properly about their investment in the Company for income tax reporting purposes.

Management shall be responsible for engaging an accountant to prepare and to see to the filing of all Federal, state and local tax returns on behalf of the Company. Members acknowledge that the Company may not be able to provide all information required for income tax reporting purposes on a timely basis and that they should expect to extend the time for filing their income tax returns.

      7.4    **Capital Accounts.**  As part of the Company's books of account, an individual "Capital Account" shall be maintained for each Member at all times in accordance with sound accounting principles consistently applied.

      7.5    **Financial (Book) Allocations.**  The net profit or net loss of the Company, determined on an annual basis in accordance with sound accounting principles, shall be allocated as follows:

    (a)    *In the case of a net profit:*

        (i)    If any net losses were allocated in any prior fiscal year pursuant to clause (b), below:

            (A)    Among the Members to the extent of and in proportion to the prior period allocations made to them or their predecessors in accordance with clause (b)(iii), below, not previously eliminated by allocation under this clause.  Allocations hereunder shall be made in the reverse order in which such net losses were originally allocated (*i.e.*, most recent net loss allocations are reversed first).

            (B)    Among the Members to the extent of and in proportion to the prior period allocations made to them or their predecessors in accordance with clause (b)(ii), below, not previously eliminated by allocation under this clause.  Allocations hereunder shall be made in the reverse order in which such net losses were originally allocated (*i.e.*, most recent net loss allocations are reversed first).

            (C)    Then in accordance with clause (ii), below.

        (ii)    If net losses were not previously allocated among the Members pursuant to clause (b), below, or if clause (i)(C), above, applies, then among all of the Members according to their Profit Percentages.

    (b)    *In the case of a net loss:*

        (i)    If any net profits were allocated in any prior fiscal year in accordance with clause (a)(ii), above, then among the Members to the extent of and in proportion to the prior period allocations made to them or their predecessors in accordance with clause (a)(ii), above, not previously eliminated by allocation under this clause.  Allocations hereunder shall be made in the reverse order in which such net profits were originally allocated (*i.e.*, most recent net profit allocations are reversed first).

        (ii)    Then among the Members, to the extent of and in proportion to their Unreturned Capital.

(iii)     Then among the Members according to their Profit Percentages; but no allocation of loss or deduction shall be made to a Member to the extent such allocation causes or increases a deficit in such Member's Capital Account balance at the end of the fiscal year to which such allocation relates; such loss or deduction shall instead be allocated among the other Members in accordance with their relative Profit Percentages, subject to the limitations of this clause; except that once all of the Members' Capital Account balances have been reduced to zero, such loss or deduction shall be allocated among the Members in a manner that Management determined fairly comports with the Members' economic interests in the Company and risk of loss.

7.6     <u>Tax Allocations</u>.  Except as provided herein, or as otherwise required by the Code or Treasury Regulations promulgated thereunder (including, without limitation, Treasury Regulations Section 1.704-1 and 1.704-2), Company income, gain, loss, deduction, credit and other partnership items, as computed for Federal income tax purposes, shall be allocated among the Members in the same manner as the corresponding book items are allocated pursuant to Section 7.5.

7.7     <u>Changes in Profit Percentages</u>.  In the event of any changes in any Member's Profit Percentage during a fiscal year, Management shall take into account the requirements of Code Section 706(d) and shall have the right to select any method of determining the varying interests of the Members during the fiscal year which satisfies Code Section 706(d).

7.8     <u>Tax Elections</u>.  Management shall have the right to make (and revoke) any and all tax elections for the Company, including, without limitation, an election to adjust the tax basis of Company assets under Code Section 754.

7.9     <u>Administration of Tax Proceedings</u>.  Management shall appoint, remove and replace the Company's "Tax Matters Partner" as defined in Code Section 6231(a)(7) (referred to herein as the "Tax Matters Member").  The Tax Matters Member shall have the right to resign by giving 30 days written notice to the Members.  Upon the resignation of the Tax Matters Member, a successor Tax Matters Member shall be selected by Management.

7.10     <u>Federal Taxpayer Identification Number</u>.  Management hereby authorizes Michael Dardashtian to apply for a Federal taxpayer identification number for the Company and to execute in connection therewith Internal Revenue Service Form SS-4 as an authorized signatory for and on behalf of the Company or any of its Members or members of Management.

<u>Article 8</u>
<u>Management of the Company</u>

8.1     <u>Management by Managers</u>.  The affairs of the Company shall be managed and controlled by Management in accordance with this Agreement generally and this Article in particular.  Management shall be comprised of one or more "Managers."

(a)     *Number*.  There shall be two (2) Manager(s) of the Company.

(b)     *Appointment of Manager(s)*.  The Members appoint the person or persons identified on the first page of this Agreement as the initial Manager(s) of the Company.

(c)     *Decision-Making*.  Whenever Management shall be required to take any action, make any decision or exercise any discretion and there shall be more than one Manager, then except as otherwise

8

provided in this Agreement, the action, decision or exercise of discretion shall require the approval of all of the persons appointed as Manager.

(d)     *Removal and Replacement of Managers.*  Members holding at least fifty-one (51%) percent of the Profit Percentages shall have the authority at any time and from time to time to (i) remove a Manager from office and (ii) appoint a new Manager whenever there is a vacancy in the office of Manager.  A successor Manager shall be entitled to all of the rights and privileges of the Manager, as Manager, to whose position it succeeded, and shall be subject to all of the obligations of the predecessor Manager, as Manager, whether or not such successor Manager is a signatory to this Agreement.

Michael Dardashtian (and his successors collectively) shall have the authority at any time and from time to time to remove and replace Michael Dardashtian (and any of his successors) as Manager. David Gitman (and his successors collectively) shall have the authority at any time and from time to time to remove and replace David Gitman (and any of his successors) as Manager.  A successor Manager shall be entitled to all of the rights and privileges of the Manager, as Manager, to whose position it succeeded, and shall be subject to all of the obligations of the predecessor Manager, as Manager, whether or not such successor Manager is a signatory to this Agreement.

8.2     Authority of Management.

(a)     *Exclusive Right to Manage.*  Except as otherwise provided herein, Management shall have the sole and exclusive right and authority to operate, manage, conduct and control the affairs of the Company.  Management shall make all decisions affecting the affairs of the Company and shall carry out the purposes of the Company as Management deems proper, convenient or advisable.

(b)     *Power and Authority.*  Without limiting the generality of the foregoing, and consistent with the purposes of the Company, Management shall have all of the rights, powers and authority under the Act and otherwise as provided by law, including the right, power and authority to: acquire assets; purchase goods and services; sell, exchange, lease, license or otherwise deal in or with any and all assets of the Company; open and maintain one or more bank accounts and designate (and change the designation of) signatories thereon; borrow funds to finance the Company's activities and in connection with such borrowing, mortgage, hypothecate, pledge, lien or otherwise encumber the revenues and assets of the Company; guaranty the debts of affiliates and others when Management believes it will benefit the Company to do so; enter into any contract or agreement or amend or cancel the same; and invest and reinvest any funds or other assets of the Company – all as incident to or necessary for the operations of the Company.  Without limitation of the foregoing, and for the avoidance of any doubt, it is explicitly declared that Management has the right, power and authority to sell, exchange or otherwise dispose of all or substantially all of the Company's assets, including in a transaction that is not in the ordinary course of business.

(c)     *No Duty to Inquire.*  Nothing herein contained shall impose any obligation on any person or firm doing business with the Company to inquire as to whether or not Management has exceeded its power and authority in executing any agreement, contract, lease, mortgage, security agreement, deed or other instrument on behalf of the Company, and any such third person shall be fully protected in relying upon such authority.  Management may designate one or more persons to act as authorized signatories of the Company and the signatures of such authorized signatories on any agreement, contract, lease, mortgage, security agreement, deed or other instrument shall be binding on the Company.

(d)     *General Proscriptions.*  Without the written consent or ratification of all of the Members, Management shall have no authority to expend or use Company money or property other than on the

account and for the benefit of the Company or to pledge any of the Company's credit or property for other than Company purposes.

8.3     Management's Time Commitment.  Management shall cause so much time to be devoted to the business of the Company as, in its judgment, the conduct of the Company's business shall reasonably require.

8.4     Compensation of Management.  Management shall not be entitled to any fees or other remunerations for its services in managing the Company.  Insofar as a member of Management is a Member, this Section shall not be construed to limit such Member's share of distributions under this Agreement.

8.5     Expenditures by Management.  The Company shall reimburse Management for any costs that may be properly expended on behalf of the Company made out of funds other than those of the Company.

8.6     Related Business Partners.  Management may employ, contract for services with, acquire or sell goods, property and materials from or to and otherwise deal with any Member, any member of Management or any affiliate of the foregoing on any basis which is customary and competitive, or otherwise fair and reasonable.

8.7     Liability of Management.  Management (which for purposes of this Section and Section 8.8 shall include its partners, officers, directors, shareholders, members, managers, employees, agents and affiliates) shall not be liable to a Member or the Company for honest mistakes of judgment, or for action or inaction, taken reasonably and in good faith for a purpose that was reasonably believed to be in the best interests of the Company, or for losses due to such mistakes, action or inaction, or for the negligence, dishonesty or bad faith of any employee, broker or other agent of the Company, provided that such employee, broker or agent was selected, engaged or retained and supervised with reasonable care. Management may consult with counsel and accountants in respect of Company affairs and be fully protected and justified in any action or inaction that is taken in accordance with the advice or opinion of such counsel or accountants, but if, and only if, they shall have been selected with reasonable care. The Members shall look solely to the assets of the Company for the return of their capital and, if the assets of the Company remaining after payment or discharge of the debts and liabilities of the Company are insufficient to return such capital, they shall have no recourse against Management for such purpose. Notwithstanding any of the foregoing to the contrary, the provisions of this Section shall not be construed to relieve (or attempt to relieve) any person of any liability by reason of gross negligence, recklessness or intentional wrongdoing or to the extent (but only to the extent) that such liability may not be waived, modified or limited under applicable law, but shall be construed so as to effectuate the provisions of this Section to the fullest extent permitted by law.

8.8     Indemnification.  The Company shall indemnify any person who was or is a party, or is threatened to be made a party, to any threatened, pending or completed action, suit or proceeding (other than an action by or in the right of the Company), whether civil, criminal, administrative or investigative, by reason of the fact that the person is or was a manager, member, officer, employee or agent of the Company, or is or was serving at the request of the Company as a director, manager, officer, employee or agent of another limited liability company, corporation, partnership, joint venture, trust or other enterprise, against expenses (including attorney's fees and costs), judgments, fines and amounts paid in settlement actually and reasonably incurred by the person in connection with the action, suit or proceeding, if the person acted in good faith and in a manner the person reasonably believed to be in, or not opposed to, the best interests of the Company or, with respect to any criminal action or proceeding, had no reasonable cause to believe the person's conduct was unlawful.  The termination of any action,

suit or proceeding by judgment, order, settlement, conviction or upon a plea of *nolo contendere* or its equivalent shall not, of itself, create a presumption that the person did not act in good faith and in a manner that the person reasonably believed to be in, or not opposed to, the best interests of the Company or, with respect to any criminal action or proceeding, that the person had reasonable cause to believe that the person's conduct was unlawful.

      8.9    Officers of the Company.  Management may from time to time appoint one or more persons to serve as officers of the Company, in such capacities and with such delegated rights and powers as Management may approve; provided, however, that no such officer shall have any different or greater rights and powers than Management has under this Agreement. Officers appointed by Management shall be entitled to be indemnified by the Company in accordance with Section 8.8.

Article 9
Membership in the Company

      9.1    Rights and Obligations of the Members.  Unless a Member is a member of Management, and except as expressly provided in this Agreement to the contrary, no Member shall take part in the control or management of the Company, nor shall any Member have any authority to act for or on behalf of the Company or to sign for or bind the Company. Unless admitted to the Company as a Member in accordance with Article 10, no person who is not a signatory to this Agreement shall be considered a Member. The Company and Management need deal only with persons as Members that are so admitted and shall not be required to deal with any other person (other than with respect to distributions to assignees pursuant to assignments in compliance with Article 10) merely because of an assignment or transfer of an interest to such person or by reason of the incapacity of a Member. Any distribution made in accordance with this Agreement by the Company to the person shown on the Company records as a Member or to its legal representatives, or to the assignee of the right to receive Company distributions as provided herein, shall acquit the Company and Management with respect to such distribution of all liability to any other person that may have an interest in or claim to such distribution by reason of any other assignment by the Member with respect to such distribution or by reason of such Member's incapacity, or for any other reason.

      9.2    Liability.  No Member shall be personally liable for any of the debts of the Company or any of the losses thereof beyond the amount contributed or required to be contributed by it to the Company under this Agreement and as otherwise specified in the Act.

      9.3    Expenditures of Members.  In the discretion of Management, the Company may reimburse the Members for any costs that may be properly expended by them on behalf of the Company made out of funds other than those of the Company.

      9.4    Partition and Accounting.  No Member shall have the right to partition any property of the Company during the term of this Agreement, or while such assets are held in trust pursuant to Section 16.4, nor shall any Member make application to any court of authority having jurisdiction in the matter or commence or prosecute any action or proceeding for such partition and the sale thereof, and upon any breach of the provisions of this Section by any Member, the other Members, in addition to all of the rights and remedies in law and in equity that they may have, shall be entitled to a decree or order restraining and enjoining such application, action or proceeding. To the maximum extent permitted by law, the Members specifically renounce, waive and forfeit all rights, whether arising under contract or statute or by operation of law, to seek, bring or maintain any action in any court of law or equity for an accounting.

      9.5    Resignations and Withdrawals.  No Member shall be entitled to withdraw or resign from the Company, except pursuant to the terms of this Agreement. No Member shall be entitled to receive

11

any money or property from the Company except (a) by way of distributions as provided pursuant to Article 6, (b) by way of distributions upon the winding-up of the Company pursuant to Article 16, (c) in respect of any loans to the Company then due and owing to such Member and (d) as expressly provided elsewhere in this Agreement.

9.6     Trustee Liability.

(a)     *Actions as Trustees.*  When this Agreement is executed by the trustee of any trust, such execution is by the trustee, not individually, but solely as trustee in the exercise and under the power of authority conferred upon and vested in such trustee, and it is expressly understood and agreed that nothing herein contained shall be construed as creating any liability on the part of any such trustee personally to pay any amounts required to be paid hereunder, or to perform any covenant, either express or implied, contained herein, all such liability, if any, being expressly waived by the parties hereto by their execution hereof. Any liability of any Member which is a trust to the Company or to any third person shall be only that of such trust to the full extent of its trust estate and shall not be a personal liability of any trustee, grantor or beneficiary thereof.

(b)     *Successor Trustee.*  Any successor trustee or trustees of any trust which is a Member herein shall be entitled to exercise the same rights and privileges and be subject to the same duties and obligations as its predecessor trustee. As used in this Agreement, the term "trustee" shall include any or all such successor trustees.

(c)     *Termination of Trust.*  The termination of any trust which is a Member shall not terminate the Company. Upon the allocation or distribution of all or any portion of the Company interest of a trust which is a Member pursuant to the exercise of any power of appointment, or otherwise, to a beneficiary of such trust or to another person or persons or to another trust or trusts, whether or not such distribution shall terminate such distributing trust, each such distributee shall be entitled to be admitted to the Company as a Member to the extent of the proportionate share of the Company interest distributed to it, subject to the terms of this Agreement, including, without limitation, the restrictions contained in Article 10.

### Article 10
### Transfers by Members and Issuance of Additional Interests

10.1    Transfers by Members.

(a)     *Generally.*  Except as set forth herein, no Member shall sell, exchange, pledge, mortgage, hypothecate or otherwise transfer or encumber its interest in the Company without the prior written consent of Management. Any such transfer or encumbrance shall be void from inception and of no force or effect whatsoever. Direct or indirect transfers of interests in entities that are Members shall also be subject to the limitations of this Section.

(b)     *Permitted Transferees.*  Management shall not unreasonably withhold or delay its consent to a transfer of all or any part of a Member's interest to a Permitted Transferee. In the case of a Member who is an individual, a Permitted Transferee is (i) such Member's spouse; (ii) a lineal descendant or ancestor of such Member or a spouse of any of the foregoing; (iii) a trust established for the benefit of the Member or any person described in clauses (i) or (ii), above; (iv) any entity wholly-owned and controlled by the Member and/or any one or more of the persons described in clauses (i), (ii) or (iii), above; or (v) any other Member. In the case of a Member who is an entity, a Permitted Transferee is any person who is directly or indirectly controlled by the Member or directly or indirectly controls the Member; as used

herein, "control" means possessing more than 50 percent of the capital, profits and voting rights of an entity.

10.2   <u>Transfers by Management</u>.  Management is an agent of the Company and its interest in managing the affairs of the Company is not susceptible of being and may not be sold, assigned, pledged, mortgaged or otherwise disposed of or transferred. Insofar as a member of Management is a Member or is otherwise entitled to distributions under Article 6, Section 10.1 shall govern the transfer of such member of Management's right to distributions and other economic interests in the Company.

10.3   <u>Issuance of Additional Interests</u>.

(a)   *Additional Members and Membership Interests*.  Management may admit into the Company one or more additional Members or issue additional membership interests to existing Members on such terms as Management may determine is fair and reasonable.

(b)   *Adjustment of Profit Percentages*.  Upon the admission into the Company of one or more additional Members or the issuance of additional interests to existing Members, Management is authorized to adjust the Profit Percentages of the existing Members to take account of the additional capital contributions made by the additional Members in relation to the sum of (A) those additional capital contributions and (B) the aggregate capital contributions of the Members immediately prior to the capital contributions of the additional Members.  The dilution of Profit Percentages of the existing Members shall be in proportion to the existing Members' Profit Percentages.  If an additional or existing Member is to receive a Profit Percentage (or an additional Profit Percentage) and is not required to make a capital contribution in respect of same, Management is authorized to dilute the Profit Percentages of the existing Members in proportion to the existing Members' Profit Percentages.

Nothing herein contained shall be construed to require or cause the dilution of any so-called carried interest or promote interest that may inure to a Member or a member of Management.

(c)   *Rights and Obligations of Additional Members*.  Additional Members shall be entitled to all of the rights and privileges of the original Members hereunder and shall be subject to all of the obligations and restrictions hereunder, and in all other respects their admission shall be subject to all of the terms and provisions of this Agreement.

10.4   <u>General Provisions</u>.  The following rules shall apply to transfers of Company interests and the admission of additional persons to the Company:

(a)   *Procedure for Admission*.  No person shall be admitted as a transferee or additional Member hereunder unless and until (i) in the case of an assignment of an interest in the Company permitted hereby, the assignment is made in writing, signed by the assignor and accepted in writing by the assignee, and a duplicate original of the assignment is delivered to and accepted by Management, and (ii) the prospective admittee executes and delivers to the Company a written agreement, in form and substance satisfactory to Management, pursuant to which said person agrees to be bound by this Agreement.

(b)   *Binding Effect*.  Any person acquiring or claiming an interest in the Company, in any manner whatsoever, shall be subject to and bound by all terms, conditions and obligations of this Agreement to which its predecessor in interest, if any, was subject or bound, without regard to whether such person has executed a counterpart hereof or any other document contemplated hereby.  No person, including the legal representatives, heirs or legatees of a deceased Member, shall have any rights or

13

obligations greater than those set forth herein and no person shall acquire an interest in the Company or become a Member except as permitted hereby.

(c)     *Actions Prior to Acceptance of Assignment.*  Notwithstanding that a person acquiring or claiming an interest in the Company is bound by all terms, conditions and obligations of this Agreement to which its predecessor in interest, if any, was subject or bound, the Company and Management shall be entitled to treat the assignor of the assigned interest as the absolute owner thereof in all respects and shall incur no liability for distributions made in good faith to such assignor prior to such time as the documents specified in this Section have been delivered to and accepted by Management. Any person to whom an interest in the Company is attempted to be transferred in violation of this Article shall not have the rights of a Member of the Company otherwise provided under the Act, including, but not limited to, the right (i) to receive distributions from the Company, (ii) to vote on any matter, (iii) to participate in the management of the Company, (iv) to act as an agent of the Company, (v) to obtain any information or accounting of the affairs of the Company or (vi) to inspect the books or records of the Company. If, however, by law, the Company is required to recognize the purported transfer of a Member's interest in the Company, the purported transferee's rights shall be strictly an economic interest in the Company limited solely to distributions (and accompanying allocations) as provided by this Agreement with respect to such economic interest, and the Member whose interest in the Company has purportedly been transferred shall have no right to any distributions with respect to such interest in the Company. Any distributions to such purported transferee may be applied (without limiting any other legal or equitable rights of the Company) to satisfy any debts, obligations or liabilities for damages that the transferor or transferee may have to the Company. A Member attempting to engage in any purported transfer that has not been approved in writing by Management shall be liable to indemnify and hold harmless the Company and the other Members from all costs, liability and damages that either of them may incur (including, but not limited to, incremental tax liability and attorney's fees and expenses) as a result of such purported transfer. For purposes of this paragraph, an economic interest in the Company shall mean a person's interest in the Company including, without limitation, such person's rights to distributions (and accompanying allocations), but excluding the right to vote and otherwise to participate in the management and control of the affairs of the Company.

(d)     *Consent of Members.*  Each Member hereby consents to the substitution of any assignee of a Member's interest or the admission of any additional person as a Member as approved by Management.

(e)     *Costs.*  The costs incurred by the Company in processing an assignment (including attorney's fees and costs) shall be borne by the assignee, and shall be payable prior to and as a condition of admission to the Company.

Article 11
<u>Miscellaneous Provisions</u>

11.1     <u>Loans from Members.</u>  If Management determines that it would be in the interests of the Company to borrow funds from a Member or an affiliate of a Member, then prior to accepting any such funds:

(a)     *Notice to Members.*  Management shall send to each Member a notice (the "Loan Notice"), which shall advise each Member of the total amount of funds which the Company seeks to borrow (the "Loan Amount"), the terms of the proposed borrowing (including the rate of interest and the collateral security, if any) and the date on which such funds are required (the "Loan Date"). The Loan Date shall be not less than five days after the Loan Notice. Said borrowing may be secured or unsecured.

14

as determined by Management in its sole discretion, but shall be evidenced by one or more promissory notes as are customary.

(b)     *Election to Participate.*  Within five days of the date of the Loan Notice, Members may elect to participate in the borrowing by delivering to Management written notice of the same, together with its portion of the Loan Amount.  The portion of the Loan Amount which each Member may elect to lend to the Company shall be determined *pro rata* according to the Members' Profit Percentages.  Any portion of the Loan Amount not loaned by the Members in accordance with this Section may be loaned by any Member or affiliate of a Member as Management may determine.

(c)     *Excuse.*  The provisions of this Section shall not apply to short-term loans made in exigent circumstances bearing a market rate of interest.

(d)     *Priority.*  Management shall have the discretion to repay all loans from Members or affiliates of Members before distributions are made to the Members under Sections 6.2 or 6.3.

11.2     Right of Reimbursement and/or Contribution.  In the event any Member (or affiliate of a Member) guaranties any indebtedness of the Company, then the Company shall promptly reimburse the guarantor for any and all payments made by the guarantor thereunder.  Without limitation of the foregoing sentence, and notwithstanding the terms of any such guaranty, as between and among the Members, each of the Members shall be liable with respect to such guaranty in proportion to such Member's Profit Percentage.  If any Member (or affiliate of a Member) makes payment with respect to a guaranty of Company indebtedness that at time of demand has not been reimbursed by the Company, the other Members shall immediately make a payment to such Member (or such affiliate of a Member) such that after all payments between and among the Members are made, each Member shall have contributed to the payment of such guaranty an amount equal to the amount of such payment multiplied by such Member's Profit Percentage.  Any Member and any affiliate of a Member making payment on any such guaranty or making a contribution in respect thereof shall have the right to enforce this Section.  This Section shall apply to any person who holds an interest in the Company, whether or not such person is a Member.  In the event that the obligation under the guaranty arises by reason of the gross negligence, fraud or willful misconduct of a particular Member (or affiliate of a particular Member), that Member shall be solely responsible for funding the reimbursement obligations described herein.

11.3     Conversion.  Notwithstanding anything to the contrary in this Agreement, Management shall have the right and power in its sole discretion to cause the Company to contribute its assets to, merge with, consolidate with or convert into any other entity formed under the laws of the State or the laws of any other state in accordance with the Act, whereupon the assets and liabilities of the Company shall become the assets and liabilities of such other entity, the Members (including Management) or, in the case of a contribution, the Company, shall become the owner(s) of such other entity (without modification of their economic interests *inter se*), and Management shall become the controlling person of such other entity.  By way of illustration and not by way of limitation, the Company may be converted into a limited partnership in which Members are limited partners and Management is the general partner, or into a real estate investment trust in which Members are non-voting shareholders and Management is the sole voting shareholder.  Should the Company merge with, consolidate with or convert into another entity in accordance with this Section, Members agree that they shall be bound by the terms of the organizational documents of such entity as presented by Management.  Such organizational documents (viewed as if they were amendments to this Agreement) shall comport with Section 15.1.  The execution of such organizational documents (viewed as if they were amendments to this Agreement) shall be subject to Section 15.2.

11.4    "Bring-Along" Rights.  In the event that Management proposes to enter into one or more agreements to sell to any person or persons (referred to herein collectively as the "purchaser") all or substantially all of the membership interests in the Company in a single transaction or related series of transactions in lieu of a sale of all or a substantial part of the assets of the Company, all of the Members hereby agree to sell their respective interests in the Company to the purchaser on the terms set forth in such agreements. The agreements shall provide for the payment to the Members for their interests in the Company amounts equal to the amounts that they would have received had the Company (a) sold all of its assets at the price implicit in the price to be paid by the purchaser for the membership interests in the Company, (b) satisfied all of its obligations and (c) made liquidating distributions to the Members in accordance with Article 16 hereof.  The costs associated with the sale shall, in general, be borne by the Members in the same proportion.  Management may reallocate among the Members so much of the considerations that a Member would be entitled to receive as equals the amounts which such Member then owes to the Company or to another Member.  Amounts that the purchaser agrees to pay in consideration of consulting, employment, non-competition and similar agreements shall be allocated (if not allocated in the agreements) among the Members as Management shall deem reasonable and appropriate.  Management is hereby granted by each Member a power of attorney, coupled with an interest, to execute in the name of the Member any and all agreements, contracts, documents and other instruments (including instruments of assignment) which Management deems necessary or useful in order to consummate the transactions aforesaid; said instruments shall be deemed to have been executed on behalf of the Members as if signed by the Members themselves.

11.5    Redemption of Interests.

(a)    *Membership Interests Subject to Redemption.*    The interests of any Member in the Company shall be subject to redemption (*i.e.,* purchase by the Company) as provided in this Section.

(b)    *Election to Redeem Made by Management.*    The decision to redeem a Member's interest in the Company in accordance with this Section shall be made by Management in its sole discretion, but only in the following circumstances applicable to a Member:

(i)    Willful or serious misconduct by the Member with respect to the business, operations or assets of the Company.

(ii)    Fraud or dishonesty on the part of the Member, whether or not with respect to the business or affairs of the Company, which affects the business, operations, assets or reputation of the Company.

(iii)    The Member's conviction of a felony crime, or a non-felony crime involving an act of moral turpitude.

(iv)    A transfer by the Member of its interest in the Company in violation of this Agreement.

(v)    An attempt by the Member to withdraw from the Company in violation of this Agreement.

(vi)    An attempt by the Member to partition the property of the Company in violation of this Agreement.

(vii)    A breach by the Member of any of the other terms, conditions and obligations contained in this Agreement.

16

(viii)    A failure to contribute additional capital to the Company pursuant to Management's call in Section 5.2(b) above.

(ix)    A breach by the Member of any employment agreement between the Member and the Company.

(x)    Any event resulting in a separation of the Member from service to the Company as an employee, contractor or agent.

For purposes of clauses (i), (ix) and (x), the term "Company" shall include the Company and any of its subsidiaries or other affiliates.

The interests of all transferees, successors or assignees of a Member (including a Permitted Transferee) shall also be subject to redemption under this Section if any transferee, successor or assignee has engaged in any of the acts described in the clauses set forth above or if, in the case of a partial assignment, the assigning Member (while a Member) engaged in any of the acts described in the clauses set forth above.

(c)    *Redemption Notice.* If Management decides to redeem a Member in accordance with this Section, Management shall send such Member (the "Redeemed Member") written notice (the "Redemption Notice") of its decision. The Redemption Notice shall specify the date on which the redemption shall close (the "Redemption Closing Date"); the Redemption Closing Date shall be established in accordance with paragraph (f).

(d)    *Purchase Price.* The purchase price (the "Purchase Price") of a Redeemed Member's interest shall equal (i) the amount that the Redeemed Member would have received had the Company (A) terminated on the date the Redemption Notice was given, (B) sold all of its assets at their fair market values on the date the Redemption Notice was given, (C) satisfied all of its debts and obligations and (D) made distributions to the Members in accordance with Section 16.2, less (ii) any distributions made to the Redeemed Member after the date the Redemption Notice is given to Redemption Closing Date. The fair market values of the Company's assets shall be determined by Management.

(e)    *Payment of Purchase Price.* The Purchase Price shall be paid in the form of an unsecured promissory note (the "Redemption Note") payable to the Redeemed Member and payable over a three year term. The principal amount of the Redemption Note shall bear interest at the lowest rate necessary to avoid the imputation of additional interest for Federal income tax purposes. Level payments of interest and principal shall be made on the note on a quarterly basis to fully amortize the principal balance over the term of the Redemption Note. The first payment under the Redemption Note shall be due 90 days after the Redemption Closing Date. The Redemption Note shall be prepayable at any time and from time to time. The outstanding balance of the Note shall be prepaid upon the dissolution of the Company in accordance with Section 16.2(b).

(f)    *Redemption Closing Date and Closing Deliveries.* The Redemption Closing Date shall be on a date and at the time specified by Management in the Redemption Notice but not later than the 30th day following the date the Redemption Notice is given. Closing shall occur at the Company's principal office or at such other place specified by Management in the Redemption Notice. At the closing the Company shall tender the Note to the Redeemed Member and the Redeemed Member shall accept the same and execute such documents of transfer as Management may request. If the Redeemed Member shall not accept the tender or execute said documents, Management shall be entitled to execute the documents of transfer for and on behalf of the Redeemed Member, with the same effect as if the Redeemed Member had done so itself, and the contemplated transfer shall be deemed closed once Management has deposited the Note (i) as an interpleader in any court of competent jurisdiction or (ii) in

17

a non-interest bearing escrow account at any established title company, trust company or banking institution, under instructions that the same (and any payments made under the Note after such deposit) may be withdrawn by the Redeemed Member upon demand. The closing of a redemption as contemplated in this paragraph shall not prejudice a Redeemed Member's right to contest the amount of the Purchase Price but a Redeemed Member shall not be permitted to contest the closing as contemplated by this paragraph.

(g) *Allocation of Redeemed Member's Interest.* The Percentage Interest of a Redeemed Member shall be reallocated among the Members in accordance with their relative Profit Percentages. If a member of Management possesses a Profit Percentage, the reallocation shall also include such member of Management.

**Article 12**
**Special Covenants**

12.1 <u>Competitive Undertakings</u>. Except as otherwise provided herein, any Member and Management may engage in business ventures of any nature and description independently or with others, including, but not limited to, business of the character described in Article 3 (or any part thereof), and neither the Company nor any of the Members shall have any rights in or to such independent ventures or the income or profits derived therefrom.

12.2 <u>Confidentiality</u>.

(a) *Restriction on Disclosure.* Each Member (which term, for purposes of this Section, includes each member of Management, whether or not such member of Management is a Member) recognizes and acknowledges that by virtue of its relationship with the Company it may be exposed to, discover, develop, generate or contribute to the Company's Confidential Information (as defined below). Each Member agrees that it will not, at any time or in any manner, either directly or indirectly, publish, communicate, divulge, disclose, disseminate or otherwise reveal to any person or entity, or use for any purpose whatsoever any Confidential Information, except as may be necessary in the course of performing authorized services for the Company or as may be required by applicable order of court, law, statute or regulation. Each Member further agrees to notify the Company before disclosing any Confidential Information under compulsion of law. Each Member hereby acknowledges that all Confidential Information is valuable, material and will significantly affects the effective and successful conduct of the Company's business and its goodwill. Each Member will take all necessary steps and precautions to protect any Confidential Information and shall comply with all policies of the Company in regard to Confidential Information. Upon the Company's request, any Member shall promptly return to the Company any and all correspondence, notes, data and documents containing or reflecting Confidential Information, keeping no copies for himself. The rights and protections granted herein are in addition to the rights, remedies and protections afforded to the Company under any applicable law, statute or regulation.

(b) *Definitions.* For the purposes of this Agreement, the term "Confidential Information" shall mean all information or data relating to the business and affairs of the Company not generally known outside of the Company, including, without limitation, any of the Company's processes, data, designs, compilations of information, apparatus, computer programs, information of or relating to suppliers or customers, customer requirements, cost or price data, research data, business plans, marketing or sales plans or information, financial data, salary information, policies and procedures, sales know-how or any other information that may be considered to be proprietary to or a trade secret of the Company, whether or not such information is considered a trade secret within the meaning of applicable law. Information shall not be considered "Confidential Information" if any of the following apply:

18

(i)    It is already in or enters into the public domain otherwise than as a consequence of a breach of the terms of this Agreement.

(ii)    It is already properly and lawfully in the possession of the receiving party and is not subject to any obligation of secrecy on the receiving party's part.

(iii)    It becomes available to a party on a non-confidential basis from a source other than the Company, provided that such information was properly and lawfully in the possession of such source and not, so far as the receiving party is aware (after making due and careful inquiry), subject to any obligation of secrecy on the part of such source.

## Article 13
## Securities and Other Matters

**13.1**    <u>No Registration Statement</u>. The interests evidenced by this Agreement have not been registered with the Securities and Exchange Commission or any state but have been issued pursuant to exemptions under the Federal Securities Act of 1933, as amended (the "Securities Act"), and applicable state securities laws.

**13.2**    <u>Transfers of Interests Restricted</u>. The sale, transfer, pledge, hypothecation or other disposition of any of interests in the Company is restricted and may not be accomplished except in accordance with this Agreement and an applicable registration statement or an opinion of counsel satisfactory to Management that registration is unnecessary or an exemption from registration under the Securities Act and applicable state securities laws.

## Article 14
## Intentionally Omitted

## Article 15
## Amendments to Operating Agreement

**15.1**    <u>Amendments</u>. The terms of this Agreement may be modified or amended at any time and from time to time with the written consent of Management and Members holding a majority of the Profit Percentages; but, in no event shall any modification or amendment to this Agreement (a) disproportionately decrease the right of any Member to distributions; (b) cause any Member to incur any personal additional liability with respect to the Company; or (c) amend this Article – unless in each case the Members adversely affected thereby consent in writing to such modification or amendment.

**15.2**    <u>Power of Attorney</u>. Each Member hereby agrees that, upon the execution of this Agreement, it shall and hereby does consent and appoint Management as its true and lawful attorney, coupled with an interest in its name, place and stead to sign, execute, acknowledge, swear to and file any and all documents which in the discretion of such attorney are required to be signed, executed, acknowledged, sworn to or filed by the Member to discharge the purposes of the Company as hereinabove stated or the provisions of this Agreement. Without limitation, among the documents which Management may execute on behalf of each Member shall be the following:

(a)    Any amendments to this Agreement, when this Agreement is amended in accordance with Section 15.1.

(b)     The Charter and any other instrument which may be required of the Company pursuant to the Act or the laws of any other jurisdiction and any amendments thereto that are not prohibited by Section 15.1.

The grant of authority set forth in this Section is a special power of attorney coupled with an interest, is irrevocable and shall survive the death, incapacity, insolvency, bankruptcy, liquidation or dissolution of a Member; may be exercised by Management for a Member by a facsimile signature or by listing the names of all of the Members executing any instrument with the signature of Management, as attorney in fact for all of them; and shall survive the delivery of an assignment by a Member of all or any portion of its interest, except that where the assignee has been approved by Management for admission to the Company as a substituted Member, the power of attorney shall survive the delivery of such assignment for the sole purpose of enabling Management to execute, acknowledge and file any instrument necessary to effect such substitution, and the grant of authority set forth in this Section shall be deemed to have been made by such substitute Member.

## Article 16
## Winding-Up and Dissolution of the Company

16.1     _Winding-Up and Dissolution Procedures_.  Upon an event described in Section 4.2, the affairs of the Company shall be wound-up and the Company shall be dissolved.  Management shall preside over the winding-up and dissolution of the Company or may appoint one or more agents to do so. Management shall make such filings in the State and in such other states in which the activities of the Company make it necessary or desirable to do so and do or cause to be done such other acts and things as shall be required to dissolve the Company.

16.2     _Distributions Upon Winding-Up_.  Except as otherwise provided in this Article, the winding-up and dissolution of the Company shall involve:

(a)     The orderly sale or other disposition of the Company's non-cash assets within a commercially reasonable time.

(b)     The payment or settlement of (and where appropriate, the establishment of reasonable reserves for) the Company's debts and other obligations, including to Members who are creditors, in the order of priority and to the extent provided by law.

(c)     The distribution of any remaining sums among the Members in accordance with Section 6.3.

16.3     _Distributions In Kind_.  In the event that Management determines that it is necessary or desirable to make a distribution of Company property in kind, such property shall be transferred and conveyed to the distributees as tenants in common so as to vest in them undivided interests in the whole of such property in proportion to their respective rights to share in the proceeds of the sale of such property in accordance with the provisions of Section 16.2(c).  All such Company property shall be valued at fair market value as determined by Management and shall be subject to such reasonable conditions and restrictions as are necessary or desirable in order to preserve the value of the assets distributed or for legal reasons.

16.4     _Liquidating Trust_.  In the discretion of Management, all or any portion of the distributions that would otherwise be made to the Members pursuant to Section 16.2(c) may be distributed to a trust established for the benefit of the Members for the purposes of liquidating Company assets, collecting amounts owed to the Company and paying any debts or other obligations of the

Company arising out of or in connection with the Company. Management shall appoint one or more persons as liquidating trustee. The assets of any such trust shall be distributed to the Members from time to time in the discretion of the Liquidating Trustee in the same proportions as the amount distributed to such trust by the Company would otherwise have been distributed to the Members pursuant to this Agreement.

16.5   <u>Final Accounting</u>. As part of the winding-up of the Company, a final accounting shall be made of the activities of the Company from the date of the last previous accounting to the date of dissolution. If a Member has a deficit in its Capital Account, such Member shall not be obligated to contribute any amount of that deficit to the Company.

<u>Article 17</u>
<u>General Provisions</u>

17.1   <u>Notices</u>. All notices, demands, offers or other communications required or permitted to be given pursuant to this Agreement shall be in writing and shall be transmitted by courier, recognized overnight delivery service (such as FedEx) or first class (postage prepaid) certified U.S. mail. Any notice, demand, offer or other communication shall be effective on the date of receipt at the address of the addressee. Notices, demands, offers or other communications to a Member shall be addressed to the Member at the address beneath the Member's name on the signature page of this Agreement or, if applicable, in such Member's subscription agreement. Notices, demands, offers or other communications to the Company shall be addressed to the Company in care of Management. Notices, demands, offers or other communications to Management shall be addressed to each member of Management at the address beneath each such person's name on the signature page of this Agreement. Any Member or member of Management may change its address for all future notices, demands, offers or other communications by giving notice to all of the other Members and members of Management stating its new address.

17.2   <u>Successors</u>. This Agreement and all the terms and provisions hereof shall be binding upon the parties hereto and their respective legal representatives, heirs, successors and assigns, except as expressly herein otherwise provided.

17.3   <u>Third Party Benefits</u>. Without limiting Section 17.2, the provisions of this Agreement are intended solely to benefit the Company and the parties hereto and, to the fullest extent permitted by applicable law, shall not be construed as conferring any benefit upon any other person, including without limitation any creditor of the Company (and no such creditor or other person shall be a third party beneficiary of this Agreement), and except as required by the Act, the Members shall have no duty or obligation to any such creditor or other person to make any contributions or return any money or other property to the Company.

17.4   <u>Governing Law</u>. This Agreement shall be construed in conformity with the domestic laws of the State, as applied to agreements whose only parties are residents of the State and which are to be performed entirely within the State.

17.5   <u>Severability</u>. If any provision of this Agreement, or the application of such provision to any person or circumstance, shall be held invalid by a court of competent jurisdiction, the remainder of this Agreement, or the application of such provision to persons or circumstances other than those to which it is held invalid by such court, shall not be affected thereby.

17.6   <u>Other Rules of Construction</u>. Every provision of this Agreement shall be construed simply according to its fair meaning and not strictly for or against any Member (notwithstanding any rule

21

of law requiring an Agreement to be strictly construed against the drafting party). The following additional rules of construction shall apply to this Agreement:

(a)    All pronouns shall include the masculine, feminine or neuter thereof, wherever the context and facts require such construction.

(b)    The term "person" refers to an individual, corporation, partnership, joint venture, limited liability company, limited liability partnership, association, joint stock company, statutory trust, common-law trust, unincorporated organization, government authority or any other organization whether or not a legal entity.

(c)    The term "party" means a signatory to this Agreement, including a Member, member of Management and any successor to any of the foregoing, whether or not such successor has executed or otherwise joined in this Agreement. The fact that a successor is a party shall not give that person any greater rights than it has under the express terms of this Agreement. By way of illustration, a successor who has not been admitted to the Company in accordance with Article 10 is a party to this Agreement for purposes of the dispute resolution procedures in Section 17.8, but despite being a party is still subject to the limitations of Section 10.4(c).

(d)    All terms defined in this Agreement in the singular have the same meanings when used in the plural and vice versa.

(e)    The use of the word "including" herein shall not be considered to limit the provisions which it modifies but instead shall mean "including without limitation" unless the provision states otherwise.

(f)    Headings, titles and subtitles us are inserted for convenience of reference only and are to be ignored in any construction of the provisions hereof.

(g)    An "Article" of this Agreement is typically identified with a number (e.g., "Article 17"). A "Section" of this Agreement corresponds to an Article and is typically identified with a number that includes a decimal (e.g., "Section 17.6"). A "paragraph" of this Agreement corresponds to a Section and is typically identified by a lower case letter (e.g., paragraph "(g)"). A "clause" of this Agreement corresponds to a paragraph and is typically identified with a roman numeral or an upper case letter (e.g., "(i)," "(I)" or "(A)").

(h)    Except where express reference is made to "business days," references in this Agreement to a number of days within which an action must be taken (including the giving of notice or the delivery of documents) shall mean calendar days. Notwithstanding the preceding sentence, whenever the final day on which an action must be taken (including the giving of notice or the delivery of documents) occurs on a non-business day (i.e., Saturday, Sunday or a holiday recognized by the U.S. Federal government, the State or the state in which the Company's principal office is located), then such period or date shall be extended until the immediately following business day.

17.7    <u>Members Not Agents</u>.  Nothing contained herein shall be construed to constitute any Member the agent of another Member, except as specifically provided herein.

17.8    <u>Dispute Resolution</u>.  The Company and the parties to this Agreement hereby irrevocably and unconditionally agree that any suit, action or proceeding arising out of or related to this Agreement or the Company shall be brought only in the United States District Court for the Southern District or in the Supreme Court of New York County, State of New York, and the specific choice from among the

22

foregoing shall be determined by the party initiating such suit, action or proceeding. To the fullest extent permissible by law, the Company and the parties to this Agreement hereby consent to the personal jurisdiction, venue and forum of such courts and hereby irrevocably and unconditionally waive any claim or objection that it is not subject to the jurisdiction of such courts, that the venue is improper, that the forum is inconvenient or any similar objection, claim or argument. Service of process on any of the parties hereto with regard to any such action may be made and is considered legally proper by mailing the process to such person by certified mail to the address of such person as provided in Section 17.1 or to any subsequent address to which notices shall be sent.

17.9    Waiver of Trial by Jury.  Each party acknowledges and agrees that any controversy which may arise under this Agreement is likely to involve complicated and difficult issues, and therefore each such party hereby irrevocably and unconditionally waives any right such party may have to a trial by jury with respect to any litigation directly or indirectly arising out of or relating to this Agreement. Each party understands and has considered the implications of this waiver. Each party makes this waiver voluntarily.

17.10    Attorney's Fees.  If the Company, any Member or any member of Management obtains a judgment in connection with a dispute arising under or in connection with any this Agreement, such party shall be entitled to recover from the non-prevailing party its court costs, and reasonable attorney's fees and disbursements incurred in connection therewith and in any appeal or enforcement proceeding thereafter, in addition to all other recoverable costs.

17.11    Remedies.  Subject to any express provisions of this Agreement, no remedy conferred upon the Company, any Member or any member of Management is intended to be exclusive of any other remedy herein or by law provided or permitted, but each shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law, in equity or by statute.

17.12    Waiver.  No waiver by the Company, any Member or any member of Management of any breach of this Agreement shall be deemed to be a waiver of any other breach of any kind or nature, and no acceptance of payment or performance by the Company, any Member or any member of Management after any such breach shall be deemed to be a waiver of any breach of this Agreement, whether or not the Company, any Member or any member of Management knows of such breach at the time it accepts such payment or performance. No failure or delay on the part of the Company, any Member or any member of Management to exercise any right it may have shall prevent the exercise thereof by the Company, any Member or any member of Management at any time such other may continue to be so in default, and no such failure or delay shall operate as a waiver of any default.

17.13    Entire Understanding.  This Agreement (and any subscription agreement that a Member may have entered into with the Company in connection herewith) constitutes the entire understanding among the Members and supersedes any prior understanding and/or written or oral agreements among them with respect to the Company. In the event of any conflict between this Agreement (and any subscription agreement that a Member may have entered into with the Company) and any other written or oral communications between the Company, Management or any employee or agent of either, and the Members (including any private placement memorandum for the issuance of interests in the Company), this Agreement (and any subscription agreement that a Member may have entered into with the Company) shall control and take precedence. Notwithstanding anything to the contrary contained in this Agreement, the parties hereto acknowledge that, as of the date hereof, Management, on its own behalf and/or on behalf of the Company, may agree in letters or other writings with one or more Members (each, an "other agreement"), and may from time to time hereafter agree in other agreements entered into with one or more Members to be admitted to the Company following the date hereof, in its sole discretion, to exceptions or departures from the provisions of this Agreement. Each other agreement, as in effect from

23

time to time, shall be incorporated herein by reference with respect to the Member or Members who are parties thereto. The parties hereto agree that any such exceptions or departures contained in an other agreement with a Member shall govern with respect to the Member who is a party to such other agreement notwithstanding the provisions of this Agreement.

17.14    Further Assurances.  Each of the parties hereto shall hereafter execute and deliver such further instruments and do such further acts and things as may be required or useful to carry out the intent and purpose of this Agreement and as are not inconsistent with the terms hereof. Recognizing that the Company, the Members and the members of Management may find it necessary from time to time to establish to third parties the then-current status of performance hereunder, each party hereto agrees, upon the written request of another party hereto, reasonably from time to time, to furnish promptly a written statement of the status of any matter pertaining to this Agreement or the Company to the best of the knowledge and belief of the party making such statements.

17.15    Counterparts and Electronic Transmission.  This Agreement may be executed in counterparts, each of which shall be an original, but all of which shall constitute one and the same instrument. Signatures to this Agreement that are transmitted electronically (*i.e.*, via e-mail or facsimile) shall be binding.

*[Signatures begin on next page of this document]*

*[Signature Page to Operating Agreement]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed.

MANAGER:                                          MANAGER:

Michael Dardashtian                               David Gitman
Print Name of Manager                             Print Name of Manager

_[signature]_                                     _[signature]_
Signature                                         Signature

13 Polofield La.                                  580 5th St #3
Great Neck, NY 11020                              Brooklyn, NY 11215
Address                                           Address


MEMBERS:                           PROFIT            CAPITAL
                                   PERCENTAGES       CONTRIBUTIONS

Michael Dardashtian                   50%              $500.00
Print Name of Member

_[signature]_
Signature

13 Polofield La.
Great Neck, NY 11020
Address


David Gitman                          50%              $500.00
Print Name of Member

_[signature]_
Signature

580 5th St #3
Brooklyn, NY 11215
Address

Macintosh HD:Users:mdardashtian:Downloads:Cooper Square Op. Agr. v1 9.8.11.doc

**Exhibit 3**


DEPARTMENT OF THE TREASURY
INTERNAL REVENUE SERVICE
CINCINNATI  OH   45999-0023

Date of this notice:  08-09-2011

Employer Identification Number:
~~~587

Form:  SS-4

Number of this notice:  CP 575 A

COOPER SQUARE VENTURES
MICHAEL DARDASHTIAN MBR
10616 JAMAICA AVE
RICHMOND HILL, NY  11418

For assistance you may call us at:
1-800-829-4933

IF YOU WRITE, ATTACH THE
STUB AT THE END OF THIS NOTICE.

WE ASSIGNED YOU AN EMPLOYER IDENTIFICATION NUMBER

Thank you for applying for an Employer Identification Number (EIN).  We assigned you EIN 45-2943587.  This EIN will identify you, your business accounts, tax returns, and documents, even if you have no employees.  Please keep this notice in your permanent records.

When filing tax documents, payments, and related correspondence, it is very important that you use your EIN and complete name and address exactly as shown above.  Any variation may cause a delay in processing, result in incorrect information in your account, or even cause you to be assigned more than one EIN.  If the information is not correct as shown above, please make the correction using the attached tear off stub and return it to us.

Based on the information received from you or your representative, you must file the following form(s) by the date(s) shown.

          Form 941                    01/31/2012
          Form 940                    01/31/2012
          Form 1065                   04/15/2012

If you have questions about the form(s) or the due date(s) shown, you can call us at the phone number or write to us at the address shown at the top of this notice.  If you need help in determining your annual accounting period (tax year), see Publication 538, *Accounting Periods and Methods*.

We assigned you a tax classification based on information obtained from you or your representative.  It is not a legal determination of your tax classification, and is not binding on the IRS.  If you want a legal determination of your tax classification, you may request a private letter ruling from the IRS under the guidelines in Revenue Procedure 2004-1, 2004-1 I.R.B. 1 (or superseding Revenue Procedure for the year at issue).  Note: Certain tax classification elections can be requested by filing Form 8832, *Entity Classification Election.*  See Form 8832 and its instructions for additional information.

A limited liability company (LLC) may file Form 8832, *Entity Classification Election*, and elect to be classified as an association taxable as a corporation.  If the LLC is eligible to be treated as a corporation that meets certain tests and it will be electing S corporation status, it must timely file Form 2553, *Election by a Small Business Corporation*.  The LLC will be treated as a corporation as of the effective date of the S corporation election and does not need to file Form 8832.

(IRS USE ONLY)    575A                08-09-2011  COOP  B  9999999999  SS-4

    If you are required to deposit for employment taxes (Forms 941, 943, 940, 944, 945, CT-1, or 1042), excise taxes (Form 720), or income taxes (Form 1120), you will receive a Welcome Package shortly, which includes instructions for making your deposits electronically through the Electronic Federal Tax Payment System (EFTPS).  A Personal Identification Number (PIN) for EFTPS will also be sent to you under separate cover. Please activate the PIN once you receive it, even if you have requested the services of a tax professional or representative.  For more information about EFTPS, refer to Publication 966, *Electronic Choices to Pay All Your Federal Taxes*.  If you need to make a deposit immediately, you will need to make arrangements with your Financial Institution to complete a wire transfer.

    The IRS is committed to helping all taxpayers comply with their tax filing obligations.  If you need help completing your returns or meeting your tax obligations, Authorized e-file Providers, such as Reporting Agents (payroll service providers) are available to assist you.  Visit the IRS Web site at www.irs.gov for a list of companies that offer IRS e-file for business products and services.  The list provides addresses, telephone numbers, and links to their Web sites.

    To obtain tax forms and publications, including those referenced in this notice, visit our Web site at www.irs.gov.  If you do not have access to the Internet, call 1-800-829-3676 (TTY/TDD 1-800-829-4059) or visit your local IRS office.

IMPORTANT REMINDERS:

    *  Keep a copy of this notice in your permanent records.  This notice is issued only one time and the IRS will not be able to generate a duplicate copy for you.

    *  Use this EIN and your name exactly as they appear at the top of this notice on all your federal tax forms.

    *  Refer to this EIN on your tax-related correspondence and documents.

    If you have questions about your EIN, you can call us at the phone number or write to us at the address shown at the top of this notice.  If you write, please tear off the stub at the bottom of this notice and send it along with your letter.  If you do not need to write us, do not complete and return the stub.  Thank you for your cooperation.

Keep this part for your records.        CP 575 A (Rev. 7-2007)

--------------------------------------------------------------------------------

Return this part with any correspondence
so we may identify your account.  Please                              CP 575 A
correct any errors in your name or address.
                                                                     9999999999

Your Telephone Number   Best Time to Call   DATE OF THIS NOTICE:  08-09-2011
(     )      -                               EMPLOYER IDENTIFICATION NUMBER: 587
_____    _____      FORM:  SS-4              NOBOD

INTERNAL REVENUE SERVICE                    COOPER SQUARE VENTURES
CINCINNATI  OH   45999-0023                 MICHAEL DARDASHTIAN MBR
‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖                     10616 JAMAICA AVE
                                            RICHMOND HILL, NY  11418

**Exhibit 4** A

LIMITED LIABILITY COMPANY OPERATING AGREEMENT

OF

NDAP, LLC

Limited Liability Company Operating Agreement

of

NDAP, LLC

This Limited Liability Company Operating Agreement of the above, a limited liability company organized pursuant to the New York Limited Liability Company Law, is entered into and shall be effective as of the Effective Date, by and among the Company and the persons executing this Agreement.

## ARTICLE I
## DEFINITIONS

For purposes of this Agreement (as defined below), unless the context clearly indicates otherwise, the following terms shall have the following meanings:

1.1  **Act.** The New York Limited Liability Company Act and all amendments to the Act.

1.2  **Additional Contribution.** An additional Capital Contribution payable by the Members to the Company pursuant to Article VIII.

1.3  **Additional Contribution Share.** A Member's proportionate share of an Additional Contribution, (i) equal to the product of (A) such Member's Initial Sharing Ratio (set forth in Schedule A to this Agreement) and (B) such Additional Contribution or (ii) as otherwise agreed by the Members under Section 8.2.

1.4  **Agreement.** This Limited Liability Company Operating Agreement including all amendments adopted in accordance with the Agreement and the Act.

1.5  **Articles.** The Articles of Organization of the Company, as amended from time to time, and filed with the Secretary of State of New York.

1.6  **Assignee.** A transferee of a Membership Interest who has not been admitted as a Substitute Member.

1.7  **Bankrupt Person.** A Person who: (1) has become the subject of an Order for Relief under the United States Bankruptcy Code by voluntary or involuntary petition, or (2) has initiated, either in an original Proceeding or by way of answer in any state insolvency or receivership Proceeding, an action for liquidation, arrangement, composition, readjustment, dissolution, or similar relief.

1

1.8  **Business Day.** Any day other than Saturday, Sunday or any legal holiday observed in the State of New York.

1.9  **Capital Account.** The account maintained for a Member or Assignee determined in accordance with Article VIII.

1.10  **Capital Contribution.** Any contribution of Property or services made by or on behalf of a Member or Assignee.

1.11  **Commitment.** The Capital Contributions that a Member is obligated to make, including a Member's Initial Capital Contribution and any Additional Contribution Share of a Member.

1.12  **Company.** The company named at the beginning of this Operating Agreement, a limited liability company formed under the laws of New York, and any successor limited liability company.

1.13  **Default Interest Rate.** The prime rate published by the Wall Street Journal for the last Business Day on which a Commitment is payable.

1.14  **Delinquent Member.** A Member who has failed to meet the Commitment of that Member.

1.15  **Disability.** The inability of a Member by reason of injury or mental or physical illness to substantially perform his usual duties as a manager for a period of six (6) consecutive months without an intervening return to work exceeding twenty (20) days during said period.

1.16  **Disposition.** Any sale, assignment, exchange, mortgage, pledge, grant, hypothecation, or other transfer, absolute or as security or encumbrance (including dispositions by operation of law).

1.17  **Dissociation.** Any action which causes a Person to cease to be a Member as described in Article XII hereof.

1.18  **Dissolution Event.** An event, the occurrence of which will result in the dissolution of the Company under Article XIII.

1.19  **Distribution.** A transfer of Property to a Member on account of a Membership Interest as described in Article IX.

1.20  **Effective Date.** The date of filing of the Articles of Organization or such other date as set forth in the Articles of Organization.

1.21  **Fiscal Year.** The calendar year.

1.22 **Initial Capital Contribution.** The Capital Contribution agreed to be made by the Members as described In Article VIII.

1.23 **Initial Membership Interest.** The Initial Membership Interest set forth in Schedule A.

1.24 **Initial Sharing Ratio.** The Initial Sharing Ratio set forth in Schedule A.

1.25 **Majority.** For purposes of this Agreement, Majority shall mean more than fifty (50%) percent of the Membership Interests.

1.26 **Management Right.** The right of a Member to participate in the management of the Company, to vote on any matter, and to grant or to withhold consent or approval of actions of the Company.

1.27 **Managing Member.** A member (or The Member) selected to manage the affairs of the Company under Article VII hereof.

1.28 **Manager.** A person (or the persons) selected to manage the affairs of the Company under Article VII hereof.

1.29 **Member.** A person executing the Agreement as a Member, and a Substitute Member.

1.30 **Membership Interest.** The rights of a Member to Distributions (liquidating or otherwise) and allocations of the profits, losses, gains, deductions, and credits of the Company, and, to the extent permitted by this Agreement, to possess and exercise Management Rights.

1.31 **Net Cash Flow.** With respect to any fiscal period of the Company, all revenues of the Company during that period decreased by (a) cash expenditures for operating expenses, (b) capital expenditures to the extent not made from reserves, (c) reserves for contingencies and working capital, established in such amounts as the Members may determine, (d) repayment of principal on any financing and (e) taxes.

1.32 **Organization.** A Person other than a natural person, including without limitation corporations (both non-profit and other corporations), partnerships (both limited and general), joint ventures, limited liability companies, business trusts and unincorporated association, but the term does not include joint tenancies and tenancies by the entirety.

1.33 **Person.** An individual, trust, estate, or any Organization permitted to be a member of a limited liability company under the laws of the State of New York.

1.34 **Principal Office.** The Principal Office of the Company set

3

forth in Section 2.6.

1.35 **Proceeding.** Any administrative, judicial, or other adversary proceeding, including without limitation litigation, arbitration, administrative adjudication, mediation, and appeal or review of any of the foregoing.

1.36 **Property.** Any property, real or personal, tangible or intangible, including money, and any legal or equitable interest in such property, but excluding services and promises to perform services in the future.

1.37 **Schedule A.** Schedule A to this Agreement setting forth the name, address, Initial Capital Contribution, number of Units, Initial Membership Interest and Initial Sharing Ratio of each Member, and the Member designated as the Tax Matters Partner.

1.38 **Sharing Ratio.** With respect to any Member, as of any date, the ratio (expressed as a percentage) of (i) such Member's Capital Contribution to (ii) the aggregate Capital Contributions of all Members, or such other ratio as shall be agreed by all Members from time to time. The Initial Membership Interest and Sharing Ratio of each Member is set forth in Schedule A hereof, and Schedule A shall be amended as necessary to conform to any changes thereof agreed to by the Members. In the event all or any portion of a Membership Interest is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Membership Interest and Sharing Ratio of the transferor to the extent it relates to the transferred Membership Interest.

1.39 **Substitute Member.** An Assignee who has been admitted to all of the rights of membership pursuant to Section XI hereof.

1.40 **Tax Characterization and Additional Tax Terms.** It is intended that the Company be characterized and treated as a partnership for, and solely for, federal, state and local income tax purposes. For such Purpose, (i) the Company shall be subject to all of the provisions of Subchapter K of Chapter 1 of Subtitle A of the Code, (ii) all references to a "Partner," to "Partners" and to the Partnership in this Agreement (including the provisions of Section 7.4 and the provisions of Article VIII) and in the provisions of the Code and Tax Regulations cited in this Agreement shall be deemed to refer to a Member, the Members and the Company, respectively. In addition, the following terms shall have the following meanings:

(a)  <u>Adjusted Capital Account Deficit</u> shall mean, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

4

(i)  Credit to such Capital Account the minimum gain chargeback that such Member is deemed to be obligated to restore pursuant to the penultimate sentences of Section 1.704-2(g)(1) and 1.704-2 (i)(5) of the Tax Regulations; and

(ii)  Debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), and 1.704-1(b)(2)(ii)(d)(6) of the Tax Regulations.

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Tax Regulations and shall be interpreted consistently therewith.

(b)  <u>Code</u> shall mean the Internal Revenue Code of 1986.

(c)  <u>Nonrecourse Deductions</u> has the meaning set forth in Section 1.704-2(b)(1) of the Tax Regulations.

(d)  <u>Nonrecourse Liability</u> has the meaning set forth in Section 1.704-2(b)(3) of the Tax Regulations.

(e)  <u>Partner Nonrecourse Debt</u> has the meaning set forth in Section 1.704-2(b)(4) of the Tax Regulation.

(f)  <u>Partner Nonrecourse Debt Minimum Gain</u> means an amount, with respect to each Partner Nonrecourse Debt, equal to the Partnership Minimum Gain that would result if such Partner Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Section 1.704-2(i)(3) of the Tax Regulations.

(g)  <u>Partner-Nonrecourse Deductions</u> has the meaning set forth in Sections 1.704-2(i)(1) and 1.704-2(i)(2) of the Tax Regulations.

(h)  <u>Partnership Minimum Gain</u> has the meaning set forth in Sections 1.704-2(b)(2) and 1.704-2(d) of the Tax Regulations.

(i)  <u>Profits and Losses</u> shall mean, for each Fiscal Year, an amount equal to the Company's taxable income or loss for such Fiscal Year, determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income or loss), with the following adjustments:

(i)  Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this Section 1.36(i) shall be added to such taxable income or loss;

5

(ii)   Any expenditures of the Company described in Section 705(a)(2)(B) of the Code or treated as Section 705(a)(2)(B) of the Code expenditures pursuant to Section 1.704-1(b)(2)(iv)(i) of the Tax Regulations, and not otherwise taken into account in computing Profits or Losses pursuant to this Section 1.39(i) shall be subtracted from such taxable income or loss;

(iii) Notwithstanding any other provisions of this definition, any items which are specially allocated pursuant to Sections 8.4 or 8.5 shall not be taken into account in computing profits or Losses.

The amounts of the items of partnership income, gain, loss, or deduction available to be specially allocated pursuant to Sections 9.4 or 9.5 shall be determined by applying rules analogous to those set forth in clauses (i) through (iii) above.

(j)   _Tax Regulations_ shall mean the federal income tax regulations promulgated by the United States Treasury Department under the Code as such Tax Regulations may be amended from time to time.   All references herein to a specific section of the Tax Regulations shall be deemed also to refer to any corresponding provision of succeeding Tax Regulations.

1.41 Unit.   One of the   one hundred units of Membership Interest that are authorized to be issued under this Agreement. Each Unit represents a Membership Interest with an Initial Sharing Ratio of one percent (1%), subject to adjustment as provided herein.

A Unit is divisible into fractional parts.   References to Units herein shall be solely for the purpose of certificating the Membership interests authorized hereunder. Voting, the granting or withholding of consents or approvals, and allocation of Profits and Losses and Distributions shall be made pursuant to the applicable provisions of this Agreement without reference to the number of Units held by Members.

## ARTICLE II
## FORMATION

2.1 Organization.   The Members hereby organize the Company as a New York limited liability company pursuant to the provisions of the Act.

2.2 Agreement.   For and in consideration of the mutual covenants herein contained and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Members executing the Agreement hereby agree to the terms and conditions of the Agreement, as it may from time to time be amended. It is the express intention of the Members that

6

the Agreement shall be the sole source of agreement of the parties, and, except to the extent a provision of the Agreement expressly incorporates federal income tax rules by reference to sections of the Code or Tax Regulations or is expressly prohibited or ineffective under the Act, the Agreement shall govern, even when inconsistent with, or different than, the provision of the Act or any other law or rule. To the extent any provision of the Agreement is prohibited or ineffective under the Act, the Agreement shall he deemed to be amended to the least extent necessary in order to make the Agreement effective under the Act. In the event the Act is subsequently amended or interpreted in such a way to make any provision of the Agreement that was formerly invalid valid, such provision shall be considered to be valid from the effective date of such interpretation or amendment.

2.3     Name. The name of the Company is the name set forth at the beginning of this Operating Agreement, and all business of the Company shall be conducted under that name.

2.4     Term. The Company shall be dissolved and its affairs wound up in accordance with the Act and the Agreement, unless the term shall be extended by amendment to the Agreement and the Articles, or unless the Company shall be sooner dissolved and its affairs wound up in accordance with the Act or the Agreement.   In all other respects, the term is perpetual.

2.5     Registered Agent and Office. The registered agent for the service of process and the registered office shall be that person and location reflected in the Articles. The Members may, from time to time, change the registered agent or office through appropriate filings with the Secretary of State of New York. In the event the registered agent ceases to act as such for any reason or the registered office shall change, the Members shall promptly designate a replacement registered agent or file a notice of change of address as the case may be.

2.6     Principal Office.   The Principal Office of the Company shall be located at 106-16 Jamaica Avenue, Richmond Hill, New York 11418

2.7     Publication.  Within 120 days after the Effective Date, the Members shall cause a notice containing the substance of the Articles, in the form required by the Act, to be published once in each week for six successive weeks in two newspapers of the county in which the Principal Office is located.

ARTICLE III
PURPOSE; NATURE OF BUSINESS

The business purpose of the Company is to engage in any and all business activities permitted under the laws of the State of New

7

York, including but not limited to the operation and management of real property.

The Company shall have the authority to do all things necessary or convenient to accomplish its purpose and operate its business as described in this Article III.   The Company exists only for the purpose specified in this Article III, and may not conduct any other business without the unanimous consent of the Members.   The authority granted to the Members hereunder to bind the Company shall he limited to actions necessary or convenient to this business.

ARTICLE IV
ACCOUNTING AND RECORDS

4.1   Records to be Maintained. The Company shall maintain the following records at the Principal Office:

(a)   a current list of the full name set forth in alphabetical order and last known mailing address of each Member, together with the information set forth on Schedule A relating to each Member's Initial Capital Contribution, number of Units, Membership Interest and Sharing Ratio;

(b)   a copy of the Articles and all amendments thereto, together with executed copies of any powers of attorney pursuant to which the Articles or any such amendment has been executed;

(c)   a copy of the Company's federal, state and local income or information tax returns and reports for the three most recent Fiscal Years;

(d)   a copy of this Agreement including all amendments thereto; and

(e)   the Company's books and records, including financial statements of the Company, which shall be open to inspections by the Members or their agents at reasonable times.

4.2   Reports to Members. The Company shall provide reports, including a balance sheet.

4.3   Tax Returns and Reports. The Members, at Company expense, shall prepare and timely file income tax returns of the Company in all jurisdictions where such filings are required, and the Company shall prepare and deliver to each Member, within ninety (90) days after the expiration of each Fiscal Year, and at Company expense, all information returns and reports required by the Code and Tax Regulations and Company information necessary for the preparation of the Members' federal income tax returns.

8

ARTICLE V
NAMES AND ADDRESSES OF MEMBERS

The names and addresses of the Members are as stated on Schedule A.

ARTICLE VI
RIGHTS AND DUTIES OF MEMBERS

6.1  Management Rights.   No member other than the Managing Member shall have authority to bind the Company on any Management Right except that the following actions shall require the Majority consent of all of the Members:

( a)  the sale of Company Property other than in the ordinary course of business;

( b)  the merger or consolidation of the Company with any other Person;

( c)  the continuation of the Company after a Dissolution Event;

( d)  the borrowing of funds or the pledging, mortgaging or otherwise encumbering of any Company Property, except in the ordinary course of business.

( e)  the requirement that Additional Contributions be made.

( f)  the selection of the Company's regularly engaged accountants;

and the following actions shall require the consent of sixty-six and two-thirds (66 2/3 %) percent of all Members:

(a)  any amendment to the Agreement or to the Articles;

(b)  the payment of compensation to the Managing Members; and

(c)  the admission of a new Member.

6.2  Liability of Members.  No Member shall be liable as such for the liabilities of the Company.

6.3  Indemnification.  A Member shall indemnify the Company for any costs or damages incurred by the Company as a result of any unauthorized action by such Member.

6.4  Representations and Warranties. Each Member, and in the

9

case of a trust or other entity, the person(s) executing the Agreement on behalf of the entity, hereby represents and warrants to the Company and each other Member that: (a) if the Member is an entity, it has power to enter into the Agreement and to perform its obligations hereunder and that the person(s) executing the Agreement on behalf of the entity has the power to do so; and (b) the Member is acquiring its interest in the Company for the Member's own account as an investment and without an intent to distribute the interest. The Members acknowledge that their interests in the Company have not been registered under the Securities Act of 1933 or any state securities laws, and may not be resold or transferred without appropriate registration or the availability of an exemption from such requirements.

6.5   Conflicts of Interest/Confidentiality.

(a)   David Gitman and Michael Dardashtian shall not be entitled to enter into transactions that may be considered to be competitive with the Company and agree that during the term of this Agreement and for a period of twenty-four (24) months following the termination of this Agreement, they shall not be engaged in any business, whether internet based or of a traditional brick and mortar type that is competitive with the Company without the express written permission of the Majority of the Members of the Company. If such competitive business is of a traditional brick and mortar type, such business will not be considered competitive if it is located outside of the City of New York or Nassau and Suffolk counties or the District of Columbia or Prince Georges County in Maryland.

(b)   A Member, including a Managing Member, does not violate a duty or obligation to the Company merely because the Member's conduct furthers the Member's own interest. A Member may lend money to and transact other business with the Company. The rights and obligations of a Member who lends money to or transacts business with the Company are the same as those of a person who is not a Member, subject to other applicable law. No transaction with the Company shall be voidable solely because a Member has a direct or indirect interest in the transaction if the transaction is fair and reasonable to the Company.

(c)   David Gitman and Michael Dardashtian agree that all Confidential Information they receive while Members of the Company shall be maintained by them in the strictest of confidence, to be used only in connection with the operation of the Company and for no other purpose, including, but not limited to the retail or wholesale distribution or sale of auto parts, whether through internet based or through a traditional brick and mortar locations, unless with the express written permission of the Majority of the Members of the Company.   For purposes of this Agreement, Confidential Information shall mean information which is non-public,

10

confidential or proprietary in nature.

ARTICLE VII
MANAGING MEMBER

7.1  Managing Member.  Except as otherwise provided in the Agreement, the management of the Company and all decisions concerning the daily business affairs of the Company shall be made by the Managing Member.  The Managing Members shall be:  Cooper Square Ventures, LLC, the Members of which must be only David Gitman or Michael Dardashtian or either of them and no other natural persons or entities unless agreed to by the Majority Members.

7.2  Term of Office as Managing Member.  Each Managing Member shall serve until the Dissociation of such Managing Member or any removal of such Managing Member pursuant to Section 7.8.

7.3  Authority of Managing Member to Bind the Company.  Only the Managing Members and authorized agents of the Company shall have the authority to bind the Company.  Subject to Section 6.1, the Managing Members have the power, on behalf of the Company, to do all things necessary or convenient to carry out the daily business and affairs of the Company (as described in Article III), including:

(x)  the establishment of the Company's offices;

(y)  the hiring and appointment of employees and agents of the Company, the defining of their duties and the establishment of their compensation, and the dealing with tradespeople on such terms as the Managing Members shall determine;

(z)  the purchase of liability and other insurance to protect the Company's business and Property;

but shall specifically not include the following, which shall be decided by a Majority of the Members:

(a)  the institution, prosecution and defense of any Proceeding in the Company's name;

(b)  the purchase, receipt, lease or other acquisition, ownership, holding, improvement, use and other dealing with Real Property, wherever located;

(c)  the sale, conveyance, mortgage, pledge, lease, exchange, and other disposition of Property, except in the ordinary course of business of the Company;

(d)  the entering into of contracts and guaranties involving greater than $ 50,000.00 either singly or cumulatively,

11

incurring of liabilities; borrowing of money, issuance of notes, bonds, and other obligations, and the securing of any of its obligations by mortgage or pledge of any of its Property or income;

(e)   the lending of money, investment and reinvestment of the Company's funds, and receipt and holding of Property as security for repayment;

(f)   the payment of pensions and establishment of pension plans, pension trusts, profit sharing plans, and benefit and incentive plans for Members, employees, and agents of the Company;

(g)   the participation in partnership agreements, joint ventures, or other associations of any kind with any entity, person or persons;

(h)   the indemnification of any Person;

(i)   the making of such elections under the Code and Tax Regulations and other relevant tax laws as to the treatment of items of Company income, gain, loss, deduction and credit, and as to all other relevant matters as the Managing Member deems necessary or appropriate, including without limitation, elections referred to in Section 754 of the Code, the determination of which items of cash outlay shall be capitalized or treated as current expenses, and the selection of the method of accounting and bookkeeping procedures to be used by the Company.

7.4   **Actions of the Managing Member.** The Managing Member has the power to bind the Company as provided in this Article VII. No Person dealing with the Company shall have any obligation to inquire into the power or authority of the Managing Member acting on behalf of the Company. If there is more than one Managing Member, the Managing Members shall manage the Company by the affirmative vote of all the Managing Members.

7.5   **Compensation of Managing Member.** The Managing Member shall be reimbursed for all reasonable expenses incurred in managing the Company and shall not be entitled to compensation, unless a Majority of all of the Members' consent thereto. The Managing Members shall be required to devote full time to the management of the Company business for the proper management of such business and be the principal activity that the Managing Members are engaged in.

David Gitman and Michael Dardashtian shall each receive a salary from the Company of $1,000.00 per week, which shall begin on November 1, 2011.

7.6   **Managing Member's Standard of Care.** Each Managing Member shall discharge the Managing Member's duties to the Company and the

12

other Members in good faith and with that degree of care that an ordinarily prudent person in a similar position would use under similar circumstances, recognizing he or she is acting on behalf of all Members in the nature of a fiduciary. In discharging its duties and obligations, as set for in section 7.7, a Managing Member shall be fully protected in relying in good faith upon the records required to be maintained under Article IV and upon such information, opinions, reports or statements by any Person as to matters the Managing Member reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, profits or losses of the Company or any other facts pertinent to the existence and amount of assets from which Distributions to Members might properly be paid. The Company shall indemnify and hold harmless each Managing Member against any loss, damage or expense (including attorneys' fees) incurred by the Managing Member as a result of any act performed or omitted on behalf of the Company or in furtherance of the Company's interests without, however, relieving the Managing Member of liability for failure to perform his or her duties in accordance with the standards set forth herein. The satisfaction of any indemnification and any holding harmless shall be from and limited to Company Property and the other Members shall not have any personal liability on account thereof.

7.7  Authority of the Managing Members. The Managing Members shall have full and complete charge of all daily affairs of the Company, its management and control, subject to the terms and conditions of this Agreement. Except as otherwise prohibited by law or by this Agreement, the Managing Members shall continue to possess all of the rights and powers of a member in a limited liability company under the laws of the State of New York.

Notwithstanding anything contained herein to the contrary, all decisions concerning the affairs of the Company and its management and control shall be made by the unanimous consent of all Managing Members if there be more than one (1) Managing Member. The preceding sentence shall not apply, however, in the event that the Managing Members unanimously designate one (1) of the Managing Members to serve as the Managing Member. In such event, the Managing Members shall have the exclusive control and management of the day-to-day operation of the Company business. The Managing Member shall continue to serve as such for as long as he or she shall have the unanimous consent of the Managing Members.

7.8  Resignation; Removal of Managing Member. The Managing Member shall have a right to resign upon sixty (60) days' notice to the Company, and may be removed as Managing Members by a Majority vote of the Members only for cause which for purposes of this

13

Agreement shall be defined to mean gross misconduct injurious to the Company, a willful failure to perform their duties or the conviction of a crime.

ARTICLE VIII
CONTRIBUTIONS AND CAPITAL ACCOUNTS

8.1  Initial Contributions.  Each Member shall make the Initial Capital Contribution described for that Member on Schedule A at the time and on the terms specified in Schedule A and shall perform that Member's Commitment, and shall receive the number of Units of Membership Interest and Sharing Ratio described for that Member on Schedule A.   The Managing Member shall issue certificates representing the Units subscribed for by the Members.  No Member shall have the right to withdraw or be repaid any Capital Contribution except as provided in the Agreement.

8.2  Additional Contributions.  In addition to the Initial Capital Contributions, the Members shall make such Additional Contributions as the Majority of the Members shall vote, from time to time.  However, no additional capital contributions shall be required until the following is done by the Company:

(a)  make reasonable attempts to borrow the amount of additional funds determined needed by the Majority and then

(b)  allow each Member the opportunity to lend to the Company additional funds determined by the Majority to be necessary as provided in paragraph 8.3.

8.3  Enforcement of Commitments.  In the event any Member (a Delinquent Member) fails to perform the Delinquent Member's obligation to commit additional capital pursuant to section 8.2 above, the other Members shall give the Delinquent Member a notice of such failure. If the Delinquent Member fails to perform the Commitment (including the payment of any costs associated with the failure and interest at the Default Interest Rate) within ten Business Days of the giving of such notice, the other Members may reduce the number of units and sharing ratio of the non-contributing partner and increase the number of units and sharing ratio of the contributing member by a percentage equal to the fraction, the numerator of which is the capital advanced by the contributing member and the denominator of which is the total capital contributions contributed by all Members since inception of the Company.

In the event the Delinquent Member fails to meet such Commitments, the other Members may elect to lend additional money to the Company at an interest rate equal to the Prime Rate of JPMorgan Chase in effect at the time the loan is outstanding, as adjusted monthly.

14

8.4  Capital Account. A separate capital account shall be maintained for each Member throughout the term of the Company in accordance with the rules of Section 1.704-1(b)(2)(iv) of the Tax Regulations as in effect from time to time, and, to the extent not inconsistent therewith, to which the following provisions apply:

(a)  To each Member's Capital Account there shall be credited (i) the amount of money contributed by such Member to the Company (including liabilities of the Company assumed by such Member as provided in Section 1.704-1(b)(2)(iv)(c) of the Tax Regulations); (ii) the fair market value of any property contributed to the Company by such Member (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to under Section 752 of the Code); and (iii) such Member's share of Profits and items of income and gain that are specially allocated.

(b)  To each Member's Capital Account there shall be debited (i) the amount of money distributed to such Member by the Company (including liabilities of such Member assumed by theCompany as provided in Section 1.704-1(b)(2)(iv)(c) of the Tax Regulations) other than amounts which are in repayment of debt obligations of the Company to such Member; (ii) the fair market value of property distributed to such Member (net of liabilities secured by such distributed property that such Member is considered to assume or take subject to under Section 752 of the Code); and (iii) such Member's share of Losses or items of loss or deduction that are specifically allocated.

(c)  The Capital Account of a transferee Member shall include the appropriate portion of the Capital Account of the Member from whom the transferee Member's interest was obtained.

(d)  In determining the amount of any liability, there shall be taken into account Section 752(c) of the Code and any other applicable provisions of the Code and Tax Regulations.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Section 1.704-1(b) of the Tax Regulations, and shall be interpreted and applied in a manner consistent with such Tax Regulations. In the event the Members shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto (including, without limitation, debits or credits relating to liabilities that are secured by contributed or distributed property or that are assumed by the Company or any Member), are computed in order to comply with such Tax Regulations, the Members may make such modification, provided that it is not likely to have a material effect on the amounts distributable to any Member pursuant to Article XII hereof upon the dissolution of the

15

Company. The Members also shall (i) make any adjustments that are necessary or appropriate to maintain equality between the Capital Accounts of the Members and the amount of Company capital reflected on the Company's balance sheet, as computed for book purposes, in accordance with Section 1.704-1(b)(2)(iv)(g) of the Tax Regulations and (ii) make any appropriate modifications in the event unanticipated events might otherwise cause this Agreement not to comply with Section 1.704-1(b) of the Tax Regulations.

8.5  **No Obligation to Restore Deficit Balance.** Except as required by law, no Member shall be required to restore any deficit balance in its Capital Account.

8.6  **Withdrawal; Successors.** A Member shall not be entitled to withdraw any part of its Capital Account or to receive any distribution from the Company, except as specifically provided in the Agreement, and no Member shall be entitled to make any capital contribution to the Company other than the Commitments. Any Member, including any additional or Substitute Member, who shall receive an interest in the Company or whose interest in the Company shall be increased by means of a transfer to it of all or part of the interest of another Member, shall have a Capital Account with respect to such interest initially equal to the Capital Account with respect to such interest of the Member from whom such interest is acquired except as otherwise required to account for any step up in basis resulting from a termination of the Company under Section 708 of the Code by reason of such interest transfer.

8.7  **Interest.** No Member shall be entitled to interest on such Member's Capital Contribution or on any Profits retained by the Company.

8.8  **Investment of Capital Contributions.** The Capital Contributions of the Members shall be invested in demand, money market or time deposits, obligations, securities, investments or other instruments constituting cash equivalents, until such time as such funds shall be used for Company purposes. Such investments shall be made for the benefit of the Company.

8.9  **No Personal Liability.** No Member shall have any personal liability for the repayment of any Capital Contributions of any Member.

<div align="center">

ARTICLE IX
ALLOCATIONS AND DISTRIBUTIONS

</div>

9.1  **Profits and Losses.** Profits and Losses, and each item of Company income, gain, loss, deduction, credit and tax preference with respect thereto, for each Fiscal Year (or shorter period in respect of which such Items are to be allocated) shall be allocated among the Members as provided in this Article IX.

<div align="center">16</div>

9.2   Profits. After giving effect to the special allocations set forth in Sections 9.4 and 9.5, Profits for any Fiscal Year shall be allocated in the following order of priority:

(a) First, to the Members, if any, who received any allocation of Losses under Section 9.3(c), in proportion to (and to the extent of) the excess, if any, of (i) the cumulative Losses allocated to such Members pursuant to Section 9.3(c) for all prior Fiscal Years, over (ii) the cumulative profits allocated to such Members pursuant to this Section 9.2(a) for all prior Fiscal Years;

(b) Second, to the Members, in proportion to (and to the extent of) the excess, if any, of (i) the cumulative Losses allocated to each Member pursuant to Section 9.3(b) hereof for all prior Fiscal Years, over (ii) the cumulative Profits allocated to each Member pursuant to this Section 9.2(b) for all prior Fiscal Years;

(c) Third, to the Members, in proportion to (and to the extent of) the excess, if any, of (i) the cumulative Losses allocated to each Member pursuant to Section 9.3(a)(ii) hereof for all prior Fiscal Years, over (ii) the cumulative Profits allocated to such Member pursuant to this Section 9.2(c) for all prior Fiscal Years;

(d) Fourth, the balance of the Profits remaining, if any, among the Members, pro rata, in proportion to their respective Sharing Ratios.

(e) Notwithstanding the provisions of Section 9.2 and 9.3, David Gitman and Michael Dardashtian together, or an entity formed by them, shall receive an allocation of profits and losses equal to sixty-six and two thirds (66 2/3%) percent during the initial twenty-four (24) months of the term of this Agreement and thereafter fifty (50%) percent of profits or losses for each month thereafter.

Notwithstanding the above [entity to be formed] agrees to lend to the Company its share of its allocated profit (less taxes due thereon) earned during the first twenty-four months of operation of the Company, without interest.

9.3   Losses. After giving effect to the special allocations set forth in Sections 9.4 and 9.5, Losses shall be allocated as set forth in Section 9.3(a), subject to the limitation in Section 9.3(b) below, and, if applicable, as provided in Section 9.3(c).

(a) Losses for any Fiscal Year shall be allocated in the following order of priority:

(i) first, to the Members in proportion to and to the extent of the excess, if any, of (A) the cumulative Profits

17

allocated to each such Partner pursuant to Section 9.2(d) hereof for all prior Fiscal Years, over B) the cumulative Losses allocated to such Partner pursuant to this Section 9.3(a)(i) for all prior Fiscal Years; and

(ii) the balance, if any, among the Members in proportion to their respective Sharing Ratios.

(b) The Losses allocated pursuant to Section 9.3(a) hereof shall not exceed the maximum amount of Losses that can be so allocated without causing any Member to have an Adjusted Capital Account Deficit at the end of any Fiscal Year. In the event some, but not all, of the Members would have Adjusted Capital Account Deficits as a consequence of an allocation of Losses pursuant to Section 9.3(a) hereof, the limitation set forth in this Section 9.3(b) shall be applied on a Member by Member basis so as to allocate the maximum permissible Losses to the Members under Section 1.704-1(b)(2)(ii)(d) of the Tax Regulations.

(c) In the event that there are any remaining Losses in excess of the limitations set forth in Section 9.3(b), such remaining Losses shall be allocated among the Members in proportion to their respective Sharing Ratios.

9.4   Special Allocations.  The following special allocations shall be made in the following order:

(a) <u>Minimum Gain Chargeback.</u>  Except as otherwise provided in the Tax Regulations, notwithstanding any other provision of this Article VIII, if there is a net decrease in Partnership Minimum Gain during any Fiscal Year, each Member shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Partnership Minimum Gain, determined in accordance with Section 1.704-2(g) of the Tax Regulations. Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Sections 1.704-2(f)(6) and 1.704-2(j)(2) of the Tax Regulations. This Section 9.4(a) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(f) of the Tax Regulations and shall be interpreted consistently therewith.

(b) <u>Partner Minimum Gain Chargeback.</u> Except as otherwise provided in Section 1.704-2(i)(4) of the Tax Regulations, notwithstanding any other provision of this Article VIII, if there is a net decrease in Partner Nonrecourse Debt Minimum Gain attributable to a Partner Nonrecourse Debt during any Fiscal Year, each Member who has a share of the Partner Nonrecourse Debt Minimum Gain attributable to such Partner Nonrecourse Debt, determined in

18

accordance with Section 1.704-2(i)(5) of the Tax Regulations, shall be specifically allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Partner Nonrecourse Debt Minimum Gain attributable to such Partner Nonrecourse Debt, determined in accordance with Section 1.704-2(i)(4) of the Tax Regulations. Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Sections 1.704-2(i)(4) and 1.704-2(j)(2) of the Tax Regulations. This Section 9.4(b) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(i)(4) of the Tax Regulations and shall be interpreted consistently therewith.

(c) _Qualified Income Offset._ In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Section 1.704- 1(b)(2)(ii)(d)(4), Section 1.704-1(b)(2)(ii)(d)(5), or Section 1.704-1(b)(2)(ii)(d)(6) of the Tax Regulations, items of Company income and gain shall be specially allocated to the Member in an amount and manner sufficient to eliminate, to the extent required by the Tax Regulations, the Adjusted Capital Account Deficit of the Member as quickly as possible, provided that an allocation pursuant to this Section 9.4(c) shall be made only if and to the extent that the Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article IX have been tentatively made as if this Section 9.4(c) were not in this Agreement.

(d) _Gross Income Allocation_. In the event any Member has a deficit Capital Account at the end of any Fiscal Year which is in excess of the sum of the amounts such Member is deemed to be obligated to restore pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Tax Regulations, each such Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this Section 9.4(d) shall be made only if and to the extent that such Member would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Article IX have been made as if Section 9.4(c) and this Section 9.4(d) were not in this Agreement.

(e) _Nonrecourse Deductions_. Nonrecourse Deductions for any Fiscal Year shall be specially allocated among the members in proportion to their Sharing Ratios.

(f) _Partner Nonrecourse Deductions_. Any Partner Nonrecourse Deductions for any Fiscal Year shall be specially allocated to the Member who bears the economic risk of loss with respect to the Partner Nonrecourse Debt to which such Partner Nonrecourse Deductions are attributable in accordance with Section

19

1.704-2(i)(1) of the Tax Regulations.

(g) <u>Mandatory Allocations Under Section 704(c) of the Code</u>. Notwithstanding the foregoing provisions of this Section 8.4, in the event Section 704(c) of the Code or Section 704(c) of the Code principles applicable under Section 1.704-1(b)(2)(iv) of the Tax Regulations require allocations of Profits or Losses in a manner different than that set forth above, the provisions of Section 704(c) of the Code and the Tax Regulations thereunder shall control such allocations among the Members. Any item of Company income, gain, loss and deduction with respect to any property (other than cash) that has been contributed by a Member to the capital of the Company or which has been revalued for Capital Account purposes pursuant to Section 1.704-1(b)(2)(iv) of the Tax Regulations) and which is required or permitted to be allocated to such Member for income tax purposes under Section 704(c) of the Code so as to take into account the variation between the tax basis of such property and its fair market value at the time of its contribution shall be allocated solely for income tax purposes in the manner so required or permitted under Section 704(c) of the Code using the "traditional method" described in Section 1.704-3(b) of the Tax Regulations; <u>provided</u>, <u>however</u>, that curative allocations consisting of the special allocation of gain or loss upon the sale or other disposition of the contributed property shall be made in accordance with Section 1.704-3(c) of the Tax Regulations to the extent necessary to eliminate any disparity, to the extent possible, between the Members' book and tax Capital Accounts attributable to such property; <u>further provided</u>, <u>however</u>, that any other method allowable under applicable Tax Regulations may be used for any contribution of property as to which there is agreement between the contributing Member and the other Members.

9.5  Curative Allocations. The allocations set forth in Sections 9.4(a) through (g) (the "Regulatory Allocations") are intended to comply with certain requirements of the Tax Regulations. It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss, or deduction pursuant to this Section 9.5. Therefore, notwithstanding any other provision of this Article IX (other than the Regulatory Allocations), the Members shall make such offsetting special allocations of Company income, gain, loss, or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of this Agreement and all Company items were allocated pursuant to Sections 9.2 and 9.3. The Members (i) shall take into account future Regulatory Allocations under Sections 9.4(a) and 9.4(b) that, although not yet made, are likely to offset other Regulatory Allocations previously made under Sections 9.4(e)

20

and 9.4(f) and (ii) may reallocate Profits and Losses for prior open years (or items of gross income and deduction of the Company for such years) among the Members to the extent it is not possible to achieve such result with allocations of items of income (including gross income) and deduction for the current year and future years. This Section 9.5 shall control notwithstanding any reallocation or adjustment of taxable income, taxable loss, or items thereof by the Internal Revenue Service or any other taxing authority.

9.6   Other Allocation Rules.

(a)  For purposes of determining the Profits, Losses, or any other item allocable to any period (including allocations to take into account any changes in any Member's Sharing Ratio during a Fiscal Year and any transfer of any interest in the Company), Profits, Losses, and any such other item shall be determined on a daily, monthly, or other basis, as determined by the Members using any permissible method under Section 706 of the Code and the Tax Regulations thereunder.

(b)  The Members are aware of the income tax consequences of the allocations made by this Article IX and hereby agree to be bound by the provisions of this Article IX in reporting their shares of Company income and loss for income tax purposes.

(c)  Solely  for  purposes  of  determining  a  Member's proportionate share of the "excess nonrecourse liabilities of the partnership within the meaning of Section 1.752-3(a)(3) of the Tax Regulations, the Members' interests in Company Profits are in proportion to their Sharing Ratios.

(d)  To the extent permitted by Section 1.704-2(h)(3) of the  Tax  Regulations,  the  Members  shall  endeavor  to  treat distributions of Net Cash Flow as having been made from the proceeds of a Nonrecourse Liability or a partner Nonrecourse Debt only to the extent that such distributions would cause or increase an Adjusted Capital Account Deficit for any Partner.

(e)  Except as otherwise provided in this Article IX, an allocation of Company Profits or Losses to a Member shall be treated as an allocation to such Member of the same share of each item of income, gain, loss and deduction taken into account in computing such Profits or Losses.

(f)  For  purposes  of  determining  the  character  (as ordinary income or capital gain) of any profits allocated to the Members pursuant to this Article IX, such portion of profits that is treated as ordinary income attributable to the recapture of depreciation shall, to the extent possible, be allocated among the Members in the proportion which (i) the amount of depreciation previously allocated to each Member bears to (ii) the total of such

21

depreciation allocated to all Members. This section 9.6(f) shall not alter the amount of allocations among the Members pursuant to this Article IX, but merely the character of income so allocated.

(g) Except for arrangements expressly described in this Agreement, no Member shall enter into (or permit any Person related to the Member to enter into) any arrangement with respect to any liability of the Company that would result in such Member (or a person related to such Member under Section 1.752-4(b) of the Tax Regulations) bearing the economic risk of loss (within the meaning of Section 1.752-2 of the Tax Regulations) with respect to such liabilities unless such arrangement has been approved by all Members. To the extent a Member is permitted to guarantee the repayment of any Company indebtedness under this Agreement, each of the other Members shall be afforded the opportunity to guarantee such Member's *pro rata* share of such indebtedness, determined in accordance with the Members' respective Sharing Ratios.

9.7  Minimum 1% Interest of Managing Member.  Notwithstanding anything in this Article IX, the Managing Member shall at all times during the existence of the Company have a minimum 1% allocation of each material item of income, gain, loss, deduction and credit of the Company.

9.8  Distribution of Net Cash Flow. (a) Amounts and Timing. Net Cash Flow shall be distributed to the Members in proportion to their respective shares of Profits allocated to each of them for such period (and prior periods) under Section 9.3, to the extent that such amounts have not been distributed previously under this Section 9.7. Such distributions shall be made within 90 days of the end of each Fiscal Year to those persons recognized on the books of the Company as Members or as Assignees on the last day of such Fiscal Year.

(b) Amounts Withheld.  All amounts withheld pursuant to the Code and Tax Regulations or any provision of any state or local tax law with respect to any payment, distribution, or allocation to the Company or the Members shall be treated as amounts distributed to the Members pursuant to this Section 9.7 for all purposes under this Agreement. The Members are authorized to withhold from distribution, or with respect to allocations, to the Members and to pay over to any federal, state, or local government any amounts required to be so withheld pursuant to the Code and Tax Regulations or any provision of any other federal, state, or local law, and shall allocate any such amounts to the Members with respect to which such amount was withheld.

(c) Draws for Members. The Company may pay to each Member a quarterly draw, to be unanimously determined by a Majority of the Members, and each such draw, if any, shall be treated as a loan from the Company to each Member receiving such draw and shall be deemed

22

repaid by reducing the amount of each subsequent distribution to the Member receiving such draw pursuant to this Section 9.7(c) by the lesser of (a) the entire amount otherwise distributable to the Member receiving such draw and (b) the entire amount of any unrepaid draws pursuant to this Section 9.7(c). All draws hereunder shall be made to the Members pro rata based on their estimated respective shares of Profits allocated to each of them for such Fiscal Year under this Article VIII. Any draw by any Member made pursuant to this Section 9.7(c) shall not result in any decrease in the Sharing Percentage of such Member.

## ARTICLE X
### TAXES

10.1    Tax Matters Partner.   The Managing Members shall be the Tax Matters Partner of the Company pursuant to Section 6231(a)(7) of the Code. Such Managing Member shall not resign as the Tax Matters Member unless, on the effective date of such resignation, the Company has designated another Member as Tax Matters Member and such Member has given its consent in writing to its appointment as Tax Matters Member. The Tax Matters Member shall receive no additional compensation from the Company for its services in that capacity, but all expenses incurred by the Tax Matters Member in such capacity shall be borne by the Company. The Tax Matters Member is authorized to employ such accountants, attorneys and agents as it, in its sole discretion, determines is necessary to or useful in the performance of its duties. In addition, such Member shall serve in a similar capacity with respect to any similar tax related or other election provided by state or local laws.

10.2 Mandatory Section 754 Election.   Upon a transfer by a Member of an interest in the Company, which transfer is permitted by the terms of this Agreement, or upon the death of a Member or the distribution of any Company Property to one or more Members, the Members, upon the request of one or more of the transferees or distributees, shall cause the Company to file an election on behalf of the Company, pursuant to Section 754 of the Code, to cause the basis of the Company's property to be adjusted for federal income tax purposes in the manner prescribed in Section 734 or Section 743 of the Code, as the case may be. The cost of preparing such election, and any additional accounting expenses of the Company occasioned by such election, shall be borne by such transferees or distributees.

## ARTICLE XI
### DISPOSITION OF MEMBERSHIP INTERESTS

11.1 Disposition. Except as set forth in this Article XI, no Member or Assignee may Transfer all or a portion of the Member's or Assignee's Membership Interest.

23

11.2 <u>Dispositions not in Compliance with this Article Void</u>. Except as expressly permitted or required by this Agreement, no Member or Assignee shall Transfer all or any portion of his Membership Interest in the Company or any rights therein without the consent of a Majority. Any Transfer or attempted Transfer by any Member or Assignee in violation of the preceding sentence shall be null and void and of no force or effect whatsoever.

11.3 <u>Restrictions on Transfers</u>. Each Member hereby acknowledges the reasonableness of the restrictions on Transfer imposed by this Agreement in view of the Company's purposes and the relationship of the Members. Accordingly, the restrictions on Transfer contained herein shall be specifically enforceable. Each Member hereby further agrees to hold the Company and each Member (and each Member's successors and assigns) wholly and completely harmless from any cost, liability, or damage (including, without limitation, liabilities for income taxes and costs of enforcing this indemnity) incurred by any of such indemnified Persons as a result of a Transfer or an attempted Transfer in violation of this Agreement.

11.4 <u>Permitted transfers</u>.

(a) <u>General</u>. A Member or Assignee shall have the right to Transfer all or any portion of his Membership Interest only by means of a Permitted Transfer.

(b) <u>Definition of Permitted Transfer; Permitted Transferees</u>.

(i) A "Permitted Transfer" is any Transfer by a Member or Assignee of all of that Member's Membership Interest to a Permitted Transferee provided that such Transfer otherwise complies with the conditions and restrictions of this Article XI.

(ii) A "Permitted Transferee" of a Member or Assignee is any Person who is (1 ) another Member of the Company, (2) any other Person approved as a Permitted Transferee by the consent of a Majority or (3) permitted to receive a Membership Interest pursuant to Sections 11.6, 11.7, 11.8 or 11.9 hereof.

c) <u>Conditions to Permitted Transfers.</u> A Transfer otherwise permitted as a Permitted Transfer under this Section shall not be a valid Transfer of a Membership Interest and shall be considered null and void unless and until the following conditions are satisfied:

(i) The transferor and transferee shall execute such documents and instruments of conveyance and assumption as may be necessary or appropriate in the opinion of counsel to the Company to effect such Transfer and to confirm the Permitted Transferee's agreement to be bound by the provisions of this Agreement and assumption of all monetary obligations of the transferor Member with

24

respect to the Membership Interest being transferred and the transferor Member's agreement to guarantee the prompt payment and performance of such assumed obligations.

(ii) The transferor and transferee shall furnish the Company with the transferee's taxpayer identification number, sufficient information to determine the transferee's initial tax basis in the Membership Interest Transferred, and any other information reasonably necessary to permit the Company to file all required Federal and state tax returns and other legally required information statements or returns. Without limiting the generality of the foregoing, the Company shall not be required to make any Distribution otherwise provided for in this Agreement with respect to any Transferred Membership Interest until it has received such information.

(iii) Except as otherwise specifically provided, a Member making a Permitted Transfer of all of his Membership Interest and the Permitted Transferee thereof shall pay all reasonable costs and expenses incurred by the Company in connection with such Transfer.

(iv) In the opinion of tax counsel to the Company, the transfer of the Membership Interest shall have no adverse tax consequences for the Company.

(d) <u>Admission of Permitted Transferee as a Member</u>. A Permitted Membership Interest can be transferred to a Member in the Company only upon the consent of a Majority. The rights of a Permitted Transferee who is not admitted as a Member shall be limited to the right to receive allocations and Distributions from the Company with respect to the Membership Interest Transferred, as provided by this Agreement. The transferee of such Membership Interest shall not be a Member with respect to such Membership interest, and, without limiting the foregoing, shall not have the right to inspect the Company's books, act for or bind the Company, or otherwise interfere in its operations.

(e) <u>Effect of Permitted Transfer on Company</u>. The Members intend that the Permitted Transfer of a Membership Interest in the Company shall not cause the dissolution of the Company under the Act; however, notwithstanding the occurrence of any such dissolution, the Members shall continue to hold the Company's assets and operate its business in Company form under this Agreement as if no such dissolution had occurred.

11.5 <u>Distribution Among Members</u>. If a Permitted Transfer of a Membership Interest occurs during any Fiscal Year, any Net Profits, Net Loss, and all other items attributable to such Membership Interest for such Fiscal Year shall be divided and allocated between the transferor and the transferee by taking into account their

varying interests during the Fiscal Year in accordance with Section 706(d) of the Code, using any conventions permitted by law and selected by the Company. All Distributions on or before the date of a Permitted Transfer shall be made to the transferor, and all Distributions thereafter shall be made to the transferee. Solely for purposes of making such allocations and Distributions, the Company shall recognize a Permitted Transfer not later than the end of the calendar month during which it is given notice stating the date such Membership Interest was Transferred and such other information as the Company may reasonably require. If a Transfer is not a Permitted Transfer then all of such items shall be allocated, and all Distributions shall be made, to the Person who, according to the books and records of the Company, on the last day of the Fiscal Year during which the Transfer occurs, was the owner of the Membership Interest. The Members and the Company shall incur no liability for making allocations and distributions in accordance with the provisions of this Section and this Agreement, whether or not the Members or the Company has any knowledge of any Transfer of ownership of any interest in the Company.

11.6 <u>Transfers Between Members</u>.   Except as specifically provided, the restrictions of Article XI shall not apply to a Transfer from one Member to another Member.

11.7 <u>Transfer to Descendants of Members</u>.   The restrictions of Article XI shall apply to a Transfer from a Member to his or her descendant, either during his or her life, or upon his or her death by Will, either directly or in a Trust for the descendant's benefit.

11.8 <u>Tag-Along/Drag-Along</u>.   If at any time any Member proposes to sell fifty (50%) percent or more of the Membership Interests of the Company to a bona fide purchaser in an arms-length transaction, for fair value, such Member shall provide each other Member with not less than twenty (20) days' prior written notice of such proposed sale, which notice shall include all of the terms and conditions of such proposed sale and which shall identify the purchaser.   In such notice, the offering Member shall indicate whether he/it elects to require each other Member to sell to the purchaser the same percentage (the "Percentage") of the Membership Interests then owned by each such other Member as the percentage of the total number of Membership Interests owned by such offering Member which are to be sold pursuant to the bona fide purchaser and, if such offering Member so elects, each such other Member shall sell the same Percentage of his/its Membership Interests to the purchaser at the same time as, and on the same terms and conditions at which, the offering Member sells the Membership Interests owned by him/it.

If the offering Member shall not elect to require each other Member to sell his/its Membership Interest pursuant to the preceding paragraph, each other Member shall have the option, exercisable by written notice to the offering Member within ten (10) days after the receipt of the offering Member's notice, to require the offering

Member to arrange for the bona fide purchaser to purchase the same Percentage of the Membership Interests then owned by each such other Member as well as the offering Member's Interests at the same time as, and upon the same terms and conditions at which, the offering Member sells his/its shares. If any such other Member shall make this election, the offering Member agrees that he/it shall either (a) arrange for the proposed purchaser to purchase the same Percentage of the Membership Interest then owned by each such other Member at the same time as, and upon the same terms and conditions at which, the offering Member sells hi/its Membership Interests, or (b) not effect the proposed sale to such purchaser.

11.9 <u>Purchase of Shares on Death of Member</u>.

(a) Upon the death of a Member, the Member's Estate shall be obligated to sell and the Company shall be obligated to purchase, at the price determined under Section 11.9(d), the Membership Interest of the deceased Member.

(b) The transfer of the deceased's Member's Membership Interest shall take place within 180 days following the appointment of the Estate's representative.

(c) The price determined hereunder shall be paid in twenty (20) semi-annual installments, bearing interest at the then Applicable Federal Rate.

(d) The purchase price of each percentage share of Membership Interest which is purchased pursuant to any of the provisions of this Agreement, except as otherwise hereinafter provided, shall be the value per interest of such Membership Interest which is determined by a mutually selected appraiser or, if the parties cannot agree on an appraiser, by an appraiser selected by an appraiser selected by each. If such appraisers cannot agree on a third appraiser, then the price shall be determined by the American Arbitration Association, under its commercial arbitration rules then in effect in Nassau County.

## ARTICLE XII
## DISSOCIATION OF A MEMBER

12.1 Dissociation. A person shall cease to be a Member upon the happening of any of the following events:

(a) the withdrawal or retirement of a Member;

(b) the bankruptcy of a Member;

(c) in the case of a Member who is a natural person, the death of the Member or the entry of an order by a court of competent jurisdiction adjudicating the Member incompetent to manage the Member's personal estate;

27

(d) in the case of a Member that is a trust or who is acting as a Member by virtue of being a trustee of a trust, the termination of the trust (but not merely the substitution of a new trustee);

(e) in the case of a Member that is a separate Organization other than a corporation, the dissolution and commencement of winding up of the separate Organization;

(f) in the case of a Member that is a corporation, the filing of a certificate of dissolution, or its equivalent, for the corporation or the revocation of its charter; or

(g) in the case of a Member that is an estate, the distribution by the fiduciary of the estate's entire interest in the company.

12.2    Rights of Dissociating Member.  In the event any Member dissociates prior to the expiration of the term of this Agreement, the Member shall be entitled to participate in the winding up of the Company to the same extent of any other Member.  The Company shall pay to the Member, beginning six months from the date of such Dissociation, an amount equal to the value of the Member's Membership Interest in the Company, to be paid over a period not to exceed five years together with interest at the Applicable Federal Rate necessary to avoid the imputation of interest under the Code. The payments shall be personally guaranteed by the remaining members. The value of the Member's Membership Interest shall include the amount of any Distributions to which the Member is entitled under the Agreement and the fair market value of the Member's Membership Interest as of the date of Dissociation as determined by a duly qualified appraiser selected by a majority of the Members, including the Dissociated member or his legal representative.  If said Members can not agree upon an appraiser, each Member shall select an appraiser and those appraisers shall select the appraiser who shall determine the fair market value of the Member's Membership Interest.

ARTICLE XIII
DISSOLUTION AND WINDING UP

13.1 Dissolution.  The Company shall be dissolved and its affairs wound up, upon the first to occur of any of the following events (each of which shall constitute a Dissolution Event):

(a)   the expiration of the term of the Agreement, unless the Company is continued with the consent of all of the Members;

(b) the unanimous written consent of all of the Members;

(c)   the Dissociation of any Member, unless at the time

28

of such Dissociation there are at least two remaining Members and the Company is continued with the consent of all of the remaining Members within 180 days after such Dissociation;

     (d) when there is but one Member.

   13.2   Effect of Dissolution. Upon dissolution, the Company shall not be terminated and shall continue until the winding up of the affairs of the Company is completed and a certificate of dissolution has been issued by the Secretary of State of New York.

   13.3  Distribution of Assets on Dissolution. Upon the winding up of the Company, the Members acting together or such Person(s) designated by the Members representing at least a majority of the Members' Sharing Ratios) shall take full account of the assets and liabilities of the Company, shall liquidate the assets (unless the Members determine that a distribution of any Company Property in-kind would be more advantageous to the Members than the sale thereof) as promptly as is consistent with obtaining the fair value thereof, and shall apply and distribute the proceeds therefrom in the following order:

     (a)   first, to the payment of the debts and liabilities of the Company to creditors, including Members who are creditors, to the extent permitted by law, in satisfaction of such debts and liabilities, and to the payment of necessary expenses of liquidation;

     (b)   second, to the setting up of any reserves which the Members may deem necessary or appropriate for any anticipated obligations or contingencies of the Company arising out of or in connection with the operation or business of the Company. Such reserves may be paid over by the Members to an escrow agent or trustee selected by the Members to be disbursed by such escrow agent or trustee in payment of any of the aforementioned obligations or contingencies and, if any balance remains at the expiration of such period as the Members shall deem advisable, shall be distributed by such escrow agent or trustee in the manner hereinafter provided;

     (c)   then, to the Members in accordance with positive Capital Account balances taking into account all Capital Account adjustments for the Company's taxable year in which the liquidation occurs. Liquidation proceeds shall be paid within 60 days of the end of the Company's taxable year in which the liquidation occurs. Such distributions shall be in cash or Property (which need not be distributed proportionately) or partly in both, as determined by the Members.

   If at the time of liquidation the Members shall determine that an immediate sale of some or all Company Property would cause undue loss to the Members, the Members may, in order to avoid such loss; defer liquidation.

13.4   Winding Up and Filing Articles of Dissolution. Upon the commencement of the winding up of the Company, articles of dissolution shall be delivered by the Company to the Secretary of State of New York for filing. The articles of dissolution shall set forth the information required by the Act. The winding up of the Company shall be completed when all debts, liabilities, and obligations of the Company have been paid and discharged or reasonably adequate provision therefor has been made, and all of the remaining Property of the Company has been distributed to the Members.

ARTICLE XIV
MISCELLANEOUS

14.1   Notices. Notices to the Company shall be sent to the Principal Office of the Company.   Notices to the Members shall be sent to their addresses set forth on Schedule A. Any Member may require notices to be sent to a different address by giving notice to the other Members in accordance with this Section 14.1. Any notice or other communication required or permitted hereunder shall be in writing, and shall be deemed to have been given with receipt confirmed if and when delivered personally, given by prepaid telegram or mailed first class, postage prepaid, delivered by courier, or sent by facsimile, to such Members at such address.

14.2   Headings. All Article and section headings in the Agreement are for convenience of reference only and are not intended to qualify the meaning of any Article or section.

14.3   Entire Agreement. This Agreement together with the schedules and appendices attached hereto constitutes the entire agreement between the parties and supersedes any prior agreement or understanding between them respecting the subject matter of this Agreement.

14.4 Binding Agreement. The Agreement shall be binding upon, and inure to the benefit of, the parties hereto, their successors, heirs, legatees, devisees, assigns, legal representatives, executors and administrators, except as otherwise provided herein.

14.5 Saving Clause. If any provision of this Agreement, or the application of such provision to any Person or circumstance, shall be held invalid, the remainder of this Agreement, or the application of such provision to Persons or circumstances other than those as to which it is held invalid, shall not be affected thereby. If the operation of any provision of this Agreement would contravene the provisions of the Act, such provision shall be void and ineffectual.

14.6   Counterparts. The Agreement may be executed in several counterparts, and all so executed shall constitute one agreement, binding on all the parties hereto, even though all parties are not signatory to the original or the same counterpart. Any counterpart

30

of either the Agreement shall for all purposes be deemed a fully executed instrument.

14.7   Governing Law. The Agreement shall be governed by and construed in accordance with the laws of the State of New York.

14.8   No Membership Intended for Nontax Purposes. The Members have formed the Company under the Act, and expressly do not intend hereby to form a partnership, either general or limited, under the New York Partnership Act. The Members do not intend to be partners one to another, or partners as to any third party. To the extent any Member, by word or action, represents to another person that any Member is a partner or that the Company is a partnership, the Member making such wrongful representation shall be liable to any other Members who incur personal liability by reason of such wrongful representation.

14.9   No Rights of Creditors and Third Parties under Agreement. The Agreement is entered into among the Company and the Members for the exclusive benefit of the Company, its Members, and their successors and assignees. The Agreement is expressly not intended for the benefit of any creditor of the Company or any other person. Except and only to the extant provided by applicable statute, no such creditor or any third party shall have any rights under the Agreement or any agreement between the Company and any Member with respect to any Capital Contribution or otherwise.

14.10   General Interpretive Principles. For purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

(a)   the terms defined in this Agreement include the plural as well as the singular, and the use of any gender herein shall be deemed to include the other gender;

(b)   accounting terms not otherwise defined herein have the meanings given to them in the United States in accordance with generally accepted accounting principles;

(c)   references herein to "Sections", "paragraphs", and other subdivisions without reference to a document are to designated Sections, paragraphs and other subdivisions of this

agreement;

(d)  a reference to a paragraph without further reference to a Section is a reference to such paragraph as contained in the same Section in which the reference appears, and this rule shall also apply to other subdivisions;

(e)  the words "herein", "hereof, "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular provision; and

(f)  the term "include" or "including" shall mean without limitation by reason of enumeration.


IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals as of the Effective Date.

COOPER SQUARE VENTURES, LLC

By: _____
David Gitman, Managing Member

By: _____
Michael Dardashtian, Managing Member


NDA HOLDING LLC
By: BRWY LLC, its sole member

By: _____


AS TO PARAGRAPH 6.5 ONLY:

_____
David Gitman

_____
Michael Dardashtian


TAX MATTER PARTNER:

By: _____

\\Server1\documents\00008674.000.WPD

32

SCHEDULE A

| Name and Address of Member | Description of Value Of Initial Capital Contribution | No. Of Units Membership Interest and Sharing Ratio |
|---|---|---|
| Cooper Square Ventures, LLC | 4900 | 49 units/49.0% |
| NDA Holding LLC | 51 units/51.0% | 5100 |

\\Server1\documents\00008674.000.WPD

# EXHIBIT B

N. Y. S. DEPARTMENT OF STATE
DIVISION OF CORPORATIONS AND STATE RECORDS                ALBANY, NY 12231-0001

FILING RECEIPT
================================================================================
ENTITY NAME: NDAP, LLC

DOCUMENT TYPE: ARTICLES OF ORGANIZATION (DOM LLC)              COUNTY: NASS

================================================================================
FILED:08/24/2011 DURATION:********  CASH#:110824000774 FILM #:110824000713

         FILER:                                          EXIST DATE
         ------                                          ----------
         BLUMBERGEXCELSIOR CORPORATE                     08/24/2011
         SERVICES INC.
         52 SOUTH PEARL STREET 2ND FL.
         ALBANY, NY 12207

         ADDRESS FOR PROCESS:
         --------------------
         THE LLC
         106-16 JAMAICA AVE
         RICHMOND HILL, NY 11418

         REGISTERED AGENT:
         -----------------



================================================================================
SERVICE COMPANY: BLUMBERG/EXCELSIOR CORPORATE SERVICES     SERVICE CODE: 39 *

    FEES        235.00
                --------              PAYMENTS       235.00
    FILING      200.00                               --------
    TAX           0.00              CASH              0.00
    CERT          0.00              CHECK             0.00
    COPIES       10.00              CHARGE            0.00
    HANDLING     25.00              DRAWDOWN        235.00
                                    OPAL              0.00
                                    REFUND            0.00
================================================================================
                                             DOS-1025 (04/2007)

ARTICLES OF ORGANIZATION

OF

NDAP, LLC

Under Section 203 of the Limited Liability Company Law of the State of New York

THE UNDERSIGNED, being a natural person of at least eighteen (18) years of age and acting as the organizer of the limited liability company (the "Company") hereby being formed under Section 203 of the Limited Liability Company Law of the State of New York (the "LLCL"), certifies that:

FIRST:        The name of the Company is:

NDAP, LLC

SECOND:    The county within the State of New York in which the principal office of the Company is to be located is NASSAU.

THIRD:        The Secretary of State is designated as the agent of the Company upon whom process against the Company may be served. The post office address within or without the State of New York to which the Secretary of State shall mail a copy of any process against the Company served upon such Secretary of State is THE LLC, 106-16 JAMAICA AVE., RICHMOND HILL, NY 11418.

IN WITNESS WHEREOF, I have subscribed these Articles of Organization and do hereby affirm the foregoing as true under penalties of perjury, this 08/24/11

_Sharon Babala_

Sharon Babala
*Sole Organizer*
c/o Blumberg*Excelsior* Corporate Services
52 South Pearl Street, 2nd Floor
Albany, NY  12207

# ARTICLES OF ORGANIZATION

## OF

## NDAP, LLC

Under Section 203 of the Limited Liability Company Law of the State of New York

# BLU-39
# DRAWDOWN

**FILED BY:**

BLUMBERGEXCELSIOR CORPORATE SERVICES INC.
52 SOUTH PEARL STREET, 2ND FLR
ALBANY, NY  12207

**Exhibit 5** A

 DEPARTMENT OF THE TREASURY
INTERNAL REVENUE SERVICE
CINCINNATI  OH   45999-0023

Date of this notice:  08-25-2011

Employer Identification Number:
XXXXXXX597

Form:  SS-4

Number of this notice:  CP 575 A

NDAP
MICHAEL DARDASHTIAN MBR
10616 JAMAICA AVE
RICHMOND HILL, NY  11418

For assistance you may call us at:
1-800-829-4933

IF YOU WRITE, ATTACH THE
STUB AT THE END OF THIS NOTICE.

WE ASSIGNED YOU AN EMPLOYER IDENTIFICATION NUMBER

Thank you for applying for an Employer Identification Number (EIN).  We assigned you
EIN 45-3082597.  This EIN will identify you, your business accounts, tax returns, and
documents, even if you have no employees.  Please keep this notice in your permanent
records.

When filing tax documents, payments, and related correspondence, it is very important
that you use your EIN and complete name and address exactly as shown above.  Any variation
may cause a delay in processing, result in incorrect information in your account, or even
cause you to be assigned more than one EIN.  If the information is not correct as shown
above, please make the correction using the attached tear off stub and return it to us.

Based on the information received from you or your representative, you must file
the following form(s) by the date(s) shown.

                    Form 941                01/31/2012
                    Form 940                01/31/2012
                    Form 1065               04/15/2012

If you have questions about the form(s) or the due date(s) shown, you can call us at
the phone number or write to us at the address shown at the top of this notice.  If you
need help in determining your annual accounting period (tax year), see Publication 538,
*Accounting Periods and Methods*.

We assigned you a tax classification based on information obtained from you or your
representative.  It is not a legal determination of your tax classification, and is not
binding on the IRS.  If you want a legal determination of your tax classification, you may
request a private letter ruling from the IRS under the guidelines in Revenue Procedure
2004-1, 2004-1 I.R.B. 1 (or superseding Revenue Procedure for the year at issue).  Note:
Certain tax classification elections can be requested by filing Form 8832, *Entity
Classification Election*.  See Form 8832 and its instructions for additional information.

A limited liability company (LLC) may file Form 8832, *Entity Classification
Election*, and elect to be classified as an association taxable as a corporation.  If
the LLC is eligible to be treated as a corporation that meets certain tests and it
will be electing S corporation status, it must timely file Form 2553, *Election by a
Small Business Corporation*.  The LLC will be treated as a corporation as of the
effective date of the S corporation election and does not need to file Form 8832.



(IRS USE ONLY)      575A            08-25-2011  NDAP  B  9999999999  SS-4

 

 

 

    If you are required to deposit for employment taxes (Forms 941, 943, 940, 944, 945,
CT-1, or 1042), excise taxes (Form 720), or income taxes (Form 1120), you will receive a
Welcome Package shortly, which includes instructions for making your deposits
electronically through the Electronic Federal Tax Payment System (EFTPS).  A Personal
Identification Number (PIN) for EFTPS will also be sent to you under separate cover.
Please activate the PIN once you receive it, even if you have requested the services of a
tax professional or representative.  For more information about EFTPS, refer to
Publication 966, *Electronic Choices to Pay All Your Federal Taxes*.  If you need to
make a deposit immediately, you will need to make arrangements with your Financial
Institution to complete a wire transfer.

    The IRS is committed to helping all taxpayers comply with their tax filing
obligations.  If you need help completing your returns or meeting your tax obligations,
Authorized e-file Providers, such as Reporting Agents (payroll service providers) are
available to assist you.  Visit the IRS Web site at www.irs.gov for a list of companies
that offer IRS e-file for business products and services.  The list provides addresses,
telephone numbers, and links to their Web sites.

    To obtain tax forms and publications, including those referenced in this notice,
visit our Web site at www.irs.gov.  If you do not have access to the Internet, call
1-800-829-3676 (TTY/TDD 1-800-829-4059) or visit your local IRS office.

IMPORTANT REMINDERS:

    *  Keep a copy of this notice in your permanent records.  This notice is issued only
       one time and the IRS will not be able to generate a duplicate copy for you.

    *  Use this EIN and your name exactly as they appear at the top of this notice on all
       your federal tax forms.

    *  Refer to this EIN on your tax-related correspondence and documents.

    If you have questions about your EIN, you can call us at the phone number or write to
us at the address shown at the top of this notice.  If you write, please tear off the stub
at the bottom of this notice and send it along with your letter.  If you do not need to
write us, do not complete and return the stub.  Thank you for your cooperation.

 

                    Keep this part for your records.        CP 575 A (Rev. 7-2007)

-------------------------------------------------------------------------------

    Return this part with any correspondence
    so we may identify your account.  Please                        CP 575 A
    correct any errors in your name or address.
                                                              9999999999

    Your Telephone Number  Best Time to Call   DATE OF THIS NOTICE:  08-25-2011
    (    )    -                                 EMPLOYER IDENTIFICATION NUMBER:  ░░░░░597
    _____   _____        FORM:  SS-4              NOBOD

 

INTERNAL REVENUE SERVICE                        NDAP
CINCINNATI  OH   45999-0023                     MICHAEL DARDASHTIAN MBR
|..|..|..|..|..|..|..|..|..|..|..|..|..|..|     10616 JAMAICA AVE
                                                RICHMOND HILL, NY  11418



# EXHIBIT B

Oct-14-2011 07:57 AM BANK OF AMERICA - Greatneck 516-498-3116          47/56

# Bank of America

*ade DAVID*

**BANK OF AMERICA, N.A. (THE "BANK")**

**Limited Liability Company Signature Card**

| | |
|---|---|
| Account Number | 4830 3825 7345 |
| Account Type | BUSINESS ECONOMY CHECKING |
| Account Title | COOPER SQUARE VENTURES, LLC |

☐ Temporary Signature Card

Name of Company    COOPER SQUARE VENTURES, LLC

Tax Identification Number ▮▮▮▮587

For a Limited liability Company enter the tax classification (D = disregarded entity, C = corporation, or P = partnership)
on this line.    *C*

☐ Exempt payee

By signing below, the above named Association agrees that this account is and shall be governed by the terms and conditions set forth in the following documents, as amended from time to time: (1) the Deposit Agreement and Disclosures, (2) the Business Schedule of Fees, and (3) the Miscellaneous Fees for Business Accounts, and the Association further acknowledges the receipt of these documents.

**Substitute Form W-9, Certification-Under penalties of perjury, I certify that:** (1) The number shown on this form is the correct taxpayer identification number (or I am waiting for a number to be issued to me), and (2) I am not subject to backup withholding because: (A) I am exempt from backup withholding, or (B) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (C) The IRS has notified me that I am no longer subject to backup withholding, and (3) I am a U.S. citizen or other U.S. person (as defined in the instructions).
**Certification Instructions**
You must cross out item (2) above if you have been notified by the IRS that you are currently subject to backup withholding because of underreporting interest or dividends on your tax return. (See also IRS instructions for Form W-9).

> The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding.

| Name (typed or printed) | Signature | Date |
|---|---|---|
| 1. MICHAEL DARDASTIAN | | 10/13/11 |
| 2. DAVID GITMAN | | 10/13/11 |
| 3. | | |
| 4. | | |
| 5. | | |

I, the undersigned, hereby certify (1) that I am a duly authorized member/manager of the Company named above, (2) that the above named person(s) are there persons currently empowered to act under the Company resolutions authorizing this account and the other banking services provided therein, (3) that the specimen signature set forth opposite the name of each person is true and genuine, and (4) the Substitute Form W-9 certifications.

This  13  day of  OCTOBER  2011

DAVID GITMAN
NY DL ▮▮▮▮▮
I - 9/6/11 E - 11/23/11

NISHAD DARDASTIAN
NY DL ▮▮▮▮▮
I - 9/13/16 E - 11/6/19

**ATM/Deposit/Check Card Request**

Provided that the account referenced above is eligible to receive automated teller machine cards and/or Check Cards, I (as authorized by the resolutions which authorizes this account) hereby request the issuance of such cards to any of the authorized signers on this account.

BOA VISA DEBIT 4035
EXP 09/15

ARLEN DAVIS
GITMAN

Member/Manager                                          Member/Manager

**Bank Information**

| | |
|---|---|
| Date | 10/13/2011 |
| Banking Center Name | GREATNECK |
| Associate's Name | GLORIA NARDONE |
| Associate's Phone Number | 516-482-1033 |

95-14-7011M 06-2009
NNY



# EXHIBIT C

ChannelReply is a Software as a Service solution created to facilitate the messaging of eBay and Amazon store owners communications with their customers.

Worldwide retailers pay a monthly subscription fee to ChannelReply in order to connect their eBay and Amazon store messages with a customer service software solution.  Once connected ChannelReply's API passes messages from customers contacting store owners via eBay and Amazon accounts to large customer service management software solutions.  This allows for free flowing communication between store owners and customers.

By depleting the bank account, which operates ChannelReply, David Gitman has put our company at risk of operating.  If auto debits continue to bounce, the servers that run ChannelReply will be turned off.  ChannelReply's API will no longer function and ChannelReply's customers will no longer be able to communicate with their own customers reaching out to them via eBay and Amazon.

The more than two hundred companies we service process thousands of customer service messages daily through ChannelReply's servers.

# EXHIBIT D

6/1/2017                                    ndap Mail - SaaS Builders | AngelList



Mike Dash <mdash@ndap-llc.com>

## SaaS Builders | AngelList

David Gitman <dgitman@ndap-llc.com>                        Mon, Oct 19, 2015 at 4:34 PM
To: Michael Dash <mdash@ndap-llc.com>

Here's what I sent him.

Cooper Square Ventures creates, operates and acquires eCommerce websites. Our current portfolio of properties was (re)built using modern technologies to bring antiquated merchandising online.

In the past 5 years, our eCommerce platform has evolved from serving omni-channel consumers (B2C) to serving multi-channel consumers (B2C) and businesses (B2B). During this organic transformation, we built a suite of internal tools to enhance eCommerce Product Information Management, Customer Relationship Management, Pricing Strategies and more. We realized these tools were not only valuable to us, but to other eCommerce merchants.

We are therefore now pivoting into SaaS eCommerce (pronounced / sassy-commerce) to transform our internal e-commerce tools into a platform to drive success for any eCommerce merchant.  (not sure this is worded right?)

The first product we've launched is ChannelReply. It's a multi-channel eCommerce messaging solution. It connects help desks with marketplaces. For example, eBay and Amazon sellers can perform their customer service with the power of ZenDesk.

We are actively developing new features, adding help desks and supporting additional marketplaces with ChannelReply. We're now also planning to release additional eCommerce tools.

David Gitman
ndap
Tel: (646) 553-5917
dgitman@ndap-llc.com | http://www.ndap-llc.com

## Exhibit 6

# COOPER SQUARE VENTURES, LLC

### ChannelReply Beta Test Agreement

This Beta Test Agreement ("Agreement") governs the disclosure of information by Cooper Square Ventures, LLC. ("Company") to ~~████████~~ LLC (the "Recipient") and Recipient's use of Company's beta service offering for ChannelReply ("Service").

1.  Subject to the terms and conditions of this Agreement, Company grants Recipient a nonexclusive, nontransferable license to use the Company Service for a period designated by the Company for the purpose of testing and evaluating the Service.

2.  Beta Functionality Performance - This offering is new.   As a beta subscriber you may experience some issues with performance or functionality.  ChannelReply will make its best efforts to resolve these issues in a timely manner. However, there is no guarantee that all issues will be resolved, nor does the typical performance SLA for the ChannelReply platform apply to this functionality.  Please note, there will be no financial credits (or other compensation) issued should this beta not meet your expectations in terms of performance, functionality or otherwise.

3.  Feedback - You agree to provide regular, timely and confidential feedback on the performance of the beta feature to ChannelReply, at Company's request, so that ChannelReply can make further improvements to the software.

4.  Confidentiality - You agree to keep any information regarding the Beta functionality and your participation in the beta confidential (please see confidentiality clause in terms and conditions).

5.  Support - Support for this feature will be available through ChannelReply's typical support channels (support@ChannelReply.com) while the offering is in beta.

6.  Post-beta Publicity - If you wish to continue using the functionality upon completion of the beta period, you agree to participate in a case study and/or survey and provide a quote for a press release.

7.  Fee/Billing – A non-refundable initial install fee shall be billed to you prior to installation in the amount of $500.  Pricing for eBay ChannelReply support shall be $99 per month, billed on the first day of each month.  Pricing for Amazon ChannelReply support shall be an additional $99 per month, billed on the first day of each month.  Pricing for combined eBay and Amazon ChannelReply support shall be $149 per month, billed on the first day of each month. If payment is not received by the 7th day of the month, service shall be suspended. These prices are subject to change at the Company's sole discretion at any time. Recipient shall be granted at least two weeks advanced notice.



1010 Northern Blvd, Ste 208  ❧  Great Neck, 11021  ❧  (646) 553-5920  ❧  info@coopersquare.ventures

# COOPER SQUARE VENTURES, LLC

8.  Participation – You agree that you are able and willing to dedicate the time necessary to cooperate with us so that we may maximize the beta functionality.  This may at times require Recipient to grant Company complete access to one or more of Recipient's accounts, including but not limited to eBay, Amazon, ZenDesk and any other account used in conjunction with ChannelReply for the purpose of Company performing configuration, maintenance and troubleshooting.

9.  Time Frame: The Company's Service shall be provided on a month-to-month basis.  Should the subscriber seek to cancel or suspend service for any reason, a notice must be sent to Support@ChannelReply.com 30 days in advance or Recipient will be billed for the following month. The Company reserves the right to cancel or suspend Recipient's use and access to Service at any time for any reason with or without cause.

## ADDITIONAL TERMS AND CONDITIONS

## (INCORPORATED HEREIN AS PART & PARCEL OF THIS AGREEMENT)

10.  The Recipient agrees that it at all times will hold in strict confidence and not disclose Confidential Information (as defined below) to any third party except as approved in writing by the Company and will use the Confidential Information for no purpose other than evaluating the Service. The Recipient shall only permit access to Confidential Information to those of its employees having a need to know and who have signed confidentiality agreements or are otherwise bound by confidentiality obligations at least as restrictive as those contained herein. "Confidential Information" means all non-public materials and information provided or made available by Company to Recipient, including products and services, information regarding technology, know-how, processes, software programs, research, development, financial information and information regarding third parties.

11.  After Recipient's evaluation of the Service is complete, or upon request of the Company, the Recipient shall promptly return to the Company all documents, notes and other tangible materials and return or certify the destruction of all electronic documents, notes, software, data, and other materials in electronic form representing the Confidential Information and all copies thereof.

12.  The Recipient agrees that nothing contained in this Agreement shall be construed as granting any ownership rights to any Confidential Information disclosed pursuant to this Agreement, or to any invention or any patent, copyright, trademark, or other intellectual property right.  The Recipient shall not make, have made, use or sell for any purpose any product or other item using, incorporating or derived from any Confidential Information or the Service.  The Recipient will not modify, reverse engineer, decompile, create other works from, or disassemble any software programs contained in the Confidential Information or the Service.

# COOPER SQUARE VENTURES, LLC

13.    This Service is a beta release offering and is not at the level of performance of a commercially available product offering.  The Service may not operate correctly and may be substantially modified prior to first commercial release, or at Company's option may not be released commercially in the future.  THE SERVICE AND DOCUMENTATION ARE PROVIDED "AS IS" WITHOUT WARRANTY OF ANY KIND, AND COMPANY AND ITS LICENSORS DISCLAIM ALL WARRANTIES, EXPRESS, IMPLIED, OR STATUTORY, INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTIES OF TITLE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS, MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE.  NO ORAL OR WRITTEN ADVICE OR CONSULTATION GIVEN BY COMPANY, ITS AGENTS OR EMPLOYEES WILL IN ANY WAY GIVE RISE TO A WARRANTY.  THE ENTIRE RISK ARISING OUT OF THE USE OR PERFORMANCE OF THE SERVICE REMAINS WITH RECIPIENT.

14.    COMPANY AND ITS LICENSORS SHALL NOT BE LIABLE FOR LOSS OF USE, LOST PROFIT, COST OF COVER, LOSS OF DATA, BUSINESS INTERRUPTION, OR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, PUNITIVE, SPECIAL, OR EXEMPLARY DAMAGES ARISING OUT OF OR RELATED TO THE SERVICE OR THIS AGREEMENT, HOWEVER CAUSED AND REGARDLESS OF THE FORM OF ACTION, WHETHER IN CONTRACT, TORT (INCLUDING NEGLIGENCE) STRICT LIABILITY, OR OTHERWISE, EVEN IF SUCH PARTIES HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.  IN NO EVENT WILL COMPANY'S AGGREGATE CUMULATIVE LIABILITY FOR ANY CLAIMS ARISING OUT OF OR RELATED TO THIS AGREEMENT EXCEED $50.00 OR THE AMOUNT RECIPIENT ACTUALLY PAID COMPANY UNDER THIS AGREEMENT (IF ANY).

15.    The Recipient's obligations under this Agreement shall survive any termination of this agreement. This Agreement shall be governed by and construed in accordance with the laws of New York. The Recipient hereby agrees that breach of this Agreement will cause Company irreparable damage for which recovery of damages would be inadequate, and that the Company shall therefore be entitled to obtain timely injunctive relief under this Agreement, as well as such further relief as may be granted by a court of competent jurisdiction.  The Recipient will not assign or transfer any rights or obligations under this Agreement without the prior written consent of the Company.

# COOPER SQUARE VENTURES, LLC

Agreed to and Accepted on and by:

Signature: ~~████████~~                    Date: 9/3/14

Name: ~~████████████~~                    Title: Owner



**Exhibit 7**

5/29/2017                                    ndap Mail - Tactical Fallout just paid for your invoice CR-1000703



Mike Dash <mdash@ndap-llc.com>

## Tactical Fallout just paid for your invoice CR-1000703

**'service@paypal.com' via Partners <partners@ndap-llc.com>**                    Thu, Sep 4, 2014 at 2:57 PM
Reply-To: "service@paypal.com" <service@paypal.com>
To: "Cooper Square Ventures, LLC" <paypal@coopersquareventures.com>

PayPal

Transaction ID: 2GH26806A69238132

## You received a payment

Dear Cooper Square Ventures, LLC,

Thanks for using PayPal. To see all the transaction details, log in to your PayPal account.

See your invoice

It may take a few moments for this transaction to appear in your account.

**Customer**                                          **Note from customer**
                                   None

**Shipping address** – confirmed

United States

| Description | Unit price | Qty | Amount |
|---|---|---|---|
| Channel Reply Install | $500.00 | 1 | $500.00 |

|  | | |
|---|---|---|
| Subtotal | $500.00 |
| Shipping and handling | $0.00 |
| **Total** | $500.00 USD |

Invoice ID CR-1000703

Sincerely,
PayPal

Help Center | Resolution Center | Security Center

5/29/2017                              ndap Mail - Tactical Fallout just paid for your invoice CR-1000703

This email was sent by an automated system, so if you reply, nobody will see it. To get in touch with us, log in to your account and click "Contact Us" at the bottom of any page.

Copyright © 2014 PayPal, Inc. All rights reserved. PayPal is located at 2211 N. First St., San Jose, CA 95131.

PayPal Email ID PP1560 – ac9c8f3a9b581

# EXHIBIT B

6/5/2017                                    ndap Mail – Welcoming Konstantyn Bagaiev



Mike Dash <mdash@ndap-llc.com>

## Welcoming Konstantyn Bagaiev

**David Gitman** <david@coopersquare.ventures>          Tue, Oct 21, 2014 at 9:53 AM
To: "team@ndap-llc.com" <team@ndap-llc.com>

Good Morning,

I'd like to welcome Konstantyn Bagaiev to the team full time. Some of you may know Konstantyn already as "Agent K". He has been working with us for 2 years on ChannelReply (Zendesk eBay intergration). K will continue to develop ChannelReply and help us grow and optimize our catalogs.

Please join me in welcoming Konstantyn to the ndap t.

**David Gitman**
**Cooper Square Ventures**
Tel: (646) 553-5917
david@coopersquare.ventures I http://coopersquare.ventures

# EXHIBIT C

6/5/2017                        ndap Mail - Payee Added in Online Business Suite



Mike Dash <mdash@ndap-llc.com>

## Payee Added in Online Business Suite

transfers@mail.sbinvoicesandpayments.bankofamerica.com                Fri, Nov 14, 2014 at
<transfers@mail.sbinvoicesandpayments.bankofamerica.com>                       12:14 PM
To: partners@ndap-llc.com

> To: NDAP, LLC
> Payee: Konstantyn Bagaiev
> Date Added: November 14, 2014
>
> This payee has been added to your list of payees in Online Business Suite Direct Payments.
>
> At Bank of America we care about your security, so for your protection we are notifying you of this activity.
>
> If you did not intend to add this payee, please contact us immediately at 866.758.5972.
>
>
>
> --------------------------------------------------------------------------------
>
> Email Preferences
>
> This is a service email from Bank of America. Please note that you may receive service email in accordance with your
> Bank of America service agreements, whether or not you elect to receive promotional email.
>
> --------------------------------------------------------------
> --------------------------------------------------------------
>
>
> Contact us about this email
>
> Please do not reply to this email with sensitive information, such as an account number, PIN, password, or Online ID. The
> security and confidentiality of your personal information is important to us. If you have any questions, please either call the
> phone number on your account statement or go to the Contact Us page below, so we can properly verify your identity:
> http://www.bankofamerica.com/contact/
>
> Privacy and Security
>
> Keeping your financial information secure is one of our most important responsibilities. For an explanation of how we
> manage customer information, please read our Privacy Policy:
> http://www.bankofamerica.com/privacy
>
> You can also learn how Bank of America keeps your personal information secure and how you can help protect yourself:
> http://www.bankofamerica.com/privacy/index.cfm?template=privacysecur_prevent_fraud
>
> Bank of America Email, 8th Floor, 101 South Tryon St.,
> Charlotte, NC 28255-0001
>
> Bank of America, N.A. Member FDIC. Equal Housing Lender:
> http://www.bankofamerica.com/help/equalhousing.cfm
>
> (C) 2014 Bank of America Corporation. All rights reserved.
>
> This e-mail was sent to: (partners@ndap-llc.com).

# EXHIBIT D

**NDAP, LLC**
**1010 Northern Blvd, Suite 208**
**Great Neck, NY 11021**
**USA**

Dated as of January 1st, 2016

Dear Mr. Bagaev:

When signed by each of the parties hereto, this letter sets forth the entire agreement between NDAP, LLC., a New York Limited Liability Company (the "Company") and Konstantyn Bagaev Registration Number: ~~2436~~ (the "Contractor"), with respect to the engagement of Contractor as an independent contractor by the Company on the following terms and conditions:

    1. <u>Acknowledgment</u>. Contractor understands and acknowledges that:

    (a) The Company is engaged in a continuous program of research, design, development, production, publishing, marketing and servicing with respect to its business and as part of Contractor's engagement by the Company, Contractor is (or may be) expected to make new contributions and inventions of value to the Company.

    (b) The Company's engagement of Contractor creates a relationship of confidence and trust between Contractor and the Company with respect to certain information applicable to the business of the Company or the business of any client, customer, or business partner of the Company, which may be made known to Contractor by the Company or by any client, customer, or business partner of the Company, or learned by Contractor during the period of Contractor's engagement.

    (c) The Company possesses and will continue to possess information that has been created, discovered or developed by, or otherwise become known to, the Company (including, without limitation, information created, discovered, developed or made known by Contractor during the period of or arising out of Contractor's engagement by the Company, whether before or after the date hereof) or in which property rights have been or may be assigned or otherwise conveyed to the Company, which information has commercial value in the business in which the Company is engaged and is treated by the Company as confidential.

    (d) As used herein, the period of Contractor's engagement includes any time during which Contractor shall perform any services for or on behalf of the Company, in any capacity, including as an employee.

    2. <u>Engagement</u>. All work performed by Contractor shall be documented in a Work Order signed by authorized representatives of both parties and affixed hereto as Exhibit A. Each Work Order shall set forth, at a minimum, the work to be done, the duration of the assignment, and the fees for the work to be performed.

3. <u>Commitment to Company</u>.   During the period of Contractor's engagement by the Company, Contractor will devote that portion of Contractor's business time, energy and attention to the business and affairs of the Company subject to the Work Order included as Attachment A herein.

4. <u>Term of Engagement</u>.  As per Work Order included as Attachment A. Termination of this Agreement shall not affect the obligations of Contractor under Sections 5(d), 6, 7 and 8 hereof.  Notwithstanding the terms of the Work Order, Company reserves the right to terminate its engagement of Contractor at any time for any reason, including but not limited to, if Company finds Contractor's work to be unsatisfactory or if there is a breakdown in communication between Company and Contractor . In the event that Company exercises its right to terminate Contractor at will, Company shall only be responsible for compensating Contractor for the fair market value of work already performed and shall have no obligation to compensate Contractor for future works not yet performed, whether such works are anticipated by a signed Work Order or not.   Notwithstanding the foregoing, Contractor shall have no right to terminate premature of completing a signed Work Order. Any such refusal to complete work on a signed Work Order will be deemed a breach of this agreement and result in harm to the Company, entitling the Company to seek damages and injunctive or other equitable relief as described in Section 10, Remedies, below.

5. <u>Declaration</u>.

(a)  Contractor acknowledges and agrees that Contractor is acting as an independent contractor in the performance of the services hereunder, and nothing herein contained shall be deemed to create an agency and/or an employer/employee relationship between Contractor and the Company.   As an independent contractor, Contractor shall determine the times and locations at which his services are performed, subject to the timetable for the completion of specified tasks as the Company and Contractor shall agree.  Contractor shall bear all costs associated with the performance of his services (with the exception of travel costs associated with work with NDAP, LLC, so long as such travel costs are pre-approved by an authorized representative of NDAP, LLC).

(b)  Contractor shall in no event be entitled to participate in, or receive any benefits from, any of the Company's benefit or welfare plans, specifically including, but not limited to, coverage under the Company's workers' compensation program.  The Company shall have no obligation whatsoever to compensate Contractor on account of any damages or injuries which Contractor may sustain as a result or in the course of performance of Contractor's services hereunder.

(c)  Contractor shall be solely responsible for the payment of all Federal and State income taxes, social security taxes, Federal and State unemployment and similar taxes and all other assessments, taxes, contributions or sums payable, with the exception of applicable sales tax, with respect to Contractor as a result of or in connection

with the services performed by Contractor hereunder and Contractor shall file all returns and reports with respect to any of the foregoing.

      (d)    Contractor shall defend, indemnify and hold harmless the Company and its affiliates and their officers, directors, employees, agents, successors and permitted assigns from and against all losses, damages, liabilities, deficiencies, actions, judgments, interest, awards, penalties, fines, costs or expenses of whatever kind (including reasonable attorneys' fees) arising out of or resulting from (a) bodily injury, death of any person or damage to real or tangible, personal property resulting from Contractor's acts or omissions; and (b) Contractor's breach of any representation, warranty or obligation under this Agreement. The Company may satisfy such indemnity (in whole or in part) by way of deduction from any payment due to Contractor.   The provisions of this paragraph shall survive the expiration or earlier termination of this agreement

      6. <u>Works Made for Hire</u>.  Contractor acknowledges that all right, title and interest in all works of authorship, designs, computer programs, copyrights and copyright applications, inventions, discoveries, developments, original content production or programming, know-how, systems, processes, formulae, patent and patent applications, trade secrets, new products, internal reports and memoranda, strategies, and marketing plans conceived, devised, developed, written, reduced to practice, or otherwise created or obtained by Contractor in connection with Contractor's engagement by the Company (the "Intellectual Property") shall be regarded as "works made for hire" with Company as the sole author and owner thereof including, without limitation, as works specially ordered or commissioned for use as part of an audiovisual work.  Company will own all right, title and interest in the Intellectual Property with the full and unrestricted right to exploit same in any manner or media now known or hereafter devised and without any additional compensation to Contractor. To the extent that any such Intellectual Property is for any reason not deemed to be works made for hire, Contractor hereby transfers and assigns to the Company all right, title and interest in and to the Intellectual Property from the inception of creation thereof.  Promptly after Contractor creates or obtains knowledge of any Intellectual Property, Contractor will disclose it to the Company.  Upon request of the Company, Contractor will execute and deliver all documents or instruments and take all other action as the Company may deem reasonably necessary to transfer all right, title, and interest in any Intellectual Property to the Company; to vest in the Company good, valid and marketable title to such Intellectual Property; to perfect, by registration or otherwise, trademark, copyright and patent protection of the Company with respect to such Intellectual Property; and otherwise to protect the Company's trade secrets and proprietary interest in such Intellectual Property.  In the event Contractor does not sign any such document or instrument within five (5) days of a request thereof, Company shall have the right to execute such document or instrument in Contractor's name and take any other action in order to vest in Company all rights hereunder and Contractor appoints Company as Contractor's attorney in fact to do so, which power of attorney is irrevocable and coupled with an interest.

7. <u>Documentation</u>.   In the event of the termination of Contractor's engagement for any reason, Contractor will deliver to the Company all documents, notes, drawings, blueprints, formulae, specifications, computer programs, data and other materials of any nature pertaining to any Intellectual Property or to Contractor's work with the Company, and will not take any of the foregoing or any reproduction of any of the foregoing that is embodied in a tangible medium of expression.

8. <u>Confidentiality</u>.   At all times, both during Contractor's engagement by the Company and after its termination, Contractor will keep in strict confidence and will not disclose any confidential or proprietary information relating to the business of the Company, or any client, customer, or business partner of the Company, to any person or entity, or make use of any such confidential or proprietary information for Contractor's own purposes or for the benefit of any person or entity, except as may be necessary in the ordinary course of performing Contractor's duties for the Company.

9. <u>Other Agreements</u>.   Contractor represents and warrants that Contractor's execution and delivery of this Agreement and the performance of all the terms of this Agreement do not and will not breach any agreement to keep in confidence proprietary information acquired by Contractor in confidence or trust.   Contractor has not entered into and shall not enter into any agreement, either written or oral, in conflict with this Agreement.   Contractor represents that Contractor has not brought and will not bring with Contractor to the Company or use at the Company any materials or documents of an employer or a former employer that are not generally available to the public, unless express written authorization from such employer for their possession and use has been obtained.   Contractor also understands that Contractor is not to breach any obligation of confidentiality that Contractor has to any employer or former employer and agrees to fulfill all such obligations during the period of Contractor's affiliation with the Company.

10. <u>Remedies</u>.   Contractor acknowledges that a remedy at law for any breach or threatened breach of the provisions of this Agreement would be inadequate and therefore agrees that the Company shall be entitled to injunctive relief in addition to any other available rights and remedies in case of any such breach or threatened breach; <u>provided</u>, <u>however</u>, that nothing contained herein shall be construed as prohibiting the Company from pursuing any other remedies available for any such breach or threatened breach.   Contractor further acknowledges that in the event of breach by Company of this or any other agreement Contractor may have with Company, Contractor shall be limited to an action-at-law for damages actually suffered, subject first to mediation by a mediator chosen by both parties or if the parties cannot agree then through a court-appointed mediator; in no event shall Contractor have the right to terminate or rescind any rights granted to Company hereunder, to obtain equitable relief or otherwise to enjoin, restrain or otherwise interfere with the full exploitation of the rights herein granted including, without limitation, with respect to any or all Intellectual Property.

11. <u>Assignment</u>.   This Agreement and the rights and obligations of the parties hereto shall bind and inure to the benefit of any successor or successors of the Company by reorganization, merger or consolidation or otherwise and any assignee of all

or substantially all of its business and properties, but neither this Agreement nor any rights or benefits hereunder may be assigned by Contractor.

12. Interpretation, Severability. It is the desire and intent of the parties that the provisions of this Agreement shall be enforced to the fullest extent permissible under the laws and public policies applied in each jurisdiction in which enforcement is sought. Accordingly, if any particular provision of this Agreement shall be adjudicated to be invalid or unenforceable, such provisions shall be deemed amended to delete there from the portion thus adjudicated to be invalid or unenforceable, such deletion to apply only with respect to the operation of such provision in the particular jurisdiction in which such adjudication is made. In addition, if any one or more of the provisions contained in this Agreement shall for any reason be held to be excessively broad as to duration, geographical scope, activity or subject, it shall be construed by limiting and reducing it so as to be enforceable to the extent compatible with the applicable law as it shall then appear. Should any part(s) of this Agreement be rendered or declared invalid by a court of competent jurisdiction of the State of New York, such invalidation of such part(s) or portion(s) of this Agreement should not invalidate the remaining portions thereof, and they shall remain in full force and effect.

13. Notices. Any notice which a party is required or may desire to give pursuant to this Agreement shall be given by personal delivery or registered or certified mail, return receipt requested, addressed to Contractor at Contractor's address of record with the Company and addressed to the Company at its principal office, or at such other place as either party may from time to time designate in writing. The date of personal delivery or the date of mailing any such notice shall be deemed to be the date of delivery thereof.

14. Waivers. If either party shall waive any breach of any provision of this Agreement, such party shall not thereby be deemed to have waived any preceding or succeeding breach of the same or any other provision of this Agreement.

15. Governing Law. This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to principles governing conflicts of laws.

16. No Employment Agreement. Contractor acknowledges that this Agreement does not constitute an employment agreement and agrees that, except to the extent herein specified to the contrary, this Agreement shall be binding upon Contractor regardless of whether or not Contractor's engagement shall continue for any length of time hereafter and whether or not Contractor's engagement is terminated for any reason whatsoever by the Company or Contractor or both.

17. Complete Agreement; Amendments; Prior Agreements. The foregoing is the entire agreement of the parties with respect to the subject matter hereof and may not be amended, supplemented, canceled or discharged except by written instrument executed by both parties.

Very truly yours,

NDAP, LLC.

By: _____
Name: David Gitman
Title: Managing Member
For: NDAP, LLC

AGREED TO AND ACCEPTED

_____
Konstantyn Bagaev

Address: ████████████████138
         ████████████████78
         ████████████

Registration Number: ████████2436

Business Name: IP ████████████

<u>EXHIBIT A -</u> WORK ORDER

Contractor:   Konstantyn Bagaev

Start Date Under Agreement: January 1$^{st}$, 2016

Term of Work Order:  One Year, with ability to extend as the parties agree.

Time Commitment:  Contractor shall dedicate at minimum 75% of Contractor's business time, energy and attention to the business and affairs of the Company.

Rate of Payment:   $2,000 per month, pro rata for any work due within 30 days of receipt of invoice.

Scope of Services: Act on behalf of Client in the capacity of Work for Hire / Consultant working on various projects included but not limited to ChannelReply API Connection CarPartKings

By:     IP Bagaev Konstantin
        Konstantyn Bagaev
        Ul Mira d 59 k3 kv 138
        Jeleznogorsk 307178
        Russia

Registration Number:  315463300002436

Signed:_____        Date: _____

Agreed and Accepted by Konstantyn Bagaev

By:   NDAP, LLC. (Company)
Rep; David Gitman

By: _____        Date: _____

## Exhibit 8

P-8

**NDAP, LLC**
1010 Northern Blvd, Suite 208
Great Neck, NY 11021
USA

Dated as of January 1st, 2016

Dear Mr. Bagaev:

When signed by each of the parties hereto, this letter sets forth the entire agreement between NDAP, LLC., a New York Limited Liability Company (the "Company") and Konstantyn Bagaev Registration Number: ~~XXXXXXX~~2436 (the "Contractor"), with respect to the engagement of Contractor as an independent contractor by the Company on the following terms and conditions:

1. <u>Acknowledgment</u>.  Contractor understands and acknowledges that:

(a)  The Company is engaged in a continuous program of research, design, development, production, publishing, marketing and servicing with respect to its business and as part of Contractor's engagement by the Company, Contractor is (or may be) expected to make new contributions and inventions of value to the Company.

(b)  The Company's engagement of Contractor creates a relationship of confidence and trust between Contractor and the Company with respect to certain information applicable to the business of the Company or the business of any client, customer, or business partner of the Company, which may be made known to Contractor by the Company or by any client, customer, or business partner of the Company, or learned by Contractor during the period of Contractor's engagement.

(c)  The Company possesses and will continue to possess information that has been created, discovered or developed by, or otherwise become known to, the Company (including, without limitation, information created, discovered, developed or made known by Contractor during the period of or arising out of Contractor's engagement by the Company, whether before or after the date hereof) or in which property rights have been or may be assigned or otherwise conveyed to the Company, which information has commercial value in the business in which the Company is engaged and is treated by the Company as confidential.

(d)  As used herein, the period of Contractor's engagement includes any time during which Contractor shall perform any services for or on behalf of the Company, in any capacity, including as an employee.

2. <u>Engagement</u>.  All work performed by Contractor shall be documented in a Work Order signed by authorized representatives of both parties and affixed hereto as Exhibit A.  Each Work Order shall set forth, at a minimum, the work to be done, the duration of the assignment, and the fees for the work to be performed.

3. <u>Commitment to Company</u>.    During the period of Contractor's engagement by the Company, Contractor will devote that portion of Contractor's business time, energy and attention to the business and affairs of the Company subject to the Work Order included as Attachment A herein.

4. <u>Term of Engagement</u>.  As per Work Order included as Attachment A. Termination of this Agreement shall not affect the obligations of Contractor under Sections 5(d), 6, 7 and 8 hereof.  Notwithstanding the terms of the Work Order, Company reserves the right to terminate its engagement of Contractor at any time for any reason, including but not limited to, if Company finds Contractor's work to be unsatisfactory or if there is a breakdown in communication between Company and Contractor . In the event that Company exercises its right to terminate Contractor at will, Company shall only be responsible for compensating Contractor for the fair market value of work already performed and shall have no obligation to compensate Contractor for future works not yet performed, whether such works are anticipated by a signed Work Order or not.    Notwithstanding the foregoing, Contractor shall have no right to terminate premature of completing a signed Work Order. Any such refusal to complete work on a signed Work Order will be deemed a breach of this agreement and result in harm to the Company, entitling the Company to seek damages and injunctive or other equitable relief as described in Section 10, Remedies, below.

5. <u>Declaration</u>.

(a)  Contractor acknowledges and agrees that Contractor is acting as an independent contractor in the performance of the services hereunder, and nothing herein contained shall be deemed to create an agency and/or an employer/employee relationship between Contractor and the Company.   As an independent contractor, Contractor shall determine the times and locations at which his services are performed, subject to the timetable for the completion of specified tasks as the Company and Contractor shall agree.  Contractor shall bear all costs associated with the performance of his services (with the exception of travel costs associated with work with NDAP, LLC, so long as such travel costs are pre-approved by an authorized representative of NDAP, LLC).

(b)  Contractor shall in no event be entitled to participate in, or receive any benefits from, any of the Company's benefit or welfare plans, specifically including, but not limited to, coverage under the Company's workers' compensation program.  The Company shall have no obligation whatsoever to compensate Contractor on account of any damages or injuries which Contractor may sustain as a result or in the course of performance of Contractor's services hereunder.

(c)  Contractor shall be solely responsible for the payment of all Federal and State income taxes, social security taxes, Federal and State unemployment and similar taxes and all other assessments, taxes, contributions or sums payable, with the exception of applicable sales tax, with respect to Contractor as a result of or in connection

with the services performed by Contractor hereunder and Contractor shall file all returns and reports with respect to any of the foregoing.

(d) Contractor shall defend, indemnify and hold harmless the Company and its affiliates and their officers, directors, employees, agents, successors and permitted assigns from and against all losses, damages, liabilities, deficiencies, actions, judgments, interest, awards, penalties, fines, costs or expenses of whatever kind (including reasonable attorneys' fees) arising out of or resulting from (a) bodily injury, death of any person or damage to real or tangible, personal property resulting from Contractor's acts or omissions; and (b) Contractor's breach of any representation, warranty or obligation under this Agreement. The Company may satisfy such indemnity (in whole or in part) by way of deduction from any payment due to Contractor. The provisions of this paragraph shall survive the expiration or earlier termination of this agreement

6. <u>Works Made for Hire</u>. Contractor acknowledges that all right, title and interest in all works of authorship, designs, computer programs, copyrights and copyright applications, inventions, discoveries, developments, original content production or programming, know-how, systems, processes, formulae, patent and patent applications, trade secrets, new products, internal reports and memoranda, strategies, and marketing plans conceived, devised, developed, written, reduced to practice, or otherwise created or obtained by Contractor in connection with Contractor's engagement by the Company (the "Intellectual Property") shall be regarded as "works made for hire" with Company as the sole author and owner thereof including, without limitation, as works specially ordered or commissioned for use as part of an audiovisual work. Company will own all right, title and interest in the Intellectual Property with the full and unrestricted right to exploit same in any manner or media now known or hereafter devised and without any additional compensation to Contractor. To the extent that any such Intellectual Property is for any reason not deemed to be works made for hire, Contractor hereby transfers and assigns to the Company all right, title and interest in and to the Intellectual Property from the inception of creation thereof. Promptly after Contractor creates or obtains knowledge of any Intellectual Property, Contractor will disclose it to the Company. Upon request of the Company, Contractor will execute and deliver all documents or instruments and take all other action as the Company may deem reasonably necessary to transfer all right, title, and interest in any Intellectual Property to the Company; to vest in the Company good, valid and marketable title to such Intellectual Property; to perfect, by registration or otherwise, trademark, copyright and patent protection of the Company with respect to such Intellectual Property; and otherwise to protect the Company's trade secrets and proprietary interest in such Intellectual Property. In the event Contractor does not sign any such document or instrument within five (5) days of a request thereof, Company shall have the right to execute such document or instrument in Contractor's name and take any other action in order to vest in Company all rights hereunder and Contractor appoints Company as Contractor's attorney in fact to do so, which power of attorney is irrevocable and coupled with an interest.

7. <u>Documentation</u>.   In the event of the termination of Contractor's engagement for any reason, Contractor will deliver to the Company all documents, notes, drawings, blueprints, formulae, specifications, computer programs, data and other materials of any nature pertaining to any Intellectual Property or to Contractor's work with the Company, and will not take any of the foregoing or any reproduction of any of the foregoing that is embodied in a tangible medium of expression.

8. <u>Confidentiality</u>.   At all times, both during Contractor's engagement by the Company and after its termination, Contractor will keep in strict confidence and will not disclose any confidential or proprietary information relating to the business of the Company, or any client, customer, or business partner of the Company, to any person or entity, or make use of any such confidential or proprietary information for Contractor's own purposes or for the benefit of any person or entity, except as may be necessary in the ordinary course of performing Contractor's duties for the Company.

9. <u>Other Agreements</u>.   Contractor represents and warrants that Contractor's execution and delivery of this Agreement and the performance of all the terms of this Agreement do not and will not breach any agreement to keep in confidence proprietary information acquired by Contractor in confidence or trust.  Contractor has not entered into and shall not enter into any agreement, either written or oral, in conflict with this Agreement.  Contractor represents that Contractor has not brought and will not bring with Contractor to the Company any materials or documents of an employer or a former employer that are not generally available to the public, unless express written authorization from such employer for their possession and use has been obtained.  Contractor also understands that Contractor is not to breach any obligation of confidentiality that Contractor has to any employer or former employer and agrees to fulfill all such obligations during the period of Contractor's affiliation with the Company.

10. <u>Remedies</u>.   Contractor acknowledges that a remedy at law for any breach or threatened breach of the provisions of this Agreement would be inadequate and therefore agrees that the Company shall be entitled to injunctive relief in addition to any other available rights and remedies in case of any such breach or threatened breach; <u>provided</u>, <u>however</u>, that nothing contained herein shall be construed as prohibiting the Company from pursuing any other remedies available for any such breach or threatened breach.  Contractor further acknowledges that in the event of breach by Company of this or any other agreement Contractor may have with Company, Contractor shall be limited to an action-at-law for damages actually suffered, subject first to mediation by a mediator chosen by both parties or if the parties cannot agree then through a court-appointed mediator; in no event shall Contractor have the right to terminate or rescind any rights granted to Company hereunder, to obtain equitable relief or otherwise to enjoin, restrain or otherwise interfere with the full exploitation of the rights herein granted including, without limitation, with respect to any or all Intellectual Property.

11. <u>Assignment</u>.   This Agreement and the rights and obligations of the parties hereto shall bind and inure to the benefit of any successor or successors of the Company by reorganization, merger or consolidation or otherwise and any assignee of all

or substantially all of its business and properties, but neither this Agreement nor any rights or benefits hereunder may be assigned by Contractor.

12. <u>Interpretation, Severability</u>.  It is the desire and intent of the parties that the provisions of this Agreement shall be enforced to the fullest extent permissible under the laws and public policies applied in each jurisdiction in which enforcement is sought.  Accordingly, if any particular provision of this Agreement shall be adjudicated to be invalid or unenforceable, such provisions shall be deemed amended to delete there from the portion thus adjudicated to be invalid or unenforceable, such deletion to apply only with respect to the operation of such provision in the particular jurisdiction in which such adjudication is made.  In addition, if any one or more of the provisions contained in this Agreement shall for any reason be held to be excessively broad as to duration, geographical scope, activity or subject, it shall be construed by limiting and reducing it so as to be enforceable to the extent compatible with the applicable law as it shall then appear.  Should any part(s) of this Agreement be rendered or declared invalid by a court of competent jurisdiction of the State of New York, such invalidation of such part(s) or portion(s) of this Agreement should not invalidate the remaining portions thereof, and they shall remain in full force and effect.

13. <u>Notices</u>.  Any notice which a party is required or may desire to give pursuant to this Agreement shall be given by personal delivery or registered or certified mail, return receipt requested, addressed to Contractor at Contractor's address of record with the Company and addressed to the Company at its principal office, or at such other place as either party may from time to time designate in writing.  The date of personal delivery or the date of mailing any such notice shall be deemed to be the date of delivery thereof.

14. <u>Waivers</u>.  If either party shall waive any breach of any provision of this Agreement, such party shall not thereby be deemed to have waived any preceding or succeeding breach of the same or any other provision of this Agreement.

15. <u>Governing Law</u>.  This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to principles governing conflicts of laws.

16. <u>No Employment Agreement</u>.  Contractor acknowledges that this Agreement does not constitute an employment agreement and agrees that, except to the extent herein specified to the contrary, this Agreement shall be binding upon Contractor regardless of whether or not Contractor's engagement shall continue for any length of time hereafter and whether or not Contractor's engagement is terminated for any reason whatsoever by the Company or Contractor or both.

17. <u>Complete Agreement; Amendments; Prior Agreements</u>.  The foregoing is the entire agreement of the parties with respect to the subject matter hereof and may not be amended, supplemented, canceled or discharged except by written instrument executed by both parties.

Very truly yours,

NDAP, LLC.

By: _____
Name: David Gitman
Title: Managing Member
For: NDAP, LLC

AGREED TO AND ACCEPTED

_____
Konstantyn Bagaev

Address: ~~████████████~~438
~~████████████~~78

Registration Number: ~~████████████~~2436

Business Name: IP ~~████████████~~

EXHIBIT A - WORK ORDER

Contractor:  Konstantyn Bagaev

Start Date Under Agreement: January 1st, 2016

Term of Work Order:  One Year, with ability to extend as the parties agree.

Time Commitment:  Contractor shall dedicate at minimum 75% of Contractor's business time, energy and attention to the business and affairs of the Company.

Rate of Payment:  $2,000 per month, pro rata for any work due within 30 days of receipt of invoice.

Scope of Services: Act on behalf of Client in the capacity of Work for Hire / Consultant working on various projects included but not limited to ChannelReply API Connection CarPartKings

By:    IP Bagaev Konstantin
       Konstantyn Bagaev
       Ul Mira d 59 k3 kv 138
       Jeleznogorsk 307178
       Russia

Registration Number:  315463300002436

Signed:_____          Date: _____

Agreed and Accepted by Konstantyn Bagaev

By:   NDAP, LLC. (Company)
Rep;  David Gitman

By: _____          Date: _____



Exhibit 9

P-7

# COOPER SQUARE VENTURES, LLC

### ChannelReply Beta Test Agreement

This Beta Test Agreement ("Agreement") governs the disclosure of information by Cooper Square Ventures, LLC. ("Company") to ▓▓▓▓▓▓▓▓▓▓ (the "Recipient") and Recipient's use of Company's beta service offering for ChannelReply ("Service").

1.    Subject to the terms and conditions of this Agreement, Company grants Recipient a nonexclusive, nontransferable license to use the Company Service for a period designated by the Company for the purpose of testing and evaluating the Service.

2.    Beta Functionality Performance - This offering is new.   As a beta subscriber you may experience some issues with performance or functionality.  ChannelReply will make its best efforts to resolve these issues in a timely manner. However, there is no guarantee that all issues will be resolved, nor does the typical performance SLA for the ChannelReply platform apply to this functionality.  Please note, there will be no financial credits (or other compensation) issued should this beta not meet your expectations in terms of performance, functionality or otherwise.

3.    Feedback - You agree to provide regular, timely and confidential feedback on the performance of the beta feature to ChannelReply, at Company's request, so that ChannelReply can make further improvements to the software.

4.    Confidentiality - You agree to keep any information regarding the Beta functionality and your participation in the beta confidential (please see confidentiality clause in terms and conditions).

5.    Support - Support for this feature will be available through ChannelReply's typical support channels (support@ChannelReply.com) while the offering is in beta.

6.    Post-beta Publicity - If you wish to continue using the functionality upon completion of the beta period, you agree to participate in a case study and/or survey and provide a quote for a press release.

7.    Fee/Billing – A non-refundable initial install fee shall be billed to you prior to installation in the amount of $1,500.  Pricing for a custom solution for all eBay and Amazon accounts listed below shall be billed at $350 a month for the first (3) three months at which point the accounts will be reviewed and prices adjusted in accordance with the usage. If payment is not received by the 7th day of the month, service shall be suspended. These prices are subject to change at the Company's sole discretion at any time. Recipient shall be granted at least two weeks advanced notice.

8.    Participation - You agree that you are able and willing to dedicate the time necessary to cooperate with us so that we may maximize the beta functionality.  This may at times

---

## COOPER SQUARE VENTURES, LLC

require Recipient to grant Company complete access to one or more of Recipient's accounts, including but not limited to eBay, Amazon, ZenDesk and any other account used in conjunction with ChannelReply for the purpose of Company performing configuration, maintenance and troubleshooting.

9.     **Time Frame:** The Company's Service shall be provided on a month-to-month basis. Should the subscriber seek to cancel or suspend service for any reason, a notice must be sent to Support@ChannelReply.com 30 days in advance or Recipient will be billed for the following month. The Company reserves the right to cancel or suspend Recipient's use and access to Service at any time for any reason with or without cause.

**ADDITIONAL TERMS AND CONDITIONS**

**(INCORPORATED HEREIN AS PART & PARCEL OF THIS AGREEMENT)**

10.     The Recipient agrees that it at all times will hold in strict confidence and not disclose Confidential Information (as defined below) to any third party except as approved in writing by the Company and will use the Confidential Information for no purpose other than evaluating the Service. The Recipient shall only permit access to Confidential Information to those of its employees having a need to know and who have signed confidentiality agreements or are otherwise bound by confidentiality obligations at least as restrictive as those contained herein. "Confidential Information" means all non-public materials and information provided or made available by Company to Recipient, including products and services, information regarding technology, know-how, processes, software programs, research, development, financial information and information regarding third parties.

11.     After Recipient's evaluation of the Service is complete, or upon request of the Company, the Recipient shall promptly return to the Company all documents, notes and other tangible materials and return or certify the destruction of all electronic documents, notes, software, data, and other materials in electronic form representing the Confidential Information and all copies thereof.

12.     The Recipient agrees that nothing contained in this Agreement shall be construed as granting any ownership rights to any Confidential Information disclosed pursuant to this Agreement, or to any invention or any patent, copyright, trademark, or other intellectual property right. The Recipient shall not make, have made, use or sell for any purpose any product or other item using, incorporating or derived from any Confidential Information or the Service. The Recipient will not modify, reverse engineer, decompile, create other works from, or disassemble any software programs contained in the Confidential Information or the Service.

13.     This Service is a beta release offering and is not at the level of performance of a commercially available product offering. The Service may not operate correctly and

## COOPER SQUARE VENTURES, LLC

may be substantially modified prior to first commercial release, or at Company's option may not be released commercially in the future. THE SERVICE AND DOCUMENTATION ARE PROVIDED "AS IS" WITHOUT WARRANTY OF ANY KIND, AND COMPANY AND ITS LICENSORS DISCLAIM ALL WARRANTIES, EXPRESS, IMPLIED, OR STATUTORY, INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTIES OF TITLE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS, MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE. NO ORAL OR WRITTEN ADVICE OR CONSULTATION GIVEN BY COMPANY, ITS AGENTS OR EMPLOYEES WILL IN ANY WAY GIVE RISE TO A WARRANTY. THE ENTIRE RISK ARISING OUT OF THE USE OR PERFORMANCE OF THE SERVICE REMAINS WITH RECIPIENT.

14. COMPANY AND ITS LICENSORS SHALL NOT BE LIABLE FOR LOSS OF USE, LOST PROFIT, COST OF COVER, LOSS OF DATA, BUSINESS INTERRUPTION, OR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, PUNITIVE, SPECIAL, OR EXEMPLARY DAMAGES ARISING OUT OF OR RELATED TO THE SERVICE OR THIS AGREEMENT, HOWEVER CAUSED AND REGARDLESS OF THE FORM OF ACTION, WHETHER IN CONTRACT, TORT (INCLUDING NEGLIGENCE) STRICT LIABILITY, OR OTHERWISE, EVEN IF SUCH PARTIES HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. IN NO EVENT WILL COMPANY'S AGGREGATE CUMULATIVE LIABILITY FOR ANY CLAIMS ARISING OUT OF OR RELATED TO THIS AGREEMENT EXCEED $50.00 OR THE AMOUNT RECIPIENT ACTUALLY PAID COMPANY UNDER THIS AGREEMENT (IF ANY).

15. The Recipient's obligations under this Agreement shall survive any termination of this agreement. This Agreement shall be governed by and construed in accordance with the laws of New York. The Recipient hereby agrees that breach of this Agreement will cause Company irreparable damage for which recovery of damages would be inadequate, and that the Company shall therefore be entitled to obtain timely injunctive relief under this Agreement, as well as such further relief as may be granted by a court of competent jurisdiction. The Recipient will not assign or transfer any rights or obligations under this Agreement without the prior written consent of the Company.

# COOPER SQUARE VENTURES, LLC

Services Requested:

**eBay Accounts:**

**UK:**
micksgarage_uk
thecaraccessoryoutlet
discountcarparts4u4less
micksgarageofficialhondastore
theautobrakingoutlet
theukcarpartsoutlet
thecarserviceoutlet

**FR:**
micksgarage_FR

**OZ:**
micksgarage_australia

**DE:**
micksgarage_derfilterstore

**Amazon Account:**
Micksgarage Parts & Accessories

Agreed to and Accepted on and by:

Signature: ▓▓▓▓▓▓▓▓▓▓▓    Date: 14|01|15

Name: ▓▓▓▓▓▓▓▓▓▓▓    Title: CHANNEL MGR

**Exhibit 10** A



# EXHIBIT B

```
N. Y. S. DEPARTMENT OF STATE
DIVISION OF CORPORATIONS                          ALBANY, NY  12231-0001
                              FILING  RECEIPT
================================================================================
ENTITY NAME : NDAP, LLC

DOCUMENT TYPE : ASSUMED NAME LTD LIABILITY CO
================================================================================
   FILER:                                 FILED:  07/16/2014
   ------                                 CASH#:  329822
                                          FILM#:  20140716077
   MICHAEL DARDASHTIAN
   1010 NORTHERN BLVD.
   SUITE 208
   GREAT NECK          NY   11021



   PRINCIPAL LOCATION
   ------------------

   1010 NORTHERN BLVD
   SUITE 208
   GREAT NECK
   NY   11021




   COMMENT:

   ASSUMED NAME
   ------------
   CAR PART KINGS



================================================================================
SERVICE COMPANY :      +++  NO SERVICE COMPANY  +++           CODE:
                                                              BOX :

FEES       25.00                          PAYMENTS:   25.00
----                                      --------
FILING :   25.00                          CASH    :
COUNTY :     .00                          CHECK   :
COPIES :     .00                          C CARD  :   25.00
MISC   :     .00
HANDLE :     .00
                                          REFUND  :
                                          ------
================================================================================
                      DO3HD108                    DOS-281 (04/2007)
```