## **Exhibit 21**

Wed, Feb 15, 10:44 AM

I'm reaching out to Alice.

Can you send any other CSV or ndap legal docs.

Can u send the peak agreement, any other liabilities on the business. Thank you.

no other liabilities – peak agreement is long been voided at this point

Can you send it. With all other docs. Creating a repository that ▓▓▓▓ will demand access to

Standard x and o

why would ▓▓▓ need to know about that doc its been voided

## Exhibit 22

why would ▮▮▮▮ need to know about that doc its been voided

All co want to know all arrangements that are potential liabilities. Their lawyers will ask for it. We are trying to show that not just 1 party in mix.

OK will send – not sure what other docs are necessary at this point..

i dont have any other agreements in place

They won't take sellers word for it. They have to go thru their process. They are also PE owned FYI.

yes i know – ill go thru see what else we have but we haven't

**Exhibit 23**

P-25

## Message

| | |
|---|---|
| **From:** | David Gitman [dgitman@accelcommerce.com] |
| **Sent:** | 4/14/2017 3:52:48 PM |
| **To:** | Jeremy Falk [jfalk@accelcommerce.com] |
| **Subject:** | CR P&L 2016 |
| **Attachments:** | Channel Reply -Profit and Loss For The Year 2016.xlsx |

**CHANNELREPLY, LLC**
**Profit and Loss**
**January - December 2016**

| | | Total | Description |
|---|---|---|---|
| **Income** | | | |
| Paypal Sales | $ | 103,166.85 | |
| Paypal Processing Fees | $ | (7,926.82) | |
| **Total Paypal Sales** | $ | 95,240.03 | |
| Sales - Software Subscriptions | | | |
| ChannelReply Enterprise Monthly | $ | 9,595.36 | |
| ChannelReply Professional Monthly | $ | 4,057.04 | |
| ChannelReply Starter Monthly | $ | 1,928.97 | |
| ChannelReply Starter Yearly | $ | 468.00 | |
| Discounts given | $ | (748.00) | |
| **Total Sales - Software Subscriptions** | $ | 15,301.37 | |
| Stripe Payment Processing Fees | $ | (1,908.92) | |
| Stripe Returns | $ | (4,882.60) | |
| **Stripe Sales** | $ | 72,195.56 | |
| **Total Income** | $ | 175,945.44 | |
| **Gross Profit** | $ | 175,945.44 | |
| **Expenses** | | | |
| Advertising | | | |
| Marketing | $ | 600.64 | E- Seller Publishing Ltd. |
| Social Media | $ | 698.27 | Facebook, Twitter |
| **Total Advertising** | $ | 1,298.91 | |
| Bank Service Charges | $ | 460.00 | Wire Transfer Fee |
| Consultants | $ | 75,288.00 | Consulting expense of Konstantyn Bagaiev for 2016 |
| Dues & Subscriptions | $ | 148.66 | LinkedIn |
| Etsy Fees | $ | 0.20 | ETSY |
| Office Expenses | $ | 102.22 | Staples |
| Office Meals | $ | 136.42 | California Pizza Kitchen, Java Moon Express, 7-Eleven |
| Professional Services | | | |

(from CSV reclass to CR)

| | | | |
|---|---|---:|---|
| Consulting | $ | | |
| Legal & Professional Fees | $ | 24,527.66 | Justin Golschneider |
| Total Professional Services | $ | 943.11 | Fiverr and V-Corp Services |
| | $ | 25,470.77 | |
| Site Operations | $ | 8,714.93 | and Amazon Web Services( Assume 450/month for CR. |
| Software | $ | 1,510.28 | 1Password, Builtwith Pty Ltd and LogMeIn |
| Travel | | | |
| Air Flights | $ | 852.10 | Delta,Gogo Inflight Internet |
| Lodging | $ | 2,037.00 | Wynn Las Vegas |
| Taxi | $ | 483.01 | TaxiPass Vegas,Uber,Yellow Cab |
| Total Travel | $ | 3,372.11 | |
| Travel Meals | $ | 214.83 | NOPA |
| Total Expenses | $ | 116,717.33 | |
| Net Income | $ | 59,228.11 | |

(from NDAP reclass to CR)

Wednesday, Apr 12, 2017 04:24:50 AM GMT-7 - Accrual Basis

**<u>Exhibit 24</u>**

5/30/2017                                                ndap Mail - RE: CPK



p-34

Mike Dash <mdash@ndap-llc.com>

## RE: CPK

**David Gitman** <dgitman@ndap-llc.com>                                    Sat, May 27, 2017 at 4:34 PM
To: Michael Dash <mdash@ndap-llc.com>
Cc: "Jeffrey E. Rothman" <jrothman@srrlaw.com>, Jeremy Falk <jeremy.falk@gmail.com>, Joel Liebman
<joel@lghaccountants.com>, Umar Farooq <umar@farooqco.com>

Thank you for taking the time to express the taxation benefits from your distributions to the company. However, I will continue to authorize the company to proceed with a financial audit to correctly state capital accounts, individual tax liabilities, etc.

Your resistance for an accounting has given me cause to transfer the company's cash balances to a call deposit account. This money will remain in this account until an audit is completed by the company's accountant, Liebman Goldberg & Hymowitz or you accept my conservative estimate of $121,500 in overpayments.

I will also continue to authorize Summit Rock Holdings in working with Buy Auto Parts to execute on the terms of purchase.

I agree Umar should work directly with your lawyer. Please reply with your attorney's information.

I will remind you once again that you will receive the final asset purchase agreement early next week. It would be rational and prudent for you to execute the agreement before the accounting is complete. The proceeds from the purchase will be held in escrow by the company's attorney, Jeff Rothman until the accounting is complete. Any other action may be considered as a breach of contract.

I would also like to remind you that there will be a true-up with the accounting. You should consider applying your proceeds from the asset purchase to satisfy your liability with the company instead of paying it back.

You will receive your share of the asset purchase proceeds after the company's liabilities are satisfied as required by our operating agreements and the asset purchase agreement.

On Fri, May 26, 2017 at 7:49 PM Michael Dash <mdash@ndap-llc.com> wrote:

Dave,

As I mentioned in my prior email, I don't agree with your approach. As someone who holds 50% decision making power, I am not willing to fund your "reconciliation" with money from the company. Should you choose to do so on your own, please be advised that you will have to pay for that personally. I would suggest you not waste your time, since healthcare is a benefit, that resulted in a tax deduction for the company and is not a distribution. It is my understanding that it is not customary to factor that into distributions related to the sale of a company. You had the option to draw healthcare benefits in an equal amount to mine and opted not to.

I am not sure who Umar is. I have never met or approved hiring him. I do not approve Umar being paid from our company. Jeff Rothman is our company's hired attorney. If you hired Umar as your personal attorney then you will have to pay for that personally.

Umar, please refrain from emailing me and reach out to my attorney if you have been hired to represent Dave in a resolution.

As per our operating agreement, I am legally owed 50% of profits from the sale of any company that we jointly own. I offered to give you more than my 50% share, which I am not required to do. I believe my last offer is more than fair and reasonable and certainly more than you have been willing to do for me and I stand by it. That's where I'm at. If this is not good enough for you, please let BAP know unfortunately we could not reach an agreement.

If you truly want to make a deal happen then let me know if you accept or feel free to propose an equally reasonable alternative by early next week. Trying to find ways to justify whittling down my profit percentage is not going to work for me or accomplish a deal, so please don't waste anyones time with that. I've demonstrated flexibility, but unless I get a fair profit share from this deal, I'm not going to agree to it.

Hope everyone has a good holiday weekend.

5/30/2017                                   ndap Mail - RE: CPK

Mike

Michael Dash
**ndap**
Tel: (646) 553-5918
mdash@ndap-llc.com | http://www.ndap-llc.com



On Fri, May 26, 2017 at 12:09 PM, David Gitman <dgitman@ndap-llc.com> wrote:
As you all know I have been responsible for a leading integration between CPK and BAP. We have been notified that BAP will provide us with a final APA on Tuesday. They are not interested in making any changes. They are looking to close the transaction in the middle of next week.  Rene has reiterated, "time kills all deal".

On Thu, May 25, 2017 at 5:27 PM David Gitman <dgitman@ndap-llc.com> wrote:
Joel,

Thank you for taking my call. I look forward to reviewing the accounting on Tuesday.
On Thu, May 25, 2017 at 4:50 PM David Gitman <dgitman@ndap-llc.com> wrote:
Hi Joel,

I have had an accounting to create the true up in my previous email. Can you please validate this accounting on behalf of company, CSV and NDAP.

Thank you.

On Thu, May 25, 2017 at 2:06 PM Michael Dash <mdash@ndap-llc.com> wrote:
Dave,

Thank you for your response. I disagree with your assessment of distributions. I am not willing to do a tit for tat of expenditures. If so, I would have to put a value on bringing Parts Authority to the table, without which we would have no business, and bringing the deal with Buy Auto Parts as well as charging back your various expenses.

It seems there is a deal to be had here. Unfortunately, if Jeremy doesn't agree to come down and the deal doesn't close, then legally he is owed nothing.  He acquired our confidential brokerage agreement through misrepresentation, doctored it and then pressured me to sign it by withholding info on an offer from BAP. You also pressured me to sign. I'm well aware that you and Jeremy are presently running a side business together which is a huge conflict of interest on both of your parts and I believe it is affecting your willingness to give me my fair share of my own business, which violates our partnership agreement.

Not sure why you wrote Jeremy would be due $110,000.  As soon as we found out we owed Parts Authority $100,000, Jeremy agreed in writing to accept $80,000. We are at a stalemate over $10,000.  If Jeremy comes down to $70k, then we can close this deal. 70k is the most I will ever agree to give to Jeremy. If you feel he deserves more, then it will have to come out of your share. Alice gets the ~$10k that you suggested, which I agree is reasonable. If there's an issue with Alice, I am willing to give her up to 5%, split evenly with you, even though I never promised her any cut.

We split the remainder of the profits 50/50, as per our operating agreement and you can charge back up to 120 hours of post-transaction work at your rate of $250 per hour against my share.  I will require proof of work orders from Buy Auto Parts and all work documented with time tracking and screenshots in Time Doctor.  This is triple your work estimate of 40 hours and compensates you at your full rate on top of any hourly rate paid to you by BAP, therefore, I believe anyone would view this as generous to you.

To quickly recap –
$450,000 – Sale of Company
($100,000) – Payment to Parts Authority
($10,000) – Closing Costs
($10,850) – Payment to Alice Fritz

($70,000) – Jeremy Falk

$259,150 – Remaining Distributions

$129,575 – each for David and Michael pre-post transaction work by David.

I negotiated a resolution of a debt around $800k down to $100k. Parts Authority is expecting that money. In the event the deal doesn't close and they pursue the debt, I'm confident my offers will be viewed as generous and facilitative of a deal. I do not think offering me $50,000 from a $450,000 sale of a company of which I am a 50% owner would be deemed reasonable.

Since we are 45 days past the date of our signed LOI and BAP is ready to close, please let me know if you would like to move forward. If not, then I will have to move on myself. This has become too time-consuming and so far not very productive. I hope we can put this to rest.

Thanks
Mike

Michael Dash
**ndap**
Tel: (646) 553-5918
mdash@ndap-llc.com ǀ http://www.ndap-llc.com


On Wed, May 24, 2017 2:53 PM, David Gitman dgitman@ndap-llc.com wrote:
Hi Mike,

Thank you for reaching out to me. I'm on the way back to New York. I want to respond to you via email so we can both understand the rationale behind the proposed distribution to you and settle this matter.

Please take a moment to understand the accounting below so you can understand how the sale proceeds should be distributed. If this is workable, we can work out any minor details.

- **Purchase Price** - $450,000.
- **Liabilities** - $210,000. These are NDAP's lawful responsibility to pay before any distributions are made
    - Parts Authority - You came to an $100,000 agreement with Randy to release us from debt.
    - Summit Rock Holdings - You came to and executed a $110,000 agreement with Jeremy for the transaction.
- **Distributions After Liabilities** - After paying our legal obligations we are left with $240,000.
- **Distributions Without Account Reconciliation**
    - Alice Fritz - $10,850. I'm willing to talk Alice into taking less than 5%. However, be aware that there is no deal if Alice rejects the offer.
    - Michael Dardashtian - $114,575 - $5,000 (50% of closing costs) = $109,575.
    - David Gitman - $114,575 - $5,000 (50% of closing cost) = $109,575.
- **Previous Distributions to Michael Dardashtian** - I have asked the accountants to reconcile and verify around $121,500 in previous distributions that have been taken by

you as a partner, including cash, health insurance, and other expenses. Accounting for these previous distributions gives you a negative account balance of around $11,975.

Subject to a confirmation by the accountant that the previous distributions to you were no more than $121,500, I am willing to forego the negative balance that is due and rework the accounting to offer you $50,000 from the proceeds of the sale because of our friendship over the years and our partnership in CSV. Let me know within the next day or so if this works and we can proceed to close this matter and move with the sale.

-david

On Mon, May 22, 2017 at 7:12 PM Michael Dash <mdash@ndap-llc.com> wrote:

Dave,

There are $350,000 in distributions after payment to Parts Authority of which you and I as 50% owners are due $175,000 each. I am willing to take $100,000, in recognition of the fact that you may have to oversee the transition of the technology. I'm also willing to split the legal fees with you 50/50. I estimate they are about $10,000 right now. Which would bring me down to $95,000.

Dave, there will be $250,000 to distribute as you see fit. In order for me to relinquish more than 70% of the remaining profits and control over distributions to you, I would need something in writing saying that I am released from liability related to your distributions to Jeremy and Alice. I can pay personally for my attorney to write that up.

In terms of distributions, If you insist on making a distribution to an employee, of your own accord or based on your own promises, then I would recommend 10% to Alice after payment to Parts Authority ($35,000). I would also recommend 13% to our broker Jeremy (~$60,000 based on the deal value). An employee shouldn't be making more than 10% of distributions especially after receiving a salary for a year of not working. I also recommend, the distribution should be contingent upon her completing a year with BAP. The industry standard for a broker is 10%, and that's for brokers who bring deals to the table. Jeremy did not bring a deal to the table, I did. Again, these are only my recommendations - with this structure you can determine distributions as you see fit.

If followed, you would walk away with $155,000 minus legal fees so approximately $150,000. That comes out to very close to a 65/35 split, which I believe is more than generous and fair and compensates you for any additional work at your full hourly rate of two times the hours Jeremy suggested (120hrs post sale @ 250hr = $30K) plus an extra cushion if you'd like to pay out Jeremy and Alice different amounts.

Dave, please let me know if this works for you. If so, great. If you would like to discuss anything further by phone or in person, feel free to reach out to me. I will not be taking any more calls or texts from Jeremy regarding our profit sharing as partners.

Jeremy, please send all future communications regarding Buy Auto Parts to me via email. If Dave tells you that he does not agree to this and refuses to discuss it further, partner-to-partner, then Jeremy, you have my authority to notify Buy Auto Parts in a timely manner that Dave and I unfortunately could not come to an agreement as partners.

Dave, I hope we can move forward as we have spent considerable time over the years and worked hard towards getting a deal closed.

In the end, this is my company too. I won't have a broker and an employee make more than me or be on even keel with me. Beyond the fact that I worked as an equal partner with you for years, day in and day out to build this company, I also brought us the initial opportunity and this deal. If that's not understood and respected by all parties then this deal may not happen. I don't believe that two partners should communicate through a third party. I prefer an amicable meeting in person and teamwork. However, out of respect for you and your preference Dave, I have put my ego aside and put my position in writing. Here it

5/30/2017                                      ndap Mail - RE: CPK

is and I am open to discussing it. Now the choice is yours. I will respect your decision as I hope you will respect my position, which I believe to be generous and considerate toward you and your contributions.

Furthermore, for the record, I want to make my intentions clear. I understand that Buy Auto Parts has also spent a considerable amount of time, effort and expense on working toward a deal. Both you and I signed a letter of intent. I fully intended to make a deal with BAP and still fully intend to do so. I have made repeated attempts to speak with you by phone or in person to work out the terms of a deal and discuss a fair split that would satisfy both of us and you wrote back that you didn't see the value in meeting with me. Through a middleman you offered me $50,000 from the $450,000 sale of a company where I am a 50/50 owner. You suggested our broker receive double my share and our employee also make more than me. Just to be clear, I never agreed to any distribution to an employee either orally or in writing. However, despite being insulted by your offer, I am once again demonstrating my intent and effort to ultimately achieve a deal with BAP by offering you the opportunity to keep or distribute as you see fit, more than double my share, even after distributing a reasonable, customary/industry standard broker fee. I believe that any objective observer would not only find this to be a reasonable offer, but a generous one that demonstrates my good faith efforts to perform my part in furtherance of a deal.

Thank you.
Mike


Michael Dash
**ndap**
Tel: (646) 553-5918
mdash@ndap-llc.com I http://www.ndap-llc.com

**Exhibit 25**

## COOPER SQUARE, LLC / COOPER SQUARE VENTURES, LLC

### SERVICES AGREEMENT

This Agreement for Services is a binding agreement (this "*Agreement*") that is made and entered into as of February 15, 2017 (the "*Effective Date*") by and between Summit Rock Holdings LLC, a Delaware limited liability company ("*Consultant*") and the following: Cooper Square Ventures, LLC, and Cooper Square, LLC, and NDAP, LLC (dba/ Car Part Kings) and NDA Holdings LLC (the "*Company*"). "Consultant" and "Company" herein referred to individually as a "*Party*," or collectively as the "*Parties*").

### RECITALS

WHEREAS, Consultant has rendered the Services (as defined below) to the Company dating from December 1, 2015 through the execution and termination of this Agreement.

WHEREAS, the Company desires to retain Consultant to perform the services described herein, and for Consultant at its discretion to perform such services on the terms and conditions described herein.

NOW THEREFORE, in consideration of the promises and mutual agreements contained herein, the Parties hereto, intending to be legally bound, agree as follows:

<u>Section 1.</u>        Services

1.1.    Consultant has since December 1, 2015 successfully performed, and shall continue to perform some, of the following services for the Company (or its designee): (i) providing strategic and financial analysis and conduct due ___nce (which may include constructing financial models and managing certain aspects of Company transactions), (ii) ___e the Company in connection with the sale of assets of the Company, the merger or joint venture of the Company with another entity, and /or the recapitalization of the Company, a change of control, or a licensing transaction of the Company (iii) solicit proposals from investors and purchasers, (iv) provide advice to the Company in the negotiation process, (v) perform business development for current businesses and the sourcing of new investment opportunities for the Company, (vi) contribute toward the institutionalization of the Company and develop its processes to enable capital raising for the execution of transactions, and (vii) contribute toward the formalization of business development or investment processes, protocols and operating procedures (items (i) through (vii), together with other services previously provided, are collectively referred to herein as the "*Services*").

<u>Section 2.</u>        Compensation and Consideration

2.1.    The Company hereby engages the Consultant. As compensation and consideration for some of the Services rendered by Consultant, the Company will provide a one-time payment of US$160,000 in cash by wire transfer immediately upon the closing of a transaction. The Company in compensation and consideration of Services provided by the Consultant, Consultant will be in addition be awarded and paid by Company in cash by wire transfer an amount equal to 0.25% of the Purchase Price for a transaction resulting in a change of control of the NDA Holdings, LLC to another Party which shall be payable upon the closing of a transaction.

The term "Purchase Price" shall encompass the value of (1) all consideration received or to be received by the Company pursuant to a transaction, whether such consideration is paid in cash, debt which for purposes of calculating the "Purchase Price" shall be reduced to present value or equity securities, when received and (2) future monetary considerations payable to Company or its owners (whether prior to or post termination of this Agreement) including the earn outs when paid, royalty fees, license fees, when paid and equity ownership (or in the case of a sale of assets, the consideration received for such assets, ___ n received and (3) to the extent not included in the Purchase Price, the value of any outstanding long-term debt of the ___ss assumed by the investor as part of the transaction. Note, any outstanding payables greater than 90 days will be considered as long term debt. If a transaction involves a combination or series of transactions, the Purchase Price shall be the

1

sum of (i) Purchase Price at the initial closing plus (ii) the Purchase Price at each subsequent date, which shall be calculated and paid when received by Company.

### Section 3.        Confidentiality

3.1.    *Confidentiality.* Consultant will do everything reasonably possible to preserve Company confidentiality. Company will not hold Consultant liable for any actions by investor or potential purchasers, or any other parties related to the process that may violate the confidentiality. Consultant agrees to hold in confidence all proprietary information provided by the Company in connection with this project. Consultant agrees not to share any confidential information with persons outside of its office without the Company's consent, except that the Consultant may share the materials with potential third parties in connection with its duties. Confidential Information shall not include any such information which (i) was publicly known or made generally available prior to the time of disclosure to Consultant; (ii) becomes publicly known or made generally available after disclosure to Consultant through no wrongful action or inaction of Consultant; or (iii) is in the rightful possession of or was obtained by Consultant, without confidentiality obligations or restrictions at the time of disclosure.

### Section 4.        Term and Termination

4.1.    *Term.* This Agreement shall remain in effect until after the close of a transaction with the Company (the *"Term"*). Consultant shall continue to receive any and all accrued but unpaid Compensation and Consideration payable to Consultant under this Agreement. Consultant shall continue to perform services and be eligible to receive any and all compensation under this Agreement on any opportunities which, as of the date of termination any work had begun by Consultant. The Company shall promptly pay to Consultant any compensation owed upon the receipt or distribution of any funds from which Consultant is eligible for compensation under this Agreement.

### Section 5.        Indemnification

5.1.    In connection with Consultant's engagement (which engagement commenced prior to the date hereof) to advise and assist the Company, the Company, agrees to indemnify and hold harmless Consultant and its affiliates, the respective members, directors, officers, agents and employees of Consultant and its affiliates and each other person, if any, controlling Consultant or any of its affiliates and each of their respective successors and assigns, the fullest extent permitted by law, from and against any losses, claims, damages, or liabilities (or actions, including shareholder actions, in respect thereof) related to or arising out of such engagement. Company shall defend, indemnify and hold the Consultant harmless from and against any and all liability, loss, expense, including attorneys' fee, or claims for injury or damages (each a *"Claim"*) arising out of the performance of this Agreement. Expenses incurred by Consultant in defending any Claim shall be paid by the Company in advance of the final disposition of such Claim upon receipt by the Company of an undertaking. Company will reimburse Consultant and any other party entitled to be indemnified hereunder for all expenses (including counsel fees) as they are incurred by Consultant or any such other indemnified party in connection with investigating, preparing or defending any such action or claim whether or not in connection with pending or threatened litigation in which Consultant is a party.

If the indemnification provided for in the foregoing paragraph is judicially determined to be unavailable (other than in accordance with the terms hereof) to any person otherwise entitled to indemnity in respect of any losses, claims, damages, or liabilities referred to herein, then, in lieu of indemnifying such person hereunder, the Company shall contribute to the amount paid or payable by such person as a result of such losses, claims, damages, or liabilities (and expenses relating thereto) (i) in such proportion as is appropriate to reflect the relative benefits to the Company, on the one hand, and Consultant, on the other hand, of the engagement provided for in this Agreement or (ii) if the allocation provided for in clause (i) above is not available, in such proportion as is appropriate to reflect not only the relative benefits referred to in such clause (i) but also the relative fault of the Company, as well as any other relevant equitable considerations.

The Company also agrees that neither Consultant, nor any of its affiliates nor any officer, directors, employee or agent of Consultant or any of its affiliates, nor any person controlling Consultant or any of its affiliates, shall have any liability to the Company for or in connection with such engagement. The foregoing agreement shall be in addition to any rights that Consultant, the Company or any indemnified party may have at common law or otherwise, including, but not limited to any right to contribution. For the sole purpose of enforcing and otherwise giving effect to the provisions of this Agreement, the

2

Company hereby consents to personal jurisdiction and service and venue in any court in which any claim which is subject to this agreement is brought against Consultant or any other indemnified party.

**Section 6.**        **Miscellaneous**

6.1.    *Governing Law; Consent to Personal Jurisdiction.* This Agreement shall be governed by the laws of the State of New York, without regard to the conflicts of law provisions of any jurisdiction.

6.2.    *Authority / Indemnity.* The person(s) signing this Agreement has full legal authority to bind the Company to this Agreement.

6.3.    *Arbitration.* Any dispute, controversy or claim arising out of or relating to this Agreement including, but not limited to, the validity, interpretation, performance, breach or termination of this Agreement shall be resolved in accordance with the procedures specified in this Agreement, which shall be the sole and exclusive procedures for the resolution of any such disputes. The Parties shall attempt in good faith to resolve any dispute arising out of or relating to this Agreement promptly by negotiation. In the event that any dispute is not resolved to the satisfaction of any Party, such Party may provide the other written notice of any dispute not resolved in the normal course of business (a *"Dispute Notice"*). If a dispute has not been resolved within 30 days after delivery of the related Dispute Notice, such Party may initiate arbitration of the dispute in the manner hereinafter provided. Such dispute shall be settled by arbitration in accordance with the then current rules of the American Arbitration Association (*"AAA"*) by a sole independent and impartial arbitrator, which arbitrator shall be appointed under the procedures of the AAA Commercial Arbitration Rules and Mediation Procedures. The arbitration shall be governed by the United States Arbitration Act, 9 U.S.C. Sections 1-16, and judgment upon any award rendered by the arbitrator may be entered in any court having jurisdiction thereof. The place of arbitration shall be New York, New York. The procedures specified in this section shall be the sole and exclusive procedures for the resolution of disputes arising between the Parties arising out of or relating to this Agreement. All negotiations pursuant to this section shall be confidential and treated as compromise and settlement negotiations for purposes of the Federal Rules of Evidence and applicable state rules of evidence.

6.4.    *Assignability.* This Agreement will be binding for the benefit of the Consultant's heirs, executors, assigns, administrators, and other legal representatives. There are no intended third-party beneficiaries to this Agreement, except as expressly stated. Notwithstanding anything to the contrary herein, the Company may assign this Agreement and its rights and obligations under this Agreement to any successor to all or substantially all of the Company's relevant assets, whether by merger, consolidation, reorganization, reincorporation, sale of assets or stock, or otherwise.

6.5.    *Entire Agreement.* This Agreement constitutes the entire agreement and understanding between the Parties with respect to the subject matter herein and supersedes all prior written and oral agreements, discussions, or representations between the Parties. Consultant represents and warrants that he/she is not relying on any statement or representation not contained in this Agreement. To the extent any terms set forth in any exhibit or schedule conflict with the terms set forth in this Agreement, the terms of this Agreement shall control unless otherwise expressly agreed by the Parties in such exhibit or schedule. The undersigned acknowledges that the Company has received all necessary approvals, read the Agreement and received a copy and understands that this is a legal binding contract.

6.6.    *Survival.* All sections of this Agreement will survive termination or expiration of this Agreement.

6.7.    *Headings.* Headings are used in this Agreement for reference only and shall not be considered when interpreting this Agreement.

6.8.    *Severability.* If a court or other body of competent jurisdiction finds, or the Parties mutually believe, any provision of this Agreement, or portion thereof, to be invalid or unenforceable, such provision will be enforced to the maximum extent permissible so as to effect the intent of the Parties, and the remainder of this Agreement will continue in full force and effect.

6.9.    *Modification, Waiver.* No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in writing signed by the Parties. Waiver by the Company of a breach of any provision of this Agreement will not operate as a waiver of any other or subsequent breach.

3

6.10.    *Notices.* Any notice or other communication required or permitted by this Agreement to be given to a Party shall be in writing and shall be deemed given (i) if delivered personally or by commercial messenger or courier service, (ii) when sent by electronic mail or confirmed facsimile, or (iii) if mailed by U.S. registered or certified mail (return receipt requested), to the Party at the Party's address written below or at such other address as the Party may have previously specified by like notice. If by mail, delivery shall be deemed effective three business days after mailing in accordance with this section.

      (a)    If to Cooper Square Ventures, LLC or NDAP, LLC (dba/Car Part Kings), to:

           1010 Northern Blvd, Suite 208
           Great Neck, NY 11021

      (b)    If to Consultant, to the address for notice on the signature page to this Agreement or, if no such address is provided, to the last address of Consultant provided by Consultant to the Company.

6.11.    *Attorneys' Fees.* In any proceeding at law or equity that is brought by one of the Parties to this Agreement to enforce or interpret the provisions of this Agreement, the prevailing Party may be awarded reasonable attorneys' fees, in addition to any other relief to which that Party may be entitled.

6.12.    *Signatures.* This Agreement may be signed in multiple counterparts, each of which shall be deemed an original, with the same force and effectiveness as though executed in a single document.

WITNESS WHEREOF, the Parties hereto have executed this Consulting Agreement as of the date first written above.

**SUMMIT ROCK HOLDINGS, LLC**

**COOPER SQUARE, LLC**

**COOPER SQUARE VENTURES, LLC**

By: _____

By: _____

Name: Jeremy Falk

Name: Michael Dardashtian

Title: Authorized Signatory

Title: Member

Address for Notice:

By: _____

Name: David Gitman

Title: Member

**Exhibit 26**

P-53

# STATE OF DELAWARE
# SHORT FORM CERTIFICATE
# OF DISSOLUTION
# (SECTIONS 275 AND 391 (a) (5) (b))

State of Delaware
Secretary of State
Division of Corporations
Delivered 10:17 AM 06/20/2017
FILED 10:17 AM 06/20/2017
SR 20174838133 - File Number 6427452

The corporation organized and existing under the General Corporation Law of the State of Delaware, hereby certifies as follows:

1.     The dissolution of CHANNELREPLY INC.

has been duly authorized by the Board of Directors and Stockholders in accordance with subsections (a) and (b) of Section 275 or by unanimous consent of Stockholders in accordance with subsection (c) of Section 275 of the General Corporation Law of the State of Delaware.

2.     The date of filing of the Corporation's original Certificate of Incorporation in Delaware was 5/30/2017

3.     The date the dissolution was authorized is 6/20/2017

4.     The names and addresses of the directors and officers of the corporation are as follows:

| NAME | TITLE | ADDRESS |
|---|---|---|
| DAVID GITMAN | President | 100 Sterling PL Apt 1 Brooklyn, NY 11217 |

5.     The corporation has no assets and has ceased transacting business.

6.     The corporation, for each year since its incorporation in this State, has been required to pay only the minimum franchise tax then prescribed by Section 503 of the General Corporation Law of the State of Delaware

7.     The corporation has paid all franchise taxes and fees due to or assessable by this State through the end of the year in which the certificate of dissolution is filed.

By: DAVID GITMAN
Authorized Officer

Name: /s/ DAVID GITMAN
Print or Type



The First State

Page 1

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF DISSOLUTION OF "CHANNELREPLY INC.", FILED IN THIS OFFICE ON THE TWENTIETH DAY OF JUNE, A.D. 2017, AT 10:17 O'CLOCK A.M.

Jeffrey W. Bullock, Secretary of State

6427452  8100
SR# 20174838133

Authentication: 202741039
Date: 06-20-17

You may verify this certificate online at corp.delaware.gov/authver.shtml

Doc ID: 3a2df8d855a175f76a14b9b6104218aad3e2feb0

*P-43*

# Clerky

### Filing Request and Summary

By signing this Filing Request and Summary, ChannelReply Inc. (the "Company") and its undersigned representative hereby:

1. Request and authorize that Clerky[1], on behalf of the Company, submit the Designated Document(s)[2] for filing with the Designated Agency (the "Filing") and attend to other matters related to the Filing.

2. Acknowledge that the Company is familiar with and solely responsible for complying with any further obligations that may arise from the Filing and Related Matters[3], such as, without limitation: (i) paying franchise taxes, business privilege taxes, corporate income taxes and the like, (ii) filing tax reports, tax returns, annual and other periodic reports and the like, (iii) registering or qualifying to do business in other jurisdictions, (iv) obtaining and renewing business licenses, permits and the like or (v) paying its registered agent's fees and maintaining current contact information with its registered agent.

3. Authorize Clerky, on behalf of the Company, to take all action Clerky deems appropriate to appoint the Designated Registered Agent as the Company's registered agent in the Designated Jurisdiction.

4. Agree that (a) any offer or undertaking by Clerky to attend to or assist with any Filing and Related Matters is for convenience only and does not give rise to any Clerky duty or obligation and (b) that Clerky shall not be liable to any person for any act or omission related to Filing and Related Matters.

5. Represent that they have read and hereby agree to both (a) Clerky's terms of service available at https://www.clerky.com/site/terms and (b) the standard terms of service available at the Designated Registered Agent's web site for registered agent and other services it provides to the Company.

6. Consent to conduct business electronically with Clerky, the Designated Agency and the Designated Registered Agent, including, without limitation, the electronic execution, submission or delivery of all documents, notices, service of process and other communications.

7. Appoint Clerky as agent and representative (attorney-in-fact) of the Company and its undersigned representative (in such person's capacity as an officer or authorized representative of the Company) to execute and deliver on behalf of the Company any Designated Document(s) or Company Document(s) Clerky deems appropriate in connection with Filing and Related Matters (including, without limitation, a consent to service of process to irrevocably appoint the Designated Agency or an appropriate designee as the Company's agent upon whom process against the Company may be served with the same force and validity as if served personally on the Company) and take all other action Clerky deems appropriate.

8. Authorize Clerky, the Designated Agency and the Designated Registered Agent to charge the Company's or the Company's representative's credit card on file with any of them for all Clerky, government, registered agent, filing service or any third-party fees and charges related to Filing and Related Matters, including resubmission and renewal fees.

9. Agree that Clerky may, on behalf of the Company, direct the Designated Agency or the Designated Registered Agent to (a) establish an account for the Company for all Filing and Related Matters, including registered agent or other services and (b) use the Company Information and any contact information therein for all purposes related to Filing and Related Matters, including, without limitation, the delivery of all documents, notices, service of process and other communications.

---

[1] Clerky means Clerky, Inc., a Delaware corporation, or its agents, representatives or third-party designees.

[2] Capitalized terms not elsewhere defined have the meaning given in the Summary.

[3] Filing and Related Matters means any matter referenced in or related to this Filing Request and Summary, including, without limitation, anything related to (a) the Filing, (b) further or ongoing matters related to the Filing, (c) registered agent or other services and (d) all other related matters.

# Clerky

10. Represent that the information in this Filing Request and Summary, the Designated Document(s) and the Company Document(s) (the "Company Information") is current, true, and complete.

### Summary[4]

**The Company Corporation Account Information**

| | |
|---|---|
| Company Name | ChannelReply Inc. |
| Number of Shares of Common Stock Authorized | 10,000,000 shares Common Stock with a par value of $0.00001 per share |
| Company Contact Person for the Designated Registered Agent | David Gitman |
| Contact Person Address | 100 Sterling Place Apt 1A Brooklyn, NY 11217 |
| Contact Person Telephone | (646) 878-9184 |
| Contact Person E-mail | david@dalva.ventures |

**Filing Information**

| | |
|---|---|
| Designated Jurisdiction | Delaware |
| Designated Agency | Secretary of State |
| Designated Registered Agent Name | The Company Corporation (terms of service available at https://www.incorporate.com/legal.html) |
| Designated Document(s) | • Certificate of incorporation |

---

[4] This summary table is provided for convenience only and shall have no legal effect.

# Clerky

By the signature below, the proposed entity to be organized as **ChannelReply Inc.** and its undersigned incorporator and representative acknowledge and agree to all matters set forth above in this Filing Request and Summary.

**ACKNOWLEDGED AND AGREED:**

E-signed using Clerky (91ab5527cb+f272f4f+e9b7b4a5c60)

*David Gitman*

**Exhibit 27**

Exhibit 27 - SHR-CSV.png



Mike Dash <mdash@ndap-llc.com>

**SHR-CSV services agreement**

Jeremy Falk <jeremy.falk@gmail.com>
To: Michael Dash <mdash@ndap-llc.com>
Cc: David Gitman <dgitman@ndap-llc.com>

Fri, Mar 3, 2017 at 12:27 PM

Mistyped. No offer

On Mar 3, 2017, at 12:24 PM, Michael Dash <mdash@ndap-llc.com> wrote:

> Counter? Was there an initial offer?
>
> On Mar 3, 2017, at 12:19 PM, Jeremy Falk <jeremy.falk@gmail.com> wrote:
>
>> Will review. No counter offer yet

## **Exhibit 28**

5/30/2017                                                 ndap Mail - Consulting Agreement: 3.6.2017 - draft



Mike Dash <mdash@ndap-llc.com>

## Consulting Agreement: 3.6.2017 - draft

Jeremy Falk <jeremy.falk@gmail.com>                                          Sun, Mar 5, 2017 at 8:23 AM
To: Mike Dash <mdash@ndap-llc.com>, David Gitman <dgitman@ndap-llc.com>

Guys,

I reviewed the lawyer's comments. Below is an explanation of the majority of the points in question. I have accepted what
I could and kept the original language where I cannot (and it is unreasonable for me to accept.) See highlights below.
Some other adjustments are included in the doc. Can one of you give me a call to discuss?

Introductory paragraph: Cooper Square LLC: Attached is the operating agreement that I received from Mike that has CSV
incorporated as "Cooper Square". It may have been an error in initial drafting but I have not seen documentation that shows "Cooper
Square Ventures," only "Cooper Square". I have included both LLC names to ensure that the correct entity is captured. I have
attached your operating agreement that I received. If there is an alternative document I should review, please let me know. Otherwise,
let's keep both listed names in the document.

Section 1. Recitals:

Please give me a call to discuss this point. I appropriately included the total services that have been provided, not just transaction
process execution. This preference should not matter to CSV since it is merely a description of services.

The key point outlined in 2 places in the document is that CSV only gives consideration to Consultant if a transaction is consummated.
I would like to discuss this so give me a call.

Section 2. Compensation Timing/Schedule:

The compensation payment schedule should be consistent with: 1) what you previously agreed to with Peak (in fact, Peak had better
terms since you were going to pay them in full at signing of a transaction); and 2) standard practice in the industry.

Instead of Consultant being placed at the front of the line, CSV is pushing me to the back of the line which is highly unusual.
However, if you prefer to stage payments to me then an accommodation could be that it should be by percentage of distribution that
CPK receives. As an accommodation, we can do 60% of distributions to Consultant until the fee is paid out. That to me seems like a
reasonable compromise.

Section 2: Purchase Price Definition:

I have kept the changes here that I believe I can live with. I am keeping the other parts of the definition consistent with what was
originally agreed to with Peak. It is consistent with industry practice.

Section 4. Term and Termination:

I understand what you are seeking to accomplish. I propose that the Agreement shall remain in effect until the later of: 1) submission
of an offer or 2) May 30, 2017. I understand your desire to have me drive the transaction quickly so I moved the date forward (from
June to May) as an accommodation. However, I cannot speak to your ability or ~~inability~~ ability to close by then so I cannot agree to
your "closing of transaction" stipulation. That middle ground should work.

Section 5. Indemnification:

5/30/2017                                          ndap Mail - Consulting Agreement: 3.6.2017 - draft

This needs to stay in for the following reasons: 1) It was in the Peak document and agreed to by CSV and signed off by your attorney; and 2) It is a standard clause in these arrangements; and 3) With everything going on between the CSV partners, I feel it is necessary at this juncture to keep the indemnification clause in the document. I have not run the business since inception so I should not be liable for any materials I have provided.

Section 6.3 Arbitration:

This clause is standard in Agreements. It is intended to find a cost effective and efficient means to resolve disagreements. If you want to go down a more challenging track then you can force any disputes to court which is not in your interest. I would encourage standard arbitration as an efficient alternative.

Section 6.11. Attorney's fees:

This is included since it keeps everyone "honest and on the same page". Reasons to comply since it can be expensive to "not comply" and a further incentive to do as was negotiated.

Give me a call to discuss and let's get this done soon so we can get to a transaction asap!

Jeremy



**2 attachments**

📄 **ConsultingAgreementv1_3.6.17.docx**
35K

📄 **Cooper Square Ventures, LLC - Operating Agreement.pdf**
3821K

**Exhibit 29** A



Mike Dash <mdash@ndap-llc.com>

---

## CPK: SRH Consulting Agreement

**Michael Dash** <mdash@ndap-llc.com>                                    Tue, Mar 7, 2017 at 10:03 AM
To: David Gitman <david@gitman.net>

Thats exactly what I had Jeff draft in the agreement, he is including language that makes it open ended and can be construed as consulting services in a contract if he were to chose at any point to sue us. I made it very clear in our version he only gets paid if a deal closes. He changed it.

**Michael Dash**
**ndap**
Tel: (646) 553-5918
mdash@ndap-llc.com I http://www.ndap-llc.com

On Tue, Mar 7, 2017 10:02 AM, David Gitman david@gitman.net wrote:
> How do we owe him money if there is no deal?

> On Tue, Mar 7, 2017 at 10:00 AM Michael Dash <mdash@ndap-llc.com> wrote:
>> I'm trying to protect us. I suggest you talk to Jeff, what it seems Jeremy is trying to do is attach himself to NDAP and CSV so that we possibly owe him money if a deal is not done or we try and do something with CR. I'm not comfortable with that. Also, he is including LLC's that don't exist in this agreement which put's us at risk. He's including potential deals in this agreement that don't exist. He's refused to show me an offer letter and refused to have me on the phone wi███████proving that there is even an offer at this point.. have you seen or heard anything from██████Why are we jumping through hoops if no deal is on the table?

>> Michael Dash
>> ndap
>> Tel: (646) 553-5918
>> mdash@ndap-llc.com I http://www.ndap-llc.com

> On Tue, Mar 7, 2017 at 9:56 AM, David Gitman david@gitman.net wrote:
>> Jeremy, thank you for all your hard work. We truly appreciate it. All your suggested changes are reasonable.

>> Mike, this situation has become emotional and is embarrassing at this point. Please execute this immediately. I'm ready to counter sign.

>> On Tue, Mar 7, 2017 at 9:51 AM Jeremy Falk <jeremy.falk@gmail.com> wrote:
>>> Mike and Dave,

>>> I included Dave on this email chain. I reviewed CSV's proposed changes and included revisions to the attached file. I have been counseled that the edits presented are reasonable, appropriate and put me in a far worse position than industry standard. My lawyer is also expressing to me that what CSV is asking of me is beyond normal, and telling me under no circumstances to sign this attached agreement. My changes are appropriate and reasonable. I am willing to execute an agreement if we implement the changes that were agreed to on Sunday that are now correctly reflected in the doc.

>>> We have spent a lot of time on this agreement and I have stretched as far as I can. I also recognize that you feel that you have extended yourselves too. This is not an emotional decision for me - If we can get this agreement done then let's get to██████However, the points below are necessary for me. I can't prevent you from flushing to

zero all the progress that has been made. Let me know how you guys want to proceed.

1) There are minor tweaks relating to incorrect grammar, misspellings, missing periods etc.

2) Signature line: I re-included David Gitman in the signature of this document. He needs to be included in this process and execute this agreement. It cannot only be Mike.  You are partners in CSV.

3) Section 1: Services.  I have been providing services to you guys for a few years. My lawyer says that it should reflect a "Since December 1, 2015" time frame in the "Services" segment.  If you don't want to include it in the document then the alternative I see is that I notify ▓▓▓ of such and then either Mike or Dave resends to BAP the same documents that I have already provided so that it is coming from a Member of CSV.  Up to you which route you want to take. I need to then have the data come again from CSV to ▓▓▓▓ That can practically happen seamlessly.

4) Section 2. Mike and I agreed on to Sunday to "1/3, 1/3, 1/3 on all distributions".  The draft I received yesterday did not reflect what we agreed to on Sunday. They have me being paid at an unusual pace which I am not comfortable with. We directly discussed the scenario that is now drafted in this Agreement. I cannot execute anything other than this schedule.  I implemented very accommodating terms here: Industry standard and your former Peak agreement has this role being paid upfront.  What I drafted is what we discussed and both agreed to on Sunday.

Why the "30 day" delay on distributions? I can understand if you need a few days to execute so I am agreeing to 7 days. The 30 days is what you offer business vendors. Immediate payment is standard in this scenario.

5) Section 6.3: Indemnification.  An appropriate indemnification needs to be included. I originally included the Peak indemnification clause which was much longer. You edited and I revised down to 1 paragraph. This is standard practice and I have limited to the extent that anyone feels comfortable.

6) Section 4: Term. I already discussed this with Mike and you agreed to this on Sunday. It never made it in to the latest draft. Agreement remains in effect until a date (I proposed 4/14) or an indication of interest from ▓▓▓ You originally drafted a signed transaction closing which is unreasonable. We agreed to this change on Sunday.

Please review this yourselves and determine what are next steps.

Jeremy

# EXHIBIT B

DocuSign Envelope ID: 21A1002A-987E-448B-AD4F-7B2A739C104D

# COOPER SQUARE VENTURES, LLC/NDAP,LLC

## SERVICES AGREEMENT

This Agreement for Services is a binding agreement (this *"Agreement"*) that is made and entered into as of March 3, 2017 (the *"Effective Date"*) by and between Summit Rock Holdings LLC, a Delaware limited liability company (*"Consultant"*) and the following: Cooper Square Ventures, LLC, and NDAP, LLC (dba/ Car Part Kings) (the *"Company"*). "Consultant" and "Company" herein referred to individually as a *"Party,"* or collectively as the *"Parties"*.

## RECITALS

WHEREAS, Company has engaged in negotiations with ▓▓▓▓▓▓▓ (the "Buyer") concerning a contemplated sale of NDAP, LLC and/or its assets to Buyer (the "Transaction"); and

WHEREAS, the Company desires to retain Consultant to perform the services described herein with respect to negotiations with Buyer solely with reference to the Transaction, and for Consultant to perform such services on the terms and conditions described herein.

NOW THEREFORE, in consideration of the promises and mutual agreements contained herein, the Parties hereto, intending to be legally bound, agree as follows:

### Section 1.    Services

1.1.    Consultant since December 1, 2015 has provided Services and shall continue to perform the following services for the Company (or its designee) solely with respect to the Buyer and solely concerning the Transaction: (i) providing strategic and financial analysis and conducting due diligence (which may include constructing financial models and managing certain aspects of the Transaction), (ii) advising the Company in connection with the sale of assets pertaining to the Transaction or the structuring of the Transaction as a merger or joint venture with Buyer, (iii) soliciting proposals from Buyer, (iv) providing advice to the Company in the negotiation process, (v) performing business development for current businesses and the sourcing of new investment opportunities for the Company as same may pertain to the Transaction, (vi) advising concerning institutionalization of the Company and the development of its processes to enable capital raising for the execution of the Transaction, and (vii) contributing toward the formalization of business development or investment processes, protocols and operating procedures as same may pertain to the Transaction (items (i) through (vii), together with other services previously provided, are collectively referred to herein as the *"Services"*).

### Section 2.    Compensation and Consideration

2.1.    Company hereby engages Consultant to perform the Services with Buyer solely concerning the Transaction and for no other purpose.  As compensation and in full payment and consideration of all Consultant's services rendered hereunder, Company shall pay Consultant a fee (the "Fee") solely in the event of a closing of the Transaction and solely in the event Company receives payment of the Purchase Price (as defined below).  The Fee shall be calculated as follows:

(a)    The total Fee shall equal:

$110,000.00 + (0.0025 x Purchase Price)

DocuSign Envelope ID: 21A1002A-987E-448B-AD4F-7B2A739C104D

(b)      Payment of the Fee. Consultant will receive one-third (33%) of all distributions to the Company until the total Fee (Section 2.1 (a)) is paid to Consultant, after which 100% of distributions shal be paid  to the Company. Consultant will be paid no later than seven (7) days after Company's receipt of Purchase Price installments.

(c)      The term "Purchase Price" shall encompass the value of (1) all consideration received or to be received by the Company pursuant to a transaction, whether such consideration is paid in cash, or debt which for purposes of calculating the "Purchase Price" shall be reduced to present value or equity securities, when received and (2) future monetary considerations payable to Company or its owners (whether prior to or post termination of this Agreement) including the earn outs when paid, royalty fees, license fees, when paid and equity ownership (or in the case of a sale of assets, the consideration received for such assets, when received and (3) to the extent not included in the Purchase Price, the value of any outstanding long-term debt of the business assumed by the investor as part of the transaction. Note, any outstanding payables greater than 90 days will be considered as long term debt if assumed by Buyer as part of the Transaction.  If a Transaction involves a combination or series of installments, the Purchase Price shall be the sum of the amount paid at the closing plus the amount of the installments.

(d)      In the event the Transaction does not close, for any reason or for no reason, __NO__ compensation shall be due Consultant.

### Section 3.      Confidentiality

3.1.      *Confidentiality.* Consultant will do everything reasonably possible to preserve Company confidentiality.  Company will require all potential parties and professionals to whom confidential information is provided to maintain confidentiality of all such confidential information.  Consultant agrees to hold in confidence all proprietary information provided by the Company in connection with this project. Consultant agrees not to share any confidential information with persons outside of its office without the Company's consent, except that the Consultant may share the materials with the Buyer in connection with its duties, subject to Buyer agreeing to hold such confidential information in confidence.  Confidential Information shall not include any such information which (i) was publicly known or made generally available prior to the time of disclosure to Consultant; (ii) becomes publicly known or made generally available after disclosure to Consultant through no wrongful action or inaction of Consultant; or (iii) is in the rightful possession of or was obtained by Consultant, without confidentiality obligations or restrictions at the time of disclosure.

### Section 4.      Term and Termination

4.1.      *Term.* This Agreement shall remain in effect until the submission of a letter of intent or April 14, 2017, whichever shall occur first (the "*Term*").  Any sums due consultant pursuant to Section 2.1 shall survive termination of this Agreement.

### Section 5.      Intentionally Omitted

### Section 6.      Miscellaneous

6.1.      *Governing Law; Consent to Personal Jurisdiction.* This Agreement shall be governed by the laws of the State of New York, without regard to the conflicts of law provisions of any jurisdiction.

6.2.      *Authority.*  The person(s) signing this Agreement has full legal authority to bind the Company to this Agreement.

6.3.      Indemnification. (a)   Company shall indemnify and hold harmless the Consultant, its officers and employees from and against any damages, liabilities, claims, and losses, costs and expenses, but only to the extent caused by negligent acts, errors and omissions of Company, or of those for whom the Company is legally liable related to or arising out of such engagement. Company shall defend, indemnify and hold the Consultant harmless from and against any and all liability, loss, expense, including attorneys' fee, or claims for injury or damages (each a "*Claim*") arising out of the performance of this Agreement.  Expenses incurred by Consultant in defending any Claim shall be paid by the Company in

DocuSign Envelope ID: 21A1002A-987E-448B-AD4F-7B2A739C104D

advance of the final disposition of such Claim upon receipt by the Company of an undertaking. Company will reimburse Consultant and any other party entitled to be indemnified hereunder for all expenses (including counsel fees) as they are incurred by Consultant or any such other indemnified party in connection with investigating, preparing or defending any such action or claim whether or not in connection with pending or threatened litigation in which Consultant is a party. The Company also agrees that neither Consultant shall have any liability to the Company for or in connection with such engagement.

(b)     Consultant shall indemnify and hold harmless the Company, its officers and employees from and against damages, liabilities and losses, costs and expenses, but only to the extent caused by the negligent acts, errors and omissions of Consultant, or of those for whom the Consultant is legally liable, which arise out of the Consultant's performance of its services under this Agreement.

6.4.   *Assignability.* This Agreement will be binding for the benefit of the Consultant's heirs, executors, assigns, administrators, and other legal representatives. There are no intended third-party beneficiaries to this Agreement, except as expressly stated. Notwithstanding anything to the contrary herein, the Company may assign this Agreement and its rights and obligations under this Agreement to any successor to all or substantially all of the Company's relevant assets, whether by merger, consolidation, reorganization, reincorporation, sale of assets or stock, or otherwise.

6.5.   *Entire Agreement.* This Agreement constitutes the entire agreement and understanding between the Parties with respect to the subject matter herein and supersedes all prior written and oral agreements, discussions, or representations between the Parties. Consultant represents and warrants that he/she is not relying on any statement or representation not contained in this Agreement. To the extent any terms set forth in any exhibit or schedule conflict with the terms set forth in this Agreement, the terms of this Agreement shall control unless otherwise expressly agreed by the Parties in such exhibit or schedule. The undersigned acknowledges that the Company has received all necessary approvals, read the Agreement and received a copy and understands that this is a legal binding contract.

6.6.   *Survival.* All sections of this Agreement will survive termination or expiration of this Agreement.

6.7.   *Headings.* Headings are used in this Agreement for reference only and shall not be considered when interpreting this Agreement.

6.8.   *Severability.* If a court or other body of competent jurisdiction finds, or the Parties mutually believe, any provision of this Agreement, or portion thereof, to be invalid or unenforceable, such provision will be enforced to the maximum extent permissible so as to effect the intent of the Parties, and the remainder of this Agreement will continue in full force and effect.

6.9.   *Modification, Waiver.* No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in writing signed by the Parties.  Waiver by the Company of a breach of any provision of this Agreement will not operate as a waiver of any other or subsequent breach.

6.10.   *Notices.* Any notice or other communication required or permitted by this Agreement to be given to a Party shall be in writing and shall be deemed given (i) if delivered personally or by commercial messenger or courier service, (ii) when sent by electronic mail or confirmed facsimile, or (iii) if mailed by U.S. registered or certified mail (return receipt requested), to the Party at the Party's address written below or at such other address as the Party may have previously specified by like notice. If by mail, delivery shall be deemed effective three business days after mailing in accordance with this section.

(a)     If to Cooper Square Ventures, LLC or NDAP, LLC (dba/Car Part Kings), to:

1010 Northern Blvd, Suite 208
Great Neck, NY 11021

with a copy to:

Seligson, Rothman & Rothman
29 West 30th Street, 10th Floor
New York, NY 10001

DocuSign Envelope ID: 21A1002A-987E-448B-AD4F-7B2A739C104D

Attn: Jeffrey E. Rothman, Esq.

(b)      If to Consultant, to: or unless a change in address is provided

450 East 83rd Street (Suite 15C)
New York, New York 10028

6.11.   *Intentionally Omitted.*

6.12.   *Signatures.*  This Agreement may be signed in multiple counterparts, each of which shall be deemed an original, with the same force and effectiveness as though executed in a single document.

[Signature Page Follows]

DocuSign Envelope ID: 21A1002A-987E-448B-AD4F-7B2A739C104D

IN WITNESS WHEREOF, the Parties hereto have executed this Consulting Agreement as of the date first written above.

**SUMMIT ROCK HOLDINGS, LLC**

By: _Jeremy Falk_
Name: Jeremy Falk
Title: Authorized Signatory

**COOPER SQUARE VENTURES, LLC**

By: _Michael Dardashtian_
Name: Michael Dardashtian
Title: Member

_David Gitman_
Name: David Gitman
Title: Member

**NDAP, LLC**

By: _Michael Dardashtian_
Name: Michael Dardashtian
Title: Member

_David Gitman_
Name: David Gitman
Title: Member

## **Exhibit 30**



Mike Dash <mdash@ndap-llc.com>

## CPK: BAP Indication of Interest

**Jeremy Falk** <jeremy.falk@gmail.com>                                  Fri, Mar 10, 2017 at 9:03 AM
To: Mike Dash <mdash@ndap-llc.com>, David Gitman <david@gitman.net>

Mike.and Dave,

██████finalized a CPK indication of interest with their board of directors yesterday evening PT.  We received last night an indication of interest from ████Let's discuss next steps at 11:15am ET.

(Note: This is not an executed version. Renee will send that through later this morning.)

Jeremy

📎 CPK LOI 2017.03.09.pdf
288K

# **Exhibit 31**

P-19



# HARVARD BUSINESS SERVICES, INC.

16192 COASTAL HIGHWAY
LEWES, DELAWARE 19958-9776
Phone: (302) 645-7400 (800)-345-2677
Fax: (302) 645-1280
www.delawareinc.com

Mr. Jeremy Falk
450 East 83rd street
Suite 15C
New York NY, 10028

Dear Mr. Falk ,

We would like to convey our congratulations to you and Dalva Ventures, LLC. We hope you enjoy terrific success with your new company. Thank you for giving us the opportunity to serve you as your incorporator and Delaware Registered Agent. You are now our valued client and we want to increase your success in any way we can.

Name: **Dalva Ventures, LLC**
Date of Formation: February 13, 2017
Delaware State File Number: **6315718**
HBS Record ID Number: 321107

Enclosed is the Recorded Copy of your Certificate of Formation. Please review the information on the certificates and insert them in your corporate kit.

Please remember the following:

**1. We must be made aware of any address changes. You may provide this information to us via email (mail@delawareinc.com) or phone (800-345-2677 ext. 6903). This will ensure that we remind you of the following two things:**

2. Delaware LLC/LP tax is due **June 1st** each year. If the LLC/LP tax is not received by June 1st, a $200 late penalty plus 1.5% interest monthly will be imposed by the State of Delaware and your company will cease to be in good standing.

3. Your annual registered fee of $50 is due on the anniversary month of your corporation. If the registered agent fee is not received by the due date, a $25 late penalty will be imposed. Failure to pay the registered agent fee within 3 months of the due date may lead to the loss of your registered agent, which could cause your company to become forfeit with Delaware.

We would like to thank you once again, and wish you the best of luck. You can help us by telling a friend or business associate about our services. We work hard to keep things simple for you and your associates when it's time to incorporate.

Sincerely,

Filing Department
Harvard Business Services, Inc.

State of Delaware
Secretary of State
Division of Corporations
Delivered 04:44 PM 02/13/2017
FILED 04:44 PM 02/13/2017
SR 20170860288 - File Number 6315718

# CERTIFICATE OF FORMATION
## OF
### Dalva Ventures, LLC

(A Delaware Limited Liability Company)

**First:** The name of the limited liability company is: Dalva Ventures, LLC

**Second:** Its registered office in the State of Delaware is located at 16192 Coastal Highway, Lewes, Delaware 19958, County of Sussex. The registered agent in charge thereof is Harvard Business Services, Inc.

IN WITNESS WHEREOF, the undersigned, being fully authorized to execute and file this document have signed below and executed this Certificate of Formation on this February 13, 2017.

_Richard H. Bell, II_

Harvard Business Services, Inc., Authorized Person
By: Richard H. Bell, II, President

# STATEMENT OF AUTHORIZED PERSON
**************************
IN LIEU OF ORGANIZATIONAL MEETING
FOR
Dalva Ventures, LLC
February 13, 2017

We, Harvard Business Services, Inc., the Authorized Person of Dalva Ventures, LLC -- a Delaware Limited Liability Company -- hereby adopt the following resolution pursuant to Section 18-201 of the Delaware Limited Liability Company Act:

**Resolved:** That the Certificate of Formation of Dalva Ventures, LLC was filed with the Secretary of State of Delaware on February 13, 2017.

**Resolved:** That on February 13, 2017 the following persons were appointed as the initial Members of the Limited Liability Company until their successors are elected and qualify:

Jeremy Falk

**Resolved:** That the undersigned signatory hereby resigns as the authorized person of the above named Limited Liability Company.

This resolution shall be filed in the minute book of the company.

Harvard Business Services, Inc., Authorized Person
By: Richard H. Bell, II, President

*** This document is not part of the public record. Keep it in a safe place. ***

# HARVARD'S ADDITIONAL SERVICES

Did you know we offer many services other than formation/registered agent services? Below is a description of some of our popular services:

**Foreign Qualification:**
Many companies choose Delaware as their State of formation to take advantage of the strong corporate law structure but they do not actually do business in the State of Delaware. If your business will operate in a State other than the State of Delaware, a foreign qualification filing will typically be required. This filing allows a company to transact business in a jurisdiction other than where it was formed. Since every State has their own requirements to foreign qualify, let HBS take care of this detail for you.

**Good Standing Certificates (Also known as Certificates of Existence):**
A certificate of good standing may be required by many different parties, such as banks or different States. We can obtain a good standing from the State of Delaware for you to eliminate the hassle of dealing with the State of Delaware. You may place the order online, www.delawareinc.com/gstanding or contact us by email, phone or fax.

**Tax ID Service:**
We can obtain the Federal Tax Identification Number for your Delaware Corporation or LLC. The Federal Tax Identification Number, also known as a company's "EIN", is mandatory for opening US bank accounts, obtaining loans, hiring employees, or conducting business in the United States. Our service eliminates the hassle of dealing with the IRS.

**Mail Forwarding Services:**
Many clients do not have a physical address, other than their home offices; others want to establish a U.S. presence. Harvard Business Services, Inc. provides the use of our address as a mailing address for your company. Some of our mail forwarding services are:

Premium Service: This service is based on an annual fee that includes weekly forwarding of all business correspondence for 1 year. Reasonable postage is built-in to the price. Over-sized packages are not included.

Basic 6 Service: This service includes 6 forwards (6 pieces of mail). We suggest this service for clients who expect to receive little or no mail at all. You have the option to renew or upgrade this service once the 6 forwards have been exhausted or when the year term has expired, whatever comes first. Reasonable postage is built into the price. Over-sized packages are not included.

Basic 15 Service: This service includes 15 forwards (15 pieces of mail). We suggest this service for clients who may not receive a high volume of mail, but expect more than what would be covered under the Basic 6 service. For example, this service would be great for a company looking to receive 1 bank statement a month. You have the option to renew or upgrade this service once the 15 forwards have been exhausted or when the year term has expired, whatever comes first. Reasonable postage is built into the price. Over-sized packages are not included.

We also offer custom mail forwarding services, if none of the above options suit your business needs.

Many of our other services can be found on our website: www.delawareinc.com/ourservices. To initiate any of the above services, please call 1-800-345-2677 ext. 6911 or 302-645-7400 ext. 6911. You may also send an email request to info@delawareinc.com.



# HARVARD BUSINESS SERVICES, INC.

16192 COASTAL HIGHWAY
LEWES, DELAWARE 19958-9776
Phone: (302) 645-7400 (800)-345-2677
Fax: (302) 645-1280
www.delawareinc.com

ACCOUNT:

Mr. Jeremy Falk
450 East 83rd street
Suite 15C
New York NY, 10028

February 15, 2017

## RECEIPT:

**Dalva Ventures, LLC**
Delaware Division of Corporations file # 6315718
Record ID # 321107

Service Provided:

| | |
|---|---|
| Formation | $279.00 |
| Discount | -$80.00 |

## AMOUNT PAID: $199.00

# PAID IN FULL

*** Keep this receipt for your records ***

**Exhibit 32**

GMail
by Google

Proposal for PA...

Mike Dash <mdash@ndap-llc.com>

Jeremy Falk <jeremy.falk@gmail.com>
To: Michael Dash <mdash@ndap-llc.com>
Cc: David Gitman <dgitman@ndap-llc.com>

Wed, Mar 15, 2017 at 11:42 AM

Yes

On Mar 15, 2017, at 11:40 AM, Michael Dash <mdash@ndap-llc.com> wrote:

Sounds good. I am sending Randy email shortly. Once he confirms, I will push to have Jeff draw up an agreement for PA to sign.

Thanks.

On Wed, Mar 15, 2017 11:38 AM, David Gitman dgitman@ndap-llc.com wrote:
I just spoke to Jeremy. He's okay taking 80k in light of the PA offer. Jeremy, please confirm.

Are we going to put in place an agreement with PA? Do we need to draw something up?

100% Recycled   30% PCW



**Exhibit 33**