**Exhibit 34**

P-55

Konstantyn Bagaev
Chelobit`evskoe ave,  12 bl 5, apt 54
Moscow, Russia, 127495
+79256441995
doomerb@gmail.com

June 20th, 2017

David Gitman
Chief Technology Officer
ChannelReply

Dear Mr Gitman:

I am writing to inform you that I am leaving ChannelReply, effective today, June 20th, 2017. Although I have so enjoyed founding and working on ChannelReply from idea to success, the recent events clearly show me that there is no future for me in working with Michael Dardashtian. Please let me know when I will receive my final payment.

Despite having to leave, I deeply appreciate the opportunities you've provided with me during my time at ChannelReply. I am very grateful for all of your assistance along the way.

Please do not hesitate to be in touch if there is opportunity to work on ChannelReply or any other project without Michael Dardashtian.

Once again, thank you so much for the opportunity to be a part of ChannelReply from its beginning. I do hope that we can stay in touch as business colleagues, and I look forward to working with you again in the future should the opportunity present itself. Many thanks for your understanding.

Sincerely,

Konstantyn Bagaev

CONFIDENTIAL P37

Oleksii Glukharev
Akhsarova str, 11-a, 138
Kharkov, Ukraine, 61202
+380509119315
aleksey@webtec.com.ua

June 20th, 2017

David Gitman
Chief Technology Officer
ChannelReply

Dear Mr Gitman:

I am writing to inform you that I am leaving ChannelReply, effective today, June 20th, 2017. Although I have so enjoyed founding and working on ChannelReply from idea to success, the recent events clearly show me that there is no future for me in working with Michael Dardashtian. Please let me know when I will receive my final payment.

Despite having to leave, I deeply appreciate the opportunities you've provided with me during my time at ChannelReply. I am very grateful for all of your assistance along the way.

Please do not hesitate to be in touch if there is opportunity to work on ChannelReply or any other project without Michael Dardashtian.

Once again, thank you so much for the opportunity to be a part of ChannelReply from its beginning. I do hope that we can stay in touch as business colleagues, and I look forward to working with you again in the future should the opportunity present itself. Many thanks for your understanding.

Sincerely,

Oleksii Glukharev.

**Exhibit 35** A

Google

Gmail ▾

COMPOSE

Inbox (9)
Starred
Sent Mail
Drafts (1)
Christian
David and Yaov
▸ David Gitman

Mary Faith ▾   +

Michelle Spalding
You: Got it :-)

David Gitman
✉◀ You were in a vid

Tristan Andan
✉◀ You were in a vid

Yoav Maor

---

label:david-gitman-david_accel-commerce

↰   Remove label   ⊕        ⊞ ▾      ◷ ▾      🏷 ▾         More ▾

Thank you

4 of 8   ‹ ⌄  ⌃ ›

People (2)

David Gitman
to me ▾

May 1 (2 days ago)

David Gitman:   Add to circles

He will review your work. I'm trying to focus more on the technology and Jeremy is focusing on the
finance side.

Show details

The 1.95 charge is a test charge from PayPal to link our debit card to PayPal. I will send you a
paypal login.
launchrock-sas-hosting-services https://www.launchrock.com/

Mary Faith Andan   That would be great.                                     May 1 (2 days ago)

Mary Faith Andan   would you mind to send here the updated company c...      May 1 (2 days ago)

David Gitman   Can you access https://www.lucidchart.com/invitations/ac...    May 1 (2 days ago)

Mary Faith Andan   Fyi, I will classify this as Software expense.             May 1 (2 days ago)

David Gitman   Sounds good to me. Jeremy might want to change it         May 1 (2 days ago)

# EXHIBIT B

ack to Bookkeeper

< Fri, May 19 2017 1:35 am UTC >



# EXHIBIT C



**Upwork** JOBS   FREELANCERS   REPORTS   MESSAGES

Q ∨ Find Freelancers   ?   ⌂°   ⚔ Accel Comme... ∨

Contracts / Bookkeeper

Mary Faith Andan
1:35 am Tue in Philippines

TIME & PAYMENTS   MESSAGES & FILES   WORK DIARY

∨   Monday, May 1, 2017   📅   ∧   Today

Total: 0:10hrs   Tracked: 0:10hrs   Manual: 0:00hrs

Pay ∨

TERMS & SETTIN

David Gitman
Freelancer

Accel Commerce
Agency

Accel Commerce
Client

Car Part Kings
Client

ChannelReply
Client

Settings

Logout

Invisible

ndap

WORKING ON ACCE

12
am

# EXHIBIT D

Fri, May 19 2017 2:26 am UTC



| Contract | Time (UTC) | |
|---|---|---|
| Mary Faith Andan | 2:18:03 am | Keyboard |
| Bookkeeper | | 108 |

Activity

# EXHIBIT E

David's-Front.jpg

David Gitman
Managing Partner

E | dgitman@accelcommerce.com

W | www.accelcommerce.com

P | (646) 878-9104

# EXHIBIT F



# EXHIBIT G

Jeremy Falk
**Managing Partner**

E    jfalk@accelcommerce.com

W    www.accelcommerce.com

P    (646) 242-9579

# EXHIBIT H

Google
in:draft
Gmail
COMPOSE
Inbox (5)
Starred
Drafts (1)
David Gitman
1 of 1
Hi David,
You should see the reimbursements in CBO
David Gitman
Show details
Accel Commerce
Check Detail
Date
Name
Memo/Description
Check
David Gitman

**Exhibit 36**

5/30/2017                                      ndap Mail - Fwd: RE:



                                                  Mike Dash <mdash@ndap-llc.com>

## Fwd: RE:

**Michael Dash** <mdash@ndap-llc.com>                         Tue, Apr 18, 2017 at 10:23 PM
To: Jeffrey Rothman <jrothman@srrlaw.com>

Jeff - first draft of the agreement.

Please review and let's discuss.

Thank you
Michael

Begin forwarded message:

> **From:** Jeremy Falk <jeremy.falk@gmail.com>
> **Date:** April 18, 2017 at 9:58:53 PM EDT
> **To:** Michael Dash <mdash@ndap-llc.com>
> **Subject: Fwd: RE:**

See below. Just came through. Included details for lawyer review. Let's discuss tomorrow.

> I am attaching a draft of the contract from our lawyer.  I have highlighted two sections in yellow
> that I know will need a little work.  The first is a list of what we are actually acquiring.  The
> second is the section that describes the monthly payment.  I am having our CFO review it, as I
> feel the way it is worded now, it may trigger the debt covenant we have with our bank and we
> definitely want to avoid any bank review contingency on this deal.  It may need to be worded
> more like an agreed upon "royalty payment."

> With that said, please let me know if you have any issues with the remaining portions of the
> document.  We can be ready to close by month-end.

---

 Car Part Kings Asset Purchase Agreement - v.1 - DMD Draft 4-14-17.docx
45K

## <u>Exhibit 37</u>

P-21

## OPERATING AGREEMENT
## MEMBER MANAGED

**DATE:**

**PARTIES:**

### RECITAL:

The parties to this agreement (the "Members") are entering into this agreement for the purpose of forming a limited liability company under the Limited Liability Company Act of the state of __Delaware_____ (the "Act").

### AGREEMENTS:

**1.    FORMATION**

   **1.1    Name.**  The name of this limited liability company (the "Company") is __Accel Commerce, LLC_____.

   **1.2    Articles of Organization.**  Articles of organization for the Company were filed with the Secretary of State for the state of __Delaware_____ on __March 20, 2017____.

   **1.3    Duration.**  The Company will exist until dissolved as provided in this agreement.

   **1.4    Principal Office.**  The Company's principal office will initially be at __195 Montague St, 14th Fl, Brooklyn, NY 11021_____, but it may be relocated by the Members at any time.

   **1.5    Designated Office and Agent for Service of Process.**  The Company's initial designated office will be at __16192 Coastal Hwy, Lewes, DE 19958_____, and the name of its initial agent for service of process at that address will be __16192 Coastal Hwy, Lewes, DE 19958_____.  The Company's designated office and its agent for service of process may only be changed by filing notice of the change with the Secretary of State of the state in which the articles of organization of the Company were filed.

   **1.6    Purposes and Powers.**  The Company is formed for the purpose of engaging in the business of *.  The Company has the power to do all things necessary, incident, or in furtherance of that business.

i

1.7     **Title to Assets.**  Title to all assets of the Company will be held in the name of the Company.  No Member has any right to the assets of the Company or any ownership interest in those assets except indirectly as a result of the Member's ownership of an interest in the Company.  No Member has any right to partition any assets of the Company or any right to receive any specific assets upon liquidation of the Company or upon any other distribution from the Company.

2.      **MEMBERS, CONTRIBUTIONS AND INTERESTS**

2.1     **Initial Members.**  The names and addresses of the Members of the Company, the amounts of their initial capital contributions, and their initial Ownership Interests are:

| Name and address | Contribution | Ownership Interest |
|---|---|---|
| Dalva Ventures, LLC | $100 | 100% |

Each Member's Ownership Interest at any time will be determined by the ratio of the Member's aggregate capital contributions to the aggregate capital contributions of all Members.

2.2     **Initial Capital Contributions.**  The initial capital contributions of * and * must be paid to the Company, in cash, immediately after all parties have signed this agreement.  The initial capital contribution of * must be made by *'s transferring to the Company the assets listed on the attached Exhibit A.  The transfer of the assets must be made immediately after all parties have signed this agreement by *'s executing and delivering to the Company such documents as may be necessary to transfer the assets listed on the attached Exhibit A to the Company free and clear of all liens and encumbrances.  The transfer documents must include warranties of title and good right to transfer.

**2.3    Additional Members.** Except as otherwise provided in the section of this agreement relating to substitution, additional Members of the Company may be admitted only with the consent of all Members.

**2.4    Additional Contributions.** Except as otherwise provided in the Act, no Member will be required to contribute additional capital to the Company. Additional capital contributions to the Company may be made by the Members only with the Members' unanimous approval. If the Members approve additional capital contributions, the Members must set a maximum amount for such contributions that will be accepted from the Members. Each Member will then have the right, but not the obligation, to contribute a pro rata share of the maximum based upon the Member's Ownership Interest. If any Member elects to contribute less than the Member's pro rata share of the maximum, the other Members may contribute the difference on a pro rata basis in accordance with their Ownership Interests or on any other basis they may agree upon.

**2.5    No Interest on Capital Contributions.** No interest will be paid on capital contributions.

**2.6    Capital Accounts.** An individual capital account will be maintained for each Member. A Member's capital account will be credited with all capital contributions made by the Member and with all income and gain (including any income exempt from federal income tax) allocated to the Member. A Member's capital account will be charged with the amount of all distributions made to the Member and with all losses and deductions (including deductions attributable to tax-exempt income) allocated to the Member. Members' capital accounts must be maintained in accordance with the federal income tax accounting principles prescribed in Treasury Regulations §1.704-1(b)(2)(iv).

**3.    ALLOCATION OF PROFITS AND LOSSES**

**3.1    Determination.** The net profit or net loss of the Company for each fiscal year will be determined according to the accounting principles employed in the preparation of the Company's federal income tax information return for that fiscal year. In computing net profit or net loss for purposes of allocation among the Members, no special provision will be made for tax-exempt or partially tax-exempt income of the Company, and all items of the Company's income, gain, loss, or deduction required to be separately stated under IRC §703(a)(1) will be included in the net profit or net loss of the Company.

**3.2    Allocation of Net Profits and Net Losses.** The net profit or net loss of the Company for a fiscal year will be allocated among the Members in proportion to their Ownership Interests.

3.3     **Allocations Solely for Tax Purposes.** In accordance with IRC §704(c) and the corresponding regulations, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company will be allocated among the Members, solely for income tax purposes, so as to take into account any variation between the adjusted basis of such property for federal income tax purposes in the hands of the Company and the agreed value of such property as set forth in this agreement, or in any document entered into at the time an additional contribution is made to the Company. Any elections or other decisions relating to the allocations to be made under this section will be made by action of the Members. The allocations to be made under this section are solely for purposes of federal, state, and local income taxes and will not affect, or in any way be taken into account in computing, any Member's capital account, allocable share of the net profits and net losses of the Company, or right to distributions.

3.4     **Prorates.** If a Member has not been a Member during a full fiscal year of the Company, or if a Member's Ownership Interest in the Company changes during a fiscal year, the net profit or net loss for the year will be allocated to the Member based only on the period of time during which the Member was a Member or held a particular Ownership Interest. In determining a Member's share of the net profit or net loss for a fiscal year, the Members may allocate the net profit or net loss ratably on a daily basis using the Company's usual method of accounting. Alternatively, the Members may separate the Company's fiscal year into two or more segments and allocate the net profits or net losses for each segment among the persons who were Members, or who held particular Ownership Interests, during each segment based upon their Ownership Interests during that segment.

## 4.     DISTRIBUTIONS

4.1     **Distributions to Pay Taxes.** To enable the Members to pay taxes on income of the Company that is taxable to the Members, the Company must make cash distributions to the Members. During each fiscal year the Company must distribute an amount equal to the product of (a) the highest aggregate rate of federal, state, and local income and self-employment tax imposed on the Company's income for that fiscal year (taking into account the deductibility of state and local income taxes for federal income tax purposes) allocated to any Member who was a Member for the full fiscal year times (b) the amount of the taxable income of the Company allocated to all Members for that fiscal year. Distributions must be paid at least quarterly during each fiscal year at times that coincide with the Members' payment of estimated taxes, and the amount of each distribution will be based upon the anticipated taxable income of the Company for the fiscal year of the distribution and the anticipated tax rates of Members, as determined at the time the distribution is made. The Company's obligation to make distributions under this section is subject to the restrictions governing distributions under the Act.

4.2     **Additional Distributions.** Subject to the restrictions governing distributions under the Act, additional distributions of cash or property may be made from time to time by the Company to the Members, at such times and in such amounts as the Members determine.

**4.3     Allocation of Distributions.**  All distributions to pay taxes and additional distributions must be made to Members in proportion to their Ownership Interests.

## 5.     ADMINISTRATION OF COMPANY BUSINESS

**5.1     Management.**  All Members have the right to participate in the management and conduct of the Company's business.  Subject to the limitations imposed by this agreement or by action of the Members, each Member is an agent of the Company and has authority to bind the Company in the ordinary course of the Company's business.

**5.2     Actions by Members.**  Except as otherwise provided in this agreement, all decisions requiring action of the Members or relating to the business or affairs of the Company will be decided by the affirmative vote or consent of Members holding a majority of the Ownership Interests.  Members may act with or without a meeting, and any Member may participate in any meeting by written proxy or by any means of communication reasonable under the circumstances.

**5.3     Approval of Other Members Required.**  In addition to the other actions requiring unanimous Member approval under the terms of this agreement, no Member has authority to do any of the following without the prior written consent of all other Members:

    **5.3.1**   To sell, lease, exchange, mortgage, pledge, or otherwise transfer or dispose of all or substantially all of the property or assets of the Company;

    **5.3.2**   To merge the Company with any other entity;

    **5.3.3**   To amend the articles of organization of the Company or this agreement;

    **5.3.4**   To incur indebtedness by the Company other than in the ordinary course of business;

    **5.3.5**   To authorize a transaction involving an actual or potential conflict of interest between a Member and the Company;

    **5.3.6**   To change the nature of the business of the Company; or

    **5.3.7**   To commence a voluntary bankruptcy case for the Company.

**5.4     Devotion of Time; Outside Activities.**  Each of the Members must devote so much time and attention to the business of the Company as the Members agree is appropriate. Members may engage in business and investment activities outside the Company, and neither the

v

Company nor the other Members have any rights to the property, profits, or benefits of such activities. But no Member may, without the consent of all other Members, enter into any business or investment activity that is competitive with the business of the Company, or use any property or assets of the Company other than for the operation of the Company's business. For this purpose, the property and assets of the Company include, without limitation, information developed for the Company, opportunities offered to the Company, and other information or opportunities entrusted to a Member as a result of being a Member of the Company.

5.5   **Compensation and Reimbursement.** Members who render services to the Company are entitled to such compensation as may be agreed upon by the Members from time to time. Any compensation paid to a Member for services rendered will be treated as an expense of the Company and a guaranteed payment within the meaning of IRC §707(c), and the amount of the compensation will not be charged against the share of profits of the Company that would otherwise be allocated to the Member. Members are also entitled to reimbursement from the Company for reasonable expenses incurred on behalf of the Company, including expenses incurred in the formation, dissolution, and liquidation of the Company.

5.6   **Self Interest.** A Member does not violate any duty or obligation to the Company merely as a result of engaging in conduct that furthers the interest of the Member. A Member may lend money or transact other business with the Company, and, in this case, the rights and obligations of the Member will be the same as those of a person who is not a Member, so long as the loan or other transaction has been approved or ratified by the Members. Unless otherwise provided by applicable law, a Member with a financial interest in the outcome of a particular action is nevertheless entitled to vote on such action.

## 6.   ACCOUNTING AND RECORDS

6.1   **Books of Account.** The Members must keep such books and records relating to the operation of the Company as are appropriate and adequate for the Company's business and for the carrying out of this agreement. At a minimum, the following must be maintained at the principal office of the Company: (a) financial statements for the three most recent fiscal years; (b) federal, state, and local income tax returns for the three most recent fiscal years; (c) a register showing the current names and addresses of the Members; (d) a copy of the Company's articles of organization and any amendments thereto; (e) this agreement and any amendments thereto; (f) minutes of any meetings of Members; and (g) consents to action by Members. Each Member will have access to all such books and records at all times.

6.2   **Fiscal Year.** The fiscal year of the Company will be the calendar year.

6.3   **Accounting Reports.** Within 90 days after the close of each fiscal year, Company must deliver to each Member an unaudited report of the activities of the Company for the preceding fiscal year, including a copy of a balance sheet of the Company as of the end of the year and a profit and loss statement for the year.

vi

6.4     **Tax Returns.**  The Company must prepare and file on a timely basis all required federal, state, and local income tax and other tax returns.  Within 90 days after the end of each fiscal year, the Company must deliver to each Member a Schedule K-1, showing the amounts of any distributions, contributions, income, gain, loss, deductions, or credits allocated to the Member during the fiscal year.

6.5     **Tax Matters Partner.**  Anytime the Company has more than 10 Members, any Member is an entity other than an estate or a C corporation, or any Member is a nonresident alien individual, the Members must designate one of the Members as the tax matters partner of the Company in accordance with IRC §6231(a)(7) and keep such designation in effect at all times.

7.      **DISSOCIATION AND DISSOLUTION**

7.1     **Withdrawal.**  A Member may withdraw from the Company only after giving notice of withdrawal to the other Members at least 90 days prior to the effective date of the withdrawal.

7.2     **Expulsion.**  A Member may be expelled from the Company by an affirmative vote of the Members holding a majority of the Ownership Interests held by Members other than the expelled Member if the expelled Member has been guilty of wrongful conduct that adversely and materially affects the business or affairs of the Company, or the expelled Member has willfully or persistently committed a material breach of the articles of organization of the Company or this agreement or has otherwise breached a duty owed to the Company or to the other Members to the extent that it is not reasonably practicable to carry on the business or affairs of the Company with that Member.  The right to expel a Member under the provisions of this section does not limit or adversely affect any right or power of the Company or the other Members to recover any damages from the expelled Member or to pursue other remedies permitted under applicable law or in equity.  In addition to any other remedies, the Company or the other Members may offset any such damages against any amounts otherwise distributable or payable to the expelled Member.

7.3     **Events of Dissolution.**  Except as otherwise provided in this agreement, the Company will dissolve upon the earliest of:  (a) the death, incompetence, withdrawal, expulsion, bankruptcy, or dissolution of any Member; (b) approval of a dissolution of the Company by unanimous consent of the Members; or (c) at such time as the Company has no members.

7.4     **Effect of Member's Dissociation.**  Within 120 days following the death, incompetence, withdrawal, expulsion, bankruptcy, or dissolution of a Member, the other Members (whether one or more) may elect to continue the Company by themselves or with others, and to cause the Company to purchase the interest of the dissociating Member pursuant to the provisions of the sections of this agreement relating to purchase price and payment for member's interest.  Making the election is in the sole discretion of the other Members and

requires the consent of other Members holding a majority of the Ownership Interests held by the other Members. Notice of the election must be given in writing to the dissociating Member or the dissociating Member's successor in interest promptly after the election is made. If the other Members do not so elect, the Company will be dissolved.

7.5    **Purchase Price.** If the other Members elect to cause the Company to purchase the interest of a dissociating Member under the section of this agreement relating to effect of member's dissociation, the purchase price of the dissociating Member's interest in the Company will be determined by agreement between the other Members (acting by vote) and the dissociating Member. If an agreement on the purchase price is not reached within 30 days following the election to purchase the interest of the dissociating Member, the interest must be valued by a third party appraiser selected by the other Members who is reasonably acceptable to the dissociating Member, and the purchase price will be the value determined in that appraisal. In appraising the interest to be purchased, the appraiser must determine the fair market value of the interest as of the date of the event of dissociation. In determining the value, the appraiser must consider the greater of the liquidation value of the Company or the value of the Company based upon a sale of the Company as a going concern. The appraiser must also consider appropriate minority interest, lack of marketability, and other discounts. If the appraisal is not completed within 120 days following the election to purchase the interest of the dissociating Member, either the other Members or the dissociating Member may apply to a court of competent jurisdiction for the appointment of another appraiser, in which case the court-appointed appraiser must appraise the interest of the dissociating Member in accordance with the standards set forth in this section, and the purchase price will be the value determined in that appraisal.

7.6    **Payment for Member's Interest.** The purchase price for the interest of a Member purchased under the section of this agreement relating to effect of member's dissociation will be paid as follows:

7.6.1    The purchase price will bear interest from the date of the election of the other Members to purchase the dissociating Member's interest at the prime rate of interest in effect on the date of the election as quoted in The Wall Street Journal or, if that publication is not available, another reputable national publication selected by the other Members that is reasonably acceptable to the dissociating Member.

7.6.2    The purchase price will be payable in accordance with the terms of a promissory note of the Company providing for the payment of the principal amount in 60 equal monthly installments, including interest on the unpaid balance, with the first installment to be due one month after the date of closing and an additional installment to be due on the same day of each month thereafter until the promissory note is paid in full. The promissory note will bear interest from the date of the closing at the rate specified above. The promissory note must provide that if any installment is not paid when due, the holder may declare the entire remaining balance, together with all accrued interest,

viii

immediately due and payable. Partial or complete prepayment of the remaining balance due under the promissory note will be permitted at any time without penalty, provided that any partial prepayment will not affect the amount or regularity of payments coming due thereafter.

7.6.3   The purchase must be closed within 30 days following the determination of the purchase price. At the closing, the dissociating Member must sign and deliver to the Company a written assignment transferring the entire interest of the dissociating Member in the Company to the Company free and clear of all encumbrances. Such assignment must contain warranties of title and good right to transfer. At the closing, the Company must pay the accrued interest on the purchase price then due to the dissociating Member, and the Company must also deliver its promissory note to the dissociating Member. Each of the other Members must sign and deliver to the dissociating Member a security agreement granting a security interest to the dissociating Member in that percentage of the interest of each of the other Members in the Company equal to the Ownership Interest of the dissociating Member being purchased by the Company. The security agreement must be in a form reasonably acceptable to the attorney for the dissociating Member and will secure payment of the promissory note by the Company. The security agreement must provide that if there is a default in the payment of the promissory note by the Company and the security interest is foreclosed or the interest in the Company is retained by the secured party in satisfaction of the indebtedness, the interest may be transferred without the necessity of tendering the interest to the Company under the section of this agreement relating to tender of interest and the person acquiring the interest in the Company will be admitted as a member of the Company without further consent of the Members being required.

> *As an example of the operation of this provision, if the Ownership Interest of a dissociating Member was 25% and there are three other Members, each with an Ownership Interest of 33-1/3% after the purchase of the dissociating Member's Ownership Interest by the Company, each of the other Members would be required to grant the dissociating Member a security interest in an Ownership Interest of 8-1/3%.*

7.7   **Effect of Purchase of Member's Interest.** A dissociating Member will cease to be a Member upon the election of the other Members to cause the Company to purchase the dissociating Member's interest pursuant to the section of this agreement relating to effect of member's dissociation. Thereafter, the dissociating Member will have no rights as a Member in the Company, except the right to have the dissociating Member's interest purchased in accordance with the terms of this agreement.

7.8   **Successor in Interest.** For purposes of this section relating to dissociation and dissolution, the term "dissociating Member" includes the dissociating Member's successor in interest.

8.    **WINDING UP AND LIQUIDATION**

    **8.1    Liquidation Upon Dissolution.**  Upon the dissolution of the Company, the Members must wind up the affairs of the Company unless the dissolution results from the dissociation of a Member and the other Members elect to continue the Company under the provisions of this agreement relating to effect of member's dissociation.  If the affairs of the Company are wound up, a full account must be taken of the assets and liabilities of the Company, and the assets of the Company must be promptly liquidated.  Following liquidation of the assets of the Company, the proceeds must be applied and distributed in the following order of priority:

        **8.1.1**    To creditors of the Company in satisfaction of liabilities and obligations of the Company, including, to the extent permitted by law, liabilities and obligations owed to Members as creditors (except liabilities for unpaid distributions);

        **8.1.2**    To any reserves set up for contingent or unliquidated liabilities or obligations of the Company deemed reasonably necessary by the Members, which reserves may be paid over to an escrow agent by the Members to be held by such escrow agent for disbursement in satisfaction of the liabilities and obligations of the Company, with any excess being distributed to the Members as provided below; and

        **8.1.3**    To Members in proportion to the positive balances of their capital accounts, after taking into account all adjustments made to capital accounts for the fiscal year during which the distributions to Members are made.

    **8.2    Distribution of Property in Kind.**  With approval of the Members, property of the Company may be distributed in kind in the process of winding up and liquidation.  Any property distributed in kind will be valued and treated for the Company's accounting purposes, in accordance with Treasury Regulations §1.704-1(b)(2)(iv)(e)(1), as though the property distributed had been sold at fair market value on the date of distribution.  If property is distributed in kind, the difference between the fair market value of the property and its adjusted tax basis will, solely for the Company's accounting purposes and to adjust the Members' capital accounts, be treated as a gain or loss on the sale of the property and will be credited or charged to the Members' capital accounts in the manner specified in the section of this agreement relating to capital accounts.

    **8.3    Negative Capital Accounts.**  If any Member has a negative balance in the Member's capital account upon liquidation of the Company, the Member will have no obligation to make any contribution to the capital of the Company to make up the deficit, and the deficit will not be considered a debt owed to the Company or any other person for any purpose.

9.    **TRANSFER OF MEMBERS' INTERESTS**

x

**9.1     General Restrictions.**  No Member may transfer all or any part of such Member's interest as a member of the Company except as permitted in this agreement.  Any purported transfer of an interest or a part of an interest in violation of the terms of this agreement will be null and void and of no effect.  For purposes of this section a "transfer" includes a sale, exchange, pledge, or other disposition, voluntarily or by operation of law.

**9.2     Permitted Transfers.**  A Member may transfer all or a part of the Member's interest in the Company with the prior written consent of all other Members.  If the other Members do not consent to a particular transfer, the Member may transfer all or a part of the Member's interest if such interest or part has been tendered for sale to the Company in accordance with the section of this agreement relating to tender of interest, the tender has not been accepted within the time limit set forth in that section, the transfer is made to the transferee named in the notice of tender within 180 days after the notice of tender is effective, and the transfer is at a price and upon terms no more favorable to the transferee than those set forth in the notice of tender.

**9.3     Tender of Interest.**  If a Member wishes to transfer all or part of the Member's interest in the Company and the other Members do not consent, the interest or the part to be transferred must be tendered to the Company by giving written notice of such tender to the Company.  Such notice must contain the name and address of the proposed transferee, the price to be paid by the proposed transferee for the interest, if any, and the terms of the proposed transfer.  If a Member's interest is transferred by operation of law, the successor in interest to the transferring Member may give the required notice of tender to the Company at any time following the transfer, and such successor in interest will be deemed to have given the notice of tender at the time any other Member gives notice to the successor in interest and to all other Members of the failure to give the notice of tender.  Within 30 days after a notice of tender is given, the other Members may accept the tender on behalf of the Company and have the Company purchase the interest tendered for the lesser of the price set forth in the notice of tender (if the proposed transfer is to be by sale) or the price applicable to the purchase of a Member's interest pursuant to the section of this agreement relating to the effect of member's dissociation. The tender must be accepted on behalf of the Company by giving notice of acceptance to the transferring Member or the transferring Member's successor in interest.  The purchase may, at the option of the other Members, be on the terms set forth in the notice of tender, if any, or the terms set forth in the section of this agreement relating to payment for member's interest.  For purposes of those provisions, the date of the acceptance of tender will be deemed to be the date on which the other Members elected to purchase the interest of a dissociating Member.

**9.4     Effect of Tender.**  The Member tendering the interest will cease to be a Member with respect to the tendered interest upon an acceptance of the tender by the Company. Thereafter, the Member tendering the interest will have no rights as a Member in the Company, except the right to have the tendered interest purchased in accordance with the terms of this agreement.

**9.5    Substitution.** If the interest of a Member is transferred, the transferee of the interest may be admitted as a Member of the Company if the transferee executes and delivers to the Company a written agreement to be bound by all of the terms and provisions of this agreement. But the transferee is entitled to be admitted as a Member only if all of the other Members consent to the admission of the transferee as a Member, and this consent may be withheld reasonably or unreasonably. If a Member who is the only member of the Company transfers the Member's entire interest, the transferee will be admitted as a Member of the Company effective upon the transfer without the requirement of an agreement to be bound by this agreement or consent. If the transferee is not admitted as a Member, the transferee will have the right only to receive, to the extent assigned, the distributions from the Company to which the transferor would be entitled. Such transferee will not have the right to exercise the rights of a Member, including, without limitation, the right to vote or inspect or obtain records of the Company.

## 10.    INDEMNIFICATION AND LIABILITY LIMITATION

**10.1    Indemnification.** Except as otherwise provided in this section, the Company must indemnify each of the Members to the fullest extent permissible under the law of the state in which the articles of organization of the Company have been filed, as the same exists or may hereafter be amended, against all liability, loss, and costs (including, without limitation, attorneys' fees) incurred or suffered by the Member by reason of or arising from the fact that the Member is or was a member of the Company, or is or was serving at the request of the Company as a manager, member, director, officer, partner, trustee, employee, or agent of another foreign or domestic limited liability company, corporation, partnership, joint venture, trust, benefit plan, or other enterprise. The Company may, by action of the Members, provide indemnification to employees and agents of the Company who are not Members. The indemnification provided in this section is not exclusive of any other rights to which any person may be entitled under any statute, agreement, resolution of Members, contract, or otherwise. But despite any other provision of this agreement, the Company has no obligation to indemnify a Member for:

**10.1.1** Any breach of the Member's duty of loyalty to the Company;

**10.1.2** Acts or omissions not in good faith that involve intentional misconduct or a knowing violation of law;

**10.1.3** Any unlawful distribution under the Act; or

**10.1.4** Any transaction in which the Member derives improper personal benefit.

**10.2    Limitation of Liability.** No Member of the Company is liable to the Company or to the other Members for monetary damages resulting from the Member's conduct as a Member except to the extent that the Act, as it now exists or may be amended in the future, prohibits the

elimination or limitation of liability of members of limited liability companies. No repeal or amendment of this section or of the Act will adversely affect any right or protection of a Member for actions or omissions prior to the repeal or amendment.

## 11. MISCELLANEOUS PROVISIONS

**11.1   Amendment.** The Members may amend or repeal all or part of this agreement by unanimous written agreement. This agreement may not be amended or repealed by oral agreement of the Members.

**11.2   Binding Effect.** The provisions of this agreement will be binding upon and will inure to the benefit of the heirs, personal representatives, successors, and assigns of the Members. But this section may not be construed as a modification of any restriction on transfer set forth in this agreement.

**11.3   Notice.** Except as otherwise provided in other sections of this agreement, any notice or other communication required or permitted to be given under this agreement must be in writing and must be mailed by certified mail, return receipt requested, with postage prepaid. Notices addressed to a Member must be addressed to the Member's address listed in the section of this agreement relating to initial members, or if there is no such address listed for a Member, the address of the Member shown on the records of the Company. Notices addressed to the Company must be addressed to its principal office. The address of a Member or the Company to which notices or other communications are to be mailed may be changed from time to time by the Member's or the Company's giving written notice to the other Members and the Company. All notices and other communications will be deemed to be given at the expiration of three days after the date of mailing.

**11.4   Litigation Expense.** If any legal proceeding is commenced for the purpose of interpreting or enforcing any provision of this agreement, including any proceeding in the United States Bankruptcy Court, the prevailing party in such proceeding will be entitled to recover a reasonable attorney's fee in such proceeding, or any appeal thereof, to be set by the court without the necessity of hearing testimony or receiving evidence, in addition to the costs and disbursements allowed by law.

**11.5   Additional Documents.** Each Member must execute such additional documents and take such actions as are reasonably requested by the other Members in order to complete or confirm the transactions contemplated by this agreement.

**11.6   Counterparts.** This agreement may be executed in two or more counterparts, which together will constitute one agreement.

**11.7    Governing Law.** This agreement will be governed by the law of the state in which the articles of organization of the Company have been filed.

**11.8    Severability.** If any provision of this agreement is invalid or unenforceable, it will not affect the remaining provisions.

**11.9    Third-Party Beneficiaries.** The provisions of this agreement are intended solely for the benefit of the Members and create no rights or obligations enforceable by any third party, including creditors of the Company, except as otherwise provided by applicable law.

**11.10   Authority.** Each individual executing this agreement on behalf of a corporation or other entity warrants that he or she is authorized to do so and that this agreement constitutes a legally binding obligation of the corporation or other entity that the individual represents.

**11.11   Counsel.** This agreement has been drafted by * (the "Attorney"), who represents * in connection with the creation of the Company. * and * each understand that the Attorney can represent only one party in connection with this matter, that the Attorney represents * and does not represent them, and that they have been advised by the Attorney that they should retain attorneys of their own choice in connection with this matter.

David Gitman
Davla Ventrues, LLC

Jermey Falk



**Exhibit 38**

P-22

# Accel Commerce

## PROFIT AND LOSS

### January - December 2017

| | TOTAL |
|---|---|
| Income | |
| Billable Expense Income | 4,963.65 |
| Discounts given | -7,941.75 |
| Sales | 82,250.76 |
| Uncategorized Income | 1.68 |
| **Total Income** | **$79,274.34** |
| **GROSS PROFIT** | **$79,274.34** |
| Expenses | |
| Advertising & Marketing | 248.04 |
| Bank Charges & Fees | 215.99 |
| Annual Fees | 95.00 |
| Maintenance Fees | 10.00 |
| Merchant Fees | 1,109.67 |
| Trial Deposits | -0.01 |
| Wire Fees | 199.00 |
| **Total Bank Charges & Fees** | **1,629.65** |
| Conferences and Seminars | 100.00 |
| Contractors | 925.00 |
| Dues & subscriptions | 4,900.19 |
| Educational Expense | 359.00 |
| Entertainment | 18.00 |
| Meals | 1,340.94 |
| **Total Entertainment** | **1,358.94** |
| Equipment Rental | |
| Apple Financial Services Lease ($158.49) | 158.49 |
| **Total Equipment Rental** | **158.49** |
| Legal & Professional Fees | 1,470.09 |
| Branding | 374.00 |
| **Total Legal & Professional Fees** | **1,844.09** |
| Office Supplies | 1,264.78 |
| Payroll Expenses | 26.68 |
| Rent & Lease | 6,252.33 |
| Salaries & Wages | 48,843.23 |
| Shipping, Freight & Delivery | 22.69 |
| Software | 1,098.60 |
| Telephone | 129.13 |
| Travel | 3,930.65 |
| Travel Meals | 275.13 |
| **Total Travel** | **4,205.78** |
| Utilities | |
| Cloud Computing Services | 2,574.80 |
| Internet Service Provider | 29.90 |
| **Total Utilities** | **2,604.70** |

| | TOTAL |
|---|---|
| Total Expenses | |
| NET OPERATING INCOME | $75,971.32 |
| | $3,303.02 |
| Other Expenses | |
| eCommerce Quality Assurance Testing | 63.98 |
| Total Other Expenses | |
| | $63.98 |
| NET OTHER INCOME | |
| | $ -63.98 |
| NET INCOME | |
| | $3,239.04 |

# Accel Commerce

### PROFIT AND LOSS

### January - December 2018

|  | TOTAL |
|---|---|
| Income | |
|   Billable Expense Income | |
|   Discounts given | 6,582.00 |
|   Sales | -25,047.84 |
| Total Income | 96,680.10 |
| GROSS PROFIT | $78,214.26 |
| Expenses | $78,214.26 |
|   Advertising & Marketing | |
|   Bad Debt | 467.77 |
|   Bank Charges & Fees | 17,375.25 |
|     Annual Fees | 718.67 |
|     Maintenance Fees | 95.00 |
|     Merchant Fees | 48.00 |
|     Wire Fees | 52.85 |
|   Total Bank Charges & Fees | 150.00 |
|   Conferences and Seminars | 1,064.52 |
|     Registration | |
|     Travel | 1,790.00 |
|     Travel Meals | 3,225.45 |
|   Total Conferences and Seminars | 384.47 |
|   Contractors | 5,399.92 |
|   Dues & subscriptions | 7,068.75 |
|   Entertainment | 7,548.68 |
|     Meals | 177.03 |
|   Total Entertainment | 3,158.25 |
|   Equipment Rental | 3,335.28 |
|     Apple Financial Services Lease ($136.50) | |
|     Apple Financial Services Lease ($158.49) | 1,501.50 |
|   Total Equipment Rental | 2,038.38 |
|   Gift | 3,539.88 |
|   Insurance | 132.84 |
|   Interest Paid | 1,582.59 |
|   Legal & Professional Fees | 354.12 |
|   Office Expenses | 1,595.57 |
|   Office Supplies | 128.00 |
|   Office Supplies & Software | 153.62 |
|   Rent & Lease | 87.60 |
|   Salaries & Wages | 14,331.84 |
|   Software | 21,073.63 |
|   Taxes & Licenses | 203.61 |
|   Telephone | 329.00 |
|   Travel | 390.11 |
|   Auto | 551.97 |
| | 33.40 |

|  | TOTAL |
|---|---|
| Total Travel | 585.37 |
| Utilities | |
| Cloud Computing Services | |
| Total Utilities | 3,379.03 |
| Total Expenses | 3,379.03 |
| NET OPERATING INCOME | $90,126.98 |
| Other Income | $ -11,912.72 |
| Credit Card Rewards | |
| Total Other Income | 2,417.87 |
| NET OTHER INCOME | $2,417.87 |
| NET INCOME | $2,417.87 |
|  | $ -9,494.85 |

| Name | Pay Period | Hourly Rate | Hours Worked | Paid | Status |
|---|---|---|---|---|---|
| Aramayis Hovhannisyan | 5/15/2017 | $14.00 | 56.83 | $795.62 | Paid |
| Sasha Anpilov | 5/15/2017 | $20.00 | 72.01 | $1,440.20 | Paid |
| William Regonas | 5/15/2017 | $5.00 | 5.27 | $26.35 | Paid |
| Aramayis Hovhannisyan | 5/31/2017 | $14.00 | 80.2 | $1,122.80 | Paid |
| Sasha Anpilov | 5/31/2017 | $20.00 | 61.6 | $1,232.00 | Paid |
| Tim Deo | 5/31/2017 | $10.00 | 13 | $130.00 | Paid |
| William Regonas | 5/31/2017 | $5.00 | 5.32 | $26.60 | Paid |
| Aramayis Hovhannisyan | 6/15/2017 | $14.00 | 52.5 | $735.00 | Paid |
| Sasha Anpilov | 6/15/2017 | $20.00 | 73.66 | $1,473.20 | Paid |
| Tim Deo | 6/15/2017 | $10.00 | 13.5 | $135.00 | Paid |
| William Regonas | 6/15/2017 | $5.00 | 72.3 | $361.50 | Paid |
| Aramayis Hovhannisyan | 6/30/2017 | $14.00 | 61.5 | $861.00 | Paid |
| Sasha Anpilov | 6/30/2017 | $20.00 | 51.6 | $1,032.00 | Paid |
| Tim Deo | 6/30/2017 | $10.00 | 4 | $40.00 | Paid |
| William Regonas | 6/30/2017 | $5.00 | 1 | $5.00 | Paid |
| Aramayis Hovhannisyan | 7/15/2017 | $14.00 | 55.5 | $777.00 | Paid |
| Sasha Anpilov | 7/15/2017 | $20.00 | 0.08 | $1.60 | Paid |
| Tim Deo | 7/15/2017 | $10.00 | 1.83 | $18.30 | Paid |
| William Regonas | 7/15/2017 | $5.00 | 0.29 | $1.45 | Paid |
| Aramayis Hovhannisyan | 7/31/2017 | $14.00 | 77.58 | $1,086.12 | Paid |
| Sasha Anpilov | 7/31/2017 | $20.00 | 70.44 | $1,408.80 | Paid |
| Tim Deo | 7/31/2017 | $10.00 | 7 | $70.00 | Paid |
| William Regonas | 7/31/2017 | $5.00 | 0.29 | $1.45 | Paid |
| Aramayis Hovhannisyan | 8/15/2017 | $14.00 | 26.5 | $371.00 | Paid |
| Sasha Anpilov | 8/15/2017 | $20.00 | 56.97 | $1,139.40 | Paid |
| Tim Deo | 8/15/2017 | $10.00 | 1 | $10.00 | Paid |
| Aramayis Hovhannisyan | 8/31/2017 | $14.00 | 78 | $1,092.00 | Paid |
| Jordan Griffey | 8/31/2017 | $25.00 | 65.3 | $1,632.50 | Paid |
| Sasha Anpilov | 8/31/2017 | $20.00 | 39.67 | $793.40 | Paid |
| Tim Deo | 8/31/2017 | $10.00 | 5 | $50.00 | Paid |
| Aramayis Hovhannisyan | 9/15/2017 | $14.00 | 46 | $644.00 | Paid |
| Jordan Griffey | 9/15/2017 | $25.00 | 72.47 | $1,811.75 | Paid |
| Sasha Anpilov | 9/15/2017 | $20.00 | 55.3 | $1,106.00 | Paid |
| Aramayis Hovhannisyan | 10/1/2017 | $14.00 | 60 | $840.00 | Paid |
| Jordan Griffey | 10/1/2017 | $25.00 | 64.56 | $1,614.00 | Paid |
| Sasha Anpilov | 10/1/2017 | $20.00 | 51.87 | $1,037.40 | Paid |
| William Regonas | 10/1/2017 | $5.00 | 9.02 | $45.10 | Paid |
| Artem Lalaints | 10/1/2017 | $35.00 | 1.08 | $37.80 | Paid |
| Aramayis Hovhannisyan | 10/15/2017 | $14.00 | 60 | $840.00 | Paid |
| Jordan Griffey | 10/15/2017 | $25.00 | 78.86 | $1,971.50 | Paid |
| Sasha Anpilov | 10/15/2017 | $20.00 | 58.09 | $1,161.80 | Paid |
| William Regonas | 10/15/2017 | $5.00 | 11.97 | $59.85 | Paid |
| Gnun Ulikhanyan | 10/15/17 | $25.00 | 14 | $350.00 | Paid |
| Aramayis Hovhannisyan | 11/1/2017 | $14.00 | 49 | $686.00 | Paid |
| Jordan Griffey | 11/1/2017 | $25.00 | 84.69 | $2,117.25 | Paid |
| Sasha Anpilov | 11/1/2017 | $20.00 | 53.72 | $1,074.40 | Paid |
| Gnun Ulikhanyan | 11/1/17 | $25.00 | 85 | $2,125.00 | Paid |
| Aramayis Hovhannisyan | 11/16/2017 | $14.00 | 24 | $336.00 | Paid |

| | | | | |
|---|---|---|---|---|
| Jordan Griffey | 11/16/2017 | $25.00 | 78.13 | $1,953.25 Paid |
| Sasha Anpilov | 11/16/2017 | $20.00 | 19.52 | $390.40 Paid |
| Gnun Ulikhanyan | 11/16/17 | $25.00 | 36.75 | $918.75 Paid |
| William Regonas | 11/16/2017 | $5.00 | 7.02 | $35.10 Paid |
| Sasha Anpilov | 11/16/2017 | $20.00 | 38.33 | $766.60 Paid |
| William Regonas | 11/16/2017 | $5.00 | 2.54 | $12.70 Paid |
| Aramayis Hovhannisyan | 12/1/2017 | $14.00 | 36.96 | $517.44 Paid |
| Jordan Griffey | 12/1/2017 | $25.00 | 81.47 | $2,036.75 Paid |
| Sasha Anpilov | 12/1/2017 | $20.00 | 69.82 | $1,396.40 Paid |
| William Regonas | 12/1/2017 | $5.00 | 44.78 | $223.90 Paid |
| Aramayis Hovhannisyan | 12/15/2017 | $14.00 | 18.58 | $260.12 Paid |
| Jordan Griffey | 12/15/2017 | $25.00 | 83.53 | $2,088.25 Paid |
| Sasha Anpilov | 12/15/2017 | $20.00 | 11.95 | $239.00 Paid |
| William Regonas | 12/15/2017 | $5.00 | 78.36 | $391.80 Paid |
| Aramayis Hovhannisyan | 12/31/2017 | $14.00 | 6 | $84.00 Paid |
| Jordan Griffey | 12/31/2017 | $25.00 | 56.16 | $1,404.00 Paid |
| Sasha Anpilov | 12/31/2017 | $20.00 | 11.24 | $224.80 Paid |
| William Regonas | 12/31/2017 | $5.00 | 22.35 | $111.75 Paid |
| Aramayis Hovhannisyan | 1/15/2018 | $14.00 | 3.78 | $52.92 Paid |
| Jordan Griffey | 1/15/2018 | $25.00 | 51.76 | $1,294.00 Paid |
| Sasha Anpilov | 1/15/2018 | $20.00 | 4.97 | $99.40 Paid |
| William Regonas | 1/15/2018 | $5.00 | 2.88 | $14.40 Paid |
| Aramayis Hovhannisyan | 1/31/2018 | $14.00 | 53.34 | $746.76 Paid |
| Jordan Griffey | 1/31/2018 | $25.00 | 81.45 | $2,036.25 Paid |
| Sasha Anpilov | 1/31/2018 | $20.00 | 56.44 | $1,128.80 Paid |
| Aramayis Hovhannisyan | 2/15/2018 | $14.00 | 16.5 | $231.00 Paid |
| Jordan Griffey | 2/15/2018 | $25.00 | 69.8 | $1,745.00 Paid |
| Sasha Anpilov | 2/15/2018 | $20.00 | 62.2 | $1,244.00 Paid |
| William Regonas | 2/15/2018 | $5.00 | 2.43 | $12.15 Paid |
| Aramayis Hovhannisyan | 2/28/2018 | $14.00 | 6.1 | $85.40 Paid |
| Jordan Griffey | 3/1/2018 | $25.00 | 67.38 | $1,684.50 Paid |
| Sasha Anpilov | 3/2/2018 | $20.00 | 38.13 | $762.60 Paid |
| William Regonas | 3/3/2018 | $5.00 | 6.55 | $32.75 Paid |
| Jordan Griffey | 3/16/2018 | $25.00 | 66.53 | $2,363.00 Paid |
| William Regonas | 3/16/2018 | $5.00 | 17.23 | $86.15 Paid |
| Jordan Griffey | 3/31/2018 | $25.00 | 60 | $1,500.00 Paid |
| Jordan Griffey | 3/31/2018 | $25.00 | 8.21 | $205.25 Paid |
| Jordan Griffey | 4/15/2018 | $25.00 | 68.22 | $1,705.50 Paid |
| Jordan Griffey | 5/1/2018 | $25.00 | 79.39 | $1,984.75 Paid |
| Jordan Griffey | 5/15/2018 | $25.00 | 59.5 | $1,487.50 Paid |
| Jordan Griffey | 6/1/2018 | $25.00 | 49.25 | $1,231.25 Paid |
| Jordan Griffey | 6/15/2018 | $25.00 | 34 | $425.00 Paid |
| Jordan Griffey | 6/15/2018 | $25.00 | 34 | $425.00 |
| Jordan Griffey | 6/30/2018 | $25.00 | 76 | $1,900.00 |
| Jordan Griffey | 7/15/2018 | $25.00 | 8.5 | $212.50 |
| Jordan Griffey | 7/31/2018 | $25.00 | 34.5 | $862.50 |
| William Regonas | 10/13/2018 | $5.00 | 6 | $30.00 Paid |
| Jordan Griffey | 12/31/2018 | $25.00 | 21 | $525.00 |

| Method | Confirmation Number |
|---|---|
| Payoneer ACH | 6229529116 |
| Payoneer ACH | 6226678484 |
| Payoneer ACH | 6226679071 |
| Payoneer ACH | 6265608365 |
| Payoneer ACH | 6265602581 |
| Payoneer ACH | 6270747820 |
| Payoneer ACH | 6265595936 |
| Payoneer ACH | 6300017075 |
| Payoneer ACH | 6300034829 |
| Payoneer ACH | 6300022289 |
| Payoneer ACH | 6300023582 |
| Payoneer ACH | 6341004048 |
| Payoneer ACH | 6341005136 |
| Payoneer ACH | 6341007720 |
| Payoneer ACH | 6341010759 |
| Payoneer ACH | 6378989715 |
| Payoneer ACH | 6378991041 |
| Payoneer ACH | 6378992075 |
| Payoneer ACH | 6378992942 |
| Payoneer ACH | 6423744470 |
| Payoneer ACH | 6423744638 |
| Payoneer ACH | 6423744800 |
| Payoneer ACH | 6423745172 |
| Payoneer ACH | 6450532534 |
| Payoneer ACH | 6450534778 |
| Payoneer ACH | 6450535291 |
| Payoneer ACH | 6512245728 |
| Wire Transfer | 5022774547 |
| Payoneer ACH | 6512248908 |
| Payoneer ACH | 6512249745 |
| Payoneer ACH | 6564798743 |
| Wire Transfer | 5023685731 |
| Payoneer ACH | 6562042386 |
| Payoneer ACH | 6564802377 |
| Wire Transfer | 5024555736 |
| Payoneer ACH | 6562112168 |
| Payoneer ACH | 6562123746 |
| Payoneer ACH | 6564805734 |
| Payoneer ACH | 6596434694 |
| Wire Transfer | 5022774547 |
| Payoneer ACH | 6596436594 |
| Payoneer ACH | 6596438525 |
| Wire Transfer | 5026614134 |
| Payoneer ACH | 6639462053 |
| Wire Transfer | 5026614302 |
| Payoneer ACH | 6639463674 |
| Wire Transfer | 5026614134 |
| Payoneer ACH | 6674343569 |

| | | |
|---|---|---|
| Wire Transfer | | 5027495839 |
| Payoneer ACH | | 6674344705 |
| Wire Transfer | | 5027495772 |
| Payoneer ACH | | 6674346869 |
| Payoneer ACH | | 6683978049 |
| Wire Transfer | | 5027705429 |
| Payoneer ACH | | 6712202166 |
| Wire Transfer | | 5028401073 |
| Payoneer ACH | | 6712208600 |
| Payoneer ACH | | 6712210955 |
| Payoneer ACH | | 6758149151 |
| Wire Transfer | | 5029519874 |
| Payoneer ACH | | 6758151556 |
| Payoneer ACH | | 6758153909 |
| Payoneer ACH | | 6791806797 |
| Wire Transfer | | 5030769910 |
| Payoneer ACH | | 6791809385 |
| Payoneer ACH | | 6791811505 |
| Payoneer ACH | | 6827767252 |
| Wire Transfer | | 5031175241 |
| Payoneer ACH | | 6827768920 |
| Payoneer ACH | | 6827770342 |
| Payoneer ACH | | 6868931040 |
| Wire Transfer | | 5032228569 |
| Payoneer ACH | | 6868932538 |
| Payoneer ACH | | 6909973420 |
| Wire Transfer | | 5033205488 |
| Payoneer ACH | | 6909975747 |
| Payoneer ACH | | 6909977015 |
| Payoneer ACH | | 6944744360 |
| Wire Transfer | | 5033956820 |
| Payoneer ACH | | 6944255740 |
| Payoneer ACH | | 6944257651 |
| Wire Transfer | | 5035001647 |
| Payoneer ACH | | 6987607453 |
| Wire Transfer | | 5036102511 |
| Wire Transfer | | 5036792023 |
| Wire Transfer | | 5036792023 |
| Wire Transfer | | 5037658799 |
| Wire Transfer | | 5039326238 |
| Wire Transfer | | 5039326238 |
| Wire Transfer | | 5040323410 |
| Personal CC Charges Payback | QB J/E 2018-3 | |
| Wire Transfer | | 5202083674 |
| Personal CC Charges Payback | QB J/E 2018-1 | |
| Personal CC Charges Payback | QB J/E 2018-2 | |
| PayPal | 3WJ903151K4900949 | |
| Personal CC Charges Payback | QB J/E 2018-6 | |

| Name | (Multiple Items) |
|---|---|
| Pay Period | SUM of Paid |
| 5/15/2017 | 2262.17 |
| 5/31/2017 | 2511.4 |
| 6/15/2017 | 2704.7 |
| 6/30/2017 | 1938 |
| 7/15/2017 | 798.35 |
| 7/31/2017 | 2566.37 |
| 8/15/2017 | 1520.4 |
| 8/31/2017 | 3567.9 |
| 9/15/2017 | 3561.75 |
| 10/1/2017 | 3574.3 |
| 10/15/2017 | 4383.15 |
| 11/1/2017 | 6002.65 |
| 11/16/2017 | 4412.8 |
| 12/1/2017 | 4174.49 |
| 12/15/2017 | 2979.17 |
| 12/31/2017 | 1824.55 |
| 1/15/2018 | 1460.72 |
| 1/31/2018 | 3911.81 |
| 2/15/2018 | 3232.15 |
| 2/28/2018 | 85.4 |
| 3/1/2018 | 1684.5 |
| 3/2/2018 | 762.6 |
| 3/3/2018 | 32.75 |
| 3/16/2018 | 2449.15 |
| 3/31/2018 | 1705.25 |
| 4/15/2018 | 1705.5 |
| 5/1/2018 | 1984.75 |
| 5/15/2018 | 1487.5 |
| 6/1/2018 | 1231.25 |
| 6/15/2018 | 850 |
| 6/30/2018 | 1900 |
| 7/15/2018 | 212.5 |

| | |
|---|---|
| 7/31/2018 | 862.5 |
| 10/13/2018 | 30 |
| 12/31/2018 | 525 |

## **Exhibit 39**

DocuSign Envelope ID: A537888A-AE8E-44B9-B⋯959AD84B1AA0

P-20

## OPERATING AGREEMENT
## MEMBER MANAGED

**DATE:**

**PARTIES:**

### RECITAL:

The parties to this agreement (the "Members") are entering into this agreement for the purpose of forming a limited liability company under the Limited Liability Company Act of the state of Delaware_____ (the "Act").

### AGREEMENTS:

1. **FORMATION**

    **1.1    Name.** The name of this limited liability company (the "Company") is DALVA VENTURES, LLC_____

    **1.2    Articles of Organization.** Articles of organization for the Company were filed with the Secretary of State for the state of Delaware_____ on February 13, 2017.

    **1.3    Duration.** The Company will exist until dissolved as provided in this agreement.

    **1.4    Principal Office.** The Company's principal office will initially be at 16192 Coastal Hwy, Lewes, DE 19958_____, but it may be relocated by the Members at any time.

    **1.5    Designated Office and Agent for Service of Process.** The Company's initial designated office will be at 16192 Coastal Hwy, Lewes, DE 19958_____, and the name of its initial agent for service of process at that address will be Harvard Business Services, Inc._____. The Company's designated office and its agent for service of process may only be changed by filing notice of the change with the Secretary of State of the state in which the articles of organization of the Company were filed.

    **1.6    Purposes and Powers.** The Company is formed for the purpose of engaging in the business of *. The Company has the power to do all things necessary, incident, or in furtherance of that business.

i

DocuSign Envelope ID: A537888A-AE8E-44B9-B(   )59AD84B1AA0

**1.7     Title to Assets.** Title to all assets of the Company will be held in the name of the Company. No Member has any right to the assets of the Company or any ownership interest in those assets except indirectly as a result of the Member's ownership of an interest in the Company. No Member has any right to partition any assets of the Company or any right to receive any specific assets upon liquidation of the Company or upon any other distribution from the Company.

## 2.     MEMBERS, CONTRIBUTIONS AND INTERESTS

**2.1     Initial Members.** The names and addresses of the Members of the Company, the amounts of their initial capital contributions, and their initial Ownership Interests are:

| Name and address | Contribution | Ownership Interest |
|---|---|---|
| David Gitman | $50 | 50% |
| 100 Sterling Pl, Apt 1A Brooklyn, NY 11217 | | |
| Laura Gitman | $50 | 50% |
| 100 Sterling Pl, Apt 1A Brooklyn, NY 11217 | | |

Each Member's Ownership Interest at any time will be determined by the ratio of the Member's aggregate capital contributions to the aggregate capital contributions of all Members.

**2.2     Initial Capital Contributions.** The initial capital contributions of * and * must be paid to the Company, in cash, immediately after all parties have signed this agreement. The initial capital contribution of * must be made by *'s transferring to the Company the assets listed on the attached Exhibit A. The transfer of the assets must be made immediately after all parties have signed this agreement by *'s executing and delivering to the Company such documents as may be necessary to transfer the assets listed on the attached Exhibit A to the Company free and clear of all liens and encumbrances. The transfer documents must include warranties of title and good right to transfer.

DocuSign Envelope ID: A537888A-AE8E-44B9-B:   959AD84B1AA0

**2.3    Additional Members.** Except as otherwise provided in the section of this agreement relating to substitution, additional Members of the Company may be admitted only with the consent of all Members.

**2.4    Additional Contributions.** Except as otherwise provided in the Act, no Member will be required to contribute additional capital to the Company. Additional capital contributions to the Company may be made by the Members only with the Members' unanimous approval. If the Members approve additional capital contributions, the Members must set a maximum amount for such contributions that will be accepted from the Members. Each Member will then have the right, but not the obligation, to contribute a pro rata share of the maximum based upon the Member's Ownership Interest. If any Member elects to contribute less than the Member's pro rata share of the maximum, the other Members may contribute the difference on a pro rata basis in accordance with their Ownership Interests or on any other basis they may agree upon.

**2.5    No Interest on Capital Contributions.** No interest will be paid on capital contributions.

**2.6    Capital Accounts.** An individual capital account will be maintained for each Member. A Member's capital account will be credited with all capital contributions made by the Member and with all income and gain (including any income exempt from federal income tax) allocated to the Member. A Member's capital account will be charged with the amount of all distributions made to the Member and with all losses and deductions (including deductions attributable to tax-exempt income) allocated to the Member. Members' capital accounts must be maintained in accordance with the federal income tax accounting principles prescribed in Treasury Regulations §1.704-1(b)(2)(iv).

# 3.    ALLOCATION OF PROFITS AND LOSSES

**3.1    Determination.** The net profit or net loss of the Company for each fiscal year will be determined according to the accounting principles employed in the preparation of the Company's federal income tax information return for that fiscal year. In computing net profit or net loss for purposes of allocation among the Members, no special provision will be made for tax-exempt or partially tax-exempt income of the Company, and all items of the Company's income, gain, loss, or deduction required to be separately stated under IRC §703(a)(1) will be included in the net profit or net loss of the Company.

**3.2    Allocation of Net Profits and Net Losses.** The net profit or net loss of the Company for a fiscal year will be allocated among the Members in proportion to their Ownership Interests.

DocuSign Envelope ID: A537888A-AE8E-44B9-BE   )59AD84B1AA0

**3.3     Allocations Solely for Tax Purposes.**  In accordance with IRC §704(c) and the corresponding regulations, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company will be allocated among the Members, solely for income tax purposes, so as to take into account any variation between the adjusted basis of such property for federal income tax purposes in the hands of the Company and the agreed value of such property as set forth in this agreement, or in any document entered into at the time an additional contribution is made to the Company.  Any elections or other decisions relating to the allocations to be made under this section will be made by action of the Members.  The allocations to be made under this section are solely for purposes of federal, state, and local income taxes and will not affect, or in any way be taken into account in computing, any Member's capital account, allocable share of the net profits and net losses of the Company, or right to distributions.

**3.4     Prorates.**  If a Member has not been a Member during a full fiscal year of the Company, or if a Member's Ownership Interest in the Company changes during a fiscal year, the net profit or net loss for the year will be allocated to the Member based only on the period of time during which the Member was a Member or held a particular Ownership Interest.  In determining a Member's share of the net profit or net loss for a fiscal year, the Members may allocate the net profit or net loss ratably on a daily basis using the Company's usual method of accounting. Alternatively, the Members may separate the Company's fiscal year into two or more segments and allocate the net profits or net losses for each segment among the persons who were Members, or who held particular Ownership Interests, during each segment based upon their Ownership Interests during that segment.

**4.     DISTRIBUTIONS**

**4.1     Distributions to Pay Taxes.**  To enable the Members to pay taxes on income of the Company that is taxable to the Members, the Company must make cash distributions to the Members.  During each fiscal year the Company must distribute an amount equal to the product of (a) the highest aggregate rate of federal, state, and local income and self-employment tax imposed on the Company's income for that fiscal year (taking into account the deductibility of state and local income taxes for federal income tax purposes) allocated to any Member who was a Member for the full fiscal year times (b) the amount of the taxable income of the Company allocated to all Members for that fiscal year.  Distributions must be paid at least quarterly during each fiscal year at times that coincide with the Members' payment of estimated taxes, and the amount of each distribution will be based upon the anticipated taxable income of the Company for the fiscal year of the distribution and the anticipated tax rates of Members, as determined at the time the distribution is made.  The Company's obligation to make distributions under this section is subject to the restrictions governing distributions under the Act.

**4.2     Additional Distributions.**  Subject to the restrictions governing distributions under the Act, additional distributions of cash or property may be made from time to time by the Company to the Members, at such times and in such amounts as the Members determine.

iv

DocuSign Envelope ID: A537888A-AE8E-44B9-B:   959AD84B1AA0

4.3    **Allocation of Distributions.**  All distributions to pay taxes and additional distributions must be made to Members in proportion to their Ownership Interests.

5.    **ADMINISTRATION OF COMPANY BUSINESS**

5.1    **Management.**  All Members have the right to participate in the management and conduct of the Company's business.  Subject to the limitations imposed by this agreement or by action of the Members, each Member is an agent of the Company and has authority to bind the Company in the ordinary course of the Company's business.

5.2    **Actions by Members.**  Except as otherwise provided in this agreement, all decisions requiring action of the Members or relating to the business or affairs of the Company will be decided by the affirmative vote or consent of Members holding a majority of the Ownership Interests.  Members may act with or without a meeting, and any Member may participate in any meeting by written proxy or by any means of communication reasonable under the circumstances.

5.3    **Approval of Other Members Required.**  In addition to the other actions requiring unanimous Member approval under the terms of this agreement, no Member has authority to do any of the following without the prior written consent of all other Members:

5.3.1    To sell, lease, exchange, mortgage, pledge, or otherwise transfer or dispose of all or substantially all of the property or assets of the Company;

5.3.2    To merge the Company with any other entity;

5.3.3    To amend the articles of organization of the Company or this agreement;

5.3.4    To incur indebtedness by the Company other than in the ordinary course of business;

5.3.5    To authorize a transaction involving an actual or potential conflict of interest between a Member and the Company;

5.3.6    To change the nature of the business of the Company; or

5.3.7    To commence a voluntary bankruptcy case for the Company.

5.4    **Devotion of Time; Outside Activities.**  Each of the Members must devote so much time and attention to the business of the Company as the Members agree is appropriate. Members may engage in business and investment activities outside the Company, and neither the

DocuSign Envelope ID: A537888A-AE8E-44B9-B... 959AD84B1AA0

Company nor the other Members have any rights to the property, profits, or benefits of such activities. But no Member may, without the consent of all other Members, enter into any business or investment activity that is competitive with the business of the Company, or use any property or assets of the Company other than for the operation of the Company's business. For this purpose, the property and assets of the Company include, without limitation, information developed for the Company, opportunities offered to the Company, and other information or opportunities entrusted to a Member as a result of being a Member of the Company.

   **5.5   Compensation and Reimbursement.** Members who render services to the Company are entitled to such compensation as may be agreed upon by the Members from time to time. Any compensation paid to a Member for services rendered will be treated as an expense of the Company and a guaranteed payment within the meaning of IRC §707(c), and the amount of the compensation will not be charged against the share of profits of the Company that would otherwise be allocated to the Member. Members are also entitled to reimbursement from the Company for reasonable expenses incurred on behalf of the Company, including expenses incurred in the formation, dissolution, and liquidation of the Company.

   **5.6   Self Interest.** A Member does not violate any duty or obligation to the Company merely as a result of engaging in conduct that furthers the interest of the Member. A Member may lend money or transact other business with the Company, and, in this case, the rights and obligations of the Member will be the same as those of a person who is not a Member, so long as the loan or other transaction has been approved or ratified by the Members. Unless otherwise provided by applicable law, a Member with a financial interest in the outcome of a particular action is nevertheless entitled to vote on such action.

**6.   ACCOUNTING AND RECORDS**

   **6.1   Books of Account.** The Members must keep such books and records relating to the operation of the Company as are appropriate and adequate for the Company's business and for the carrying out of this agreement. At a minimum, the following must be maintained at the principal office of the Company: (a) financial statements for the three most recent fiscal years; (b) federal, state, and local income tax returns for the three most recent fiscal years; (c) a register showing the current names and addresses of the Members; (d) a copy of the Company's articles of organization and any amendments thereto; (e) this agreement and any amendments thereto; (f) minutes of any meetings of Members; and (g) consents to action by Members. Each Member will have access to all such books and records at all times.

   **6.2   Fiscal Year.** The fiscal year of the Company will be the calendar year.

   **6.3   Accounting Reports.** Within 90 days after the close of each fiscal year, Company must deliver to each Member an unaudited report of the activities of the Company for the preceding fiscal year, including a copy of a balance sheet of the Company as of the end of the year and a profit and loss statement for the year.

DocuSign Envelope ID: A537888A-AE8E-44B9-B... 959AD84B1AA0

**6.4    Tax Returns.**  The Company must prepare and file on a timely basis all required federal, state, and local income tax and other tax returns.  Within 90 days after the end of each fiscal year, the Company must deliver to each Member a Schedule K-1, showing the amounts of any distributions, contributions, income, gain, loss, deductions, or credits allocated to the Member during the fiscal year.

**6.5    Tax Matters Partner.**  Anytime the Company has more than 10 Members, any Member is an entity other than an estate or a C corporation, or any Member is a nonresident alien individual, the Members must designate one of the Members as the tax matters partner of the Company in accordance with IRC §6231(a)(7) and keep such designation in effect at all times.

## 7.    DISSOCIATION AND DISSOLUTION

**7.1    Withdrawal.**  A Member may withdraw from the Company only after giving notice of withdrawal to the other Members at least 90 days prior to the effective date of the withdrawal.

**7.2    Expulsion.**  A Member may be expelled from the Company by an affirmative vote of the Members holding a majority of the Ownership Interests held by Members other than the expelled Member if the expelled Member has been guilty of wrongful conduct that adversely and materially affects the business or affairs of the Company, or the expelled Member has willfully or persistently committed a material breach of the articles of organization of the Company or this agreement or has otherwise breached a duty owed to the Company or to the other Members to the extent that it is not reasonably practicable to carry on the business or affairs of the Company with that Member.  The right to expel a Member under the provisions of this section does not limit or adversely affect any right or power of the Company or the other Members to recover any damages from the expelled Member or to pursue other remedies permitted under applicable law or in equity.  In addition to any other remedies, the Company or the other Members may offset any such damages against any amounts otherwise distributable or payable to the expelled Member.

**7.3    Events of Dissolution.**  Except as otherwise provided in this agreement, the Company will dissolve upon the earliest of:  (a) the death, incompetence, withdrawal, expulsion, bankruptcy, or dissolution of any Member; (b) approval of a dissolution of the Company by unanimous consent of the Members; or (c) at such time as the Company has no members.

**7.4    Effect of Member's Dissociation.**  Within 120 days following the death, incompetence, withdrawal, expulsion, bankruptcy, or dissolution of a Member, the other Members (whether one or more) may elect to continue the Company by themselves or with others, and to cause the Company to purchase the interest of the dissociating Member pursuant to the provisions of the sections of this agreement relating to purchase price and payment for member's interest.  Making the election is in the sole discretion of the other Members and

vii

DocuSign Envelope ID: A537888A-AE8E-44B9-B:   959AD84B1AA0

requires the consent of other Members holding a majority of the Ownership Interests held by the other Members. Notice of the election must be given in writing to the dissociating Member or the dissociating Member's successor in interest promptly after the election is made. If the other Members do not so elect, the Company will be dissolved.

**7.5     Purchase Price.** If the other Members elect to cause the Company to purchase the interest of a dissociating Member under the section of this agreement relating to effect of member's dissociation, the purchase price of the dissociating Member's interest in the Company will be determined by agreement between the other Members (acting by vote) and the dissociating Member. If an agreement on the purchase price is not reached within 30 days following the election to purchase the interest of the dissociating Member, the interest must be valued by a third party appraiser selected by the other Members who is reasonably acceptable to the dissociating Member, and the purchase price will be the value determined in that appraisal. In appraising the interest to be purchased, the appraiser must determine the fair market value of the interest as of the date of the event of dissociation. In determining the value, the appraiser must consider the greater of the liquidation value of the Company or the value of the Company based upon a sale of the Company as a going concern. The appraiser must also consider appropriate minority interest, lack of marketability, and other discounts. If the appraisal is not completed within 120 days following the election to purchase the interest of the dissociating Member, either the other Members or the dissociating Member may apply to a court of competent jurisdiction for the appointment of another appraiser, in which case the court-appointed appraiser must appraise the interest of the dissociating Member in accordance with the standards set forth in this section, and the purchase price will be the value determined in that appraisal.

**7.6     Payment for Member's Interest.** The purchase price for the interest of a Member purchased under the section of this agreement relating to effect of member's dissociation will be paid as follows:

**7.6.1**    The purchase price will bear interest from the date of the election of the other Members to purchase the dissociating Member's interest at the prime rate of interest in effect on the date of the election as quoted in The Wall Street Journal or, if that publication is not available, another reputable national publication selected by the other Members that is reasonably acceptable to the dissociating Member.

**7.6.2**    The purchase price will be payable in accordance with the terms of a promissory note of the Company providing for the payment of the principal amount in 60 equal monthly installments, including interest on the unpaid balance, with the first installment to be due one month after the date of closing and an additional installment to be due on the same day of each month thereafter until the promissory note is paid in full. The promissory note will bear interest from the date of the closing at the rate specified above. The promissory note must provide that if any installment is not paid when due, the holder may declare the entire remaining balance, together with all accrued interest,

DocuSign Envelope ID: A537888A-AE8E-44B9-B  )59AD84B1AA0

immediately due and payable. Partial or complete prepayment of the remaining balance due under the promissory note will be permitted at any time without penalty, provided that any partial prepayment will not affect the amount or regularity of payments coming due thereafter.

7.6.3    The purchase must be closed within 30 days following the determination of the purchase price. At the closing, the dissociating Member must sign and deliver to the Company a written assignment transferring the entire interest of the dissociating Member in the Company to the Company free and clear of all encumbrances. Such assignment must contain warranties of title and good right to transfer. At the closing, the Company must pay the accrued interest on the purchase price then due to the dissociating Member, and the Company must also deliver its promissory note to the dissociating Member. Each of the other Members must sign and deliver to the dissociating Member a security agreement granting a security interest to the dissociating Member in that percentage of the interest of each of the other Members in the Company equal to the Ownership Interest of the dissociating Member being purchased by the Company. The security agreement must be in a form reasonably acceptable to the attorney for the dissociating Member and will secure payment of the promissory note by the Company. The security agreement must provide that if there is a default in the payment of the promissory note by the Company and the security interest is foreclosed or the interest in the Company is retained by the secured party in satisfaction of the indebtedness, the interest may be transferred without the necessity of tendering the interest to the Company under the section of this agreement relating to tender of interest and the person acquiring the interest in the Company will be admitted as a member of the Company without further consent of the Members being required.

*As an example of the operation of this provision, if the Ownership Interest of a dissociating Member was 25% and there are three other Members, each with an Ownership Interest of 33-1/3% after the purchase of the dissociating Member's Ownership Interest by the Company, each of the other Members would be required to grant the dissociating Member a security interest in an Ownership Interest of 8-1/3%.*

7.7    **Effect of Purchase of Member's Interest.** A dissociating Member will cease to be a Member upon the election of the other Members to cause the Company to purchase the dissociating Member's interest pursuant to the section of this agreement relating to effect of member's dissociation. Thereafter, the dissociating Member will have no rights as a Member in the Company, except the right to have the dissociating Member's interest purchased in accordance with the terms of this agreement.

7.8    **Successor in Interest.** For purposes of this section relating to dissociation and dissolution, the term "dissociating Member" includes the dissociating Member's successor in interest.

DocuSign Envelope ID: A537888A-AE8E-44B9-B    959AD84B1AA0

## 8.   WINDING UP AND LIQUIDATION

**8.1   Liquidation Upon Dissolution.**  Upon the dissolution of the Company, the Members must wind up the affairs of the Company unless the dissolution results from the dissociation of a Member and the other Members elect to continue the Company under the provisions of this agreement relating to effect of member's dissociation.  If the affairs of the Company are wound up, a full account must be taken of the assets and liabilities of the Company, and the assets of the Company must be promptly liquidated.  Following liquidation of the assets of the Company, the proceeds must be applied and distributed in the following order of priority:

**8.1.1**   To creditors of the Company in satisfaction of liabilities and obligations of the Company, including, to the extent permitted by law, liabilities and obligations owed to Members as creditors (except liabilities for unpaid distributions);

**8.1.2**   To any reserves set up for contingent or unliquidated liabilities or obligations of the Company deemed reasonably necessary by the Members, which reserves may be paid over to an escrow agent by the Members to be held by such escrow agent for disbursement in satisfaction of the liabilities and obligations of the Company, with any excess being distributed to the Members as provided below; and

**8.1.3**   To Members in proportion to the positive balances of their capital accounts, after taking into account all adjustments made to capital accounts for the fiscal year during which the distributions to Members are made.

**8.2   Distribution of Property in Kind.**  With approval of the Members, property of the Company may be distributed in kind in the process of winding up and liquidation.  Any property distributed in kind will be valued and treated for the Company's accounting purposes, in accordance with Treasury Regulations §1.704-1(b)(2)(iv)(e)(1), as though the property distributed had been sold at fair market value on the date of distribution.  If property is distributed in kind, the difference between the fair market value of the property and its adjusted tax basis will, solely for the Company's accounting purposes and to adjust the Members' capital accounts, be treated as a gain or loss on the sale of the property and will be credited or charged to the Members' capital accounts in the manner specified in the section of this agreement relating to capital accounts.

**8.3   Negative Capital Accounts.**  If any Member has a negative balance in the Member's capital account upon liquidation of the Company, the Member will have no obligation to make any contribution to the capital of the Company to make up the deficit, and the deficit will not be considered a debt owed to the Company or any other person for any purpose.

## 9.   TRANSFER OF MEMBERS' INTERESTS

x

DocuSign Envelope ID: A537888A-AE8E-44B9-B    959AD84B1AA0

**9.1    General Restrictions.**  No Member may transfer all or any part of such Member's interest as a member of the Company except as permitted in this agreement.  Any purported transfer of an interest or a part of an interest in violation of the terms of this agreement will be null and void and of no effect.  For purposes of this section a "transfer" includes a sale, exchange, pledge, or other disposition, voluntarily or by operation of law.

**9.2    Permitted Transfers.**  A Member may transfer all or a part of the Member's interest in the Company with the prior written consent of all other Members.  If the other Members do not consent to a particular transfer, the Member may transfer all or a part of the Member's interest if such interest or part has been tendered for sale to the Company in accordance with the section of this agreement relating to tender of interest, the tender has not been accepted within the time limit set forth in that section, the transfer is made to the transferee named in the notice of tender within 180 days after the notice of tender is effective, and the transfer is at a price and upon terms no more favorable to the transferee than those set forth in the notice of tender.

**9.3    Tender of Interest.**  If a Member wishes to transfer all or part of the Member's interest in the Company and the other Members do not consent, the interest or the part to be transferred must be tendered to the Company by giving written notice of such tender to the Company.  Such notice must contain the name and address of the proposed transferee, the price to be paid by the proposed transferee for the interest, if any, and the terms of the proposed transfer.  If a Member's interest is transferred by operation of law, the successor in interest to the transferring Member may give the required notice of tender to the Company at any time following the transfer, and such successor in interest will be deemed to have given the notice of tender at the time any other Member gives notice to the successor in interest and to all other Members of the failure to give the notice of tender.  Within 30 days after a notice of tender is given, the other Members may accept the tender on behalf of the Company and have the Company purchase the interest tendered for the lesser of the price set forth in the notice of tender (if the proposed transfer is to be by sale) or the price applicable to the purchase of a Member's interest pursuant to the section of this agreement relating to the effect of member's dissociation. The tender must be accepted on behalf of the Company by giving notice of acceptance to the transferring Member or the transferring Member's successor in interest.  The purchase may, at the option of the other Members, be on the terms set forth in the notice of tender, if any, or the terms set forth in the section of this agreement relating to payment for member's interest.  For purposes of those provisions, the date of the acceptance of tender will be deemed to be the date on which the other Members elected to purchase the interest of a dissociating Member.

**9.4    Effect of Tender.**  The Member tendering the interest will cease to be a Member with respect to the tendered interest upon an acceptance of the tender by the Company. Thereafter, the Member tendering the interest will have no rights as a Member in the Company, except the right to have the tendered interest purchased in accordance with the terms of this agreement.

DocuSign Envelope ID: A537888A-AE8E-44B9-B      959AD84B1AA0

**9.5    Substitution.** If the interest of a Member is transferred, the transferee of the interest may be admitted as a Member of the Company if the transferee executes and delivers to the Company a written agreement to be bound by all of the terms and provisions of this agreement. But the transferee is entitled to be admitted as a Member only if all of the other Members consent to the admission of the transferee as a Member, and this consent may be withheld reasonably or unreasonably. If a Member who is the only member of the Company transfers the Member's entire interest, the transferee will be admitted as a Member of the Company effective upon the transfer without the requirement of an agreement to be bound by this agreement or consent. If the transferee is not admitted as a Member, the transferee will have the right only to receive, to the extent assigned, the distributions from the Company to which the transferor would be entitled. Such transferee will not have the right to exercise the rights of a Member, including, without limitation, the right to vote or inspect or obtain records of the Company.

## 10.    INDEMNIFICATION AND LIABILITY LIMITATION

**10.1    Indemnification.** Except as otherwise provided in this section, the Company must indemnify each of the Members to the fullest extent permissible under the law of the state in which the articles of organization of the Company have been filed, as the same exists or may hereafter be amended, against all liability, loss, and costs (including, without limitation, attorneys' fees) incurred or suffered by the Member by reason of or arising from the fact that the Member is or was a member of the Company, or is or was serving at the request of the Company as a manager, member, director, officer, partner, trustee, employee, or agent of another foreign or domestic limited liability company, corporation, partnership, joint venture, trust, benefit plan, or other enterprise. The Company may, by action of the Members, provide indemnification to employees and agents of the Company who are not Members. The indemnification provided in this section is not exclusive of any other rights to which any person may be entitled under any statute, agreement, resolution of Members, contract, or otherwise. But despite any other provision of this agreement, the Company has no obligation to indemnify a Member for:

**10.1.1** Any breach of the Member's duty of loyalty to the Company;

**10.1.2** Acts or omissions not in good faith that involve intentional misconduct or a knowing violation of law;

**10.1.3** Any unlawful distribution under the Act; or

**10.1.4** Any transaction in which the Member derives improper personal benefit.

**10.2    Limitation of Liability.** No Member of the Company is liable to the Company or to the other Members for monetary damages resulting from the Member's conduct as a Member except to the extent that the Act, as it now exists or may be amended in the future, prohibits the

DocuSign Envelope ID: A537888A-AE8E-44B9-B959AD84B1AA0

elimination or limitation of liability of members of limited liability companies. No repeal or amendment of this section or of the Act will adversely affect any right or protection of a Member for actions or omissions prior to the repeal or amendment.

## 11. MISCELLANEOUS PROVISIONS

**11.1   Amendment.** The Members may amend or repeal all or part of this agreement by unanimous written agreement. This agreement may not be amended or repealed by oral agreement of the Members.

**11.2   Binding Effect.** The provisions of this agreement will be binding upon and will inure to the benefit of the heirs, personal representatives, successors, and assigns of the Members. But this section may not be construed as a modification of any restriction on transfer set forth in this agreement.

**11.3   Notice.** Except as otherwise provided in other sections of this agreement, any notice or other communication required or permitted to be given under this agreement must be in writing and must be mailed by certified mail, return receipt requested, with postage prepaid. Notices addressed to a Member must be addressed to the Member's address listed in the section of this agreement relating to initial members, or if there is no such address listed for a Member, the address of the Member shown on the records of the Company. Notices addressed to the Company must be addressed to its principal office. The address of a Member or the Company to which notices or other communications are to be mailed may be changed from time to time by the Member's or the Company's giving written notice to the other Members and the Company. All notices and other communications will be deemed to be given at the expiration of three days after the date of mailing.

**11.4   Litigation Expense.** If any legal proceeding is commenced for the purpose of interpreting or enforcing any provision of this agreement, including any proceeding in the United States Bankruptcy Court, the prevailing party in such proceeding will be entitled to recover a reasonable attorney's fee in such proceeding, or any appeal thereof, to be set by the court without the necessity of hearing testimony or receiving evidence, in addition to the costs and disbursements allowed by law.

**11.5   Additional Documents.** Each Member must execute such additional documents and take such actions as are reasonably requested by the other Members in order to complete or confirm the transactions contemplated by this agreement.

**11.6   Counterparts.** This agreement may be executed in two or more counterparts, which together will constitute one agreement.

DocuSign Envelope ID: A537888A-AE8E-44B9-B(   )59AD84B1AA0

**11.7   Governing Law.** This agreement will be governed by the law of the state in which the articles of organization of the Company have been filed.

**11.8   Severability.** If any provision of this agreement is invalid or unenforceable, it will not affect the remaining provisions.

**11.9   Third-Party Beneficiaries.** The provisions of this agreement are intended solely for the benefit of the Members and create no rights or obligations enforceable by any third party, including creditors of the Company, except as otherwise provided by applicable law.

**11.10   Authority.** Each individual executing this agreement on behalf of a corporation or other entity warrants that he or she is authorized to do so and that this agreement constitutes a legally binding obligation of the corporation or other entity that the individual represents.

**11.11   Counsel.** This agreement has been drafted by * (the "Attorney"), who represents * in connection with the creation of the Company. * and * each understand that the Attorney can represent only one party in connection with this matter, that the Attorney represents * and does not represent them, and that they have been advised by the Attorney that they should retain attorneys of their own choice in connection with this matter.

David Gitman
David Gitman   3/1/2017

Laura Gitman
Laura Gitman   3/1/2017

Jeremy Falk
Jeremy Falk   3/1/2017

xiv

**Exhibit 40**



Konstantin Bagaev
May 22, 2017, 04:26 AM

Channel Reply Customer Support ( JIRA: ChannelReply )

⊟ Application: Slack - channelreply

⌨ Keystrokes / min: 109

⊕ Mouse movements / min: 34

**Exhibit 41**

P-32

# CHASE ◯

JPMorgan Chase Bank, N.A.
P O Box 659754
San Antonio, TX 78265-9754

June 02, 2017 through June 30, 2017
Account Number:   000000912597775

00179405 1 AV 00.373

00179405 DRE 802 141 18217 NNNNNNNNNNNN T 1 000000000 64 0000 T252946 P11563
CHANNELREPLY INC.
100 STERLING PL APT 1A
BROOKLYN NY 11217-3324

## CUSTOMER SERVICE INFORMATION

| | |
|---|---|
| Web site: | Chase.com |
| Service Center: | 1-800-242-7338 |
| Deaf and Hard of Hearing: | 1-800-242-7383 |
| Para Espanol: | 1-888-622-4273 |
| International Calls: | 1-713-262-1679 |

## CHECKING SUMMARY   Chase Performance Business Checking

| | INSTANCES | AMOUNT |
|---|---|---|
| Beginning Balance | | $0.00 |
| Deposits and Additions | 15 | 22,579.25 |
| Checks Paid | 1 | -3,478.33 |
| ATM & Debit Card Withdrawals | 7 | -5,773.16 |
| Electronic Withdrawals | 5 | -13,302.76 |
| Other Withdrawals | 1 | -25.00 |
| Ending Balance | 29 | $0.00 |

Your account ending in 6302 is linked to this account for overdraft protection.

## DEPOSITS AND ADDITIONS

| DATE | DESCRIPTION | | AMOUNT |
|---|---|---|---|
| 06/05 | Www.Channelreply Transfer | CCD ID: Wfmstripe1 | $8,767.23 |
| 06/05 | Online Transfer From Chk ...8685 Transaction#: 6270339831 | | 500.00 |
| 06/05 | Stripe      Transfer | CCD ID: Wfmstripe1 | 251.72 |
| 06/06 | Stripe      Transfer | CCD ID: Wfmstripe1 | 1,144.66 |
| 06/07 | Stripe      Transfer | CCD ID: Wfmstripe1 | 632.89 |
| 06/08 | Stripe      Transfer | CCD ID: Wfmstripe1 | 426.98 |
| 06/09 | Stripe      Transfer | CCD ID: Wfmstripe1 | 515.33 |
| 06/12 | Stripe      Transfer | CCD ID: Wfmstripe1 | 522.53 |
| 06/13 | Stripe      Transfer | CCD ID: Wfmstripe1 | 299.00 |
| 06/14 | Stripe      Transfer | CCD ID: Wfmstripe1 | 1,100.62 |
| 06/15 | Stripe      Transfer | CCD ID: Wfmstripe1 | 527.69 |
| 06/16 | Stripe      Transfer | CCD ID: Wfmstripe1 | 1,272.33 |
| 06/19 | Online Transfer From Chk ...8685 Transaction#: 6307866097 | | 5,000.00 |
| 06/19 | Stripe      Transfer | CCD ID: Wfmstripe1 | 942.83 |
| 06/20 | Stripe      Transfer | CCD ID: Wfmstripe1 | 675.44 |
| **Total Deposits and Additions** | | | **$22,579.25** |

# CHASE ⬡

June 02, 2017 through June 30, 2017
Account Number:     000000912597775

## CHECKS PAID

| CHECK NO. | DESCRIPTION | DATE PAID | AMOUNT |
|-----------|-------------|-----------|--------|
| 50000  ^ | | 06/19 | $3,478.33 |
| Total Checks Paid | | | $3,478.33 |

If you see a description in the Checks Paid section, it means that we received only electronic information about the check,
not the original or an image of the check. As a result, we're not able to return the check to you or show you an image.
^ An image of this check may be available for you to view on Chase.com.

## ATM & DEBIT CARD WITHDRAWALS

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 06/08 | Card Purchase        06/05 Flyuia     V2Bk25 Gatwick Airpo Card 6918 | $1,096.06 |
| 06/09 | Recurring Card Purchase 06/08 Intuit *Qb Online 800-286-6800 CA Card 6918 | 38.11 |
| 06/20 | Card Purchase        06/18 Harvard Business Serv 302-645-7400 DE Card 6918 | 50.00 |
| 06/21 | Card Purchase        06/20 Upcounsel.Com Stripe.Com CA Card 6918 | 2,829.75 |
| 06/21 | Card Purchase        06/20 Delaware Div of Corp 302-7393077 DE Card 6918 | 400.00 |
| 06/21 | Recurring Card Purchase 06/20 Upcounsel.Com 855-879-3076 CA Card 6918 | 1,349.25 |
| 06/21 | Recurring Card Purchase 06/20 Time Doctor LLC 877-568-4807 NV Card 6918 | 9.99 |
| Total ATM & Debit Card Withdrawals | | $5,773.16 |

## ATM & DEBIT CARD SUMMARY

David Gitman  Card 6918

| | | AMOUNT |
|---|---|---|
| | Total ATM Withdrawals & Debits | $0.00 |
| | Total Card Purchases | $5,773.16 |
| | Total Card Deposits & Credits | $0.00 |
| ATM & Debit Card Totals | | |
| | Total ATM Withdrawals & Debits | $0.00 |
| | Total Card Purchases | $5,773.16 |
| | Total Card Deposits & Credits | $0.00 |

## ELECTRONIC WITHDRAWALS

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 06/12 | 06/10 Online Transfer To Chk ...8685 Transaction#: 6287681435 | $500.00 |
| 06/13 | 06/13 Online Transfer To Chk ...8685 Transaction#: 6292831621 | 5,000.00 |
| 06/16 | 06/16 Online Transfer 6300005724 To Konstantyn Bagaiev (Payone #############0776 Transaction #: 6300005724 | 2,347.92 |
| 06/19 | 06/19 Online Transfer 6307683456 To Konstantyn Bagaiev (Payone #############0776 Transaction #: 6307683456 | 2,000.00 |
| 06/20 | 06/20 Online Wire Transfer Via: Bank of America N A/0959 A/C: Bank of America New York NY Ben: Cooper Square Ventures Great Neck NY 11021 US Ssn: 0365101 Trn: 3847900171Es | 3,454.84 |
| Total Electronic Withdrawals | | $13,302.76 |

## OTHER WITHDRAWALS

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 06/22 | 06/22 Withdrawal | $25.00 |
| Total Other Withdrawals | | $25.00 |

# CHASE ⬡

JPMorgan Chase Bank, N.A.
P O Box 659754
San Antonio, TX 78265-9754

June 02, 2017 through June 30, 2017

Account Number: **000000912597775**

00179405 1 AV 00.373

00179405 DRE 802 141 18217 NNNNNNNNNNN T 1 000000000 64 0000 T252946 P11563
CHANNELREPLY INC.
100 STERLING PL APT 1A
BROOKLYN NY 11217-3324

## CUSTOMER SERVICE INFORMATION

| | |
|---|---|
| Web site: | Chase.com |
| Service Center: | 1-800-242-7338 |
| Deaf and Hard of Hearing: | 1-800-242-7383 |
| Para Espanol: | 1-888-622-4273 |
| International Calls: | 1-713-262-1679 |

## CHECKING SUMMARY   Chase Performance Business Checking

| | INSTANCES | AMOUNT |
|---|---|---|
| Beginning Balance | | $0.00 |
| Deposits and Additions | 15 | 22,579.25 |
| Checks Paid | 1 | -3,478.33 |
| ATM & Debit Card Withdrawals | 7 | -5,773.16 |
| Electronic Withdrawals | 5 | -13,302.76 |
| Other Withdrawals | 1 | -25.00 |
| Ending Balance | 29 | $0.00 |

Your account ending in 6302 is linked to this account for overdraft protection.

## DEPOSITS AND ADDITIONS

| DATE | DESCRIPTION | | AMOUNT |
|---|---|---|---|
| 06/05 | Www.Channelreply Transfer | CCD ID: Wfmstripe1 | $8,767.23 |
| 06/05 | Online Transfer From Chk ...8685 Transaction#: 6270339831 | | 500.00 |
| 06/05 | Stripe      Transfer | CCD ID: Wfmstripe1 | 251.72 |
| 06/06 | Stripe      Transfer | CCD ID: Wfmstripe1 | 1,144.66 |
| 06/07 | Stripe      Transfer | CCD ID: Wfmstripe1 | 632.89 |
| 06/08 | Stripe      Transfer | CCD ID: Wfmstripe1 | 426.98 |
| 06/09 | Stripe      Transfer | CCD ID: Wfmstripe1 | 515.33 |
| 06/12 | Stripe      Transfer | CCD ID: Wfmstripe1 | 522.53 |
| 06/13 | Stripe      Transfer | CCD ID: Wfmstripe1 | 299.00 |
| 06/14 | Stripe      Transfer | CCD ID: Wfmstripe1 | 1,100.62 |
| 06/15 | Stripe      Transfer | CCD ID: Wfmstripe1 | 527.69 |
| 06/16 | Stripe      Transfer | CCD ID: Wfmstripe1 | 1,272.33 |
| 06/19 | Online Transfer From Chk ...8685 Transaction#: 6307866097 | | 5,000.00 |
| 06/19 | Stripe      Transfer | CCD ID: Wfmstripe1 | 942.83 |
| 06/20 | Stripe      Transfer | CCD ID: Wfmstripe1 | 675.44 |
| **Total Deposits and Additions** | | | **$22,579.25** |

# CHASE ◆

June 02, 2017 through June 30, 2017
Account Number:   000000912597775

## CHECKS PAID

| CHECK NO. | DESCRIPTION | DATE PAID | AMOUNT |
|---|---|---|---|
| 50000  ^ | | 06/19 | $3,478.33 |
| Total Checks Paid | | | $3,478.33 |

If you see a description in the Checks Paid section, it means that we received only electronic information about the check, not the original or an image of the check. As a result, we're not able to return the check to you or show you an image.
^ An image of this check may be available for you to view on Chase.com.

## ATM & DEBIT CARD WITHDRAWALS

| DATE | DESCRIPTION | | AMOUNT |
|---|---|---|---|
| 06/08 | Card Purchase         06/05 Flyuia      V2Bk25 Gatwick Airpo Card 6918 | | $1,096.06 |
| 06/09 | Recurring Card Purchase 06/08 Intuit *Qb Online 800-286-6800 CA Card 6918 | | 38.11 |
| 06/20 | Card Purchase         06/18 Harvard Business Serv 302-645-7400 DE Card 6918 | | 50.00 |
| 06/21 | Card Purchase         06/20 Upcounsel.Com Stripe.Com CA Card 6918 | | 2,829.75 |
| 06/21 | Card Purchase         06/20 Delaware Div of Corp 302-7393077 DE Card 6918 | | 400.00 |
| 06/21 | Recurring Card Purchase 06/20 Upcounsel.Com 855-879-3076 CA Card 6918 | | 1,349.25 |
| 06/21 | Recurring Card Purchase 06/20 Time Doctor LLC 877-568-4807 NV Card 6918 | | 9.99 |
| Total ATM & Debit Card Withdrawals | | | $5,773.16 |

## ATM & DEBIT CARD SUMMARY

David Gilman  Card 6918

| | | AMOUNT |
|---|---|---|
| Total ATM Withdrawals & Debits | | $0.00 |
| Total Card Purchases | | $5,773.16 |
| Total Card Deposits & Credits | | $0.00 |

ATM & Debit Card Totals

| | | AMOUNT |
|---|---|---|
| Total ATM Withdrawals & Debits | | $0.00 |
| Total Card Purchases | | $5,773.16 |
| Total Card Deposits & Credits | | $0.00 |

## ELECTRONIC WITHDRAWALS

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 06/12 | 06/10 Online Transfer To Chk ...8685 Transaction#: 6287681435 | $500.00 |
| 06/13 | 06/13 Online Transfer To Chk ...8685 Transaction#: 6292831621 | 5,000.00 |
| 06/16 | 06/16 Online Transfer 6300005724 To Konstanlyn Bagaiev (Payone ############0776 Transaction #: 6300005724 | 2,347.92 |
| 06/19 | 06/19 Online Transfer 6307683456 To Konstanlyn Bagaiev (Payone ############0776 Transaction #: 6307683456 | 2,000.00 |
| 06/20 | 06/20 Online Wire Transfer Via: Bank of America N A/0959 A/C: Bank of America New York NY Ben: Cooper Square Ventures Great Neck NY 11021 US Ssn: 0365101 Trn: 3847900171Es | 3,454.84 |
| Total Electronic Withdrawals | | $13,302.76 |

## OTHER WITHDRAWALS

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 06/22 | 06/22 Withdrawal | $25.00 |
| Total Other Withdrawals | | $25.00 |

**CHASE** ◈

June 02, 2017 through June 30, 2017
Account Number: **000000912597775**

## DAILY ENDING BALANCE

| DATE | AMOUNT | DATE | AMOUNT | DATE | AMOUNT |
|------|--------|------|--------|------|--------|
| 06/05 | $9,518.95 | 06/12 | 11,127.17 | 06/19 | 7,443.39 |
| 06/06 | 10,663.61 | 06/13 | 6,426.17 | 06/20 | 4,613.99 |
| 06/07 | 11,296.50 | 06/14 | 7,526.79 | 06/21 | 25.00 |
| 06/08 | 10,627.42 | 06/15 | 8,054.48 | 06/22 | 0.00 |
| 06/09 | 11,104.64 | 06/16 | 6,978.89 | | |

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC FUNDS TRANSFERS:** Call or write us at the phone number or address on the front of this statement (non-personal accounts contact Customer Service) if you think your statement or receipt is incorrect or if you need more information about a transfer listed on the statement or receipt. We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared. Be prepared to give us the following information:

- Your name and account number
- The dollar amount of the suspected error
- A description of the error or transfer you are unsure of, why you believe it is an error, or why you need more information.

We will investigate your complaint and will correct any error promptly. If we take more than 10 business days (or 20 business days for new accounts) to do this, we will credit your account for the amount you think is in error so that you will have use of the money during the time it takes us to complete our investigation.

**IN CASE OF ERRORS OR QUESTIONS ABOUT NON-ELECTRONIC TRANSACTIONS:** Contact the bank immediately if your statement is incorrect or if you need more information about any non-electronic transactions (checks or deposits) on this statement. If any such error appears, you must notify the bank in writing no later than 30 days after the statement was made available to you. For more complete details, see the Account Rules and Regulations or other applicable account agreement that governs your account.



JPMorgan Chase Bank, N.A. Member FDIC



June 02, 2017 through June 30, 2017
Account Number:   000000912597775

This Page Intentionally Left Blank

## **Exhibit 42**

P-42

# CHANNELREPLY INC.

## COMMON STOCK PURCHASE AGREEMENT

This Common Stock Purchase Agreement (this "Agreement") is made as of
__06/08/2017__ by and between ChannelReply Inc., a Delaware corporation (the
"Company"), and Konstantyn Bagaiev ("Purchaser").

1.      **Sale of Stock.** Subject to the terms and conditions of this Agreement,
simultaneously with the execution and delivery of this Agreement by the parties or on such other
date as the Company and Purchaser shall agree (the "Purchase Date"), the Company will issue
and sell to Purchaser, and Purchaser agrees to purchase from the Company, one million
(1,000,000) shares of the Company's Common Stock (the "Shares") at a purchase price of
$0.00001 per share for a total purchase price of US Dollars Ten ($10) (the "Aggregate Purchase
Price"). On the Purchase Date, Purchaser will deliver the Aggregate Purchase Price to the
Company and the Company will enter the Shares in Purchaser's name as of such date in the
books and records of the Company or, if applicable, a duly authorized transfer agent of the
Company. The Company will deliver to Purchaser, upon request, a notice of issuance with
respect to the Shares as soon as practicable following such date. As used elsewhere herein, the
term "Shares" refers to all of the Shares purchased hereunder and all securities received in
connection with the Shares pursuant to stock dividends or splits, all securities received in
replacement of the Shares in a recapitalization, merger, reorganization, exchange or the like, and
all new, substituted or additional securities or other property to which Purchaser is entitled by
reason of Purchaser's ownership of the Shares.

2.      **Consideration.** As consideration for the mutual promises and covenants set forth
in this Agreement, Purchaser will deliver the Aggregate Purchase Price by an assignment of
certain assets as set forth in the Assignment of IP and Other Assets and check made out to the
Company.

3.      **Limitations on Transfer.** Purchaser acknowledges and agrees that the Shares
purchased under this Agreement are subject to (i) the terms and conditions that apply to the
Company's Common Stock, as set forth in the Company's Bylaws, including (without limitation)
certain transfer restrictions set forth in Section 5.02 of the Company's Bylaws, as may be in
effect at the time of any proposed transfer (the "Bylaw Provisions"), and (ii) any other limitation
or restriction on transfer created by applicable laws. In addition to the foregoing limitations on
transfer, Purchaser shall not assign, encumber or dispose of any interest in the Shares while the
Shares are subject to the Company's Repurchase Option (as defined below). After any Shares
have been released from such Repurchase Option, Purchaser shall not assign, encumber or
dispose of any interest in the Shares except to the extent permitted by, and in compliance with
the Bylaw Provisions, applicable laws, and the provisions below.

(a)      **Repurchase Option; Vesting.**

(i)      In the event of the voluntary or involuntary termination of
Purchaser's Continuous Service Status (as defined below) for any reason (including, without
limitation, resignation, death or Disability (as defined below)), with or without cause, the

Doc ID: 3b1251d685bf353e10ca67c932022282d5cd7d17

Company shall upon the date of such termination (the "Termination Date") have an irrevocable, exclusive option (the "Repurchase Option") for a period of three (3) months from such date to repurchase all or any portion of the Unvested Shares (as defined below) held by Purchaser as of the Termination Date at the original purchase price per Share (adjusted for any stock splits, stock dividends and the like) specified in Section 1. As used in this Agreement, "Unvested Shares" means Shares, if any, that have not yet been released from the Repurchase Option.

(ii)     Unless the Company notifies Purchaser within three (3) months from the Termination Date that it does not intend to exercise its Repurchase Option with respect to some or all of the Unvested Shares, the Repurchase Option shall be deemed automatically exercised by the Company as of the end of such 3-month period following such Termination Date, provided that the Company may notify Purchaser that it is exercising its Repurchase Option as of a date prior to the end of such 3-month period. Unless Purchaser is otherwise notified by the Company pursuant to the preceding sentence that the Company does not intend to exercise its Repurchase Option as to some or all of the Unvested Shares to which it applies at the time of termination, execution of this Agreement by Purchaser constitutes written notice to Purchaser of the Company's intention to exercise its Repurchase Option with respect to all Unvested Shares to which such Repurchase Option applies. The Company, at its choice, may satisfy its payment obligation to Purchaser with respect to exercise of the Repurchase Option by either (A) delivering a check to Purchaser in the amount of the purchase price for the Unvested Shares being repurchased, or (B) in the event Purchaser is indebted to the Company, canceling an amount of such indebtedness equal to the purchase price for the Unvested Shares being repurchased, or (C) by a combination of (A) and (B) so that the combined payment and cancellation of indebtedness equals such purchase price. In the event of any deemed automatic exercise of the Repurchase Option pursuant to this Section 3(a)(ii) in which Purchaser is indebted to the Company, such indebtedness equal to the purchase price of the Unvested Shares being repurchased shall be deemed automatically canceled as of the end of the 3-month period following the Termination Date unless the Company otherwise satisfies its payment obligations. As a result of any repurchase of Unvested Shares pursuant to this Section 3(a), the Company shall become the legal and beneficial owner of the Unvested Shares being repurchased and shall have all rights and interest therein or related thereto, and the Company shall have the right to transfer to its own name the number of Unvested Shares being repurchased by the Company, without further action by Purchaser.

(iii)     50% of the Shares shall initially be subject to the Repurchase Option (the "Vesting Shares"). 1/24 of the Vesting Shares shall be released from the Repurchase Option on the 30th day of each month thereafter (and if there is no corresponding day, the last day of the month), until all Vesting Shares are released from the Repurchase Option; provided, however, that such scheduled releases from the Repurchase Option shall immediately cease as of the Termination Date. Fractional shares shall be rounded down to the nearest whole share.

(b)     **Transfer Restrictions; Right of First Refusal.** Before any Shares held by Purchaser or any transferee of Purchaser (either being sometimes referred to herein as the "Holder") may be sold or otherwise transferred (including transfer by gift or operation of law), the Company shall first, to the extent the Company's approval is required by any applicable Bylaw Provisions, have the right to approve such sale or transfer, in full or in part, and shall then have the right to purchase all or any part of the Shares proposed to be sold or transferred, in each

-2-

Doc ID: 3b1251d685bf353e10ca67c932022282d5cd7d17

case, in its sole and absolute discretion (the "Right of First Refusal"). If the Holder would like to sell or transfer any Shares, the Holder must provide the Company or its assignee(s) with a Notice (as defined below) requesting approval to sell or transfer the Shares and offering the Company or its assignee(s) a Right of First Refusal on the same terms and conditions set forth in this Section 3(a). The Company may either (1) exercise its Right of First Refusal in full or in part and purchase such Shares pursuant to this Section 3(a), (2) decline to exercise its Right of First Refusal in full or in part and permit the transfer of such Shares to the Proposed Transferee (as defined below) in full or in part or (3) decline to exercise its Right of First Refusal in full or in part and, to the extent the Company's approval is required by any applicable Bylaw Provisions, decline the request to sell or transfer the Shares in full or in part.

       (i)      **Notice of Proposed Transfer.** The Holder of the Shares shall deliver to the Company a written notice (the "Notice") stating: (A) the Holder's intention to sell or otherwise transfer such Shares; (B) the name of each proposed purchaser or other transferee ("Proposed Transferee"); (C) the number of Shares to be sold or transferred to each Proposed Transferee; (D) the terms and conditions of each proposed sale or transfer, including (without limitation) the purchase price for such Shares (the "Transfer Purchase Price"); and (E) the Holder's offer to the Company or its assignee(s) to purchase the Shares at the Transfer Purchase Price and upon the same terms (or terms that are no less favorable to the Company).

       (ii)      **Exercise of Right of First Refusal.** At any time within 30 days after receipt of the Notice, the Company and/or its assignee(s) shall deliver a written notice to the Holder indicating whether the Company and/or its assignee(s) elect to permit or reject the proposed sale or transfer, in full or in part, and/or elect to accept or decline the offer to purchase any or all of the Shares proposed to be sold or transferred to any one or more of the Proposed Transferees, at the Transfer Purchase Price, provided that if the Transfer Purchase Price consists of no legal consideration (as, for example, in the case of a transfer by gift), the purchase price will be the fair market value of the Shares as determined in good faith by the Company. If the Transfer Purchase Price includes consideration other than cash, the cash equivalent value of the non-cash consideration shall be determined by the Company in good faith.

       (iii)      **Payment.** Payment of the Transfer Purchase Price shall be made, at the election of the Company or its assignee(s), in cash (by check), by cancellation of all or a portion of any outstanding indebtedness, or by any combination thereof within 60 days after receipt of the Notice or in the manner and at the times set forth in the Notice.

       (iv)      **Holder's Right to Transfer.** If any of the Shares proposed in the Notice to be sold or transferred to a given Proposed Transferee are both (A) not purchased by the Company and/or its assignee(s) as provided in this Section 3(a) and (B) approved by the Company to be sold or transferred, then the Holder may sell or otherwise transfer any such Shares to the applicable Proposed Transferee at the Transfer Purchase Price or at a higher price, provided that such sale or other transfer is consummated within 120 days after the date of the Notice; provided that any such sale or other transfer is also effected in accordance with the Bylaw Provisions and any applicable laws and the Proposed Transferee agrees in writing that the Bylaw Provisions and the provisions of this Agreement, including this Section 3 shall continue to apply to the Shares in the hands of such Proposed Transferee. The Company, in consultation with its legal counsel, may require the Holder to provide an opinion of counsel evidencing

-3-

compliance with applicable laws. If the Shares described in the Notice are not transferred to the Proposed Transferee within such period, or if the Holder proposes to change the price or other terms to make them more favorable to the Proposed Transferee, a new Notice shall be given to the Company, and the Company and/or its assignees shall again have the right to approve such transfer and be offered the Right of First Refusal.

        (v)    <u>Exception for Certain Family Transfers</u>. Anything to the contrary contained in this Section 3(a) notwithstanding, the transfer of any or all of the Shares during Holder's lifetime or on Holder's death by will or intestacy to Holder's Immediate Family or a trust for the benefit of Holder or Holder's Immediate Family shall be exempt from the provisions of this Section 3(a). "<u>Immediate Family</u>" as used herein shall mean lineal descendant or antecedent, spouse (or spouse's antecedents), father, mother, brother or sister (or their descendants), stepchild (or their antecedents or descendants), aunt or uncle (or their antecedents or descendants), brother-in-law or sister-in-law (or their antecedents or descendants) and shall include adoptive relationships, or any person sharing Holder's household (other than a tenant or an employee). In such case, the transferee or other recipient shall receive and hold the Shares so transferred subject to the Bylaw Provisions and the provisions of this Agreement, including this Section 3, and there shall be no further transfer of such Shares except in accordance with the terms of this Section 3 and the Bylaw Provisions.

        (c)    <u>Company's Right to Purchase upon Involuntary Transfer</u>. In the event of any transfer by operation of law or other involuntary transfer (including divorce or intestate transfer upon death, but excluding transfer upon death by will (to any transferee) or a transfer to Immediate Family as set forth in Section 3(b)(v) above) of all or a portion of the Shares by the record holder thereof, the Company shall have an option to purchase any or all of the Shares transferred at the fair market value of the Shares on the date of transfer (as determined by the Company in its sole discretion). Upon such a transfer, the Holder shall promptly notify the Secretary of the Company of such transfer. The right to purchase such Shares shall be provided to the Company for a period of 30 days following receipt by the Company of written notice from the Holder.

        (d)    <u>Assignment</u>. The right of the Company to purchase any part of the Shares may be assigned in whole or in part to any holder or holders of capital stock of the Company or other persons or organizations.

        (e)    <u>Restrictions Binding on Transferees</u>. All transferees of Shares or any interest therein will receive and hold such Shares or interest subject to the Bylaw Provisions and the provisions of this Agreement, including, without limitation, Section 3, including, insofar as applicable, the Repurchase Option. In the event of any purchase by the Company hereunder where the Shares or interest are held by a transferee, the transferee shall be obligated, if requested by the Company, to transfer the Shares or interest to Purchaser for consideration equal to the amount to be paid by the Company hereunder. In the event the Repurchase Option is deemed exercised by the Company pursuant to Section 3(a)(ii) hereof, the Company may deem any transferee to have transferred the Shares or interest to Purchaser prior to their purchase by the Company, and payment of the purchase price by the Company to such transferee shall be deemed to satisfy Purchaser's obligation to pay such transferee for such Shares or interest, and

-4-

also to satisfy the Company's obligation to pay Purchaser for such Shares or interest. Any sale or transfer of the Shares shall be void unless the provisions of this Agreement are satisfied.

      (f)    **Termination of Rights.** The transfer restrictions set forth in Section 3(a) above, the Right of First Refusal granted the Company by Section 3(a) above and the right to repurchase the Shares in the event of an involuntary transfer granted the Company by Section 3(c) above shall terminate upon (i) the first sale of Common Stock of the Company to the general public pursuant to a registration statement filed with and declared effective by the Securities and Exchange Commission under the Securities Act of 1933, as amended (the "Securities Act") (other than a registration statement relating solely to the issuance of Common Stock pursuant to a business combination or an employee incentive or benefit plan) or (ii) any transfer or conversion of Shares made pursuant to a statutory merger or statutory consolidation of the Company with or into another corporation or corporations if the common stock of the surviving corporation or any direct or indirect parent corporation thereof is registered under the Securities Exchange Act of 1934, as amended (the "Exchange Act").

      (g)    **Lock-Up Agreement.** If so requested by the Company or the underwriters in connection with the initial public offering of the Company's securities registered under the Securities Act of 1933, as amended, Purchaser shall not sell, make any short sale of, loan, grant any option for the purchase of, or otherwise dispose of any securities of the Company however or whenever acquired (except for those being registered) without the prior written consent of the Company or such underwriters, as the case may be, for 180 days from the effective date of the registration statement, plus such additional period, to the extent required by FINRA rules, up to a maximum of 216 days from the effective date of the registration statement, and Purchaser shall execute an agreement reflecting the foregoing as may be requested by the underwriters at the time of such offering.

    4.    **Escrow of Unvested Shares.** For purposes of facilitating the enforcement of the provisions of Section 3 above, Purchaser agrees to deliver a Stock Power in the form attached to this Agreement as Exhibit A executed by Purchaser and by Purchaser's spouse (if required for transfer), in blank, and such stock certificate(s), if any, to the Secretary of the Company, or the Secretary's designee, to hold such Shares (and stock certificate(s), if any) and Stock Power in escrow and to take all such actions and to effectuate all such transfers and/or releases as are required in accordance with the terms of this Agreement. Purchaser hereby acknowledges that the Secretary of the Company, or the Secretary's designee, is so appointed as the escrow holder with the foregoing authorities as a material inducement to make this Agreement and that said appointment is coupled with an interest and is accordingly irrevocable. Purchaser agrees that said escrow holder shall not be liable to any party hereof (or to any other party). The escrow holder may rely upon any letter, notice or other document executed by any signature purported to be genuine and may resign at any time. Purchaser agrees that if the Secretary of the Company, or the Secretary's designee, resigns as escrow holder for any or no reason, the Board of Directors of the Company shall have the power to appoint a successor to serve as escrow holder pursuant to the terms of this Agreement.

    5.    **Investment and Taxation Representations.** In connection with the purchase of the Shares, Purchaser represents to the Company the following:

Doc ID: 3b1251d685bf353e10ca67c932022282d5cd7d17

(a)    Purchaser is aware of the Company's business affairs and financial condition and has acquired sufficient information about the Company to reach an informed and knowledgeable decision to acquire the Shares. Purchaser is purchasing the Shares for investment for Purchaser's own account only and not with a view to, or for resale in connection with, any "distribution" thereof within the meaning of the Securities Act or under any applicable provision of state law. Purchaser does not have any present intention to transfer the Shares to any other person or entity.

(b)    Purchaser understands that the Shares have not been registered under the Securities Act by reason of a specific exemption therefrom, which exemption depends upon, among other things, the bona fide nature of Purchaser's investment intent as expressed herein.

(c)    Purchaser is not a U.S. Person (as defined below) and is an affiliate (as defined in Rule 501(b) under the Securities Act) of the Company and is not acquiring the Securities for the account or benefit of a U.S. Person. A U.S. Person means any one of the following:

* any natural person resident in the United States of America;

* any partnership or corporation organized or incorporated under the laws of the United States of America;

* any estate of which any executor or administrator is a U.S. person;

* any trust of which any trustee is a U.S. person;

* any agency or branch of a foreign entity located in the United States of America;

* any non-discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary for the benefit or account of a U.S. person;

* any discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary organized, incorporated or (if an individual) resident in the United States of America; and

* any partnership or corporation if:

(A) organized or incorporated under the laws of any foreign jurisdiction; and

(B) formed by a U.S. person principally for the purpose of investing in securities not registered under the Securities Act, unless it is organized or incorporated, and owned, by accredited investors (as defined in Rule 501(a) under the Securities Act) who are not natural persons, estates or trusts.

(d)    At the time of the origination of contact concerning this Agreement and the date of the execution and delivery of this Agreement, Purchaser was outside of the United States.

-6-

Doc ID: 3b1251d685bf353e10ca67c932022282d5cd7d17

(e)      Purchaser will not, during the period commencing on the date of issuance of the Purchased Shares or Warrants and ending on the first anniversary of such date, or such shorter period as may be permitted by Regulation S or other applicable securities law (the "Restricted Period"), offer, sell, pledge or otherwise transfer the Purchased Shares or the Warrants in the United States, or to a U.S. Person for the account or for the benefit of a U.S. Person, or otherwise in a manner that is not in compliance with Regulation S.

(f)      Purchaser will, after expiration of the Restricted Period, offer, sell, pledge or otherwise transfer the Purchased Shares or Warrants only pursuant to registration under the Securities Act or an available exemption therefrom and, in accordance with all applicable state and foreign securities laws.

(g)      Purchaser was not in the United States, engaged in, and prior to the expiration of the Restricted Period will not engage in, any short selling of or any hedging transaction with respect to the Securities, including without limitation, any put, call or other option transaction, option writing or equity swap.

(h)      Neither Purchaser nor or any person acting on his behalf has engaged, nor will engage, in any directed selling efforts to a U.S. Person with respect to the Securities and Purchaser and any person acting on his behalf have complied and will comply with the "offering restrictions" requirements of Regulation S under the Securities Act.

(i)      The transactions contemplated by this Agreement have not been pre-arranged with a buyer located in the United States or with a U.S. Person, and are not part of a plan or scheme to evade the registration requirements of the Securities Act.

(j)      Neither Purchaser nor any person acting on his behalf has undertaken or carried out any activity for the purpose of, or that could reasonably be expected to have the effect of, conditioning the market in the United States, its territories or possessions, for any of the Securities. Purchaser agrees not to cause any advertisement of the Securities to be published in any newspaper or periodical or posted in any public place and not to issue any circular relating to the Securities, except such advertisements that include the statements required by Regulation S under the Securities Act, and only offshore and not in the U.S. or its territories, and only in compliance with any local applicable securities laws.

(k)      Each certificate representing the Shares shall be endorsed with the following legends, in addition to any other legend required to be placed thereon by applicable federal or state securities laws:

(A) "THE SECURITIES ARE BEING OFFERED TO INVESTORS WHO ARE NOT U.S. PERSONS (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT OF 1933, AS AMENDED ("THE SECURITIES ACT")) AND WITHOUT REGISTRATION WITH THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION UNDER THE SECURITIES ACT IN RELIANCE UPON REGULATION S PROMULGATED UNDER THE SECURITIES ACT."

-7-

(B) "TRANSFER OF THESE SECURITIES IS PROHIBITED, EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF REGULATION S, PURSUANT TO REGISTRATION UNDER THE SECURITIES ACT, OR PURSUANT TO AVAILABLE EXEMPTION FROM REGISTRATION. HEDGING TRANSACTIONS MAY NOT BE CONDUCTED UNLESS IN COMPLIANCE WITH THE SECURITIES ACT."

(l)      Purchaser consents to the Company making a notation on its records or giving instructions to any transfer agent of the Company in order to implement the restrictions on transfer of the Securities set forth in this Section 5.

(m)      Purchaser further acknowledges and understands that the securities must be held indefinitely unless they are subsequently registered under the Securities Act or an exemption from such registration is available.  Purchaser further acknowledges and understands that the Company is under no obligation to register the securities.

(n)      Purchaser is familiar with the provisions of Rule 144, promulgated under the Securities Act, which, in substance, permits limited public resale of "restricted securities" acquired, directly or indirectly, from the issuer of the securities (or from an affiliate of such issuer), in a non-public offering subject to the satisfaction of certain conditions.  Purchaser understands that the Company provides no assurances as to whether he or she will be able to resell any or all of the Shares pursuant to Rule 144, which rule requires, among other things, that the Company be subject to the reporting requirements of the Exchange Act, that resales of securities take place only after the holder of the Shares has held the Shares for certain specified time periods, and under certain circumstances, that resales of securities be limited in volume and take place only pursuant to brokered transactions.  Notwithstanding this Section 5(n), Purchaser acknowledges and agrees to the restrictions set forth in Section 5(o) below.

(o)      Purchaser further understands that in the event all of the applicable requirements of Rule 144 are not satisfied, registration under the Securities Act, compliance with Regulation A, or some other registration exemption will be required; and that, notwithstanding the fact that Rule 144 is not exclusive, the Staff of the Securities and Exchange Commission has expressed its opinion that persons proposing to sell private placement securities other than in a registered offering and otherwise than pursuant to Rule 144 will have a substantial burden of proof in establishing that an exemption from registration is available for such offers or sales, and that such persons and their respective brokers who participate in such transactions do so at their own risk.

(p)      Purchaser represents that Purchaser is not subject to any of the "Bad Actor" disqualifications described in Rule 506(d)(1)(i) to (viii) under the Securities Act. Purchaser also agrees to notify the Company if Purchaser becomes subject to such disqualifications after the date hereof.

(q)      Purchaser understands that Purchaser may suffer adverse tax consequences as a result of Purchaser's purchase or disposition of the Shares.  Purchaser represents that Purchaser has consulted any tax consultants Purchaser deems advisable in connection with the

-8-

Doc ID: 3b1251d685bf353e10ca67c932022282d5cd7d17

purchase or disposition of the Shares and that Purchaser is not relying on the Company for any tax advice.

6.   <u>Restrictive Legends and Stop-Transfer Orders.</u>

(a)   <u>Legends</u>.  Any stock certificate or, in the case of uncertificated securities, any notice of issuance, for the Shares, shall bear the following legends (as well as any legends required by the Company or applicable state and federal corporate and securities laws):

(i)   "THE SECURITIES REFERENCED HEREIN HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AND HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF.  NO SUCH SALE OR DISTRIBUTION MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR AN OPINION OF COUNSEL IN A FORM SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933."

(ii)   "THE SECURITIES REFERENCED HEREIN MAY BE TRANSFERRED ONLY IN ACCORDANCE WITH THE TERMS OF AN AGREEMENT BETWEEN THE COMPANY AND THE STOCKHOLDER, A COPY OF WHICH IS ON FILE WITH AND MAY BE OBTAINED FROM THE SECRETARY OF THE COMPANY AT NO CHARGE."

(iii)   "THE TRANSFER OF SECURITIES REFERENCED HEREIN IS SUBJECT TO RESTRICTIONS REQUIRING APPROVAL OF THE COMPANY PURSUANT TO AND IN ACCORDANCE WITH THE COMPANY'S BYLAWS, COPIES OF WHICH MAY BE OBTAINED UPON WRITTEN REQUEST TO THE COMPANY AT ITS PRINCIPAL PLACE OF BUSINESS.  THE COMPANY SHALL NOT REGISTER OR OTHERWISE RECOGNIZE OR GIVE EFFECT TO ANY PURPORTED TRANSFER OF SHARES OF STOCK THAT DOES NOT COMPLY WITH THE COMPANY'S BYLAWS.

(b)   <u>Stop-Transfer Notices</u>.  Purchaser agrees that, in order to ensure compliance with the restrictions referred to herein, the Company may issue appropriate "stop transfer" instructions to its transfer agent, if any, and that, if the Company transfers its own securities, it may make appropriate notations to the same effect in its own records.

(c)   <u>Refusal to Transfer</u>.  The Company shall not be required (i) to transfer on its books any Shares that have been sold or otherwise transferred in violation of any of the provisions of this Agreement or (ii) to treat as owner of such Shares or to accord the right to vote or pay dividends to any purchaser or other transferee to whom such Shares shall have been so transferred.

(d)   <u>Required Notices</u>.  Purchaser acknowledges that the Shares are issued and shall be held subject to all the provisions of this Section 6, the Certificate of Incorporation and the Bylaws of the Company and any amendments thereto, copies of which are on file at the principal office of the Company.  A statement of all of the rights, preferences, privileges and restrictions granted to or imposed upon the respective classes and/or series of shares of stock of the Company and upon the holders thereof may be obtained by any stockholder upon request and without charge, at the principal office of the Company, and the Company will furnish any stockholder, upon request and without charge, a copy of such statement.  Purchaser acknowledges that the provisions of this Section 6 shall constitute the notices required by Sections 151(f) and 202(a) of the Delaware General Corporation Law and Purchaser hereby expressly waives the requirement of Section 151(f) of the Delaware General Corporation Law

-9-

that it receive the written notice provided for in Sections 151(f) and 202(a) of the Delaware General Corporation Law within a reasonable time after the issuance of the Shares.

7.    <u>No Employment Rights</u>.  Nothing in this Agreement shall affect in any manner whatsoever the right or power of the Company, or a parent, subsidiary or affiliate of the Company, to terminate Purchaser's employment or consulting relationship, for any reason, with or without cause.

8.    <u>Section 83(b) Election</u>.  Purchaser understands that Section 83(a) of the Internal Revenue Code of 1986, as amended (the "<u>Code</u>"), taxes as ordinary income the difference between the amount paid for the Shares and the fair market value of the Shares as of the date any restrictions on the Shares lapse.  In this context, "<u>restriction</u>" means the right of the Company to buy back the Shares pursuant to the Repurchase Option set forth in Section 3(a) of this Agreement.  Purchaser understands that Purchaser may elect to be taxed at the time the Shares are purchased, rather than when and as the Repurchase Option expires, by filing an election under Section 83(b) (an "<u>83(b) Election</u>") of the Code with the Internal Revenue Service within 30 days from the date of purchase.  Even if the fair market value of the Shares at the time of the execution of this Agreement equals the amount paid for the Shares, the election must be made to avoid income under Section 83(a) in the future.  Purchaser understands that failure to file such an election in a timely manner may result in adverse tax consequences for Purchaser.  Purchaser further understands that an additional copy of such election form should be filed with Purchaser's federal income tax return for the calendar year in which the date of this Agreement falls.  Purchaser acknowledges that the foregoing is only a summary of the effect of United States federal income taxation with respect to purchase of the Shares hereunder, does not purport to be complete, and is not intended or written to be used, and cannot be used, for the purposes of avoiding taxpayer penalties.  Purchaser further acknowledges that the Company has directed Purchaser to seek independent advice regarding the applicable provisions of the Code, the income tax laws of any municipality, state or foreign country in which Purchaser may reside, and the tax consequences of Purchaser's death, and Purchaser has consulted, and has been fully advised by, Purchaser's own tax advisor regarding such tax laws and tax consequences or has knowingly chosen not to consult such a tax advisor.  Purchaser further acknowledges that neither the Company nor any subsidiary or representative of the Company has made any warranty or representation to Purchaser with respect to the tax consequences of Purchaser's purchase of the Shares or of the making or failure to make an 83(b) Election.  PURCHASER (AND NOT THE COMPANY, ITS AGENTS OR ANY OTHER PERSON) SHALL BE SOLELY RESPONSIBLE FOR APPROPRIATELY FILING SUCH FORM WITH THE IRS, EVEN IF PURCHASER REQUESTS THE COMPANY, ITS AGENTS OR ANY OTHER PERSON MAKE THIS FILING ON PURCHASER'S BEHALF.

Purchaser agrees that Purchaser will execute and deliver to the Company with this executed Agreement a copy of the Acknowledgment and Statement of Decision Regarding Section 83(b) Election (the "<u>Acknowledgment</u>"), attached hereto as <u>Exhibit B</u> and, if Purchaser decides to make an 83(b) Election, a copy of the 83(b) Election, attached hereto as <u>Exhibit C</u>.

Doc ID: 3b1251d685bf353e10ca67c932022282d5cd7d17

9.     <u>Certain Defined Terms</u>.

(a)     "<u>Affiliate</u>" means an entity other than a Subsidiary which, together with the Company, is under common control of a third person or entity.

(b)     "<u>Consultant</u>" means any person, including an advisor but not an Employee, who is engaged by the Company, or any Parent, Subsidiary or Affiliate, to render services (other than capital-raising services) and is compensated for such services, and any Director whether compensated for such services or not.

(c)     "<u>Continuous Service Status</u>" means the absence of any interruption or termination of service as an Employee or Consultant.  Continuous Service Status as an Employee or Consultant shall not be considered interrupted or terminated in the case of:  (i)  Company approved sick leave; (ii)  military leave; (iii)  any other bona fide leave of absence approved by the Company, provided that such leave is for a period of not more than ninety (90) days, unless reemployment upon the expiration of such leave is guaranteed by contract or statute, or unless provided otherwise pursuant to a written Company policy.  Also, Continuous Service Status as an Employee or Consultant shall not be considered interrupted or terminated in the case of a transfer between locations of the Company or between the Company, its Parents, Subsidiaries or Affiliates, or their respective successors, or a change in status from an Employee to a Consultant or from a Consultant to an Employee.

(d)     "<u>Director</u>" means a member of the Board of Directors of the Company.

(e)     "<u>Disability</u>" means "disability" within the meaning of Section 22(e)(3) of the Code.

(f)     "<u>Employee</u>" means any person employed by the Company, or any Parent, Subsidiary or Affiliate, with the status of employment determined pursuant to such factors as are deemed appropriate by the Board of Directors of the Company in its sole discretion, subject to any requirements of applicable laws, including the Code.  The payment by the Company of a director's fee shall not be sufficient to constitute "employment" of such director by the Company or any Parent, Subsidiary or Affiliate.

(g)     "<u>Parent</u>" means any corporation (other than the Company) in an unbroken chain of corporations ending with the Company if each of the corporations other than the Company owns stock possessing 50% or more of the total combined voting power of all classes of stock in one of the other corporations in such chain.

(h)     "<u>Subsidiary</u>" means any corporation (other than the Company) in an unbroken chain of corporations beginning with the Company if each of the corporations other than the last corporation in the unbroken chain owns stock possessing 50% or more of the total combined voting power of all classes of stock in one of the other corporations in such chain.

10.     <u>Miscellaneous</u>.

(a)     <u>Governing Law.</u>  The validity, interpretation, construction and performance of this Agreement, and all acts and transactions pursuant hereto and the rights and

Doc ID: 3b1251d685bf353e10ca67c932022282d5cd7d17

obligations of the parties hereto shall be governed, construed and interpreted in accordance with the laws of the state of Delaware, without giving effect to principles of conflicts of law. For purposes of litigating any dispute that may arise directly or indirectly from this Agreement, the parties hereby submit and consent to the exclusive jurisdiction of the state of Delaware and agree that any such litigation shall be conducted only in the courts of Delaware or the federal courts of the United States located in Delaware and no other courts.

(b)     **Entire Agreement.** This Agreement sets forth the entire agreement and understanding of the parties relating to the subject matter herein and supersedes all prior or contemporaneous discussions, understandings and agreements, whether oral or written, between them relating to the subject matter hereof.

(c)     **Amendments and Waivers.** No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, shall be effective unless in writing signed by the parties to this Agreement. No delay or failure to require performance of any provision of this Agreement shall constitute a waiver of that provision as to that or any other instance.

(d)     **Successors and Assigns.** Except as otherwise provided in this Agreement, this Agreement, and the rights and obligations of the parties hereunder, will be binding upon and inure to the benefit of their respective successors, assigns, heirs, executors, administrators and legal representatives. The Company may assign any of its rights and obligations under this Agreement. No other party to this Agreement may assign, whether voluntarily or by operation of law, any of its rights and obligations under this Agreement, except with the prior written consent of the Company.

(e)     **Notices.** Any notice, demand or request required or permitted to be given under this Agreement shall be in writing and shall be deemed sufficient when delivered personally or by overnight courier or sent by email, or 48 hours after being deposited in the U.S. mail as certified or registered mail with postage prepaid, addressed to the party to be notified at such party's address as set forth on the signature page, as subsequently modified by written notice, or if no address is specified on the signature page, at the most recent address set forth in the Company's books and records.

(f)     **Severability.** If one or more provisions of this Agreement are held to be unenforceable under applicable law, the parties agree to renegotiate such provision in good faith. In the event that the parties cannot reach a mutually agreeable and enforceable replacement for such provision, then (i) such provision shall be excluded from this Agreement, (ii) the balance of the Agreement shall be interpreted as if such provision were so excluded and (iii) the balance of the Agreement shall be enforceable in accordance with its terms.

(g)     **Construction.** This Agreement is the result of negotiations between and has been reviewed by each of the parties hereto and their respective counsel, if any; accordingly, this Agreement shall be deemed to be the product of all of the parties hereto, and no ambiguity shall be construed in favor of or against any one of the parties hereto.

Doc ID: 3b1251d685bf353e10ca67c932022282d5cd7d17

(h)     **Counterparts**.  This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, and all of which together shall constitute one and the same agreement.  Execution of a facsimile or scanned copy will have the same force and effect as execution of an original, and a facsimile or scanned signature will be deemed an original and valid signature.

(i)     **Electronic Delivery**.  The Company may, in its sole discretion, decide to deliver any documents related to this Agreement or any notices required by applicable law or the Company's Certificate of Incorporation or Bylaws by email or any other electronic means. Purchaser hereby consents to (i) conduct business electronically (ii) receive such documents and notices by such electronic delivery and (iii) sign documents electronically and agrees to participate through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

*[Signature Page Follows]*

-13-

The parties have executed this Common Stock Purchase Agreement as of the date first set forth above.

THE COMPANY:

CHANNELREPLY INC.

By: _____
(Signature)

Name: David Gitman
Title: CEO/President

Address: 2711 Centerville Rd, Ste 400
Wilmington, DE 19808
United States

PURCHASER:

KONSTANTYN BAGAIEV
(PRINT NAME)

By: _____
(Signature)

Name: Konstantyn Bagaiev
Title: Software Developer

Address:
Chelobityevskoye sh. 12 bl 5 apt 54
Moscow, Russia 127495
Email: Konstantyn@ChannelReply.com

-14-

I, _____, spouse of _____ ("Purchaser"), have read and hereby approve the foregoing Common Stock Purchase Agreement (the "Agreement").  In consideration of the Company's granting my spouse the right to purchase the Shares as set forth in the Agreement, I hereby agree to be bound irrevocably by the Agreement and further agree that any community property or other such interest that I may have in the Shares shall hereby be similarly bound by the Agreement.  I hereby appoint my spouse as my attorney-in-fact with respect to any amendment or exercise or waiver of any rights under the Agreement.

_____
Spouse of Purchaser (if applicable)

Doc ID: 3b1251d685bf353e10ca67c932022282d5cd7d17

## EXHIBIT A

## STOCK POWER

FOR VALUE RECEIVED, the undersigned ("Holder"), hereby sells, assigns and transfers unto _____ ("Transferee") _____ shares of the Common Stock of ChannelReply Inc., a Delaware corporation (the "Company"), standing in Holder's name on the Company's books as Certificate No. [U]CS-_____ whether held in certificated or uncertificated form, and does hereby irrevocably constitute and appoint _____ to transfer said stock on the books of the Company with full power of substitution in the premises.

Dated:_____

HOLDER:

Konstantyn Bagaev
_____
(PRINT NAME)

By:_____
        (Signature)

Name: Konstantyn Bagaiev
Title:_____

Address:
Chelobityevskoye sh. 12 bl 5  apt 54
Moscow, Russia 127495

Email: Konstantyn@ChannelReply.com

This Stock Power may only be used as authorized by the Common Stock Purchase Agreement between the Holder and the Company, dated   06/08/2017   and the exhibits thereto.

*Instructions:*  Please do not fill in any blanks other than the signature line.  The purpose of this Stock Power is to enable the Company to exercise its repurchase option set forth in the Agreement without requiring additional signatures on the part of Holder.

IF YOU WISH TO MAKE A SECTION 83(B) ELECTION, THE FILING OF SUCH ELECTION IS YOUR RESPONSIBILITY.

THE FORM FOR MAKING THIS SECTION 83(B) ELECTION IS ATTACHED TO THIS AGREEMENT.

YOU MUST FILE THIS FORM WITHIN 30 DAYS OF PURCHASING THE SHARES.

YOU (AND NOT THE COMPANY, ANY OF ITS AGENTS OR ANY OTHER PERSON) SHALL BE SOLELY RESPONSIBLE FOR FILING SUCH FORM WITH THE IRS, EVEN IF YOU REQUEST THE COMPANY, ITS AGENTS OR ANY OTHER PERSON TO MAKE THIS FILING ON YOUR BEHALF AND EVEN IF THE COMPANY, ANY OF ITS AGENTS OR ANY OTHER PERSON HAS PREVIOUSLY MADE THIS FILING ON YOUR BEHALF.

The election should be filed by mailing a signed election form by certified mail, return receipt requested to the IRS Service Center where you file your tax returns.  See www.irs.gov.

Doc ID: 3b1251d685bf353e10ca67c932022282d5cd7d17

## EXHIBIT B

### ACKNOWLEDGMENT AND STATEMENT OF DECISION
### REGARDING SECTION 83(b) ELECTION

The undersigned has entered into a stock purchase agreement with ChannelReply Inc., a Delaware corporation (the "Company"), pursuant to which the undersigned is purchasing 1,000,000 shares of Common Stock of the Company (the "Shares"). In connection with the purchase of the Shares, the undersigned hereby represents as follows:

    1.    The undersigned has carefully reviewed the stock purchase agreement pursuant to which the undersigned is purchasing the Shares.

    2.    The undersigned either [check and complete as applicable]:

(a) ___ has consulted, and has been fully advised by, the undersigned's own tax advisor, _____, whose business address is _____, regarding the federal, state and local tax consequences of purchasing the Shares, and particularly regarding the advisability of making elections pursuant to Section 83(b) of the Internal Revenue Code of 1986, as amended (the "Code") and pursuant to the corresponding provisions, if any, of applicable state law; or

(b) ___ has knowingly chosen not to consult such a tax advisor.

    3.    The undersigned hereby states that the undersigned has decided [check as applicable]:

(a) ___ to make an election pursuant to Section 83(b) of the Code, and is submitting to the Company, together with the undersigned's executed stock purchase agreement, an executed form entitled "Election Under Section 83(b) of the Internal Revenue Code of 1986;" or

(b) ___ not to make an election pursuant to Section 83(b) of the Code.

4.      Neither the Company nor any subsidiary or representative of the Company has made any warranty or representation to the undersigned with respect to the tax consequences of the undersigned's purchase of the Shares or of the making or failure to make an election pursuant to Section 83(b) of the Code or the corresponding provisions, if any, of applicable state law.

Dated: _06/08/2017_____

**PURCHASER:**

Konstantyn Bagaev
_____
(PRINT NAME)

_____
(Signature)

Address:
Chelobityevskoye sh. 12 bl 5 apt 54
Moscow, Russia 127495_____

_____
Spouse of Purchaser (if applicable)

-2-

**EXHIBIT C**

## ELECTION UNDER SECTION 83(B)
## OF THE INTERNAL REVENUE CODE OF 1986

     The undersigned taxpayer hereby elects, pursuant to Section 83(b) of the Internal Revenue Code, to include in taxpayer's gross income for the current taxable year, the amount of any compensation taxable to taxpayer in connection with taxpayer's receipt of the property described below:

1.  The name, address, taxpayer identification number and taxable year of the undersigned are as follows:

    NAME OF TAXPAYER: _____

    NAME OF SPOUSE: _____

    ADDRESS: _____
                  _____

    IDENTIFICATION NO. OF TAXPAYER: _____

    IDENTIFICATION NO. OF SPOUSE: _____

    TAXABLE YEAR: _____

2.  The property with respect to which the election is made is described as follows:

    _____ shares of the Common Stock of ChannelReply Inc., a Delaware corporation (the "Company").

3.  The date on which the property was transferred is: _____

4.  The property is subject to the following restrictions:

    Repurchase option at cost in favor of the Company upon termination of taxpayer's employment or consulting relationship.

5.  The fair market value at the time of transfer, determined without regard to any restriction other than a restriction which by its terms will never lapse, of such property is: $_____.

6.  The amount (if any) paid for such property:  [Paid for with property having a value of $_____ and equivalent to the value of the Shares] OR [$_____].

Doc ID: 3b1251d685bf353e10ca67c932022282d5cd7d17

The undersigned has submitted a copy of this statement to the person for whom the services were performed in connection with the undersigned's receipt of the above-described property.  The transferee of such property is the person performing the services in connection with the transfer of said property.

<u>The undersigned understands that the foregoing election may not be revoked except with the consent of the Commissioner</u>.

Dated:_____

PURCHASER:

_____
(PRINT NAME)

_____
(Signature)

Address:

_____
_____
_____

_____
Spouse of Purchaser (if applicable)

-2-

Doc ID: 3b1251d685bf353e10ca67c932022282d5cd7d17

## EXHIBIT D

FORM OF ASSIGNMENT OF IP AND OTHER ASSETS

*(See Attached)*

Doc ID: 3b1251d685bf353e10ca67c932022282d5cd7d17

# CHANNELREPLY INC.

## ASSIGNMENT OF IP AND OTHER ASSETS

This Assignment of IP and Other Assets (this "Agreement") is made and entered into effective as of ___06/08/2017_____ (this "Effective Date") by and ChannelReply Inc., a Delaware corporation (the "Company"), and Konstantyn Bagaiev (the "Assignor").

WHEREAS, prior to the Effective Date, the Assignor has developed certain technology and intellectual property on behalf of the Company and has developed or acquired other tangible personal property, as further described below, which relate to the Company's actual and proposed business associated with the ChannelReply Platform and software and website applications (the "Business");

WHEREAS, the Assignor desires such technology and intellectual property and other tangible personal property to be assigned to and owned by the Company, in connection with the sale of the shares of the Company's capital stock issued by the Company to the Assignor on or about the date hereof;

NOW THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties to this Agreement hereby agree as follows:

1. **Certain Definitions**. As used herein, the following capitalized terms will have the meanings set forth below:

(a) "Technology" means all inventions, technology, ideas, concepts, processes, business plans, documentation, financial projections, models and any other items, authored, conceived, invented, developed or designed by the Assignor relating to the technology or Business of the Company that is not otherwise owned by the Company.

(b) "Derivative" means: (i) any derivative work of the Technology (as defined in Section 101 of the U.S. Copyright Act); (ii) all improvements, modifications, alterations, adaptations, enhancements and new versions of the Technology (the "Technology Derivatives"); and (iii) all technology, inventions, products or other items that, directly or indirectly, incorporate, or are derived from, any part of the Technology or any Technology Derivative.

(c) "Intellectual Property Rights" means, collectively, all worldwide patents, patent applications, patent rights, copyrights, copyright registrations, moral rights, trade names, trademarks, service marks, domain names and registrations and/or applications for all of the foregoing, trade secrets, know-how, mask work rights, rights in trade dress and packaging, goodwill and all other intellectual property rights and proprietary rights relating in any way to the Technology, any Derivative or any Embodiment, whether arising under the laws of the United States of America or the laws of any other state, country or jurisdiction.

(d) "Embodiment" means all documentation, drafts, papers, designs, schematics, diagrams, models, prototypes, source and object code (in any form or format and for

Doc ID: 3b1251d685bf353e10ca67c932022282d5cd7d17

all hardware platforms), computer-stored data, diskettes, manuscripts and other items describing all or any part of the Technology, any Derivative, any Intellectual Property Rights or any information related thereto or in which all of any part of the Technology, any Derivative, any Intellectual Property Right or such information is set forth, embodied, recorded or stored.

(e)    "Business Assets" means all business and marketing plans, worldwide marketing rights, software, customer and supplier lists, price lists, mailing lists, customer and supplier records and other confidential or proprietary information relating to the Technology, as well as all computers, office equipment and other tangible personal property owned (i.e., not leased) by Assignor immediately prior to the execution and delivery of this Agreement and used in or related to the Business.

(f)    "Assigned Assets" refers to the Technology, all Derivatives, all Intellectual Property Rights, all Embodiments and Business Assets, collectively.

2.    Assignment.

(a)    The Assignor hereby sells, transfers, assigns and conveys, to the Company, and its successors and assigns, the Assignor's entire right, title and interest in and to the Assigned Assets and all rights of action, power and benefit belonging to or accruing from the Assigned Assets including the right to undertake proceedings to recover past and future damages and claim all other relief in respect of any acts of infringement thereof whether such acts shall have been committed before or after the date of this assignment, the same to be held and enjoyed by said Company, for its own use and benefit and the use and benefit of its successors, legal representatives and assigns, as fully and entirely as the same would have been held and enjoyed by the Assignor, had this assignment not been made.

(b)    The Assignor hereby appoints the Company the attorney-in-fact of the Assignor, with full power of substitution on behalf of the Assignor to demand and receive any of the Assigned Assets and to give receipts and releases for the same, to institute and prosecute in the name of the Assignor, but for the benefit of the Company, any legal or equitable proceedings the Company deems proper in order to enforce any rights in the Assigned Assets and to defend or compromise any legal or equitable proceedings relating to the Assigned Assets as the Company shall deem advisable.  The Assignor hereby declares that the appointment made and powers granted hereby are coupled with an interest and shall be irrevocable by the Assignor.

(c)    The Assignor hereby agrees that the Assignor and the Assignor's successors and assigns will do, execute, acknowledge and deliver, or will cause to be done, executed, acknowledged and delivered such further acts, documents, or instruments confirming the conveyance of any of the Assigned Assets to the Company as the Company shall reasonably deem necessary, provided that the Company shall provide all necessary documentation to the Assignor.

3.    Assignor Representations and Warranties.  The Assignor represents and warrants to the Company that to the best of Assignor's knowledge the Assignor is the owner, inventor and/or author of, and can grant exclusive right, title and interest in and to, each of the Assigned Assets transferred by the Assignor hereunder and that none of the Assigned Assets are

Doc ID: 3b1251d685bf353e10ca67c932022282d5cd7d17

subject to any dispute, claim, prior license or other agreement, assignment, lien or rights of any third party, or any other rights that might interfere with the Company's use, or exercise of ownership of, any of the Assigned Assets. The Assignor further represents and warrants to the Company that to the best of Assignor's knowledge the Assigned Assets are free of any claim of any prior employer or third-party client of the Assignor or any school, university or other institution the Assignor attended, and that the Assignor is not aware of any claims by any third party to any rights of any kind in or to any of the Assigned Assets. The Assignor agrees to immediately notify the Company upon becoming aware of any such claims.

4.      **Reimbursement of Expenses.** The Company shall as promptly as practicable, reimburse the Assignor for the Assignor's actual out-of-pocket costs reasonably incurred with respect to Assignor's acquisition and maintenance of the Assigned Assets.

5.      **Miscellaneous.**

(a)     **Governing Law.** The validity, interpretation, construction and performance of this Agreement, and all acts and transactions pursuant hereto and the rights and obligations of the parties hereto shall be governed, construed and interpreted in accordance with the laws of the state of Delaware, without giving effect to principles of conflicts of law.

(b)     **Entire Agreement.** This Agreement sets forth the entire agreement and understanding of the parties relating to the subject matter herein and supersedes all prior or contemporaneous discussions, understandings and agreements, whether oral or written, between them relating to the subject matter hereof.

(c)     **Amendments and Waivers.** No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, shall be effective unless in writing signed by the parties to this Agreement. No delay or failure to require performance of any provision of this Agreement shall constitute a waiver of that provision as to that or any other instance.

(d)     **Successors and Assigns.** Except as otherwise provided in this Agreement, this Agreement, and the rights and obligations of the parties hereunder, will be binding upon and inure to the benefit of their respective successors, assigns, heirs, executors, administrators and legal representatives. The Company may assign any of its rights and obligations under this Agreement. No other party to this Agreement may assign, whether voluntarily or by operation of law, any of its rights and obligations under this Agreement, except with the prior written consent of the Company.

(e)     **Notices.** Any notice, demand or request required or permitted to be given under this Agreement shall be in writing and shall be deemed sufficient when delivered personally or by overnight courier or sent by email, or 48 hours after being deposited in the U.S. mail as certified or registered mail with postage prepaid, addressed to the party to be notified at such party's address as set forth on the signature page, as subsequently modified by written notice, or if no address is specified on the signature page, at the most recent address set forth in the Company's books and records.

-3-

Doc ID: 3b1251d685bf353e10ca67c932022282d5cd7d17

(f)     <u>Severability</u>.  If one or more provisions of this Agreement are held to be unenforceable under applicable law, the parties agree to renegotiate such provision in good faith. In the event that the parties cannot reach a mutually agreeable and enforceable replacement for such provision, then (i) such provision shall be excluded from this Agreement, (ii) the balance of the Agreement shall be interpreted as if such provision were so excluded and (iii) the balance of the Agreement shall be enforceable in accordance with its terms.

(g)     <u>Construction</u>.  This Agreement is the result of negotiations between and has been reviewed by each of the parties hereto and their respective counsel, if any; accordingly, this Agreement shall be deemed to be the product of all of the parties hereto, and no ambiguity shall be construed in favor of or against any one of the parties hereto.

(h)     <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, and all of which together shall constitute one and the same agreement.  Execution of a facsimile or scanned copy will have the same force and effect as execution of an original, and a facsimile or scanned signature will be deemed an original and valid signature.

*[Signature Page Follows]*

-4-

Doc ID: 3b1251d685bf353e10ca67c932022282d5cd7d17

IN WITNESS WHEREOF, the undersigned have executed this Agreement effective as of the date and year first above written.

Dated: ___06/08/2017_____

ASSIGNOR:

KONSTANTYN BAGAIEV

_____
(Signature)

Address:
Chelobityevskoye sh. 12 bl 5 apt 54
Moscow, Russia 127495
Email: Konstantyn@ChannelReply.com

_____
Spouse of Assignor (if applicable)

THE COMPANY:

CHANNELREPLY INC.

By:_____
                (Signature)

Name: David Gitman
Title: CEO/President

Address:
2711 Centerville Road, Ste 400
Wilmington, DE 19808
United States

-5-

Doc ID: 3b1251d685bf353e10ca67c932022282d5cd7d17

## EXHIBIT E

### FORM OF PATENT ASSIGNMENT

*(See Attached)*

Doc ID: 3b1251d685bf353e10ca67c932022282d5cd7d17

# CHANNELREPLY INC.

## PATENT ASSIGNMENT

THIS PATENT ASSIGNMENT by [Assignor 1] and [Assignor 2] (collectively, the "Assignors") witnesseth:

WHEREAS, said Assignors have invented certain new and useful improvements in _____ set forth in [an application for Letters Patent of the United States] / having an oath or declaration executed on even date herewith; bearing Serial No. _____ and filed on [Date]; and

WHEREAS, [Company Name], a corporation duly organized under and pursuant to the laws of Delaware, and having a principal place of business at _____, _____, _____ ("Assignee"), is desirous of acquiring the entire right, title and interest in and to said inventions and said [application for Letters Patent of the United States] OR [provisional application], and in and to any Letters Patent or Patents, U.S. or foreign, to be obtained therefor and thereon:

NOW THEREFORE, in consideration of One Dollar ($1.00) and other good and sufficient considerations, the receipt of which is hereby acknowledged, said Assignors have sold, assigned, transferred and set over, and by these presents do sell, assign, transfer and set over, to Assignee, its successors, legal representatives and assigns, the entire right, title and interest in and to the above-referenced inventions, application for Letters Patent, provisional application, and any and all Letters Patent or Patents in the United States of America and all foreign countries which may be granted therefor and thereon, and in and to any and all divisions, continuations, and continuations-in-part of said application, and reissues and extensions of said Letters Patent or Patents, and all rights under the International Convention for the Protection of Industrial Property and all rights of action, power and benefit belonging to or accruing from the above-mentioned invention including the right to undertake proceedings to recover past and future damages and claim all other relief in respect of any acts of infringement thereof whether such acts shall have been committed before or after the date of this assignment, the same to be held and enjoyed by said Assignee, for its own use and benefit and the use and benefit of its successors, legal representatives and assigns, to the full end of the term or terms for which Letters Patent or Patents may be granted, as fully and entirely as the same would have been held and enjoyed by the Assignor, had this sale and assignment not been made;

AND for the same consideration, said Assignors hereby covenant and agree to and with said Assignee, its successors, legal representatives and assigns, that, at the time of execution and delivery of these presents, said Assignors are the sole and lawful owners of the entire right, title and interest in and to the above-referenced inventions and application for Letters Patent, and that the same are unencumbered and that said Assignors have good and full right and lawful authority to sell and convey the same in the manner herein set forth;

AND for the same consideration, said Assignor hereby covenants and agrees to and with said Assignee, its successors, legal representatives and assigns, that, at the time of execution and delivery of these patents, said Assignor is the joint and lawful joint owner of the right, title and interest in and to the above-referenced inventions and application for Letters Patent, and that the same are unencumbered and that said Assignor has good and full right and lawful authority to convey the same in the manner herein set forth;

Doc ID: 3b1251d685bf353e10ca67c932022282d5cd7d17

AND for the same consideration, said Assignors hereby covenant and agree to and with said Assignee, its successors, legal representatives and assigns, that said Assignors will, whenever counsel of the said Assignee, or the counsel of its successors, legal representatives and assigns, shall advise that any proceeding in connection with said inventions, or said application for Letters Patent, or any proceeding in connection with Letters Patent for said inventions in any country, including interference proceedings, is lawful and desirable, or that any division, continuation or continuation-in-part of any application for Letters Patent, or any reissue or extension of any Letters Patent, to be obtained thereon, is lawful and desirable, sign all papers and documents, take all lawful oaths, and do all acts necessary or required to be done for the procurement, maintenance, enforcement and defense of Letters Patent for said inventions, without charge to said Assignee, its successors, legal representatives and assigns, but at the cost and expense of said Assignee, its successors, legal representatives and assigns;

AND said Assignors hereby request the Commissioner of Patents to issue said Letters Patent of the United States to said Assignee as the Assignee of said inventions and the Letters Patent to be issued thereon for the sole use and benefit of said Assignee, its successors, legal representatives and assigns.

Dated:_____

**ASSIGNOR:**

[ASSIGNOR 1]

_____
(Signature)

Address:

_____
_____ _____
[United States]
Email: _____

Dated:_____

**ASSIGNOR:**

[ASSIGNOR 2]

_____
(Signature)

Address:

_____
_____ _____
[United States]
Email: _____

Doc ID: 3b1251d685bf353e10ca67c932022282d5cd7d17

## RECEIPT

ChannelReply Inc., a Delaware corporation (the "Company"), hereby

acknowledges receipt of:

_____✔___ A check in the amount of $ 10.00 .

_____✔___ The assignment of certain intellectual property and/or other assets having an
aggregate value equal to $1_____

given by _Konstantyn Bagaiev_____ as consideration for _1,000,000_____

shares of Common Stock of the Company recorded on the books of the Company.

Dated: _06/08/2017_____

THE COMPANY:

CHANNELREPLY INC.

By:_____
          (Signature)

Name: David Gitman_____
Title: CEO/President_____

Doc ID: 3b1251d685bf353e10ca67c932022282d5cd7d17

## RECEIPT AND CONSENT

The undersigned hereby acknowledges receipt of <u>1,000,000</u> shares of Common Stock of ChannelReply Inc., a Delaware corporation (the "<u>Company</u>").

The undersigned further acknowledges that the Secretary of the Company, or his or her designee, is acting as escrow holder pursuant to the Common Stock Purchase Agreement that Purchaser has previously entered into with the Company.  As escrow holder, the Secretary of the Company, or his or her designee, holds the aforementioned shares issued in the undersigned's name.

Dated: 06/08/2017 _____

**PURCHASER:**

Konstantyn Bagaev
_____
(PRINT NAME)

By: _____
(Signature)

Name: <u>Konstantyn Bagaiev</u>
Title: _____

Address:
<u>Chelobityevskoye sh. 12 bl 5  apt 54</u>
<u>Moscow, Russia 127495</u>

Email: <u>Konstantyn@ChannelReply.com</u>

_____
Spouse of Purchaser (if applicable)

## Exhibit 43

Exhibit 45 - Dave email to Joel.png

Page 1 of 1

5/30/2017



ndap Mail - RE: CPK

Mike Dash <mdash@ndap-llc.com>

## RE: CPK

**David Gitman** <dgitman@ndap-llc.com>                                                      Thu, May 25, 2017 at 5:27 PM
To: Michael Dash <mdash@ndap-llc.com>
Cc: "Jeffrey E. Rothman" <jrothman@srrlaw.com>, Jeremy Falk <jeremy.falk@gmail.com>, Joel Liebman
<joel@lghaccountants.com>, Umar Farooq <umar@farooqco.com>

Joel,

Thank you for taking my call. I look forward to reviewing the accounting on Tuesday.
On Thu, May 25, 2017 at 4:50 PM David Gitman <dgitman@ndap-llc.com> wrote:

  Hi Joel,

  I have had an accounting to create the true up in my previous email. Can you please validate this accounting on behalf
  of company, CSV and NDAP.

  Thank you.

**Exhibit 44**

6/13/2017                    ndap Mail - Your Same Day wire transfer was successfully sent          P ~ 51

 by Google

Mike Dash <mdash@ndap-llc.com>

## Your Same Day wire transfer was successfully sent

'Online Transfers from Bank of America' via Partners <partners@ndap-llc.com>          Tue, Jun 13, 2017 at 2:41 PM
Reply-To: Online Transfers from Bank of America <bankofamericatransfers@mail.transfers.bankofamerica.com>
To: partners@ndap-llc.com

We have successfully sent the following transfer:

*******************************************
Item #:        203612044
Amount:        $5,060.00
To:            Dalva Ventures
Fee:           30.00
Send on Date:  06/13/2017
Service:       Same Day
*******************************************

If there is a problem with executing your request, we will notify you both by email and on the Manage Accounts tab. You can always check your transfer status on the Review Transfer screen at www.bankofamerica.com.

Sincerely,

Member Service

www.bankofamerica.com

_____
_____

This is a service email from Bank of America.  Please note that you may receive service emails in accordance with your Bank of America service agreements, whether or not you elect to receive promotional email.

Read our privacy policy: http://www.bankofamerica.com/privacy

Please don't reply directly to this automatically-generated email message.

Bank of America Email, 8th Floor-NC1-002-08-25, 101 South Tryon St., Charlotte, NC 28255-0001

Bank of America, N.A. Member FDIC. Equal Housing Lender:

http://www.bankofamerica.com/help/equalhousing.cfm

(C) 2017 Bank of America Corporation. All rights reserved.

This email was sent to: partners@ndap-llc.com