UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
MICHAEL DARDASHTIAN, individually and
on behalf of COOPER SQUARE VENTURES, LLC
NDAP, LLC and CHANNEL REPLY,

                                    Plaintiffs,                          1:17 Civ.4327 (LLS)

                    -against-

DAVID GITMAN, ACCEL COMMERCE, LLC,
DALVA VENTURES, LLC, KONSTANTYN
BAGAIEV, OLESKII GLUKHAREV
and CHANNEL REPLY, INC.,

                                    Defendants.
-------------------------------------------------------------------X


## MEMORANDUM OF LAW


                                        Respectfully submitted,

                                         /s/ Sang J. Sim
                                        SIM & DEPAOLA, LLP
                                        By: Sang J. Sim, Esq
                                        Attorneys for Defendants
                                        42-40 Bell Blvd. Suite 201
                                        Bayside, New York 11361
                                        (718) 281-0400

## TABLE OF CONTENTS

TABLE OF AUTHORITIES……………………………………………………………5

PRELIMINARY STATEMENT……………………………………………………......6

COUNTER-STATEMENT OF FACTS……………………………………………….7

    A. DEPOSITION OF MICHAEL DARDASHTIAN……………………………..7
    B. DEPOSITION OF CARLEEN GASKIN………………………………………..13


ARGUMENT…………………………………………………………………………20

POINT I
PLAINTIFFS ARE NOT ENTITLED TO A REDEMPTION OF
DEFENDANT DAVID GITMAN'S RIGHT, TITLE AND
STOCK INTEREST BECAUSE DAVIT GITMAN
RETAINS HIS RIGHTS UNDER THE OPERATING AGREEMENT……………………20


POINT II
GITMAN DID NOT VIOLATE ARTICLE 11.5(b) OF THE CSV
OPERATING AGREEMENT …………………………………………………..……..27


POINT III
THERE ARE TRIABLE ISSUES OF FACT TO PRECLUDE
SUMMARY JUDGMENT AS TO COUNTS FIVE, TEN, TWELVE,
EIGHTEEN AND NINETEEN ………………………………………………...…..31


    A. Summary Judgment Should Be Denied as to Counts 5, 12, 18 and 19 ….…..31
    B. Plaintiffs Failed to Demonstrate Entitlement to Summary Judgment
       On the Conversion Claim…………………………………………………….36


POINT IV
APPLICATION OF THE UNCLEAN HANDS DOCTRINE
PRECLUDES SUMMARY JUDGMENT IN THIS CASE……………………...…..37


POINT V
PLAINTIFFS ARE NOT ENTITLED TO SUMMARY
JUDGMENT ON THE BREACH OF CONTRACT CLAIM…………………...…..40


POINT VI
PLAINTIFFS' VALUATION REPORT IS UNRELIABLE…..…………………….…..41

POINT VII

DEFENDANTS COUNTER-CLAIMS SHOULD NOT BE DISMISSED…………..…..49

    A.  Triable Issues of Fact Exist to Deny Plaintiffs' Motion
        for Summary Judgment on David Gitman's Claims
        for Breach of Fiduciary Duty and Breach of
        Contract against Michael Dardashtian……………………………………..49
    B.  Summary Judgment As to Defendants Claim for
        Constructive Trust and Unjust Enrichment Must Be
        Denied Since There Are Triable Issues of Fact……..………………….....51

POINT VIII

TRIABLE ISSUES OF FACT EXIST AS TO DEFENDANTS'
CLAIM FOR DECLARATORY JUDGMENT THAT GITMAN
OWNS 67.5% OF CHANNEL REPLY…………………….….………………......52

POINT IX

DAVID GITMAN IS ENTITLED TO AN ACCOUNTING
BASED ON DARDASHTIAN'S ADMISSION THAT HE
TOOK UNEVEN DISTRIBUTIONS…………………………………………………54

CONCLUSION…………………………………………………..…………………54

## <u>TABLE OF AUTHORITIES</u>

CASES

*Aetna Cas. & Sur. Co. v. Aniero Concrete Co., Inc.,* 404 F.3d 566, 607 (2d Cir.2005)….…..38

*Air Support Int'l, Inc. v. Atlas Air, Inc.,* 54 F. Supp.2d 158, 165 (E.D.N.Y. 1999)………..40

*Amorgianos v. National R.R. Passenger Corp.,* 303 F. 3d 256, 265 (2d Cir. 2002)…41, 42, 48, 49

*Aramony v. United Way*, 949 F. Supp. 1080, 1086 (S.D.N.Y. 1996)……………………..…36

*Atl. Cas. Ins. Co. v. Coffey,* 548 Fed.Appx. 661, 664 (2d Cir.2013)…………………………38

*Bentley v. Tibbals,* 223 F. 247 (2d Cir.1915)………………………………………………37

*Byron v. Clay,* 867 F.2d 1049, 1052 (7th Cir.1989)…………………………………………..38

*Bytemark*, *Inc. v. Xerox Corp.*, 342 F. Supp. 3d 496, 505 (S.D.N.Y. 2018)………………..…32

*Carson Optical Inc. v. eBay Inc.*, 202 F. Supp. 3d 247, 268 (E.D.N.Y. 2016)…………….......32

*Chem. Bank v. Stahl ,* 237 A.D.2d 231, 655 N.Y.S.2d 24, 25 (1997)…………………………38

*Chevron Corp. v. Salazar ,* Nos. 11 cv 3718, 11 cv 0691(LAK),

2011 WL 3628843, at *6 n. 39 (S.D.N.Y. Aug. 17, 2011)……………………………………38

*Cigogne, Inc. v. Luxury Trading Corp.*, 13 A.D.2d 928, 930 (1st Dept. 1961)………………..32

*Corsello v. Verizon N.Y., Inc.,* 18 N.Y.3d 777, 790, 944 N.Y.S.2d 732,

967 N.E.2d 1177 (2012)………………………………………………………………………..51

*Counihan v. Allstate Insurance Co.,* 194 F.3d 357, 362 (2d Cir.1999)………………………...51

*Crossroads ABL, LLC v. Canaras Capital Mgmt. LLC* 2011 N.Y. Slip Op. 51971…………..21

*Daubert v. Merrill Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 597 (1993)……………………41

*Dior v. Milton,* 155 N.Y.S.2d 443, 451 (Sup. Ct.), aff'd, 156 N.Y.S.2d 996 (1956)…………...32

*Ficus Investments, Inc. v. Private Capital Management, LLC* 61 A.D.3d (N.Y. App. Div. 2009)………………………………………………………………………………………………21

*General Electric v. Joiner,* 522 U.S. 136, 146 (1997)……………………………………………..49

*Hughes v. Ester C Co.,* 930 F.Supp.2d 439, 471 (E.D.N.Y.2013)………………………………51

*In re Ades and Berg Group Investors,* 550 F.3d 240, 245 (2d Cir.2008)………………………..51

*In re Mid-Island Hosp., Inc.*………………………………………………………………………………49

*ITC Ltd. v. Punchgini, Inc.*, 9 N.Y.3d 467, 476 (2007)………………………………………...32

*Kirschner v. KPMG LLP,* 15 N.Y.3d 446, 912 N.Y.S.2d 508, 938 N.E.2d 941, 960 (2010)…...38

*Kumho Tire Co., Ltd. V. Carmichael,* 526 U.S. 137, 149 (1999)………………………………..42

*Lia v. Saporito,* 909 F.Supp.2d 149, 174 (E.D.N.Y.2012)………………………………………38

*LinkCo, Inc. v. Fujitsu Ltd.*, 230 F. Supp.2d 492, 500 (S.D.N.Y. 2002) …………………..…31

*Lippe v. Bairnco Corp.,* 288 B.R. 678 (S.D.N.Y. 2003)………………………………….47, 48

*Lopresti v. Terwilliger*, 126 F.3d 34, 41 (2d Cir. 1997)…………………………………………36

*Mallis v. Bankers Trust Co.,* 615 F.2d 68, 75 (2d Cir.1980)…………………………………….38

*Marks v. New York Univ.,* 61 F. Supp.2d 81, 88 (S.D.N.Y. 1999)……………………………40

*National Basketball Ass'n v. Motorola, Inc.,* 105 F.3d 841, 851 (2d Cir. 1997)…………….…31

*Residential Bd. of Managers of the Columbia Condominium v. Alden* 178 A.D.2d 121, 122 (1st Dept.1991)………………………………………………………………………………………...21

*Roslyn Union Free School Dist. v. Barkan,*
16 N.Y.3d at 653, 926 N.Y.S.2d 349, 950 N.E.2d 85 (2011)……………………………...…54

*SNS Bank, N.V. v. Citibank, N.A.,* 777 N.Y.S.2d 62, 65 (1st Dep't 2004)………………………49

*Telecom Int'l Am., Ltd. v. AT & T Corp.*, 280 F.3d 175, 197 (2d Cir. 2001)……………………32

*Vigilant Ins. Co. of America v. Housing Auth. of El Paso, Texas,* 87 N.Y.2d 36, 44 (1995)……36

*Weiss v. Mayflower Doughnut Corp.,* 1 N.Y.2d 310, 152 N.Y.S.2d 471,

135 N.E.2d 208, 210 (1956)……………………………………………………………………38

## PRELIMINARY STATEMENT

The Defendants, David Gitman, Accel Commerce, LLC, Dalva Ventures, LLC and Channel Reply, Inc. hereby respectfully submit this memorandum of law in response to Plaintiffs' partial motion for summary judgment for a redemption of David Gitman's membership in Cooper Square Ventures LLC ("CSV") and on counts 2, 5, 7, 10, 12, 18, 19 and 20 of Plaintiffs' First Amended Complaint and dismissal of Defendants Amended Counterclaims in their entirety.

Contrary to the assertions made by the Plaintiffs, it is respectfully submitted that there are triable issues of fact that precludes summary judgment as a matter of law as set forth in Defendants' Response to Plaintiffs' Rule 56.1 Statement of Undisputed Facts; the Affidavit of David Gitman; deposition transcript of Michael Dardashtian; deposition transcript of Carleen Gaskin; and documents that were attached to Plaintiffs' motion for summary judgment as set forth in the Sim Declaration.

As a threshold matter, David Gitman was removed from the day-to-day operations of CSV in order to maintain the status quo by the Court.  An interim manager was appointed by the Court to replace David Gitman.  The Plaintiff, Michael Dardashtian and the interim manager served a notice of redemption of David Gitman's interest in CSV while this action was being litigated and before any issues in dispute were resolved by the Court.  David Gitman sent a notice of rejection of the Redemption notice since the Court did not displace David Gitman's rights under the Operating Agreement, including his right to consent to a redemption of his interests in CSV.  For the reasons set forth below, it is submitted that the interim manager lacks the authority to consent to a redemption on behalf of David Gitman.  Further, permitting a redemption at this stage of litigation would clearly disrupt the status quo and as such, the redemption notice must be deemed null and void.

6

Further, it is submitted that contrary to the arguments made by the Plaintiffs, it is submitted that there are triable issues of fact that preclude summary judgment in this case. Notably, for years, Michael Dardashtian took advantage of David Gitman as set forth in David Gitman's Affidavit.  For example, Michael Dardashtian took uneven distributions from CSV in violation of the Operating Agreement, which was not authorized or consented to by David Gitman.  Further, Michael Dardashtian had a history on reneging on agreements and promises he made over the years, which included granting equity to developers who assisted in developing the business over the years as well as promises and agreements he made with David Gitman with respect to ownership percentages in regard to Channel Reply.  Thus, there is an issue of fact as to whether an agreement existed with respect to the disputed ownership of Channel Reply.  This is a credibility issue that must be determined by a trier of fact and thus, summary judgment is inappropriate since this involves an issue that must be decided by the trier of facts. As set forth in more detail below, it is submitted that this case is rife with credibility issues that would warrant denial of summary judgment.

## COUNTER-STATEMENT OF REVELANT FACTS

It is respectfully submitted that there are triable issues of fact that are in dispute that precludes summary judgment as a matter of law.  Defendants refer this Court to Defendants' Response to Plaintiffs' Rule 56.1 Statement of Facts and the affidavit of David Gitman for relevant counter-statement of facts.

### A.  DEPOSITION OF MICHAEL DARDASHTIAN

After graduating from college, Mr. Dardashtian began working for Concord Mortgage Company.  After  that, he started working for a construction company as a project manager.  Sim Declaration Exhibit A 10: 12-18  He then started working for VirtualHealth and Bodicy in sales.

Sim Declaration Exhibit A 11:10-14, 12:3  Mr. Dardashtian left VirtualHealth to start a company with David Gitman.  Sim Declaration Exhibit A 13:11-15

Mr. Dardashtian first met David Gitman through LinkedIn around 2008. Sim Declaration Exhibit A 13:16-19  He searched for someone with a set of skills, someone with IPTV experience, with over-the-air programming experience, network cabling experience. David Gitman met these requirements. Sim Declaration Exhibit A 13:20 to 14:4  David Gitman started working for VirtualHealth as their Chief Technology Officer.  Sim Declaration Exhibit A 14:8-12

While working together, David Gitman and Michael Dardashtian discussed various businesses they can form together.  Most of these business ideas had an internet component to them. Sim Declaration Exhibit A 16:19-25

There came a time when David Gitman and Michael Dardashtian decided to start a company.  The type of company they opened was an online automotive parts company.  The company was called Cooper Square Ventures LLC. Sim Declaration Exhibit A 19:4-5 According to Michael Dardashtian, both he and David Gitman worked on the administration of the business together as well as programming work together. Sim Declaration Exhibit A 20:8-13

When CSV started, both Michael Dardashtian and David Gitman worked full time at CSV.  Sim Declaration Exhibit A 22:17-25 An employee named Alice Fritz worked for the company a few months later.  She was the lead programmer for CSV. Sim Declaration Exhibit A 25:12-16  Prior to hiring Alice Fritz, David Gitman and Michael Dardashtian did the programming. Sim Declaration Exhibit A 25:14-19

When they started the business, they had a joint venture agreement with NDA Holdings. Sim Declaration Exhibit A 26:3-7 The Joint Venture came to be known as NDAP. Sim

Declaration Exhibit A 26:8-10  Initially, CSV owned 49% of the joint venture while NDA Holdings owned 51%. Sim Declaration Exhibit A 26:11-15 However, prior to selling NDAP, CSV became 100% owner of NDAP. Sim Declaration Exhibit A 28:8-14 CSV operated this business until they sold the business. Sim Declaration Exhibit A 28:2-5

When CSV was operating NDAP, Michael Dardashtian and David Gitman had similar duties, which included being responsible for the operation and function of the company, including being responsible for administration of the company. Sim Declaration Exhibit A 30:5-18  Both worked together with respect to the programming side of the business as well. Sim Declaration Exhibit A 30:19-25

CSV also entered into a joint venture for Plumburs.  Plumburs was similar to NDAP except it sold plumbing supplies.  Plumburs business ceased because David Gitman refused to continue working on the busines. Sim Declaration Exhibit A 53:21-25

When CSV was formed, it was his understanding that they would receive equal distributions.  Both Michael Dardashtian and David Gitman received W-2 paychecks from CSV. However, Michael Dardashtian did not recall if he received any 1099 payments from CSV. There were times when Michael Dardashtian received distribution from CSV that David Gitman did not receive.  Sim Declaration Exhibit A 58:19-22  Michael Dardashtian testified that it was a time when David Gitman worked full time at Cue Connection and not at CSV. Sim Declaration Exhibit A 58:23-25

Michael Dardashtian also testified that he received benefits from CSV, namely health care benefits while David Gitman did not receive health care benefits. Sim Declaration Exhibit A 61:14-22  When asked why, Michael Dardashtian testified that he believed that David Gitman received health care benefits through his wife's company and the benefits were better than what

CSV offered. Sim Declaration Exhibit A 61:23 to 62:3  Michael Dardashtian testified that David Gitman knew he was receiving health care benefits. Sim Declaration Exhibit A 62:8-10

Michael Dardashtian also testified that he and David Gitman had company cars that were provided by CSV. Sim Declaration Exhibit A 63:12-23 Michael Dardashtian leased a Volvo XC60 while David Gitman leased a BMW. Sim Declaration Exhibit A 63:12-23  Michael Dardashtian testified that his Volvo lease payments were about $425 a month while David Gitman lease payment was about $550 a month. Sim Declaration Exhibit A 63:24 to 64:6

With respect to CSV, Michael Dardashtian did not recall whose idea it was to create Channel Reply.  Sim Declaration Exhibit A 65:3-5  Channel Reply is a service that provides for easy messaging for eBay, Amazon and Wal-Mart customers to answer their marketplace messages in the help desk of their choice.  Sim Declaration Exhibit A 64:17-23

When asked if Channel Reply's software used open-source data or proprietary programming, Michael Dardashtian testified that he did not recall. Sim Declaration Exhibit A 65:18-25  When asked if he performed any programming for Channel Reply, Michael Dardashtian testified that he did not recall. 69:5-8  Michael Dardashtian also testified that he also did not recall if David Gitman programmed for Channel Reply. Sim Declaration Exhibit A 69:9-11

Michael Dardashtian testified that he had a conversation with David Gitman about offering Mr. Bagaiev equity in Channel Reply but that never came into fruition. Sim Declaration Exhibit A 74:22 to 75-3 They also sent an email to Mr. Bagaiev to let him know that they were considering offering him equity in Channel Reply. Sim Declaration Exhibit A 75:4-9  Michael Dardashtian testified that it was jointly decided not to give Mr. Bagaiev any equity in Channel Reply. Sim Declaration Exhibit A 75:23 to 76:17 Michael Dardashtian testified that there was

never any discussion about David Gitman receiving a greater share of Channel Reply. Sim Declaration Exhibit A 77:4-17  There were discussions offering Mr. Glukharev equity in Channel Reply as well. Sim Declaration Exhibit A 77:18-25

When asked if David Gitman continued to perform work for CSV while he was working for Cue Connect, Michael Dardashtian provided that he doesn't remember and that he believes his workload decreased by a "decent amount". Sim Declaration Exhibit A 90:19-24  However, David Gitman was involved with the decision making and he continued communicating with David Gitman. Sim Declaration Exhibit A 91:4-11

In late 2016, Michael Dardashtian took a full time position at Yopto. Sim Declaration Exhibit A 100:25 to 101:6 Michael Dardashtian testified that Cooper Square Ventures was very close to Yotpo because of Car Parts Kings. CSV was one of Yopto's first customers.  Sim Declaration Exhibit A 101:19-25 Yotpo wanted to hire Michael Dardashtian to start the enterprise sales team. Sim Declaration Exhibit A 102:13-178  Yotpo and Channel Reply share a lot of customers. Sim Declaration Exhibit A 103:16-22 Yotpo provides reviews and ratings for websites of products and business services. They provide loyalty and referral systems.   Michael Dardashtian testified that there is no portion of Yotpo's business that conflicts with Channel Reply's business. Sim Declaration Exhibit A 104:22 to 105:4

Two former employees who had resigned have come back to work for CSV.  They are Konstantyn Bagaiev and Oleksii Glukharev. Sim Declaration Exhibit A 106:2-8  Michael Dardashtian rehired them. Sim Declaration Exhibit A 106:9-10  He does not recall if they reached out to him or he reached out to them. Sim Declaration Exhibit A 106:11-16

CSV hired a broker to assist in negotiating the terms of the sale of NDAP to BAP.  Sim Declaration Exhibit A 113:10-18  Jeremy Falk was a business broker. Sim Declaration Exhibit A

113:19-21 Michael Dardashtian and David Gitman were introduced to Jeremy Falk prior to the

business transaction. Sim Declaration Exhibit A 113:22 to 114:5

With respect to Channel Reply, the business was held under CSV. They formed Channel

Reply LLC but no operating agreement because David Gitman refused to sign it. Sim

Declaration Exhibit A 134:8-16 When asked why David Gitman refused to sign the operating

agreement for Channel Reply LLC,. Michael Dardashtian testified that David Gitman never

indicated to him why he wouldn't sign. Sim Declaration Exhibit A 135:6-9

When asked if there were any adjustments that were made at year end to reflect the

differences in distributions, Michael Dardashtian testified that there were never any adjustments.

He testified that they had a gentlemen's agreement and there would be no adjustments.

Michael Dardashtian spoke with some Channel Reply customers about using Yopto after

he took employment. Sim Declaration Exhibit A 167:18-24 Yopto and Channel Reply share

about 55 customers. Sim Declaration Exhibit A 170:13-16

Mr. Bagaiev contacted him about returning to work for Channel Reply. He had a couple

of different conversations that entailed salary negotiations.  It also involved him agreeing to

confidentiality of the company as well as having him sign a new consulting contract with the

company. Sim Declaration Exhibit A 175:14-23  The same applied to Mr. Glukharev.  Messrs.

Bagaeiv and Glukharev are both defendants in this case and Michael Dardashtian did not dismiss

the claims against these two individuals.  When asked if it was his intention to continue the

action against them, he responded that he did not know.  Sim Declaration Exhibit A 178:18-24

After the NDAP transaction was consummated, he would describe his relationship with

David Gitman as being volatile. Sim Declaration Exhibit A 179:9-12

12

Accel Commerce, LLC is the entity that David Gitman is involved with Jeremy Falk. Sim Declaration Exhibit A 182:16-23  Dalva Ventures LLC was also an entity that David Gitman was involved with his wife. Sim Declaration Exhibit A 183:3-7

With respect to Channel Reply LLC, it was formed jointly by them but David Gitman would not sign the operating agreement. Sim Declaration Exhibit A 188:14-23

David Gitman hired a bookkeeper to review CSV's Quickbooks accounts.  Michael Dardashtian believes that the basis in which David Gitman stole money from the company is based on the bookkeeper "bad work". Sim Declaration Exhibit A 201:7-11


**B.  DEPOSITION OF CARLEEN GASKIN**

Ms. Gaskin does not possess any valuation credentials.  Sim Declaration Exhibit B 10:2-8 Rather, Ms. Gaskin holds only forensic accounting credentials. Sim Declaration Exhibit B 10:17-20 Ms. Gaskin has never been involved in shareholder dispute cases involving software or SaaS companies.  Sim Declaration Exhibit B 11:10-16

Ms. Gaskin has worked with Bill Morrison before joining Withum at Morrison & Company.  She is also aware of the book written by Bill Morrison and she considers the book to be authoritative in the field of valuations. Sim Declaration Exhibit B 15:5-13

Channel Reply provides access for its subscription customers to use the software that facilitates the communication between seller and customer on selling platforms such as Amazon and eBay. Sim Declaration Exhibit B 17:9-16  Thus, the service Channel Reply is providing to its customers is the use of the software and thus, Channel Reply is a SaaS company. Sim Declaration Exhibit B 17:17-23  When asked if Channel Reply earns income through subscriptions, Ms. Gaskin responded that she believes most of the income is derived from

subscriptions but she is not positive if 100 percent of the income is derived from subscriptions. Sim Declaration Exhibit B 19:5-19  When asked if when she researched and reviewed the company, if she found income other than subscription based income, Ms. Gaskin responded that the general ledger of the company did not detail if the income was from subscription based or not.  Sim Declaration Exhibit B 19:20 to 20:8

Ms. Gaskin interviewed Michael Dardashtian about what the company did but she doesn't recall if 100 percent of what the company earned came from subscriptions. Sim Declaration Exhibit B 19:20 to 20:8  Ms. Gaskin interviewed Michael Dardashtian but did not interview anyone else. Sim Declaration Exhibit B 20:14-17  She did not interview the company's CPA and interim manager, Joel Liebman.  Sim Declaration Exhibit B 20:18-21  When asked why she didn't interview Mr. Liebman, Ms. Gasking testified "we got the information that we needed to from Mr. Dardashtian so we didn't – I didn't have any questions for Mr. Liebman?" Sim Declaration Exhibit B 20:25 to 21:4  She had all her questions answered by Mr. Dardashtian. Sim Declaration Exhibit B 21:5-8 Ms. Gaskin also had all the documents she requested from Mr. Dardashtian. Sim Declaration Exhibit B 21:9-12 This is the reason that Ms. Gaskin felt that she did not need to interview Mr. Liebman. Sim Declaration Exhibit B 21:13-15

Ms. Gaskin provided that an asset method of valuation is based on reviewing a company's balance sheet and adjusting it to the fair value of the assets and liabilities to derive the fair value for the company. Sim Declaration Exhibit B 23:11-23  Ms. Gaskin did not rely on the asset approach for value of CSV because the business is not an asset-intensive business. Sim Declaration Exhibit B 24:2-13  Ms. Gaskin testified that there are not many assets of the company other than the cash account.  With respect to the software, because the software can be easily duplicated, she didn't value it separately. Sim Declaration Exhibit B 26:3-14  The software

is easily duplicated based on her discussion with Mr. Dardashtian. Sim Declaration Exhibit B
27:23 to 28:3

      With respect to the market approach, it is based on comparability to either public
companies in the similar industry or to the sale of any public or private companies that also
occurred in a similar industry.  You would compare those transactions of companies with the
subject company to generate any type of multiples in order to value the company. Sim
Declaration Exhibit B 31:21 to 32:9  With the market approach, there are two variations, namely
the guideline company public method and the transaction  method. Sim Declaration Exhibit B
32:10-16

      With the market approach, Ms. Gaskin was asked if she developed an analysis under this
method.  Ms. Gaskin responded by providing that they reviewed public companies under the
market approach with the guideline public company method and also researched private sales
transactions under the transaction method to see if they could determine any comparable
companies. Sim Declaration Exhibit B 32:17-25   However, they did not find any comparable
companies and thus, they did not rely on the market approach. Sim Declaration Exhibit B 33:11-
19

      Ms. Gaskin provided that she maintains a list of companies they looked at for the market
approach in her case files.  With respect to the checklist that documents compliance with the
steps in the AICPA's BPL Valuation report, she indicated that she did not maintain a checklist.
Sim Declaration Exhibit B 35:14-23

      Ms. Gaskin did not know the difference between application software firms and system
software firms.  Sim Declaration Exhibit B 36:21 to 37:2  In searching for comparable
companies, Ms. Gaskin did not know how many software public companies that are categorized

as application software companies. Sim Declaration Exhibit B 37:3-9  She also indicated that if there were 336 application software companies, she would not be surprised. Sim Declaration Exhibit B 37:10-14  She also did not know how many public software companies that were categorized as application software companies that would be considered small cap firms.  She stated that she did not know but wouldn't be surprised at 131 companies. Sim Declaration Exhibit B 37:15-24  She also did not know how many public software companies are categorized as system software companies.  Sim Declaration Exhibit B 38:17 to 39:5

Ms. Gaskin testified that they did not find any comparable companies using the guideline public company method based on their research. Sim Declaration Exhibit B 39:6 to 40:5  When asked if she researched SaaS companies, she testified that she did not and only reviewed the industry with SIC code 7371, which are software development companies. Sim Declaration Exhibit B 40:6-18  She did not perform any comparable searches for SaaS companies even though she clearly identified Channel Reply as a SaaS company in her valuation report. Sim Declaration Exhibit B 40:19-23   She simply stated it is subjective and she did not find any comparable companies so she did not use the market approach.

Ms. Gaskin described the income approach is a valuation method by which the value of a business is based on estimating its ongoing income stream. Sim Declaration Exhibit B 47:8-12 There are various types of income approach valuations. Sim Declaration Exhibit B 47:13-15 One of these types would be the discounted cash flow method. Sim Declaration Exhibit B 47:16-18

The discounted cash flow method requires the valuator to project what the income stream would be for the business for a period of years until they believe that the income stream is going to stabilize at some point and then those income streams are present value to the current valuation date in order to calculate value for the company.  Sim Declaration Exhibit B 47:19 to

16

48:7 Ms. Gaskin testified that she considered the discounted cash flow method but did not use it based on financial information and her discussions with Mr. Dardashtian on the company's future expectations.  Thus, she did not believe that there was sufficient financial information available in order to appropriately predict what the company would be earning in the future. Sim Declaration Exhibit B 48:8 to 49:11  In Ms. Gaskin's valuation report, she provided that "The DCF method was considered in our analysis but not employed given that a forecast was not provided to us and we were unable to estimate the future cash flows ourselves."  Sim Declaration Exhibit B 49:14-18  Ms. Gaskin provided that there was no forecast prepared by the company. Sim Declaration Exhibit B 49:21-25 She asked Mr. Dardashtian for a forecast during the interview.  She asked if the company had previously prepared projections and asked him if he had any projections that have been prepared as of the valuation date, and he said that he did not have one and none were prepared. Sim Declaration Exhibit B 50:12-19  Ms. Gaskin did not ask Mr. Dardashtian to prepare a projection. Sim Declaration Exhibit B 50:20-22  She also did not consider asking the company CPA and interim manager, Mr. Liebman to prepare a projection. Sim Declaration Exhibit B 51:25 to 52:4 Further, Ms. Gaskin's valuation report also provided "Additionally based on discussions with management, the future expectations of operations are estimated to remain consistent or to remain relatively consistent.  There are no significant growth opportunities or unplanned expenses projected."  Sim Declaration Exhibit B 52:6-12  Ms. Gaskin stated that based on discussions with Mr. Dardashtian, given the previous trends and previous growth, the company would remain similar financially to where it was at the valuation dates." Sim Declaration Exhibit B 52:15 to 53:8

Further, Mr. Gaskin as a forensic accountant testified that she is capable of preparing projections but she chose not to do so because she chose not to use the discounted cash flow model for this valuation. Sim Declaration Exhibit B 53:9-15

Ms. Gaskin reviewed the sales history for CSV.  At the end of December 31, 2016, Channel Reply's revenues were $184,544.   At the end of December 31, 2017, revenues were $376,136.  At the end of December 31, 2018, revenues were $590,089.  At the end of December 31, 2019, revenues were at $792,465.  Sim Declaration Exhibit B 57:2-18  Ms. Gaskin provided that it was her professional judgment that going forward, the company's revenues would be stabilized.   On the other hand, in her valuation report, Ms. Gaskin provided that as a result of Covid, consumers are moving more towards e-commerce and away from brick and mortar stores so that they expect continued growth in this area. Sim Declaration Exhibit B 61:7-16 Further, Ms. Gaskin also provided that SaaS companies have some of the highest growth in the industry. Sim Declaration Exhibit B 61:17-21  Thus, when asked why would a SaaS company like Channel Reply experience a slow down, Ms. Gaskin responded that

> We did apply a higher growth rate initially to the company to account for that, and then in the long-term we estimated that the company was going to grow actually at I believe it was 4 percent which was slightly higher than the economy growth rate was expected to be because of the industry that it is in. A company cannot continue to grow at a 43 percent rate or a 10 percent rate each year into perpetuity. The point of valuation is to try an estimate the cash flows to a point of that it can remain consistently throughout the rest of it's business life.  Sim Declaration Exhibit B 62:3-18

Further, Ms. Gaskin has never heard of the H model for Discounted Cash Flow method. Sim Declaration Exhibit B 68-2-5  Ms. Gaskin provided that given the previous growth of the firm, she did not believe that the company reached a relatively stable earnings capacity at that time so she used the capitalization of earnings method.   Ms. Gaskin was not aware of the Rule 40 where investors or buyers value technology companies more favorably if they achieved revenue growth

of above 40 percent a year. Sim Declaration Exhibit B 69:15-25 Channel Reply has revenue

growth of over 43% per year.  Sim Declaration Exhibit B 66:2-9

Capitalized excess earnings method is also known as the earnings excess method. Sim

Declaration Exhibit B 72:6-10 Capitalized excess earnings method is a hybrid of basically the

asset approach and the income approach.  It is not a widely used approach but it is another

approach that is available for valuation purposes.  Sim Declaration Exhibit B 72:11-19 When

asked why it is not a widely used approach, Ms. Gaskin provided "because the income approach,

the market approach are the more common ones that are deemed to be give a more appropriate

value for businesses.  Sim Declaration Exhibit B 72:20-25  Ms. Gaskin provided, in relevant part

as follows:

> Q.     And, you indicated that income approach and market approach is more accepted,
>        is that what you said?
> A.     Yes, that's what I said.
> Q.     And, why is it more accepted?
> A.     I believe I said because its based on the financial analysis that you do provides.
>        Depending on which one is appropriate to value your business based on your
>        analysis, it provides the best indication of value.

Sim Declaration Exhibit B 73:5-18

Ms. Gaskin was asked whether she was aware that the Internal Revenue Service, in

Revenue Rule 68609 notes that the excess earnings method should be used to value intangible

assets only if there is no better basis available.  Ms. Gaskin testified that she is aware of that

ruling by the Internal Revenue Service.  Sim Declaration Exhibit B 75:9-15

Ms. Gaskin made tax adjustments to the valuation even though Channel Reply operates

as a pass-through entity with no corporate taxation. Ms. Gaskin did not provide for a pass-

through tax premium for Channel Reply business in her valuation report.  Further, Ms. Gaskin

testified that Channel Reply at the time held $693,000 in cash.  Ms. Gaskin also conceded that

typically businesses of this nature holds three months of expenses.  For Channel Reply, the three

month expenses equal $126,000.   Despite the company holding onto $693,000 when it only

needs to hold $126,000, Despite this fact. Ms, Gaskin did not believe Channel Reply held excess

cash.   However, Ms. Gaskin did state that she is aware that excess cash is a non-operating asset

that should be added back to month-to-month in any valuation method. Sim Declaration Exhibit

B 87:14-18


## ARGUMENT

## POINT 1

## PLAINTIFFS ARE NOT ENTITLED TO A REDEMPTION OF DEFENDANT DAVID GITMAN'S RIGHT, TITLE AND STOCK INTEREST BECAUSE DAVIT GITMAN RETAINS HIS RIGHTS UNDER THE OPERATING AGREEMENT


It is respectfully submitted that the Plaintiffs' entire argument as to why they believe that

they are entitled to a redemption of David Gitman's ownership interest in CSV is flawed. The

entire argument is premised on their unfounded reliance that once David Gitman was temporarily

removed as the manager of CSV to maintain the status quo, that somehow, David Gitman lost all

rights under the operating agreement.  Certainly, we disagree with the Plaintiffs' incorrect

assertion.  Simply stated, the purpose of removal was to maintain the status quo.  If the interim

manager and Dardashtian is permitted to conduct a redemption prior to finality of all issues in

this case, then clearly this is not maintaining the status quo.

The Plaintiffs appear to be arguing that Michael Dardashtian and the interim-manager

appointed by the Court has the authority to trigger a redemption of David Gitman's ownership

interest in CSV.  We certainly disagree.

The relevant operating agreement, on the first page, explicitly identifies Michael Dardashtian and David Gitman as initial Managers of the Company.   Article 8.1(d) governs the removal and replacement of Managers in  the company.  Article 8.1(d) provides, in relevant part, as follows:

> Michael Dardashtian (and his successors collectively) shall have the authority at any time and from time to time to remove and replace Michael Dardashtian (and any of his successors) as Manager.  David Gitman (and his successors collectively) shall have the authority at any time and from time to time to remove and replace David Gitman (and any of his successors) as Manager.

As such, under the terms of the operating agreement, only David Gitman has the authority to remove and replace David Gitman as a manager of the company.

It is important to note that David Gitman was removed from the day-to-day operation of the business as a manager and an interim manager was appointed to retain the status quo. Notwithstanding the Court's appointment of an interim manager of the Company, it is respectfully submitted that Defendant DAVID GITMAN retained his voting rights under the Operating Agreement, which have not been extinguished or diminished.

New York courts have held that even in cases in which a Defendant is enjoined from the day-to-day business of a company, his rights under the Operating Agreement are still enforced. *Ficus Investments, Inc. v. Private Capital Management, LLC* 61 A.D.3d (N.Y. App. Div. 2009). The function of a preliminary injunction is not "to determine the ultimate rights of the parties but to maintain the status quo until there can be a full hearing on the merits". *Crossroads ABL, LLC v. Canaras Capital Mgmt. LLC* 2011 N.Y. Slip Op. 51971 (quoting *Residential Bd. of Managers of the Columbia Condominium v. Alden* 178 A.D.2d 121, 122 (1st Dept. 1991)). That basic purpose would be disrupted and even harmed if Defendant DAVID GITMAN's rights under the Operating Agreement with respect to redemptions are not preserved.

21

Because Defendant David Gitman was removed as a manager without his consent to maintain the stauts quo, it is submitted that David Gitman retains his rights under the Operating Agreement despite being enjoined from engaging in any operational activities. It is respectfully submitted that the status quo with respect to David Gitman's rights under the Operating Agreement be preserved. In this respect, as set forth in detail below, the Operating Agreement provides that David Gitman is identified as a Manager of the Company. Pursuant to the Operating Agreement, David Gitman must consent to a redemption and he must consent to the fair market value of the member units being redeemed. In this case, David Gitman has not consented to a redemption and has not consented to a fair market value for 50% of his interest.

Clearly, the Plaintiff is attempting to disrupt the status quo by displacing all of David Gitman's rights under the Operating Agreement. It is submitted that the Court's removal of David Gitman from the day-to-day operations of the Company did not displace his voting rights under the Operating Agreement. To do otherwise, is to permit injustice to David Gitman by granting the Plaintiffs a windfall that would jeopardize the status quo completely before this case is resolved on the merits. It would also allow Plaintiffs to flout the terms of the Operating Agreement.

The parties held a conference with Judge Stanton on June 19, 2017 in which the restraining order granted by Judge Ramos was extended and in which Defendant David Gitman was replaced by Joseph Liebman, who was to become an interim manager for the Company.

Two days later in another conference, Judge Stanton clarified the limits of the restraining order on June 21, 2017. Judge Stanton told Defendant GITMAN and all the parties and attorneys present that the June 19, 2017 order did not impact GITMAN's vote as an owner of interest in the company. Judge Stanton's description of the order is as follows:

"THE COURT:   By the way, in relieving you, as I did on Monday, I did not mean to take away your vote, your ability to vote on matters as a 50 percent shareholder—

MR. GITMAN:   Thank you, your Honor.

THE COURT:   --in the company. I don't mean to deprive you of the exercise of a vote, or, if and where you have it under the articles, a veto. What I took away was your ability to act for the company, but not your ownership."

Sim Declaration Exhibit C: Page 13: Line 15-23

Later in the hearing, counsel for Plaintiff asked Judge Stanton to confirm that Defendant DAVID GITMAN still had voting power as an owner.

"MS. DITLOW:   Before you mentioned that Mr. Gitman still has his voting power?

THE COURT:   As the owner of his financial interest in the company."

Sim Declaration Exhibit C: Page 16: Line: 23-Page 17: Line: 1

Therefore, David Gitman was removed from the day-to-day operations of the Company but not his rights as an owner of the Company. Further, there is a guiding principle that the status quo must be maintained until all issues are resolved.

It is also submitted that pursuant to the Operating Agreement, David Gitman is identified as a Manager as that term is defined in the Operating Agreement.  Removal of David Gitman as his role as manager in the day-to-day affairs of the business does not extinguish his rights to vote and consent to a redemption or his right to vote and consent to the fair market value of the member units being redeemed.

Based on Judge Stanton's clarification, never at any point in this litigation, have Defendant David Gitman's rights under the Operating Agreement been nullified or invalidated and nor have they expired. Moreover, Joel Liebman, as the interim manager does not have the powers to approve the redemption of David Gitman and does not have the power to consent to the fair market value of the redemption value.   It is respectfully submitted that no party in this case should be able to redeems shares or alter the breakdown of the Profit Percentages before this case has been resolved since this would disrupt the status quo while David Gitman is temporarily removed as the manager.  Therefore, the Redemption notice that was issued prior to the resolution of the issues in this case must be deemed to be null and void.

Throughout this litigation, this Court has deferred to the Operating Agreement of the Company as the authority on how the Company is to be managed. The temporary replacement of Defendant GITMAN with a court-appointed interim manager does not alter the voting rights that David Gitman possesses under the Operating Agreement. The governing instrument of the Company has always been and remains its Operating Agreement.

Article 8.1(d) of the Operating Agreement governs the process for removal of managers. It states as follows:

> "Members holding at least fifty-one (51%) percent of the Profit Percentages shall have the authority at any time and from time to time to (i) remove a Manager from office and (ii) appoint a new manager whenever there is a vacancy in the office of Manager…. David Gitman (and his successors collectively) shall have the authority at any time and from time to time to remove and replaced David Gitman (and any of his successors) as Manager."

In short, Article 8.1(d) of the Operating Agreement specifies all the conditions in which a manager may be removed under the facts of this case.  Since the Plaintiff and David Gitman each own 50%, only David Gitman may replace himself with a successor in order to alter his rights under the Operating Agreement.  Clearly, David Gitman did not appoint a successor Manager to

extinguish his voting rights under the redemption provision of the Operating Agreement. Under this section, managers can be removed by members, who combined, hold at least 51% of Profit Percentages. Members who combined hold at least 51% of Profit Percentages can appoint a new manager. A manager has a right to remove himself and appoint a successor. Accordingly, because Plaintiff Michael Dardashtian and Defendant David Gitman each owns a 50% share of the Company, neither one can unilaterally remove the other as manager.

Article 8.1 governs the management structure of the Company. It sets up the governing body comprised of two managers, defined as "Management". Article 8.1 states the following:

> "The affairs of the Company shall be managed and controlled by Management in accordance with this Agreement generally and this Article in particular. Management shall be comprised of one more "Managers".

Article 8.1(a) states the following:

> "There shall be two (2) Managers of the Company"

Thus, Article 8.1(a) of the Operating Agreement mandates that there can only be two managers at a time. However, this Court only removed David Gitman from the day-to-day operations of the Company to maintain the status quo. David Gitman has never appointed a successor that would extinguish his rights to consent to a redemption or to consent to the fair market value of the redemption value. The interim manager appointed by the Court clearly does not have this right. It is also obvious that the interim manager is acting on the behest of the Plaintiff to the detriment of Davit Gitman's interest. The interim manager cannot be said to be impartial between the two parties.

Although the Court's order on Defendant David Gitman is not able to undertake any day-to-day duties any manager, this current situation does at all not constitute Defendant's removal of his voting rights under the terms of the Operating Agreement. Equally certain is the fact that

the removal from day-to-day operations does not permit the Plaintiffs to disrupt the status quo.

Article 11.5(b) of the Operating Agreement lays out the guidelines for redemption of

shares. It reads as follows:

> "The decision to redeem a Member's interest in the Company in accordance with this
> Section shall be made by Management in its sole discretion, but only in the following
> circumstances applicable to a Member: i) Willful or serious misconduct by the Member
> with respect to the business operations or assets of the Company, ii) Fraud of
> dishonesty on the part of the Member, whether or not with respect to the business
> or affairs of the Company, which affects the business, operations, assets or reputation
> of the Company iii) The Member's conviction of a felony crime, or a non-felony crime
> involving an act of moral turpitude iv) A transfer of the Member of its interest in the
> Company in violation of this Agreement v) An attempt by the Member to withdraw from
> the Company in violation of this Agreement vi) An attempt by the Member to partition
> the Company in violation of this Agreement vii) A breach by the Member of any other
> terms, conditions and obligations contained in this Agreement viii) A failure to
> contribute additional capital to the Company pursuant to Management's call in Section
> 5.2(b) above ix) A breach by the Member of any employment agreement between the
> Member and the Company x) Any event resulting in a separation of the Member from
> service to the Company as an employee, contractor or agent.
> The interests of all transferees, successors or assignees of a Member (including a
> a Permitted Transferee) shall also be subject to redemption under this Section if any
> transferee, successor or assignee has engaged in any of the acts described in the
> clauses set forth above or if, in the case of a partial assignment, the assigning Member
> (while a Member) engaged in any of the acts described in the clauses set forth above."

This article specifically vests the Plaintiff David Gitman with the sole authority to redeem David

Gitman's shares. It lists ten offenses as prerequisites for redemption. But these offenses do not

automatically trigger redemption and it does not displace David Gitman's rights to consent to the

fair market value of the redemption.  Even as Article 11.5(b) lists these offenses, it still places

redemption of a member's shares at the discretion of the managers. To date, Defendant DAVID

GITMAN who retains his voting rights as a manager has not consented to a price at which shares

can be redeemed, nor has Defendant consented to the redemption itself.

With respect to the proposed fair market value of the redemption, it is submitted that the valuation report relied on by the Plaintiffs is unreliable for the reasons set forth below. However, according to Article 11.5(d), the Redemption Purchase Price is what the member would have received had the company the following three following steps: 1) sold all assets at fair market value 2) paid off all its debts and 3) distributed the remaining funds among the members. The fair market value of assets is whatever fair market value was on day of redemption and debts owned is whatever debt was on the day of redemption

It is submitted that the interim manager appointed by the Court does not have the authority to consent to a redemption since that rights was never divested from David Gitman. Likewise, the power to agree to fair market value was also not divested from David Gitman. Defendant David Gitman, upon receiving the Notice of Redemption from Plaintiff Michael Dardashtian has communicated a Notice of Rejection of the said rejection. Defendant Gitman has not agreed to a redemption being made or the fair market value of a redemption. Defendant Gitman, although currently enjoined from managing the Company, still retains voting power as an owner of shares, and accordingly this redemption contravenes Sections 11.5(b) and 11.5(d) of the Operating Agreement and is therefore null and void.

## POINT II

## GITMAN DID NOT VIOLATE ARTICLE 11.5(b) OF THE CSV OPERATING AGREEMENT AND DID NOT BREACH HIS FIDUCIARY DUTY

Plaintiffs argue that David Gitman breached his fiduciary duty because he sought to pay Jeremy Falk an "inflated" commission in connection with the sale of NDAP by trying to insinuate that David Gitman and Jeremy Falk were partners and members of two competing e-

commerce companies, Dalva Ventures LLC and Accel Commerce, LLC.  However, each of these assertions have been duly refuted by David Gitman. With respect to the so-called inflated commission, it was Dardashtian who negotiated the commission with Jeremy Falk.  Dardashtian had also signed the services agreement with Falk. Sim Declaration Exhibit F. In this respect, the agreement specifically provides that Falk's entity shall be entitled to a total fee equal to $110,000 plus 0.0025 of the purchase price. Sim Declaration Exhibit F. Based on this agreed upon commission, David Gitman believed that a company should honor its agreement, which included an agreement for commissions to be paid in connection with Jeremey Falk's efforts to secure a sale of NDAP.  However, as is the *modus operandi* for Michael Dardashtian, he reneged on this agreement.

Simply because Dardashtian obtained a low settlement amount after commencing suit against Falk does not demonstrate that the commission he negotiated was inflated.  As such, the commission was established by an agreement that was signed by Michael Dardashtian. Sim Declaration Exhibit F. To suggest that David Gitman inflated the commission is absurd and this entire argument should be deemed unavailing.  However, it does demonstrate a constant pattern of conduct on the part of Michael Dardashtian.  He makes an agreement only to renege on that agreement.  This is a common pattern of conduct.

To be clear, Jeremy Falk was never business partners with David Gitman.  This assertion is clearly speculative and conclusory at its core.  In this respect, the Plaintiffs submitted Accel Commerce operating agreement. The operating agreement clearly provides that Dalva Ventures LLC is the 100 percent owner of Accel. Sim Declaration Exhibit I. In turn, Dalva Ventures operating agreement demonstrates that David Gitman and Laura Gitman are 100 percent owners of Dalva. Sim Declaration Exhibit I.  To be clear, Jeremy Falk did not have any ownership

percentage in either Accel Commerce or Dalva Ventures.  Further, both these entities were created to provide consulting services to customers in order for David Gitman to explore other opportunities outside of Channel Reply.  They were not formed to compete with Channel Reply's ecommerce business. David Gitman did not intend to create a SaaS company.   Any assertion to the contrary can only be described as conclusory and speculative. Jeremy Falk assisted David Gitman in providing financial and accounting advise since David Gitman is unfamiliar with this area of the business.  Gugliardi Declaration Exhibit J.

At the very least, David Gitman has raised an issue of fact to demonstrate that the assertions made by the Plaintiffs with respect to their breach of fiduciary claims are speculative and conclusory at best.  Thus, summary judgment on the breach of fiduciary duty claim must be denied.

Further, Plaintiffs argument that David Gitman shared their self-described confidential and proprietary profit and loss statement to gain a competitive advantage is false and without merit.  As a threshold matter, it is difficult to ascertain how a profit and loss statement would give a person a competitive advantage especially if David Gitman had access to it in the first place.  As David Gitman explains, Jeremy Falk had viewed the profit and loss statements of the company because he had in fact executed non-disclosure agreements with the company.

Moreover, the Plaintiffs argue that David Gitman transferred funds into a new bank account that caused the CSV account to be overdrawn.  In this respect, the Plaintiffs argue that David Gitman drove up the companies' debt and caused the bank account to be overdrawn.  As an initial matter, it is notable to mention that the alleged charges that the Plaintiffs accuse David Gitman of charging or spending were recurring expenses that were set up for automatic payments prior to the transfer of funds.  David Gitman did not increase any debts of the company.  These

alleged expenses were recurring expenses that the company had set up for automatic payments. Thus, David Gitman denies any allegation that he drove up the company's debt. Again, the assertions made by the Plaintiffs must be deemed to be conclusory and speculative.

With respect to the password accounts, David Gitman, in preparation for the sale of NDAP assets undertook completing the due diligence on behalf of the company. He hired Umar Farooq to provide legal counsel with respect to the sale of NDAP, who advised him that these were proper under the circumstances of the case. Further, David Gitman clearly sent an email demonstrating that he did not intend to keep the funds. Rather, he sought an audit of the company or an offset for the uneven distributions that Dardashtian took from the company. Dardashtian even admitted that he took uneven distributions. Further, the quickbook transaction statement submitted by the Plaintiffs in support of their summary judgment and attached as Sim Declaration Exhibit H demonstrates that Dardashtian did in fact take uneven distributions from CSV in violation of the CSV Operating Agreement. Davit Gitman provided that the goal was to continue to run Channel Reply but not enable access to the money until an audit was completed. Guaglardi Declaration Exhibit J ¶67. In this respect, it is clear that the parties intended to spin off Channel Reply since Dardashtian even formed Channel Reply LLC. Obviously, he knew that Channel Reply had to be spinned off into another entity separate from CSV. Rather than utilizing Channel Reply LLC, David Gitman utilized Channel Reply Inc.

Further, David Gitman had to segregate all technology accounts and subscriptions attributable to the Channel Reply business away from NDAP. Guaglardi Dec. Exhibit J ¶68 This was a fact that Dardashtian clearly knew since David Gitman had texted him advising him of the need to spin-off the assets of CSV. David Gitman did not intend to take the Channel Reply business for himself. Rather, he spun off Channel Reply and sought to enforce the agreement he

had with Dardashtian in regard to the agreed upon ownership structure.  This is a triable issue of fact that goes to the heart of the matter.  Since this issue cannot be determined on a summary judgment motion because it involves questions of credibility, summary judgment motion must be denied.

**POINT III**

**THERE ARE TRIABLE ISSUES OF FACT TO PRECLUDE SUMMARY JUDGMENT
AS TO COUNTS FIVE, TEN, TWELVE, EIGHTEEN AND NINETEEN**

The Plaintiffs seek the grant of summary judgment with respect to Counts 5, 10, 12, 18 and 19.  However, it is submitted that there are triable issues of fact that preclude summary judgment relief for the Plaintiffs as a matter of law.

### A.  Summary Judgment Should Be Denied as to Counts 5, 12, 18 and 19

The Plaintiffs claim they are entitled to summary judgment on Counts 5, 12, 18 and 19 since David Gitman took trade secrets, including proprietary software and confidential information from Channel Reply.  However, the ownership of Channel Reply is being contested in this case.  Notwithstanding this crucial issue, it is submitted that there are triable issues of fact with respect to Counts 5, 12, 18 and 19 to preclude summary judgment as a matter of law.

As a threshold matter, there was no trade secrets that were misappropriated in this case. "The central principle underlying a claim for unfair competition under New York law is that one may not misappropriate the results of the labor, skill, and expenditures of another" in bad faith. *LinkCo*, *Inc. v. Fujitsu Ltd*., 230 F. Supp.2d 492, 500 (S.D.N.Y. 2002) (citations omitted). Although unfair competition may take many forms, *see National Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841, 851 (2d Cir. 1997), the pivotal question is always the same: whether the

31

conduct complained of is "fair or unfair." *Cigogne, Inc. v. Luxury Trading Corp.*, 13 A.D.2d 928, 930 (1st Dept. 1961).

"The essence of an unfair competition claim under New York law is that the defendant misappropriated the fruit of plaintiff's labors and expenditures by obtaining access to plaintiff's business idea either through fraud or deception, or an abuse of a fiduciary or confidential relationship." *Bytemark*, *Inc. v. Xerox Corp.*, 342 F. Supp. 3d 496, 505 (S.D.N.Y. 2018) (*quoting Telecom Int'l Am., Ltd. v. AT & T Corp.*, 280 F.3d 175, 197 (2d Cir. 2001)). Although "[t]here is no complete list of the activities which constitute unfair competition," the "general principle" is that "commercial unfairness will be restrained when it appears that there has been a misappropriation, for the commercial advantage of one person, of a benefit or property right belonging to another." *Dior v. Milton*, 155 N.Y.S.2d 443, 451 (Sup. Ct.), aff'd, 156 N.Y.S.2d 996 (1956).

The New York Court of Appeals has explained that there are "two theories of common-law unfair competition: palming off and misappropriation." *ITC Ltd. v. Punchgini, Inc.*, 9 N.Y.3d 467, 476 (2007). Misappropriation, the theory upon which Plaintiffs have premised their claims, "prevents individuals from 'misappropriat[ing] the results of the skill, expenditures and labors of a competitor.'" *Carson Optical Inc. v. eBay Inc.*, 202 F. Supp. 3d 247, 268 (E.D.N.Y. 2016) (*quoting ITC Ltd.*, 9 N.Y.3d at 477).

In this case, the Plaintiffs seek summary judgment on their claim for unfair competition. However, it is submitted that the Defendants never misappropriated any trade secrets that belonged exclusively to Plaintiffs.  Rather, as David Gitman alleges, the ownership structure of Channel Reply is 50% owned by CSV, 42.5% owned individually by David Gitman, and the remaining 7.5% by the two developers.  David Gitman affirms that CSV owned 50% of Channel

Reply and he acknowledged it from the beginning.  He never sought to undercut or to displace CSV's ownership rights in Channel Reply.  Rather, David Gitman sought to enforce his rights under the agreement he had with Michael Dardashtian.  At the very least, this is a triable issue of fact.

The Defendants did not misappropriate any assets.  Rather, as David Gitman has always maintained, Channel Reply business needed to be split off from CSV due to the NDAP sale. Dardashtian was fully aware of this need to split off the various businesses in order to separate NDAP assets.  Further, Channel Reply is not owned solely by CSV.  Rather, CSV only owns 50% of Channel Reply and the remaining 50% is owned by Gitman and the two developers. Moreover, David Gitman, with Dardashtian's knowledge, undertook to split-off the business. Channel Reply Inc. was not formed to compete with Channel Reply but to continue the business as per the agreement between Dardashtian and Gitman.  At the very least, this issue as to the ownership structure of Channel Reply must be resolved prior to any other determination can be made in the case.  Since the resolution of this issue requires resolving credibility issues, this summary judgment should be denied in its entirety.

This is a triable issue of fact that must preclude summary judgment.  The Plaintiffs assert that it is undisputed that Gitman took the funds, software, doe, electronic accounts, proprietary data, assets, trade secrets, tradename, customer lists and customers with him.  However, other than making conclusory assertions, the Plaintiffs have failed to demonstrate entitlement to summary judgment on this issue.  In this respect, Plaintiffs have failed to identity what electronic accounts Gitman took with him.  Gitman has stated that he was required to separate out the accounts in order to effectuate the sale of NDAP.  As such, accounts were changed to effectuate this condition precedent to the sale.  Other than making a conclusory and general allegation that

33

Gitman took everything, David Gitman disputes this allegation and thus, a triable issue of fact exists to preclude summary judgment as a matter of law.

The Plaintiffs allege that Defendants stole, fraudulently used, possessed and misappropriated Channel Reply's trade secrets and confidential information to form and maintain a competing business operation to CSV and Channel Reply.  However, this certainly is not the case.

As set forth by David Gitman, he was tasked to complete the due diligence for the sale of NDAP assets to Meridien.  As a result, he was obligated to segregate and separate the various businesses conducted through CSV.  This task proved challenging because Dardashtian commingling of accounts among various businesses conducted through CSV.  Further, David Gitman provides that there was an agreement between Gitman and Dardashtian regarding the ownership of Channel Reply business.  In this respect, it was agreed that David Gitman and the two developers would cumulative own 50% of Channel Reply while CSV would own the other 50% of the Channel Reply business.  As David Gitman provided, without this agreement, David Gitman would have been free to develop this business outside of CSV since he was the creator of Channel Reply.  It was always agreed that Channel Reply would be operated through a separate entity.  For this reason, Dardashtian formed Channel Reply LLC.  However, upon formation of Channel Reply LLC, Dardashtian created the operating agreement.  The operating agreement clearly demonstrated to David Gitman that Dardashtian intended to renege on his verbal agreement regarding the ownership structure.  For this reason, David Gitman refused to execute the Channel Reply LLC operating agreement because this was not the agreement that was agreed to by the parties.  Further, David Gitman was obligated to separate the business of Channel Reply.  As such, David Gitman created Channel Reply Inc. to effectuate the separation of the

Channel Reply business from CSV and NDAP to effectuate the sale of NDAP.  Guaglardi

Declaration Exhibit J ¶64. It was never David Gitman's intent to start a competing business with

CSV.  Rather, this was a spin-off in order to effectuate the agreed to ownership structure and in

preparation for the sale of NDAP.  Guaglardi Declaration Exhibit J ¶64. It can be hardly said that

David Gitman took any trade secrets from CSV since CSV did not have exclusive ownership

rights to Channel Reply.  Rather, CSV only owned 50% of Channel Reply.

 Further, David Gitman has clearly demonstrated that he never intended to start a new

company but rather, a continuation of the business through a split off to reflect the ownership

structure that had been agreed to between the parties.  Certainly, Dardashtian and Gitman differs

with respect to this agreement and thus, is a credibility issue that must be resolved by the trier of

facts.  Therefore, it is respectfully submitted that the Plaintiffs have failed to meet their prima

facie burden by eliminating all triable issues of fact as a matter of law.

 Moreover, the Plaintiffs have failed to demonstrate that they suffered any damages on

these claims simply because they did not suffer any damages since the Court ordered

maintenance of the status quo during the pendency of this litigation.  However, the Plaintiffs

argue that they suffered damages by way of attorney fees they had to incur in this case.

 To be clear, David Gitman never operated any competing business.

 In addition, it is also clear that Ms. Gaskin testified that she believed, based on her

discussion with Dardashtian that the Channel Reply software could be easily duplicated and for

this reason, attributed no value to the intellectual property to support her low and undervalued

opinion as to the value of the Channel Reply business.  Now, it appears that the Plaintiffs are

arguing that the intellectual property has an enormous value when it suits their argument.

Notwithstanding these contradictory positions, it is submitted that the issue is rife with triable issues that precludes summary judgment as a matter of law.

### B.  Plaintiffs Failed to Demonstrate Entitlement to Summary Judgment On the Conversion Claim.

Conversion is the "exercise of unauthorized dominion over the property of another in interference with a plaintiff's legal title or superior right of possession." *Lopresti v. Terwilliger*, 126 F.3d 34, 41 (2d Cir. 1997) (citation omitted); *see Vigilant Ins. Co. of America v. Housing Auth. of El Paso, Texas*, 87 N.Y.2d 36, 44 (1995). The plaintiff asserting a conversion claim must allege that it had "ownership, possession or control of the money before its conversion," *ESI, Inc. v. Coastal Power Production Company*, 995 F. Supp. 419, 433 (S.D.N.Y. 1998) (citing *Aramony v. United Way*, 949 F. Supp. 1080, 1086 (S.D.N.Y. 1996).

To establish a claim of conversion, a plaintiff "must show legal ownership or an immediate superior right of possession to a specific identifiable thing and must show that the defendant exercised an unauthorized dominion over the thing in question . . . to the exclusion of the plaintiff's rights." *Fiorenti v. Central Emergency Physicians, PLLC,* 305 A.D.2d 453, 454-55 (N.Y.App.Div. 2003). Thus, unlike misappropriation of corporate assets which requires only a showing of "tangible expectancy" and diversion, conversion requires a showing of plaintiff's ownership or legal right to possession of specific, identifiable property at the time of the alleged conversion and a showing that the defendant wrongfully took possession of the property thereby depriving the plaintiff of its right to possession. *See* 18 Am. Jur. 2d Conversion § 2 (2008).

In this case, Gitman alleges that he was tasked with completing the due diligence with respect to the NDAP sale.  In order to effectuate the sale, they were required to separate out the accounts of CSV as Michael Dardashtian knew.  In order to complete the due diligence to go forward with the NDAP sale, David Gitman undertook the segregation of accounts, business and

accounts of CSV to facilitate the NDAP sale. In fact, when David Gitman transferred the funds, he advised Dardashtian that it was his intention to hold the money until an audit is completed. It was not his intention to deprive Dardashtian of his ownership rights of Channel Reply or to take the monies.

It is clear that Gitman alleges that there was an agreement by which CSV would own 50% of Channel Reply while the remaining ownership percentages would belong to Gitman and the two developers. As such, these are issues of fact that demonstrate that there was no conversion of funds. In fact, by Court Order, the funds were returned in order to maintain the status quo during the pendency of this litigation and thus, there was no conversion by which summary judgment can be granted. At the very least, this is a triable issue of fact that precludes summary judgment as a matter of law. Thus, Plaintiffs motion seeking summary judgment on the claim of conversion must be denied.

### POINT IV
### APPLICATION OF THE UNCLEAN HANDS DOCTRINE PRECLUDES SUMMARY JUDGMENT IN THIS CASE INCLUDING AND AWARED FOR ATTORNEYS FEES

The doctrine of unclean hands is based on the maxim that "one who comes into equity must come with clean hands." *Bentley v. Tibbals,* 223 F. 247 (2d Cir.1915). The defense is limited by the rule that the plaintiff's improper conduct must be related in some substantial and significant way to the claim he now asserts. 1 DAN B. DOBBS, LAW OF REMEDIES 2–4(2), at 95 (2nd ed. 1993) ( "DOBBS" ) (footnote omitted).

Thus, under New York law, the unclean hands doctrine "bars the grant of equitable relief where the defendant proves: '(1) that the plaintiff is guilty of immoral, unconscionable conduct directly related to the subject matter in litigation; (2) that the conduct was relied upon by the

defendant; and (3) that the defendant was injured thereby.' " *Atl. Cas. Ins. Co. v. Coffey,* 548

Fed.Appx. 661, 664 (2d Cir.2013) (quoting *Lia v. Saporito,* 909 F.Supp.2d 149, 174

(E.D.N.Y.2012), *cert. denied,* —— U.S. ——, 134 S.Ct. 2305, 189 L.Ed.2d 176 (2014) ).  As an

equitable defense, unclean hands will not bar a legal claim. *Aetna Cas. & Sur. Co. v. Aniero*

*Concrete Co., Inc.,* 404 F.3d 566, 607 (2d Cir.2005) (adopting the District Court's decision

holding, *inter alia,* that defendant may not "avail itself of the unclean hands as a defense"

because plaintiff was seeking "damages in an action at law"); *Chevron Corp. v. Salazar ,* Nos. 11

cv 3718, 11 cv 0691(LAK), 2011 WL 3628843, at *6 n. 39 (S.D.N.Y. Aug. 17, 2011) (collecting

cases). However, unclean hands finds its legal counterpart in the doctrine of *in pari delicto,*

*Byron v. Clay,* 867 F.2d 1049, 1052 (7th Cir.1989) (Posner, J.); *see Kirschner v. KPMG LLP,* 15

N.Y.3d 446, 912 N.Y.S.2d 508, 938 N.E.2d 941, 960 (2010) (noting the "doctrinal similarity"

between the defense of unclean hands and *in pari delicto* ) (citing *Chem. Bank v. Stahl ,* 237

A.D.2d 231, 655 N.Y.S.2d 24, 25 (1997) ), which "instructs courts to refrain from intervening in

a dispute between two parties at equal fault." *Id.* . at 961. Perhaps reflecting the merger of law

and equity, courts use unclean hands and *in pari delicto* interchangeably, 1 DOBBS § 2.4(2), 93

n. 6, and apply unclean hands to bar legal relief where the "plaintiff's reprehensible conduct is

'directly related to the subject matter in litigation and the party seeking to invoke the (unclean

hands) doctrine was injured by such conduct.' " *Mallis v. Bankers Trust Co.,* 615 F.2d 68, 75 (2d

Cir.1980) (quoting *Weiss v. Mayflower Doughnut Corp.,* 1 N.Y.2d 310, 152 N.Y.S.2d 471, 135

N.E.2d 208, 210 (1956) ), *cert. denied,* 449 U.S. 1123, 101 S.Ct. 938, 67 L.Ed.2d 109 (1981).

    In *RST (2005) Inc. v. Research In Motion Ltd.,* No. 07 cv 3737(VM), 2008 WL 5416379

(S.D.N.Y. Dec. 17, 2008) another District Court Judge also rejected the *Milberg* court's

conclusion for a different reason. The *Milberg* Court, it said, had mistakenly relied on *Mallis,* a

case that "considered and rejected on the merits an unclean hands defense in a legal action, without considering whether the defense was available in a legal action." *Id.* at *8. As noted in the text, however, Judge Friendly specifically addressed New York's unclean hands defense and concluded that it would bar a legal claim (there, fraud and negligent misrepresentation) if the plaintiffs' wrongful conduct was directly related to the subject matter of the litigation.

In this case, Dardashtian has admitted that he took uneven distributions, which is a breach of his fiduciary duty and a violation of the operating agreement. The Quickbooks transaction report demonstrates that Dardashtian did in fact take more distributions and benefits than David Gitman. The uneven distribution and unexplained transactions are set forth in the accounting documents provided to the Plaintiffs as well as admission by Michael Dardashtian during his deposition. Sim Declaration Exhibit E. This included taking a cash distribution as well as other benefits that were not offered or provided to David Gitman, including health benefits and 401K contributions. The fact remains that Michael Dardashtian wrongful conduct triggered David Gitman's response to right the wrong.

Further, David Gitman has asserted that Dardashtian had agreed that the Channel Reply business would be a joint venture by which CSV would own only 50% of Channel Reply while the remaining 50% would be owned by David Gitman, individually and the two developers. In fact, communication between Bagaiev and Gitman demonstrates that Bagaiev state that Dardashtian had promised him equity in Channel Reply. Sim Declaration Exhibit K

Since Gitman is the nonmovant, his version of the facts must be given deference. Therefore, there are triable issues of fact, including the application of the unclean hands doctrine to preclude summary judgment to Plaintiffs.

With respect to Plaintiffs' application for attorneys fees, it is submitted that this application is premature since all issues must be resolved before this Court can make any determination with respect to attorneys fees.

## POINT V

## PLAINTIFFS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON THE BREACH OF CONTRACT CLAIM

The elements of a breach of contract claim under New York law are: (1) the existence of a contract; (2) performance by the party seeking recovery; (3) non-performance by the other party; and (4) damages attributable to the breach. *Marks v. New York Univ.,* 61 F. Supp.2d 81, 88 (S.D.N.Y. 1999); *Air Support Int'l, Inc. v. Atlas Air, Inc.,* 54 F. Supp.2d 158, 165 (E.D.N.Y. 1999).

The Plaintiffs argue that they are entitled to a redemption because David Gitman violated Article 12.2 of the Operating Agreement by divulging and disseminating CSV's Confidential Information without identifying what confidential information that David Gitman divulged or disseminated other than showing Jeremy Falk CSV's profit and loss statement. However, the Plaintiffs fail to note that Jeremy Falk executed a nondisclosure agreement with CSV. Jeremy Falk had access to the profit and loss statements for CSV when he assisted in the sale of NDAP. As such, it is difficult to fathom how this constituted a breach of contract by David Gitman. Further, the Plaintiffs have failed to identify what damages they sustained. The Plaintiffs also continue to speculatively assert that Jeremy Falk is an undisclosed business partner of Gitman, when in fact, he is not. As stated, Jeremy Falk had no ownership interest in Accel Commerce or Dalva. Jeremy Falk was a friend to David Gitman, who offered to provide financial and accounting assistance to David Gitman.

It is clear that the Plaintiffs have failed to establish a prima facie entitlement to summary judgment on the breach of contract claim.  For this reason, summary judgment must be denied.

## POINT VI

### PLAINTIFFS' VALUATION REPORT IS UNRELIABLE

It is submitted that the valuation report submitted by the Plaintiffs must be deemed to be unreliable and thus, excluded.

In determining whether expert testimony is admissible under Rule 702, the Court is charged with the task of ensuring: (1) the evidence is relevant, (2) the expert is qualified, and (3) the expert's testimony rests on a reliable foundation. *See Amorgianos v. National R.R. Passenger Corp.,* 303 F. 3d 256, 265 (2d Cir. 2002) (relying on *Daubert v. Merrill Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 597 (1993)). Under *Daubert,* the Court has a duty to "ensure that the courtroom door remains closed to junk science while admitting reliable expert testimony that will assist the trier of fact." *Amorgianos,* 303 F.3d at 267.

In general, the first inquiry the court must make is whether the proffered testimony is relevant under Rule 401, which defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. *See Amorgianos,* 303 F. 3d at 265. Because there is a sufficient basis to exclude the testimony on other grounds, the Court declines to address the issue of relevancy as a basis for exclusion as moot.

In determining whether expert testimony is reliable, the Supreme Court has identified a number of factors which may be considered, including: (1) whether a theory or technique can be,

and has been, tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) a technique's known or potential rate of error and the existence and maintenance of standards controlling the techniques operation; and (4) whether a particular technique or theory has gained general acceptance in the relevant scientific community. *See Daubert* at 593-94; *Kumho Tire Co., Ltd. V. Carmichael,* 526 U.S. 137, 149 (1999). Thus, the inquiry by the trial court in performing its discretionary role as the gatekeeper must be a flexible inquiry that "must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the . . . court's belief as to the correctness of those conclusions." *Amorgianos,* 303 F.3d at 266.

The trial court's inquiry must ensure that every step of the expert's analysis is reliable. *Amorgianos,* 303 F.3d at 266. In doing so, the court has to "undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Id.* If the court determines that either the data, methodology or the studies upon which the expert's opinion is based are inadequate to support the expert's conclusions, then the court must exclude the expert's testimony. *Id.* at 266. While minor flaws in an expert's reasoning will not require exclusion, the court must exclude the evidence "if the flaw is large enough that the expert lacks `good grounds' for his or her conclusions." *Id.* at 267 (quoting *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 745 (3d Cir. 1994)).

Rule 702 requires that an expert be qualified "by knowledge, skill, experience, training or education. . . ." Fed.R.Evid. 702. In this case, Carleen Gaskin testified that she does not have any valuation credentials.  Ms. Gaskin does not possess any valuation credentials.  Sim Declaration Exhibit B 10:2-8 Rather, Ms. Gaskin holds  forensic accounting credentials. Sim Declaration

Exhibit B 10:17-20 Ms. Gaskin has never been involved in shareholder dispute cases involving software or SaaS companies.  Sim Declaration Exhibit B 11:10-16 This admission demonstrates that she does not have the knowledge, skill, training or experience to render an opinion with respect to the valuation of a SaaS business.  Ms. Gaskin admitted that she has never issued valuations on SaaS companies.  In fact, Ms. Gaskin did not know the difference between application software firms and system software firms for SaaS businesses.  Sim Declaration Exhibit B 36:21 to 37:2  .  Ms. Gaskin was not aware of the Rule 40 where investors or buyers of technology companies view companies more favorably if they achieved revenue growth of above 40 percent a year. Sim Declaration Exhibit B 69:15-25 To be clear, Channel Reply has revenue growth of over 43% per year for the last three years.  Sim Declaration Exhibit B 66:2-9

Even if Ms. Gaskin were found to be otherwise qualified as an expert on business valuation, her valuation report and testimony must be deemed inadmissible because she showed a discernible measure of negligence in preparing the valuation report.

Further, it is submitted that the valuation report makes egregiously contradictory assumptions and choices that renders the valuation report and any accompanying expert testimony unreliable.  In this respect, Ms. Gaskin clearly identifies the Channel Reply business as being a SaaS business, which means it is a software as a service company.  Despite this fact, Ms. Gaskin testified that she did not use the comparable companies method because she could not find any comparable companies.  She could not find any comparable SaaS companies because she never analyzed any SaaS companies although Ms. Gaskin is aware of SaaS companies since she testified that SaaS companies have some of the highest growth rates in the industry. Sim Declaration Exhibit B 61:17-21   Rather, she searched for software development companies, which are not SaaS companies at all. This is akin to searching for a comparable apple

in an orange grove.   Based on this flawed search, she could not find any comparable companies

and thus, arbitrarily concluded that the comparable companies method was not appropriate in this

case.  This is only the tip of the iceberg.

Egregious is the fact that although the company has seen growth in excess of 43% per

annum for the last three years, Ms. Gaskin testified that believes that the growth for Channel

Reply has stabilized despite opining that the Covid pandemic has created growth opportunities in

the ecommerce industry due to customers abandonment of brick and mortar businesses.  Clearly,

there was no support for Ms. Gaskin's testimony that Channel Reply's growth has stabilized

when it continues to see growth in revenues to this day.   Based on this flawed assumption, Ms.

Gaskin chose to rely solely on the capitalized excess earnings method, which is also known as

the earnings excess method.  Sim Declaration Exhibit B 72:6-10 With respect to this method, it is

important to note that Ms. Gaskin testified that the book Standards of Value co-authored by

William J. Morrison was authoritative in the field of valuation. Sim Declaration Exhibit B 15:5-

13  In this respect, Standard of Value, provides, in relevant part, as follows:

> *Excess earnings method.* The excess earnings method has rarely been employed in fair
> value cases.  In *Balsamides,* however, the excess earnings method was used by the
> plaintiff's expert, who stated that the defendants would not provide the information
> needed to employ any other method.

In this case, it is certain that Ms. Gaskin had access to all information.  Ms. Gaskin did not

testified that the Defendants in this case had information that she needed or that the defendants

failed to provide the information she needed.

Ms. Gaskin provided that the capitalized excess earnings, also known as the excess

earnings method is not widely used "because the income approach, the market approach are the

more common ones that are deemed to be give a more appropriate value for businesses."  Sim

Declaration Exhibit B 72:20-25  Ms. Gaskin provided, in relevant part as follows:

> Q.      And, you indicated that income approach and market approach is more accepted, is that what you said?
> A.      Yes, that's what I said.
> Q.      And, why is it more accepted?
> A.      I believe I said because its based on the financial analysis that you do provides. Depending on which one is appropriate to value your business based on your analysis, it provides the best indication of value.

Sim Declaration Exhibit B 73:5-18

Clearly, Ms. Gaskin even admits that there are more reliable methods.  As stated above,

Ms. Gaskin testified that she did not use the market approach because she could not find

comparable SaaS companies when she only searched software development companies and not

other SaaS companies.  More ridiculous is her reasoning why she did not use the income

approach, which is also known as the discounted cash flow method.

With respect to the income approach, Ms. Gaskin provided that the discounted cash flow

method requires the valuator to project what the income stream would be for the business for a

period of years until they believe that the income stream is going to stabilize at some point and

then those income streams are present value to the current valuation date in order to calculate

value for the company.  Sim Declaration Exhibit B 47:19 to 48:7  11  In Ms. Gaskin's valuation

report, she provided that "The DCF method was considered in our analysis but not employed

given that a forecast was not provided to us and we were unable to estimate the future cash flows

ourselves."  Sim Declaration Exhibit B 49:14-18   Ms. Gaskin provided that there was no

forecast prepared by the company. Sim Declaration Exhibit B 49:21-25 She asked Mr.

Dardashtian for a forecast during the interview.  She asked if the company had previously

prepared projections and asked him if he had any projections that have been prepared as of the

valuation date, and he said that he did not have one and none were prepared. Sim Declaration

Exhibit B 50:12-19  Ms. Gaskin did not ask Mr. Dardashtian to prepare a projection. Sim

Declaration Exhibit B 50:20-22  The reason Ms. Gaskin provided was that if the company did

not prepare a forecast unrelated to the litigation, then she would prefer to review forecasts that

are not biased in any sense. She also provided that it is not uncommon for a company of this size

not to prepare projections so she didn't want to ask him to do something that they have never

done before.   Thus, she did not believe that they had the financial trend availability based on the

company to be able to appropriately project what the cash flows will be. Sim Declaration Exhibit

B 50:24 to 51:24  She also did not consider asking the company CPA and interim manager, Mr.

Liebman to prepare a projection. Sim Declaration Exhibit B 51:25 to 52:4

However, in her testimony during her deposition, she testified that she interviewed

Michael Dardashtian and interviewed no one else, including the interim-manager and the

company's CPA, Joel Liebman.  Sim Declaration Exhibit B 20:14-21   When asked why she

didn't interview Mr. Liebman, Ms. Gaskin testified "we got the information that we needed to

from Mr. Dardashtian so we didn't – I didn't have any questions for Mr. Liebman?"  Sim

Declaration Exhibit B 20:25 to 21:4  She had all her questions answered by Mr. Dardashtian.

Sim Declaration Exhibit B 21:5-8 Ms. Gaskin also had all the documents she requested from Mr.

Dardashtian. Sim Declaration Exhibit B 21:9-12 This is the reason that Ms. Gaskin felt that she

did not need to interview Mr. Liebman. Sim Declaration Exhibit B 21:13-15  As such, Ms.

Gaskin did not take any reasonable steps to obtain projections for the company.  Further, Ms.,

Gaskin testified that as a forensic accountant, she was capable to preparing a projection. In this

respect, Mr. Gaskin as a forensic accountant testified that she is capable of preparing projections

but she chose not to do so because she chose not to use the discounted cash flow model for this

valuation. Sim Declaration Exhibit B 53:9-15   As such, her justification for not utilizing the more reliable discounted cash flow method was negligent and unreasonable. However, incredibly, she testified that in formulating a value under the excess earnings method, she projected growth at 10 percent per annum for the short term and 5 percent for the long term. Thus, even though she testified that she did perform a projection to use the discounted cash flow method, she did use a projection in order to use the excess earnings method to formulate an artificially low valuation.  Clearly, this valuation report must be deemed unreliable and subject to preclusion.

Courts "recognize that the most reliable method for determining the value of a business is the Discounted Cash Flow ("DCF") Method." *Lippe v. Bairnco Corp.,* 288 B.R. 678 (S.D.N.Y. 2003) (citing Shannon P. Pratt et. al., Valuing A Business: The Analysis and Appraisal of Closely Held Companies 154 (4th ed. 2000) ("Regardless of what valuation approach is used, in order for it to make rational economic sense from a financial point of view, the results should be compatible with what would result if a well-supported discounted economic income analysis were carried out.")), *aff'd,* 99 Fed. Appx. 274 (2d Cir. 2004).

Ms. Gaskin was asked whether she was aware that the Internal Revenue Service, in Revenue Rule 68609 notes that the excess earnings method should be used to value intangible assets only if there is no better basis available.  Ms. Gaskin testified that she is aware of that ruling by the Internal Revenue Service.  Sim Declaration Exhibit B 75:9-15

Ms. Gaskin made tax adjustments even though Channel Reply operates as a pass-through entity with no corporate taxation. Ms. Gaskin did not provide for a pass-through tax premium for Channel Reply business, which renders this valuation report unreliable.

Further, Ms. Gaskin testified that Channel Reply at the time held $693,000 in cash.  Ms. Gaskin also conceded that typically businesses of this nature holds three months of expenses. For Channel Reply, the three month expenses equal $126,000.   Despite the company holding onto $693,000 when it only needs to hold $126,000, Despite this fact,.Ms, Gaskin did not believe Channel Reply held excess cash.   However, Ms. Gaskin did state that she is aware that excess cash is a non-operating asset that should be added back to month-to-month in any valuation method, which she failed to do. Sim Declaration Exhibit B 87:14-18

Further, Ms. Gaskin did not perform any valuations using other methods in her report. Using other methods provides a sanity check for the valuation of a business. This point was noted in the authoritative book Ms. Gaskin identified, Standard of Value, which provides, in pertinent part, as follows:

> A valuation supported by several independent indicia of value is considered more reliable than one by an expert who "does not even attempt to perform reasonableness checks upon his valuation"

In this case, Ms. Gaskin performed no reasonableness checks within her valuation.  Ms. Gaskin's valuation is unreliable.  It is respectfully submitted that this Court should not accept a valuation report when the report failed to employ the necessary reliable methods of valuation as well as using reliable assumptions and projections which relied on inadequate data.  In this respect, Ms. Gaskin even admitted that there are more reliable methods such as the discounted cash flow method and the comparable company method.  It is submitted that Channel Reply is an early stage business with high growth.

In *Lippe,* the Court excluded the testimony of a business valuation expert based, in part, on the expert's failure to use the DCF method in determining the value of the business. The Court held "[b]y failing to use the DCF method and relying solely on the comparable companies

method, [the expert] did not have an ability to do a `check' on his determinations." *Lippe,* 288 B.R. at 689. Accordingly, the expert's testimony was excluded as unreliable. *Id.* at 701.

For essentially the same reason, Ms. Gaskin's failure to use the DCF method or the comparable company method amounts to a material flaw in her methodology sufficient to bar her testimony as an expert witness because her conclusions lack `good grounds.' *See Amorgianos,* 303 F.3d at 266.  The Supreme Court has clearly stated: "nothing in either *Daubert* or the Federal Rules of Evidence requires a . . . court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *General Electric v. Joiner,* 522 U.S. 136, 146 (1997). As such, "when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony. *Amorgianos,* 303 F.3d at 266; *Nimely,* 414 F.3d at 396-97.

Clearly, the failure to perform any checks also renders her report unreliable.  It is without question that the Defendants have valid causes to challenge the valuation report and the expected testimony of Ms. Gaskin.  As such, summary judgment must be denied with respect to a redemption based on Ms. Gaskin's valuation report.

## POINT VII

## DEFENDANTS COUNTER-CLAIMS SHOULD NOT BE DISMISSED

**A.  Triable Issues of Fact Exist to Deny Plaintiffs' Motion for Summary Judgment on David Gitman's Claims for Breach of Fiduciary Duty and Breach of Contract against Michael Dardashtian**

At the outset, Plaintiffs assert that the Defendants may not maintain both a contract claim and breach of fiduciary duty claim despite they claimed both a breach of fiduciary duty claim and breach of contract claim.

The elements of a claim for breach of fiduciary duty under New York law are "breach by a fiduciary of a duty owed to plaintiff; defendant's knowing participation in the breach; and damages." *See In re Mid-Island Hosp., Inc.,* 276 F.3d 123, 130 (2d Cir. 2002); *SNS Bank, N.V. v. Citibank, N.A.,* 777 N.Y.S.2d 62, 65 (1st Dep't 2004).

In this case, it is clear that Dardashtian owed a fiduciary duty to CSV and to David Gitman. By Dardashtian's own admission, he breached his fiduciary duty by taking uneven distributions despite the fact that the operating agreement specifically provides that all distributions be equal.

Further, David Gitman provided in his affidavit that Yotpo and ChannelReply are in related businesses. Yotpo and ChannelReply both take customer requests and feedback and store it to a CRM. Yotpo competes with ChannelReply's products, as it markets itself as a marketing content solution and generates reviews, ratings, questions and answers for eCommerce websites. David Gitman created a small software program to monitor when ChannelReply's customers started using Yotpo. When I was able to run the program last on July 1st, 2017, it reported 221 results. Additionally, features David Gitman developed for ChannelReply such as a feedback management appeared in Yotpo soon after Dardashtian joined. The major difference is that Yotpo built their own CRM while ChannelReply utilizes 3rd party CRMs. ,Further, Dardashtian also improperly provided confidential and/or proprietary information belonging to the ChannelReply joint venture to, yet another competitive company called Volo Commerce. Upon information and belief, on or about November 7, 2016, Dardashtian provided a confidential and

proprietary presentation deck which detailed how the ChannelReply product lines work to Volo

Commerce without first obtaining a non-disclosure agreement. Volo Commerce is now

competing with the ChannelReply product line.

Additionally,  Dardashtian allowed a personal conflict of interest to interfere with the

execution of his duties to the ChannelReply platform.   Upon information and belief, Dardashtian

sought to divert resources from established ChannelReply product lines to the development of a

Desk.com integration product because, upon information and belief, he was seeking an offer of

employment from Salesforce, which owns Desk.com.

These allegations are material issues of fact that precludes summary judgment for

Plaintiffs.


### B.  Summary Judgment As to Defendants Claim for Constructive Trust and Unjust Enrichment Must Be Denied Since There Are Triable Issues of Fact

Under New York law, the elements of a constructive trust are: "(1) a confidential or

fiduciary relationship; (2) a promise, express or implied; (3) a transfer made in reliance on that

promise; and (4) unjust enrichment." *In re Ades and Berg Group Investors,* 550 F.3d 240, 245

(2d Cir.2008) (citing *Sharp v. Kosmalski,* 40 N.Y.2d 119, 121, 386 N.Y.S.2d 72, 351 N.E.2d 721

(1976)). The Second Circuit has noted that "[a]lthough these factors provide important

guideposts, the constructive trust doctrine is equitable in nature and should not be rigidly

limited." *Counihan v. Allstate Insurance Co.,* 194 F.3d 357, 362 (2d Cir.1999) (internal

quotations and citations omitted). A claim for unjust enrichment, requires a demonstration that

(1) the party was enriched (2) at the other party's expense and (3) under the circumstances of

such enrichment equity and good conscience require the offending party to make restitution.

*Hughes v. Ester C Co.,* 930 F.Supp.2d 439, 471 (E.D.N.Y.2013) ; *accord Corsello v. Verizon*

*N.Y., Inc.,* 18 N.Y.3d 777, 790, 944 N.Y.S.2d 732, 967 N.E.2d 1177 (2012) ("The basis of a claim for unjust enrichment is that the defendant has obtained a benefit which 'in equity and good conscience' should be paid to the plaintiff").

In this respect, it is certain that David Gitman has testified that he has an agreement with Michael Dardashtian in regard to the ownership structure of Channel Reply. Based on his assurance of an agreement, David Gitman undertook the work to create Channel Reply with CSV participation. Since Channel Reply had to be split off from CSV due to the NDAP sale and after learning that Michael Dardashtian intended to renege on another agreement, David Gitman sought to transfer the Channel Reply business into Channel Reply Inc, by which CSV would own 50% and the remaining share being allocated between David Gitman and the two developers.

Dardashtian now seeks a redeem Gitman's 50% interest in CSV by using an unreliable valuation report by asserting that Channel Reply is owned exclusively by CSV. Clearly, this would unjustly enrich Dardashtian since the agreement as alleged by Gitman would demonstrate that Dardashtian, through his 50% ownership of CSV would only be entitled indirectly entitled to 25% of Channel Reply. At the very least, it is submitted that there are triable issues of fact that precludes summary judgment on this issue. Thus, summary judgment should be denied.

## POINT VIII

## TRIABLE ISSUES OF FACT EXIST AS TO DEFENDANTS' CLAIM FOR DECLARATORY JUDGMENT THAT GITMAN OWNS 67.5% OF CHANNEL REPLY

It is understood that David Gitman asserted a counterclaim for declaratory judgment that CSV only owns 50% of Channel Reply while the remaining 50% belongs to the two developers and David Gitman individually. In support of its summary judgment, the Plaintiffs makes

conclusory assertion that it is unrefuted that CSV owns 100% of Channel Reply.  However, this point is not undisputed since David Gitman disputes this fact.  This is a credibility issue that must be resolved by the trier of fact and cannot be decided as a matter of law.

In support of its motion, the Plaintiffs attach an affidavit from one of the developers, Bagaiev.  However, it is submitted that there are issues with the credibility of Bagaiev's affidavit since he was rehired by the company for more money.  He continues to work for CSV under Michael Dardashtian.  Further, he is also a named defendant in this case.  Michael Dardashtian, when asked if he intended to dismiss his claims against Bagaiev, Dardashtian testified that he will wait and see how the case proceeds before deciding to release Bagaiev.  Obviously, this is akin to a gun to Bagaiev's head. Thus, the veracity of his affidavit is in doubt.  At the very least, this is a credibility issue that must be determined by a trier of fact.

Despite this fact, there is a discussion between Bagaiev and Gitman that references the fact that Dardashtian promised Bagaiev shares.  In this respect, this communication, in relevant part, are as follows:

> Bagaiev.konstantyn 12/11/2017, 7:59:33 AM:  Mike promised me share, you promised me something. I don't care any more.  If I'll get fired – I'll start something for myself.
>
> *   *   *
>
> Bagaiev.konstantyn 9/27/2017, 4:40:50 AM: I was promised by both you and Mike that I have equity. I want to hear both, you and Mike reasons to sign such agreement.

Clearly, Bagaiev did indicate that he was promised equity or shares by Michael Dardashtian.  As such, this directly contradicts the assertions he is making in his affidavit, clearly because Dardashtian holds the threat of litigation over his head and he is being paid by CSV with Dardashtian in control.  Further, there is no indication that Bagaiev even provided that he would

be willing to appear in Court to testify as to the assertions he made in his affidavit.  Further, it is worth noting that the Bagaiev's affidavit is not properly authenticated by a notary.

It is also clear that David Gitman provided that there was an agreement that Channel Reply would be a new venture. As was done in the past, CSV would be a participant in a joint venture in which it was not a 100 percent owner. In fact, when CSV started the joint venture, it was a 49% participant.  Likewise, Channel Reply would be a joint venture by which CSV would own 50% and David Gitman would own 42.5% individually and the two developers would own the remaining 7.5%.  Following the formation of the spin off entity, Channel Reply Inc., David Gitman and Bagaiev executed a Stock Purchase Agreement to provide Bagaiev with 5% of the equity in Channel Reply he was promised. Sim Declaration Exhibit J.

Thus, this is an issue of fact since there is a discrepancy between Dardashtian and Gitman's version.  As a nonmovant, Gitman's version must be given deference, which would result in denial of summary judgment on this issue.

## POINT IX

## DAVID GITMAN IS ENTITLED TO AN ACCOUNTING BASED ON DARDASHTIAN'S ADMISSION THAT HE TOOK UNEVEN DISTRIBUTIONS

An accounting is an "equitable remedy ... designed to require a person in possession of financial records to produce them, demonstrate how money was expended and return pilfered funds in his or her possession" *Roslyn Union Free School Dist. v. Barkan,* 16 N.Y.3d at 653, 926 N.Y.S.2d 349, 950 N.E.2d 85 (2011)

It is understood that under New York law, the members of an LLC may seek an equitable accounting. The right to an equitable remedy is premised upon the existence of a fiduciary relationship and a breach of the duty imposed by that relationship respecting property in which

the party seeking an accounting has an interest.  To be clear, an accounting involves more than simply turning over existing books and records.  It would appear that the Plaintiffs argue that David Gitman has access to the books and records.  However, an accounting involves more than turning over existing books and records.  It also involves Michael Dardashtian demonstrating how the monies of the company were expended, which includes his uneven distributions as well as the discrepancies between tax return income and company income.  Therefore, it is submitted that the Plaintiffs are not entitled to summary judgment on this issue.

## CONCLUSION

For the foregoing reasons, it is respectfully submitted that Plaintiffs' motion for partial summary judgment be denied in its entirety.

Dated: Bayside, New York
      September 28, 2020

Yours,

_/s/Sang J. Sim_____
**SIM & DEPAOLA, LLP**
BY: Sang J. Sim, Esq.
*Attorneys for Defendant(s)*
42-40 Bell Boulevard Suite 201
Bayside, New York 11361
(718) 281-0400

TO:   Guaglardi & Meliti, LLC
      *Attorneys for Plaintiffs*
      365 W Passaic St #130
      Rochelle Park, NJ 07662
      bguaglardi@adgmlaw.com
      Tel: (201) 947-4100
      Fax: (201) 947-1010

55

1:17 Civ.4327 (LLS)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

MICHAEL DARDASHTIAN, individually and on behalf of COOPER SQUARE VENTURES,
LLC NDAP, LLC and CHANNEL REPLY,

                              Plaintiffs,

    -against-

DAVID GITMAN, ACCEL COMMERCE, LLC, DALVA VENTURES, LLC, KONSTANTYN
BAGAIEV, OLESKII GLUKHAREV and CHANNEL REPLY, INC.,

                              Defendants.

---

**MEMORANDUM OF LAW**

---

**SIM & DEPAOLA, LLP**
BY: Peter Sim
Attorney for Defendant(s)
42-40 Bell Boulevard, Ste 201
Bayside, NY 11361
Tel. (718) 281-0400

---

To:    Guaglardi & Meliti, LLC
       365 W Passaic St #130
       Rochelle Park, NJ 07662

Attorney(s) for Plaintiffs

---

Service of a copy of the within is hereby admitted.
Dated


Attorney(s) for