UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MICHAEL DARDASHTIAN, individually and on behalf of COOPER SQUARE VENTURES, LLC NDAP, LLC and CHANNEL REPLY<br><br>Plaintiffs,<br><br>against.<br><br>DAVID GITMAN, ACCEL COMMERCE, LLC, DALVA VENTURES, LLC, KONSTANTYN BAGAIEV, OLESKKII GLUKHAREV and CHANNEL REPLY, INC.,<br><br>Defendants. | Case No.: 17-cv-4327 (LLS)(RWL) |

**RESPONSE TO PLAINTIFFS' STATEMENT OF FACTS PURSUANT TO RULE 56.1**

Pursuant to Rule 56.1(a) of the Local Rules of the Southern District of New York, Defendants, David Gitman, Accel Commerce, LLC, Dalva Ventures, LLC and Channel Reply, Inc. submit this Rule 56.1 Statement of Undisputed Material Facts in opposition to Plaintiffs' Motion for Partial Summary Judgment

**A. THE PLAINTIFF COMPANIES**

**Cooper Square, LLC a/k/a Cooper Square Ventures LLC**

1. Dardashtian and Defendant David Gitman (hereinafter "Gitman") are both managers and founders of Cooper Square, LLC a/k/a Cooper Square Ventures, LLC ("CSV"). (See Defendants' Amended Counterclaim dated June 9, 2020 ("Counterclaim") at paragraph ("para") 10, annexed to the Declaration of Barry Guaglardi ("Guaglardi Decl.") at Ex. E.

RESPONSE:  Undisputed

1

2. On August 13, 2011, Dardashtain and Gitman with the intention to be bound thereby, eash executed an Operating Agreement for CSV (CSV Operating Agreement), granting Dardashtian and Gitman each a 50% ownership interest in CSV, and sharing equal management control on behalf of CSV.

RESPONSE:  Undisputed

3. All income and expenses for CSV and ChannelReply have been maintained in the CSV Bank Account since October 31, 2011, through present.

RESPONSE:  Undisputed.

4. All income and expenses for CSV and ChannelReply have been maintained in the CSV Bank Account since October 31, 2011 through present.

RESPONSE:  Undisputed up to the point in time when Gitman was removed from the day to day management of CSV.

5. Gitman has no proof in his possession to support his claim for disproportionate distribution, misappropriation, or theft allegedly committed by Dardashtian as it related to CSV, ChannelReply and/or NDAP.

RESPONSE:   Disputed except that the Defendants provided an accounting report demonstrating disproportionate distributions that Michael Dardashtian took from the Company without corresponding distributions to David Gitman.  This includes  bank account statement demonstrates that Dardashtian did take an uneven  distribution. For instance, in 2016, Michael Dardashtain took a cash distribution totaling $20,000 while David Gitman only received $10,000.  Further, in 2013, Michael Dardashtian took a distribution into his 401K in the amount of $13,500 while David Gitman did not.  Further, Michael Dardashtian caused the Company to pay for his health insurance in the amount of

$17,635 without corresponding credit to David Gitman.  Further, the accounting report demonstrates that  Charge-Be provided net revenue for Channel Reply in the amount of $447,000 while Quickbooks profit and loss statements only reported $343,000.  This evidence is maintained and stored in the Company's Quickbook accounts, tax returns and bank statements.  Gitman Affidavit ¶ 112

Further, Michael Dardashtian testified that he made distributions to himself without reciprocal distribution to David Gitman during his deposition.  Sim Declaration Exhibit A 58:19-22   In addition, he admitted that he caused CSV to pay for health care benefits for himself and his family without David Gitman's consent or knowledge. Sim Declaration Exhibit A 61:14-22

**NDAP, INC.**

6.  NDAP, LLC ("NDAP") is a wholly owned subsidiary of CSV, which was established for the purpose of creating an e-commerce software platform to sell and distribute auto parts under the name "Next Day Auto Parts," later to be known as "Car Part Kings."

    RESPONSE: Undisputed

7.  Pursuant to Article 6.5 of the NDAP Operating Agreement, Dardashtian and Gitman agreed that Gitman and Dardashtian "shall not be entitled to enter into transactions that may be considered competitive with the Company and "for twenty four (24) months following the termination of this Agreement, they shall not be engaged in any business, whether internet based or of a traditional brick and mortar type that is competitive with the Company without the express written permission of the Majority.

    RESPONSE: Undisputed.

8. From August 24, 2011 through July 28, 2017, NDAP created, owned and operated an original proprietary software which facilitated the online inventory and sale of auto parts through Carpartkings.

RESPONSE: Undisputed except that the software was not proprietary.

### ChannelReply

9. Since "ChannelReply" was established, it has been solely owned and operated by and through CSV.

RESPONSE: Refuted.  ChannelReply was created after David Gitman and Michael Dardashtian entered into an oral agreement.  Since Michael Dardashtian had begun working full time at Yopto, a competitor online e-commerce solutions business, David Gitman and Michael Dardashtian agreed that Channel Reply would be created by David Gitman with the assistance of his developers.  ChannelReply would be created through CSV but the ownership of Channel Reply would be owned 50% by CSV, 5% by Bagaiev, 2.5% by Gukharev and 42.5% individually by David Gitman.  On this basis, ChannelReply was created.  Gitman Affidavit ¶¶ 153, 81, 82

10. CSV owns 100% of ChannelReply and Dardashtian and Gitman each own 50% of ChannelReply by and through their ownership interest in CSV as provided in the CSV Operating Agreement.

RESPONSE: Disputed.  CSV owns 50% of Channel Reply.  Dardashtian and Gitman each own 50% of CSV.  The remainder is owned 5% by Bagaiev, 2.5% by Gukharev and 42.5% individually by David Gitman. Gitman Affidavit ¶¶ 153, 81, 82

11. ChannelReply was never owned by CSV 50%, Gitman individually 42.5%, Bagaiev 5% and Glukarev 2.5%

RESPONSE: Disputed. Channel Reply is owned by CSV 50%, Gitman individually 42.5%, Bagaiev 5% and Glukarev 2.5%.  Gitman Affidavit ¶¶ 153, 81, 82

12. The ChannelReply software, including its code, is CSV's intellectual property and constitutes a protected trade secret as provided by 18 U.S.C. 1836.

RESPONSE: Disputed since CSV only owns 50% of ChannelReply.  Further, ChannelReply software is open source coding and thus does not qualify as trade secrets. Gitman Affidavit ¶ 10

13. CSV's Terms of Service with ChannelReply customers requires each ChannelReply customer to agree to ChannelReply's technical safeguards to protect the security and confidentiality of ChannelReply's service data.

RESPONSE: Undisputed.

14. Gitman transferred ChannelReply's intellectual property, confidential information, including ChannelReply's business accounts, ChannelReply's contract terms and conditions with existing cuistomers, customer lists, protected trade secrets including its software code to Gitman's company, Channel Reply Inc.

RESPONSE:  Disputed since David Gitman did not transfer any intellectual property. Dardashtian breached his fiduciary duty by making uneven distributions to himself. Further, Michael Dardashtian reneged on his oral agreement to David Gitman, Bagaiev and Glukharev.  Further, Channel Reply Inc. was never established to be wholly owned by David Gitman but rather in proportion to the ownership 50% to CSV, 42.5% to David Gitman, 5% to Bagaiev and 2.5% to Glukharev.  Further, David Gitman created Channel Reply Inc. out of necessity to create separate accounts due to the pending NDAP sale. Gitman Affidavit ¶ 154

## B.  CHRONOLOGICAL STATEMENT OF UNDISPUTED FACTS

**Defendant Gitman's Access to the Plaintiff Companies' Records**

15. On October 31, 2016, Gitman advised that he wanted to have a "grip" on all financial related aspects of the Plaintiff Companies and requested that Dardashtian agree to a third party to review the financial records.

RESPONSE:  Undisputed

16. From December 2, 2013 through the present, Gitman has had, at all times relevant hereto, complete access to the Plaintiff Companies' QuickBooks accounts, and has logged in to access the Plaintiff Companies' QuickBooks multiple times each year from 2013 through the present.

RESPONSE: Undisputed.

**ChannelReply, Inc., Access Commerce, LLC and Dalva Ventures, LLC**

17. In early 2017, Gitman decided that he no longer wanted to be a partner with Dardashtian on any new ventures.

    RESPONSE: Undisputed to the extent that David Gitman decided he no longer wanted to be partner with Dardashtain on any new ventures after Dardashtian took uneven distributions demonstrating that he could no longer be trusted and he reneged on his oral agreement with respect to the joint venture ownership structure for Channel Reply business. Gitman Affidavit ¶ 154

18. As of January 2017, Gitman and Falk has been operating Accel Commerce, LLC (Accel), listing Gitman as Accel's business manager, with the purpose of doing business in the e-commerce industry.

    RESPONSE: Disputed to the extent that Falk has not been operating Accel Commerce, LLC.  Further, Gitrman has not been operating Accel Commerce, LLC.  Accel Commerce was not doing business to compete with CSV.  Rather, Accel Commerce, LLC was established to provide strictly consulting services. Accel Commerce, LLC never commenced doing any business since formation. Gitman Affidavit ¶ 131  Accel Commerce did not commence its business until the instant action was commenced. Gitman Affidavit ¶ 131

19. On or about February 13, 2017, Gitman , Laura Gitman anmd Jeremy Falk ("Falk") executed an operating agreement for Dalva Ventures, LLC, a company engaged in e-commerce ("Davla").

RESPONSE:  Disputed.  Jeremy Falk only registered Dalva Ventures for David Gitman and his wife using his discounted rate with the filing service.  There was no business relationship with Jeremy Falk and Dalva Ventures.  Gitman Affidavit ¶ 131

20. As of February 13, 2017, Falk was a consultant for NDAP in connection with a potential sale of NDAP to a third party purchaser.

RESPONSE: Undisputed but Falk was a consultant before February 13, 2017. Jeremy Falk has been consulting for CSV, NDAP, Plumburs, Channel Reply since 2015.   Gitman Affidavit ¶ 50

21. On or about and between February 26, 2017 and March 7, 2017, Gitman  requested that Dardashtain agree to pay Falk $160,000.00 in accordance with the Falk Agreement.

RESPONSE: Disputed since the agreement with Jeremy Falk for his consulting and sales brokering, including the amount that was to be paid for his fees was negotiated and initiated by Michael Dardashtian and not David Gitman. Gitman Affidavit ¶ 127  David Gitman only insisted that business should be operated by honoring commitments and not reneging on said agreements. Gitman Affidavit ¶ 129 Sim Declaration Exhibit F.

22. As of March 7, 2017, Gitman and Falk were members of Dalva.

RESPONSE: Disputed.  Falk was never a member of Dalva. Rather, Jeremy Falk only registered the company for David Gitman in order to avail themselves to the discounted rates for filing services that Jeremy Falk had access to.  Gitman Affidavit ¶ 131

23. On March 15, 2017, Falk agreed to reduce his fee to $80,000.00 per Dardashtian's request.

    RESPONSE: Undisputed but the service agreement with Falk's company clearly set forth the commission the entity was supposed to receive. Sim Declaration Exhibit F.

24. Accel did business in the years 2017-2018.

    RESPONSE: Undisputed to the extent that Accel started doing business only after this action was commenced. Gitman Affidavit ¶ 131

25. On April 14, 2017, Gitman used his email address dgitman@accelcommerce.com to sent to Falk at jfalk@accelcommerce.com a copy of ChannelReply's Profit and Loss Statements for the year 2016, without Dardashtian's authorization and/or consent.

    RESPONSE:. Undisputed to the extent that Jeremy Falk had a continuing non-disclosure agreement with David Gitman and Michael Dardashtian.  Gitman Affidavit ¶ 50 This was also not the first time that Jeremy Falk had seen their financial statements.

26. On May 27, 2017, Gitman advised Dardashtian that Dardashtian's resistance for an accounting has given [Gitman] cause to transfer the company's cash balances to a call deposit account," and "this money will remain in this account until an audit is completed by the company's accountant, Liebman Goldberg & Hymowitz ("Liebman") or you accept my conservative estimate of $121,500 in overpayments."

    RESPONSE:  Undisputed to the extent that David Gitman's attorney, Umar Farooq directed David Gitman to take these actions and assured him that these acts were proper under the circumstances. Gitman Affidavit ¶ 113

**Gitman's Transfer of the Plaintiff Companies' Funds**

27. As of May 27, 2017, without Dardashtian's knowledge or consent, Gitman changed the passwords and/or otherwise transferred the Plaintiff Companies online accounts to a separate domain, removing Dardashtian's ability to access same, including, but not limited to, "1 password" which controls all of the passwords for all of the Plaintiff Companies' online accounts, and Google Suite, which includes access to the Plaintiff Companies' data, customer lists, subscriptions with customers, invoices, etc.

RESPONSE: Undisputed to the extent that Gitman's attorney at the time instructed Gitman to take these actions and it was necessary steps to separate the various businesses due to prepare for the pending NDAP sale. Gitman Affidavit ¶ 59 The commingling of funds by Michael Dardashtian made this separation of businesses more challenging. Gitman Affidavit ¶ 61 Michael Dardashtian had full knowledge of account changes. David Gitman was handling the due diligence for the asset sale to Meridian. Gitman Affidavit ¶ 59 This included identifying the intermingled accounts and services in order to separate them due to the pending sale. During this process, David Gitman was tasked to separate CSV, NDAP, Channel Reply, Plumburs and related assets into separate accounts. Gitman Affidavit ¶ 60

28. Gitman also "moved" the Plaintiff Companies' Chargebee and Stripe accounts to Channel Reply, Inc., a company formed by Gitman without Dardashtian's knowledge or consent, and of which Dardashtian had no ownership or affiliation.

RESPONSE: Undisputed to the extent that Gitman's attorney at the time instructed Gitman to take these actions and it was necessary steps to separate the various businesses due to

prepare for the pending NDAP sale. Gitman Affidavit ¶ 59 The commingling of funds by Michael Dardashtian made this separation of businesses more challenging. Gitman Affidavit ¶ 61  Michael Dardashtian had full knowledge of account changes. Gitman Affidavit ¶ 60  David Gitman was handling the due diligence for the asset sale to Meridian. This included identifying the intermingled accounts and services in order to separate them due to the pending sale.  During this process, David Gitman was tasked to separate CSV, NDAP, Channel Reply, Plumburs and related assets into separate accounts. Gitman Affidavit ¶ 60 Further, Michael Dardashtian continued to have ownership through CSV.

29. The Plaintiff Companies' Chargebee account, Stripe account and Slack account were all transferred to Channel Reply Inc. and those specific accounts no longer exists.

RESPONSE: Undisputed to the extent that Gitman's attorney at the time instructed Gitman to take these actions and it was necessary steps to separate the various businesses due to prepare for the pending NDAP sale.  The commingling of funds by Michael Dardashtian made this separation of businesses more challenging.  Michael Dardashtian had full knowledge of account changes.  David Gitman was handling the due diligence for the asset sale to Meridian.  This included identifying the intermingled accounts and services in order to separate them due to the pending sale.  During this process, David Gitman was tasked to separate CSV, NDAP, Channel Reply, Plumburs and related assets into separate accounts.  Gitman Affidavit ¶ 59-62

30. After the TRO was entered, Gitman created new Chargebee, Slack and Stripe accounts to provide Dardashtian with access "in an effort to fully comply with the TRO."

11

RESPONSE: Disputed. David Gitman did not create new accounts after the TRO was entered.  Rather, David Gitman complied with the TRO in an expeditious manner.

31. As of May 27, 2017, and continuing thereafter, Gitman transferred Dardashtain's business accounts, including Dardashtian's email addresds michael@channelreply.com to Gitman's new G suite account for ChannelReply.

RESPONSE: Undisputed to the extent that Gitman's attorney at the time instructed Gitman to take these actions and it was necessary steps to separate the various businesses due to prepare for the pending NDAP sale.  The commingling of funds by Michael Dardashtian made this separation of businesses more challenging.   Michael Dardashtian had full knowledge of account changes.  David Gitman was handling the due diligence for the asset sale to Meridian.  This included identifying the intermingled accounts and services in order to separate them due to the pending sale.  During this process, David Gitman was tasked to separate CSV, NDAP, Channel Reply, Plumburs and related assets into separate accounts.  Gitman Affidavit ¶ 59-62

32. Gitman's lockout of Dardashtian from the Plaintiff Companies accounts was intentional until such time that an accounting was "properly set-up."

RESPONSE: Disputed as to intentional since Gitman's attorney at the time instructed Gitman to take these actions and David Gitman was working on the due diligence with Umar Farooq who instructed him to continue following through to close the sale of NDAP.  As such, in order to prepare for the NDAP sale, David Gitman, through advice of

company's counsel, Umar Farooq, segregated the business of CSV.  Gitman Affidavit ¶ 59-62

33. On or about and between May 27, 2017 through May 30, 2017, Gitman caused the removal of Dardashtian's access to the following business accounts belonging to the Plaintiff Companies:

a) 1Password Account – this is a password and login account management system.  It holds all of my personal passwords and the companies shared passwords. Account was paid for our of company funds.

b) Chargebee Account – This is our subscription management account that holds the customer information and billing information for all of our ChannelReply customers.

c) Stripe Account – This is our credit card billing services that allows us to receive credit card payments from our customers.

d) PayPal Account – This is an online payment system which allows us to take online payments from our customers.

e) Upwork account -  This is a freelancer marketplace that allows us to hire and pay freelancers to run the business.

f) Zendesk Accounts – This is a customer service management account which allows us to talk to our customers when they email us through support tickets.

g) JIRA Account – This is a project management software that allows us to manage projects effectively for our business and work with one another to successfully complete tasks.

h) Slack – This is a messaging management software for our business that allows company employees  and freelancers to openly communicate with one another and share documents.

i) Amazon Seller Central – This is our Amazon seller account that allows us to sell products on Amazon and manage our MWS accounts for ChannelReply sellers.

j) EBay Accounts – This allows us to sell products on eBay and manage our eBay subscription id's for ChannelReply sellers.

k) Timedoctor – This allows us to manage the time management of employees and freelancers via an online portal to track time and take screenshots of employees and freelancers work.

l) Amazon Web Services (AWS) – This is where we manage all of our Amazon Web Servers which keep the businesses servers running effectively.

m) American Express Account – This is NDAP corporate credit card account.

n) Magento Accounts – This is our Magento Admin which allows us to see all backend data associated with our business.

o) QuickBooks Accounts – This is where all the finances are held and all accounting and reconciliation is done.

p) Desk.com Account -  This is a customer service management account which allows us to talk to our customers when they email us through support tickets.

q) GoDaddy Account – We have a company godaddy account which owns and operates many domains, I cannot login to Godaddy to even list all of the domains we own together.

r) Magemojo – This is our Magento hosted server account

s)   Mailchimp – This is our email subscription newsletter account.

t)   GitHub – This is where all of our software is checked in and stored for sharing.

u)   Ringcentral – This is our VOIP system that allows us to make and receive internet phone calls and faxes

v)   Join.met – This is a screen share service that allows us to talk to customers and share our screens with them.

RESPONSE: Disputed to the extent that Gitman's attorney at the time instructed Gitman to take these actions and it was necessary steps to separate the various businesses due to prepare for the pending NDAP sale.  The commingling of funds by Michael Dardashtian made this separation of businesses more challenging.  Michael Dardashtian had full knowledge of account changes.  David Gitman was handling the due diligence for the asset sale to Meridian.  This included identifying the  intermingled accounts and services in order to separate them due to the pending sale.  During this process, David Gitman was tasked to separate CSV, NDAP, Channel Reply, Plumburs and related assets into separate accounts.  Gitman Affidavit ¶ 59-62


34. Gitman admits that he suspended Dardashtian's "1 Password" account, which Gitman restores "in compliance with the TRO."

RESPONSE: Undisputed to the extent that Gitman's attorney at the time instructed Gitman to take these actions but the purpose was not to lock Dardashtian out but David Gitman suspended many unused accounts as part of the diligence process for the pending NDAP sale.  Further, Umar Farooq assured David Gitman that he was taking the correct actions to enforce his rights and to complete the Meridian sale.  Gitman Affidavit ¶ 59-62

35. On or aboiut and between May 27, 2017 to May ,30, 2017, without Dardashtian's knowledge, authorization or consent, Gitman authorized and completed two (2) electronic transfers from CSV Bank Account:

(1) Transfer in the amount of $23,982.53 to Checking Account ending #5141-David Gitman, Banking Ctr. Northwood #0094043 PA, Confirmation #2589533902

RESPONSE: Undisputed to the extent that Umar Farooq, the attorney hired to assist in the NDAP sale, instructed Gitman to take these actions and to move the company funds to a call account in order to complete the sale of NDAP and to complete an audit of the company's books.

36. Gitman used $5,060.00 of the Plaintiff Companies' funds to pay Gitman's personal counsel, Umar Farooq.

RESPONSE: Undisputed to the extent that the legal fees arose from the NDAP transaction and Umar Farooq worked as the company attorney with respect NDAP sale.  However, David Gitman reimbursed the company as instructed by the Court.

37. On Monday, May 29, 2017, Defendant Gitman cancelled Dardashtian's participation in a pre-scheduled weekly conference call with Gitman, Bagaiev and Glukarev.

RESPONSE: Disputed that Gitman cancelled Dardashtian's participation. Rather, Dardashtian may have been removed during account and service cleanup in connection with the preparation for the sale of NDAP.

38. As of May 31, 2017, Gitman continued to charge a lease auto payment for his personal BMW to the CSV Bank Account.

RESPONSE: Undisputed and to add that Dardashtian also charged a lease auto payment for his personal Volvo to the CSV Bank Account.

39. Gitman does not have proof of his possession that Dardashtian took any disproportionate distributions in the amount of $121,500 or otherwise from Plaintiff Companies.

RESPONSE: Disputed. Disproportionate payments was provided in an accounting statement and report, which information is contained in the CSV's Quickbook accounts as well as bank statements. Gitman Affidavit ¶ 111 An accounting report was produced during discovery that demonstrates uneven distributions. Further, Michael Dardashtian testified that he took disproportionate distributions during his deposition. Sim Declaration Exhibit A 58:19-22

40. Dardashtian did not have access to send or receive emails from his michael@channelreply.com email address from May 30, 2017 to June 14, 2017.

RESPONSE: Disputed. Michael Dardashtian may not have had access to that email account before this period of time because David Gitman had to separate the GSuite accounts in preparation for the pending sale of NDAP to Meridian. Gitman Affidavit ¶ 59

**Defendants' Unlawful Competition with Plaintiff Companies**

41. Without Dardashtian's knowledge, authorization and/or consent, Gitman opened a separate
    bank account under the name Channel Reply Inc., with Chase Bank under account number
    ending in #7775, with an address of 100 Sterling Pl., Apt 1A, Brooklyn, New York 11217.

    RESPONSE:  Disputed.  Michael Dardashtian knew that David Gitman was setting up a
    new company under the structure as they had previously agreed.  Gitman Affidavit ¶ 89


42. Gitman, with the assistance of his personal attorney, Umar Farooq, Esq.,, created Channel
    Reply Inc., to set up a new competitive company to that of ChannelReply and intended to
    create a stock ownership plan to incentivize the developers, Bagaiev and Oleksii
    Gluikharev.

    RESPONSE: Disputed.  The company was not set up to be a competitive but rather a spin
    off company that was dictated by the due diligence.  Umar Farooq was an attorney
    representing the company with respect to the sale of NDAP.  It was also intended to
    formalize the agreed upon ownership percentages that had been promised for over a year.
    The new company intended to allocate ownership of ChannelReply business to 50% CSV,
    42.5%  David Gitman, 5% to Bagaiev and 2.5% to Glukharev. Gitman Affidavit ¶ 89


43. On June 1, 2017, Gitman, using his Dalva email account, David@dalva.ventures, sent to
    Bagaiev and Glukarev employment agreements for Bagaiev and Glukharev to become
    employees of Channel Reply Inc.

    RESPONSE: Undisputed.

44. On June 2, 2017, Gitman charged $3,500 to amazon web services using NDAP's
American Express credit card.

RESPONSE: Disputed since this was a recurring charge that occurred monthly and it was
in place prior to this time period. Gitman Affidavit ¶ 167

45. On June 2, 2017 at 7:12 p.m., Gitman advised Bagaiev, that providing Dardashtian with a
lesser ownership interest in ChannelReply "considering how much money [Dardashtian]
stole it is more than generous."

RESPONSE: Undisputed.

46. On June 8, 2017, Gitman entered into a "Common Stock Purchase Agreement" with
Bagaiev providing Bagaiev 1,000,000 shares of stock in Channel Reply Inc.

RESPONSE: Undisputed

47. On June 19, 2017 at 5:57:58 p.m., Gitman told Bagaiev to "clear his text (sic)
conversation with Gitman.

RESPONSE: Undisputed

**Resignation of Developers from CSV**

48. On June 20, 2017 at 9:13 a.m., Gitman sent to Bagaiev and Glukhjarev resignation letter
"templates" and then asked Bagaiev to "please use one of these."

RESPONSE: Disputed.  David Gitman responded to Bagaiev asking what an American resignation letter looked like.   Gitman Affidavit ¶ 168

49. On June 20, 2017 at 3:37 p.m. regarding Bagaiev's resignation letter, Gitman advised Bagaiev, referring to Gitma's former counsel Linday Ditlow, Esq., that "Lindsay asked me to send you an email to send mike the resignation letter.

RESPONSE:  Undisputed.

50. On June 20, 2017 at 5:46 p.m., regarding Bagaiev's resignation letter, Gitman advised Bagaiev "The lawyers want it to come from you not them. Otherwise Mike might argue that we are conspiring.

RESPONSE: Undisputed.

51. By letters dated June 20, 2017, Bagaievc and Glukharev resigned from ChannelReply "effective June 20, 2017."

RESPONSE: Undisputed to the extent that Bagaiev and Glukharev entered into an employment contract with Dardashtian.

**Gitman's Interference with Dardashtian's and the Plaintiff Companies' Past, Present and Future Expectation of Economic Gain**

52. In the year 2017, Accel Commerce generated a gross profit of $79,274.32

RESPONSE: Disputed as to the definition of gross profit.  David Gitman only began work on Accel Commerce after the instant lawsuit was commenced.  Accel Commerce's net profit was  only $3,239.04 in 2017.  Gitman Affidavit ¶ 169

53. On May 1, 2020, Plaintiff Companies' co-managers, Dardashtian and Liebman issued a "Redemption Notice" pursuant to Article 11.5 of the CSV Operating Agreement authorizing CSV to redeem all of Gitman's rights, title and interests in the Plaintiff Companies ("Redemption Notice"), with a Redemption Closing to take place on June 1, 2020 ("Redemption Closing Date").

RESPONSE: Undisputed except Liebman is only an interim manager.

54. Pursuant to Article 11.5(f) of the CSV Operating Agreement, "[the closing of a redemption as contemplated in this paragraph shall not prejudice a Redeemed Member's right to contest the amount of the Purchase Price but a Redeemed Member shall not be permitted to contest the closing as contemplated by this paragraph.

RESPONSE: Undisputed.

55. On May 6, 2020, Gitman sent a "Rejection of Notice of Redemption, Cooper Square Ventures, LLC", contesting the closing on the grounds that Gitman never "consented, endorsed, supported or approved of the proposed redemption".

RESPONSE: Undisputed.

Dated: Bayside, New York
      September 28, 2020

Respectfully submitted,

**SIM & DEPAOLA, LLP**

By: /s/ Sang J. Sim, Esq.
Sang J. Sim, Esq.