Delaware block method. The DCF methodology is widely used in the determination of fair value, especially in Delaware. In the 1995 *Kleinwort Benson* decision, the Delaware court concluded that DCF was a better way of determining the value of a corporation than a market-based approach, and it stated that the DCF method should have greater weight because it values the corporation as a going concern, rather than comparing it to other companies.[132] In *Grimes v. Vitalink*, the Court of Chancery stated that the "discounted cash flow model [is] increasingly the model of choice for valuations in this Court,"[133] and in *Gholl v. eMachines, Inc.*, it pointed out that DCF "is widely accepted in the financial community and has frequently been relied upon by this Court in appraisal actions."[134]

- *Guideline methods—the market approach*. These methods involve valuing a privately held company based on multiples generated from the market prices of guideline public companies' traded shares (the *guideline* or *comparable company* method) or from guideline transactions involving both public and private companies (the *guideline* or *comparable transaction* method).[135] Those values can vary greatly depending on the selection of companies and on their similarity to the subject company. Although courts often rely more heavily on DCF, the market approach continues to be widely used.
- *Asset value*. Asset value is seldom used in appraisals. *Paskill* prohibited using a net asset value method alone for purposes of an appraisal of a going concern in Delaware because a going concern's liquidation value cannot be considered in appraisal.[136] However, asset value may be given an appropriate weight in limited circumstances. For example, a real estate company was valued primarily on its asset value in *Ng v. Heng Sang Realty Corp.*[137]
- *Excess earnings method*. The excess earnings method has rarely been employed in fair value cases. In *Balsamides*, however, the excess earnings method was used by the plaintiff's expert, who stated that the defendants would not provide the information needed to employ any other method.[138] The excess earnings method has not been addressed in Delaware.

---

[132] *Kleinwort Benson Limited*, 1995 Del. Ch. LEXIS 75 (June 15, 1995), at *28.

[133] *Grimes v. Vitalink Communications Corp.*, 1997 Del. Ch. LEXIS 124 (Aug. 26, 1997), at *3.

[134] *Gholl v. eMachines, Inc.*, 2004 Del. Ch. LEXIS 171 (July 7, 2004), at *20.

[135] When guideline transactions are utilized, adjustments are necessary to eliminate the effect of impermissible premiums.

[136] *Paskill Corp. v. Alcoma Corp.*, 747 A.2d 549 (Del. 2000).

[137] *Ng v. Heng Sang Realty Corp.*, 2004 Del. Ch. LEXIS 69 (Apr. 22, 2004).

[138] *Balsamides*, 734 A.2d 721, 730.

on the system during the valuation period. If the shares are listed . . . . but no transactions are reported during the valuation period or if the shares are [not] listed . . . and if at least 3 members of [FINRA] are market makers for the securities, the highest closing bid per share . . . during the valuation period. If no report or quote is available [or in] the case of property other than cash or shares, the fair market value of the property on the date in question as determined in good faith by the board of directors of the corporation.

a. Emphasis added by authors.

- *Rules of thumb.* Rules of thumb are seldom accepted by courts as a valuation method. There are rare exceptions: For example, in a Delaware case, the court accepted value per recoverable ton of coal reserves as a valuation method;[139] a Louisiana court valued an alarm company at a multiple of its monthly revenues.[140]

It is common for courts to consider more than one method. In the U.S. District Court's *Steiner* decision (applying Nevada law),[141] the court weighted various methods in order to find a fair value of the stock. First, it looked to find enterprise value, weighting a DCF valuation 30% and what it called a mergers-and-acquisitions method 70%. To find market value, the guideline company method was considered. Then enterprise value and market value were weighted 75% and 25%, respectively.

The Delaware Court of Chancery has explicitly used weighting in some cases as well. For example, the court in *Andaloro* weighted DCF at 75% and comparable companies at 25%.[142] In *U.S. Cellular*, the weighting was 70% DCF, 30% comparable acquisitions.[143] In *Dobler*, the court gave a 30% weight to DCF, 5% to comparable companies, and 65% to comparable acquisitions.[144]

Courts tend to prefer analyses that use more than one valuation approach. A valuation supported by several independent indicia of value is considered more reliable than one by an expert who "does not even attempt to perform reasonableness checks upon his valuation."[145] In *Hanover Direct*, the court criticized an expert who used only DCF and stated, "If a discounted cash flow analysis reveals a valuation similar to a comparable companies or comparable transactions analysis, I have more confidence that both analyses are accurately valuing a company."[146]

---

139 *Neal v. Alabama By-Products Corp.*, 1990 Del. Ch. LEXIS 127 (Aug. 1, 1990), at *36, *aff'd, Alabama By-Products Corp. v. Neal*, 588 A.2d 255 (Del. 1991).

140 *Yuspeh v. Klein*, 840. So.2d 41, 53 (La. App. 2003).

141 *Steiner Corp. v. Benninghoff*, 5 F. Supp. 2d 1117 (D. Nev. 1998).

142 *Andaloro v. PFPC Worldwide, Inc.*, 2005 Del. Ch. LEXIS 125 (Aug. 19, 2005), at *78.

143 *In re U. S. Cellular Oper. Co.*, 2005 Del. Ch. LEXIS 1 (Jan. 6, 2005), at *77.

144 *Dobler v. Montgomery Cellular Holding Co.*, 2004 Del. Ch. LEXIS 139 (Oct. 4, 2004), at *73; *aff'd in part, rev'd in part on other grounds, Montgomery Cellular Holding Co. v. Dobler*, 880 A.2d 206 (Del. 2005).

145 *Cede & Co. v. Technicolor*, 2003 Del. Ch. LEXIS 146 (Del. Ch. Dec. 31, 2003), at *13–14.

146 *In re Hanover Direct, Inc. Shareholders Litig.*, 2010 Del. Ch. LEXIS 201 (Sept. 24, 2020), at *6.

Courts have often used the guideline company method when DCF could not be utilized because of the unavailability of adequate projections. In *Borruso*, the court was limited to using a multiple of comparable companies' revenues, as there was insufficient information to adequately apply any other multiple or method.[147] In *Doft*, the court rejected both experts' DCF analyses because the projections were unreliable[148] and relied on the EBITDA multiples and P/E ratios of comparable companies.[149] The U.S. District Court, applying Delaware law in *Connector Service*, noted that a multiple of EBITDA was a better method than DCF because the EBITDA multiple was based on the multiples used by the subject company itself in two prior acquisitions.[150]

The MBCA excludes "any appreciation or depreciation in anticipation of the corporate action."[151] Delaware prescribes that fair value excludes "any element of value arising from the accomplishment or expectation of the merger or consolidation."[152] This requires valuing the company as if the corporate action had not taken place.

## FAIR VALUE IN DELAWARE

### Delaware Fair Value Standards

Fair value for both appraisal and entire fairness in Delaware is a pro rata portion of the value of the company as a going concern. The Delaware Supreme Court developed the standards for valuations in appraisal and entire fairness cases in four seminal cases: *Tri-Continental* (1950),[153] *Sterling v. Mayflower* (1952),[154] *Weinberger* (1983),[155] and *Cavalier Oil Corp. v. Harnett* (1989).[156]

---

147 *Borruso v. Communications Telesystems Intl.*, 753 A.2d 451, 455 (Del. Ch. 1999).

148 *Doft & Co. v. Travelocity.com, Inc.*, 2004 Del. Ch. LEXIS 75 (May 21, 2004), at *21.

149 *Id.*, at *44.

150 *Connector Service Corp.*, 1998 U.S. Dist. LEXIS 18864, at *4–7.

151 Some statutes add the phrase "unless exclusion would be inequitable."

152 8 Del. C. § 262(h).

153 See discussion of *Tri-Continental* in **"Fair Value as Defined by Various Authorities and Statutes"** above.

154 *Sterling v. Mayflower Hotel Corp.*, 93 A.2d 107 (Del. 1952).

155 See discussion of *Weinberger* in **"Customary and Current Valuation Techniques"**.

156 *Cavalier Oil Corp. v. Harnett*, 564 A.2d 1137 (Del. 1989) ("*Cavalier* "). See discussion of *Cavalier* in **"Fair Value Is Proportionate Share of Equity Value"** ahead.

> it incorporates elements of value—associated with acquisitions of control by third parties—that do not belong to the acquired enterprise or to shares of stock in that enterprise.[225]

Thus, in a majority of states, fair value in an appraisal now excludes any discount for lack of marketability or minority interest and any premium for control. Delaware explicitly took this position in *Cavalier*, and most states now concur.

## Levels of Value

Levels of value have been presented and explained by two leading valuation authorities in recent editions of their books: Shannon Pratt's *Valuing a Business*[226] and Christopher Mercer's *Business Valuation: An Integrated Theory*.[227] Pratt's levels-of-value chart shows five levels of value for publicly traded companies: synergistic (strategic) value, value of control shares, market value of freely traded minority shares, value of restricted stock, and value of nonmarketable shares.[228] Mercer describes the levels of value as *strategic control value*, *financial control value*, *marketable minority value*, and *nonmarketable minority value*.[229]

Discounts and premiums should also be viewed in light of the type of valuation methodology used and the resultant level of value arrived at based on that method. If indeed shareholder-level discounts (or premiums) are applicable, they should be applied after the valuation of the corporation itself.[230]

The levels of value are described as follows:

- *Synergistic value or strategic control value*—This is the highest value that would be paid for control shares by a buyer who expects to benefit from synergies.

---

[225] *Id.*, at 1038.

[226] Shannon P. Pratt, *Valuing a Business: The Analysis and Appraisal of Closely Held Companies*, 5th ed. (New York: McGraw Hill, 2008), at 384.

[227] Z. Christopher Mercer and Travis W. Harms, *Business Valuation: An Integrated Theory*, 2nd ed. (Hoboken, NJ: John Wiley & Sons, 2007).

[228] Pratt, *Valuing a Business*, 5th ed., at 384. The restricted stock level (which is not shown separately by Mercer) is for shares that are not currently marketable but will become marketable with the passage of time.

[229] Mercer and Harms, at 71.

[230] David Laro and Shannon P. Pratt, *Business Valuation and Taxes: Procedure, Law and Perspective* (Hoboken, NJ: John Wiley & Sons, 2005), at 266.

discounts for lack of control and lack of marketability would commonly be considered. The minority shares would have less value because buyers normally consider liquidity and the lack of control before purchasing minority shares. The argument for the use of fair market value is that if minority shareholders were to sell in the open market, they would receive a discounted price for their shares and that, in fact, these shareholders were aware of the minority status of their shares when they initially acquired them. The advocates of discounts assert that the failing to consider marketability and minority discounts unfairly enriches minority shareholders.

Probably the most popular argument *against* discounts for minority shareholders involves the original purpose of appraisal, which is to compensate minority shareholders for what was taken from them. If the appraisal statutes were created to protect minority shareholders from controlling and/or opportunistic shareholders, a minority discount would be contrary to logic, as the majority shareholders would obviously benefit from a reduction in the amount they would have to pay the minority after a squeeze-out.

With respect to marketability discounts, the argument against applying a discount for lack of marketability is that the judicial proceeding itself creates a market for the shares, and therefore no marketability discount is applicable. If the minority shareholders were to lose a pro rata portion of the corporation's value because they were forced out, penalizing the minority would reward rather than deter the controller. Indeed, controllers would be encouraged to engage in freeze-outs if by doing so, they could buy out the minority at a diminished price and thereby receive a premium for mistreating the minority.

On the other hand, adding control premiums to valuations of minority shares would enrich the minority at the expense of the majority. As Hamermesh and Wachter explain:

> Control value does not exist in a corporation owned by a fluid, disaggregated mass of shareholders. Rather, it is created by the aggregation of shares. Such aggregation of shares entails a reduction in agency costs, resulting in the creation of ***value that fairly belongs to the entity aggregating the shares*** [emphasis added].[224]
>
> Excluding value associated with control from the measurement of fair value does not impose a "minority discount"; it simply denies shareholders value that does not inhere in the firm in which they are invested. Thus, third-party sale value is an inappropriate standard for determining the fair value of dissenting shares because

[224] Hamermesh and Wachter, "Rationalizing Appraisal Standards," at 1023–1024.

d as of the day prior the
here is an active market
will be no more than the
be adjusted to reflect any
posal.[220] In the landmark
ceded that shareholders
areholders who accepted

uce a fair cash value
om that received by
corporate change is
market price of the

her state. One commen-
senting public company

praisal remedy use-
d corporations, and
ontext in the future.
variably exceed the
nent of the merger;
nt, and the apprais-
mpotent by judicial

Court has held that
available to minor-
s of a merger price.
(Ohio 1990); *Arm-*
*edy in Ohio is thus*
n effect, as long as
over the prevailing
y shareholders and

of the Statutory Appraisal
g-Private Merger Transac-

(Ohio 1987).
(Ohio App. 1990).



appropriate to itself any value not accurately reflected in the market price.[222]

Moreover, Ohio's fair cash value standard negatively impacts shareholders of private companies because it allows discounts that would not be permitted in calculating fair value. Using the willing buyer–willing seller approach, Ohio has concluded that minority and marketability discounts are appropriate. In an oppression case, the Ohio Court of Appeals concluded:

> The cases that appellant cites in support of his public policy argument [opposing discounts] are distinguishable because they all are from foreign jurisdictions where statutory law provides that a dissenting shareholder is entitled to the "fair value" of his or her shares. The concept of "fair value" is far different from the "fair cash value" concept.[223]

## FAIR VALUE NORMALLY EXCLUDES DISCOUNTS AND PREMIUMS

### Most States Now Reject Minority and Marketability Discounts

An issue in many fair value cases is whether discounts and/or premiums are applicable. If applicable, the issue becomes the magnitude of such discounts and/or premiums. The primary issue is shareholder-level discounts. The debate for the courts is whether minority shares should be valued at a pro rata portion of enterprise or by valuing the shares themselves based on their minority status. The debate is important because the use of discounts or their nonuse can result in the unfair enrichment of one of the parties.

For *fair* value, the issue centers on the definition of what the minority shareholders had prior to the valuation date and what they have lost because of the transaction. When the standard of value focuses on what was lost (i.e., a pro rata share of enterprise value), discounts would be detrimental to the minority shareholders.

If, instead, the standard of value becomes what the investor could reasonably realize in the market for a minority position (*fair market value*), then

[222] Wertheimer, "Shareholders' Appraisal Remedy," at 656, n. 207.

[223] *English v. Artromick Intl., Inc.*, 2000 Ohio App. LEXIS 3580 (Aug. 10, 2000), at *14.