1                    Michael Dardashtian
2    Q.     Do you know who programmed the
3    front-end?
4    A.     I don't remember.  I don't specifically
5    remember who actually programmed front-end.
6    Q.     Could it be David Gitman?
7    A.     Possibly.  I don't remember.
8    Q.     Do you know if David Gitman is a
9    front-end programmer?
10   A.     I don't believe that's his specialty,
11   but he could possess the ability to write
12   front-end code.
13   Q.     Do you have the ability to write
14   front-end code?
15   A.     I do.  Not as strong as the others, but,
16   you know, the current website that exists for
17   Cooper Square Ventures and Plumburs, I
18   programmed.
19   Q.     You came up with a program with back-end
20   as well?
21   A.     I have written back-end code.
22   Definitely not as strong as the other
23   programmers, but I -- I have written code.
24   Q.     You have written back-end code for
25   Channel Reply?

Michael Dardashtian

1

2    A.     You have already asked me that question

3    multiple times.

4    Q.     No, not the back-end code.

5    A.     You've asked if I've written code for

6    Channel Reply.

7    Q.     I am asking you:  Do you recall if you

8    wrote any of the back-end code?

9    A.     1 don't recall if I have written

10   specific code for Channel Reply.

11   Q.     Let's discuss Alice Fritz.  When Alice

12   Fritz left CSV to go to BAP, was additional

13   compensation given to her?

14   A.     By?

15          MR. OSTRER:  Objection to form.

16   A.     Yeah.  Can you ask --

17   Q.     By CSV, as a percentage of the sales

18   price.

19   A.     No.  The entire sale is sitting in an

20   escrow account.

21   Q.     Why is that sitting in an escrow

22   account?

23   A.     Because of the lawsuit, I believe.  I

24   would have to -- I don't remember specifically

25   if the requirement of the lawsuit was to put

1                    Michael Dardashtian

2      all the monies in escrow, but that's where all

3      the monies sit, in an attorney escrow account.

4      Cooper Square --

5      Q.      You would agree that CSV has an

6      obligation to Alice Fritz?

7      A.      No, I wouldn't -- I wouldn't agree to

8      that.

9      Q.      Was there an understanding that Ms.

10     Fritz would receive some compensation?

11     A.      It was discussed.

12     Q.      Was it agreed to?

13     A.      No, never formally agreed to.

14     Q.      When discussions like this occur, you

15     offered it to her and she refused or it was

16     never offered to her?

17     A.      When you say you, are you talking about

18     Cooper Square Ventures or --

19     Q.      Yes, CSV.

20     A.      I don't recall if it was offered to her

21     specifically or if it was discussed.  I -- I

22     don't recall.  Yeah.  If you have a document, I

23     could look at it.

24     Q.      Does Alice Fritz still perform any

25     services for CSV?

1                    Michael Dardashtian

2    A.      No.

3    Q.      You do not hire her as a consultant to

4    do programming?

5    A.      No.  She works for -- to my knowledge,

6    she still works at BAP.

7    Q.      At the time when NDAP was sold to BAP,

8    were there any specific employees that were,

9    prior to the sales, working exclusively for

10   NDAP?

11                    MR. OSTRER:  Object to form.

12   A.      I don't recall which employees were

13   working.  It's hard to say.  It was a long time

14   ago.  I would have to look at my records.

15   Q.      One thing I am trying to understand is,

16   if NDAP was sold to BAP, were there any

17   reshuffling of employees that CSV had to

18   make --

19   A.      I don't remember.

20   Q.      -- to accommodate --

21   A.      Yeah --

22   Q.      -- to accommodate --

23   A.      -- yeah.  I know the question.  I don't

24   remember specifically.

25   Q.      Do you recall if any of those employees

```
1                   Michael Dardashtian
2      were transferred to Channel Reply?
3      A.     I don't -- I don't remember
4      specifically.
5      Q.     Then likewise, you could not say
6      specifically whether any of those people were
7      transferred to Plumburs or any other businesses
8      being operated by CSV at that time, correct?
9      A.     I don't remember who was -- who was put
10     where, who was let go, who was -- I --
11     honestly, it was a while ago, and I'd have to
12     check all my records and look and see who was.
13     Q.     With respect to Channel Reply, you were
14     involved in the day-to-day business of Channel
15     Reply?
16     A.     Yes.
17     Q.     Whose idea was Channel Reply in the
18     first place?
19     A.     It was both David and I's idea.
20     Q.     You guys sat down and had a
21     conversation?
22     A.     There was a need of the company.
23     Q.     Somebody had to have put it out in terms
24     of the first time, right?
25     A.     Well, we used -- Zendesk was our
```

1           Michael Dardashtian

2    customer service solution at the time for Car

3    Part Kings on our website, so Zendesk is a help

4    desk software that websites used for customer

5    service.  We also did customer service with --

6    literally, our customer service agents would

7    have three screens, an eBay screen, an Amazon

8    screen, and their Zendesk screen so that they

9    can handle customer service in three different

10   places.

11           I don't -- I don't remember specifically

12   if it was a customer service agent who said,

13   hey, can we have everything in one place or if

14   it was David or myself.  We said, hey, we

15   should have everything in one place; but as a

16   group, we said we should try to put everything

17   in one place.

18   Q.     For how long were you having

19   conversations with David Gitman before you guys

20   decided to go ahead of developing Channel

21   Reply?

22   A.     I don't recall specifically.

23   Q.     Was it months?  Was it the first

24   meeting?

25   A.     I honestly don't remember.  It was a

1              Michael Dardashtian

2  long time ago.  Yeah, I don't know.

3  Q.     Do you know how much CSV invested in

4  developing Channel Reply?

5  A.     I don't.  I don't.

6  Q.     Was it significant resources?

7  A.     I'd have to check our books.  I don't

8  know.

9  Q.     Did eBay suspend the account in 2017 for

10  Channel Reply?

11  A.     I don't recall.  I don't believe so.

12  Channel Reply's eBay account is still

13  functioning today, so no.  I don't believe so.

14  And if it was --

15  Q.     Do you know -- go ahead.  I am sorry.

16  A.     I said if -- if it did, I -- I don't

17  recall specifically.  But if they did, I'm

18  assuming it was a minor suspension since we

19  have our account operating today.

20  Q.     Do you know if Channel Reply owns any

21  trademarks?

22  A.     I believe -- yeah.  I -- honestly, I

23  don't -- I don't recall specifically.  I think

24  we own the Channel Reply trademark, but I --

25  I'm not one hundred percent sure.

1         Michael Dardashtian
2         MR. GUAGLARDI:  Sang, I
3    apologize.  As far as clarification,
4    what do you mean by trademarks?  You
5    mean registered trademarks with the
6    federal patent trademark?  Do you
7    mean --
8         MR. SIM:  I am specifically
9    asking about registered federal
10   trademarks.
11        MR. GUAGLARDI:  I would just
12   appreciate it if you could make a
13   distinction --
14        MR. SIM:  Sure.
15        MR. GUAGLARDI:  -- of federal
16   and a registered because there are state
17   law, there are common law trademarks,
18   and we do not want the record to be
19   incomplete.
20        MR. SIM:  Sure.
21        THE WITNESS:  I --
22        MR. SIM:  Just for the record, I
23   am asking about federal registered
24   trademarks.
25   A.   I don't recall if we -- if we

1              Michael Dardashtian

2   registered.  I'd have to check my records.

3   Q.     Was there any loss of income to Channel

4   Reply when you started working for Yotpo?

5   A.     No.

6   Q.     Income remained the same?

7   A.     It increased.

8   Q.     As far as Channel Reply is concerned, is

9   that being held under a separate entity?

10  A.     Channel Reply is held under Cooper

11  Square Ventures.

12  Q.     Channel Supply itself does not have a

13  separate, related entity, correct?

14  A.     Well, we formed Channel Reply LLC, but

15  there's no operating agreement to that entity

16  because David refused to sign it.

17  Q.     As far as Channel Reply is concerned, it

18  is your position that CSV owns a hundred

19  percent of that?

20  A.     Yes.

21  Q.     Were there any discussions that the

22  Channel Reply business would be placed or

23  transferred into an outside entity?

24  A.     That's what -- yeah.  There was a

25  discussion about it, which is why we formed

1                    Michael Dardashtian

2    Channel Reply LLC.  But again, because David

3    refused to sign the operating agreement and

4    form a separate entity and create a bank

5    account, we never -- we never memorialized.

6    Q.     Do you know the reason why David refused

7    to sign the operating agreement?

8    A.     He never indicated to me any specific

9    reason.

10   Q.     He did not indicate to you that you guys

11   were having separate discussions regarding

12   ownership percentages for Channel Reply?

13   A.     No.

14   Q.     As part of this transaction that the

15   programmers, Mr. Bagaiev, Glukharev and Ms.

16   Alice Fritz would own a percentage of this

17   entity?

18   A.     No.

19   Q.     There were never any of those

20   discussions?

21   A.     We talked, as I mentioned before, about

22   possibly giving percentage of ownership to Mr.

23   Bagaiev and Glukharev in Channel Reply, never

24   Alice Fritz.  And those discussions never

25   impeded us creating Channel Reply.  It actually

```
 1                   Michael Dardashtian
 2    was the opposite.  Because we never created it,
 3    we never even talked further about and
 4    memorialized the equity for Mr. Bagaiev and
 5    Glukharev.
 6    Q.     There were never any discussions that
 7    CSV would only take a fifty percent interest in
 8    Channel Reply LLC?
 9    A.     No.  And honestly, David's made that
10    claim, but I'd love to see documentation that
11    shows that.  If you have it, please, show it to
12    me.
13    Q.     With respect to Channel Reply's business
14    today, you indicated that there was a
15    significant growth in Channel Reply's business?
16    A.     Yes.
17    Q.     This is a viable, continuing entity?
18    A.     It is and --
19               MR. OSTRER:  Objection.
20               THE WITNESS:  I'm sorry.  What
21          was that?
22               MR. OSTRER:  You can answer.  I
23          was just putting my objection on the
24          record.
25               THE WITNESS:  Got it.  Got it.
```

1                    Michael Dardashtian

2          Sorry.

3    A.     It is a -- it is, you know, a profitable

4    entity.

5    Q.     Were there any attempts to sell Channel

6    Reply?

7    A.     Not formally.  There was a inquiry that

8    Mr. Gitman had brought to the table from a

9    possible third party, but nothing ever

10   memorialized or formalized.

11   Q.     When did Mr. Gitman bring that party?

12   A.     I don't remember specifically.

13   Q.     Was it before the lawsuit or after the

14   lawsuit?

15   A.     During the lawsuit.

16   Q.     During?

17   A.     Yes.

18   Q.     Did you pursue that transaction at all?

19   A.     We attempted to.  The -- the gentleman

20   that Mr. Gitman provided wouldn't provide us

21   with any financial information or proof that he

22   could actually purchase the company.

23   Q.     Who was this gentleman that Mr. Gitman

24   introduced?

25   A.     John Jessup.

                    Michael Dardashtian

1

2   Q.      Did you know John Jessup before this?

3   A.      Yeah.  We had hired him for a project

4   for Car Part Kings in which he never completed,

5   charged us and demanded our money in return,

6   which he returned a check to me, and I hung it

7   on the wall.

8   Q.      When was this?

9   A.      I don't recall specifically the date.

10  Q.      Why did you hang that check on the wall?

11  A.      Because I felt he was a shyster and he

12  was trying to steal money from us, so I was

13  pretty proud that I got our money back from him

14  that we paid him to do a project that he never

15  completed.

16  Q.      When Mr. Gitman brought Mr. Jessup to

17  this transaction, you were already suspicious

18  of Mr. Jessup at this time, correct?

19  A.      Well, since he could not perform a -- a

20  task in which he claimed he could, I was

21  skeptical that he would be able to purchase a

22  company, which is why we asked him for proof of

23  funds that he was a real buyer, that he was

24  interested in which he never responded.

25              MR. OSTRER:  Mike, there was a

1              Michael Dardashtian

2         connection issue.  You may have to

3         repeat your answer.

4              MR. SIM:  Stella, did you get

5         that?

6              Can you tell me what the

7         response was?

8         (The requested portion of the record

9    was read by the reporter.)

10   Q.    Before asking for the proof of funds,

11   did you have an understanding of what the

12   transaction would be with Mr. Jessup?

13   A.    No.

14   Q.    David Gitman never had that conversation

15   with you?

16   A.    With me?  No.  We haven't spoken since

17   the lawsuit directly.

18   Q.    How did you know that Mr. Jessup came to

19   the transaction through Mr. Gitman?

20   A.    I believe Mr. Gitman's attorneys at the

21   time then informed my attorneys that there was

22   an interest.

23   Q.    That transaction, you asked for proof of

24   funds, and it never went beyond that?

25   A.    Correct.  We asked if he was an

```
1                Michael Dardashtian
2   accredited buyer with proof of funds.  I
3   believe we asked for an NDA.  I don't remember
4   if he ever signed it or not, so he just didn't
5   seem like a real buyer.
6   Q.      Were there any other interests for any
7   other parties to purchase Channel Reply?
8   A.      No, not to my knowledge.
9   Q.      Are there any specific, dedicated
10  employees working on Channel Reply today?
11              MR. OSTRER:   Object to form.
12  A.      There are people working for Channel
13  Reply, yes.
14  Q.      Working exclusively for Channel Reply?
15  A.      To my knowledge, exclusively, but they
16  could be working on other projects as well.
17  Q.      Would that include Mr. Bagaiev?
18  A.      Yes, Mr. Konstantyn Bagaiev would be
19  included in that.
20  Q.      How about Mr. Glukharev?
21  A.      Yes.
22  Q.      By the way, where is Mr. Bagaiev working
23  from?
24  A.      He lives in the Ukraine.
25  Q.      He is located right now in the Ukraine?
```

1                    Michael Dardashtian

2    A.      Yes.

3    Q.      He is working for Channel Reply or CSV

4    from Ukraine?

5    A.      He works for, yes, Cooper Square

6    Ventures from the Ukraine.

7    Q.      How is he compensated?

8    A.      He is paid by the hour.

9    Q.      As far as salary is concerned or payment

10   of payroll, you, CSV, would withhold foreign

11   withholding taxes before sending payment to Mr.

12   Bagaiev?

13                    MR. OSTRER:   Object to form.

14   A.      No.   He has a signed a W-8BEN form to

15   which I am informed covers us from having to

16   pay his taxes.   We pay him directly, and he's

17   responsible for paying taxes in his own

18   country.

19   Q.      Same thing for Mr. Glukharev as well, he

20   is working from Ukraine?

21   A.      I believe he's in the Ukraine, yes.

22   Q.      They both work remotely?

23   A.      Yes.

24   Q.      You are not a hundred percent sure

25   whether they work exclusively for Channel

1               Michael Dardashtian

2    Reply?

3    A.    If they have outside projects, that

4    is -- yeah.  It could be.  I wouldn't know

5    about them.  They don't share --

6    Q.    Other than Channel Reply, what other

7    businesses is CSV operating at this current

8    time?

9    A.    No other businesses.

10   Q.    The only stream of income is coming from

11   Channel Reply?

12   A.    Right.

13   Q.    Because NDAP was sold?

14   A.    Yes.

15   Q.    Plumburs ceased operating?

16   A.    Correct.

17   Q.    Are there any other businesses being

18   contemplated for CSV?

19   A.    Not at this time.

20   Q.    You continue to be employed by Yotpo?

21   A.    Yes.

22   Q.    You still work full time for CSV?

23   A.    I devote a good amount of time to CSV

24   and Channel Reply to maintain and grow the

25   company.

1                    Michael Dardashtian

2    Q.      How much is that significant amount of

3    time on a weekly basis?

4    A.      It really depends on the week and the

5    amount of work that is required by the team.

6    Since I manage the entire team, I discuss

7    projects with them on a daily basis.  The --

8    the continuity of the projects, the progress of

9    the projects, the -- you know, marketing -- the

10   marketings' activities that we're going to be

11   doing for the week, the customer service issues

12   that we're having, the -- the follow-up

13   campaigns that we're running.

14          I manage everybody and everything.  I am

15   the one that's running the company as the

16   managing member, so, you know, those

17   responsibilities fall on me.

18   Q.      In terms of managing CSV regarding

19   Channel Reply, does your wife assist you in

20   this?

21   A.      No.

22   Q.      Does your wife participate in any

23   function for CSV or its related entities?

24   A.      Does she today?  No.

25   Q.      Did she ever?

1                    Michael Dardashtian

2    A.     I believe she helped assist write some

3    agreements for -- legal agreements for the

4    company.

5    Q.     When was that?

6    A.     I don't remember specific dates.

7    Q.     Do you know for what agreements?

8    A.     I don't recall specifically.  We could

9    look them up.

10   Q.     Does that mean --

11   A.     She helped David personally as well with

12   some legal issues.

13   Q.     Was this at the time of formation of the

14   entity, CSV?

15   A.     No.  We had an outside counsel for that,

16   and we still maintain that outside counsel.

17   Q.     Somewhere before the lawsuit your wife

18   assisted CSV in writing some agreements?

19   A.     Correct.

20   Q.     Did she participate in the NDAP sale?

21   A.     No.

22   Q.     Did she participate in the joint venture

23   with NDA Holdings?

24   A.     No.

25   Q.     How about the sale of Parts Authority?

1                    Michael Dardashtian

2    A.      No.

3    Q.      How about modification of the repayment

4    to NDA Holdings to Parts Authority?

5    A.      No.  All those -- all of these are

6    handled by our company attorney, Jeffrey

7    Rothman.

8    Q.      With respect to the business

9    transactions between you and David Gitman, from

10   the time of formation until the time of the

11   lawsuit, were there any instances in which

12   David Gitman signed your name to documents or

13   in turn, you signed his name to any documents?

14   A.      We had an understanding that if there

15   was a document that needed to be signed, we

16   would get the other's permission ahead of time.

17   If we couldn't be in front of a computer or

18   there was another issue.  And once we had that

19   permission, there could be signature at which

20   time we would upload the document to our shared

21   Google Drive so that both of us can review it

22   together.

23   Q.      Has there been occasions in which David

24   Gitman signed your signature to agreements or

25   documents?

1                   Michael Dardashtian

2    A.      I do not know.

3    Q.      Are there instances --

4    A.      I don't remember, I should say.  There

5    definitely could have been.

6    Q.      Were there any instances where you

7    signed David Gitman's name to any agreements or

8    documents?

9    A.      I could recall one, specifically.

10   Q.      What was that?

11   A.      There was an agreement that Mr. Bagaiev

12   had asked us to execute for his bank to get

13   bank authorization on a payment.

14   Q.      You signed David Gitman's name?

15   A.       Yeah.  David had sent me the request

16   from Mr. Bagaiev that Mr. Bagaiev made the

17   request of David, and David, for whatever

18   reason, wasn't in front of his computer, asked

19   me to execute the agreement and upload it to

20   our shared drive so that we could review it

21   together afterwards.

22   Q.      You reviewed it afterwards?

23   A.      Well, it was uploaded to the shared

24   drive, so David had full access to view it or

25   review it, yeah.

1          Michael Dardashtian

2     Q.     Were there any other instances in which

3     you signed David Gitman's name?

4     A.     Not to my knowledge, no.

5     Q.     Did you sign David Gitman's name to any

6     of the NDAP transactions?

7     A.     I'm sorry.  You broke up when you were

8     saying that.  Can you repeat the question?

9     Q.     I asked were there any instances where

10    you signed David Gitman's name to any of the

11    NDAP transactions?

12    A.     No.

13    Q.     How about to any of the transactions

14    regarding Parts King, Parts Authority?

15    A.     I'm sorry.  Can you repeat the question?

16    Q.     Sure.  Did you sign David Gitman's name

17    to any documents related to the transaction

18    with Parts Authority?

19    A.     No.

20    Q.     How about signing David Gitman's name to

21    any transactions that related to Channel Reply?

22    A.     I don't remember.  I don't recall

23    specifically, but I don't believe so.

24    Q.     How about for Plumburs?

25    A.     Similar, I don't believe so.

1              Michael Dardashtian

2    Q.     Let's talk about Mr. Falk.  Were there

3    any issues regarding monies being owed to Mr.

4    Falk?

5    A.     Yes.  So Mr. Falk initially signed an

6    agreement with us as our broker and asked for

7    a -- I don't remember the specific amount, over

8    a hundred thousand dollars, in which we

9    verbally and -- at a later date, we verbally

10   and in writing confirmed that he was willing to

11   take less money because the transaction would

12   be less than we initially thought.

13          And there was a disagreement about this

14   between David and I in which David wanted to

15   pay him more money, and I wanted to pay him

16   less money.  I didn't understand why David

17   wanted to pay him more money considering the

18   money was coming from Cooper Square Venture,

19   and it would be against David's best interest

20   to pay Jeremy more money.

21   Q.     David Gitman was pressing you to pay Mr.

22   Falk more money?

23   A.     Yes.

24   Q.     Did you ask David Gitman why?

25   A.     I did, and I never got a response.

1                   Michael Dardashtian

2   Q.      He never responded to you?

3   A.      No.  To that question, no.

4   Q.      What was Mr. Falk's position?

5   A.      So, as I stated, he was a broker for

6   Cooper Square Ventures.  We later find out that

7   he was in business with David Gitman behind my

8   back, so I didn't know that, that he was

9   working with David Gitman without disclosing

10  that to me or Cooper Square Ventures.

11  Q.      What business was he working with David?

12  A.      He was helping run an e-commerce

13  consulting company with David Gitman.

14  Q.      What was that company?  Was it doing

15  business under a different entity or something

16  else?

17  A.      I forget the name of the entity and the

18  specifics, but, you know, it was produced in

19  productions.

20  Q.      Is it one of the Defendants in this

21  action?

22  A.      I don't recall specifically.

23  Q.      How did you find out, anyway?

24  A.      I found out when David had locked me out

25  of all access to my email and our bank account

1                    Michael Dardashtian

2    and he depleted our bank account and

3    essentially stole all our money and tried to

4    steal the company.  The one thing that he

5    forgot to lock me out of was our Time Doctor

6    software, which I mentioned before was

7    monitoring our employees.

8              So when he was conversing with our

9    employees, their screens were taking -- the

10   software was taking snapshots of their screens.

11   So when I saw the snapshots of David and Jeremy

12   forming an entity together and running an

13   entity together, that's when I realized that he

14   and David -- David and Jeremy were,

15   essentially, in cahoots.

16   Q.     Was this the first time you realized

17   there was a problem with you and David Gitman

18   when he locked you out?

19   A.     Well, we were arguing before he locked

20   me out of everything.

21   Q.     Let's go back.  I am assuming that when

22   you first started the business, your

23   relationship with David Gitman was pleasant.

24   A.     Yes.

25   Q.     Did there come a time where that

1                    Michael Dardashtian
2      relationship changed?
3      A.     I didn't believe so.  David was -- you
4      know, we were always friendly.  We were always
5      cordial, even when he left and went to Cue
6      Connect.  When I went to Yotpo, I discussed it
7      with him that I was leaving, and I got -- I
8      sought his advice.  I remember having a drink
9      with David and telling him that I was gonna go,
10     and he thought it was a great idea.  He gave me
11     his blessing to go, as I did with Cue Connect.
12            So we were always on very good terms.  I
13     think -- in fact, like, a couple of weeks
14     before we started fighting, he was at my
15     daughter's birthday party with his daughter,
16     so -- in which I remember at the birthday
17     party, we actually discussed me joining Yotpo.
18     I think when the sale was actually happening,
19     David didn't believe that the sale was actually
20     gonna happen.
21            I remember we actually have a written
22     communication in which we provided in the
23     lawsuit in which he stated that we would never
24     sell the company, he didn't wanna be involved,
25     it was a waste of time his time, I've never

1                   Michael Dardashtian

2    sold anything in my life.  He was getting very

3    upset.

4           And then when he realized that we were

5    actually gonna sell the company, he demanded

6    that I gave him -- you know, essentially,

7    the -- eighty percent or more of the profits of

8    the sale.  We were fifty-fifty partners, so I,

9    obviously, refused that, and that's when things

10   escalated or de-escalate -- or escalated,

11   probably is the word, quickly.

12   Q.     When you talk about escalation, it all

13   started from the NDAP transaction?

14   A.     I mean, that was -- that was where I

15   felt things started going.  When there was an

16   actual transaction on the table, when we felt

17   that there could be something happening, that's

18   when I felt that David's attitude towards me

19   had changed.

20   Q.     Do you know why David was asking for

21   eighty percent of that transaction?

22   A.     He felt that the -- you know, you'd have

23   to ask David.  I mean, it's -- my

24   interpretation of it is different than what

25   David would think, so you would have to ask

1                    Michael Dardashtian
2    him.
3    Q.      I am asking you regarding your
4    understanding.
5    A.      I believe that he thought that because
6    it was a technology and a technology sale, that
7    he deserved more of the income.
8    Q.      Why would a technology sale -- did he do
9    most of the technology?  Is that the issue?
10   A.      Well, you know, as we both did, he
11   helped manage the technologists who were
12   building the code, but in order to manage
13   technologists and hire technologists, you need
14   to run a business.  You need to be successful.
15   You need to do marketing.  You need to do, you
16   know, joint venture partnerships.  There needs
17   to be a business to run to hire technologists
18   in the first.
19           So, you know, if -- if Square was sold
20   today, the CTO of Square wouldn't be the only
21   one that received the funds.  The entire
22   company would receive the funds.  As part of
23   our operating agreement, we're fifty-fifty
24   partners.  We should both enjoy fifty-fifty
25   proceeds from the funds.

1           Michael Dardashtian

2    Q.    It is your understanding that a dispute

3    arose regarding who did what work for or built

4    value to that NDAP business?

5    A.    I believe he thought that he provided

6    more value than I did to the business.

7    Q.    Because he believed he added the

8    technology side of that business?

9    A.    He believed he provided more technology

10   value than I did.

11   Q.    Would you say that he added, he provided

12   more technology to that business than you did?

13   A.    Yeah.  There wouldn't have been a

14   business without me.

15   Q.    I am not talking about the business as a

16   whole, right?

17   A.    Well, I don't look --

18   Q.    I am talking about --

19   A.    -- I don't look at them as separate.

20   There's a business, and you run the business.

21   I mean, there wouldn't be technology in a

22   business without the business, so...

23   Q.    What part of the business do you think

24   that you did more than Mr. Gitman?

25   A.    I think we did equal amounts across the

1                    Michael Dardashtian

2    business.  We shared equal responsibilities.

3    Q.    On the administrative side of the

4    business, you shared equal responsibilities?

5    A.    Yes.

6    Q.    On the marketing side of the business,

7    you shared equal responsibilities?

8    A.    Yes.

9    Q.    You each worked equal amount of time?

10   A.    Yes.

11   Q.    On the technology side, you provided

12   equal amount of contributions to the

13   technology?

14   A.    I believe so.

15   Q.    That technology side we are talking

16   about would be the programming side?

17   A.    As I mentioned many times, technology is

18   just not about programming.  Programming is one

19   component to technology.  If you just program,

20   that's not going to give very much value.  So

21   there's many components to technology.  Just in

22   a single organization that's large, there could

23   be, you know, ten different silos within

24   technology for different functions.  So coding

25   is just one.

1              Michael Dardashtian

2   Q.     With respect to, let's say, NDAP,

3   because this is where the dispute started from,

4   right?  How many silos of technology do you

5   think there existed?

6   A.     Well, similar.  We had project

7   management, we had program management, we had

8   coding, we had design.  I mean, there was many

9   phases of technology at our company.

10  Q.     Out of those various components, what

11  areas did you take over?

12  A.     Well, we both managed and contributed to

13  all areas.

14  Q.     I am just trying to understand why there

15  was a dispute between you and David Gitman

16  regarding --

17  A.     You'd have to ask David.

18  Q.     -- the transfer of NDAP?

19  A.     I didn't -- yeah.  You'd have to ask

20  David that question.  I didn't feel that there

21  was a dispute.  He did.  I mean, he wanted more

22  money.  I actually offered him more money at a

23  given time just to end the dispute, and he

24  still --

25  Q.     How much money did you offer him

```
 1                    Michael Dardashtian
 2    additional?
 3    A.      I don't remember the specifics, but I
 4    felt it was pretty significant.
 5    Q.      For what reason did you offer it?
 6    A.      To end the dispute.
 7    Q.      Just because you did not like the
 8    dispute?
 9    A.      I felt it was unproductive, and I
10    thought that eventually we could end up where
11    we are today in a lawsuit, and I didn't want
12    that to happen.
13    Q.      Did the same dispute occur regarding
14    Channel Reply as well?
15    A.      No.
16    Q.      Because it was never for sale; it was
17    never sold?
18    A.      Correct.
19    Q.      A dispute arose regarding the ownership
20    of the entity Channel Reply LLC?
21    A.      No, never.
22    Q.      No dispute ever arose regarding --
23    A.      No.
24    Q.      -- allocation or ownership or rights
25    regarding Channel Reply's business?
```

1                    Michael Dardashtian

2    A.      No.

3    Q.      At that point in time when you formed

4    Channel Reply LLC, would it be safe to say that

5    Channel Reply was profitable at this time?

6    A.      I don't remember.

7    Q.      Was there a period of time that Channel

8    Reply sustained losses?

9    A.      I don't remember.  I would have to check

10   the books.

11   Q.      Regarding the Channel Reply business,

12   that was -- let me withdraw that, and let me

13   ask you a different way.

14          With respect to NDAP, NDAP was held by a

15   separate entity, right?

16                MR. OSTRER:   Objection.

17   A.      NDAP was a separate entity.  NDAP was

18   NDAP LLC.

19   Q.      The owner of NDAP LLC was CSV, correct?

20   A.      After we purchased it, yes, correct.

21   Q.      After a point in time where you

22   purchased, where CSV controlled a hundred

23   percent of NDAP, did you file a consolidated

24   tax return for CSV, including NDAP --

25   A.      Yes.

1                    Michael Dardashtian

2    Q.      -- or did NDAP file separate partnership

3    returns?

4    A.      We filed a consolidated return.

5    Q.      That brought up all the financial

6    results for NDAP and all the related business

7    for CSV, correct?

8                    MR. OSTRER:   Object to form.

9    A.      Correct.

10   Q.      You had reciprocal K-1 distributions

11   each year?

12   A.      I'm sorry.   What do you mean by

13   reciprocal?

14   Q.      The tax returns created or gave out a

15   K-1 for each of its owners, correct?

16   A.      Yes, correct.

17   Q.      That means you received a K-1 from the

18   partnership and David Gitman received a K-1

19   from the partnership, correct?

20   A.      Yes, that's correct.

21   Q.      Each of these K-1s that you received,

22   were they identical to David Gitman?

23   A.      I would have to double-check the

24   returns.   I believe so, but I would have to

25   double-check.   I can't say for certain without

```
1              Michael Dardashtian
2   looking at the K-1s.
3   Q.    Was there a policy in place at CSV to
4   make adjustments at year-end regarding what
5   partners took what?
6   A.    No.
7   Q.    There were never any adjustments?
8   A.    No.
9   Q.    The health care benefits that you
10  received, those CSV, there was no allocations
11  of those benefits to your K-1 as opposed to
12  David's?
13  A.    No.  David had a --
14  Q.    There was no --
15  A.    -- David had specific benefits that I
16  didn't have, so we -- we had, as I mentioned, a
17  gentleman's agreement where we ran the business
18  together, and that would be it.
19  Q.    What other benefits did David get that
20  you did not have?
21  A.    I can't recall specifically what
22  benefits, but I know he -- he -- he partook in
23  a lot of travel on the company's expense that I
24  did not.
25  Q.    You say we partook --
```

1               Michael Dardashtian

2   A.      No, I said David.

3   Q.      -- or you said David?

4   A.      David had many business trips on the

5   company's expense that I did not.

6   Q.      Those were business trips?

7   A.      He claimed they were business trips, but

8   he had taken his wife on one of them, so I

9   don't believe you're allowed to take your wife

10  on a business trip and have the company pay for

11  it.

12  Q.      Did you say something to him when he

13  took his wife on a trip?

14  A.      No, I did not.

15  Q.      You did not object?  You did not ask him

16  why his wife was accompanying him on this trip?

17  A.      Nope.  He asked me and I said okay

18  because that was the type of relationship that

19  we had.  Similar to our health care where I

20  used it, he didn't object and that was it.

21  Q.      Just to go back regarding the health

22  care that you received.  The company made

23  direct payments to the health care provider or

24  the health care insurance company for your

25  health care?

```
 1              Michael Dardashtian
 2   A.    I -- I can't recall exactly how the
 3   payments were distributed.  I would have to
 4   check the books.
 5   Q.    Just to be clear, this was health care
 6   coverage through CSV coverage?
 7   A.    Again, I would have to check where --
 8   how -- where -- I believe so.  I would have to
 9   check specifically to verify.
10   Q.    This was not your wife's health care --
11   A.    No.
12   Q.    -- that CSV was making a payment for?
13   A.    This was my family health care.
14   Q.    That CSV was the insurance policyholder?
15   A.    I don't know.  It's a confusing
16   question.  I mean, maybe ask it a different
17   way.  But my understanding is Cooper Square
18   Ventures was offering health care insurance to
19   employees.  I partook in that insurance.
20   Q.    David Gitman opted out?
21   A.    He was receiving insurance benefits from
22   his wife's company, so he opted not to take
23   benefits.
24   Q.    Do you know if there is any
25   documentation of where he opted out to taking
```

1                    Michael Dardashtian

2    health care benefits?

3    A.     Not to my knowledge, but...

4    Q.     Who was responsible for managing the

5    health care policy?

6    A.     David and I.

7    Q.     David and you chose the health care

8    policies?

9    A.     Yes.

10   Q.     With respect to payment of company

11   credit cards, who was responsible for that?

12   A.     Both David and I.

13   Q.     Both of you looked at company credit

14   cards each month and wrote checks jointly?

15   A.     Both of us reviewed the company finances

16   and both of us had access to the checks and the

17   credit cards to use for the company's benefit.

18   Q.     When you took the employment with Yotpo,

19   was David employed elsewhere as well?

20   A.     I do not know.

21   Q.     Do you know if David was working full

22   time with CSV at this time when you left for

23   Yotpo?

24   A.     I do not know.

25   Q.     Did you ever ask him?

Michael Dardashtian

1

2    A.      Not specifically.

3    Q.      Because you indicated that you had a

4    conversation with David about going to work for

5    Yotpo, correct?

6    A.      Yes, I did.

7    Q.      David Gitman gave you his blessing,

8    correct?

9    A.      Yes.

10   Q.      When this conversation was going on,

11   were there any discussions about functions or

12   duties that David had, would have to increase

13   on behalf of CSV because of your employment

14   with Yotpo?

15   A.      No.  In fact, he was looking for a

16   full-time job in which I actually almost got

17   him one.  I had referred him to a company to be

18   a -- I forget the role.  And he applied for it

19   with his resume.  It's all documented.  You

20   guys have all the documents.  And he was so

21   thankful that I actually offered it that he

22   said that if I got him the job -- it was with

23   an e-commerce company called Adorama -- that if

24   -- if I got him the job, he was gonna use Yotpo

25   at that company as a thank you.

Michael Dardashtian

1

2    Q.     What do you mean use Yotpo as a thank

3    you to you?

4    A.     So he would purchase the software for

5    that company if he was employed at that company

6    as a thank you for getting him that job.

7    Q.     That company would become a customer of

8    Yotpo?

9    A.     Correct.

10   Q.     Would it be fair to say by the time when

11   you took employment at Yotpo that the functions

12   and duties of a manager lessened, for lack of

13   better words, than when you first started the

14   company?

15   A.     No.

16           MR. OSTRER:   Objection.

17   Q.     That it became more self-running --

18   A.     No.

19   Q.     -- based on the number of employees or

20   the work?

21   A.     No, I would disagree with that

22   statement.

23   Q.     Your duties never changed at CSV after

24   you took employment at Yotpo?

25   A.     Correct.  My duties have always remained

```
                     Michael Dardashtian
1
2    constant, except for when I had to pick up more
3    duties due to David being removed.
4    Q.     That is after being removed.  Prior to
5    being removed, did David work equally with you
6    at CSV?
7    A.     I didn't log David's hours, so I
8    couldn't say whether he worked an equal amount
9    as me.
10   Q.     Did you log hours?
11   A.     No, neither of us did.
12   Q.     There is no way for David to know how
13   many hours you worked?
14   A.     Correct.  And there's no way for me to
15   know how much David worked.  That's the way we
16   worked since forming the company.
17   Q.     You worked pretty much remotely at this
18   time?
19   A.     Yeah.  The whole company was remote.
20   Q.     Do you know since what year the company
21   was remote?
22   A.     I don't.
23   Q.     Let's talk about this agreement,
24   continue that discussion, this agreement with
25   David Gitman.
```

```
1              Michael Dardashtian
2              MR. OSTRER:  Is this an okay
3         time to take a quick few minutes or do
4         you --
5              MR. SIM:  Sure, sure.  That is
6         fine.
7          (At this time a pause was taken in the
8     proceeding.)
9              MR. SIM:  Can we have the last
10        few questions read back?
11         (The requested portion of the record
12    was read by the reporter.)
13    Q.    Mr. Dardashtian, let's talk about Yotpo.
14    When you started employment with Yotpo, did you
15    tell Yotpo to build specific features that were
16    present on Channel Reply?
17    A.    No.
18    Q.    Did you ever disclose customer
19    information with Channel Reply to Yotpo?
20    A.    I -- I discussed with some Channel Reply
21    customers the Yotpo platform because I thought
22    it could benefit their businesses.
23    Q.    You reached out to Channel Reply
24    customers in your role as an employee of Yotpo?
25    A.    No, as a Channel Reply executive.
```

Michael Dardashtian

1

2   Q.    As a Channel Reply executive, you

3   reached out to the customers of Channel Reply

4   to talk to them about features offered on

5   Yotpo?

6   A.    I thought that their business could

7   benefit from a solution like Yotpo.  It could

8   increase their business, which would benefit

9   Channel Reply.

10  Q.    As a result of that reaching out to

11  Channel Reply customers, did Yotpo acquire many

12  of the Channel Reply customers during your

13  first year at Yotpo?

14  A.    I don't believe so, no.

15  Q.    Do you believe that any customers

16  purchased the Yotpo platform?

17  A.    Not as a direct result of me personally.

18  If they did join the Yotpo platform, which

19  Yotpo has thousands of customers, they joined

20  at their own accord.

21  Q.    How many of the Channel Reply customers

22  did you reach out to on behalf of Yotpo?

23             MR. OSTRER:  Object to form.

24  A.    A very limited few.

25  Q.    You did not reach out to all your

1                    Michael Dardashtian

2     customers --

3     A.      No.

4     Q.      -- or a majority of customers?

5     A.      No.

6     Q.      Was there a specific reason why you

7     reached out to them, is it to introduce Yotpo

8     to them or some other reason?

9     A.      Probably previous conversations that

10    were had about needs of their companies and

11    what they were looking for.

12    Q.      As a result of you joining Yotpo, did

13    Yotpo introduce features that were similar to

14    Channel Reply?

15    A.      No.

16    Q.      Yotpo never introduced any features that

17    were similar to Channel Reply?

18                    MR. OSTRER:  Asked and answered.

19    A.      No, never did.

20    Q.      Just for clarification, Yotpo and

21    Channel Reply are not competitors?

22    A.      Not in any way --

23                    MR. OSTRER:  Object to form.

24    A.      -- not in any way, shape or form.

25    Q.      As you sit here today, do you know if

1              Michael Dardashtian

2    Yotpo acquired many of the Channel Reply

3    customers?

4              MR. OSTRER:  Asked and answered.

5              THE WITNESS:  Do you want me to

6         answer the question or...

7              MR. OSTRER:  Yes.

8    A.     If -- if they have acquired customers of

9    Channel Reply's or Channel Reply's acquired

10   customers of Yotpo, that is very normal

11   business practices since they're complementary

12   softwares.

13   Q.     You do not know?

14   A.     I don't.  I know that Yotpo and Channel

15   Reply share approximately fifty-five or more

16   customers together.

17   Q.     How many customers does Channel Reply

18   have?

19   A.     In the -- in the neighborhood of eight

20   hundred.

21   Q.     How many customers does Yotpo have?

22   A.     Thousands.

23   Q.     Let's talk about Mr. Bagaiev, because

24   there is a point in time Mr. Bagaiev left CSV,

25   but he came back, correct?

1                    Michael Dardashtian

2    A.      Yeah.   When David Gitman told him to

3    leave CSV.

4    Q.      Was Mr. Bagaiev fired by David Gitman?

5    A.      No.   He was encouraged to resign.

6    Q.      How was he encouraged to resign?

7    A.      He was under the impression, to my

8    knowledge, that -- that -- that -- I was not

9    operating the company fairly, so I was being

10   talked down to by Mr. Gitman to Mr. Bagaiev,

11   and he thought that if -- if he left the

12   company, along with Oleksii, that I would have

13   no -- I would have no option but to bring back

14   David so that they could come back on.

15   Q.      It is your understanding that if Mr.

16   Bagaiev and Oleksii left, you would have no

17   other option but to bring David Gitman back in?

18   A.      That's what David believed and --

19   Q.      Okay.

20   A.      Yeah.

21   Q.      Instead of bringing David back in, you

22   brought Konstantyn and Oleksii back in?

23                    MR. OSTRER:   Object to form.

24   A.      At first, I brought in a consultant

25   company.   After they saw that I was able to run

1               Michael Dardashtian

2      the company without them, they came back and

3      asked for their jobs back.

4      Q.      What consulting company did you use?

5      A.      Titan Company.

6      Q.      You hired them to take over the

7      functions of David Gitman, Konstantyn and

8      Oleksii?

9      A.      Correct.

10     Q.      What part of David's function did Titan

11     take over?

12     A.      Well, David had already been removed as

13     an -- and actually, I don't remember if David

14     had been removed at that time.  I believe so.

15     I -- I don't know specifically, to tell you the

16     truth, if he had been removed or not, but they

17     were in charge of maintaining the technology so

18     that business could run and we wouldn't default

19     on our customers.

20     Q.      Prior to David's removal, was David

21     involved in maintaining the program?

22     A.      In a limited capacity.

23     Q.      What do you mean by a limited capacity?

24     A.      There was times where he wouldn't answer

25     emails for, you know, a couple of days or

1              Michael Dardashtian

2    respond to a message for a couple of days.  But

3    when he ultimately answered, he helped.

4    Q.    Is that the definition of maintaining

5    the program is answering messages,

6    responding --

7    A.    No.

8    Q.    -- or something else?

9    A.    No.  He -- if -- if a developer had a

10   specific question where they thought David

11   could be helpful, they would ask it of David

12   and David could provide his advice.  That was,

13   you know, David -- David's contribution.  He

14   wasn't writing code.

15   Q.    Is that the function of maintaining the

16   program?

17   A.    It's one of the functions of maintaining

18   the program.

19   Q.    What are the other functions?

20   A.    It's -- you know, you have to review the

21   codebase.  You have to assist in QA.  You have

22   to assist in DevOps.  You have to assist in

23   maintenance of the code and releases in

24   security procedures.  There's a number of

25   functions.

                    Michael Dardashtian

1

2    Q.     Were there any of those functions that

3    David performed on behalf of Channel Reply?

4    A.     At times, he helped out with certain

5    things.

6    Q.     Do you know if he managed those items?

7    A.     Well, they're managed by a group of

8    people, not just one person.

9    Q.     Who are those group of people?

10   A.     The developers and the managers.

11   Q.     When you say developers, who are you

12   referring to as developers?

13   A.     We have a number of different

14   developers.

15   Q.     Can you name them?

16   A.     Konstantyn is a developer.  Oleksii is a

17   developer.  Sergey is a developer.  And then

18   we've had some consultant developers here and

19   there when we need them.

20   Q.     Would you consider a Alice Fritz a

21   developer?

22   A.     Well, she was a developer for Car Part

23   Kings.

24   Q.     She was a developer for CSV?

25              MR. OSTRER:  Asked and answered.

1                  Michael Dardashtian

2    A.     She was a developer for NDAP, I believe.

3    Q.     NDAP was owned by CSV, correct?

4    A.     Yes.

5    Q.     You indicated that Mr. Bagaiev contacted

6    you about getting rehired?

7    A.     Yes.

8    Q.     You did not contact him?

9    A.     Well, we had a couple of different

10   conversations.  I believe he reached out first

11   and we had a couple of different conversations

12   about him coming back and that's what started

13   the process of bringing him back.

14   Q.     When you say the process of bringing him

15   back, did the process entail compensation to

16   Mr. Bagaiev?

17   A.     It entailed negotiating his salary or

18   renegotiating his salary.  It involved ensuring

19   that he would follow the protocols of the

20   company and the confidentiality of the company.

21   It involved him signing a new consulting

22   contract with the company since he had

23   resigned.  Yeah.

24   Q.     Was there a consulting agreement before

25   he resigned?

```
 1                    Michael Dardashtian
 2    A.      Yes.
 3    Q.      Then there was a new consulting
 4    agreement after he was rehired?
 5    A.      After he was rehired.
 6    Q.      Prior to him resigning, what was his
 7    compensation?
 8    A.      I don't know the specific amount.
 9    Q.      What was his compensation after he was
10    rehired?
11    A.      I would have to check.  I don't know it
12    offhand.
13    Q.      Would you say there was an increase?
14    A.      I don't remember.
15    Q.      You do not know if it is the same, less
16    or more?
17    A.      I don't remember.  I'd have to
18    double-check.
19    Q.      How about for Oleksii?
20    A.      Again, I would have to double-check.
21    Q.      When you were negotiating with Mr.
22    Bagaiev, was Oleksii also part of this
23    negotiation?
24    A.      No.  Oleksii joined in a much later
25    date.
```

1                    Michael Dardashtian

2    Q.      After you rehired Mr. Bagaiev, Oleksii

3    was rehired again?

4    A.      I think over a year later or more.

5    Q.      Under what circumstances was Oleksii

6    rehired?

7    A.      Similar.  I had discussions with him

8    about why he wanted to come back, if he thought

9    he could provide value, what his salary

10   requirements were, what other projects he was

11   working on.  Similar questions.

12   Q.      You do not know if Oleksii is being paid

13   more now than he did before he resigned?

14   A.      I don't remember.  I could double-check,

15   but I would have to check the records.

16   Q.      You mentioned Sergey.  Who is Sergey?

17   A.      He's another developer.

18   Q.      He never worked for Channel Reply or CSV

19   before?

20   A.      Well, he's worked for Channel Reply, CSV

21   for a while.

22   Q.      How long has he worked for CSV?

23   A.      I would have to check specifically.

24   Q.      Do you know if this was before NDAP?

25                    MR. OSTRER:  Object to form.

1                    Michael Dardashtian

2    A.     I don't remember specifically.  I'd have

3    to check.

4    Q.     My understanding is that Konstantyn and

5    Oleksii are Defendants in this action, correct?

6    A.     Correct.

7    Q.     Did you dismiss claims against

8    Konstantyn and Oleksii?

9    A.     No.

10   Q.     You are still maintaining an action

11   against Konstantyn and Oleksii?

12   A.     They're still apart of this lawsuit.

13   Q.     They never answered, though?

14   A.     Correct.

15   Q.     As part of rehiring them, you did not

16   agree to dismiss claims against them?

17   A.     That was not part of the agreement.

18   Q.     Is it your intention to continue your

19   claim against them?

20   A.     I don't know.

21   Q.     Why don't you know?

22   A.     I don't know yet.

23   Q.     You are deciding?

24   A.     It's a consideration.

25   Q.     Consideration based on what factors?

1                Michael Dardashtian

2    A.    I would have to discuss it with my

3    attorneys.   I'm not -- I'm not certain of the

4    advantages or disadvantages.

5    Q.    We were talking earlier about a fallout

6    with David Gitman that started with the NDAP

7    transaction.

8                MR. OSTRER:   Objection.

9    Q.    After the NDAP transaction was

10   consummated, how would you describe your

11   relationship with David Gitman?

12   A.    It was volatile.

13   Q.    Volatile meaning that you were on

14   speaking terms or not speaking terms?

15   A.    I reached out to David many times via

16   email, via phone, via text messages to meet

17   with him.   He would not respond to me or meet

18   with me.

19   Q.    There came a time that you learned that

20   he started another entity?

21   A.    Yeah.

22   Q.    You had earlier discussed that he had

23   created an entity with Mr. Falk to provide

24   consulting work, correct?

25   A.    Yes.

1                    Michael Dardashtian

2    Q.     Is that the first time you discovered

3    that he created another entity?

4    A.     Yes.  When I discovered that they were

5    working together was the first time that I

6    discovered the new entity.

7    Q.     Did you discuss this matter with David?

8    A.     I reached out to him to discuss it.  He

9    did not respond to me.

10   Q.     At what point in time was this when you

11   reached out to him?

12   A.     After I found out.

13   Q.     This was after the NDAP transaction was

14   consummated, correct?

15   A.     I don't remember.  It could have been

16   before.  I don't remember.  I'd have to check.

17   Q.     Do you know what this entity that David

18   created with Mr. Falk, what that business was?

19   A.     I said it was an e-commerce consulting

20   company.

21   Q.     Consulting meaning that they were

22   providing services to other companies?

23   A.     Yeah, similar to what Cooper Square

24   Ventures did for other e-commerce companies.

25   Q.     What portion of revenues did Cooper

1                    Michael Dardashtian

2    Square earn providing consulting services?

3    A.     I would have to check the records.

4    Q.     Would you say significant?

5    A.     I would have to check.

6    Q.     How about for today?

7    A.     Today, we do not do that.

8    Q.     Do you know when you stopped doing that?

9    A.     I don't remember.

10   Q.     Did there come a time that you learned

11   that David Gitman created another company?

12   A.     The companies that I know of are the

13   ones that we included in our lawsuit.

14   Q.     You included Summit Rock Holdings LLC.

15   Do you know what that entity is?

16   A.     I believe that's Jeremy Falk's entity.

17   Q.     That has nothing to do with David

18   Gitman, correct?

19   A.     It could.  I have no idea.

20   Q.     With respect to Jeremy Falk, do you know

21   if Jeremy Falk answered in this action?

22   A.     I don't know if he formally answered or

23   not.  I don't remember.  It was a while ago,

24   but I believe we settled with him.

25   Q.     You settled by receiving compensation

1                Michael Dardashtian

2    from Jeremy Falk?

3    A.     No.   We -- we negotiated down his broker

4    fee from his over a hundred thousand down to --

5    it was, like, fifty-five thousand, fifty

6    thousand.

7    Q.     So you paid Mr. Falk --

8    A.     Yes.

9    Q.     -- a resolution, basically?

10   A.     Correct.

11   Q.     That settlement basically resolved

12   Jeremy Falk and Summit Rock Holdings LLC,

13   correct?

14   A.     I believe so.  I would have to, again,

15   check with my attorneys for legal resolution.

16   Q.     We do not need to double-check on that.

17          As far as Accel Commerce LLC, what is

18   your understanding with respect to that entity?

19   A.     Well, that was the entity that David, I

20   believe, was involved with Jeremy on.

21   Q.     That is the e-commerce consulting

22   business?

23   A.     Yes.

24   Q.     It is your understanding that, that

25   business is still in existence today?

1                    Michael Dardashtian

2    A.      I don't know.

3    Q.      How about Dalva Ventures LLC?

4    A.      Again, I believe David was involved

5    there with his wife and possibly Jeremy Falk.

6    I don't know for sure.  I've never seen the

7    docs, you know, in detail, and I can't say.

8    Q.      What is your understanding with respect

9    to what business Dalva Ventures LLC does?

10   A.      I'm not sure.

11   Q.      How about Channel Reply, Inc.?

12   A.      That was the company that David tried to

13   start by himself and steal the company --

14   together and essentially, implant it into

15   Channel Reply, Inc.

16              MR. OSTRER:  There was a break

17          there, Mike.  You may need to re-answer

18          it.

19   A.      It was my understanding that Channel

20   Reply, Inc. was the company that David formed

21   by himself without ever letting me know.  I'm

22   not sure who he talked to about it or who he --

23   who advised him to create, but he created it

24   himself.  He made himself a hundred percent

25   owner and he stole all of our funds, he stole

1                     Michael Dardashtian

2     our technology and he stole our employees to

3     try to create it and lock me out of it.

4     Q.      When you say that he stole all of the

5     technology, what technology did he steal?

6     A.      All of Channel Reply's software, code

7     and technology.

8     Q.      Are you saying that Channel Reply right

9     now is conducting business using the exact same

10    technology that CSV is operating Channel Reply

11    to?

12    A.      It's not exactly the same.  We've made

13    improvements to it.

14    Q.      Channel Reply, Inc. is using CSV

15    programming?

16    A.      Channel Reply, Inc. doesn't exist

17    anymore, to my knowledge.

18    Q.      Do you know if it ever existed?

19    A.      I believe it existed.  We saw formation

20    documents for it, and the judge advised that it

21    would be terminated or eviscerated.

22    Q.      Do you know if Channel Reply ever

23    started the started business?

24               MR. GUAGLARDI:  Excuse me, Sang.

25            I apologize.  I just want clarification.

1              Michael Dardashtian

2         When you use the word Channel Reply, it

3         is very important if you are now making

4         reference to Channel Reply, Inc. that

5         you distinguish.

6              MR. SIM:  I thought I said Inc.

7              MR. GUAGLARDI:  You just said

8         Channel.  I am sure it was inadvertent.

9              MR. SIM:  I said Channel Reply,

10        Inc.

11             MR. GUAGLARDI:  If you go back

12        on the record, you will see you did not.

13        You just said Channel Reply.  Let's just

14        keep the record clear, if you would.

15        When you refer to Channel Reply, Inc.,

16        please use Inc.

17             MR. SIM:  Let me just get a read

18        back.  I just want to make sure that we

19        are clear on this if I said Inc. on

20        there or not because I thought I did.

21          (The requested portion of the record

22    was read by the reporter.)

23             MR. SIM:  My apologies.

24             MR. GUAGLARDI:  No problem.  I

25        know it was inadvertent.  I just want

1              Michael Dardashtian

2         the record clear.

3              MR. SIM:  I will clarify that.

4         Thank you for that clarification.

5              MR. GUAGLARDI:  Let's get an

6         agreement so we, counsel, understand.

7         When you are you going to refer to

8         Channel Reply, Inc., say Channel Reply,

9         Inc.  If you are going to refer Channel

10        Reply LLC, then refer to Channel Reply

11        LLC.  If you are going to refer to

12        Channel Reply that is owned by Cooper

13        Square Ventures, you can just say

14        Channel Reply, so this way it is clear

15        that we have a record that is clear.

16             MR. SIM:  Perfect.  I agree to

17        that, and I thank you for that

18        clarification.

19             MR. GUAGLARDI:  No problem.

20   Q.    As you sit here today, do you know if

21   Channel Reply, Inc. ever started its business?

22   A.    I do not.

23   Q.    Do you know if Channel Reply, Inc. ever

24   produced a working platform?

25   A.    I do not.  I wasn't involved.

1              Michael Dardashtian

2   Q.     Do you know if Channel Reply, Inc. ever

3   earned any income?

4   A.     I do not.

5   Q.     With respect to the technology that you

6   are alleging that David Gitman stole for

7   Channel Reply, Inc., do you know if it was a

8   hundred percent technology or a portion of that

9   technology or something else?

10             MR. OSTRER:   Object to form.

11  A.     A hundred percent.   He stole the entire

12  business.   In fact, all of the payment

13  configuration gateways that were receiving, all

14  of the contracts that we had.   Everything were

15  still Channel Reply's, and he moved them into

16  Channel Reply Inc.'s and never even changed

17  them.

18  Q.     Did he receive any payments that

19  belonged to Channel Reply and diverted those

20  payments to Channel Reply, Inc.?

21  A.     It is my -- it is my belief that he did,

22  and I believe we have proof of that.

23  Q.     Do you know, as you sit here today,

24  whether if he diverted those funds if those

25  funds returned?

Michael Dardashtian

A.      It was ordered by the judge to be
returned and he did return money, so I would
hope that he returned all monies earned.  But I
didn't run the business, and I don't have
access to the bank account, so I don't know.

Q.      When you say you did not the run
business, you are talking about Channel Reply,
Inc., correct?

A.      Correct.

Q.      You indicated that Channel Reply LLC was
formed, correct?

A.      Yes.

Q.      You formed that entity?

A.      David and I --

         MR. OSTRER:  Objection to form.

A.      David and I formed the entity.

Q.      David would not sign the operating
agreement is your assertion, correct?

A.      Yes.

Q.      Do you know if any bank accounts were
opened for Channel Reply LLC?

A.      They were not.

Q.      Simply because the operating agreement
was unsigned?

1              Michael Dardashtian

2     A.     Correct.  You can't open a -- I mean, to

3     my knowledge, with our bank, you cannot open a

4     bank account without an operating agreement.

5     Q.     Was there any other reason?

6     A.     That was my primary reason.  If David

7     had a reason of his own, that was David's.  He

8     never shared it with me.  I emailed him a copy

9     of the operating agreement that our attorney

10    had prepared for us, and he never executed it.

11    Q.     Since Channel Reply LLC does not have

12    a -- well, let me withdraw that.

13           Was it your intention that after Channel

14    Reply LLC was formed and bank accounts opened

15    that all the income coming to CSV for its

16    Channel Reply business would be transferred to

17    Channel Reply LLC?

18    A.     It was something that we had discussed.

19    Q.     And agreed to?

20    A.     It was in concept.  We didn't have

21    anything in writing, but we decided that it

22    would be cleaner for the business to do it that

23    way.

24    Q.     You undertook that effort to create

25    Channel Reply LLC?

Michael Dardashtian

1

2    A.    David and I did together.

3    Q.    Who filed the documents with the

4    Secretary of State?

5    A.    I believe it was our attorney, Jeffrey

6    Rothman.

7    Q.    What happened to Channel Reply LLC?

8    A.    Nothing.

9    Q.    It was not dissolved?

10   A.    I don't believe so.

11   Q.    The entity still exists, but there is no

12   business being conducted through Channel Reply

13   LLC, correct?

14   A.    To the best of my knowledge, yes.

15   Q.    The business of Channel Reply still

16   resides with CSV, correct?

17   A.    Yes, as it always has.

18   Q.    The income from Channel Reply gets

19   picked up by CSV, correct?

20              MR. OSTRER:   Object to form.

21   A.    Yeah.

22   Q.    You indicated that CSV has no other

23   source of income other than Channel Reply,

24   correct?

25   A.    Correct.

1           Michael Dardashtian

2    Q.     As far as the income coming in through

3    Channel Reply, does that come through a

4    Chargebee?

5    A.     No.   Chargebee is the subscription

6    technology.   The actual payments themselves

7    come through Strike and PayPal.

8    Q.     Can you tell me if there could be

9    discrepancies between what Chargebee indicates

10   as revenues as opposed to PayPal or the other

11   platform you mentioned?

12   A.     It's possible that there would be

13   discrepancies.   I -- yeah.   I didn't develop

14   the technology.   We just use it.

15   Q.     Under what circumstance would there be a

16   discrepancy?

17   A.     If a payment -- you know, if Chargebee

18   thought a payment had been made because it

19   received false API notification from Strike or

20   PayPal and that payment never actually was

21   made, so, you know, the payment perhaps failed.

22   The charge we didn't know it failed.   That's a

23   circumstance in which there could be a

24   discrepancy.

25   Q.     There has been allegations that the

1                  Michael Dardashtian
2    revenues listed on the Chargebee differs from
3    the tax returns filed by CSV.  Are you aware of
4    that?
5    A.      Our bookkeepers have access to our
6    Chargebee account, our Strike account, our
7    PayPal account and our bank account, and they
8    are tasked with reconciling so that all of the
9    revenues that we receive as a company are
10   accounted for in our books and records.
11   Q.      That type of recording those
12   transactions, that is not undertaken by you; it
13   is undertaken by the accountants?
14   A.      It is undertaken by our bookkeepers,
15   yes.
16   Q.      Who are the bookkeepers?
17   A.      Raymond & Associates.
18   Q.      Are they in-house or are they
19   third-party, outside service providers?
20   A.      They are outside consultants.
21   Q.      Unrelated to the accounting firm?
22   A.      Unrelated to our CPA, our accountant.
23   Q.      These transactions are recorded in
24   QuickBooks through your company?
25   A.      Yes.

1                  Michael Dardashtian

2    Q.      Who maintains the QuickBooks accounts?

3    A.      -- the ones who maintain the books and

4    records so that they're accurate and our

5    accountant has access, I have access and David

6    has access.

7    Q.      On a day-to-day basis, who is

8    maintaining the QuickBooks from your

9    understanding?

10                  MR. OSTRER:   Objection to form.

11   A.      Our bookkeepers.

12   Q.      That is the third-party,

13   service-provided bookkeepers, correct?

14   A.      Yes.

15   Q.      When a check is written, it is written

16   out through a QuickBooks account?

17   A.      If a check is written -- I mean, it's

18   very rare that a check is written; most stuff

19   is done digitally or through a credit card --

20   it would be -- there would be a charge made or

21   a -- you know, an online payment made, and our

22   bank account, our Citibank -- our Bank of

23   America bank account and our credit card is

24   connected to QuickBooks so that everything can

25   be reconciled.

1              Michael Dardashtian

2    Q.     Maybe I was unclear with my question.

3    There are certain features on QuickBooks that

4    you can actually issue a check via QuickBooks,

5    authorize payments on QuickBooks by going into

6    QuickBooks itself and effectuate those

7    transactions, as opposed to writing checks

8    outside of QuickBooks and then going back into

9    QuickBooks to reconcile that transaction.

10          My question is:  Between the two

11   different types of transactions and recordings

12   in QuickBooks, which did CSV undertake?

13              MR. OSTRER:  Objection to form.

14   A.     CSV did not use QuickBooks' check or

15   bill paying mechanism, whatever you call it.

16   CSV has always operated outside of QuickBooks.

17   Q.     Somebody would have to go in to

18   reconcile these transactions with outside

19   transactions?

20   A.     Correct.  Our bank account is tied

21   directly into QuickBooks, so the bank

22   reconciliations come through QuickBooks, and

23   then it's also done again in bank statements as

24   well just to verify that nothing is missing.

25   Q.     Do you know how often that is verified,

```
 1                  Michael Dardashtian
 2   let's say, within a thirty-day period or month?
 3   A.      I --
 4   Q.      Is it verified once a month or more than
 5   once a month or less than once a month?
 6   A.      More than once a month.
 7   Q.      Do you know if it is on a weekly basis?
 8   A.      I don't --
 9   Q.      However way you can describe it.
10   A.      Yeah.  I don't know for certain how
11   often, but there's an audit log in QuickBooks
12   where you can see every single time someone
13   logs in or adjusts something in the account.
14   Q.      Who is logging into the QuickBooks?
15   A.      Well, I mentioned that I have access,
16   David Gitman has access, our bookkeepers have
17   access and our accountant has access.
18   Q.      The accountants will typically on a
19   QuickBooks type of transaction would go in
20   year-end to make year-end adjustments, correct?
21          They would not participate in day-to-day
22   management of the QuickBooks account; would
23   that be fair to say?
24   A.      Yes, correct.
25   Q.      Your third-party service provider that
```

1                    Michael Dardashtian

2      you use, they would actually be responsible for

3      the day-to-day maintenance of the QuickBooks

4      account, correct?

5      A.      Yes.

6      Q.      As far as your concern, as far as your

7      use of QuickBooks, you are not responsible for

8      the day-to-day management or maintenance of

9      that QuickBooks account.  You are there just to

10     monitor; would that be fair to say?

11     A.      Are you referring to me, myself?

12     Q.      Yes, you, yourself.

13     A.      Correct.  I do not maintain the books.

14     I monitor them, make sure they're updated and

15     monitor the business through them, the business

16     itself.

17     Q.      That would be the same function that

18     Gitman would have for monitoring --

19     A.      Yes.

20     Q.      -- QuickBooks as well, correct?

21     A.      Absolutely.  He has full access to

22     QuickBooks or bank accounts or bank statements

23     or credit cards.  Everything.  I have never

24     removed his access to anything.

25     Q.      David Gitman would never be responsible

1             Michael Dardashtian

2    for maintaining that QuickBooks account,

3    correct?

4             MR. OSTRER:  Object to form.

5    A.     His responsibility is the same as mine

6    as a managing member.  He has fiduciary duties

7    the same as mine as a managing member.  We

8    share the responsibilities.

9    Q.     Let's talk about the process in which

10   tax returns are filed for CSV.  Is it custom

11   and practice for CSV to prepare the financial

12   reports and send the financial reports to your

13   accountant for the preparation of tax returns?

14   A.     The financial reports are prepared by

15   our bookkeepers, who are CPAs.  They prepare

16   the books and records.  They send them to

17   Cooper Square Ventures for review, Cooper

18   Square Ventures validates and makes sure that

19   there's -- they're accurate, and then they're

20   sent to our accountants for a third validation,

21   in which they can file the returns.

22   Q.     When it gets sent to CSV, who does the

23   verification?

24   A.     It's David and my responsibility as

25   managing members.

```
1              Michael Dardashtian
2   Q.     As managing members, did you both sit
3   down together and review them before sending
4   them off for preparation of a tax return?
5   A.     Yes, we have.
6   Q.     Have you done that every year that a tax
7   return has been filed?
8   A.     I -- I can't say.  I don't remember if
9   we've done it every single year that way.
10  Q.     Were there any instances CSV made
11  adjustments to the books?
12  A.     I don't remember.
13  Q.     Were there any instances in which the
14  financial report that was presented to CSV by
15  the bookkeepers was incorrect?
16  A.     The only other time our books and
17  records were incorrect when David hired Mary
18  Faith Andan to try to reconcile our books, and
19  she destroyed our books.
20  Q.     Who is Mary Faith Andan?
21  A.     Mary Faith Andan is a Upwork consultant
22  that David hired to try to reconcile our books.
23  Q.     When you say tried to reconcile the
24  books, why do you say tried?
25  A.     Because she failed miserably.
```

1                    Michael Dardashtian

2    Q.      How did she fail?

3    A.      She, you know, absolutely decimated our

4    books.  They made no sense whatsoever.  She

5    incorrectly labeled.  She incorrectly

6    classified.  She did not tie or reconcile

7    anything out to our bank statements, our credit

8    card statements.  She's not even a qualified or

9    certified CPA.  She is based in, you know, Asia

10   somewhere.

11   Q.      Do you know what her qualifications are?

12   A.      I don't.  I don't think she has any

13   qualifications, to tell you the truth.

14   Q.      Do you know if she is a certified Intuit

15   QuickBooks online ProAdvisor?

16   A.      I mean, if she is, that's her -- I don't

17   think that's a real thing.  I think she labeled

18   herself that.  She's not a CPA in this country.

19   She has no accreditation.

20   Q.      You are certain that she does not have

21   any of these certifications?

22   A.      Last I checked.

23   Q.      Do you know if she is an accountant?

24   A.      I -- last I had checked, she was not

25   a -- an accredited U.S. accountant.

1                    Michael Dardashtian

2    Q.      What is an accredited U.S. accountant?

3    That is a certified public accountant you are

4    talking about?

5    A.      Well, she was not a certified public

6    accountant nor was she a working accountant in

7    the United States.  She was located overseas.

8    Q.      Do you know if she is a certified

9    accountant?

10   A.      I don't know.  I don't know.  I do know

11   that David Gitman tried to refer her and her

12   services to Sigmento who were invested in, and

13   she decimated their books too.  And we have a

14   letter, I believe, we filed with the courts

15   from their investors and CPA saying that she

16   actually destroyed their books, and it was an

17   issue for them as well.

18   Q.      As a result of Mary Faith Andan's work,

19   so to speak, in the QuickBooks accounts, you

20   are indicating that she made, basically, a

21   mess, right?

22           Do you know in particular what were the

23   issues?

24   A.      I would have to check with our CPAs who

25   cleaned up her mess.

1                    Michael Dardashtian

2    Q.    As a result of her work, were your

3    financial reports misstated?

4    A.    Yes.

5    Q.    By how much?

6    A.    I don't know.

7    Q.    Do you know if it is a significant

8    amount?

9    A.    I believe so.  I think the basis that

10   David believing that I stole money is based on

11   her bad work.

12   Q.    Let's talk about this allegation of you

13   stealing money, all right.  Just for the

14   record, I do not think there is stealing money

15   between owners of entities.  There could be

16   different sets of allocations, different

17   distributions that requires accountings.

18         Other than, let's say, the distribution

19   you took when David went to go work for Cue

20   Connect, were there any other distributions you

21   took that David did not receive reciprocal

22   payments?

23   A.    No.

24   Q.    You also indicated that you received a

25   health care benefit that David did not receive.

1                   Michael Dardashtian

2       Other than the health care benefits, did you

3       receive any other benefits that David Gitman

4       did not receive?

5       A.      Not to my knowledge or not to my

6       recollection.

7       Q.      Did CSV ever pay for your personal

8       living expenses?

9       A.      I don't recall.  I don't think so.

10      When -- can you be more specific when you say

11      personal living expenses?

12      Q.      Forget personal living expenses.  Just

13      say, personal expenses.

14      A.      No.  CSV pays for my car.  Yeah.

15      Nothing personal.

16      Q.      A car is necessary for your business?

17      A.      There are times where a car is

18      necessary.  That's why David Gitman had his car

19      running through CSV as well.

20      Q.      For what purpose did David need a car?

21      A.      Same as I did.  While he was a

22      participant in -- before he was removed, he had

23      his car through the business.

24      Q.      What purpose did David Gitman have for

25      having a car?

1                    Michael Dardashtian

2    A.      You would have to ask David.

3    Q.      What purpose did you have for having a

4    car?

5    A.      For client meetings, warehouse visits,

6    meeting with distributors, meeting with

7    vendors, meeting with different technology

8    companies or partners.

9    Q.      How many times a month would you have

10   those meetings?

11   A.      A number of times.

12   Q.      Going back to Mary Faith Andan.  You

13   indicated that she made a complete mess of

14   those books.  Do you know if your accountants

15   ever contacted her?

16   A.      I do not know.

17   Q.      Do you know if your accountants

18   contacted her or your bookkeepers contacted her

19   to help remedy the work she did?

20   A.      No.  I asked them to clean up her mess,

21   that they should basically undo her doing.

22   Q.      You know that QuickBooks provides

23   accountants an option to have an accountant's

24   copy, correct?

25   A.      I've heard that.  I'm not an accountant,

1                    Michael Dardashtian

2    so I wouldn't know.

3    Q.    Do you know if Mary Faith Andan was

4    given an accountant's copy of the QuickBooks?

5    A.    I do not know.

6    Q.    Do you know --

7    A.    David was the one who had access.

8    Q.    Do you know if Mary Andan was given full

9    access to your QuickBooks account --

10   A.    You would have to ask --

11   Q.    -- as opposed --

12         You do not know?

13   A.    I could go back and check through the

14   audit logs, but offhand, no, I don't know.

15   Q.    I am asking this because if she had an

16   accountant's copy or if an accountant's copy

17   existed, and she made a mess of those

18   statements, all you have to do is just revert

19   back to the original accountant's copy that

20   your accountant would have to undo everything.

21               MR. OSTRER:  Objection.

22               MR. SIM:  Did somebody say

23         something?

24               MR. OSTRER:  I was just putting

25         my objection in.

```
 1                   Michael Dardashtian
 2                   MR. SIM:  Object to the form
 3         again?
 4                   MR. OSTRER:  Yes, you can
 5         continue.
 6    Q.    Under that scenario, did any of your
 7    accountants attempt to revert the work back
 8    prior to Mary Faith Andan's work?
 9                   MR. OSTRER:  Object to form.
10    A.    Possibly.  I would have to check the
11    audit logs.
12    Q.    You are not sure?
13    A.    Not offhand, no.
14    Q.    You indicated that Mary Faith Andan's
15    work was a basis upon which David Gitman
16    believed you took money from CSV, correct?
17    A.    That's my belief.  I don't -- I don't
18    know for certain.  That's my belief.
19    Q.    Do you know how much that Mary Faith
20    Andan --
21    A.    I don't know.
22    Q.    -- indicated you took?
23    A.    All I've ever heard David say is
24    hundreds of thousands of dollars, so he's never
25    given me anything of substance.  Listen, the
```

1          Michael Dardashtian

2   business has two bank accounts.  It's not very

3   hard to go into the bank accounts and look at

4   every single distribution or credit or

5   withdrawal ever made from those bank accounts.

6   Q.     Were there any instances in which you

7   wrote a check payable to cash?

8   A.     I don't know.  I would have to check our

9   books and records.

10  Q.     Under what circumstances would a check

11  be written to cash?

12  A.     I don't remember.  There could have been

13  circumstances where we had to pay a vendor

14  cash.

15  Q.     Why would you pay a vendor cash in that

16  hypothetical?

17  A.     I don't know.  If they requested it.  I

18  remember we moved once.  I don't remember if we

19  paid cash to move or -- I don't know.  That's

20  why I'd have to go back and check our books and

21  records.

22  Q.     From the inception until today, do you

23  keep petty cash in the office?

24  A.     No.

25  Q.     Petty cash was never needed?

1                   Michael Dardashtian

2    A.      No.

3    Q.      Are there reimbursements that you

4    provide for your employees?

5    A.      I don't remember.  I don't think so, but

6    I don't remember.  We'd have to check the

7    books.

8    Q.      If there were reimbursements under that

9    hypothetical, who would be responsible for

10   approving it?

11   A.      It would depend on who the employee sent

12   the -- it would be either me or David.  So if

13   they had sent it to me, then I could approve

14   it.  If they sent it to David, then David could

15   approve it.

16   Q.      There were instances you did not need

17   two of you to approve it?

18   A.      Possibly or possibly we would speak

19   about them if they even existed.  I don't -- I

20   don't recall if we ever reimbursed anybody for

21   anything.

22   Q.      Let me ask you about protocols at CSV

23   regarding checks or checkbooks.  As far as the

24   checkbooks are concerned, are these electronic

25   checks or they are manual checks?

1                    Michael Dardashtian

2    A.     Both.

3    Q.     Who had access to these checkbooks, the

4    manual checkbook?

5    A.     David and I.

6    Q.     Where were they stored?

7    A.     In our office.

8    Q.     Did you share an office?

9    A.     Yes.

10   Q.     It was one office with two desks?

11   A.     Yes.

12   Q.     Inside that office was a manual

13   checkbook?

14   A.     In a -- yeah, in a file cabinet.

15   Q.     The checkbook was, sort of, like in a

16   checkbook, three-part check; is that what we

17   are talking about?

18   A.     Yeah.

19   Q.     After you draft the check, there is a

20   memo part on the left-hand side that you would

21   indicate what the checks were for?

22   A.     I believe it was underneath.  It wasn't

23   on the left-hand side; but yeah.

24   Q.     You would record so both of you would

25   have access to that manual checkbook to know

1                   Michael Dardashtian

2    what checks were written out of that check?

3    A.      Correct.  And then if the check cleared,

4    it would be reconciled in QuickBooks as well

5    along with the memo.

6    Q.      As far as the computer checks were

7    concerned, where were those checks stored?

8    A.      Well, they would only be cut directly

9    through our Bank of America bank account, which

10   David and I had access to.

11   Q.      You indicated there were two bank

12   accounts?

13   A.      Yeah.  There was one for NDAP and one

14   for CSV.

15   Q.      It was actually two separate accounts

16   for two separate entities?

17   A.      Two separate --

18   Q.      It is not that CSV had two bank

19   accounts?

20   A.      -- two separate accounts for two

21   separate entities.  The login was the same

22   account, though, so we can manage the accounts

23   in one place.

24   Q.      CSV had two accounts?

25   A.      No.

```
 1                  Michael Dardashtian
 2    Q.      Only one?
 3    A.      CSV had one bank account.
 4    Q.      Yes.
 5    A.      And NDAP had -- I believe NDAP had two
 6    accounts because one was a checking and one was
 7    a savings.
 8    Q.      The NDAP account, was it Citibank?
 9    A.      No.  All the accounts were held in --
10    NDAP and CSV were both held in Bank of America.
11              MR. OSTRER:  Sang, is this an
12          okay time to take three minutes?
13              MR. SIM:  Yes, that is fine.
14          (At this time a pause was taken in the
15    proceeding.)
16    Q.      I am going to just touch on two
17    different areas, and I think we will wrap it
18    up.
19    A.      Okay.
20    Q.      I am just going to go back to the
21    developers.  Do you know if Mr. Bagaiev has the
22    same contract with CSV as the other developers?
23    A.      I -- I believe so.  I would have to
24    double-check, but we have a standardized
25    contract now.
```

                         Michael Dardashtian

1

2    Q.     Mr. Bagaiev signed a standardized

3    contract?

4    A.     Yes.

5    Q.     It was not anything unique to Mr.

6    Bagaiev?

7    A.     Well, the -- the contract that Bagaiev

8    signed is now a standardized.

9    Q.     I am just going to go and discuss your

10   allegations against Mr. Gitman in your

11   complaint.  You asserted a cause of action for

12   breach of fiduciary duty.  Are you aware of

13   that?

14   A.     Yes.

15   Q.     What fiduciary duty are you alleging

16   that he breached?

17   A.     Well, he stole all of the money out of

18   our bank account, depleted it and almost caused

19   us to not be able to service our customers,

20   overdraw our bank account, not pay third-party

21   vendors that we were working with.  He almost

22   put the company out of business.

23   Q.     The money has been returned to the

24   company, correct?

25              MR. OSTRER:  Asked and answered.

1              Michael Dardashtian

2    A.     After the fact -- after the judge forced

3    him to put the money back, he put the money

4    back.

5    Q.     Did the business go out of business for

6    that when the money was transferred?

7    A.     No, it did not.

8    Q.     Do you know what damages CSV sustained?

9    A.     Well, we did lose some customers as a

10   result of the entire ordeal.  We -- we lost

11   customers.  We had to renegotiate contracts

12   with a couple of vendors that we bounced

13   payments on.  We had to re-talk to our bank and

14   assert to our bank that we were not a, you

15   know, failing entity, that we were successful.

16   There was just a lot of damaging issues that

17   had arisen by him taking all these actions.

18   Q.     When you say lost customers, do you know

19   which customers you lost?

20   A.     One of the biggest that comes to mind

21   was Snapchat.

22   Q.     How did CSV lose Snapchat?

23   A.     Well, when David Gitman convinced

24   Konstantyn and Oleksii to resign and assisted

25   in their resignation, there was a period in

```
 1                 Michael Dardashtian
 2   which I was the only operating member of the
 3   company before I found Titan Co.  So a lot of
 4   customer service inquiries and questions and
 5   issues were coming in, and the business was
 6   overwhelmed.
 7            So we were not able to respond to
 8   everybody in an immediate fashion by not
 9   responding and solving the issues of a few of
10   the customers, mainly, you know, the one that I
11   can remember being the biggest was Snapchat, we
12   lost their business.
13   Q.      This was not because David transferred
14   the money, though?
15   A.      Well, it was as a result of what he did.
16   I mean, it was --
17   Q.      You are saying that you lost Snapchat
18   because he had the developers leave?
19   A.      I mean, it's all related.  They left
20   because he took the money to start a new
21   company.
22   Q.      I am just trying to understand, just for
23   the record, --
24   A.      Yeah.
25   Q.      -- how him transferring the money
```

```
 1                    Michael Dardashtian
 2      affected Snapchat's getting timely responses?
 3                    MR. OSTRER:   Objection to form.
 4      A.      By him defunding the company, we didn't
 5      have the ability to pay any of our employees.
 6      Q.      There was no payment to employees during
 7      this period of time?
 8      A.      No, we didn't have the ability to make a
 9      payment to our employees.
10      Q.      Did employees leave the business?
11      A.      Yes.  Oleksii and Konstantyn both left
12      the business.
13      Q.      The reason was because you could not pay
14      them?
15      A.      I don't know.  You would have --
16                    MR. OSTRER:   Object to form.
17      A.      -- you would have to ask them the
18      reason.
19      Q.      You also have a breach of contract claim
20      against Mr. Gitman?
21                    MR. OSTRER:   Objection.
22      A.      Yes.
23                    MR. OSTRER:   You can answer, if
24          you know.
25      A.      I -- I believe so.
```

```
 1              Michael Dardashtian
 2    Q.    What was the breach?  What was the
 3    contract?
 4              MR. OSTRER:  Objection.
 5    A.    I -- I -- it's hard for me to answer
 6    that question without fully understanding it.
 7    I am not a lawyer.
 8    Q.    You are not aware of your claim against
 9    Mr. Gitman for breach of contract?
10              MR. OSTRER:  Objection to form.
11    A.    I am aware of the claim.  If you can
12    explain to me specifically what part of our
13    contract or if you have a question about our
14    contract and how I think he breached it, sure,
15    I mean, I'd be happy to answer it.
16    Q.    What portion of your contract do you
17    think he breached?
18              MR. OSTRER:  Objection.
19    A.    I believe he started a competitive
20    solution, directly competitive to Channel
21    Reply.  He stole all of our code.  He stole all
22    our money, and he stole our developers and
23    locked me out of the company as a fifty percent
24    owner.
25    Q.    Do you know if CSV sustained damages as
```

```
 1                  Michael Dardashtian
 2    a result?
 3                  MR. OSTRER:   Objection.
 4    A.     I believe so.
 5    Q.     What?
 6                  MR. OSTRER:   Objection.
 7    A.     I would have to go through our records.
 8    Q.     As you sit here today, you do not know
 9    the damages that arose as a result of this
10    alleged breach of contract?
11                  MR. OSTRER:   Objection.
12    A.     I would have to check our records.
13                  MR. OSTRER:   I just want to make
14           this clear.  I am objecting to form and
15           that all of this entire line of
16           questioning is calling for a legal
17           conclusion.  Witness can still answer.
18                  I am not preventing him from
19           answering the question, but this entire
20           line of questioning, I do want my
21           objections noted.
22    Q.     You also allege breach of convent of
23    good faith of fair dealing, correct?
24                  MR. OSTRER:   Objection.
25    A.     Yes.
```

1                    Michael Dardashtian

2     Q.     Do you know under what facts you are

3     making this allegation?

4                    MR. OSTRER:  I am going to

5          object again.

6     A.     I would have to confer with our records

7     and our attorney.

8     Q.     You also made a claim for unjust

9     enrichment?

10                   MR. OSTRER:  Objection.

11    A.     I would have to confer with my attorneys

12    similarly.

13    Q.     Are you aware that you made this claim?

14                   MR. OSTRER:  Objection.

15    A.     If it was made, then yes, I was aware

16    that it was made.

17    Q.     Do you know what the claim of unjust

18    enrichment is?

19                   MR. OSTRER:  Objection again.

20    A.     I have would have to confer with my

21    attorneys on this specific claim.

22    Q.     Confer with attorneys is one thing, but

23    I am asking you:  As you sit here today, do you

24    know what that claim involves?

25                   MR. OSTRER:  Objection again.

1          Michael Dardashtian

2          Mr. Sim, you are asking him

3     about a legal document --

4          MR. SIM:  I am going to tell you

5     right now, get my name straight.  My

6     name is not that difficult.

7          MR. OSTRER:  Oh, Mr. Sim --

8          MR. SIM:  You have called

9     me Mr. Sang before and now Mr. Sing.

10         MR. OSTRER:  No, Mr. Sim.

11         MR. SIM:  I give you respect,

12    and I expect respect back.

13         MR. OSTRER:  No, Mr. Sim.

14         MR. SIM:  Okay.

15         MR. OSTRER:  I did not mean any

16    disrespect.

17         MR. SIM:  Sure.  I understand.

18         MR. OSTRER:  I apologize if you

19    took any disrespect from that, but there

20    was nothing intentional there.  I know

21    your name, Sim.  I was saying Mr. Sim.

22    I apologize if it sounded like Sing.

23         Mr. Sim, this entire line of

24    questioning is asking him legal

25    questions about a legal document that is

```
              Michael Dardashtian

1
2           not in front of him, so I am not trying
3           to interfere with this line of
4           questioning, but I do have to put in my
5           objections to each one of these
6           questions.
7                MR. SIM:  No, no, certainly.
8           Make the objection.  I am just asking
9           him his understanding of what is
10          involved with his claim.  I am not
11          asking him to define it.  I am just
12          asking him his understanding.
13               MR. OSTRER:  Okay.  You can ask
14          him everything you want to.  I just need
15          my objections noted.
16               MR. SIM:  Sure.
17    A.    I would have to -- honestly, it's been a
18    while.  I'd have to review the legal documents
19    again.
20    Q.    As far as the claim, you also made a
21    claim for conversion?
22               MR. OSTRER:  Objection.
23    A.    Again, I would have to review the legal
24    documents.
25    Q.    Do you know what conversion is?
```

```
1                    Michael Dardashtian
2    A.     I would have to review the legal
3    documents.
4    Q.     So you do not know what conversion is?
5                    MR. OSTRER:   Objection.
6    A.     I would have to review the legal
7    documents.
8    Q.     What legal documents would you need to
9    review?
10   A.     Our claims.
11   Q.     I am asking you:  As you sit here today,
12   do you know what the allegation of conversion
13   is?
14                   MR. OSTRER:   Objection.
15   Q.     That is a simple yes or no.
16   A.     I would have to review it.
17   Q.     You do not know?
18                   MR. OSTRER:   Objection.
19   A.     I -- I -- I would need to review it.
20   Q.     Did you make a claim against David
21   Gitman regarding tortious interference?
22                   MR. OSTRER:   Objection.
23   A.     Again, I would have to review our legal
24   document.
25   Q.     Based on these claims, can you identify
```

1               Michael Dardashtian

2    specifically what damages you sustained?

3               MR. OSTRER:   Objection.   Same

4         reason.

5    A.    Again, I would need to review our legal

6    document and all of our previous history and

7    document, compile that again.   I don't know it

8    off the top of my head.

9    Q.    You do not know the damages off the top

10   of your head; is that what you said?

11   A.    I don't --

12              MR. OSTRER:   Objection.

13   A.    -- specifically, I don't know the

14   damages off the top of my head, no.

15              MR. SIM:   I have no further

16        questions, sir.   Thank you for your

17        participation.

18

19

20        (Continued on next page to

21        accommodate jurat.)

22

23

24

25

```
 1                  Michael Dardashtian

 2         MR. OSTRER:  Thank you.

 3

 4              (Time Noted:  3:40 p.m.)

 5

 6

 7                  MICHAEL DARDASHTIAN

 8

 9

10   Subscribed and sworn to before me

11   this        day of          2020.

12

13

14         Notary Public

15

16

17

18

19

20

21

22

23

24

25
```

```
 1
 2                        I N D E X
 3
 4    WITNESS              EXAMINATION BY          PAGE
 5    Mr. Dardashtian      Mr. Sim                 5-221
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1

2              C E R T I F I C A T E

3

4         I, STELLA VAKS, hereby certify that the

5    Examination Before Trial of MICHAEL DARDASHTIAN was

6    held before me on the 16th day of April, 2020; that

7    said witness was duly sworn before the commencement

8    of his testimony; that the testimony was taken

9    stenographically by myself and then transcribed by

10   myself; that the party was represented by counsel as

11   appears herein;

12        That the within transcript is a true record

13   of the Examination Before Trial of said witness;

14        That I am not connected by blood or marriage

15   with any of the parties; that I am not interested

16   directly or indirectly in the outcome of this

17   matter; that I am not in the employ of any of the

18   counsel.

19        IN WITNESS WHEREOF, I have hereunto set my

20   hand this 28th day of April, 2020.

21

22           *Stella Vaks*

23           STELLA VAKS

24                                    

25