UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT COURT OF NEW YORK

----------------------------------------------X

MICHAEL DARDASHTIAN, individually and on

behalf of COOPER SQUARE VENTURES, LLC, NDAP,

LLC, and CHANNEL REPLY,

                  Plaintiffs,

       -against-       Case No.

                    17-cv-4327(LLS)(RWL)

DAVID GITMAN, ACCEL COMMERCE, LLC, DALVA

VENTURES, LLC, KONSTANTYN BAGAIEV, OLESKKII

GLUKHAREV and CHANNEL REPLY, INC.,

                  Defendants.

----------------------------------------------X

                Date: June 22, 2020

                Time: 10:30 a.m.

      EXAMINATION BEFORE TRIAL of CARLEEN

GASKIN, an Expert Witness called on behalf of

the Plaintiff, taken by the Defendant, via

video-conference, pursuant to Court Order,

held at the above mentioned date and time,

before a Notary Public of the State of New

York.

1    A P P E A R A N C E S:

2

3    GUAGLARDI & MELITI, LLP
          Attorneys for Plaintiffs
4         365 West Passaic Street
          Suite 130
5         Rochelle Park, New Jersey 07662
     BY:  BARRY S. GUAGLARDI, ESQ.

6

7

     SIM & DePAOLA, LLP
8         Attorneys for Defendants
          42-40 Bell Boulevard
9         Suite 201
          Bayside, New York 11361
10   BY:  SANG J. SIM, ESQ.

11

12

13

     Also present
14        Michael Dardashtian, Plaintiff

15

16

17

18

19

20

21

22

23

24

25

1          F E D E R A L   S T I P U L A T I O N S

2

3          IT IS HEREBY STIPULATED AND AGREED by

4    and between(among) counsel for the respective

5    parties that herein, that filing and sealing

6    be and the same are hereby waived.

7

8          IT IS FURTHER STIPULATED AND AGREED

9    that all objections, except as to the form of

10   the question, shall be reserved to the time of

11   the trial.

12

13         IT IS FURTHER STIPULATED AND AGREED

14   that the within deposition may be sworn to and

15   signed before any officer authorized to

16   administer an oath, with the same force and

17   effect as if signed and sworn to before the

18   Court.

19

20         IT IS FURTHER STIPULATED AND AGREED by

21   and between counsel for all parties present

22   that pursuant to CPLR section 3113(d) this

23   deposition is to be conducted by video

24   conference, that the court reporter, all

25   counsel, and the witness are all in separate

```
 1   remote locations and participating via

 2   videoconference (LegalView/Zoom) meeting under

 3   the control of Lexitas Court Reporting

 4   Service, that the officer administering the

 5   oath to the witness need not be in the place

 6   of the deposition and the witness shall be

 7   sworn in remotely by the court reporter after

 8   confirming the witness's identity, that this

 9   videoconference will not be recorded in any

10   manner and that any recording without the

11   express written consent of all parties shall

12   be considered unauthorized, in violation of

13   law, and shall not be used for any purpose in

14   this litigation or otherwise.

15

16        IT IS FURTHER STIPULATED that exhibits

17   may be marked by the attorney presenting the

18   exhibit to the witness, and that a copy of any

19   exhibit presented to a witness shall be

20   e-mailed to or otherwise in possession of all

21   counsel prior to any questioning of a witness

22   regarding the exhibit in question.  All

23   parties shall bear their own costs in the

24   conduct of this deposition by video

25   conference, not withstanding the obligation by
```

1    CPLR to supply a copy of the transcript to the

2    deposed party by the taking party in civil

3    litigation matters.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    C A R L E E N   G A S K I N, the witness

2         herein, having been first duly sworn

3         by a Notary Public of the State of New

4         York, was examined and testified as

5         follows:

6              THE REPORTER:  Please state

7    your name for the record.

8              THE WITNESS:  Carleen Gaskin.

9              THE REPORTER:  Please state

10   your address for the record.

11             THE WITNESS:  250 Pehle

12   Avenue, Saddle Brook, New Jersey

13   07663.

14   EXAMINATION BY

15   MR. SIM:

16             MR. SIM:  Good morning, Ms.

17   Gaskin.

18             THE WITNESS:  Good morning.

19             MR. SIM:  My name is Sang Sim.

20   I'm with the firm Sim & DePaola and

21   we represent the Defendants, Mr.

22   Gitman and the various Defendant

23   entities in this action.  Today, I'm

24   going to be taking your deposition.

25   And it's my understanding you've been

1                    C. GASKIN

2          deposed before?

3                    THE WITNESS:  Yes.

4                    MR. SIM:  I'm just going to

5          give you some ground rules just

6          before we start just so that everyone

7          is clear on that.  Firstly, I'm going

8          to be asking you a series of

9          questions and you're going to have to

10         respond to my questions verbally

11         because there's a court reporter

12         taken down a written transcript.  You

13         understand that, right?

14                   THE WITNESS:  Yes.

15                   MR. SIM:  Also, during the

16         course of questioning if you don't

17         understand a particular question,

18         please let me know, I'll be very

19         happy to rephrase, clarify, however

20         way to get you to understand that

21         question, but if you answer we can

22         only assume you've understood it,

23         correct?

24                   THE WITNESS:  Understood.

25                   MR. SIM:  Also, during the

```
1                    C. GASKIN
2        course of questioning if you need a
3        break for whatever reason, you know,
4        I'll be very happy to accommodate, I
5        just ask that any open questions be
6        answered before taking such a break.
7              THE WITNESS:  Okay.
8        Q.    Ms. Gaskin, can you tell us a
9   little bit about your education
10  background?
11       A.    Sure.  I am a graduate of
12  Marist College.  I have my bachelor's of
13  science in accounting.  I received my CPA
14  in 2003.  I am certified in financial
15  forensics from AICPA as well.  If I
16  recall correctly I received that in
17  around 2010, but that's an estimate; I
18  don't remember the details.  I -- my -- I
19  have been a forensic accounting for most
20  of my career.  I have been in public
21  accounting for over twenty years.  I'm a
22  partner at Withum, Smith & Brown in the
23  forensic evaluation services group and I
24  am also the head of their matrimonial
25  litigation division.
```

```
1                    C. GASKIN
2        Q.     And, you indicated that you're
3    a partner at Withum's.  Could you give us
4    some background in terms of your work
5    experience?  You weren't always employed
6    also by Withum's, right?
7        A.     No.  So in 2010, Withum
8    acquired Morrison & Company, who was my
9    previous employer.  They were an all
10   forensic firm as well.  And prior to
11   Morrison & Company I had worked for
12   Rosenfarb Winters for -- except for about
13   the first one and a half to two years of
14   my employment experience which was
15   focused in tax preparation, I have been
16   in forensics since Morrison & Company was
17   only a forensic accounting firm that
18   focused mostly in matrimonial litigation,
19   we've also done shareholder disputes,
20   fraud investigations, and some government
21   work, damage claims, pretty -- we have --
22   Withum has it's own separate corporate
23   valuation department as well in our
24   group, so we have experience in pretty
25   much any area of forensics that exist.
```

```
 1                    C. GASKIN

 2        Q.     But you personally don't have

 3   any valuation credentials; do you?

 4        A.     Not valuation credentials, no.

 5   I have the ASA and the works I've passed

 6   all four exam courses but I can't list

 7   that on my CV yet because I haven't

 8   received the designation.

 9        Q.     And, when did you take those?

10        A.     I don't remember which years.

11   It's over -- it's over a span of years

12   cause it's a series of four courses.  I

13   have to submit a valuation report.

14   That's the last step in order to get the

15   credentials.  I'm in the works of doing

16   that.

17        Q.     And, the CFF designation that

18   you have, that's largely a forensic

19   accounting credential, correct?

20        A.     That is.

21        Q.     And you've been predominantly

22   involved in matrimonial type of cases?

23        A.     Yes, matrimonial shareholder

24   dispute.

25        Q.     And involved in what kind of
```

```
 1                    C. GASKIN
 2  companies?
 3        A.     It ranges from all type of
 4  industries, large to small.  I mean, the
 5  list is medical practices, real estate
 6  entities, construction software
 7  companies, retail operations.  Probably
 8  almost every industry I've come across in
 9  the years I have been doing this?
10        Q.     And, have you been involved in
11  shareholder dispute regarding SaaS
12  companies other than this case?
13        A.     Understood.  The shareholder
14  disputes that I have been involved in,
15  no, I don't believe they were software
16  companies.
17        Q.     And, have you valued SaaS
18  companies prior to this case?
19        A.     I've -- I'm trying to -- I
20  just recently worked in a larger software
21  development company last summer, but they
22  were not SaaS.  They were -- they did
23  development for specific software for
24  hair salons.  And I have done previous
25  companies that have written other
```

1                    C. GASKIN

2    software programs related to -- I can't

3    remember the industry, but not -- nothing

4    exactly the same as Mr. Dardashtian and

5    Mr. Gitman's company.  Software

6    development companies, yes?

7         Q.    So software development

8    companies but not SaaS companies?

9         A.    Correct.

10        Q.    And, are you familiar with --

11             MR. GUAGLARDI:  Sang --

12             MR. Sim:  Yeah.

13             MR. GUAGLARDI:  I apologize.

14        I'm just having a little bit of a

15        streaming issue.  I don't know if

16        it's on my end or your end.

17             MR. SIM:  It seems good to me.

18             MR. GUAGLARDI:  Carleen, are

19        you having issues with Sang hearing

20        him contemporaneous at the time that

21        he's speaking or is it just me?

22             THE WITNESS:  It might be just

23        you.  I'm okay, but occasionally when

24        you talk you break up a little bit.

25             MR. GUAGLARDI:  Okay.  All

```
 1                    C. GASKIN
 2        right.  Go ahead, Sang.  I'll figure
 3        out my issue.  Maybe I'll have to do
 4        it by phone.
 5        Q.      Ms. Gaskin, are you familiar
 6   with the statement of standards for
 7   forensic services?
 8        A.      I am.
 9        Q.      And, with respect to the
10   valuation report you prepared for this
11   particular case, did you conform with
12   this statement of standards for forensic
13   services?
14        A.      Yes.
15        Q.      And I had sent an e-mail
16   earlier with the valuation report.  And
17   I'm going to have that marked as the
18   Defendant's Exhibit A of this deposition.
19   Everybody receive a copy of that?
20        A.      I did.  Just so you're aware I
21   have a separate copy that was previously
22   printed out so I had it available because
23   I only have one computer screen.
24        Q.      Sure.
25                I want to make sure, you know,
```

```
1                    C. GASKIN
2    that we got this marked as Defendant's A.
3    And I'm going to ask you take a look at
4    and ask you if that's true and accurate
5    copy of the valuation report that you
6    prepared?
7         A.    I'm just going to pull it up
8    on my screen just to scan through it.
9    Okay?
10        Q.    Sure.
11              (Whereupon, Valuation report
12        was marked as Defendant's Exhibit A,
13        for identification, as of this date.)
14        A.    Yes.  I just finished scanning
15   through the report.  It's my complete
16   report.
17        Q.    You indicated that you worked
18   at the Withum Litigation valuation
19   practice?
20        A.    Yes.
21        Q.    And prior to that you worked
22   with Bill Morrison?
23        A.    Yeah.  I guess you know him.
24   I never said his name was Bill.  But yes,
25   Morrison & Company.
```

1                    C. GASKIN

2         Q.    Yeah, Bill Morrison's company,

3    right?

4         A.    Correct.  Yes.

5         Q.    And, are you aware of his book

6    on valuation?

7         A.    Yes.

8         Q.    And, have you read that book?

9         A.    Not cover to cover but pages

10   of it, yes.

11        Q.    And, do you consider that book

12   to be authoritative?

13        A.    I do.

14        Q.    Before I think we got

15   interrupted by Barry's technical

16   problems, I asked you to take a look at

17   the valuation report I had e-mailed over

18   marked as Defendant's Exhibit A.  And can

19   you tell me if that's a true and accurate

20   copy of your valuation report?

21        A.    Yes, it was.

22        Q.    And, that is your signature in

23   the back?

24        A.    It is.

25        Q.    And, can you tell me what your

```
1                    C. GASKIN
2    understanding with respect to CSV is,
3    what do that they do?
4         A.    It's my understanding that
5    they create programs, software programs.
6    They have developers that write programs
7    in order to create a program to help
8    vendors communicate with their customers
9    who are a selling on various different
10   websites such as, you know, like Amazon
11   and eBay, they deal with various
12   different help desk sites to try and help
13   with these communications so that there's
14   no in between that the sellers can
15   communicate directly with their customers
16   through one platform.
17        Q.    So, you know, as far as CSV,
18   that would be ChannelReply's business,
19   correct?
20        A.    Yes.  They're a -- it's a
21   company doing business as, so the two
22   different names, same company,
23   CSV/Channel Reply are the same company.
24        Q.    So CSV in the past had
25   different areas of business as well,
```

1                    C. GASKIN

2    correct?

3         A.     They had various other

4    entities that they had owned, yes.

5         Q.     And, they did other types of

6    business other than the business that

7    ChannelReply's doing, correct?

8         A.     Correct.

9         Q.     And ChannelReply basically

10   provides access for it's subscription

11   customers for the use of the software

12   that facilitates the communication

13   between seller and customer on selling

14   platforms such as Amazon, eBay; would you

15   say that's true?

16        A.     Yes.

17        Q.     So the services that it's

18   providing to it's to customers is the use

19   of the software, correct?

20        A.     Yes.

21        Q.     And, this is why it's referred

22   to as a SaaS company, correct?

23        A.     Yes.

24        Q.     And, do you know how revenue

25   is generated in ChannelReply?

                          C. GASKIN

1

2       A.      I'm not quite sure how you

3   mean how it's generated.

4       Q.      Okay.

5               Let's say, for instance, a

6   customer of ChannelReply, how do they

7   collect income from these customers?

8       A.      You mean how they send

9   payment?

10      Q.      I mean, it's a

11  subscription-based.  That's pretty much

12  what I'm getting at, it's a

13  subscription-based type of service,

14  correct?

15      A.      Yes.

16      Q.      So a seller subscribes to the

17  use of ChannelReply services and for an

18  annual fee or a monthly fee they get

19  access to this platform, correct?

20              MR. GUAGLARDI:  Objection.

21      You can answer probably -- to

22      whatever you want.  I'm just

23      objecting to the form of the

24      question.

25      A.      Yeah, I believe most are

```
 1                      C. GASKIN
 2    subscription.  Honestly say that it's
 3    100 percent, but I believe it's a
 4    subscription.
 5         Q.     When you say most, do you
 6    believe that there's other forms of
 7    income for ChannelReply?
 8         A.     I'm not positive, that's why
 9    I'm saying yes.  I believe mostly it's
10    subscription-based, but I'm not sure if
11    there's -- if they do any service work
12    more or anything, it would be more of a
13    one-time charge.  I don't want to sit
14    here and say yes, it's 100 percent
15    subscriptio- based.  But I believe there
16    might be some additional -- like if a
17    customer needs help or assistance, that
18    could be an additional charge.  It
19    wouldn't be based on a subscription.
20         Q.     And, when you were researching
21    and reviewing the company, did you find
22    any income other than subscription-base
23    for ChannelReply?
24         A.     Based on the general ledger,
25    it doesn't detail if it's
```

```
 1                    C. GASKIN
 2   subscription-based or not.  They were
 3   just deposits into the bank account.  And
 4   I interviewed Mr. Dardashtian from
 5   management about what the company did,
 6   and at this time I don't recall if 100
 7   percent that they're their revenue was
 8   subscription-based.
 9        Q.     And, if the income was
10   100 percent subscription-based, would
11   that alter your opinion set forth in the
12   valuation report?
13        A.     No.
14        Q.     And, you indicated that you
15   interviewed Mr. Dardashtian.  Did you
16   interview anyone else?
17        A.     No.
18        Q.     You didn't interview the CPA,
19   the interval manager, Joel Lieberman
20   (sic)?
21        A.     I did not.
22        Q.     How come?
23             MR. GUAGLARDI:  Objection.
24        You can answer.
25        A.     We got the information that we
```

```
 1                    C. GASKIN
 2   needed to from Mr. Dardashtian so we
 3   didn't -- I didn't have any questions for
 4   Mr. Lieberman?
 5        Q.     And, you know, so based on
 6   your interview with Mr. Dardashtian, you
 7   had all your questions answered?
 8        A.     Yes, that I asked him, yes.
 9        Q.     And, you received all the
10   documentation you needed from Mr.
11   Dardashtian?
12        A.     I did.
13        Q.     So that's why you didn't feel
14   the need to speak to Mr. Joel Lieberman?
15        A.     Correct.
16        Q.     And, you knew Mr. Joel
17   Lieberman --
18             MR. GUAGLARDI:  I'm sorry to
19        interrupt, Sang, I think his name is
20        Liebman, L-I-E-B-M-A-N.
21             MR. SIM:  Oh, Liebman.  I'm
22        sorry.  I'm sorry.  My apologies.
23        A.     I know another Lieberman.
24   It's just -- it's coming out that way.
25   Sorry.
```

1                      C. GASKIN

2        Q.      You aware Mr. Joel Liebman is

3    a CPA?

4        A.      Yes.

5        Q.      And he was a CPA for the

6    company for many, many years?

7        A.      Yes.

8        Q.      And, you didn't feel you

9    needed to speak or interview Mr. Liebman?

10              MR. GUAGLARDI:  Objection.

11       You can answer.

12       A.      No, I did not.

13       Q.      Can you tell us the documents

14   that you received in preparing your

15   valuation report that you received from

16   the company CSV?

17       A.      Sure.  They're all listed,

18   just for reference purposes, in Appendix

19   A in my report which included -- sorry --

20              MR. GUAGLARDI:  Do we --

21              MR. SIM:  I can just clean

22       this up.

23       Q.      So basically what's listed as

24   Appendix A is a complete list?

25       A.      Yes.

```
 1                   C. GASKIN
 2        Q.      And, can we -- let's start
 3   talking about methods of valuation.
 4   We've got different approaches to
 5   valuation, correct?
 6        A.      Correct.
 7        Q.      So then the valuation methods,
 8   let's talk about the asset approach
 9   first.  Can you tell us what the asset
10   approach is?
11        A.      Sure.  The asset approach is a
12   valuation method that's based on
13   reviewing a company's balance sheet and
14   adjusting it to the fair value of the
15   assets and liabilities that are recorded
16   to make sure there's assets and
17   liabilities; if they should be recorded,
18   that they're added, if there's anything
19   that needs to be removed in order to
20   accurately reflect the value of the
21   company and it's net equity as of the
22   valuation date for the -- for -- in this
23   case it would be fair value.
24        Q.      And, as far as you --
25        A.      Basically a book value -- -
```

1                   C. GASKIN

2        Q.      And, did you perform a book

3    value analysis of CSV?

4        A.      We reviewed the balance sheet.

5    I did not rely on the asset approach for

6    value.

7        Q.      Why not?

8        A.      Because this is not an

9    asset-intensive business.  There's not

10   very many assets or if at all except for

11   basically a cash account and we believe

12   that the income approach reflected a

13   better indication value of the company.

14       Q.      And, the software, as part of

15   this SaaS company, you wouldn't consider

16   that an asset of the company?

17       A.      The software itself?

18       Q.      Yes.

19       A.      No, we did not value -- we

20   valued that in relation to it's cash flow

21   generated for the company in the income

22   approach, but we did not --

23       Q.      I'm talking about -- I'm sorry

24   -- I'm talking about the asset approach,

25   right.  So we're just talking about the

1                    C. GASKIN

2    asset approach now.  And you indicated

3    that there was no assets of the company

4    other than the cash account so that you

5    didn't feel that the asset approach was

6    appropriate.  And within this asset

7    approach, did you take into account the

8    value of that software, the software is

9    really the main product of ChannelReply

10   and then that's reason why subscribers

11   subscribe for the use of that software.

12   You didn't consider that an asset of the

13   company under the asset approach?

14        A.     We did --

15               MR. GUAGLARDI:  Objection.

16               THE WITNESS:  I'm sorry.  Yes,

17        I'm sorry.  I'm sorry.

18               MR. GUAGLARDI:  Just give me a

19        chance to be able to interject --

20               THE WITNESS:  Understood.

21               MR. GUAGLARDI:  -- to the

22        extent I need to.  Thank you.

23        Objection.  Go ahead.

24        A.     We did consider it.

25               MR. GUAGLARDI:  You can answer

```
 1                    C. GASKIN
 2      it.
 3      A.      We did consider it.  I'm under
 4   the understand that there is patent or
 5   trademark for this software.  But given
 6   the fact that it's easily duplicated we
 7   didn't value it separately as a patent or
 8   trademark.  And as I said previously, we
 9   valued the company using the income
10   approach which reflect the value based on
11   the income earned by that software, which
12   actually we believed generated a higher
13   value for the company than using the
14   asset approach.
15      Q.      And, it was your understanding
16   the software of this company employs or
17   is part of this SaaS company is easily
18   duplicated?
19      A.      Yes.
20      Q.      And, where did you get that
21   understanding?
22           MR. GUAGLARDI:  Slow down.
23      Let me -- excuse me.  This is not a
24      conversation.  This is a deposition
25      so that means Mr. Sim is going to ask
```

```
 1                    C. GASKIN
 2        a question, I have an opportunity to
 3        object, you can then answer.  And
 4        he's not going to ask a next question
 5        until you answer, right.  So to the
 6        last question, I am interposing an
 7        objection.  Now you can go forward.
 8        Thank you.
 9              MR. SIM:  Just for
10        clarification, Barry, which question
11        are interposing an objection?
12              MR. GUAGLARDI:  There were two
13        that one followed quickly.  So I'm
14        objecting to both, how is that, so
15        that the record is clear.
16              MR. SIM:  That's fine.
17        A.     Can we have a read back of the
18   question now so I know what I'm
19   answering?
20              (Whereupon, the requested
21        portion of the record was read back
22        by the Court Reporter.)
23        Q.     Let me ask you this, Ms.
24   Gaskin, what makes you believe that that
25   software is easily duplicated?
```

```
 1                  C. GASKIN
 2       A.     Based on my conversations with
 3   Mr. Dardashtian.
 4       Q.     And, just for clarification,
 5   under the asset approach, you didn't
 6   value the software?
 7       A.     Well, we didn't consider the
 8   approach, so I did not value any
 9   trademarks or patents.
10       Q.     Or the value of the software,
11   so I'm not asking about the trademark or
12   the patent --
13            MR. GUAGLARDI:  Objection.
14       Q.     -- but I'm asking for the
15   value of the software.  You didn't
16   consider the asset of the value of that
17   software, correct?
18       A.     I didn't consider -- I
19   don't --
20            MR. GUAGLARDI:  Objection.
21       A.     I don't know that --
22            THE WITNESS:  I heard you say
23       objection, yes.
24            MR. GUAGLARDI:  Objection.  I
25       don't know if that was a question or
```

```
 1                    C. GASKIN
 2        a follow up to the form of question.
 3        Sang, I'm going to ask, if you could,
 4        I don't want to have a discussion,
 5        please just phrase the questions as
 6        questions, not -- and if it's a
 7        follow up as a follow up to the form
 8        of the question.
 9             MR. SIM:  I understand.  That
10        probably was a question, Barry.
11             MR. GUAGLARDI:  That's all
12        right.  Just for the record.
13             MR. SIM:  I understand.
14             MR. GUAGLARDI:  Objection to
15        the last question if it was a
16        question.  Go ahead.
17        Q.    Ms. Gaskin, just so that we're
18   clear, it's your understanding that
19   because that software was easily
20   duplicated you didn't value that software
21   as an asset under the asset approach?
22        A.    No, that's not what -- I don't
23   agree with how that's being phrased.  We
24   consider the asset approach to value
25   which means reviewing all of the
```

```
 1                  C. GASKIN
 2   company's recorded asset and liabilities
 3   which would include any intangibles which
 4   is what I believe you're referring to is
 5   something to the extent of a patent or a
 6   trademark that would be related to
 7   something like a software development,
 8   and we did not believe that that was an
 9   appropriate approach in order to value
10   the company so we base it off the cash
11   flows that are generated from this
12   software development and use the income
13   approach to value.  The asset approach
14   was not deemed appropriate, that's why I
15   did not use it.  Not -- I did not say
16   that it was because there was no value to
17   this software.
18        Q.    So why did you deem it not
19   appropriate?
20        A.    Because this company is not an
21   asset-intensive business and I believe
22   the better way to value this company was
23   based on it's income stream and not it's
24   balance stream.
25        Q.    And, this is what I'm asking
```

```
1                     C. GASKIN
2    the question, you know, when you say it's
3    not an asset-intensive company, did you
4    assess the value of the software in
5    deciding the asset approach would not be
6    appreciate?
7              MR. GUAGLARDI:  Objection.
8        Asked and answered now two times.
9        You can answer it again a third time.
10       A.     I valued this software based
11   on the income approach.  We did not deem
12   the asset approach appropriate to value
13   it.
14       Q.     So then as a result you
15   decided that the asset approach was not
16   appropriate for this particular case,
17   correct?
18             MR. GUAGLARDI:  Objection.
19        Asked and answered.
20       A.     Yes.
21       Q.     How about the market approach,
22   can you tell us what a market approach
23   is?
24       A.     Sure.  That is an approach
25   that is based on comparability to either
```

```
 1                   C. GASKIN
 2   public companies in the similar industry
 3   or to the sale of any public or private
 4   companies that also occurred in a similar
 5   industry and you would compare those
 6   transactions of those companies to your
 7   subject company for valuation to see if
 8   you can generate any type of multiples in
 9   order to value your subject company.
10        Q.      And inside your valuation
11   approach you identified two types of
12   market approaches?
13        A.      Yes, I do.
14        Q.      And, what are the two types?
15        A.      The guideline company public
16   method and the transaction method.
17        Q.      And, did you develop an
18   analysis under the market approach?
19        A.      Well, we reviewed public
20   companies under the market approach with
21   the guideline public company method and
22   we also researched private sales
23   transactions under the transaction method
24   to see if can determine if there were any
25   comparable companies, we did not find any
```

1                    C. GASKIN
2    companies that were comparable under
3    either of these approaches in order to
4    determine a valuation multiple for the
5    subject company.
6         Q.    So you didn't consider the
7    market approach to be usable because you
8    couldn't find comparable public traded
9    firms --
10              MR. GUAGLARDI:  Objection.
11        Q.    -- or there are were, you
12   know, incomparable data-related to the
13   company's business?
14              MR. GUAGLARDI:  Objection.
15        Form of question.
16        A.    No, we did not rely on the
17   market approach because we could not find
18   comparable transactions or comparable
19   companies.
20        Q.    And, you indicated that you
21   did perform som research on some public
22   companies?
23        A.    Yes.
24        Q.    Can you at least name five to
25   ten public companies that you analyzed?

```
1                    C. GASKIN
2              MR. GUAGLARDI:  Objection.  Is
3       it five, ten six, seven, eight, nine?
4              THE WITNESS:  I was just going
5       to ask the same thing.
6       Q.    So you cannot?
7       A.    No, I was going ask you -- to
8   Barry's question, my question was going
9   to be how many did you want me to name?
10      Q.    Do you have a list of
11  companies that you researched?
12      A.    I do.
13      Q.    Was there any reason that
14  wasn't attached to your valuation report?
15      A.    Yes, there was.
16      Q.    What is the reason?
17      A.    Because we did not rely on the
18  approach so as long as I maintain a work
19  paper file related to the research that
20  we did, I do not have to include the --
21  any analysis or research that we did for
22  the approach since it was not used.
23      Q.    So you have a public company
24  on a search matrix?
25      A.    Yeah, we have a few different
```

```
 1                    C. GASKIN
 2  data sources that we research for
 3  transactions and public companies and I
 4  maintain that list.
 5            MR. SIM:  I'm going to call
 6       for the production of that list.
 7            MR. GUAGLARDI:  We'll take it
 8       under advisement.  If you could, just
 9       send a quick note on it.  Thank you.
10            MR. SIM:  Sure.  I'll just
11       mark that.
12            (Whereupon, request is noted
13       on index page.)
14       Q.    Also, just speaking of your
15  files, do you have a checklist in your
16  report that documents with compliance in
17  the steps in the AICPA's BPL Valuation
18  report per AICPA guidelines and statement
19  of standards for valuation services
20  number one?
21       A.    We don't maintain a specific,
22  like an actual checklist page if that's
23  your specific question, no, I do not.
24       Q.    When you say specific
25  checklist page, do you have something
```

C. GASKIN

1                      C. GASKIN

2    akin to a checklist?

3         A.    No.  That's what I -- I assume

4    you mean an actual -- just so I can

5    clarify your question, and you can tell

6    me if I'm understanding you correctly, an

7    actual if I say a checklist, checkoff, I

8    do not have something like that in my

9    work paper file.

10        Q.    So a checklist wasn't used as

11   part of your part of your valuation for

12   the market approach method?

13        A.    No, we consider.

14             MR. GUAGLARDI:  Excuse me.

15        Excuse me.  Objection to the form of

16        the question.  Thank you.  You can

17        answer.

18        A.    No.  We followed the

19   guidelines.  I do not maintain a specific

20   checklist page.

21        Q.    Ms. Gaskin, can I ask you, do

22   you know what the difference is between

23   application software firms and sytem

24   software firms?

25             MR. GUAGLARDI:  Objection.

1                    C. GASKIN

2        A.    No, I do not offhand.

3        Q.    And, as part of your search

4    for comparable public companies, do you

5    know how many software public companies

6    that are categorized as application

7    software companies?

8              MR. GUAGLARDI:  Objection.

9        A.    No.

10       Q.    If I told you it was about

11   336, would that surprise you?

12             MR. GUAGLARDI:  Objection.

13       A.    Would it surprise me?

14   Probably not.

15       Q.    Ms. Gaskin, do you know how

16   many public software companies that are

17   categorized as application software

18   companies that would be considered small

19   in kneecap firms more closely in size to

20   CSV?

21             MR. GUAGLARDI:  Objection.

22       A.    No, I don't.

23       Q.    And, if I told you about 131,

24   would that surprise you?

25             MR. GUAGLARDI:  Objection.

```
 1                    C. GASKIN
 2       A.    I don't know about the word
 3  "surprise," but I just said I'm not aware
 4  of the number so I don't know how to
 5  answer that.
 6       Q.    And, do you know how many
 7  public software companies are categorized
 8  as system software companies?
 9       A.    No.
10       Q.    And, would it surprise you if
11  I told you there was 112 companies?
12             MR. GUAGLARDI:  Objection.
13       A.    I'm assuming you're just
14  telling me information you got from
15  someone else.  I can't say I'm surprised
16  or not.
17       Q.    And, as part of your research,
18  do you know how many public software
19  companies that are categorized as system
20  software companies that would be
21  considered small in kneecap firms closely
22  in size to CSV?
23             MR. GUAGLARDI:  Same
24       objection.
25       A.    Well, I don't know the
```

C. GASKIN

specifics of if you're breaking these

company lists out on your own, but the

companies we looked at, none of them were

deemed comparable.

Q.     And, why were they not deemed

comparable?

A.     Well, there's a whole bunch of

criteria that you need to consider when

you use the market approach.  You have to

look at -- well, if you're looking at

public companies, you have to look at the

size, you got to look at comparable

services, you have to look at financial

data, you know, size of revenues, the

amount of net profit, are they -- what

location do they have, do they have

multiple locations, do they have multiple

departments, do they have a concentration

of clients, do they have similar

competitors, do they have similar risks,

do they have same size of management.

Basically you're trying to find as close

of a company that's built like you're

subject company, CSV, to see if their

```
 1                    C. GASKIN
 2    comparable or not.  We did not find any
 3    comparable companies using the guideline
 4    public company method based on our
 5    research.
 6         Q.      And, these analysis that you
 7    performed were all on SaaS companies?
 8         A.      We reviewed the industry with
 9    SIC Code 7371, which is software
10    development companies, and are provided
11    with a list of companies that fall in
12    that code.  Now, that means could it be
13    companies that specific only do software
14    development or companies that have a
15    department that do software development
16    and we review that list to determine
17    whether or not they are comparable to our
18    subject company.
19         Q.      So you look for comparable
20    companies in the soft development field,
21    not SaaS field, correct?
22              MR. GUAGLARDI:  Objection.
23         A.      Yeah, we use SIC Code 7371.
24         Q.      Are you sure that 7371 is
25    correct?
```

1                    C. GASKIN

2              MR. GUAGLARDI:  Objection.

3        A.      That's what we chose based on

4    the services provided.

5        Q.      You had an option to choose

6    something else?

7              MR. GUAGLARDI:  Objection.

8        A.      Not -- we used software

9    development that we used the SIC code

10   that was reported I believe on the

11   company's tax determined based it off of

12   what they report as on their tax returns

13   to the IRS.

14       Q.      And, you didn't do any

15   independent review in terms of what the

16   appropriate classification would be when

17   you're doing a valuation?

18              MR. GUAGLARDI:  Could you

19        repeat that question.

20              MR. SIM:  Could you read that

21        back?

22              (Whereupon, the requested

23        portion of the record was read back

24        by the Court Reporter.)

25              MR. GUAGLARDI:  You can

C. GASKIN

2    answer.

3         A.      We believe the review that we

4    did was appropriate.

5         Q.      What review that you did?

6         A.      The industry search --

7              MR. GUAGLARDI:  Objection.

8         A.      -- the industry search and

9    review of comparables that are in my work

10   paper file.

11        Q.      And software development

12   companies would be a company like SAGA

13   that develop softwares for sale in

14   market, correct, they develop softwares?

15        A.      It could be.

16             MR. GUAGLARDI:  Objection.

17        Q.      But CSV through ChannelReply

18   they don't software in the market, they

19   sell software as a service, correct?

20        A.      I would agree.

21        Q.      And, did you study any public

22   companies in the SaaS business?

23        A.      I looked at the list of the

24   company companies that came up.  Remember

25   type of services is only one form of

```
 1                    C. GASKIN
 2   comparability.  And everything single
 3   company that we came up, whether they
 4   were close or not into the service line
 5   as CSV is there was plenty of the other
 6   reasons as to why all of these public
 7   companies were not comparable, most of
 8   which were financially not comparable.
 9        Q.      And, that had to do with
10   number of offices, I think those are some
11   of the factors that you listed, correct?
12        A.      Well, yeah, correct, that's
13   not financial related, that's some of the
14   criteria that we also considered.
15        Q.      What would the number of
16   offices have to do with the SaaS
17   business?
18        A.      The amount of clients that
19   you're --
20              MR. GUAGLARDI:  Objection.
21        A.      -- the amount of clients that
22   you're able to service, the amount
23   employees that you're able to house, you
24   know, if you're going to be servicing
25   across the country or internationally.
```

```
 1                     C. GASKIN
 2        Q.      Well, my understanding is that
 3    for a SaaS business when the software
 4    permits a number of users it's the
 5    scalability, the software itself, not
 6    necessarily the number of offices that
 7    dictates how many customers it can
 8    service, correct?
 9        A.      Well, I think that --
10                MR. GUAGLARDI:  Objection.
11        A.      -- I think that when you're
12    comparing companies that have many office
13    as to something as CSV where they have
14    just a handful of program developers,
15    whether or not you can work remotely or
16    you're going to make the comparison that
17    once the service is up and running you
18    can service as many clients as you need
19    is not necessarily accurate because the
20    more clients you have the more IT help
21    you're going to need, the more help desk
22    service and customer service you're going
23    to need, which would require more
24    employees or potentially more office
25    space when you're servicing a wider range
```

1                    C. GASKIN

2  of client base for a public company than

3  CSV is.

4       Q.    And, this has to do with

5  scalability.  So when, you know, you

6  perform a valuation and under the market

7  approach you would make adjustments for

8  the fact there be less number of offices

9  or less number of developers, correct?

10      A.    You could.  Those are all

11 subjective.

12      Q.    And, did you decide to making

13 the adjustments in using some of the SaaS

14 businesses out there in that's in public

15 space?

16      A.    I did not use the market

17 approach so --

18           MR. GUAGLARDI:  Objection.

19           THE WITNESS:  Are you on a

20      delay, Barry?  Should I wait even

21      longer?

22           MR. GUAGLARDI:  Yeah, I must

23      be the Internet -- I don't what to

24      tell you I'm sitting in my office,

25      but I guess the building is not used

1                    C. GASKIN

2       to some many users at once.  It's

3       just giving me a little bit of a

4       delay.  Thanks.

5            THE WITNESS:  All right.  I

6       think you objected to the last

7       question.  I just want to --

8            MR. GUAGLARDI:  I did, but you

9       can answer.  Any objection I make you

10      can answer it, just let me make the

11      objection.

12            THE WITNESS:  Understood.

13      A.     I did not adjust any multiples

14   because we did not use the market

15   approach so we never got the point of

16   where we were able determine what an

17   appropriate valuation multiple would be

18   using the market approach because we did

19   not find any comparable transactions or

20   companies to utilize, therefore there

21   would be no multiples to adjust.

22      Q.     Just so I'm clear because you

23   couldn't find any comparable publically

24   traded firms or companies, you didn't

25   even perform any market approach

1                    C. GASKIN
2    analysis, correct?
3         A.    Correct.
4         Q.    And I believe the third
5    approach would be what's known as an
6    income approach?
7         A.    Yes.
8         Q.    What is an income approach?
9         A.    Income approach is when you
10   place the value on a business based on
11   it's estimated ongoing income stream,
12   cash flow.
13        Q.    And, you got various kinds of
14   income approach valuations, correct?
15        A.    Yes.
16        Q.    And one of those would be the
17   discounted cash flow?
18        A.    That's correct.
19        Q.    And, what is the discounted
20   cash flow?
21        A.    The discounted cash flow is
22   one of the methods under the income
23   approach as you said and the valuator has
24   to project what the income stream is
25   going to be for that business for a

1                    C. GASKIN
2   period of years until they believe that
3   the income stream is going to stabilize
4   at some point and then those income
5   streams are present valued to the current
6   valuation date in order to calculate
7   value for the company.
8        Q.     Did you use that discounted
9   cash flow?
10       A.     We considered it.  We did not
11  use it.
12       Q.     And, why didn't you use it?
13       A.     Because we did not believe it
14  was an appropriate method based on the
15  information available.
16       Q.     What information available did
17  you consider it not an appropriate
18  method?
19            MR. GUAGLARDI:  Objection.  If
20        you understand that question.  Could
21        you repeat that question, please?
22            (Whereupon, the requested
23        portion of the record was read back
24        by the Court Reporter.)
25            MR. GUAGLARDI:  Go ahead.

1                    C. GASKIN
2        A.      Based on the financial
3    information that we reviewed and our
4    discussions with Mr. Dardashtian on the
5    company's future expectations, we did not
6    believe doing a discounted cash flow was
7    appropriate and we did not believe that
8    there was financial information available
9    in order to be able to appropriately
10   predict what the company is going to earn
11   in the future.
12       Q.      And, in on page 19 of your
13   valuation report, you indicated, and I'll
14   quote, The DCF method was considered in
15   our analysis but not employed given that
16   a forecast was not provided to us and we
17   were unable to estimate the future cash
18   flows ourselves."  Do you recall that?
19       A.      Yes.  I believe that's what I
20   just explained.
21       Q.      And, when you say the forecast
22   was not provided to you, who didn't
23   provide the forecast?
24       A.      There was no forecast prepared
25   by the company to provide.

1                    C. GASKIN

2       Q.     Did you ask for one?

3       A.     Yes.

4       Q.     And, who did you ask?

5       A.     We asked Mr. Dardashtian.

6       Q.     And, this was during the

7  interview or a separate correspondence?

8       A.     This was during an interview.

9       Q.     And, you asked him for a

10  projection?

11      A.     Yes.

12      Q.     And he said he can't do it?

13             MR. GUAGLARDI:  Objection.

14      A.     No.  I asked him if the

15  company has previously prepared

16  projections and I asked him if he had any

17  projections that have been prepared as of

18  the valuation date, and he said that he

19  did not have any and none were prepared.

20      Q.     And, did you ask him to

21  prepare one?

22      A.     I don't believe that I did.

23      Q.     Why not?

24      A.     Because if the company has not

25  previously prepared forecasts in my

C. GASKIN

1
2    professional opinion unrelated to this
3    litigation, I would prefer to review
4    forecasts that are not biased in any
5    sense while there my not be any malintent
6    on either parties' mind when they're
7    preparing these.  If I ask them to
8    prepare as a result of this litigation,
9    I'd be concerned that it may not be
10   completely accurate as if either party
11   would've prepared a projection outside of
12   this litigation and based on the industry
13   and being able to project income going
14   forward is also an extremely difficult
15   thing to do.  It's not uncommon for a
16   company this size not to prepare for
17   projections so I didn't want to ask him
18   to do something that they've never done
19   before.  So and we did not believe that
20   we had the financial trend availability
21   based on the company only doing the
22   software for a couple of years to be able
23   to appropriately project what the cash
24   flows be on?
25        Q.    And, you didn't consider

1                    C. GASKIN

2   asking the company CPA, Mr. Liebman,

3   correct?

4        A.     No.

5        Q.     And your valuation report also

6   indicated that "Additionally based on

7   discussions with management, the future

8   expectations of operations are estimated

9   to remain consistent or to remain

10  relatively consistent.  There are no

11  significant growth opportunities or

12  unplanned expenses projected."  Do you

13  recall that?

14       A.     Yes.

15       Q.     And, what did you mean by

16  that, that the expectations of operations

17  are estimated to remain relatively

18  consistent?

19       A.     As of each valuation date we

20  have to assess where the current

21  company's cash flow is and how it's going

22  to compare to what the company's future

23  expectations of cash flow are going to

24  be.  Based on our review of the financial

25  documents and discussions with Mr.

```
 1                    C. GASKIN
 2   Dardashtian at each valuation date, we
 3   assess the company that it was at a
 4   stable position given the previous trends
 5   and previous growth and that the company
 6   would remain similar financially to where
 7   it was at valuation dates that we
 8   prepared for the company.
 9       Q.      And, as a forensic accountant
10   you weren't capable of preparing
11   projections?
12              MR. GUAGLARDI:  Objection.
13       A.     I am capable of preparing
14   projections.  I chose not to use that
15   approach in this valuation.
16       Q.     Why not?
17       A.     Because I did not think it was
18   appreciate.  We believed when -- at each
19   valuation date when assessed that the
20   company's financial situation, that the
21   capitalization earnings approach was the
22   appropriate method to value.
23       Q.     And, the company's capitalized
24   earnings approach, that's not really
25   considered a main stream valuation
```

1                          C. GASKIN

2    approach, that's considered more fringed,

3    correct?

4                MR. GUAGLARDI:  Objection.

5         A.     I don't know that I can agree

6    with your statement.  I've never --

7         Q.     What would you disagree about

8    that statement?

9         A.     I believe think they're both

10   equal -- equally considered approaches.

11        Q.     Ms. Gaskin, you analyzed the

12   sales history of CSV; didn't you?

13        A.     Yes.

14        Q.     And specifically you also

15   identified to the point where you named

16   it as an Exhibit 2 in your valuation

17   report, correct?

18        A.     Can you repeat that question?

19        Q.     You got sales history embodied

20   in Table 2 of your valuation report,

21   correct?

22        A.     Yes.  Sorry.  Exhibit 2

23   reflects the summary of the companies tax

24   returns which shows the gross revenues of

25   the company?

1              C. GASKIN

2        Q.      What was the source of these

3    numbers?

4        A.      The tax returns up until 2019

5    which we were not provided with the 2019

6    tax return so we used the company's

7    QuickBooks file in order to prepare their

8    financial statements.

9        Q.      And, when you analyzed CSV

10    revenue sales you noticed that sales grow

11    almost five times in the year from 2016

12    to 2019, correct?

13       A.      Well, if I rely on your math

14    which eyeballing it quickly, yes is --

15    no, I do not -- from 2016 to 2019, is

16    that what you said?

17       Q.      Yes.

18       A.      The sales did not even double.

19    2016 it was a little over 400,000, and

20    2019 is was a little over 792; that's not

21    five times.

22       Q.      No, in your Table 2 you make

23    an adjustment of NDAP revenues.  This is

24    for ChannelReply.  So when you make that

25    adjustment, ChannelReply, it's actually

```
 1                    C. GASKIN
 2  revenues was 184,544 in Table 2, correct?
 3      A.    I'm looking at the summary of
 4  the tax return.  So we may be looking at
 5  two different things.  I want to make
 6  sure we're looking at the right numbers
 7  here.
 8      Q.    I'm looking at Table 2, page
 9  15.
10          MR. GUAGLARDI:  Sang, can you
11      clarify what table you're looking at,
12      what page?
13          MR. SIM:  Yeah.  I just said
14      Table 2.
15          MR. GUAGLARDI:  What page?
16          MR. SIM:  Page 15.
17      A.    Okay.  Yeah.  I was looking at
18  the wrong page.  I apologize.
19      Q.    Oh, okay.
20      A.    So yes.
21      Q.    So you would agree that
22  revenues grow from 184,000 at the end of
23  2016 to over 792,000 in 2019 --
24          MR. GUAGLARDI:  You're
25      breaking up.
```

1                    C. GASKIN

2        Q.      In Ms. Gaskin, you would agree

3    at the end of December 31, 2016,

4    ChannelReply actual revenues was

5    $184,544, correct?

6        A.      Yes.

7        Q.      And, at the end of December

8    31, 2017, ChannelReply's revenues

9    increased to $376,136, correct?

10       A.      Yes.

11       Q.      And, at the end of

12   December 31, 2018, ChannelReply's actual

13   revenues were $590,089, correct?

14       A.      Yes.

15       Q.      And, at the end of

16   December 31, 2019, ChannelReply's actual

17   revenues was $792,465, correct?

18       A.      Yes.

19       Q.      So there's an upward trend of

20   revenues for this company here, correct?

21       A.      Yes.

22       Q.      And, would you consider this

23   company as being mature?

24              MR. GUAGLARDI:  Objection.

25       A.      It depends on what date you're

1                    C. GASKIN

2    asking me, I guess.  Remember, I valued

3    this company at about three different

4    valuation dates so you're supposed

5    consider what's known as knowable at a

6    valuation date, not actually what

7    happened if the valuation date is earlier

8    than what the current date is.

9         Q.     So let's say like your, you

10   know, January 1, 2020, valuation date, at

11   that time, would you consider this

12   business to be steady mature?

13             MR. GUAGLARDI:  Objection.

14        A.     What we considered as of

15   December 31, 2019, financials which was

16   technically the May 1, 2020 date, we

17   estimated that the company's current cash

18   flow at that time is going to remain

19   relatively consistent going forward.  If

20   you looked at the capital -- the growth

21   rate that we used prior to capitalizing

22   the income, we did apply an additional

23   growth factor to consider more growth

24   moving forward in the short-term, but in

25   the long-term we believe that the company

```
1                    C. GASKIN
2    is stable.
3         Q.     Where did you get that
4    information, that the company going
5    forward would be stabilize?
6         A.     That's my professional
7    judgment based on the review of the
8    financials.
9         Q.     And, with respect to CSV's
10   three-year compounded annual growth rate
11   for ChannelReply from year end 2016 to
12   2019, what was the compounded annual
13   growth rate for CSV?
14        A.     I'd have to calculate that.  I
15   don't have it offhand.
16        Q.     If I told you about
17   43 percent, would that be about right?
18               MR. GUAGLARDI:  Objection.
19        A.     Well, if your math is -- I
20   said I didn't make the calculations.  So
21   If I assume if your math is correct --
22               MR. GUAGLARDI:  I'm going to
23        ask that nobody guess.  All right.
24        Q.     How long does it take you to
25   make those calculation?
```

1                    C. GASKIN

2      A.      Not long.

3      Q.      Could you make the calculation

4   now?

5      A.      Sure.  I'm just pulling out my

6   calculator.  Yes, that's about right,

7   43 percent.

8      Q.      About 43 percent, correct?

9   And in a company that's been growing the

10  last three years at 43 percent, you would

11  consider that a stable state?

12     A.      No, what I consider -- when I

13  look at the current financials is that I

14  don't consider that a company can

15  continue to grow at a 43 percent growth

16  rate.  Based on the amount it had grown

17  and the size of the company we

18  anticipated that it was -- that it hit

19  the top of that growth rate and it was

20  not going to continue at that rate moving

21  forward, it was going to continue at a

22  rate more consistent with what the

23  industry standard was seeing.

24     Q.      And, when you say "the

25  industry standard is seeing," industry

```
 1                    C. GASKIN
 2   standard means SaaS companies?
 3        A.      The industry standard of the
 4   economy as a whole and the IT and
 5   software development industry itself
 6   which is detailed in my valuation report.
 7        Q.      And, in your valuation report
 8   you indicated that as a result of Covid
 9   that you see consumers moving more
10   towards e-commerce and away from
11   brick-and-mortar stores and so that you
12   see continued growth in this area; would
13   that be fair?
14        A.      Yes, we said some continued
15   growth that was going to result from
16   Covid.
17        Q.      And, you also indicated in
18   your report that SaaS companies have some
19   of the highest growth in the industry,
20   correct?
21        A.      Yes.
22        Q.      So why would a company, a SaaS
23   company like CSV now experience a
24   slowdown?
25        A.      Well, based on the information
```

```
 1                    C. GASKIN
 2   that we used and the calculation that we
 3   did as of the May 2020 calculation, we
 4   did apply a higher growth rate initially
 5   to the company to account for that, and
 6   then in the long-term we estimated that
 7   the company was going to grow actually at
 8   I believe it was 4 percent which was
 9   slightly higher than the economy growth
10   rate was expected to be because of the
11   industry that it is in.  A company cannot
12   continue to grow at a 43 percent rate or
13   a 10 percent rate each year into
14   perpetuity.  The point of valuation is to
15   try an estimate the cash flows to a point
16   of that it can remain consistently
17   throughout the rest of it's business
18   life.
19        Q.    And, in a point of a valuation
20   would be at a particular time would the
21   value of the company would be, correct?
22        A.    At a particular point in time,
23   yes.
24        Q.    And, you also indicated that
25   you don't expect CSV, that there's no
```

```
 1                    C. GASKIN
 2  significant growth opportunities, I think
 3  that's what you provided in your report,
 4  correct?
 5       A.    Yes.  As we were aware as when
 6  we prepared this analysis there was
 7  nothing we were aware of that could
 8  continue to increase this company's sales
 9  at a rate of 43 percent.
10       Q.    How about continuing to
11  increase at 20 percent?
12            MR. GUAGLARDI:  Objection.
13       A.    I think we estimated the cash
14  flows based on the growth rated in our
15  report.  We did not believe the company
16  was going to continue to grow at a rate
17  20 percent a year into perpetuity.
18       Q.    And, when you say
19  "perpetuity," what do you mean by
20  "perpetuity"?
21       A.    Well, the concept of valuation
22  is that someone's going to pay for a
23  business for the expected cash flows for
24  the life that the business is able to
25  maintain, so perpetuity could mean five
```

```
1                    C. GASKIN
2    years, it could mean twenty-five years
3    for a business but is expected as a going
4    concern to be long-term so being able to
5    sustain a growth rate well above what the
6    economy is projected to grow at if you're
7    eventually going to -- when you're going
8    to purchase a business and keep it
9    running, it's very unrealistic to think
10   that they're going to be able to grow
11   year over year at a substantial rate
12   above the growth of the economy.
13        Q.    And, did you independently
14   verify that?
15        A.    Independently verify, I don't
16   understand your question.
17        Q.    Well, I mean, in your report
18   you basically have a lot of, you know,
19   forecast from economics reports and
20   things of this nature.  Did you find any
21   economics report regarding SaaS
22   businesses that would reconcile your view
23   that there'd be no further growth other
24   than the capitalization rate that you
25   provided?
```

```
 1                    C. GASKIN
 2          MR. GUAGLARDI:  Objection.
 3      A.      We didn't say that the growth
 4  rate is the one based on the
 5  capitalization rate.  There is two growth
 6  rates in that calculation.  The first one
 7  we applied I believe it was a 10 percent
 8  growth rate applicable for the long-term
 9  growth factor in the 2020 valuation
10  number and then we used the long-term
11  growth rate of 4 percent and the
12  capitalization rate which is the expected
13  long-term growth rate into perpetuity
14  while the company remains active and at a
15  stable level.
16      Q.      So where did you come up with
17  4 percent?
18      A.      That was my professional
19  judgment based only our research.
20      Q.      Based on your research.  And
21  could you identify that research?
22      A.      Yes.  It's the economic and
23  industry research that's in our file and
24  based on the financial history of the
25  company.
```

```
 1                 C. GASKIN
 2      Q.     And based on the financial
 3   history of the company, they got a growth
 4   rate of 43 percent, correct?
 5              MR. GUAGLARDI:  Objection.
 6      A.     Yes.  And as I had previously
 7   explained, it's my position that that
 8   growth rate is not able to be maintained
 9   into perpetuity.
10      Q.     So that you reduced that to 4
11   percent?
12      A.     In the capitalization rate for
13   the estimated long-term growth, yes,
14   there's additional growth rate considered
15   in the capitalization rate and the
16   capitalization calculation.
17      Q.     And let me ask you a question,
18   why did you chose a discontinued flow
19   method to capture various cash flow
20   rates?
21      A.     Because when we reviewed the
22   trends of the company and based on the
23   research we performed for the industry
24   and based on the discussions with Mr.
25   Dardashtian and what was known or
```

1                    C. GASKIN

2    knowable at the time of each valuation

3    date, which were all relatively close at

4    those times, we chose that the company

5    had experienced large growth up until

6    that point and that it was going to

7    stabilize because we did not believe that

8    that level of growth was going to be able

9    to be maintained going forward.

10        Q.    So you didn't analyze CSV

11   under two-stage DCF model, correct?

12        A.    I'm sorry, can you repeat

13   that?  I didn't hear.

14        Q.    So you didn't analyze CSV

15   under a two-stage DCF model?

16             MR. GUAGLARDI:  Objection.  If

17        she understand what that means.

18        A.    We didn't -- like I said

19   before, we did not use a discounted cash

20   flow method to value the company.

21        Q.    And a two-stage DCF model is

22   also known as a H-model, correct?

23        A.    I've never used that method

24   before.  But we did not use any DCF

25   method in this report.

1                    C. GASKIN

2        Q.      Are you familiar with the

3    H-model?

4        A.      No, I'm not.  I never heard of

5    that.

6        Q.      Would you consider not using a

7    H-model against best practices for high

8    growth firms?

9        A.      Can you repeat --

10               MR. GUAGLARDI:  Objection.

11       A.      Can you repeat that question?

12       Q.      Sure.

13               MR. SIM:  Can I just have that

14       read back, please.

15               (Whereupon, the requested

16       portion of the record was read back

17       by the Court Reporter.)

18       A.      We didn't use -- I didn't use

19    any DCF methods in my approach.

20       Q.      And, why not?

21               MR. GUAGLARDI:  Same

22       objection.  It's been asked and

23       answered multiple times.  But you can

24       answer it again.

25       A.      As of the valuation dates we

```
 1                    C. GASKIN
 2    deemed the capitalization of earnings
 3    method to be most appropriate.  Given the
 4    previous growth of the firm we did not
 5    believe it was able to be sustained
 6    moving forward and that the company
 7    reached a relatively stable earnings
 8    capacity at that time so we used
 9    capitalization of earnings method.
10         Q.    Did you do any analysis under
11    discounted cash flow method?
12         A.    I did not prepare a discounted
13    cash flow for the reasons I've already
14    put on the record.
15         Q.    Are you aware that investors
16    or buyers of valued tech companies look
17    at a company favorably if there's a
18    combined revenue growth and net mar gage
19    profit margin that are above 40 percent a
20    year --
21              MR. GUAGLARDI:  Objection.
22         Q.    -- that's known as a Rule 40,
23    are you aware of that?
24              MR. GUAGLARDI:  Objection.
25         A.    No.
```

```
1                    C. GASKIN
2       Q.     And, do you know that CSV
3  exceeds the Rule 40 for revenues alone
4  before even considering profitability?
5             MR. GUAGLARDI:  Objection.
6        How could she possibly answer that
7        question if you didn't ask her what
8        the Rule 40 is?  I mean, it's
9        ridiculous.  Objection.
10            MR. SIM:  She's an expert.
11       Barry, she can tell me if she doesn't
12       know Rule 40.
13            MR. GUAGLARDI:  Only if you
14       ask her the question.
15            MR. SIM:  I did ask her the
16       question.
17            MR. GUAGLARDI:  And she said
18       she didn't.
19            MR. SIM:  And she said she's
20       not aware of Rule 40.
21            MR. GUAGLARDI:  So how can you
22       ask her a question if that
23       encompasses Rule 40 if she's not
24       aware of it?  Objection.
25            MR. SIM:  Let's take a break
```

```
1                    C. GASKIN
2        for five minutes, if you guys don't
3        mind.
4               MR. GUAGLARDI:  Sure.
5               THE WITNESS:  Sure.
6               (Whereupon, a brief recess was
7        taken by all parties.)
8   CONTINUED EXAMINATION BY
9   MR. SIM:
10       Q.     Ms. Gaskin, you indicated that
11  you had spoken Mr. Dardashtian over the
12  phone in an interview, correct?
13       A.     I did, yes.
14       Q.     And, did you ask Mr.
15  Dardashtian if it was his intent to sell
16  the business or his intent to keep the
17  business?
18       A.     Yes, yes, we had that
19  discussion.
20       Q.     What did Mr. Dardashtian tell
21  you?
22       A.     That it was his intent to keep
23  the business.
24       Q.     So it wasn't his intent to
25  sell the business, correct?
```

1                    C. GASKIN

2              MR. GUAGLARDI:  Objection.

3        She just answered that.

4        A.      Not based on my interview with

5    him, no.

6        Q.      Ms. Gaskin, can you tell me

7    the about the capitalized excess earnings

8    method, it's also known as the earnings

9    excess method, correct?

10       A.      Yes.

11       Q.      Can you tell us what is a

12   capitalized earnings excess earnings

13   method?

14       A.      Capitalized excess earning

15   method is a hybrid of basically the asset

16   approach and the income approach.  And

17   it's not a widely used approach but it is

18   another approach that's available for

19   valuation purposes.

20       Q.      And, why is it not a widely

21   used approach?

22       A.      Because the income approach,

23   the market approach are the more common

24   ones that are deemed to be give a more

25   appropriate value for businesses.  The --

```
 1                    C. GASKIN
 2   in my experience, the excess earnings
 3   method is -- some people call it like a
 4   double check.
 5        Q.    And, you indicated that income
 6   approach and market approach is more
 7   accepted, is that what you said?
 8        A.    Yes, that's what I said.
 9        Q.    And, why is it more accepted?
10        A.    I believe I said because it's
11   based on the financial analysis that you
12   do provides.  Depending on which one is
13   appropriate to value your business based
14   on your analysis, it provides the best
15   indication of value.
16        Q.    And, do you know what the
17   history of the capitalized excess
18   earnings method was?
19        A.    The history?
20        Q.    Yes.
21        A.    I don't know that I understand
22   your question.
23        Q.    Well, the history in terms of
24   why it was created.
25        A.    I'm not sure how to answer
```

1                    C. GASKIN
2    that.
3        Q.     When you say you don't know
4    how to answer, is it because you don't
5    know the history or you don't understand
6    the question?  I'm not exactly sure.
7        A.     Well, why it was -- a
8    valuation a method that was created to
9    value a business?
10       Q.     Yes.
11       A.     I don't know that I can answer
12   any more than I just said.
13       Q.     So you don't know the history?
14              MR. GUAGLARDI:  Objection.
15       A.     I think I answered it.  I
16   don't know if you're waiting.  I don't
17   know what you tell you about the history
18   for the creation approach.
19       Q.     Is it your understanding that
20   this approach was created during the
21   prohibition to value retail liquor
22   businesses?
23              MR. GUAGLARDI:  Objection.
24       Come on, Sang.  You seriously want
25       her to answer that question?

                    C. GASKIN

1                   MR. SIM:  Yes.

2                   MR. GUAGLARDI:  Okay.  I mean,

3         let's take judicial note that I'm not

4         sure Carleen was around in 1929.

5         But, you know, my objection is noted.

6         A.    I did not know it was created

7    to value liquor businesses.

8         Q.    And, are you aware that the

9    Internal Revenue Service, Revenue Rule

10   68609 notes that the excess earnings

11   method should be used to value intangible

12   assets only if there is no better basis

13   available?

14        A.    I am aware of that.

15        Q.    And, does CSV have significant

16   intangible value?

17        A.    We calculated that value using

18   the capitalization of earnings method.

19        Q.    And, you say that it does have

20   significant intangible value?

21        A.    The capitalization of earnings

22   value calculates value of the business

23   based on it's operating income and it

24   includes all of it's assets.

1                    C. GASKIN

2        Q.      And, did you value the

3   software as a standalone?

4        A.      Company software is what

5   produces the revenue which is why we use

6   a capitalization of earnings method, we

7   valued it's income stream.

8        Q.      And I noticed that as we go in

9   to your valuation report there are some

10   assumptions, and I can get into those

11   assumptions, right.  And do you have any

12   support where you indicated that $150,000

13   salary adjustment in your report?

14        A.      Support meaning work papers?

15        Q.      Yes.

16        A.      I do in my file.

17             MR. SIM:  I'm going to call

18        for the production of those work

19        papers.

20             MR. GUAGLARDI:  We'll take it

21        under advisement.  Just send in a

22        note.

23             (Whereupon, request is noted

24        on index page.)

25        Q.      And I notice that you also

1                    C. GASKIN

2    took a discount for lack of

3    marketability?

4          A.      Yes, I did.

5          Q.      And, why did you take a

6    discount for lack of marketability?

7          A.      Because based under the fair

8    value standard under for valuing a

9    business for shareholder dispute, it's

10   something that should be considered in

11   your valuation and given the current

12   conditions of this business we believe

13   that it was an appropriate discount to

14   take?

15         Q.      And but you interviewed Mr.

16   Dardashtian and he indicated that he

17   intends to hold on to the company and not

18   sell it?

19         A.      That's correct.

20         Q.      So why would a lack of

21   marketability discount be appropriate?

22         A.      Because under the fair value

23   statute you have the value the business

24   and when you're looking at a shareholder

25   dispute as to what would be considered if

```
 1                   C. GASKIN
 2    the parties were able to -- part of it is
 3    what is it worth int the open market and
 4    how easily would it be able to liquidate
 5    moving forward is one of the standards
 6    that has to be considered in the
 7    valuation.
 8         Q.     And, are you familiar with the
 9    New York fair value cases where some
10    courts have indicated that there should
11    be -- if there's a prohibition against
12    discount for lack of marketability?
13              MR. GUAGLARDI:  Objection.
14         A.     And it's a -- we relied on
15    that there's court cases that support the
16    discount for lack of marketability.
17         Q.     Are you aware of New York
18    course cases that prohibit the use of
19    discontinue for lack of marketability?
20              MR. GUAGLARDI:  Objection.
21         A.     I believe that there are some
22    out there, but I -- it's my understanding
23    based on a fair value standard in the
24    State of New York that discounts for lack
25    marketability are accepted in shareholder
```

                    C. GASKIN
 1
 2   disputes.
 3        Q.     In your analysis, in your
 4   valuation report, did you use cases in
 5   the business valuation resources under
 6   BVLaw?
 7        A.     I don't understand your
 8   question.
 9        Q.     As part of your research
10   analysis, did, you use a website BVLaw?
11             MR. GUAGLARDI:   Objection.
12        A.     Not that I'm aware.  I don't
13   know what I would use BVLaw for.
14        Q.     And let me go back to CSV.
15   It's your understanding that this is a
16   pass-through S Corporation?
17        A.     Yes.
18        Q.     And, are you aware of any
19   studies or empirical evidence that
20   indicates that pass-through entities tend
21   to be more valuable than C Corporations
22   due to the avoidance of taxes at the
23   entity level?
24        A.     Yes, I am aware of that
25   information regarding that issue.

```
 1                    C. GASKIN
 2        Q.        And, did you apply any
 3   adjustment upward for the fact that CSV
 4   is a pass-through entity and do not pay
 5   any entity level taxes?
 6        A.        We do not handle that
 7   adjustment separately.  I handle that
 8   adjustment in my tax assessment when I do
 9   the capitalization of earnings rate.
10        Q.        Cause I notice that when you
11   were doing the adjustment for taxes you
12   took a tax of 27 percent into your
13   calculation when there's no 27 percent
14   tax at the entity level for this entity.
15        A.        That's correct on a tax rate
16   we used and we applied an applicable tax
17   rate based on a combination of factors
18   for valuation purposes and take into
19   consideration what the shareholders' tax
20   rate is at their level as well since
21   taxes aren't completely avoided, they're
22   just transferred through to the other
23   shareholder level.
24        Q.        So when you're doing a
25   valuation of C Corporation you would take
```

```
 1              C. GASKIN
 2   the corporate tax rate and then also
 3   apply a dividend tax rate to it's
 4   shareholders?
 5              MR. GUAGLARDI:  Objection.
 6       A.     No, I would not do that.
 7       Q.     So why would do that for an
 8   entity level that has pass-through taxes
 9   that doesn't pay taxes at the entity
10   level?
11       A.     Because you have to plan for
12   different events in the future since
13   we're valuing future cash flow that there
14   could be some built in taxes if and when
15   the business is ever sold or there's
16   other transfers that happened and in
17   addition to the fact that all of the
18   public company data and the
19   capitalization rates all considered tax
20   rates, and if you don't consider a tax
21   rate at all and only consider this at a
22   gross level, my opinion you're going to
23   overvalue the business.
24       Q.     But you didn't apply any S
25   Corp. or LLC premium models in your
```

```
 1                 C. GASKIN
 2   analysis, correct?
 3        A.     No, I did not.
 4        Q.     Do you think an S Corp.
 5   pass-through entity premium model should
 6   have been applied?
 7        A.     No, I did not.
 8        Q.     And I also -- there, as part
 9   of the valuation assumption you had
10   readjusted Mike Dardashtian's personal
11   expenses of $250,000.  Can you explain
12   what these adjustments are?
13        A.     Those are not -- those are not
14   all Michael Dardashtian's personal
15   expenses.  Those are all expenses that
16   were deemed to be non-business-related
17   which related to a court ordered
18   allocation of fee payment regarding this
19   litigation that was split between both
20   Mr. Gitman and Mr. Dardashtian.  So this
21   was deducted as a professional fee
22   expense on the tax return.  We just
23   allowed it as a deduction since we do not
24   deem it to be an ongoing necessary
25   business expense that partners received
```

```
1                     C. GASKIN
2    the benefit of.
3         Q.    And, as far as the NDAP books,
4    did you make any adjustments NDAP
5    business in the valuation?
6         A.    In the earlier years when that
7    company did exist prior to the sale we
8    removed that activity from CSV's records
9    since that company was sold and it
10   wouldn't be deemed continuing operations
11   of CSV.
12        Q.    And, in your valuation of this
13   company, did you analyze excess cash?
14        A.    I did.
15        Q.    And, as far as the cash of
16   December 31, 2019, there was about
17   $693,000 sitting in the account?
18        A.    That sounds about correct,
19   yes.
20        Q.    And, was that excess cash
21   computed into the valuation model?
22        A.    We do not believe there is
23   excess cash on the balance, so there was
24   no excess cash added into the valuation.
25        Q.    So you don't believe the 600
```

                    C. GASKIN
1
2   -- excess of 693,000 is excess cash that
3   the company is holding?
4        A.    No, we do not.
5        Q.    And, in part of your report
6   you indicated that the cash is being held
7   because of litigation, that under normal
8   circumstances these amounts would have
9   been distributed to the owners, correct?
10       A.    I believe the report says that
11  this amount would have been paid as
12  compensation for services performed by
13  the owners.  I can find the exact page.
14  But that's my position, that if there was
15  no litigation, there would have been a
16  reasonable compensation paid to the
17  owners for running the business for
18  profits were distributed.
19       Q.    And, why would you think that
20  the company need to hold $693,000?
21       A.    That's not what I said.  I
22  acknowledge that there's $693,000 on the
23  balance sheet as of December 31st.  I do
24  not believe that if this company was
25  running under normal circumstances

1                    C. GASKIN
2    without this litigation that there would
3    be $693,000 on the books.  One of the
4    main reasons is, there would have been an
5    appropriate salary paid for the functions
6    that have been performed in order to run
7    this company for the past few years that
8    has not been paid and if those salaries
9    were paid there would not be that cash
10   balance on the books as of December 31,
11   2019.
12        Q.      And, did you compare the
13   company's excess cash to guideline public
14   or private companies?
15        A.      Making an adjustment for
16   estimated compensation that should've
17   been paid to owners we then compared what
18   the cash balance would be to be to
19   industry statistics and it was in line
20   with what industry statistics presented.
21        Q.      And, what industry statistics
22   you referring to?
23        A.      We reviewed Integra database
24   and I compared it to the balance as to
25   what would be necessary in order to

1                    C. GASKIN

2     estimate the company's, I believe it was

3     three months of bills that cash on hand,

4     and both of those analysis, the company

5     was in line.

6          Q.     What are the company's monthly

7     expenses as you recall?

8          A.     Give me a second, I can pull

9     that up.

10         Q.     Sure.

11         A.     Based on our 2019 analysis, an

12    estimate of three months or ninety days

13    of company's expenses was approximately

14    $126,000.

15         Q.     And, the company's holding is

16    $693,000, correct?

17         A.     Without paying officers'

18    compensation, yes.

19         Q.     And, you estimated the officer

20    compensation to be about $150,000 a year?

21         A.     Correct.

22         Q.     And, you don't believe there's

23    excess cash held by this company?

24         A.     After a consideration that the

25    company should have paid $150,000 a year

1                          C. GASKIN

2    to it's officers, no, I do not.

3         Q.     Are you saying that that

4    company should pay it's officers that

5    amount of money?

6                 MR. GUAGLARDI:   Objection.

7         A.     We're -- yes, we're -- we are

8    estimating $150,000 a year of reasonable

9    officers' compensation that would be paid

10   to whoever's running the officers'

11   responsibilities and day-to-day tasks to

12   maintain company operations which has not

13   been paid over the last couple of years.

14        Q.     And, are you aware that excess

15   cash is a non-operating asset that should

16   be added back to month-to-month in any

17   valuation method?

18        A.     Yes, I am.

19               (Continued on the following

20         page to include signature line and

21         jurat.)

22

23

24

25

```
 1                    C. GASKIN
 2        Q.      And, you don't believe that
 3   there's excess cash being held by this
 4   company?
 5        A.      No, for the same reason I
 6   stated before, after a reasonable
 7   officers' compensation that should've
 8   been paid over the past few years which
 9   has been held by the company, I do not
10   believe that there's excess cash on this
11   books.
12            MR. SIM:  Ms. Gaskin, I
13        appreciate it.  Thank you.  I have no
14        more questions.
15             (Whereupon, at 11:50 a.m., the
16        Examination of this Witness was
17        concluded.)
18
19        _____
20                  CARLEEN GASKIN
21
     Signed and subscribed to before me,
22
     this_____day of _____  20___
23
24   _____
          NOTARY PUBLIC
25
```

1                          I  N  D  E  X

2

3

   EXAMINATION BY:                              PAGE

4

   Mr. Sim                                      6

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    E X H I B I T S

2

3

    EXHIBIT          DESCRIPTION                    PAGE

4

    A                Valuation report               14

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    R E Q U E S T S

 2

 3

    DOCUMENT REQUESTS:                    PAGE
 4

    Data source research list for          35
 5  transactions and public companies

 6  Work papers indicating $150,000 salary   76
    adjustment in your report

 7

 8

 9

10  INSERTS:                        PAGE  LINE

11  NONE

12

13

14

    RULINGS:                        PAGE  LINE
15
    NONE

16

17

18

19

20

21

22

23

24

25
```

1                          CERTIFICATION

2

   STATE OF NEW YORK   )

3                      SS:

   COUNTY OF NASSAU    )

4

5          I, Suzanne Catalano, a stenotype

6    reporter and Notary Public within and for the

7    State of New York, do hereby certify:

8          That the witness, CARLEEN GASKIN,

9    whose Examination Before Trial is hereinbefore

10   set forth, was first duly sworn by me, and

11   that such Examination Before Trial is a true

12   and accurate record of the testimony given by

13   said witness; and I further certify that I am

14   not related to any of the parties of this

15   action by blood or marriage and that I am in

16   no way interested in the outcome of this

17   matter.

18          IN WITNESS WHEREOF, I have hereunto

19   set my hand this 22nd day of June, 2020.

20

21

22                              _Suzanne Catalano_

23                              SUZANNE CATALANO

24

25