UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
MICHAEL DARDASHTIAN, individually and
on behalf of COOPER SQUARE VENTURES, LLC
NDAP, LLC and CHANNELREPLY, LLC    1:17 Civ.4327 (LLS)

        Plaintiffs,

               **AFFIDAVIT OF DAVID**
  -against-          **GITMAN**


DAVID GITMAN, ACCEL COMMERCE, LLC,
DALVA VENTURES, LLC, KONSTANTYN
BAGAIEV, OLESKII GLUKHAREV
and CHANNEL REPLY, INC.,
         Defendants.
-------------------------------------------------------------------X

   David Gitman, being duly sworn under penalties of perjury deposes and says the

following under penalties of perjury:

1.  I am a named defendant in this case and thus, I am familiar with the facts and

   circumstances as set forth herein.

2.  I initially met and was hired by Dardashtian on November 18th, 2010 as the Chief

   Technology Officer of Virtual Health, L.L.C. d/b/a Vodyssey Group ("hereinafter

   "Vodyssey").

3.  Along with Dardashtian, I formed Cooper Square Ventures, LLC ("hereinafter

   "CSV") as a holding company for NDAP LLC, d/b/a Next Day Auto Parts, d/b/a

   Car Part Kings ("hereinafter "NDAP"). We were the only managing members of

   CSV.

4.  I named the company CSV as Dardashtian and I regularly meet at a Starbucks by

   Cooper Square.

5.    From May 2011 I worked full time on CSV and its businesses including, among others, NDAP, Plumburs, LLC ("hereinafter "Plumburs"), Sigmento (M.C. Commerce Ltd.) ("hereinafter "Sigmento"), and QuickShip Today, LLC ("hereinafter "Quick Ship").

6.    In addition to being a cofounder, I am also the Chief Technology Officer ("CTO") of CSV in charge of product and technology for CSV and its related entities.

7.    Dardashtian joined CSV full-time 6 months after I did as the Chief Executive Officer ("CEO").

8.    Dardashtian was responsible for sales, marketing, legal, and finance for all of the entities. In practical terms and with respect to the day to day operation of CSV, Dardashtian controlled the financial side of the business.

9.    ChannelReply was created, designed, built, managed, maintained and operated by me in March 2012.

10.    ChannelReply utilizes licensed software, and services, and open source software with varying licenses such as GNU or MIT, and software developed by me and independent contractors.

**VODYSSEY BUSINESS**

11.    I initially met and was hired by Dardashtian on November 18th, 2010 when he hired me as the Chief Technology Officer Vodyssey.

12.    I started working at Vodyssey almost immediately.

13.     Dardashtian was not able to supply me an executed agreement with Vodyssey until January 31, 2011. I had to walk out of the office in order to get the agreement that he promised me 74 days earlier. This is a theme that continues through this day with Dardashtian and why this case exists.

14.     I was misled into working for Vodyssey without compensation by Dardashtian. This is also part of the theme that continues through this day with Dardashtian and why this case exists.

15.     My agreement with Vodyssey had me defer salary until March 2011. In April 2011 I left Vodyssey since I never received any compensation.

16.     There were constant excuses by Dardashtian of when I would be paid the back salary totaling $62,500.

17.     I was never paid any of my contractually agreed compensation. Additionally, benefits, bonuses or even my expenses were never paid.

18.     I was not only working for free but somehow funding Vodyssey operations through my unreimbursed expenses.

19.     Though I was unable to collect any benefit for working at Vodyssey, Dardashtian collected a salary, equity and benefits including health. Even as I was working at CSV/NDAP as outlined below.

**NDAP BUSINESS**

20.     In May 2011, after I left Vodyssey, Dardashtian introduced me to a family friend. They were a partner at Parts Authority.

21.     Parts Authority is an automotive aftermarket warehouse distributer. They were a traditional brink-and-mortar business headquartered on Long Island, NY. Their core business was "hot-shot delivery". They would quickly deliver a car part to an auto repair facility.

22.     Parts Authority was interested in being a player in the online car parts space. They aspired to overtake eBay and Amazon.

23.     With Parts Authority's deep knowledge, expertise and special priced automotive aftermarket parts, my knowledge of eCommerce (specifically as working at eBay engineering and product) and Michael's self-represented acumen of sales, marketing, legal and finance, we should have created a successful business and partnership.

24.     NDAP was formed for the purpose of creating an e-commerce software platform to sell and distribute auto parts online under the name "Next Day Auto Parts," later rebranded as "Car Part Kings" ("hereinafter "CPK").

25.     NDAP was a subsidiary owned by CSV and BRWY who's acronym is made up the Parts Authority partners Buller, Rosenthal, Wotman, Yanofsky

26.      BRWY initially owned 51% of the company.

27.     At some point another company named NDA Holdings, LLC (hereinafter "NDA") took over BRWY ownership.

28.     It's unclear to me what percentage of NDAP that BRWY or NDA owns now. Dardashtian forged my signature on multiple occasions including agreements with BRWY as outlined below.

29.     I agreed that in exchange for working for Parts Authority's Vice President of
        Technology without pay they would create NDAP, LLC d/b/a Next Day Auto
        Parts, d/b/a Car Part Kings so that CSV can sell automotive aftermarket parts,
        online.

30.     So, from May 2011 through October 2011 I worked at Parts Authority supporting
        the Vice President of Technology.

31.     My contribution to the technology of Parts Authority and having regular meetings
        with the partners was critical to the establishment of. NDAP and the reason CSV
        was created.

32.     Dardashtian never provided services to Parts Authority. However, he continued to
        collect benefits from Vodyssey.

33.     I traveled from Brooklyn to Parts Authority headquarters on Long Island for about
        6 months.

34.     I incurred a large amount of time and expenses working at Parts Authority. I
        somehow again agreed with Dardashtian's scheme to defer my salary.

35.     This is the second time Dardashtian's misled me into deferring a salary, expenses,
        benefits, additional ownership, etc.

36.     In or about November 2011, I began to receive compensation ($1,000 a week) for
        my work for CSV. Dardashtian and I both received the same compensation for
        our work until approximately February 2015. In February 2015, I stopped
        receiving compensation for my work even though I continued to work full-time
        for CSV. Notwithstanding the fact that 1 stopped receiving payments at that time,
        unbeknownst to me, I understand that Dardashtian made a payment to himself in

the amount of $10,000.00. I understand Dardashtian admits to taking an uneven distribution in his deposition.

37.     Additionally, Dardashtian has misrepresented himself and his abilities. It quickly became clear my duties would have to expand to one of a Chief Operating Officer ("COO") and maybe even into Dardashtian's Chief Operating Officer ("CEO") role.

38.     I'm a technologist and did my best to continue that passion for my work. But if the companies were to stay alive, I had to take on some of Dardashtian's responsibilities. I oversaw many of the day-to-day administrative and operational functions of the businesses.

39.     It was agreed between Dardashtian and myself that I was to be compensated for my additional time and responsibilities if there was a liquidity event such as a sale of the company.

40.     I still have not been compensated for my additional time and responsibilities.

41.     However, when I asked for this additional compensation, even at the time of the NDAP sale, Dardashtian refused.

42.     On or about September 1, 2011, on behalf of CSV, I retained Alice Fritz ("hereinafter "Fritz") to work as a developer for NDAP. On March 15, 2012, on behalf of NDAP, I retained Konstantyn Bagaiev ("hereinafter "Bagaiev") as an independent contractor to work for NDAP in order to help me to develop a script to answer eBay messages. On or about April 1, 2015, on behalf of NDAP, I retained Oleskii Glukharev ("hereinafter "Glukharev") as an independent

contractor to work as a developer on the NDAP project along with Bagaiev and Fritz.

43.     My work on NDAP was substantial. I created all of NDAP's business, product, and technology with little to no involvement from Dardashtian including the Magento ecommerce platform, Pentaho Data Integration platform, warehouse distributor integration, user experience design, user interface design, multichannel catalog and inventory and pricing, creation and management of billions of landing pages, search engine optimization, search engine marketing, pricing tools and algorithms, marketing price protection, fraud detection, tax compliance, structured data validation, image validation, order routing, cross boarder fulfillment, order reconciliation, quality assurance, system administration, performance optimization, reporting and analytics.

44.     Dardashtian was supposed to lead NDAP's sales and marketing efforts. However, he never realized a sales and marketing program for NDAP.

45.     Dardashtian failures put NDAP in a distressed state and we were forced to find a buyer for NDAP so that CSV could sell off the company.

46.     It was agreed that Dardashtian would try and find a buyer for NDAP. Dardashtian failed at selling NDAP.

47.     On June 24th, 2015, Dardashtian hired The Peakstone Group to sell NDAP.

48.     On Tue, Jun 9, 2015, 10:22 AM, during the process of selling the company Dardashtian forged my signatures on an agreement with the BRWY / NDA in an attempt to take full control of the company.

49.     Dardashtian and Peakstone Group failed to sell NDAP.

50. Dardashtian then hired Jeremy Falk ("hereinafter "Falk") to sell NDAP in 2015. Falk had executed a non-disclosure agreement that continued for all relevant times.

51. On or about October 31, 2016, Dardashtian abandoned his duties at CSV and took a full-time role at Yotpo Ltd ("hereinafter "Yotpo") as the Head of Sales. His role came with an initial salary of $200,000, a $50,000 bonus and 30,666 stock options, health and dental insurance and a 401(K), 13 paid personal days while I worked yet again for no compensation.

52. When Dardashtian took a full-time role at Yotpo it became apparent that my fulltime commitment would be required to fix the companies' issues abandoned by Dardashtian.

53. Falk was successful in brokering a sale of NDAP to Meridian Rack & Pinion, Inc. ("hereinafter "Meridian")

54. On or about July 28, 2017, the technology assets developed by me were sold to Meridian. for a total purchase price of $450,000.

55. This assertion that the technology assets that I created, built, managed, etc., were the only value in the transaction is supported by the terms of the sale, which required ongoing support and technology integration by me. I signed a tag-along, drag-along agreement, Dardashtian had no such agreements.

56. I again was misled by Dardashtian and never compensated for this agreement.

57. Additionally, my future income or employment prospects would be limited by the terms of the sale.

58.   In order to effectuate the sale of NDAP, I was tasked to manage the due diligence period. Dardashtian was a full-time employee of Yotpo and did not have the technical ability to perform the work required.

59.   During due diligence I was required to demonstrate, prepare and transfer the technology assets to work within Meridian's infrastructure. This included a great deal of work to segregate and separate out the various assets including code, services, and accounts. The accounts included Chargebee and Stripe accounts. Michael Dardashtian had full knowledge that these accounts needed to be transferred due to the sale of NDAP. Further, the GSuite accounts including email addresses were changed to prepare for the NDAP.

60.   During this process, I separated CSV, NDAP, ChannelReply, Plumburs and related assets into separate accounts. Dardashtian had full knowledge of the need for account changes.

61.   The commingling of financial accounts by Dardashtian made this separation of businesses more challenging.

62.   This preparation work entailed separating accounts, identifying which business accounts were attributable to the NDAP business and which were not. Much of the activities associated with preparing for the sale of NDAP have been distorted by Dardashtian to falsely accuse me of taking all these steps to lock him out of ChannelReply's business when in fact, segregating and changing the accounts were necessary for the NDAP sale.

63. This took about 6 months of work before the suit was filed, many more after. It required trips to Meridian's office in San Diego. Dardashtian never even visited Meridian's office.

64. I again was misled by Dardashtian and never compensated for this work. Somehow Dardashtian tricked me and used this suit to exploit me to work for free. Dardashtian was able to get me to work for years, without compensation.

65. It took about a year after the sale for me to finish the required work for Meridian.

## CHANNELREPLY BUSINESS

66. ChannelReply was created by me in March 2012.

67. I registered the domain name ChannelReply.com on May 12, 2014.

68. As stated on the ChannelReply website, the ChannelReply platform "integrates marketplace customer service messages and order information with the Helpdesk of your choice."

69. In August 2015, December 2016 and June 2017, I went to Ukraine to work with developers in person. I worked on the development and product roadmap for ChannelReply.

70. To the best of my knowledge, Dardashtian has never met a contractor or employee working on ChannelReply in person.

71. The idea, architecture, infrastructure, features, frameworks, integrations, project management for the ChannelReply platform, were created by me, with little if no involvement by Dardashtian.

72.    Bagaiev was responsible for the coding of ChannelReply.

73.    Bagaiev and I failed at the first two attempts to create a minimum viable product. However, we were successful with our 3rd attempt.

74.    Dardashtian was unable to develop new ChannelReply product features, failed to negotiate an international Amazon account for ChannelReply service, and was unable to negotiate a contract with Salesforce, Zendesk, Freshdesk, Amazon or eBay.

75.    An eBay seller account is required to support customers, fix software bugs, and implement new features. So, we used the Plumburs' eBay account for software development.

76.    Many customer issues and new features were frozen due to Dardashtian's lack of basic action. The Plumburs' eBay account was suspended because Dardashtian did not do any basic work to ensure it met certain required minimum seller performance standards, such as responding to emails from eBay about issues with the account. This also caused irreparable harm to both the business and reputations of, among others, CSV, Plumburs, LLC and Gitman.

77.    My personal eBay account was also suspended because of Dardashtian's inaction and negligence since the two accounts (Gitman's and Plumburs') were linked; I had spent the last 18 years developing a perfect rating for my personal eBay account. I was unable to buy or sell any items on eBay due to Dardashtian's lack of basic eBay account management. My professional reputation with eBay was further damaged with the loss of my preferred access status.

78.   In August 2015, it was also agreed by Dardashtian and I that both Bagaiev and Glukharev deserved increases in compensation in connection with their work for NDAP.

79.   After I returned from a trip to the Ukraine in the fall of 2015 and spoke with Dardashtian, we both explained to Bagaiev and Glukharev that we were in a tough financial situation because of the failing auto parts business. (These failings were due to Dardashtian's inability to execute on his responsibilities.) Instead of a raise, we offered the current software developers an opportunity to participate as owners. Five percent (5%) for Bagaiev and two and a half percent (2.5%) for Glukharev in a new joint venture named ChannelReply that Dardashtian and I had agreed to undertake.

80.   Specifically, it was agreed between Dardashtian and I that CSV would have a 50% ownership interest in the joint venture and the other 50% would be owned by me, Bagaiev and Glukharev.

81.   As set forth above, Bagaiev would own 5% and Glukharev would own 2.5% of the joint venture. The remaining 42.5% would be held by me and I could offer equity from that remaining 42.5% to take on capital or for additional contractors and employees I needed to hire to expand ChannelReply at my sole discretion.

82.   The joint venture arrangement was agreed to by Dardashtian and me. The reason being that since Dardashtian was working full time at Yotpo and because ChannelReply was my concept, I could have easily commenced this business without CSV. In order to be part of the ChannelReply business, Dardashtian had initially agreed to this joint venture arrangement.

83.    However, Dardashtian misled me again. As ChannelReply business grew, Dardashtian reneged on yet another agreement.

84.    As part of the joint venture, it was Dardashtian's responsibility to set up a legal entity for the ChannelReply business that provided the Developers and me with the agreed upon ownership interests.

85.    As of June 2016, Dardashtian had failed to do that as he was working full time for Yotpo for 8 months. During this time Dardashtian collected over $130,000 from Yotpo not including bonus and benefits.

86.    As a result, in June 2016, Bagaiev once again expressed his concerns about his future with the ChannelReply business to Dardashtian since he had not yet received confirmation that the promised legal entity had been set up.

87.    As was common with Dardashtian, he reneged on this agreement simply because he realized the potential as he witnessed the increase in business.

88.    I refused to sign the operating agreement that Dardashtian drafted for ChannelReply LLC's as it was simply a copy of CSV's agreement. It was not what we all agreed to.

89.    I expected Dardashtian to live up to the terms of the verbal agreement that he had agreed to. Dardashtian knew that I would be setting up a new company under the structure we had agreed to. Channel Reply Inc. was intended to be a spin-off company to continue the ChannelReply business. It was not a new competitive company.


**UNEVEN DISTRIBUTIONS**

90.     Dardashtian would owe the company a balance for uneven distributions even after the sale of NDAP.

91.     When CSV started, Dardashtian ask me to use his father to cash checks for a small fee instead of setting up payroll for CSV. Dardashtian explained that this was a common practice however, I declined involvement with this scheme.

92.     When Dardashtian left CSV for Yotpo, I asked Dardashtian to see the books and records to gauge how well the business was performing.

93.     I first requested this information from the company's then bookkeeper, Greg Freyman (hereinafter "Freyman"), CPA, on November 1, 2016 after noticing Dardashtian had not been keeping the financial books of CSV up to date for some time.

94.     However, it is believed that Dardashtian blocked Freyman from providing me with the requested accounting.

95.     On January 23, 2017, I requested that Freyman provide me with Administrator access to the company's accounting software where the company's financial books and records were maintained. That same day, Freyman asked Dardashtian to approve my request. Dardashtian did not approve my request for Administrator access to the company's books and records.

96.     When I spoke to Dardashtian why he blocked me from using Freyman, he said cost.

97.     On that same call he also blocked me from using Joel Liebman ("Liebman"), the company accountant and now the interim manager from updating the books and running reports for me due to cost.

98.     I doubted cost was the issue but did my best to respect Dardashtian's concerns.

99.     Since I was blocked from using Freyman and Liebman to help understand the financial situation of the company, I then found a more economical solution.

100.    I hired Mary Faith Adan ("hereinafter "Adan"), a Certified QuickBooks Pro Advisor as a bookkeeper to review the books and records of the company. Adan performed a review of the books and records of the businesses. She discovered many alarming discrepancies.

101.    Adan discovered copies of paper checks made out to cash or Dardashtian and signed by Dardashtian. The company primarily relied on electronic payments. We rarely if ever used a paper check. It was very alarming.

102.    Adan also discovered a substantial amount of personal expenses being charged to the company accounts by Dardashtian. Adan also discovered intermingling of accounts between separate businesses.

103.    Adan also discovered Dardashtian's distributions for health care benefits for himself and his family. These payments were for a company sponsored plan, Amy Dardashtian's a/k/a Amy Dash SAG-AFTRA union and directly to hospitals like North Shore LIJ. It's still not clear if all these payments were for Dardashtian at all. Dardashtian improperly had CSV pay out at least tens of thousands of dollars, perhaps over one hundred thousand in family health care expenses for himself, while I did not receive equivalent payments as an equal co-owner of CSV.

104.   Dardashtian has taken other uneven distributions from the companies' bank accounts without obtaining my consent.

105.   Due to these findings, Dardashtian repeatedly refused to cooperate with Adan.

106.   Specifically, on March 18, 2017, Adan sent Dardashtian an e-mail asking questions about charges incurred on Dardashtian's corporate credit card to determine whether the expenses were "Personal or Business." On March 20, Dardashtian replied that he was travelling and would take a look when he returned.

107.   Not hearing back from Dardashtian, on April 2, Adan sent Dardashtian a follow-up e-mail. On April 3, Dardashtian replied asking Adan to resend the file with questioned expenses. Adan resent the file that same day.

108.   Later that day, on April 3, Dardashtian asked to schedule a call with Adan. A call was then scheduled for April 7, 2017. However, subsequently, Dardashtian proceeded to reschedule the call four (4) separate times.

109.   On April 14, 2017, Adan e-mailed Dardashtian suggesting that the call take place the following Monday and never heard back from Dardashtian.

110.   From in or about November 2011 to February 2016, Dardashtian and I received compensation for their work for CSV. However, since an accounting was never performed, I do not know if we received equal compensation for the work we performed during this time.

111.   In 2016, Michael Dardashtian took a cash distribution totaling $20,000 while I only received $10,000. Further, in 2013, Michael Dardashtian took a distribution

into his 401K in the amount of $13,500 while I did not. Further, Michael Dardashtian caused the Company to pay for his health insurance in the amount of $17,635 without corresponding credit to me. Further, the accounting report demonstrates that Chargebee provided net revenue for ChannelReply in the amount of $447,000 while QuickBooks profit and loss statements only reported $343,000. This evidence is maintained and stored in the Company's QuickBooks accounts, tax returns and bank statements.

112.    In May 2017, Umar Farooq advised me that it was proper under the circumstances to transfer the cash balances arising from the ChannelReply business to a call deposit account in order to complete an audit of the company's books. I never intended to use the money for my benefit.

### DARDASHTIAN'S OUTSIDE EMPLOYMENT

113.    Beginning in or about February 2016, Dardashtian began to maintain employment positions outside of CSV and NDAP.

114.    From on or about February 10, 2016 through approximately August 9, 2016, Dardashtian worked for ChargePass, a company which focused on payment technology for the cannabis industry.

115.    On or about October 31, 2016 to the present, Dardashtian has worked full-time as the Head of Sales for a company named Yotpo.

116.    Yotpo competes with ChannelReply's products, as it markets itself as a marketing content solution and generates reviews, ratings, questions and answers for eCommerce websites

117.   I created a small software program to monitor when ChannelReply's customers started using Yotpo. When I was able to run the program last on July 1st, 2017, it reported 221 results.

118.   Additionally, features I developed for ChannelReply such as a feedback management appeared in Yotpo soon after Dardashtian joined.

119.   Furthermore, Dardashtian's work for Yotpo had a negative effect on CSV, NDAP, and ChannelReply since Dardashtian was no longer devoting a substantial amount of time and attention to CSV or NDAP on a regular basis. In fact, since Dardashtian started working at Yotpo, he had little to no involvement with CSV, NDAP, or ChannelReply and his involvement had been limited to sporadic accounting and finance matters.

120.   Yotpo and ChannelReply are in related businesses. Yotpo and ChannelReply both take customer requests and feedback and store it to a CRM. The major difference is that Yotpo built their own CRM while ChannelReply utilizes 3rd party CRMs.

121.   Upon information and belief, Dardashtian also improperly provided confidential and/or proprietary information belonging to the ChannelReply joint venture to, yet another competitive company called Volo Commerce.

122.   Upon information and belief, on or about November 7, 2016, Dardashtian provided a confidential and proprietary presentation deck which detailed how the ChannelReply product lines work to Volo Commerce without first obtaining a non-disclosure agreement. Volo Commerce is now competing with the ChannelReply product line.

123.  Additionally, upon information and belief, Dardashtian allowed a personal conflict of interest to interfere with the execution of his duties to the ChannelReply platform. Upon information and belief, Dardashtian sought to divert resources from established ChannelReply product lines to the development of a Desk.com integration product because, upon information and belief, he was seeking an offer of employment from Salesforce, which owns Desk.com.

124.  Upon information and belief, Dardashtian collected millions from brokering the sale of real estate.

**JEREMY FALK**

125.  On March 3, 2017, CSV retained the services of the consulting firm, Summit Rock Holdings, LLC (hereinafter "Summit Rock") of which Falk is a member.

126.  CSV agreed to pay Summit Rock an agreed-upon fee to act as consultant and broker involving the sale of NDAP. This fee was set forth in the services agreement that was executed by all of the parties.

127.  The contract and agreed upon fee with Summit Rock were negotiated and finalized by Dardashtian on behalf of CSV. The agreement which is annexed as Sim Declaration Exhibit G was signed by both Dardashtian and myself. The agreement provides for payment of a commission to Falk as I had advocated for in accordance with the agreement that was entered by the parties.

128.  On May 17, 2017, shortly before the closing date for the sale of NDAP, a disagreement arose over the fee which was to be paid to Summit Rock for its services.

129. Dardashtian refused to pay Falk the agreed upon fee. I, on the other hand, insisted that the agreed upon fee should be paid because I believed that one should honor an agreement. After a discussion regarding the fee owed to Summit Rock, Dardashtian reaffirmed his refusal to pay the fee to Falk that was originally agreed upon.

130. Contrary to the unfounded allegation that I entered into business with Falk, this is false. Falk, through his entity Summit had executed a non-disclosure agreement. Falk, prior to the allegation that I divulged confidential information by showing Falk CSV's profit and loss statement, Falk reviewed CSV's profit and loss statements because he was consulting for the company. The idea that I showed Falk the profit and loss statement because I was in business with him is false. Since Falk was bound by a nondisclosure agreement, I showed him the profit and loss statement to get advice with respect to financial and accounting matters. I reject and deny any allegation that it was for the purpose of competing against Channel Reply.

131. Falk was never a member of Dalva Ventures, LLC ("hereinafter "Dalva"). Rather, Falk was a mentor and assisted in the formation of Dalva by permitting us to benefit from his discounts for the filing service. Falk and I were never in business together. He was not my business partner. Further, Falk has never been operating Accel Commerce, LLC. Further, I did not operate Accel Commerce LLC prior to the instant lawsuit being filed. Accel Commerce was not doing business to compete with CSV. Rather, Accel Commerce, LLC was established to provide strictly consulting services.

132.   Dardashtian attempts to allege that I had a separate business interests with Falk and thus, I pushed for him to get paid. Thus, somehow, I attempted to divert more funds to Falk than we were required to do. This allegation is untrue.

133.    I did not have a separate business relationship with Falk. I simply wanted to act in good faith and honor any agreements that the company had with Falk without seeking to undermine that agreement.

134.   Certainly, Dardashtian seems to take pride in asserting that he got Falk to take less than what was agreed to under the threat of litigation. On the other hand, I believe in good business. The company should use its best effort to honor all agreements without renegotiating the terms of the original agreement.

135.   To prepare for the sale of NDAP, I had to separate the various accounts of CSV. At the assurance of Umar Farooq. Esq., that it would be a sale and legal way to separate out the accounts at a time when Dardashtian seemed to be mismanaging the business and potentially preventing the legal execution of its contracts, on May 27, 2017, believing that I was protecting the interests of the Company, made a withdrawal from the bank account of the Company. Shortly after the withdrawal, I notified Plaintiff of the withdraw via email. In the email, I described in detail, my reasons for making the withdrawal. It was never my intent to take the funds but rather, it was to set into motion the sale of NDAP.

**DEVELOPMENTS AFTER THE TRO**

136.    After my removal from the day to day operation of CSV and Dardashtian was responsible for managing ChannelReply on his own, he hired a developer who quickly caused problems to the functioning of ChannelReply and was substantially more expensive.

137.    Dardashtian then realized the value that the previous developers had been providing to the company.

138.    Dardashtian's wife, Amy Dardashtian a/k/a Amy Dash, eventually reached out to Bagaiev, slandered me and offered him increased compensation and to remove the lawsuit against him. This essentially convinced Bagaiev to return to work on ChannelReply. The amount paid to retain Bagaiev was significantly above what Dardashtian had previously been willing to pay.

139.    I proceeded to meet all my responsibilities and provide technical support throughout the integration of NDAP assets by the buyer.

140.    It is my firm belief that the lawsuit was originally filed to pressure me into giving up what I was due. Dardashtian likely assumed I would settle to make it go away, as can be seen by the number of times Dardashtian's counsel attempted to start settlement discussions, though no offers were in good faith as they all began below my current ownership stake. Further, Dardashtian's wife, Amy Dardashtian a/k/a Amy Dash continued to interfere in the business and reach out to my wife at to try and negotiate a settlement.

141.    It took about a year after the sale for me to finish the required work for Meridian.


**DISCREPANCIES WITH MICHAEL DARDASHTIAN'S TESTIMONY**

142.  Contrary to Dardashtian's claims that he and I shared similar duties, including being responsible for the operation and function of the company including being responsible for the administration of the company, this is false.

143.  At the inception, I was the technology person while Dardashtian touted himself as the finance and businessperson. Based on these strengths, I was responsible for managing, creating and developing the technology side of the business. On the other hand, Dardashtian, being the business minded person, focused on sales, marketing and financial side of the business.

144.  Dardashtian did not work on the programming side of the business even though he testified that he did not recall if he did any programming for ChannelReply. Dardashtian did not even understand the technology basis of the platform.

145.  With respect to compensation from CSV, it was agreed that we would always receive equal distributions from the business and that we would not be compensated by CSV as per the operating agreement.

146.  It is understood that Dardashtian admitted that he distributed monies to himself without giving reciprocal distribution to me. Dardashtian testified that it was because I was working at Cue Connect. First, I fully disclosed to Dardashtian that I would begin working at Cue Connect and with his consent, I took the position. Further, this was at the same time that Dardashtian also had a fulltime job outside of CSV without my consent. Second, Dardashtian never told me that he would be taking an uneven distribution from CSV.

147.   Further, Dardashtian admitted that he also receives other benefits from CSV that I was not given, namely health care benefits for him and his family. Dardashtian testified that I received medical benefits from my wife's employer that was better than what he purchased. This is simply untrue. I obtained my health benefits from my wife's employer's health insurance before I met Dardashtian. Further, the health benefits were not better. Dardashtian did make payments to SAG-AFTRA, his wife's entertainment and media union for health benefits, a non-company sponsored plan. Dardashtian elected to pay for his health benefits and without ever offering me reciprocal health benefits through CSV.

148.   Contrary to the testimony given by Dardashtian, at that time, I did not know that CSV was paying for his health care benefits for himself and his family. I never agreed that CSV would pay for his medical benefits. He did this on his own without my approval or without offering reciprocal benefits to me and my family.

149.   Contrary to Dardashtian's testimony, I never used the company card to pay for personal expenses, such as family travel expenses. This is simply untrue.

150.   With respect to car payments, it is understood that the company would pay for company cars. Dardashtian had a vehicle and I had a vehicle that CSV paid for.

151.   Dardashtian testified that he did not know if I continued to perform work for CSV while working for Cue Connect. However, I did continue to perform work for CSV, and he was fully aware of that work.

152.   It is understood that Dardashtian testified that they formed ChannelReply LLC. This is true. It had been agreed that ChannelReply LLC would be owned 50% by CSV, 42.5% by David Gitman, 5% by Bagaiev and 2.5% by Glukharev.

153.   Michael Dardashtian reneged on his oral agreement to David Gitman, Bagaiev and Glukharev. Further, ChannelReply Inc. was never established to be wholly owned by David Gitman but rather in proportion to the ownership 50% to CSV, 42.5% to David Gitman, 5% to Bagaiev and 2.5% to Glukharev. Further, David Gitman created ChannelReply Inc. out of necessity to create separate accounts due to the pending NDAP sale.

154.   It is also understood that Dardashtian testified that Yotpo's business does not conflict with ChannelReply's business. However, they are related businesses

## CARLEEN GASKIN'S BUSINESS ASSUMPTIONS WERE INCORRECT

155.   It is submitted that Carleen Gaskin searched for software development companies while searching for comparable companies to ChannelReply. However, ChannelReply is not a software development company. Rather, as Ms. Gaskin properly identified in her valuation report, ChannelReply is a SaaS business. She also could have used any of the 300 publicly traded software companies for comparable data.

156.   Ms. Gaskin relied on the IT consulting industry SIC for industry growth projections though it is well established that SaaS is a very different sector. ChannelReply does not provide any consulting services and its growth potential is not constrained by the factors outlined in Gaskin's report. Software is designed to scale quickly and often has very high margins. Gaskin's report begins by acknowledging that ChannelReply is a SaaS business serving eCommerce but then does not provide any specific research or support related to SaaS ventures.

157.   Further, Ms. Gaskin provided that there were companies that were not compatible due to the number of offices they had. She indicated the number of offices were apply to SaaS companies due to the number of employees a company could house as well as the number of clients you could service. Thus, the more clients a company has, the more IT help they are going to need, which requires more employees and more office space.

158.   However, most SaaS software revenue is purely software and not service-fee driven. SaaS firms generate recurring revenue on a per-user, per-month basis that is a subscription. Installation fees, if any, are often a fraction of the SaaS lifetime total value, of a client whose annual recurring revenue can eventually grow significantly. This is ChannelReply's pricing model. Further, the company has had high growth rates and high profit margin for the past three years without an increase in the number of employees, which is to be expected for a SaaS company but negates Ms. Gaskin's core assumption.

159.   Further, I disagree with Ms. Gaskin's assumptions that ChannelReply has reached its full revenue growth. As I do not currently have access to all the necessary information to make my own projection, I see no reason why ChannelReply's growth should sharply decline from its growth over the past 3 years. As a SaaS business in a favorable sector, it is my opinion that the business will continue growing for the foreseeable future based on past performances and Dardashtian has provided no evidence why the value of the business would suddenly decline. If so, this would be a breach of fiduciary duty or mismanagement by Dardashtian given the strong track record.

160.   In fact, it is my belief that ChannelReply's growth since June 2017 would have been much higher under my leadership as there would have been technological product enhancements that would have further increased the service potential.

161.   It is my understanding based on expert review that Ms. Gaskin relied on a direct capitalization method, but that this method is inappropriate for either early-stage businesses or businesses with high growth. ChannelReply clearly is both.

162.   Further, it is my understanding that the direct capitalization method is not a leading method overall, not recommended for usage in fair value disputes, and inappropriate for early stage business. Further, Gaskin did not even use any of the leading business valuation methods entirely (DCF method, guideline public company method, and guideline M&A method).

163.   It is beyond debate that ChannelReply is an early-stage business and possessed all three core elements (intangible nature, start-up stage, and high-growth nature) for the applicable Valuation Dates.

164.   Further the valuation supplied by Gaskin did not rely on any budgets or projections prepared by Liebman, the accountant and temporary manager of CSV.

165.   ChannelReply averaged a 43.1% compound annual growth rate ("CAGR") in revenue for the three-years from year-end 2016 to year-end 2019. The 43.1% growth makes it clear that Gaskin's projected growth rate of 4% for periods (short-term, near-term, and long-term) is unrealistic and intended to force an unfair purchase price.

166.   Given my current experience in eCommerce and general market trends, the market is currently more favorable towards eCommerce and the SaaS solution

that ChannelReply provides than at any time during the company's history. This is due to high growth of eCommerce due to Covid-19. Any quick desk-based review would reveal these trends, yet Gaskin did not account for any increased market potential and instead argues that generic software expenditures will slow.

## ASSERTIONS MADE BY DARDASHTAIN IN HIS MOTION FOR SUMMARY JUDGMENT

167.   Dardashtian alleges that I charged $3,500 to amazon web services on June 2, 2017 using NDAP's American Express credit card but this was a recurring charge that occurred monthly that was in place prior to June 2, 2017. This was not a personal expense but rather, a business expense.

168.   On June 20, 2017, I sent a template resignation letter after Bagaiev asked what an American resignation letter looked like.

169.   I began work on Accel Commerce after the instant lawsuit was commenced. Accel Commerce only made a net profit of $3,239.04 in 2017.

170.   Dardashtian alleges that I unilaterally cancelled Dardashtian's participation in pre-schedule weekly conference calls with the developer. However, I never cancelled Dardashtian's participation. In fact, Dardashtian did not attend a meeting in many months.

171.   With respect to the various accounts that Dardashtian alleges that he was locked out of, Dardashtian was fully aware that these accounts had to be separated due to the NDAP sale. Further, all Dardashtian needed to do was reset his password. I

never intended for him to be locked out of the accounts for the nefarious reasons the Plaintiffs allege. Rather, it was simply to prepare for the NDAP sale.

172.   I never tried to obtain a paid job from Sigmento. However, Sigmento did ask if I would be interested in working for Sigmento as CEO but I declined the offer.


I certify under penalty of perjury that the foregoing statements made by me are true., I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.


Dated: September <u>24th</u>, 2020

<br>

*David Gitman*
_____
David Gitman

State of Florida, County of Broward

Sworn and subscribed to before me on this 24th day of September 2020 by David Gitman.

*F. Norman James Embree*
_____
Notary Public   Norman James Embree

Notarized online using audio-video communication

NOTARY PUBLIC • STATE OF FLORIDA

NORMAN JAMES EMBREE
Notary Public - State of Florida
Commission # GG252975
Expires on September 2, 2022