UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

CIVIL ACTION NO. 1:17 4327

MICHAEL DARDASHTIAN,                :
individually and on behalf of       :       VIDEOCONFERENCE
COOPER SQUARE VENTURES, LLC,        :       STENOGRAPHIC
NDAP, LLC and CHANNEL REPLY, LLC:            DEPOSITION
                                    :       TRANSCRIPT OF:
          Plaintiffs,               :
                                    :       DAVID GITMAN
          vs.                       :         (Day Two)
                                    :
DAVID GITMAN, JEREMY FALK,          :
SUMMIT ROCK HOLDINGS, LLC,          :
ACCEL COMMERCE, LLC, DALVA          :
VENTURES, LLC, KONSTANTYN BAGAEV:
OLESKSII GLUKHAREV and CHANNEL      :
REPLY, INC.,                        :
                                    :
          Defendants.               :
------------------------------:

Tuesday, April 14, 2020


B E F O R E:

        JOSEPHINE M. BIAGINI, a Certified Court

Reporter and Notary Public of the State of New Jersey,

License No. 1133, held via videoconference on the

above date, commencing at 11:00 a.m.


        JOSEPHINE M. BIAGINI & ASSOCIATES
              Certified Court Reporters
                    PO Box 71
              Wyckoff, New Jersey 07481
                  (201) 446-7576
              Email: JBiaginiCSR@aol.com

ORIGINAL

2

A P P E A R A N C E S :


        GUAGLARDI & MELITI, LLP
        By:    BARRY S. GUAGLARDI, ESQ.
               EVAN OSTRER, ESQ.
               Mack Centre I
               365 West Passaic Street
               Suite 130
               Rochelle Park, New Jersey   07662
               (201) 947-4100
               Bguaglardi@adgmlaw.com
               Eostrer@adgmlaw.com
                   Counsel for the Plaintiffs
                   (Via videoconference)



        SIM & DE PAOLA, LLP
        By:    BRETT SINGER, ESQ.
               4240 Bell Boulevard
               Suite 201
               Bayside, New York   11361
               (718) 281-0400
               Bsinger@simdepaola.com
                   Counsel for the Defendant,
                   David Gitman
                   (Via teleconference)



A L S O   P R E S E N T :

        Michael Dardashtian  (Via teleconference)

3

I N D E X

WITNESS                              PAGE

DAVID GITMAN

    By:  Mr. Guaglardi            8


E X H I B I T S

NUMBER        DESCRIPTIONS                          PAGE

P-38          Email dated 5/27/17 to Cooper Square
              Ventures, LLC from PayPal                15

P-39          Screenshot of conversations             29

P-40          E-mail containing travel documents      60

P-41          HelloSign Audit Trail                   60

P-42          Channel Reply, Inc., Common Stock
              Purchase Agreement dated 6/8/17         85

P-43          Clerky Filing Request and Summary       95

P-45          Screenshots of conversations            96

P-46          Screenshot of bank account of CSV
              dated 5/31/17                          103

P-47          Order To Show Cause For Preliminary
              Injunction and Temporary Restraints    106

P-48          Order Amending 6/8/17 Order To Show
              Cause For Preliminary Injunction and
              Temporary Restraints                   118

P-51          Online transfer from Bank of America
              e-mail dated 6/13/17                   170

P-53          State of Delaware - Short Form
              Certificate of Dissolution             172

4

## E X H I B I T S

| NUMBER | DESCRIPTIONS | PAGE |
|---|---|---|
| P-54 | HelloSign Audit Trail with attached document history | 173 |
| P-55 | Letter dated 6/20/17 to David Gitman from Konstantyn Bagaev and letter dated 6/20/17 to David Gitman from Oleksii Glukharev | 126 |
| P-57 | Viber conversations between David Gitman and Konstantyn Bagaev dated 7/10/2017 to 9/20/2017 | 176 |
| P-58 | Conversation between David Gitman and Mary Faith Andan with attached bank statement | 231 |
| P-59 | Archived conversations between David Gitman and Aleksey Glukharev | 130 |
| P-60 | Archived conversations between David Gitman and Konstantyn Bagaev | 233 |
| P-63 | E-mail dated 10/04/2018 to Evan Ostrer from Lindsay F. Ditlow Re:  Settlement Counteroffer | 292 |
| P-64 | Communications between David Gitman and Konstantyn Bagaev | 107 |

MARKED PAGE

Page 60

5

REQUESTS FOR DOCUMENTS/INFORMATION

39/12    Stock plan agreement presented to Aleksey
         Glukharev

101/8    Check whether (646) 553-5918 was ever David
         Gitman's phone number

193/8    Names of all ADAs David Gitman spoke to

201/25   List of every business D. Gitman has formed
         or is an owner, member, partner,
         shareholder, officer or director of

229/16   Packages of documents D. Gitman put together
         for ADAs

230/22   List of customers taken from CR to Yotpo

230/22   E-mails from M. Dardashtian taking customers
         from CR to Yotpo

244/25   Supplemental production of additional
         communications exchanged between D. Gitman
         and K. Bagaev

266/14   Any recordings D. Gitman made of M.
         Dardashtian, Judge Lehrburger or anyone
         relating to litigation

267/23   Documents transmitting any recordings to
         Bagaev

301/25   Any accounting of financials of CSV, CR or
         NDAP since inception through today

304/19   Any proof that David Gitman did not have
         complete access to CSV, NDAP or CR's bank
         accounts or QuickBooks

306/9    Proof of disproportionate distributions,
         misappropriation or theft to M. Dardashtian

308/1    Any third party that confidential
         information was shared with, with or without
         nondisclosure agreements

308/1    Any nondisclosure agreements relating to the
         above confidential information

1           MR. GUAGLARDI:  We're on the record.

2    It's April 14, 2020 at 11:14 a.m.  We are commencing

3    day two of David Gitman's deposition.  It's being done

4    by consent.  Mr. Gitman has asked that we start the

5    deposition at eleven a.m.  He had childcare issues.

6    We all consented to that, as well.

7           We had some issues with trying to get this

8    deposition conducted by Zoom, so we could it do it by

9    video, so we needed to coordinate and make sure that

10   everyone's internet connection, including mine, was

11   okay.  So that took a little bit of time.  That's why

12   we're starting at 11:15.

13          I'm Barry Guaglardi and then we have Evan

14   Ostrer on.  We're from Guaglardi & Meliti.  We

15   represent Michael Dardashtian and the plaintiff

16   companies in a litigation involving David Gitman and

17   others in the Southern District of New York before

18   Judge Lehrburger.  We have on the phone or on the

19   video Mr. Brett Singer, who is an associate with Peter

20   Kim, as well, and he is going to be representing

21   Mr. Gitman in connection with the deposition.

22          It has been agreed between the parties and

23   counsel that we are going to conduct this deposition

24   by Zoom in accordance with Judge Lehrburger's order,

25   and the parties have consented to do so and to have

7

1  the Court Reporter, who is Josephine Biagini, be at a

2  remote location in her home while Mr. Ostrer is at his

3  home, while I'm at my home, while Mr. Gitman is at his

4  home, and while Mr. Singer is at his home.  We have

5  the video working properly.  Everybody's video I can

6  see.  We believe that the sound is now working, audio

7  is now properly, and we're going to commence day two

8  of Mr. Gitman's deposition.  I just wanted to place

9  that on the record.

10          Mr. Singer, is everything I said accurate and

11  is it okay with you?

12               MR. SINGER:  Yes, it is, Counsel.

13  Everything is fine.  We can proceed.

14               MR. GUAGLARDI:  Thank you.  My

15  discussion with Mr. Singer's associate, Mr. Kim, was

16  that the deposition would continue until completed.

17  As I told Mr. Kim, I'm going to attempt to do that.

18          My health has been a little shaky, although

19  thank God okay, so I'm going to attempt to get through

20  the deposition today.  And we're going to aim to

21  complete it so that we can commence with

22  Mr. Dardashtian's deposition on Thursday of this week,

23  and to the extent necessary continue it on Friday.

24

25

1   D A V I D   G I T M A N, appearing via teleconference,

2         residing at 2139 Bluff Oak Drive, Cary, North

3         Carolina, having been first duly sworn,

4         testifies as follows:

5

6   EXAMINATION BY MR. GUAGLARDI:

7         Q.      Mr. Gitman, we're going to continue

8   with day two of your deposition.

9         Have you had the opportunity since the

10  completion of day one of your deposition through today

11  to review any documents?

12  A.      No.

13        Q.      Have you spoken to anyone about the

14  subject matter of your deposition since the completion

15  of your day one deposition?

16  A.      Yes.

17        Q.      Who have you spoken to about it?

18        MR. GUAGLARDI:  Brett, I'm going to

19  interrupt Mr. Gitman for a second.  So Mr. Singer, you

20  weren't at day one's deposition.  As a result of day

21  one's deposition, I almost discontinued the deposition

22  right at the outset, and Mr. Kim had to pull

23  Mr. Gitman out of the room because Mr. Gitman was

24  conducting himself in the same manner that he is now,

25  which is I ask a simple question as who have you

1    spoken to and he's taking a full 30 seconds before he

2    answers the question.

3          The delay of the deposition will result in

4    having to take a third day of the deposition.  We will

5    immediately contact Judge Lehrburger if there is going

6    to be any delay.  Clearly it's not a delay because of

7    Mr. Gitman's audio because he is in a business setup,

8    as he indicated, so that tells me he's conducting

9    himself in the same way as he did in day one.

10         So I'm going to ask you to please instruct

11   your client not to delay the answer, to answer the

12   question, because all that we're going to do is it's

13   going to just take longer and we will absolutely not

14   begin Mr. Dardashtian's deposition until this

15   deposition is completed.  All I'm asking for is a

16   common courtesy.

17                  MR. SINGER:  David, you can hear

18   Barry's question.  Right?  I can't hear you now.

19                  MR. GUAGLARDI:  Now I can't hear you

20   either.  Let the record reflect that Mr. Gitman moved

21   out of the room where we can hear him clearly into a

22   room where we now can't hear him at all.

23                  MR. SINGER:  Well, let's slow down.

24                  THE WITNESS:  Hi, Brett.  I moved to a

25   location that's a little closer to my routers to try

10

1   and prevent some of the lag that was previously

2   happening.

3                   MR. SINGER:  Okay, great.

4   BY MR. GUAGLARDI:

5           Q.     So then let's move forward.

6           So Mr. Gitman, have you spoken to anyone since

7   the completion of day one of your deposition?

8   A.      Yes.

9           Q.     And what have you spoken to that

10  person about with respect to the deposition?

11  A.      I spoke to family, friends and my attorneys

12  about the deposition.

13          Q.     And how many times have you spoken to

14  your attorneys about the deposition after completion

15  of your first day of the deposition?

16  A.      I'm not sure.  It would take me a while to

17  answer that.

18          Q.     Was it more than five times that you

19  spoke to your attorney since day one completion?

20  A.      Yes.

21          Q.     And was it more than ten times?

22  A.      Yes.

23          Q.     And was it more than 15 times?

24  A.      Possibly.

25          Q.     And was it more than 20 times?

11

1    A.       Possibly.

2            Q.       And in those approximate 20 or more

3    times that you spoke to your attorneys about your

4    deposition since the completion of day one of your

5    deposition, what was the subject matter of the

6    discussion?

7            MR. SINGER:  I object on the grounds

8    of attorney/client privilege.

9            Q.       Okay.  How long, Mr. Gitman, did each

10   of these conversations that you took -- strike that.

11           Were these conversations about scheduling or

12   about the subject matter of the deposition?

13           MR. GUAGLARDI:  That's not a

14   privileged communication.

15           MR. SINGER:  I object on privilege

16   grounds, but you can answer.

17           MR. GUAGLARDI:  You're objecting as to

18   whether or not there was a discussion about

19   scheduling?  How is scheduling an attorney/client

20   privileged communication?

21           MR. SINGER:  Counsel, I don't really

22   see what the relevance of this is.

23           MR. GUAGLARDI:  The relevance is to

24   know whether or not Mr. Gitman spoke about the subject

25   matter of his deposition after the completion of his

12

1  deposition when he was given an expressed instruction

2  during day one of his deposition that he should not

3  communicate with counsel until the completion of his

4  deposition, and it was agreed that he would not do

5  that.

6           MR. SINGER:  I note my objection, but

7  you can answer.

8           MR. GUAGLARDI:  Thank you.

9  BY MR. GUAGLARDI:

10          Q.     Mr. Gitman, did you speak to your

11 attorneys for 20 or more times about the subject

12 matter of your deposition?

13 A.       I don't remember how many times I spoke to

14 them.

15          Q.     My question is not how many times you

16 spoke with them.  My question is when you spoke with

17 them, did you speak with them about scheduling or

18 about the subject matter of your testimony?

19 A.       I don't remember.  I definitely spoke about

20 the scheduling.  I don't remember speaking about the

21 subject matter.

22          Q.     Did you need to speak with them 20

23 times about scheduling your deposition?

24 A.       I don't remember.

25          Q.     Did you talk to them about your

13

1   testimony?

2              MR. SINGER:  Note my objection, but

3   you can answer.

4   A.      I don't remember; possibly.

5          Q.      When was the last time you spoke to

6   your attorneys about your testimony that you were

7   going to be giving today?

8   A.      I spoke to them right before the call.

9          Q.      And for how long?

10             MR. SINGER:  I object on privilege

11  grounds.

12             MR. GUAGLARDI:  Do you object to how

13  long the conversation went on the basis of attorney/

14  client privilege?

15             MR. SINGER:  Yes.

16             MR. GUAGLARDI:  Are you sure you want

17  to keep -- we're in Federal Court, and so Rule 11

18  applies, and we are attempting to just get through the

19  deposition.  I'm attempting to find out why your

20  client spoke to counsel regarding the subject matter

21  and testimony when he was instructed not to, number

22  one, and number two, I'm trying to find out how long

23  those conversations were.

24             MR. SINGER:  I note my objection, but

25  he can answer.

14

1          Q.      How long was the conversation today?

2     A.      If you give me a few minutes, I can check my

3     phone logs.

4          Q.      You can approximate.

5               MR. SINGER:  You don't have to check

6     your phone.  You can approximate.

7               MR. GUAGLARDI:  That's what I

8     indicated to him, absolutely.

9     A.      For eleven minutes.

10         Q.      And on these approximate 20 or more

11    times, did you speak with Mr. Sang or did you speak

12    with other attorneys in addition to Sang?

13    A.      I have no idea who Mr. Sang is.

14         Q.      Did you speak with Peter about your

15    deposition during those 20 or more times or other

16    attorneys, as well?

17    A.      I did speak with Peter.

18         Q.      Did you speak with any other

19    attorneys, as well, in addition to Peter during those

20    20 or more times?

21    A.      Yes.

22         Q.      What other attorneys did you speak

23    with?

24    A.      Other associates in the firm.

25         Q.      Who?

1   A.       I don't remember their names.

2            Q.       You don't remember their names?

3   A.       That's correct.

4            Q.       Did you speak with Mr. Brett Singer?

5   A.       I just indicated I spoke to Mr. Brett Singer

6   for eleven minutes before the call.

7            Q.       Is that the only time you spoke with

8   Mr. Brett Singer?

9   A.       Yes.

10           Q.       So other than Mr. Brett Singer this

11  one time and Peter Kim, what other attorneys in

12  Mr. Kim's firm did you speak with?

13  A.       I would have to get back to you on that.   I

14  don't know right now.

15           Q.       And were all of those times discussing

16  the subject matter of your testimony?

17  A.       No.

18           Q.       Were any of those times concerning the

19  subject matter of your testimony?

20  A.       I don't know.

21           Q.       Do you have the documents that were

22  e-mailed to you, the exhibits, Mr. Gitman?

23  A.       I have one, two, three --

24           Q.       Can you turn to P-38, which is a

25  document that says in the subject matter line "Account

16

1   alert, balance below $25."

2   A.       I see PM 38 open, but I do not see that

3   message.  Is there a specific page you would like me

4   to look at?

5           Q.       What do you have as PM-38?

6   A.       The document labeled PM-38.

7           Q.       And what is it?

8   A.       I will show you.

9           Q.       I'm sorry?  Mr. Gitman?

10  A.       One moment.  I'm trying to bring it up.

11          Q.       I thought you were looking at it.

12  A.       I am.  I am trying to bring it up for you.

13                   MR. SINGER:  You can specify which

14  page number you want my client to look at, Counsel.

15                   THE WITNESS:  Can you see what I'm

16  seeing now?

17                   MR. GUAGLARDI:  I can, although that

18  is not P-38.

19                   THE WITNESS:  It's a document that was

20  sent to me labeled PM-P38.pdf.

21                   MR. OSTRER:  That is P-38.

22                   MR. SINGER:  For the record, this is a

23  ten-page exhibit.  It would help to specify which page

24  you want my client to look at.

25                   MR. GUAGLARDI:  Evan, I'm looking at

1    Gmail, "Account alert, balance below $25, Bank of

2    America."  That's the first page of PM-38.

3           Is that something different than what everyone

4    else is looking at?

5                    MR. SINGER:  Looks like the second

6    page, Counsel.  Looks like the second page.

7                    MR. OSTRER:  Yeah, "Account alert,

8    balance below $25" is the second page of P-38.

9                    MR. GUAGLARDI:  That's fine.  I have

10   that erroneously as the first page.

11   BY MR. GUAGLARDI:

12          Q.     Mr. Gitman, do you see the page that's

13   on the screen right there?

14   A.     I do.

15          Q.     Can you identify what that is?

16   A.     It's an e-mail.

17          Q.     And what was the purpose of the

18   e-mail?

19   A.     It's an e-mail that states your account

20   balance is low.

21          Q.     Is that because you removed monies

22   from the Bank of America NDAP account?

23   A.     I don't know.

24          Q.     Did you remove monies from the NDAP

25   account on or about May 27, 2017?

18

1    A.      I don't remember.

2            Q.      Do you recall submitting a sworn

3    certification before the Southern District of New York

4    where you admitted to removing the monies, and you

5    were told by the judges in the Southern District of

6    New York to replace the monies and put them back or

7    that you might be detained?

8    A.      No, I don't remember.

9            Q.      You don't recall sitting in the

10   judge's chambers and having the judge tell you that

11   the money needed to be put back into the account that

12   you withdrew?

13   A.      I do remember a judge ordering me to put the

14   transferred money into an NDAP bank account.

15           Q.      And did you transfer the money back

16   into the account?

17   A.      I did follow the judge orders.

18           Q.      And why did you take the money out of

19   the account?

20   A.      I was instructed to by my attorney, Umar

21   Farooq, to move the money into a holding account.

22           Q.      Umar Farooq told you to move the money

23   from the NDAP account into a holding account?

24   A.      That's correct.

25           Q.      What holding account did you move the

1   money into from the NDAP account?

2   A.      I don't have that account information in front

3   of me, but I could find it if you need it.

4           Q.      Was that an account that you opened up

5   yourself?

6   A.      Yes.  It's an account that Umar Farooq

7   instructed me to open.

8           Q.      And you didn't get Michael

9   Dardashtian's consent to open that account and move

10  the money; did you?

11  A.      I did not get Michael Dardashtian's consent to

12  open a new bank account.

13          Q.      And you didn't notify Michael

14  Dardashtian that you were opening up a new bank

15  account; did you?

16  A.      I did notify him after it was open.

17          Q.      Did you notify him before you opened

18  the account?

19  A.      No.  Maybe.  I actually don't remember.  I

20  take that back.

21          Q.      Do you have any written proof that you

22  notified him that you were opening up a new bank

23  account?

24  A.      Possibly.

25          Q.      Have you produced that proof in this

20

1   case?

2   A.      Possibly.

3           Q.      And the new account that you opened

4   up, in whose name was the new account?

5   A.      I don't remember.

6           Q.      Was that in the name ChannelReply,

7   Inc.?

8   A.      I don't believe so.

9           Q.      Was that in your individual name?

10  A.      I don't think so.

11          Q.      Was it in the name ChannelReply?

12  A.      No, I don't think so.

13          Q.      So do you know what name the new

14  holding account was opened under?

15  A.      I don't remember.  This is, you know, over

16  three years ago.

17          Q.      At the time that you moved the money,

18  you also removed Michael Dardashtian's access to the

19  ChannelReply.com e-mail; didn't you?

20  A.      I don't remember.

21          Q.      So let me remind you, Mr. Gitman, that

22  today's deposition, although it's being conducted by

23  videotape, is under the penalties of perjury.

24          Are you aware of that?

25  A.      I'm very aware of that.

1          Q.      And do you recognize that although

2     you're sitting in your home where we can see each

3     other, that it's as if you were sitting in a courtroom

4     in the Southern District of New York, swearing before

5     a federal judge as to your answers?

6          Are you aware of that?

7     A.      Yes.

8          Q.      And are you aware that if give --

9     you're on mute right now, just so you understand.  I'm

10    seeing your video and it shows that you are now off

11    mute.

12         Are you aware that if you are giving false

13    answers, A, that you could be subject to the penalty

14    of perjury and sanctions?  Are you aware of that?

15    A.      Yes.

16         Q.      Are you aware of the fact that if your

17    false answers create a delay in this deposition and we

18    have to continue this deposition, that we will seek an

19    award of sanctions and counsel fees against you for

20    any willful answers that you're giving that are false.

21         Are you aware of that?

22    A.      I was not aware of that until you just told

23    me.

24         Q.      Okay.  So now I'm going to ask you

25    again.  Did you remove Michael Dardashtian's access to

22

1  the ChannelReply.com e-mail that he had previously

2  maintained?

3  A.      I don't remember.

4          Q.      Did you remove Michael Dardashtian's

5  access to any of ChannelReply's accounts at or around

6  May 27, 2017?

7  A.      I don't remember.

8          Q.      You don't know whether you removed his

9  access?

10  A.      I don't remember what technical changes I made

11  three years ago.

12          Q.      Do you recall that the court ordered

13  you to restore Michael Dardashtian's access to the

14  ChannelReply.com e-mail?

15  A.      I don't remember that.

16          Q.      Did you ever advise either

17  Mr. Glukharev or Mr. Bagaev that you were removing

18  Michael Dardashtian from access to the ChannelReply

19  company because you believed that Michael Dardashtian

20  stole money from the company?

21  A.      I don't remember that.

22          Q.      Did you have any discussions with --

23          You know who Mr. Bagaev is.  Right?

24  A.      I do.

25          Q.      And you know who Mr. Glukharev is;

23

1    don't you?

2    A.      I know who you're referring to.

3           Q.      And they are both developers who were

4    hired by the company to assist in the development of

5    the ChannelReply codes and business.   Correct?

6    A.      No.

7           Q.      What were they retained by the company

8    for?

9    A.      As software developers.

10          Q.      Did they help develop the software for

11   ChannelReply?

12   A.      They did.

13          Q.      And do you recall ever speaking with

14   them and advising either of them that you were

15   removing Michael Dardashtian's access to all of the

16   ChannelReply applications and e-mails?

17   A.      No.

18          Q.      Did you ever tell either of them that

19   Michael Dardashtian misappropriated or stole money

20   from any of the companies ChannelReply, NDAP, CSV?

21   A.      I don't remember.

22          Q.      Can you go to page 2 of P-38.

23   A.      I have page 2 on the screen.

24          Q.      Can you flip it to the next page.   Can

25   you go back to the page that you just had up.

24

```
 1              Is that Michael@ChannelReply.com, is that
 2   Michael Dardashtian's e-mail?
 3   A.      I don't know.
 4              Q.      Did you ever e-mail him at Michael@
 5   ChannelReply.com?
 6   A.      I don't believe so.
 7              Q.      Can you go to the next page.
 8              Did you ever see that page before when you
 9   tried to log in on the ChannelReply.com e-mail?
10   A.      I don't understand the question.
11              Q.      Have you ever seen that page before
12   today?
13   A.      I don't remember.
14              Q.      Can you go to the next page.
15              What is PayPal@CooperSquareVentures.com?
16   A.      I don't know.
17              Q.      Is that one of the accounts that by
18   which ChannelReply was able to receive its money when
19   a customer paid for ChannelReply service?
20   A.      I don't know.
21              Q.      You don't know whether ChannelReply
22   had a PayPal account?
23   A.      No.  I don't remember.
24              Q.      And do you know whether you ever
25   removed Michael Dardashtian from the ChannelReply's
```

1   PayPal account?

2   A.      I don't remember.

3           Q.      Do you know whether ChannelReply ever

4   received its revenue from a PayPal account in the name

5   of Cooper Square Ventures?

6   A.      I don't remember.

7           Q.      And do you know whether you've ever

8   discontinued Michael Dardashtian's access to the

9   Cooper Square Ventures' PayPal account?

10  A.      I don't remember.

11          Q.      Can you go to the next page.  Can you

12  go to the next page.

13          What is Stripe?

14  A.      I believe it's a payment gateway, but I'm not

15  sure.

16          Q.      Do you see the three logos where it

17  says Stripe and then XERO?

18  A.      I do.

19          Q.      What is XERO?

20  A.      It's some sort of accounting software, as far

21  as I know.

22          Q.      And the circle next to XERO, where it

23  looks like a C with a dot in the middle, what is that?

24  A.      I'm not familiar with that logo.

25          Q.      Are you aware of whether or not

1   ChannelReply or Cooper Square Ventures had a Stripe

2   account?

3   A.      I don't remember.

4            Q.      Do you know whether Cooper Square

5   Ventures or ChannelReply had a XERO account?

6   A.      I don't remember.

7            Q.      And what is Chargebee?

8   A.      I believe it's a payment gateway.

9            Q.      And did ChannelReply use Chargebee in

10  order to receive money from its customers?

11  A.      I don't remember.

12           Q.      Do you know anything about how

13  ChannelReply ever received any money from its

14  customers?

15  A.      I don't remember how it worked three years

16  ago.

17           Q.      And you don't remember because it's

18  two years ago?

19  A.      Because it's three years ago.

20           Q.      And so you don't have any recollection

21  from what happened two years ago?

22  A.      I don't have much of a recollection of the

23  technical configuration of the product I have not been

24  with for over three years.

25           Q.      But when you signed sworn statements

1  that you submitted to the Southern District of New

2  York under the penalty of perjury, did you have a good

3  recollection then when you signed those documents and

4  swore them to be true?

5  A.      I don't remember what I remembered when I

6  signed those documents.

7          Q.      And today you don't have any

8  recollection of anything that has to do with

9  ChannelReply.  Is that true?

10 A.      I have a recollection of ChannelReply.

11         Q.      But did ChannelReply have customers?

12 A.      It did.

13         Q.      Did the customers pay for

14 ChannelReply's service?

15 A.      I believe so.

16         Q.      How did they pay?

17 A.      I assume they used their credit cards.

18         Q.      You don't know?

19 A.      I don't remember how they paid.  I assume they

20 used their credit cards.

21         Q.      Do you know whether when they paid the

22 money went into a bank account in the name of Cooper

23 Square Ventures?

24 A.      I don't remember how the money was routed.

25         Q.      Do you know whether you received money

28

1  as a result of the money that the customers of

2  ChannelReply paid to the company?

3  A.       I believe I never received any monies.

4          Q.       Did you receive money that paid your

5  lawyers?

6  A.       I don't understand the question.

7          Q.       Did you ever receive money as a result

8  of orders of the court that was distributed to you and

9  Michael Dardashtian where that money was utilized for

10 you to pay your attorneys and Michael Dardashtian to

11 pay his attorneys?

12 A.       I don't understand the question.

13         Q.       Have you ever received monies since

14 the initiation of this lawsuit from the Cooper Square

15 Ventures bank account?

16 A.       No.

17         Q.       Was money ever released on your behalf

18 and paid to your attorneys from that account?

19 A.       I don't know how my attorneys have been paid.

20         Q.       Can you go to the next page.  Can you

21 go to the next page.  Can you go to the next page.

22         Are you familiar with the e-mail

23 Mdash@NDAP-LLC.com?

24 A.       Yes.  I see it on the screen.

25         Q.       Do you have any independent

1   recollection that that's Michael Dardashtian's e-mail

2   at NDAP?

3   A.      Yes.

4           Q.      And you've used that e-mail to e-mail

5   him and he's used that e-mail to e-mail you?

6   A.      Yes.

7           Q.      Can you go to the next page.

8   A.      There are no more pages.

9           Q.      Okay.  Can you go to the next exhibit.

10  A.      Can you specify which document you'd like me

11  to open?

12          Q.      The next exhibit, which would be P-39.

13  You had the right exhibit up and you took it off the

14  screen.  Can you put it back up, please.  Mr. Gitman?

15  A.      Yeah, I'm working on it.

16          Q.      What is that document?

17  A.      I'll need a few minutes to look over it.

18  Looks like some sort of screenshots.

19          Q.      Mr. Gitman, do you see in the lower

20  left-hand corner, are you on the page that says

21  Aleksey Glukharev, June 1st, 2017, 3:08 a.m.?

22  A.      I see that, but it seems like some of it is

23  cut off.  But yes, that does look like that's what it

24  says.

25          Q.      Did you have conversations with

30

1   Aleksey Glukharev on June 1st, 2017?

2   A.      I don't remember.

3           Q.      Did you write and talk to Glukharev

4   and Konstantyn Bagaev about removing Mike out of

5   ChannelReply and bringing them in as partners?

6   A.      I don't remember.

7           Q.      Did you have any conversations with

8   Mr. Glukharev or Mr. Bagaev on June 1st or June 2nd of

9   2017 relating to removing Michael Dardashtian out of

10  ChannelReply?

11  A.      I don't remember.

12          Q.      And looking at this page, which is

13  P-39, that does not help refresh your recollection?

14  A.      It does not.

15          Q.      Do you see where it says employee

16  details?  Let's start at the top of the document.

17  Company address, state of incorporation says Delaware.

18          Is that where ChannelReply was formed?

19  A.      I don't remember.

20          Q.      Did you form --

21          You already told us in your last deposition

22  you formed Channel Reply, Inc.  Correct?

23  A.      Yes, I did.

24          Q.      And do you see where it says employee

25  details?

31

1    A.      I do.

2            Q.      And it says name, Aleksey Glukharev.

3    Right?

4    A.      Yes.

5            Q.      On June 1st, 2017, Mr. Glukharev was

6    working for ChannelReply; wasn't he?

7    A.      I don't remember.

8            Q.      Do you see where it says primary

9    duties?

10   A.      I do.

11           Q.      And two lines above that it says

12   employee job title, lead software engineer.

13   A.      I see that.

14           Q.      Did you insert those words in this

15   document?

16   A.      I don't believe so.

17           Q.      Below that where it says vice

18   president of engineering, were you making

19   Mr. Glukharev vice president of engineering for

20   Channel Reply, Inc.?

21   A.      I don't believe so.  I don't remember.

22           Q.      Can you read what the primary duties

23   were?  Can you read it, please?

24   A.      Sure.  Let me zoom in.  "You will perform the

25   duties customary performed by an employee in your

32

1  position or as otherwise may be assigned to you by the

2  company."

3        Q.      And you meant customarily, right, not

4  customary?

5  A.      Yes, that is what it says.  Thank you for

6  correcting me.

7        Q.      And below that it says compensation

8  terms.  Correct?

9  A.      Yes.

10       Q.      What did you write there?

11 A.      I don't believe I wrote this, but it does

12 say -- I'm happy to read it if you'd like.

13       Q.      What does it say?

14 A.      "$20 per hour.  As a regular employee of the

15 company, you will be eligible to participate in those

16 company-sponsored benefits generally made available to

17 all employees."

18       Q.      And what type of equity award was

19 being given to Mr. Glukharev?

20 A.      I'm not sure.

21       Q.      Does it say restricted stock?

22 A.      The document says type of equity award,

23 restricted stock.

24       Q.      How many units or shares were being

25 given to Mr. Glukharev?

1    A.      The number of vested and unvested equity award

2    shares is 125,000.  The number of unvested equity

3    award shares seems to be 62,500.  The vesting

4    provision is 1/48th of the vesting shares shall vest

5    each month.  Excluded IP is none; restricted prior

6    agreements is none.

7            Q.      Is it your testimony under oath that

8    this document wasn't for Channel Reply, Inc.?

9    A.      I don't remember.

10           Q.      Do you see up top it says e-mail,

11   Aleksey@ChannelReply.com?

12   A.      I see that.

13           Q.      Was that an e-mail that was set up for

14   Aleksey at ChannelReply or at Channel Reply, Inc.?

15   A.      I don't know.

16           Q.      Could you go to the next page.  By the

17   way, go back to that page, please.

18           On that same page that you've been reading

19   from, who lives at 100 Sterling Place, Brooklyn, New

20   York, Apartment 1A?

21   A.      I don't know anymore.

22           Q.      Did you ever live there?

23   A.      I did.

24           Q.      You don't know anymore who lived

25   there, but you formally lived there.

1          Is that your answer to that question?

2    A.      No.   You asked me who lives there and I said I

3    don't know.

4          Q.      Okay.   But you formally lived there?

5    A.      I'm sorry.   Could you repeat the question?

6          Q.      You formally lived at 100 Sterling

7    Place, Apartment 1A, Brooklyn, New York.   Correct?

8    A.      That's correct.

9          Q.      Go to the next page, please.

10         Is this a communication between you and

11   Mr. Glukharev?

12   A.      It appears to be.

13         Q.      What type of communication is that?

14   A.      I'm unsure.

15         Q.      Is it a Skype communication?  Is it a

16   Slack communication like it says in the upper

17   left-hand corner?

18   A.      It says Slack in the upper left-hand corner.

19         Q.      So what is Slack?

20   A.      Slack is a communication tool.

21         Q.      Did you use Slack as a communication

22   tool to communicate with Aleksey Glukharev?

23   A.      I don't remember.

24         Q.      Does this help refresh your

25   recollection?

35

1   A.      Slightly.  It seems like it might be a

2   conversation in Slack between Aleksey and I.

3            Q.      We're going to read it together.  On

4   the top at 12 p.m. -- hold on one second.

5            Do you see in the lower left-hand corner it

6   says June 1st, 2017 at 3:26 a.m.?

7   A.      I do not see that.

8            Q.      You don't see where it says Aleksey

9   Glukharev, June 1st, 2017 at 3:26 p.m.?

10  A.      I do not.

11               MR. SINGER:  Neither do I.

12               MR. GUAGLARDI:  Let the record reflect

13  that that's what the document says and I believe that

14  Mr. Gitman is just being conveniently evasive, but

15  we'll deal with that with the judge.

16           Q.      Can you go back to the top of the

17  document.

18               MR. SINGER:  Is it possible you could

19  zoom out?  Maybe then that will show the date.

20  A.      Sure, Brett.  Let me try to zoom out a little.

21           Q.      Does that help you, Mr. Gitman?

22  A.      No.  I'm not able to see any date stamp on

23  this page.

24           Q.      I'll represent to you it's June 1st,

25  2017 to 3:26 a.m.  Can you go back to the top of the

1  document and zoom in.

2         Can you read at the top of the page from

3  Aleksey Glukharev at 12 p.m.  What did he say to you?

4  A.      I'm unable to read the document.  The text is

5  too blurry.

6               MR. SINGER:  Counsel, if I may, are

7  you asking him to start where it says good morning?

8               MR. GUAGLARDI:  Yeah, absolutely.

9               MR. SINGER:  I see some vague markings

10  above it, but I don't see like --

11               MR. GUAGLARDI:  I'll represent to you

12  that the markings below David Gitman is a star and it

13  says active with a green dot and @David.  That is

14  above Aleksey Glukharev.

15               MR. SINGER:  Okay.

16         Q.      Mr. Gitman, at 12 o'clock p.m.,

17  Mr. Glukharev said what to you?

18  A.      I'm unable to read it.  Could you read it to

19  me, please?

20         Q.      You can't read the words: "Good

21  morning," exclamation point, "I got notification from

22  Clerky"?  You don't see that at the top under Aleksey

23  Glukharev where your counsel just read?

24  A.      Let me zoom in.  I'll see if I can see it.

25         Q.      If your counsel can read it, I'm

37

1    surprised you can't, and I can read it.  We're all

2    looking at the same document.

3    A.      Okay.  Would you like me to zoom in and try to

4    read it?

5            Q.      Sure.

6                    MR. GUAGLARDI:  Counsel, while we're

7    doing this, this is part of the delay issue that I'm

8    referring to that is just going to make this

9    deposition go longer.  You read it carefully, easily,

10   I did, as well, and Mr. Gitman is looking at the same

11   document.

12                   MR. SINGER:  The deponent is doing his

13   best.  We'll see what he can read.  We'll see what he

14   can read.

15           Q.      I'm waiting for you, Mr. Gitman.

16   A.      Okay.  It says David Gitman and then Aleksey

17   Glukharev.  "Good morning," exclamation point.  "I got

18   notification from Clerky.

19           Q.      Who is Clerky?

20   A.      I don't remember.  I think it's some sort of

21   incorporation service, if I remember correctly.

22           Q.      And you responded to him at 12 o'clock

23   and said "Great."  Correct?

24   A.      I don't see any time stamps.

25           Q.      I'll represent to you that's what the

1    document shows.  You zoomed in too much, so you zoomed

2    out the time stamp, but that's what it says.

3           Then Aleksey Glukharev wrote to you --

4    A.     Again, I don't see any time stamp.

5           Q.     There is no question pending.

6           The next, Aleksey Glukharev said to you:

7    "Should I register?"  You wrote: "This is the initial

8    stock plan agreement.  Please.  You are getting

9    125,000 shares."

10          I read that correctly.  Right?

11   A.     I believe so.

12          Q.     So you presented Mr. Glukharev with an

13   initial stock plan agreement?

14   A.     I don't remember.

15          Q.     You don't recall looking at this

16   document whether that refreshes your recollection that

17   you gave Glukharev a stock plan agreement?

18   A.     That's correct.

19          Q.     And you recall on the page before that

20   where we read the 125,000 shares for that company,

21   that you're telling Mr. Glukharev now that he is

22   getting 125,000 shares?

23   A.     I don't understand the question.

24          Q.     What were you giving him 125,000

25   shares of?

39

```
 1   A.      I don't remember.
 2           Q.      Was it of Channel Reply, Inc.?
 3   A.      I don't remember.
 4           Q.      Did you offer to give him 125,000
 5   shares of any other company?
 6   A.      I don't remember.
 7           Q.      Do you recall where the stock plan
 8   agreement is that you presented to him?
 9   A.      I don't remember a stock plan agreement.
10           Q.      Did you produce it in this case?
11   A.      I don't know.
12           Q.      We didn't receive any stock plan
13   agreement that you presented to Aleksey Glukharev in
14   this case in discovery, and we're reiterating a demand
15   for it where we will seek court intervention.
16           The court has already ordered you to produce
17   this document.  Did you produce it pursuant to the
18   court's order?
19   A.      I produced all documents per the court order.
20           Q.      Did you produce the initial stock plan
21   agreement referenced on this exhibit, P-39, to us?
22   A.      I don't know what was produced to you.
23                   MR. GUAGLARDI:  Jo, mark that page,
24   please.  Keep a list.
25           Q.      Aleksey Glukharev wrote to you in
```

1   response to you telling him you're getting 125,000

2   shares, and he said: "There is a little collision.  My

3   name is the foreign passport is Oleksii Glukharev.

4   It's Ukrainian transcription of my name.  Is it

5   important for this agreement?"  And then you

6   responded: "Hmm.  What does your driver's license

7   say?"  And you transposed it and wrote diver's

8   license.  Then you spelled his name Oleksii Glukharev,

9   question mark.  And he responded back to you "Yep."

10  And you responded to him: "I'll change it then."  Then

11  he responded to you: "Thank you."

12          So you were changing his name on the initial

13  stock plan agreement because it was misspelled.

14          Is that true?

15  A.      I don't know.

16          Q.      Can you go to the next page.

17          Did you ever have a Slack conversation with

18  Konstantyn Bagaev on June 2nd, 2017?

19  A.      I don't know.

20          Q.      Let's look at the conversation you had

21  with Konstantyn Bagaev on June 2nd, 2017.  On the top

22  he wrote: "To get a property, my father can, in

23  quotes, sell me a house we build."  You then wrote:

24  "Our lawyer will step in to help."

25          What lawyer were you referring to when you

41

```
1    wrote to Mr. Bagaev on June 2nd, 2017?
2    A.      I don't know.
3            Q.      Were you referring to Dentons?
4    A.      I don't know.
5            Q.      Were you referring to the attorney
6    that you referred to earlier today in your testimony?
7    A.      I don't know.
8            Q.      Mr. Bagaev wrote to you on June 2nd,
9    2017 at 1:37 p.m. in response to your statement, and
10   he wrote: "Hope that helps."  You wrote to him: "We
11   can try for an L-1, I think."
12           Is that a visa you were trying to get for
13   Mr. Bagaev, an L-1 visa?
14   A.      I don't know.
15           Q.      Is there such a thing as an L-1 visa,
16   Mr. Gitman?
17   A.      I don't know.
18           Q.      You've never heard of one?
19   A.      I don't remember ever hearing of one.
20           Q.      Mr. Bagaev responded to you and said:
21   "Actually this visa barrier makes me angry, like in
22   sport the enemy makes me angry."  Then you responded:
23   "Anyway, we will get the right team to support your
24   travel to ensue capital C capital R is a success."
25           You wrote that.  Correct?  You wrote
```

42

1   everything on that page; didn't you?

2   A.      I believe so.

3           Q.      What does CR mean, ChannelReply?

4   A.      I believe so.

5           Q.      So when you said: "anyway, we will get

6   the right team to support your travel to ensue," you

7   meant ensure; didn't you?

8   A.      I don't know what I meant.

9           Q.      Did you want to ensure that

10  ChannelReply was going to be a success?

11  A.      I don't know what I wanted.

12          Q.      Did you ever want ChannelReply to be a

13  success?

14  A.      Yes.

15          Q.      Did you want ChannelReply to be a

16  success on June 2nd, 2017?

17  A.      I don't know.

18          Q.      Did you ever want ChannelReply to fail

19  on June 2nd, 2017?

20  A.      I don't know.

21          Q.      Mr. Bagaev responded back to you:

22  "I'll check for visa options."  And then you wrote to

23  him: "I would let our law firm handle it, but feel

24  free to read up."

25          When you wrote that to Mr. Bagaev, what law

43

1  firm were you referring to?

2  A.      I don't know.

3          Q.      So on June 2nd, 2017, which was the

4  day after you spoke to Mr. Glukharev and offered him

5  125,000 shares, you were offering Mr. Bagaev an

6  opportunity to become an owner of ChannelReply, as

7  well, an bring him over with a visa so that he could

8  become part of the company.  Is that true?

9  A.      No.

10         Q.      What were you doing then with

11  Mr. Bagaev?

12  A.      I don't know.  I don't remember.

13         Q.      Then how do you know that it wasn't

14  true then?

15              MR. SINGER:  What was the question?

16  A.      You'll have to repeat the question.  There

17  were three parts to your question.

18         Q.      On June 2nd, 2017 -- you're on mute,

19  Mr. Gitman.

20         On June 2nd, 2017 did you offer Mr. Bagaev an

21  ownership interest in ChannelReply?

22  A.      I don't remember.

23         Q.      Did you offer to bring him over with a

24  visa?  You're on mute again, Mr. Gitman.

25         Did you offer to bring him over with a visa so

44

1  that he could become a part owner of ChannelReply on

2  June 2nd, 2017?

3  A.      No.

4           Q.      Why were you offering to bring him

5  over on a visa and have your law firm handle it?

6  A.      I don't believe I ever offered Konstantyn

7  Bagaev that type of arrangement.

8           Q.      Isn't that what it says on this

9  document?

10 A.      No.

11          Q.      Does it say "I would let our law firm

12 handle it"?  Didn't you write that to him?

13 A.      Yes.

14          Q.      Weren't you offering to have your law

15 firm handle his visa?

16 A.      No.

17          Q.      Isn't that what it says right above

18 it?

19 A.      No.

20          Q.      Did you offer Mr. Bagaev 125,000

21 shares of Channel Reply, Inc., as well?

22 A.      I don't remember.

23          Q.      Do you recall how many shares you

24 offered Mr. Bagaev to join Channel Reply, Inc.?

25 A.      No.

45

1        Q.      Did you have consent from
2   Mr. Dardashtian on June 1st or June 2nd, 2017 to offer
3   Mr. Bagaev or Mr. Glukharev any shares in
4   ChannelReply?
5   A.      I don't remember.
6        Q.      Can you go to the next page.
7               MR. GUAGLARDI:  Evan, that page that
8   Mr. Gitman has, is that identified as P-38?
9               MR. OSTRER:  The page that's up on the
10  screen?
11              MR. SINGER:  No.  It's P-39, Counsel.
12              MR. OSTRER:  We've been on P-39.
13       Q.      So this is still P-39.
14       So continuing, Mr. Gitman, what did you write
15  to Mr. Bagaev on June 2nd, 2017 right on the top line?
16  What did you write to him?  In fact, put it back up,
17  I'm going to read it, and then you can tell me if I
18  read it correctly.
19       Did you write to Mr. Bagaev:  "You have the
20  option of getting Michael Dardashtian share if he
21  doesn't join and the available (ungranted) option
22  shares as well over time"?
23  A.      Yes.
24       Q.      So you were offering Bagaev Michael
25  Dardashtian's share of ChannelReply?

46

A.       No.

         Q.      What did you mean then when you wrote
that?

A.       I meant that he has the option of getting
Michael Dardashtian's share if he doesn't join and the
available ungranted option shares as well over time.

         Q.      Did you have a discussion with Michael
Dardashtian about offering Mr. Bagaev Michael
Dardashtian's share of ChannelReply?

A.       I don't remember.

         Q.      How would you be permitted to offer
Mr. Bagaev Michael Dardashtian's share of ChannelReply
when Michael Dardashtian owned Michael Dardashtian's
share of ChannelReply?

A.       I don't know.

         Q.      Okay.  So Mr. Bagaev wrote back to you
in response to your statement: "What I can tell is
that Mike will never accept this."  And you wrote to
Mr. Bagaev: "I think it's fair.  I will work with Mike
on it."

         Did you ever work with Mike on offering Mike's
share of ChannelReply to Mr. Bagaev?

A.       I don't remember.

         Q.      Mr. Bagaev wrote in response to your
statement: "I mean, he will never accept small share.

47

```
1    Probably that will make no sense to him."
2             Bagaev wrote that to you; didn't he?
3    A.       Yes.
4             Q.       And so you and Aleksey Glukharev and
5    Bagaev were forming your own company, Channel Reply,
6    Inc., in an effort to take over the ChannelReply
7    intellectual property and then going to offer Mike
8    Dardashtian a small share of that company.
9             Is that true?
10   A.       I don't believe so.
11            Q.       What do you believe, Mr. Gitman, was
12   happening on June 2nd, 2017 when Mr. Bagaev wrote that
13   to you?
14   A.       I don't remember that date.
15            Q.       Do you recall why Mr. Bagaev was
16   saying Mike wouldn't take a small share of
17   ChannelReply?
18   A.       I don't recall other than what you see up on
19   the screen.
20            Q.       Didn't Mike Dardashtian on June 2nd,
21   2017 own 50 percent of ChannelReply?
22   A.       I don't remember.
23            Q.       How much of ChannelReply did you own
24   on June 2nd, 2017?
25   A.       I don't remember.
```

48

1          Q.      Continuing on that page, you wrote to

2     Mr. Bagaev: "Considering how much money he stole, it

3     is more than generous."

4          You wrote that to Mr. Bagaev; didn't you?

5     A.      Yes.

6          Q.      Does that help refresh your

7     recollection about an earlier question I asked which

8     was whether you ever claimed to either of these

9     developers that Michael Dardashtian stole money from

10    the company?

11    A.      It doesn't help my recollection, but it seems

12    that is what I wrote here.

13         Q.      Why would you say to Konstantyn Bagaev

14    that Michael Dardashtian stole money from the company?

15    A.      I'm not sure what was in my head three years

16    ago.  I can't answer that.

17         Q.      Do you realize that you were

18    disparaging Michael Dardashtian to one of the

19    developers for ChannelReply, a company that he was a

20    half owner of?

21    A.      I was not disparaging, and I'm also not sure

22    if Michael Dardashtian is a half owner of that

23    company, so. . .

24         Q.      What would you characterize your

25    statement to -- strike that.

49

1          On June 2nd, 2017 Bagaev was working for

2    ChannelReply and Cooper Square Ventures.   Correct?

3    A.      I don't know.

4          Q.      You don't know?

5    A.      That's correct.  I don't remember what was

6    happen -- I don't remember the June that you're

7    referring to.  That was a long time ago.

8          Q.      Don't you know that on June 2nd, 2017

9    Bagaev was also working for NDAP and being paid by

10   NDAP and CSV?

11   A.      No, I don't know that.

12          Q.      So you don't consider talking to

13   Bagaev as one of the developers of ChannelReply

14   working with CSV and NDAP and telling him that

15   Dardashtian stole money as disparaging Michael

16   Dardashtian?

17   A.      That's correct.

18          Q.      Can you go to the next page.

19          Now, on the top you wrote, and this is now

20   June 4, 2017 at 12:16 a.m., you wrote to Bagaev:

21   "Great.  Confirming with my boss."

22          Now, would your boss be your wife?

23   A.      No.

24          Q.      What other boss did you have on

25   June 4, 2017 other than your wife?

1   A.      I don't know.

2           Q.      Your wife wasn't your boss on June 4,

3   2017?

4   A.      No.

5           Q.      Is anyone else in the room with you

6   right now while we're taking this deposition?

7   A.      My dog is sitting by my side.

8           Q.      Were you employed by anyone else on

9   June 4, 2017?

10  A.      I don't remember.

11          Q.      Did you have any other bosses in June

12  of 2017?

13  A.      I don't remember.

14          Q.      So the reference to Bagaev that you're

15  confirming with your boss, who would that be?

16  A.      I don't remember.  I don't know.

17          Q.      Mr. Bagaev wrote to you with a smily

18  face.  Do you see that?

19  A.      I do.

20          Q.      And then he wrote: "Dave, one more

21  thing, since ChannelReply is a new company, our

22  customers are accepting/accepted terms and conditions

23  with old or new company?  Should we update them?"

24          What was your answer to that question?

25  A.      "Absolutely.  I want our lawyer to review the

51

1  current one."

2      Q.      What does that mean?

3  A.      It means I absolutely -- I'm not sure how to

4  explain that sentence.

5      Q.      You can't really explain that

6  sentence?  That's surprising.

7  A.      No, that's not what I said.  I'm not sure how

8  to explain that sentence.

9      Q.      Let's see if I can ask you some

10  questions to help clarify that.

11  A.      That would be helpful.  Thank you.

12      Q.      Mr. Bagaev wrote to you just before

13  that and he said: "Since ChannelReply is a new

14  company."

15      Didn't ChannelReply exist before June 4, 2017?

16  A.      I don't remember.

17      Q.      Didn't you and Mike Dardashtian have

18  ChannelReply for a long time before June 4, 2017?

19  A.      I don't remember.

20      Q.      When did ChannelReply first get

21  developed and go online where it sold to its first

22  customer?

23  A.      I don't know.

24      Q.      No?  Okay.

25      So was Bagaev referring to Channel Reply, Inc.

52

1  as being the new company?

2  A.      I don't know.

3          Q.      When he wrote and said that our

4  customers are accepting or accepted terms and

5  conditions with the old or new company, what did he

6  mean between the old and the new company?

7  A.      I don't know.  You would have to ask him.

8          Q.      We did.  We will ask him those

9  questions.

10         Did ChannelReply, the company that existed

11 before you formed Channel Reply, Inc., have terms and

12 conditions that were posted on the internet?

13 A.      I don't remember.

14         Q.      You don't remember.  When you wrote on

15 this page to Mr. Bagaev, "I want our lawyer to review

16 the current one," what was the current one that you

17 wanted your lawyer to review?

18 A.      I don't know.  This was over three years ago.

19         Q.      What lawyer did you want to do the

20 review?

21 A.      I don't remember.  This is over three years

22 ago.

23         Q.      Was that Dentons?

24 A.      I don't know.  This is over three years ago.

25         Q.      Was that the other attorney you

1   referred to earlier in today's deposition?

2   A.      I don't know.  It was over three years ago.

3           Q.      Were there new terms and conditions

4   that you prepared for Channel Reply, Inc. that were

5   different than the old ones that were already posted

6   on the website?

7   A.      I don't know.  It was over three years ago.

8           Q.      Were you looking to take ChannelReply

9   and its technology and steal it and move it to Channel

10  Reply, Inc.?

11  A.      No.

12          Q.      Were you looking to take the

13  technology from ChannelReply that was owned by you and

14  Dardashtian and move it to Channel Reply, Inc.?

15  A.      No.

16          Q.      Why then did the judge have you

17  dissolve Channel Reply, Inc.?

18  A.      I don't know.

19          Q.      Mr. Bagaev responded to you "Okay."

20  And then you wrote to him: "Flight booked.  I come in

21  on Monday the 12th at 8 p.m.  I leave Saturday the

22  17th at 7 a.m."  And he wrote, Bagaev wrote to you:

23  "Okay.  I'll check tickets, too, now."

24          Was that flight that you booked for June 12,

25  2017 at 8 p.m. so that you could travel to the Ukraine

54

1    and meet with Bagaev and Glukharev?

2    A.       I don't remember.

3             Q.      You don't remember whether or not you

4    flew to the Ukraine to meet with Bagaev and Glukharev

5    in June of 2017?

6    A.       That's correct.

7             Q.      Did you ever go meet with Bagaev and

8    Glukharev in the Ukraine ever?

9    A.       Yes, many times.

10            Q.      How many times?

11   A.       Several.

12            Q.      How many is several?  More or less

13   than five?

14   A.       Probably more.

15            Q.      More or less than ten?

16   A.       I would say less.

17            Q.      So between five and ten.  And what was

18   the purpose of your meetings when you went to meet

19   with Bagaev and Glukharev in the Ukraine five to ten

20   times?

21   A.       We would write code.

22            Q.      Did you tell Michael Dardashtian that

23   in June of 2017 you were going to meet Bagaev and

24   Glukharev in Ukraine?

25   A.       I don't remember.

1       Q.    Did you go to meet with Bagaev and

2  Glukharev in June of 2017 to discuss business,

3  ChannelReply business?

4  A.    I don't remember.

5       Q.    Did you go in June of 2017 to the

6  Ukraine to meet with Bagaev and Glukharev to discuss

7  their ownership interest in the new company that you

8  formed, Channel Reply, Inc.?

9  A.    I don't remember.

10       Q.    Do you see on the right side of that

11  page, that one that we're reading right now under

12  downloads?

13  A.    Yes.

14       Q.    On the first line it says Channel

15  Reply, Inc.  Do you see that?

16  A.    No, I can't read that.

17       Q.    Why don't you zoom out and see if you

18  can read it.  Do you see it says Channel Reply, Inc.

19  on the first line under downloads?

20  A.    No, I can't read that.

21       Q.    You can't read it?

22       MR. GUAGLARDI:  Counsel, I'll

23  represent I'm going to read it and I'm sure you can

24  read it, too, so we don't waste time.  It says,

25  "Channel Reply, Inc., cap table 201706," and then

56

1   below that it says, "Channel Reply, Inc., cap table
2   053117."  Below that it says: "Konstantyn Contractor
3   Agreement," in parenthesis, number one, end
4   parenthesis.
5        Q.     Do you see on the third line under
6   downloads, Mr. Gitman, where it says "Konstantyn
7   Contractor Agreement"?
8   A.        No, I can't read that.
9        Q.     Did you ever prepare a contractor
10  agreement for Konstantyn Bagaev to go work for Channel
11  Reply, Inc.?
12  A.        I don't know.
13       Q.     Did you ever present Konstantyn Bagaev
14  with a contractor agreement to go work for Channel
15  Reply, Inc.?
16  A.        I don't know.
17       Q.     Did you ever get consent from Michael
18  Dardashtian to form Channel Reply, Inc., a competing
19  company with ChannelReply?
20  A.        I don't know.
21       Q.     Did you ever get consent from Michael
22  Dardashtian to take the ChannelReply intellectual
23  property or software and move it to Channel Reply,
24  Inc.?
25  A.        I don't know.

57

1        Q.      Did you ever get consent from Michael

2   Dardashtian to present Konstantyn Bagaev with an

3   independent contractor agreement to go work for

4   Channel Reply, Inc.?

5   A.      I don't know.

6        Q.      Did you ever get consent from Michael

7   Dardashtian to offer Konstantyn Bagaev ownership

8   shares in Channel Reply, Inc.?

9   A.      I don't know.

10        Q.      Did you ever get consent from Michael

11   Dardashtian to offer shares of ownership to Aleksey

12   Glukharev in Channel Reply, Inc.?

13   A.      I don't know.

14        Q.      Did you ever get consent from Michael

15   Dardashtian to take Glukharev or Bagaev and retain

16   them for Channel Reply, Inc., to do work for that

17   company?

18   A.      I don't know.

19        Q.      Can you go to the next page.

20        That's an e-mail to you, correct, with your

21   flight information to go to the Ukraine; isn't it?

22   A.      I can't tell.

23             MR. GUAGLARDI:  Counsel, do we need to

24   do this in a different way?  Because this is a basic

25   question off of a document we're all looking at and

58

1   it's an e-mail that's from Travel Document to David

2   Gitman dated June 12, 2017.  I mean, I can read it

3   very clearly.

4                    MR. SINGER:  Counsel, I don't know how

5   well the deponent can see the exhibit.

6                    MR. GUAGLARDI:  Well, it's on the

7   computer in front of him and it's the same exhibit

8   that you and I are looking at.

9                    MR. SINGER:  And he will do his best

10  to read it.

11                   MR. GUAGLARDI:  Well, what's going to

12  happen is this, we're going to have to end up taking

13  this deposition over again at his expense and we will

14  seek counsel fees because if this transcript can't

15  read clearly with a document that is clear to the eye

16  because Mr. Gitman wants to be evasive, then we will

17  conduct the deposition in a different way.  We will

18  ask the federal judge to appoint a magistrate, and

19  then when Mr. Gitman has to answer the questions, the

20  magistrate will decide whether Mr. Gitman is avoiding

21  the answers to the questions and then we will ask for

22  sanctions and legal fees.

23                   MR. SINGER:  The deponent will do his

24  best to read the exhibit, and the deposition will go

25  on for as long as it has to, as long as there is no

59

1  duplication.

2          MR. GUAGLARDI:  We're trying not to

3  duplicate.  I'm asking questions about documents that

4  are on the screen.

5  BY MR. GUAGLARDI:

6      Q.      Mr. Gitman, what is the document on

7  the screen?

8  A.      I don't know.  Seems like an e-mail.

9      Q.      Did you book a flight to the Ukraine

10 on June 5, 2017?

11 A.      I don't remember.

12     Q.      Did you take a flight to go to the

13 Ukraine on June 12, 2017?

14 A.      I don't remember.

15     Q.      Did you use amadeus.com to book any

16 flights in 2017?

17 A.      I don't remember.

18     Q.      Can you go to the next page.

19          MR. GUAGLARDI:  Are we through with

20 that exhibit?

21          MR. SINGER:  That is the last page,

22 Counsel.

23     Q.      Can you go to the next document,

24 Mr. Gitman.

25 A.      Which document would you like me to open?

```
 1          Q.     It would be P-40.  Can you read it?

 2          Is that the travel document you have where you

 3    booked your flight to the Ukraine?

 4    A.     I don't understand the question.

 5          Q.     Can you read P-40 or no?

 6    A.     It's electrical to me.  It says -- I can make

 7    out it's a Google e-mail.  It says forward, Gitman,

 8    David, MR, 12, June 27, JFK, gate --

 9          Q.     Let's move to the next page.

10          MR. GUAGLARDI:  Mark that page, Jo.

11          Q.     PM-41.

12          MR. OSTRER:  Barry, just refer to the

13    page as P.  The PM just indicates that it's premarked

14    for purposes of today.

15          MR. GUAGLARDI:  Okay.  So anywhere

16    where I made a reference to an exhibit as a PM, it's

17    just going to be P and then the exhibit number.

18          Is that okay, Brett?

19              MR. SINGER:  That's fine, Counsel.

20              MR. GUAGLARDI:  Thank you.

21          Q.     So we're on P-41.

22          What is P-41, Mr. Gitman?  Do you know what

23    HelloSign is?

24    A.     It's a HelloSign audit trail.

25          Q.     What is that?
```

1              MR. GUAGLARDI:  You're on mute.

2              THE WITNESS:  I understand I'm on

3    mute.  You don't need to keep repeating it.

4              MR. GUAGLARDI:  Well, I don't know why

5    you would be on mute and I would object to you being

6    on mute.

7              THE WITNESS:  I understand you don't

8    understand how technology works.  It's very clear to

9    everyone.

10             MR. SINGER:  You can hear Counsel's

11   questions.  Right, David?

12             THE WITNESS:  I can hear and I'm able

13   to reply to his questions.

14             MR. SINGER:  Sure.  That's all we need

15   to establish.

16             MR. OSTRER:  Counsel, if I may for one

17   second, when it's on mute before a question is pending

18   and before an answer is given, there is no way to tell

19   if somebody is in the room with him, and I previously

20   heard myself a female voice before.  Mr. Gitman should

21   have his --

22             THE WITNESS:  I heard that female

23   voice, as well, and it sounded like Amy Dardashtian.

24             MR. OSTRER:  Well, I would just ask

25   that if you're the one --

1           THE WITNESS:  So, Counsel, please be

2  aware that there are people probably on this call who

3  should not be.

4           MR. OSTRER:  Mr. Gitman, let me

5  finish.  I am going to ask that you keep your

6  recording off of mute at all times so that we have

7  full clarification that you're the only one in the

8  room and the only one providing testimony.

9           THE WITNESS:  Sure.  I'll need to

10  reconfigure my computer for that.  So if you can wait

11  about ten minutes, I'm happy to do that.

12           MR. GUAGLARDI:  Where is Mr. Gitman?

13           MR. SINGER:  I don't know.  I think he

14  might have exited, so he is going to reenter.

15           MR. GUAGLARDI:  Brett, all we're

16  trying to do is get through the deposition and avoid

17  any kind of improprieties, and we appreciate you're

18  working with us on it just so that there is no --

19       You weren't at the last deposition.  We had

20  some difficulties.

21           MR. SINGER:  I understand.

22           MR. GUAGLARDI:  I don't know where he

23  just disappeared off the screen.

24           MR. SINGER:  Counsel, I don't know if

25  my client -- how long it's going to take him to

63

1    reconfigure his computer.  I think his purpose was to

2    make it so that he would not be on mute at any time.

3    You wouldn't see the mute icon.  I think that's what

4    he's trying to fix.

5              MR. GUAGLARDI:  Well, it's not that I

6    don't want to see the mute icon.  I don't want him on

7    mute because he's supposed to be alone in the

8    deposition.  No other parties, including his wife, are

9    permitted in the room.  She's not a party to the case.

10   You, I don't have to explain.  Understand that the

11   only people allowed in the deposition are parties, the

12   Court Reporter and counsel, and we need an assurance

13   that that is going on and that no information is being

14   provided to him by any third party source to my

15   questions.  That's all.

16             MR. OSTRER:  The app here, what I'm

17   not understanding, the app here gives you a clear icon

18   where you can either mute or unmute.  I don't know why

19   he would have to reconfigure his entire computer in

20   order to use the same application that we're all using

21   for purposes of today.  Now, I'm no tech genius.

22             MR. SINGER:  Neither am I.

23             MR. OSTRER:  We all have on our screen

24   the mute icon.  Why couldn't he just click unmute and

25   leave it as is?  I don't get it.

64

1            MR. SINGER:  Is this off the record?

2            MR. OSTRER:  If you want to go off the

3    record for a second, Brett, I have no problem.

4         (There is a discussion held off the record.)

5            THE WITNESS:  You should hear me after

6    auto mute.  It's a piece of software that we use

7    because we spend many, many hours sharing screens when

8    we do coding together, so that way we're not

9    distracted.  So I had to remove, it's called Shush, I

10   had to remove the software.

11           MR. SINGER:  I can see you.  Can

12   everybody else see David?

13           MR. GUAGLARDI:  I can see David now,

14   yes.

15           THE WITNESS:  I'd also like to request

16   that everyone who isn't an attorney be removed from

17   the Zoom, so there is no confusion of female

18   background voices.

19           MR. OSTRER:  Well, Michael is a party

20   to the litigation.  He has every right to be present.

21        I'm just going to ask can you turn off the

22   chat?  Is there a way to turn off that chat?

23           THE WITNESS:  I'm not comfortable

24   proceeding with anyone but attorneys on here.

25           MR. GUAGLARDI:  Okay.  Listen, I'm

1    conducting this --

2                    THE WITNESS:  You guys figure it out.

3                    MR. GUAGLARDI:  Mr. Gitman.

4                    THE WITNESS:  I will not answer

5    anymore questions.

6                    MR. SINGER:  Hold on, hold on.

7                    MR. GUAGLARDI:  Mr. Gitman, your

8    counsel with advise you properly, but I'll just advise

9    you so that we don't have any misunderstandings.  You

10   don't dictate the rules of the United States District

11   Court and the Federal Rules of Civil Procedure.

12        The Federal Rules of Civil Procedure control

13   this proceeding, and the Federal Rules of Civil

14   Procedure --

15                    MR. SINGER:  He knows that.

16                    MR. GUAGLARDI:  Well, I'm going to

17   make sure that I reiterate because he just indicated

18   he is not going to answer questions.  So I'm going to

19   finish my statement and then you can advise your

20   client accordingly.

21        As a party to this litigation, which Michael

22   Dardashtian is, he has every right to be in the

23   deposition, whether it was in person or on the phone,

24   and he will be participating in the deposition,

25   similarly just as you can participate at the time of

66

1     his deposition.  And we will continue to conduct the

2     deposition with Mr. Dardashtian listening in.  He has

3     every right to.

4                 MR. SINGER:  So that's Michael Dash?

5     That's Michael Dardashtian who is also present?

6                 MR. GUAGLARDI:  Correct.

7                 THE WITNESS:  Yes.  Michael

8     Dardashtian and there are other people present with

9     him.  So I will not continue to answer questions.

10                MR. DARDASHTIAN:  There is no one else

11    present with me.  I'm on the phone and no one else is

12    on the phone with me.  I've been on mute this entire

13    call.  If you look at the record, I have not come off

14    mute except for now.

15                MR. SINGER:  Okay.  I just want to

16    know who was present at this deposition besides the

17    attorneys and the Court Reporter.

18                MR. GUAGLARDI:  You do.  The deponent,

19    David Gitman, and Michael Dardashtian, the Plaintiff,

20    and the Court Reporter.  That's who's present.

21                MR. SINGER:  So Counsel, you can

22    represent that the only other party besides the

23    deponent and the attorneys and the Court Reporter is

24    an actual party to the case?

25                MR. GUAGLARDI:  Absolutely, yeah, 100

67

1   percent.

2            THE WITNESS:  And I heard Amy

3   Dardashtian's voice, so I am not comfortable

4   proceeding.

5            MR. GUAGLARDI:  Mr. Singer, I'm going

6   to give you an opportunity to talk to your client and

7   we're going to do one of two things; we're not going

8   to waste the time and I will notify the court

9   immediately if your client isn't back in the chair.

10  Give him a call.  If you want to take him offline.

11       This is the type of behavior that we dealt

12  with in the first deposition.  This is what the court

13  has dealt with with this type of behavior and I'm not

14  going to tolerate it.  We have people that are being

15  paid by the hour on the phone and we have the Court

16  Reporter and we're wasting time.

17            MR. SINGER:  I know how depositions

18  work, Counsel.

19            MR. GUAGLARDI:  I know you do, but

20  your client doesn't.  So please speak to him and get

21  him back in the seat so we can conduct the deposition.

22  I don't care if you go offline and you talk to him.

23            MR. SINGER:  It's fine.  This is

24  something that just has to proceed as best we can.  I

25  mean, I take it that Counsel is acting in good faith

68

1    and that the person, the other party that is listening

2    to this who is present to this deposition is solely a

3    party.  I will let my office know, just to be on the

4    safe side on my end, and if they say anything to me, I

5    will let, obviously, everybody in the deposition know.

6             MR. GUAGLARDI:  Brett, I can let you

7    know so that you can save time, Michael Dardashtian is

8    the Plaintiff.

9             MR. SINGER:  I know that; I know that.

10            MR. GUAGLARDI:  Michael Dash, that's

11    just the short version for Michael Dardashtian.

12            MR. SINGER:  I deduced that, but I am

13    going to let my office know and just let them know.

14    I'm not saying, I'm not saying that you can't do

15    anything.  I'm just letting my office know of the

16    minor bump in the road.

17            MR. GUAGLARDI:  Jo, keep the time.

18       (At this point, a recess is taken from 12:41

19    p.m.)

20            MR. GUAGLARDI:  Brett, can we

21    continue?

22            MR. SINGER:  Just a second.

23            MR. GUAGLARDI:  Mr. Gitman, can you

24    put P-41 back on the screen.  Thank you.

25            THE WITNESS:  You can do that, Barry.

1                    MR. GUAGLARDI:  Brett?

2                    MR. SINGER:  Just a second.  Just a

3     second, please.  I can't send a text.  I'm texting my

4     office, not the client, not the deponent.

5                    MR. GUAGLARDI:  We're wasting time.

6                    MR. SINGER:  Can I send my text,

7     Counsel?

8                    MR. GUAGLARDI:  Sure.  You can send

9     your text to confirm that the Plaintiff is entitled to

10    be in the deposition.  Yes, you can do that.

11                   MR. SINGER:  We can resume.

12                   MR. GUAGLARDI:  I'm waiting for

13    Mr. Gitman.

14                   THE WITNESS:  I have no issue with the

15    Plaintiff being here, but I don't believe only the

16    Plaintiff is here.  So I'm not comfortable continuing.

17                   MR. GUAGLARDI:  I'm not concerned with

18    what you believe.  The Plaintiff is representing that

19    he's in the room alone, just as you're representing

20    you're in the room alone.

21                   THE WITNESS:  As your colleague Evan

22    pointed out before, there was female voices.

23                   MR. GUAGLARDI:  I'm going to

24    discontinue the deposition now unless you instruct

25    your client to move forward.  You have one minute, the

70

1  deposition is going to be over, I'm contacting

2  Judge Lehrburger.  Talk to your client offline.  I'm

3  not wasting another minute on the case.

4              MR. SINGER:  Counsel, if the witness

5  can be reasoned with, can you?

6              MR. GUAGLARDI:  No.  I'm letting you

7  know I'm conducting the deposition.  Your client is

8  being obstreperous, he's wasting time, and he's

9  wasting my time, and I don't appreciate my time being

10  wasted, and my client is paying for me and Mr. Ostrer

11  and your client is wasting time.

12              MR. SINGER:  If I can persuade my

13  client to follow through with this deposition, can I

14  persuade you to be patient?

15              MR. GUAGLARDI:  You have one minute

16  where we can re-conduct this deposition.  Check with

17  your client.  Put the exhibit P-41 up on the screen,

18  Mr. Gitman, and let's move forward.  If he doesn't do

19  it, I'm on the phone with Judge Lehrburger in a

20  minute.

21              THE WITNESS:  Please go ahead and

22  call.

23              MR. SINGER:  Please be patient.

24  Please be patient, Counsel.

25              MR. GUAGLARDI:  One minute.

1              MR. SINGER:  Don't go anywhere yet,

2    David.

3         (At this point, a brief recess is taken.)

4              MR. SINGER:  Can you proceed, David?

5    If I hear anything -- can you hear me?

6              MR. OSTRER:  He's on mute.  You can

7    see that the mute icon is by his name again.

8              MR. SINGER:  David, please don't

9    leave.  This deposition is not yet over.  I would ask

10   that we proceed.  I ask that we proceed.

11             MR. OSTRER:  And let the record

12   reflect that he is back on mute again.

13             MR. SINGER:  David, please unmute your

14   computer.

15             MR. OSTRER:  Now he just did.

16             MR. GUAGLARDI:  Mr. Gitman, could you

17   please put P-41 up on the screen?

18             THE WITNESS:  I cannot.  You can, as

19   you are -- as it's your deposition.

20             MR. GUAGLARDI:  Mr. Singer, your

21   client is again being evasive.  All we're going to go

22   is we're going to end up conducting it in front of a

23   federal magistrate.  I have no problem doing that.

24   Mr. Gitman will have to fly up.

25             MR. SINGER:  Counsel, I urge you to

72

1   ask the question again.  I urge you to ask the

2   question again.

3                  MR. GUAGLARDI:  Mr. Gitman has shown

4   the exhibits on the screen for everyone, so that we're

5   all on the same page.  Now he's playing a childish

6   game and refusing to do it and he's asked me to do it.

7   Mine are in a book, so he's wasting time.  Either he's

8   going to conduct himself in an appropriate manner or

9   we'll discontinue the deposition.

10                  MR. SINGER:  Please proceed, Counsel.

11  I am giving you permission to continue the deposition.

12                  MR. GUAGLARDI:  Will you instruct your

13  client to put the exhibit up on the screen?

14                  MR. SINGER:  David, if you can, please

15  put the exhibit up on the screen, if you can.

16                  THE WITNESS:  I can see the exhibit.

17                  MR. SINGER:  I can't see anything.

18                  MR. GUAGLARDI:  Me either.

19                  MR. SINGER:  Don't worry.  We'll work

20  this out.  We'll work this out.

21                  THE WITNESS:  I won't be answering any

22  questions until I'm assured that there is nobody else

23  who shouldn't be in this.

24                  MR. GUAGLARDI:  Brett, talk to your

25  client offline, last opportunity.  Last opportunity.

73

1   Call him on his cell.

2              MR. SINGER:  I will communicate with

3   my client as I see fit.  I don't need to take this

4   conversation offline.

5         Don't worry, David, just present the exhibits

6   on the screen so that we can walk through them.

7              THE WITNESS:  I have the exhibits

8   open, and I am not going to hold this proceeding with

9   other people who should not be in this room.

10             MR. SINGER:  As far as we can tell, I

11  don't think that there is anyone other than the

12  Plaintiff present in the deposition or the attorneys.

13             THE WITNESS:  As we all heard female

14  voices talk about the case and specifically what

15  questions are being asked earlier, I'm not comfortable

16  proceeding.

17             MR. SINGER:  Please ask your question,

18  Counsel.

19             MR. GUAGLARDI:  Counsel, I'm trying to

20  ask my question.  Your client is saying he's not going

21  to proceed in the deposition.  He said he's not going

22  to answer the questions and he's not posting the

23  exhibit on the screen so that you can review it.

24             MR. OSTRER:  Counsel, if I may just

25  for one second, in advance of this deposition I have

1   been sending you the premarked exhibits so that they

2   can be reviewed as a courtesy and available to both

3   Mr. Gitman and yourself.  Mr. Gitman has the

4   documents, he can put them on the screen so that we

5   can proceed in an orderly fashion.  I went through the

6   process of getting you these documents earlier for

7   this purpose.  There is no reason why there should be

8   any type of delay at this moment other than --

9                    THE WITNESS:  You can present the

10  documents just as easily.

11                   MR. SINGER:  Well, let's not go there,

12  not for the moment, Evan.  Why don't we just focus on

13  the exhibit that we're talking about right now because

14  the exhibits that you sent to me while the EBT, after

15  the EBT actually started, that's a different story.

16       For now, we're talking about Exhibit 41.  Can

17  somebody please upload Exhibit 41.

18                   MR. OSTRER:  Brett, if you go to the

19  share, you put your curser over the screen, the Zoom

20  screen.

21                   THE WITNESS:  Evan, you can, as well.

22                   MR. OSTRER:  No, I can't do it on the

23  laptop I'm using, David.  Thank you.

24                   THE WITNESS:  You can figure it out.

25                   MR. SINGER:  Let's calm down, please,

1  everybody.

2              MR. OSTRER:  Brett, if you can, go to

3  the share icon.  Then you can put the document.

4              MR. SINGER:  I'm sorry to ask a silly

5  question like that.  Does it say the word share?

6              MR. OSTRER:  Yeah, it says share.  If

7  you put your cursor in the middle of the screen,

8  you'll see on the bottom of the page, invite

9  participants, share, chat, record.

10             MR. SINGER:  I see participants, I see

11 mute, I see more.

12             MR. OSTRER:  Your client can click a

13 button so we don't have to spend another minute doing

14 this.  So I don't understand why this is going on

15 right now.  This is a nonsensical exercise.

16             MR. SINGER:  I'm trying to upload an

17 exhibit so the deposition can continue.

18             MR. OSTRER:  It can't continue only

19 because your client is not clicking a button to pull

20 the document back up on the screen.

21             MR. SINGER:  David, have you uploaded

22 Exhibit 41?  I can't hear you, David.

23             THE WITNESS:  I see Exhibit 41.

24             MR. SINGER:  You see Exhibit 41, but

25 none of the rest of us do.

76

1              THE WITNESS:  I have it open in front

2    of me.

3              MR. GUAGLARDI:  We're done.  We're

4    going to get the federal judge on right now.

5         Evan, get his number.

6              MR. SINGER:  It's not necessary.

7              MR. GUAGLARDI:  Yes, it is.  I'm done.

8    Get me Judge Lehrburger's phone number.

9         You have a choice, Brett, get your client to

10   comply or we're going to get the judge on the phone.

11   I'm not wasting time right now.

12             MR. SINGER:  David, just do your best.

13             THE WITNESS:  I'm happy to continue if

14   I know there are no other people who shouldn't be in

15   the meeting as Evan brought up earlier.

16             MR. SINGER:  David, please, you don't

17   want a judge on the phone.  If you could upload it.  I

18   mean, I'm literally just figuring out how to put an

19   exhibit on the screen.

20             THE WITNESS:  I'm happy to speak to

21   the judge and explain to him what's going on.  It

22   would be my pleasure.

23             MR. SINGER:  Just please wait, please.

24   We're trying to upload the exhibit.  That's just what

25   we're trying to put on the screen.

1           THE WITNESS:  I'm sure the judge would

2    like to hear from Barry right now.

3           MR. SINGER:  I, again, am trying to --

4    I'm trying to find a way to upload the exhibit myself.

5    I'm just beginning to understand the technology.  I'm

6    sorry about this.  It's just taking a while.

7           MR. GUAGLARDI:  The delay is not your

8    fault, Brett.  The delay is your client's fault.  He

9    had the documents on the screen and he just indicated

10   that he put them back on the screen, but he wants an

11   assurance that there is nobody else in the room.  So

12   he's holding the exhibits hostage and won't proceed

13   because of this.  That's not a good move.

14           THE WITNESS:  I'm taking screenshots

15   of what's going on, just letting you all know.  I'm

16   recording it.

17           MR. SINGER:  I have told my client to

18   upload Exhibit 41.  At the moment, that's all I can

19   do.  I've tried.  And Counsel, does this next question

20   that you're going to ask --

21           MR. GUAGLARDI:  All it's going to do

22   is slow things up because everyone needs to be on the

23   exact same exhibit, and we're not sure if we're on the

24   same page, then it's going to become more complicated.

25           MR. SINGER:  Does the next question

1    that you're going to be asking, does it depend on

2    Exhibit 41?

3              MR. GUAGLARDI:  Sure.  We just got to

4    Exhibit 41.  Every question that I'm going to talk

5    about has to relate to Exhibit 41.

6              MR. SINGER:  I'm just texting my

7    office, letting them know what's going on.  Just give

8    me a second.

9              MR. GUAGLARDI:  And your client,

10   Mr. Singer, had just indicated on the record that he's

11   taking photos of the deposition screen, which he has

12   no authority to do, and we will also be addressing

13   that with the judge.

14             MR. SINGER:  We are doing our best to

15   move this deposition along, Counsel.

16             MR. GUAGLARDI:  You are in good faith

17   trying to help.  Your client is completely obfuscating

18   and creating a problem and a delay for this

19   deposition, and we will seek the appropriate remedies

20   from the court as a result of that.

21             MR. SINGER:  I don't think you'll need

22   to seek remedies because this deposition will be

23   completed when all is said and done.

24             MR. GUAGLARDI:  Do you want to take a

25   moment and speak with your office and speak with

1    Mr. Gitman directly?  We needed to involve Mr. Kim the

2    last time in order to get your client to comply.

3    Maybe you guys can have an offline conversation and we

4    can take a five-minute break so that we can proceed in

5    an orderly way.

6           I have the judge's number and I will call the

7    judge if I need to.  I would prefer not to have to do

8    it, and I'm sure the judge is not going to appreciate

9    being burdened about this under the circumstances

10   either, but if I'm left with no choice because your

11   client won't proceed with the deposition, then I'm

12   going to call the judge.

13           MR. SINGER:  I am texting my superiors

14   right now advising them.  Hopefully we can move this

15   forward, Counsel.  I do thank you for your patience.

16   If you want to take a five-minute break, obviously

17   you're entitled to.

18           MR. GUAGLARDI:  I'm going to stay on,

19   but you can take a five-minute break so that maybe

20   you, your superior and Mr. Gitman can speak.

21           MR. SINGER:  In light of things, I'm

22   going to call my office and I'll be right back.  I

23   haven't gotten any texts back yet, but I'll call my

24   office and ask them what I can do.

25           Thank you, Counsel.

80

```
 1              (At this point a recess is taken from 11:59
 2    p.m. to 12:04 p.m.)
 3              MR. SINGER:  Counsel, you can continue
 4    to proceed with your questions.  My office has just
 5    asked once again for your reassurance that nobody
 6    other than attorneys for the parties, the Court
 7    Reporter, and I guess one of the parties is present at
 8    the deposition.  We don't want anybody who is not a
 9    party in this case to be involved or present in this
10    deposition.
11              MR. GUAGLARDI:  I'm giving you the
12    same assurance that you're giving me.  Your client is
13    representing that no one is in the room with him.  My
14    client is representing that there is nobody in the
15    room with him.  In fact, I don't even see
16    Mr. Dardashtian up there anymore.
17              THE WITNESS:  There is no video of him
18    either, so I don't believe it.  And Evan even stated
19    before he heard voices from Michael.
20              MR. GUAGLARDI:  Are we ready to
21    proceed with the deposition, Brett?
22              MR. SINGER:  I am, Counsel.
23              MR. GUAGLARDI:  I didn't ask you.  I
24    asked you are we going to proceed.  That's not just
25    you.  It's your client and it's the deposition exhibit
```

81

1  and it's moving forward.

2                    MR. SINGER:   We can proceed, Counsel.

3  You can start anew.

4  BY MR. GUAGLARDI:

5          Q.     Are you going to put the deposition

6  exhibit up on the screen, Mr. Gitman, or you're not

7  going to?

8  A.     I see the deposition -- I see document P-41 on

9  my screen.

10                   Q.     Okay.  Can you tell me what P-41 is?

11 A.     It's an audit trail from HelloSign.

12                   Q.     What is that?

13 A.     I'm not sure.

14                   Q.     Have you ever used HelloSign?

15 A.     I believe so.

16                   Q.     What is it?

17 A.     That's a service that my attorney used to

18 electronically sign documents.

19                   Q.     Which attorney?

20 A.     Umar Farooq.

21                   Q.     What does audit trail refer to?

22 A.     I'm not sure.

23                   Q.     The title to the document says

24 "Channel Reply, Inc. - Stock Issuance - Konstantyn

25 Bagaev."  Correct?

82

1   A.      Yes.

2           Q.      And were you issuing shares of stock

3   to Konstantyn Bagaev for Channel Reply, Inc.?

4   A.      I don't know.

5           Q.      Who would know?

6           Weren't you the owner of Channel Reply, Inc.?

7   A.      I don't remember what happened around the time

8   stamp of these documents, this document.

9           Q.      You were the owner of Channel Reply,

10  Inc. on June 6th, June 7th, June 8th of 2017.

11  Correct?

12  A.      I don't remember.

13          Q.      Who would remember, Mr. Gitman, if you

14  were the owner?

15  A.      I don't know.  I would have to pull the

16  Channel Reply, Inc. documents to confirm that

17  information.

18          Q.      Didn't we go over the Channel Reply,

19  Inc. documents during the last deposition?

20  A.      I don't remember.  That was a long time ago.

21          Q.      So you don't remember the last

22  deposition either.  That was a long time ago?

23  A.      Yes.  I believe it was about six weeks or two

24  months ago.

25          Q.      Are you taking any medication that

83

1   would impair your ability to understand the nature of

2   this proceeding?

3   A.      No.

4          Q.      Are you taking any drugs or any type

5   of alcoholic beverages or narcotics that would impair

6   your ability to understand the nature of these

7   proceedings?

8   A.      No.

9          Q.      And you don't recall the testimony you

10  gave at the time of your last deposition?

11  A.      I remember some of my testimony from the last

12  deposition.

13         Q.      This P-41 relates to the stock

14  issuance, shares of stock in Channel Reply, Inc. to

15  Mr. Bagaev.  Did you issue shares to Mr. Bagaev in

16  Channel Reply, Inc.?

17  A.      I don't remember.

18         Q.      Was it your intent to do that?

19  A.      I don't remember.

20         Q.      Do you see where it says on P-41

21  Document History?

22  A.      I do.

23         Q.      And if you look down it says under the

24  first sentence sent for signature to David Gitman and

25  Konstantyn Bagaev?

84

1    A.      I see that.

2            Q.      So was Umar Farooq sending you and

3    Bagaev a stock purchase agreement?

4    A.      I don't know who sent this.

5            Q.      Do you see on the third line that it

6    says signed by Konstantyn Bagaev?

7    A.      I do.

8            Q.      Do you know whether Mr. Bagaev signed

9    the stock purchase agreement for Channel Reply, Inc.?

10   A.      I don't know.

11           Q.      Do you see on the fifth line it says

12   signed by David Gitman on June 8, 2017?

13   A.      Yes.

14           Q.      Did you sign that document?

15   A.      I don't remember.

16           Q.      You don't remember whether you signed

17   a document for stock purchase agreement for Channel

18   Reply, Inc. with Konstantyn Bagaev?

19   A.      That's correct.

20           Q.      You received this document from Umar

21   Farooq; didn't you?

22   A.      I don't know.

23           Q.      Can you go to the next exhibit, which

24   is P-41.

25   A.      I believe that was P-41.  I can reopen it if

1   you would like.

2           Q.      What do you have as the next exhibit?

3   A.      I don't understand the question.

4           Q.      What is the next exhibit that you

5   have?  P-42?

6   A.      I'm sorry.  Do you want me to open P-42?

7           Q.      Yes.

8   A.      Okay.  I have it open.

9           Q.      Channel Reply, Inc. Common Stock

10  Purchase Agreement.

11  A.      That is the title of the document, correct.

12          Q.      Who prepared it?

13  A.      I don't remember.

14          Q.      Did Umar Farooq prepare it?

15  A.      I don't remember.

16          Q.      Did he prepare it at your request?

17  A.      I don't remember.

18          Q.      Do you recall ever seeing this

19  document before?

20  A.      I don't remember seeing this document before.

21          Q.      Isn't it a document that you produced

22  in discovery?

23  A.      I don't know.

24          Q.      Do you know the audit trail P-41 was a

25  document you produced in discovery?

1  A.      No.  I don't remember that.  I produced my

2  discovery documents over two years ago.

3          Q.      Was this document reviewed by your

4  counsel?

5  A.      I don't know.  I have no idea what my counsel

6  did.

7          Q.      Who was your counsel on June 8, 2017;

8  Umar Farooq?

9  A.      I don't remember.

10          Q.      Have you ever read this document

11  before today?

12  A.      Possibly.  I don't remember reading it.

13          Q.      Did you present this document to

14  Konstantyn Bagaev?

15  A.      I don't know.

16          Q.      Did you present this document to

17  Aleksey Glukharev?

18  A.      I don't know.

19          Q.      Was the purpose of this document to

20  form Channel Reply, Inc. without Michael Dardashtian?

21  A.      I don't know.

22          Q.      Can you go to page 14 of Exhibit P-42.

23  A.      Okay.

24          Q.      Do you see where it says the company,

25  Channel Reply, Inc.?

87

1    A.       I do.

2             Q.       That's your signature; isn't it?

3    A.       Yes.

4             Q.       And you signed as CEO/President as

5    Channel Reply, Inc., and that was on June 8, 2017.

6    Correct?

7    A.       I don't know the date I signed it.

8             Q.       Can you go to the first page of P-42.

9    A.       Okay.

10            Q.       Second line, June 8, 2017 is when the

11   agreement was executed.   Correct?

12   A.       Yes.

13            Q.       Can you go back to page 14.

14   A.       Um-hum.

15            Q.       Where purchaser is listed, Bagaev's

16   name is there.   Correct?

17   A.       Correct.

18            Q.       And he's under the title Software

19   Developer.   Right?

20   A.       Right.

21            Q.       So what software was he developing?

22   A.       I don't remember.

23            Q.       Can you go to Exhibit A.

24   A.       Is there a page number you'd like me to look

25   at?

88

1              MR. SINGER:  I believe it's page 16.

2         Q.       It's two pages after page 14 without a

3    page number.

4    A.       Okay.  I see page 16.

5         Q.       And Bagaev was acquiring stock in

6    Channel Reply, Inc.?

7    A.       I don't know.

8         Q.       Mr. Gitman, aren't you the one who

9    created these documents so that you could form a new

10   company that competed with ChannelReply?

11   A.       No.

12        Q.       What were these documents prepared

13   for?

14   A.       I don't remember.

15        Q.       Weren't they prepared at your

16   direction?

17   A.       I don't remember.

18        Q.       Was there any other owner of Channel

19   Reply, Inc. on June 8, 2017?

20   A.       I don't know.

21        Q.       Can you go to later on in that

22   exhibit, it is eight pages after the document that

23   you're looking at now, which your counsel called

24   page 16.

25   A.       I assume you mean page 24?

89

1          Q.      It's entitled Channel Reply, Inc.

2    Assignment of IP and Other Assets.

3    A.      Okay.  I'm on page 23.

4          Q.      Do you see the first whereas clause?

5    A.      Yes.

6          Q.      Can you read it into the record.

7    A.      "Whereas, prior to the effective date, the

8    assignor has developed certain technology and

9    intellectual property on behalf of the company and has

10   developed or acquired other tangible personal property

11   as further described below which relates to the

12   company's actual and proposed business associated with

13   the ChannelReply platform and software and website

14   applications (the business)."

15         Q.      So did you have this document prepared

16   so that Bagaev could assign whatever rights he had to

17   the ChannelReply platform over to Channel Reply, Inc.?

18   A.      I don't know.

19         Q.      Can you go to page 5 of that document.

20   A.      I'm now on page 27.

21         Q.      Can you go to page 5 of the document

22   entitled Assignment of IP and Other Assets where it's

23   the signature page?

24   A.      Yes, I'm on page 27.

25         Q.      Is that your signature for the company

1   under Channel Reply, Inc. as the CEO/President?

2   A.      Yes.

3           Q.      And when you signed that document,

4   what did you understand that document to mean?

5   A.      I don't remember.

6           Q.      Can you go four pages forward in that

7   exhibit to the document entitled Receipt.

8   A.      I'm on page 31 now.

9           Q.      Does it say Receipt at the top?

10  A.      It does.

11          Q.      It says: "Channel Reply, Inc., a

12  Delaware corporation, (the company), hereby

13  acknowledges receipt of a check in the amount of $10,

14  the assignment of certain intellectual property and/or

15  other assets having an aggregate value equal to $1,

16  given by Konstantyn Bagaev as consideration for

17  1 million shares of common stock of the company

18  recorded on the books of the company, dated June 8,

19  2017."

20          I read that correctly.  Right?

21  A.      Yes.

22          Q.      That's your signature.  You signed as

23  president and CEO of Channel Reply, Inc. on that

24  receipt; didn't you?

25  A.      Yes.

91

1          Q.      Did you offer Bagaev a million shares

2   of Channel Reply, Inc.?

3   A.      I don't remember.

4          Q.      Isn't that what the document says?

5   A.      Yes.

6          Q.      Can you go to the next page.  It says

7   Receipt and Consent on the top.  Right?

8   A.      Yes.

9          Q.      It says: "The undersigned hereby

10  acknowledges receipt of a 1 million shares of common

11  stock of Channel Reply, Inc., a Delaware corporation."

12  Correct?

13  A.      Yes.

14         Q.      And Bagaev was the purchaser of those

15  million shares?

16  A.      Yes.

17         Q.      And he signed?

18  A.      Yes.

19         Q.      How much did he pay for those million

20  shares of Channel Reply, Inc.?

21  A.      I don't know.

22         Q.      Did you ever tell Michael Dardashtian

23  that you were having Bagaev sign Exhibit P-42?

24  A.      I don't know.

25         Q.      Did you ever tell Michael Dardashtian

92

```
1    that you prepared Exhibit P-42 or had it prepared?

2    A.      I don't know.

3            Q.      Can you go to Exhibit P-43.

4            And before we ask questions about P-43, on

5    P-42, you said or the document said on P-42 that

6    Channel Reply, Inc. owns the ChannelReply platform and

7    software.  Is that true?

8    A.      I don't know.

9            Q.      Well, on June 8, 2017 Channel Reply,

10   Inc. didn't own the ChannelReply platform or software;

11   did it?

12   A.      I don't know.

13           Q.      Why would you have a document written

14   that's untrue?

15   A.      I don't understand what you're saying.

16           Q.      Why would you have a document written

17   on June 8, 2017 that says Channel Reply, Inc. owns the

18   ChannelReply platform and software if it didn't own

19   it?

20   A.      I wouldn't do something like that.

21           Q.      Well, did you?

22   A.      No.

23           Q.      Did Channel Reply, Inc. own the

24   ChannelReply platform and software on June 8, 2017?

25   A.      I don't know.
```

93

1          Q.      Well, who would know?

2   A.      I don't know.

3          Q.      Did you talk to Michael Dardashtian on

4   June 8, 2017 and ask him whether Channel Reply, Inc.

5   owned the ChannelReply platform and software?

6   A.      I don't know.

7          Q.      Did Channel Reply, Inc. ever buy the

8   ChannelReply platform and software from Cooper Square

9   Ventures?

10  A.      I don't know.

11         Q.      Did Channel Reply, Inc. ever buy the

12  platform and software from ChannelReply?

13  A.      I don't know.

14         Q.      Wasn't ChannelReply developed in 2012?

15  A.      I don't know.

16         Q.      Was there ever a written agreement

17  between you and Mike giving complete ownership of the

18  ChannelReply software to Channel Reply, Inc.?

19  A.      I don't know.

20         Q.      Was there ever any agreement between

21  you and Mike giving complete ownership of the

22  ChannelReply platform and software to Channel Reply,

23  Inc.?

24  A.      I don't know.

25         Q.      So you created Channel Reply, Inc. and

94

1   then provided yourself with 100 percent ownership of

2   the ChannelReply software?

3   A.      I don't think so.

4            Q.      And then you gave ownership interest

5   in Channel Reply, Inc. to Konstantyn in that software?

6   A.      I don't think so.

7            Q.      Are you aware under the Cooper Square

8   Ventures operating agreement that no member shall have

9   the right to partition any property of the company?

10  A.      I don't have the agreement in front of me.

11           Q.      I didn't ask you that; did I?  I asked

12  if you're aware of that.

13  A.      I don't remember the provisions, all of the

14  provisions of the agreement.

15           Q.      Are you aware that you can't sell any

16  interest in the company of Cooper Square Ventures

17  without the consent of management?

18  A.      Again, I'm not -- I don't remember any of the

19  provisions of the Cooper Square Ventures operating

20  agreement.

21           Q.      Are you aware that under Section 11.5

22  of the Cooper Square Ventures operating agreement that

23  one of the bases to redeem someone's interest is a

24  willful or serious misconduct, fraud or dishonesty,

25  transferred by the member of its interest in the

95

```
 1   company and attempt by the member to partition the
 2   property of the company or by breach by the member of
 3   any other terms of the agreement?
 4   A.      No.
 5           Q.      Do you recall signing the Cooper
 6   Square Ventures operating agreement?
 7   A.      Yes.
 8           Q.      We already went through that.  Right.
 9           Can you go to P -- actually, we're looking at
10   P-43.  Do you know what that is?
11   A.      It's a Clerky Filing Request and Summary.
12           Q.       What is that?
13   A.      I don't know.
14           Q.      Can you look at the last page of P-43.
15   A.      Um-hum.
16           Q.      That's your signature.  Correct?
17   A.      I don't know.  It looks like a digital
18   signature.
19           Q.      Did you authorize Umar Farooq to --
20           Did you sign this digitally?
21   A.      I don't remember.
22           Q.      Aren't you the one who incorporated
23   Channel Reply, Inc.?
24   A.      I believe so.  I don't remember what I did
25   three years ago or later.
```

1          Q.      Can you go to Exhibit 45.

2    A.      Um-hum.  I have it open.

3          Q.      Do you see there is a photo on

4    Exhibit 45 on the right.

5    A.      Um-hum.

6          Q.      Where it says CTO David Gitman?

7    A.      Um-hum.

8          Q.      That's a picture of you; isn't it?

9    A.      Yes.

10         Q.      And above that it says

11   Michael@ChannelReply.com with a question mark?

12   A.      I don't see that.

13         Q.      You don't see it on the exhibit?

14   A.      That's correct.

15         Q.      Do you see on the left-hand side of

16   the exhibit another picture?

17   A.      I do.

18         Q.      And is there like a digital business

19   card that says Michael Dash, Michael@ChannelReply.com?

20   A.      I don't know what that is.

21         Q.      I didn't ask you if you knew what that

22   was.  I asked you --

23   A.      I do not see a digital business card.

24         Q.      Do you see where it says Michael Dash

25   in bold?

1    A.      I do.

2            Q.      Do you see under it where it says

3    Michael@ChannelReply.com?

4    A.      I do.

5            Q.      And do you see a picture to the right

6    of that?

7    A.      I do.

8            Q.      Who is the picture of?

9    A.      That's me.

10           Q.      Why is there a picture of you next to

11   Michael Dash and Michael@ChannelReply.com?

12   A.      I have no idea what this is.

13           Q.      Did you create this false depiction as

14   if you were Michael Dardashtian with his e-mail?

15   A.      No.

16           Q.      Can you explain why your photo appears

17   next to his name and his e-mail?

18   A.      Somebody could insert a photo.

19           Q.      Did you insert the photo?

20   A.      No.

21           Q.      Did you have someone insert the photo?

22   A.      No.

23           Q.      Do you know who inserted the photo?

24   A.      No.  I don't know what this -- I don't even

25   know what we're looking at.

1          Q.       Well, you know

2     Michael@ChannelReply.com is not your e-mail.  Correct?

3     A.       Yes.

4          Q.       Yes, it's not your e-mail.  Right?

5     A.       Correct.

6          Q.       And Michael Dash is the name that

7     Michael Dardashtian went by.  Correct?

8     A.       I believe so.

9          Q.       So can you explain why your picture

10    appears next to his name and his e-mail?

11    A.       I don't know what we're looking at.

12         Q.       Okay.  Let's look below that where

13    next to Michael Dash it says Mdash@NDAP-LLC.com.

14         Do you see right below where it says that?

15    A.       I do.

16         Q.       And that was Michael Dardashtian's

17    NDAP e-mail; wasn't it?

18    A.       Yes.

19         Q.       And that says Michael Dash to David.

20         David is you.  Correct?

21    A.       I don't know.

22         Q.       What are the words under the words "to

23    David"?

24    A.       "Boom out of nowhere."

25         Q.       So was somebody putting your photo in

99

1  next to Michael Dash so that you could impersonate him

2  and then saying, boom, out of nowhere, look, you've

3  now become Michael Dash?

4  A.      I don't understand the question.

5          Q.      Was there a joke being made that you

6  were replacing Michael Dash by throwing him out of the

7  company?

8  A.      I don't believe so.  I don't understand the

9  question.  I don't understand the document I'm looking

10  at.

11          Q.      So you can't explain why --

12          Do you know who Eric Shen is?

13  A.      No, I don't.

14          Q.      Can you look at the top of the Exhibit

15  P-45.  Do you see where Eric Shen's name is?

16  A.      I do.

17          Q.      And it says Partner Integrations

18  Manager, Platform Team, ZenDesk?

19  A.      I can't see that on this document.

20          Q.      Did you ever communicate with Eric

21  Shen?

22  A.      I don't remember.

23          Q.      Did you ever tell Eric Shen that you

24  were taking up to three partners at Channel Reply,

25  Inc.?

100

1   A.      I don't believe I said anything like that.  I

2   don't -- I wouldn't know.

3           Q.      Can you go to the second page of

4   Exhibit P-45.

5   A.      Um-hum.

6           Q.      On the right-hand side do you see

7   where it says Michael Dash with the photo?

8   A.      Um-hum.

9           Q.      That's your photo.  Correct?

10  A.      Yes.

11          Q.      And who is Jon Aniano?

12  A.      I don't know.

13          Q.      Were you communicating with Jon Aniano

14  as if you were Michael Dardashtian?

15  A.      No, I don't believe so.

16          Q.      Do you see on the --

17  A.      Again, I don't know, I don't know what I'm

18  looking at.

19          Q.      Well, without the substance of what

20  you're looking at, what type of communication is this?

21  A.      I don't know.  I have no idea.

22          Q.      Did you participate in any part of

23  that communication?

24  A.      I don't believe so.

25          Q.      Do you see where it says, "I set up an

101

1   account with name ChannelReply," under the fourth line

2   where it says Michael Dash to Jon, David?

3   A.      Yes.

4           Q.      Who set up an account with the name

5   ChannelReply as of that date?

6   A.      I don't know.

7           Q.      Whose telephone number is

8   (646) 553-5918?

9   A.      I don't know.

10          Q.      Is it yours?

11  A.      I don't know.

12          Q.      You don't know your phone numbers?

13  A.      I don't remember my phone numbers from many

14  years ago.

15          Q.      Did you ever have that phone number?

16  A.      Again, I don't remember my phone numbers from

17  many years ago.

18          MR. GUAGLARDI:  Counsel, I'm going to

19  ask your client to confirm whether that was ever his

20  phone number, (646) 553-5918.

21          Jo, mark that page.

22          MR. SINGER:  Just to the best of your

23  memory, just answer if that was ever your phone

24  number.

25          THE WITNESS:  Okay, Brett, I don't

1   believe it was ever my phone number.

2          Q.      Okay.  I'm going to ask you to go back

3   in your records and I'm going to ask for confirmation

4   under penalty of perjury whether that was your phone

5   number.

6          On the next line, under the "I set up an

7   account with name ChannelReply," did you ever set up

8   an account with the name ChannelReply?

9   A.      I don't remember.

10         Q.      Did you ever set up an account with

11  ZenDesk with the name ChannelReply?

12  A.      I don't remember.

13         Q.      The portal,

14  https://ChannelReply.desk.com, what is that?

15  A.      I don't know.

16         Q.      You've never seen that before?

17  A.      I don't recall ever seeing it before.

18         Q.      You never used it before?

19  A.      I don't recall ever using it before.

20         Q.      The last line is from Jon Aniano to

21  Michael and David: "Hi Michael, just a quick update, I

22  extended your trial into a partner/developer sandbox.

23  You should be all set to go now."

24         Did you ever receive that message?

25  A.      I don't know.

103

1          Q.      What is a partner/developer sandbox?

2   A.      I don't know.

3          Q.      Can you go to Exhibit 46, P-46.

4          Are you there?

5   A.      I have it open now.

6          Q.      That's the Cooper Square Ventures bank

7   account information; isn't it?

8   A.      I don't see that.

9          Q.      Pardon?

10  A.      That's not the document I have open.

11         Q.      What document do you have open?

12  A.      I'm sorry.  I had the wrong document open.  I

13  now have a screenshot from a cell phone that says

14  Cooper Square Ventures.

15         Q.      Right.  Is that a Cooper Square

16  Ventures reference on May 31st, 2017 to the account

17  balance in the Cooper Square Ventures bank account on

18  that day as being negative $62.11?

19  A.      I don't know.  I don't know how to read that.

20         Q.      Do you know whether there was an

21  overdraft fee on that date because you transferred all

22  the money out of the Cooper Square Ventures Bank of

23  America bank account into your holding account in your

24  name?

25  A.      I don't know.

104

1        Q.      Did you have a BMW on May 31st, 2017?

2   A.      I believe so.

3        Q.      Did you pay $528.57 as a monthly

4   payment for your BMW?

5   A.      I don't remember.

6        Q.      Did you pay from the Cooper Square

7   Ventures bank account your car payment?

8   A.      I don't remember.

9        Q.      Let's look at that exhibit, that

10  entry.  It says: "5/31/2017 BMW Financial Services,

11  David Gitman."  Doesn't it say your name?

12  A.      It does.

13       Q.      Doesn't that help refresh your

14  recollection as to whether or not that payment was for

15  you?

16  A.      It does not.

17       Q.      Did you have a $528.57 monthly payment

18  in May of 2017 for your car?

19  A.      I don't remember.

20       Q.      Did Michael Dardashtian have a BMW?

21  A.      He had a Volvo.

22       Q.      Is that a BMW?

23  A.      I don't know.

24       Q.      You don't know whether a Volvo is a

25  BMW?

1    A.      No.

2            Q.      Okay.   What is Upwork?

3    A.      I don't know.

4            Q.      Is Upwork Umar Farooq's company?

5    A.      I don't know.

6            Q.      Did you find Umar Farooq through a

7    company by the name of Upwork?

8    A.      I don't know.

9            Q.      Did you pay Umar Farooq by paying

10   Upwork?

11   A.      I don't know.

12           Q.      Do you see the next entry after BMW,

13   $218, a payment to Upwork Escrow?

14   A.      Yes.

15           Q.      Did you make a payment to Umar Farooq

16   on May 31st, 2017 in any amount of money from the

17   Cooper Square Ventures bank account?

18   A.      I don't believe so.

19           Q.      How did you pay Umar Farooq?

20   A.      I don't remember.

21           Q.      Go to the next page.

22           Are you saying under oath that Umar Farooq was

23   not found through the company Upwork?

24   A.      I don't believe so.

25           Q.      Did Umar Farooq have any relationship

1   to Upwork?

2   A.       I have no idea.

3            Q.       Did you ever pay Umar Farooq directly

4   for his legal services to him, payable to him?

5   A.       I don't remember.

6            Q.       Can you go to Exhibit P-47.

7   A.       Okay.

8            Q.       You're familiar with this Order to

9   Show Cause that was served on you when it was secured

10  by Michael Dardashtian through the United States

11  District Court, Southern District of New York.

12  Correct?

13  A.       I'm familiar with this document.

14           Q.       Mike had to file this Order to Show

15  Cause; didn't he?

16  A.       I don't know.

17           Q.       And the Order to Show Cause was

18  granted; wasn't it?

19  A.       Partially.

20           Q.       Were you surprised when you learned

21  Mike knew of all the details that were contained in

22  the Order to Show Cause?

23  A.       No.

24           Q.       Did you ever advise Konstantyn Bagaev

25  that you didn't know how Mike knew of all the details

1   that were contained in the Order to Show Cause?

2   A.      I don't remember saying that.

3           Q.      Can you go to Exhibit 64, P-64?

4                   MR. SINGER:  64 or 54, Counsel?

5                   MR. GUAGLARDI:  64.

6                   MR. OSTRER:  Barry, it's me, Evan.

7   You're going to have to bear with me a sec to forward

8   it.

9                   MR. SINGER:  I'll forward it to my

10  client, Evan.

11                  MR. OSTRER:  Brett, it may take a

12  second, but you'll have up to P-65 in this next

13  transmittal.

14                  MR. SINGER:  Thanks, Evan.

15                  MR. OSTRER:  Just off the record,

16  Brett, if you don't mind.

17                  MR. SINGER:  Yup.

18          (There is a discussion held off the record.)

19                  MR. SINGER:  Let me know if you

20  haven't received the e-mails.  I forwarded them, I

21  have them, and I am ready to access them.  64 I

22  believe it was that Counsel was going to be asking.

23                  MR. GUAGLARDI:  Do you have Exhibit 64

24  up?

25                  THE WITNESS:  I don't know.  I haven't

1  received it yet.

2            MR. GUAGLARDI:  Counsel, do you have

3  Exhibit 64?

4            MR. SINGER:  I do.  Just give me a

5  second.  It's two pages long, it looks like.

6       I'll be right back.  If that's okay, I'd like

7  to go to the bathroom.

8            THE WITNESS:  Yeah, it's fine with me.

9            MR. SINGER:  Counsel, can I be excused

10  for two minutes?

11            MR. GUAGLARDI:  Yeah, of course.

12       (At this point, a recess is taken from 1:49

13  p.m. to 1:55 p.m.)

14  BY MR. GUAGLARDI:

15       Q.    Mr. Gitman, your attorney was nice

16  enough to put Exhibit 64, put the exhibits on the

17  screen.  This is a communication between you and

18  Mr. Bagaev.

19            MR. GUAGLARDI:  Are you able to move

20  up to the top of the document, Brett?

21            MR. SINGER:  Yes, just a second.  Can

22  everybody see?

23       Q.    Mr. Gitman, I'm going to read it from

24  the top.  It says David Gitman, and then it's a

25  conversation between Mr. Bagaev and you.

1        Mr. Bagaev wrote: "Okay."  And you wrote:

2    "Mike calling" -- I'm going to repeat that.

3    Withdrawn.

4        Mr. Bagaev wrote to you and said "Okay."  Then

5    Mr. Bagaev said to you: "Mike calling, I declined."

6    You then wrote to Mr. Bagaev: "That's a good idea."

7    Bagaev said to you: "He wants to chat."  You wrote to

8    Bagaev: "I strongly recommend blocking him."  You then

9    wrote to Mr. Bagaev: "I'm reading the docs now.  I

10   don't get how he knows all these details."

11       What were you and Mr. Bagaev talking about on

12   the same day that the Order to Show Cause was filed,

13   which was filed with the court on June 8, 2017?

14            MR. SINGER:  Before you answer, I'd

15   just like to say that this exhibit is fairly grainy,

16   but the client can answer obviously Counsel's

17   question.

18            MR. GUAGLARDI:  And the exhibit when

19   it's presented to the court at the time of trial will

20   not be grainy and I'm reading it as an officer of the

21   court and representing that that's what the document

22   says.

23            MR. SINGER:  Fair enough.

24       Q.      What were you talking about on June 8,

25   2017 with Mr. Bagaev when you said, "I'm reading the

110

1   docs now; I don't get how he knows all these details"?

2   A.      I don't remember.

3        Q.      Were you talking to Mr. Bagaev and

4   telling him not to talk to Mike and to block him?

5        I can't hear you.

6   A.      Yes.

7        Q.      Why?

8   A.      I don't know.

9        Q.      And were you confused as to how Mike

10  Dardashtian knew all the details that were contained

11  in the Order to Show Cause that we filed and you were

12  reading them at the exact same time on the day we

13  filed them?

14  A.      I'm sorry, Barry, my speakers cut out.  Could

15  you please repeat that?

16       Q.      Were you reading the Order to Show

17  Cause on June 8, 2017?

18  A.      I have no idea.

19       Q.      Were you telling Mr. Bagaev that it

20  was a good idea to decline talking to Mike while Mike

21  Dardashtian was reaching out to talk to them?

22  A.      Yes.

23       Q.      Why?

24  A.      I had no idea.

25       Q.      And why did you tell Bagaev to block

1  Mike and not talk to him?

2  A.      I have no idea.

3           Q.      Why were you confused how Mike knew

4  all of the details?

5           Were you trying to hide things from him?

6  A.      I have no idea.

7           Q.      Then Konstantyn Bagaev wrote to you

8  and said: "I speak with him.  Sorry."

9           Why was Bagaev apologizing to you for talking

10  to Mike?  Didn't he work for Mike?

11  A.      You'd have to ask him.

12           Q.      And then you wrote to Bagaev: "It's

13  okay."  And then Bagaev wrote to you: "Maybe I

14  misheard something, but he has some screenshots."

15           Did you learn what screenshots Mike had?

16  A.      No.  I don't think so.

17           Q.      And then you wrote to Bagaev:

18  "Generally is not a good idea to talk directly with

19  people who are suing you."

20           Why would you write that to Bagaev?

21  A.      I don't remember.

22           Q.      And then Bagaev wrote to you: "I asked

23  if - something - about my share of 5 percent costs

24  $25,000.  He told - in quotes - yes, that it is true,

25  end quote.  Then he told me that you lie everywhere

1    and stealing company.  I asked if I - something -

2    taxes for my salary.  He told he doesn't know.  I

3    didn't share any more info."

4          Why were you and Bagaev on June 8, 2017

5    talking outside of Mike about ChannelReply?

6    A.    I don't know.

7          Q.    Then you wrote: "Okay."  And then

8    Bagaev wrote to you: "He told he wants to be 50/50

9    partners with you."  And you wrote to him, you wrote

10   to Bagaev and said: "I have no interest in ever

11   working with Mike again."

12         Why would you write that to Bagaev?

13   A.    I don't know.

14         Q.    Then Bagaev wrote to you: "I need a

15   walk.  We can talk with voice.  Probably I'll call to

16   Aleksey and tell him that everything is okay."  And

17   you wrote to Bagaev: "Sure."

18         Now, why would Bagaev be writing to or calling

19   Aleksey to tell him that everything is okay?

20   A.    You'd have to ask him.

21         Q.    So as of June 8, 2017, had you already

22   told Bagaev and Aleksey that you were stealing the

23   ChannelReply software and platform and moving it over

24   to Channel Reply, Inc. so that you could own it and

25   bring in Aleksey Glukharev and Konstantyn Bagaev as

113

1  partners in Channel Reply, Inc.?

2  A.      No.

3        Q.      Well, what did you tell them on

4  June 8, 2017 or before that?

5  A.      I don't remember.

6        Q.      Why would you tell them not to talk to

7  Mike Dardashtian who was an owner of ChannelReply, CSV

8  and NDAP on June 8, 2017?

9  A.      I don't remember.

10        Q.      Go to the second page of Exhibit 64.

11              MR. SINGER:  Let me zoom out and

12  rotate it.

13              MR. GUAGLARDI:  Thank you.

14        Q.      Mr. Gitman, that's a Skype

15  conversation; isn't it?

16  A.      I don't know.

17        Q.      Do you see on the upper left-hand

18  side, that's a picture of Mike Dardashtian.  Right?

19        It doesn't have your photo next to his name.

20  It has his photo next to his name; doesn't it?

21  A.      Yes.

22        Q.      So do you see that the conversation

23  takes place and there is multiple conversations, and

24  one of them is May 27, 2017?

25  A.      Yes.

114

1    Q.  What does it say under May 27, 2017?

2 A.  "David Gitman has ejected Mike Dash from this

3 conversation."

4    Q.  At 4:33 p.m.  Right?

5 A.  I don't know.

6    Q.  Why would you eject Mike Dardashtian

7 from a conversation?

8 A.  I don't remember.

9    Q.  Was Mike Dardashtian trying to find

10 out information on how you had deleted his access to

11 ChannelReply and were trying to steal the company from

12 him, and when you realized he was part of the

13 conversation you ejected him?

14 A.  No.

15    Q.  Well, why would you eject him from a

16 conversation on May 27, 2017?

17 A.  I don't know.

18    Q.  Who is Justin Golschneider?

19 A.  I don't know.

20    Q.  Who is Nikita?

21 A.  I don't know.

22    Q.  Never heard their names before?

23 A.  They're not familiar to me.

24    Q.  Who is Alice Fritz?

25 A.  She's a developer.

115

```
 1          Q.      Who is David Morris?
 2   A.      A business person.  I don't know how to
 3   describe him.
 4          Q.      Does he have any ownership in any
 5   business with you?
 6   A.      Not with me.
 7          Q.      With who?
 8   A.      I don't know.
 9          Q.      Well, what affiliation does he have
10   with ChannelReply?
11   A.      He shouldn't have any.
12          Q.      Well then why is he on there?
13   A.      You tell me.  I don't know.
14          Q.      Who is Dennis Sary?
15   A.      I would like to know that.  I don't know.  I
16   plan on looking it up.
17          Q.      Who is Jason Diaz?
18   A.      He's a business partner of Mike's.
19          Q.      Who is William Regonas?
20   A.      He's a contractor.
21          Q.      For who?
22   A.      I don't know.  Car Part Kings.
23          Q.      Going back to Exhibit 47, please.
24   A.      One second.
25               MR. GUAGLARDI:  Brett, can you put
```

116

1    Exhibit 47 up.

2                    MR. SINGER:  Yes, yes.  Just a second.

3                    THE WITNESS:  Just let me grab those

4    names.

5                    MR. SINGER:  Let me find it and pull

6    it up.  Let me know which page you want me to go onto.

7            Q.       So Mr. Gitman, when you were on

8    June 8, 2017 reviewing Exhibit 47, were you at the

9    same time speaking to Konstantyn Bagaev --

10   A.        I don't know.

11           Q.       -- about the fact that you just

12   received this document and that you couldn't

13   understand how Mike understood all of the details?

14   A.        I don't know.

15           Q.       At that time you were unaware that

16   your communication with the developers were being

17   monitored through Time Doctor; weren't you?

18   A.        I don't know.

19           Q.       You know what Time Doctor is.  Right?

20   A.        Yes.

21           Q.       What is it?

22   A.        It's time tracking software.

23           Q.       So Mike was able to see exactly that

24   you were on with the developers at the time that you

25   were on with the developers on June 8, 2017.

117

1             Are you aware of that?

2    A.      No.

3             Q.      Who had access to Time Doctor as of

4    June 8, 2017?

5    A.      I have no idea.

6             Q.      You did; didn't you?

7    A.      I don't know.

8             Q.      You don't know whether you had access?

9    A.      That's correct.

10            Q.      Do you know if Mike had access?

11   A.      I don't remember.

12            Q.      After this Order to Show Cause was

13   then entered by the court restraining you, right, you

14   went into Time Doctor and removed all the data; didn't

15   you?

16   A.      No.

17            Q.      You didn't?

18   A.      No.   I would never delete data.

19            Q.      Can data be removed from Time Doctor?

20   A.      No.   I would not delete data.

21            Q.      Did someone else remove the data from

22   Time Doctor?

23   A.      I don't know.

24            Q.      Did you ask anyone to remove the data

25   from Time Doctor?

1   A.      I don't believe so.

2           Q.      You understand that if you removed

3   data after the entry of the Order to Show Cause, that

4   that might be a basis to claim that you intentionally

5   destroyed evidence.  Are you aware of that?

6   A.      No, I was not aware of that until you just

7   said it.

8           Q.      Can you explain how there was

9   information on Time Doctor on June 8, 2017 and then

10  after that it miraculously disappeared?

11  A.      No, I can't.  You would have to ask Time

12  Doctor.

13          Q.      Did you read Exhibit 47 in its

14  entirety on or about June 8, 2017 when the court

15  entered its order?

16  A.      I don't remember.

17          Q.      Can you go to Exhibit 48, please.

18  A.      Yes.

19          Q.      Thank you.

20          Mr. Gitman, I'm showing you Exhibit 48.

21  That's the order that the court entered amending the

22  June 8, 2017 order.  You're aware of that.  Right?

23  A.      I'm sorry.  What's the question?

24          Q.      Exhibit 48 is the order that amends

25  the June 8, 2017 order that we just went over.

119

1           Are you aware of that?

2    A.      It does say Order Amending 6/8/17 Order To

3    Show Cause For Preliminary Injunction and Temporary

4    Restraints.

5           Q.      Did you ever read the order that was

6    entered for the purpose of your compliance?

7    A.      I don't remember.

8           Q.      Are you saying under oath that you're

9    not aware of, that you never read a court order that

10   gave you directions on things that you were ordered to

11   do by the court?

12   A.      No.  What I'm saying is I don't remember

13   reading it.

14          Q.      How about you look at it right now.

15   A.      I am looking at it right now.

16          Q.      Okay.  Well, I see you looking away,

17   not at it.  But if you're looking at it, then do you

18   see at the bottom of the first page that the first

19   thing that it orders you to do is redeposit into the

20   Cooper Square Ventures Bank of America bank account

21   all money that you withdrew?  Do you see that?

22   A.      No.

23                  MR. GUAGLARDI:  Counsel?

24                  MR. SINGER:  Which page do you want me

25   to go to?

120

1              MR. GUAGLARDI:   Page 1 right at the

2    bottom.

3         Q.      Do you not see that?

4    A.      I'm sorry.   What's the question?

5         Q.      The question is were you directed to

6    redeposit the monies that you misappropriated from the

7    Cooper Square Ventures Bank of America bank account

8    and did you do it?

9    A.      No.

10        Q.      No, what?

11   A.      No.

12        Q.      Did you redeposit the monies that you

13   took from the Cooper Square Ventures bank account?

14   A.      I redeposited the money that I withdrew from

15   the Cooper Square Ventures bank account.

16        Q.      Go to the next page, at the top.

17        Did you immediately restore Michael

18   Dardashtian with full and complete access to all NDAP,

19   CSV and ChannelReply electronic accounts --

20   A.      Yes.

21        Q.      -- including, but not limited to, all

22   password access to all codes, accounts on Google

23   Domain, bank accounts, e-mail accounts, payment portal

24   accounts, and any other password-protected account and

25   information relating to NDAP, CSV and ChannelReply,

121

1  including all 22 accounts listed in Exhibit 58 to

2  Dardashtian's affidavit?

3  A.       I believe so.

4          Q.       Did you direct Dalva Ventures, Channel

5  Reply, Inc., Accel Commerce and any of their owners,

6  members, officers, directors, managers, employees,

7  subcontractors, agents, transferees and

8  representatives to return to Plaintiffs all physical

9  and electronic copies, backups, disks, drives, USB

10 drives, storage devices containing copies or originals

11 of any NDAP, CSV or ChannelReply company confidential

12 information as defined in the CSV operating agreement,

13 trade secrets, company data or other property that was

14 in your, Dalva Ventures, Channel Reply, Inc. or Accel

15 Commerce's possession, custody or control?

16 A.       I don't remember.

17         Q.       Did you comply with the court order in

18 that provision?

19 A.       I believe so, but I don't remember doing it.

20         Q.       Now, why would the court order you to

21 return all of the money into the CSV's bank account?

22 A.       I don't know.

23         Q.       Why did the court direct you to

24 restore Michael Dardashtian's access to all of the

25 accounts that the court ordered you to do that to?

122

1   A.      I don't know.

2          Q.      And why did the court direct you to

3   have all of those other companies return back

4   ChannelReply's information to ChannelReply?

5   A.      I don't know.

6          Q.      So as we sit here today, almost three

7   years later, you don't understand why the court

8   ordered you to take those actions.  Is that true?

9   A.      That's correct.

10         Q.      You don't think you did anything

11  wrong; do you?

12  A.      I know I didn't do anything wrong.

13         Q.      Would you do it all over again the

14  same way if you had the chance?

15  A.      I don't understand the question.

16         Q.      If you could withdraw all the money --

17         If you weren't removed as a director or as a

18  manager, as the court has removed you, and you had

19  access to the codes, the passwords, the bank accounts

20  and all of ChannelReply's confidential information,

21  would you again just terminate Michael Dardashtian's

22  access and withdraw all the money from the bank

23  account and shift all the information to a new company

24  in your name?

25  A.      It's impossible to do something that I haven't

123

1    done before again.

2          Q.      When the money got put back in the

3    Bank of America bank account, didn't it come from

4    Dalva Ventures?

5    A.      I don't know.

6          Q.      Why would you reimburse CSV with money

7    from the Dalva account?

8    A.      I don't think I did that.

9          Q.      Well, if you did do that, why would

10   you have done it?

11   A.      I don't believe I did it.

12         Q.      Who owned Dalva Ventures?

13   A.      I'm an owner of Dalva Ventures.

14         Q.      Who else?

15   A.      My wife.

16         Q.      Anyone else?

17   A.      No.

18         Q.      Tell us everything that you did to

19   restore Mike's access to all of the ChannelReply

20   accounts that you removed his access from earlier?

21   A.      I don't remember what I did three years ago to

22   restore Mike's access.

23         Q.      You don't know how to restore a

24   person's access as we sit here today?

25   A.      Again, I don't remember what I did three years

1    ago.

2          Q.       Well, would it have been anything

3    different than you would do today if you deleted his

4    access?

5    A.       I don't know what I did three years ago.

6          Q.       How did you terminate his access?

7    A.       I don't remember terminating any access.

8          Q.       Are you swearing under oath that you

9    didn't terminate Mike's access?

10   A.       No.  I'm telling you I don't remember what I

11   did three years ago.

12         Q.       In this litigation you were removed by

13   the judge as manager of CSV in the plaintiff

14   companies.  Right?

15   A.       Yes.

16         Q.       And Mike was appointed to manage the

17   companies along with Mr. Liebman.  Right?

18   A.       I believe so.

19         Q.       Do you remember the date that you were

20   removed as manager?

21   A.       I do not.

22         Q.       June 21st, 2017?  Is that the date?

23   A.       I don't know.

24         Q.       Was it your goal to try and damage CSV

25   in hopes that Judge Stanton would remove Mike and

125

1    reinstate you as a manager?

2    A.      I don't believe so.  I don't -- that doesn't

3    make sense to me.

4            Q.      Didn't you ever tell Konstantyn Bagaev

5    that you wanted to prove that Mike was failing as the

6    CEO of ChannelReply or CSV?

7    A.      I don't believe so.

8            Q.      Did you ever tell Mr. Bagaev to resign

9    from ChannelReply?

10   A.      I don't believe so.

11           Q.      You never, you're swearing under oath

12   that you never had a conversation with Bagaev where

13   you encouraged or told him to resign from

14   ChannelReply?

15   A.      I don't believe so.

16           Q.      Did you ever have a conversation with

17   Dentons about helping prepare a letter for Bagaev to

18   resign from ChannelReply?

19   A.      I don't believe so.

20           Q.      You never had a conversation with

21   Lindsay Ditlow about preparing a letter or reviewing a

22   letter that Bagaev would resign from ChannelReply?

23   A.      I don't remember.

24           Q.      You're under oath.

25           Did you ever have a conversation with Lindsay

1    Ditlow about Bagaev resigning from ChannelReply?

2    A.      I don't remember.

3            Q.      Go to Exhibit 55.

4                    MR. SINGER:  Let me pull that up.

5                    MR. GUAGLARDI:  Thank you.  We're

6    going to go back to that other exhibit, but 55 right

7    now.

8                    MR. SINGER:  Counsel.

9            Q.      Mr. Gitman, looking at Exhibit 55,

10   have you ever seen that document before?

11   A.      I don't remember.

12           Q.      It was addressed to you.  Please read

13   it.

14   A.      "Konstantyn Bagaev."

15           Q.      You can read it to yourself.

16           Did you instruct Bagaev to write this letter

17   and send it to you and say that he was quitting, and

18   he was quitting because he couldn't work with Mike

19   Dardashtian?

20   A.      I don't believe so.

21           Q.      You don't believe so or you didn't?

22   A.      I don't remember this letter or anything

23   around this letter.  Again, it was three years ago.

24           Q.      And you're swearing under oath that

25   you had no conversation with your lawyer, Lindsay

1  Ditlow, about reviewing this letter before it was sent

2  by Bagaev to you?

3  A.      I don't remember having a conversation with

4  Lindsay Ditlow about this letter.

5          Q.      You're aware that other people have

6  already provided information and said that you did;

7  aren't you?

8  A.      No, I'm not aware of that.

9          Q.      Go to the second page of Exhibit 55.

10 A.      Okay.

11         Q.      This is a letter from Oleksii

12 Glukharev to you.  Correct?

13 A.      Yes.

14         Q.      And it's the exact same letter as the

15 one that Bagaev wrote; isn't it?

16 A.      It's very similar.

17         Q.      Is there anything that's different

18 other than their name?

19 A.      I don't know.  I would have to compare them

20 side-by-side.

21         Q.      Well, I'll represent to you that they

22 are the same letter with the exception of their name.

23         Who wrote the letter?

24 A.      I don't know.

25         Q.      Did you ever see the letter before it

1  went out?

2  A.      I don't know.

3          Q.      I'm asking you under oath, did you

4  ever see this letter, either of these two letters that

5  were addressed to you before they were actually sent

6  to you?

7  A.      I don't know.

8          Q.      Did you approve the letters before

9  they were sent to you?

10  A.      I don't believe so.

11          Q.      Did your lawyers at Dentons approve

12  these letters before they were sent to you?

13  A.      I don't believe so.

14          Q.      Was this something that you conspired

15  with Bagaev and Glukharev to resign at the same time,

16  blaming Mike so that they could go and work with you

17  at Channel Reply, Inc.?

18  A.      No.

19          Q.      When did you go --

20          Didn't you just return from the Ukraine within

21  days before the date of these letters?

22  A.      I don't know.

23          Q.      Weren't you in the Ukraine from

24  June 12th of 2017 or thereabouts until about June 15th

25  or 16th, 2017 --

129

1    A.      I don't know.

2            Q.       -- with Glukharev and Bagaev?

3    A.      I don't remember.

4            Q.       So if you met with them the week

5    before in the Ukraine and then a week later they wrote

6    a termination letter resigning, and it's coincidental

7    that at that same time you just formed Channel Reply,

8    Inc. and offered them through a stock purchase

9    agreement an interest in your new company, how do you

10   explain that?

11   A.      I don't remember these events.

12           MR. GUAGLARDI:  Counsel, going back to

13   exhibit -- bear with me for a second.

14           Q.       Did you at the time, Mr. Gitman, that

15   these letters were sent, which was June 20, 2017, were

16   you trying to make it impossible for Mike Dardashtian

17   to be able to manage ChannelReply because the

18   developers quit?

19   A.      I don't believe so.

20           Q.       You don't believe so?

21           Is it possible that you were communicating

22   with Bagaev and Glukharev and told them to resign

23   because you knew that without them that you thought

24   that Michael Dardashtian would have a difficult time

25   in managing ChannelReply?

1    A.      I don't believe so, no.

2            Q.      Go to Exhibit 59.

3    A.      Barry, I need to take a bathroom break.

4            Q.      Go ahead.

5            (At this point, a brief recess is taken.)

6                    THE WITNESS:  I'm back.

7                    MR. GUAGLARDI:  Do you have

8    Exhibit 59?

9                    MR. SINGER:  Yes, it should be right

10   there.

11   BY MR. GUAGLARDI:

12           Q.      Mr. Gitman, these are archived

13   conversations between you and Aleksey Glukharev.  They

14   were produced by you or through your electronic

15   discovery, I believe.  Right?  So let's look at that.

16           Can you go to page 2.

17   A.      Yeah.

18           Q.      It says: "The judge has set

19   February 12th as the date for the settlement

20   conference."

21           Why are you talking to Glukharev about the

22   lawsuit?

23   A.      I don't remember why I was talking to him in

24   December of 2017 about the lawsuit.

25           Q.      And then it says, you said to him: "I

1   e-mailed you the files.  We finally filed

2   counterclaims.  A new judge was assigned."

3          Why are you talking to him about that?

4   A.     I don't remember why I was talking to him in

5   December of 2017 about it.

6          Q.     As we sit here today, it doesn't help

7   refresh your recollection?

8   A.     Not at all.

9                 MR. GUAGLARDI:  Can you go to the next

10  page, Counsel.

11                MR. SINGER:  Yes.

12                MR. GUAGLARDI:  Can you go to the next

13  page.  Can you go to the next page and just move it up

14  a little.  That's fine.

15         Q.     On the bottom of that, Mr. Gitman, on

16  June 22nd, 2017 at 10:44 a.m. you wrote to Glukharev

17  and said: "I had to move ChannelReply.com to NDAP

18  G Suite account for judge's order."

19         What does that mean?

20  A.     It means I had to move the ChannelReply.com to

21  NDAP Gmail account for judge's order.  I don't see any

22  other context besides what that says.

23         Q.     Wasn't the ChannelReply.com originally

24  in the NDAP G Suite?

25  A.     I don't know.

1      Q.      Didn't you move it out of the NDAP

2  G Suite to prevent Michael Dardashtian from having

3  access and the court ordered you to put it back there?

4  A.      No.

5      Q.      No?  Then why did you put it back

6  there?

7  A.      Because the court ordered me to put it back

8  there.

9      Q.      Why did the court order you to put it

10  back there?

11  A.      I don't know.

12      Q.      You never asked the court?

13  A.      I did not.

14      Q.      You never asked your lawyer?

15  A.      I did.

16      Q.      And what was the answer?

17  A.      I don't remember.

18          MR. GUAGLARDI:  Can you go to the next

19  page, Counsel.

20          MR. SINGER:  Yes.

21          MR. GUAGLARDI:  And can you go to the

22  next page.

23          MR. SINGER:  Yes.

24          MR. GUAGLARDI:  Thank you.  Can you go

25  to the next page and then one more page.

1          Q.      Top: "I'm talking to lawyers."

2          Why are you talking to lawyers on June 22nd,

3   2017 at 10:10 in the morning, Mr. Gitman?

4   A.      I have no idea.

5          Q.      Did you have any other lawyers in June

6   of 2017 other than Dentons?

7   A.      I have no idea.  I don't remember.

8          Q.      Was Dentons your lawyer in June of

9   2017?

10  A.      I don't remember.

11              MR. GUAGLARDI:  Can you go to the next

12  page, Counsel.  And can you get to the next page.

13  That's good, right there.

14         Q.      Right at the top of that page,

15  Mr. Gitman, which is June 21st, 2017 at 7:26:02 a.m.,

16  you wrote to Aleksey: "Can you check with K where he

17  sent it."

18         "K" you told me in the last deposition is an

19  abbreviation for Konstantyn.  Correct?

20  A.      Yes.

21         Q.      Bagaev.  Correct?

22  A.      Um-hum.

23         Q.      And Aleksey wrote to you and then you

24  wrote back to Aleksey and said: "Lindsay asked me to

25  send you an e-mail to send Mike the resignation

134

1   letter.  Which his e-mail address should I use".

2        Can you explain that?

3   A.     What would you like me to explain?

4        Q.        Anything that you know about what your

5   and Lindsay Ditlow's involvement was with Aleksey

6   Glukharev's resignation letter to ChannelReply.

7   A.     If there is a specific question, I'm happy to

8   answer it.

9        Q.        I just asked you a specific question.

10  A.     Can you repeat it?

11       Q.        Tell me whatever knowledge you have

12  about your and Lindsay Ditlow's involvement with

13  Aleksey Glukharev's resignation letter to

14  ChannelReply.

15  A.     I don't remember, but I will -- I do believe

16  what happened was that the resignation letter was sent

17  to me and then Lindsay said make sure Mike also

18  receives a copy of it.

19       Q.        And how do you form the basis for that

20  belief?

21  A.     I have a vague recollection of it.

22       Q.        If you go down to the middle of the

23  page, on June 20, 2017 at 3:37 p.m., you wrote:

24  "Lindsay asked me to send you an e-mail to send Mike

25  the resignation letter."

1        Why would Lindsay have any involvement in

2  giving guidance on whether Mike should get a

3  resignation letter?

4  A.      I'm not sure.  You would have to ask my

5  counsel.

6        Q.      We will.  If you go down to the bottom

7  of that page, the second from the bottom, David

8  Gitman, it was June 20, 2017 at 9:39 a.m., before the

9  letter was received, and you wrote to Aleksey: "Do you

10  want to add anything else."

11        Can you explain why you were asking Aleksey

12  whether he wanted to add anything else to his

13  resignation letter before he even sent it?

14  A.      I don't believe I'm asking him about his

15  resignation letter in this context.

16        Q.      Had his resignation letter even been

17  sent?

18  A.      I don't know.

19        Q.      It hadn't been sent.

20  A.      I don't know that.

21        Q.      Why were you asking Aleksey if he

22  wanted to add anything else to his resignation letter

23  before it was sent?

24  A.      I don't -- that's not what I was doing.

25                MR. GUAGLARDI:  Can you go to the next

136

1    page, Counsel.  Thank you.

2                MR. SINGER:  Yes.

3         Q.      Where it says, "I wrote my name as in

4    documents" on June 20, 2017 at 9:26 a.m., were you

5    confirming with Aleksey that his name was spelled

6    right in his own resignation letter?

7    A.      That's not me that wrote that.

8         Q.      He wrote it to you.

9    A.      That's correct.

10        Q.      Why would he write to you to confirm

11   that he wrote his name the same in the resignation

12   letter as in the other documents?

13   A.      I don't believe he's talking about his

14   resignation letter.

15        Q.      Look below that.

16   A.      I am.

17        Q.      Isn't that the resignation letter

18   document?

19   A.      I don't believe so.

20        Q.      Did you produce that document?

21   A.      I produced all documents years ago.

22        Q.      Do you know if that reference is not

23   to the resignation document?

24   A.      I don't know what that link is to, if that's

25   what you're referring to.

137

1        Q.       It could be to the resignation

2   document.   Correct?

3   A.      I don't know.

4              MR. GUAGLARDI:  Can you go to the next

5   page, Counsel.

6              MR. SINGER:  Yes.

7        Q.       In the middle of the page, Mr. Gitman,

8   you wrote at nine a.m. on June 20: "I don't let anyone

9   fuck with it."

10  A.      Um-hum.

11       Q.       What does that mean?

12  A.      I don't know the context of the conversation.

13       Q.       Well, let's look before that then.

14             MR. GUAGLARDI:  Counsel, can you go to

15  the next page.

16             MR. SINGER:  Yes.

17             MR. GUAGLARDI:  And then the next page

18  and then the next page and then the next page.  Thank

19  you.  And one more page.  Thank you.  So let's move

20  that back up a little.

21       Q.       So Mr. Gitman, we're now at the

22  June 19, 2017 at 1:19 p.m.  You wrote to Aleksey:

23  "When did you start working with ChannelReply?"

24             Why were you asking him on June 19, 2017 when

25  he started working with ChannelReply?

138

1   A.       I have no idea.

2            Q.       What did he write back to you?

3   A.       I don't see anything in this, in front of me.

4                     MR. GUAGLARDI:  Go to the next page,

5   Counsel, the page before.

6                     MR. SINGER:  Sure.

7            Q.       Didn't he respond to you on June 19,

8   2017 at 1:21 p.m.: "It was April 2015"?

9   A.       That seems out of order.

10           Q.       No, it really doesn't.

11                    MR. GUAGLARDI:  If you go back,

12  Counsel, to the page after.  Thank you.

13           Q.       "When did you start working with

14  ChannelReply?"  You asked him on June 19, 2017 at

15  1:19 p.m.

16                    MR. GUAGLARDI:  Now please go to the

17  page before.

18           Q.       Same day at 1:21 p.m., which is after,

19  he responded: "It was April 2015."

20  A.       Got it.  It's in reverse chronological order

21  here.

22           Q.       So Aleksey began working for

23  ChannelReply in April of 2015.  Correct?

24  A.       I don't know.

25           Q.       That's what he told you; isn't it?

1   A.      Yes.

2          Q.      And then you wrote to him: "Thanks."

3   And he wrote: "I wish you good luck!"  And then you

4   wrote: "I'm on the way to the judge now."  And that

5   was on June 19 at 2:44 p.m.

6          So you were actually talking to Aleksey

7   Glukharev on the day that you were traveling to the

8   judge; weren't you?

9   A.      I don't remember.

10              MR. GUAGLARDI:  Can you move that up,

11   Counsel.

12              MR. SINGER:  Yes.

13              MR. GUAGLARDI:  Thank you.

14          Q.      Then he wrote to you: "Take a deep

15   breath!"  And he wrote: "Your lawyers are almost the

16   best.  Everything should be fine."  And you wrote:

17   "The lawyers are awesome."

18          Who are you talking about, your lawyers at

19   Dentons?

20   A.      I have no idea.

21          Q.      Well, weren't you going to court on

22   this case on June 19, 2017?

23   A.      I don't remember what I was doing on June 19,

24   2017.

25          Q.      But you just said you're on the way to

140

1    the judge now, so you do know that you were on the way

2    to the judge; don't you?

3    A.      No.  Again, I don't remember what I was doing

4    on June 19, 2017.

5            MR. GUAGLARDI:  Counsel, can you move

6    it up?  Keep going to the top of the page.

7            Q.      Then you wrote to him, now it's the

8    next day, you wrote to him on June 20th: "How's your

9    day going?"  He wrote: "It's strange.  No work."  And

10   you wrote to him: "I know."

11           Why were you writing to him and saying that

12   you know he's got no work?  Because ChannelReply was

13   at a standstill because of your attempt to steal it?

14   A.      No.

15           Q.      Why was ChannelReply at a standstill?

16   A.      I don't know that it was.

17           Q.      Well, why did he have no work?

18   A.      I don't know.

19           Q.      Well, you just said "I know."  You

20   wrote to him when he wrote "No work," you said "I

21   know."

22   A.      Again, I don't remember a conversation from

23   three years ago.

24           Q.      Then he wrote: "But I have a lot to

25   dos."  And you said: "Strange for me, too."

1          Why was it strange for you, too?

2   A.      I don't know.

3          Q.      Because you were going to the judge?

4   A.      I have no idea.

5                  MR. GUAGLARDI:  Can you move it up,

6   Counsel.

7                  MR. SINGER:  Yes.

8          Q.      And you wrote to him: "Is the family

9   keeping you busy?"  He wrote: "Yeah."  You gave him

10  the thumbs up.  And then he wrote: "As Konstantyn told

11  me, we have to wait for Wednesday?  Probably there

12  will be some decision from the judge?"

13         Were you talking to Konstantyn at this time,

14  too, to keep him up to date on what was going on with

15  the lawsuit because you were hiring him and Aleksey

16  Glukharev and offering them shares in Channel Reply,

17  Inc. to steal the company?

18  A.      No.

19         Q.      Well, why were you communicating with

20  Konstantyn at this time then?

21  A.      I don't remember my conversations with

22  Konstantyn at that time.

23                 MR. GUAGLARDI:  Can you move it up,

24  please.

25         Q.      And then you wrote to him on June 20,

1   2017 at 7:12 in the morning: "As Konstantyn told me we

2   have to wait for Wednesday?"  Excuse me.  That's what

3   Glukharev wrote to you.  "Probably there will be some

4   decision from the judge?"  And then you wrote: "Yes.

5   I will review options, all options when Konstantyn is

6   back online."

7           You wrote that on June 20, 2017 at 7:13 a.m.;

8   didn't you?

9   A.      Yes.

10          Q.      Why were you going to review all

11  options with Glukharev and Konstantyn at that time?

12  A.      I don't remember.

13          Q.      What options were you going to review

14  with them?

15  A.      Again, I don't remember any conversations

16  on -- around this time three years ago.

17          Q.      Were you reviewing with them how you

18  three were going to steal the company from Mike

19  Dardashtian?

20  A.      No.

21          Q.      Well, what were the options that you

22  were reviewing?

23  A.      I don't know.

24                  MR. GUAGLARDI:  Can you move it up,

25  Counsel.

1          MR. SINGER:  Yeah.

2          Q.      Then you wrote "Yes."  He wrote

3    "Okay."  He wrote: "He looks green."  You wrote

4    "Sick," question mark.  He wrote "No."  He wrote: "I

5    mean in Skype."  You wrote "Yes."  You then wrote:

6    "Hopefully he will respond soon."  Glukharev wrote:

7    "Ah, okay."  And then he wrote: "I was talking to

8    Konstantyn, so I'm waiting for letter."

9          This is June 20th, 7:44 a.m.  Why was Aleksey

10   Glukharev at 7:44 a.m. on June 20th waiting for his

11   resignation letter when it was his resignation letter?

12   A.      I don't see any reference to a resignation

13   letter.

14         Q.      What letter was he waiting for?

15   A.      You would have to ask him.

16              MR. GUAGLARDI:  Can you move it up,

17   please.

18              MR. SINGER:  Yes.

19         Q.      You wrote thumbs up.  And he wrote:

20   "Excuse me for question, but I would like to clarify.

21   Konstantyn told me that you said he doesn't need to

22   look for a new job.  Is it the same for me?"

23         Why, Mr. Gitman, was Glukharev writing to you

24   in the context of his resignation and asking you if he

25   is supposed to be looking for a new job when he didn't