144

1  even send a letter for resignation yet?

2  A.      I don't know if he sent the letter of

3  resignation yet, and you would have to ask him that.

4              MR. GUAGLARDI:  Can you move it up,

5  Counsel.

6              MR. SINGER:  Yes.

7         Q.      And you wrote "of course" in response

8  to his question is it the same for him, that he

9  doesn't need to look for a new job.

10        Why are you telling him at 8:58 in the morning

11 on June 20, 2017 that he doesn't need to look for a

12 new job when he hasn't even sent his resignation

13 letter out yet?

14 A.      I don't believe this is about a resignation

15 letter.

16        Q.      Why are you telling him that he

17 doesn't need to look for a new job?

18 A.      I don't remember.

19        Q.      What is it to you --

20        How did he not have a job on June 20, 2017?

21 A.      I don't know.  Maybe you can tell me.

22        Q.      No, I'm asking you.  I'm asking you

23 why you wrote, of course, you don't need to look for a

24 new job.  Those are your words.  Right?

25        "Of course," you wrote those?

1    A.      Yes, I wrote the words "of course."

2            Q.      And why did you write it?

3    A.      I don't remember, again, any conversations

4    from or the context of them from June 20th.

5            Q.      Let's see if we get more context.

6    Let's look forward.  You then wrote "First off," and

7    he wrote "Thank you" because you told him he didn't

8    need to look for a new job.  Then you wrote on

9    June 20, 2017 at 8:59 a.m.: "If CR doesn't work out, I

10   will do something new for you."

11           You wrote that.  Right?

12   A.      That's not what I wrote.

13           Q.      "If CR doesn't work out, I will do

14   something new with you."  Isn't that what you wrote?

15   A.      That is what I wrote, yes.

16           Q.      CR refers to ChannelReply.  Right?

17   A.      Yes.

18           Q.      So you wrote if ChannelReply doesn't

19   work out, I will do something new with you?

20   A.      Yes.

21           Q.      And that was on June 20, 2017 at 8:59

22   a.m.  Right?

23   A.      Yes.

24           Q.      That was the date of their resignation

25   letters; wasn't it?

1   A.      I don't know.

2           Q.      I'll just represent to you that if you

3   were to go back to Exhibit 55, which we don't need to

4   do, the date of the resignation letters were June 20,

5   2017.

6                   MR. SINGER:  Do you want me to pull it

7   up, Counsel?  I can.

8                   MR. GUAGLARDI:  I'll represent it.

9   We'll save time.  That's the date of both those

10  letters say.

11          Q.      Mr. Gitman, at almost nine in the

12  morning on the day that their resignation letters are

13  dated, why were you writing to Glukharev saying if

14  ChannelReply doesn't work out, I will do something new

15  with you?

16  A.      Because I would be happy to work with him

17  again.  He's a good developer.

18          Q.      What do you mean if ChannelReply

19  doesn't work out?

20  A.      I mean if it doesn't work out.  That's it.

21          Q.      ChannelReply was already in existence

22  for three years before that date.  What do you mean if

23  it doesn't work out?

24  A.      I don't know.  I'm sorry.

25          Q.      Did you mean that if the court didn't

147

1   let you steal the company through Channel Reply, Inc.

2   and that doesn't work out, that you'll do something

3   new with him?

4   A.      No.

5                   MR. SINGER:  Note my objection, but

6   you can answer.

7           Q.      Well, what did you mean, Mr. Gitman?

8   A.      I don't know.

9           Q.      How were you going to do something new

10  with Mr. Glukharev when you had a fiduciary duty to

11  Michael Dardashtian, ChannelReply, Cooper Square

12  Ventures and NDAP?

13  A.      The Cooper Square Ventures operating agreement

14  let's me start any venture I would like on my own.

15          Q.      Does it let you do that with the

16  confidential information that's owned by Cooper Square

17  Ventures?

18  A.      No, I don't believe so.

19          Q.      Does it let you do that with taking

20  the proprietary intellectual property that's owned by

21  Cooper Square Ventures and then start a competing

22  business?

23  A.      I don't know if it does, but I wouldn't do

24  that.

25          Q.      So what were you looking to do?

1          On June 20, 2017, had Channel Reply, Inc. been

2    formed by you?

3    A.     Yes.

4          Q.     And you had already locked Michael

5    Dardashtian's access out to the company as of that

6    date; didn't you?

7    A.     I don't know.

8          Q.     Didn't the court enter a July 8, 2017

9    retraining order making you restore access?

10   A.     I don't remember.

11         Q.     Weren't you already removed as a

12   manager as of June 20, 2017?

13   A.     I don't remember.

14         Q.     You then said to Mr. Glukharev: "I

15   have many ideas and I will find a way to fund it."

16         What other ideas did you have that you were

17   going to involve Glukharev in?

18   A.     I don't remember.

19         Q.     How many shares had you offered

20   Glukharev in Channel Reply, Inc. as of June 20, 2017?

21   A.     I don't know.

22              MR. GUAGLARDI:  Can you move it up,

23   Counsel.

24              MR. SINGER:  Yeah.

25         Q.     And then, Mr. Gitman, also on June 20,

1   2017 you then responded, after you said "and I will

2   find a way to fund it," you said, "However, I think we

3   will have ChannelReply."

4           Now, what did you mean when you wrote that to

5   Glukharev on June 20th at 8:59 a.m.?

6   A.      I don't remember.

7           Q.      Well, you said, "I think we will have

8   ChannelReply."  Isn't that what you wrote?

9   A.      Yes.

10          Q.      Who is the "we"?

11  A.      I don't remember.

12          Q.      Was that you and Mr. Glukharev and

13  Mr. Bagaev?

14  A.      I don't remember.

15          Q.      Did it include Mike Dardashtian?

16  A.      I don't remember.

17          Q.      Why would you say to Mr. Glukharev, "I

18  think we will have ChannelReply"?

19  A.      I don't know.

20          Q.      Were you trying to steal the company

21  from Mike Dardashtian?

22  A.      No.

23          Q.      Well, then why were you having all

24  these conversations with the developers and not

25  Michael Dardashtian involved?

1   A.      I don't remember conversations at that time

2   with or without Mike Dardashtian.

3           Q.      Do you see Mike Dardashtian is part of

4   this conversation?

5   A.      Not at the moment.

6           Q.      And then after you wrote, "However, I

7   think we will have ChannelReply," Aleksey wrote,

8   "Thank you again," and you wrote, "No, thank you," and

9   then you wrote, "I hope so."  Then you wrote on

10  June 20th at 8:59 a.m., "We are a team."

11          What did you mean when you wrote, "We are a

12  team" on June 20, 2017 at 8:59 before Mr. Glukharev

13  even sent his resignation letter to you?

14  A.      I'm not sure if I received his resignation

15  letter before him sending this message.

16          Q.      Mr. Gitman, on June 20th Glukharev was

17  resigning from ChannelReply; wasn't he?

18  A.      I don't know.

19          Q.      Didn't the resignation letter say in

20  Exhibit 55 that he was resigning from ChannelReply

21  because he couldn't work with Mike?

22          Isn't that what he said?

23  A.      I don't think those were his words.

24          Q.      Wasn't he resigning from ChannelReply

25  on June 20, 2017?

1   A.      I'm not sure.  I don't remember the date of

2   the resignation letter or when I received it.

3           Q.      Leaving aside the date, which is

4   June 20, 2017, wasn't he resigning from ChannelReply?

5   A.      I don't remember what happened on that date.

6           Q.      Okay.  So who was the team?  "We are a

7   team."  Who is on the team?

8   A.      I don't know who I'm referring to.

9           Q.      Then you wrote above that, seconds

10  later: "I see my work team like my family at home."

11          What did you mean by that?

12  A.      I feel close to the people I work with.

13          Q.      Like Mike Dardashtian?

14  A.      Like Mike Dardashtian.

15          Q.      So you felt so close to Mike that you

16  told Aleksey and Bagaev to block him and not talk to

17  him.  You must have felt close to Mike.

18                  MR. SINGER:  Objection, but you can

19  answer.

20  A.      I often do have disagreements and don't talk

21  to family when I'm upset with them for some time.

22          Q.      And then after you wrote, "I see my

23  work team like my family at home," you wrote seconds

24  later, "I don't let anyone fuck with it."

25          What does that mean?

152

1  A.      I'm very protective of the people I work with

2  and my family.

3          Q.      Is that how come you locked Michael

4  Dardashtian from the access to ChannelReply?

5  A.      I didn't do that.

6          Q.      Is that how come you drained the bank

7  accounts at Bank of America and the CSV account and

8  transferred it to your name?

9  A.      I didn't do that.

10         Q.      Is that how come it took a court order

11 from the United States District Court, Southern

12 District of New York to order you to put the money

13 back and return his access?

14 A.      I don't understand the question.

15         Q.      The next thing you wrote was: "Thank

16 you for iPhone for Petr.  It helps us feed him."

17 Aleksey wrote that to you.

18         Who did you give an iPhone to?

19 A.      I didn't give an iPhone to anyone.

20         Q.      Who is P-E-T-R, Petr?

21 A.      Aleksey's son.

22         Q.      So it says: "Thank you for iPhone for

23 Petr.  It helps us feed him."

24         Did you give an iPhone to Aleksey to give to

25 his son?

153

1    A.      No.

2            Q.      You didn't give him a gift?

3    A.      I gave him a gift.  I often send my colleagues

4    gifts for the kids.

5                    MR. GUAGLARDI:  Can you move that up,

6    Counsel.

7                    MR. SINGER:  Yes.

8            Q.      And then you wrote to Aleksey: "He

9    plays with it," question mark.  "Awesome," exclamation

10   point.  And then you wrote, June 20, 2017 9:01 a.m.:

11   "I thought it was cute."  He wrote: "Every time he

12   eats."  You wrote: "That feels so good to hear.  I

13   will tell Shira she picked out a great thing."

14           Who's Shira?

15   A.      That's my daughter.

16           Q.      So your daughter picked out the iPhone

17   that you gave as a gift to Aleksey Glukharev's son?

18   A.      Again, I never gave Aleksey's son an iPhone.

19           Q.      You gave a gift?

20   A.      That's correct.

21           Q.      What was the gift?

22   A.      There was several gifts; so a couple of

23   onesies, a Brooklyn t-shirt.  The kid was an infant,

     so only a few weeks old.  We got him like a plush toy,

     `ooks like a phone that he can squeeze, things like

154

1   that.

2          Q.       Above that he wrote: "He discovered a

3   touch screen.  It's funny."

4                   MR. GUAGLARDI:  Can you move it up,

5   Counsel.  Keep going all the way to the top.

6          Q.       Now we're at June 20th, 9:26 a.m.  So

7   after all these discussions, now Aleksey is writing:

8   "I wrote my name as in documents."

9          Does it help put in context to you that he now

10  is first checking how his name looks on the

11  resignation letter that hasn't been sent yet?

12  A.      No.

13                  MR. GUAGLARDI:  Can you move it up,

14  Counsel, to the day before.

15                  MR. SINGER:  Sure.

16         Q.       Now, we're at June 20th, 9:39 a.m.,

17  and you wrote: "Checking now."  You're checking the

18  spelling of his name.  And you're asking him: "Do you

19  want to add anything else?"  And he's saying "now" and

20  then he's saying "no."  You're saying "thanks".  And

21  then at 3:37, later that same day, you write: "Lindsay

22  asked me to send you an e-mail to send Mike the

23  resignation letter."

24         Now, why would Lindsay be asking you to tell

25  Glukharev to first send Mike the resignation letter?

155

1  A.      I don't know.  That's what they advised me to

2  do.

3                  MR. GUAGLARDI:  Can you go now,

4  Counsel, to the last three pages of the document of

5  Exhibit 59.

6                  MR. SINGER:  The top or the bottom.

7                  MR. GUAGLARDI:  The end three pages.

8          Q.      Mr. Gitman, this is another

9  conversation that you're having with Aleksey Glukharev

10 that goes from April 3, 2019 to November 11, 2019.

11                 MR. GUAGLARDI:  Can you go to the next

12 page, Counsel.

13                 MR. SINGER:  Yes.

14                 MR. GUAGLARDI:  Can you go to the next

15 page, Counsel.

16                 MR. SINGER:  Yes.

17         Q.      So now, Mr. Gitman, you wrote on

18 November 11 to Mr. Glukharev and you said: "Can I have

19 your feedback on this."  This is not -- strike that.

20         On November 11 at 9:34 a.m. Glukharev wrote to

21 you: "I applied a new job, but I think you know that."

22         What did you respond back to him?

23 A.      "Yeah, I'm upset."

24         Q.      What were you upset about?

25 A.      That Aleksey went to work for Mike again.

156

1          Q.     Now, so after Aleksey resigned, he

2    went back to work for the company, for CSV.  Correct?

3    A.     I don't know.

4          Q.     You just indicated he went back to

5    work for Mike again and that made you upset.  Correct?

6    A.     I believe he went back to work for Mike, yes.

7    I don't know for sure.  I haven't seen any, anything.

8          Q.     Mike was running ChannelReply.

9    Correct?

10   A.     I don't know.  All I know is that Mike's

11   full-time job is at Yotpo.

12         Q.     Mr. Gitman, please answer the

13   question.

14                MR. GUAGLARDI:  Move to strike.

15   A.     I am answering the question.

16         Q.     You responded: "Yeah, I'm upset."  I

17   asked you why you were upset, and you said because he

18   went back to work for Mike again.

19         My question to you is when you say he went

20   back to work for Mike again, you mean he went back to

21   work for ChannelReply again.  Correct?

22   A.     No.

23         Q.     Well, who did he go back to work for

24   then?

25   A.     Mike.

1          Q.      In what company?

2     A.      I don't know.

3          Q.      Well, what company was Mike running?

4     A.      Yotpo, Cooper Square Ventures.   I don't know.

5          Q.      Did Glukharev go to work for Yotpo or

6     did he go to work for ChannelReply in November of

7     2019?

8     A.      I don't know.

9          Q.      What company did the court order that

10    Mike was the manager of?

11    A.      Cooper Square Ventures.

12         Q.      And ChannelReply?

13    A.      No.

14         Q.      No?

15    A.      No, that's correct.

16         Q.      NDAP?

17    A.      Yes.

18         Q.      So are you mad that Glukharev went

19    back to work for Mike at CSV and NDAP?

20    A.      I don't know that's where he's working.

21         Q.      My question is what were you upset

22    about?

23    A.      That Aleksey is working for Mike again.

24         Q.      And then you wrote: "New lawyers are

25    not happy either."

158

1             Who are the new lawyers?  Dentons?

2    A.     I don't remember what context that was in.

3             Q.     You don't know?  Isn't that less than

4    a year ago?

5    A.     It was about six months ago.

6             Q.     You don't remember six months ago

7    where you wrote in a --

8    A.     Well, I was switching lawyers at that time, so

9    I don't remember which law firm or which set of

10   lawyers I was talking to.

11            Q.     Oh, that's right.  It might be

12   Mr. Kim's firm that are the new lawyers.  Correct?

13   A.     I don't know who Mr. Kim is.

14            Q.     Who is your current lawyer?

15   A.     Peter Sim.

16            Q.     Excuse me.  So the new lawyer was

17   Peter Sim?

18   A.     I was talking to multiple lawyers around that

19   time, so I don't remember who I was referring to.

20            Q.     Why would you tell Glukharev, "New

21   lawyers are not happy either"?

22   A.     I don't remember.  I must have gotten some

23   feedback from the attorneys I was speaking to that

24   day.

25            Q.     And then Aleksey wrote back to you:

159

1    "I can imagine.  However, it's time to go further."

2         What did you respond back to Aleksey on

3    November 11th at 9:45 a.m. in response to his

4    statement where he said, "However, it's time to go

5    further"?  What did you then say?

6    A.    "It would've been prudent for you to talk to

7    me before making this decision."

8         Q.    Why did Glukharev need to talk to you

9    before deciding to go back to work for CSV and NDAP?

10   A.    I don't know if Glukharev is working for CSV

11   or NDAP.

12        Q.    Why did Mr. Glukharev need to go talk

13   to you before making any decision to go to work for

14   anybody?

15   A.    He doesn't.

16        Q.    Well, then why did you tell him it

17   would have been prudent for you to talk to me before

18   making this decision?

19   A.    I like to give him advice and that's all.  He

20   comes to me for advice.

21        Q.    What advice did you want to give him?

22   A.    I don't know.  I didn't --

23        Q.    What advice would you have given him

24   if he talked to you first?

25   A.    I don't know.  That's a very challenging

160

1   hypothetical to answer.

2         Q.      Would you have told him that it

3   wouldn't have been a good idea for him to go back and

4   work for the company?

5   A.      I don't know.

6         Q.      For CSV and NDAP?

7   A.      No.  I probably would have told him just to be

8   careful.

9         Q.      Well, you weren't happy that he went

10  back to work for the company that you were an owner

11  of; were you?

12  A.      I wasn't thrilled about it, yeah.

13        Q.      Right.  So you didn't want him to go

14  and try and help the company grow at that time in

15  November of 2019?

16  A.      No, I did.

17        Q.      You did, but you just were upset with

18  the fact that he went back to work there.  Why would

19  you be upset if you wanted him to go back and work

20  there?

21  A.      I was upset because he didn't talk to me about

22  it first.  It seemed like he just made the change

23  without talking to me about it.

24        Q.      You didn't want him to go work there;

25  did you?

1   A.      No, I have no issue with him working there.

2           Q.      Isn't that what you said earlier, that

3   you were upset that he went back to work with Mike?

4   A.      No.  I said I was upset that he went to work

5   for Mike again.

6           Q.      Then you wrote: "I deserved at least

7   you reaching out to me."  Why?  Why did you deserve

8   him reaching out to you, for what reason?

9   A.      Because we're friends and I thought he would

10  reach out to me before making such a big decision.

11          Q.      He then wrote to you at 9:48 on

12  November 11, 2019: "Well, I didn't tell to Mike

13  anything new.  He has our screenshots."

14          What does that mean?

15  A.      I don't know.  You'll have to ask him.

16          Q.      Well, you responded to that and said:

17  "That's not what I'm talking about.  It's not about

18  the lawsuit."

19          So you knew that the screenshots had to do

20  with the lawsuit; didn't you?

21  A.      I don't understand the question.

22          Q.      You knew that Glukharev went back to

23  work for him and Glukharev said Mike already knew

24  everything because he already had the screenshots, so

25  I didn't give up David Gitman on any of the things

162

1    that he did to try and hurt the company.

2              Isn't that what he said?

3    A.        I'm not following you at all.

4              Q.        You then wrote at 9:49: "It's about

5    you not reaching out to me before making a decision

6    that will hurt both of us."

7              Can you explain to me how Glukharev's decision

8    to go back and work for Mike at CSV and NDAP is going

9    to hurt him and you?

10   A.        Yeah, it hurt me emotionally and -- excuse me?

11             Q.        Did it hurt you any other way other

12   than emotionally?

13   A.        No.

14             Q.        How was it going to hurt him?  He was

15   going to have --

16   A.        Would you like me to answer the question or

17   would you like to keep talking?

18             Q.        Yeah.  Well, I would like you to

19   answer the question.  That would be wonderful.

20   A.        Okay.  And which question would you like me to

21   answer?

22             Q.        I would like you to answer the

23   question as to how it was going to hurt him.

24   A.        How was what going to hurt him?

25             Q.        Him going back to work for Mike.

163

1  A.      I was concerned that he had a good agreement

2  in place.  It's also I can see it being very

3  challenging going to work for someone who is suing

4  you.

5          Q.      What agreement did he have in place?

6  A.      I don't know.  That's why I was concerned.

7          Q.      You just said he had a good agreement

8  in place.

9  A.      No.  That he would have a good agreement in

10 place.

11         Q.      What agreement would he have in place?

12 A.      With Mike, whatever he's doing with Mike now.

13         Q.      How is it going to hurt him?

14 A.      I don't actually know.  That's a good

15 question.  I'm just concerned that it will.

16         Q.      Then he wrote to you: "I got hurt two

17 years ago when I had to look for a new job and back to

18 the office.  But as I said, it's time to go further

19 and I wish you the same."

20         So Glukharev is telling you he wants to go

21 back to work for the company, for ChannelReply, for

22 CSV, for NDAP and for Mike and to grow and make money,

23 and you're telling him not to; aren't you?

24 A.      No, that's not the case at all.

25         Q.      You then responded to his statement by

164

1    saying: "Why didn't you talk to me about this?  Why

2    did you go behind my back?"

3         What did you mean by saying go behind your

4    back?  He went to go to work --

5    A.    Again, I was upset that he didn't come talk to

6    me about the change he was making.

7         Q.    Why would he have to come talk to you?

8    You were a manager that was removed by the court for

9    malfeasance.

10   A.    I don't know what malfeasance means.

11        Q.    You were removed by the court for

12   taking actions that injured the company.

13   A.    I don't know if that's true.

14        Q.    Why were you removed as a manager and

15   locked out of your own company?

16   A.    I don't believe I was locked out of my own

17   company.

18        Q.    Why was access removed from you

19   completely and you removed as a manager?

20   A.    I don't believe access was removed completely

21   from me.

22        Q.    Why were you removed from any decision

23   making?

24   A.    I'm not removed from any decision making.

25        Q.    Why were you removed as a manager?

1    A.      You would have to ask the court that.

2            Q.      I'm asking you that.

3    A.      I don't have an answer to that.

4            Q.      You still don't know why you were

5    removed as a manager; do you?

6            Are you going to answer the question?

7    A.      I'm thinking of the answer.

8            Q.      Take your time.

9    A.      I will.  No, I don't know why.

10           Q.      You don't think you did anything

11   wrong.  You don't think you did anything wrong; do

12   you?

13   A.      I didn't do anything wrong.

14           Q.      You don't think you deserve to be

15   removed as a manager; do you?

16   A.      I don't believe I did anything wrong, and have

17   a good time proving it.

18           Q.      Glukharev then wrote to you on

19   November 11 at 11:06 a.m. and said: "It's not about

20   you, it's just about me.  You told me more than two

21   years ago that you'll understand if I go back to

22   ChannelReply.  Now this happened.  I don't wanna hurt

23   you or do something against you.  However, I don't

24   know what you could suggest me.  You know that I was

25   looking for an interesting project and ChannelReply

166

1   was interesting for me."

2        Glukharev wrote that to you; didn't he?

3   A.    Yes.

4        Q.    He's telling you he wants to go back

5   to work for ChannelReply and you're encouraging him

6   not to; aren't you?

7   A.    No.

8        Q.    You then responded to him: "I

9   understand that you're going back.  My issue is that

10  you didn't talk to me about it.  You went behind my

11  back and did it.  I now understand that you don't

12  believe that you owed me a conversation."

13       So how did he go behind your back by going and

14  taking a job working at a company that he worked for

15  previously?

16  A.    Because he's a defendant in this lawsuit.

17       Q.    Do you know why he's a defendant?  Is

18  he a defendant in this lawsuit because you named him

19  as a defendant or because Dardashtian named him a

20  defendant?

21  A.    Because Dardashtian named him a defendant.

22       Q.    Do you know why he's named as a

23  defendant?

24  A.    I do not.

25       Q.    Then why would it matter to you

1   whether he went behind your back to go back and work

2   for a company when he was named as a defendant when

3   you don't even know why he was named as a defendant?

4   A.      I don't understand your question.

5         Q.      What is the relevance of his being

6   named as a defendant to you?

7   A.      I don't understand the question.

8         Q.      What does it matter whether Glukharev

9   was named as a defendant in the lawsuit?

10  A.      I still don't understand the question.

11        Q.      You referenced earlier that Glukharev

12  was named as a defendant when I asked you why it

13  bothered you that he went behind your back to go back

14  and work for a company that he formally worked for.

15  Your response was he was named as a defendant.

16  A.      I'm sorry.  I'm not following you.  I don't

17  believe that's the conversation just now.

18        Q.      In any case, you then said: "I wish

19  you health and happiness."  He wrote: "I wish the same

20  for you and don't be mad at me, please."  Then you

21  wrote -- he wrote: "I wish you the same and don't be

22  mad at me, please."  Your response on November 11,

23  2019 at 11:17 was: "I'm beyond mad.  I'm beyond mad.

24  You lost a friend.  I can no longer protect you.  Good

25  luck."

168

1          Now, is that you encouraging him to go back

2     and work for the company that you're an owner of along

3     with Dardashtian?

4     A.     Again, I don't know what company he's working

5     for.

6          Q.     When you wished him good luck, what

7     company did you understand he was going back to work

8     for?

9     A.     I did not understand that he was going to work

10     back for any company.  I only understood he was going

11     to go work for Mike --

12          Q.     Why did you tell --

13     A.     Again, please let me speak, Barry.  If you

14     would like me to answer the questions, let me speak.

15          Q.     I'm listening to your answer.

16     A.     Ask the question again because I forgot it.

17               MR. GUAGLARDI:  Jo, can you read it?

18          (The testimony is read by the Reporter as

19     follows:

20          "QUESTION:  When you wished him good luck,

21     what company did you understand he was going back to

22     work for?

23          "ANSWER:  I did not understand that he was

24     going to work back for any company.  I only understood

25     he was going to go work for Mike --")

169

1      Q.      What company did you understand he was

2    going back to work for?

3    A.      I didn't understand that he was going back to

4    work for any company.  I understood he was going back

5    to work for Mike.

6      Q.      And why were you beyond mad, why did

7    you tell him that you lost a friend, and why did you

8    tell him that I can no longer protect you?

9    A.      I was hurt.

10      Q.      About what?

11    A.      That he didn't speak to me about making such a

12    big, large decision.

13      Q.      Do you think maybe he didn't trust you

14    because you tried to involve him in Channel Reply,

15    Inc. and caused him to become a defendant in a federal

16    lawsuit?

17    A.      No.

18      Q.      That never came to your mind as a

19    possible reason why Glukharev no longer trusted you?

20    A.      How do you know he no longer trusted me?

21      Q.      In the deposition process I ask the

22    questions and you give the answers.

23              MR. SINGER:  Lack of foundation, but

24    you can answer.  You can answer it.  I'm going to

25    object.

170

1  A.      What question am I answering?

2              MR. GUAGLARDI:  Jo?

3              (The pending question is read by the Reporter

4  as follows:

5              "QUESTION:  That never came to your mind as a

6  possible reason why Glukharev no longer trusted you?")

7              Q.      Do you understand the question?

8  A.      I answered it.

9              Q.      Did you come to realize that Glukharev

10  no longer trusted you?

11  A.      No.  I believe he still trusts me.

12              Q.      Do you understand that Glukharev felt

13  that he didn't need to get your approval to go back

14  and work with Mike?

15  A.      I don't think anyone knows how Glukharev felt.

16  You can ask him how he feels.

17              Q.      Does the fact that Glukharev went back

18  to work for Mike without talking to you about it and

19  getting your approval tell you that he didn't need

20  your approval?

21  A.      No.

22              MR. GUAGLARDI:  We're going to go

23  quick to Exhibit 51.

24              MR. SINGER:  All right.

25              Q.      Mr. Gitman, are you and your dog

171

1  ready?

2  A.      Yes.

3          Q.      Dalva Ventures on June 13, 2017 was

4  your company, your and your wife's.  Correct?

5  A.      Yes.

6          Q.      And there was a transfer of $5,060 to

7  Dalva Ventures on that day, wasn't there, from Bank of

8  America?

9  A.      I don't know.

10         Q.      Are you denying that you took money

11  from the Cooper Square Ventures bank account and

12  transferred it to your company?

13  A.      I don't remember transferring.

14         Q.      Can you go to --

15         So let me ask you, the court ordered you to

16  dissolve Channel Reply, Inc.  Right?

17  A.      Yes.

18         Q.      And you've indicated that you don't

19  know why the court ordered you to dissolve it.

20         Is that true?

21  A.      Yes.

22         Q.      So you don't -- you're not aware that

23  the court ordered you to dissolve Channel Reply, Inc.

24  because you should have never formed it because it was

25  a company that was utilizing the same name as

172

1   ChannelReply, which already existed under Cooper

2   Square Ventures, and that it was a directly competing

3   business?

4           You're not aware that that's the reason the

5   court ordered you to dissolve it?

6   A.      I don't believe that's the reason.

7           Q.      What do you believe the reason is

8   then?

9   A.      I don't know, but I know it's not what you

10  just said.

11          Q.      What did you do to dissolve the

12  company?

13  A.      I don't remember.

14                  MR. GUAGLARDI:  Can you go to

15  Exhibit 53.

16                  MR. SINGER:  Yes.

17          Q.      Mr. Gitman, on May 30 -- strike that.

18          On June 20, 2017, you signed a certificate of

19  dissolution of Channel Reply, Inc.; didn't you?

20  A.      I don't remember.

21          Q.      How about we look at it.

22  A.      Great.

23          Q.      Do you see your name under authorized

24  officer?

25  A.      Yes.

173

1          Q.      Do you see on page 2 that it was filed

2    on June 20, 2017?

3    A.      I don't know if this page -- I only see

4    page 1.

5                  MR. GUAGLARDI:  Can you go to page 2,

6    Counsel.

7                  MR. SINGER:  Yes.

8          Q.      Was the certificate of dissolution

9    filed by you on June 20, 2017?

10   A.      I don't believe it was filed by me.

11         Q.      Was it filed at your direction on

12   June 20, 2017?

13   A.      I believe so.

14         Q.      And you were doing that because the

15   court ordered you to dissolve Channel Reply, Inc.?

16   A.      I don't remember why I was doing it.

17         Q.      Did you dissolve Channel Reply, Inc.

18   for any reason other than the fact that the court

19   ordered you to do it?

20   A.      I don't know.

21         Q.      Did you voluntarily choose to dissolve

22   Channel Reply, Inc.?

23   A.      I don't know.

24                 MR. GUAGLARDI:  Can you go to

25   Exhibit 54, please, counsel.

174

1           MR. SINGER:  Yes.

2           Q.      Can you go to the second page.

3           So Mr. Gitman, this is Unanimous Written

4      Consent of the Stockholders of Channel Reply, Inc. in

5      Lieu of a Meeting, and this was signed on the next

6      page --

7           MR. GUAGLARDI:  Counsel.

8           Q.      -- by you on behalf of Dalva Ventures,

9      LLC and Mr. Bagaev on June 29, 2017 in order to

10     dissolve Channel Reply, Inc.; wasn't it?

11     A.      I don't know.

12          Q.      Why would Mr. Bagaev be needed to sign

13     a resolution, consent of the shareholders to dissolve

14     Channel Reply, Inc.?  Was he already a shareholder?

15     A.      I don't know.

16          Q.      Well, do you see in the second whereas

17     clause and in the first one it says: "Whereas, the

18     stockholders the corporation unanimously approve of

19     the complete liquidation and dissolution of the

20     corporation.  Whereas, the undersigned stockholders

21     deem it advisable and in the best interest of the

22     corporation that the corporation be completely

23     liquidated and dissolved."

24          And then Mr. Bagaev signed that document;

25     didn't he?

175

1  A.       Konstantyn has signed this document.

2            Q.       Why?

3  A.       I don't know.  Again, I don't understand this.

4            Q.       Did he sign the document because he

5  was a shareholder of Channel Reply, Inc.?

6  A.       I don't know.  I assume he had to sign it for

7  the dissolution to happen.

8            MR. SINGER:  Just note for the record

9  that the copy, the second page of Exhibit 54, I

10 believe, is a little out of whack and can still be

11 read, but we hope a better copy will be provided.

12           Q.       Mr. Gitman, was Mr. Bagaev on

13 June 27th a shareholder of Channel Reply, Inc. and is

14 that why he had to sign the authorization for the

15 certificate of dissolution to be filed?

16 A.       I don't know.  I would have to consult with an

17 attorney.

18           Q.       You signed it; didn't you?

19 A.       I did.

20           Q.       And you signed it on behalf of Dalva

21 Ventures; didn't you?

22 A.       Yes.

23           Q.       So was Dalva Ventures a shareholder of

24 Channel Reply, Inc.?

25 A.       I believe so.  I don't remember.

176

1          Q.      So you individually weren't.  Dalva

2    Ventures was.  Correct?

3    A.      Possibly.  Again, I don't remember.

4          Q.      Well, can you think of another reason

5    why Dalva Ventures would sign the Unanimous Written

6    Consent of Stockholders of Channel Reply, Inc. if it

7    wasn't a shareholder?

8    A.      I cannot.  But I am also --

9          Q.      No question is pending.

10   A.      I'm also not versed in --

11         Q.      No question is pending.

12   A.      I'm also not versed in formation, business

13   formations.

14              MR. GUAGLARDI:  Move to strike.  Move

15   to strike.

16         Q.      Was this document also sent to Aleksey

17   Glukharev, to your knowledge?

18   A.      I don't know.

19         Q.      So as of the dissolution date of

20   Channel Reply, Inc., who owned ChannelReply?

21   A.      I don't know.

22              MR. GUAGLARDI:  Let's go to

23   Exhibit 57, please, Counsel.

24              MR. SINGER:  Okay.

25              MR. OSTRER:  Brett, while you're

177

1   pulling that up, just so you know, this document, it

2   may have been the way I scanned it in just now, but it

3   was also contained in the supplemental production from

4   your firm, so I would take a look.  It came from your

5   office.  It could have been the form in which it was

6   produced.  If not, I will resend you a cleaner copy

7   after the deposition is concluded.

8              MR. SINGER:  But this is what you'll

9   be asking about at the moment?

10             MR. OSTRER:  No, no.  The prior

11   exhibit we were just addressing, the Unanimous Written

12   Consent of Stockholders.

13             MR. SINGER:  Oh, right, right.

14             MR. OSTRER:  You indicated previously

15   that it looked a little muddled by the way it was

16   scanned in.  I'm just telling you it could have been

17   the way it was produced by your firm.  If not, I will

18   resend you a cleaner copy when I can scan it in and

19   I'll resend it at a later time.

20             MR. SINGER:  That's fine.

21         Number 57 is right here.

22             MR. GUAGLARDI:  Thank you.

23         Q.    Mr. Gitman, you use Viber; don't you?

24   A.      I have.

25         Q.    And you have used Viber with

178

1   Konstantyn Bagaev; haven't you?

2   A.      I don't remember.

3          Q.      Well, you produced documents that

4   showed that, so let's go through them.  These are

5   Viber conversations between you and Mr. Bagaev from

6   July 10, 2017 to September 20, 2017.

7          On July 10 you wrote to Mr. Bagaev and asked

8   him if he got the release yet.  What release --

9   A.      I don't know.

10         Q.      -- were you referring to?

11  A.      I don't remember a conversation from three

12  years ago.

13         Q.      He wrote to you and said: "Dave, in

14  your e-mail you asked me to point on 10 percent

15  suggestion to Alice.  Here it is."

16         Alice Fritz is the reference that he's talking

17  about?

18  A.      I don't know.  You would have to ask him.

19         Q.      Do you know any other Alices --

20  A.      Yes.

21         Q.      -- that are involved in ChannelReply?

22  A.      I don't know any Alice involved in

23  ChannelReply.

24         Q.      Then he wrote to you on July 10 at

25  9:08 a.m. and said: "It is from Mike's initial

179

1   affidavit, Exhibit 68."

2          Were you talking to Mr. Bagaev about the

3   lawsuit?

4   A.       I'm sorry.  Somebody else is speaking, so I

5   couldn't hear you.

6          Q.       Were you talking to Mike about the

7   lawsuit?  Excuse me.

8          Were you talking to Mr. Bagaev about the

9   lawsuit with Mike?

10  A.       I'm not following you.

11         Q.       Did you have discussions with Bagaev

12  about the lawsuit that you have going on with Mike

13  that's the subject of this deposition?

14  A.       Yes, I have had many conversations.

15         Q.       With him about the lawsuit?

16  A.       Yes.

17         Q.       Why?

18  A.       Because he is a co-defendant.

19         Q.       What does that have to do with you

20  having discussions?  What did you discuss?

21  A.       I don't remember.

22         Q.       You remember having conversations, but

23  you don't remember any of them?

24  A.       I don't remember the context of them, no.  I

25  haven't spoken to Konstantyn in years.

180

1        Q.     So if you go down to your conversation

2  at 10:01 a.m. on July 10 it says: "It sounds like he's

3  not going to give you a release unless you sign over

4  all intellectual property to him.  He must've have

5  gotten a new lawyer to draft that."

6        What were you referring to?

7  A.     I don't remember.

8        Q.     And then Bagaev says: "I will not sign

9  this for release only.  I don't think I actually going

10  to sign anything at all.  Except for my share

11  agreement."

12        Did you have a discussion with Bagaev about

13  whether Konstantyn was going to get an ownership

14  interest in ChannelReply?

15  A.     I don't remember having those conversations.

16        Q.     Then you wrote at 10:04 a.m. on

17  July 10, 2017: "Make sure that you're fully vested and

18  can't be diluted with the shares.  Otherwise, he could

19  fire you the next day and he'll have the IP and you'll

20  have no work.  I'm happy to sign anything to ensure

21  that you have ownership and no tax liability."

22        Were you telling Bagaev not to sign on with

23  the company ChannelReply that Mike was managing?

24  A.     I don't know what I was saying.

25        Q.     And then he wrote to you at 10:12:

1   "Dave, you should negotiate this with Mike somehow or

2   he should negotiate this with you.  Someone should

3   make first step.  Both should.  Both should be ready

4   to give up in some requirements.  You need long

5   negotiations without rage.  Not a single ultimatum

6   e-mail."

7          What did you think about that, that Bagaev

8   wrote to you?

9   A.       What did I think about it?  I don't remember

10  what I thought about it.

11         Q.       Did he think that you were enraged?

12  A.       I don't know what he thought.  Again, you'll

13  have to ask him his thoughts.

14         Q.       When you speak to him, do you get

15  angry?

16  A.       I haven't spoken to him in years, as I just

17  stated.

18         Q.       David Gitman, you wrote at 10:13 on

19  July 10, 2017, you said: "I can't negotiate for you."

20  And Bagaev said: "I mean only you and Mike."  And then

21  David Gitman, you wrote: David, we spoke with Barry.

22  They aren't willing to mediate he said.  We think next

23  best step is to go forward with the counterclaims.

24  Please let us know if you would like to discuss

25  further.  We will prepare the counterclaims for your

182

1   review early next week.  Best regards, Lindsay."

2       So you cut and pasted an e-mail from Lindsay

3   and sent it to Bagaev showing that Mike was unwilling

4   to mediate.  Is that what that was?

5   A.      I don't know what that was.

6       Q.      Isn't that what it says?

7   A.      I don't know what the intent was.

8       Q.      He said to you you should negotiate

9   with Mike and you sent it back saying that they are

10  not willing to mediate; that Barry, that's me, that

11  Lindsay spoke to me and we're not willing to mediate.

12  So you sent that to Bagaev.

13      Didn't you send that to say Mike is not

14  willing to negotiate to make Mike look bad?

15  A.      I don't understand anything you're saying.  I

16  can't follow you, Barry.

17      Q.      Didn't Mike make an offer to redeem

18  your shares and didn't we sit all day in your

19  counsel's office and write up an agreement?

20  A.      I don't know what you're talking about, sorry.

21  You've got to be clearer.

22      Q.      Didn't Mike Dardashtian make an offer

23  in writing to you to redeem your shares in the company

24  and buy out your interest at your lawyer's office at

25  Dentons where we drafted the agreement that ultimately

183

1   you refused to sign?

2   A.      No.   I don't of such an event.   I don't know

3   if such -- I don't know if that happened.

4           Q.      You didn't sit in the court before

5   Judge Lehrburger with a written agreement and then

6   refuse to sign it?

7   A.      I don't remember that.

8           Q.      You don't remember?  You're under

9   oath.

10          You don't remember receiving Mike's offer to

11  redeem your shares that was written out in detail in a

12  buyout agreement that was presented to you and your

13  lawyers where we spent five hours in Judge

14  Lehrburger's chambers at the courthouse and ultimately

15  you refused to sign it?  You don't recall that?

16  A.      No, I don't.

17                  MR. GUAGLARDI:  Can you go to the next

18  page, Counsel.

19                  MR. SINGER:  Yes.

20          Q.      Mr. Gitman, on the top of the next

21  page it says, Bagaev said: "What was said?"  You said:

22  "We asked for mediation or arbitration.   They have no

23  interest in that.  Barry can't take mediation or

24  arbitration because he is working on a contingency

25  basis."

184

1        Where did you learn that I was working on a

2 contingency basis?

3 A.     I don't know.

4        Q.     Well, why would you write that?

5 A.     I don't remember why I wrote something from

6 July 10, 2017.

7        Q.     Well, where did you learn what my fee

8 arrangement was with Michael Dardashtian?

9 A.     I don't know where I learned it.

10        Q.     And why would you seek to share

11 whatever you think it is with Konstantyn Bagaev?

12 A.     I don't know.

13        Q.     And what was your fee arrangement with

14 Dentons?

15 A.     They were billing me on an hourly basis for

16 their work.

17        Q.     And they sued you.  Correct?

18 A.     No.

19        Q.     Do they have a judgment against you?

20 A.     No.

21        Q.     How much money do you currently owe

22 them?

23 A.     $800,000.

24        Q.     And have you agreed with that amount?

25 A.     I don't understand the question.

1          Q.        Have you disputed that amount or have

2    you agreed that that amount is valid, the amount they

3    say that you owe them?

4    A.        As far as I know it's valid.

5          Q.        And that's billed on an hourly basis?

6    A.        Yes.

7          Q.        What were the hourly rates they

8    charged you?

9    A.        All over the place and they changed from

10   month-to-month.

11         Q.        Well, what was Brian Cousin's hourly

12   rate?

13   A.        A couple of grand an hour.

14         Q.        And what was Mark Meredith's hourly

15   rate?

16   A.        In the hundreds.

17         Q.        Where in the hundreds?

18   A.        I don't remember.

19         Q.        What was Lindsay Ditlow's hourly rate?

20   A.        Somewhere between the two.

21         Q.        Between the hundreds and a couple of

22   thousand?

23   A.        Yeah.

24         Q.        And you owe them approximately

25   $800,000?

186

1  A.        Yeah.   Maybe a little bit more.

2            Q.        Have you paid them any money?

3  A.        Yes.

4            Q.        How much?

5  A.        I don't remember exactly.

6            Q.        Has all of that money come from the

7  court-ordered distributions that you paid them?

8  A.        No, no.

9            Q.        Have you paid them any money

10 independent of the court-ordered distributions?

11 A.        Yes.

12           Q.        How much?

13 A.        I don't know.

14           Q.        Can you approximate?

15 A.        Hundreds of thousands.

16           Q.        More than a hundred thousand?

17 A.        I -- yes.

18           Q.        More than 200,000?

19 A.        Probably, yeah.

20           Q.        More than 300,000?

21 A.        Probably.

22           Q.        More than 500,000?

23 A.        I don't think so.

24           Q.        So their total bill to you so far has

25 been more than a million dollars?

187

1    A.      Possibly.

2            Q.      Do they have any liens against you?

3    A.      No.

4            Q.      What's your fee arrangement with your

5    current firm, Mr. Sim's firm?

6                    MR. SINGER:  I'm going to object to

7    that on the grounds of privilege.

8                    MR. GUAGLARDI:  There is no attorney/

9    client privilege in a fee arrangement.  That's not

10   invading any communications between you and your

11   client relating to the substance of this case.  It's

12   dealing with what the fee arrangement is.

13                   MR. SINGER:  I put my objection on the

14   record.  I don't know if this can go down for a

15   ruling.  I mean, what is the relevance of this,

16   Counsel?

17                   MR. GUAGLARDI:  Trying to

18   understand -- Mr. Gitman brought it up when he said

19   that our fee arrangement was a contingency.  So I

20   asked him how he learned it, if that was the case.

21   I'm not saying it is or it isn't, and I want to know

22   what your fee arrangement is.

23                   MR. SINGER:  I mean, if it's a

24   question about prior representation from another firm,

25   I'll allow it.  But this, this, I don't know, Counsel.

188

1   Is there any way that you can wait to ask this

2   question?

3               MR. GUAGLARDI:  Why don't you do this,

4   why don't you just let him answer it and then you can

5   make the objection.

6   A.      Yeah, sure.  I hired a firm that specializes

7   in criminal proceedings and I said find every dollar

8   you can and make sure you put Mike Dardashtian in

9   prison.  I don't care what it costs.

10              Q.      So that's your response to the nature

11  of your fee arrangement with Mr. Sim's firm?

12  A.      Yeah.  They get every penny recovered as long

13  as. . .

14              Q.      As long as what?

15  A.      I'll walk away with zero.

16              Q.      As long as what?

17  A.      As long as Mike Dardashtian is in prison or at

18  least arraigned, and the ADA is ready to go.

19              Q.      So continuing on Exhibit 57 on the

20  second page.

21  A.      I don't plan to walk away with a penny.

22              MR. GUAGLARDI:  There is no question

23  pending.

24              THE WITNESS:  That's fine.  Thank you,

25  Barry.  I need a bathroom break since there is no

1    question pending.

2                    MR. GUAGLARDI:  That's fine.

3                    MR. SINGER:  It's okay.  We're here,

4    Dave.

5         (At this point, a recess is taken from 3:56

6    p.m.)

7                    MR. SINGER:  Counsel, my office is

8    curious to know if you're going to be producing your

9    client on Thursday?

10                    MR. GUAGLARDI:  Yeah, I believe so.

11   As long as we get done today, yeah.

12                    MR. SINGER:  I'll let my office know.

13        (The recess ends at 4:01 p.m.)

14   BY MR. GUAGLARDI:

15        Q.    Mr. Gitman, I'm looking at your

16   July 10, 2017 conversations with Mr. Bagaev and I'm

17   looking at page 2 of Exhibit 57, and it says: "We

18   asked for mediation or arbitration.  They have no

19   interest in that.  Barry can't take mediation or

20   arbitration because he is working on a contingency

21   basis.  Unless Mike would pay his fees and Mike has no

22   interest in that."  Then Bagaev asked you: "Do you

23   have written decline on this suggestion?"  Then you

24   asked: "From Barry?"  And he said: "Basically this can

25   be used in court.  Like they have no goodwill."  You

190

1    wrote: "We have it in multiple e-mails."  Bagaev

2    wrote: "Do they explain the reason?"  You gave a

3    quote: "My client has no interest in mediation," end

4    quote.  He wrote: "Okay, I see.  Thanks.  Actually,

5    this is clear.  Current situation suits Mike.  He has

6    all he needs."  Then you wrote: "I think this will

7    change when Barry realizes how little money there is

8    to be made.  I mean, I hope this will change.  I'm

9    done being defensive.  Now it's time to play offense."

10   He wrote to you: "Dave, I can give several suggestions

11   right now to you, but they are all useless while you

12   are with Dentons."  You wrote: "I am meeting with

13   other lawyers."

14          I read that correctly.  Right?

15   A.     Yeah.

16                MR. SINGER:  Yes.

17          Q.     So didn't we have multiple settlement

18   discussions with you that lasted over months and

19   months between counsel and appearing and involving

20   Judge Lehrburger on multiple occasions?

21   A.     Not before July 10th.

22          Q.     Did we have multiple settlement

23   meetings at some point in time, either before or after

24   July 10, 2017?

25   A.     No, not before.

191

1          Q.        Did we have multiple settlement
2    discussions after?
3    A.        Yes.
4          Q.        Did we attempt to try and meet with
5    you and Farooq and the corporate attorney and the
6    corporate accountant of CSV before we even filed a
7    lawsuit?
8    A.        Yes.
9          Q.        And didn't you refuse to do that
10   unless there was an accounting paid for by the
11   company?
12   A.        No.
13         Q.        Didn't we offer to do an accounting,
14   and then if the accounting didn't produce the results
15   that you thought it did, that you would have to pay
16   for it and didn't you refuse that offer?
17   A.        Can you repeat the question?
18         Q.        Didn't you refuse the offer of having
19   an accounting done, but if the result of the
20   accounting was that there was nothing out of the
21   ordinary, that you had to pay for it?
22   A.        No.
23         Q.        That offer was never made to you in
24   writing multiple times?
25   A.        That's correct.

192

1        Q.      And weren't you presented with a
2   written buyout agreement that was negotiated between
3   our firm and Dentons that you refused to sign?
4   A.      Yes.
5        Q.      And wasn't that the reason that
6   Dentons quit on you?
7   A.      No.
8        Q.      Why did Dentons quit on you?
9   A.      Brian moved to a new firm.
10       Q.      Say that again.
11  A.      Brian moved to a new firm.  My attorney moved
12  to a new firm and the new firm did not want the case.
13       Q.      Continuing on page 2 of Exhibit 57 --
14       And before we do that, you made a reference
15  earlier to your wanting Mike Dardashtian in prison and
16  you made a reference to an ADA.
17  A.      Yes.
18       Q.      What ADA did you speak to to try and
19  put Mike Dardashtian --
20  A.      Multiple.  I have spoken to multiple ADAs in
21  the last four years.
22       Q.      Who did you speak to?
23  A.      And most recently the financial crimes
24  manager.
25       Q.      And who did you speak to?

1   A.      I have all of their names.  I don't have them

2   in front of me.

3          Q.      Were these meetings that you had with

4   these multiple assistant district attorneys meetings

5   during the course of this lawsuit after the lawsuit

6   had been filed?

7   A.      Before and after.

8          Q.      I would like the names of all of the

9   ADAs that you spoke to.

10         MR. GUAGLARDI:  Counsel, I'm going to

11  ask you to produce those names in discovery.

12         MR. SINGER:  I'll take it under

13  advisement.  Please follow up in writing.

14         MR. GUAGLARDI:  The transcript is the

15  writing and we're making the request that all of the

16  names of the ADAs that Mr. Gitman has spoken to be

17  produced.

18         MR. SINGER:  We'll take it under

19  advisement.

20         MR. GUAGLARDI:  Thank you.

21         Q.      Mr. Gitman, referring you now back to

22  page 2 of Exhibit 57 at 10:27 a.m. on July 10, 2017,

23  Bagaev wrote to you: "First and main is you should

24  clearly know if you are able to compete.  Clearly this

25  is important."  You wrote to Bagaev: "Why is this

194

1   important," question mark.  Bagaev wrote: "Because all

2   our issues are because it wasn't clear."  You wrote to

3   Bagaev: "What do you mean by, in quotes, our issues,

4   end quote," question mark.  Bagaev wrote: "I mean this

5   suit and that we couldn't immediately win it."  You

6   wrote to him: "There is no suit yet."  He wrote to

7   you: "Like it is not clear that you didn't break the

8   law."  You wrote: "It's only been an order of

9   protection.  I didn't break any laws."  Bagaev wrote

10  to you: "I don't care what it is.  If you don't break

11  the law, then why can't you control the company?"

12          I read that clearly.  Right?  And I read that

13  correctly?

14  A.      Yes, you read it well.  Very good.

15          Q.      Now, why are you discussing the

16  ability to compete with Bagaev with ChannelReply?

17  A.      I don't remember.

18          Q.      And you were an owner of CSV and NDAP

19  on July 10, 2017; weren't you?

20  A.      I'm still an owner.

21          Q.      My question was were you an owner on

22  July 10, 2017 of CSV and NDAP and of ChannelReply?

23  A.      I was an owner of NDAP and Cooper Square

24  Ventures on July 10.

25          Q.      Of 2017?

195

1   A.      Yes.

2           Q.      Were you not an owner of ChannelReply

3   on July 10, 2017?

4   A.      I don't know.

5           Q.      And didn't you have a fiduciary duty

6   to Michael Dardashtian on July 10, 2017?

7   A.      Yes, absolutely.

8           Q.      And by having a discussion with Bagaev

9   about competing with ChannelReply with its own

10  intellectual property and software in another company

11  that didn't involve Michael Dardashtian, weren't you

12  breaching your fiduciary duty to Michael Dardashtian?

13  A.      No, not at all.

14          Q.      How were you not?

15  A.      My agreement allows me to compete.

16          Q.      And didn't you acknowledge that your

17  agreement doesn't allow you to compete with the

18  intellectual property owned by the company against the

19  company?

20  A.      It does not allow me to take intellectual

21  property, that's correct.

22          Q.      So how were you going to compete with

23  ChannelReply's intellectual property without taking

24  ChannelReply's intellectual property?

25  A.      It's because ChannelReply doesn't have IP.

196

1          MR. GUAGLARDI:  Could you repeat that,

2     Jo.

3     A.     ChannelReply does not have intellectual

4     property.

5          MR. GUAGLARDI:  I asked the Court

6     Reporter.

7          (The last answer is read by the Reporter.)

8          Q.     So all of the software and codes and

9     the ChannelReply platform that's existed for years

10    that's been the income from which has been reported by

11    Cooper Square Ventures doesn't have any intellectual

12    property.  Is that your answer under oath?

13    A.     You asked multiple questions there.  Which one

14    would you like me to answer?

15         Q.     The question that deals with does

16    ChannelReply have intellectual property?

17    A.     As far as I know, it does not.

18         Q.     So what do you call the software and

19    the codes?  Is that not intellectual property?

20    A.     It would be if it was proprietary.  Everything

21    built there is common knowledge.

22         Q.     So because it's common knowledge, it's

23    not proprietary to ChannelReply.  Is that your belief?

24    A.     Yes.

25         Q.     And it's common knowledge to who?

197

1  A.      To anyone.

2        Q.      And how is it common knowledge to

3  anyone?

4  A.      These methods are widely published and

5  available for public consumption.

6        Q.      Is ChannelReply currently using those

7  methods in order to earn money?

8  A.      I don't know.

9        Q.      Was it on July 10, 2017?

10  A.      It was used in public methods, yes.

11        Q.      And would you agree that the more

12  people that competed with ChannelReply using

13  ChannelReply's methods, that that would be damaging to

14  ChannelReply?

15  A.      No.  It actually might lift the product.

16        Q.      It might lift the product, but hurt

17  the financial ability for Cooper Square Ventures to

18  make money?

19  A.      No.  It might actually help Cooper Square

20  Ventures make money.

21        Q.      So you --

22  A.      A rising tide raises all boats.

23        Q.      So your belief is that by forming a

24  competitive company, Channel Reply, Inc., and taking

25  ChannelReply's methods and using them as a competitor

198

1   of Cooper Square Ventures, that that was going to

2   benefit Cooper Square Ventures.  Is that your belief?

3   A.      No.

4           Q.      Well, was it going to benefit or hurt

5   Cooper Square Ventures?

6   A.      I don't know.

7           Q.      Well, what was your intention, to

8   benefit Cooper Square Ventures or hurt it when you

9   formed Channel Reply, Inc. to do the same type of

10  business?

11  A.      I had no intentions either way.

12          Q.      You had no intention of what?

13  A.      Helping or hurting Cooper Square Ventures.

14          Q.      Was your belief that forming Channel

15  Reply, Inc., that that was going to hurt or help

16  Cooper Square Ventures when you formed a business to

17  do exactly the same thing that they were doing with

18  ChannelReply?

19  A.      No.  It would neither help or hurt Cooper

20  Square Ventures.

21          Q.      So forming a business that does the

22  same thing as Cooper Square Ventures, using

23  ChannelReply's methods and operations, you believe

24  would not have hurt ChannelReply?

25  A.      I don't understand the question.

199

1          Q.      If you go back to the second page of
2     Exhibit 57 where you said, "It's only been an order of
3     protection" in response to Bagaev saying, "Like it is
4     not clear that you didn't break the law," and you
5     said, "It's only been an order of protection," what
6     did you mean?
7     A.      I don't know.
8          Q.      Were you minimizing the court's
9     July 8, 2017 order that restrained you by saying it's
10    only an order of protection?
11    A.      No.
12         Q.      Well, weren't you referring to the
13    federal court's order when you said it's only an order
14    of protection?
15    A.      I don't understand the question.
16         Q.      What order were you referring to,
17    Mr. Gitman, when you said, "It's only been an order of
18    protection"?
19    A.      I assume the order of protection you showed us
20    earlier.
21         Q.      So what did you mean when you said,
22    "It's only been an order of protection"?
23    A.      I didn't mean anything.
24         Q.      Well, when you wrote it to him you
25    said "it's only."  You were saying it's only an order

200

1   of protection.  What did that mean?

2   A.      I didn't mean anything.

3           Q.      And then you wrote: "I didn't break

4   any laws."  That's your belief, right, you didn't

5   break any laws?

6   A.      That's my and my attorneys' beliefs.

7           Q.      Is that why you were removed as

8   manager?

9   A.      I don't understand the question.

10          Q.      Why were you removed as manager if you

11  didn't break any laws?

12  A.      I don't know.

13          Q.      Then he wrote to you: "I don't care

14  what it is.  If you don't break the law, then why

15  can't you control the company?"

16          Did you answer him on that?

17  A.      I don't know.

18          Q.      Okay.  Let's go to the next page.

19          He wrote: "Basically, as I say, all senseless

20  with these lawyers."  And you wrote: "Because the

21  judge asked for everything to be reset to June 26th

22  before he will allow even a preliminary trail to

23  start."  He wrote: "All discussions are useless."  You

24  wrote: "The judge doesn't want a trial with a moving

25  target.  It makes sense to me."

201

1          Why are you having these discussions about the
2     lawsuit involving a company that you owned with an
3     independent contractor for the company?
4     A.     I had discussions about the lawsuit with all
5     the defendants.
6          Q.     Then you wrote at 10:32 a.m.: "I'm
7     also very happy not to have control right now.  I can
8     focus on building other things."  And he said: "I
9     see."  You wrote that.  Correct?
10    A.     Yes.
11         Q.     What other things were you building on
12    July 10, 2017?
13    A.     I don't remember.
14         Q.     Have you built other things since
15    July 10, 2017?
16    A.     Countless.
17         Q.     And are you operating them?
18    A.     Yes.
19         Q.     And are you making money?
20    A.     Some, somewhat.
21         Q.     What other things --
22         Can you identify all businesses that you have
23    started since July 10, 2017, please, for the record?
24    A.     Not at the moment.
25              MR. GUAGLARDI:  Counsel, I'm going to

202

1   ask for a list of every business that Mr. Gitman has

2   formed or is an owner of, a member of, a partner of, a

3   shareholder of, an officer of, a director of, a

4   shareholder of or has any affiliated interest as a

5   manager or an independent contractor.  We'd like to

6   understand what he's done since July 10, 2017 so that

7   we can understand whether any of it competes with any

8   of the plaintiff companies.

9               MR. SINGER:  The demand might be

10  overbroad, but we'll take all requests under

11  advisement.

12         Q.      Mr. Gitman, are you currently involved

13  in any competing companies with any of the plaintiff

14  companies?

15  A.      No.

16         Q.      Have you formed any businesses that

17  compete with any of the plaintiff companies?

18  A.      No.

19         Q.      Have you developed any technology of

20  any kind that competes in any way with any of the

21  plaintiff companies since --

22  A.      No.

23         Q.      -- the beginning of this lawsuit?

24  A.      No.

25         Q.      If you go to July 10, 2017 at 10:36

1    a.m., you wrote, and it's page 3 of Exhibit 57, you

2    wrote: "I have no interest in working with Mike."

3              You wrote that.  Right?

4    A.       Yes.

5              Q.       Why did you write that?

6    A.       Because he stole money from the company.

7              Q.       What money did he steal from the

8    company?

9    A.       I don't have that in front of me.

10             Q.       How much money did he steal from the

11   company?

12   A.       Hundreds of thousands of dollars.

13             Q.       Have you produced any of that to us in

14   the course of the discovery of this case?

15   A.       Yes.

16             Q.       And can you identify what documents

17   support your claim that Michael Dardashtian has taken

18   any money that he's not entitled to?

19   A.       Yes.

20             Q.       What documents are they?

21   A.       Bank statements, account, you know,

22   accountings, attorney work product, so we have

23   internal accountings done through the attorneys.

24             Q.       When did he take any money that he's

25   not entitled to?

204

1    A.      I don't have the dates in front of me.

2            Q.      What purpose was it for?

3    A.      I don't know.

4            Q.      What amounts did he take?

5    A.      I don't have that in front of me.

6            Q.      Who were the checks made payable to?

7    A.      I don't have that in front of me.

8            Q.      Do you know what the purposes were for

9    the money that they were used for?

10   A.      I don't have that in front of me.

11           Q.      Have you produced any of these

12   accountings to us?

13   A.      I don't know if the attorneys have produced

14   any of this information.

15           Q.      Have you identified any damage amounts

16   that say that Michael Dardashtian is responsible for

17   misappropriating any specific sum of dollars by

18   identifying it to us in discovery?

19   A.      I don't know what the attorneys have produced.

20           Q.      Then you tell him at 10:37 a.m.: "You

21   know I was removed as a managing member weeks ago.  I

22   called you right after court."  He said: "Yes, I know

23   this.  But telling in front of judge that he takes

24   responsibility is a bit different way."  You wrote to

25   him and said: "I'm sorry if I didn't give the details

1    of the conversation.  It was a crazy day and the days

2    after were tough.  I didn't mean to hide.  It is very

3    emotional and another emotion takes over from another

4    event and I forget to explain something.  I hope you

5    can understand that I try to give you all details, but

6    some are missed."  Bagaev wrote to you: "Important

7    ones."  Gitman said "Yes."  You then said: "I'm sure

8    there are other important ones, as well."

9              MR. GUAGLARDI:  Can you go to the next

10   page, please, Counsel.

11             MR. SINGER:  Yes.

12        Q.    Then you wrote to Bagaev and said:

13   "You can be in the courtroom."

14        You were giving Bagaev permission to be in the

15   courtroom?

16   A.    No.

17        Q.    Well, why would you tell him he could

18   be in the courtroom?

19   A.    He's legally allowed to be in the courtroom.

20   I was just informing him.

21        Q.    Bagaev wrote to you then on July 10 at

22   10:41 a.m. and said: "Dave, my main concern is that

23   there were no strategy.  Nothing being explained, but

24   for some reason I should leave job and see how," and

25   then in capitals "my" and then lower case "project is

206

1   being destroyed."

2         So you told Bagaev to leave his job?

3   A.    No.

4         Q.    Well, that's what he just said you

5   told him.

6   A.    That's not what he said.

7         Q.    He said, "But for some reason I should

8   leave job."

9   A.    I don't know why he's saying that.  You'll

10  have to ask him.

11        Q.    Why would you tell Bagaev to leave the

12  job in a company that you're a part owner of?  To hurt

13  the company?

14  A.    I never told him to leave the job.

15        Q.    He just said to you that you said to

16  him to leave the job?

17  A.    No, he didn't say that.

18        Q.    Did you tell him to leave the job?

19  A.    No.

20        Q.    Did you help him write the resignation

21  letter?

22  A.    No.

23        Q.    Did you write the resignation letter?

24  A.    No.

25        Q.    Do you know who wrote the resignation

207

1    letter?

2    A.      I believe he wrote his own resignation letter.

3            Q.      When you read the resignation letter

4    and then you looked at how Bagaev writes, do you think

5    that Bagaev wrote that resignation letter?

6            You realize you're under the penalties of

7    perjury.  I'm reminding you now for the fourth time

8    probably.

9            Do you know who wrote the resignation letter?

10   A.      I don't.

11           Q.      Did you have any involvement in

12   writing his resignation letter?

13   A.      No.

14           Q.      Do you know who did?

15   A.      No.  But you make a good point, that it's --

16   he doesn't write that well from the letter you showed

17   me earlier.

18           Q.      Then you wrote --

19   A.      I hadn't realized that before.

20           Q.      Then you wrote to him at 10:42 on

21   July 10, 2017, you said: "I'm looking for new lawyers.

22   Mike has been e-mailing with Volo as of last week."

23           Who is Volo?

24   A.      I don't remember.

25           Q.      How do you know Mike has been

208

1    e-mailing?  Do you have access to Mike's e-mails?

2    A.      I don't currently have access to Mike's

3    e-mail.

4            Q.      Did you ever have access to Mike's

5    e-mails?

6    A.      Yes.

7            Q.      When?

8    A.      When I was a managing member of Cooper Square

9    Ventures.

10           Q.      And how could you have access to his

11   private e-mails?

12   A.      They're not private.  They're company e-mails.

13           Q.      So if he sent an e-mail on his

14   ChannelReply or CSV or NDAP e-mail to someone, you

15   could go in and read his e-mails?

16   A.      That's correct.

17           Q.      Did you have a password to be able to

18   go into his private account and do that?

19   A.      No.

20           Q.      How'd you do it?

21   A.      I have access to it.

22           Q.      How?

23   A.      That's just how it works.

24           Q.      How?

25   A.      You'll have to ask Google that question.

209

1          Q.      How did you have access to Mike

2     Dardashtian's ChannelReply e-mail, NDAP e-mail or CSV

3     e-mail?

4     A.      I just explained it to you.

5          Q.      No, you didn't.  I'm asking you how

6     did you have access to it?

7     A.      As administrator of the G Suite, I have access

8     to everybody's e-mail.

9          Q.      Who was the administrator of the

10    G Suite?

11    A.      Myself and I believe Mike was, as well.  Maybe

12    other people; I don't know.

13         Q.      When did that access get terminated

14    for you?

15    A.      I don't know.  I don't know.

16         Q.      Have you looked at any of Mike's

17    private e-mails since this lawsuit started?

18    A.      No.

19         Q.      If you go down on that same page at

20    10:47 you wrote to Bagaev: "Mike's going to make money

21    for both sides."  What did you mean by that?

22    A.      No idea.

23         Q.      Well, why don't you look at it.

24    A.      I'm looking at it.

25         Q.      What did you mean when you wrote it?

1  A.      I have no idea.

2          Q.      Well, look above.  It says, Bagaev

3  wrote to you: "You can read in Slack general chat."

4  You wrote: "Where is the agreement with Volo?  Crazy."

5  Bagaev wrote: "Are you asking me?"  Gitman, you said:

6  "I'm asking a rhetorical question."  He wrote a smiley

7  face.  You wrote: "Mike's going to make money for both

8  sides.  I also believe that that Desk.com is kicking

9  back Michael money, but we won't be able to prove that

10  until the discovery phase of the trial."

11          What do you mean?

12  A.      I don't know.  I don't remember.

13          Q.      You don't know what you mean what I

14  just read to you?

15  A.      I don't know what I meant in 2017.

16          Q.      What does it mean to you today?

17  A.      It doesn't mean anything to me today.

18          Q.      Bagaev wrote to you, he said what you

19  said is senseless.  "In this case Mike would recommend

20  Desk for customers," meaning ChannelReply customers.

21  He wrote: "We have very few of Desk customers."  Then

22  you wrote: "It doesn't mean it's not in place.  The

23  truth will come out."

24          What were you talking about?

25  A.      I don't remember.

211

1              MR. GUAGLARDI:  Can you go to the next
2    page, Counsel.
3              MR. SINGER:  Yes.
4              MR. GUAGLARDI:  Thank you.
5        Q.      At the top of the page at 10:59 on
6    July 10, 2017 you wrote: "My strategy is to put an end
7    to this as quickly as possible.  Otherwise, I'm told
8    this will take years.  The current strategy is to file
9    counterclaim so Mike comes to the table."  Bagaev
10   wrote: "It is not a strategy.  It is just next step."
11   You wrote: "What would a strategy be?"  Bagaev wrote:
12   "What counterclaim can achieve, what it can't, how
13   Mike can react, how he can't.  What should be next
14   step in both good and bad cases?  What are
15   probabilities of each?  What should be your next step
16   after counterclaim?  Can Mike pull time after
17   counterclaim?  How much does all that cost for both
18   you and Mike?"  You wrote "OTP."  What does OTP mean?
19   A.      On the phone.
20       Q.      On the phone.  And then he wrote to
21   you: "A lot of questions which you should have reply
22   before doing any step."
23              So if your goal was to put an end to this as
24   quickly as possible and Mike offered to redeem your
25   shares and buy you out and presented it to you in

212

```
1    writing in an agreement back a long time ago before
2    the judge and you refused to sign the agreement, how
3    was that going to comport with your strategy of ending
4    this as quickly as possible?
5    A.      I don't understand your question.
6            Q.      How much did Mike offer to redeem your
7    shares for and buy you out when we were in court?
8    A.      I could not tell you.
9            Q.      Didn't you sit there with the court
10   and your counsel, all three of them, and review the
11   agreement that we prepared?
12   A.      I don't remember.
13           Q.      Didn't we bring a laptop into the
14   courtroom in order to be able to make changes to the
15   agreement so we could print it out and get it signed
16   while we were in court?
17   A.      No.
18           Q.      Didn't you tell your lawyers and the
19   judge that you weren't in the mindset to sign the
20   agreement and you didn't want to sign it and dragged
21   it out more?
22   A.      No.
23           Q.      So all of that never happened?
24   A.      I don't remember that happening.
25           Q.      So if you look at 11:16 on the same
```

213

1  page, July 10, 2017 at 11:16, Bagaev said to you:

2  Actually, strategy assumes goals."  And you wrote:

3  "This is a slow, long process."  He said to you: "I

4  don't see clear goals."  You wrote to him: "My goal is

5  to settle and move on."

6          Was that really your goal or were you just

7  lying to him?

8  A.     I don't remember my goal at the time, but. . .

9          Q.     What's your goal today, other than to

10 put Mr. Dardashtian in jail?

11 A.     That's my only goal.  Class D felony.  He

12 wouldn't even be able to vote again.

13              MR. GUAGLARDI:  There is absolutely no

14 question pending.  Move to strike.

15         Q.     Did you ever give Bagaev your

16 counterclaim to review before you filed it?

17 A.     Probably.

18         Q.     On the bottom at 11:56 a.m., July 17,

19 2017, you wrote -- Bagaev wrote: "Hi.  I read the

20 documents.  Finally something that seems like a job of

21 law company."  You said: "Yes, it's nice to be on the

22 offense instead of only dealing with compliance."

23              MR. SINGER:  Where is this, Counsel?

24              MR. GUAGLARDI:  11:55 a.m., July 17,

25 2017.

214

1          Q.      I read that correctly.  Right,

2     Mr. Gitman?

3     A.       Sure.

4          Q.      And he wrote: "Could be great if filed

5     in three to five days after Mike's affidavit."  You

6     said: "It couldn't be."  And then he wrote: "But I

7     can't get how can it end everything."  You said: "It

8     would end Mike's case.  Then it would only be my case

9     against him."  Bagaev wrote: "He will open a new one."

10    You said: "I was told he can't open the same case."

11    Bagaev said: "Probably he can do that in another court

12    if federal one is not a correct one."  You wrote:

13    "I'll have to ask more about it."  He wrote: "Well,

14    Denton should know better than me.  At least the money

15    he spent on lawyers are burned."  You wrote:  "Yes,

16    they claim over $100,000."

17          So why are you having these discussions with

18    Mr. Bagaev?

19    A.       He's a co-defendant.

20          Q.      Is he on your team?

21    A.       I don't understand the question.

22          Q.      Was he on your team?

23    A.       What team?

24          Q.      Was he loyal to you and not to Mike?

25    A.       I don't believe -- I don't understand that

215

1    question.

2        Q.    Were you and Mr. Bagaev attempting to

3    strategize together on how to hurt Mike and the

4    company?

5    A.    No.

6        Q.    So when you wrote, "It would end

7    Mike's case," what were you referring to, your

8    counterclaim?

9    A.    I don't remember.  It was probably some

10   motions that were filed, if I had to guess.  But my

11   counterclaims weren't filed until December, I believe,

12   of that year, so it must have been some sort of

13   motion.

14               MR. GUAGLARDI:  Can you go to the next

15   page, Counsel.

16               MR. SINGER:  Yes.

17               MR. GUAGLARDI:  Can you go to the next

18   page.  Thank you.

19        Q.    Mr. Gitman, on August 2nd, 2017 at

20   4:48 p.m. you wrote to Bagaev and said you were in

21   Boston for a few days.  And he said: "Meeting

22   clients," question mark.  And you wrote: "Trying to

23   raise money."

24               What were you trying to raise money for on

25   August 3rd, 2017?

216

1    A.      I don't remember.

2            Q.      And then on August 3rd at 6:25 a.m.

3    you wrote to Bagaev: "Now that the deal is closed, I

4    can take some sting action."

5            I read that correctly.  Right?

6    A.      I don't know.  I'm looking for it.

7            Q.      Can you read it?  It's 6:25 a.m.,

8    August 3rd, 2017.

9    A.      Yeah.  I think I meant strong, but yes, that's

10   correct.

11           Q.      And the deal that you referred to as

12   closed was the Car Part King deal.  Correct?

13   A.      I don't know.

14           Q.      Can you look above that on August 3rd

15   at 6:22 a.m., you said: "CPK deal closed on Friday."

16   A.      Okay.

17           Q.      That's Car Part King.  Right?

18   A.      Yes.

19           Q.      So when you wrote, "Now that the deal

20   is closed, I can take some sting action," you were

21   referring to Car Part Kings closed.  Right?

22   A.      No.

23           Q.      What deal were you referring to that

24   closed?

25   A.      Car Part Kings.

217

1        Q.    Okay.  Then you wrote: "Anyway,
2  meeting with the district attorney today and sending
3  notice to Yotpo today, maybe Volo Commerce, too."
4  Bagaev said: "What kind of notice?"  You wrote: "Cease
5  and desist."  Bagaev wrote: "What kind of illegal
6  activity they do?  Place yourself on their side."  You
7  wrote: "They're facilitating customers that are
8  property of ChannelReply, NDAP and CSV."  He wrote:
9  "They'll just say that they are not doing that."  You
10  said: "There are a few laws that they are breaking."
11  He wrote: "That's it?"  You wrote: "We have proof."
12  He wrote: "Dave, we are not losing customers to them.
13  They'll just ask how many customers did ChannelReply
14  lose."  You wrote: "I don't plan on suing them at the
15  moment.  However, they should consider not working
16  with Mike anymore."
17        I read that correctly.  Right?
18  A.    Um-hum.
19        Q.    Were you trying to interfere with
20  Yotpo's business relationships with its customers?
21  A.    No.  Mike Dardashtian was.
22        Q.    Were you trying to interfere with
23  Mike's business relationship with Yotpo?
24  A.    No.
25        Q.    Were you trying to interfere with

218

1   Mike's relationship with Volo?

2   A.      No.

3           Q.      Were you threatening them in order to

4   try and hurt Mike?

5   A.      No.

6           Q.      Why were you going to the district

7   attorney?

8   A.      Because Mike has forged my signature multiple

9   times and stole money from the company, Class D

10  felony.

11          Q.      Did you say that anywhere in these

12  notifications to Mr. Bagaev?

13  A.      Possibly.

14          Q.      Were you trying to threaten Mike

15  through criminal activities in order to gain some type

16  of competitive advantage in this case?

17  A.      No.  I was very early told that that is

18  illegal and the district attorney told me they will

19  not take action until this case is completed.

20          Q.      Were you trying to hurt Mike by going

21  to the district attorney?

22  A.      No.

23          Q.      When Bagaev told you that ChannelReply

24  is not losing customers, was ChannelReply losing

25  customers as a result of any of those actions that you

219

1   complained of?

2   A.      Yes.

3           Q.      How?

4   A.      Mike was taking the customers from

5   ChannelReply to his employer.  I have a documented

6   list of these customers and we plan on, you know,

7   what's it called, deposing Yotpo next.

8           Q.      At 7:10 a.m. on that same day, on

9   August 3rd, you wrote: "Mike has no right to share

10  these customers."

11  A.      That's correct.

12          Q.      Bagaev wrote: "If Mike shared

13  customers with Volo, we would have more cancellations

14  then."  You wrote: "Well, either Mike shared how

15  ChannelReply works with Volo or there is no

16  intellectual property to be shared, which would clear

17  me of all of his allegations."

18          You wrote that.  Correct?

19  A.      Yes.

20          Q.      So what's your position?  Is it that

21  there is no intellectual property owned by

22  ChannelReply or that there is?

23  A.      There isn't.

24          Q.      Mr. Gitman, if there isn't any

25  intellectual property owned by ChannelReply, then how

220

1   would Mike be violating any law by sharing anything?

2   A.      From what I understand, sharing customers is

3   different.

4           Q.      Sharing customers is what?

5   A.      It's somehow different.  You'll have to ask my

6   attorneys about that.

7                   MR. GUAGLARDI:  Can you go to the next

8   page, Counsel.

9                   MR. SINGER:  Yes.

10          Q.      On August 3rd, 2017 at 7:14 a.m.,

11  Mr. Gitman, you wrote to Mr. Bagaev: "Have some

12  e-mails, but most of it was from his personal

13  account."

14          How do you have e-mails that are Mike's

15  personal e-mails?

16  A.      I was possibly CC'ed on them.  I don't know.

17          Q.      Did you improperly access Mike's

18  personal e-mail account?

19  A.      No, never.

20          Q.      If you continue on, you then said:

21  "We're going to have to judge for access to his

22  personal e-mails.  Ask."  And Bagaev wrote: "I see.

23  You are not able to use what you have now, but you

24  have it."  You wrote: "I am.  It's enough for the

25  cease and desist.  I don't think Apple or Volo are bad

221

1   people.  I don't want to go after them.  Yotpo.  So we

2   will legally inform them of these illegal activities,

3   but if they continue to do it, then we will take

4   action.  Deal is closed.  Mike is sitting on a beach

5   all week, it's time to finally strike."

6          So did you improperly access Mike's personal

7   e-mails?

8   A.      No.

9          Q.        If you go down to August 8, 2017 at 10

10  a.m., you asked Bagaev: "Do you have any conversations

11  with Amy or Mike talking badly about me?"  And Bagaev

12  wrote: "I was talking with Mike about you yesterday.

13  I told him that I think you are not constructive.  I

14  asked him what happened between you both before the

15  deal.  I'd like to know the real reason of your hate

16  to each other.  He didn't explain, but it seems to me

17  that he knows it.  You wrote: "I'm sorry you feel I'm

18  not constructive.  I've been trying to settle.  I have

19  no hate.  Do you have any conversations with Amy or

20  Mike talking badly about me?"  Bagaev asked you: "Can

21  you tell me why you are asking?"  You said: "Lawyers

22  are asking for it."

23         You're lying to Mr. Bagaev, aren't you, in

24  this conversations?

25                 MR. SINGER:  Note my objection, but

222

1    you can answer.

2    A.       No.

3            Q.       You're lying to him because when you

4    say that, when you say to him "I've been trying to

5    settle, I have no hate, that's absolutely false; isn't

6    it?

7    A.       No.

8            Q.       Tell me every settlement offer you

9    made in this case.

10   A.       Again, I made a statement --

11           Q.       Mr. Gitman, answer the question.

12   Answer the question.  You said to Bagaev on August 8,

13   2017 at 10:04 a.m., "I've been trying to settle."

14           Tell me every settlement offer you made at

15   10:05 a.m. to settle this case, every one of them.

16   A.       I don't have that in front of me.

17           Q.       Do you remember any one of them?

18   A.       Not off the top of my head.

19           Q.       Was any of them reduced to a writing?

20   A.       Yes.

21           Q.       Were they presented by your lawyers?

22   A.       I could not tell you that.

23           Q.       And as you sit here in your deposition

24   for a federal court matter you can't identify a single

25   settlement offer that you ever made to settle this

223

1  case?

2  A.      I can.  Again, these offers were made over

3  three years ago, so it's very difficult to remember

4  the exact offers.

5          Q.      What are you willing to settle for

6  today?

7  A.      Zero.  There is no chance of settlement today.

8          Q.      So there is no chance of you settling

9  today?

10  A.      That's correct.

11          Q.      You don't have a settlement offer?

12  A.      I don't understand your question.

13          Q.      You don't have a settlement offer that

14  you want to present to settle the case; do you?

15  A.      I no longer have a settlement offer, that's

16  correct.

17          Q.      And you don't know what your

18  settlement offer was before; do you?

19  A.      I don't remember the previous settlement

20  offers.

21          Q.      Do you recall a range of how much you

22  were willing to accept to be bought out?

23  A.      I was never willing to be bought out.

24          Q.      You were never willing to be bought

25  out?

224

1    A.      That's correct.

2           Q.      So if your counsel presented

3    settlement offers where you were willing to be bought

4    out for certain sums of money, was that without your

5    authority?

6    A.      Yes.

7           Q.      Was that made in bad faith?

8    A.      I don't know.  You would have to ask them.

9           Q.      So if we sat for six or seven hours in

10   Dentons' office with a buyout agreement where you were

11   being bought out, is that something you never --

12   A.      I don't know about any meeting in Dentons'

13   office.

14                  MR. SINGER:  Just wait for the

15   question.

16   A.      I'm sorry.  He's breaking up a little.

17                  MR. SINGER:  That's fine.

18           Barry, if you want to ask the question again.

19           Q.      When we sat in Dentons' office all day

20   rewriting an agreement where my client was buying you

21   out, are you saying that your attorneys had no

22   authority to meet with us all day in their office?

23   A.      I don't know what authority my attorneys have.

24           Q.      When we met with the federal judge and

25   you and our client all day on several days, with a

225

1   written document where our client was redeeming your

2   shares and buying you out, are you saying that you

3   didn't participate in that settlement conference and

4   weren't willing to be bought out?

5   A.      I was never willing to be bought out.

6                   MR. GUAGLARDI:  Counsel, the exhibit

7   we're on, can you go back to --

8                   MR. SINGER:  Which page?

9                   MR. GUAGLARDI:  10:34 on July 10.

10                  MR. SINGER:  Sure.  Page 3 I believe

11  it is.

12          Q.      Mr. Gitman, at 10:34 or 10:33 on

13  July 10, 2017, you wrote to Bagaev: "Let Mike kill the

14  companies.  It only makes me look better."

15          What did you mean?

16  A.      I don't know.

17          Q.      Were you hoping that Mike, while he

18  was managing the companies, would not be able to

19  properly manage the companies and the companies would

20  fail and go out of business so that you could look

21  better?

22  A.      No.

23          Q.      Well, what did you mean?

24  A.      I don't know.

25          Q.      Did you want to regain control and be

226

1   reappointed as the manager?

2   A.      I'm not sure.

3          Q.      Well, what did Bagaev think you meant?

4   Let's look at the next line.  He wrote: "This is what

5   I can't agree with.  I don't want to destroy

6   ChannelReply."  Isn't that what he wrote?

7   A.      Yes.

8          Q.      So Bagaev is looking out for the best

9   interest of the company and you don't care whether the

10  company gets destroyed.  Isn't that the case?

11  A.      No.

12         Q.      Isn't that what you wrote?

13  A.      No.

14         Q.      What did you write?

15  A.      "Let Mike kill the companies.  It only makes

16  me look better."

17         Q.      What does that mean?

18  A.      It means what it means.  It means exactly --

19         Q.      Bagaev interpreted that to mean that

20  you didn't care whether the companies went out of

21  business, as long as you looked good and Mike looked

22  bad, and he didn't want ChannelReply to be destroyed.

23  A.      Is there a question?

24         Q.      How come you weren't concerned about

25  the companies staying in business?

227

1           MR. SINGER:  I'm going to object to

2  the question, but go ahead and answer.

3  A.      I was concerned about the companies staying in

4  business.

5           Q.      If you look to your next statement at

6  10:34, you wrote: "Mike will milk ChannelReply for all

7  money he can make out of it.  Other than that, it's

8  done."  What did you mean by that?

9  A.      Yeah.  Mike doesn't care about the geek factor

10 is probably what I meant.  He doesn't care about the

11 technology or that we were actually building

12 something.  Mike only cares about the money.

13          Q.      You only wanted --

14 A.      Would you like me to answer the question or

15 would you like to keep talking?

16          Q.      Are you through?

17 A.      No.

18          Q.      Okay.  You can finish.

19 A.      I forgot what I was saying.

20          Q.      Were you only considered that Mike

21 looked bad and that the companies went out of business

22 so it could make you look good?

23 A.      Absolutely not.

24          Q.      Was it more important for you to be in

25 control of the company than for the companies to

228

1   actually succeed?

2   A.      Absolutely not.

3          Q.      Tell me everything that you said to

4   the district attorney.

5   A.      No.

6          Q.      You told the district attorney no?

7   A.      No, I'm not telling you.  It's privileged.

8                  MR. GUAGLARDI:  Counsel, I'm going to

9   ask you to instruct your client to answer the question

10  or it's going to be the basis for me to have a whole

11  new deposition with him.  Nothing about his

12  conversation with a district attorney is privileged.

13  You could explain that to him.

14                 MR. SINGER:  You can answer.

15  A.      I refuse to answer it.

16         Q.      Mr. Gitman, unless you are asserting

17  the Fifth Amendment right against self-incrimination

18  on this issue, you have an obligation to answer.

19  There is no attorney/client privileged communication

20  between you and a public official who represents the

21  government of the United States.  That district

22  attorney does not represent you, and your counsel is

23  nodding in agreement with me right now.

24         Answer the question.

25  A.      No.

229

1            MR. GUAGLARDI:  Counsel?

2            MR. SINGER:  What you can remember you

3    said to the DA, you can tell him.  Try to tell him as

4    much as you can remember.

5    A.      Sure.  They asked me to put together packets

6    of information and present it to them in a certain

7    way, and that's it.  That's most of the conversations

8    I had with them.

9            Q.      Did you put packages together?

10   A.      Yes.  I have them.  I have them sitting right

11   here in front of me.

12           Q.      We're going to ask for copies of the

13   packages that you --

14   A.      You already have, you already have -- all of

15   the information has been already given to you.

16           MR. GUAGLARDI:  We're going to ask for

17   copies of the packages - Jo, please mark the

18   transcript - of any documentation or information that

19   you provided to the district attorneys and every one

20   of the district attorneys whose names you haven't

21   given us yet that we're asking for, so that --

22           MR. SINGER:  We'll take it under

23   advisement.  Sorry, go ahead, Counsel, please finish.

24           MR. GUAGLARDI:  So that we have full

25   and complete knowledge of who you spoke to, what you

230

1    said and what was provided to them.

2                 MR. SINGER:  We'll take all requests

3    under advisement.

4                 MR. GUAGLARDI:  Thank you.

5         Q.      Mr. Gitman, you said you sent a notice

6    to Yotpo?

7    A.      Yes, we did.

8         Q.      What is Yotpo?

9    A.      Mike's employer.

10        Q.      What is the nature of Yotpo's

11   business?  Is it a marketing platform?

12   A.      It's a competitor to ChannelReply.

13        Q.      And what proof do you have that Yotpo

14   is in any way competing with ChannelReply?

15   A.      I have a list of customers that have been

16   taken from ChannelReply to Yotpo.

17        Q.      And is that the only proof you have

18   that there is competition between Yotpo and

19   ChannelReply?

20   A.      I also have e-mails from Mike giving him

21   product ideas of ChannelReply to Yotpo.

22        Q.      I'm going to ask you to produce those

23   lists of customers and we're going to ask you to

24   produce the e-mails that you just referred to.

25   A.      They are e-mails that you produced to us.

231

1          MR. GUAGLARDI:  Okay.  Counsel, in

2   connection with what Mr. Gitman just referred to

3   regarding Yotpo, we're going to ask for whatever list

4   of customers or whatever e-mails he's referring to.

5   And if they are e-mails that have already been

6   exchanged, we're going to ask you to identify them by

7   Bates stamp so we know what they are.

8          Q.     Mr. Gitman, the customers that you say

9   have gone to Yotpo, were they no longer customers of

10  ChannelReply?

11  A.     That's correct.

12         Q.     They weren't customers of both?

13  A.     No, that's correct.

14         Q.     Was the letter that you sent to Yotpo

15  designed to cause Mike Dardashtian to lose his job

16  with Yotpo?

17  A.     No.

18         Q.     Who wrote the letter?

19  A.     Dentons.

20         Q.     Mark Meredith?

21  A.     I don't remember who.

22         MR. GUAGLARDI:  Can you go to

23  Exhibit 58, please.

24         MR. SINGER:  Yes.

25         Q.     Mr. Gitman?

232

1    A.      Yeah.

2         Q.     This is a conversation between you and

3    Mary Faith Andan?

4    A.     I can't see it, but. . .

5         Q.     How about you look at it and read it

6    because it's very legible.

7    A.     Again, I can't see it.

8         Q.     How is it that you can't see it when

9    it's on the screen and we can see it.

10          MR. SINGER:  It does look a bit

11    grainy.

12          MR. GUAGLARDI:  Can you zoom in?

13    A.     Maybe I need some, maybe I need some glasses.

14          MR. GUAGLARDI:  How about you zoom in

15    the other way.

16    A.     I'll also take a screenshot for the record to

17    show that I can't read this.

18         Q.     You're not permitted to take any

19    screenshots of anything.

20        For that matter, I have a question for you,

21    Mr. Gitman.  Have you taken any audio recordings of

22    this deposition?

23    A.     No.

24         Q.     Have you taken any audio recordings of

25    any court conferences with any of the federal judges

233

1    in this case?

2    A.        No.

3             Q.        So you're swearing under oath that you

4    have never taken an audiotape of any conferences with

5    the federal court judges and the parties or their

6    counsel?

7    A.        Yes.

8             Q.        Have you taken any audio recordings of

9    the judges in this case?

10   A.        No.

11            Q.        You're under oath.  You realize that?

12   A.        Um-hum.

13            Q.        Have you taken any recordings with

14   your phone of the federal judges in this case?

15   A.        No.

16            Q.        Can you read this dialogue between you

17   and Mary Faith Andan?

18   A.        No, I can't.

19                      MR. GUAGLARDI:  Counsel, let's move

20   forward.

21                      MR. SINGER:  Which exhibit is next?

22                      MR. GUAGLARDI:  Bear with me for a

23   second.  Let's go to Exhibit 60.

24            Q.        Mr. Gitman, these are conversations

25   that were produced in electronic discovery by you,

234

1   with you and Bagaev.  And so in December of 2017 you

2   were working on a motion to dissolve the company?

3   A.      I don't remember.

4           Q.      Was it your belief that dissolving

5   ChannelReply was going to somehow benefit you and

6   Michael Dardashtian?

7   A.      I don't remember.

8           Q.      Okay.  If you look down on the page,

9   Bagaev asked you: "Is it true that Mike agreed on

10  having 25 percent?"

11          Did you tell Bagaev that Mike was agreeing to

12  reduce his 50 percent interest in ChannelReply to

13  25 percent?

14  A.      I don't think so.  I don't know.

15          Q.      Did you ever tell Bagaev or Glukharev

16  that Mike was willing to reduce his ownership in the

17  company ChannelReply that he owned 50 percent of to

18  something less than 50 percent?

19  A.      I don't remember.

20          Q.      You wouldn't lie under oath; would

21  you?

22  A.      Of course not.

23                  MR. GUAGLARDI:  Go to the next page,

24  Counsel, please.

25                  MR. SINGER:  Yes.

235

1        Q.      You're telling Bagaev that the case

2    should be decided on February 12.  Was that true or is

3    that another lie?

4    A.      I don't know.  And I am not accepting it's

5    another lie.

6        Q.      And Bagaev wrote to you and said: "So

7    let's go back to my initial question.  What better

8    options I have?  I told you to sign off on September

9    after your e-mail.  You can't protect me since June."

10   And then you wrote to him on December 11: "I'm signing

11   off."

12       So were you having a discussion with Bagaev

13   telling him to leave the company and not go back to

14   the company?

15   A.      No.

16       Q.      You didn't tell him to leave

17   ChannelReply and not go back there?

18   A.      No.

19               MR. GUAGLARDI:  Can you go to the next

20   page, Counsel.

21               MR. SINGER:  Yes.

22       Q.      You now write to him on December 11 at

23   8:15 a.m. saying: "You acted on your own and I can't

24   protect you anymore.  If you have concerns, you

25   could've called me.  You know my phone number.  You

236

1   got played as I said you would.  Now there is going to

2   be consequences."

3           What did you mean when you wrote those things

4   to Mr. Bagaev?

5   A.      I don't remember the context of this

6   conversation.

7           Q.      Well, what did you mean when you told

8   him, "Now there is going to be consequences"?

9           Were you threatening Bagaev because he was

10  going to go back to work for the ChannelReply company

11  that Mike was managing?

12  A.      No.  I would never threaten.

13          Q.      Well, what did you mean that there was

14  going to be consequences?

15  A.      I think he was probably shooting himself in

16  the foot.  He was hurting himself.

17          Q.      Didn't he write to you thereafter and

18  said: "But you never explain me.  These are things

19  that are good for ChannelReply.  Sometimes you say

20  that I shouldn't do things.  I still have no idea.

21  Dave, in June I asked you what strategy do you have.

22  Instead you talked to me your way.  And now ask why I

23  didn't call to say hello."

24          What was your response to Bagaev when he wrote

25  to you and told you that you told him to leave, you

237

1  told him to not go back, you told him you had strategy

2  and you left him hanging?

3  A.      I'm sorry.  What's the question?

4          Q.      The question is what did you tell

5  Bagaev about why he shouldn't go back to work for

6  Mike?

7  A.      I don't remember saying anything like that to

8  him.

9          Q.      Why is Bagaev writing to you in

10  December of 2017 and having to explain to you that he

11  wants to go back to work for Mike, but was looking for

12  a strategy from you in June and you didn't give him

13  one?

14  A.      You would have to ask him that.

15              MR. GUAGLARDI:  Can you go to the next

16  page, Counsel.

17              MR. SINGER:  Yes.

18          Q.      The next page, Mr. Gitman, on

19  December 11 at 8:12 a.m., you wrote to Bagaev and

20  said: "There are two roles in a LLC, a manager and an

21  owner.  I was removed as a manager, which means I am

22  essentially a silent owner.  Exactly."

23              Is that your understanding?

24  A.      I'm sorry.  What's the question?

25          Q.      Was that your understanding what you

238

1    wrote, that those are the two roles in an LLC, and

2    that you were a silent owner?

3    A.      My understanding is similar to that right now,

4    yes.

5                   MR. GUAGLARDI:  Can you go to the next

6    page, Counsel.

7                   MR. SINGER:  Yes.

8          Q.      Mr. Gitman, on the top of this page it

9    says, and you wrote this to Bagaev on December 11 at

10   8:10 a.m.: "I'm sorry you feel that way, but if I

11   didn't respond to Skype to executing agreement, like

12   that seems like a very inconsistent retaliation."  And

13   Bagaev wrote: "I don't have any other connections to

14   you.  I know that you can reply to e-mail.  Once I

15   tried to reach you in Viber with no luck."  And you

16   wrote: "I was in no way ignoring you."

17         So you're telling Bagaev that his signing an

18   agreement with Mike was an inconsistent retaliation

19   against you?

20   A.      No.

21         Q.      Well, what were you saying about a

22   very inconsistent retaliation?

23   A.      I don't know.

24                  MR. GUAGLARDI:  Later on that page, if

25   you can move it down a little, Counsel.

239

1           MR. SINGER:  Sure.

2      Q.      Then Bagaev said: "And you ignored me

3  in Skype.  That's it.  You told me that he has."  And

4  then you wrote: "It's over.  You made your decision."

5           What did you mean?

6  A.      I don't remember.

7      Q.      Did you mean that his relationship

8  with you is over because he agreed to go back and work

9  with Mike in the company?

10  A.      I don't believe so.

11      Q.      Well, what did you mean?

12  A.      I don't know.

13           MR. GUAGLARDI:  Can you go to the next

14  page, Counsel.

15           MR. SINGER:  Yes.

16      Q.      Now, Mr. Gitman, you're writing to

17  Bagaev and you said: "I'll forward you the e-mail."

18  So he wrote to you and said: "You wrote in e-mail that

19  Mike has access."  You wrote and said: "I'll forward

20  you the e-mail."  He wrote: "I don't see any way that

21  it can be end up."  You wrote: "That's what I wrote in

22  e-mail."  He wrote: "That is what you say now,"

23  capital now, "but that time you just ignored."  You

24  wrote: "I did ignore you.  I was acting by the judge's

25  orders."

240

1              What order did the court enter that told you

2    to ignore Bagaev?

3    A.      I don't know.

4              Q.      Was that another lie you told Bagaev?

5    A.      I don't lie.

6              Q.      Was that another false statement that

7    you told Bagaev?

8    A.      No.  I don't make false statements.

9              Q.      What order did the court give that

10   said that you were not allowed to talk to Bagaev?

11   A.      I don't -- there was no order.  This is being

12   interpreted the wrong way.  It's out of context.

13             Q.      Tell me what the context is.

14   A.      I don't know.  I don't have the full document.

15             Q.      You wrote it.  You have the full

16   document.

17   A.      No, I don't.

18             Q.      This is every statement in the

19   document.

20   A.      I don't have -- I can't see the whole thing

21   and I have not had the chance to review it.

22             Q.      It's right there, review it.

23   A.      Again, it's difficult for me to read this way.

24   If you prefer to reconvene at another time where you

25   send the documents beforehand, I'd be happy to answer

241

1   that.

2           Q.      Mr. Gitman, these are documents you

3   sent us in discovery.  They're your documents that you

4   produced.

5   A.      But I'm not able to read them as you have not

6   produced the documents for today's conversation --

7   deposition.

8           Q.      So you don't know what you wrote or

9   what you meant when you wrote on December 11, 2017 to

10  Mr. Bagaev; do you?

11  A.      I don't remember the conversation from

12  December 11 of 2017.

13          Q.      And even though you're reading it,

14  that doesn't help refresh your recollection?

15  A.      Unfortunately, I don't have access to the full

16  document.

17          Q.      This is the entire exchange between --

18  A.      Okay.  So let's start at the beginning and

19  I'll sit here for the next 20 minutes and read the

20  document.

21          Q.      We did start at the beginning.

22  A.      I would like a chance to review the entire

23  document.

24          Q.      Okay.  We'll move on.

25  A.      No, I would like a chance to review the entire

242

1   document.

2         Q.        You can review the document on your

3   time.  I'm going to ask questions.

4   A.        This is my time.

5                 THE WITNESS:  Brett, I'd like to

6   review the document.

7                 MR. GUAGLARDI:  Counsel, we're going

8   to go through and when I ask a question about a

9   provision in the document, Mr. Gitman will have the

10  time to review the provision in the document.

11                THE WITNESS:  Brett, I would like to

12  review the document in front of me.

13                MR. SINGER:  Just a second.  It is

14  true that these are deposition exhibits.  However,

15  they were e-mailed to us while the deposition earlier

16  today was in progress.

17                MR. GUAGLARDI:  These are deposition

18  exhibits containing exhibits that Mr. Gitman's counsel

19  through Mr. Gitman produced to us in discovery.  These

20  are not documents that we produced.  These are

21  documents Mr. Gitman produced.

22                MR. SINGER:  I understand.

23                MR. OSTRER:  If I may, can I cut in?

24                MR. GUAGLARDI:  No.  Excuse me for one

25  second.  We are going to complete the deposition.

243

1   It's 5:20.  It's already been delayed as a result of

2   caregiving, which we're okay with.  We're not going to

3   waste time now on documents produced by you or by your

4   predecessor to us that contain conversations that

5   Mr. Gitman had that we have started at the beginning

6   of and went through almost every single statement to

7   keep it in context.

8           Let's move on to the next one.  Can you move

9   to the next page.

10          THE WITNESS:  No, thank you.  I would

11  like to review the document in front of me before

12  answering any questions.

13          MR. GUAGLARDI:  Counsel, move to the

14  next page.  There is no question pending.

15          MR. SINGER:  Is there any --

16      I mean, Counsel, Evan, would you want to say

17  something?

18          MR. OSTRER:  I did.  I produced --

19  this exhibit was produced in your supplemental

20  production, which is the exhibit is in the same format

21  in which it came from your office.  To the extent that

22  this is an incomplete exhibit, that would be because

23  you didn't produce all communications that we

24  requested, and to the extent you didn't produce all

25  communications that we requested, then you should be

244

1   producing and supplementing your production again so

2   we have all communications that were exchanged between

3   Mr. Gitman and Mr. Bagaev.

4        The fact that this exhibit was sent to you

5   three hours ago before it was sent to Mr. Gitman is no

6   different than if we were all sitting in the same room

7   and Counsel presented the witness with a copy of the

8   exhibit and handed it to him.  So to suggest that you

9   didn't have it before the deposition commenced and

10  you're only looking at the exhibit for the first time

11  at deposition is a little silly.

12                  THE WITNESS:  Either way I would like

13  to review the document.

14                  MR. GUAGLARDI:  Let's go to the next

15  page.  When there is a question pending, if there is a

16  question that Mr. Gitman needs to review the document,

17  we'll do that.

18                  MR. SINGER:  Okay.

19                  MR. GUAGLARDI:  Thank you.

20                  THE WITNESS:  Since there is no

21  question pending, I'm going to take a bathroom break.

22                  MR. GUAGLARDI:  Can you go to the next

23  page, please, before you take that bathroom break.

24                  MR. SINGER:  Which page, Barry?

25                  MR. GUAGLARDI:  If you go to the top

245

1    right there.  Yes, that is the page.

2                    MR. SINGER:  Off the record.

3            (There is a discussion held off the record.)

4            Q.      In the middle of that page,

5    Mr. Gitman -- actually, let's start at the top so we

6    have full context.

7            On December 11, 2017, 8:07 a.m., Bagaev wrote:

8    Just explain me what you expected.  How did you expect

9    to end up this," question mark.  You wrote: "Because

10   nobody in their right mind would sign an agreement

11   like that."  He wrote: "Why you always think that I

12   don't understand something?  Why you always think I

13   don't understand something?"  You wrote: "I told you

14   should sign an agreement that would remove you from

15   the case and give you ownership.  The document says

16   everything but that and even gives Mike power of

17   attorney to make the decisions for you.  I don't think

18   you understand what you signed."

19           So my question is why were you talking to

20   Bagaev about the agreement that he signed to go back

21   to work with ChannelReply?

22   A.      I'd like a chance to review all 146 pages of

23   this document before I answer any questions about it.

24                    MR. GUAGLARDI:  Brett, what do you

25   want to do?

246

```
 1                    THE WITNESS:  I have the document.

 2    I'm happy to sit here and read it.

 3                    MR. GUAGLARDI:  I will call the judge.

 4    We will charge our hourly rates and we will ask the

 5    judge to call to order that Mr. Gitman reimburse our

 6    counsel fees in advance as a deposit if we have to

 7    wait for him to read a document he produced about a

 8    conversation he had when the question is limited to

 9    what's on this page and I just read the entire page.

10                    MR. SINGER:  David, just take it one

11    page at a time.  Like there is a good chance that a

12    lot of these pages he's not going to even ask you

13    about, so just take it on faith.  It's a good idea to

14    get through this today, trust me.

15                    THE WITNESS:  Yeah, I'd like some time

16    to review the document either way before I speak

17    further about it.

18                    MR. SINGER:  I understand, but he's

19    probably -- he's asking about one page at a time.

20                    THE WITNESS:  I appreciate that.  But

21    I'd really appreciate the chance to review the

22    document before I swear about speaking to it.

23                    MR. GUAGLARDI:  Counsel, if your

24    client insists on doing that, we're going to call the

25    judge because I'm not asking him a question about the
```

1    whole document.  I am asking him a question about the

2    page I read and that's the only thing I'm asking him

3    about.  He's trying to dictate the deposition, and I

4    know you're trying to counsel him and he's not

5    listening to you.  So if we have to get the judge on

6    and the judge orders that he has to pay fees, then

7    maybe that's something that he will understand.

8                 MR. SINGER:  We don't want the judge

9    on the phone.  All we want, David, is just for you to

10   answer questions about this page.

11                THE WITNESS:  And is this the last

12   page?  How many more pages will there be without me

13   having to go through all 146?

14                MR. GUAGLARDI:  I guarantee you this,

15   that each time I have a question, we'll read the

16   entire page to put the question in context.

17                THE WITNESS:  Since you don't want to

18   answer my question, I'm going to take the time to read

19   the 146 pages.

20                MR. SINGER:  No, don't worry about it.

21   This is moving along.

22                THE WITNESS:  It's not.  I asked a

23   very simple question.

24                MR. SINGER:  I know it's hard, but

25   they actually, I think, are pretty close to being done

248

1    with this exhibit.

2              THE WITNESS:  I don't believe so at

3    all.  We're on page 7 of 146.

4              MR. SINGER:  They are not going to ask

5    you about anything close to 146 pages.

6              THE WITNESS:  I'm asking how many

7    pages they're asking.  So I'm happy just to read those

8    pages then.

9              MR. SINGER:  Counsel, whatever your

10   next question is.

11             MR. GUAGLARDI:  Counsel, we're wasting

12   time.

13             MR. SINGER:  Whatever your next

14   question is.

15             MR. GUAGLARDI:  I'm trying to get to

16   the question.

17        Jo, can you read back my last question,

18   please.

19        (The pending question is read by the Reporter

20   as follows:

21        "QUESTION:  So my question is why were you

22   talking to Bagaev about the agreement that he signed

23   to go back to work with ChannelReply?")

24   A.    I'd like a few minutes to review the document.

25             Q.      Read the page right there.  That's the

249

1   only place it references it, so you can read it.

2   A.      I would like a few minutes to review the

3   entire document you put in front of me.

4                MR. GUAGLARDI:  Counsel, I promise

5   you, this is the last time.  You can have whatever

6   discussion you want with your client and then we'll

7   decide how we're going to proceed.

8                MR. SINGER:  David, I promise you, you

9   don't want a federal judge on the phone.  It's just

10  not a good way to end things, especially after you've

11  done such a great job today.

12               THE WITNESS:  I agree, but I believe I

13  have the right to review a document before answering

14  questions about it.  I'll be happy to reiterate that

15  to the judge.

16               MR. SINGER:  It's a good idea to just

17  answer one question at a time and maybe you'll be

18  presently surprised.  Maybe this exhibit is not going

19  to amount to much at the end.

20               THE WITNESS:  I'm not getting any

21  insight into how much there is going to be, so I'm

22  going to go ahead and read the entire document.

23               MR. GUAGLARDI:  We'll wait here.  Go

24  ahead, Counsel.

25               Jo, mark the time.  We're going to seek relief

250

1   from the court and we're going to be seeking fees

2   associated with --

3                    THE WITNESS:  Actually, why don't you

4   call the judge right now.  I would love to speak to

5   him about this.

6                    MR. SINGER:  You don't want to speak

7   to a judge.

8                    THE WITNESS:  Go ahead, Barry, I'm

9   calling your bluff.  I thought so.

10                    MR. GUAGLARDI:  Counsel, you can deal

11   with your client.  Jo, just mark the time.

12        Mr. Gitman, take your time and read whatever

13   you want to read.  You have the exhibit.  We'll be

14   waiting here for you.

15                    THE WITNESS:  What's the exhibit

16   number?

17                    MR. GUAGLARDI:  It's exhibit number

18   60.  Take all the time you need and we'll be waiting

19   here.  Jo, mark all the time and we'll be seeking fees

20   for all the time associated with it.

21        Take your time and read it.  Let me know when

22   you're done.

23        (A recess is taken starting at 5:39 p.m.)

24                    MR. OSTRER:  Can we go on the record

25   for one second.  Just let the record reflect that it's

251

1   now 6:23 p.m. and I've been sitting here.  Mr. Gitman

2   has not for at least the past nine minutes or so.

3        We can go back off the record.

4        (Off the record.)

5             MR. OSTRER:  Let the record reflect

6   that Mr. Gitman just sat back down at 6:26.

7             MR. SINGER:  We can continue.

8             MR. GUAGLARDI:  Jo, mark the time.

9        (The time is 6:28 p.m.)

10            MR. GUAGLARDI:  Can you read back the

11  last question.  And I want to know how much time has

12  elapsed.

13       We're back on the record.  I was questioning

14  Mr. Gitman on Exhibit 60.  Mr. Gitman had refused to

15  answer any further questions because he wanted to

16  review the entire Exhibit 60, despite his own

17  attorneys urging that he go page by page based on the

18  questions I was going to ask.  His own attorney

19  advised him that it was unnecessary to read the whole

20  exhibit, that I might not question him on the whole

21  exhibit, and that that was actually accurate and

22  proper.  Mr. Gitman disregarded his own attorney's

23  advice and, as a result of that, we went off the

24  record at 5:39.  Mr. Gitman was back at approximately

25  6:26, which was almost 50 minutes that the deposition

252

1   has been delayed to allow Mr. Gitman to read

2   Exhibit 60.  Now we're going to continue with the

3   deposition at 6:30 at night on Zoom and continue.

4           So Josephine, you can read back the last

5   question that I asked before 5:39 p.m. when we went

6   off the record to allow Mr. Gitman to read Exhibit 60,

7   which by the way, is an exhibit Mr. Gitman's counsel

8   produced to us and contains conversations only between

9   Mr. Gitman and Konstantyn Bagaev.

10          What's the last question I asked Mr. Gitman?

11  Before you ask the last question, we will be reserving

12  our right to make an application for counsel fees to

13  have Mr. Gitman pay for this deposition, for the

14  transcript cost and for our hourly fees associated

15  with the actions and behavior that he has exhibited in

16  the deposition.  I'm reserving my right to do that.

17          What's the last question?

18              MR. SINGER:  Plaintiff will oppose

19  such an application.  I'm sorry.  Defendant will

20  oppose such an application.  Anyway, proceed, Counsel.

21          (The pending question is read by the Reporter

22  as follows:

23          "QUESTION:  So my question is why were you

24  talking to Bagaev about the agreement that he signed

25  to go back to work with ChannelReply?")

253

1    A.        Because he is a co-defendant.

2         Q.        Mr. Gitman, referring you to

3    December 11, 2017 at 8:06 a.m. where you wrote to

4    Mr. Bagaev and said: "I told you should sign an

5    agreement that would remove you from the case and give

6    you ownership.  The document says everything but that

7    and even gives Mike power of attorney to make the

8    decisions for you.  I don't think you understand what

9    you signed."

10        Why did you write that to Mr. Bagaev?

11   A.        There was no reason.

12        Q.        Why did you attempt to negotiate on

13   behalf of Mr. Bagaev to have him removed as a

14   defendant for the case and to get ownership in a

15   company that you and Dardashtian owned 50/50?

16   A.        I don't understand the question.

17        Q.        Why did you write to Bagaev, who is

18   someone who isn't an owner of the company, and try and

19   have him negotiate an ownership interest in the

20   company?

21   A.        He was promised ownership in the company.

22        Q.        By who?

23   A.        By Michael Dardashtian.

24        Q.        What ownership?

25   A.        I don't remember the exact amount.

254

1          Q.      Did you promise him ownership?

2  A.      Yes.   We both did.

3          Q.      How much?

4  A.      Again, I don't remember the exact amount.

5          Q.      Was he paying for the ownership?

6  A.      No.   It was a stock grant of some sort.

7          Q.      When you say the document says

8  everything but that, what document?   Is that the

9  document Mike Dardashtian had Bagaev sign to an

10 independent contractor for the company?

11 A.      I don't know.

12         Q.      Did you read it?

13 A.      Read what?

14         Q.      The document.

15 A.      What document?

16         Q.      The document you say in your statement

17 to Mr. Bagaev where you say, "The document says

18 everything but that and even gives Mike power of

19 attorney to make the decisions for you."

20         How could you know that if you didn't read the

21 document?

22              MR. SINGER:  Counsel, one question at

23 a time, please.

24         Q.      How could you know that if you didn't

25 read the document?

255

1  A.      How could I know what if I didn't read what

2  document?

3          Q.      The statements that you made about a

4  document in that statement I just made.

5  A.      I'm sorry, Barry, I'm not following you.

6              MR. GUAGLARDI:  Counsel, we're going

7  to end this deposition.  This is ridiculous.

8          I'm going to ask it one more time.  If you

9  don't answer the question, we will end the deposition.

10         Q.      You wrote to Mr. Bagaev and you

11 indicated, in quote, the document says everything but

12 that and even gives Mike power of attorney to make the

13 decisions for you, end quote.

14         What document are you referring to?

15 A.      I don't know.

16             MR. GUAGLARDI:  Can you go to the next

17 page, Counsel.

18             MR. SINGER:  Yes.  Up or down?

19             MR. GUAGLARDI:  This is always going

20 to go chronologic order that way.

21         Q.      Bagaev told you at 8:05 a.m. on

22 December 11, 2017, he said: "You told me a month or

23 more ago that I had to sign such document."

24         Did you tell Bagaev that, that he had to sign

25 a document?

256

```
1    A.      No, I don't believe so.

2            Q.      So Bagaev was lying to you?

3    A.      No.

4            Q.      Well, did you tell him or is he lying?

5    A.      Neither.

6            Q.      What's the answer?

7    A.      Neither.  He's not -- nobody is lying.

8            Q.      You then wrote at 8:04: "I'm asking

9    the judge to dissolve ChannelReply and all other

10   entities.  It was worth saving before you signed the

11   papers.  At this point I see no future in us working

12   well together and think everything should be

13   dissolved."  What did you mean by that?

14   A.      I didn't mean anything by it.

15           Q.      Didn't you say to Mr. Bagaev that you

16   don't see any point in continuing with ChannelReply

17   and you want it dissolved?

18   A.      I did say that.

19           Q.      Why?

20   A.      I don't know.

21           Q.      Were you threatening Bagaev because he

22   signed an agreement with Mike, so now you wanted to

23   try and dissolve the company because you couldn't

24   steal it?

25                   MR. SINGER:  Objection, objection.
```

1          Q.        You can answer.

2     A.        No.

3                    MR. GUAGLARDI:  Go to the next page,

4     Counsel, please.  Thank you.

5                    MR. SINGER:  Yeah.

6          Q.        On December 11, 2017 at 8:02 a.m. you

7     wrote to Bagaev, "Why did you have to fuck me over,"

8     question mark.  Why did you write that?

9     A.        I don't remember.

10         Q.        How did Bagaev fuck you over?

11    A.        I don't remember.

12         Q.        By signing an agreement with

13    ChannelReply to continue working for them?

14                   MR. SINGER:  Counsel, one question at

15    a time.

16                   MR. GUAGLARDI:  That was one question.

17                   MR. SINGER:  No, it wasn't.  It was

18    two questions in one.

19                   MR. GUAGLARDI:  I'll rephrase the

20    question.

21         Q.        Did Bagaev fuck you over by signing an

22    agreement with ChannelReply?

23    A.        No.

24         Q.        Then how did he fuck you over?

25    A.        I don't remember.

258

1          Q.          What did you mean by that?  You've had

2     the time to read this for 50-some-odd minutes.

3     A.          I didn't have the chance to complete reading

4     it.

5          Q.          This is the beginning of where you

6     started reading.

7     A.          No.  I read it in chronological order.

8          Q.          So you don't know why you said to

9     Bagaev, "Why did you have to fuck me over"?

10    A.          I don't remember why I said that.

11         Q.          Bagaev responded to that statement by

12    saying: "Never mind.  I'm tired of that.  Do whatever

13    you both want.  I'll do my best for ChannelReply."

14         I read that correctly.  Right?

15    A.          That's incorrect.  He didn't respond to that

16    statement.  You're reading it backwards.

17         Q.          You are correct about that.

18         When Bagaev wrote to you and said, "I'll do my

19    best for ChannelReply," you responded to him by

20    saying, "Why did you have to fuck me over."

21         What did you mean by that when he said I just

22    want to do my best for ChannelReply?

23    A.          I'm sorry.  Can you repeat the question?

24                    MR. GUAGLARDI:  Jo?

25         (The pending question is read by the

1    Reporter.)

2    A.      I don't know.

3                    MR. GUAGLARDI:   Counsel, can you

4    please fast forward to October, where it begins on the

5    top October 2nd, 2017, 3:56 a.m.

6                    MR. SINGER:   There we go.

7                    MR. GUAGLARDI:   Thank you.

8            Q.      Mr. Bagaev wrote you on October 2nd at

9    3:21 a.m. and said: "Dave, I've explained you before

10   about the agreement, which I needed for my bank.   I've

11   signed it, but never sent my signature to Mike.   Two

12   months ago Mike wanted me to sign such agreement, but

13   I declined this and didn't sign it."   You wrote: "I

14   know.   Thanks for confirming."

15           Why were you happy that Mr. Bagaev was

16   confirming to you that he refused to sign the

17   agreement that Mr. Dardashtian wanted him to sign,

18   which only protected ChannelReply?

19   A.      I wasn't happy about anything.

20           Q.      Why did you tell him thanks for

21   confirming that he didn't sign the agreement that Mike

22   needed him to sign to protect ChannelReply?

23   A.      I don't know if that's -- I don't know which

24   agreement he's talking about.

25           Q.      Wasn't he talking about the

1    independent contractor agreement that Mike presented,

2    that Mike wanted him to sign, that you indicated

3    earlier was a mistake because it gave Mike power of

4    attorney and gave him no ownership interest?

5    A.      I didn't make any such warrants.

6              MR. GUAGLARDI:  Can you fast forward,

7    Counsel, to 9/27/2017, 4:41 p.m.  Thank you.

8              Q.      On the bottom of that on September 27,

9    2017 at 4:38 p.m., you wrote to Bagaev and said:

10   "Also, they mentioned I would have to help get you to

11   sign an agreement with ChannelReply for no equity."

12   And Bagaev wrote: "Why should I do this?"  And you

13   wrote: "And I would not be able to compete with

14   ChannelReply.  They think you will since you went back

15   to work.  I said that's crazy."

16        Why are you discussing with Bagaev about the

17   fact that you and he are both trying to work outside

18   of ChannelReply?

19   A.      I don't know.  And I don't believe that's the

20   context of the conversation.

21             MR. GUAGLARDI:  Can you go to the next

22   page, Counsel.

23             MR. SINGER:  Yes.

24             Q.      If you look at the top of the next

25   page, Mr. Gitman, September 27, 4:37 p.m., you wrote

261

1  to Bagaev: "Just walking out.  Judge feels that we are

2  too far apart."

3         So you were writing to Bagaev as you're

4  walking out of the courthouse?

5  A.     I don't know.

6         Q.     Well, it says: "Just walking out.

7  Judge feels that we are too far apart."

8         Were you in court on September 27, 2017 on

9  this case?

10  A.     I don't know.

11         Q.     Why were you writing to Bagaev and

12  giving him a play-by-play breakdown of the settlement

13  negotiations between you and Mike?

14  A.     He is a co-defendant.

15         Q.     Were you hoping that he was going to

16  leave ChannelReply and continue with you to form a

17  competing business?

18  A.     No.

19         Q.     And when you wrote that the judge

20  feels we are too far apart, how far apart were you?

21  A.     I don't know.

22         MR. GUAGLARDI:  Counsel, could you go

23  to the page beginning September 27, 1:46 p.m.

24         Q.     Okay.  Mr. Gitman, on September 27 at

25  1:46:06 p.m. you wrote to Bagaev: "So a few things."

262

1   Actually, let's go below that.  Let's go to the bottom
2   of the page.
3          You wrote at 1:44: "It was supposed to be an
4   appearance for compliance.  The judge said I'm in
5   compliance and is trying to get the case settled."
6          Did the judge tell you that you were in
7   compliance or were you making another false statement
8   to Bagaev?
9   A.      I haven't made any false statements to Bagaev.
10         Q.      Did the judge tell you that you were
11  in compliance?
12  A.      I don't remember.
13         Q.      Well, you wouldn't tell Bagaev that if
14  it wasn't true; would you?
15         MR. SINGER:  I object to the question.
16  Counsel, I'm not sure that the litigant, the deponent
17  understands the difference between a settlement
18  conference and a compliance conference.  Maybe if
19  you'll clarify that for him, he'll be able to answer
20  the question better.
21         MR. GUAGLARDI:  I don't think that
22  there is any misunderstanding.
23         MR. SINGER:  I think there is.
24         MR. GUAGLARDI:  Your objection is
25  noted.  There is no speaking objection and that's not

263

1    a basis.  If you want to object to form, you can.

2                    MR. SINGER:  I do.  I object to form.

3           Q.      And my question is, Mr. Gitman, what

4    did you mean by the word compliance?

5    A.      I don't know.

6           Q.      Did the judge tell you you were in

7    compliance?

8    A.      I don't know.

9           Q.      Then you wrote: "We are on a quick

10   break." Bagaev said: "I see.  Hope you'll settle."

11   You wrote: "This is the first time they would talk

12   about settling.  Otherwise, they would have looked bad

13   in front of judge and he would have put restrictions

14   on Michael."  Is that true?

15   A.      I don't know.

16          Q.      What restrictions would the judge have

17   put on Michael Dardashtian?

18   A.      I don't know.

19          Q.      Were you just telling Bagaev another

20   false statement?

21                  MR. SINGER:  Objection.

22   A.      I haven't told Bagaev false statements.

23          Q.      Okay.  Then you said: "So a few

24   things.  I only have a few minutes."  Then Bagaev

25   wrote to you: "I see.  Good news?"  You wrote: "Great,

264

1   great news.  I was able to get my phone into

2   courtroom."

3        How were you able to get your phone into the

4   courtroom?

5   A.     I don't remember.

6              MR. GUAGLARDI:  Can you turn to the

7   page before that now, Counsel.

8              MR. SINGER:  Yes.

9        Q.     Let's start right at the bottom.  So

10  when you wrote to Bagaev and said, "I was able to get

11  my phone into the courtroom," Bagaev wrote, "Laugh out

12  loud, don't be banned because of that."  Then you

13  wrote this: "I recorded Michael saying he will never

14  give you any ownership."

15       You recorded Michael Dardashtian in the

16  federal courthouse?

17             MR. SINGER:  Note my objection, but

18  you can answer.  You can answer.

19       Q.     During a conference with the court?

20  A.     I don't believe so.

21       Q.     What did you mean when you said, "I

22  recorded Michael saying he will never give you any

23  ownership"?

24  A.     I don't remember.

25       Q.     Did you get permission from the

265

1   federal judge to audiotape the conference?

2   A.      I don't believe so.

3           Q.      Did you violate the court's order?

4   Did you violate any order of the court that prohibits

5   audiotaping conferences before a federal judge?

6   A.      No.

7           Q.      How did you audiotape the conference

8   then?

9   A.      I didn't.

10          Q.      Why did you say, "I recorded Michael

11  saying he will never give you any ownership"?

12  A.      I don't remember.

13          Q.      Is that a lie?

14  A.      No.

15                  MR. SINGER:  Note my objection.  You

16  can answer.

17          Q.      Is it truthful or is it false?

18                  MR. SINGER:  Over my objection, you

19  can answer.

20  A.      What's the question?

21          Q.      Did you audiotape any part of the

22  conference at all?

23  A.      No.

24          Q.      On September 27, 2017.

25  A.      No.

266

1          Q.      Then how did you say I recorded

2   Michael?

3   A.      Maybe I recorded him outside the courthouse.

4   I don't know.

5          Q.      Your statement above that says: "Judge

6   allowed me to have it to bring up papers about

7   settlement."  What did the judge allow you to have?

8   A.      I don't know.

9          Q.      The phone?

10  A.      I don't know.

11         Q.      And then he said: "I see."  Then you

12  wrote at 9/27/2017 at 1:47 p.m. and 38 seconds: "I

13  will send you the recording."

14              MR. GUAGLARDI:  I'm asking Counsel for

15  that recording, and I will notify Judge Lehrburger if

16  I don't receive it by the end of the week.  I want the

17  recording that is being referred to in this, on this

18  page, and I want the full and complete recording, not

19  just the recording that addresses Michael Dardashtian

20  saying that he will not give any ownership to Bagaev,

21  if it was even said.

22              MR. SINGER:  I'll take it under

23  advisement.

24         Q.      Whatever recordings were made by you,

25  Mr. Gitman --

267

```
1          Was that the only time you audiotaped a court
2     conference?
3                    MR. SINGER:  Objection.  Lack of
4     foundation.  Lack of foundation.  He never said that
5     he actually recorded a court conference.
6     A.      I would never record a court conference.
7          Q.      Is that the only time that you
8     recorded in the courthouse?
9     A.      I never recorded --
10                   MR. SINGER:  Objection; lack of
11    foundation.
12    A.      -- in the courthouse.
13         Q.      Any recordings you made of my client,
14    me, Judge Lehrburger, Evan Ostrer, anyone relating to
15    this litigation in court or out of court, we're asking
16    for all tape recordings, all audio recordings, all
17    video recordings of any kind.
18                   MR. GUAGLARDI:  Jo, mark that page.
19         Q.      After you said to Bagaev, "I will send
20    you the recording," he said to you, "I'd like to hear
21    it."  Did you ever send it to him?
22    A.      I don't know.
23                   MR. GUAGLARDI:  We want any document
24    where you transmitted a recording to Bagaev.
25         Mark that too, Jo.
```

268

1      Q.      You then asked Bagaev: "Also, how much

2   do you think ChannelReply makes every month?"  He

3   wrote: "Currently, total income 35,000."  And then he

4   wrote: "34 to 35, depending on yearly sign-ups.  I

5   don't know about expenses.  I think around 15,000.

6   Can be more if includes lawyers."

7              MR. GUAGLARDI:  Can you go to the page

8   before, Counsel.

9              MR. SINGER:  Is this the right page or

10  further down?

11             MR. GUAGLARDI:  The top of it is

12  9/27/2017, 1:52, so it would be the other way.

13     Q.      You then wrote: "35 right now,"

14  question mark.  Bagaev wrote: "Sorry, wrong info."

15  Bagaev wrote: "32,590 last month."  You wrote, "Oh,"

16  question mark.  Bagaev wrote: "$28,730 this month.

17  Will more until 30th of September."  Then Bagaev

18  wrote: "And it was about 34 on July."  You wrote:

19  "Thank you."  And then he wrote: "And we make about

20  2000 more every month."  Then he wrote "Dave."

21         Why were you asking him for the numbers on

22  ChannelReply when you had access to the bank accounts?

23  A.      I don't know.

24     Q.      Why wouldn't you just access the bank

25  accounts to see what the gross revenues were every

269

1    month for the company that you were a part owner of

2    and you had access to the bank accounts?

3    A.      I don't know.

4               MR. GUAGLARDI:   Counsel, can you go in

5    the other direction and we're going to go to, it would

6    be June 22, 2017, 10:21:17.

7               Q.      Mr. Gitman, looking down at June 20,

8    2017 at 3:37:32 p.m., you wrote to Bagaev: "Lindsay

9    asked me to send you an e-mail to send Mike the

10   resignation letter."  Bagaev wrote to you at 5:44:27

11   p.m. on June 20, 2017: "I need to send e-mail to

12   Mike," question mark.  You responded back at

13   5:45 p.m.: "Yes."  At 5:46 p.m. on June 20, 2017 you

14   said: "The lawyers want it to come from you, not them.

15   Otherwise, Mike might argue that we are conspiring."

16              What were you discussing with Mr. Bagaev at

17   5:46 p.m. on June 20?

18   A.      It appears I was asking Konstantyn to send his

19   resignation letter directly to Mike.

20              Q.      So does that confirm to you that Mike

21   hadn't received Konstantyn's resignation letter until

22   sometime after 5:46 p.m. on June 20?

23   A.      No.

24              Q.      That doesn't confirm that to you?

25   A.      It does not.

270

1          Q.      Who was sending Mike the resignation

2     letter, Mr. Bagaev?

3     A.      I don't know.

4          Q.      Well, when Mr. Bagaev wrote to you at

5     5:44 and asked you if he needed to send the e-mail to

6     Mike, were you able to infer that he hadn't sent it to

7     Mike at that point?

8     A.      No.

9          Q.      Were you conspiring with Mr. Bagaev

10     and your lawyers to have the lawyers draft a

11     resignation letter for Bagaev and send it to Mike?

12                    MR. SINGER:  Over my objection, you

13     can answer.

14     A.      No.

15          Q.      Who wrote the resignation letter?

16     A.      I don't know.

17          Q.      Bagaev didn't even know he was

18     supposed to send it to Mike as of 5:45 on June 20; did

19     he?

20     A.      Sorry.  What's the question?

21          Q.      Bagaev didn't even know he was

22     supposed to send his own resignation letter to Mike as

23     of 5:45 on June 20, 2017; did he?

24                    MR. SINGER:  Objection to form.  You

25     can answer.

271

```
1   A.      I don't understand the question.  That's a
2   statement.
3           Q.      Did Bagaev understand that he was
4   supposed to send his own resignation letter to Mike?
5   A.      I don't know what he thought.
6           Q.      I'm asking you.
7   A.      You would have to ask him that.
8           Q.      I'm asking you that.
9   A.      I don't know.
10              MR. SINGER:  Asked and answered.
11          Q.      Why were you writing -- strike that.
12          What did you mean, "The lawyers want it to
13  come from you, not them"?
14  A.      It means the lawyers want Konstantyn's
15  resignation letter to come directly from him to Mike.
16          Q.      What lawyer?
17  A.      Dentons.
18          Q.      Dentons didn't represent Bagaev; did
19  they?
20  A.      Not as far as I know.
21          Q.      Dentons represented you only; didn't
22  they?
23              MR. SINGER:  Objection, but you can
24  answer.
25  A.      Yes, I believe so.
```

272

1          Q.      So what does it matter what Dentons
2    wanted?
3    A.      You would have to ask them.
4          Q.      Were you resigning from ChannelReply
5    or was Bagaev?
6               MR. SINGER:  Objection to form, but
7    you can answer.
8    A.      I was not objecting -- I was not resigning
9    from ChannelReply.
10         Q.      Who was?
11              MR. SINGER:  Objection to form, but
12   you can answer.
13         Q.      Who was resigning from ChannelReply?
14   A.      Konstantyn.
15         Q.      Then why would your lawyers have
16   anything to say about where he sends his resignation
17   letter?
18   A.      Again, you would have to ask them.  I would
19   not know that.
20         Q.      And why did you write, "Otherwise,
21   Mike might argue that we are conspiring"?
22   A.      That's what I was told by my lawyers.
23         Q.      Which lawyer told you that?
24   A.      I don't remember.
25              MR. SINGER:  Objection.

273

1              MR. GUAGLARDI:   There is no privilege

2     at all.  He has already waived the privilege.  He has

3     already made statements without objection about what

4     his lawyers told him.

5              Q.     Can you tell me which lawyer told you

6     that Mike might argue that you're conspiring?

7     A.      No.

8              Q.     Was it Lindsay Ditlow?

9     A.      Again, I don't know.

10              Q.     Who did you speak with on June 20

11    regarding Bagaev resigning?

12    A.      I couldn't tell you.

13              Q.     You understand that perpetration of a

14    fraud isn't covered by the attorney/client privilege?

15              Do you know that?

16    A.      I don't understand the statement you're

17    making.

18              MR. SINGER:  My client understands.

19              MR. GUAGLARDI:  I hope he does,

20    because we'll be addressing it with the court.

21              Can we move forward, Counsel, please, to the

22    page with June 20, 2017, 7:02:39 a.m., please.  Thank

23    you.

24              Q.     Mr. Gitman, on June 19, 2017 at

25    5:58:13 p.m., you wrote to Mr. Bagaev and said:

274

1    "Please clear text conversion."

2            Why did you write and tell him to please clear

3    the text conversion?

4    A.      I have no idea.

5            Q.      What did you mean by that?

6    A.      I have no idea.

7            Q.      You don't know what you meant by the

8    words you're reading right now?

9    A.      That's correct.

10           Q.      What does "please clear text

11   conversion" mean?

12   A.      I don't remember.

13           Q.      Does that mean that you asked Bagaev

14   to delete his texts with you?

15   A.      No.

16           Q.      What does it mean?

17   A.      I don't know.

18           Q.      Well, if you don't know what it means,

19   how do you know it didn't mean that?

20   A.      I wouldn't ask somebody to do something like

21   that.

22           Q.      You wouldn't ask someone to delete

23   texts.  Correct?

24   A.      That's correct.

25           Q.      Just like you wouldn't audiotape

275

1   anyone in a federal courthouse.  Correct?

2            MR. SINGER:  Objection to form,

3   Counsel, unnecessary.

4            MR. GUAGLARDI:  We're going to go

5   backward, Counsel, to June 18, 2017 at 4:14:21 p.m.

6   Thank you.

7        Q.     On June 12, 2017 at 10:49:26 a.m., you

8   wrote to Bagaev and said: "I would like to leave you

9   and A with a few options to think about overnight,

10   tonight.  Should we go back to ChannelReply the way

11   things were, in parenthesis, I might step away in this

12   case, end parenthesis, fight in court, start a

13   competing product, etc?"  I read that correctly?

14        You wrote that.  Right?

15   A.     Yes.

16        Q.     And the letter A on the first line

17   where it says "I would like to leave you and A," you

18   mean Aleksey Glukharev.  Correct?  That's A?

19   A.     Yes.

20        Q.     And K is Konstantyn Bagaev.  Correct?

21   A.     Yes.

22            MR. GUAGLARDI:  There is no K in the

23   sentence.  And he refers to K as Konstantyn and A as

24   Aleksey.  That was for the Court Reporter's

25   edification.

276

1          Q.      So again, Mr. Gitman, with the names,

2     I would like to leave you and Aleksey Glukharev with a

3     few options to think about overnight, tonight.  Should

4     we go back to ChannelReply (I might step away in this

5     case), fight in court, start a competing product, et

6     cetera.

7          Why have that conversation with Bagaev on

8     June 12, 2017?

9     A.      I don't remember.

10         Q.      Weren't you a partner of Mike

11    Dardashtian's in NDAP, CSV and ChannelReply on

12    June 12, 2017?

13    A.      Yes.

14         Q.      Didn't you have a fiduciary duty to

15    Mike Dardashtian on June 12, 2017?

16    A.      Yes.

17         Q.      Didn't you have a fiduciary duty to

18    ChannelReply on June 12, 2017?

19    A.      I don't know.

20         Q.      Didn't you have a fiduciary duty to

21    Cooper Square Ventures on June 12, 2017?

22    A.      Yes.

23         Q.      Didn't you have a fiduciary duty to

24    NDAP on June 12, 2017?

25    A.      Yes.

277

1       Q.    So how could you have a discussion

2  with Bagaev and Aleksey Glukharev and say to them do

3  you want to fight in court, start a competing product

4  or go back to ChannelReply the way it was without

5  breaching that fiduciary duty?

6  A.    Like I explained many times before, it's

7  permitted by my agreement.

8       Q.    Can you explain for the judge who is

9  going to read the transcript how you believe to take

10  the ChannelReply software and the ChannelReply

11  platform away from ChannelReply and Cooper Square

12  Ventures or NDAP and move it to Channel Reply, Inc. or

13  any other third party, and how you are permitted to do

14  that?

15       MR. SINGER:  Object to the question,

16  but you can answer.

17  A.    I don't understand the question.

18       Q.    How were you able to do that under any

19  agreement?

20  A.    I'm sorry.  I don't understand the question.

21  There seem to be multiple questions there.

22       Q.    How are you permitted to take the

23  ChannelReply platform and software away from Cooper

24  Square Ventures or NDAP?

25  A.    Am I allowed to take it away?  No.  But I am

278

1  allowed to copy it.

2          Q.      And you're allowed to use the copy for

3  in a competing business?

4  A.      Yes.

5          Q.      And that's why you moved to it Channel

6  Reply, Inc.?

7  A.      No.

8          Q.      Why did you move it to Channel Reply,

9  Inc.?

10  A.      Because Mike never solidified ChannelReply,

11  LLC.

12          Q.      Didn't Mike create, organize and file

13  ChannelReply, LLC?

14  A.      He filed.

15          Q.      And didn't he then offer the same

16  operating agreement, 50/50, between you and him as

17  existed for Cooper Square Ventures?

18  A.      I don't know.

19          Q.      Didn't we go through this already in

20  your first deposition?

21  A.      I don't remember.

22          Q.      Don't you remember him offering you

23  the actual operating agreement and tell you that it

24  was exactly identical to the one with Cooper Square

25  Ventures and just changing the name to ChannelReply,

```
 1    LLC?

 2    A.       No.

 3             Q.       And you refused to sign it?

 4    A.       No.

 5                      MR. GUAGLARDI:  Counsel, can you go to

 6    June 1st, 2017, 1:06:37 p.m.

 7                      MR. SINGER:  Sure.

 8             Q.       So on June 1st, 2017 at 1:05:30 p.m.,

 9    you wrote to Bagaev: "If Mike didn't fuck over all the

10    shareholders and liabilities that we're supposed to

11    pay just to pay him himself, we would not be in this

12    position."

13             You wrote to Bagaev and said Mike fucked over

14    the shareholders and liabilities?

15    A.       Yes.

16             Q.       Why?

17    A.       Because that's what he did.

18             Q.       How?

19    A.       There were multiple shareholders that he

20    verbally and in written promised equity to who he --

21    that he never did.

22             Q.       Who?

23    A.       Alice Fritz, Konstantyn, Aleksey and others.

24             Q.       And was an agreement ever prepared to

25    give anybody any stock interest?
```

280

```
1    A.       You would have to ask Mike that.

2            Q.       Did you ever prepare an agreement to

3    give Alice Fritz, Konstantyn or Aleksey ownership

4    interest in any company?

5    A.       No.   That is not my role in the company.

6                     MR. GUAGLARDI:   Counsel, can you move

7    that forward to June 1st, 2017, 1:12:28.

8                     MR. SINGER:   Sure.

9            Q.       Mr. Gitman, on June 1st, 2017 at

10   1:11:59 p.m., you wrote to Bagaev and said: "When did

11   we build first version on ZenDesk script?"

12           You wrote that.   Right?

13   A.       Um-hum.

14           Q.       That was the first version of

15   ChannelReply you're referring to.   Correct?

16   A.       No.

17           Q.       What was it?

18   A.       I don't remember, but it's some sort of script

19   to work with ZenDesk.

20           Q.       Not ChannelReply?

21   A.       I don't believe so.

22           Q.       What was his answer?

23   A.       January 2012.

24           Q.       Wasn't that when ChannelReply's first

25   version was formed?
```

281

1   A.      No.

2           Q.      When was it?

3   A.      I don't remember.

4           Q.      Well, how do you know that it wasn't

5   January of 2012?

6   A.      It seems a little early.

7           Q.      Well, when was it according to you if

8   that's a little early?

9   A.      Years later.

10          Q.      When?

11  A.      I would have to look at my e-mails.  I don't

12  know offhand.

13          Q.      So you don't know whether January 2012

14  is accurate; do you?

15  A.      I don't believe it's accurate.

16          MR. GUAGLARDI:  Can you go, Counsel,

17  to June 4, 2017 at 2:18:52 on the top.

18          Q.      Mr. Gitman, you wrote on June 4, 2017

19  at 1:23:18 p.m. to Bagaev and said: "Please don't call

20  Mike until we meet in a week."

21          You wrote that.  Right?

22  A.      Yes.

23          Q.      Then you wrote: "I want to explain

24  everything in person."  Right?

25  A.      Yes.

282

1          Q.      Why did you write that to Bagaev?

2   A.      No idea.

3          Q.      You wanted to be able to try and tell

4   Mike that you were going to remove the company out of

5   ChannelReply and put it into a new company in a new

6   name?

7                  MR. SINGER:  Objection, but you can

8   answer.

9   A.      I don't understand the question.

10         Q.      Was the purpose of your discussion

11  with Mike going to be that you were taking all of the

12  intellectual property of ChannelReply and moving it to

13  Channel Reply, Inc.?

14  A.      I had no plan of a discussion with Mike

15  according to these messages.

16                 MR. GUAGLARDI:  Can you go, Counsel,

17  to June 4, 2017 at 2:26:37.  Thank you.

18         Q.      Mr. Gitman, on June 4, 2017 at 2:26:02

19  p.m., Bagaev wrote to you and said: "Dave, I mentioned

20  previously that Mike can put his money to cover stolen

21  ones.  Thus it will look like you are really stolen

22  ChannelReply from NDAP.  Is it legal?"  And you wrote:

23  "What is done is illegal.  But besides that, I don't

24  trust them going forward."

25                 Did Bagaev tell you that taking ChannelReply

283

1   from NDAP was stealing?

2   A.      No.

3          Q.      What did he say?

4   A.      "Dave, I mentioned previously that Mike can

5   put his money to cover stolen ones.  Thus, it will

6   look like you are really stolen ChannelReply from

7   NDAP."

8          Q.      What did you understand that to mean

9   when he wrote that to you?

10  A.      Exactly what he wrote.

11         Q.      What did you understand it to mean?

12  A.      Exactly what he wrote.

13         Q.      I'll ask one more time.  What did you

14  understand it to mean when he said, "It will look like

15  you are really stolen ChannelReply from NDAP"?

16  A.      Exactly what he wrote.

17         Q.      Is that what the court interpreted

18  when they ordered you to put it back and dissolve

19  Channel Reply, Inc.

20              MR. SINGER:  Objection, but you can

21  answer.

22  A.      I don't know what the court interpreted.  I

23  cannot speak for the court.

24         Q.      And then Bagaev asked you: "Is it

25  legal?"  And what you wrote is: "What is done is

284

```
 1   illegal.  But besides that, I don't trust them going
 2   forward."  Who didn't you trust going forward?
 3   A.      I don't know who I'm referring to.
 4                MR. GUAGLARDI:  Counsel, can you go to
 5   the page June 4, 2:29:59.
 6                MR. SINGER:  Yes.
 7        Q.      Mr. Gitman, we are now at June 4,
 8   2017, 2:27:30 p.m., Bagaev wrote to you: "So you are
 9   in parity right now.  He stole money and you stole
10   ChannelReply.  Right?"
11                MR. SINGER:  Objection, but you can
12   answer.
13        Q.      Did I read it correctly, Mr. Gitman?
14   A.      Yes, you read that statement correctly.
15        Q.      Okay.  So --
16   A.      I also said two lines above that I have not
17   stole ChannelReply.
18        Q.      I didn't get to that yet.  My question
19   to you relating to the statement I read was Bagaev
20   interpreted what you did as stealing ChannelReply.
21           Is that true?
22   A.      No.
23        Q.      Well, what did he mean?
24   A.      You'd have to ask him.
25        Q.      He stole money and you stole
```

285

1   ChannelReply.

2   A.      You'd have to ask him.

3               MR. SINGER:  Objection, but you can

4   answer.

5       Q.      And your response was: "His number one

6   job is to watch money and accounting.  I have not

7   stolen ChannelReply."

8       So you didn't steal ChannelReply; that's your

9   belief?

10  A.      Yes.

11      Q.      Do you know why the court ordered you

12  to put it back then?

13  A.      I would have to ask the court.

14      Q.      So let's continue up the statement, at

15  the top of that on June 4 at 2:29:13, you wrote to

16  Bagaev: "Mike will continue to have ownership at

17  ChannelReply.  However, I will not be in a position to

18  let him be in charge of money.  But he will not have

19  half ownership as he had."

20      I read that correctly.  You wrote that.

21  Right?

22  A.      No.  I wrote some of that and Konstantyn wrote

23  the other some of that.

24      Q.      So Konstantyn wrote: "But he will not

25  have half ownership as he had."  Correct?

286

1    A.       Yes.

2             Q.       Let's go to the page before that.   So

3    the page before that on June 4, 2017 at 2:30:09 p.m.,

4    your response was: "He never had half."

5             You wrote that; didn't you?

6    A.       Yes.

7             Q.       Dardashtian never owned half of

8    ChannelReply?

9    A.       Correct.

10            Q.       What did he own?

11   A.       Cooper Square Ventures and NDAP.

12            Q.       How much of ChannelReply did he own?

13   A.       I don't know.

14            Q.       Well, how do you know it wasn't half

15   then?

16   A.       You're right, I don't know if it was half.

17            Q.       The money that came in from

18   ChannelReply into the bank accounts went into the

19   Cooper Square Ventures bank account; didn't it?

20   A.       No.

21            Q.       Did it go into the NDAP bank account?

22   A.       I don't think so.   I don't know.

23            Q.       What bank account did it go in?

24   A.       I don't know.

25            Q.       When you filed tax returns with every

287

1    entity that you owned with Mike Dardashtian, did you

2    file your schedule K-1s?

3    A.      Yes.

4            Q.      And did you file federal tax returns?

5    A.      Yes.

6            Q.      And didn't all those federal tax

7    returns and K-1s reflect that Mike owned 50 percent

8    and you owned 50 percent?

9    A.      I don't know.

10           Q.      You wouldn't lie on a federal tax

11   return; would you?

12   A.      No.

13           Q.      And if you took a gain or a loss on a

14   federal tax return since ChannelReply started, that

15   would be evidence of what percentage ownership you had

16   in the company; wouldn't it be?

17   A.      No.

18           Q.      Why wouldn't it be?

19   A.      Because the ownership with ChannelReply was

20   never fully sorted out.

21           Q.      So did you pay taxes and not declare

22   the income on the money that was earned from

23   ChannelReply?

24                   MR. SINGER:  Objection.  Lack of

25   foundation, but you can answer.

288

1              MR. GUAGLARDI:  There is no

2    foundation.  I'm asking a question.

3         Q.      On all the money that was earned in

4    ChannelReply, did you file taxes and pay the taxes on

5    that money?

6    A.      As far as I know.  You would have to check

7    with Joel Liebman.  I don't know.

8         Q.      Did you file your taxes for the money

9    you earned on ChannelReply?

10   A.      You would have to check with Joel Liebman.

11        Q.      I'm checking with you.

12   A.      I don't know.  You would have to check with

13   Joel Liebman.

14        Q.      So if Joel Liebman says that the money

15   that was paid in ChannelReply went into Cooper Square

16   Ventures' bank account or NDAP's bank account and you

17   guys paid the taxes on it, and you each declared

18   50 percent ownership, then would that be what the

19   truth is?

20   A.      I'm not sure Joel Liebman would know that

21   answer.

22        Q.      Well, who would?

23   A.      Only Mike Dardashtian.

24        Q.      Should I check with the IRS?

25   A.      Please do.

289

1          MR. SINGER:  Objection to form, but

2    you can answer.

3          THE WITNESS:  I'm taking a break.  I

4    need to use the restroom.

5          MR. GUAGLARDI:  Okay.

6     (A recess is taken from 7:31 to 7:42 p.m.)

7          THE WITNESS:  Sorry for the delay.

8     Q.     I'm just going to refresh your

9    recollection.  On the top of the page before, you

10   wrote: "Mike will continue to have ownership at

11   ChannelReply.  However, I will not be in a position to

12   let him be in charge of money."  Bagaev wrote: "But he

13   will not have half ownership as he had."  You then

14   wrote: "He never had half."  Bagaev wrote: "Well, for

15   me you always were 50/50 partners.  When you hired me

16   for the full time, you told that you are equal

17   partner."

18        So Mr. Gitman, Mr. Bagaev says that you told

19   him that you were 50/50 partners in ChannelReply;

20   didn't you?

21   A.     Um-hum.  Sorry.  What's the question?

22        Q.     Mr. Bagaev said that you told him when

23   he started with you that you and Mike were 50/50

24   partners in ChannelReply; didn't you?

25   A.     Yes.  That is the statement you just read me.

1          Q.      Did you lie to him or was that the
2    truth?
3    A.      No, I believe that's the truth.
4                  MR. SINGER:  Note my objection.
5          Q.      Excuse me?
6    A.      I don't remember.  What?
7          Q.      Was it the truth when you told Bagaev
8    that you and Mike were 50/50 partners in ChannelReply?
9    A.      No.  I never said we were 50/50 partners in
10   ChannelReply.
11         Q.      Isn't that what he said that you've
12   told him?
13   A.      No.  I told him -- he said I told him that we
14   were 50/50 partners in Cooper Square Ventures.
15         Q.      Aren't you talking about ChannelReply?
16   Should I bring you back to the page before?
17   A.      If you want to.
18         Q.      You said: "Mike will continue to have
19   ownership at ChannelReply.  However, I will not be in
20   a position to let him be in charge of the money."
21   Bagaev wrote to you and said: "But he will not have
22   half ownership as he had."
23         That references ChannelReply; doesn't it?
24   That's his response to your statement before.
25   A.      It might, but I was not -- the statement I

291

1   made to him when he first joined was not about

2   ChannelReply.

3          Q.      Okay.  It was about something other

4   than ChannelReply?

5   A.      That's correct.

6          Q.      So what right did you have on June 4,

7   2017 for you to dictate that you will not be in a

8   position to let Mike be in charge of the money?

9   A.      I don't understand the question.

10          Q.      What right did you have on June 4,

11  2017 to dictate what right Mike had to be in charge of

12  the money of ChannelReply?

13                  MR. SINGER:  Objection on the record,

14  but you can answer.

15  A.      I don't know, and I don't believe I was

16  talking about ChannelReply money.

17          Q.      In the same sentence it says: "Mike

18  will continue to have ownership at ChannelReply.

19  However, I will not be in a position to let him be in

20  charge of money."

21          Are you saying that that reference to money

22  wasn't to ChannelReply's money?

23  A.      No, it is.  I apologize.  I'm a little tired,

24  Barry.

25          Q.      So what right did you have to decide

292

1   on June 4 that Mike wasn't going to be in charge of

2   ChannelReply's money?

3   A.      I'm not sure.

4           Q.      And what right did you have to offer

5   him anything less than his half ownership that he

6   already owned in ChannelReply?

7   A.      I don't believe he owned half.

8           Q.      You told Bagaev he owned half.

9   A.      No, I didn't.  I said he owned half of Cooper

10  Square Ventures.

11          Q.      Where does it say Cooper Square

12  Ventures?

13  A.      I don't know, but that's what was in my head,

14  if I remember correctly.

15          Q.      At one point in time didn't you agree

16  to be bought out for $650,000?

17  A.      No, I don't believe so.  I wouldn't make an

18  agreement like that.  That wouldn't even cover

19  attorney costs.

20          MR. GUAGLARDI:  Let's go to Exhibit 63

21  if we can, Brett.

22          MR. SINGER:  Sure.

23          Q.      Mr. Gitman, Lindsay Ditlow, Brian

24  Cousin and Mark Meredith were all three your lawyers

25  from Dentons.  Correct?

293

1    A.      Yes.

2            Q.      I'm showing you an e-mail from me --

3    strike that.

4            I'm showing you an e-mail from Lindsay Ditlow

5    dated October 4, 2018 at 1:49 p.m. to Evan Ostrer,

6    copying David Cousin and Mark Meredith, and the

7    subject matter is Settlement Counteroffer.

8            Do you see that?

9    A.      Yes.

10           Q.      Can you tell me what number 2 says?

11   A.      No, I can't see it.

12           MR. SINGER:  Here it is.

13   A.      Sure.  You want me to read the whole thing?

14           Q.      I want you to tell me whether your

15   counsel wrote to our law firm and offered for you to

16   be bought out for $650,000.  That's my question.

17   A.      That's what this e-mail appears to state.

18           Q.      Is that correct what I said, that your

19   attorney wrote to my firm and said you were willing to

20   accept $650,000 to be bought out of ChannelReply?

21           MR. SINGER:  He's only asking you

22   about paragraph 2.  Keep that in mind.

23   A.      I'm sorry, Barry.  I didn't hear your

24   question.  Could you ask it again, please?

25           Q.      Did you authorize your counsel to

294

1   respond to our offer to settle with a counteroffer

2   whereby you agreed to accept $650,000 to be bought out

3   of all of your interests, including ChannelReply?

4   A.      I don't know.

5           Q.      Well, did your counsel write this --

6   A.      When was this?  What's the date of this?

7           Q.      October 4, 2018.

8   A.      Yeah.  I mean, that's a year and a half ago, I

9   don't remember.

10          Q.      You don't remember whether you agreed

11  to be bought out?

12  A.      Yes.

13          Q.      Earlier you told me you never agreed

14  to be bought out.  Which is true; what you said

15  earlier, that you never agreed to be bought out by

16  Dardashtian, or what's contained in your lawyer's

17  letter that's dated October 4, 2018?

18  A.      I don't remember agreeing to being bought out.

19          Q.      Are you aware, now that you see your

20  own lawyer's letter that says settlement counteroffer,

21  that Michael Dardashtian sought to redeem your shares

22  and buy you out at a specific price prior to

23  October 4, 2018, which precipitated this counteroffer?

24  A.      I'm sorry, I'm having trouble following the

25  question.

1          MR. GUAGLARDI:  Josephine, could you
2    read that back, please?
3          THE WITNESS:  I'm tired.  It might be
4    easier to have shorter questions.
5          (The pending question is read by the
6    Reporter.)
7    A.     I'm sorry.  I don't understand the question.
8          Q.     Do you understand what the word
9    counteroffer means?
10   A.     Yes.
11         Q.     What does it mean?
12   A.     It means to give, respond to somebody's offer
13   with another offer.
14         Q.     Great.  And on October 4, 2018 your
15   attorney submitted your counteroffer.  Correct?
16   A.     I don't know.
17         Q.     Isn't that what it says?
18   A.     I don't know.  I haven't read the whole thing.
19   It seems to be like an offer for some $650,000 buyout.
20         Q.     And on the top of it, do you see in
21   the subject line?  What does it say in the subject
22   line?
23   A.     Settlement -- Re: Settlement Counteroffer.
24         Q.     And your attorney wrote that.  Right?
25   A.     Wrote what?

296

1       Q.     The words settlement counteroffer.

2  A.     I don't know.  This seems to be an e-mail

3  chain because it's a response.

4       Q.     Isn't the subject line under her own

5  e-mail?  It says from Lindsay Ditlow.

6  A.     Again, it says Re: Settlement Counteroffer.

7  So I don't know if she wrote settlement counteroffer

8  in the original e-mail.  This seems to be a reply to

9  an e-mail.

10       Q.     Did you agree to be bought out for

11  $650,000 on October 4, 2018?

12  A.     No.

13       Q.     So your attorney had no authority to

14  write the offer that they wrote?

15           MR. SINGER:  Note my objection, but

16  you can answer.

17  A.     I don't know what --

18           MR. SINGER:  You can answer.

19  A.     I don't know what authority they had.

20       Q.     Mr. Gitman, are you aware that as a

21  result of this e-mail, that we, on Michael

22  Dardashtian's side, spent tens of hours negotiating

23  with your attorneys, including meeting with them at

24  their office and going to court and burdening the

25  judge and having hours and hours of meetings with the

297

1   judge over the terms contained in your lawyer's

2   letter, settlement offer?

3   A.      No, I did not know that.

4         Q.      So you're saying that you never agreed

5   to be bought out for $650,000 as this e-mail suggests?

6   A.      That's not something that would work for me,

7   obviously.

8         Q.      That's not my question.  Let me repeat

9   my question.

10        Are you telling me that on October 4, 2018,

11  that you never authorized your attorney to offer to be

12  bought out for $650,000 on the terms contained in this

13  offer letter?

14  A.      I don't know what I've authorized and not

15  authorized my attorney to do.

16        Q.      Are you aware that in the NDAP

17  operating agreement that it indicates that a member

18  shall not be engaged in any business, whether internet

19  based or of a traditional brick and mortar type, that

20  is competitive with the company without the expressed

21  written permission of the majority of the members of

22  the company?

23              MR. SINGER:  Are you referring to an

24  exhibit, Counsel?

25              MR. GUAGLARDI:  I'm asking him about

298

1    the NDAP operating agreement and I read the provision

2    into the record and asked him --

3    A.      Yeah, I'm happy -- I don't remember that.  I'm

4    happy to read the document if you have it available.

5            Q.      Well, you indicated earlier that the

6    Cooper Square Ventures operating agreement permitted

7    you to engage in competitive business activity; didn't

8    you?

9    A.      I don't remember.

10           Q.      Are you aware that NDAP restricts any

11   competitive business activity in the NDAP operating

12   agreement?

13   A.      I don't know.  I don't have the agreement in

14   front of me.

15           Q.      You never asked Mike Dardashtian for

16   permission for you to form Dalva Ventures or Accel

17   Commerce.  Correct?

18   A.      Correct.

19           Q.      And when you entered into the

20   operating agreements with both Cooper Square Ventures

21   and NDAP, you agreed that all confidential information

22   and intellectual property that you received when a

23   member of either of those entities would be maintained

24   in the strictest confidence and for the benefit of

25   those entities only.  Correct?

1    A.      I don't know.  I don't have the agreement in

2    front of me.

3           Q.      So you don't know as you sit here

4    today as an owner and an officer of those companies

5    whether you have a duty to maintain confidential

6    information and intellectual property solely for the

7    benefit of those companies?

8    A.      Again, I have not been a member of the

9    company, a manager of the company for years.  I would

10   have to re-review the documents, which I don't have in

11   front of me.

12          Q.      Aren't you a member of both the

13   companies today?

14   A.      Yeah.  I don't know actually.  I'm not sure.

15          Q.      You don't know whether you're a member

16   of Cooper Square Ventures as we sit here today?

17   A.      I believe I'm a member of Cooper Square

18   Ventures.  I'm not sure about NDAP.

19          Q.      Didn't you last month ask for the

20   schedule K-1 from the corporate accountant for both

21   these entities?

22   A.      No, I did not.

23          Q.      Didn't you ask for them at some point

24   in 2020 for your K-1 for both of these entities?

25   A.      I'm not sure.  I asked for my K-1.

1          Q.      And if you asked for your K-1, doesn't

2    that mean you're an owner of both NDAP and CSV?

3    A.      I don't know.  I just asked for my K-1.

4          Q.      Did you receive it?

5    A.      I received a K-1, a single K-1.

6          Q.      From what entity?

7    A.      I don't know.  I don't have it in front of me.

8          Q.      What percentage ownership did it tell

9    you you owned in CSV?

10   A.      I don't know.  It's not in front of me.

11         Q.      Did it tell you you owned 50 percent

12   ownership in CSV?

13   A.      I don't know.  It's not in front of me.

14         Q.      Did you receive any K-1 for

15   ChannelReply?

16   A.      I don't know.

17         Q.      Is that because ChannelReply is owned

18   by Cooper Square Ventures?

19   A.      I don't believe it is.

20         Q.      Did you receive an independent K-1 for

21   the money that ChannelReply earned in 2019?

22   A.      Did I receive, I'm sorry?

23         Q.      Did you receive a K-1 from

24   ChannelReply for the income that ChannelReply earned

25   in 2019?

301

1    A.      I don't believe so.

2            Q.      Why not?

3    A.      You would have to ask Joel Liebman.

4            Q.      Well, did ChannelReply not declare its

5    income for 2019?

6            Did it not declare its income for 2019?

7    A.      I'm not a manager of the company and able to

8    answer that.

9            Q.      Isn't it true that ChannelReply's

10   income gets filed under Cooper Square Ventures?

11   A.      I have no idea of any of the operations of the

12   company.

13           Q.      Have you performed any forensic

14   accounting on any of the plaintiff businesses as of

15   today?

16   A.      I don't understand that question.

17           Q.      Have you retained any third party to

18   perform any type of accounting on the financials of

19   the business operation of Cooper Square Ventures,

20   ChannelReply or NDAP since their inception through

21   today?

22   A.      Yes, multiple times.

23           Q.      And who prepared those accountings?

24   A.      Mary Faith Andan and Steven Shulman.

25                   MR. GUAGLARDI:  Okay.  I'm going to

302

1    ask you to produce all of those accountings.  They

2    have not been produced to us.

3                    MR. SINGER:  We'll take it under

4    advisement.

5                    MR. GUAGLARDI:  Jo, please identify

6    that request.

7           Q.      Mary Faith Andan, does she have any

8    degrees, certifications or credentials?

9    A.      As I answered this question in our first

10   deposition, yes.

11          Q.      What is she?  Is she a CPA?

12   A.      I believe so.

13          Q.      Do you know if she is or you think she

14   is?

15   A.      I believe so.

16          Q.      In what country?

17   A.      I don't know.  You'll have to check with her.

18          Q.      Sigmento, did you ever work for them?

19   A.      No.

20          Q.      Did you ever fly to Israel to become

21   the CEO of Sigmento?

22   A.      No.

23          Q.      Did you ever fly to Israel to become

24   the CFO of Sigmento?

25   A.      No.

303

1          Q.      Did you ever fly to Israel to meet

2    with Sigmento over taking any type of employment with

3    Sigmento?

4    A.      No.

5          Q.      Did you have any affiliation ever with

6    Sigmento?

7    A.      Yes.   Cooper Square Ventures invested in

8    Sigmento.

9          Q.      And did you ever meet with them to

10   become employed by them or retained by them on your

11   own individual behalf?

12   A.      I did fly to Israel and have spent time with

13   them as an advisor.

14         Q.      For what purpose?

15   A.      To be as an advisor.

16         Q.      What type of advisor?

17   A.      As an advisor, business advisor.

18         Q.      Were you ever retained as a business

19   advisor by Sigmento?

20   A.      No.  I'm an investor.

21         Q.      How much did you invest in Sigmento?

22   A.      $10,000.

23         Q.      And what did you get in exchange for

24   the $10,000 investment?

25   A.      I don't remember.  You'd have to ask Mike

304

1   Dardashtian who handled the amount.

2           Q.      You've always had access to all of

3   CSV, NDAP and ChannelReply's bank accounts and

4   QuickBooks accounts.   Correct?

5   A.      No.

6           Q.      When have you not had access?

7   A.      I don't know the exact time and dates.

8           Q.      Well, how do you know you didn't have

9   access?

10  A.      Because I couldn't log in.

11          Q.      Why couldn't you log in?

12  A.      I don't know.

13          Q.      Do you have any proof that you tried

14  to log in and you were unable to log in?

15  A.      I don't know.

16          Q.      Do you have any document at all that

17  shows that your access was denied?

18  A.      I don't know.

19                  MR. GUAGLARDI:   I'm going to ask you

20  to produce any document, any proof whatsoever that you

21  have that shows that you have not had full and

22  complete access to all of CSV, NDAP or ChannelReply's

23  bank accounts, QuickBooks accounts or any other

24  accounts that they maintained at any time from the

25  inception of the accounts through the present date.

305

1          Jo, please identify that, as well.

2                    MR. SINGER:  Take it under advisement.

3          Q.     Mr. Gitman, what proof do you have

4    that there has been any unequal distribution of any of

5    the funds from any of these companies, CSV, NDAP or

6    ChannelReply, as between you and Michael Dardashtian?

7    A.     Mary Faith Andan and Steven Shulman's

8    accounting.

9                    MR. GUAGLARDI:  To the extent that

10   they're the same accountings, Brett, we would like

11   them.  If they are different, we want them, as well,

12   to demonstrate anything that Mr. Gitman claims was a

13   disproportionate distribution or any theft or

14   misappropriation that he alleges against

15   Mr. Dardashtian.  Okay?

16                   MR. SINGER:  We'll take it under

17   advisement.

18         Q.     Mr. Gitman, what do you believe

19   constitutes confidential information belonging to

20   ChannelReply?

21   A.     I don't know.

22         Q.     What do you believe constitutes

23   confidential information belonging to Cooper Square

24   Ventures?

25   A.     I don't know.

306

1      Q.      What do you believe constitutes
2  confidential information belonging to NDAP?
3  A.      I don't know.
4      Q.      What do you believe constitutes
5  intellectual property belonging to ChannelReply?
6  A.      I don't know.
7      Q.      What do you believe constitutes
8  intellectual property belonging to Cooper Square
9  Ventures?
10 A.      I don't know.
11     Q.      What do you believe constitutes
12 intellectual property belonging to NDAP?
13 A.      I don't know.
14     Q.      Have you ever shared confidential
15 information belonging to any of those three entities
16 with any third party?
17 A.      Yes.
18     Q.      Who?
19 A.      We routinely share confidential information
20 with third parties.
21     Q.      Who?
22 A.      I don't, I don't know off the top of my head.
23     Q.      I'm going to ask you again.  Who did
24 you share ChannelReply, Cooper Square Ventures or
25 NDAP's confidential information with outside of Mike

307

1    Dardashtian?

2    A.      I don't know off the top of my head.  Many,

3    many people.

4           Q.      Do you understand that you are not

5    permitted to share that confidential information with

6    anyone outside the company?

7    A.      I am.

8           Q.      You are permitted to do that?

9    A.      I am permitted to do that.

10          Q.      Based on what authority do you rely

11   on?

12   A.      Well, for the most part, I made sure I would

13   agree that we share the information with Michael and

14   we would usually put a nondisclosure agreement in

15   place with that.

16          Q.      Outside of the nondisclosure

17   agreement, did you ever share confidential information

18   belonging to ChannelReply, Cooper Square Ventures and

19   NDAP with any third party?

20              MR. SINGER:  Over my objection, you

21   can answer.

22   A.      Possibly.

23          Q.      With who?

24   A.      I don't know.  I didn't say with all certainty

25   that I have.

1        Q.       We're going to ask you to advise us

2   through Counsel as to the identity of any third party

3   that you shared ChannelReply, Cooper Square Ventures,

4   NDAP's confidential information with, other than with

5   a nondisclosure agreement, and then we want the

6   nondisclosure agreement, as well.

7   A.       You have those agreements.

8               MR. GUAGLARDI:   Okay, Counsel?

9               MR. SINGER:   All requests are taken

10   under advisement.

11               MR. GUAGLARDI:   Jo, mark that.

12        Q.       Mr. Gitman, did you ever share any of

13   ChannelReply, Cooper Square Ventures or NDAP's

14   intellectual property with any third party other than

15   Michael Dardashtian?

16   A.       Yes.

17        Q.       With who?

18   A.       Again, you keep asking the same question.   I

19   don't know.

20        Q.       We're going to ask for a list of any

21   people you shared that with, and if there is

22   nondisclosure agreements, we're going to ask for a

23   copy of those, as well.

24   A.       You're going to have to get those from Mike

25   Dardashtian.

309

1              MR. GUAGLARDI:  Evan, does Mr. Gitman

2   and Counsel have Exhibit 68?

3              MR. SINGER:  Let me check.

4              MR. OSTRER:  No, they do not.  I can

5   send that.  It will take me a minute or two.

6              MR. GUAGLARDI:  Don't worry about it.

7        Q.     Mr. Gitman, what are you seeking in

8   this lawsuit?

9   A.        To put Mike Dardashtian in prison.

10             Q.       Anything else?

11  A.        That's it.

12             MR. GUAGLARDI:  Thank you, Counsel.

13  Thank you, Mr. Gitman.  We're going to conclude the

14  deposition.  I'm going to reserve the right that I

15  indicated to you earlier about making application for

16  fees associated with and for the Court Reporter fees

17  associated with it.  I hope everybody stays safe and

18  healthy, and God bless you all.

19             MR. SINGER:  Thank you all.  Have a

20  good night.

21

22        (The deposition is concluded at 8:10 p.m.)

23

24

25

310

1                    CERTIFICATE OF OFFICER

2

3        I, JOSEPHINE M. BIAGINI, A Notary Public and
   Certified Court Reporter of the State of New Jersey,
4  do hereby certify that prior to the commencement of
   the examination,
5

6                        DAVID GITMAN

7  was sworn by me to testify the truth, the whole truth
   and nothing but the truth.
8

9        I DO FURTHER CERTIFY that the foregoing is a
   true and correct transcript of the testimony as taken
10 stenographically by and before me at the time, place
   and on the date herein before set forth.
11

12       I DO FURTHER CERTIFY that I am neither a
   relative nor employee nor attorney nor counsel of any
13 of the parties to this action, and that I am neither a
   relative nor employee of such attorney or counsel, and
14 that I am not financially interested in the action.

15

16

17  _____
    Notary Public of the State of New Jersey
18  My commission expires September 23, 2023
    C.S.R. License No. XI01133
19

20

21

22

23

24

25