UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

MICHAEL DARDASHTIAN, individually and
on behalf of COOPER SQUARE, LLC
a/k/a COOPER SQUARE VENTURES, LLC,
NDAP, LLC, and CHANNELREPLY,

                   Plaintiffs,

         - against -

DAVID GITMAN, ACCEL COMMERCE, LLC,
DALVA VENTURES, LLC,
KONSTANTYN BAGAIEV, OLEKSII
GLUKHAREV, and CHANNEL REPLY, INC.,

                 Defendants.

------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 2/16/2021

17-CV-4327 (LLS) (RWL)

**REPORT AND RECOMMENDATION
TO HON. LOUIS L. STANTON:
<u>SUMMARY JUDGMENT</u>**

**ROBERT W. LEHRBURGER, United States Magistrate Judge.**

      This case is an unfortunate tale of two entrepreneurs who started an e-commerce business together and came to irreconcilable differences. In 2011, Plaintiff Michael Dardashtian and Defendant David Gitman founded, as equal fifty-fifty owners and co-managers, Plaintiff Cooper Square Ventures, LLC ("CSV"). CSV is an operating company that includes a subsidiary NDAP, LLC, and what has become CSV's primary business, a software service branded as ChannelReply (together, the "Plaintiff Companies"). Over time, the business relationship between Dardashtian and Gitman became strained. In 2017, Gitman established three companies that he did not disclose to Dardashtian, including Defendant Accel Commerce, LLC ("Accel"), Defendant Dalva Ventures, LLC ("Dalva"), and in May 2017 Defendant Channel Reply, Inc. ("CRINC").

      Then, over the course of a few weeks, Gitman usurped unilateral control of CSV, NDAP, and ChannelReply. Gitman withdrew all of CSV's operating funds and

1

deposited them in an account under his name; he funneled CSV's ChannelReply customers and business to CRINC; he changed passwords for virtually all accounts and services necessary to operate the CSV business so that Dardashtian would not have access; he redirected all of Dardashtian's email to go to Gitman; and he induced the two software developers essential to implementation of ChannelReply software to leave CSV and join Gitman's newly-formed CRINC.  Gitman claims he did all that to protect the Plaintiff Companies, not to compete with them.

In response, Dardashtian filed this action and successfully obtained a temporary restraining order, a preliminary injunction, dissolution of CRINC, and appointment of a successor interim co-Manager in place of Gitman to work with Dardashtian in running CSV, NDAP, and ChannelReply.  Dardashtian now moves for partial summary judgment, specifically with respect to his contractual claim for mandatory redemption of all of Gitman's rights, title, and interests in the Plaintiff Companies (CSV, NDAP and ChannelReply); and his claims for breach of fiduciary duty, theft of trade secrets, unfair competition, conversion, and attorneys' fees.  Dardashtian also moves for summary judgment dismissing all of Gitman's counterclaims.  For the reasons set forth below, Dardashtian's motion should be GRANTED in part and DENIED in part.  Dardashtian is entitled to summary judgment on all of his affirmative claims at issue on this motion except with respect to the purchase price to be paid upon redemption, and on all of Gitman's counterclaims with the sole, and very limited, exception that Dardashtian allegedly breached his fiduciary duty by receiving health insurance that Gitman opted not to take, and drawing two small distributions while Gitman was working full time for another company.

## Factual Background[1]

**A.     The Parties**

Dardashtian and Gitman met through LinkedIn in 2008, worked together at a company called Virtual Health, and eventually decided to start their own company, which they called Cooper Square Ventures, LLC.   (Dardashtian Dep. 11-13, 19.[2]) Dardashtian took primary responsibility for sales, marketing, and finance, while Gitman, as Chief Technology Officer, took primary responsibility for technology and development.  (Gitman Aff. ¶¶ 6-8, 143.[3])

CSV is an e-commerce software company providing software as a service or "SaaS."  Dardashtian and Gitman each own a 50% interest in CSV.  (SUF ¶¶ 1-2; SUF Response ¶¶ 1-2; Liebman Decl. ¶ 6.[4])  They are the company's only members, and the CSV Operating Agreement designates them as co-Managers of CSV's daily operations. (SUF ¶¶ 1-2; SUF Response ¶¶ 1-2.)

ChannelReply is a subscription software service that facilitates communications between online marketplace owners, such as Amazon and eBay, and their customers

---

[1] The facts are undisputed except where noted.   The Court draws the facts from Plaintiffs' Rule 56.1 Statement of Undisputed Facts (Dkt. 180-1) ("SUF"), Defendants' Response to Plaintiffs' Statement of Facts Pursuant to Rule 56.1 (Dkt. 184) ("SUF Response"), and the declarations, affidavits, and exhibits submitted by the parties.

[2] "Dardashtian Dep." refers to the Deposition of Michael Dardashtian, dated April 16, 2020, attached as Exhibit A to the Declaration of Sang J. Sim, dated Sept. 28, 2020 (Dkt. 186-1, 187-1).

[3] "Gitman Aff." refers to the Affidavit of David Gitman, dated Sept. 24, 2020 (Dkt. 189).

[4] "Liebman Decl." refers to the Declaration of Joel Liebman, CPA, dated Aug. 13, 2020 (Dkt. 180-22).

and potential customers.  (Dardashtian Aff. ¶¶ 7, 15 and Ex. 5C, 5D.[5])  The software code for ChannelReply was developed by independent contractors, Konstantyn Bagaiev and Oleksii Glukharev (the "Developers"), together with Gitman.  (Dardashtian Aff. ¶ 19; Gitman Aff. ¶ 72; Bagaiev Aff. ¶¶ 16, 95.[6])  Bagaiev was the lead Developer and primarily under Gitman's supervision.[7]  (Dardashtian Aff. ¶ 17; Gitman Aff. ¶ 69.)

NDAP is a wholly-owned subsidiary of CSV that sold auto parts online.[8]  (SUF Response ¶ 6.)  In July 2017, CSV sold NDAP's assets for $450,000 consisting of cash and a promissory note.  (Liebman Decl. ¶ 4; Gitman Aff. ¶ 54; Gaskin Aff. Ex. A at 4 (citing NDAP Asset Purchase Agreement).[9])  Although NDAP is no longer operational, it holds a cash escrow account and the balance of the promissory note.  (Gaskin Aff. Ex. A at 4.)

CSV also maintained 50% ownership in Plumburs LLC, which provided a service similar to NDAP but for plumbing supplies.  (Gaskin Aff. Ex. A at 4.)  Plumburs operated

---

[5] "Dardashtian Aff." refers to the Affidavit of Michael Dardashtian in Support of Summary Judgment, dated Aug. 13, 2020 (Dkt. 180-29).

[6] "Bagaiev Aff." refers to the Affidavit of Konstantyn Bagaiev AKA Kostiantyn Bagaiev, dated July 29, 2020 (Dkt. 180-26).  Although Bagaiev's affidavit is not notarized, it contains Bagaiev's declaration under penalty of perjury under the laws of the United States that the information provided is true and correct.  (Bagaiev Aff. at 21.)  As such, the statement is admissible as a declaration pursuant to 28 U.S.C. § 1746.

[7] Although named as defendants, the Developers, who reside abroad, never appeared in this action.

[8] NDAP is an acronym for "Next Day Auto Parts" and was later rebranded as Car Part Kings.  (Gitman Aff. ¶ 24.)

[9] "Gaskin Aff." refers to the Affidavit of Carleen J. Gaskin, CPA/CFF, dated Aug. 12, 2020 (Dkt. 180-24).

for only a short time and ceased to do business.  (Gaskin Aff. Ex. A at 4; Opp. Mem. at 9 (citing Dardashtian Dep. at 53:21-25).[10])

Dardashtian and Gitman share equally in the profits of CSV, NDAP, and ChannelReply, as reflected in the CSV Operating Agreement and CSV's income tax returns and Form K-1s issued to Dardashtian and Gitman.  (Liebman Decl. ¶¶ 6, 9; SUF ¶ 2; CSV Operating Agreement at 28.[11])

Jeremy Falk is a principal and member of Summit Rock Holdings, Inc., LLC.  Falk served as broker and consultant to CSV and NDAP in connection with the sale of NDAP.  (SUF ¶ 20; SUF Response ¶ 20.)

Dalva, formed in February 2017, is owned by Gitman and his wife.  (Dalva Operating Agreement, Sim Decl. Ex. J, at i-ii.[12])  Although not identified as an owner, Falk is a signatory to the Dalva Operating Agreement and assisted with its registration.  (*See* SUF ¶ 19; SUF Response ¶¶ 19, 22; Sim Decl. Ex. J at xiv.)

Dalva, in turn, is the sole owner of Accel, formed in or about the same time as Dalva.  (Accel Operating Agreement, Sim Decl. Ex. I, at i-ii.)  Falk appears to have been involved in the formation of Accel as well; there is a signature line, though unsigned, for him on the Accel Operating Agreement.  (Sim Decl. Ex. I at xiv.)  Gitman established Accel to explore his own business opportunities in e-commerce.  (Gitman OSC Aff.

---

[10] "Opp. Mem." refers to Defendants' Memorandum of Law in opposition to Plaintiffs' motion for summary judgment (Dkt. 183).

[11] The CSV Operating Agreement is attached as Exhibit 2 to Dardashtian Aff. (Dkt. 180-30 at 4-28).

[12] "Sim Decl." refers to the Declaration of Sang J. Sim in Opposition to Plaintiffs' Motion for Summary Judgment, dated Sept. 28, 2020 (Dkt. 185).

¶ 110.[13]) Dardashtian alleges that Gitman and Falk had been operating Accel as early as January 2017. (SOF ¶ 18.) Gitman asserts that Accel did not start doing business until commencement of this action, in June 2017; was established to provide consulting services and not to compete with CSV; and that Falk was not involved in operating Accel, although Falk did advise Gitman financially. (SOF Response ¶ 18; Gitman Dep. at 208; *see also* Gitman Aff. ¶ 131 (asserting he did not operate Accel until after the instant lawsuit was filed).[14]) Accel financial records indicate that Accel was paying employees at least as early as May 15, 2017, a few weeks before Dardashtian filed this action. (Dardashtian Aff. Ex. 38.)

Gitman also formed Channel Reply, Inc. ("CRINC"). Gitman registered CRINC with the Delaware Secretary of State on May 30, 2017. (Dardashtian Aff. Ex. 26.)

The CSV Operating Agreement permits its members to form and operate a competing business, but not to take CSV's business. (CSV Operating Agreement § 12.1.) Additionally, the "outside activities" clause of the CSV Operating Agreement prohibits Dardashtian and Gitman from using CSV's confidential information for their own benefit or that of any competing business. (CSV Operating Agreement § 12.2.) The Operating Agreement also forbids Dardashtian and Gitman from using CSV's money or property other than for CSV's benefit. (CSV Operating Agreement § 8.2(d).)

---

[13] "Gitman OSC Aff." refers to the Affidavit of David Gitman in Opposition to Plaintiff's Order to Show Cause Seeking Preliminary Injunction, dated June 19, 2017 (Dkt. 22).

[14] "Gitman Dep." refers to the deposition of David Gitman, dated March 2, 2020 (Dkt. 196).

**B.      ChannelReply**

There are two primary aspects of ChannelReply about which the parties disagree: the proprietary nature of ChannelReply, and ownership of ChannelReply.

### 1.      To What Extent ChannelReply Is a Proprietary Trade Secret

As noted, the ChannelReply service software and computer code was created by Gitman and the Developers for CSV.   According to Developer Bagaiev, the ChannelReply computer code is confidential, and the software contains confidential customer data, all of which makes ChannelReply unique and valuable.  (Bagaiev Aff. ¶ 96.)  ChannelReply went through years of "development and tweaking," and "[e]ven with the cheapest developers and minimal features, it would cost much more for a merchant to build the solution for himself over a long period of time and it would not cover any specific use cases and not even be close to a 'similar solution.'"  (Bagaiev Aff. ¶¶ 96-97.)  Even Gitman admits that he and Bagaiev "failed at the first two attempts to create a minimum viable product," further underscoring that the ChannelReply software was not generally known or readily engineered.  (Gitman Aff. ¶ 73.)

Nonetheless, Gitman disputes the proprietary nature of ChannelReply, asserting that the software is "open source coding and thus does not qualify as trade secrets." (SUF Response ¶ 12.)  The only support he cites for that statement is his own Affidavit at Paragraph 10.  His affidavit statement, however does not support what his response to the SUF says.  Rather, his statement indicates the opposite: that while ChannelReply uses "licensed software, and services, and open source software with varying licenses," it also uses "software developed by [Gitman] and independent contractors."  (Gitman Aff. ¶ 10.)  Gitman nowhere explains why the use of open source software as a part of

ChannelReply renders the entirety non-proprietary, and he does not otherwise provide evidence contradicting that of Developer Bagaiev.[15]

Gitman also does not present any evidence that CSV ever distributed copies of its software or disclosed its unseen "back end" to customers or other third parties. CSV does not sell its software. Rather, the ChannelReply business is a software as service platform by which customers subscribe to use of software.[16] Thus, even if ChannelReply software were developed entirely from open source software, CSV's implementation of it would remain secret under the business model employed by CSV. *Cf. irth Solutions, LLC v. Apex Data Solutions and Services, LLC* , No. 18-CV-6884, 2020 WL 1899128, at *1 (W.D.N.Y. April 17, 2020) (describing plaintiff's theft of trade secret allegations that defendant infiltrated plaintiff's software as service platform and

---

[15] Although not referenced in his response to the SUF, Gitman's opposing brief points to deposition testimony of Plaintiffs' valuation expert who said that she was told by Dardashtian that the ChannelReply software "is easily duplicated" and who did not assign any value to the ChannelReply software in conducting her valuation. (Opp. Mem. at 35.) But whether software is "easily duplicated" could mean a number of things that have nothing to do with whether the code itself is proprietary, and the expert's deposition testimony repeatedly makes clear that the only reason she did not assign a value to ChannelReply software as an asset is because she did not use the asset valuation method. She accounted for the software's value instead based on income generated. (Gaskin Dep. at 24-31.) "Gaskin Dep." refers to the Deposition of Carleen Gaskin, dated June 22, 2020, attached as Exhibit B to Sim Decl. (Dkt. 188-1).

[16] Although not submitted by the parties, nor a basis for the Court's decision, the following definition of "software as a service" is informative: "SaaS provides a complete software solution that you purchase on a pay-as-you-go basis from a cloud service provider. You rent the use of an app for your organization, and your users connect to it over the Internet, usually with a web browser. All of the underlying infrastructure, middleware, app software, and app data are located in the service provider's data center. The service provider manages the hardware and software, and with the appropriate service agreement, will ensure the availability and the security of the app and your data as well." Microsoft Azure, *What is Saas?*, https://azure.microsoft.com/en-us/overview/what-is-saas (last visited Feb. 16, 2021).

servers to conduct systematic exploration of the platform's "architecture, modules, overall functionality, and user interface").

Moreover, Gitman does not dispute, or at least has not presented any evidence to dispute, that CSV goes to considerable lengths to protect the ChannelReply software, and other information, from public disclosure. CSV protects the ChannelReply software and data in several ways, including strictly limiting access, employing encryption, using passcodes, and maintaining firewall protection. (Dardashtian Aff. ¶ 7; Bagaiev Aff. ¶¶ 96-98.) CSV also employs terms of service that require customers to maintain the confidentiality of information disclosed to them (subject to limited exceptions), adhere to technical safeguards for data security and confidentiality, and refrain from hacking or attempting to gain access beyond the scope of their subscription. (Dardashtian Aff. Ex. 11C §§ 2.3, 3.3; SUF ¶ 13; SUF Response ¶ 13.)

Gitman also has not presented any evidence to dispute other aspects of ChannelReply-related information that are proprietary to and protected by the Plaintiff Companies, such as financial information, customer data, and computer passcodes. (SOF Response ¶ 14 (denying that Gitman transferred intellectual property and confidential information but not citing any supporting evidence[17]); *see* Bagaiev Aff. ¶¶ 94-96.)

---

[17] The lone fact source cited to dispute the fact that Gitman transferred ChannelReply intellectual property, confidential information, and trade secrets, is paragraph 154 of his own affidavit. (SUF Response ¶ 14.) That paragraph, however, addresses an issue entirely unrelated to confidentiality of, or trade secret protection for, ChannelReply information and data. (*See* Gitman Aff. ¶ 154 ("It is also understood that Dardashtian testified that Yotpo's business does not conflict with ChannelReply's business. However, they are related businesses").) Accordingly, the asserted fact remains undisputed.

### 2.      Ownership of ChannelReply

The parties disagree about the ownership of ChannelReply.   According to Dardashtian, CSV owns ChannelReply in its entirety.   Gitman contends that CSV owns only 50% of ChannelReply.   The record is indisputably clear, however, that CSV owns 100% of ChannelReply.   No reasonable juror could conclude otherwise.

First, CSV's exclusive ownership of ChannelReply is consistent with the CSV Operating Agreement, which makes Dardashtian and Gitman equal owners of CSV. ChannelReply is not a separate corporate entity, but rather a service provided by CSV. (*See* Liebman Decl. ¶¶ 2 (ChannelReply is a doing-business-as service entity owned by CSV), 4 (CSV is the operating entity for ChannelReply).)   By virtue of the CSV Operating Agreement, Dardashtian and Gitman each own 50% of ChannelReply.

CSV's full ownership of ChannelReply also is reflected in the ChannelReply terms of service.   The terms expressly identify the ChannelReply service as CSV's intellectual property, which "belong[s] exclusively to the ChannelReply Contracting Party," the ChannelReply Contracting Party being defined as CSV.   (Dardashtian Aff. Ex. 11C §§ 4., 17.1.)

The parties' handling of ChannelReply's finances also demonstrates CSV's 100% ownership.   From its inception in 2014, ChannelReply's income has been paid into, and its expenses have been paid from, CSV's bank account.   (SUF ¶ 3; SUF Response ¶ 3; Liebman Decl. ¶ 7.)   ChannelReply's income and expenses have always been reported on CSV's tax returns.   (Liebman Decl. ¶ 7.)   And, both Gitman and Dardashtian's tax returns and forms reflect their fifty-fifty share of CSV income (which includes 100% of ChannelReply income), which would not be the case if Gitman

somehow owned more than 50% of ChannelReply by way of CSV or otherwise. (Liebman Decl. ¶ 9; Dardashtian Reply Aff. Ex. 150.[18])   Moreover, CSV's outside accountant and interim successor co-Manager, Joel Liebman, confirms that CSV receives 100% of ChannelReply's income and that, through CSV, Gitman and Dardashtian each receive 50% of ChannelReply's income and losses.  (Liebman Decl. ¶ 9.)

Despite all this, Gitman asserts the existence of an oral agreement with Dardashtian by which "ChannelReply would be created through CSV but … would be owned 50% by CSV, 5% by [Developer] Bagaiev, 2.5% by [Developer] Gukharev and 42.5% individually by David Gitman," and that this is in fact the ownership structure. (SUF Response ¶¶ 9-11.)  By virtue of Gitman and Dardashtian's fifty-fifty ownership of CSV, this arrangement would leave Gitman with 67.5% ownership of ChannelReply and Dardashtian with only 25%.

The only evidentiary support Gitman presents for his purported division of ownership is his own say-so that in fall 2015 he and Dardashtian orally agreed to the arrangement and that they offered the Developers to participate in "a new joint venture named ChannelReply" by providing Bagaiev with 5% ownership and Gukharev 2.5% ownership.  (SUF Response ¶¶ 9-11; Gitman Aff. ¶¶ 79-82, 153.)  There is evidence that Dardashtian and Gitman offered equity to Bagaiev (Sim Decl. Ex. K at 2 ("I was promised by both you and Mike that I have equity")), but even Bagaiev confirms there never was a final agreement and that he never received equity in ChannelReply.

---

[18] "Dardashtian Reply Aff." refers to the Affidavit of Michael Dardashtian in Further Support of Partial Summary Judgment, dated Oct. 16, 2020 (Dkt. 195-1).

(Bagaiev Aff. ¶¶ 19-20, 105-106.)   Nor is there any evidence in the record of any agreement or intention by Dardashtian to cede more than 50% of ChannelReply to Gitman. [19]   And, again, such an arrangement is belied by the CSV Operating Agreement, the parties' tax filings, and the testimony of CSV's accountant Liebman.

What's more, when asked at his deposition what basis he had to claim that he owned more of ChannelReply than Dardashtian, Gitman responded, "My belief is based on my value to ChannelReply."  (Gitman Dep. at 109.)  When asked whether his belief was based on anything else, Gitman said that he could not think of anything else. (Gitman Dep. at 109.)   He made no mention of an alleged oral agreement with Dardashtian.  And later in his deposition Gitman conceded he did not know whether ChannelReply was owned by CSV or in what capacity he owned ChannelReply. (Gitman Dep. at 121, 123.)

Based on the record, no reasonable juror could find that any such arrangement ever was consummated or that CSV owns anything less than 100% of ChannelReply.

**C.    Gitman and Dardashtian's Falling Out**

In early 2017, Gitman decided that he no longer wanted to be a partner with Dardashtian on any new ventures.  (SUF ¶ 17; SUF Response ¶ 17.)  The reason for that is disputed.   Gitman has articulated multiple reasons including Dardashtian's

---

[19] In pursuing the possibility of issuing equity to the Developers, Dardashtian and Gitman discussed forming a separate corporate entity for ChannelReply that would be a wholly-owned subsidiary of CSV.  (Dardashtian Aff. ¶ 31.)  Dardashtian thus registered a corporate entity called ChannelReply, LLC, in June 2016.  (Dardashtian Aff. ¶ 32 and Ex. 14.)   But Gitman never signed the operating agreement for ChannelReply, LLC, provided by Dardashtian, because, according to Gitman, it essentially copied the CSV Operating Agreement and thus did not reflect the ownership percentages sought by Gitman.  (Gitman Aff. ¶ 88; Gitman Dep. at 145-47; Dardashtian Aff. ¶ 36; Dardashtian Aff. Ex. 19B (draft ChannelReply LLC operating agreement prepared by Dardashtian).)

alleged "reneging" on an agreement to issue equity to the Developers, mismanagement by Dardashtian, Dardashtian's resistance to an accounting, and purported revelation that Dardashtian received certain distributions that Gitman did not.

### 1.   Alleged Reneging on Equity Agreement

As shown above, there is no proof of there ever being an actual agreement to issue equity in a manner that would have given equity to the Developers while providing Gitman a controlling interest of 67.5% in ChannelReply.[20]

### 2.   Alleged Mismanagement

Gitman accuses Dardashtian of mismanagement, such as failing to realize a sales and marketing program for NDAP resulting in the need to sell the company, neglecting CSV while working full time as head of sales for a non-CSV company called Yotpo Ltd., being unable to negotiate contracts with certain counterparties, and inaction in regard to a Plumburs eBay account.  (Gitman Aff. ¶¶ 44, 51, 74-77.)  Once again, however, Gitman does not identify any supporting evidence of neglect, inability, or inaction other than his own say-so.[21]

---

[20] Gitman also makes a number of recriminations against Dardashtian that he had duped Gitman into working for free on multiple occasions and had a history of reneging on agreements, even prior to and apart from CSV-related matters.  Gitman provides no evidentiary support for these accusations, however, other than his own conclusory assertions.  Even if those assertions were sufficient to raise a fact issue, which they are not, they are not material to determination of the instant motion.

[21] It is undisputed that Dardashtian did work full time at Yotpo (Dardashtian Aff. ¶ 30) with Gitman's knowledge (Dardashtian Aff. ¶ 30 and Ex. 138-139), just as Gitman worked full time at another company called Cue Connect with Dardashtian's knowledge. (Gitman Aff. ¶ 146; Gitman Dep. at 125-26; Dardashtian Aff. ¶¶ 28-29; Bagaiev Aff. ¶ 102.)  Gitman's full time job outside CSV came to an end after about six months in December 2016 (Dardashtian Aff. ¶¶ 42, 54; Gitman Dep. at 138), while Dardashtian's continued.  But Gitman cites no evidence, other than his own conclusory statements, for

### 3.      Alleged Resistance to Accounting

On October 31, 2016, Gitman informed Dardashtian that Gitman wanted to get a "grip" on all financial-related aspects of the Plaintiff Companies and requested that Dardashtian agree to a third-party review of financial records.   (SUF ¶ 15; SUF Response ¶ 15.)  Dardashtian cooperated in that effort, informing Gitman to "make the call" on which third-party to use and instructing that Gitman "should have every bit of information that he needs accessible to him and the CPA of his choosing." (Dardashtian Aff. Ex. 118 at 33, 38.)  Ultimately, Gitman selected a bookkeeper named Mary Faith Andan.  (Gitman Aff. ¶ 100.)

Gitman claims that he needed to hire a bookkeeper because Dardashtian blocked Gitman's access to the company's books and records kept in QuickBooks. (Gitman Aff. ¶¶ 95-96.)  There is no evidence to support that assertion; rather, Gitman preferred having a third-party do the work, and he "just [could]n't find the time to get through it."  (Dardashtian Aff. Ex. 118 at 31.)   Gitman does not dispute that he has always had the ability to access the financial books and records in QuickBooks and has done so many times.  (SUF Response ¶ 16.)   And, as explained above, the relevant correspondence in the record demonstrates that Dardashtian cooperated with Gitman and did not block his access to QuickBooks.   Indeed, Dardashtian facilitated Andan's access to QuickBooks to which she logged in more than 100 times between February and June 2017.  (Dardashtian Aff. ¶ 48 and Ex. 128, 129A-F.)

---

the assertion that Dardashtian neglected CSV.  To the contrary, according to Developer Bagaiev, Dardashtian was intensely involved in the business while Gitman showed little interest until May 2017.  (Bagaiev Aff. ¶¶ 102-103.)

There is evidence of Dardashtian's resistance to a different issue, specifically Gitman's desire to make changes in the original electronic financial records for NDAP. On January 23, 2017, Gitman made a number of inquiries to Dardashtian regarding NDAP and CSV finances.  (*See generally* Dardashtian Aff. Ex. 119.)  Gitman said that he wanted to become the master administrator of a defunct NDAP QuickBooks account so that he could "delete" it, even though the company's internal bookkeeper was the master administrator.  (Dardashtian Aff. Ex. 119 at 51-52.)  Gitman then said he wanted to "make changes" to the NDAP books and had been doing so for months. (Dardashtian Aff. Ex. 119 at 54.)  Dardashtian opposed the idea because he did not think it was appropriate to alter the NDAP financial records while a potential buyer was conducting due diligence.  (Dardashtian Aff. ¶¶ 46-47 and Ex. 119 at 54.)  The dialogue then devolved into a discussion about taxes and the corporate relationship between CSV and NDAP in which Gitman accused Dardashtian of "talking in circles" and that Gitman was now "really suspicious."  (Dardashtian Aff. Ex. 119 at 57-62.)

The accounting issue came up again on May 25, 2017, when Gitman asked that CSV's outside accountant Liebman validate Gitman and Andan's accounting. Dardashtian rejected the idea as a waste of company funds since Gitman previously hired and fired several accountants on different occasions, continued to use company funds to pay Andan, and Liebman would be reviewing the books in any event at the end of the tax year.  (Dardashtian Aff. ¶¶ 94-95.)  At his deposition, Gitman conceded that he could not unilaterally decide to conduct an audit (Gitman Dep. at 249-50), and acknowledged that the CSV Operating Agreement prohibits either Gitman or

Dardashtian from bringing or maintaining an action in any court of law or equity for an accounting (Gitman Dep. at 36; *see* CSV Operating Agreement § 9.4).

### 4. Alleged Unequal Distributions and Benefits[22]

According to Gitman, Andan's review of company QuickBooks records revealed that Dardashtian received certain distributions or benefits that Gitman did not, including in particular a 2013 401(k) contribution in the amount of $13,500, health insurance, and two cash distributions totaling $10,000.[23] (SUF Response ¶ 5; Gitman Aff. ¶¶ 103-104,

---

[22] Dardashtian urges the Court to discount entirely Gitman's purported evidence of unequal distributions because in a response to a discovery request asking for "any and all proof of disproportionate distributions, misappropriation, or theft allegedly committed by Michael Dardashtian as it relates to Plaintiffs CSV, ChannelReply and/or NDAP at any time relevant herein through the present," Defendants answered that they had none in their possession. (Response to Plaintiffs'/Counterclaim-Defendant(s)' Request for Documents/Information, attached as Exhibit M to Declaration of Barry Guaglardi, dated Aug. 13, 2020 (Dkt. 180-4) ("Guaglardi Decl."), Dkt. 180-16, ¶ 12.) Defendants expressly reserved the right to amend and/or supplement the response "up to the close of discovery" but never did so. (Guaglardi Decl. Ex. M. ¶ 12.) Gitman's failure to identify any such evidence is telling because he has had unfettered access to CSV's books, financial records, and accounts. (*See* Dardashtian Aff. ¶ 167 and Ex. 114 (compilation of Gitman's log-ins to CSV's QuickBooks account).) Nonetheless, the Court accepted Dardashtian's submission of additional exhibits and a reply affidavit from Dardashtian that specifically addresses the asserted facts underlying this issue. (Dkt. 194.) Accordingly, the Court finds no prejudice to Plaintiffs and will consider the evidence addressed by the parties.

[23] Gitman claims the bookkeeper discovered "many glaring discrepancies," including inconsistency in revenue reported, although he does not identify any particular time frame. (Gitman Aff. ¶¶ 100, 111.) Gitman's Affidavit, however, offers no admissible report, testimony, or documents to support that statement. Gitman's statement of what the bookkeeper found or concluded is inadmissible hearsay. Fed. R. Evid. 801-802. Gitman's attorney did submit a document referred to as "Accounting Documents." (Sim Decl. ¶ 6 and Ex E.) That document, however, is unauthenticated and includes charts bearing the legend "Shulman Associates LLC Valuation Consulting Services." There is no expert report from Shulman Associates LLC or any foundation that would render it admissible. Accordingly, this document will be disregarded. Evidence submitted by Dardashtian confirms the absence of any inconsistent revenue reporting. (Dardashtian Reply Aff. ¶ 8 and Ex. 149(b).)

111, 146-147; *see also* Dardashtian Aff. ¶¶ 28, 37.)  To the extent Dardashtian received these distributions and benefits, the parties dispute whether Gitman was aware of them and consented to them.

### a.    401(k) Contribution

Gitman asserts that in 2013 Dardashtian received $13,500 in 401(k) contributions that Gitman did not.  There is no admissible evidence to support that assertion other than Gitman's own allegation.  In response, Dardashtian states that Gitman received the same contribution as Gitman and has submitted a copy of January 2014 bank records that include a deposited CSV check for $13,500 made out to "Michael Dardashtian CSV 401k" (Check No. 51) and a check of the same date in the same amount made out to "Pershing LLC FBO Cooper Square Ventures, LLC" (Check No. 52).  (Dardashtian Reply Aff. ¶ 7 and Ex. 149(a) at 5.)  Following the parties' briefing, Dardashtian submitted a letter, at the Court's request, explaining that Pershing LLC was Gitman's "401(k) holding company." (Dkt. 208 at 1.)  In any event, Gitman's counsel confirmed at oral argument, that Gitman had in fact received the relevant 401(k) contribution. Accordingly, it is now undisputed that Gitman received the same 401(k) contribution as Dardashtian did.

### b.    Health Insurance

It is undisputed that, after 2013, Dardashtian received health insurance paid for by CSV while Gitman did not.[24]  Dardashtian asserts that Gitman was offered the same

---

[24] Tax filings for 2013 indicate that both Dardashtian and Gitman received health insurance benefits that year.  (Dardashtian Reply Aff. Ex. 150 at 2, 5.)  Gitman's statement in his affidavit that Dardashtian received health benefits "without offering me reciprocal health benefits through CSV" (Gitman Aff. ¶ 147) is belied by Gitman's own

insurance benefits but opted instead to be insured under his wife's policy.  (Dardashtian Reply Aff. ¶ 10.)  Gitman admits that he opted not to "draw healthcare benefits in an equal amount" to Dardashtian (Gitman Dep. at 247), but nonetheless contends that he "did not receive equivalent payments as an equal co-owner of CSV."  (Gitman Aff. ¶ 103.)  Whether or not Gitman agreed to or acquiesced in that arrangement is a disputed issue that the record does not resolve.

> ### c.   $10,000 Distribution

That Dardashtian received $10,000 more in distribution than Gitman during 2016 is undisputed.  (SUF Response ¶ 39; Dardashtian Dep. 58:19-25; Dardashtian Aff. ¶¶ 28, 37.)  The parties dispute, however, the context in which that occurred and the extent to which Gitman knew and approved it.  Dardashtian explains that he received two draws of $5,000 each that Gitman did not during the roughly six-month period when Gitman had left CSV to work full time at Cue Connect.  (Dardashtian Aff. ¶¶ 28, 37.)  According to Dardashtian, he and Gitman discussed the issue, and Gitman agreed to the arrangement in exchange for CSV paying Gitman's car lease payments and other personal expenses while he worked at Cue Connect.  (Dardashtian Aff. ¶ 37.)  Gitman, however, disputes having made such an agreement, and the communications Dardashtian cites in support are far from conclusive.  (Dardashtian Aff. Ex. 20B-20I.)  To resolve this issue, Dardashtian says that he "will credit Mr. Gitman $5,000." (Dardashtian Reply Aff. ¶ 13.)

---

deposition testimony given months earlier.  (*See* Gitman Dep. at 247 (admitting that he had option to draw healthcare benefits equal to Dardashtian but "opted" not to).)

D.     **The NDAP Sale Dispute**

The services agreement that Dardashtian and Gitman signed with Falk for his services to find a buyer for the sale of NDAP provides that Falk would be paid a fee of "$110,00.00 + (0.0025 x Purchase Price)."  (Dardashtian Aff. Ex. 29B § 2.1.)  The three of them later agreed to reduce Falk's fee to $80,000.  (SUF ¶ 23; Dardashtian Aff. Ex. 32.)

As the date approached to sign a purchase agreement for the sale of NDAP, Gitman and Dardashtian could not agree on how the revenue from the sale of NDAP should be distributed after payment of certain liabilities.  In an effort to get the deal done, and in recognition of additional work that would be required of Gitman to transfer the relevant technology, on May 22, 2017, Dardashtian offered to take a lesser portion of net proceeds in the amount of approximately only 35%.  (Dardashtian Aff. Ex. 24; *see also* Gitman Aff. ¶¶ 29-34, 39-41.)   Gitman, however, advocated a distribution that would pay Falk $110,000 (not the agreed-upon $80,000), Dardashtian only $50,000, and Gitman roughly $110,000.  (Dardashtian Aff. Ex. 24.)  In arriving at those numbers, Gitman asserted that Dardashtian actually was due nothing from the sale of NDAP because Dardashtian had allegedly received approximately $121,500 in unequal distributions (distinct from the health insurance and $10,000 draw discussed above).  (Dardashtian Aff. ¶ 85 and Ex. 24.)   That allegation, however, has no admissible substantiation in the record.[25]

---

[25] The only purported evidence of such disparity comes from the same "Accounting Documents" document referenced earlier that is unauthenticated and devoid of any foundation that would render it admissible.  (*See* Sim Decl. ¶ 6 and Ex E.)  And, as also

There are intimations that Falk was working with Gitman in forming a competing business, but the evidence regarding Falk's role is ambiguous, and the parties dispute his role.  (*See* Dardashtian Aff. ¶¶ 80-81 and Ex. 35A-H; Gitman Aff. ¶¶ 130-31.)  It is indisputable, however, that Gitman formed Accel in February 2017, followed by CRINC in May 2017.

## E.   Gitman's Transfer and Use of CSV's Funds

CSV maintains an operating account with Bank of America for the purpose of funding ChannelReply, NDAP, and other CSV operations.  (Dardashtian Aff. ¶¶ 14, 120.)  On or about May 27 to May 30, 2017, without Dardashtian's knowledge or consent, Gitman withdrew all funds, amounting to $73,982.53, from CSV's bank account and deposited it in an account owned and maintained by Gitman.  (SUF ¶ 35, SUF Response ¶ 35; Dardashtian Aff. ¶¶ 98-99 and Ex. 46A, 46B.)  Later that same day, Dardashtian received an email from Gitman stating that Dardashtian's "resistance for an accounting has given [Gitman] cause to transfer the company's cash balances to a call deposit account" and that the money would remain in that account "until an audit is completed by the company's accountant … or you accept my conservative estimate of $121,500 in overpayments."  (SUF Response ¶ 26; Dardashtian Aff. Ex. 24.)  In the email, Gitman also made statements dictating what the company would and would not do at Gitman's direction.  (Dardashtian Aff. Ex. 24.)

As a result of Gitman's transfer of funds out of CSV's account, the account had no funds to pay expenses, many of which were pre-scheduled, causing it to become

---

noted earlier, evidence submitted by Dardashtian confirms the absence of any such disparity.  (Dardashtian Reply Aff. ¶ 8 and Ex. 149(b).)

overdrawn and threatening the shutdown of ChannelReply.  (Dardashtian Aff. ¶¶ 120, 123 and Ex. 63, 72B.)  On May 31, 2017, Gitman increased CSV's overdrawn status by making charges to the CSV operating account and using a company credit card. (Dardashtian Aff. ¶ 130.)   The parties dispute whether any such charges were personal.[26]

## F.   Gitman's Appropriation of Plaintiffs' Passcodes, Software, and Accounts

Also as of May 27, 2017, without Dardashtian's knowledge of consent, Gitman removed Dardashtian's access to key operations of ChannelReply, NDAP, and CSV, thus providing Gitman with sole control.   (SUF ¶ 27; SUF Response ¶ 27.[27])   Specifically, Gitman changed the passwords and transferred the Plaintiff Companies' online accounts to a separate domain that was inaccessible to Dardashtian.  (SUF ¶ 27; SUF Response ¶ 27.)   Among others, those accounts included "1 password," which controls all passwords for all of the Plaintiffs Companies' online accounts, and Google Suite, which includes access to the Plaintiff Companies' data, customer lists, and

---

[26] Among other transactions, Gitman used the account funds to make a lease payment on his BMW automobile.  (SUF ¶ 38; SUF Response ¶ 38.)   According to Gitman, however, "it is understood that the company would pay for company cars.  Dardashtian had a vehicle and I had a vehicle that CSV paid for."  (Gitman Aff. ¶ 150.)  Gitman also used NDAP's credit card to charge $3,500 to Amazon Web Services, which Gitman alleges was a recurring monthly business expense.  (SUF ¶ 44; SUF Response ¶ 44; Gitman Aff. ¶ 167.)

[27] In many of his responses to Plaintiffs' statement of undisputed facts, Gitman concedes they are "undisputed."  At the same time, however, he qualifies his response with nonresponsive assertions.   For example, in several "undisputed" responses, Gitman states that his attorney instructed him to take the various actions (commandeering accounts, etc.) and that Gitman was conducting due diligence and identifying assets for the sale of NDAP.  (*E.g.*, SUF Response ¶¶ 27-29, 31-34, 40.)

subscriptions with customer, invoice, and other essential information.  (SUF ¶¶ 27, 34; SUF Response ¶¶ 27, 34.)

Going further, Gitman moved some of the Plaintiff Companies' online accounts (Chargebee for managing customer subscriptions, Slack for messaging management, and Stripe for credit card billing) to Gitman's newly-formed CRINC.  (SUF ¶¶ 28-29, 33; SUF Response ¶¶ 28-29, 33.)   Gitman also transferred Dardashtian's michael@channelreply.com email address to the newly-created CRINC G Suite account, allowing Gitman to send and receive Dardashtian's business emails.  (SUF ¶ 31; SUF Response ¶ 31.)   As a result, customer service emails, among others, previously directed to Dardashtian were redirected to Gitman.  (Dardashtian Aff. ¶ 126 and Ex. 54.)

Dardashtian not only did not have access to ChannelReply accounts, but customer payments were diverted to a CRINC bank account instead of CSV's account.  (Dardashtian Aff. Ex. 41 (bank statement showing $22,579.25 in deposits).)  And even after the Court ordered Gitman to restore matters to the status quo, several accounts could not be recovered, including Dardashtian's business email address, Dardashtian's Slack account, and the ChargeBee account, although Gitman was able to provide access to the data and communications in the new accounts.  (Dardashtian Aff. Ex. 146; Affidavit of David Gitman in Opposition to Plaintiff's Order to Show Cause Seeking Preliminary Injunction, dated June 19, 2017, attached as Exhibit J to Guaglardi Aff., Dkt. 180-13, ¶ 101.)

Other business accounts for which Gitman changed passwords included Amazon Seller (Amazon sales), Amazon Web Services (Amazon web server management),

Amercian Express (NDAP corporate credit card), Desk.com (customer service management), eBay (eBay sales), GitHub (software storage), GoDaddy (domain operation), JIRA (project management), Join.me (screenshare), MageMojo (Magento-hosted server), Magento (backend data), Mailchimp (email subscription newsletter), PayPal (online payment), QuickBooks (accounting), RingCentral (VOIP system), Time Doctor (employee time management), Upwork (freelancer marketplace), and Zendesk (customer service management.  (SUF ¶ 33, SUF Response ¶ 33.)

## G.    Gitman's Solicitation of the Developers to Work for CRINC

In addition to usurping control of the Plaintiff Companies' operations, Gitman also solicited the Developers to resign from the Plaintiff Companies and work for him instead.  To do so, Gitman employed a combination of maneuvers, including offering the Developers stock in CRINC, providing resignation letter templates, and casting aspersions on Dardashtian.

On May 29, 2017, Gitman sent Dardashtian an event communication indicating that a weekly meeting with the Developers was cancelled.[28]  (SUF ¶ 37; Dardashtian Aff. Ex. 64.)  Gitman then informed Developer Bagaiev that Gitman intended to fly to Russia or Ukraine immediately to meet privately with the Developers.  (Dardashtian Aff. ¶ 122.)  According to Bagaiev, Gitman advised Bagaiev that Gitman decided to remove Dardashtian from ChannelReply and start his own company doing the same thing as

---

[28] Gitman purports to dispute that he cancelled Dardashtian's participation but provides no evidentiary support.  Rather, he merely speculates that Dardashtian "may have been removed during account and service cleanup in connection with the preparation for the sale of NDAP."  (SUF Response ¶ 37.)  Because Gitman provides no evidentiary basis to dispute the stated fact, the Court deems it undisputed.  In his Affidavit, Gitman says that Dardashtian had not attended a meeting in many months (Gitman Aff. ¶ 170), but that does not explain Gitman's affirmative cancellation of the recurring event.

ChannelReply, using ChannelReply's software, codes, names, and customers. (Bagaiev Aff. ¶ 31.)  Gitman also told Bagaiev that Gitman would provide Bagaiev with equity if he agreed to join him.  (Bagaiev Aff. ¶ 31; *see also* Bagaiev Aff. ¶ 34 ("Dave told me to sign documents … online which would provide me with a 5% equity interest in his new company, Channel Reply Inc.").)   While Gitman was discussing and executing his plans with Bagaiev, Gitman told Bagaiev not to take or return Dardashtian's calls until after the end of Gitman's visit with Bagaiev in Ukraine. (Bagaiev Aff. ¶¶ 36, 41.)

On June 1, 2017, Gitman emailed the Developers agreements for them to become employees of CRINC.  (SUF ¶ 43; SUF Response ¶ 43.)  On June 8, 2017 – the same day that Dardashtian filed the complaint in this action and moved for immediate injunctive relief – Gitman entered into a stock purchase agreement with Bagaiev providing Bagaiev with one million shares of stock in CRINC.  (SUF ¶ 46; SUF Response ¶ 46.)  On June 10, 2017, Gitman expressed to Bagaiev, "Let Mike kill the companies.  It only makes me look better."  (Dardashtian Aff. Ex. 64B at 3.)  On June 19, 2017 – more than a week after the Court had entered a temporary restraining order against Gitman and just before entering court for a hearing on Plaintiffs' motion for a preliminary injunction – Gitman told Bagaiev to "clear txt convers[at]ion" with Gitman. (SUF ¶ 47; SUF Response ¶ 47; Bagaiev Aff. Ex. A at 40-41.)

The next day, on June 20, 2017, Gitman emailed to the Developers resignation letter templates and asked Bagaiev to "[p]lease use one of these."[29]  (SUF ¶ 48;

---

[29] Gitman purports to dispute this fact by stating, non-responsively, that Bagaiev asked him what an American resignation letter looked like.  (SUF Response ¶ 48.)  The text

Bagaiev Aff. ¶¶ 71-72 and Ex. A at 37.)  Later that day, Gitman advised Bagaiev to send the resignation letter to Dardashtian and told Bagaiev that "[t]he lawyers want it to come from you not them.  Otherwise Mike might argue that we are conspiring."  (SUF ¶¶ 49-50; SUF Response ¶¶ 49-50; Bagaiev Aff. ¶ 73 and Ex. A at 36.)  And, by letters dated June 20, 2017, the Developers resigned from ChannelReply effective that day.[30]  (SUF ¶ 51.)  In communicating with the Developers seeking to have them resign from ChannelReply and work instead for CRINC, Gitman made statements about Dardashtian casting him in a negative light.  For instance, Gitman stated in email to Bagaiev that Dardashtian "stole" money, operated a "pyramid scheme," and was a "bully."  (Dardashtian Aff. Ex. 73, 74, 75, 82, 83; *see also* Bagaiev Aff. ¶¶ 30, 42, 48, 63, 67.)  As Bagaiev puts it, "My relationship with Mike was broken by Dave."[31]  (Bagaiev Aff. ¶ 104; *see also* Bagaiev Aff. ¶ 116.)

In sum, over the course of a few weeks in May and June 2017, Gitman disenfranchised Dardashtian from, and took complete control of, every aspect of CSV and ChannelReply, including monetary funds, electronic accounts, passwords,

---

evidence, however, fully supports the asserted fact.  (Bagaiev Aff. ¶¶ 71-72 and Ex. A at 36-39.)

[30] Gitman purports to dispute this fact in the face of indisputable email evidence, once again providing no evidentiary citation or support and otherwise being nonresponsive.  (SUF Response ¶ 51 ("Undisputed to the extent that Bagaiev and Glukharev entered into an employment contract with Dardashtian".)  Accordingly, the Court accepts the fact as undisputed.

[31] After the preliminary injunction proceedings described below, and after having had to hire interim developers unfamiliar with ChannelReply at greater expense, CSV was able to rehire the Developers.  (Dardashtian Aff. ¶¶ 157, 162.)

computer data, customer lists, financial information, payment portals, email accounts, and its tradename.

## H.    Gitman's Purported Justifications for His Actions

Gitman asserts that none of what he did as set forth above was to enrich himself or to compete with ChannelReply but rather to protect CSV and ChannelReply.  (Gitman Aff. ¶¶ 112, 135 ("[I] believ[ed] I was protecting the interests of the Company," and "I never intended to use the money for my benefit.").)

He says that "[t]o prepare for the sale of NDAP, I had to separate the various accounts of CSV."  (Gitman Aff. ¶ 135; *see also* SUF Response ¶¶ 27-29, 31-33.) Gitman states that the accounts for CSV, NDAP, ChannelReply, and Plumburs were co-mingled; and he sought to identify "which business accounts were attributable to the NDAP business and which were not."  (Gitman Aff. ¶ 62.)   But Gitman offers no evidence that, or explanation why, the measures he took – depleting CSV's bank account, transferring assets to CRINC, and depriving Dardashtian of access to virtually all ChannelReply's data and operations – were necessary to accomplish the sale of NDAP.  Gitman's proffered justification also is not the reason Gitman set forth in the email he sent to Dardashtian on May 27, 2017, explaining that he had transferred CSV's bank funds and locked Dardashtian out of accounts because of Dardashtian's resistance to conducting a third-party audit.  (Dardashtian Aff. Ex. 24.)

Gitman also asserts that he established CRINC "to formalize the agreed upon ownership percentages that had been promised for over a year" by which Gitman would have received 67.5% ownership of ChannelReply.  (SUF Response ¶ 42)  As set forth earlier, there is no evidence of any such agreement.

Gitman also claims that in taking the actions he did, he relied upon instructions and advice of an attorney named Umar Farooq.  (Gitman Aff. ¶ 135; SUF Response ¶¶ 27-29, 31-36.)  Gitman expended $5,060 of CSV funds for that purpose. (SUF ¶ 36; SUF Response ¶ 36.)  Gitman's SUF Response characterizes Farooq as "the company attorney with respect [to the] NDAP sale."  (SUF Response ¶ 36; *see also* SUF Response ¶¶ 35, 42.)  But at the same time, Gitman's SUF Response refers to Farooq as "Gitman's attorney at the time."  (SUF Response ¶ 32; *see also* SUF Response ¶¶ 27-29, 31, 33.)  Despite Gitman's appearing to be of two minds about the issue, the indisputable evidence is that Farooq was Gitman's personal attorney, not CSV or NDAP's counsel.  Indeed, at the hearing on whether to extend the terms of the TRO, Mr. Farooq appeared, stating "I represent David Gitman and Dalva Ventures, LLC, and Channel Reply, Inc."  (Transcript of Order to Show Cause Hearing, dated June 8, 2017, Dkt. 51 ("6/8/2017 Tr."), at 2.)

## Procedural Background

### A.   Proceedings Prior to the Instant Motion

Dardashtian, individually and on behalf of the Plaintiff Companies, commenced this action on June 8, 2017.[32]  The verified complaint alleged nineteen claims, including breach of fiduciary duty, misappropriation of trade secrets, conversion, unfair competition, and others.  (Dkt. 4.)  Dardashtian sought immediate injunctive relief, alleging that Gitman locked him out from numerous electronic accounts of the Plaintiff Companies; misappropriated CSV and ChannelReply's confidential information and

---

[32] The initial complaint named Falk and Summit Rock Holdings as additional defendants.  On January 10, 2018, however, the parties stipulated to dismissal of both. (Dkt. 74.)

trade secrets and transferred them to Gitman's newly formed CRINC; solicited the software Developers from the Plaintiff Companies to join CRINC; and transferred virtually all funds maintained in the CSV bank account to Gitman's bank account. (*See generally* Dkt. 3.)

On June 9, 2017, the then sitting emergency Part One judge of this Court (the Honorable Edgardo Ramos, U.S.D.J.) issued a temporary restraining order. (Dkt. 3 ("TRO").) The TRO required Gitman, among other things, to immediately restore Dardashtian's access to all of the Plaintiff Companies' accounts, return funds that Gitman had transferred out of Plaintiff Companies' bank account, and not share or use ChannelReply computer code or other confidential information. (TRO ¶¶ a, b, g, h, n.)

After hearing from the parties on June 19 and 21, 2017, the Court (the Honorable Louis L. Stanton, U.S.D.J.) obtained Gitman's commitment to dissolve CRINC, which he did, and extended the restraints imposed by Judge Ramos in the TRO. (Transcript of Order to Show Cause Hearing, dated June 19, 2017, Dkt. 185-1 ("6/19/2017 Tr."), at 36-37.) Additionally, the Court removed Gitman as co-Manager of the Plaintiff Companies and appointed the accountant of CSV, ChannelReply, and NDAP – Joel Liebman – as Dardashtian's interim successor co-Manager instead. (*See* 6/19/2017 Tr. at 34-35; Liebman Decl. ¶¶ 1, 5.) The Court then referred the matter to the Honorable James C. Francis, IV, U.S.M.J., for purposes of overseeing Gitman's compliance, restoring the factual situation to that existing before Gitman's challenged conduct, and recommending preliminary injunction provisions necessary to address Gitman's continuing violations. (Dkt. 34.) On October 10, 2017, Judge Francis ordered that Dardashtian's motion for a preliminary injunction be consolidated with a trial on the

merits and that the temporary injunction previously entered remain in effect in the meantime.  (Dkt. 68 ¶ 1.)

On October 30, 2017, the case was redesignated and referred to the undersigned for completion of discovery, non-dispositive motions, and settlement.  On November 28, 2018, Judge Stanton issued a decision on a motion to dismiss filed by Gitman with respect to some but not all asserted claims.  (Dkt. 70.)  Judge Stanton denied the motion with respect to Dardashtian's claims for theft of trade secrets under federal law, breach of fiduciary duty under state law, conversion, tortious interference with prospective economic advantage, defamation, and attorneys' fees.  Judge Stanton dismissed claims for violation of the Computer Fraud and Abuse Act, identity theft, and injunctive relief as an independent claim rather than as a form of relief.

During the ensuing two years, the parties devoted substantial time and effort to attempting to resolve the dispute and then to conducting discovery.  On October 18, 2019, Gitman's attorneys filed a motion to withdraw as counsel, which the Court granted.  (Dkt. 117.)  Gitman subsequently retained new counsel.

On May 1, 2020, Dardashtian filed a First Amended Verified Complaint, which is now the operative complaint.  (Dkt. 137 ("Amended Compl.").)  The Amended Complaint added two claims, one of which is at the center of the instant motion.  Count Twenty seeks declaratory judgment that all of Gitman's right, title, and interests in the Plaintiff Companies be subject to redemption at a specific amount – the Purchase Price – pursuant to § 11.5 of the CSV Operating Agreement.  That provision states that "the interests of any Member in the Company shall be subject to redemption (i.e., purchase by the Company) as provided in this Section."  (CSV Operating Agreement § 11.5(a).)

The decision to redeem "shall be made by Management in its sole discretion, but only" in certain circumstances, including, among others, "(i) Willful or serious misconduct by the Member with respect to the business, operations or assets of the Company"; "(ii) Fraud or dishonesty on the part of the Member … which affects the business, operations, assets or reputation of the Company"; "(vii) A breach by the Member of any of the other terms, conditions and obligations contained in [the CSV Operating Agreement]."[33]  (CSV Operating Agreement § 11.5(b).)

The same day Dardashtian filed the Amended Complaint, CSV (through Dardashtian and Liebman) issued a Notice of Redemption to Gitman to redeem all of Gitman's right, title, and interests in the Plaintiff Companies pursuant to § 11.5 of the CSV Operating Agreement (the "Redemption Notice").  (SUF ¶ 53; SUF Response ¶ 53; Dkt. 143 ¶ 1.)  The redemption was scheduled for June 1, 2020.  (SUF ¶ 53; SUF Response ¶ 53; Dkt. 143 ¶ 5.)  On May 6, 2020, Gitman issued a "Rejection of Notice of Redemption," contesting the closing on the grounds that Gitman never consented, endorsed, supported, or approved of the redemption.  (SUF ¶ 55; SUF Response ¶ 55; Dkt. 143 ¶ 6.)  The parties then agreed to postpone the redemption closing date pending decision of Dardashtian's intended motion for summary judgment.  (Dkt. 143 ¶ 9.)

---

[33] The second additional claim in the Amended Complaint, Count Twenty-One, seeks judicial dissolution of CSV and its wholly-owned companies pursuant to New York Limited Liability Corporation Law ("L.L.C.L." or the "LLC Law") § 702 and §§ 4.2 and 16 of the CSV Operating Agreement, and an order that Dardashtian (or CSV) be permitted to an equitable buy-out of all of Gitman's rights, title, and interests in the Plaintiff Companies.

On June 9, 2020, Gitman filed an Amended Answer and nine counterclaims, which generally mirror claims asserted by Dardashtian in that they allege breach of fiduciary duty; breach of contract; tortious interference with prospective economic advantage; unjust enrichment; and declaratory judgment that Gitman and his companies are free to compete against the Plaintiff Companies and that Gitman and the software developers own ChannelReply.  (Dkt. 149 ("Counterclaims").)

## B.    Plaintiffs' Motion for Partial Summary Judgment

Dardashtian filed the instant motion on August 14, 2020.[34]  (Dkt. 180.)  The motion seeks summary judgment on eight claims: Count Two for breach of fiduciary duty; Count Five for theft of trade secrets in violation of 18 U.S.C. §§ 1832, 1836; Count Seven for breach of contract; Count Ten for conversion; Count Twelve for unfair competition in violation of 15 U.S.C. § 1125; Count Eighteen for unfair competition in violation of New York State law; Count Nineteen for misappropriation of trade secrets under state law; and Count Twenty for declaratory judgment that Gitman's right, title, and interests in the Plaintiff Companies must be redeemed.  Dardashtian also seeks summary judgment that Plaintiffs are entitled to attorneys' fees pursuant to the CSV Operating Agreement, and summary judgment dismissing all of Gitman's counterclaims.

Dardashtian argues that the undisputed facts establish that Gitman engaged in a series of disloyal and dishonest acts, including misappropriation of CSV funds and trade secrets, freezing Dardashtian out of CSV's operations, forming a competing company

---

[34] Amending the scope of earlier referrals, Judge Stanton referred the summary judgment for report and recommendation on August 20, 2020.  (Dkt. 182.)  The motion was fully briefed as of October 23, 2020.  Oral argument took place on February 11, 2021.

with the same name as ChannelReply, and soliciting for employment by his own business the software developers who worked for the Plaintiff Companies.  These acts, and others, says Dardashtian, violate express provisions of the CSV Operating Agreement as well as Gitman's fiduciary duty to both Dardashtian and the Plaintiff Companies, and entitle Dardashtian to invoke and compel redemption of Gitman's right, title, and interests in CSV and the other Plaintiff Companies.  From there, Dardashtian argues that one or more of the discrete acts of serious misconduct and disloyalty entitle Dardashtian to summary judgment on individualized claims, such as theft of trade secrets and conversion, and unfair competition.

In opposition, Gitman argues that disputed issues of fact require denial of summary judgment.  Gitman also asserts that Gitman cannot be subject to redemption without his approval because his removal as co-Manager was based on preliminary, not final, relief.  And, he further contends that Dardashtian has unclean hands, which precludes granting summary judgment.  As explained below, however, the undisputed evidence warrants granting summary judgment to Plaintiffs in most all respects.

### Legal Standard

To obtain summary judgment under Rule 56 of the Federal Rules of Civil Procedure, the movant must show that there is no genuine dispute of material fact.  Fed. R. Civ. P. 56(a).  A fact is material "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The moving party bears the initial burden of identifying "the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The opposing party must then come forward with specific materials

establishing the existence of a genuine dispute; conclusory statements or mere allegations are not sufficient to defeat summary judgment. *Anderson*, 477 U.S. at 248; *Geyer v. Choinski*, 262 F. App'x 318, 318 (2d Cir. 2008). Where the nonmoving party fails to make "a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment must be granted. *Celotex*, 477 U.S. at 322; *accord El-Nahal v. Yassky*, 835 F.3d 248, 252 (2d Cir. 2016).

The moving party may demonstrate the absence of a genuine issue of material fact "'in either of two ways: (1) by submitting evidence that negates an essential element of the non-moving party's claim, or (2) by demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the non-moving party's claim.'" *Nick's Garage, Inc. v. Progressive Casualty Insurance Co.*, 875 F.3d 107, 114 (2d Cir. 2017) (quoting *Farid v. Smith*, 850 F.2d 917, 924 (2d Cir. 1988)). A party asserting that a fact cannot be, or is genuinely, disputed "must support the assertion by" either "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1); *see also Powell v. National Board of Medical Examiners*, 364 F.3d 79, 84 (2d Cir. 2004) (if movant demonstrates absence of genuine issue of material fact, nonmovant bears burden of demonstrating "specific facts showing that there is a genuine issue for trial").

In assessing the record to determine whether there is a genuine issue of material fact, a court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *Anderson*, 477 U.S. at 255; *Smith v. Barnesandnoble.com, LLC*, 839

F.3d 163, 166 (2d Cir. 2016); *Sutera v. Schering Corp.*, 73 F.3d 13, 16 (2d Cir. 1995) ("The district court must draw all reasonable inferences and resolve all ambiguities in favor of the nonmoving party and grant summary judgment only if no reasonable trier of fact could find in favor of the nonmoving party."). At the same time, the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. Summary judgment may be granted, however, where the nonmovant's evidence is conclusory, speculative, or not significantly probative. *Id.* at 249-50. If there is nothing more than a "metaphysical doubt as to the material facts," summary judgment is proper. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

Under the local rules of this District, the moving party has the obligation to submit a statement of undisputed material issues of fact warranting summary judgment, and the opposing party must submit a corresponding statement responding to each item set forth in the movant's statement. Local Rule 56.1(a), (b). The parties did so here, although the counter-evidence submitted by Defendants is thin, consisting primarily of citations to Gitman's affidavit and his own conclusory statements. Additionally, a non-moving party may submit a statement of additional material issues of fact that the party contends are disputed and require trial. Local Rule 56.1(b). Defendants did not submit any such statement. Accordingly, the Court need only consider whether Plaintiffs' statements of undisputed fact, and the evidence cited in support, establish the claims they assert, and whether the evidence cited by Defendants in opposition creates a genuine dispute as to any of those facts. That said, the Court has reviewed and

considered the entire summary judgment record, including portions of Gitman's affidavit not cited in Defendants' responding statement of disputed material facts.

## Discussion

## I.  Plaintiffs' Claims

### A.    Redemption (Count Twenty)

Plaintiffs' primary objective on the instant motion is to redeem Gitman's interest in CSV, NDAP, and Plumburs pursuant to § 11.5 of the CSV Operating Agreement. The undisputed, and indisputable, facts demonstrate a brazen series of maneuvers by Gitman to seize control of CSV's business, financial property, and ChannelReply business in violation of the CSV Operating Agreement.  These acts easily qualify as ones triggering the right of redemption.  Plaintiffs are entitled to summary judgment in that respect.  The Court at this juncture should not, however, enter summary judgment as to the Purchase Price until Plaintiffs' valuation expert is given a chance to testify subject to cross-examination.  Further, Gitman's removal as co-Manager should be made permanent prior to redemption.

### 1.    Gitman Indisputably Engaged in Misconduct Meriting Redemption

The CSV Operating Agreement permits Management, in its discretion, to redeem a Member's interest based on "[w]illful or serious misconduct by the Member with respect to the business, operations or assets of the Company."  (CSV Operating Agreement § 11.5(b)(i).)  The proof of Gitman's willful and serious misconduct toward the Plaintiff Companies and Dardashtian as a Member and Manager is overwhelming. Gitman does not and cannot genuinely dispute that, without Dardashtian's consent, Gitman drained CSV of its operating funds to his personal account thus putting CSV in

financial peril; usurped control of ChannelReply and ChannelReply's confidential information; established and operated a company using the ChannelReply name; funneled ChannelReply customers to CRINC; changed passwords on virtually all of CSV and ChannelReply's operational accounts so that Dardashtian did not have access; diverted Dardashtian's emails to himself; and induced the Developers to resign from CSV and enter into agreements to work for Gitman's CRINC – and assisted them with doing so.

That same conduct also amounts to "breach by the Member of any of the other terms, conditions and obligations contained in [the CSV Operating Agreement]," another basis for Management's exercising the right of redemption. (CSV Operating Agreement § 11.5(b)(vii).) For instance, Gitman's siphoning of CSV's funds to his personal account is a clear violation of the provision that "Management shall have no authority to expend or use Company money or property other than on the account and for the benefit of the Company." (CSV Operating Agreement § 8.2(d).) Additional breaches of that provision include diversion of ChannelReply customer payments to the CRINC account and misappropriation of CSV's intellectual property, such as the ChannelReply brand name, ChannelReply software, and confidential financial and customer data. Gitman's use of CSV's confidential data for the benefit of CRINC and Gitman personally also constitutes violation of the CSV's prohibitions on using the company's confidential information "except as may be necessary in the course of performing authorized services for the

Company or as may be required by applicable order of court, law, statute or regulation."[35]  (CSV Operating Agreement § 12.2(a).)

Gitman's attempt to justify his actions as protecting CSV and ChannelReply rather than harming them are without any evidentiary basis.  (*See* Gitman Aff. ¶¶ 112, 135 ("[I] believ[ed] I was protecting the interests of the Company" and "I never intended to use the money for my benefit.").)  To recap, there is no evidence that, or explanation (let alone one that a reasonable juror could find) why, the measures he took – depleting CSV's bank account, transferring assets to himself and to CRINC, depriving Dardashtian of access to virtually all ChannelReply data and operations, etc. – were necessary to accomplish the sale of NDAP.  Nor is there any evidence of an actual agreement to give Gitman a controlling 67.5% of ChannelReply or any explanation of how the steps Gitman took were meant "to formalize the agreed upon ownership percentages."  (SUF Response ¶ 42.)  And, no reasonable juror could find that Gitman acted on advice of CSV's corporate counsel, because the lawyer Gitman retained – with CSV funds – to advise him about CRINC was his personal attorney.  (*See* 6/8/2017 Tr. at 2) (attorney Farooq stating to the Court that "I represent David Gitman and Dalva

---

[35] Gitman's myriad actions to commandeer ChannelReply and cripple Dardashtian's ability to co-Manage may well comprise other triggers for redemption, but the Court need not go further given the indisputable examples set forth above of willful and serious misconduct and breach.  (*See, e.g.*, CSV Operating Agreement § 11.5(b)(ii) (fraud or dishonesty), (vi) (attempt to partition).)  Similarly, there are other actions taken by Gitman that, if proven, constitute actionable misconduct and breaches of contract (and fiduciary duty) but which the Court does not address because of factual disputes. For example, the specific roles of Jeremy Falk, Dalva Ventures, and Accel Commerce remain unresolved but are not material to determination of the instant motion given the indisputable evidence of other violations.

Ventures, LLC, and Channel Reply, Inc.").)  No reasonable juror could find that Gitman acted for the good of CSV or its businesses as opposed to Gitman's own self-interest.

### 2.    Gitman's Ownership Rights Do Not Forestall Redemption

Without a leg to stand on to justify his misconduct, Gitman argues that he cannot be subject to redemption because the Court's removal of him as co-Manager of CSV did not deprive him of his ownership rights under the CSV Operating Agreement.  (Opp. Mem. at 20-27.)  This argument has some merit but ultimately provides Gitman with no salvation.

During the hearing on extending the restraints imposed by Judge Ramos, Judge Stanton emphasized that the Court's immediate goal was to preserve the status quo, while imposing "interim restrictions" to prevent further harm.  (6/19/2017 Tr. at 8, 9, 11.)  As the Court explained, "Basically [Plaintiffs] [are] not entitled to have any interest in getting anything better than what they had [as of May 26, 2017]."  (6/19/2017 Tr. at 31.)

In removing Gitman as co-Manager, the Court was similarly clear about the limits of his ruling.  While removing Gitman from the day-to-day management of CSV, Judge Stanton's order did not strip Gitman of his ownership rights or financial interests in the Plaintiff Companies: "I don't mean to deprive you of the exercise of a vote, or, if and where you have it under the articles, a veto.  What I took away was your ability to act for the company, but not your ownership."  (Transcript of Show Cause Hearing, dated June 21, 2017, Dkt. 53 ("6/21/2017 Tr."), at 13.)  The Court later warned Plaintiffs' counsel, "Mr. Gitman's stock ownership is a valid financial interest, which you would impair at your peril."  (6/21/2017 Tr. at 21.)

Gitman contends that allowing redemption go forward would contravene the limitations specifically underscored by the Court.  Indeed, authorizing redemption while only preliminary measures are in place would deprive Gitman of both his right to vote as a shareholder and his financial interest in CSV.  Absent Gitman's removal as Manager, redemption could not be exercised without his agreement precisely because he and Dardashtian were co-Managers.  Allowing Dardashtian to take advantage of that temporary state of affairs by having Dardashtian and "interim successor" co-Manager Liebman (6/19/2017 Tr. at 35) compel redemption of Gitman's interests would substantially disrupt the status quo, turn what is supposed to be a preventative measure into a sword that would inalterably change the position of the parties, and put Plaintiffs in a better position than they had been before Gitman's misconduct.

Plaintiffs fail to engage with this argument.  Instead, they make other arguments that either respond to other, less persuasive arguments made by Gitman or are otherwise incorrect.  For instance, they erroneously argue that "[e]ven if Gitman was not removed as manager, Plaintiffs would *still* have the authority to redeem Gitman's interest upon a determination by a Manager of any of the enumerated criteria set forth in Article 11.5, see also 11.5(B)(x)."  (Reply Mem. at 10.[36])  But the Operating Agreement says no such thing.  Rather, it expressly requires two Managers to run the company, that the decision to redeem be made in the sole discretion of Management, and that decisions requiring discretion require approval of all Managers, not one Manager, or only a part of Management.  (CSV Operating Agreement §§ 8.1(a), (c), 11.5(b).)  The

---

[36] "Reply Mem." refers to Plaintiffs' Reply Memorandum of Law in Further Support of Plaintiffs' Motion for Partial Summary Judgment and Reply to Defendants' Response to Plaintiffs' Rule 56.1 Statement of Material Facts (Dkt. 195).

Court suspects that Plaintiffs would not accept their own a proposition were the roles of Dardashtian and Gitman reversed.

Ultimately, however, the argument that redemption will upset the status quo is academic. That is because the instant motion is one for summary judgment and a final determination on the merits. This Court has determined that Gitman engaged in the extensive willful and serious misconduct that led the Court to remove him and replace him with an interim successor. Having found that the indisputable facts confirm Gitman's misconduct, the Court should now make Gitman's removal permanent, upon which CSV's Management – Dardashtian and Liebman as co-Managers – may compel redemption of Gitman's interests.

GItman's other arguments against redemption cannot forestall that result. Gitman argues that only Gitman can remove himself as co-Manager. (Opp. Mem. at 24.) He cites § 8.1(d) of the CSV Operating Agreement, which provides that "Michael Dardashtian (and his successors collectively) shall have the authority at any time and from time to time to remove and replace Michael Dardashtian (and any of his successors) as Manager. David Gitman (and his successors collectively) shall have the authority at any time and from time to time to remove and replace David Gitman (and any of his successors) as Manager." Gitman's argument ignores, however, that § 8.1(d) is entirely distinct from the right of redemption under § 11.5. Section 11.5 gives "Management in its sole discretion" the power to redeem a Member's interest in the event of that Member's misconduct. (CSV Operating Agreement § 11.5(b).) Upon Gitman's removal being made final, Management will consist of Dardashtian and Liebman, who collectively have determined to exercise the right of redemption under

§ 11.5.  And, even § 8.1(d) does not support Gitman's argument as it authorizes not only Gitman, but also his successors, such as Liebman, to remove Gitman.

Accordingly, Plaintiffs are entitled to summary judgment finalizing Gitman's removal as a Manager and declaring that Plaintiffs have the right to redeem Gitman's interests in the Plaintiff Companies pursuant to § 11.5(f) of the CSV Operating Agreement.

### 3.      Summary Judgment Is Not Warranted on the Purchase Price

The CSV Operating Agreement prescribes the formula for determining the redemption Purchase Price.  The "Redeemed Member's" interest "shall equal (i) the amount that the Redeemed Member would have received had the Company (A) terminated on the date the Redemption Notice was given, (B) sold all of its assets at their fair market values on the date the Redemption Notice was given, (C) satisfied all of its debts and obligations and (D) made distributions to the Members" as required "less (ii) any distributions made to the Redeemed Member after the date the Redemption Notice is given to Redemption Closing Date."  (CSV Operating Agreement § 11.5(d).)  Further, "[t]he fair market values of the Company's assets shall be determined by Management."  (CSV Operating Agreement § 11.5(d).)

Dardashtian contends that the redemption Purchase Price is beyond dispute and can be determined on this motion.  The Purchase Price stated in the Redemption Notice for CSV and ChannelReply is $505,000.[37]  (Gauglardi Decl. Ex. N at 7.)  As support,

---

[37] The Redemption Notice also provided Purchase Prices for NDAP ($295,000 in receivables) and Plumburs ($2,270.41 from bank account balance).  (Gauglardi Decl. Ex. N at 7-8.) Gitman has offered nothing to dispute Plaintiffs' calculation of those numbers.

Dardashtian has submitted an expert valuation from Carleen Gaskin and Jessica Hollobaugh of WithumSmith+Brown, PC, who are certified public accountants and certified in financial forensics.  (Gaskin Aff. ¶ 1 and Ex. A.)

Gitman has not submitted any expert valuation.[38]  He does, however, offer criticisms of Gaskin's valuation, particularly as to the assumptions made, methodology used, and Gaskin's qualifications.  (Opp. Mem. 13-20, 41-49; Gitman Aff. ¶¶ 155-166.) Whether those criticisms are valid, and, if so, how they may affect the valuation amount, cannot be determined on the present record.

The parties' dispute about Gaskin's expert report presents the question of "what showing must be made in order to defeat a motion for summary judgment filed by the party having the burden of proof, where the moving party has proffered expert testimony on a material issue, but the opposing party has not."  *Ross University School of Medicine, Ltd. v. Brooklyn-Queens Health Care, Inc.*, No. 09-CV-1410, 2012 WL 6091570, at *19-20 (E.D.N.Y.  Dec. 7, 2012).  The answer depends on the specificity, and factual grounding, of the non-moving party's challenges to the expert report.

In cases where the non-moving party has presented only conclusory statements of unreliability or criticisms that have no factual underpinning, the non-moving party's challenge to the moving party's expert report will not forestall summary judgment.  *See, e.g.*, *Rivera v. Home Depot USA, Inc.*, 776 Fed. App'x 4, 7-8 (2d Cir. 2019) (affirming

---

[38] Gitman belatedly sought to submit an expert valuation report well after the deadline to do so had passed and then sought to recast the report as a "rebuttal" report even though the case management order never contemplated rebuttal experts.  The Court therefore granted Plaintiffs' application to strike the proffered report, leaving Defendants without a valuation expert.  (Dkt. 162.)  As the Court noted, however, Defendants were free to continue to use their expert in a consulting capacity.  (Dkt. 162 at 3.)

summary judgment because "not only did [defendant] fail to retain any expert witness to counter [plaintiff's expert] on damages – something it was not required to do – but, more importantly, [defendant] *also* failed to pinpoint any reason why [plaintiff's] report should be disbelieved, other than its own conclusory statement that there was 'insufficient medical evidence in the record to support' it") (emphasis in original); *Millennium Pipeline Company, L.L.C. v. Certain Permanent and Temporary Easements*, 919 F. Supp. 2d 297, 302 (W.D.N.Y. 2013) (granting summary judgment despite challenge to expert valuation report because, "in the absence of some admissible proof from him concerning the value of the taking here, a general request to cross-examine plaintiff's expert will not suffice to defeat Millennium's well-founded motion for summary judgment"). "Were it otherwise, summary judgment would almost never be available in cases involving the use of expert testimony, since the nonmoving party could always argue that he should be permitted to cross-examine the movant's expert at trial." *Millennium Pipeline*, 919 F. Supp. 2d at 302.

In contrast, summary judgment is not appropriate where the non-moving party identifies particular alleged defects in the expert's methodology, or contradictions or inconsistencies posed by the factual record. *See, e.g.*, *Fortune Society v. Sandcastle Towers Housing Development Fund Corp.*, 388 F. Supp. 3d 145, 175-76 (E.D.N.Y. 2019) (denying summary judgment where defendants raised "sufficient challenges regarding the underlying methodology and conclusions" of expert statistical analyses allegedly establishing disparate impact); *Ross*, 2012 WL 6091570 at *21 (defendants' "specific factual attacks on [plaintiff]'s calculation of Future Replacement Costs create a genuine issue of material fact sufficient to preclude summary judgment as to this

component of damages"); *Ramos v. SimplexGrinnell LP*, 796 F. Supp. 2d 346, 377 (E.D.N.Y. 2011) (denying motion for summary judgment on damages where expert's calculations were inconsistent with documentary evidence), *vacated in part on other grounds*, 773 F.3d 394 (2d Cir. 2014); *Brown v. County of Nassau*, 736 F. Supp. 2d 602, 620 (E.D.N.Y. 2010) (denying summary judgment because "even though [defendant] has submitted no expert to contradict plaintiff's ADA expert," defendant identified with specificity alleged flaws in expert's methodology and conclusions "on a number of levels").

Here, Gitman has specified numerous aspects of the Gaskin valuation that purportedly render it unreliable.  These include: (1) Gaskin's lack of familiarity with SaaS business and with a particular rule for valuing technology companies; (2) basing her valuation on software development companies, not SaaS companies; (3) assuming that ChannelReply growth has stabilized despite an increasing growth rate over the previous three years; (4) using the "excess earnings method" which, according to a treatise Gaskin recognizes as authoritative, has rarely been used in fair value cases; (5) failing to use the more common discounted cash flow method; (6) interviewing only Dardashtian for information; (7) testifying she could not prepare a projection of cash flow that could be used for the discounted cash flow method, yet elsewhere projecting a growth rate; (8) failing to provide for a pass-through tax premium; (9) believing CSV did not have excess cash despite expense figures purportedly indicating otherwise; (10) eschewing other valuation methods as a "sanity check."  In support of these criticisms, Gitman cites to deposition testimony, authoritative treatises, accounting and tax rules, and case law.  (Opp. Mem. at 41-49.)  These criticisms all may prove to be unfounded

or inconsequential, but Gitman has set them forth with enough specificity and cited sources to survive summary judgment on the Plaintiff Companies' valuation.

Dardashtian's response is that the purported flaws are only those of defense counsel and therefore of no relevance.   (Reply Mem. at 8-9.)   But, as the cases discussed above explain, the relevant inquiry is the nature and specificity of the criticisms, not the person identifying them.   Gitman has identified specific alleged flaws in the Gaskin valuation, several of which are tied to facts in the record.   Accordingly, defense counsel should be given the opportunity to cross-examine Gaskin, and granting judgment on the Purchase Price at this time would be premature.

## B.    Breach of Fiduciary Duty (Count Two)

Under New York law, the three elements of a breach of fiduciary duty claim are "'(i) the existence of a fiduciary duty; (ii) a knowing breach of that duty; and (iii) damages resulting therefrom.'" *Williams Trading LLC v. Wells Fargo Securities, LLC*, 553 Fed. App'x 33, 35 (2d Cir. 2014) (quoting *Johnson v. Nextel Communications, Inc.*, 660 F.3d 131, 138 (2d Cir. 2011)).

It cannot be disputed that Gitman owed a fiduciary duty both to Dardashtian and to CSV and its subsidiaries.   "Under New York law, LLC members owe one another, as well as the LLC, various fiduciary duties." *Rennaker Co. Consulting, Inc. v. TLM Group, LLC*, No. 16-CV-3787, 2017 WL 2240235, at *4 (S.D.N.Y. March 29, 2017) (collecting cases).   Similarly, pursuant to New York's LLC law, managing members of the LLC have a fiduciary duty to the LLC and the other members of the LLC.   *In re FKF 3, LLC*, 13-CV-3601, 2018 WL 5292131, at *5 (S.D.N.Y. Oct. 24, 2018); *Weidberg v. Barnett*, 752 F. Supp. 2d 301, 307 (E.D.N.Y. 2010) (applying New York law, parties did not

dispute that "members and managers of limited liability companies owe fiduciary duties not just to the LLC, but also directly to the members of the LLC"); *see* N.Y. Ltd. Liab. Co. Law § 409 ("[a] manager shall perform his or her duties as a manager … in good faith and with that degree of care that an ordinarily prudent person in a like position would use under similar circumstances").[39]

A fiduciary obligation "has two prongs, generally characterized as the duty of care and the duty of loyalty." *Norlin Corp. v. Rooney, Pace Inc.*, 744 F.2d 255, 264 (2d Cir. 1984). Accordingly, "[u]nder New York law, a managing member of a limited liability company owes statutory and common-law fiduciary duties to the other members of the company, including the duties of good faith and care." *Le Metier Beauty Investment Partners LLC v. Metier Tribeca, LLC*, 13-CV-4650, 2015 WL 769573, at *8 (S.D.N.Y. Feb. 24, 2015). "[I]t is elemental that a fiduciary owes a duty of undivided and undiluted loyalty to those whose interests the fiduciary is to protect." *Birnbaum v. Birnbaum*, 73 N.Y.2d 461, 466, 541 N.Y.S.2d 746, 748 (1989). The fiduciary duty of loyalty bars "not only blatant self-dealing, but also requir[es] avoidance of situations in which a fiduciary's personal interest possibly conflicts with the interest of those owed a fiduciary duty." *Id.*

It also cannot be genuinely disputed that Gitman engaged in numerous acts breaching his fiduciary duty, particularly to CSV. The same acts justifying redemption also are acts of disloyalty to CSV: Gitman withdrew all of CSV's operating funds and deposited them in Gitman's own personal account; Gitman caused CSV's account to

---

[39] The NDAP Operating Agreement expressly provides that each manager "is acting on behalf of all Members in the nature of a fiduciary." (Dardashtian Aff. Ex. 4A at § 7.6.) The CSV Operating Agreement does not have a similar provision, but the same fiduciary duties apply by operation of the law recited above.

become overdrawn; Gitman established a corporation, CRINC, using the brand name of CSV's ChannelReply; Gitman redirected CSV customer payments and support to CRINC; Gitman changed account passwords, preventing CSV's co-Manager, Dardashtian, from carrying out his duties; Gitman induced CSV's Developers to come work for Gitman and CRINC, and assisted the Developers in resigning from CSV. Gitman took these actions without seeking approval from his co-Manager Dardashtian or even first discussing them with him.  Gitman's stated objective was to diminish CSV's ownership in ChannelReply from 100% to 50% and increase his personal ownership interest in ChannelReply from 50% (by way of ownership in CSV) to 67.5%, while reducing Dardashtian's share to 25%.  Reduced to its essence, Gitman usurped CSV's ChannelReply assets for his own gain, while putting CSV's ChannelReply business in peril.  His  conduct epitomizes disloyalty as both a co-Manager and a Member of CSV.

Nor can it be genuinely disputed that Gitman breached his fiduciary duty not only to CSV but also to Dardashtian, his co-Manager and co-Member.  Gitman redirected Dardashtian's email to himself.  In inducing the Developers to resign from CSV, Gitman personally disparaged Dardashtian.   And, Gitman acted with the goal, in part, of reducing Dardashtian's ownership interest in ChannelReply.

In opposition, Gitman again advances the same purported justifications that the Court already has determined have no factual support.  (Opp. Mem. at 30.)  Thus, Gitman says he needed to separate NDAP accounts from other CSV accounts to prepare for the sale of NDAP, even though there is no basis in the record for why Gitman would need to have transferred accounts and changed passwords and to have done so without informing Dardashtian.  Gitman says he did not intend to keep the CSV

funds as demonstrated by his email informing Dardashtian that Gitman sought an audit. But that just shows that Gitman jeopardized CSV's financial status (putting it in an overdrawn state) and seized personal control of CSV's money (depositing it in an account in Gitman's name personally) to use as a hostage to extract a concession from Dardashtian (agreement to use CSV's funds to pay for an audit). And, finally, Gitman says he did not intend to take ChannelReply's business for himself but instead "sought to enforce the agreement he had with Dardashtian" that would give Gitman 67.5% ownership. (Opp. Mem. at 30-31.) Putting aside that there is no evidence of there being such agreement, even if there had been, Gitman's acts remain just as disloyal to CSV. Gitman's proffered justification shows that he commandeered ChannelReply because he wanted greater ownership – a benefit for him, and a detriment to CSV as the arrangement would cut CSV's ownership in ChannelReply by half.

As for damages, the Second Circuit recently clarified that this third element for breach of fiduciary duty "more precisely requires proof of 'damage' (harm or injury)." *Yukos Capital S.A.R.L. v. Feldman*, 977 F.3d 216, 241 (2d Cir. 2020). The element is indisputably satisfied here. Gitman's conduct put CSV in peril by draining its operating account, causing it to be overdrawn, and cutting CSV off from its main business, ChannelReply. At the very least that is financial damage, even if temporary. CSV also had to pay direct out-of-pocket expenses as a result of Gitman's breach, including for hiring interim, more expensive developers during the period that the Developers had resigned.[40] (Dardashtian Aff. ¶ 157.) *See Yukos Capital*, 977 F.3d at 246 ("if a plaintiff

---

[40] Dardashtian also states that "[t]he loss of existing and potential customers, including at least one extremely large retailer, has caused irreparable harm to [him],

shows that she suffered an out-of-pocket loss, she has proved both that she suffered 'damage' and 'damages'").  Gitman has not set forth anything to the contrary.

In short, CSV and Dardashtian are entitled to summary judgment on Count Two for Gitman's breach of fiduciary duty.

## C.    Contractual Breach of the CSV Operating Agreement (Count Seven)

Gitman's indisputable breaches of the CSV Operating Agreement have been discussed above in the context of CSV's right to redemption and Gitman's acts of misconduct.  For those same reasons, Plaintiffs are entitled to summary judgment that Gitman breached the CSV Operating Agreement.  Gitman's opposition addresses merely the issue of whether Gitman's disclosure of confidential financial data about ChannelReply's profits and losses to Jeremy Falk was a breach of contract.  (Opp. Mem. at 40.)  The Court recognizes that there may be genuine issues of material fact concerning Falk's role and therefore has not grounded any of this Report and Recommendation on those facts.[41]  Accordingly, Gitman's argument in opposition to

---

ChannelReply and CSV, and its other businesses."  (Dardashtian Aff. ¶ 120.)  The Court finds this statement vague, and no detail or elaboration is provided.  The Court therefore does not rely on the assertion in finding the third element satisfied.  Additionally, Dardashtian refers to the "tremendous financial damage to [Dardashtian] personally and to the Plaintiff Companies" in having to pay and incur legal fees and costs of litigation of more than $550,000.  (Dardashtian Aff. ¶ 176.)  Expenditure of legal fees and costs is a cognizable injury in RICO cases.  *E.g.*, *Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 638 (S.D.N.Y. 2014) (plaintiff's "injuries … include among other things the payment of legal fees to defend against the enforcement actions"), *aff'd*, 833 F.3d 74 (2d Cir. 2016).  Plaintiffs have not provided any authority, however, that being compelled to expend legal fees and costs is a cognizable harm in a breach of fiduciary duty case, and the Court has not found any.  Accordingly, the Court does not rely on Plaintiffs' legal expenditures for its determination that the damage element is satisfied.

[41] Gitman's disclosure of ChannelReply financial data to Falk does appear questionable.  Gitman sent the data to Falk on March 14, 2017, using Accel email addresses for both

breach of contract is of no moment, and Plaintiffs are entitled to summary judgment on Count Seven for breach of contract.

### D.  Theft of Trade Secrets Under Federal Law and State Law (Counts Five, Nineteen)

Plaintiffs asset claims for Gitman's misappropriation of CSV's trade secrets under both federal and state law.  Pursuant to the Federal Defend Trade Secret Act ("DTSA"), a private right of action may be brought for misappropriation of trade secrets related to a product or service used or intended for use in interstate commerce.  18 U.S.C. §§ 1832, 1836.  In relevant part, the statute imposes liability on a person who, (1) "with intent to convert a trade secret … to the economic benefit of anyone other than the owner thereof" and (2) "intending or knowing that the offense will[ ] injure any owner of that trade secret," and (3) "without authorization," (4) takes, conceals, copies, duplicates, downloads, uploads, replicates, transmits, delivers, sends, or conveys the trade secret. 18 U.S.C. § 1832.

Under DTSA, a trade secret can take many forms and information, including, for example, financial, business, and technical information, programs, or codes, whether tangible or intangible.  18 U.S.C. § 1839(3).  In all events, however, information will not be deemed a trade secret unless it meets two requirements: (1) the owner "has taken

---

Gitman (dgitman@accelcommerce.com) and Falk (jfalk@accelcommerce.com).  (SUF ¶ 25; SUF Response ¶ 25; Dardashtian Aff. ¶ 78 and Ex. 23.)  The record reveals no reason for providing the information other than, vaguely according to Gitman, "because [Falk] was consulting for the company."  (Gitman Aff. ¶ 130.)  But Falk assisted with the sale of NDAP, not ChannelReply.  And Gitman provides no explanation as to why he sent the email using Accel email addresses rather than his email address for CSV, ChannelReply, or otherwise.  Gitman points out that the services agreement signed by Falk requires him to preserve the confidentiality of confidential CSV and NDAP information (Sim Decl. Ex. F 3.), but that does not address the issue of whether it was proper for Gitman to disclose the information to Falk in the first place.

reasonable measures to keep such information secret," and (2) "the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." *Id.*; *Iacovacci v. Brevet Holdings, LLC*, 437 F. Supp. 3d 367, 380 (S.D.N.Y. 2020).

Certain ChannelReply information, of which CSV is the owner, qualifies as trade secrets. This includes at least the ChannelReply backend developed by Gitman and the Developers, as well as financial and customer data. (SUF ¶¶ 12, 14.) *See, e.g.*, *Paz Systems, Inc. v. Dakota Group Corp.*, 514 F. Supp. 2d 402, 408 (E.D.N.Y. 2007) (finding customer information and financial data were trade secrets); *Tradescape.com v. Shivaram*, 77 F. Supp. 2d 408, 419-20 (S.D.N.Y. 1999) (issuing preliminary injunction and recognizing trade secrets to include, among others, plaintiff's source codes and other computer codes, computer programs, and software).

It is indisputable that that information provides value to CSV's ChannelReply business, provides a competitive advantage, and is not readily ascertainable without considerable effort. (Bagaiev Aff. ¶¶ 94-97.) As set forth in the Factual Background section, Gitman fails to raise any genuine dispute regarding the proprietary nature of the ChannelReply customer and financial data and software. His assertion that ChannelReply employs open software coding is of no moment because ChannelReply operates as a software as service platform in which customers and other third parties do not have access to the software back end that is not publicly disclosed. Moreover, a "trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of

which, in unique combination, affords a competitive advantage and is a protectable secret." *Integrated Cash Management Services v. Digital Transactions, Inc.*, 920 F.2d 171, 174 (2d Cir. 1990) (internal quotation marks omitted). Indeed, Gitman's admitted initial failures in developing the software belie his conclusory assertion that the ChannelReply software would be easy for others to develop. (*Compare* Gitman Aff. ¶ 10, *with* Gitman Aff. ¶ 73.)

Nor does Gitman present any evidence to dispute that CSV goes to considerable lengths to protect the ChannelReply infrastructure and other information from public disclosure by multiple means, including limited access, encryption, passcodes, and terms of service imposing requirements regarding confidentiality, technical safeguards, and data security. (Dardashtian Aff. ¶ 7 and Ex. 11C §§ 2.3, 3.3; Bagaiev Aff. ¶¶ 96-98; SUF ¶ 13; SUF Response ¶ 13.)

Rather, in his opposition brief, Gitman focuses on one argument: that CSV owns only 50% of ChannelReply, while Gitman owns 42.5% and the Developers the remaining 7.5%.[42] (Opp. Mem. at 31-36.) Again, however, that argument does not help

---

[42] Gitman's opposition devotes but a single paragraph to whether the ChannelReply software is a protectable trade secret. (Opp. Mem. at 35-36.) Most notably, that paragraph nowhere says that Gitman himself challenges the proprietary nature of the software code. Rather, it merely refers to the testimony of Plaintiffs' valuation expert who did not attribute value to ChannelReply software, which, as explained earlier, was because she used a valuation method that did not require ascribing value to assets. Moreover, Giitman's opposition faults Plaintiffs for ascribing "enormous value" to their intellectual property. (Opp. Mem. at 35.) To be sure, protectible trade secrets must have value, but nothing requires them to have "enormous value" (whatever "enormous" may mean). *See Computer Associates International v. Bryan*, 784 F. Supp.982, 986 (E.D.N.Y. 1992) (plaintiff is not required to demonstrate that the information it seeks to protect is vital to its business, but only that "the information would provide the unauthorized user of it with an unfair competitive advantage which it would not otherwise have enjoyed" (internal quotation marks omitted)).

Gitman because there is no genuine dispute that CSV owns 100% of ChannelReply. Even if it did not, Gitman provides no explanation as to why his partial personal ownership would allow him to commandeer ChannelReply in its entirety for the benefit of CRINC without permission from CSV or co-Manager Dardashtian.   And, although Gitman maintains that CRINC was not established to compete with CSV's ChannelReply, it remains indisputable that Gitman appropriated ChannelReply software and data to further his personal desire to seize greater control of ChannelReply and did so in a way that was injurious to CSV.

"The elements for a misappropriation claim under New York law are fundamentally the same" as those under DTSA.   *Iacovacci*, 437 F. Supp. 3d at 380 (citing *North Atlantic Instruments, Inc. v. Haber,* 188 F.3d 38, 43-44 (2d Cir. 1999)).   The Court's analysis and outcome of the trade secrets claim against Gitman under New York law are thus the same as under the DTSA.   *See, e.g.*, *ExpertConnect, LLC v. Fowler*, No. 18-CV-4828, 2019 WL 3004161, at *7 (S.D.N.Y. July 10, 2019) (complaint sufficiently pleading DTSA claim "also states a claim for misappropriation of trade secrets under New York law"); *Free Country Ltd v. Drennen*, 235 F. Supp. 3d 559, 565-68 (S.D.N.Y. 2016) (conducting single merits analysis for misappropriation of trade secrets claim under both federal and New York State law).   Indeed, Gitman does not distinguish one from the other in answering both as one and the same.   (*See* Opp. Mem. at 31-36.)

Plaintiffs are entitled to summary judgment on Counts Five and Nineteen for misappropriation of trade secrets.

**E.     Unfair Competition Under Federal and State Law (Counts Twelve, Eighteen)**

Plaintiffs also move for summary judgment on claims for unfair competition under federal and state law.  On the federal side, Plaintiffs invoke the federal Lanham Act, which imposes liability on a person who, in connection with any goods or services, uses in commerce "any word, term, name, symbol, or device … or any false designation of origin" which "is likely to cause confusion" or "to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person."  15 U.S.C. § 1125(a)(1).  This provision frequently, though by no means exclusively, is invoked to address infringing use of an unregistered trademark or brand name.  *See, e.g.*, *EMI Catalogue Partnership v. Hill, Holliday, Connors, Cosmopulos Inc.*, 228 F.3d 56, 61 (2d Cir. 2000) (Section 1125(a)(1) "protects unregistered trademarks from infringement"); *Genesee Brewing Co. v. Stroh Brewing Co.*, 124 F.3d 137, 142 (2d Cir. 1997) (analyzing, pursuant to § 1125(a)(1), plaintiff's claim for infringement of its unregistered trademark "honey brown").  The "central issue" in any case under the statute is "whether there is a likelihood of confusion."  *Lang v. Retirement Living Publishing Co., Inc.*, 949 F.2d 576, 579 (2d Cir. 1991).

Plaintiffs contend that Gitman's operation under the corporate name Channel Reply, Inc. unfairly trades off the name of CSV's ChannelReply and that Gitman's adoption of Channel Reply, Inc., as a name constitutes false designation of origin.  Not quite.  Mere adoption of a corporate name does not implicate trademark rights.  *See Dial-A-Mattress Operating Corp. v. Mattress Madness, Inc.*, 841 F. Supp. 1339, 1349 (E.D.N.Y. 1994) ("The mere act of incorporation under a particular name does not

confer any right to trade under that name.")  There is no evidence that Gitman used Channel Reply, Inc. as a trademark or a brand.

That does not, however, save the day for Gitman.  The trademark or brand name at issue here is ChannelReply.  When Gitman usurped ChannelReply's operations, he literally appropriated the ChannelReply brand and passed it off as his or CRINC's – that is, as having a different origin.  During the time that Gitman operated CRINC, ChannelReply customer payments went to a CRINC bank account even though customers were never informed that they were doing business with a different entity not affiliated with CSV.  (Dardashtian Aff. ¶¶ 120, 150 and Ex. 41.)  That is a direct violation of § 1125(a)(1).[43]

The New York law of unfair competition "encompasses a broad range of conduct" and typically protects the misappropriation of "the results of the labor, skill, and expenditures of another."  *LinkCo, Inc. v. Fujitsu Ltd.*, 230 F. Supp. 2d 492, 500

---

[43] Gitman's conduct bears most of the indicia of likelihood of confusion: use of the same mark; on the same goods; marketed through the same channels; to the same customers; in bad faith; causing actual confusion.  *See Car-Freshener Corp. v. American Covers, LLC*, 980 F.3d 314, 326-27 (2d Cir. 2020) ("In determining whether the requisite likelihood of confusion has been shown … we consider the eight factors identified by Judge Friendly in *Polaroid v. Polarad Electronics*, 287 F.2d 492, 495 (2d Cir. 1961): (i) the strength of the senior user's marks; (ii) the similarity of the parties' marks; (iii) the market proximity of their products; (iv) the likelihood that the senior user will bridge any gap separating the parties' current markets; (v) the existence of actual consumer confusion; (vi) whether the junior user acted in bad faith in adopting its mark; (vii) the quality of the junior user's products; and (viii) the sophistication of the relevant consumer group" (footnote omitted)).  As to strength of the mark, "ChannelReply" is at least descriptive, and likely suggestive.  Quality of the products is irrelevant since they are literally the same product.  Assuming ChannelReply's customers are relatively sophisticated, that is of no moment given that Gitman's misappropriation occurred on the "back end" such that customers would have had no indication that they were doing business with a non-CSV entity.  Gitman has offered no admissible evidence to the contrary.

(S.D.N.Y. 2002). It also typically requires a showing of bad faith. *Pablo Chavez v. British Broadcasting Corp.*, No. 17-CV-9572, 2019 WL 2250446, at *6 (S.D.N.Y. May 23, 2019) ("The plaintiff's claims for state and federal unfair competition and false designation of origin require the same elements of proof as the plaintiff's trademark infringement claim, except that unfair competition under New York law requires evidence of bad faith."); *Omnicron Capital, LLC v. Omicron Capital, LLC*, 433 F. Supp. 2d 382, 395 (S.D.N.Y. 2006) ("To prevail on a claim for unfair competition under New York common law, a plaintiff must couple its evidence supporting liability under the Lanham Act with additional evidence demonstrating the defendant's bad faith" (internal quotation marks omitted)). The Court has little trouble finding that Gitman engaged in unfair competition as he misappropriated CSV's funds, software, electronic accounts, financial and customer data, and the like in bad faith.

Gitman's opposition to summary judgment on the unfair competition claims is the same as for the misappropriation of trade secrets claim – that Gitman personally owns 42.5% of ChannelReply (and, through CSV, a total of 67.5%), and he was entitled to take the actions he did to impose that regime. (Opp. Mem. at 31-36.) As repeatedly noted, that argument is meritless.

Summary judgment should be granted in favor of Plaintiffs on Counts Twelve and Eighteen for unfair competition under federal and state law.

## F.    Conversion (Count Ten)

Lastly, Plaintiffs move for summary judgment on their claim that Gitman is liable for conversion under New York State law. As the Court previously has recognized, "[a] conversion takes place when someone, intentionally and without authority, assumes or

exercises control over personal property belonging to someone else, interfering with that person's right of possession."  (Dkt. 70 at 18 (quoting *Colavito v. New York Organ Donor Network, Inc*, 8 N.Y.3d 43, 49-50, 827 N.Y.S.2d 96, 100 (2006)).  "[A]n action will lie under New York law for conversion of money where there is an obligation to return or otherwise treat in a particular manner the specific money in question."  (Dkt. 70 at 18 (quoting *LoPresti v. Terwilliger*, 126 F.3d 34, 41-42 (2d Cir. 1997)).   A claim for conversion also applies, among other things, to electronic records stored on a computer.   *Thyroff v. Nationwide Mutual Insurance Co.*, 8 N.Y.3d 283, 292-93, 832 N.Y.S.2d 873, 879 (2007).

Plaintiffs have presented indisputable evidence that Gitman converted CSV's property.[44]  Specifically, Gitman transferred $73,982.53 from CSV's bank account (at Bank of America) to an account in Gitman's own name.[45]  He did so without CSV's authorization, which required Dardashtian's approval as co-Manager.  Similarly, Gitman converted CSV's electronic accounts when he transferred them to a separate domain that was inaccessible to Dardashtian and controlled instead by Gitman and CRINC. (SUF ¶¶ 27-29, 34; SUF Response ¶¶ 27-29, 34.)  These included Google Suite and its access to CSV's data, customer lists, subscription information, and other data, as well

---

[44] The Court addresses the conversion of only CSV's property.   To the extent Dardashtian asserts conversion in his individual capacity, his statement of undisputed facts does not sufficiently present relevant facts.

[45] Plaintiffs have identified the specific account from which Gitman withdrew CSV's funds.  (*See* Dardashtian Aff. ¶ 97 and Ex. 45A, 45B.)  "[F]unds of a specific, named bank account are sufficiently identifiable to support a conversion claim."  *Newbro v. Freed*, 409 F. Supp. 2d 386, 395 (S.D.N.Y. 2006) (internal quotation marks omitted).

as Chargebee for managing customer subscriptions, Slack for messaging management, and Stripe for credit card billing.  (SUF ¶¶ 28-29; SUF Response ¶¶ 28-29.)

To be sure, the funds and accounts ultimately were restored to their rightful owner, CSV, by order of the Court.[46]  The time period during which Gitman seized control of ChannelReply and received CSV customer payments was relatively short-lived, but only because Dardashtian successfully sought and obtained emergency relief. The fact that order was restored may diminish the damage caused by Gitman's misconduct, but it does not diminish the impropriety of his transgressions.  *See Polanco v. NCO Portfolio Management, Inc.*, 23 F. Supp. 3d 363, 371 (S.D.N.Y. 2014) ("A party cannot avoid a conversion claim because it eventually returned the property in question"); *Slue v. New York University Medical Center*, 409 F.Supp. 2d 349, 364 (S.D.N.Y. 2006) ("A claim for conversion will exist even when the deprivation is partial or temporary").

Gitman's arguments in opposition are the same ones already deemed to be without merit – that he had to segregate accounts for the sale of NDAP and that Gitman was entitled to more than 50% ownership, directly and through ownership in CSV, of ChannelReply.  (Opp. Mem. at 36-37.)  With respect to the money in CSV's bank account in particular, Gitman contends that he did not intend to "take the monies" but rather to hold the funds until an audit was completed.  (Opp. Mem. at 37.)  But it is undisputed that Gitman did "take" the money – he withdrew it from the CSV account, deposited in an account in his name, and took away CSV's ability to control its own

---

[46] As noted earlier, three accounts could not be recovered, but Gitman was able to make their data available.

funds. That is conversion regardless of whether Gitman intended it only to be temporary. Moreover, Gitman nowhere indicates he would have returned the funds in the absence of an audit. To the contrary, the funds were returned only by virtue of court order.

Plaintiffs are entitled to summary judgment on Count Ten for conversion.

## G. Attorney's Fees

Dardashtian moves for summary judgment on entitlement to attorney's fees, with the amount of such fees to be determined later. The CSV Operating Agreement expressly provides for recovery of reasonable attorney's fees and disbursements from the "non-prevailing party" by "the Company, any Member or any member of Management" who "obtains a judgment in connection with a dispute arising under or in connection with" the agreement. (CSV Operating Agreement § 17.10.) Additionally, New York law permits a recovery of reasonable attorney's fees by a successful plaintiff who has sued on behalf of the company derivatively. N.Y. Bus. Corp. Law § 626(e).

Gitman does not advance any argument as to why Plaintiffs should not be awarded attorney's fees if they are deemed the prevailing party. Rather, Gitman argues that Plaintiffs should not prevail. As this Report and Recommendation makes clear, however, that argument is largely unavailing precisely because Plaintiffs are entitled to summary judgment in their favor on their claims at issue on the instant motion and, as discussed below, on all but a limited portion of one of Gitman's counterclaims.

Nevertheless, a determination of the extent to which Plaintiffs should be granted attorney's fees is premature as the instant motion is only for partial summary judgment. To what extent attorney's fees should be awarded should await a comprehensive

judgment.  *See Jackson v. Odenat*, 9 F. Supp.3d 342, 367 (S.D.N.Y. 2014) (attorney's fees request for partial summary judgment was premature because it was "not yet clear whether [movant] is a 'prevailing party' under either the copyright or trademark acts"); *Danaher Corp. v. Travelers Indemnity Co.*, No. 10-CV-121, 2013 WL 364734, at * 4 (S.D.N.Y. Jan. 31, 2013) (referring to "the unobjectionable proposition that, when the right to attorneys' fees depends on whether a party has prevailed or had some success on the merits in an action, that right cannot be determined until all of the constituent causes of action have been resolved").

## H.    Unclean Hands

Gitman argues that summary judgment should be denied with respect to all of Plaintiffs' claims presently at issue based on the doctrine of unclean hands.  (Opp. Mem. at 37-40.)  That argument does not withstand scrutiny.

The doctrine of unclean hands is based on the maxim that one "who comes into equity must come with clean hands."  *Precision Instrument Manufacturing Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 814 (1945).  "The unclean hands doctrine proscribes equitable relief when, but only when, an individual's misconduct has 'immediate and necessary relation to the equity that he seeks.'" *Henderson v. United* States, 575 U.S. 622  n.1 (2015) (quoting *Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 245 (1993))).  "The Second Circuit has repeatedly emphasized the narrowness of the doctrine's application."  *Specialty Minerals, Inc. v. Pluess-Staufer AG*, 395 F. Supp. 2d 109, 112 (S.D.N.Y. 2005) (collecting cases).  Whether the doctrine bars relief is a matter within the court's discretion.  *Precision Instrument*, 324 U.S. at 815,; *Gidatex S.r.L. v. Campaniello*

Case 1:17-cv-04327-LLS-RWL   Document 209   Filed 02/16/21   Page 61 of 81

*Imports, Ltd.*, 82 F. Supp. 2d 126, 132 (S.D.N.Y. 1999) ("application of the unclean hands doctrine rests with the discretion of the court, which is not bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion") (internal quotation marks and brackets omitted).

As Gitman acknowledges, unclean hands is an equitable defense that does not bar a legal claim.  (Opp. Mem. at 38.); *see also Aetna Casualty and Surety Co. v. Aniero Concrete Co., Inc.*, 404 F.3d 566, 607 (2d Cir. 2005) (adopting district court decision); *JSC Foreign Economic Association Technostroyexport v. International Development and Trade Services, Inc.*, 386 F. Supp. 2d 461, 477 (S.D.N.Y. 2005). Accordingly, to the extent Plaintiffs seek non-equitable relief, Gitman's assertion of unclean hands is not a defense.  Gitman does not address which of Plaintiffs' claims are legal in nature and which are equitable.

In any event, Gitman may not avail himself of the unclean hands defense based on the undisputed record.  As set out in the factual background section above and discussed more fully in the section below addressing Gitman's counterclaims, the only potentially wrongful conduct on Dardashtian's part is limited to taking $10,000 in distribution that Gitman did not, and life insurance that was offered to Gitman but which he declined.  Neither of these incidents, separately or together, bears a sufficient relationship to Plaintiffs' claims against Gitman.  As Gitman would have it, however, "Dardashtian['s] wrongful conduct triggered David Gitman's response to right the wrong."  (Opp. Mem. at 39.)

That is nothing more than saying that Gitman engaged in misconduct because he believed Dardashtian engaged in misconduct.  If being "triggered" were sufficient, then

defendants would be able to invoke unclean hands most any time they engaged in misconduct in response to what they believed was plaintiff's misconduct, which is not the law. *See Gidatex*, 82 F. Supp. 2d at 132 (finding no unclean hands to trademark infringement claim where defendant continued to use trademark because it believed plaintiff wrongfully terminated license agreement).

Moreover, there are several reasons for the Court to exercise its discretion not to apply unclean hands. First, the wrong of which Gitman claims is readily addressable with monetary damages. Second, the scope of Dardashtian's alleged misconduct, if any, pales in comparison to the wrongful conduct committed by Gitman. Third, at best, unclean hands would forestall equitable relief only as to Dardashtian. Gitman has not alleged that CSV engaged in misconduct, and it is CSV that seeks redemption and other relief apart from any relief that Dardashtian may seek individually.

To the extent that Dardashtian's claims are legal, not equitable, in nature, Gitman contends that Dardashtian's claims are barred by the doctrine of *in pari delicto*, which, Gitman says, is used "interchangeably" with unclean hands. (Opp. Mem. at 38.) That is not correct. "Although the doctrines of unclean hands and *in pari delicto* are often mentioned in the same breath, they are 'distinct terms for ... distinct situations.'" *Republic of Iraq v. ABB AG*, 768 F.3d 145, 168 (2d Cir. 2014) (quoting *Perma Life Mufflers v. International Parts Corp.*, 392 U.S. 134, 153 n.1 (1968) (Harlan, J., concurring in part and dissenting in part)).

Unlike the unclean hands doctrine, "the *in pari delicto* doctrine … permits the 'defendant [to] escape liability' to the plaintiff based on the plaintiff's 'at least substantially equal responsibility *for the underlying illegality*.'") *Id.* (alteration and

emphasis in original) (quoting *Pinter v. Dahl*, 486 U.S. 622, 635-36 (1988))).  In other words, "Plaintiffs who are truly *in pari delicto* are those who have themselves violated the law in cooperation with the defendant."  *Id.* (quoting *Pinter*, 486 U.S. at 636).  Here, Gitman nowhere asserts that Dardashtian was complicit with Gitman in the misconduct alleged by Daradashtian; rather, Gitman accuses Dardashtian of independent wrongdoing.  The doctrine of *in pari delicto* therefore is inapt.

Defendants' unclean hands defense has no merit and does not provide safe haven for Gitman.

## II.  Defendants' Counterclaims

Plaintiffs move for summary judgment against all nine of Defendants' counterclaims.  As explained below, Plaintiffs are entitled to summary judgment on all of Defendants' Counterclaims with the narrow exception of whether Dardashtian violated his fiduciary duty in taking unequal distributions of $10,000 and benefits consisting of life insurance and a 401(k) contribution in 2013.  Plaintiffs also move to strike Gitman's jury demand.  The Court agrees that the demand should be stricken as prohibited by the CSV Operating Agreement.

### A.   Breach of Fiduciary Duty (First and Second Counterclaims)

As with Dardashtian's claim for breach of fiduciary duty, Gitman's claim requires three elements – a fiduciary duty, knowing breach of that duty, and resulting damages.  *Williams Trading LLC*, 553 Fed. App'x at 35; *Johnson*, 660 F.3d at 138.  Gitman asserts two claims for breach of fiduciary duty.  The First Counterclaim alleges Dardashtian's breach of fiduciary duty to Gitman personally.  Gitman brings the Second Counterclaim derivatively, alleging Dardashtian's breach of fiduciary duty to the Plaintiff Companies.

The derivative claim cannot survive summary judgment as it is contrary to indisputable fact, and otherwise based merely on information and belief.  Gitman's personal fiduciary duty claim largely fails as well, except to the extent that it seeks to address allegedly uneven distributions and benefits. Before addressing the counterclaims individually, the Court first addresses two arguments advanced by Plaintiffs as to both.

### 1.    Plaintiffs' Failure-to-Segregate Argument

Dardashtian argues that Gitman's fiduciary duty claims, although stated as two separate causes of action, should be dismissed because they impermissibly intermingle Gitman's claims as an individual, and Gitman's derivative claims on behalf of the Plaintiff Companies.  (Pl. Mem. 48.)  Courts have dismissed breach of fiduciary claims, particularly where litigants bring claims individually that should be brought derivatively, or vice-versa.  *See Jones v. Citigroup, Inc.*, 28 Misc. 3d 132(A), 958 N.Y.S.2d 61 (Table), 2010 WL 2944224 (1st Dep't 2010) (intermingling of individual and derivative claims required dismissal of complaint) (citing *Abrams v. Donati*, 66 N.Y.2d 951, 953, 498 N.Y.S.2d 782, 783 (1985) ("A complaint the allegations of which confuse a shareholder's derivative and individual rights will, therefore, be dismissed")).

Gitman made this very argument in moving to dismiss Plaintiffs' Complaint at the outset of this case.  The Court denied that portion of Gitman's motion, however, finding that the Complaint created "no such confusion" as it specified which claims were being pursued individually and those being pursued derivatively.  (Dkt. 70 at 12.)

Gitman's First and Second Counterclaims are set forth separately – the First being on behalf of Gitman individually and the Second derivatively.  Despite that separation, the two causes of action purport to be based on all the same facts alleged

previously in the Counterclaims' Statement of Facts section. (*See* Counterclaims ¶¶ 83, 89.) In that respect, the First and Second Claims may be said to be intermingled.

Nonetheless, the Counterclaims' Statement of Facts is organized and denoted to distinguish which facts serve as the basis for Gitman's individual breach of fiduciary duty claims, and those which are the basis for his derivative claims. In particular, one of the fact sections of the Counterclaims is specifically styled as directed to Gitman's claim for breach of fiduciary duty asserted derivatively on behalf of the Plaintiff Companies. It reads: "Dardashtian breached his Fiduciary Duties to the Counterclaim Plaintiff Entities By Misappropriating Confidential and/or Proprietary Information Belonging to Those Entities." (Counterclaims at 36.) That section then charges Dardashtian with conduct damaging to CSV, NDAP, and ChannelReply in three respects: (1) working for a competitor – Yotpo; (2) providing confidential and/or proprietary ChannelReply information to a competitor called Volo Commerce; and (3) seeking to "to divert resources from established ChannelReply product lines to the development of a Desk.com integration product." (*See* Opp. Mem. at 50-51.) All other sections of the Counterclaims' Statement of Facts alleging misconduct fall under sections that expressly allege damage to Gitman or other individuals. (*See* Counterclaims at 33 ("Dardashtian's Lack of Involvement in CSV and its Related Businesses Damaged Gitman"), 34 ("Dardashtian Fails to Fulfill Promises to the Developers"), 38 ("Dardashtian has Refused to Consent to an Accounting" followed by allegations of Dardashtian receiving payments that Gitman did not).)

Gitman's opposing brief does not address this issue at all. It actually conflates the discussion of fiduciary duty, without any distinction between breaches asserted by

Gitman individually or derivatively.  (*See* Opp. Mem. at 49-51.)  And, it distills the alleged breaches of fiduciary duty down to Dardashtian's taking uneven distributions, and the assertions concerning Dardashtian's work for and disclosures to companies outside of CSV, NDAP, and ChannelReply.  Although Gitman's brief does not distinguish which of the foregoing alleged breaches are individual or derivative, the Court will adopt the distinction as set forth in the Counterclaims' Statement of Facts: i.e., the uneven distribution allegations are asserted personally by Gitman, and the outside company allegations are asserted derivatively.

### 2.    Plaintiff's Duplication of Breach of Contract Argument

Dardashtian also argues that Gitman's breach of fiduciary claims fail because they merely duplicate his claims for breach of contract and therefore have no independent viability.  (Pl. Mem. at 44) (citing *Balta v. Ayco Company, LP*, 626 F. Supp. 2d 347 (W.D.N.Y. 2009)).  Gitman's opposing brief underscores the problem by collapsing into one point both "Breach of Fiduciary Duty and Breach of Contract" and then failing to distinguish which factual assertions are relevant to one claim or the other or both.  (Opp. Mem. at 49.)  This Court previously has determined, however, that, in addition to a claim for breach of contract, Dardashtian could assert a cause of action for breach of fiduciary duty, and denied Gitman's motion to dismiss it.  (Dkt. 70 at 17-18.)  In doing so, the Court expressly recognized that, based on the alleged facts, Gitman owed a fiduciary duty to Dardashtian as co-Manager of CSV and NDAP.  (Dkt. 70 at 17.)  Conversely, it is indisputable that Dardashtian owed a fiduciary duty to Gitman.

### 3.   Derivative Fiduciary Duty on Behalf of the Plaintiff Companies

Each of the claims asserted by Gitman derivatively are insufficient to withstand summary judgment.  The first such claim finds fault with Dardashtian's work for Yotpo, an alleged competitor.  As Gitman asserts in support of his counterclaim of a declaration of his right to compete (see Seventh Counterclaim below), however, the CSV Operating Agreement expressly permits both Dardashtian and Gitman to "engage in business ventures of any nature and description independently or with others," including those having the same purposes as CSV.  (CSV Operating Agreement § 12.1.)  Accordingly, to the extent Dardashtian was working for a competitive enterprise, there was no breach by virtue of that alone.[47]  To the extent that Gitman suggests that Dardashtian took customers from ChannelReply to Yotpo, Gitman conceded in discovery that he has no documentary support (Guaglardi Decl. Ex. M at Demand No. 5), and he has not now submitted any evidence to support that assertion.

Gitman's other accusations, those concerning Volo Commerce and diversion of resources to another product, are grounded solely on "information and belief."  (Opp. Mem. at 50-51; Gitman Aff. ¶¶ 121-123.)  Facts stated on "information and belief" may be sufficient to withstand a motion to dismiss at the pleading stage, but they are wholly

---

[47] Whether or not Yotpo in fact can be considered a competitor of ChannelReply is disputed by the parties.  Dardashtian makes a strong showing that, far from being a competitor, Yotpo is a customer of ChannelReply – a fact that Gitman does not rebut. (Dardashtian Aff. ¶ 30.)  Gitman even offered to help provide Dardashtian with "sales guys for Yotpo" in December 2016, something that he presumably would not do if he thought Yotpo was a competitor.  (Dardashtian Aff. Ex. 138.)  Meanwhile, Gitman advances an inconsistent position, asserting in one place that Yotpo competes with ChannelReply but in another merely that the two had "related businesses."  (*Compare* Gitman Aff. ¶ 116, *with* Gitman Aff. ¶¶ 120, 154.)  But whether or not there is a genuine dispute, the fact is not material, for the reasons explained above.

insufficient to forestall summary judgment. *Patterson v. County of Oneida, New York*, 375 F.3d 206, 219 (2d Cir. 2004); *Roswell Capital Partners LLC v. Alternative Construction Technologies*, 638 F. Supp. 2d 360, 367 (S.D.N.Y. 2009) ("Information-and-belief allegations are insufficient to defeat a summary judgment motion"). As a result, summary judgment should be granted dismissing the derivative breach of fiduciary claims.

### 4.    Personal Fiduciary Duty to Gitman

As noted above, the only alleged breach of fiduciary duty to Gitman individually, not derivatively, mentioned in Gitman's opposing argument is Dardashtian's taking distributions and benefits that Gitman did not. (Opp. Mem. at 50.) And, as set forth in the factual background section, whether or not Dardashtian received undue distributions and benefits is a disputed issue but limited to two specific items: Dardashtian's receipt of healthcare insurance, which Gitman opted not to take; and $10,000 in distributions while Gitman worked for Cue Connect.[48]    In this respect, and only this respect, summary judgment should be denied on Gitman's First Counterclaim.

That is because the other theories of Dardashtian's breach of fiduciary duty to Gitman personally are fatally deficient. As denoted by the Counterclaims' Statement of Facts, those theories are (1) allegations of inaction by Dardashtian; (2) failure to fulfill

---

[48] Dardashtian has attested that he "will credit $5,000" to Gitman "to eliminate the issue" despite disputing that the $10,000 distribution was improper. (Dardashtian Reply Aff. ¶ 13.)   Dardashtian's commitment may well resolve any compensation due for that portion of the distribution issue. But it is not entirely clear exactly what Dardashtian has in mind or how the "credit" will be implemented. And Dardashtian has not cited any authority for why his statement of intent is sufficient at this juncture to eliminate the issue. Accordingly, summary judgment is not appropriate as to the $10,000 distribution matter.

promises to the Developers; and (3) Dardashtian's refusal to consent to an accounting.[49]

Gitman asserts that, at times, Dardashtian failed to act or remain sufficiently involved in CSV's business, such as with respect to maintaining Plumburs' eBay account, keeping financial records up to date, or turning his attention to Yotpo.[50] (Gitman Aff. ¶¶ 76, 93, 119.) Dardashtian provides substantial evidence controverting those assertions (*see* Pl. Mem. 49-52), but regardless they do not give rise to a breach of fiduciary duty claim, and Gitman's assertions of harm are either non-existent or purely conclusory.[51]

---

[49] Gitman also alleges that Dardashtian forged his name on various documents. (*See, e.g.*, Counterclaims ¶¶ 55-58; Gitman Aff. ¶ 48.) Putting aside the factual issue whether Dardashtian simply signed on Gitman's behalf rather than doing anything nefarious, Gitman fails to allege any resulting injury or harm to him or the Plaintiff Companies. In the absence of injury or harm, there is no claim for breach of fiduciary duty. *Yukos Capital*, 977 F.3d at 243.

[50] Gitman does not mention these concerns in his arguments defending his breach of fiduciary duty claims. (*See* Opp. Mem. at 49-51.) To the extent these assertions are alleged to have been to the Plaintiff Companies' detriment as well as Gitman's, and therefore derivative in nature, they are no less insufficient to withstand summary judgment.

[51] For instance, while asserting that Dardashtian had not been keeping CSV's financial books up to date, Gitman does not identify any resulting harm. (Gitman Aff. ¶ 93.) Regarding Dardashtian's work for Yotpo, Gitman avers that it "had a negative effect on CSV, NDAP, and ChannelReply since Dardashtian was no longer devoting a substantial amount of time and attention to CSV or NDAP on a regular basis." (Gitman Aff. ¶ 119.) That statement is purely conclusory, and Gitman provides no specifics, let alone evidence, to demonstrate the alleged negative effect. And as for Plumburs, Gitman asserts that its eBay account was suspended due to Dardashtian's failures and that "[m]any customer issues and new features were frozen due to Dardashtian's lack of basic action." (Gitman Aff. ¶ 76.) But, again, Gitman does not identify any customer issue, any customer who had an issue, any feature that was frozen, or any loss of customers, business, or money, let alone present any supporting evidence. Again, Gitman's assertions are wholly conclusory. Gitman does assert damage to his

Gitman accuses Dardashtian of failing to fulfill promises to the Developers, specifically with respect to issuing them equity in ChannelReply. (Counterclaims ¶¶ 46-54.) The Counterclaims allege that "Dardashtian's failure to adhere to the agreements with the Developers damaged both Gitman's and CSV's relationships with the Developers. (Counterclaims ¶ 54.) Putting aside that the indisputable proof is that there were no such agreements, the allegation of damage to Gitman and CSV remains an empty allegation. Gitman does not even repeat that allegation in his Affidavit, and there is no evidence in the record to support it.

Finally, Gitman's claim that Dardashtian's opposition to an accounting (aside from being a fiction as set forth in the factual background above) cannot be the basis for a breach of fiduciary duty claim because the CSV Operating Agreement expressly bars both Gitman and Dardashtian from attempting to compel an accounting in law or equity. (CSV Operating Agreement § 9.4.)

In sum, summary judgment is warranted on the First and Second Counterclaims, with one exception: Gitman's claim that Dardashtian received undue distribution of $10,000, one year of 401(k) contribution that Gitman allegedly did not receive, and health insurance, which Gitman elected not to take but for which he alleges he did not consent.

## B.  Breach of Contract (Third Counterclaim)

Gitman's counterclaim for breach of contract is grounded on allegations that Dardashtian disclosed confidential information in violation of the CSV Operating

---

"preferred access status" with respect to his personal eBay account. (Gitman Aff. ¶ 77.) But nothing before the Court supports the notion that Dardashtian had any fiduciary duty to Gitman with respect to Gitman's personal eBay account.

Agreement.   (Counterclaims ¶¶ 97-98.)   But as explained above, in his opposing brief, Gitman has conflated his breach of fiduciary and breach of contract claims insofar as asserting breach based on Dardashtian's work for Yotpo, alleged dislosures to Volo Commerce, and diversion of resources.   (Opp. Mem. at 49-51.)   For the same reasons these allegations were insufficient to withstand summary judgment as discussed in the breach of fiduciary duty section above, they are insufficient to sustain the breach of contract claim.   Summary judgment therefore should be granted in Plaintiffs' favor on the Third Counterclaim.

## C.      Tortious Interference with Contract (Fourth Counterclaim)

In his Fourth Counterclaim, Gitman claims that by failing to "create the necessary paperwork," Dardashtian wrongfully interfered with the alleged joint venture agreement that would have given Dardashtian only 25% interest in ChannelReply while giving Gitman 67.5% interest.   (Counterclaims ¶¶ 104-105.)

As an initial matter, Gitman did not attempt to defend this claim in his opposition. The claim thus may be deemed abandoned, warranting summary judgment in favor of Dardashtian.   *See Jackson v. Federal Express*, 766 F.3d 189, 198 (2d Cir. 2014) ("in the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition [to summary judgment] that relevant claims or defenses that are not defended have been abandoned"); *Collins v. City of New York*, 295 F. Supp. 3d 350, 361 (S.D.N.Y. 2018) ("Federal courts may deem a claim abandoned when a party opposing summary judgment fails to address the movant's argument in any way" (internal quotation marks and brackets omitted)).

Second, no reasonable juror could conclude that there was an actual contractual agreement to the joint venture that Gitman alleges.   At most, there is evidence of promises made to give Developer Bagaiev an equity interest in ChannelReply, although the evidence conclusively shows that such an arrangement ultimately was not agreed upon, as even Bagaiev concedes.   (Bagaiev Aff. ¶ 105.)   Gitman has not presented any evidence that Dardashtian ever agreed to a joint venture relationship that would have given Gitman anything but equal ownership of ChannelReply.   Without an actual contract, there can be no interference with contract.   *See Valley Lane Industries Co., v. Victoria's Secret Direct Brand Management, L.L.C.*, 455 Fed. App'x 102, 104 (2d Cir. 2012) (affirming dismissal of tortious interference with contract claim where claimant failed to sufficiently allege facts establishing the existence of a binding contract); *see generally Rich v. Fox News Network, LLC*, 939 F.3d 112, 126-27 (2d Cir. 2019) (tortious interference with contract requires "'[1] the existence of a valid contract between the plaintiff and a third party, [2] defendant's knowledge of that contract, [3] defendant's intentional procurement of the third-party's breach of the contract without justification, [4] actual breach of the contract, and [5] damages resulting therefrom'" (alterations in original) (quoting *Lama Holding Co. v. Smith Barney Inc.,* 88 N.Y.2d 413, 424 646 N.Y.S.2d 76, 82 (1996))).

Summary judgment should be granted in favor of Plaintiffs on the Fourth Counterclaim.

## D.   Tortious Interference with Prospective Economic Relations (Fifth Counterclaim)

Gitman's Fifth Counterclaim fares no better.   Gitman claims that Dardashtian "mislead [sic] the Developers and betrayed their trust[,] causing damage to the

relationship … among the parties to the joint venture" (i.e., the Developers, Gitman, and CSV).  (Counterclaims ¶¶ 112-113.)  As with the Fourth Counterclaim, Gitman makes no argument in opposition to defend this counterclaim and has thereby abandoned it. *Jackson*, 766 F.3d at 198; *Collins*, 295 F. Supp. 3d at 361.  And, as with the Fourth Counterclaim, this claim is premised on the existence of the same joint venture agreement for which there is no evidence.

Moreover, the evidence is indisputable that the wrongdoer here is Gitman: he induced the Developers to leave CSV and join CRINC, which, as explained above, violated Gitman's fiduciary duty to Dardashtian and CSV, and breached the CSV Operating Agreement.  The Developers returned to CSV after the Court required Gitman to dissolve CRINC, not because of any wrongdoing by Dardashtian.

Plaintiffs are entitled to summary judgment on the Fifth Counterclaim.

## E.   Unjust Enrichment and Constructive Trust (Sixth Counterclaim)

Under New York law, a claim for unjust enrichment requires the plaintiff to prove "'(1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover.'"  *Marathon Structured Finance Fund, LP v. Paramount Pictures Corp.*, 622 Fed. App'x 85, 86 (2d Cir. 2015) (quoting *Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir.2004)).  A constructive trust may be imposed as a remedy to prevent unjust enrichment.  *In re First Central Financial Corp.*, 377 F.3d 209, 212 (2d Cir. 2004) (citing *Simonds v. Simonds*, 45 N.Y.2d 233, 242, 408 N.Y.S.2d 359, 364 (1978)).

A claim for unjust enrichment and constructive trust will not stand, however, where the parties' relationship is governed by a written contract. *Id.* at 213 (citing *Clark-Fitzpatrick, Inc. v. Long Island RailRoad Co.*, 70 N.Y.2d 382, 388, 521 N.Y.S.2d 653, 655 (1987)); *Kandem-Ouaffo v. Pepsico, Inc.*, 160 F. Supp. 3d 553, 568 (S.D.N.Y. 2016) ("unjust enrichment is not available where there is a valid contract between the parties covering the same subject matter," and "as with the remedy of unjust enrichment, it is well-settled that a constructive trust cannot be imposed where a valid agreement covers the subject matter of the dispute" (internal brackets omitted)); *Northern Shipping Funds I, LLC v. Icon Capital Corp.,* 921 F. Supp. 2d 94, 107 (S.D.N.Y. 2013) (dismissing claim for constructive trust because "[the plaintiff] has a contractual claim against [the defendant]").

The Sixth Counterclaim alleges that Dardashtian has been unjustly enriched in two respects. The first is directed at the distributions that Gitman claims Dardashtian received but Gitman did not. (Counterclaims ¶¶ 119-120, 123.) The second is based on the alleged joint venture that would have given Gitman 67.5% interest in ChannelReply. According to Gitman, Dardashtian is being unjustly enriched because CSV is receiving 100% of ChannelReply income, thereby providing Dardashtian and Gitman each with 50% of the income. (Counterclaims ¶¶ 121-122, 124.) Gitman's opposition in defense of the Sixth Counterclaim addresses only the joint venture theory and ignores the issue of unequal distributions. (Opp. Mem. at 52.) Regardless, neither asserted basis of unjust enrichment has merit.

No unjust enrichment claim can be made with respect to distributions because Gitman's and Dardashtian's rights vis-à-vis distributions are governed by a written

contract, namely the CSV Operating Agreement.  (CSV Operating Agreement "Article 6 – Distributions by the Company.")  *See In re First Central Financial*, 377 F.3d at 213; *Kandem-Ouaffo*, 160 F. Supp. 3d at 568.  And Gitman has no claim for unjust enrichment or constructive trust because, as explained above, no reasonable juror could find that the parties agreed to a joint venture providing Gitman with a 67.5% interest in ChannelReply or, for that matter, any agreement other than the CSV Operating Agreement giving Gitman and Dardashtian equal shares.

Plaintiffs are entitled to summary judgment dismissing the Sixth Counterclaim.

## F.    Declaratory Judgment of Gitman's Right to Compete
##        (Seventh Counterclaim)

Gitman claims he is "entitled to declaratory judgment that he is free to own and/or work for any entity which competes with CSV and/or its related entities as long as he does not utilize CSV's Confidential Information (as defined in paragraph 12.2 of the CSV Operating Agreement) to do so."  (Counterclaims ¶ 130.)  In support, Gitman relies specifically on § 12.1 of the CSV Operating Agreement, which provides in relevant part: "Except as otherwise provided herein, any Member and Management may engage in business ventures of any nature and description independently or with others." (Counterclaims ¶ 129; CSV Operating Agreement § 12.1.)  The counterclaim further posits that neither the ChannelReply source code nor its customer data are confidential or proprietary, suggesting that he is free to use that information to compete with CSV. (Counterclaims ¶ 127.)

There are multiple defects in Gitman's claim that warrant summary judgment. First, Gitman once again does not even attempt to defend this claim in his opposition, electing instead to focus on only a subset of his counterclaims.  The Seventh

Counterclaim therefore should be deemed abandoned.   *Jackson*, 766 F.3d at 198; *Collins*, 295 F. Supp. 3d at 361.

Second, as explained above, Gitman's assertions that the ChannelReply source code and customer data are not confidential or proprietary are merely conclusory and not supported with any evidence sufficient to create a genuine dispute on that issue. For instance, the counterclaim alleges that that ChannelReply "utilizes a 70 year old store and forward system," that "there has been no effort to construct and refine any algorithms to distinguish the product from the competition," and that "[a]n eCommerce merchant can build a similar software to respond to their customers on eBay and Amazon for about $2,500 plus operational and administrative costs."   (Counterclaims ¶ 127(e), (h).)   Gitman has not identified any evidence in the record to support these allegations, which remain just that, allegations.   Mere allegations, however, do not create a genuine dispute.  *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009); *I.M. v. United States*, 362 F. Supp. 3d 161, 190 (S.D.N.Y. 2019).  And, while Gitman's Affidavit asserts that the ChannelReply source code is not confidential or proprietary, his assertions in that regard remain conclusory.   *See Anderson*, 477 U.S. at 249-50 (summary judgment may be granted where the nonmovant's evidence is conclusory, speculative, or not significantly probative).

Third, and entirely dispositive of the issue, Gitman's requested declaration is flatly inconsistent with the CSV Operating Agreement.  Gitman seeks a declaration that "as long as" he does not use CSV's confidential information, he is free to compete.  But that is not what the CSV Operating Agreement says.  Section 12.1, on which Gitman relies, expressly qualifies the right to compete with the introductory phrase "Except as

otherwise provided herein ...."[52]  The CSV Operating Agreement prohibits Dardashtian and Gitman from using CSV's money or property other than for CSV's benefit.  (CSV Operating Agreement § 8.2(d).)  Gitman thus is not free to use, for example, the ChannelReply name, which is CSV's tradename; nor may Gitman use CSV's funds or accounts for another company's benefit.  In other words, refraining from use of CSV's confidential information is necessary, but not sufficient, for Gitman to operate competitively.

Gitman has provided no evidence to support a declaration that is less restrictive than what the CSV Operating Agreement requires.  Accordingly, summary judgment should be granted in favor of Plaintiffs on Gitman's Seventh Counterclaim.

## G.    Accounting and Records (Eighth Counterclaim)

The Eighth Counterclaim combines a request for an accounting of CSV and CSV-related entities, together with a demand for an order requiring Dardashtian to make company records available pursuant to N.Y. Ltd. Liab. Co. Law § 1102(b).  As an initial matter, Gitman's claim for an accounting is foreclosed by the CSV Operating Agreement, by which both Gitman and Dardashtian "renounce[d], waive[d] and forfeit[ed] all rights, whether arising under contract or statute or by operation of law, to seek, bring or maintain any action in any court of law or equity for an accounting."  (CSV Operating Agreement § 9.4.)  *See Peroff v. Liddy, Sullivan, Galway, Begler & Peroff, P.C.*, 852 F. Supp. 239, 243 (S.D.N.Y. 1994)  (finding waiver and denying accounting

---

[52] The NDAP Operating Agreement goes further and bars any competitive transactions. (Dardashtian Aff. Ex. 4A § 6.5(a).)  But at this juncture, NDAP merely holds funds awaiting distribution; it does not have any customer-facing business operations.  The NDAP Operating Agreement's unqualified bar on competition is therefore of little relevance.

where shareholder agreement provided that partner could audit the books and records solely at his own cost and expense); *Hand v. Kenyon & Kenyon*, 227 A.D.2d 137, 641 N.Y.S.2d 307 (1st Dep't 1996) (affirming denial of accounting based on waiver by entering into partnership agreement providing for calculating and distributing assets); *Raymond v. Brimberg*, 99 A.D.2d 988, 989, 473 N.Y.S.2d 437, 439 (1st Dep't 1984) (reversing grant of accounting order where limited partnership agreement "effectively establishes the exclusive procedure for determining the interest of the partners … and thus constitutes a waiver of a judicial accounting").  Gitman ignores this provision and does not address it in his opposition.

As for access to records pursuant to the Limited Liability Corporation Law, the applicable section provides in relevant part:

> Any member may, subject to reasonable standards as may be set forth in, or pursuant to, the operating agreement, inspect and copy at his or her own expense, for any purpose reasonably related to the member's interest as a member, the records [of the company], any financial statements maintained by the limited liability company for the three most recent fiscal years and other information regarding the affairs of the limited liability company as is just and reasonable.

N.Y. Ltd. Liab. Co. Law § 1102(b).  As the provision states, the right of inspection is at the requesting member's own expense.  Gitman has presented no evidence that he is willing to pay for the costs incurred, and Gitman has never suggested he would do so; rather, he sought an audit at CSV's expense.  Moreover, as established earlier, Gitman has had – and continues to have – complete access to the CSV entities' financial records, tax returns, and other relevant records and made use of multiple accountants to review them.

There is no legal or factual basis for Gitman's claim for an accounting. Dardashtian is entitled to summary judgment on the Eighth Counterclaim.

## H. Declaratory Judgment that Gitman Owns 67.5% of ChannelReply (Ninth Counterclaim)

Gitman seeks a declaratory judgment that the ownership interests in any ChannelReply business are apportioned 50% to CSV, 42.5% to Gitman individually, 5% to Bagaiev, and 2.5% to Glukharev.  Because Gitman and Dardashtian each own 50% of CSV, this arrangement would give Gitman 67.5% of the ChannelReply business.  As explained previously, there is no evidentiary basis for this claim.  Gitman highlights the snippets of email between him and Bagaiev referring to Dardashtian's supposed "promise" of some equity.  (Opp. Mem. 53).  Putting aside that a promise is only one component of an agreement, the evidence cited does not include any promise concerning Gitman's equity share.  Plaintiffs are entitled to summary judgment on the Ninth Counterclaim.

## I. Gitman's Demand for a Jury Trial

Gitman has demanded a jury trial.  (Dkt. 149.)  In entering the CSV Operating Agreement, however, both Gitman and Dardashtian waived their right to trial by jury for any controversy "directly or indirectly arising out of or relating" to the CSV Operating Agreement.  (CSV Operating Agreement § 17.9.)  All of the parties' claims fall within that wide universe of disputes.  Accordingly, Plaintiffs have withdrawn their own demand for a jury trial and contend that § 17.9 of the CSV Operating Agreement requires striking Defendants' jury demand.  (Pl. Mem. at 71)

Gitman did not address this issue in his opposition, which alone, as explained above, is ground to strike the demand.  In any event, contractual waivers of jury trials

are enforceable when they are made knowingly, intentionally, and voluntarily. *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 188 (2d Cir. 2007) (citing *National Equipment Rental, Ltd. v. Hendrix*, 565 F.2d 255, 258 (2d Cir.1977)).   The waiver provision states that each party makes their waiver voluntarily, and Gitman has never claimed, let alone provided evidence, that he did not knowingly and intentionally cede his right to jury trial in entering into the CSV Operating Agreement.   Accordingly, the Court agrees that the jury demand should be stricken.

## Conclusion

For the reasons discussed above, I recommend that Plaintiffs' motion for partial summary judgment be GRANTED in part and DENIED in part as follows:

1. Summary judgment should be GRANTED to Plaintiffs on Counts Two, Five, Seven, Ten, Twelve, Eighteen, Nineteen, and Twenty of the Amended Complaint, except with respect to the Purchase Price for redemption under Count Twenty.   Before the closing on redemption of Gitman's interest in the Plaintiff Companies occurs, the Court should first (1) issue an order making permanent Gitman's removal as co-Manager, and (2) determine the Purchase Price after allowing Defendants the opportunity to cross-examine Plaintiffs' valuation expert Gaskin.

2. Summary judgment should be DENIED as premature without prejudice as to Plaintiffs' claim for attorney's fees.

3. Summary judgment should be GRANTED to Plaintiffs dismissing all of Defendants' Counterclaims First through Ninth except DENIED with respect to the Second Counterclaim for Gitman's individual claim for breach of fiduciary duty, limited

solely to the issue of the propriety of Dardashtian's receipt of health insurance and $10,000 in distributions.

4. Defendants' request for a jury trial should be STRICKEN as contractually waived pursuant to the CSV Operating Agreement.

## **Procedures for Filing Objections**

Pursuant to 28 U.S.C. § 636 (b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days to file written objections to this Report and Recommendation.  Such objections shall be filed with the Clerk of Court, with extra copies delivered to the Chambers of the Honorable Louis L. Stanton, 500 Pearl Street, New York, New York 10007, and to the Chambers of the undersigned, 500 Pearl Street, New York, New York 10007.  **FAILURE TO FILE TIMELY OBJECTIONS WILL RESULT IN WAIVER OF OBJECTIONS AND PRECLUDE APPELLATE REVIEW.**

Respectfully submitted,

_____
ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE

Dated: February 16, 2021
        New York, New York

Copies transmitted this date to all counsel of record.